ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Nancy Hall, individually and as the Representative and Administratrix of the Estate of Tommy Hall, deceased, her husband, | : : : : | CIVIL ACTION - LAW |
| Plaintiff, | : : | |
| | : | 1:01-CV-1265 |
| CUNA Mutual Group, Cuna Mutual Insurance Society, | : : | |
| Defendants. | : | Judge Sylvia H. Rambo |

FILED
HARRISBURG, PA
APR 2 4 2002
MARY E. D'ANDREA, CLERK
Deputy Clerk

**PLAINTIFF'S REPLY BRIEF WITH RESPECT TO
PLAINTIFF'S MOTION TO AMEND THE COMPLAINT**

## I. STATEMENT OF FACTS

On or about November 18, 1998, Plaintiff, Nancy Hall, and her late husband, Tommy B. Hall, refinanced the mortgage on their home in Fayetteville, Franklin County, Pennsylvania. As part of refinancing the mortgage, Mr. Hall purchased mortgage insurance through his lender, Patriot Federal Credit Union. Defendant, CUNA Mutual Group and CUNA Mutual Insurance Society, issued a policy to the Patriot Federal Credit Union and to Mr. and Mrs. Hall.

On or about November 4, 1999, Mr. Hall died as a result of a metastatic melanoma. Within a few days thereafter, Plaintiffs submitted a claim for benefits under the group mortgage insurance policy. Defendants denied Plaintiffs' claim for benefits, asserting that Plaintiff's decedent had submitted a false application for mortgage insurance in that he had failed to disclose a prior doctor visit in 1993. Defendants improperly reported the conduct of Plaintiff's decedent

1

to the Fraud Section of the Pennsylvania Department of Insurance.

## II. PROCEDURAL HISTORY

On July 9, 2001, Plaintiff Nancy Hall commenced this action, both individually and as the administratrix of the Estate of her late husband, by filing a Complaint against Defendants, CUNA Mutual Insurance Society and CUNA Mutual Group.

On March 15, 2002, Plaintiff filed a Motion to Amend the Complaint, seeking permission to allege, among other things, Defendants continued bad faith, negligence, breach of contract and other tortious conduct when the Defendants, despite a wide range of additional information, denied Plaintiffs' claims for benefits under the policy. The Court, in its initial Case Scheduling Order, allowed the parties until March 15, 2002, to amend the pleadings.

Defendants have filed an Objection to the Amended Complaint, seeking to strike paragraph #22, #23, and #29 of Plaintiff's proposed Amended Complaint. Those paragraphs state as follows,:

> 22.     Shortly after the Complaint was filed, CUNA received additional information which it failed to timely and appropriately consider and continued, despite the information, to deny benefits under the policy, negligently, intentionally, carelessly, in violation of the contract, recklessly, in wanton disregard for their insured's interest, and in bad faith as they failed to pay on the policy when they received, among other things, the following:
>
> (a)     Medical records and work release from Dr. Hurley showing no cancerous findings in 1993;
> (b)     Deposition transcript from Dr. Hurley, stating no cancerous finding in 1993;
> (c)     Deposition transcripts from pathologists who reviewed the 1993 slides, stating no cancerous findings in 1993.
> (d)     Two deposition transcripts and a sworn videotape deposition of Mr. Hall taken before his death in which Mr. Hall states, under oath, he was not aware of cancer before January, 1999;

2

(e) Voluminous medical records of Mr. Hall revealing no diagnosis and treatment for cancer prior to January, 1999;

(f) Dr. David Weinreich of Bethesda, Maryland, provided an Attending Physician's Statement wherein he indicated that Mr. Hall's first symptoms appeared in January, 1999;

(1) Dr. Weinreich further indicated that the patient had never before had the same or similar condition and that the diagnosis was metastatic melanoma;

(2) The doctor indicated that the date of the first visit was in January, 1999 and the last visit at the time he filled out the Attending Physician's Statement was September 30, 1999;

(3) The doctor further indicated that the melanoma was a rapidly-progressive disorder and that the patient had not been hospitalized up to that point.

23. During discovery in the instant action, despite the additional information, among other things which follow, CUNA has continued negligently, carelessly, intentionally, recklessly, in violation of the contract and insurance laws, in wanton disregard for their insured's interests, and in bad faith and inconscionably continue to deny benefits and make payment under the policy. CUNA discovered:

(a) Testimony from treating doctors that it would be an abuse of their records to imply or infer that Mr. Hall knew he had cancer prior to December, 1998;

(b) No evidence or records exist which prove a diagnosis or treatment of cancer prior to December, 1998;

(c) Treating doctors provided an explanation that the link between the 1993 mole and the subsequent diagnosis of malignant melanoma in 1999 was not made until early 1999, after the insurance application had already been submitted to and approved by CUNA;

(d) Depositions from CUNA's own employees that the critical document in determining the diagnoses of cancer is a pathology report, that the only pathology report relevant to CUNA's inquiry is the 1993 pathology report and that the 1993 pathology report reveals dysplastic nevus, a non-cancerous finding.

(e) Other discovery, including but not limited to all the depositions taken, including those of CUNA's own employees, which establish CUNA's negligent, grossly negligent, intentional, systemic bad faith, bad faith,

3

> breach of contract, wanton and reckless conduct, blatant disregard for their insured's interest, breach of implied covenants of good faith and fair dealing and other common law and statutory violations.
>
> 29. CUNA has systemically acted in bad faith and breached their contracts with insureds as they received and accepted group credit life insurance premiums at one rate, yet when claims are made, they are investigated based on individual life applications, for which rates are determined differently.

This Brief is filed in support of Plaintiffs' Motion to Amend the Complaint and in reply to Defendant's Objections to Paragraphs #22, #23, and #29 of the Amended Complaint. As is obvious from the language of the Amended Complaint, Plaintiffs are not merely attempting to assert discovery misconduct, but rather continued refusal by the insurer to pay benefits to the insured as required under the Policy. Plaintiffs have not alleged that the Defendants improperly took depositions or engaged in discovery misconduct, but rather, that the result of all of the information exchanged and the depositions taken and the investigation in the case lead only to the conclusion that the Defendants must pay under the insurance policy. With respect to Paragraph #29, Plaintiffs have not asserted a class action suit or class action allegations. Plaintiffs have merely stated that CUNA Mutual has systemically engaged in bad faith towards Mrs. Hall, just as CUNA Mutual has done with respect to other insureds.

Defendants have misstated the questions involved in that Plaintiffs' allegations do not assert discovery misconduct, but rather, that the relationship between the insured and the insurer is of a continuing nature and that, with the additional information obtained, CUNA Mutual must pay according to the policy. Furthermore, Plaintiffs have not sought class certification and are not seeking to bring a claim on behalf of all insureds. Rather, Paragraph #29 of the Amended

Complaint simply states that CUNA Mutual has systemically engaged in bad faith towards Mr. and Mrs. Hall, just as they have with respect to other insureds.

### III. ARGUMENT

Defendants have cited a string of cases for the proposition that discovery abuses by an insurer or its lawyer in defending a bad faith claim do not, in and of themselves, constitute a proper bad faith claim against an insurer. For this proposition, Defendants cite O'Donnell vs. Allstate Ins. Co., 734 A.2d 901, 908 (Pa. Super. 1999); Slater vs. Liberty Mut. Ins. Co., 1999 WL 178367, *2 (E.D. Pa., filed March 30, 1999); Krisa vs. Equitable Life Assurance Soc'y, 109 F. Supp.2d 316, 321 (M.D. Pa. 2000). None of these cases relate to the allegations in the Amended Complaint itself. Plaintiffs have not alleged discovery abuses as a basis for the continuing bad faith claim. Rather, all of Plaintiffs' claims are that the insurance company, CUNA Mutual, continues to improperly deny benefits under the policy despite receiving voluminous, credible, and overwhelming evidence that it had a duty to pay under its policy. These allegations relate specifically to the relationship to the parties as insurer and insured. In the Slater case, Plaintiffs attempted to amend the Complaint to include allegations that the Defendants withheld material documents during the course of discovery, raised insupportable objections to discovery requests, delayed in producing discoverable material, and failed to produce pertinent material within the discovery deadline. These types of allegations are far different than Plaintiffs' allegations in the present case that CUNA Mutual, as an insurance company, continued to receive information from the insured, through Counsel, that there had been no treatment or diagnosis of cancer prior to the date of the application.

As stated in the Amended Complaint, Plaintiffs produced at the beginning of the case,

5

among other things, the deposition transcript of the doctor who removed the mole who testified that the mole was not cancerous and that he had indicated to the patient that the mole was non-cancerous. Plaintiffs produced a video tape transcript of the insured, who testified under oath prior to his death, that he was not aware of any cancerous conditions prior to early 1999, after the application was made. Plaintiffs also produced the deposition transcripts from the pathologists who removed the mole who further indicated that there were no cancerous findings from the removal of that mole. These types of allegations are far different than the allegations of discovery abuse raised in the <u>Slater</u> case. Plaintiffs' allegations go directly to information that was provided to the insurance company which compelled the insurance company to pay under the policy and which CUNA has continued to ignore. Despite this information, the insurance company continued to refuse to pay under the policy, and, according to the Amended Complaint, engaged in bad faith when it refused to pay despite this overwhelming information. As stated in <u>Slater</u>, the bad faith statute is implicated, "by any bad faith breach of a fiduciary or contractual duty owed to an insured by an insurer by virtue of the issuance of an insurance policy." (<u>Slater</u>, page 1).

In citing to <u>Slater</u>, Defendants have specifically omitted any reference to footnote 3 which states, as follows:

> "This does not mean that an insurer can not be liable for bad faith conduct arising in the insurer/insured relationship which happens to occur during the pendency of an action, or for initiating an action against an insured in a bad faith effort to evade a duty owed under a policy." (<u>Slater</u>, page 2).

As this footnote indicates, Plaintiffs may amend the Complaint to include bad faith allegations which continue during the pendency of the litigation.

Likewise, the <u>Ridgeway</u> case, cited by the Defendants, does not stand for the proposition

6

that Plaintiffs may not bring allegations of continued bad faith during the pendency of litigation by an insurance company's continued bad faith conduct in denying benefits under the policy, but rather, the <u>Ridgeway</u> case simply states that an Amended Complaint may not be brought for delay in payment of a post-judgment verdict. The <u>Ridgeway</u> case, specifically at page 16, states that Ridgeway was not suing to obtain proceeds from the insurance policy improperly denied her, but suing to obtain payment on a settlement and judgment.

In the instant case, it is specifically Mrs. Hall and Mr. Hall's Estate which are seeking to amend the Complaint to assert continued bad faith in the continued denial of benefits under the insurance policy. As distinguished in <u>Ridgeway</u>, Courts have routinely allowed amendments of a Complaint to include, "investigatory practices of an insurer during litigation initiated by an insured to obtain the proceeds of his or her insurance policy." <u>Ridgeway</u>, page 14, citing <u>O'Donnell vs. Allstate Ins. Co.</u>, 734 A.2d 901 (Pa. Super. 1999), (conduct of an insurer during litigation may be considered as evidence of bad faith under Section 8371.) The <u>Ridgeway</u> case, citing <u>O'Donnell</u>, specifically states that, "we find that the broad language of Section 8371 was designed to remedy all instances of bad faith conduct by an insurer, whether occurring before, during, or after litigation." (<u>O'Donnell</u>, at 906, <u>Ridgeway</u>, at 14).

In <u>O'Donnell</u>, the Superior Court adopted a policy holder argument that, "given the expanded applicability of the bad faith statute, it is now clear...that bad faith suits are not restricted to the denial of claims, but rather, may be extended to the misconduct of an insured during the pendency of litigation." In support of its broad interpretation of Section 8371, the Superior Court explained,

7

"The plain language of Section 8371 clearly reveals the lack of any
restrictive language limiting the scope of bad faith conduct...by enacting
this statute, the legislature specifically responded to our Supreme Court's
refusal to create a common law remedy, see D'Ambrosio, and
implicitly rejected the Court's conclusion that the provisions
of the UIPA are sufficient to define and determine bad faith
conduct by insurers. Therefore, we find that the broad
language of Section 8371 was designed to remedy all instances
of bad faith conduct by an insurer, whether occurring before,
during, or after litigation...In so finding, we refused to hold
that an insurer's duty to act in good faith ends upon the
initiation of suit by the insured." (O'Donnell, 734 A.2d 901
(Pa. Super. 1991).

In fact, Pennsylvania law, for decades, has imposed upon an insurer a duty to act in good faith in all phases of claim handling against its insured. This good faith standard was first announced in Cowden vs. Aetna Casualty and Surety Co., 389 Pa 459, 134 A.2d 223 (1957), and has been reiterated in subsequent cases by Pennsylvania Appellate Courts and by the Federal Courts applying Pennsylvania law. See, Bell vs. Commercial Insurance Company of Newark, N.J., 280 F.2d 514 (3rd Circ.1960); Ashbrook vs. Kowalick, 332 F. Supp. 78 (E.D.P. 1971); Gray vs. Nationwide Mutual Insurance Co., 422 Pa. 500, 233 A.2d 8 (1966); Shearer vs. Reed, 286 Pa. Supp. 188, 428 A.2d 635 (1981).

Defendant CUNA Mutual's efforts to avoid and evade payment to Mrs. Hall and the Estate of Tommy Bob Hall, their own insured, was unconscionable at the time of the claim process when CUNA Mutual had in its possession the pathology report from the removal of the mole which stated that the mole was not cancerous, and its conduct became more egregious over time as evidence mounted that any interpretation CUNA Mutual may put upon the insured's health condition could not amount to any diagnosis or treatment of cancer ever being made prior to the date of the application. CUNA Mutual's own medical director, Dr. Ansfield, testified

8

under oath, as follows:

> Q. "Is there anything in the pathology report that in your mind indicates that there was a cancer that was removed in 1993?"
>
> A. "No, I do not." (Pg. 15 - Ansfield Deposition).
>
> Q. "Let me ask the question again. Is there anything from the 1993 contemporaneous records with the surgical procedure of the removal of the mole that indicates that any form of cancer was developing in Mr. Hall?"
>
> A. "No, there is not." (Pg. 16 - Ansfield Deposition).
>
> Q. "You don't have any records, do you, or any information to establish that Mr. Hall knew he had cancer on November 18, 1998, do you?"
>
> A. "No, I do not." (Pg. 19 - Ansfield Deposition).
>
> Q. "Let me rephrase the question to address the objection. Do you have any information that on November 18, 1998 Mr. Hall knew he had cancer?"
>
> A. "No." (Pg. 20 - Ansfield Deposition).

Attached hereto as Exhibit A are those pages from the deposition transcript.

CUNA Mutual's continuing refusal to pay benefits under the policy despite continuing and overwhelming evidence that it must pay, can not evade the purview of the judicial system. The Amended Complaint addresses CUNA Mutual's conduct at the time the initial claim was made, at the time of the initial disclosures in this case, and throughout the course of litigation when further information was revealed that compelled CUNA Mutual to pay under the policy.

Plaintiffs have not asserted discovery abuses as the basis for its Complaint, but rather, CUNA Mutual's refusal to pay under its policy when it has an obligation to do so. Furthermore, Plaintiffs have not brought a class action suit on behalf of all CUNA Mutual insureds, while such

9

suit may certainly be appropriate, but rather, has alleged in the Amended Complaint that CUNA Mutual engaged in systemic bad faith when they issued a policy to Mrs. Hall, under a group policy through Mr. Hall's Credit Union and engaged in an investigation as though an individual policy had been issued. This process of post-claim underwriting is evidence of systemic bad faith, although it has not been raised at present as a class action suit.

Furthermore, CUNA Mutual's systemic bad faith, as alleged in the Amended Complaint, is further evidenced by CUNA Mutual's referral of Mr. Hall, a deceased and insured, to the Pennsylvania Attorney General's Office for fraud, when CUNA Mutual had a document in its possession which established, through a pathology report, that no cancer had been diagnosed or treated prior to the date of the application. CUNA Mutual sent Mrs. Hall, the surviving spouse, a letter indicating that the fraud referral had been made, in an effort to intimidate and frighten her from pursuing her claim. The Amended Complaint asserts that CUNA Mutual does this in every fraud referral case with respect to surviving widows and spouses. CUNA Mutual does this with full knowledge that no prosecution will ever take place against a decedent as criminal cases are not prosecuted against those who are dead. The Amended Complaint further alleges that CUNA Mutual received a letter, within 30 days, from the Attorney General's Office that no investigation or criminal process would go forward, and then, as a systemic policy, did not notify Mrs. Hall or any of their insureds in similar circumstances, that there would be no investigation.

Amended pleadings, governed by Federal Rule of Civil Procedure 15, should be freely allowed. Justice requires that CUNA Mutual's conduct does not evade judicial and jury review.

Wherefore, Plaintiffs request that the Amended Complaint be filed.

Respectfully submitted,

*Stephen R. Pedersen*
Stephen R. Pedersen
214 Senate Avenue
Suite 602
Camp Hill, PA 17011
(717) 763-1170
Attorney for Plaintiffs

DATE: April 24, 2002

# CERTIFICATE OF SERVICE

And now, this 24th day of April, 2002, I, Carleen S. Jensen, do hereby certify that I have, this date, served a true and correct copy of the within **PLAINTIFF'S REPLY BRIEF WITH RESPECT TO PLAINTIFF'S MOTION TO AMEND THE COMPLAINT** upon each of the attorneys of record at the following address(es) by sending same in the United States mail:

>Michael R. Kelley, Esq.
>Charles T. Young
>100 Pine Street
>P O Box 1166
>Harrisburg, PA 17108-1166
>
>Catherine Mahady-Smith, Esq.
>3115-A N. Front Street
>Harrisburg, PA 17110

DATE: 4-24-02

Carleen S. Jensen
Assistant to Stephen R. Pedersen, Esquire
214 Senate Avenue, Suite 602
Camp Hill, PA 17011
(717) 763-1170

I. D. No. 72026
Counsel for Plaintiff

EXHIBIT A    15

| | | |
|---|---|---|
| 1 | Q | When did you first review that? |
| 2 | A | My memory is that I first reviewed this on |
| 3 | | December 9th, 1999. It was on that date that I |
| 4 | | received an underwriting risk evaluation worksheet |
| 5 | | following a claims review on the deceased, |
| 6 | | Mr. Tommy Hall, who expired in 1999. Following that |
| 7 | | claim, the case was referred to me. |
| 8 | Q | And did you review the 1993 pathology report? |
| 9 | A | I did. |
| 10 | Q | And you have that report in front of you right now? |
| 11 | A | I do. |
| 12 | Q | Can you tell us on that pathology report what the |
| 13 | | pathologist's interpretation was of the mole that was |
| 14 | | removed? |
| 15 | A | Dysplastic nevus, skin (back). |
| 16 | Q | Do you have any information as you sit here today to |
| 17 | | contradict that interpretation? |
| 18 | A | I do not. |
| 19 | Q | Is there anything in the pathology report that in |
| 20 | | your mind indicates that there was a cancer that was |
| 21 | | removed in 1993? |
| 22 | A | No, I do not. |
| 23 | Q | Did you review all of the medical records that -- |
| 24 | | this is going to get a little bit complicated. Let |
| 25 | | me just ask what medical records you reviewed as part |

16

```
 1         of your evaluation in the underwriting claim.
 2    A    In my initial review, I reviewed the biopsy report
 3         and the outpatient records from the Chambersburg
 4         Hospital in Chambersburg, Pennsylvania.  The
 5         outpatient report lists a surgical procedure
 6         conducted by Dr. James E. Hurley, which was conducted
 7         on March 13th, 1993.
 8    Q    The surgical report in the record that you're
 9         referring to now, is there any indication on that
10         record that there was a cancer that was removed from
11         Mr. Hall?
12    A    The report lists that Mr. Hurley -- that Dr. Hurley
13         conducted the procedure on referral from
14         Dr. George Baker, and I did not have a report from
15         Dr. Baker.
16    Q    Let me ask the question again.  Is there anything
17         from the '93 contemporaneous records with the
18         surgical procedure of the removal of the mole that
19         indicates that any form of cancer was developing in
20         Mr. Hall?
21    A    No, there is not.
22    Q    What other records did you review?
23    A    I reviewed the records of Dr. Charlesworth, is that
24         correct?
25    Q    Yes.
```

|    |   |                                                                          |
|----|---|--------------------------------------------------------------------------|
| 1  |   | already completed the application form for insurance,                    |
| 2  |   | wasn't it?                                                                |
| 3  | A | That is correct. If I may, I would like to go back                        |
| 4  |   | to the December 11th, 1998 note. Dr. Charlesworth's                       |
| 5  |   | history describes that the lump on the neck had                           |
| 6  |   | occurred -- let me correct that -- was discovered by                      |
| 7  |   | the patient at least several weeks prior to the                           |
| 8  |   | evaluation of December 11th, 1998. To me this raised                      |
| 9  |   | the possibility that the lesion or lump was                               |
| 10 |   | discovered on or about the time of the application.                       |
| 11 | Q | Now, are you saying you would have expected Mr. Hall                      |
| 12 |   | to make his own diagnosis of cancer upon the                              |
| 13 |   | discovery of a lump in his neck?                                          |
| 14 | A | I don't think that that would be possible for a                           |
| 15 |   | layperson to make a determination as to what the lump                     |
| 16 |   | was. All I am saying is that it appears that                              |
| 17 |   | Mr. Hall discovered a lump, as stated, several weeks                      |
| 18 |   | before the December 11th, 1998 visit. Mr. Hall's                          |
| 19 |   | application for insurance was November 18th, 1998.                        |
| 20 | Q | You don't have any records, do you, or any                                |
| 21 |   | information to establish that Mr. Hall knew he had                        |
| 22 |   | cancer on November 18th, '98, do you?                                     |
| 23 | A | No, I do not.                                                             |
| 24 |   |             MR. KELLEY: Objection to the                                  |
| 25 |   |     form of the question.                                                 |

MADISON FREELANCE REPORTERS

```
 1   Q   Let me rephrase the question to address the
 2       objection.  Do you have any information that on
 3       November 18th, 1998 Mr. Hall knew he had cancer?
 4   A   No.
 5               MR. KELLEY:  Same objection.
 6   Q   Have you reviewed subsequent to your initial and
 7       second review the depositions that were taken in the
 8       underlying medical malpractice case?
 9   A   No.
10   Q   Are you aware that depositions were taken with
11       respect to the pathologist who did the gross
12       inspection and the microscopic inspection?
13   A   No.
14   Q   Were you aware that the deposition was taken of the
15       surgeon who removed the mole in '93?
16   A   No.
17   Q   Were you aware that those are available and your
18       counsel has those?
19   A   No.
20               THE WITNESS:  I'm aware -- I mean
21       do you have copies?
22               MR. KELLEY:  Yeah.  For the
23       record, they were supplied in the last couple
24       weeks.
25               MR. PEDERSEN:  That's correct.
```