JUDGE'S COPY 

**FILED**
HARRISBURG, PA

AUG 3 0 2002

MARY E. D'ANDREA, CLERK
Per _____
                Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Nancy Hall, individually and as the Representative and Administratrix of the Estate of Tommy Hall, deceased, her husband, **Plaintiff** | : : : : : : | **CIVIL ACTION - LAW** |
| **v.** | : : | **1:01-CV-1265** |
| Cuna Mutual Group, Cuna Mutual Insurance Society, **Defendants** | : : : | **(Judge Christopher C. Conner)** |

---

## DEFENDANTS' BRIEF IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Michael R. Kelley
Charles T. Young, Jr.
McNees Wallace & Nurick LLC
P.O. Box 1166
100 Pine Street
Harrisburg, PA 17108-1166
Phone: (717) 237-5322
Fax: (717) 237-5300

Dated: August 3D , 2002

## **TABLE OF CONTENTS**

<u>Page</u>

TABLE OF CITATIONS..................................................................... iii

I.    INTRODUCTION.................................................................1

II.   STATEMENT OF FACTS ....................................................2

     A.    Summary of Tommy Hall's Medical Records ....................5

     B.    Dr. Charlesworth.............................................................6

     C.    Dr. Chicklo .....................................................................8

     D.    Dr. Cashdollar ................................................................9

     E.    Dr. Enders .....................................................................9

     F.    Denial of Plaintiff's Claim ..............................................11

III.  PROCEDURAL HISTORY ..................................................12

IV.  STATEMENT OF QUESTIONS PRESENTED.........................13

V.   LEGAL ANALYSIS ...........................................................14

     A.    Statutory Bad Faith.......................................................14

           1.    The "Red Flags" Associated with Plaintiff's Claim..............15

           2.    The Relevant Medical Records ...........................................16

           3.    The 1993 Pathology Report & the Lack of a Pathological Finding of Cancer ...........................................18

           4.    Post-Litigation Conduct.......................................................20

     B.    Alleged Fraudulent Conduct ..........................................22

     C.    Alleged Systemic Treatment of Insureds .......................23

     D.    Immunity for Reporting to Insurance Fraud Section ......24

Page

E.    Dismissal of CUNA Mutual Group .................................................27

    1.    CUNA Mutual Group Is a Non-Entity ..................................27

    2.    CUNA Mutual Group Is Not a Proper Party to a Bad Faith Claim.......................................................................28

F.    No Cause of Action for Negligence................................................29

VI.    CONCLUSION ......................................................................................33

## TABLE OF CITATIONS

Cases:                                                                                                    Page

Adamski v. Allstate Ins. Co., 738 A.2d 1033 (Pa. Super. 1999)....................................20

Benefit Trust Life Ins. Co. v. Union Nat'l Bank of Pittsburgh,
    776 F.2d 1174 (3rd Cir. 1985)..........................................................................29

Birth Center v. St. Paul Companies, Inc., 787 A.2d 376 (Pa. 2001) ..............................32

Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79
    (3rd Cir. 2001)....................................................................................................30

Bortz v. Noon, 729 A.2d 555 (Pa. 1999) .......................................................................22

Brooks v. Hickman, 101 F.R.D. 19 (W.D. Pa. 1984) ......................................................32

Fort Washington Resources, Inc. v. Tannen, 901 F. Supp. 932 (E.D. Pa. 1995)...........31

Hayfield v. Home Depot U.S.A., Inc., 168 F. Supp.2d 436 (E.D. Pa. 2001)...................32

Huddleston v. Infertility Ctr. of America, Inc., 700 A.2d 453 (Pa. Super.
    1997)..................................................................................................................23

Jean Anderson Hierarchy of Agents v. Allstate Life Ins. Co., 2 F. Supp.2d
    688 (E.D. Pa. 1998) ...........................................................................................32

Kearns v. Minnesota Mut. Life Ins. Co., 75 F. Supp.2d 413 (E.D. Pa. 1999).................30

Keefe v. Prudential Prop. and Cas. Ins. Co., 203 F.3d 218 (3rd Cir. 2000) ...................15

Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230 (3rd Cir. 1997) ........................15

Kosierowski v. Allstate Ins. Co., 51 F. Supp.2d 583 (E.D. Pa. 1999),
    *affirmed without published opinion*, 234 F.3d 1265 (3rd Cir. 2000)......................24

Krause v. Great Lakes Holdings, Inc., 563 A.2d 1182 (Pa. Super. 1989)......................23

Krisa v. Equitable Life Assurance Soc'y, 113 F. Supp.2d 694 (M.D. Pa. 2000)........14,32

Lockhart v. Federal Insurance Co., 1998 U.S. Dist. LEXIS 4046 (E.D. Pa.1998)..........28

O'Donnell ex rel. Mitro v. Allstate Ins. Co., 734 A.2d 901 (Pa. Super. 1999).................15

Cases:  (cont'd)                                                                                    Page

Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.,
    267 F.3d 340 (3rd Cir. 2001)......................................................................31

Reformed Church of the Ascension v. Theodore Hooven & Sons, Inc.,
    764 A.2d 1106 (Pa. Super. 2000) .......................................................32

Romano v. Nationwide Mut. Fire Ins. Co., 646 A.2d 1228 (Pa. Super. 1994)...............31

Sunquest Information Systems, Inc. v. Dean Witter Reynolds, Inc.,
    40 F. Supp.2d 644 (W.D. Pa. 1999)....................................................30

Superior Precast, Inc. v. Safeco Ins. Co. of America, 71 F. Supp.2d 438
    (E.D. Pa. 1999) ...................................................................................28

Williams v. Hartford Cas. Ins. Co., 83 F. Supp.2d 567 (E.D. Pa. 2000),
    *affirmed without published opinion*, 261 F.3d 495 (3rd Cir. 2001).......................15

Windsor Sec., Inc. v. Hartford Life Ins. Co., 986 F.2d 655 (3rd Cir. 1993).....................29

Statutes:

40 P.S. §3701-101 *et seq.* ............................................................................................25
        §3701-102 ...............................................................................................25
        §3701-507(a) .........................................................................................25

42 Pa. C.S.A. § 8371 .......................................................................................14,28,32

Rules:

49 Pa. Code §16.95.........................................................................................................17

Fed. R. Civ. P. 9(b).........................................................................................................22

Other Authorities

Black's Law Dictionary, p. 956 (Sixth Edition, 1990).......................................................25

Tabor's Cyclopedic Medical Dictionary 1181 & 1202 (18th ed. 1997)...............................4

Webster's Ninth New Collegiate Dictionary,  p. 720 (1988) ...........................................25

## I.     INTRODUCTION

This case arises as a result of CUNA Mutual Insurance Society's ("CUNA")

decision to deny credit life insurance benefits to Plaintiff Nancy Hall ("Mrs. Hall")

following the death of her husband, Tommy B. Hall ("Mr. Hall"), due to cancer.  The

policy issued was intended to cover the remainder of the Halls' home mortgage in the

event of Mr. Hall's death.  Mrs. Hall alleges that CUNA is liable for "bad faith" and

related causes of action due to the denial of benefits.  CUNA denies that it acted in "bad

faith" or that it is liable under any other theory for denying benefits.

CUNA asserts that its denial of benefits was proper because, following Mrs.

Hall's claim for benefits, it learned that Mr. Hall misrepresented his true medical history

on the application for insurance when he insisted that he had never been diagnosed

with or treated for cancer.  CUNA asserts that Mr. Hall's representation that he had no

history of cancer is false for several reasons:  1) Mr. Hall died of metastatic melanoma

(a secondary site of skin cancer) less than 1 year after he submitted the application for

life insurance, and the death certificate indicated that he suffered from the melanoma for

2-3 years; 2) upon investigation of the claim, CUNA discovered that in medical records

from **six** different physicians there were at least **eleven** separate references[1] to Mr. Hall

having had malignant melanoma (a form of skin cancer) removed prior to the date of the

application for insurance; and 3) during this litigation, CUNA discovered a twelfth

medical record referencing a history of cancer -- a medical intake form, dated April 30,

---

[1] The Court will note that in the section of this brief, marked "Summary of Tommy Hall's
Medical Records," CUNA lists 13 medical records.  One of these records was not
received until after litigation commenced.  A second record is listed, but does not
reference melanoma.  Hence, 11 medical records were received during CUNA's initial
investigation which contain references to melanoma.

1998 (about 7 months prior to the insurance application), in which Mr. Hall, **in his own handwriting**, disclosed a history of cancer in 1996. Had CUNA known of Mr. Halls' history of cancer at the time the application was submitted, it would not have issued the policy. As a result of learning that Mr. Hall misrepresented his medical history on the application, CUNA rescinded the policy and returned all premiums paid. CUNA maintains that its actions were justified based upon the facts of this case.

## II.    STATEMENT OF FACTS

In November, 1998, the Halls refinanced the mortgage on their home. As part of the refinancing, the Halls applied for a credit life insurance policy, on Mr. Hall's life only, through their lender Patriot Federal Credit Union. The purpose of the policy was to insure that the remaining balance of the mortgage, which was $56,000 at the time of the application, would be paid if Mr. Hall died. On November 18, 1998, Mr. Hall submitted to CUNA a "Members Home Mortgage Protection II Application" (the "Application") (**Appendix**, at **"Tab 1"**). Part (B) of the Application asked the following question:

1.  Have you ever been treated for or diagnosed by a member of the medical profession as having any of the following (Please check the box and circle condition(s) that applies )

    Diabetes; high blood pressure; chest pain; heart, blood, blood vessel, lung or breathing disorders; **cancer**; epilepsy; stroke; pneumonia(s); arthritis, brain, mental, nervous, **back**, neck, joint or muscular **disorders**, stomach, intestines, liver, pancreas, or kidney disorders, cirrhosis, drug or alcohol abuse, acquired immune deficiency syndrome or AIDS related complex, or tested positive for antibodies to the AIDS virus? (NOTE TO RESIDENTS OF ME, ND, VT AND WI: You do not have to disclose positive test results for the antibodies to the AIDS Virus )

2

(emphasis added).  In response to the above question, Mr. Hall checked the box

marked, "No."[2]  He made no mention of a history of cancer or back disorders.  Mr. Hall

signed the application in the section containing the following pertinent language:

"These answers are true and complete to the best of my knowledge and belief...."

"Any person who, with intent to defraud or knowing that he is facilitating a fraud against

an insurer, submits an application or files a claim containing a false or deceptive

statement is guilty of insurance fraud...."

CUNA had previously issued a policy of "Group Mortgage Insurance Decreasing

Term Life" to Patriot Federal Credit Union.  Because Mr. Hall answered "No" to all of the

health questions on the application, on January 1, 1999, CUNA, relying on the accuracy

of the health declaration,  issued a Certificate of Insurance to Mr. Hall (the "Policy").

(See **Appendix,** at **Tab "2"**).

The Policy identifies "CUNA Mutual Insurance Society of Madison, Wisconsin,"

as the issuer of the policy.  (Tab "2," at D0017).  The Policy does not identify "CUNA

Mutual Group" as the insurer.  Under the Policy's "GENERAL PROVISIONS – LIFE

AND DISABILITY INSURANCE," it identified a 2-year contestability period.  The Policy

stated, in relevant part, the following:

> The Group Policy, the Application for the Group Policy and any attached
> Rider or Endorsement, is the entire insurance contract.  All statements
> made by you or your Joint Insured Debtor are considered representations
> and not warranties.  No statement can be used to void this insurance or
> deny a claim unless the statement is signed by you or your Joint Insured
> Debtor and a copy given to you or your Joint Insured Debtor.  After 2
> years from the Effective Date of insurance for you and your Joint Insured

---

[2] Mrs. Hall also filled out the Application.  She did not, however, subsequently apply for
coverage.

Debtor, no statement made by you or your Joint Insured Debtor can be used to void this insurance or deny a claim. . . .

**MISSTATEMENT OF AGE OR OTHER DATA** If the date of birth, amount of loan, amount of insurance or any other relevant data is found to be misstated, such that insurance would not have been issued had the true date of birth or other data been stated and [CUNA] discovers this during the contestable period, Our liability will be limited to a return of premiums paid by the Debtor.

(Tab "2," at D0020). Under the Policy, in the event Mr. Hall misstated material information on the Application, CUNA had the right to rescind the Policy and return the premiums. CUNA retained this right until 2 years after the Effective Date of Insurance.

On November 4, 1999 (less than 1 year after the Policy's Effective Date), Mr. Hall died as a result of a metastatic melanoma. A metastatic melanoma is a malignant mole or tumor, which manifests itself at a ***secondary site*** – the malignant cells having previously spread by way of the lymphatic system, bloodstream, or some other avenue. Tabor's Cyclopedic Medical Dictionary 1181 & 1202 (18th ed. 1997). Following Mr. Hall's death, Mrs. Hall submitted a claim for benefits, along with a copy of Mr. Hall's Certificate of Death. (*See **Appendix**, at **Tabs "3" & "4"**).

The claim submitted by Mrs. Hall was reviewed by Brenda Larson, an employee of CUNA who handled the claim. (*See **Appendix**, at **Tab "5,"** Dep. of Larson). Larson received the file soon after Mrs. Hall submitted her claim. (*See Larson Dep. at 19-20; **Appendix**, at **Tab "5A,"** Exhibit Larson 1). Upon receiving the file, Larson reviewed the claim form and Certificate of Death (Larson Dep. at 22-24). The Certificate of Death indicated that Mr. Hall had died of a metastatic melanoma, and further, that he had suffered from a metastatic melanoma for 2 to 3 years. (Larson Dep. at 23). Based on

4

this information, Larson determined that an investigation was warranted.  (Larson Dep. at 27 & 29).  CUNA subsequently requested Mr. Hall's medical records from treating physicians Drs. Guthrie/Hurley, Charlesworth, Chicklo, Cashdollar, and Enders (See Larson Dep. at 30-60 & Tab "5A").  CUNA received records from all of the above physicians except from the office of Drs. Guthrie and Hurley (who were partners).  CUNA was advised that their records were not available because they were "lost or misplaced." (*See* note of phone contact, ***Appendix,*** at ***Tab "28"***).  The medical records collected, which also included records from Dr. William Sharfman (an oncologist at Johns Hopkins) and Dr. David Weinreich, showed the following pertinent information with regard to Mr. Hall's medical history:

## A.    <u>Summary of Tommy Hall's Medical Records</u>

1)  4/13/93    Pathological Report, Chambersburg Hospital: excision of "dysplastic nevus, skin (back)" (*See **Appendix,** at **Tab "6A"***);

2)  4/30/98    New Patient Intake form, Dr. Charlesworth:  history related by patient of **"cancerous mole - removed 96"** and two back surgeries in 1989 and 1993[3]  (*See **Appendix,** at **Tab "6B"***);

3)  4/30/98    Office Note of Dr. Charlesworth:  patient related history of **"? melanoma removed back 1996"**  (*See **Appendix,** at **Tab "6C"***);

4)  1/15/99    Intake Note of Dr. Chicklo:  surgical history related Two spinal surgeries in 1989 and 1993, **"mole – <u>ca</u>  on back exc. (1993)"**  (*See **Appendix,** at **Tab "6D"***);

5)  1/22/99    Patient History of Dr. Chicklo:  **"spinal surgery and he had a malignant mole excised in 1993 on his back."**  (*See **Appendix,** at **Tab "6E"***);

6)  2/17/99    New Patient Information Record/Dr. Enders:  Patient Medical History: **"malignant mole on back <u>93</u>"**  (*See **Appendix,** at **Tab "6F"***);

7)  2/17/99    Letter from Dr. Cashdollar to Dr. Chicklo:  "I had the pleasure of seeing Tommy Hall in medical oncology consultation on Wednesday, 2-17-99.  As you are well

---

[3] This record was first received by CUNA during discovery in this action.

aware, **Mr. Hall demonstrated a left in scapular dermal lesion in 1993. Pathology revealed a malignant melanoma...."** "PMH is most notable for the malignant melanoma. Surgical resection in 1993. The patient also reports two lumbar spinal procedures in 1989 and 1993 for herniated disk disease" (*See **Appendix,** at **Tab "6G"***);

8) 2/18/99   Chambersburg Hospital/Dr. Cashdollar note: **"History of Melanoma"** (*See **Appendix,** at **Tab "6H"***);

9) 2/23/99   Dr. Enders note: **"subj: 43 yo white male with melanoma in 1993"** (*See **Appendix,** at **Tab "6I"***);

10) 3/15/99   Colonoscopy Report/Dr. Enders: "This is a 43 year-old white male who had a **melena [sic] removed in 1993..."** (*See **Appendix,** at **Tab "6J"***);

11) 7/15/99   New Patient Clinic Visit Report/Dr. Sharfman: "This is a 44-year-old white male who was in his usual state of health until 1996 when he had a number of small moles removed on his left neck that was being irritated by his shirt. **In 1993, a mole developed on his left shoulder blade. It developed a bright red rim around it. It was excised. Pathology showed a malignant melanoma"** (*See **Appendix,** at **Tab "6K"***);

12) 7/26/99   Chambersburg Hospital Radiologists Report: **"History: Melanoma"** (*See **Appendix,** at **Tab "6L"***);

13) 9/30/99   Inpatient Record/David Weinreich, M.D.: History of Present Illness: **"The patient was first diagnosed with melanoma in 1993** and underwent a wide local excision of a shoulder lesion. It subsequently recurred in his neck, which was excised in January of 1999" (*See **Appendix,** at **Tab "6M"***).

(Bold type added).

### B.    Dr. Charlesworth

Dr. Charlesworth first treated Mr. Hall on April 30, 1998, prior to Hall's execution of the CUNA Application. (*See **Appendix,** at **Tab "7,"*** Dep. of Charlesworth) Mr. Hall sought medical treatment from Dr. Charlesworth concerning pain in his left calf muscle. (Charlesworth Dep. at 28-29). Because Mr. Hall was a new patient, he was given a new patient intake form to fill out. (Exhibit Charlesworth 1, *See **Appendix**, at **Tab "7A"***). The intake form is sometimes mailed to the patient and sometimes filled out in Dr. Charlesworth's waiting room. (Charlesworth Dep. at 18-19). In this case, the original

intake form did not contain creases from mailing, so Dr. Charlesworth believed that it was most likely filled out in the waiting room.  (Charlesworth Dep. at 56).

The intake form had a section entitled, "Medical Problems."  (See **Appendix**, at **"7A"**).  During Mr. Hall's visit, the following information was provided:

| Medical Problems | Date | Hospitalizations/Surgery |
|---|---|---|
| 1.  Cancerous mole – removed | 96 | Dr. Guthrie. |
| 2.  Back surgery | 12-89 | Dr. Lang ruptured disk  L5-S1 |
| 3.  Back surgery | 1-93 | Dr. Lang bulging disk ?L4-L5 |
| 4.  Diverticulitis | | |

The notation regarding the removal of a cancerous mole was <u>not</u> made by Dr. Charlesworth.  (Charlesworth Dep. at 18-20), nor has his office identified anyone on his staff as the scrivener of this information.  Dr. Charlesworth also did not make the comments regarding "Back surgery."  (<u>Id.</u> at 20).   Dr. Charlesworth did, based on his office visit with Mr. Hall, add the notation concerning a ruptured disk at L5-S1 and a bulging disk at L4-L5.  (<u>Id.</u> at 20-21).  In addition, Dr. Charlesworth specifically recalls a discussion between Mr. Hall and his wife regarding whether a cancerous mole had been removed from Mr. Hall, and if so, what type.  (Charlesworth Dep. at 26-27).

On December 11, 1998 (3 weeks after Mr. Hall filled out the Application for CUNA), Mr. Hall returned to Dr. Charlesworth, complaining of a lump on the inside of his throat.  (Charlesworth Dep. at 36-37 & **Appendix**, at **Tab "7B,"** Exhibit Charlesworth 2).  The lump later turned out to be cancerous, specifically the metastatic melanoma which caused Mr. Hall's death.  On January 5, 1999, Dr. Charlesworth referred Mr. Hall to Dr. Chicklo – an Ear, Nose and Throat (ENT) specialist.  (Charlesworth Dep. at 41).

### C. Dr. Chicklo

Dr. Chicklo saw Mr. Hall for the first time on January 15, 1999 (about 2 months after Mr. Hall had filled out the CUNA Application).  (*See Appendix*, at **Tab "8,"** Dep. of Chicklo, at 10-11).  Dr. Chicklo's intake sheet is Exhibit Charlesworth 3.  Under a section entitled "Surgery," (*See Appendix*, at **Tab "8A."**), it states:

|          |                |                    |         |
|----------|----------------|--------------------|---------|
| Surgery  | Spinal Sg  x 2 | 1989–1993 Dr. Lang |         |
| mole <u>ca.</u> | Exc.    | 1993 [circled]     | <u>Guthrie</u> |

      on back

(underlining in original).  With the exception of the phrase "on back," the above remarks were written by Dr. Chicklo's secretary, Paula N. Statler.  (*See* Chicklo Dep. at 12-13; ***Appendix,*** at **Tab "9,"** Dep. of Statler, at 6-7).  The remarks indicate that Mr. Hall had two back surgeries, one in 1989 and one in 1993.  (Chicklo Dep. at 12-13; Statler Dep. at 7-8).  The remarks also indicate that Mr. Hall had a cancerous mole excised in 1993.  (Chicklo Dep. at 12-13; Statler Dep. at 7-8).  Dr. Chicklo circled the year 1993 and indicated that the location of the mole was on Mr. Hall's back.  (Chicklo Dep. at 12-13; Statler Dep. at 7-8).

At the time the intake sheet was filled out, Dr. Chicklo's office did <u>not</u> have Mr. Hall's medical records.  (Statler Dep. at 7).  Accordingly, the information would have come directly from the patient.  (<u>Id.</u>)  Mrs. Hall has testified that she never accompanied her husband on any of his visits to Dr. Chicklo's office.  (*See **Appendix**,* at **Tab "10,"** Dep. of Nancy Hall, 3/19/02, at 16).  Dr. Chicklo referred Mr. Hall to Dr. Cashdollar.

### D.     Dr. Cashdollar

Dr. Cashdollar is an oncologist who saw Mr. Hall on approximately 15 occasions.

(*See **Appendix,** at **Tab "11,"*** Dep. of Cashdollar, at 12-13).  On February 17, 1999 (3

months after Mr. Hall filled out the CUNA Application), Dr. Cashdollar saw Mr. Hall for

the first time.  (Cashdollar Dep. at 12).  On that date, Dr. Cashdollar's nurse recorded

information from the patient.  (Cashdollar Dep. at 14-16).  The intake sheet for Mr. Hall

stated, in pertinent part, the following:

> PMH: anemia
> xxxxxxxxxxx
> malignant mole on back 93
> ruptured & hern disc.

> SURGERY:  spinal surgery x2:  89 & 93 – ruptured & hern disc.
> malignant mole excised from back in 1993
> excisional biopsy of deep cervical node 1/22/99
>                                        . . .
> FH:     1 MOTHER       62 healthy
>         1 FATHER       65 DM, skin cancer
>         1 BROTHERS     42 healthy
>
>         1 SISTERS      Half 17 Healthy

(***Appendix,*** at ***Tab "12,"*** Document DO177; underlining added).  Under "PMH" (or Past

Medical History), Dr. Cashdollar's records indicate that Mr. Hall had had a "malignant

mole on back 93"  (Cashdollar Dep. at 14).

### E.     Dr. Enders

Dr. Enders is board certified in gastroenterology, and he saw Mr. Hall on 3

occasions.  (*See **Appendix,** at **Tab "13,"*** Dep. of Enders, at 4 & 10).  On February 23,

1999 (a little over 3 months after Mr. Hall filled out the CUNA Application), Dr. Enders

saw Mr. Hall for the first time.  (Enders Dep. at 11).  At that time, Mr. Hall provided a

record of surgeries to Dr. Enders' nurse, who recorded the information on the initial

intake form.  (Enders Dep. at 14-16; *Appendix,* at *Tab "14,"* Document D0184).  The initial intake form provides, in pertinent part, as follows:

> PMH:
> Anemia
>
> Surgery:
> Spinal x2 89 & 93 rupt & her. disc.
> <u>mal. mole excised '93</u>
> exc. by deep cervical node 1/22/99
>
> . . .
>
> FH:   1 MOTHER        62 yr. healthy
>        1 FATHER         65 yr. dm, skin ca
>        1 BROTHER       1 healthy
>
>        half
>     1 SISTERS          1  healthy

(Document DO184; underlining added).  Under "Surgery," the intake form notes the excision of a malignant mole in 1993.  (Enders Dep. at 15).

The records of Dr. Charlesworth, Dr. Chicklo, Dr. Cashdollar, and Dr. Enders contain various references to the removal of a malignant mole in 1993 and/or 1996.  Their records also contain the notes of Dr. Sharfman and Dr. Weinreich which relate a history of cancer as well.  During Brenda Larson's  investigation, she obtained the above-referenced medical records.[4]  She also obtained a "pathological report" dated 4/13/93.  (Larson Dep. at 32-34 & 44).  That pathology report contains the microscopic analysis of a mole removed from Mr. Hall.  (*Appendix*, at *Tab "15"*).  It shows that the mole was regarded as a "dysplastic nevus."  A dysplastic nevus is not cancer.  It is "a dermatologic condition in which there are cells that have abnormal pigment."

---

[4] Except the intake form at Dr. Charlesworth's office.  Despite CUNA's request during its investigation of the claim, Charlesworth's office (we assume inadvertently) failed to produce this record.  It was obtained during discovery in this litigation.

(**Appendix**, at **Tab "16,"** Dep. of Thomas J. Ansfield, M.D., at 9). While a dysplastic nevus is benign, it is a risk factor for developing melanoma, a form of skin cancer. (Id. at 10-11).

### F.    Denial of Plaintiff's Claim

After Larson collected Mr. Hall's medical records, she had them reviewed by Dr. Thomas Ansfield. (Larson Dep. at 49). Dr. Ansfield is a practicing physician, a specialist in internal medicine, and a consulting medical director with CUNA. (Ansfield Dep. at 4-5). Dr. Ansfield and Larson discussed the information they had collected. (Ansfield at 32-33, 36). Both reached the same conclusion. Mr. Hall had misrepresented his true medical background at the time of his Application. Dr. Ansfield and Larson further agreed that, if the history of cancer had been disclosed in the Application, CUNA would not have issued the Certificate of Insurance. Based on the records, and the analysis of Dr. Ansfield and Larson, CUNA denied Plaintiff's claim, rescinded the Policy, and returned the premiums to Plaintiff. By letter dated February 10, 2000, CUNA notified Mrs. Hall of its decision. (**Appendix,** at **Tab "17."**)

Larson referred the Hall file to CUNA's Special Investigative Unit ("SIU"), where the file was reviewed by Michael E. Stel. (**Appendix**, at **Tab "18,"** Dep. of Michael E. Stel, at 14-17). Based on his review of the file, Stel forwarded a report to the Insurance Fraud Section of the Office of the Attorney General in Pennsylvania. (**Appendix**, at **Tab "19."**) Stel believed that submitting the report was required by Pennsylvania's Insurance Fraud Prevention Act, 40 P.S. §3701-101 *et seq.* and as a result of bulletins from the Pennsylvania Department of Insurance which advised him that "Pennsylvania law explicitly requires insurer reporting of suspected insurance fraud to a law

enforcement agency for consideration of criminal investigation and prosecution..." (Stel Dep., p. 41). By letter dated February 22, 2000, Stel notified Mrs. Hall that a report had been filed with the Insurance Fraud Section of the Attorney General's Office. (*Appendix*, at *Tab "20."*) By letter dated February 29, 2000, the Attorney General's Office acknowledged receipt of the report from CUNA. (*Appendix*, at *Tab "21."*) By letter dated March 29, 2000, the Attorney General's Office notified CUNA that, "our investigation of the available facts and information indicate that we cannot initiate a criminal investigation at this time" (*Appendix*, at *Tab "22."*). The Office of the Attorney General offered no explanation for its decision. It did not disclose the nature of the investigation, if any, that it undertook. The Attorney General never advised CUNA that it should not have submitted the matter for consideration, or that CUNA's referral was improper.

### III.    PROCEDURAL HISTORY

On July 9, 2001, Mrs. Hall commenced this action, both individually and as the administratrix of the Estate of her late husband, by filing a Complaint against CUNA Mutual Insurance Society and its marketing trademark, "CUNA Mutual Group." On September 5, 2001, CUNA filed an Answer to the Complaint and Affirmative Defenses.

On May 22, 2002, Plaintiff filed an Amended Complaint in which she asserts a wide variety of claims, including the following: (1) CUNA breached its contract with Mr. Hall; (2) CUNA acted negligently in its handling of the claim process; (3) CUNA committed fraud and deceit; and (4) CUNA violated the bad faith statute. (Amended Complaint, ¶20, 28, & 32). Plaintiff claims that CUNA acted wrongfully, negligently, intentionally, wantonly, fraudulently, recklessly, carelessly, and in bad faith. Plaintiff

contends that CUNA's bad faith includes conduct both prior to, and after, the commencement of the litigation. Plaintiff asserts that CUNA acted wrongfully, and in bad faith, by reporting the facts surrounding the Plaintiff's claim to the Insurance Fraud Section of the Attorney General's Office. (Amended Complaint, ¶24-27). Finally, Plaintiff states that CUNA "systemically acted in bad faith and breached their contract with insureds." (Amended Complaint, ¶29).

On June 11, 2002, CUNA filed an Answer to the Amended Complaint and Affirmative Defenses in which it denied all of Plaintiffs claims. CUNA asserts that Plaintiff's decedent provided false information on the Application, and maintains that CUNA has acted properly. CUNA asserts that Plaintiff has failed to state a cause of action concerning "systemic" use of improper methods to deny claims. CUNA notes that it is immune from suit as a result of reporting suspected insurance fraud to the Insurance Fraud Section of the Attorney General's office. *See* 40 P.S. § 3701-507. Finally, CUNA asserts that "CUNA Mutual Group" is not a legally existing entity, and therefore, is not a proper party to the lawsuit.

## IV.    STATEMENT OF QUESTIONS PRESENTED

A.    WHETHER CUNA ACTED IN BAD FAITH BY DENYING PLAINTIFF'S CLAIM, RESCINDING THE POLICY, AND RETURNING PLAINTIFF'S PREMIUMS, WHEN MR. HALL'S PRIOR DIAGNOSIS OF MELANOMA IS CLEARLY APPARENT FROM HIS MEDICAL RECORDS?

Suggested Answer: No.

B.    WHETHER CUNA ACTED FRAUDULENTLY BY DENYING PLAINTIFF'S CLAIM, RESCINDING THE POLICY, AND RETURNING PLAINTIFF'S PREMIUMS, WHEN PLAINTIFF CANNOT DEMONSTRATE THE EXISTENCE OF A MISREPRESENTATION OR JUSTIFIABLE RELIANCE?

Suggested Answer: No.

C.    WHETHER PARAGRAPH 29 OF THE AMENDED COMPLAINT SHOULD BE STRICKEN BECAUSE THERE IS NO EVIDENTIARY SUPPORT FOR PLAINTIFF'S ALLEGATIONS OF "SYSTEMIC" BAD FAITH IN RECEIVING AND ACCEPTING GROUP CREDIT LIFE INSURANCE PREMIUMS?

Suggested Answer:  Yes.

D.    WHETHER CUNA IS IMMUNE FROM SUIT AND ENTITLED TO JUDGMENT IN ITS FAVOR WITH RESPECT TO ANY REPORTS MADE, AND ANY CORRESPONDENCE WITH, THE INSURANCE FRAUD SECTION OF THE ATTORNEY GENERAL'S OFFICE?

Suggested Answer:  Yes.

E.    WHETHER "CUNA MUTUAL GROUP" IS ENTITLED TO JUDGMENT IN ITS FAVOR WHEN "CUNA MUTUAL GROUP" IS NOT A LEGAL ENTITY, BUT RATHER, A TRADEMARK EMPLOYED BY CUNA MUTUAL INSURANCE SOCIETY AND ITS SUBSIDIARIES?

Suggested Answer:  Yes.

F.    WHETHER, UNDER THE CIRCUMSTANCES OF THIS CASE, PLAINTIFF MAY ASSERT CAUSES OF ACTION FOR NEGLIGENCE AND RECOVER DAMAGES FOR PAIN AND SUFFERING AND EMOTIONAL TRAUMA?

Suggested Answer:  No.

## V.    LEGAL ANALYSIS

### A.    Statutory Bad Faith

Under Pennsylvania law, a cause of action for bad faith is statutory in nature.

*See* 42 Pa. C.S.A. § 8371.  Mere negligence or bad judgment is not bad faith.  Krisa v. Equitable Life Assurance Soc'y, 113 F. Supp.2d 694, 702 (M.D. Pa. 2000).  In order to recover for bad faith, a plaintiff must prove that (1) his insurer did not have a reasonable basis for denying benefits under the policy and (2) the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim.  Keefe v. Prudential Prop.

and Cas. Ins. Co., 203 F.3d 218, 225 (3rd Cir. 2000).  The plaintiff must prove both these elements by clear and convincing evidence.  Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3rd Cir. 1997).  Moreover, each of the elements must be independently satisfied.  For example, if there is a reasonable basis for delaying or denying a claim, then – "even if it is clear that the insurer did not rely on that reason, there cannot, as a matter of law be bad faith."  Williams v. Hartford Cas. Ins. Co., 83 F. Supp.2d 567, 574 (E.D. Pa. 2000), *affirmed without published opinion*, 261 F.3d 495 (3rd Cir. 2001).

### 1.    The "Red Flags" Associated with Plaintiff's Claim

Less than 1 year after the issuance of the Policy, CUNA was presented with a Certificate of Death, which indicated that Mr. Hall had died of a metastatic melanoma, and that he had suffered from this condition for 2 to 3 years.  (Larson Dep. at 23). Pennsylvania courts have explicitly recognized that "the existence of many 'red flags,'" may properly lead to "a more thorough and protracted investigation by the insurance provider." O'Donnell ex rel. Mitro v. Allstate Ins. Co., 734 A.2d 901, 907 (Pa. Super. 1999) (footnote omitted).  In this case, there were initially at least 2 red flags:  (1) Mr. Hall died of melanoma, which he had apparently suffered from for the past 2 to 3 years; and (2) he died of a metastatic melanoma, meaning that there had been a prior primary site of cancer.  Upon conducting its investigation, CUNA found, in the words of Plaintiff's own insurance expert, a "bevy of doctor's reports that mention cancer..." (See supplemental expert report of Richard A. Schwartz, August 12, 2002, p. 1).   The reports documented a history of cancer in 1993 and 1996.

## 2.    The Relevant Medical Records

A review of the medical records at issue conclusively refutes any claim that CUNA acted in bad faith.  The records of Drs. Charlesworth, Chicklo, Cashdollar, and Enders (as well as Drs. Sharfman and Weinreich) all explicitly detail that Mr. Hall had previously been diagnosed with melanoma, which Mr. Hall failed to report on his Application.  **Twelve** separate medical records.  **Six** different doctors' records.  All of these records unequivocally chronicle a history of cancer.

First and foremost is the April 30, 1998 medical intake form at Dr. Charlesworth's office.  The form was filled out by Mr. Hall in his own hand.   CUNA's handwriting expert, John S. Gencavage, will testify that this handwritten notation was written by Mr. Hall himself.  (**Appendix,** at **Tab "23"**).  Tellingly, Plaintiff will present no expert testimony to refute this opinion. The form was filled out by Mr. Hall some 7 months prior to the application for insurance with CUNA.  On it, Mr. Hall confides to his doctor that he had a "cancerous mole - removed 96" (**Appendix**, **Tab "6B"**).   This record alone is powerful proof that Mr. Hall *knew* he had cancer prior to the application and misrepresented the facts on the application.  But the record evidence does not stop there.  Mr. Hall told his ENT, Dr. Chicklo, that he had a cancerous mole removed from his back in 1993.  Dr. Chicklo notes in his records of the first meeting with Mr. Hall, "mole – ca on back exc. (1993)."  At the time that Mr. Hall went to Dr. Chicklo's office, Dr. Chicklo did not have Mr. Hall's other records.  (Statler Dep. at 6-7).  As a result, the references to a pre-existing melanoma, which are contained in Dr. Chicklo's intake sheet, came directly from the patient.  (Statler Dep. at 6-7).  Upon seeing Mr. Hall, Dr. Chicklo asked about the prior removal of a malignant mole.  In his records, Dr. Chicklo himself made a

notation regarding the location of the pre-existing melanoma on Mr. Hall's back.

(Chicklo Dep. at 15-16). Further, Dr. Cashdollar, one of Hall's oncologists, explained in

a letter to another physician, "As you are well aware, Mr. Hall demonstrated a left in

scapular dermal lesion in 1993. Pathology revealed a malignant melanoma...."

(Appendix, Tab 6G). Another oncologist, Dr. Sharfman of Johns Hopkins, noted in his

new patient form "In 1993, a mole developed on his left shoulder blade. It developed a

bright rim around it. It was excised. Pathology revealed a malignant melanoma."

(Appendix, Tab 6K). These and the other records identified in Section II A, above,

demonstrate beyond any reasonable doubt that Hall had been treated for and

diagnosed with cancer prior to the application for insurance with CUNA.

To prove that CUNA acted in "bad faith", Plaintiff must show "clear and

convincing evidence" that CUNA had no "reasonable basis" for concluding that Mr. Hall

misrepresented his medical history on the application, and that CUNA knew (or was

reckless in failing to see that) it had no reasonable basis to deny the claim. As a matter

of law, the repeated references in the medical records of a history of cancer which pre-

dated the insurance application provide a reasonable basis for CUNA to believe that Mr.

Hall misrepresented his history of cancer. Moreover, the references in the medical

records were not the private thoughts of Mr. Hall's physicians, perhaps never

communicated to Mr. Hall. To the contrary, the information flow came from the direction

of Mr. Hall. He provided the history to his doctors. The doctors noted the history in their

records, as they are required to do by law. See 49 Pa. Code §16.95 (requiring that

medical records be legible and accurate). CUNA reasonably relied upon these records

in its decision to deny the claim and rescind the policy. Frankly, given the overwhelming information of a history of prior cancer, the decision was not a close one.

### 3.     The 1993 Pathology Report & the Lack of a Pathological Finding of Cancer

Plaintiff will argue that CUNA had no reasonable basis to deny the claim, and that it knew it had no reasonable basis to deny the claim, because CUNA had no pathology report diagnosing Mr. Hall with cancer. It is true that the only pathology report in CUNA's possession at the time it originally denied Mrs. Hall's claim was the 1993 pathology report indicating a "dysplastic nevus." The parties agree that this was not a finding of cancer. However, this was only one record and it was the earliest record which referenced Mr. Hall's history of cancer. CUNA had eleven other records, all dated after the pathology report, which clearly indicated a history of cancer. This was not an instance where one, or even two, records reflected a history which was arguably inconsistent with the pathology report. This was an instance in which six different doctors, in at least eleven different medical records (and later in a twelfth) clearly and matter-of-factly related a history of cancer. Drs. Cashdollar and Sharfman even stated, unequivocally, that a pathology report finding cancer did exist.  Brenda Larson and Dr. Ansfield reasonably believed that the pathology report in their possession was but one such pathology report, and that one or more other pathology reports existed which showed the history of cancer. Why else would six different doctors make eleven different references to a history of cancer?

CUNA did, in fact, try to obtain the pathological history. In her inquiries of Mrs. Hall, Larson was given the name of Mr. Hall's physician, Dr. Guthrie, who had removed a mole back in 1993. Guthrie was a partner in an office with a Dr. Hurley. On January

31, 2000, Dr. Hurley's office advised, by telephone, that Tommy Hall's "file cannot be found. They have misplaced or lost his records." *See **Appendix**, at **Tab "28."*** CUNA thus reasonably believed that it had all of the relevant and <u>available</u> records regarding Mr. Hall when it made its decision to deny the claim and rescind the policy.

Prior to denying Plaintiff's claim, CUNA had the Hall file reviewed by Dr. Thomas Ansfield. Dr. Ansfield testified that the 1993 pathological report indicated a dysplastic nevus, which is a known risk factor for melanoma. (Ansfield at 10, 34-40). Dr. Ansfield also testified that -- if he had treated a patient with a dysplastic nevus, he would have advised the patient regarding the need for follow-up. (Ansfield at 10-11). He stated that, "I think it's crucial to stress the need to obtain follow-up." (Ansfield, at 11). The 1993 pathological report itself recommended follow-up. It states that, "Follow up is recommended in view of the dysplastic changes noted." (***Appendix***, at ***Tab "15."***) Finally, Mr. Hall's medical records indicate that, in 1996, he actually had "a number of small moles . . . removed from his left back." (Ansfield at 60).

From the above facts, CUNA had every reason to believe that Mr. Hall followed-up on his prior diagnosis, and knew about his melanoma prior to filling-out the CUNA Application. Plaintiff has thus failed to show a preponderance of proof, let alone the clear and convincing proof which is mandated, that CUNA had no reasonable basis for its denial of the claim, or that CUNA knew or recklessly disregarded its lack of a reasonable basis. In short, Plaintiff has failed to meet its burden of demonstrating proof of bad faith conduct.

### 4.     Post-Litigation Conduct

In her Amended Complaint, Plaintiff alleges that new information was provided to CUNA after the commencement of this lawsuit, and that this new information establishes that Mr. Hall was never treated or diagnosed with cancer prior to the date of the insurance application. Accordingly, Plaintiff argues, CUNA's continued refusal to pay the claim is a distinct act of bad faith.

As outlined above, CUNA's original denial of Plaintiff's claim was well-founded. Further, with respect to the allegations of continued denial, Pennsylvania courts have held that the continued denial of a claim does not constitute a new cause of action for bad faith. Adamski v. Allstate Ins. Co., 738 A.2d 1033, 1037 & 1039 (Pa. Super. 1999). Hence, if CUNA's denial of Plaintiff's claim was reasonable, its continued denial of Plaintiff's claim creates no new cause of action in favor of Plaintiff.

Even if a claim for continued bad faith is viable, Plaintiff has not met her burden under the facts of this case. After the commencement of this litigation, Plaintiff disclosed to CUNA for the first time that Mr. and Mrs. Hall had filed a malpractice action on July 2, 1999 against several physicians who had treated Mr. Hall from 1986 through 1993. The malpractice action accused Dr. George Baker, Chambersburg Hospital, Summit Health, Howard Hoffman, M.D., Constansio Ramerez, M.D. and Dr. James Hurley of malpractice in the failure to properly diagnose, as cancerous, moles which Mr. Hall had removed in 1986 and 1993. Mrs. Hall produced, in discovery, depositions from the defendant doctors in the malpractice action which indicate that the doctors did not tell Mr. Hall he had cancer; and the deposition of Mr. Hall himself (taken in the malpractice action) in which he says he was not told by his doctors that he had cancer. Further, during their

20

depositions in this litigation, Drs. Cashdollar and Sharfman noted that the histories of cancer contained in their records likely came from previous records and that they obtained no independent, first-hand confirmation of the history of cancer.  Based upon this "new information", Mrs. Hall asked CUNA to reconsider its initial denial of the claim.

Despite the "new information" summarized above, Plaintiff has produced no explanation for the following crucial facts:  1) Mr. Hall told Dr. Charlesworth in April, 1998 that he had a history of cancer in 1996; 2) Mr. Hall told Dr Chicklo on January 15, 1999 that he had a cancerous mole excised from his back in 1993, and 3) Mr. Hall told Dr. Enders on February 17, 1999 that he had a malignant mole on his back in 1993. The information in these records came from Mr. Hall himself.  *If Mr. Hall had not been treated or diagnosed with cancer prior to the date of the application for insurance, why did he tell three doctors that he had been diagnosed with and treated for cancer in 1993 and 1996?*  CUNA has proffered this question to counsel for Plaintiffs and asked for an explanation.  No explanation has been forthcoming.  Mr. Hall clearly believed from at least April, 1998 through February, 1999 that he had been diagnosed with cancer in 1993 and/or 1996, and thus misrepresented the true facts on his application in November, 1998.  CUNA's continued refusal to pay the claim therefore is supported by Mr. Hall's own disclosures to his doctors, for which Plaintiff has not even attempted to offer some reasonable, supportable alternative explanation.

For the above reasons, CUNA acted reasonably in denying Plaintiff's claim. CUNA's continued denial of Plaintiff's claim also is reasonable as it is supported by Mr. Hall's own statements to his doctors.  Accordingly, summary judgment should be granted in favor of CUNA and against Plaintiff on the cause of action for bad faith.

### B.    Alleged Fraudulent Conduct

Under Pennsylvania law, in order to maintain a cause of action for fraud, a plaintiff must show that the defendant made (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.  Bortz v. Noon, 729 A.2d 555, 560 (Pa. 1999).  In addition, under the Federal Rules of Civil Procedure, fraud must be stated with particularity.  Fed. R. Civ. P. 9(b).  Negligent misrepresentation differs from fraud in that, "the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words."  Bortz, 729 A.2d at 561.

In the instant matter, Plaintiff has made a "boilerplate" allegation of fraud and deceit.  In Paragraph 28 of the Amended Complaint, Plaintiff alleges that, "As a result of all of the conduct described above, and the Defendants' breach of contract, intentional and negligent misrepresentations, bad faith, negligence, fraud, deceit, and violations of their duties of good faith and fair dealing, Mrs. Hall and the Estate lost the family residence."  (underlining added).  This boilerplate assertion does not allege fraud with sufficient particularity.  More importantly, Plaintiff has no evidence to support an allegation of fraud.

To begin with, Plaintiff has failed to identify or provide any evidence of a misrepresentation.  CUNA is therefore left to speculate about what the alleged misrepresentation might possibly be.  Plaintiff essentially asserts that CUNA promised to provide coverage to Mr. Hall, and later, denied coverage based on medical records it

knew to be inaccurate.  Even assuming Plaintiff's allegations to be true (which CUNA strenuously denies), the credit life insurance was sold over 1 year <u>before</u> CUNA saw the medical records of Mr. Hall.  At the time of any alleged misrepresentation, CUNA could not have known what was in Mr. Hall's medical records.  (If it had, it would simply have refused Mr. Hall's Application).  Without knowledge of Mr. Hall's medical records, CUNA could not have acted knowingly or recklessly in making any alleged misrepresentation to Mr. Hall (whatever that misrepresentation might be).  Hence, CUNA's statements to Mr. Hall would constitute a promise, which was later not honored.  Pennsylvania courts have repeatedly stated that, "[A]n unfulfilled promise to do something in the future . . . does not constitute fraud."  <u>Huddleston v. Infertility Ctr. of America, Inc.</u>, 700 A.2d 453, 461 (Pa. Super. 1997);  <u>Krause v. Great Lakes Holdings, Inc.</u>, 563 A.2d 1182, 1187 (Pa. Super. 1989).

For the foregoing reasons, Plaintiff's fraud claim has not been adequately pleaded and has no evidentiary support.  Summary judgment should therefore be granted in favor of CUNA and against Plaintiff on the allegations concerning fraud and deceit.

### C.    <u>Alleged Systemic Treatment of Insureds</u>

In Paragraph 29 of the Amended Complaint, Plaintiff has asserted that, "CUNA has systemically acted in bad faith and breached their contracts with insureds as they received and accepted group credit life insurance premiums."  In the years 1998 through 2001, CUNA rescinded only three (3) Home Mortgage Protection Life insurance policies ("HMP Life") – including the Hall Policy at issue in this case.  (***Appendix***, at ***Tab "24,"*** Dep. of Richard A. Fischer, 3/14/02, at 73, 75-76).  (The figures are contained in

Exhibits 1 & 4 to Fischer's deposition, at *Appendix*, at *Tabs "24A"* and *"24B"*).

Throughout that same period, CUNA had in force, over 9,472 Certificates of Insurance.

(Tabs "24A" and "24B"; Fischer Dep. at 70). There is absolutely no evidentiary support

for Plaintiff's allegation of "systemic" bad faith.

Additionally, courts have held that, "the bad faith statute is not intended to be a

means for individual plaintiffs to attack an entire insurance industry; rather, it 'addresses

only whether insurers acted recklessly or with ill will <u>in a particular case</u>, not whether its

business practices are reasonable in general.'" <u>Kosierowski v. Allstate Ins. Co.</u>, 51 F.

Supp.2d 583, 594 (E.D. Pa. 1999), *affirmed without published opinion*, 234 F.3d 1265

(3rd Cir. 2000) (underlining added; citations omitted). Through the allegation contained

in Paragraph 29, Plaintiff has attempted to "puff up" her own claims by haphazardly

asserting that CUNA systematically violates the law. She has neither the standing nor

the proof to support such a claim. This is inappropriate in the context of a bad faith

claim. Accordingly, summary judgment should be granted in favor of CUNA and against

Plaintiff, and Paragraph 29 of the Amended Complaint should be stricken.

### D.    Immunity for Reporting to Insurance Fraud Section

In Paragraphs 24 to 27 of the Amended Complaint, Plaintiff refers to, and relies

on, CUNA's report(s) to the Insurance Fraud Section of the Attorney General's Office in

asserting causes of action against CUNA. Plaintiff alleges that CUNA's referral of the

matter to the Attorney General and notice of same to Mrs. Hall was wrongful, negligent,

intentional, wanton, careless, and reckless. She further alleges that it was bad faith

conduct.

CUNA did not report Mr. Hall for fraud investigation to intimidate Mrs. Hall.

CUNA made the report because its fraud investigator, Michael Stel, reasonably believed

that overwhelming evidence of misrepresentation was provided to him, and that under

Pennsylvania law he had not just a right, but a *duty,* to report suspected insurance

fraud.  See 40 P.S. §3701-101 et. seq. and the Insurance Bulletin mandating the

reporting of suspected fraud at ***Appendix,*** at ***Tab "19"***.  In any event, under Pennsyl-

vania law, CUNA is immune from actions based on reports made to the Insurance

Fraud Section.  The relevant statute, known as the "Insurance Fraud Prevention Act,"

states as its purpose:  "The purpose of this act is to establish, coordinate, and fund

activities... to prevent, combat, and reduce insurance fraud, to improve and support

insurance fraud law enforcement and administration and to improve and support

insurance fraud prosecution."  40 P.S. §3701-102.  To encourage the reporting of

suspected insurance fraud, the act confers immunity on those making such a report:

> In the absence of malice, persons or organizations providing information
> to or otherwise cooperating with [the Insurance Fraud Section of the
> Attorney General's Office] . . . shall not be subject to civil or criminal
> liability for supplying the information.

40 P.S. § 3701-507(a) (underlining added).  "Malice" is commonly defined as a "desire

to see another suffer that may be fixed and unreasonable or no more than a passing

mischievous impulse."  It is the "desire to see another experience pain, injury, or

distress.  Malice implies a deep-seated often unexplainable desire to see another

suffer."  Webster's Ninth New Collegiate Dictionary,  p. 720 (1988).  In legal parlance,

"malice"  is "the intentional doing of a wrongful act without just cause or excuse, with an

intent to inflict an injury or under the circumstances where the law will imply an evil

intent."  Black's Law Dictionary, p. 956 (Sixth Edition, 1990). The obvious intent of the

immunity statute is to encourage the reporting of suspected insurance fraud and to

grant immunity from suit for such reporting in all but the most extreme cases where the

report of insurance fraud has no reasonable basis and is made only as a result of some

intentional ill-will against the person reported for fraud.

Plaintiff has not, and cannot, show malice based on CUNA's report(s) to the

Insurance Fraud Section.  Michael Stel, who had never met or spoken to either of the

Halls and played no role in the decision to deny the claim and rescind the policy,

testified that Brenda Larson referred the file to him for review.  (Stel at 16-17).  Stel

reviewed the file and determined that Mr. Hall had failed to disclose his prior diagnosis

of cancer.  (Stel at 19-20).  As a result, he filled out a form from the State of

Pennsylvania, and forwarded the form to the Insurance Fraud Section.  (Stel at 23 &

29).  By letter of February 10, 2002, Stel notified Mrs. Hall of the referral.  (Stel at 30).

Stel felt that he was required to report the suspected insurance fraud.  He had

received a bulletin from the State of Pennsylvania, which stated the following:

> The Pennsylvania insurance department has issued a bulletin to revise
> and remind insurers of their obligation under Pennsylvania law in the
> reporting of a suspected insurance fraud.  Pennsylvania law explicitly
> requires insurer reporting of suspected insurance fraud to a law
> enforcement agency for consideration of criminal investigation and
> prosecution.  Pennsylvania law provides immunity to encourage and
> protect persons in that reporting.  Accordingly, the department has
> released the following guidance to ensure seeking to meet their statutory
> obligation for reporting suspected insurance fraud.

(Stel at 41; underlining added).  Even assuming arguendo that Stel was wrong in

reporting the suspected insurance fraud (which is denied), he did not act with malice.

The bulletins, which Stel had received from Pennsylvania, indicated that he had an

"obligation" to report "suspected" insurance fraud.  Any attempt by Plaintiff to show that

Stel's actions were "malicious" would have to be manufactured with no more support than a desire to circumvent the clear intent of the statute. Stel did not have a grudge against the Halls. He believed, reasonably, that he was doing his job.

For the foregoing reasons, summary judgment should be granted in favor of CUNA, and against Plaintiff, to the extent Plaintiff attempts to rely on report(s) to the Insurance Fraud Section of the Attorney General's Office.

### E.     Dismissal of CUNA Mutual Group

### 1.     CUNA Mutual Group Is a Non-Entity

The term "CUNA Mutual Group" is a trademark, which is used in connection with CUNA Mutual Insurance Society and its subsidiaries. (**Appendix,** at **Tab "25,"** Declaration of Richard A. Fischer).[5] "CUNA Mutual Group" is not a corporation, and it is not a recognized legal entity of any sort or variety. (Id.) In his Declaration, Richard A. Fischer testified to these facts. (Id.) In his deposition, Fischer reiterated that, "CUNA Mutual Group is a marketing name. It's not a legal entity." (Fischer Dep. at 77). Additionally, Paul Lawin[6] testified that, "CUNA Mutual Group to me is a generic marketing name. I wouldn't go beyond it." (**Appendix,** at **Tab "26,"** Dep. of Paul Lawin, at 8). Finally, Plaintiff's own expert, Richard A. Schwartz, acknowledges in his report that, "CUNA Mutual Group is a marketing name." (**Appendix,** at **Tab "27,"** at 3 of 6). No document exists which creates a legal entity known as "CUNA Mutual Group." An insurance company cannot be created which has no legal existence, is not licensed

---

[5] Fischer is an assistant vice president at CUNA Mutual Insurance Society. (**Appendix**, at **Tab "24,"** Dep. of Richard A. Fischer, at 40-41.)

[6] Lawin was CUNA's corporate designee with respect to profits and losses concerning the individual life product. (**Appendix,** at **Tab "26,"** Dep. of Paul Lawin, at 5-6.)

in any state to sell insurance, and is not listed as a legal entity in any business or corporation filing.

Because CUNA Mutual Group is <u>not</u> a legal entity, it cannot be a party to this action, and the term "CUNA Mutual Group" should be eliminated from the caption of the Amended Complaint.

### 2.     CUNA Mutual Group Is Not a Proper Party to a Bad Faith Claim

Assuming arguendo that CUNA Mutual Group is a legal entity (which is denied), it still would <u>not</u> be a proper party to Plaintiff's bad faith claim.  *See* 42 Pa. C.S.A. § 8371.  Section 8371 provides as follows:

> In an action arising under an insurance policy, if the court finds that <u>the insurer</u> has acted in bad faith toward the insured, the court may take all of the following actions:...

42 Pa. C.S.A. § 8371 (underlining added).  By its express language, the bad faith statute only applies to the conduct of "the insurer."  *See* <u>Superior Precast, Inc. v. Safeco Ins. Co. of America</u>, 71 F. Supp.2d 438, 451-54 (E.D. Pa. 1999) (finding that a surety could not be held liable as an insurer under Pennsylvania's bad faith statute).  "A defendant  who is not legally obligated to pay a claim and who does not make the decision to deny the claim cannot be liable for [bad faith].  That Federal [a defendant] and other affiliated companies use stationary with a common Chubb Group letterhead or forms copyrighted by defendant Chubb does not make [Chubb Group] a party to Plaintiff's insurance contract."   <u>Lockhart v. Federal Insurance Co.</u>, 1998 U.S. Dist. LEXIS 4046 (E.D. Pa.1998) (*Appendix*, at *Tab "29"*).

While the Certificate of Insurance issued to Mr. Hall contains the trademark "CUNA Mutual Group," the insurer is specifically defined as CUNA Mutual Insurance

Society.  The Certificate of Insurance states, in pertinent part, that, "**WE, US, OUR** or

**THE SOCIETY** means the CUNA Mutual Insurance Society of Madison, Wisconsin."

(**Appendix**, at **Tab "2"**).  Under the plain language of the Certificate, Mr. Hall had one,

and only one, insurer -- CUNA Mutual Insurance Society of Madison, Wisconsin.  CUNA

Mutual Group cannot be categorized as the "insurer," just because the trademark

"CUNA Mutual Group" appears on the Policy.  The term "CUNA Mutual Group" should

be stricken from the caption of the Amended Complaint.

### F.    No Cause of Action for Negligence

Throughout her Amended Complaint, Plaintiff alleges that CUNA is liable for

negligent claim handling, negligent misrepresentation, and negligence.  (Amended

Complaint, ¶20-24, 28, 31).  While the claims are phrased in terms of "negligence,"

Plaintiff's claims boil down to the alleged wrongful denial of benefits.  On or about

November 4, 1999, Mrs. Hall submitted her claim for benefits.  CUNA thereafter

collected medical records.  By letter dated February 10, 2000, CUNA denied the claim,

rescinded the Policy, and returned Mr. Hall's premiums.  (Amended Complaint, ¶19).

With the exception of the report to the Insurance Fraud Section (for which CUNA is

immune), Plaintiff alleges no wrongful conduct other than the denial of benefits.

"As a general rule, a life insurance company has no fiduciary obligation to the

beneficiary; their relationship is solely a matter of contract."  Benefit Trust Life Ins. Co. v.

Union Nat'l Bank of Pittsburgh, 776 F.2d 1174, 1177 (3rd Cir. 1985).  Moreover, it is

axiomatic that, "[b]reach of contract, without more, is not a tort."  Windsor Sec., Inc. v.

Hartford Life Ins. Co., 986 F.2d 655, 664 (3rd Cir. 1993).  In this case, Plaintiff is

attempting to transform an alleged breach of contract – denial of benefits – into a negligence claim.  She should not be permitted to do so.

"Pennsylvania courts use two methods to determine whether tort claims that accompany contract claims should be allowed as freestanding causes of action or rejected as illegitimate attempts to procure additional damages for a breach of contract: the 'gist of the action' test and the 'economic loss doctrine' test."  Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 103 (3rd Cir. 2001).  Under the gist of the action test, "courts examine the claim and determine whether the 'gist' or gravamen of it sounds in contract or tort; a tort claim is maintainable only if the contract is 'collateral' to conduct that is primarily tortious."  Sunquest Information Systems, Inc. v. Dean Witter Reynolds, Inc., 40 F. Supp.2d 644, 651 (W.D. Pa. 1999).  Under the economic loss doctrine, plaintiff is prohibited "from recovering in tort economic losses to which their entitlement flows only from a contract."  Bohler-Uddeholm America, Inc., 247 F.3d at 104.  A court may also sometimes speak in terms of misfeasance versus nonfeasance.  A court must then "determine whether there was an improper performance of a contractual obligation (misfeasance) or a mere failure to perform (nonfeasance); misfeasance gives rise to an action in tort, and nonfeasance does not."  Kearns v. Minnesota Mut. Life Ins. Co., 75 F. Supp.2d 413, 421 (E.D. Pa. 1999).

Plaintiff cannot maintain a cause of action in negligence under any of the tests described above.  First, under the "gist of the action" doctrine, the CUNA Policy is not collateral to the Plaintiff's claims.  It is the basis of all Plaintiff's allegations.  But for the existence of an insurance policy, CUNA would have no duties to Plaintiff, and Plaintiff would have no claims upon CUNA.  The fact that the law imposes additional duties

upon insurers does not change this fact. "It is clear that the [Unfair Insurance Practices Act] and the Department of Insurance Regulations can only be enforced by the State Insurance Commissioner and not by way of private action." Romano v. Nationwide Mut. Fire Ins. Co., 646 A.2d 1228, 1232 (Pa. Super. 1994).

Second, while this case does not involve an attempt to recover economic damages in tort, it involves the inverse situation, which is equally improper. Plaintiff is attempting to recover non-economic damages when their entitlement (if any) flows solely from the existence of a contract. In her Amended Complaint, Plaintiff alleges that, "Mrs. Hall was mentally and emotionally traumatized, suffered mental anguish and torment and, because of financial necessities resulting from the Defendant's wrongful conduct, is working as a live-in maid." (Amended Complaint, ¶28). Plaintiff then seeks to recover "compensatory, contractual, extra-contractual, economic and non-economic damages, pain and suffering, emotional trauma and all damages allowed in law and equity…." (Amended Complaint, Wherefore Clause).

"Under Pennsylvania law, courts generally award damages to the non-breaching party so as to place it in the economic position it would have occupied had the contract been performed." Fort Washington Resources, Inc. v. Tannen, 901 F. Supp. 932, 943 (E.D. Pa. 1995). "[W]here a contractual 'breach occurs, contract law seeks to give to the nonbreaching party the benefit of his or her bargain, to put him or her in the position he or she would have been in had there been no breach.'" Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 351 (3rd Cir. 2001) (underlining added); see also Reformed Church of the Ascension v. Theodore Hooven & Sons, Inc.,

764 A.2d 1106, 1109 (Pa. Super. 2000) (stating that, "The policy behind contract law is

to protect the parties' expectation interests.")

In the instant matter, Plaintiff's "benefit of the bargain," or expectation interest, is

the payout of the policy proceeds, and payoff of the mortgage amount.  Had the

Certificate of Insurance not been rescinded, that is the performance Plaintiff would have

received.  Plaintiff's alleged damages do <u>not</u> properly include pain and suffering

and emotional distress;[7] yet, those are precisely the damages that Plaintiff is attempting

to recover in the guise of a negligence claim.  "[U]nder Pennsylvania's common law of

contracts, Plaintiff may not claim emotional distress damages including mental anguish,

humiliation and injury to her feelings." <u>Hayfield v. Home Depot U.S.A., Inc.</u>, 168 F.

Supp.2d 436, 460 (E.D. Pa. 2001); <i>see also</i> <u>Krisa v. Equitable Life Assurance Soc'y</u>,

109 F. Supp.2d 316, 323 (M.D. Pa. 2000) (stating that, "'[A] plaintiff may not ordinarily

recover emotional distress damages arising from a breach of contract.'"); <u>Jean</u>

<u>Anderson Hierarchy of Agents v. Allstate Life Ins. Co.</u>, 2 F. Supp.2d 688, 694 (E.D. Pa.

1998).  "Pennsylvania law does not permit a claim for emotional distress for the mere

loss of money, no matter how traumatic." <u>Brooks v. Hickman</u>, 101 F.R.D. 19, 20 (W.D.

Pa. 1984).

Finally, with the exception of CUNA's report to the Insurance Fraud Section (for

which CUNA is immune), Plaintiff's allegations consist solely of nonfeasance, sounding

---

[7] The bad faith statute provides for an award of interest, punitive damages, court costs, and attorneys' fees.  It does <u>not</u> provide for an award of pain and suffering or emotional distress.  42 Pa. C.S.A. § 8371.  In <u>Birth Center v. St. Paul Companies, Inc.</u>, 787 A.2d 376 (Pa. 2001), the Supreme Court of Pennsylvania held that, "While The Birth Center may not recover compensatory damages based on Section 8371, that Section does not alter The Birth Center's common law contract rights." <u>Id.</u> at 386.

in contract, and not tort.  Plaintiff alleges that CUNA wrongfully failed to pay the claim (Amended Complaint, ¶17); failed to properly consider additional information received from Plaintiff (Amended Complaint, ¶21-22); failed to properly investigate (Amended Complaint, ¶27); and "in bad faith and unconscionably continue[d] to deny benefits and make payment" (Amended Complaint, ¶23).  Plaintiff's assertions address CUNA's alleged failures and omissions, not its affirmative conduct.

Plaintiff's claims for bad faith and fraud fail because they are not supported by the evidence.  Plaintiff's remaining claims sound in contract, and not tort.  As a result, summary judgment should be granted in favor of CUNA and against Plaintiff on Plaintiff's allegations of negligence.  Plaintiff is not entitled to recover extra-contractual damages, and her claims for pain and suffering and emotional trauma should be dismissed.

## VI.    CONCLUSION

For the foregoing reasons, Defendants request (1) that the Court grant the Motion for Partial Summary Judgment, (2) enter judgment in favor of CUNA and against Plaintiff on her bad faith claim(s), (3) enter judgment in favor of CUNA and against Plaintiff on the fraud claim, (4) enter judgment in favor of CUNA and against Plaintiff on the negligence claims, (5) enter judgment in favor of CUNA and against Plaintiff as to the claims for pain and suffering and emotional trauma, (6) dismiss Paragraphs 24 to 27 and 29 of Plaintiff's Amended Complaint, and (7) dismiss "CUNA Mutual Group" as a

defendant, and strike the term "CUNA Mutual Group," from the caption of the Amended Complaint.

MCNEES WALLACE & NURICK LLC

By _____
Michael R. Kelley
Charles T. Young
100 Pine Street
P.O. Box 1166
Harrisburg, PA 17108-1166
Phone: (717) 237-5322
Fax: (717) 237-5300

Attorneys for Defendants

Dated: August 30, 2002

34

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this date the foregoing document was served by U.S. first-class mail, postage prepaid, upon the following:

Stephen R. Pedersen, Esquire
214 Senate Avenue, Suite 602
Camp Hill, PA  17011

Catherine Mahady-Smith, Esquire
3115-A N. Front Street
Harrisburg, PA  17110

Michael R. Kelley

Attorney for Defendants

Dated:  August 30, 2002