ORIGINAL

FILED
HARRISBURG, PA

AUG 3 0 2002

MARY E. D'ANDREA, CLE
Per _____
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Nancy Hall, individually and as the Representative and Administratrix of the Estate of Tommy Hall, deceased, her husband, **Plaintiff** | : : : : : : | **CIVIL ACTION - LAW** |
| v. | : : | 1:01-CV-1265 |
| Cuna Mutual Group, Cuna Mutual Insurance Society, **Defendants** | : : : : | (Judge Christopher C. Conner) |

RECEIVED

AUG 30 2002

PER _____
HARRISBURG, PA.    DEPUTY CLER

---

### APPENDIX TO DEFENDANT'S
### BRIEF IN SUPPORT OF ITS
### MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Michael R. Kelley
Charles T. Young, Jr.
McNees Wallace & Nurick LLC
P.O. Box 1166
100 Pine Street
Harrisburg, PA 17108-1166
Phone: (717) 237-5322
Fax: (717) 237-5300

Dated: August **30**, 2002

# MEMBERS HOME MORTGAGE PROTECTION II APPLICATION
GROUP MORTGAGE INSURANCE

CERTIFICATE NO. 32534

PLEASE PRINT

**(A)** Name _Tommy Bob Hall II_
Address _517 Mt. Pleasant Rd_
_Fayetteville Pa. 17222_
Home Phone: (_717_) _352-9030_
Social Security # _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_
Date of Birth _5-12-55_  Age _43_  Sex M☒ F☐
  Month/Day/Year
Height _5'6"_  Weight _200_
Occupation _Truck Driver_

Borrower #1
Name _Nancy M. Hall_   Borrower #2 (Must be an individual who is jointly responsible for the loan)
Address _517 Mt. Pleasant Rd_
_Fayetteville Pa. 17222_
Home Phone: (_717_) _852-9030_
Social Security # _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_
Date of Birth _5-28-53_  Age _45_  Sex M☐ F☒
  Month/Day/Year
Height _5'3"_  Weight _165_
Occupation _Housewife_

**(B)**

| Borrower #1 | | Borrower #2 | | |
|---|---|---|---|---|
| Yes | No | Yes | No | |
| ☐ | ☒ | ☐ | ☒ | 1. Have you ever been treated for or diagnosed by a member of the medical profession as having any of the following (Please check the box and circle condition(s) that applies.) |

Diabetes; high blood pressure; chest pain; heart, blood, blood vessel, lung or breathing disorders; cancer; epilepsy; stroke; pneumonia(s); arthritis, brain, mental, nervous, back, neck, joint or muscular disorders; stomach, intestines, liver, pancreas, or kidney disorders, cirrhosis, drug or alcohol abuse, acquired immune deficiency syndrome or AIDS related complex, or tested positive for antibodies to the AIDS virus? (NOTE TO RESIDENTS OF ME, MN, VT AND WI: You do not have to disclose positive test results for the antibodies to the AIDS Virus.)

| | | | | |
|---|---|---|---|---|
| ☐ | ☒ | ☐ | ☒ | 2. During the past 3 years, have you for any reason been hospitalized? |
| ☐ | ☒ | ☐ | ☒ | 3. Have you used tobacco in any form within the past 24 months? |
| ☒ | — | — | ☒ | If Disability Coverage is Requested— |

4. Are you now gainfully employed on a full-time basis and presently working 25 hours a week or more? _PA._

Name and Address of Family Physician _Dr. Ernst Charlesworth 144 S 8th St. Chambersburg, 17201_

GIVE FULL DETAILS BELOW FOR ANY HEALTH PROBLEM INDICATED IN THIS SECTION.

| Name of Person | Name & Address of Physician | Nature of Condition | Dates & Duration |
|---|---|---|---|
| | | | |
| | | | |

**(C)** LIFE COVERAGE: ☒Single ☐Joint
1 Amount of Insurance Requested ... ... ... _$56,000.00_
  (Your loan balance, up to $250,000)
DISABILITY COVERAGE: ☐Single ☐Joint ☒No Coverage
1 Amount of Insurance Benefit Requested ... ... ...
  (Your monthly payment, up to $1,000 for single and $1 500 for joint coverage)

2. Life Insurance Charge ... ...
  (Refer to rate table)
Disability Insurance Charge ... ...
  (Refer to rate table)

NOTE: You must apply and be approved for LIFE to be eligible for DISABILITY coverage. If you select **Joint Disability**, coverage and benefits will be split equally between Borrower #1 and #2. If the insurance you applied for is approved, it will become effective on the date of approval or, if later, the effective date of the loan as shown on this Application.

**(D) CONSUMER PROTECTIVE AUTHORIZATION**
**Consumer Authorization Form**
These answers are true and complete to the best of my knowledge and belief. To determine my insurability, or for claims purposes, I authorize any medical practitioner or institution, insurance company or the Medical Information Bureau, Inc., Consumer Reporting Agency, or employer to give any information about my physical or mental health condition, treatment, or any non-medical information to CUNA Mutual Insurance Society, or its reinsurer I agree that this authorization shall be valid for 30 months from the application date. I have read the Consumer Privacy Notice pertaining to the Medical Information Bureau as required by the Fair Credit Reporting Act The Society shall incur no liability until this application is approved by the Society and the first premium paid.
By signing this application, I acknowledge that I understand that this policy contains a war exclusion. Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud
I authorize my financial institution to pay my insurance premiums as indicated above to CUNA Mutual Insurance Society by Electronic Funds Transfer from my credit union account or collect these premiums with my regular loan payment, according to my financial institutions discretion As my financial institution you will be fully protected by honoring these payments until you receive written notice from me cancelling this request.

X _Tommy Bob Hall II_  _11-18-98_
  SIGNATURE OF BORROWER #1   DATE

X _Nancy M Hall_  _11-18-98_
  SIGNATURE OF BORROWER #2   DATE

**(E) TO BE COMPLETED BY LENDER OR SERVICING FIRM**
Mortgageholder's Name _Patriot Federal Credit Union_
Contract No _037-1486-6_
Member Account No _67-103537220_
Original Loan Term _80 yrs_
Months To Run _360_
Loan Balance After Last Payment _55,951.79_

B3f-902-0394

Date Last Payment Was Made _Jan. 1, 1999_
Monthly Principal And Interest _$___  (at New Date of First Payment)
Total Monthly Mortgage Payment _$303.21_
APR _6.75_
Loan Effective Date _Jan 1, 1999_  (closed Nov. 18, 98)
Is this application to replace or amend an existing Group Mortgage Insurance Certificate? ☐Yes ☒No

83d-900-0987

I/we understand that this insurance is optional and is not a condition or requirement for approval of my/our loan  My monthly premium will be $_____ x 12 = an estimated annual premium of $_____.

HMP  DEC 01 1998

**⚭ CUNA MUTUAL GROUP**
CUNA Mutual Insurance Society

P.O. Box 391, 5910 Mineral Point Road
Madison, WI 53701-0391

D0001

# CERTIFICATION — CERTIFICATE OF INSURANCE

I, Steve B. Elliott, Assistant Vice President, Order Fulfillment, of CUNA Mutual Insurance Society, Madison, Wisconsin, do hereby certify and attest that attached hereto is a true and correct specimen copy of the Member's Application (form number 1206-P1188 (05/96) STD 10/11) and Certificate of Insurance (form number B3d-900-0987) that was issued on January 1, 1999, and subsequently rescinded under the Group Mortgage Insurance Decreasing Term Life or Decreasing Term Life and Disability Policy between Tommy B. Hall of Fayetteville, Pennsylvania and CUNA Mutual Insurance Society.

# CERTIFICATION — POLICY

I, Steve B. Elliott, Assistant Vice President, Order Fulfillment, of CUNA Mutual Insurance Society, Madison, Wisconsin, do hereby certify and attest that attached hereto is a true and correct specimen copy of the Credit Insurance Policy (form number B3a-900-0987) issued to the Patriot Federal Credit Union of Pennsylvania, and that said policy is the exact agreement of insurance between the said Credit Union and CUNA Mutual Insurance Society on the 1st day of January 1999.

Steve B. Elliott,  Assistant Vice President
Order Fulfillment

State of Wisconsin )
                          )   ss
County of Dane     )

Subscribed and sworn to before me this 31st
     day of August, 2001

Notary Public, Dane County, Wisconsin
Date of Expiration  June 6, 2004

D0012

 

**CUNA MUTUAL GROUP**

*CUNA Mutual Insurance Society*

P.O. Box 391 • 5910 Mineral Point Road
Madison, WI 53701-0391
Phone: 608/238-5851

## COVERAGE SCHEDULE
### Group Mortgage Insurance
### Decreasing Term Life

| POLICYHOLDER | CERTIFICATE NUMBER |
|---|---|
| PATRIOT FEDERAL CREDIT UNION<br>800 WAYNE AVE<br>PO BOX 778<br>CHAMBERSBURG PA 17201-0778 | 00032534<br><br>037-1485-6   000 |

| EFFECTIVE DATE OF INSURANCE | TERM OF INSURANCE |
|---|---|
| 01/01/1999 | SEE SCHEDULE OF BENEFITS |

### INSURED DEBTOR
(Eligible Debtor No.1)

TOMMY B HALL
517 MT PLEASANT RD
FAYETTEVILLE, PA 17222

### DATE OF BIRTH
05/12/1955

### INSURANCE COVERAGE

Decreasing Term Life     YES

### AMOUNT OF INSURANCE ELECTED

Initial Amount of Decreasing Term Life     $  55,951.79

D0013

1206-159 (7/96)

 **CUNA MUTUAL GROUP**
*CUNA Mutual Insurance Society*

### Group Mortgage Insurance
### Schedule of Life Insurance Benefits

PAGE 1 OF 3

| | | |
|---|---|---|
| APR | 6.75% |
| Payment | $363.21 |
| Balance | $55951.79 |
| As of | JAN 1, 1999 |
| Coverage requested | $55951.79 |

INSURED
**TOMMY B HALL**

CERTIFICATE NUMBER
**00032534**

| | |
|---|---|
| Effective date | JAN 1, 1999 |
| Initial balance | $55951.79 |
| Months insured | 359 |
| Schedule | 100% |

| PERIOD | BENEFIT | PERIOD | BENEFIT | PERIOD | BENEFIT | PERIOD | BENEFIT |
|---|---|---|---|---|---|---|---|
| JAN 1999 | 55960.00 | JAN 2002 | 54030.00 | JAN 2005 | 51670.00 | JAN 2008 | 48780.00 |
| FEB 1999 | 55910.00 | FEB 2002 | 53970.00 | FEB 2005 | 51590.00 | FEB 2008 | 48690.00 |
| MAR 1999 | 55860.00 | MAR 2002 | 53910.00 | MAR 2005 | 51520.00 | MAR 2008 | 48600.00 |
| APR 1999 | 55810.00 | APR 2002 | 53850.00 | APR 2005 | 51450.00 | APR 2008 | 48510.00 |
| MAY 1999 | 55760.00 | MAY 2002 | 53790.00 | MAY 2005 | 51370.00 | MAY 2008 | 48420.00 |
| JUN 1999 | 55710.00 | JUN 2002 | 53730.00 | JUN 2005 | 51300.00 | JUN 2008 | 48330.00 |
| JUL 1999 | 55660.00 | JUL 2002 | 53670.00 | JUL 2005 | 51230.00 | JUL 2008 | 48240.00 |
| AUG 1999 | 55610.00 | AUG 2002 | 53610.00 | AUG 2005 | 51150.00 | AUG 2008 | 48150.00 |
| SEP 1999 | 55560.00 | SEP 2002 | 53540.00 | SEP 2005 | 51080.00 | SEP 2008 | 48050.00 |
| OCT 1999 | 55510.00 | OCT 2002 | 53480.00 | OCT 2005 | 51000.00 | OCT 2008 | 47960.00 |
| NOV 1999 | 55460.00 | NOV 2002 | 53420.00 | NOV 2005 | 50920.00 | NOV 2008 | 47870.00 |
| DEC 1999 | 55410.00 | DEC 2002 | 53360.00 | DEC 2005 | 50850.00 | DEC 2008 | 47770.00 |
| JAN 2000 | 55360.00 | JAN 2003 | 53290.00 | JAN 2006 | 50770.00 | JAN 2009 | 47680.00 |
| FEB 2000 | 55300.00 | FEB 2003 | 53230.00 | FEB 2006 | 50690.00 | FEB 2009 | 47580.00 |
| MAR 2000 | 55250.00 | MAR 2003 | 53170.00 | MAR 2006 | 50610.00 | MAR 2009 | 47490.00 |
| APR 2000 | 55200.00 | APR 2003 | 53100.00 | APR 2006 | 50530.00 | APR 2009 | 47390.00 |
| MAY 2000 | 55150.00 | MAY 2003 | 53040.00 | MAY 2006 | 50460.00 | MAY 2009 | 47300.00 |
| JUN 2000 | 55090.00 | JUN 2003 | 52970.00 | JUN 2006 | 50380.00 | JUN 2009 | 47200.00 |
| JUL 2000 | 55040.00 | JUL 2003 | 52910.00 | JUL 2006 | 50300.00 | JUL 2009 | 47100.00 |
| AUG 2000 | 54990.00 | AUG 2003 | 52840.00 | AUG 2006 | 50220.00 | AUG 2009 | 47000.00 |
| SEP 2000 | 54930.00 | SEP 2003 | 52780.00 | SEP 2006 | 50140.00 | SEP 2009 | 46900.00 |
| OCT 2000 | 54880.00 | OCT 2003 | 52710.00 | OCT 2006 | 50050.00 | OCT 2009 | 46800.00 |
| NOV 2000 | 54820.00 | NOV 2003 | 52640.00 | NOV 2006 | 49970.00 | NOV 2009 | 46700.00 |
| DEC 2000 | 54770.00 | DEC 2003 | 52580.00 | DEC 2006 | 49890.00 | DEC 2009 | 46600.00 |
| JAN 2001 | 54710.00 | JAN 2004 | 52510.00 | JAN 2007 | 49810.00 | JAN 2010 | 46500.00 |
| FEB 2001 | 54660.00 | FEB 2004 | 52440.00 | FEB 2007 | 49720.00 | FEB 2010 | 46400.00 |
| MAR 2001 | 54600.00 | MAR 2004 | 52370.00 | MAR 2007 | 49640.00 | MAR 2010 | 46300.00 |
| APR 2001 | 54550.00 | APR 2004 | 52300.00 | APR 2007 | 49560.00 | APR 2010 | 46200.00 |
| MAY 2001 | 54490.00 | MAY 2004 | 52230.00 | MAY 2007 | 49470.00 | MAY 2010 | 46090.00 |
| JUN 2001 | 54430.00 | JUN 2004 | 52160.00 | JUN 2007 | 49390.00 | JUN 2010 | 45990.00 |
| JUL 2001 | 54380.00 | JUL 2004 | 52090.00 | JUL 2007 | 49300.00 | JUL 2010 | 45880.00 |
| AUG 2001 | 54320.00 | AUG 2004 | 52020.00 | AUG 2007 | 49220.00 | AUG 2010 | 45780.00 |
| SEP 2001 | 54260.00 | SEP 2004 | 51950.00 | SEP 2007 | 49130.00 | SEP 2010 | 45670.00 |
| OCT 2001 | 54200.00 | OCT 2004 | 51880.00 | OCT 2007 | 49040.00 | OCT 2010 | 45570.00 |
| NOV 2001 | 54150.00 | NOV 2004 | 51810.00 | NOV 2007 | 48960.00 | NOV 2010 | 45460.00 |
| DEC 2001 | 54090.00 | DEC 2004 | 51740.00 | DEC 2007 | 48870.00 | DEC 2010 | 45350.00 |

D0014

1206-159 (7/96)

 

**CUNA MUTUAL GROUP**
*CUNA Mutual Insurance Society*

## Group Mortgage Insurance
## Schedule of Life Insurance Benefits

PAGE 2 OF 3

| | | |
|---|---|---|
| | APR | 6.75% |
| | Payment | $363.21 |
| | Balance | $55951.79 |
| | As of | JAN 1, 1999 |
| | Coverage requested | $55951.79 |

INSURED
**TOMMY B HALL**

CERTIFICATE NUMBER
**00032534**

| | |
|---|---|
| Effective date | JAN 1, 1999 |
| Initial balance | $55951.79 |
| Months insured | 359 |
| Schedule | 100% |

| PERIOD | BENEFIT | PERIOD | BENEFIT | PERIOD | BENEFIT | PERIOD | BENEFIT |
|--------|---------|--------|---------|--------|---------|--------|---------|
| JAN 2011 | 45240.00 | JAN 2014 | 40920.00 | JAN 2017 | 35620.00 | JAN 2020 | 29150.00 |
| FEB 2011 | 45140.00 | FEB 2014 | 40780.00 | FEB 2017 | 35460.00 | FEB 2020 | 28950.00 |
| MAR 2011 | 45030.00 | MAR 2014 | 40650.00 | MAR 2017 | 35300.00 | MAR 2020 | 28750.00 |
| APR 2011 | 44920.00 | APR 2014 | 40520.00 | APR 2017 | 35130.00 | APR 2020 | 28540.00 |
| MAY 2011 | 44810.00 | MAY 2014 | 40380.00 | MAY 2017 | 34970.00 | MAY 2020 | 28340.00 |
| JUN 2011 | 44690.00 | JUN 2014 | 40250.00 | JUN 2017 | 34800.00 | JUN 2020 | 28140.00 |
| JUL 2011 | 44580.00 | JUL 2014 | 40110.00 | JUL 2017 | 34630.00 | JUL 2020 | 27930.00 |
| AUG 2011 | 44470.00 | AUG 2014 | 39970.00 | AUG 2017 | 34460.00 | AUG 2020 | 27730.00 |
| SEP 2011 | 44360.00 | SEP 2014 | 39830.00 | SEP 2017 | 34300.00 | SEP 2020 | 27520.00 |
| OCT 2011 | 44240.00 | OCT 2014 | 39690.00 | OCT 2017 | 34120.00 | OCT 2020 | 27310.00 |
| NOV 2011 | 44130.00 | NOV 2014 | 39550.00 | NOV 2017 | 33950.00 | NOV 2020 | 27100.00 |
| DEC 2011 | 44010.00 | DEC 2014 | 39410.00 | DEC 2017 | 33780.00 | DEC 2020 | 26890.00 |
| JAN 2012 | 43900.00 | JAN 2015 | 39270.00 | JAN 2018 | 33610.00 | JAN 2021 | 26680.00 |
| FEB 2012 | 43780.00 | FEB 2015 | 39130.00 | FEB 2018 | 33430.00 | FEB 2021 | 26470.00 |
| MAR 2012 | 43660.00 | MAR 2015 | 38990.00 | MAR 2018 | 33260.00 | MAR 2021 | 26250.00 |
| APR 2012 | 43550.00 | APR 2015 | 38840.00 | APR 2018 | 33080.00 | APR 2021 | 26040.00 |
| MAY 2012 | 43430.00 | MAY 2015 | 38700.00 | MAY 2018 | 32910.00 | MAY 2021 | 25820.00 |
| JUN 2012 | 43310.00 | JUN 2015 | 38550.00 | JUN 2018 | 32730.00 | JUN 2021 | 25600.00 |
| JUL 2012 | 43190.00 | JUL 2015 | 38400.00 | JUL 2018 | 32550.00 | JUL 2021 | 25380.00 |
| AUG 2012 | 43070.00 | AUG 2015 | 38260.00 | AUG 2018 | 32370.00 | AUG 2021 | 25160.00 |
| SEP 2012 | 42950.00 | SEP 2015 | 38110.00 | SEP 2018 | 32190.00 | SEP 2021 | 24940.00 |
| OCT 2012 | 42830.00 | OCT 2015 | 37960.00 | OCT 2018 | 32000.00 | OCT 2021 | 24720.00 |
| NOV 2012 | 42700.00 | NOV 2015 | 37810.00 | NOV 2018 | 31820.00 | NOV 2021 | 24490.00 |
| DEC 2012 | 42580.00 | DEC 2015 | 37660.00 | DEC 2018 | 31640.00 | DEC 2021 | 24270.00 |
| JAN 2013 | 42460.00 | JAN 2016 | 37510.00 | JAN 2019 | 31450.00 | JAN 2022 | 24040.00 |
| FEB 2013 | 42330.00 | FEB 2016 | 37360.00 | FEB 2019 | 31270.00 | FEB 2022 | 23810.00 |
| MAR 2013 | 42210.00 | MAR 2016 | 37200.00 | MAR 2019 | 31080.00 | MAR 2022 | 23580.00 |
| APR 2013 | 42080.00 | APR 2016 | 37050.00 | APR 2019 | 30890.00 | APR 2022 | 23350.00 |
| MAY 2013 | 41960.00 | MAY 2016 | 36890.00 | MAY 2019 | 30700.00 | MAY 2022 | 23120.00 |
| JUN 2013 | 41830.00 | JUN 2016 | 36740.00 | JUN 2019 | 30510.00 | JUN 2022 | 22890.00 |
| JUL 2013 | 41700.00 | JUL 2016 | 36580.00 | JUL 2019 | 30320.00 | JUL 2022 | 22650.00 |
| AUG 2013 | 41570.00 | AUG 2016 | 36420.00 | AUG 2019 | 30130.00 | AUG 2022 | 22420.00 |
| SEP 2013 | 41440.00 | SEP 2016 | 36270.00 | SEP 2019 | 29930.00 | SEP 2022 | 22180.00 |
| OCT 2013 | 41310.00 | OCT 2016 | 36110.00 | OCT 2019 | 29740.00 | OCT 2022 | 21940.00 |
| NOV 2013 | 41180.00 | NOV 2016 | 35950.00 | NOV 2019 | 29540.00 | NOV 2022 | 21700.00 |
| DEC 2013 | 41050.00 | DEC 2016 | 35790.00 | DEC 2019 | 29340.00 | DEC 2022 | 21460.00 |

D0015

 

## CUNA MUTUAL GROUP
*CUNA Mutual Insurance Society*

### Group Mortgage Insurance
### Schedule of Life Insurance Benefits

PAGE 3 OF 3

| | |
|---|---|
| APR | 6.75% |
| Payment | $363.21 |
| Balance | $55951.79 |
| As of | JAN 1, 1999 |
| Coverage requested | $55951.79 |

INSURED
**TOMMY B HALL**

CERTIFICATE NUMBER
00032534

| | |
|---|---|
| Effective date | JAN 1, 1999 |
| Initial balance | $55951.79 |
| Months insured | 71 |
| Schedule | 100% |

| PERIOD | BENEFIT | PERIOD | BENEFIT | PERIOD | BENEFIT | PERIOD | BENEFIT |
|---|---|---|---|---|---|---|---|
| JAN 2023 | 21220.00 | JUL 2024 | 16610.00 | JAN 2026 | 11520.00 | JUL 2027 | 5880.00 |
| FEB 2023 | 20970.00 | AUG 2024 | 16340.00 | FEB 2026 | 11220.00 | AUG 2027 | 5550.00 |
| MAR 2023 | 20730.00 | SEP 2024 | 16070.00 | MAR 2026 | 10920.00 | SEP 2027 | 5220.00 |
| APR 2023 | 20480.00 | OCT 2024 | 15800.00 | APR 2026 | 10610.00 | OCT 2027 | 4880.00 |
| MAY 2023 | 20230.00 | NOV 2024 | 15520.00 | MAY 2026 | 10310.00 | NOV 2027 | 4550.00 |
| JUN 2023 | 19980.00 | DEC 2024 | 15250.00 | JUN 2026 | 10010.00 | DEC 2027 | 4210.00 |
| JUL 2023 | 19730.00 | JAN 2025 | 14970.00 | JUL 2026 | 9700.00 | JAN 2028 | 3870.00 |
| AUG 2023 | 19480.00 | FEB 2025 | 14690.00 | AUG 2026 | 9390.00 | FEB 2028 | 3530.00 |
| SEP 2023 | 19230.00 | MAR 2025 | 14410.00 | SEP 2026 | 9080.00 | MAR 2028 | 3180.00 |
| OCT 2023 | 18970.00 | APR 2025 | 14130.00 | OCT 2026 | 8770.00 | APR 2028 | 2840.00 |
| NOV 2023 | 18720.00 | MAY 2025 | 13840.00 | NOV 2026 | 8450.00 | MAY 2028 | 2490.00 |
| DEC 2023 | 18460.00 | JUN 2025 | 13560.00 | DEC 2026 | 8140.00 | JUN 2028 | 2140.00 |
| JAN 2024 | 18200.00 | JUL 2025 | 13270.00 | JAN 2027 | 7820.00 | JUL 2028 | 1790.00 |
| FEB 2024 | 17940.00 | AUG 2025 | 12980.00 | FEB 2027 | 7500.00 | AUG 2028 | 1440.00 |
| MAR 2024 | 17680.00 | SEP 2025 | 12690.00 | MAR 2027 | 7180.00 | SEP 2028 | 1080.00 |
| APR 2024 | 17410.00 | OCT 2025 | 12400.00 | APR 2027 | 6860.00 | OCT 2028 | 730.00 |
| MAY 2024 | 17150.00 | NOV 2025 | 12110.00 | MAY 2027 | 6530.00 | NOV 2028 | 370.00 |
| JUN 2024 | 16880.00 | DEC 2025 | 11810.00 | JUN 2027 | 6210.00 | | |

D0016

1206-159 (7/96)



**℞. CUNA MUTUAL GROUP**

*CUNA Mutual Insurance Society*

P.O. Box 391 ▪ 5910 Mineral Point Road
Madison, WI 53701-0391
Phone: 800/937-2644

# CERTIFICATE OF INSURANCE

### Group Mortgage Insurance
### Decreasing Term Life or Decreasing Term Life and Disability

Within 15 days after you receive this Certificate, you have the right to return the Certificate to the Policyholder for cancellation and any Monthly Insurance Charge paid by you or your Joint Insured Debtor will be immediately returned.

We certify that while We are paid the premiums for the Group Policy as they become due, that the Insured Debtor and/or Joint Insured Debtor are included for coverage marked in the Schedule, subject to the terms of the Group Policy.

## DEFINITIONS

As used in this Certificate, these words have the following meaning:

**HE, HIM, HIMSELF** or **HIS** means also she, her, herself or hers.

**INJURY** means accidental bodily injury which causes the Insured Debtor or Joint Insured Debtor to become Totally Disabled while under the Policy and requires the regular care of a licensed physician other than himself.

**INSURED DEBTOR** means the Eligible Debtor No. 1 on the application for insurance and who is approved by Us for insurance under the Policy and pays the required Monthly Insurance Charges. The Insured Debtor is also referred to as "you" or "your" in this Certificate.

**JOINT INSURED DEBTOR** means the Eligible Debtor No. 2 on the application for insurance and who is approved by Us for insurance under the Policy and pays the required Monthly Insurance Charges. The Joint Insured Debtor is referred to as "Joint Insured Debtor" in this Certificate.

**MONTHLY MORTGAGE PAYMENT** means the normal scheduled monthly payment of principal and interest at the time of application for insurance.

**SICKNESS** means a disease or illness which causes the Insured Debtor or the Joint Insured Debtor to become Totally Disabled while insured under the Policy and requires the care of a licensed physician other than himself.

**TOTAL DISABILITY** during the first 12 consecutive months of Total Disability, Total Disability means that the Insured Debtor or Joint Insured Debtor is not able to perform the usual duties of his occupation because of a medically determined Sickness or Injury. After the first 12 consecutive months of Total Disability, the definition changes and requires that the Insured Debtor or Joint Insured Debtor not be able to perform the duties of any occupation for which he is reasonably qualified by education, training or experience.

**RECURRENT DISABILITY** means successive periods of Total Disability due to the same or related cause unless separated by a 6-month period of continuous full-time work in a gainful occupation.

**YOU** or **YOUR** means the Insured Debtor.

**WE, US, OUR** or **THE SOCIETY** means the CUNA Mutual Insurance Society of Madison, Wisconsin.

## LIFE INSURANCE BENEFIT

We will pay a life insurance benefit, subject to the terms of the Policy, if you or your Joint Insured Debtor die while insured under the Policy. Upon receipt of proof of death of you or your Joint Insured Debtor (whichever occurs first), We will pay the Amount of Insurance Benefit to the Policyholder, to reduce or pay off the Mortgage Loan. Any excess benefits will be paid to the beneficiary named, if any, by you, otherwise to your estate. Payment will completely discharge Our liability to the extent of the amount paid.

**AMOUNT OF INSURANCE BENEFIT.** The Amount of Insurance Benefit will include accrued loan interest from the date of death to the last loan payment due date prior to death (not to exceed 30 days). It will not include any amounts of principal or other charges on the Mortgage Loan which are due and unpaid or delinquent. The Amount of Insurance Benefit will be calculated under one of the following:

D0017

B3d-900-0987PA

- If the initial amount of the Insured Debtor's Mortgage Loan is not in excess of $250,000 and he applied for an Initial Amount of Insurance equal to the initial amount of his Mortgage Loan, the amount of insurance benefit will be the unpaid scheduled principal balance of his Mortgage Loan on the date of his death, or the date of death of the Joint Insured Debtor, whichever occurs first.

- If the initial amount of the Insured Debtor's Mortgage Loan is in excess of $250,000, and he applied for an Initial Amount of Insurance of $250,000, the amount of insurance benefit will be equal to $250,000, divided by the initial amount of his Mortgage Loan, times the unpaid scheduled principal balance of his Mortgage Loan on the date of his death, or the date of death of the Joint Insured Debtor, whichever occurs first.

- If the Insured Debtor applied for an Initial Amount of Insurance which is less than the initial amount of his Mortgage Loan, the amount of insurance benefits will be equal to the Initial Amount of Insurance applied for, divided by the initial amount of his Mortgage Loan, times the unpaid scheduled principal balance of the Mortgage Loan on the date of his death, or the date of death of the Joint Insured Debtor, whichever occurs first.

**EXCLUSIONS.** We will return the Monthly Insurance Charges paid by you and no death benefit is payable if you or your Joint Insured Debtor dies as the result of:

   a.   suicide, while sane or insane, within 2 years after becoming insured under the Policy; or
   b.   an act of war; or
   c.   air travel other than as a pilot, crew member or passenger on a scheduled flight on a commercial airline.

In the case of joint life coverage, the refund of premium will equal the difference between the premium actually charged for the joint life coverage and the premium that would have been charged if only single life coverage had been provided at the time the insurance was issued. Life insurance on the survivor may continue and the joint life certificate which was issued will be replaced with a single life certificate.

**JOINT LIFE INSURANCE.** In the case of joint life insurance, the Amount of Insurance Benefit applies to the first of you or your Joint Insured Debtor to die. Only one death benefit, however, will be paid and insurance on the survivor will terminate.

**SIMULTANEOUS DEATH.** If both you and your Joint Insured Debtor die simultaneously, the Amount of Insurance Benefit will be divided equally between you and your Joint Insured Debtor. Any excess benefits will be paid to the beneficiary named, if any, by you, otherwise to your estate.

**PROOF OF LOSS.** The Policyholder will furnish proof of death to Us. The Policyholder must also furnish a statement as to the amount of the indebtedness of the Mortgage Loan.

**AUTOPSY.** We, at our own expense, have the right to require an autopsy in case of death, if it is not forbidden by law.

## DISABILITY INSURANCE BENEFIT

If disability insurance has been elected and you or your Joint Insured Debtor become Totally Disabled while insured under the Policy, We will pay a Monthly Disability Benefit subject to the terms of the Policy, when We receive written proof of Total Disability. All benefits under the Policy will be paid to the Policyholder to reduce or extinguish the Mortgage Loan.

**NON-RETROACTIVE BENEFITS.** You or your Joint Insured Debtor must be Totally Disabled for more than the period stated in the Schedule. Payment will be calculated beginning with the day shown in the Schedule.

**AMOUNT OF INSURANCE BENEFIT.** The Monthly Disability Benefit that We will pay for you or your Joint Insured Debtor's Total Disability will be the amount stated in your application for insurance under the Policy and which is also stated in the Schedule. This amount will remain the same while you or your Joint Insured Debtor are insured under the Policy, subject to the Monthly Disability Benefit. Payment Period provision and your right to reapply for a new amount of Monthly Disability Benefit.

**MONTHLY DISABILITY BENEFIT PAYMENT PERIOD.** The Monthly Disability Benefit payments are subject to a Maximum Number of Months, for any period of Total Disability. If you and your Joint Insured Debtor are both insured, this maximum will be applied separately to each of you. The limitations are as follows:

| If Total Disability Begins | Maximum Number of Months of Monthly Disability Benefit Payments |
|---|---|
| Prior to age 30 | 66 months |
| On or after age 30 and prior to age 35 | 48 months |
| On or after age 35 and prior to age 40 | 36 months |
| On or after age 40 and prior to age 45 | 24 months |
| On or after age 45 and prior to age 50 | 18 months |
| On or after age 50 and prior to age 55 | 12 months |
| On or after age 55 and prior to age 65 | 6 months |

D0018

Payment of the Monthly Disability Benefit to you and your Joint Insured Debtor, to the Maximum Number of Months as stated above, will discharge Our liability to the extent of the amount paid for that period of Total Disability.

**RECURRENT DISABILITY.** If your Total Disability or that of your Joint Insured Debtor recurs WITHIN 6 MONTHS after recovery from that period of Total Disability, We will consider this a continuation of that period of Total Disability. However, if such Total Disability recurs MORE THAN 6 MONTHS after recovery, We will consider it a new period of Total Disability.

**EXCLUSIONS.** We will not pay a benefit if you or your Joint Insured Debtor become Totally Disabled as the direct or indirect result of:

   a.  an intentionally self-inflicted injury; or
   b.  normal pregnancy; or
   c.  an act of war, or participation in a riot, crime or felony; or
   d.  air travel other than as a pilot, crew member or passenger on a scheduled flight on a commercial airline.

**TERMINATION OF DISABILITY BENEFIT PAYMENTS.** Our Monthly Disability Benefit payments for Total Disability will terminate on the earliest of the following dates. This provision applies separately to you and to your Joint Insured Debtor.

   a.  the date the Mortgage Loan is paid off; or
   b.  the date you or your Joint Insured Debtor are not Totally Disabled any more; or
   c.  the date We have made payments to the Maximum Number of Months of Disability Benefit Payments, based on the age when disability began; or
   d.  the date of death.

**PROOF OF DISABILITY.** You must contact your credit union or the Policyholder about a Total Disability claim when you or your Joint Insured Debtor are eligible for benefits. Your credit union or the Policyholder will provide you with claim forms or you can simply send Us written proof of Total Disability. That proof must show the date and the cause of the Total Disability and how serious it is, and it must be signed by a physician or a chiropractor. The initial proof should be for the initial period of Total Disability, after you or your Joint Insured Debtor have been Totally Disabled for more than the period stated in the Schedule. After that, We will require proof of continued Total Disability, from time to time.

You must send proof to Us within 90 days after Total Disability stops. If you cannot send proof to Us within 90 days, you must do so as soon as you can. Unless you have been legally incapable of filing proof of Total Disability, We won't accept it if it is filed after 1 year from the time it should have been filed. You can't start any legal action until 60 days after you send Us proof of your Total Disability and you can't start any legal action more than 3 years after you send the proof.

**PHYSICAL EXAMINATION.** We have the right to have a physician examine you or your Joint Insured Debtor as often as may be reasonably required while the claim continues.

**REAPPLICATION FOR INCREASE IN THE MONTHLY DISABILITY BENEFIT.** You and Your Joint Insured Debtor may reapply at any time (except if either you or your Joint Insured Debtor are Totally Disabled) for an increase in the amount of Monthly Disability Benefit. To reapply, you and your Joint Insured Debtor must be able to meet the Eligibility requirements for insurance under the Policy, and submit a new application for insurance which must be approved by Us. If the application for insurance is approved by Us, the increase in the amount of Monthly Disability Benefit and the new Monthly Insurance Charge for you and your Joint Insured Debtor will become effective on the date stated by Us (in accordance with the Effective Date of Insurance provision of the Policy). Such increase in the amount of Monthly Disability Benefit will be treated as new insurance and will be subject to all of the terms of the Policy, including the Exclusions section of the Disability Insurance and General Provisions section.

## TERMINATION OF LIFE AND DISABILITY INSURANCE

Insurance on you or your Joint Insured Debtor will terminate on the earliest of the following:

   a.  the date the Mortgage Loan is paid in full; or
   b.  the date the Policy is terminated; or
   c.  31 days after the due date of any Monthly Insurance Charges that are not paid by you or your Joint Insured Debtor; or
   d.  the date of transfer of all of your interest or that of your Joint Insured Debtor in the loan security; or
   e.  for your disability insurance on attainment of your 65th birthday; for disability insurance on your Joint Insured Debtor, on attainment of his 65th birthday; or
   f.  the date of your death or that of your Joint Insured Debtor.

Termination of insurance will be without prejudice to any valid claim arising prior to termination.

**RIGHT TO CONVERT.** If the life insurance on you and your Joint Insured Debtor terminates for any reason except non-payment of your monthly insurance charge, and you continue to be indebted on the loan for which you were insured, you will be entitled to convert the amount of life insurance that was terminated to an individual policy of life insurance, other than term, issued by Us. In order to convert coverage without evidence of insurability, application must be made to Us for the individual policy within 31 days of termination of the group insurance.

Any individual policy of life insurance will be for an amount equal to or smaller than the amount of life insurance that was in effect on the date of termination of the group insurance. The premium rate for the individual policy of life insurance shall be at Our rate then applicable to the:

   a. form and amount of the individual policy, and
   b. class of risk to which you belong, and
   c. your attained age on the effective date of such individual policy.

If you or your Joint Insured Debtor dies during this 31 day conversion period, and before an Individual policy is effective, We will pay the amount of life insurance which you would have been entitled to have issued to you on an individual policy basis, whether or not you had applied for the individual policy or paid the first premium.

## REINSTATEMENT OF LIFE INSURANCE

If you or your Joint Insured Debtor do not pay a required Monthly Insurance Charge within 31 days of its due date, insurance will terminate. Insurance that terminated because the required Monthly Insurance Charge was not paid during the 31 day grace period, may be reinstated without evidence of insurability if all Monthly Insurance Charges that are past due are paid during the 31 days immediately following the grace period. This is called the reinstatement period.

If insurance is desired again after the 31 day period for reinstatement has expired, a new application for insurance must be submitted to Us. The application will be treated as a new application for insurance, it must be approved by Us and it will be subject to all of the terms of the Policy.

If a debtor has requested his insurance to be reinstated and subsequently, a valid death claim is incurred during the reinstatement period, any Monthly Insurance Charges that are past due will be deducted from our benefit payment.

## GENERAL PROVISIONS — LIFE AND DISABILITY INSURANCE

The Group Policy, the Application for the Group Policy and any attached Rider or Endorsement, is the entire insurance contract. All statements made by you or your Joint Insured Debtor are considered representations and not warranties. No statement can be used to void this insurance or deny a claim unless that statement is signed by you or your Joint Insured Debtor and a copy given to you or your Joint Insured Debtor. After 2 years from the Effective Date of insurance for you and your Joint Insured Debtor, no statement made by you or your Joint Insured Debtor can be used to void this insurance or deny a claim. If coverage on one of the Joint Insured Debtor's is terminated because of contestability, the appropriate portion of the premium will be returned and coverage on the other Joint Insured Debtor will continue on a single debtor basis. The refund of premium will equal the difference between the premium actually charged for the joint coverage and the premium that would have been charged if only single coverage had been provided at the time the insurance was issued. The joint coverage certificate which was issued will then be replaced with a single coverage certificate.

| | |
|---|---|
| **MISSTATEMENT OF AGE OR OTHER DATA** | If the date of birth, amount of loan, amount of insurance or any other relevant data is found to be misstated, such that insurance would not have been issued had the true date of birth or other data been stated and the Society discovers this during the contestable period, Our liability will be limited to a return of premiums paid by the Debtor. |

If a misstatement of age is discovered after the contestable period, The Society will make the following adjustments:

### Life Insurance

If the Debtor's true age is 69 or less, the monthly insurance charge will be adjusted to reflect his true age.

If the Debtor's true age is 70 or over, the monthly insurance charge will be adjusted to reflect the monthly insurance charge for age group 64-69. In addition, there will be a reduction in the Benefit as follows:

| True Age | Benefit Reduction |
|---|---|
| 70-74 | 35% |
| 75-79 | 60% |
| 80 and over | 75% |

### Disability Insurance

If the Debtor's true age is 56 or over, The Society's liability will be limited to a refund of all monthly insurance charges paid by the Debtor.

If the Debtor's true age is 56, benefits will be adjusted to reflect his true age, and will conform to the "Monthly Disability Benefit Payment Period" provision of the Policy.

**MONTHLY INSURANCE CHARGE.** ● and your Joint Insured Debtor are required to pay a Monthly Insurance Charge in order to keep the insurance in force. The Monthly Insurance Charge is stated on your application for insurance which is attached to this Certificate. We have the right to change the premium rate applicable to insurance provided under the Policy.

For Life Insurance, the Monthly Insurance Charge is based on your age at the time you applied for insurance and the amount of insurance requested. For Disability insurance, the Monthly Insurance Charge is determined by multiplying the monthly rate by the amount of your Monthly Disability Benefit.

The Policy provides for a reduction in your Monthly Insurance Charge for life insurance if there is an accumulated prepayment of your Mortgage Loan of at least 5%. At the time you make any prepayment, call attention to your insurance so that your Monthly Insurance Charge for life insurance can be refigured.

**MAXIMUM LIMITATIONS.** The maximum limitations are only an initial eligibility requirement and will not be used as the basis to deny a valid claim. If insurance is issued to a Debtor in excess of the maximum limitations, The Society has the right to make an adjustment within 60 days from the Effective Date of Insurance, provided that no valid life claim is incurred or that the Debtor has not completed the elimination period, at the time of the adjustment. The Society will refund any excess insurance charge paid by the Debtor.

**CONFORMITY WITH STATE STATUTES.** Any part of the Group Policy which, on the Policy Date of the Group Policy, conflicts with the statutes of the state where the Group Policy was delivered is changed to conform to the minimum standards of those statutes.

PRESIDENT

D0021

11-10-99  15:27   From-PATRIOT FEDERAL CREDIT UNION        7172636820        T-832  P.02/03  F-105

## CUNA MUTUAL GROUP
*CUNA Mutual Insurance Society*
P.O. Box 1021 ● 5590 Mineral Point Road
Madison, WI 53701-1621
Phone: 800/621-6323 ● Fax: 608/231-3258

S63 825757 11/04/1999
HMPMicrof

# HOME MORTGAGE INSURANCE CLAIM NOTICE

CHECK ONE: ☑ Death Claim       11-4-1999
Date of Death
Loan payment due date prior to death     11-1-99
Attach a copy of the death certificate to this form.

☐ Disability Claim
Date of Disability
Loan balance on date of disability
We will forward a claim form to the member.

Member's Name   Tommy Bob Hall II         Contract Number  037-1485-6
                                          Patriot Fed. Cr. Union
Address   517 Mt. Pleasant Rd.            067-0103537220
          Fayetteville PA 17222           Policy/Certificate Number  00032534
                                          Mtg
Birthdate   5-12-55                       Account Number  067-0103537220

NOTICE: Any person who knowingly and with intent to injure, defraud or deceive any insurance company, submits a statement of claim containing any false, incomplete or misleading information is guilty of a crime, and in some states subject to criminal or civil penalties, or guilty of a felony.

Patriot Federal Credit Union
FULL NAME OF CREDIT UNION
P.O. Box 778, 800 Wayne Ave.
NUMBER AND STREET
Chambersburg    PA    17201    717-263-4444 ext. 4173   8:30-4:30 M-Th
CITY            STATE  ZIP CODE  AREA CODE-TELEPHONE NUMBER  CREDIT UNION OFFICE HOURS
Jeanette Duquette  —  Jeanette Duquette, Member Service Rep
SIGNATURE                        TITLE
(Mr. Mrs. Miss, Ms.)             PRINT OR TYPE NAME OF ABOVE

☐ Check here if you need an additional supply of this form.

TOTAL P.01

Received  11-10-99  15:05    From-        To-PATRIOT FEDERAL CRED    Page 01

D0043

4

11-10-99  15:27  From-PATRIOT FEDERAL CREDIT UNION        T172636028        T-832  P.03/03  F-105

This is to certify that the information here given is correctly copied from the
Local Registrar. The original certificate will be forwarded to the State Vital Records Office for permanent filing.

**WARNING: It is illegal to duplicate this copy by photostat or photograph.**

Fee for this certificate, $2.00

No. 5063854

Lucille S. Miller
Local Registrar

November 4, 1999
Date

02/23/2000

COMMONWEALTH OF PENNSYLVANIA • DEPARTMENT OF HEALTH • VITAL RECORDS
CERTIFICATE OF DEATH



D0005

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

* * * * * * * * * * * * * * * * * * * * * * * * * *

NANCY HALL, individually and as the
Representative and Administratrix of
the Estate of Tommy Hall, deceased,
her husband,

        Plaintiff,

      v.            Case No. 1:01-CV-1265

CUNA MUTUAL GROUP, CUNA MUTUAL
INSURANCE SOCIETY,

        Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF BRENDA LARSON

Thursday, November 1, 2001

1:28 o'clock p.m.

Reported by:  LISA A. CREERON

**M**ADISON **F**REELANCE **R**EPORTERS

131 W. Wilson St.          Madison, Wisconsin 53703          (608) 255-8100

BRENDA LARSON - 11/01/01 / HALL V. CUNA MUTUAL

**PAGE 1  SHEET 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

• • • • • • • • • • • • • • • • • • • • • • • • • •

NANCY HALL, individually and as the
Representative and Administratrix of
the Estate of Tommy Hall, deceased,
her husband,

Plaintiff,

v.                    Case No. 1:01-CV-1265

CUNA MUTUAL GROUP, CUNA MUTUAL
INSURANCE SOCIETY,

Defendants.

• • • • • • • • • • • • • • • • • • • • • • • • • •

DEPOSITION OF BRENDA LARSON

Thursday, November 1, 2001

1:28 o'clock p.m.

Reported by:  LISA A. CREERON

---

**PAGE 2**

2

1          DEPOSITION of BRENDA LARSON, a
2    witness in the above-entitled matter, taken at the
3    instance of the plaintiff, wherein Nancy Hall is the
4    plaintiff and CUNA Mutual Group, et al., are the
5    defendants, pending in the United States District
6    Court for the Middle District of Pennsylvania,
7    pursuant to notice, before LISA A. CREERON, a
8    Registered Professional Reporter and Notary Public in
9    and for the State of Wisconsin, at Melli, Walker,
10   Pease & Ruhly, Attorneys at Law, 10 East Doty Street,
11   in the City of Madison, County of Dane, and State of
12   Wisconsin, on the 1st day of November, 2001, commencing
13   at 1:28 o'clock p.m.

14          A P P E A R A N C E S
15      STEPHEN R. PEDERSEN,
             Attorney at Law, 214 Senate Avenue, Suite 602,
16           Camp Hill, Pennsylvania, appearing on behalf of
             the plaintiff;
17
        MICHAEL R. KELLEY,
18           McNEES, WALLACE & NURICK, Attorneys at Law,
             100 Pine Street, P. O. Box 1166,
19           Harrisburg, Pennsylvania 17108, appearing
             on behalf of the defendants.
20
        ALSO PRESENT:  MARK RICHARDSON
21             • • • • •
22
23   (Original transcript is filed with Attorney Pedersen)
24
25

---

**PAGE 3**

3

1                 I N D E X
2    Examination by:                              Page
3    Attorney Pedersen                              4
4    Attorney Kelley                                85
5    Exhibits Nos.:                          Identified
6    1 - Chronology prepared by the witness . . . . . .  20
7                   • • • • •
8                BRENDA LARSON,
9         called as a witness, being first duly
10        sworn in the above cause, testified
11        under oath as follows:
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**PAGE 4**

4

1               MR. KELLEY:  During the
2    deposition of Mr. Stel we produced a number of
3    documents, including the October 18, 2001 letter
4    from Attorney General Mike Fisher, the form
5    that's used for the insurance fraud section of
6    the Pennsylvania Attorney General's Office, the
7    names and information of attorney general
8    personnel, an e-mail regarding an e-mail
9    bulletin from the Pennsylvania insurance
10   department, an April 4, 2000 letter from the
11   Office of the Attorney General and then a number
12   of pages that look like insurance statutory
13   language and then some internal CUNA documents
14   regarding reporting of insurance fraud, and then
15   it looks like some articles or Law Review
16   materials regarding reporting of insurance
17   fraud.
18           And those I just wanted to note for the
19   record, those materials were produced -- I
20   received them for the first time yesterday, and
21   so we produced those today.
22           The usual stipulations for Brenda's
23   deposition?
24           MR. PEDERSEN:  That's fine.
25           MR. KELLEY:  With the exception

BRENDA LARSON - 11/01/01 / HALL V. CUNA MUTUAL

5

1            of she'll read and sign the deposition.
2                    MR. PEDERSEN:  That's fine.
3                EXAMINATION
4       BY MR. PEDERSEN:
5       Q   Ms. Larson, please state your full name for the
6           record.
7       A   Brenda Jean Larson.
8       Q   And that's Larson, L-A-R-S-O-N?
9       A   Correct.
10      Q   Now, I know it was sent through your counsel, but did
11          you receive the notice of deposition for your
12          deposition today?
13      A   Written notice or oral?
14      Q   Yes, written notice.
15      A   No.
16      Q   The deposition notice indicates that you're to bring
17          all records and materials which in any way relate to
18          the case.  Did you bring all of your records and
19          materials that relate to the Hall claim file either
20          through you or your counsel?
21      A   Yes, I did.
22      Q   Are there any things that you've left out from
23          bringing with you today, like computer entries,
24          loose-leaf material that you may have referred to or
25          telephone message logs or messages?

6

1       A   Not that I'm aware of, no.
2       Q   Okay.  So you believe that you brought everything
3           with you today?
4       A   I believe so.
5       Q   And is this your three-ring binder or the one
6           provided by counsel?
7                    MR. KELLEY:  That's hers, and
8           we've gone through it and she's produced
9           everything that's in there to me, which I've
10          produced to you.
11                   MR. PEDERSEN:  Okay.  I just want
12          to make sure we're starting with the same sets
13          of documents, that there aren't any missing
14          documents.
15                   MR. KELLEY:  Well, as we did go
16          through it, you can certainly see if there's
17          anything that would fit that bill, but we think
18          we've produced everything to you.
19      Q   Okay.  I'd like to get some background information,
20          first of all.  What is your position currently with
21          CUNA Mutual?
22      A   I'm the credit insurance underwriter.
23      Q   How long have you been the credit insurance
24          underwriter?
25      A   Since October of 1999.

7

1       Q   Is that for all types of insurance?
2       A   It's for credit insurance.
3       Q   Credit insurance is different than the mortgage
4           protection insurance?
5       A   No, it's the same.
6       Q   The same.  Why is it called credit insurance?
7       A   Because it's insurance on a line of credit.  Or in
8           the event of the home mortgage, it's on the actual
9           mortgage.
10      Q   Do I understand under a mortgage protection policy
11          through CUNA if a payment is made, it's made directly
12          to the mortgage company?
13      A   A payment for insurance?
14      Q   For benefits, for a payout under a policy.
15      A   The beneficiary is the credit union.
16      Q   And that would be to pay off the outstanding loan,
17          and so the mortgage coincides with the amount that
18          still exists on the mortgage, is that right?
19      A   Correct.
20      Q   And it's your understanding that when the mortgage
21          payout is made under a claim for benefits that the --
22          that extinguishes the loan or the mortgage?
23      A   In most cases.
24      Q   So no more house payments would need to be made?
25      A   In most -- correct, in most cases I would agree.

8

1       Q   And was that also in the Hall case, that was your
2           understanding?
3       A   I don't know what their loan balance was at the
4           credit union.
5       Q   You don't know whether or not the Halls at the time
6           they purchased a new home obtained the insurance
7           through CUNA Mutual and their credit union for the
8           total amount of their mortgage?
9       A   I don't know it to be the total amount, no.
10      Q   Do you know the custom and practice at CUNA Mutual
11          with respect to the insured amount?  Is it typically
12          the total amount of the outstanding mortgage?
13      A   This particular product, they can insure a minimum of
14          half.  So they have to at least insure one-half of
15          the mortgage.
16      Q   What did you do prior to October '99 when you became
17          the credit insurance underwriter?
18      A   Prior to that I was a medical claims examiner with
19          CUNA Mutual.
20      Q   CUNA offers a line of medical insurance?
21      A   They did at one time.
22      Q   What was your role as the claims manager in the
23          medical section?
24      A   It wasn't the claims manager.  I was a claim -- did I
25          say claims manager?

BRENDA LARSON - 11/01/01 / HALL V. CUNA MUTUAL

PAGE 9   SHEET 3

9

1   Q   I'm sorry, maybe I miswrote it.  But prior to --
2   A   I was a claims examiner.
3   Q   Examiner.  What was your duty with respect to being a
4       medical claims examiner for CUNA Mutual prior to
5       October of '99?
6   A   My duties were to review and process claims according
7       to the schedule of benefits of the policy.
8   Q   How long or over what period of time were you a
9       medical claims examiner for CUNA Mutual?
10   A   For CUNA Mutual, since 1997, August of 1997.
11   Q   Do you have any medical background?
12   A   I graduated from the University Hospital's school of
13       radiology technology.
14   Q   Which university?
15   A   Madison.  And it was -- can I just --
16   Q   Sure.
17   A   It was the University Hospital school of radiology
18       technology.
19   Q   How many years did you attend that school?
20   A   Two years.
21   Q   Did you obtain a degree?
22   A   I did not.
23   Q   Was there a degree offered?
24   A   There was.
25   Q   What was the degree that was offered?

PAGE 10

10

1   A   X-ray technician.
2   Q   Why didn't you obtain the degree?
3   A   I decided that I did not want to pursue it.
4   Q   In your studies towards the x-ray technician degree,
5       did you have any experience reading pathology
6       reports?
7   A   No.
8   Q   Have you ever had any training with respect to
9       reading pathology reports?
10   A   No.
11   Q   Or looking microscopically at resections of moles?
12   A   No.
13   Q   How about learning medical technology as it relates
14       to cancer and moles and microscopic findings?
15               MR. KELLEY:  I'm sorry, what's
16       your question with regard to this?
17   Q   Any training with respect to that.
18   A   With respect to medical technology?
19   Q   Terminology.
20   A   Terminology, certainly.
21   Q   As they relate to moles, cancer and microscopic
22       findings.
23   A   Terminology, yes.
24   Q   What's your understanding of what a dysplastic nevus
25       is?

PAGE 11

11

1   A   My understanding of a dysplastic nevus is that it is
2       a benign nevus with characteristics similar to
3       melanoma.
4   Q   When you say a benign finding, a finding of
5       dysplastic nevus is not the same in your mind as
6       cancer?
7   A   That would be correct.
8   Q   In fact, it's the opposite; it's something
9       noncancerous, you said benign?
10               MR. KELLEY:  If the opposite of
11       cancerous is noncancerous, I guess that's true.
12   Q   The term malignant and benign, aren't those
13       opposites?
14   A   Yes.
15   Q   And dysplastic nevus is a benign finding, isn't it?
16   A   It is.
17   Q   And that would be the opposite of a malignant
18       finding?
19   A   Correct.
20   Q   So dysplastic nevus is not cancer?
21   A   That would be correct.
22               MR. KELLEY:  I'm still not sure
23       that it's the opposite of cancer.
24               MR. PEDERSEN:  Only if salt is
25       the opposite of pepper.

PAGE 12

12

1               MR. KELLEY:  This is off the
2       record.
3              (Discussion off the record)
4   Q   Where did you obtain that understanding as to the
5       definition of dysplastic nevus?
6   A   I would not be able to pinpoint one area of where I
7       found that out or learned that.
8   Q   You've never taken any classes specifically on
9       microscopic findings for tumors?
10   A   Not specific classes on tumors, no.
11   Q   Have you had some other education on tumors and tumor
12       development?
13   A   Well, I certainly go to continuing education
14       seminars, and I've also had some continuing education
15       studies that it is mentioned.
16   Q   Have you had specific continuing education studies
17       with respect to melanoma?
18   A   Yes.
19   Q   When was the last one that you attended?
20   A   I wouldn't have an exact date here.
21   Q   Not referring to date, but time frame.  Within the
22       last three years have you attended any seminars
23       dealing with melanoma?
24   A   Are you asking specifically melanoma or in which
25       melanoma was discussed?

PAGE 13  SHEET 4

13

1   Q   In which melanoma was discussed.
2   A   I would say within the last three years.
3   Q   Do you keep seminar material?
4   A   Some.
5   Q   Do you have any seminar material in your office that
6       relates to melanoma or dysplastic nevus?
7   A   I don't recall here.  I would have to check.
8   Q   Don't throw any of them away.
9   A   Okay.
10  Q   This may be an area of inquiry later.  We'll
11      determine whether to request certain documents from
12      training seminars that you attended that relate to or
13      discuss dysplastic nevus or melanoma, okay?
14  A   All right.
15  Q   What's your understanding of the term melanocytic
16      cells?
17  A   They are a pigmented cell.
18  Q   Cancerous or not cancerous?
19  A   Not cancerous.
20  Q   Who is your supervisor at CUNA Mutual?
21  A   Currently it's Deb Haglund.
22  Q   How do you spell Haglund?
23  A   H-A-G-L-U-N-D.
24  Q   How long has Deb Haglund been your supervisor?
25  A   I would say approximately six months.

PAGE 14

14

1   Q   Who was the supervisor before that?
2   A   Jody Breese.
3   Q   How long was Jody Breese your supervisor?
4   A   I would say approximately six months prior to
5       Deb Haglund.
6   Q   And who was the supervisor before that?
7   A   Rich Fisher.
8   Q   How long was Mr. Fisher your supervisor?
9   A   I would say from October '99, and again this is a
10      guess, through October 2000.
11  Q   Because I want to be complete, covering the periods
12      of the application and the claim process, who was the
13      supervisor before Rich Fisher?
14  A   That would have been the last time frame within the
15      underwriting department.  Do you want me to go back
16      into my claim history?
17  Q   No.  You joined the underwriting department sometime
18      in October of '99, is that right?
19  A   That's correct.
20  Q   So you were not in the underwriting department when
21      Mr. Hall filled out the initial application?
22  A   That is correct.
23  Q   And the first then that you had any contact with the
24      Hall claim file would have been at the end of '99?
25  A   That is correct.

PAGE 15

15

1   Q   And that would have been two months, approximately
2       two months after you first joined the credit
3       insurance underwriting division?
4   A   Correct.
5   Q   Were you considered in training at that point?
6   A   I was.
7   Q   There's some reference in the file, isn't there, to
8       you being in training?
9   A   Yes.
10  Q   What were you in training for, to become a --
11  A   Credit insurance underwriter.
12  Q   Who was training you?  Was it Rich Fisher?
13  A   I was being mentored by Bill Nardi.
14  Q   How do you spell Nardi?
15  A   N-A-R-D-I.
16  Q   Who is Bill Nardi?
17  A   He is an underwriter with CUNA Mutual Group.
18  Q   Is he still there?
19  A   Yes, he is.
20  Q   Do you know which area he works in now?
21  A   He works for our Waverly division of CUNA Mutual Life
22      Insurance.
23  Q   I take it that's not in Madison?
24  A   Correct.
25  Q   That's in Iowa?

PAGE 16

16

1   A   That's in Waverly, Iowa.  Well, can I just clarify
2       that?  He is in Madison.  He underwrites for the
3       product in Waverly.
4   Q   Okay.  So he works out of the Madison offices?
5   A   Correct.
6   Q   Good.  Do you have a specific recollection of being
7       involved in the Hall claim process?
8   A   Specific recollection?  I guess I need you to
9       clarify.
10  Q   Do you only recall what's in the records, or do you
11      specifically recall sitting down one day and in the
12      process of reviewing the claim coming up with certain
13      conclusions?
14          MR. KELLEY:  And your question is
15      do you remember any part of the process?
16          MR. PEDERSEN:  Yes.
17          MR. KELLEY:  Not every part of
18      the process?
19          MR. PEDERSEN:  That's right.
20  A   Any part of the process, yes, I would say.  Not every
21      part of the process.
22  Q   What's your first recollection of the process?
23  Q   Do you mean the first one that comes to mind or the
24      first one within the time --
25  Q   First one chronologically.

PAGE 17  SHEET 5

17

1  A   Okay. Now you're asking me to remember -- from my
2      memory what do I recall?
3  Q   Let me try to help. I deal with people who deal with
4      large volumes of claims or files or doctors who have
5      many patients. Sometimes they recall the patients,
6      sometimes they don't. Sometimes they just go on
7      their records.
8          And so I'm asking if you have your own
9      independent recollection of the -- any part of the
10     claim process that the Halls were involved with other
11     than what's just contained in the file.
12 A   I guess I have a recollection of the process in its
13     entirety, but not a specific recollection of any one
14     specific thing.
15 Q   How many files would you typically review in a month?
16 A   For underwriting or for a claim investigation?
17 Q   Were you doing both at this time?
18         MR. KELLEY:  Objection. What's
19     this time mean?
20         MR. PEDERSEN:  In December of
21     '99.
22 A   Was I underwriting and -- I guess as the underwriter,
23     if a claim was referred to me, then that was within
24     my job description.
25 Q   I'm trying to get some sense of how many files,

PAGE 19

19

1      mortgage protection product, the claim was referred
2      to me.
3  Q   Who referred it to you?
4  A   I made a notation that it was referred to me from our
5      claim department.
6  Q   You're referring to a chronological history of some
7      events, is that right?
8  A   That's correct.
9  Q   When did you prepare that?
10 A   February of 2000.
11 Q   Now, that's something I have not seen or been
12     provided.
13 A   Okay.
14 Q   I'd like to have a copy of that.
15         MR. KELLEY:  Well, I need to look
16     at it first.
17 Q   Let me ask a few questions about that sheet.
18 A   Okay.
19 Q   Why did you prepare that chronology?
20         MR. KELLEY:  Wait a second.
21     Before you do that, let me look at it here.
22         MR. PEDERSEN:  Okay, sure.
23         MR. KELLEY:  I want to -- I mean
24     I need to talk to her and see if this was
25     prepared in anticipation of litigation or not.

PAGE 18

18

1      either claim files or underwriting files you were
2      evaluating over a period of time, either month or two
3      months at the time the Hall file came to you.
4  A   Okay, that helps. Underwriting files, I would say
5      approximately 50 per month.
6  Q   And claim files?
7  A   I would say from my best recollection there were no
8      other claim files other than this one.
9  Q   Was this the -- this wasn't the first claim file that
10     you had been involved with, is it, with CUNA Mutual?
11 A   With CUNA Mutual, yes.
12 Q   It was the very first?
13 A   I think I said the first.
14 Q   Okay. Not that there's any way to distinguish
15     between the very first --
16 A   That's right.
17 Q   I just wanted to make sure. You surprised me. Was
18     there someone at CUNA Mutual who was helping you
19     specifically address this of your first claim files?
20 A   Yes.
21 Q   Who was that?
22 A   Bill Nardi.
23 Q   How is it within CUNA Mutual that you came to get the
24     Hall file?
25 A   As the credit insurance underwriter for the home

PAGE 20

20

1          Off the record.
2              (Discussion off the record)
3              (Short recess is taken)
4  Q   We've been discussing a document that we've now
5      circulated copies of. I'm going to have this marked
6      as Exhibit 1 to this deposition.
7              (Exhibit 1 is marked for identification)
8  Q   What were the circumstances under which this document
9      was prepared?
10 A   This document was prepared so that I had a
11     chronological order of what happened and how it
12     happened.
13 Q   Did you make the entries contemporaneously with the
14     events or at some time later recreated the events?
15 A   I believe I made a Word document as you see here
16     after the file was closed.
17 Q   How was it that you made this list after the file was
18     closed, by going through the file or --
19 A   No, from a piece of paper that I had written on while
20     I was working through the file.
21 Q   Do you still have that piece of paper?
22 A   I don't believe so, no.
23 Q   You put that piece of paper onto a computer file
24     instead?
25 A   That would be correct.

PAGE 21  SHEET 6

21

1  Q  This has a date.  I don't know if it's a computer
2     generated date at the top.  Is it August of 2001?
3  A  Correct.
4  Q  Is that when the document was printed out?
5  A  No.
6  Q  What does that date reflect?
7  A  That date would most likely reflect the date that I
8     faxed it to our legal area.
9  Q  Why did you fax it to the legal area?
10 A  Our legal area requested all information on this
11    particular claim file.
12 Q  Do you know why?
13 A  At that point I was aware that there was a lawsuit
14    filed.
15 Q  How is it that you know when the document was
16    prepared, typed into the computer?
17 A  Just from my own recollection.
18 Q  And you're sure that it wasn't typed into the
19    computer after you knew a lawsuit was filed?
20 A  Positively.
21 Q  How is it that you recall that?
22 A  Just because I recall doing this after we had
23    completed the actual claim file.
24 Q  Is there a protocol within CUNA Mutual to always do
25    this when a claim file is closed, to make a

PAGE 22

22

1     chronology of all the events?
2  A  No, it's my own.
3  Q  You do that every time?
4  A  I do.
5  Q  And this was the first one, however, and you've done
6     it ever since?
7  A  That's correct.
8  Q  Because you have this chronology of events, I don't
9     have any problem with you referring to it if you need
10    to to help you refresh your memory as to when things
11    happened --
12 A  Okay.
13 Q  -- and the timing of them because we want to be
14    accurate.  I'd like you to go step by step
15    chronologically through with me, and you can refer to
16    your notes, of your involvement in the handling of
17    the claim file.
18 A  Okay.
19 Q  The very first thing that relates to your
20    involvement, I think you testified earlier that you
21    received a claim file, the first one that you had
22    received.  And what did you do?
23 A  I received a copy of the claim along with the death
24    certificate.
25 Q  What did you do in response to receiving a copy of

PAGE 23

23

1     the claim and the death certificate?
2  A  I reviewed the member's application and the death
3     certificate.
4  Q  What were you looking for?  What was the purpose for
5     reviewing those?
6  A  The purpose was to review the date of the application
7     and the diagnosis on the death certificate or the
8     reason of death or --
9  Q  And what did you find when you reviewed the death
10    certificate?
11 A  What I noted was that it appeared to indicate
12    metastatic melanoma, and it appeared to indicate two
13    to three years.
14 Q  Do you know what the two to three years meant on the
15    death certificate?
16 A  I believe it meant that the patient suffered from
17    metastatic melanoma for two to three years.
18 Q  In your copy, can you see what's written, typed above
19    the entry two to three years?  I can't on mine.
20 A  No.  No, I cannot.
21 Q  Is that the original one that you received?
22 A  No.  This would be a copy.
23 Q  Do you have any reason to think that the original is
24    more legible than this copy?
25 A  I would imagine that because this was received by our

PAGE 24

24

1     office via fax -- or maybe I shouldn't say that.  It
2     was received by -- no, I believe it was our office
3     from Patriot Federal Credit Union, that possibly the
4     fax machine made the unclear copy.
5  Q  Well, as we sit here today, do you either recall or
6     know what the typed information is above the two to
7     three years?
8  A  I do not.
9  Q  So you don't know what that two to three years
10    represents then?
11 A  I do not.
12 Q  And you don't know whether Mr. Hall had any
13    information about the metastatic melanoma for a two
14    to three-year period, do you?
15 A  Based on the death certificate?
16 Q  Based on the death certificate.
17 A  That would be correct.
18 Q  Did you have any information at that point, upon
19    receiving a copy of the application and the death
20    certificate, that any further investigation needed to
21    be done?
22 A  I'm sorry, could you repeat that?  I was putting my
23    glasses on.
24 Q  I think we've been discussing the death certificate
25    and the application.

BRENDA LARSON - 11/01/01 / HALL V. CUNA MUTUAL

---

PAGE 25  SHEET 7

25

1   A   Yes.
2   Q   Those were the first two documents you received?
3   A   Correct.
4   Q   And the application for benefits from the credit
5      union?
6   A   Correct.
7   Q   Was there anything on the application for benefits
8      and the death certificate that in your mind warranted
9      any further investigation?
10   A   Yes.
11   Q   What was that?
12   A   It warranted further investigation with regard to the
13      applicant's past medical history.
14   Q   Are you referring to the application itself?
15   A   I'm referring to the no answer on Question No. 1 from
16      the application.
17   Q   From Borrower 1?
18   A   That is correct.
19   Q   You understood Borrower 1 to be Mr. Hall?
20   A   Correct.
21   Q   What did you -- which part of that application did
22      you believe warranted further investigation?  And I
23      know we're on the specific question.  There's a long
24      paragraph there about past medical information.
25   A   You're asking for a specific within that question?

---

PAGE 26

26

1   Q   Yes.
2   A   Specifically had he ever been treated for or
3      diagnosed by a member of the medical profession as
4      having any of the following.
5   Q   And did any of those apply to Mr. Hall at that time
6      in your mind?
7   A   At the time I received the death certificate?
8   Q   Yes.
9   A   I didn't know at that time.
10   Q   Is it standard protocol upon the receipt of a death
11      certificate and an application for benefits to
12      conduct an investigation without knowing the specific
13      basis for the investigation?
14   A   Is it standard protocol?
15   Q   At CUNA Mutual.
16   A   Our policy is defined as that.
17   Q   Is that a written policy?
18   A   The actual certificate, yes.
19   Q   The conducting of an investigation when you don't
20      have a specific basis to believe that there was any
21      information that was incorrect.
22   A   Oh, no, that would not be a standard protocol.
23   Q   But that's the protocol that you applied in this
24      case, is that right?
25   A   Correct, based on the death certificate.

---

PAGE 27

27

1        MR. KELLEY:  If I could just
2      interject here, I don't think the two of you are
3      communicating.
4        THE WITNESS:  I don't think we
5      are either.
6        MR. KELLEY:  I think what he's
7      trying to get at here is do you routinely in
8      every case do a claim investigation when you get
9      a death certificate, or was there something
10      about this one that caused you to do it?  Is
11      that what you're looking for, Steve?
12   Q   In his words, yes.
13   A   We do not routinely investigate.  That would be
14      correct.  And, yes, there was a specific reason.
15   Q   That was the metastatic -- dying from metastatic
16      melanoma?
17   A   Correct.
18   Q   At that point did you have any idea of the rate at
19      which someone dies from metastatic melanoma?
20   A   I believe it can vary.
21   Q   Did you have any information as to whether or not
22      Mr. Hall at any point prior to the application knew
23      he had metastatic melanoma?
24   A   At the point at which time that I received the death
25      certificate?

---

PAGE 28

28

1   Q   At the point that he made the application.  Let me
2      try to clarify.
3   A   Okay.
4   Q   An insured, his duty is to be truthful and accurate
5      to the best of his ability at the time he makes the
6      application, isn't that right?
7   A   That is correct.
8   Q   To provide the information as requested that he knows
9      about?
10   A   Correct.
11   Q   And he has no duty to provide things that he doesn't
12      know about?
13   A   Correct.
14   Q   He has no duty to supplement later about things that
15      he learns about but didn't know about at the time of
16      the application?
17        MR. KELLEY:  Objection, calls for
18      a legal conclusion.
19   Q   I'm not asking for the legal conclusion.  I'm asking
20      within CUNA Mutual, your insureds, do they have a
21      duty to call you later on and tell you, oh, I found
22      some additional information that I didn't know before
23      and now it's a year later, but I'm supplementing my
24      application?
25        MR. KELLEY:  Object to the form.

---

BRENDA LARSON - 11/01/01 / HALL V. CUNA MUTUAL

29

1        You can answer if you understand it.
2    A   You're saying after they've been approved for
3        coverage?
4    Q   Right.
5    A   No, they would not have to.
6    Q   So Mr. Hall's duty with respect to CUNA Mutual and
7        this application form was to be truthful and accurate
8        from the information he had available then?
9    A   Correct.
10   Q   What is there about his application and the death
11       certificate that you believed prompted you to
12       investigate him?
13   A   The cause of death being metastatic melanoma was of
14       concern less than one year after the application
15       date.
16   Q   Did you have any information that at the time that
17       Mr. Hall filled out the application that he knew he
18       had cancer?
19   A   At the point that we received the death certificate?
20   Q   Right.
21   A   No.
22   Q   Did you ever get information that Mr. Hall knew in
23       November of '98 that he had cancer?
24   A   I felt that we did, yes.
25   Q   We'll go through it because I'd like you to go

30

1        through the record now and show me the information
2        that you had that led you to believe that Mr. Hall
3        knew he had cancer at the time the application was
4        filled out.
5    A   Okay. So you just want me to indicate the dates and
6        what was --
7    Q   We'll go through them one at a time.
8    A   Dr. Ernest Charlesworth's medical records.
9    Q   What did Dr. Charlesworth's medical records indicate
10       that made you believe that Mr. Hall knew he had
11       cancer at the time the application was filled out?
12   A   Date of service --
13           MR. KELLEY:  First of all, object
14       to the form of the question.  You can answer.
15           THE WITNESS:  I can answer?
16           MR. KELLEY:  Uh-hum.
17   A   Okay.  Date of service, April 30th, 1998 where the
18       medical record indicates, "Past medical history, ?
19       melanoma removed, back, 1996."
20   Q   Do you know who wrote that?
21   A   I do not know personally who wrote that.
22   Q   In your experience, was it the doctor who wrote that
23       or the patient?
24   A   With my experience, the doctor would write the
25       medical record.

31

1    Q   And the question mark, what significance would there
2        be to have a question mark concerning melanoma in
3        your mind as a claims examiner?
4    A   The question mark in my mind could apply to different
5        parts of that statement.  It could mean question mark
6        melanoma, it could mean question mark back, it could
7        mean question mark on the date.
8    Q   You didn't know at that time, the time you were
9        reviewing this, what that question mark related to?
10   A   Correct.
11   Q   We deposed earlier Dr. Ansfield, and he said there
12       were only two possibilities.  Either the patient gave
13       the doctor that information or the doctor was writing
14       down his own notes to question whether that mole was
15       a melanoma.
16           MR. KELLEY:  Objection --
17   Q   Would you agree with that?
18           MR. KELLEY:  Object to the form
19       of the question.  You can answer.
20   A   I'm going to have to have you repeat that, I'm sorry.
21   Q   Aren't there two possibilities?  Either the patient
22       told the doctor that he wondered or had a question
23       whether he had a melanoma in '93 or the doctor
24       himself was questioning whether the patient had a
25       melanoma in '93?

32

1    A   Since this was the first visit with this particular
2        physician, I would in my review process assume that
3        the patient indicated that information to this
4        doctor.
5    Q   And the patient indicating the information, isn't it
6        just as likely the patient is indicating I may have
7        had a melanoma, I don't know, in '93?
8           MR. KELLEY:  I'm going to object
9        to this line of questioning.  I mean her
10       speculating about -- calls for speculation,
11       objection.
12   Q   We have something more definitive, don't we?  We have
13       the '93 pathology report.
14   A   Along with other documents, yes.
15   Q   And you reviewed that '93 report in part of your
16       evaluation process?
17   A   Again along with all the other documents, yes.
18   Q   The '93 pathology report indicated what the mole was
19       that was removed, didn't it?
20   A   As stated in that document, yes.
21   Q   And what did the '93 pathology report tell us with
22       respect to the mole that was removed in '93?
23   A   In 1993?
24   Q   Yes.
25   A   It indicates, "Dysplastic nevus skin, back," and it

BRENDA LARSON - 11/01/01 / HALL V. CUNA MUTUAL

PAGE 33  SHEET 9

33

1     also indicates follow-up is recommended in review of
2     the dysplastic changes noted.
3   Q  Is there anything on that pathology report anywhere
4     that indicates cancer?
5   A  On this pathology report, no.
6   Q  That mole that was removed, isn't that the reference
7     that's being made to question melanoma?
8   A  That I did not know because this date indicates 1996.
9   Q  Do you have any reason to believe that '96 date was
10     wrong on the medical record?
11   A  At the time that the file was reviewed, no.
12   Q  Well, you obtained medical records from all of the
13     treating doctors that at least had records, didn't
14     you?
15   A  Yes, I did.
16   Q  And did any of those treating doctors ever refer
17     to --
18             MR. KELLEY:  I'm going to
19         object.  Wait a minute, I'm going to object to
20         that.
21             MR. PEDERSEN:  Let me ask the
22         question first.
23             MR. KELLEY:  No, I was going to
24         object to the one before that, sorry.  I think
25         your question was you obtained from all the

PAGE 34

34

1     treating physicians who had records, is that
2     what you said?
3             MR. PEDERSEN:  I can't remember.
4     I'm already on the next question.
5             MR. KELLEY:  If that was your
6         question, I object to it.  Just note it for the
7         record.
8             MR. PEDERSEN:  Okay.
9   Q  There's no place in any of the medical records that
10     evidence besides this statement, question melanoma
11     '96, that referenced any moles being removed or any
12     procedure done in '96, is there?
13   A  Actually I believe there is.  Dr. William Sharfman's
14     records of July 15th, 1999.
15   Q  He took some information from the same note, didn't
16     he?
17   A  That I do not know.
18   Q  Do you have any reason to believe that a mole or any
19     melanoma was identified or removed in '96?
20   A  I do not --
21             MR. KELLEY:  Object to the form
22         of the question.  Asked and answered.  You can
23         answer it again.
24   A  I do not know.
25   Q  The basis for your denial of the claim was the '93

PAGE 35

35

1     mole, wasn't it?
2   A  Are you saying is that the only consideration, no.
3   Q  That's the consideration that you put on the letter
4     to Mrs. Hall, isn't it, the '93 mole?
5   A  That is what I put on the letter to Mrs. Hall.
6   Q  Did you not tell Mrs. Hall everything?
7   A  That was the main reason, but the 1996 scenario was
8     of concern.
9   Q  Did you ever ask a doctor for the pathology report of
10     a '96 mole that was removed?
11   A  No.
12   Q  You don't know as you sit here today whether there
13     was a mole in '96 or not, do you?
14   A  I do not.
15             MR. KELLEY:  Object and just note
16         for the record that she asked for all the
17         records, not specifically the pathology report
18         from 1996.
19   Q  And none of them contain a pathology report from '96
20     or a hospitalization from '96 for a mole removed in
21     '96, do they?
22   A  Of the records I obtained, no.  Wait, what was the
23     last part of that question?  Did you say a mole
24     removed in 1996?
25   Q  Right.

PAGE 36

36

1   A  Yes, I did.  Dr. Sharfman's indicates that he had
2     small moles removed from -- on his left neck in 1996.
3   Q  We've been discussing the April 30th, '98 doctor
4     visit.  What was the next item in the medical records
5     that led you to believe that Mr. Hall knew in
6     November of '98 that he had cancer?
7             MR. KELLEY:  Steve, I'm going to
8         object to you doing it sort of in a piecemeal
9         basis.  You know, they performed an
10         investigation over a period of time that
11         encountered a number of different pieces of
12         paper, and a decision was made after
13         encountering all those pieces of paper.
14         Now you're asking her to go through and to
15         identify each single item that caused her to
16         reach a conclusion, and I don't think that's the
17         way the process works.  So I don't think that's
18         a fair set of questions.  Objection on that
19         basis.
20   Q  I don't know any other way to do this but
21     chronologically through the records that you have in
22     front of you that are highlighted.  Did you do that
23     highlighting, by the way, of the records in front of
24     you?
25   A  Yes, in preparation for the deposition, I did.

PAGE 37  SHEET 10

37

1   Q   You didn't do it before the deposition -- before --
2       during the claim process?
3   A   That would be correct, I did not.
4   Q   Well, what's the next piece of information that you
5       had that combined with other information led you to
6       believe that Mr. Hall knew he had cancer when he put
7       no on the mortgage application?
8   A   The next piece of mail or the next medical record
9       that was also received from Dr. Charlesworth's office
10      was date of service, January 22nd, 1999 from
11      Dr. J. M. Chicklo, C-H-I-C-K-L-O.  And in that record
12      it indicates personal history, surgery -- spinal
13      surgery, and he had a malignant mole excised in 1993
14      on his back as well as under history of present
15      illness, he has a history of having a melanoma on his
16      back a number of years ago.
17  Q   What's the date of that record?
18  A   I believe I said January 22nd, 1999.
19  Q   And a record of January 22nd, '99 led you to believe
20      that Mr. Hall knew in November of '98 that he had
21      cancer?
22  A   Based on the personal history in that record, yes.
23  Q   And you don't know how long or when Mr. Hall found
24      out he had cancer in a mole that was removed in '93,
25      do you?

PAGE 38

38

1                   MR. KELLEY:  Object to the form.
2   Q   We have a date in time where Mr. Hall gives a
3       history, at least according to your interpretation of
4       the records, and the date that the information is
5       given is January 22nd, '99.  We don't know how far
6       back in time Mr. Hall knew of his history, do we?
7   A   Well, in the personal history it says he had a
8       malignant mole excised in 1993 on his back.
9   Q   We don't know if Mr. Hall knew that, do we?
10  A   From this record I don't know that.
11  Q   Okay.  Let's go to the next record then.
12  A   I reviewed the January 22nd pathology report on the
13      left surgical node.  The diagnosis reads, "Lymph node
14      left neck, metastatic carcinoma, suspect melanoma."
15  Q   That's from the surgery on his neck that's being done
16      in January.  That doesn't relate to the '93 mole,
17      does it?
18  A   Well, it says suspect melanoma, and based on the
19      information from Dr. Chicklo with regard to the
20      patient's past medical history of a 1993 melanoma, it
21      was considered.
22  Q   This report only says suspect melanoma, right?
23  A   That is correct.
24  Q   And if you're relating that to the '93 mole, you
25      didn't have information that Mr. Hall knew he had

PAGE 39

39

1       cancer in November of '98 on that report, do you?
2   A   Just that they were suspecting that it was from a
3       melanoma.
4   Q   When a patient suspects something, is he to indicate
5       that on a mortgage application form about whether or
6       not he has cancer?
7   A   If he were told that, yes.
8   Q   And if he weren't told, he wouldn't?
9   A   Correct.
10  Q   Even if he had some concerns himself?
11  A   Correct, if he were not told.
12  Q   Because the box is only yes or no, there's no box for
13      suspect or concern?
14  A   And the question -- that's correct.  The question
15      reads have you been told or treated.
16  Q   Do you know as you sit here today whether or not
17      Dr. Hurley has been deposed?
18  A   I do not.
19  Q   Let me provide that information to you then.
20      Dr. Hurley, the doctor who removed the '93 mole, has
21      been deposed.  And are you surprised to find out that
22      in his deposition he specifically stated that he did
23      not tell Mr. Hall that he had a cancer or a malignant
24      mole and that Mr. Hall did not have one?
25                  MR. KELLEY:  Objection.

PAGE 40

40

1   Q   Does that surprise you --
2                   MR. KELLEY:  Object to the form
3       of the question.  You know, I mean it's -- I
4       mean it's the form of the question, but the
5       question's objectionable.  It's immaterial to
6       her investigation.  You can answer it.  It's of
7       no moment either way.
8                   MR. PEDERSEN:  Well, I take some
9       significance to counsel's contention that it's
10      of no moment.  We believe that it's related to
11      the conduct of the insurance company's ongoing
12      conduct, particularly in light of the
13      information that's continually provided in this
14      case, including Dr. Hurley's deposition.
15                  MR. KELLEY:  Dr. Hurley's
16      deposition was not provided to this underwriter
17      when she was performing her evaluation of this
18      claim, and none of what we're here to talk about
19      today has to do with Dr. Hurley or the
20      continuing investigation which is -- which has
21      nothing to do with this particular underwriter.
22                  MR. PEDERSEN:  Then I reserve
23      the right to redepose all of these individuals
24      after the complaint is amended that includes the
25      ongoing providing of material and failure to pay

BRENDA LARSON - 11/01/01 / HALL V. CUNA MUTUAL

41

```
 1        benefits.
 2            MR. KELLEY:  You can reserve all
 3        you want to, and we'll deal with it at the time.
 4            MR. PEDERSEN:  Okay.
 5    Q   What was the next information that you had that was
 6        included in your consideration or thought that
 7        Mr. Hall had in essence lied on his insurance
 8        application form?
 9            MR. KELLEY:  Object to the form.
10    Q   Isn't that what you're saying, that he lied on his
11        application?
12    A   That Question No. 1 may or should have been answered
13        in a different way.  Lied, I wouldn't use the term
14        lied.
15    Q   Well, did you refer it to your fraud investigation
16        section for a criminal referral for fraud?
17            MR. KELLEY:  Object to the form.
18        You can answer.
19    A   I referred it to our special investigation unit, but
20        I did not know whether or not or where it would go
21        from there.
22    Q   What's the next information that you had that you
23        believed supported the conclusion that Mr. Hall knew
24        in '98 that he had melanoma or cancer?
25    A   The February 17th letter to Dr. Chicklo from
```

43

```
 1    Q   I just don't want to skip to other issues.  What
 2        information led you to believe that -- from this
 3        letter led you to believe Mr. Hall knew in '98 that
 4        in '93 he had had a malignant mole removed?
 5    A   The portion that indicates surgical resection in 1993
 6        and the portion that indicates personal or past
 7        medical history is most notable for malignant
 8        melanoma.  And it appears to be provided by the
 9        patient.
10    Q   But that letter does not indicate when the patient
11        found out that information, does it?
12    A   It says, "Surgical resection most notable for
13        malignant melanoma in 1993."  It doesn't say when he
14        found out.
15    Q   He could have found out in '99, in January?
16            MR. KELLEY:  Objection, calls for
17        speculation.
18    Q   It does call for speculation, doesn't it, to figure
19        out when Mr. Hall knew in your mind?
20            MR. KELLEY:  Well, first of all,
21        my objection is to your question.
22            MR. PEDERSEN:  Right.
23        Now I'm asking a new question.
24            MR. KELLEY:  Very fine.
25    Q   It does call for speculation, doesn't it, to know
```

42

```
 1        Dr. Michael Cashdollar.
 2    Q   What is there in that letter that led you to believe
 3        Mr. Hall knew in '98 that he had a tumor that was
 4        cancerous?
 5    A   The information which indicates, "Personal or past
 6        medical history is most notable for the malignant
 7        melanoma.  Surgical resection in 1993.  The patient
 8        also reports two lumbar spinal procedures in 1989 and
 9        1993 for herniated disk disease."
10    Q   What is there about that entry that leads you to
11        believe Mr. Hall knew in '98 that he had cancer?
12    A   That this information provided by the patient or that
13        this information was provided by the patient that he
14        had a malignant melanoma, surgical resection in 1993
15        and also reported two lumbar spinal procedures.
16    Q   Now, this is in February, February 17th of 1999.  You
17        don't know when Mr. Hall acquired that information
18        that his '93 tumor was malignant, do you?
19    A   Actually there's another portion of this letter that
20        is taken into consideration with this information.
21    Q   I'm asking the question --
22    A   About that particular line?
23    Q   But you can refer to other parts of the letter that
24        relate to that line.
25    A   Okay.
```

44

```
 1        when Mr. Hall knew that he had a malignant tumor?
 2    A   I wouldn't say speculation.  We reviewed all the
 3        documents of the medical history that we received.
 4    Q   Including the '93 pathology report that said no
 5        cancer?
 6    A   Along with all the other documents, yes.
 7    Q   And to know when Mr. Hall became aware from '93
 8        through 2000 of when -- that he had cancer, that
 9        would require speculation on your part, wouldn't it?
10    A   I guess I wouldn't say speculation.
11    Q   From the February 17th, '99 letter, you don't know
12        when Mr. Hall knew he had cancer, do you?
13    A   Well, in a medical record, April 30th of 1998,
14        there's a mention of a melanoma.
15    Q   There's a question mark with melanoma, isn't that
16        right?
17    A   There's a question mark before the sentence, correct.
18    Q   And that's the only indication prior to '98, prior to
19        the application, contemporaneous with the events that
20        there was any suspicion of melanoma?
21    A   Not based on the medical records that we received.
22    Q   What contemporaneous records did you receive
23        contemporaneous with Mr. Hall's knowledge that said
24        that he had knowledge of cancer at the time the
25        application was filled out in November of '98?
```

BRENDA LARSON - 11/01/01 / HALL V. CUNA MUTUAL

PAGE 45  SHEET 12

45

1        MR. KELLEY: Objection. I have
2    no idea what you're talking about. If she does,
3    she can answer.
4        THE WITNESS: I don't either.
5  Q  Well, when a surgeon does a surgery, he makes a
6    contemporaneous event of the surgery?
7  A  Can you define contemporaneous for me?
8  Q  At or near the time of the event. A surgeon who
9    does a surgery makes dictations in notes at or near
10   the time of the event, doesn't he?
11 A  Hopefully.
12 Q  A pathologist who reviews slides makes observations
13   at or near the time of the event, doesn't he?
14 A  I believe so.
15 Q  A doctor who's seeing a patient and has the patient
16   sitting across from him can make findings right there
17   and record them in his medical records?
18 A  He can.
19 Q  Would you agree with me that those are
20   contemporaneous findings or events?
21 A  Yes.
22 Q  A doctor can refer to something in the past, like a
23   past history that would not be contemporaneous with
24   the event, isn't that right?
25 A  That is right.

PAGE 46

46

1  Q  And all of the notes that you're referring to since
2    April of '98 that refer to the mole in '93, they're
3    not making any contemporaneous observation or comment
4    of that mole, are they?
5  A  They're making comment in some of the notes from a
6    patient history provided to them, it appears.
7  Q  And those notes are not contemporaneous with the
8    removal of the mole, are they?
9  A  I don't really understand contemporaneous. Maybe you
10   could use another word.
11 Q  At or about the same time. The notes that are being
12   made by doctors in '99 are not being made at or about
13   the same time as the mole that was removed and
14   observed, are they?
15 A  In 1993 or 1996?
16 Q  In either '93 or '96. A doctor in '99 is not making
17   notes at or about the same time as those removals --
18 A  Correct.
19 Q  -- is he? He's compiling information from the
20   patient and from records?
21 A  Correct.
22 Q  And because those are not recordings that are
23   happening at the time of the event, we don't know
24   when Mr. Hall knew that he had cancer, do we?
25 A  Well, based on the patient medical history, I would

PAGE 47

47

1    say he did know.
2  Q  What about based on the pathology report, could he
3    have known if the pathologist told him it was not
4    cancer, told his doctor it wasn't cancer by the
5    pathology report? Could Mr. Hall have known more
6    than his doctor and more than his pathologist?
7        MR. KELLEY: Objection,
8    argumentative.
9  Q  Could Mr. Hall have been expected to know more than
10   the pathologist knew microscopically about what was
11   happening to him?
12 A  At the point in time that we received these records,
13   I did not know if there were other physicians
14   possibly that had treated him and told him he had a
15   malignant melanoma.
16 Q  And it would require speculation on your part to
17   guess whether other physicians treated him that
18   didn't provide records and what those records said,
19   wouldn't it?
20 A  It would.
21 Q  And you weren't denying a claim based on speculation?
22 A  No, we were denying a claim based on information
23   provided to us in these records that we obtained.
24 Q  You never did obtain Dr. Hurley's records, did you?
25 A  Actually I believe we received two records from

PAGE 48

48

1    Dr. Hurley, but not from his office, from another
2    physician's office.
3  Q  Weren't they Chambersburg Hospital records concerning
4    the surgery in '93?
5  A  Let me check. There is a notation that they are from
6    Chambersburg Hospital.
7  Q  Those are outpatient emergency care records relating
8    to the removal of the mole, aren't they?
9  A  They are.
10 Q  And those were contemporaneous records, surgical
11   records of the time of the removal of the mole, isn't
12   that right?
13 A  Again I would -- contemporaneous is not --
14 Q  In your vernacular?
15 A  No.
16 Q  Then let me talk about records at or about the time
17   of the events. The handwritten outpatient emergency
18   care unit records from Chambersburg Hospital, those
19   were dated and taken about the time of the mole
20   removal, aren't they?
21 A  Of the 1993 mole removal?
22 Q  Yes. And those, nowhere in those records does it
23   indicate anywhere cancer or malignancy, does it?
24 A  No.
25 Q  And you did not have Dr. Hurley's office notes or any

PAGE 49  SHEET 13

PAGE 51

**49**

1   of his records directly from his office?
2   A   That is correct.
3   Q   Did you understand that Dr. Ansfield had told you to
4       obtain Dr. Hurley's records specifically?
5   A   I attempted to obtain Dr. Hurley's records
6       specifically.
7   Q   Dr. Ansfield told you that, didn't he, by a note?
8   A   Not specifically, no.  Not Dr. Hurley specifically,
9       no.
10  Q   He didn't mention by name, but he said we better get
11      the surgeon's records from '93?
12  A   No, he asked for the referring physicians and all
13      medical records from 1993 to present, which would
14      include the surgeon.
15  Q   You don't know whether Dr. Ansfield attached
16      particular significance to the surgeons' records, the
17      surgeons who removed the mole in either notes or
18      comments to you?
19  A   No notes to me.  I don't recall in a conversation.
20      It could have been brought up, yes.
21  Q   In part of your claim process, did you consider it
22      important to get the notes and office notes from the
23      surgeon who removed the '93 mole?
24  A   I did consider it important.
25  Q   And you wrote a letter to that doctor attempting to

**51**

1   doctor about Mr. Hall's care?
2   A   Sure.
3   Q   Why didn't you when you couldn't get his records?
4   A   We were requesting the actual medical records, not a
5       phone conversation or -- I doubt he would recollect a
6       particular patient.
7   Q   At the time you were evaluating the claim, you could
8       have spoken with Dr. Hurley, but you didn't think he
9       would remember?
10  A   I did not think he would remember a specific patient
11      or pathology report, correct.
12  Q   So it comes as a surprise to you that he had his
13      deposition taken and recalled about this procedure?
14          MR. KELLEY:  Well, objection.
15          Recalled all about the procedure after he met
16          with his lawyers, after he reviewed the records
17          that he told us he didn't have, does that
18          surprise you?  You can answer the question.
19  A   I am not aware of the deposition that Mr. Hurley gave
20      or any of the information contained in it.
21  Q   But the reason you didn't talk to him is because you
22      didn't think he would recall the events?
23  A   Of a particular patient and pathology report, that's
24      correct.
25  Q   Did you call either of the pathologists to -- who did

PAGE 50

PAGE 52

**50**

1   get the records?
2   A   Yes, I did.
3   Q   What did the doctor tell you or his staff?
4   A   The physician office contacted our office on
5       January 31st, 2000 indicating that his file could not
6       be found, that they had misplaced or lost his
7       records.
8   Q   At that point did you attempt to speak with the
9       doctor to find out what he recalled of the events?
10  A   I did not.
11  Q   Why didn't you?
12  A   I contacted the physician office and spoke with the
13      medical records person.
14  Q   Did you have an authorization at the time to get
15      records or obtain information about Mr. Hall?
16  A   Yes.
17  Q   That authorization was obtained at the time of the
18      application, wasn't it?
19  A   Yes, it was.
20  Q   It was good for 30 months?
21  A   Correct.
22  Q   It would have included this period of investigative
23      time?
24  A   Correct.
25  Q   Do you believe you had authority to speak with the

**52**

1   the pathology report in '93 to get their take on
2   this, whether there was cancer or not or something
3   that was missed?
4   A   No, I did not make phone contact with a pathologist
5       with regard to a specific patient's pathology report.
6   Q   You had authority to do that, though, didn't you?
7   A   I had authority to contact medical providers.  I'm
8       not sure that a pathologist would be within that
9       realm that I --
10  Q   Well, you already had the pathology record, didn't
11      you?
12  A   I did not at this time, no.
13  Q   I'm sorry, during your review, and I need to make
14      clear about this, during the review that we're
15      talking about and you're going through and
16      highlighting different dates, you had the '93
17      pathology report, didn't you?
18  A   I did not receive the '93 pathology report until I
19      received Dr. Cashdollar and Enders' medical records.
20  Q   When was that?
21  A   I'm just going to refer to my chronological.
22      February 2nd, the day after I spoke with Dr. Hurley's
23      office.
24  Q   Then you received the pathology report from '93?
25  A   Correct.

PAGE 53  SHEET 14

53

1  Q  And you had that pathology report before you made
2     your decision with respect to coverage and rescission
3     of an insurance policy?
4  A  That was contained in the claim file, correct.
5  Q  And it was a document you reviewed?
6  A  Along with all other documents, yes.
7  Q  We were referring to Dr. Hurley's -- the calls to his
8     office to attempt to obtain his records. Did you get
9     information at that time that his records had been
10    sent to an attorney?
11 A  I did.
12 Q  Did you attempt to find out who that attorney was so
13    you could get copies of those records?
14 A  I did not.
15 Q  Why?
16 A  I don't recall.
17 Q  You obtained information about the attorney on two
18    occasions, isn't that right, January 31st and again
19    on February 1st?
20 A  Of what year?
21 Q  2000.
22 A  Did I obtain information about an attorney?
23 Q  Yes. And I'm referring to your message notes in your
24    file. There's one note dated January 31st, and at
25    the bottom of that it says attorney involved. And

PAGE 54

54

1     another note, February 1st, where it says four pages
2     attorney in Harrisburg.
3  A  No, this was my writing on the note of January 31st.
4     It was written on February 1st. After my contact on
5     February 1st I wrote attorney involved.
6  Q  Why didn't you get the name of the attorney and get
7     the records?
8  A  I didn't feel it was relevant.
9  Q  Dr. Hurley's records from the surgical procedure
10    removing the mole weren't relevant?
11 A  The attorney information. I thought that's what you
12    were asking, I'm sorry. Maybe you could repeat the
13    question.
14 Q  Well, it's all the question about obtaining
15    Dr. Hurley's records. When you found out Dr. Hurley
16    said he didn't have them, you found out that he had
17    sent them, he sent four pages to an attorney in
18    Harrisburg, but you didn't find out where that
19    attorney's office was so you could try to get the
20    records?
21 A  Well, we did receive the pathology report and one
22    other page from Chambersburg Hospital the next day.
23 Q  Those weren't Dr. Hurley's office records, though,
24    right?
25 A  They may have been contained in his office records.

PAGE 55

55

1  Q  But you don't know because you never obtained them,
2     right?
3  A  Correct.
4  Q  Have you subsequently reviewed Dr. Hurley's records
5     in preparation for your deposition today?
6  A  Not his records, no.
7  Q  So you don't know whether they indicate a cancer or
8     no cancer in the removal of the '93 mole?
9  A  Whether his records do?
10 Q  Right.
11 A  No.
12 Q  So at no point in the entire claims process did you
13    ever get Dr. Hurley's office records?
14 A  His office records, no.
15          MR. KELLEY:  What do you mean by
16       the entire claims process? Can you put a date
17       on that?
18          MR. PEDERSEN:  No.
19          MR. KELLEY:  Well, I'm going to
20       object to the question then on that basis.
21          MR. PEDERSEN:  Sure.
22 Q  What was the next document --
23          MR. KELLEY:  Just, I'm sorry,
24       Steve, I just want to make sure that you're not
25       referring to the entire claims process as

PAGE 56

56

1     continuing up to today.
2          MR. PEDERSEN:  Well, we
3       understand. We understand I've provided to you
4       Dr. Hurley's office notes --
5          MR. KELLEY:  Right.
6          MR. PEDERSEN:  -- a couple of
7       weeks ago.
8          MR. KELLEY:  Right.
9  Q  So up until a couple of weeks ago, you have no
10    information or knowledge about ever getting
11    Dr. Hurley's records, but I'll tell you that I
12    provided them to counsel a couple weeks ago.
13          MR. KELLEY:  And I just want you
14       to understand to the extent that there's any
15       continuing evaluation of this claim going on,
16       that's not being done by Ms. Larson. So I don't
17       want -- I just don't want the record to be
18       confused that when she's saying, you know, I've
19       never seen that in the continuing claims
20       investigation, that she's referring to her piece
21       of this puzzle here.
22          MR. PEDERSEN:  Okay.
23          MR. KELLEY:  All right.
24 Q  What's the next document that in your mind led you to
25    believe that Mr. Hall knew that he had cancer at the

BRENDA LARSON - 11/01/01 / HALL V. CUNA MUTUAL

PAGE 57  SHEET 15

57

1    time he filled out the application in November of
2    '98?
3                MR. KELLEY:  Object to the form.
4        You can answer.
5    A   I don't believe we finished on the letter of
6        February 17th, 1999 to Dr. Chicklo from
7        Dr. Cashdollar, and if I'm repeating, I apologize.
8        The note that indicates, "As you are well aware,
9        Mr. Hall demonstrated a left in-scapular dermal
10       lesion in 1993.  Pathology revealed a malignant
11       melanoma.  Lesion was surgically excised and
12       appeared" -- I'm sorry, "excised with apparent clear
13       surgical margins.  In early 1988 the patient
14       displayed a nontender left cervical lymph node with
15       apparent increase in size," which I assume should
16       have been December 1998.
17   Q   The information that you just read, that doesn't
18       indicate that's a patient history, does it?
19   A   It's talking about the patient's history with another
20       doctor.
21   Q   And you believe that Mr. Hall reported that he had a
22       scapular dermal lesion in '93?
23   A   I believe that he reported to this physician that he
24       had had a surgical resection in 1993 and the past
25       medical history was most notable for malignant

PAGE 58

58

1    melanoma.
2    Q   You think those are Mr. Hall's words, not the
3        doctor's words?
4    A   With regard to the past medical history?
5    Q   With regard to what you just read.
6    A   The upper paragraph or the past medical history?
7    Q   The entire section that you just read that included
8        the dermal lesion, the lymph node, the surgical
9        margins, the lesion, you believe those are Mr. Hall's
10       recitation of his history?
11   A   I would say that the only part that is Mr. Hall's is
12       that the patient had had a surgical resection in 1993
13       of a malignant melanoma.
14   Q   What makes you believe that's Mr. Hall's and not the
15       doctor reporting what he believes after reviewing the
16       pathology report or resections, slides of the mole?
17   A   The past medical history is normally provided by the
18       patient.
19   Q   There are a number of documents from February 17th
20       through July of '99 that make reference to malignant
21       mole, isn't that correct?
22   A   That's correct.
23   Q   And you believe that each time a reference to a
24       malignant mole is made that that's an indication in
25       your mind that Mr. Hall knew he had a malignant mole,

PAGE 59

59

1    a cancer when he filled out his homeowner's
2    application policy?
3    A   If it is under patient medical -- past medical
4        history or patient states, yes.
5    Q   Well, the letter that you just read from doesn't say
6        anywhere patient history or patient states, does it?
7    A   It says --
8    Q   It's a letter?  I'm sorry.
9    A   It says past medical history.  I assume the doctor
10       got the past medical history from the patient.  You
11       asked me what we based our decision on.
12   Q   And let me then go back and try to clarify.  Your
13       decision was based on references from January through
14       July of '99 to a past malignant mole?
15   A   April of 1998.
16   Q   Let me do a kind of listing and see if I get this
17       right.
18   A   Okay.
19   Q   From January -- January 22nd, '99 through July of
20       '99, references in the medical record to a malignant
21       mole that was removed in '93 for the first part, that
22       was one consideration?
23   A   In '93, yes.
24   Q   Well, those letters in '99 refer to the '93 mole,
25       malignant mole?

PAGE 60

60

1    A   There's also one that indicates 1996, but yes.
2    Q   And an April '98 doctor visit where there's a
3        question mark and then melanoma?
4    A   Where there's a question mark before the sentence,
5        yes.
6    Q   Question mark, melanoma and then a date of 1996?
7    A   Back, 1996.
8    Q   And a pathology report done at the time of the
9        removal of the mole that showed no cancer?
10   A   In combination with all of the other documents, yes.
11   Q   Right.  I'm kind of listing then --
12   A   Yep.
13   Q   -- trying to summarize them, see if I have this
14       right.  And Dr. Hurley's surgical records from
15       Chambersburg in '93, they show no cancer?
16   A   I believe you just said that.
17   Q   Well, you referred to then.  You had it open, right?
18       There was no mention of cancer or malignancy?
19   A   I thought -- I'm just saying I thought I just
20       answered that, from your records.
21   Q   And a statement from your own insured before he died
22       that he didn't know that he had cancer, that no one
23       told him he had cancer?
24   A   I know of no statement before he died.
25   Q   Well, isn't that what that application is, he checked

BRENDA LARSON - 11/01/01 / HALL V. CUNA MUTUAL

PAGE 61  SHEET 16

61

1    the box no and signed it and signed it knowing that
2    he could be investigated and under penalties of fraud
3    signing a statement that no one ever told him he had
4    cancer; isn't that what he's done?
5    A   He did.  He also didn't indicate a back surgery
6        either and signed that document.
7    Q   So you have an affirmative statement signed by and
8        dated by an insured that he's never been told that he
9        had cancer, is that right?
10   A   He's been told that he doesn't have any of those,
11       yes, that's correct, any of those conditions.
12   Q   And you weighed that also?
13   A   Weighed what also?
14   Q   You weighed the affirmative statement of the insured
15       along with the other things that I've told you, and
16       you concluded that you were not going to honor the
17       policy?
18   A   We weighed all of the documents that we had in our
19       possession, correct.
20   Q   And I've just highlighted them, is that right?
21   A   Not all of them, but, yes, some of them.
22   Q   By categories I've highlighted them, haven't I?
23   A   Again you've highlighted some of them, not all of
24       them, yes.
25   Q   How were you trained to weigh a pathology report and

PAGE 62

62

1    an operative note and statements from an insured
2    against entries in a medical record after the
3    application is made?  Who taught you how to weigh
4    those and conclude not to uphold the insured?
5    A   I don't know that any one person taught me to do
6        that.  Certainly we regard medical history and
7        medical records as an important part of a claim
8        investigation.
9    Q   Unless you don't obtain them?
10   A   I believe we had -- I'm sorry.  That would be --
11              MR. KELLEY:  Objection,
12          argumentative.  Let's move on.
13   Q   What part of your training or your experience at CUNA
14       Mutual taught you how to balance those factors in
15       deciding whether to deny benefits under a homeowner's
16       policy?
17   A   I guess my experience is not just from CUNA Mutual.
18   Q   Did you ever pick up the phone and call Mrs. Hall and
19       ask her about her husband's knowledge of the tumor or
20       cancer?
21   A   I did not pick up the phone, no.  I did write her a
22       letter in which I indicated she could contact me.
23   Q   Why didn't you call her?
24   A   I wouldn't call an insured's spouse after he was
25       deceased to ask about whether or not he knew he had a

PAGE 63

63

1    malignant melanoma prior to application.
2    Q   Why not, where she's going to lose her home as a
3        result of your decision, why not call her?
4              MR. KELLEY:  Objection,
5          objection.  Come on, Steve.
6    Q   Why not call her?
7    A   Because --
8    Q   Do you think she's too traumatically involved in her
9        husband's death?
10   A   I don't know that she knows all of his medical
11       history.
12   Q   You wouldn't know until you called, would you?
13   A   I wouldn't know if she knew all of his medical
14       history even if I did call.
15   Q   And so instead of calling her, you processed the
16       claim based on the records that you had?
17   A   Not instead of calling her.  We reviewed the records
18       that we had.
19   Q   Mrs. Hall was also an insured, wasn't she?  Wasn't
20       she one of the individuals, she was Borrower 2?
21   A   I don't believe she was.  He elected single life
22       coverage only.
23   Q   You were insuring his life, but she was one of the
24       beneficiaries under the policy, wasn't she?
25   A   No, the beneficiary is the credit union.

PAGE 64

64

1    Q   Well, she was Borrower 2 listed on the application
2        and was required to provide medical and health
3        information to you, wasn't she?
4    A   She was not.  She crossed off her portion of the
5        application and he applied for single coverage, not
6        joint coverage, and was issued such.
7    Q   Did you have an understanding that Mrs. Hall was a
8        co-homeowner?
9    A   No.
10   Q   Did you have any understanding as to the relationship
11       between Mr. and Mrs. Hall?
12              MR. KELLEY:  Object to the form.
13   Q   Did you know they were married?
14   A   I don't know that they were married, no.
15   Q   Did you have any reason to doubt they were married
16       when they were Mr. and Mrs. Hall signing on the form?
17   A   They could be divorced with the same last name, I
18       don't know.
19   Q   And filling out a joint mortgage application?
20   A   A single mortgage application.
21   Q   That bore her signature with the date?
22   A   Is that a question or --
23   Q   Did it bear her signature with a date?
24   A   It did bear her signature with a date.
25   Q   Did you have authorization to give all of her medical

BRENDA LARSON - 11/01/01 / HALL V. CUNA MUTUAL

PAGE 65  SHEET 17

65

1      records and private information with that signature?
2  A  There would be no reason to get all of her medical
3      records because she didn't apply for the coverage.
4      He applied for it alone.
5  Q  You had authorization to get it, though, by her
6      signature?
7  A  I had authorization, but I certainly wouldn't.  She
8      didn't apply for any coverage.
9  Q  Who at CUNA Mutual is most knowledgeable with respect
10     to the amount of premiums collected versus the amount
11     of benefits paid?  Is that you or not you?
12  A  It would not be me.
13  Q  Who would that be at CUNA Mutual?
14  A  I have no idea.
15  Q  Who is the president of CUNA Mutual?
16          MR. KELLEY:  Steve, before we
17     continue, we've been going for a little while.
18     Let's take a little break.
19          MR. PEDERSEN:  Okay.  Sure.
20     (Short recess is taken)
21  Q  I have a number of questions in general categories
22     relating to CUNA Mutual, and if you don't know the
23     answers, I'll ask you to indicate who might be the
24     best person or what category of person would be the
25     best one to answer that question.

PAGE 66

66

1  A  Okay.
2  Q  And the first one was, and I think I asked this
3     already, the amount of premiums collected versus the
4     amount paid out, and you said you would not know
5     that.  And I believe you said you wouldn't know who
6     the best person to ask is.  And then my question was
7     then do you know who is the president of CUNA Mutual
8     or someone in charge of finance at CUNA Mutual?
9  A  Mike Kitchen is the president.
10  Q  What's his name, Mike?
11  A  Kitchen.
12  Q  Like the kitchen in your house?
13  A  Correct.
14  Q  Is there anyone else that comes to mind that would be
15     knowledgeable about that?
16  A  I don't know any personal names of people, no.
17  Q  Categories, the division manager or something?
18  A  No.
19  Q  I don't know the titles that are used at CUNA
20     Mutual.
21  A  I don't know specific titles.  I would imagine
22     someone in the financial area, I don't know,
23     premiums.
24  Q  Is there a division within CUNA Mutual relating
25     specifically to finance?

PAGE 67

67

1  A  I don't know all the divisions in CUNA Mutual, sorry.
2  Q  The amount of premiums collected on home mortgage
3     insurance policies specifically, would that come
4     within your area?
5  A  I don't have personal knowledge of it, no.
6  Q  Who would, who's in charge of the home mortgage
7     insurance?
8  A  Who's in charge of the home mortgage insurance?
9  Q  Right.
10  A  Or who would know that question or the answer to that
11     question?
12  Q  I can break it down into two parts.  I'm trying to
13     find the answer to that question.
14  A  Deb Haglund is the manager of the home mortgage
15     protection area.
16  Q  How do you spell Haglund?
17  A  H-A-G-L-U-N-D.
18          MR. KELLEY:  Steve, just one
19     point.  I mean I don't have any problem with you
20     asking her about who are the people involved and
21     who would have knowledge about these things,
22     but -- and it doesn't sound like this witness is
23     going to have knowledge about, you know --
24          MR. PEDERSEN:  You want to
25     designate corporate designees instead, is that

PAGE 68

68

1     what you're suggesting?
2          MR. KELLEY:  Well, no.  What I'm
3     saying is I don't think this witness is going to
4     know about how much money at any different level
5     at CUNA that they bring in in policies or
6     anything like that.
7     But I think it's objectionable at this
8     point because unless you've got some other basis
9     for asking that question, I think that goes to
10     your punitive damage claim, but we're not to the
11     point where you can get discovery on punitive
12     damages.
13          MR. PEDERSEN:  Off the record.
14     (Discussion off the record)
15  Q  I would like to go specifically to your letter to
16     Mrs. Hall.  Is that a February 10th letter?
17  A  Let me see if I can find my copy here.
18  Q  It is February 10th, 2000 to Mrs. Hall.
19          THE WITNESS:  Do you have your
20     copy?
21          MR. KELLEY:  Yep.
22          THE WITNESS:  Can I just look at
23     yours?
24          MR. KELLEY:  Absolutely.
25          THE WITNESS:  Thank you, I

BRENDA LARSON - 11/01/01 / HALL V. CUNA MUTUAL

PAGE 69  SHEET 18

69

1       appreciate it.
2           MR. KELLEY:  You're welcome.
3    A   Okay.
4    Q   You indicate in that letter that Tommy, and you're
5        referring to Mr. Hall, visited a doctor in '93 and on
6        the application he did not indicate that the visit
7        occurred.  Where on the application was Mr. Hall to
8        indicate that the visit occurred to a doctor in '93?
9    A   Our question on the application, Question No. 1,
10       indicated -- indicates have you ever been told, and I
11       would have to quote it exactly here.
12          MR. KELLEY:  Why don't you do
13       that?
14          THE WITNESS:  Okay.
15   A   "Have you ever been treated for or diagnosed by a
16       member of the medical profession as having any of the
17       following.  Please check the box and circle condition
18       or conditions that apply."
19          And we also on the application have an area for,
20       "Give full details below for any health problem
21       indicated in this section.  The name of the person,
22       name and address of physician, nature of condition,
23       dates and duration."
24   Q   So I just want to understand what you're telling
25       Mrs. Hall.  Are you telling Mrs. Hall that Mr. Hall

PAGE 70

70

1        should have marked as Borrower 1 yes, should have
2        circled cancer and should have indicated the 1993
3        removal of a mole and Dr. Hurley's name?
4    A   Not just Dr. Hurley's name, but yes.
5    Q   What do you mean, not just Dr. Hurley's name, but
6        yes?
7    A   The application indicates, "Give full details below
8        for any health problem indicated in this section."
9        There may or may not have been more than one
10       physician.
11   Q   Well, now you've reviewed the records.  What
12       physician's name are you saying should have been
13       included other than Dr. Hurley?
14   A   Are you talking about cancer specifically or any of
15       the conditions?
16   Q   No, I'm referring to your letter --
17   A   Okay.
18   Q   -- of February 10th.  And you tell Mrs. Hall that the
19       review showed that Tommy visited a doctor in 1993.
20       On the application Tommy did not indicate this visit
21       had occurred.
22          And I'm asking you where on the form, how should
23       the form have been filled out to properly in
24       apparently your own conclusions have indicated his
25       medical condition at the time.  You're telling

PAGE 71

71

1        Mrs. Hall he did it improperly, he left some stuff
2        out?
3    A   Correct.
4    Q   He did not indicate that that visit had occurred in
5        '93.  So I'm asking you based upon your review how
6        the form should have been filled out to alleviate
7        that concern.
8    A   With regard to the 1993 visit?
9    Q   Well, that's what you told Mrs. Hall.  I'm not making
10       that up.
11   A   Right.
12   Q   That's what you told Mrs. Hall.
13   A   I see that.
14   Q   And how would you have remedied the problems that you
15       indicated to Mrs. Hall that were on the application?
16   A   Based on our review, yes would have been an
17       indication for Question No. 1.
18   Q   Mr. Hall should have marked yes in your opinion --
19   A   That's correct.
20   Q   -- to No. 1?  And that what else should he have done
21       to remedy the problem that you identified to
22       Mrs. Hall?
23   A   To remedy the problem addressed in that letter would
24       be to give full details below for any health problem
25       indicated in this section.

PAGE 72

72

1    Q   Well, first of all, he should have marked yes instead
2        of no, and should he have circled anything?
3    A   Yes.
4    Q   What should he have circled to remedy that problem
5        indicated in your letter to Mrs. Hall?
6    A   Based on the information that we received, cancer and
7        back.
8    Q   You didn't tell Mrs. Hall anything about failure to
9        identify a back problem, did you?
10   A   I did not in my letter of February 10th of 2000.
11   Q   So to remedy the problems indicated in your letter,
12       it would have been to circle cancer, is that right?
13   A   Correct.
14   Q   And you believed that Mr. Hall should have marked
15       cancer even though his pathology report showed no
16       cancer?
17   A   I believe that he should have marked yes based on all
18       of the documents we received.
19   Q   Including a document, a '93 pathology report that
20       said there was no cancer?
21   A   Again all -- based on all of the documents we
22       received.  And we did receive the pathology report.
23   Q   You wouldn't have considered that to be a false
24       application form to circle cancer when he had a
25       pathology report that said there was no cancer?

PAGE 73  SHEET 19

73

1  A  Based again on all the documents we received, yes.
2  Q  You would have considered that a false report?
3  A  If he marked no?  Sorry.
4  Q  If he had circled cancer when he had a pathology
5     report telling him there was no cancer.  Would that
6     have been a false application?
7  A  Again --
8           MR. KELLEY:  Is your question
9        that if that's all that exists in this case or
10       is she to consider all of the other information
11       that she's aware of?
12 Q  You're referring to a doctor visit in '93 in your
13    letter to Mrs. Hall that should have been included
14    and the results of that visit, aren't you?
15          MR. KELLEY:  Object to the form.
16 Q  I'd be happy to go through the letter again with
17    you.
18 A  No.  I am referring to a doctor visit in 1993.
19 Q  And that doctor visit your understanding was for the
20    removal of a mole?
21 A  Correct.
22 Q  And there was a pathology report that was done
23    coincidentally, simultaneously or in conjunction with
24    that doctor visit, wasn't there?
25 A  There was a pathology report along with other

PAGE 74

74

1     documents that reference the 1993 visit.
2  Q  And you indicate in your letter to Mrs. Hall that
3     Tommy or Mr. Hall did not indicate the visit
4     occurred, that '93 visit, isn't that what you're
5     referring to?
6  A  Yes, in the letter it indicates that he did not
7     indicate that a 1993 visit occurred.
8  Q  And you further indicate to Mrs. Hall that, "Had we
9     known about the medical condition revealed during
10    that visit, we would not have accepted the
11    application;" is that what you indicate in your
12    letter?
13 A  Had we known about that visit prior to application,
14    correct.
15 Q  And what is the medical condition in 1993 based on
16    the 1993 visit that you claim Mr. Hall provided false
17    information about?
18 A  About the 1993 malignant melanoma indicated in all
19    the documents we received -- well, not in all.
20    Within the documents we received, I should say.
21 Q  And in none of the documents from '93, not any?
22 A  That would be correct.
23 Q  In fact, all of the '93 documents that you reviewed
24    state there was no cancer?
25 A  That's correct.

PAGE 75

75

1  Q  And so for Mr. Hall --
2           MR. KELLEY:  We've been over this
3        a number of times, so let's move on.
4  Q  For Mr. Hall to have marked cancer based upon the '93
5     visit would not have been truthful, would it?
6  A  Again based on the information that we received, a
7     yes answer is the answer that should have been
8     marked, according to that information that we
9     received.
10 Q  From the '93 visit, from the '93 pathology report,
11    from the '93 hospital record, there's nothing in any
12    of those that indicate cancer, is there?
13          MR. KELLEY:  Objection, asked and
14       answered.  Come on, Steve, let's move on.
15 Q  Is there?
16          THE WITNESS:  Am I to answer?
17          MR. KELLEY:  Go ahead, answer it
18       again.  It's getting argumentative.  I'm going
19       to put a stop to it soon.
20 A  Again based on the documents that we received.
21 Q  Listen to the question, that's the problem.  I'm not
22    getting the answer to the question that's being
23    asked.
24    Based upon the 1993 pathology report,
25    Dr. Hurley's -- the portions of the records that you

PAGE 76

76

1     have and the surgical report from the removal of the
2     '93 mole, is there anything in any of those records
3     that indicate Mr. Hall had cancer?
4  A  In none of the medical records that we were able to
5     retain -- obtain from 1993, correct.
6  Q  And so when you refer to the '93 visit that should
7     have been listed on the application, there was
8     nothing cancerous to report about that visit, was
9     there?
10          MR. KELLEY:  Objection, asked and
11       answered.  Six times.
12 Q  There was nothing cancerous to report about the '93
13    visit, was there?
14 A  Again based on the documents that we received that
15    indicated that there was a malignant melanoma in
16    1993, I believe that it should have been a yes
17    answer.
18 Q  Didn't you say in your letter that the medical
19    condition that you're referring to was revealed
20    during that visit?
21 A  It says, "Had we known about the medical condition
22    revealed during that visit."
23 Q  What information do you have that a medical condition
24    of melanoma cancer was revealed during the visit?
25          MR. KELLEY:  That's not what the

PAGE 77  SHEET 20

77

1       letter says, objection.
2  Q  In '93? What information do you have that a medical
3      condition was revealed during the visit of '93?
4              MR. KELLEY:  That's a different
5      question.  Go ahead.
6  A  Do you want me to go through every medical record
7      that we have?
8              MR. KELLEY:  Yeah, listen to his
9      question.
10            THE WITNESS:  Okay.
11            MR. KELLEY:  Listen to his
12      question.  Go ahead, Steve.
13  Q  What information do you have that Mr. Hall's medical
14      condition was revealed during the '93 visit?
15  A  I don't have the 1993 visit records.
16  Q  You didn't have those visit records, did you?
17  A  No, we had all the other documents.
18  Q  Yet it's the failure to reveal information about that
19      visit that's the basis for your letter to Mrs. Hall,
20      isn't it?
21  A  Based again on the documents that we had -- are you
22      saying from Dr. Hurley's documents or all documents?
23  Q  I'm saying your letter.  I'm only talking about your
24      letter.
25  A  And we're referring to the 1993 visit as reported in

PAGE 78

78

1      the documents that we have.
2  Q  Your letter reflects a doctor visit in '93 that was
3      not revealed by Tom Hall, a medical condition that
4      was revealed during that visit?
5             MR. KELLEY:  No, no.  Objection.
6      It's not what that letter says.
7            MR. PEDERSEN:  It says a medical
8      condition revealed during that visit.
9            MR. KELLEY:  "Had we known about
10      the medical condition revealed during that
11      visit."  You're reading that letter to say that
12      that means that it was discussed with him on
13      that visit.
14         What this letter is saying is that there is
15      a medical condition that was revealed at that
16      time.  Whether it was revealed sometime after
17      that to Tommy Hall is a different issue.
18  Q  The only medical condition revealed in 1993 during
19      the '93 visit was the removal of a benign mole, isn't
20      that true?
21  A  Based on the documents we have, I would say no.
22  Q  Wouldn't you defer to Dr. Hurley to tell us what was
23      revealed in his own medical doctor visit and by that
24      procedure?
25  A  I believe I requested the records from Dr. Hurley's

PAGE 79

79

1      office.
2  Q  Dr. Hurley would know better than you what condition
3      was revealed during the September -- during the 1993
4      office visit, wouldn't he?
5  A  He would know better than me, yes.
6  Q  And if he said that it was a benign condition, that a
7      mole was removed, a benign condition, that would
8      differ from what you believe was revealed in the '93
9      visit, isn't it?
10  A  I personally don't have anything that says Dr. Hurley
11      said it was a benign visit.
12  Q  You don't know whether your counsel does or not
13      today?
14  A  I don't believe so.
15  Q  You refer in Paragraph 3 of your February 18th letter
16      to the home mortgage insurance contract that allows
17      you to contest the validity of the policy within the
18      two years from the date of the contract.  Which
19      portion of the policy are you referring to?
20  A  The general provisions portion of the policy.
21  Q  Let me clarify.  Doesn't that provision -- maybe you
22      can help me.  That provision simply states that after
23      two years you cannot test the validity of the
24      insurance contract?
25  A  The provision states no statement can be used to void

PAGE 80

80

1      or deny a claim -- wait.  It says, "After two years
2      no statement made by you or your joint insured debtor
3      can be used to void this insurance or deny a claim."
4  Q  Right.  So that's the policy provision that says
5      after the policy is in effect for two years, then we
6      can't go back and look at statements made by the
7      insured to rescind a policy?
8  A  Correct.
9  Q  That doesn't say the converse, does it?  It doesn't
10      say during a two-year period we have the right to
11      rescind the policy?
12  A  That we have the right to?
13  Q  Right.  It doesn't say that, does it?
14  A  It states, "After two years no statement made by you
15      or your joint insured debtor can be used to void this
16      insurance or deny a claim."
17  Q  Right.  And it doesn't state the converse of that,
18      that CUNA has a right to contest the validity of the
19      policy within the two-year period?  It simply says
20      after the two years, the -- no statements by the
21      insured can be used to void the policy?
22  A  You're correct, that statement is not in that
23      policy -- in that language.
24  Q  So when you told the insured, Mrs. Hall -- let me
25      strike the insured.

PAGE 81  SHEET 21

81

1    When you told Mrs. Hall that the mortgage
2  insurance contract had a provision that allowed you
3  to contest the validity of the policy within the
4  two-year period, it doesn't say that, does it, the
5  policy?
6  A    Again it says, "After two years from the effective
7  date of insurance for you or your joint insured
8  debtor, no statement made by you or your joint
9  insured debtor can be used to void this insurance or
10  deny a claim." Are you asking word for word? No.
11  Q    And the general concept, that doesn't grant the
12  insurance company the right to contest the validity
13  of a policy, it simply says after two years we can't?
14  A    It doesn't grant and it doesn't not allow the
15  insurance company.
16  Q    Right. It doesn't speak to that, right, what an
17  insurance company can do within the two-year period?
18         THE WITNESS:  Am I not getting
19      this? I'm sorry. I guess I don't understand
20      the question.
21         MR. KELLEY:  Well, you're trying
22      to argue with her about the law here, Steve.
23      You're better off doing it before the judge.
24  Q    Did you tell Mrs. --
25         MR. KELLEY:  Just objection for

PAGE 82

82

1      the record. What she believes about it is
2      really -- I mean is immaterial. It's going to
3      be a legal issue that's going to be determined
4      by the Court whether or not CUNA had the ability
5      to rescind this policy within the two-year
6      contestability period.
7         MR. PEDERSEN:  We disagree. I'm
8      referring to a February 10th letter in which
9      Ms. Larson affirmatively states what the policy
10      provides, and I'm suggesting that's a false
11      statement.
12         MR. KELLEY:  And the policy does
13      provide that, and she can answer the question.
14  Q    Did you also in your February 10th, 2000 letter tell
15  Mrs. Hall that no benefits will be paid under this
16  contract either now or in the future?
17  A    I believe that is in the letter. That is in the
18  letter, yes.
19  Q    You didn't leave a door open for Mrs. Hall to provide
20  further information to you?
21  A    Not in this letter specifically. My phone number is
22  there, though.
23  Q    You didn't suggest to Mrs. Hall that you were still
24  missing Dr. Hurley's records and if she could get
25  those, that would be helpful?

PAGE 83

83

1  A    That is not in the letter.
2  Q    Your letter is definitive that no benefits will be
3  paid either now or in the future, period, isn't that
4  right?
5  A    I don't think that it is definitive. If Mrs. Hall
6  would have presented or contacted me that she had
7  additional information, we certainly would review it.
8  Q    And do you believe this letter opened the door for
9  Mrs. Hall to do that kind of thing, to provide you
10  with additional information after you told her that
11  no benefits will be paid under this contract either
12  now or in the future? Did you leave a door open for
13  Mrs. Hall according to the letter?
14  A    I believe there's always a door open, certainly.
15  Q    And that's how you would read your own words, that
16  you left a door open for Mrs. Hall to provide more
17  information to you?
18  A    My name and phone number is there. Certainly if
19      there was more information, I would have been happy
20      to consider it.
21  Q    That's not what you told Mrs. Hall anywhere on the
22      letter, though, is it, that you'd be happy to
23      consider additional information?
24         MR. KELLEY:  Objection, asked and
25      answered. Move on.

PAGE 84

84

1         MR. PEDERSEN:  Don't raise your
2      voice, don't raise your voice. You can object,
3      but you can't yell and raise your voice to me,
4      not here, not anywhere.
5         MR. KELLEY:  You know, I've been
6      very patient with you here asking the same
7      question five times over again.
8         MR. PEDERSEN:  Then just object,
9      ask me to move on.
10         MR. KELLEY:  Let's move on. I
11      apologize for raising my voice. Objection, move
12      on.
13         MR. PEDERSEN:  I don't have any
14      other questions. For the record, I won't be
15      yelled at in any -- any time in my career, I'm
16      not going to be yelled at.
17         MR. KELLEY:  I apologize for
18      raising my voice, Steve.
19         MR. PEDERSEN:  The deposition is
20      over. I reserve the right to read and sign the
21      deposition.
22         MR. KELLEY:  I have some
23      questions. Please, I apologize for raising my
24      voice. I apologize for doing so. I have
25      questions. Are you going to stay for then?

BRENDA LARSON - 11/01/01 / HALL V. CUNA MUTUAL

PAGE 85  SHEET 22

85

1      MR. PEDERSEN:  I believe the
2  deposition is over.  I will stay because
3  questions from the other side are going to be
4  asked.  I have additional questions which I have
5  not asked, but I won't continue with being
6  yelled at in a deposition.
7      MR. KELLEY:  You can continue on
8  asking the questions, Steve.
9      MR. PEDERSEN:  Not being yelled
10  at in a deposition, I won't.  I won't do that.
11      MR. KELLEY:  Steve, ask your
12  questions.
13      MR. PEDERSEN:  No, I'm not going
14  to ask further questions.
15      MR. KELLEY:  I promise you that I
16  won't raise my voice again.  Ask your
17  questions.
18      MR. PEDERSEN:  No.
19      MR. KELLEY:  Okay.  Your choice.
20      EXAMINATION
21  BY MR. KELLEY:
22  Q  I have a couple questions for you.
23  A  Okay.
24  Q  Oh, at any time did you have any conversation with
25  Mrs. Hall's attorneys about the status of this claim?

PAGE 86

86

1  A  I did receive a phone call on March 14th, 2001.
2      MR. PEDERSEN:  I believe she's
3  referring to a record that hasn't been provided
4  after you reviewed the documents, a telephone
5  data sheet.  I've never seen that before.
6      MR. KELLEY:  Okay.  Let me take a
7  look at it.  There you go.
8      MR. PEDERSEN:  I'd like a copy of
9  this.
10      MR. KELLEY:  We'll get it for
11  you.
12  Q  Did you have a conversation with plaintiff's counsel?
13  A  I did.
14  Q  Which counsel was that, which lawyer was it?
15  A  Steve Pedersen.
16  Q  Would you describe that for the record, what that
17  conversation was about?
18  A  Mr. Pedersen called to indicate that he represented
19  the estate of Tommy Hall and his wife Nancy Hall in
20  numerous litigations and wished to discuss the file
21  with me.
22  Q  What else did you discuss with him?
23  A  I discussed that in order to further discuss the
24  file, that I would need written authorization from
25  him, and he further stated that he had that

PAGE 87

87

1  authorization along with depositions, and he noted a
2  taped deposition from Mr. Hall prior to his death,
3  along with medical providers, which may result in
4  medical malpractice lawsuits due to the
5  understatement of a 1993 pathology report.
6  Q  Did you indicate to him at that time that you would
7  be receptive to reviewing that information?
8  A  I did.  I indicated that if he had additional or
9  further information, we'd be happy to review that
10  information as long as it was submitted in writing to
11  us along with the authorization.
12  Q  Was this the only contact that you had with
13  plaintiff's attorneys?
14  A  It was.
15  Q  Did you ever receive anything further, you personally
16  ever receive anything further from Mr. Pedersen or
17  any of the -- Mrs. Hall's attorneys?
18  A  I have not personally received anything.
19      MR. KELLEY:  Okay.  That's all I
20  have.
21      MR. PEDERSEN:  I have nothing.
22      (3:35 p.m.)
23
24
25

PAGE 88

88

1  STATE OF WISCONSIN   )
2                       )  ss
3  COUNTY OF DANE       )
4      I, LISA A. CREERON, a Notary Public in and for
5  the State of Wisconsin, do hereby certify that the
6  above deposition was taken before me on the 1st
7  day of November, 2001, commencing at 1:28 p.m., at
8  Melli, Walker, Pease & Ruhly, 10 East Doty Street, in
9  the City of Madison, in said County and State, that it
10  was taken at the request of the plaintiff, upon verbal
11  interrogatories, that it was taken in shorthand by me, a
12  competent court reporter and disinterested person,
13  approved by all parties in interest, and thereafter
14  reduced to typewriting by me; that the said deposition is
15  a true record of the deponent's testimony; that the said
16  deposition is to be used in the above-entitled action now
17  pending in Federal Court; that the deposition was taken
18  pursuant to notice; that the said BRENDA LARSON,
19  before examination, was sworn by me to testify the truth,
20  the whole truth, and nothing but the truth relative to
21  said cause.  Dated at Madison, Wisconsin, this 5th day of
22  November, 2001.
23      ------------------------------------
24      NOTARY PUBLIC, STATE OF WISCONSIN
25      REGISTERED PROFESSIONAL REPORTER

## &

**&** 2:10,18 88:7

## ,

**'93** 31:23,25 32:7,13,15,18,21,22 34:25 35:4 37:24 38:16,24 39:20 42:18 43:4 44:4,7 46:2,16 48:4 49: 11,23 52:1,16,18,24 55:8 57:22 59: 21,23,24 60:15 69:5,8 71:5 72:19 73:12 74:4,21,23 75:4,10,10,11 76: 2,6,12 77:2,3,14 78:2,19 79:8
**'96** 33:9 34:11,12,19 35:10,13,19, 20,21 46:16
**'98** 29:23 36:3,6 37:20 39:1 41:24 42:3,11 43:3 44:18,25 46:2 57:2 60:2
**'99** 8:16 9:5 14:9,18,24 17:21 37: 19 38:5 43:15 44:11 46:12,16 58: 20 59:14,19,20,24

## *

**\*** 3:7,7,7,7,7

## 1

**1** 3:6 20:6,7 25:15,17,19 41:12 69: 9 70:1 71:17,20
**10** 2:10 88:7
**10th** 68:16,18 70:18 72:10 79:15 82:8,14
**14th** 86:1
**15th** 34:14
**17108** 2:19
**17th** 41:25 42:16 44:11 57:6 58:19
**18** 4:3
**1988** 57:13
**1989** 42:8
**1993** 32:23 37:13 38:8,20 42:7,9, 14 43:5,13 46:15 48:21 49:13 57: 10,24 58:12 70:2,19 71:8 73:18 74:1,7,15,16,18 75:24 76:5,16 77: 15,25 78:18 79:3 87:5
**1996** 30:19 33:8 35:7,18,24 36:2 46:15 60:1,6,7
**1997** 9:10,10
**1998** 30:17 44:13 57:16 59:15
**1999** 6:25 34:14 37:10,18 42:16 57:6
**1:28** 2:13 88:6
**1st** 2:12 53:19 54:1,4,5 88:5

## 2

**2** 63:20 64:1
**20** 3:6
**2000** 4:10 14:10 19:10 44:8 50:5 53:21 68:18 72:10 82:14
**2001** 2:12 4:3 21:2 86:1 88:6,21
**22nd** 37:10,18,19 38:5,12 59:19
**2nd** 52:22

## 3

**3** 79:15
**30** 50:20
**30th** 30:17 36:3 44:13
**31st** 50:5 53:18,24 54:3
**3:35** 87:22

## 4

**4** 3:3 4:10

## 5

**50** 18:5
**5th** 88:20

## 8

**8** 3:4

## A

**ability** 28:5 82:4
**able** 12:6 76:4
**about** 10:13 19:17 24:13 25:24 27:10 28:9,12,14,15,15 29:10 32: 10 39:5 40:18 42:10,22 45:2 46: 11,12,17 47:2,10 48:16,16,19 50: 15 51:1,13,15 52:14,15 53:17,22 54:14 56:10 57:19 62:19,25 66:15 67:20,21,23 68:4 70:14 72:8 74:9, 13,17,18 76:8,12,21 77:18,23 78:9
**aren't** 6:13 10:1 12:31:21 48:8,20 73:14
**argue** 81:22
**argumentative** 47:8 62:12 75:18
**articles** 4:15
**ask** 19:17 33:21 35:9 62:19,25 65: 23 66:6 84:9 85:11,14,16
**Asked** 34:22 35:16 49:12 59:11 66:2 75:13,23 76:10 83:24 85:4,5
**asking** 12:24 17:1,8 25:25 28:19, 19 36:14 42:21 43:23 54:12 67:20

## B

**back** 14:15 30:19 31:6 32:25 37: 14,16 38:6,8 59:12 60:7 61:5 72:7, 9 80:6
**balance** 6:19 9:11
**balance** 8:3 62:14
**Based** 24:15,16 26:25 37:22 38:18 44:21 46:25 47:2,21,22 59:11,13 63:16 71:5,16 72:6,17,21 73:1 74: 15 75:4,6,20,24 76:14 77:21 78:2
**basis** 26:13,20 34:25 36:9,19 55: 20 68:8 77:19
**bear** 64:23,24
**became** 8:16 44:7
**Because** 7:7 14:11 21:22 22:8,13 23:25 29:25 33:8 39:12 46:22 51: 21 55:1 63:7 65:3 68:8 85:2
**become** 15:10
**before** 2:7 14:1,6,13 19:21 28:22 33:24 37:1,1 44:17 53:1 60:4,21, 24 65:16 81:23 86:5 88:5,18
**behalf** 2:16
**believe** 6:2,4 20:15,22 23:16 24:2 25:22 26:20 27:20 30:2,10 33:9 34:13,18 36:5 37:6,18,19 40:10 42:2,11 43:2,3 45:14 47:25 50:25 56:25 57:5,21,23 58:9,14,23 60:16 62:10 63:21 66:7 72:17 76:16 78: 25 79:8,14 82:17 83:8,14 85:1 86: 2
**believed** 29:11 41:23 72:14
**believes** 58:15 82:1
**below** 69:20 70:7 71:24
**beneficiaries** 63:24
**beneficiary** 7:15 63:25
**benefits** 7:14,21 9:7 25:4,7 26:11 41:1 62:15 65:11 82:15 83:2,11
**benign** 11:2,4,9,12,15 78:19 79:6, 7
**besides** 34:10
**best** 18:7 28:5 65:24,25 66:6
**better** 49:10 79:2,5 81:23
**between** 18:15 64:11
**bill** 6:17 15:13,16 18:22
**binder** 6:5
**bore** 64:21
**Borrower** 25:17,19 63:20 64:1 70: 1
**both** 17:17
**bottom** 53:25
**box** 39:12 61:1 69:17
**break** 65:18 67:12
**Breese** 14:2,3
**BRENDA** 2:1 3:8 5:7 88:17
**Brenda's** 4:22
**bring** 5:16,18 68:5
**bringing** 5:23
**brought** 6:2 49:20
**bulletin** 4:9

## C

**C-H-I-C-K-L-O** 37:11
**call** 28:21 43:18,25 51:25 62:18, 23,24 63:3,6,14 86:1
**called** 3:9 7:6 63:12 86:18
**calling** 63:15,17
**calls** 28:17 32:10 43:16 53:7
**came** 18:3,23
**Camp** 2:16
**can** 6:16 8:13 9:15 16:1 22:15 23: 18 27:20 29:1 30:14,15 31:19 34:

## (continued, far right column)

22 40:6 41:2,18 42:23 45:3,7,16, 18,22 51:18 55:16 57:4 67:12 68: 11,17,22 79:22,25 80:3,15,21 81:9, 17 82:13 84:2 85:7
**can't** 23:19 34:3 80:6 81:13 84:3
**cancer** 10:14,21 11:6,20,23 29:18, 23 30:3,11,13 34:3 36:6 37:6,21,24 39:1,6,23 41:24 42:11 44:5,8,12,24 46:24 47:4,4 48:23 52:2 55:7,8 56: 25 59:1 60:9,15,18,22,23 61:4,9 62:20 70:2,14 72:6,12,15,16,20,24, 25 73:4,5 74:24 75:4,12 76:3,24
**cancerous** 11:11 13:18,18,19 42: 4 76:8,12
**cannot** 23:20 79:23
**carcinoma** 38:14
**care** 48:7,18 51:1
**career** 84:15
**case** 5:18 8:1 26:24 27:8 40:14 73:9
**cases** 7:23,25
**Cashdollar** 42:1 52:19 57:7
**categories** 61:22 65:21 66:17
**category** 65:24
**cause** 3:10 29:13 88:20
**caused** 27:10 36:15
**cell** 13:17
**cells** 13:16
**certain** 13:11 16:12
**certainly** 6:16 10:20 12:13 62:6 65:7 83:7,14,18
**certificate** 22:24 23:1 3,6,7,10,15, 24:15,16,20,24 25:8 26:7,11,18,25 27:9,25 29:11,19
**certify** 88:4
**cervical** 57:14
**Chambersburg** 48:3,6,18 54:22 60:15
**changes** 33:2
**characteristics** 11:2
**charge** 66:8 67:6,8
**Charlesworth's** 30:8,9 37:9
**check** 13:7 48:5 69:17
**checked** 60:25
**Chicklo** 37:11 38:19 41:25 57:6
**choice** 85:19
**chronological** 19:6 20:11 52:21
**chronologically** 16:25 22:15 36: 21
**Chronology** 3:6 19:19 22:1,8
**circle** 69:17 72:12,24
**circled** 70:2 72:2,4 73:4
**circulated** 20:5
**circumstances** 20:8
**City** 2:11 88:8
**claim** 5:19 7:21 8:24 14:12,16,24 16:7,12 17:10,16,23 18:1,6,8,9,19 19:1,5 21:11,23,25 22:17,21,23 23: 1 27:8 34:25 37:2 40:18 47:21,22 49:21 51:7 53:4 56:15 62:7 63:16 68:10 74:16 80:1,3,16 81:10 85:25
**claims** 8:18 12:24,25 9:2,4,6,9 17: 4 31:3 55:12,16,25 56:19
**clarify** 15:1,9 28:2 59:12 79:21
**classes** 12:8,10
**clear** 52:14 57:12
**closed** 20:16,18 21:25
**co-homeowner** 64:8
**coincidentally** 73:23
**coincides** 7:17
**collected** 65:10 66:3 67:2
**combination** 60:10
**combined** 37:5
**Come** 63:5 67:3 75:14
**comes** 16:23 51:12 66:14
**coming** 16:12
**commencing** 2:12 88:6
**comment** 46:3,5
**comments** 49:18
**communicating** 27:3
**company** 7:12 81:12,15,17
**company's** 40:11
**competent** 88:11
**compelling** 46:19
**complaint** 40:24
**complete** 14:11
**completed** 21:23
**computer** 5:23 20:23 21:1,16,19
**concept** 81:11
**concern** 29:14 35:8 39:13 71:7
**concerning** 31:2 48:3
**concerns** 39:10
**conclude** 62:4

BRENDA LARSON - 11/01/01 / HALL V. CUNA MUTUAL

concluded 61:16
conclusion 28:18,19 36:16 41:23
conclusions 16:13 70:24
condition 69:17,22 70:25 74:9,15 76:19,21,23 77:3,14 78:3,8,10,15, 18 79:2,6,7
conditions 61:11 69:18 70:15
conduct 26:12 40:11,12
conducting 26:19
confused 56:18
conjunction 73:23
consider 49:21,24 73:10 83:20,23
consideration 35:2,3 41:6 42:20 59:22
considered 15:5 38:21 72:23 73:2
contact 14:23 52:4,7 54:4 62:22 87:12
contacted 50:4,12 83:6
contain 35:19
contained 17:11 51:20 53:4 54:25
contemporaneous 44:19,22,23 45:6,7,20,23 46:3,7,9 48:10,13
contemporaneously 20:13
contention 40:9
contest 79:17 80:18 81:3,12
contestability 82:6
continually 40:13
continue 65:17 85:5,7
continuing 12:13,14,16 40:20 56:1,15,19
contract 79:16,18,24 81:2 82:16 83:11
conversation 49:19 51:5 85:24 86:12,17
converse 80:9,17
copies 20:5 53:13
copy 19:14 22:23,25 23:18,22,24 24:4,19 68:17,20 86:8
corporate 67:25
Correct 5:9 7:19,25 11:7,19,21 14:19,22,25 15:4,24 16:5 19:8 20:25 21:3 22:7 24:17 25:3,6,18,20 26:25 27:14,17 28:7,10,13 29:9 31:10 37:3 38:23 39:9,11,14 44:17 46:18,21 49:2 50:21,24 51:11,24 52:25 53:4 55:3 58:21,22 60:20 61:11,19 66:13 71:3,19 72:13 73:21 74:14,22,25 76:5 80:8,22
couldn't 51:3
counsel 5:10,20 6:16 56:12 79:12 86:12,14
counsel's 40:9
County 2:11 88:2,8
couple 56:6,9,12 85:22
Court 2:6 82:4 88:11,16
coverage 29:3 53:2 63:22 64:5,6 65:3,8
covering 14:11
credit 6:22,23 7:2,3,6,7,15 8:4,7, 17 15:2,11 18:25 24:3 25:4 63:25
CREERON 2:7 88:3
criminal 41:10
crossed 64:4
CUMA 2:4 4:13 6:21 7:11 8:7,10, 19,20 9:4,9,10 13:20 15:17,21 18: 10,11,18,23 21:24 26:15 28:20 29: 6 62:13,17 65:9,13,15,22 66:7,8, 19,24 67:1 68:5 80:18 82:4
currently 6:20 13:21
custom 8:10

## D

damage 68:10
damages 68:12
Dane 2:11 88:2
data 86:5
date 12:20,21 21:1,2,6,7,7 23:6 29:15 30:12,17 31:7 33:8,9 37:10, 17 38:2,4 55:16 60:6 64:21,23,24 79:18 81:7
dated 48:19 53:24 61:8 88:20
dates 30:5 52:16 69:23
day 2:12 16:11 52:22 54:22 88:6, 20
deal 17:3,3 41:3
dealing 12:23
death 22:23 23:1,2,7,8,9,15 24:15, 16,19,24 25:8 26:7,10,25 27:9,24 29:10,13,19 63:9 87:2
Deb 13:21,24 14:5 67:14
debtor 80:2,15 81:8,9
deceased 62:25
December 17:20 57:16

decided 10:3
deciding 62:15
decision 36:12 53:2 59:11,13 63:3
defendants 2:5
defer 78:22
define 45:7
defined 26:16
definition 12:5
definitive 32:12 83:2,5
degree 9:21,23,25 10:2,4
demonstrated 57:9
denial 34:25
deny 62:15 80:1,3,16 81:10
denying 47:21,22
department 4:10 14:15,17,20 19:5
deponent's 88:14
deposed 31:11 39:17,21
DEPOSITION 2:1 4:2,23 5:1,11, 12,16 20:6 36:25 37:1 39:22 40: 14,16 51:13,19 55:5 84:19,21 85:2, 6,10 87:2 88:5,13,15,16
depositions 87:1
dermal 57:9,22 58:8
describe 16:16
description 17:24
designate 67:25
designees 67:25
details 69:20 70:7 71:24
determine 13:11
determined 82:3
development 12:12
diagnosed 26:3 69:15
diagnosis 23:7 38:13
dictations 45:9
didn't 10:2 26:9 28:15,22 31:8 32: 19 33:13 34:15 37:1 38:25 47:18 49:7,10 50:11 51:3,8,17,21,22 52: 6,10,17 54:6,8,16,18 60:22 61:5 62:23 65:3,8 72:8 76:18 77:16 82: 19,23
died 20:21,24
dies 27:19
differ 79:8
different 7:3 31:4 36:11 41:13 52: 16 68:4 77:4 78:17
directly 7:11 49:1
disagree 82:7
discovery 68:11
discuss 13:13 86:20,22,23
discussed 12:25 13:1 78:12 86:23
discussing 20:4 24:24 36:3
Discussion 12:3 20:2 68:14
disease 42:9
disinterested 88:11
disk 42:9
displayed 57:14
distinguish 18:14
District 2:5,6
division 15:3,21 66:17,24
divisions 67:1
divorced 64:17
doctor 30:22,24 31:13,13,22,23 32:4 35:9 36:3 39:20 45:15,22 46: 16 47:4,6 49:25 50:3,9 51:1 57:20 58:15 59:9 60:2 69:5,8 70:19 73: 12,18,19,24 78:2,23
doctor's 58:3
doctors 17:4 33:13,16 46:12
document 20:4,8,10,15 21:4,15 32:20 53:5 55:22 56:24 61:6 72:5
documents 4:3,13 6:13,14 13:11 25:2 32:14,17 44:3,6 53:6 58:19 60:10 61:18 72:18,21 73:1 74:1, 19,20,21,23 75:20 76:14 77:17,21, 22,22 78:1,21 86:4
does 2:6 38:17 40:1 43:10,11,18, 25 45:2,5,9 48:22,23 51:17 57:18 59:6 79:12 80:9,13 81:4 82:12
doesn't 28:11 38:16 43:13,18,25 45:10,13 57:17 59:5 61:10 67:22 79:21 80:9,9,13,17 81:4,11,14,14, 16
doing 17:17 21:22 36:8 81:23 84: 24
done 22:5 24:21 34:12 38:15 56: 16 60:8 61:4 71:20 73:22
door 82:19 83:8,12,14,16
Doty 2:10 88:7
doubt 51:5 64:15
down 16:11 31:14 67:12
due 87:4
duly 3:9
duration 69:14

During 4:1 37:22,23,24 13,14 74:9 76: 20,22,24 77:3,14 78:4,8,10,18 79: 3,3 80:10
duties 9:6
duty 9:3 28:4,11,14,21 29:6
dying 27:15
dysplastic 10:24 11:1,5,15,20 12: 5 13:6,13 32:25 33:2

## E

e-mail 4:8,8
each 36:15 58:23
earlier 22:20 31:11
early 57:13
East 2:10 88:7
education 12:11,13,14,16
effect 80:5
effective 81:6
either 5:19 18:1,2 24:5 27:5 31: 12,21 40:7 45:4 46:16 49:17 51:25 61:6 82:16 83:3,11
elected 63:21
else 66:14 71:20 86:22
emergency 48:7,17
encountered 36:11
encountering 36:13
end 14:24
Enders' 52:19
entire 55:12,16,25 58:7
entirety 17:13
entries 5:23 20:13 62:2
entry 23:19 42:10
Ernest 30:8
essence 41:7
estate 86:19
et 2:4
evaluating 18:2 51:7
evaluation 32:16 40:17 56:15
Even 39:10 63:14 72:15
event 7:8 45:6,8,10,13,24 46:23
events 19:7 20:14,14 22:1,8 44:19 45:20 48:17 50:9 51:22
ever 10:8 22:6 26:22 29:22 33:16 35:9 55:13 56:10 61:3 62:18 69: 10,15 87:15,16
every 16:17,20 22:3 27:8 77:6
everything 6:2,9,18 35:6
evidence 34:10
exact 12:20
exactly 69:11
Examination 3:2 5:3 85:20 88:18
examiner 8:19 87:19
exception 4:25
excised 37:13 38:8 57:11,12
Exhibit 20:6,7
Exhibits 3:5
exists 7:18 73:9
expected 47:9
experience 10:5 30:22,24 62:13, 17
extent 56:14
extinguishes 7:22

## F

fact 11:8 74:23
factors 62:14
failure 40:25 72:8 77:18
fair 36:18
false 72:23 73:2,6 74:16 82:10
far 38:5
fax 21:9 24:1,4
faxed 21:8
February 19:10 41:25 42:16,16 44:11 52:22 53:19 54:1,4,5 57:6 58:19 68:16,18 70:18 72:10 79:15 82:8,14
Federal 24:3 88:16
feel 54:8
felt 29:24
few 19:17
figure 43:18
file 5:19 14:24 15:7 17:11 18:3,9, 24 20:16,17 18,20,23 21:1,23,25 22:17,21 33:11 50:5 53:4,24 86: 20,24
filed 21:14,19
files 17:4,15,25 18:1,1,4,6,8,19
filled 14:21 29:17 30:4,11 44:25 57:1 59:1 70:23 71:6
filling 64:19
finance 66:8,25
financial 66:22

find 23:9 39:21 50:9 53:12 54:18 67:13 68:17
finding 11:4,4,15,18
findings 10:14,22 12:9 45:16,20
fine 4:24 5:2 43:24
finished 57:5
first 3:9 4:20 6:20 14:23 15:2 16: 22,23,24,25 18:9,12,13,15,19 16 22:5,19,21 25:2 30:13 32:1 33: 22 43:20 59:21 66:2 72:1
Fisher 4:4 14:7,8,13 15:12
fit 6:17
five 84:7
follow-up 33:1
following 26:4 69:17
follows 3:11
form 4:4 28:25 29:7 30:14 31:18 34:21 38:1 39:5 40:2,4 41:8,9,17 57:3 64:12,16 70:22,23 71:6 72:24 73:15
found 12:7 28:21 37:23 43:11,14, 15 50:6 54:15,16
four 54:1,17
frame 12:21 14:14
fraud 4:5,14,17 41:15,16 61:2
front 36:22,23
full 5:5 69:20 70:7 71:24
further 24:20 25:9,12,22 74:8 82: 20 85:14 86:23,25 87:9,15,16
future 82:16 83:3,12

## G

gave 31:12 51:19
General 4:4,7,11 65:21 79:20 81: 11
General's 4:6
generated 21:2
getting 56:10 75:18,22 81:18
give 64:25 69:20 70:7 71:24
given 38:5
gives 38:2
glasses 24:23
goes 68:9
Good 16:6 50:20
got 59:10 68:8
graduated 9:12
grant 81:11,14
Group 2:4 15:17
guess 11:11 14:10 16:8 17:12,22 44:10 47:17 62:17 81:19

## H

H-A-G-L-U-N-D 13:23 67:17
Haglund 13:21,22,24 14:5 67:14, 16
half 8:14
Hall 2:3 5:19 8:1 14:21,24 16:7 18:3,24 24:12 25:19 26:5 27:22 29:17,22 30:10,12 35:4,5,6 36:5 37: 6,20,23 38:2,6,9,25 39:23,24 41:7, 23 42:3,11,17 43:3,19 44:1,7,12 46:24 47:5,9 50:15 56:25 57:9,21 58:25 62:18 63:19 64:7,11,16 68: 16,18 69:5,7,25,25,25 70:18 71:1, 9,12,15,18,22 72:5,8,14 73:13 74: 2,3,8,16 75:1,4 76:3 77:19 78:3,17 80:24 81:1 82:15,19,23 83:5,9,13, 16,21 86:19,19 87:2
Halls 8:5 17:10
handling 22:16
handwritten 48:17
happened 20:11,12 22:11
happening 46:23 47:11
happy 73:16 83:19,22 87:9
Harrisburg 2:19 54:2,18
having 26:4 37:15 69:16
health 64:2 69:20 70:8 71:24
help 17:3 22:10 79:22
helpful 82:25
helping 18:18
helps 18:4
here 12:20 13:7 19:21 20:15 24:5 27:2,7 35:12 39:16 40:18 56:21 68:17 69:11 81:22 84:4,6
hereby 88:4
herniated 42:9
highlighted 36:22 61:20,22,23
highlighting 36:23 52:16
Hill 2:16
himself 31:24 39:10

BRENDA LARSON - 11/01/01 / HALL V. CHUBB MUTUAL

history 14:16 19:6 25:13 30:18
37:12,14,15,22 38:3,6,7,20 42:6
43:7 44:3 45:23 46:6,25 57:18,19,
25 58:4,6,10,17 59:4,6,9,10 62:6
63:11,14
home 7:8 8:6 18:25 63:2 67:2,6,8,
14 79:16
homeowner's 59:1 62:15
honor 61:16
Hopefully 45:11
Hospital 9:17 48:3,6,18 54:22 75:
11
Hospital's 9:12
hospitalization 35:20
house 7:24 66:12
How 6:23 9:8,19 10:13 13:22,24
14:3,8 15:14 17:15,25 18:23 20:
11,17 21:15,21 37:23 38:5 61:25
62:3,14 67:16 68:4 70:22 71:5,14
83:15
however 22:5
Hurley 39:17,20 40:19 48:1 49:8
51:8,19 54:15 70:13 78:22 79:2,10
Hurley's 40:14,15 47:24 48:25 49:
4,5 52:22 53:7 54:9,15,23 55:4,13
56:4,11 60:14 70:3,4,5 75:25 77:
22 78:25 82:24
husband's 62:19 63:9

## I

I'd 6:19 19:14 22:14 29:25 73:16
86:8
idea 27:18 45:2 65:14
identification 20:7
identified 3:5 34:19 71:21
identify 36:15 72:9
illness 37:15
imagine 23:25 66:21
immaterial 40:5 82:2
important 49:22,24 62:7
improperly 71:1
in-scapular 57:9
include 49:14
included 41:6 50:22 58:7 70:13
73:13
includes 40:24
including 4:3 40:14 44:4 72:19
incorrect 26:21
increase 57:15
independent 17:9
indicate 23:11,12 30:5,9 39:4 43:
10 48:23 55:7 57:18 61:5 65:23
69:4,6,8 70:20 71:4 74:2,3,7,8,11
75:12 76:3 86:18 87:6
indicated 32:3,18 62:22 69:10,21
70:2,8,24 71:15,25 72:5,11 74:18
76:15 87:8
indicates 5:16 30:18 32:25 33:1,4,
8 36:1 37:12 42:5 43:5,6 57:8 60:1
69:10 70:7 74:6
indicating 32:5,6 50:5
indication 44:18 58:24 71:17
individuals 40:20
information 4:7 6:19 21:10 24:6,
13,18 25:24 26:21 27:21 28:8,22
29:8,16,22 30:1 31:13 32:3,5 34:
15 37:4,5 38:4,19,25 39:19 40:13
41:5,22 42:5,12,13,17,20 43:2,11
46:19 47:22 50:15 51:20 53:9,17,
22 54:11 56:10 57:17 64:3 65:1
72:6 73:10 74:17 75:6,8 76:23 77:
2,13,18 82:20 83:7,10,17,19,23 87:
7,9,10
initial 14:21
inquiry 13:10
instance 2:3
instead 20:24 63:15,17 67:25 72:1
insurance 4:5,9,12,14,16 6:22,23
7:1,2,3,4,6,7,13 8:6,17,20 15:3,11,
22 18:25 40:11 41:7 53:9 67:3,7,8
79:16,24 80:3,16 81:2,7,9,12,15,17
insure 8:13,14
insured 8:11 28:4 60:21 61:8,14
62:1,4 63:19 80:2,7,15,21,24,25
81:7,9
insured's 62:24
insureds 28:20
insuring 63:23
interest 88:12
interject 27:2
internal 4:13
interpretation 38:3
interrogatories 88:10

investigate 27:13 29:12
investigated 61:2
investigation 17:16 24:20 25:9,
12,22 25:12,13,19 27:8 36:10 40:6,
20 41:15,19 56:20 62:8
investigative 50:22
involved 16:7 17:10 18:10 53:25
54:5 63:8 67:20
involvement 22:16,20
Iowa 15:25 16:1
isn't 1:11:15 15:7 28:6 52:9 35:5
4 41:10 44:15 45:24 48:11 53:18
58:21 60:25 61:4 74:4 77:20 78:19
79:9 83:3
issue 78:17 82:3
issued 64:6
issues 43:1
item 36:4,15
itself 25:14

## J

January 37:10,18,19 38:5,12,16
43:15 50:5 53:18,24 54:3 59:13,
19,19
Jean 5:7
job 17:24
Jody 14:2,3
joined 14:17 15:2
joint 64:6,19 80:2,15 81:7,8
judge 81:23
July 34:14 58:20 59:14,19

## K

keep 13:3
Kelley 3:4 4:1,25 6:7,15 10:15 11:
10,22 12:1 16:14,17 17:18 19:15,
20,23 27:1,6 28:17,25 30:13,16 31:
16,18 32:8 33:18,23 34:5,21 35:15
36:7 38:1 39:25 40:2,15 41:2,9,17
43:16,20,24 45:1 47:7 51:14 55:
15,19,23 56:5,8,13,23 57:3 62:11
69:2,12 73:8,15 75:2,13,17 76:10
25 77:4,8,11 78:5,9 81:21,25 82:10
83:24 84:5,10,17,22 85:7,11,15,19,
21 86:6,10 87:19
kind 59:16 60:11 83:9
knew 21:19 27:22 29:17,22 30:3,
10 36:5 37:6,20 38:6,9,25 41:23
42:3,11 43:3,19 44:1,12 46:24 47:
10 56:25 58:25 62:25 63:13
know 5:10 8:3,5,9,10 15:20 21:1,
12,15 23:14 24:6,9,12 25:23 26:9
28:12,15,22 30:20,21 31:8 32:7
33:8 34:17,24 35:12 36:9,20 37:23
38:5,9,10 39:16 40:3 41:20 42:17
43:25 44:7,11 46:23 47:1,9,13 49:
15 55:1,7 56:18 60:22,24 62:5 63:
10,12,13 64:13,14,18 65:22 66:4,5,
7,16,19,21,22 67:1,10,23 68:4 79:
2,5,12 84:5
knowing 26:12 61:1
knowledge 44:23,24 56:10 62:19
67:5,21,23
knowledgeable 65:9 66:15
known 47:3,5 74:9,13 76:21 78:9
knows 28:8 63:10

## L

L-A-R-S-O-N 5:8
language 4:13 80:23
large 17:4
LARSON 2:1 3:8 5:5,7,8 56:16 82:
9 88:17
last 12:19,22 13:2 14:14 35:23 64:
17
later 13:10 20:14 28:14,21,23
Law 2:10,18 4:15 81:22
lawsuit 21:13,19
lawsuits 87:4
lawyer 86:14
lawyers 51:16
leads 42:10
learned 12:7
learning 10:13
learns 28:15
least 8:14 33:13 38:3
leave 82:19 83:12
led 30:2 36:5 37:5,19 42:2 43:2,3
56:24
left 5:22 36:2 38:13,14 57:9,14 71:

1 83:16
legal 21:8,9,10 28:18,19 82:3
legible 23:24
lengthy 57:10,11,22 58:8,9
less 29:14
Let 17:3 19:17,21 28:1 33:21 39:
19 48:5,16 19:22,16 68:17 79:21
80:24 86:6
Let's 38:11 62:12 65:18 75:3,14
84:10
letter 4:3,10 35:3,5 41:25 42:2,19,
23 43:3,10 44:11 49:25 57:5 59:5,
8 62:22 68:15,16 69:4 70:16 71:23
72:5,10,11 73:13,16 74:2,6,12 76:
18 77:1,19,23,24 78:2,6,11,14 79:
15 82:8,14,17,18,21 83:1,2,8,13,22
letters 59:24
level 68:4
lied 41:7,10,13,14
Life 15:21 63:21,23
light 40:12
like 4:12,15 5:23 6:19 19:14 22:14
29:25 45:22 66:12 67:22 68:6,15
85:8
likely 21:7 32:6
line 7:23 30:2 32:9 42:22,24
LISA 2:7 88:3
list 20:17
listed 64:1 76:7
Listen 75:21 77:8,11
listing 59:16 60:11
litigation 19:25
litigations 86:20
little 65:17,18
loan 7:16,22 8:3
logs 5:25
long 6:23 9:8 13:24 14:3,8 25:23
37:23 87:10
look 4:12 19:15,21 68:22 80:6 86:
7
looking 10:11 23:4 27:11
looks 4:15
loose-leaf 5:24
lose 63:2
lost 50:6
lumbar 42:8,15
Lymph 38:13 57:14 58:8

## M

machine 24:4
made 7:11,11,21,24 19:4 20:15,17
24:4 28:1 30:10 33:7 36:12 46:12,
12 53:1 58:24 68:3 80:2,6,14 81:8
Madison 2:11 9:15 15:23 16:2,4
88:8,20
mail 37:8
main 35:7
make 6:12 18:17 20:13 21:25 45:
16 52:4,13 55:24 58:20
makes 23:15 45:5,9,12 58:14
making 46:3,5,16 71:9
malignancy 48:23 60:18
malignant 11:12,17 37:13 38:8
39:23 42:6,14,18 43:4,7,13 44:1
47:15 57:10,25 58:13,20,24,25 59:
14,20,25 63:1 71:18 76:15
malpractice 87:4
manager 8:22,24,25 66:17 67:14
many 9:19 17:5,15,25
March 86:1
margins 57:13 58:9
mark 31:1,2,4,5,6,7,9 44:15,17 60:
4,6,8
marked 20:5,7 70:1 71:18 72:1,
14,17 73:3 75:4,8
married 64:13,14,15
material 5:24 13:3,5 40:25
materials 4:16,19 5:17,19
matter 2:2
maybe 9:1 24:1 46:9 54:12 79:21
McNEES 2:18
mean 16:23 17:19 19:23 31:5,6,7
32:9 40:3,4,5 65:15 67:19 70:5 82:2
means 78:12
meant 23:14,16
medical 8:18,20,23 9:4,9,11,10
13,18 25:13,24 26:3 30:8,9,18,18,
25 33:10,12 34:9,18 42:20 45:11,25
42:6 43:7 44:3,13,21 45:17 46:25
49:13 50:13 51:4 52:7,19 57:25
58:4,6,17 59:3,3,9,10,20 62:2,6,7
1 83:16

mortgage 7:3,8,9,10,12,17,18,20,
22 8:8,12,15 19:1 37:7 39:5 64:19,
20 67:2,6,8,14 79:16 81:1
most 7:23,25,25 21:7 42:6 43:7,12
57:25 65:9
move 62:12 75:3,14 83:25 84:9,
10,11
Mrs 35:4,5,6 62:18 63:19 64:7,11,
16 68:16,18 69:25,25 70:18 71:1,9,
12,15,22 72:5,8 73:13 74:2,8 77:19
80:24 81:1,24 82:15,19,23 83:5,9,
13,16,21 85:25 87:17
Ms 5:5 56:16 82:9
much 68:4
Mutual 2:4 6:21 8:7,10,19 9:4,9,10
13:20 15:17,21 18:10,11,18,23 21:
24 26:15 28:20 29:6 62:14,17 65:
9,13,15,22 66:7,8,20,24 67:17

## N

N-A-R-D-I 15:15
name 5:5 49:10 54:6 64:17 66:10
69:21,22 70:3,4,5,12 83:18
names 4:7 66:16
Nancy 2:3 86:19
Nardi 15:13,14,16 18:22
nature 69:22
near 45:8,9,13
neck 36:2 38:14,15
need 7:24 16:8 19:15,24 22:9 52:
13 86:24
needed 24:20
never 4:7 24:25 1 56:19 61:8
68:8
nevus 10:24 11:1,2,5,15,20 12:5
13:6,13 32:25
new 8:6 43:23
next 34:4 36:4 37:4,8,8 38:11 41:
5,22 54:22 55:22 56:24
node 38:13,13 57:14 58:8
noncancerous 11:9,11

BRENDA LARSON - 11/01/01 / HALL V. CUNA MUTUAL

none 35:19 40:18 74:21 76:4
nontender 57:14
normally 58:17
Nos 3:5
notable 42:6 43:7,12 57:25
Notary 2:8 88:3
notation 19:4 48:5
note 4:18 34:6,15 35:15 49:7 53:24 54:1,3 57:8 62:1
noted 23:11 33:2 87:1
notes 22:16 31:14 45:9 46:1,5,7,11,17 48:25 49:17,19,22,22 53:23 56:4
nothing 40:21 75:11 76:8,12 87:21 88:19
notice 2:7 5:11,13,14,16 88:17
November 2:12 29:23 36:6 37:20 39:1 44:25 57:1 88:6,21
Now 5:10 15:20 17:1 19:11 20:4 28:23 30:1 36:14 42:16 43:23 70:11 82:16 83:3,12 88:15
nowhere 48:22
number 4:2,11 36:11 37:16 58:19 65:21 75:3 82:21 83:18
numerous 86:20
NURICK 2:18

# O

o'clock 2:13
oath 3:11
Object 28:25 30:13 31:18 32:8 33:19,19,24 34:6,21 35:15 36:8 38:1 40:21 41:9,17 55:20 57:3 64:12 73:15 84:2,8
Objection 17:18 28:17 31:16 32:11 36:18 39:25 43:16,21 45:1 47:7 51:14 62:11 63:4,5 75:13 76:10 77:1 78:5 81:25 83:24 84:11
objectionable 40:5 68:7
observation 46:3
observations 45:12
observed 46:14
obtain 9:21 10:2 12:4 47:24 49:4,5 50:15 53:8,22 62:9 76:5
obtained 8:6 33:12,25 35:22 47:23 50:17 53:17 55:1
obtaining 54:14
occasions 53:18
occurred 69:7,8 70:21 71:4 74:4,7
October 4:3 6:25 8:16 9:5 14:9,10,18
off 7:16 12:1,3 20:1,2 64:4 68:13, 14 81:23
offered 9:23,25
offers 8:20
Office 4:6,11 13:5 24:1,2 37:9 48:1,2,25 49:1,22 50:4,4,12 52:23 53:8 54:19,23,25 55:13,14 56:4 79:1,4
offices 16:4
Oh 26:22 28:21 85:24
Okay 6:2,11,19 13:9,13 16:4 17:1 18:4,14 19:13,18,22,22 12,18 28:3 30:5,17 34:8 38:11 41:4 42:25 56:22 59:18 65:19 66:1 69:3,14 70:17 77:10 85:19,23 86:6 87:19
one 6:5 8:21 12:6,19 16:1,23,24,25 17:13 18:8 22:5,21 23:21 27:10 29:14 30:7 33:24 39:24 53:24 54:21 59:22 60:1,22 61:3 62:5 63:20,23 65:25 66:2 67:18 70:9
one-half 8:14
ongoing 40:11,25
Only 11:24 16:10 31:12 35:2 38:22 39:12 44:18 58:11 63:22 77:23 78:18 87:12
onto 20:23
open 60:17 82:19 83:12,14,16
opened 83:8
operative 62:1
opinion 71:18
opposite 11:8,10,17,23,25
opposites 11:13
oral 5:13
order 20:11 86:23
original 23:21,23
other 12:11 17:10 18:8,8 32:14,17 36:20 37:5 42:23 43:1 44:6 47:13, 17 53:6 54:22 60:10 61:15 68:8 70:13 73:10,25 77:17 84:14 85:3
out 5:22 12:7 14:21 16:4 21:4 29:17 30:4,11 37:24 39:21 43:11,14, 15,19 44:25 50:9 53:12 54:15,16, 18 57:1 59:1 64:19 66:4 70:23 71:

2,6
outpatient 48:7,17
outstanding 7:16 8:12
over 9:8 18:2 36:10 75:2 84:7,20 85:2
own 17:8 21:17 22:2 31:14 60:21 70:24 78:23 83:15

# P

p.m 2:13 87:22 88:6
Page 3:2 54:22
pages 4:12 54:1,17
paid 65:11 66:4 82:15 83:3,11
paper 20:19,21,23 36:12,13
paragraph 25:24 58:6 79:15
part 16:15,17,20,21 17:9 25:21 32:15 35:23 44:9 47:16 49:21 58:11 59:21 62:7,13
particular 8:13 21:11 32:1 40:21 42:22 49:16 51:6,23
particularly 40:12
parties 88:12
parts 31:5 42:23 67:12
past 25:13,24 30:18 38:20 42:5 43:6 45:22,23 57:24 58:4,6,17 59:3,9,10,14
pathologist 45:12 47:3,6,10 52:4, 8
pathologists 51:25
pathology 10:5,9 32:13,18,21 33:3,5 35:9,17,19 38:12 44:4 47:2,5 51:11,23 52:1,5,10,17,18,24 53:1 54:21 57:10 58:16 60:8 61:25 72:15,19,22,25 73:4,22,25 75:10,24 87:5
patient 23:16 30:23 31:12,21,24 32:3,5,6 39:4 42:7,12,13 43:9,10 45:15,15 46:6,20,25 51:6,10,23 57:13,18 58:12,18 59:3,4,6,6,10 84:6
patient's 38:20 52:5 57:19
patients 17:5,5
Patriot 24:3
pay 7:16 40:25
payment 7:11,13
payments 7:24
payout 7:14,21
Pease 2:10 88:7
PEDERSEN 2:15 3:3 4:24 5:2,4 6:11 11:24 16:16,19 17:20 19:22 33:21 34:3,8 40:8,22 41:4 43:22 55:18,21 56:2,6,22 65:19 67:24 68:13 78:7 82:7 84:1,8,13,19 85:1,9,13,18 86:2,8,15,18 87:16,21
penalties 61:2
pending 2:5 88:16
Pennsylvania 2:6,16,19 4:6,9
people 17:3 66:16 67:20
pepper 11:5
per 18:5
performed 36:9
performing 40:17
period 9:8 18:2,24 34:16 50:22 80:10,19 81:4,17 82:6 83:3
periods 14:11
person 50:13 62:5 65:24,24 66:6 69:21 88:11
personal 37:12,22 38:7 42:5 43:6 66:16 67:5
personally 20:21 79:10 87:15,18
personnel 4:8
phone 51:5 52:4 62:18,21 82:21 83:18 86:1
physician 32:2 50:4,12 57:23 69:22 70:10
physician's 48:2 70:12
physicians 34:1 47:13,17 49:12
pick 62:18,21
piece 20:19,21,23 37:4,8 56:20
piecemeal 36:6
pieces 36:11,13
pigmented 13:17
pinpoint 12:6
place 34:9
plaintiff 2:3,4 88:9
plaintiff's 86:12 87:13
please 5:19 69:17 84:23
point 15:5 21:13 24:18 27:18,22, 24 28:1 29:19 47:12 50:8 55:12 67:19 68:8,11
policies 67:3 68:5
policy 7:10,14 9:7 26:16,17 53:3 59:2 61:17 62:16 63:24 79:17,19, 20 80:4,5,7,11,19,21,23 81:3,5,13

82:5,9,10
portion 42:19 43:5,6 64:4 79:19, 20
portions 75:25
position 6:20
Positively 21:20
possession 61:19
possibilities 31:12,21
possibly 24:3 47:14
practice 8:10
premiums 65:10 66:3,23 67:2
preparation 36:25 55:5
prepare 19:9,19
prepared 3:6 19:25 20:9,10 21:16
present 37:14 49:18
presented 83:6
president 65:15 66:7,9
printed 21:4
prior 8:16,18 9:1,4 14:4 27:22 44:18,18 63:1 74:13 87:2
private 65:1
problem 22:9 67:19 69:20 70:8 71:21,23,24 72:4,9 75:21
problems 71:14 72:11
procedure 34:12 51:13,15 54:9 78:24
procedures 42:8,15
process 9:6 14:12 16:7,12,15,18, 20,21,22 17:10,12 32:2,16 36:17 37:2 49:21 55:12,16,25
processed 63:15
produced 4:2,19,21 6:8,10,18
product 8:13 16:3 19:1
profession 26:3 69:16
Professional 2:8 88:23
promise 65:15
prompted 29:11
properly 70:23
protection 7:4,10 19:1 67:15
protocol 21:24 26:10,14,22,23
provide 28:8,11 39:19 47:18 64:2 82:13,19 83:9,16
provided 6:6 19:12 40:13,16 42:12,13 43:8 46:6 47:23 56:3,12 58 17 74:16 86:3
providers 52:7 87:3
provides 82:10
providing 40:25
provision 79:21,22,25 80:4 81:2
provisions 79:20
Public 2:8 88:3
punitive 68:10,11
purchased 8:16
purpose 23:4,6
pursuant 2:7 88:17
pursue 10:3
put 20:23 35:3,5 37:6 55:16 75:19
putting 24:22
puzzle 56:21

# Q

question 10:16 16:14 25:15,23,25 30:14 31:1,2,4,5,6,7,9,14,19,22 33:7,22,25 34:4,6,10,22 35:3 39:14, 14 40:3,4 41:12 42:21 43:21,23 44:15,17 51:18 54:1 55:20 60:3,4,6 68:9 69:9,9 71:17 73:8 75:21,22 77:5,9,12 81:20 82:13 84:7
question's 40:5
questioning 31:24 32:9
questions 19:17 36:18 65:21 84:14,23,25 85:3,4,8,12,14,17,22
quote 69:11

# R

radiology 9:13,17
raise 84:1,2,3 85:16
raising 84:11,18,23
rate 27:18
reach 36:16
read 5:17 57:17 58:5,7 59:5 83:15 84:20
reading 10:5,9 78:11
reads 38:13 39:15
really 46:9 82:2
realm 52:9
reason 23:8,23 27:14 33:9 34:18 35:7 51:21 64:15 65:2
recall 13:7 16:10,11 17:2,5 21:21, 22 24:5 49:19 51:22 53:16
recalled 50:9 51:13,15

receipt 26:10
receive 5:11 44:22 52:18 54:21 72:22 86:1 87:15,16
received 4:20 22:21,22,23 23:21, 25 24:2 25:2 26:7 27:24 29:19 37:9 44:3,21 47:12,25 52:19,24 72:6, 18,22 73:1 74:19,20 75:6,9,20 76:14 87:18
receiving 22:25 24:19
receptive 87:7
recess 20:3 65:20
recitation 58:10
recollect 51:5
recollection 16:6,8,22 17:9,12,13 18:7 21:17
recommended 33:1
record 4:19 5:6 12:2,3 20:1,2 30:1,18,25 33:10 34:7 35:16 37:8,11, 17,19,22 38:10,11 44:13 45:17 52:10 56:17 59:20 62:2 68:13,14 71:5 11 77:6 82:1 84:14 86:3,16 88:14
recordings 46:22
records 5:17,18 16:10 17:7 30:8,9 33:12,13 34:1,9,14 35:17,22 36:4, 21,23 38:4 44:21,22 45:17 46:20 47:12,18,18,23,24,25 48:3,7,10,11, 16,18,22 49:1,4,5,11,13,16 50:1,7, 13,15 51:3,4,16 52:19 53:8,9,13 54:7,9,15,20,23,25 55:4,6,9,13,14 56:11 60:14 62:7 63:16,17 65:1,3 70:11 75:25 76:2,4 77:15,16 78:25 82:24
recreated 20:14
redepose 40:23
reduced 88:13
refer 22:15 33:16 41:15 42:23 45:22 46:2 52:21 59:24 76:6 79:15
reference 15:7 33:6 58:20,23 74:1
referenced 34:11
references 59:13,20
referral 41:16
referred 5:24 17:23 19:1,3,4 41:19 60:17
referring 12:21 19:6 22:9 25:14, 15 46:1 49:12 53:7,23 55:25 56:20 69:5 70:16 73:12,18 74:5 76:19 77:25 79:19 82:8 86:3
reflect 21:6,7
reflects 78:2
refresh 22:10
regard 10:16 25:12 38:19 52:5 58:4,5 62:6 71:8
regarding 4:8,14,16
Registered 2:8 88:23
relate 5:17,19 10:21 13:12 38:16 42:24
related 31:9 40:10
relates 10:13 13:6 22:19
relating 38:24 48:7 65:22 66:24
relationship 64:10
relative 88:19
relevant 54:8,10
remedied 71:14
remedy 71:21,23 72:4,11
remember 16:15 17:1 34:3 51:9,10
removal 46:8 48:8,11,20,21 55:8 60:9 70:3 73:20 76:1 78:19
removals 46:17
removed 30:19 32:19,22 33:6 34:11,19 35:10,20,24 36:2 37:24 39:20:43:4 46:13 49:17,23 59:21 79:7
removing 54:10
repeat 24:22 31:20 54:12
repeating 57:7
report 32:13,15,18,21 33:3,5 35:9, 17,19 38:12,22 39:1 44:4 47:2,5 51:11,23 52:1,5,17,18,24 53:1 54:1 21 58:16 60:8 61:25 72:15,19,22, 25 73:2,5,22,25 75:10,24 76:1,8,12 87:5
reported 42:15 57:21,23 77:25
Reporter 2:8 88:11,23
reporting 4:14,16 58:15
reports 10:6,9 42:8
represented 86:18
represents 24:10
request 13:11 88:9
requested 21:10 28:8 78:25
requesting 51:4
require 44:9 47:16
required 64:2
rescind 80:7,11 82:5

BRENDA LARSON - 11/01/01 / HALL V. CUNA MUTUAL

rescission 53:2
resection 42:7,14 43:5,12 57:24 58:12
resections 10:11 58:16
reserve 40:22 41:2 84:20
respect 8:11 9:3 10:8,17,18 12:17 29:6 32:22 53:2 65:9
response 22:25
result 63:3 87:3
results 73:14
retain 76:5
reveal 77:18
revealed 57:10 74:9 76:19,22,24 77:3,14 78:3,4,8,10,15,16,18,23 79:3,8
Review 4:15 9:6 17:15 23:6 32:2 33:1 52:13,14 70:19 71:5,16 83:7 87:9
reviewed 23:2,9 32:15 33:11 38:12 44:2 51:16 53:5 55:4 63:17 70:11 74:23 86:4
reviewing 16:12 23:5 31:9 58:15 87:7
reviews 45:12
Rich 14:7,13 15:12
right 7:18 13:14 14:18 16:19 18:16 19:7 26:24 28:6 29:4,20 35:25 38:22 40:23 43:22 44:16 45:16,24,25 48:12 53:18 54:24 55:2,10 56:5,8,23 59:17 60:11,14,17 61:9,20 67:9 71:11 72:12 80:4,10,12,13,17,18 81:12,16,16 83:4 84:20
role 8:22
routinely 27:7,13
Ruhly 2:10 88:7

S

said 11:9 18:13 31:11 34:2 37:18 44:4,23 47:18 49:10 54:16 60:16 66:4,5 72:20,25 79:6,11 88:8,13,14,17,20
salt 11:24
same 6:12 7:5,6 11:5 34:15 46:11,13,17 64:17 84:6
say 8:25 11:4 13:2,25 14:4,9 16:20 18:4,7 24:1 35:23 43:13 44:2,10 47:1 58:11 59:5 74:20 76:18 78:11,21 80:9,10,13 81:4
saying 29:2 35:2 41:10 56:18 60:19 68:3 70:12 77:22,23 78:14
says 38:7,18,22 43:12 53:25 54:1 59:7 9 76:21 77:1 78:6,7 79:10 80:1,4,19 81:6,13
scapular 57:22
scenario 35:7
schedule 9:7
school 9:12,17,19
second 19:20
section 4:5 8:23 41:16 58:7 69:21 70:8 71:25
see 6:16 19:24 20:15 23:18 59:16 60:13 68:17 71:13
seeing 45:15
seen 19:11 56:19 86:5
seminar 13:3,5
seminars 12:14,22 13:12
sense 17:25
sent 5:10 53:10 54:17,17
sentence 44:17 60:4
September 79:3
service 30:12,17 37:10
set 36:18
sets 6:12
Sharfman's 34:13 36:1
she'll 5:1
sheet 19:17 86:5
Short 20:3 65:20
shorthand 88:10
should 41:12 57:15 70:1,1,2,12,22 71:6,18,20 72:1,2,4,14,17 73:13 74:20 75:7 76:6,16
shouldn't 24:1
show 30:1 60:15
showed 60:9 70:19 72:15
side 85:3
sign 5:1 84:20
signature 64:21,23,24 65:1,6
signed 61:1,1,6,7
significance 31:1 40:9 49:16
signing 61:3 64:16
similar 11:2
simply 79:22 80:19 81:13
simultaneously 73:23

Since 6:25 9:10 22:6 32:1 46:1
single 36:15 63:21 64:5,20
sit 24:5 35:12 39:16
sitting 16:11 45:16
six 13:25 14:4 76:11
size 57:15
skin 32:25
skip 43:1
slides 45:12 58:16
small 36:2
some 4:13,15 6:19 12:11,14 13:4 15:7 17:25 19:6 20:14 28:22 34:15 39:10 40:8 46:5 61:21,23 68:8 71:1 84:22
someone 18:18 27:19 66:8,22
something 11:8 19:11 27:9 32:12 39:4 45:22 52:2 66:17
sometime 14:17 78:16
Sometimes 17:5,6,6
soon 75:19
sorry 9:1 10:15 24:22 31:20 33:24 52:13 54:12 55:2 57:12 59:8 62:10 67:1 73:3 81:19
sort 36:8
sound 67:22
speak 50:8,25 81:16
special 41:19
specific 12:10,16 16:6,8 17:13,14 25:23,25 26:12,20 27:14 51:10 52:5 66:21
specifically 12:8,24 16:11 18:19 26:2 35:17 39:22 49:4,6,8,8 66:25 67:3 68:15 70:14 82:21
speculating 32:10
speculation 32:10 43:17,18,25 44:2,9,10 47:16,21
spell 13:22 15:14 67:16
spinal 37:12 42:8,15
spoke 50:12 52:22
spoken 51:8
spouse 62:24
staff 50:3
standard 26:10,14,22
starting 6:12
State 2:9,11 5:5 74:24 80:17 88:1,4,8
stated 32:20 39:22 86:25
statement 31:5 34:10 60:21,24 61:3,7,14 79:25 80:2,14,22 81:8 82:11
statements 62:1 80:6,20
States 2:5 59:4,6 79:22,25 80:14 82:9
status 85:25
statutory 4:12
stay 84:25 85:2
Stel 4:2
step 22:14,14
STEPHEN 2:15
Steve 27:11 36:7 55:24 63:5 65:16 67:18 75:14 77:12 81:22 84:18 85:8,11 86:15
still 7:18 11:22 15:18 20:21 82:23
stipulations 4:22
stop 75:19
Street 2:10 88:7
strike 80:25
studies 10:4 12:15,16
stuff 71:1
submitted 87:10
subsequently 55:4
such 64:6
suffered 23:16
suggest 82:23
suggesting 68:1 82:10
summarize 60:13
supervisor 13:20,24 14:1,3,6,8,13
supplement 28:14
supplementing 28:23
supported 41:23
sure 6:12 9:16 11:22 18:17 19:22 21:18 51:2 52:8 55:21,24 65:19
surgeon 45:5,18 49:14,23
surgeon's 49:11
surgeons 49:17
surgeons' 49:16
surgery 37:12,13 38:15 45:5,6,9 48:4 61:5
surgical 38:13 42:7,14 43:5,12 48:10 54:9 57:13,24 58:8,12 60:14 76:1
surgically 57:11
surprise 40:1 51:12,18

surprised 18:19 39:21
suspect 36:14,18,22 39:13
suspecting 39:2
suspects 39:4
suspicion 44:20
sworn 3:10 88:18

T

take 15:23 40:8 52:1 65:18 86:6
taken 2:2 12:8 20:3 42:20 48:19 51:13 65:20 88:5,9,10,16
talk 19:24 40:18 46:14 51:25
talking 45:2 52:15 57:19 70:14 77:23
taped 87:2
taught 62:3,5,14
technician 10:1,4
technology 9:13,18 10:13,18
telephone 5:25 86:4
tell 28:21 32:21 35:6 39:23 50:3 56:11 70:18 72:8 78:22 81:24 82:14
telling 69:24,25 70:25 73:5
term 11:12 13:15 41:13
Terminology 10:19,20,23
test 79:23
testified 3:10 22:20
testify 88:18
testimony 88:14
Thank 68:25
that's 4:5,24 5:2,8 6:7,9 11:11 14:20 18:25 26:1 36:16 37:3 39:1 42:7 28:23 32:7 35:3 36:16,17 38:15,15 39:14 40:13 44:18 51:23 54:1 11 56:16 57:18 58:14,22,24 60:20 61:11 71:9,12,19 73:9 74:25 75:21,22 76:25 77:4,19 80:4 82:3,10 83:15,21 87:19
there's 6:16 15:7 18:14 25:23 34:9 39:12 42:19 44:14,15,17 53:24 56:14 60:1,2,4 75:11 83:14
thereafter 88:12
they've 29:2
thing 17:14 22:19 83:9
things 5:22 22:10 28:11,14 61:15 67:21
think 6:17 18:13 22:20 23:23 24:1 24:27:2,4,6 33:24 36:16,17 51:8, 10,22 58:2 63:8 66:2 68:3,7,9 83:5
those 4:18,19,21 11:12 23:5 25:2 26:5 33:16 36:13 45:19 46:7,17,22 47:18 48:7,10,18,22 53:13 54:1 23 58:2,9 59:24 61:10,11 62:4,14 75:12 76:2 77:16 82:25
though 52:6 54:23 65:15 72:15 82:22 83:22
thought 41:6 54:11 60:19,19
three 12:22 13:2 23:13,14,17,19 24:7,9
three-ring 6:5
three-year 24:14
throw 13:8
time 4:20 8:5,21 9:8 12:21 14:14 16:24 17:17,19 18:2,3 20:14 22:3 26:5,7,9 27:24 28:5,15 29:16 30:3, 7,11 31:8,8 33:16 37:10 38:2,6 41: 3 44:24 45:6,10,16 46:11,13,17,23 47:12 48:11,16,19 50:14,17,23 51: 7 52:12 53:9 57:1 58:23 60:8 70: 25 78:16 84:15 85:24 87:6
times 75:3 76:11 84:7
timing 22:13
titles 66:19,21
today 4:21 5:12,23 6:3 24:5 35:12 39:16 40:19 55:5 56:1 79:13
told 31:22 39:7,8,11,15 47:3,4,14 49:3,7 51:17 60:23 61:3,8,10,15 69:10 71:9,12 80:24 81:1 83:10,21
Tom 78:3
Tommy 69:4 70:19,20 74:3 78:17 86:19
took 34:15
top 21:2
total 8:8,9,12
towards 10:4
trained 61:25
training 10:8,17 13:12 15:5,8,10, 12 62:13
traumatically 63:8
treated 26:2 39:15 47:14,17 69:15
treating 33:13,16 34:1
true 11:11 78:20 88:14
truth 88:18,19,19

truthful 28:4 29:7 75:5
try 17:3 28:2 54:19 59:12
trying 17:25 27:7 60:13 67:12 81:21
tumor 12:11 42:3,18 44:1 62:19
tumors 12:9,10,11
Two 9:20 15:1,2 18:2 23:12,14,17, 19 24:6,9,13 25:2 27:2 31:12,21 42:8,15 47:25 53:17 67:12 79:18, 23 80:1,5,14,20 81:6,13
two-year 80:10,19 81:4,17 82:5
typed 21:16,18 23:18 24:6
types 7:1
typewriting 88:13
typically 8:11 17:15

U

Um-hum 30:16
unclear 24:4
under 3:11 7:10,14,21 20:8 37:14 59:3 61:2 62:15 63:24 82:15 83:11
understand 7:10 29:1 46:9 49:3 56:3,3,14 69:24 81:19
understanding 7:20 8:2 10:24 11: 1 12:4 13:15 64:7,10 73:19
understatement 87:5
understood 25:19
underwriter 6:22,24 8:17 15:11, 17 17:22 18:25 46:16,21
underwrites 16:2
underwriting 14:15,17,20 15:3 17: 16,22 18:1,4
union 7:15 8:4,7 24:3 25:5 63:25
unit 41:19 48:18
United 2:5
University 9:12,14,17
Unless 62:9 68:8
until 52:18 56:9 63:12
up 16:12 49:20 56:1,9 62:18,21 71:10
uphold 62:4
upon 24:18 26:10 71:5 75:4,24 88: 9
upper 58:6
us 32:21 47:23 51:17 78:22 87:11
use 41:13 46:10
used 4:5 56:19 79:25 80:3,15,21 81:9 88:15
usual 4:22

V

validity 79:17,23 80:18 81:3,12
vary 27:20
verbal 88:9
vernacular 48:14
versus 65:10 66:3
very 18:12,15 22:19 43:24 84:6
via 24:1
visit 32:1 36:4 60:2 69:6,8 70:20 71:4,8 73:12,14,18,19,24 74:1,3,4, 7,10,13,16 75:5,10 76:6,8,13,20, 22,24 77:3,14,15,16,19,25 78:2,4, 8,11,13,19,23 79:4,9,11
visited 69:5 70:19
voice 84:2,2,3,11,18,24 85:16
void 79:25 80:3,15,21 81:9
volumes 17:4

W

Wait 19:20 33:19 35:22 80:1
Walker 2:9 88:7
WALLACE 2:18
want 6:11 10:14,15,19 19:23 22:13 13 30:5 41:3 43:1 55:24 56:13,17, 17 67:24 69:24 77:6
wanted 4:18 18:17
warranted 25:8,12,22
wasn't 8:24 18:9 21:18 35:1 47:4 50:18 63:19,19,24 64:3 73:24
Waverly 15:21 16:1,3
way 5:17 18:14 36:17,20,23 40:7 41:13
We'll 13:10 29:25 30:7 41:3 86:10
we're 6:12 25:23 40:18 52:14 68:1 10 77:25
weeks 56:7,9,12
weigh 61:25 62:3
weighed 61:12,13,14,18
welcome 89:2
Well 6:15 12:13 16:1 19:15 24:5 33:12 37:4,14 38:17,18 40:8 41:15 43:20 44:13 45:5 46:25 51:14 52:



10 54:14,21 55:19 56:2 57:8 59:5,
24 60:17,25 64:1 68:2 70:11 71:9
72:1 74:19 81:21
**what's** 10:15,24 13:15 16:10,22
17:11,18 23:18 37:4,17 41:22 56:
24 66:10
**wherein** 2:3
**whether** 8:5 13:11 24:12 27:21
31:14,23,24 35:12 39:5,16 41:20
47:17 49:15 52:2 55:7,9 62:15,25
78:16 79:12 82:4
**who's** 45:15 67:6,8
**whole** 88:19
**wife** 86:19
**will** 82:15 83:2,11 85:2
**William** 34:13
**Wisconsin** 2:9,12 88:1,4,20
**wished** 86:20
**Within** 12:21 13:2 14:14 16:24 17:
23 18:23 21:24 25:25 28:20 52:8
66:24 67:4 74:20 79:17 80:19 81:
3,17 82:5
**without** 26:12
**witness** 2:2 3:6,9 27:4 30:15 45:4
67:22 68:3,19,22,25 69:14 75:16
77:10 81:18
**wondered** 31:22
**Word** 20:15 46:10 81:10,10
**words** 27:12 58:2,3 83:15
**working** 20:20
**works** 15:20,21 16:4 36:17
**wouldn't** 12:20 39:8 41:13 44:2,9,
10 47:19 62:24 63:12,13 65:7 66:5
72:23 78:22 79:4
**write** 30:24 62:21
**writing** 31:13 54:3 87:10
**Written** 5:13,14 20:19 23:18 26:17
54:4 86:24
**wrong** 33:10
**wrote** 30:20,21,22 49:25 54:5

## X

**X-ray** 10:1,4

## Y

**year** 28:23 29:14 53:20
**years** 9:19,20 12:22 13:2 23:13,
14,17,19 24:7,9 37:16 79:18,23 80:
1,5,14,20 81:6,13
**yell** 84:3
**yelled** 84:15,16 85:6,9
**yesterday** 4:20
**Yet** 77:18

Tommy B. Hall
#32534



EXHIBIT
Larson
11-1-01 LC

11/04/99 MEMBER DECEASED

11/10/99 CU NOTIFIES CUNA Mutual Group OF CLAIM

11/12/99 REQUESTED RECORD PAST 5 YEARS CHARLESWORTH, MD

11/29/99 RECEIVED RECORDS CHARLESWORTH, MD APRIL 1998-NOVEMBER 1999
    RECORDS INDICATE 01/22/99 MINOR HISTORY & PHYSICAL EXAM "HE HAS
    A HISTORY OF HAVING A MELANOMA ON HIS BACK A NUMBER OF
    YEARS AGO." ALSO RECORDS DATED 07/15/99 INDICATE "IN 1993 A MOLE
    DEVELOPED ON HIS LEFT SHOULDER BLADE" "IT WAS EXCISED.
    PATHOLOGY SHOWED A MALIGNANT MELANOMA."

11/30/99 REQUESTED RECORDS JANUARY 1993-APRIL 1998 FROM DR
    CHARLESWORTH, MD

12/06/99 CHARLESWORTH, MD OFFICE CALLED STATING NO OTHER RECORDS TO
    GIVE, THE/SUBMITTED ALL RECORDS SENT

12/08/99 FILE TO DR ANSFIELD FOR REVIEW OF INFORMATION RECEIVED FROM
    CHARLESWORTH MD.

12/09/99 PER DR ANSFIELD, WE ARE IN NEED OF RECORDS FROM 1993 FORWARD.

12/15/99 CALLED DR CHARLESWORTH OFFICE FOR NAMES OF REFERRING PHYS.
    THEY HAVE NO INFORMATION

12/15/99 NOTIFIED CLAIMS OF FILE DELAY

12/15/99 CONTACTED SPOUSE REQUESTING LIST OF TREATING PHYSICIANS FROM
    JANUARY 1993-APRIL 1998 BY LETTER

12/28/99 RECEIVED FROM SPOUSE TREATING PHYSICIAN NAMES AND ADDRESSES

12/29/99 WROTE TO ALL PHYSICIANS LISTED BY SPOUSE REQUESTING RECORDS
    1993 TO PRESENT

01/06/00 REC'D CALL DR BAKER OFFICE PATIENT NOT SEEN SINCE 1989

01/20/00 REQUEST BY PHONE FROM DRS ENDERS & CASHDOLLAR FOR PRE-
    PAYMENT.

01/31/00 DR HURLEY OFFICE CALLED FILE IS LOST. THEY FAXED RECORDS TO
    ATTORNEY 04/99, FILE HAS BEEN MISPLACED SINCE.

2/9/00

Per Jeff Brown –
Keep Copy for future
reference. not filmed

2/2/00 rec'd cashdollar records

2/9/00 reviewed all records of Dr. Ansfield

*LeA*

# THE CHAMBERSBURG HOSPITAL

## PATHOLOGICAL REPORT

Pathologists:
Howard L. Hoffman, M.D.
Constancio A. Ramirez, M.D.

| Name of Patient: | Age: | Date: | Doctor: | Acc. No.: |
|---|---|---|---|---|
| HALL II, TOMMY B. | 37 | 4/13/93 | HURLEY | S93-2133 op / 332103 |

Specimen:
SKIN LESION LEFT BACK

Diagnosis:
EXCISION SKIN LESION LEFT BACK

Gross:
The specimen consists of an elliptical portion of skin measuring 1.5 x 1.0 x 0.7 cm. There is a flat rounded irregularly pigmented central area. The underlying tissue is grossly unremarkable. The margins are marked and the entire structure is processed.
HLH/kk
r-4/13/93

MICROSCOPIC
Section of skin demonstrates the mid portion with groups of nevus cells in the dermis and at the epidermal-dermal junction. A few groups of melanocytic cells are also present in the superficial layer of epidermis. In one level of section, the cells at the epidermal-dermal junction are elongated and dysplastic. A mild lymphocytic infiltration is present in the underlying stroma. The overall microscopic features are regarded as those of a dysplastic nevus. The surgical margins appear free of tumor involvement consistent with complete removal of the lesion. Follow up is recommended in view of the dysplastic changes noted.

INTERPRETATION: DYSPLASTIC NEVUS, SKIN (BACK).

s-1;b-1    88305
CAR/mlw    4/15/93

Examined by_____ M.D.
H.L. Hoffman, M.D.
C.A. Ramirez, M.D.

P06180                    CHART COPY                    P0790

DATE 4-30-48   6B

## WHITE, BRIG... ...RAMER & CHARLESWORTH MEDICA... ...ATES

| PATIENT"S NAME | MARITAL STATUS S M W D SEP | BIRTHDATE | SOCIAL SECURITY NO. |
|---|---|---|---|
| Tommy Bob Hall II | S (M) W D SEP | 5-12-55 | 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 |

| STREET ADDRESS, CITY, STATE, & ZIP CODE | HOME PHONE | INSURANCE |
|---|---|---|
| 517 M+ PLEASANT RD FAYETTEVILLE PA 17222 | 717-352-9030 | BLUESHIELD BLUECROSS |

| PATIENT"S EMPLOYER | OCCUPATION | WORK PHONE. |
|---|---|---|
| CRESSLER TRUCKING INC | TRUCK DRIVER | |

NEXT OF KIN: Nancy M. Hall

ALLERGIES: NONE

| | YES | NO | | YES | NO | | | |
|---|---|---|---|---|---|---|---|---|
| CARDIAC DISEASE | | ✓ | LIVER DISEASE | | ✓ | PAP | | |
| DIABETES | | ✓ | STOMACH DISEASE | | | | | |
| SEIZURES | | ✓ | LUNG DISEASE | | ✓ | MAMMOGRAM | | |
| THYROID DISEASE | | ✓ | HYPERTENSION | | | | | |
| KIDNEY DISEASE | | ✓ | ALCOHOL | | ✓ | RECTAL | | |
| ANEMIA | | ✓ | CIGARETTES | ✓ | | PNEUMOVAX | | |
| | | | | | | TETANUS | | |

| DATE | MEDICAL PROBLEMS | DATE | HOSPITALIZATIONS/SURGERY |
|---|---|---|---|
| | 1. CANCEROUS MOLE - REMOVED | 96 | Dr. _____ |
| | 2. BACK SURGERY | 12-89 | Dr _____ Ruptured Disk L5 S1 J4 L5 |
| | 3. BACK SURGERY | 1-93 | Dr _____ Bulging Disk |
| | 4. Diverticulitis | | |
| | 5. | | |
| | 6. | | |
| | 7. | | |

| DATE | MEDICATION | | | | | PHARMACY | | PHONE: | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | P0905 | | | |

**EXHIBIT**

Charlesworth-1
-9-12
BS

EXHIBIT
Charlesworth 2
1-9-02        RS

PHYSICIAN PROGRESS NOTES

*Tommy B. Wall*

| Date | |
|------|--|
| APR 30 1996 | WT - 201        BP - 130/78  Lt |

S - c/o pain in Lt leg (calf)

Pushing pickup truck on flat ground to get it started *(illegible)* + stops then "charley horse" but pain has not *(illegible)* + very tight / stiff ⊕ calf, Tried Icy hot, no other Rx

NKA        Meds) none

*(illegible handwritten lines)* lumbar Arth surgery x2 c bilat fusion pre op
? Melanoma removed L ankle 1996

*(illegible)* truck driver x 4 years, Smoking 1½ PPD

O:    ⊕ Spasm    c mild tender(ness) Lt calf
        Strength intact    N-V intact

P:    muscle strain Lt calf

*(illegible handwritten prescription lines)*
Stretch *(illegible)*

| 12-11-98 | WT - 209        BP - 130/74  Rt |

S - c/o lump on inside of throat

*(illegible handwritten lines)*
⊕ *(illegible)* SN. ⊖ cough ⊖ chest *(illegible)*
no other new *(illegible)*    *(illegible)* smoking x 6 mons, not 5 mos, *(illegible)*

O:    Firm nodule ≈ 1.5 cm Lt *(illegible)*    No other LN
        *(illegible)* chest *(illegible)*    D/L ~ 6 /m

A:    ? *(illegible)*        P:    ✓ CBC, *(illegible)*, LFT, CXR
                            *(illegible)* tough if not gone

P0906

4260

**EXHIBIT**
Charlesworth - 3
1-9-02   PS

DATE 1-15-99
AGE 43
REF: Charlesworth

PATIENT'S NAME Tommy Hall

C/O lump - base (L) neck x 5 weeks - increased in size

H.P.I. - tender - only when moved around. - Was a stable sized lesion
- Size 1 cm to ___ quite acc to PT. -

**P.M.H.**

Allergies Ø

Medications Iron Med.

Surgery Spinal Sg x 2 1989-1993
Dr. ___
Exc. (1993)

**ROS & OTHER C/O**

Childbirth   Complicated ____   Uncomplicated ____

**FAMILY HISTORY** D- Dad - Aunt
C - Grandmother (breast)
TB - Ø
H - Grandmother (CVA)

**Immunization & Childhood Diseases**

Complic ____   Uncomplic ____

Medical Illnesses Anemia

Bleeding Tendencies Ø
Hospitalizations (Excl. Sgy.) ____

Trauma Nasal Trauma x 2 -

**HABITS**

| | Yes | No | Amt |
|---|---|---|---|
| Tobacco | X | | 1 pkg. d. |
| ETOH | | X | |

| Rinne | | AC | BC | P.N.O. Motion | Valsalva (Motion) |
|---|---|---|---|---|---|
| | Left | AC | BC | | |
| | Right | AC | BC | L ___ R ___ | L ___ R ___ |

**Physical Examination**

Weber
ML L R

**EARS**

Canals OK
External ____

**NOSE**

Septum   ML   Defl. L   R
Valves   NL   Wide L R   Closed L R
Turbinates ____

Discharge   Bilat   R   L
External   Dorsal Hump   Bridge to L ___   Bridge to R ___

P0912



THE CHAMBERS  OSPITAL
112 N. Seventh St.
Chambersburg PA 17201

Page 1

COPY

## MINOR HISTORY & PHYSICAL EXAMINATION

HALL II, TOMMY B
Patient #: 8304016
Admission Date: 01/22/99
J. M . Chicklo, M.D.

Medical Record #: 332103
Patient Type: 5
DOB: 05/12/55
Patient Rm:

**AGE:** 43

**WORKING DIAGNOSIS.** Left cervical node.

**FINAL DIAGNOSIS:** Same.

**COMPLICATIONS:** Without.

**FAMILY HISTORY:** No bleeding tendencies.

**PERSONAL HISTORY:** Allergies - none.  Medications - iron pills.  Surgery - spinal surgery and he had a malignant mole excised in 1993 on his back.  Medical Illnesses - anemia. Hospitalizations - none recently   Trauma - nasal fracture times two.

**REVIEW OF SYSTEMS:** In good health.

**DEVELOPMENTAL HISTORY.** Normal.

**SOCIAL HISTORY:** He smokes a pack of cigarettes a day.

**HISTORY OF PRESENT ILLNESS:** This patient complained of a lump in the left neck for about five weeks. He feels it has increased in size and my exam confirmed tender nodes posterior to the sternocleidomastoid in the left neck. My plan is to excise this node because it has increased in size, it does not appear to be acutely inflammatory, and he has a history of having a melanoma on his back a number of years ago  The risks, rewards and alternative methods of treatment were discussed.

**PHYSICAL EXAM.** Showed a pleasant man in no distress. Vital signs are normal. HEENT shows a deviated nasal septum. Oral cavity shows a lot of missing teeth. Neck showed a node that is about 2-3 cm just posterior to the sternocleidomastoid on the left and the posterior triangle. No other nodes were palpable. Heart and lungs clear. On his back, there is evidence of a resected lesion but no recurrence in the area

**IMPRESSION:**   Left neck node.

# FALLING SPRING MEDICAL ASSOCIATES
## NEW PATIENT INFORMATION RECORD (PLEASE PRINT OR WRITE LEGIBLY)

**PATIENT INFORMATION**

| PATIENT'S NAME | LAST | FIRST | MI | AGE | DATE OF BIRTH | SOCIAL SECURITY NO. |
|---|---|---|---|---|---|---|
| | Hall Jr | Tommy | B | 43 | 5-12-55 | 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 |

| STREET ADDRESS | □ PERMANENT | □ TEMPORARY | CITY AND STATE | ZIP CODE | HOME PHONE NO. |
|---|---|---|---|---|---|
| 517 Mt Pleasant Rd | | | Fayetteville PA | 17222 | 717-352-9030 |

| PATIENT'S EMPLOYER | MARITAL STATUS: | BUSINESS PHONE NO. |
|---|---|---|
| Cressler Trucking Inc | SINGLE (MARRIED) WIDOW DIVORCED | |

| EMPLOYER'S STREET ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|
| 1069 Seibert Ave | Shippensburg PA | |

| IN CASE OF EMERGENCY CONTACT: | NAME | RELATIONSHIP | PHONE NUMBER |
|---|---|---|---|
| Nancy Hall | | Wife | 717-352-9030 |

| SPOUSE'S NAME | DATE OF BIRTH | SOCIAL SECURITY NUMBER |
|---|---|---|
| Nancy M Hall | 5-28-99 | 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 |

| SPOUSE'S EMPLOYER | OCCUPATION (INDICATE IF STUDENT) | BUSINESS PHONE NO. |
|---|---|---|
| | | |

| EMPLOYER'S STREET ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|
| | | |

| WHO REFERRED YOU TO THIS PRACTICE? | FAMILY DOCTOR |
|---|---|
| Dr Charlesworth/Brchicko | Dr Charlesworth |

## INSURANCE INFORMATION

☐ Medicare (Medical Insurance Only)

  Medicare Number _____   Effective Date _____

☑ Blue Shield                              If Out of State, Identify _____

  Address, If Out of State _____
  Name of Insured Tommy B Hall   Identification No. QA563825959   Group No. 016824800

☐ Other Insurance

  Address _____
  Name of Insured _____   Policy No. _____   Group No. _____

☐ Other Insurance

  Address _____
  Name of Insured _____   Policy No. _____   Group No. _____

☐ Medicaid (Medical Assistance)

  Recipient Number _____

**In order to control our cost of billing, we request that office visits be paid at the time service is rendered. We would rather control our billing costs than be forced to raise our fees.**

AUTHORIZATION: I hereby authorize the physician indicated above to furnish information to insurance carriers concerning this illness/accident, and I hereby irrevocably assign to the doctor all payments for medical services rendered. I understand that I am financially responsible for all charges whether or not covered by insurance.

| 2-17-99 | Tommy B Hall Jr |
|---|---|
| Date | Responsible Party Signature |

D0176

HALL, Tommy B.

Referring Physician _in Charlecionth_ _Mr Strokes 2/11_ _throat ca_

Date Referred _____

WT _210_ HT _5'6"_ BP _134/74_ P _92_ AGE _43_

DATE: _2/17/99_

CHIEF COMPLAINT:

Lt. CERVICAL NODE

ALLERGIES: NKA

MEDICATIONS: Ferious Sulfate I DAily

PMH: anemia
~~malignant~~
MALIGNANT MOLE ON BACK 93
RUPTURED & HERN DISK.

SURGERY: Spinal surgery x2 89 & 93 ruptured & Hern Disc.
malignant mole excised from back in 1993
excisional biopsy of deep cervical node 1/22/99

SH:    OCCUPATION: TRUCK DRIVER/CUESSNER - MARRIED/1 CHILD
       SMOKE: 2ppd
       ALCOHOL: Ø
       CAFFEINE: coffee - 5 cups per DAY

FH:    ↑MOTHER 62    Healthy
       ↑FATHER 65    DM, SKIN CANCER
       1 BROTHERS 42    Healthy

1 SISTERS HALF 17    Healthy

D0177

CHS MEDICAL ONCOLOGY

MICHAEL R. CASHDOLLAR, M.D.          KEVIN J. LORENTSEN, M.D.

Medical Oncology-Hematology
120 NORTH SEVENTH STREET
SUITE 201
CHAMBERSBURG, PA 17201-1795

TELEPHONE 717-263-1022

February 17, 1999

James M. Chicklo, M.D.
1039 Wayne Avenue
Chambersburg, PA 17201

RE: TOMMY B. HALL II

Dear Jim:

I had the pleasure of seeing Tommy Hall in medical oncology consultation on Wednesday, 2-17-99. As you are well aware, Mr. Hall demonstrated a left in scapular dermal lesion in 1993. Pathology revealed a malignant melanoma. Lesion was surgically excised with apparent clear surgical margins. In early December of 1988, the patient displayed a nontender left cervical lymph node with apparent increase in size. Incisional biopsy of the lymph node on 1-22-99 demonstrated metastatic malignant melanoma. The patient is otherwise asymptomatic. Of note has been the recent documentation of moderately severe deficiency anemia with an unremarkable GI evaluation including upper GI and barium enema. CBC from 12-11-98 revealed a hemoglobin of 9.5 gram with MCV of 71. Platelet count was appropriately elevated at 426,000. There were function studies at that time that were unremarkable. Barium enema did reveal diverticular disease. A chest x-ray was unremarkable. The patient denies history of apparent blood loss. He now utilizes supplemental iron therapy. He reports recent stable appetite and weight. He denies focal pain or neurologic deficit.

PMH is most notable for the malignant melanoma. Surgical resection in 1993. The patient also reports two lumbar spinal procedures in 1989 and 1993 for herniated disk disease. No drug sensitivity is reported.

SH: The patient is a truck driver. He is married with one child. He smokes typically 1-2 packs per day for over 20 years. He denies ethanol usage.

FH: Relatively benign. The patient's father has displayed mild type II diabetes mellitus. No additional history of melanoma.

PHYSICAL EXAMINATION presently reveals a middle-aged alert white male. Wgt: 210 pounds. Hgt: 5'6". BP: 130/74. R: 16. P: 92 and regular. No peripheral adenopathy or thyromegaly. There is evidence of recent cervical lymph node resection on the left. No sclera icterus. COM's intact. Throat clear. Carotids are full without bruits. No neck vein distention. Lung fields clear. No CVA or cerebral tenderness. Cardiac rhythm is regular. No audible murmur or gallop. Abdomen is moderately obese, soft, nontender. No hepatosplenomegaly. No palpable mass lesions. Good pedal pulses. No peripheral edema. DTR's 1+ and equal. Sensation motor grossly intact.

D0178

HALL II, TOMMY B.
2-17-99
Page 2

IMP: Solitary cervical node metastasis, malignant melanoma, status post nodal excisional biopsy, 1-22-99. History of left scapular dermal malignant melanoma, 1993. Today I have requested immediate CT evaluation of the chest and abdomen to further exclude additional metastatic sites. Documentation of a solitary nodal metastatic site would prompt consideration of Alfa-Interferon therapy utilizing a high dose schedule. The additional recent documentation of significant iron deficiency anemia is also worrisome. I have also requested consideration of GI consultation via Dr. Enders for colonoscopy consideration. I think that it is important to further exclude predominantly a right colonic neoplasm. The patient's wife has undergone a colonoscopic evaluation via Dr. Enders and is familiar with the procedure.

I wish to thank you for allowing me to see and participate in the care of this very interesting patient. The patient does remain at high risk for further metastatic disease.

Respectfully,

Michael R. Cashdollar, M.D.

MRC/djm

C:    Dr. Enders
      Dr. Charlesworth

SENT   FEB 1 9 1999

D0179

TO: DR. Cashdollar          FROM: CHAMBG HOSPITAL

SINGLE COPY

Name: HALL II, TOMMY B           MR#: 332103        ReqSeq: 732710
   Date Done: 02-18-1999 Read: 02-18-1999 TPD Date: 02-19-1999 Time: 1403
Ordering Dr: Cashdollar, Michael R. M.D.          Transcriptionist: MJG
   Nurs Stat: 80                                   Pat Class: 3
   Faculty Dr: M.D., LAURIE ABRAMS
      Room no.:                                    Date of Birth: 05-12-1955
Admitting Diag: CT/METASTATIC CARCINOMA
Rsn for Exm:
100CC OMNIPAQUE INJECTED VIA INJECTOR LT 4V BY LAB

Patient phone: 7173529030     ACCOUNT NO: 533547        *** F/C:    ***
                              ** FINAL **

HISTORY: METASTATIC CARCINOMA.  HISTORY OF MELANOMA.

2/18/99
CT OF THE CHEST AND ABDOMEN:  TECHNIQUE:  7 MM NONCONTRAST IMAGES
WERE OBTAINED THROUGH THE LIVER.  FOLLOWING THE INTRAVENOUS
ADMINISTRATION OF 100 CC OF OMNIPAQUE, 7 MM HELICAL SCANS WERE
OBTAINED FROM THE THORACIC INLET THROUGH THE ILIAC CRESTS.

FINDINGS:  THERE IS NO EVIDENCE OF AXILLARY ADENOPATHY.  HOWEVER,
RIGHT HILAR ADENOPATHY MEASURES APPROXIMATELY 2 CM TRANSVERSELY BY 3
CM AP.  THERE IS NO LEFT HILAR ADENOPATHY.  MILD SUBCARINAL
ADENOPATHY IS ALSO PRESENT.  NO ADDITIONAL MEDIASTINAL ADENOPATHY IS
NOTED.  THERE IS NO EVIDENCE OF PLEURAL EFFUSION.

A 9 MM NODULE IN THE POSTERIOR SEGMENT OF THE RIGHT UPPER LOBE IS
WELL CIRCUMSCRIBED, AND WORRISOME FOR A METASTATIC LESION.

MINIMAL SUBPLEURAL FIBROTIC CHANGE IS NOTED PARTICULARLY IN THE
RIGHT MIDDLE LOBE, BUT NO OTHER SUSPICIOUS NODULES ARE
DEMONSTRATED.  THERE IS A CALCIFIED GRANULOMA IN THE ANTERIOR
SEGMENT OF THE RIGHT UPPER LOBE.

MILD BULLOUS CHANGES ARE NOTED IN THE LUNG APICES.

THE LIVER, SPLEEN, PANCREAS, RIGHT ADRENAL GLAND AND KIDNEYS ARE
UNREMARKABLE.  THE KIDNEYS EXCRETE CONTRAST BILATERALLY.

THERE IS A 3 BY 3.5 CM LEFT ADRENAL MASS.  THE MASS MEASURES 38 H.U.
PRIOR TO CONTRAST AND 69 H.U. FOLLOWING CONTRAST.  THESE VALUES ARE
NONSPECIFIC: HOWEVER, THE SIZE OF THE LESION IS SUSPICIOUS FOR
MALIGNANCY.

SMALL PARA-AORTIC LYMPH NODES ARE WITHIN NORMAL LIMITS FOR SIZE.

THERE IS A SINGLE LOOP OF SMALL BOWEL IN THE LEFT LOWER QUADRANT
DEMONSTRATING A CIRCUMFERENTIALLY THICKENED SMALL BOWEL WALL.  THIS
COULD REPRESENT INFLAMMATION OR LYMPHOMA.  METASTATIC DISEASE FROM

12-23-2000

SINGLE COPY

Name: HALL II, TOMMY B            MR#: 332103      ReqSeq: 732710
   Date Done: 02-18-1999 Read: 02-18-1999 TPD Date: 02-19-1999 Time: 1403

MELANOMA IS A LESS LIKELY CONSIDERATION, BUT IS NOT EXCLUDED.

CONCLUSIONS:  1.  9 MM RIGHT UPPER LOBE NODULE SUSPICIOUS FOR
SOLITARY METASTATIC DEPOSIT.  PRIMARY MALIGNANCY OR NONCALCIFIED
GRANULOMA ARE CONSIDERED LESS LIKELY.
             2.  3 BY 2 CM RIGHT HILAR ADENOPATHY.  MILD SUBCARINAL
ADENOPATHY.
             3.  3 BY 3.5 CM LEFT ADRENAL MASS.  ADRENAL LESIONS OF
THIS SIZE ARE WORRISOME FOR MALIGNANCY.  METASTATIC MALIGNANCY WOULD
BE MORE LIKELY IN THIS CASE.
             4.  SINGLE LOOP OF SMALL BOWEL WALL THICKENING IN THE
LEFT LOWER QUADRANT.  ALTHOUGH THIS COULD REPRESENT AN ISOLATED
REGION OF INFLAMMATORY BOWEL DISEASE, THIS AREA IS WORRISOME FOR
MALIGNANCY, INCLUDING LYMPHOMA OR METASTATIC DISEASE.

DX:  197.0
     64170   61260
HX:  197.0
F/R: P/D


            Signed by  DR.  LAURIE ABRAMS M.D.












                    PAGE    2




                                                        D0150

# FALLING SPRING MEDICAL ASSOCIATES
## NEW PATIENT INFORMATION RECORD (PLEASE PRINT OR WRITE LEGIBLY)
## PATIENT INFORMATION

| PATIENT'S NAME  LAST, FIRST  MI | AGE | DATE OF BIRTH | SOCIAL SECURITY NO. |
|---|---|---|---|
| HALL II, Tommy R | 43 | 5-12-55 | 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 |

| STREET ADDRESS  ☐ PERMANENT  ☐ TEMPORARY | CITY AND STATE | ZIP CODE | HOME PHONE NO. |
|---|---|---|---|
| 517 Mt PLEASANT RD | FAYetteville PA | 17222 | 717-352-9030 |

| PATIENT'S EMPLOYER | MARITAL STATUS: SINGLE (MARRIED) WIDOW DIVORCED | BUSINESS PHONE NO. |
|---|---|---|
| CRESSLER TRUCKING INC | | |

| EMPLOYER'S STREET ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|
| 1069 SEIBERT AVE | SHIPPENSBURG PA | |

| IN CASE OF EMERGENCY CONTACT: NAME | RELATIONSHIP | PHONE NUMBER |
|---|---|---|
| NANCY HALL | WIFE | 717-352-9030 |

| SPOUSE'S NAME | DATE OF BIRTH | SOCIAL SECURITY NUMBER |
|---|---|---|
| NANCY M HALL | 5-28-55 | |

| SPOUSE'S EMPLOYER | OCCUPATION (INDICATE IF STUDENT) | BUSINESS PHONE NO. |
|---|---|---|
| HOUSE WIFE | | |

| EMPLOYER'S STREET ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|
| | | |

| WHO REFERRED YOU TO THIS PRACTICE? | FAMILY DOCTOR |
|---|---|
| Cashdaller | |

Dr. Cashdaller's office

## INSURANCE INFORMATION

☐ Medicare (Medical Insurance Only)

Medicare Number _____  Effective Date _____

☑ Blue Shield                        If Out of State, Identify _____

Address, If Out of State _____

Name of Insured  Tommy B Hall   Identification No. QAC 563825959 Group No. 26824000

☐ Other Insurance _____

Address _____

Name of Insured _____  Policy No. _____  Group No. _____

☐ Other Insurance _____

Address _____

Name of Insured _____  Policy No. _____  Group No. _____

☐ Medicaid (Medical Assistance)

Recipient Number _____

**In order to control our cost of billing, we request that office visits be paid at the time service is rendered. We would rather control our billing costs than be forced to raise our fees.**

AUTHORIZATION: I hereby authorize the physician indicated above to furnish information to insurance carriers concerning this illness/accident, and I hereby irrevocably assign to the doctor all payments for medical services rendered. I understand that I am financially responsible for all charges whether or not covered by insurance.

2-23-99 _____        Tommy B Hall _____
Date                                        Responsible Party Signature

# CHAMBERSBURG GASTROENTEROLOGY ASSOCIATES, LTD.

120 N. Seventh Street, Suite 201, Chambersburg, PA 17201-1795 • (717) 263-0629

Board Certified
Internal Medicine/Gastroenterology

JOHN G. ENDERS, M.D.  •  MARK P. DOBISH, M.D.  •  WAYNE C. HOOVER, M.D.

HALL, TOMMY B.

2/23/99

SUBJ: 43 yo white male with melanoma in 1993. No with a cervical lymph node showing recurrent melanoma.  He developed anemia with hemoglobin of 9.5 and MCV of 71. Upper GI showed GE reflux. Barium enema demonstrated a few diverticuli. CT scan demonstrated adrenal mass and possible peri____ lymph node and a loop of small bowel left lower quadrant seemed thickened. Because of the microcytic anemia further evaluation of colon recommended to rule out neoplastic process. Patient denies hematochezia or alteration in bowel habit.  No family history of colon cancer.

OBJ: Patient's physical examination reveals a soft abdomen. Bowel sounds were normal.  No masses. Liver and spleen were not enlarged.

ASSESS: Microcytic anemia. Melanoma.  Rule our colonic neoplastic process despite negative BE.

RECOMMEND: Proceed with colonoscopy. Discussed the options with the patient. He agrees and will have this scheduled in the near future.

John G. Enders, M.D.

JGE/tml

CC: Dr. Cashollar                          SENT   MAR 0 1 1999

1/11/99

4-27-99 left msg. on ans. machine re: hemoccult/mf

5/10/99 Positive Hemoccult (grossly) 6: L6/mf

         WGD/SDFT  5/18/99 - 11:15 hn
         reg in de ELO

10/25/99 Records sent to Dailey. Bryan, Sanft, Cohen 2X/jg

11/15/99 Records sent to Hartline & Nulter - js

D0183

Referring Physician _____ Castellar _____

Date Referred

12/23/2000

WT _214_ HT _5'6"_ BP _140/10_ P _80_ AGE _43_

DATE: _2/23/99_

**CHIEF COMPLAINT:**

**ALLERGIES:** NKDA

**MEDICATIONS:**
Ferrous Sulfate Tqd

**PMH:**
Anemia

**SURGERY:**
Spinal x2 89 & 93 Rupt. Her. Disc
Mal. Mole Excised '93
Exc. Bx Deep Cervical Node 1/21/99

SH:    **OCCUPATION:** Truck Driver

**SMOKE:** 2ppd

**ALCOHOL:** NONE

**CAFFEINE:** Coffee 5cups a day
Married
1 Child

FH:  ↑ **MOTHER** 62yr. Healthy

↑ **FATHER** 65yr. Dm, Skin Ca

| **BROTHERS** ↑ Healthy

| half
| **SISTERS** ↑ healthy

D0184

THE CHAMBERSBURG HOSPITAL                           Page 1
112 N. Seventh St.
Chambersburg PA  17201                              COPY

## COLONOSCOPY REPORT

HALL II, TOMMY B                    Medical Record #:  332103
Patient #:  8316432                 Patient Type:  5
Procedure Date: 03/15/99            DOB:  05/12/55
J. G . Enders, M.D.                 Patient Rm:

COLONOSCOPIST:  J. G. Enders, M.D.

**INDICATION FOR PROCEDURE:**  This is a 43-year-old white male who had melena removed
in 1993 and then in February had a cervical node that had malignant melanoma.  He was found to
have iron deficiency anemia.  CT scan of the abdomen revealed small periaortic nodes.  An upper
GI was unremarkable.  To rule out neoplastic process in the colon, colonoscopy was
recommended.

**PROCEDURE:** The indication for the procedure as well as risks and complications were
explained in detail to this patient who gave his informed consent.  He was prepared with 50 mg of
Demerol and 5 mg of Versed intravenously.  With the patient on his left side the Olympus single
channel video colonoscope was inserted and advanced under direct visualization to the cecum.
The ileocecal valve and appendiceal orifice were clearly identified.  On slow withdrawal he had
minimal submucosal hemorrhage from the bowel prep but no sign of significant pathology.  No
polyps were seen.  No submucosal nodules.  No bleeding site.  Internal hemorrhoids were noted
that were small.  The patient tolerated the procedure very well.

**IMPRESSION:**    Essentially normal colonoscopy without site to account for iron deficiency
anemia.

**RECOMMENDATION:**  Repeat Hemoccult in a couple of weeks.  May need small bowel
follow-through if they would be positive.

JGE/dad                                     J. G . Enders, M.D.
D: 03/15/99
T: 03/16/99
cc: Dr. Charlesworth
    Dr. Cashdollar

D0152

The Johns Hopkins Hospital History #: 317-75-85

Page 1 Patient Name: HALL,TOMMY B

Tape no.: GSP109 ONCOLOGY OUTPATIENT NOTE

SHARFMAN,WILLIAM
July 15, 1999

## NEW PATIENT CLINIC VISIT REPORT

REASON FOR CONSULTATION: Mr. Hall is referred for treatment of metastatic melanoma.

HISTORY OF PRESENT ILLNESS: This is a 44-year-old white male who was in his usual state of health until 1996 when he had a number of small moles removed on his left neck that we being irritated by his shirt. In 1993 a mole developed on his left shoulder blade. It developed a bright red rim around it. It was excised. Pathology showed a malignant melanoma. He did well up until last January when he developed a lump in the left neck. A lymph node was excised and found to contain metastatic melanoma. He underwent a staging evaluation and was found to have disease in the knee, intestine and adrenal gland. He was treated with combination chemotherapy that included Platinum, DTIC and BCNU with Interferon. His last chemotherapy was in April. He just stopped the Interferon. Apparently his follow-up scan showed progression in April.

He now is here for further therapy.

Mr. Hall was quite ill as he went through chemotherapy. He is feeling better now since he has stopped the Interferon. His weight is stable. His appetite is picking up. Energy level is improving. He is not driving a truck but he is working full-time in a desk job. He has some occasional shooting pain in the groin and also some intermittent pain in the chest and abdomen.

PAST MEDICAL HISTORY: (1) Lumbar spine surgery times two in 1989 and 1995 with no residual problems. (2) BPH.

MEDICATIONS: Flomax. Tylenol.

SOCIAL HISTORY: He is a truck driver. He has one child. He is married. He does not remember a lot of sunburns or sun exposure. He does not drink alcohol.

FAMILY HISTORY: There is no melanoma in the family. There is a positive family history of diabetes and the breast cancer.

REVIEW OF SYSTEMS: Cardiac is negative. Respiratory is negative. GI is negative.

PHYSICAL EXAMINATION: Temperature, 37.3oC. Blood pressure, 107/65. Pulse, 97. Weight, 80.7 kg.

The Johns Hopkins Hospital                    History #: 317-75-85

Page 2                                        Patient Name: HALL,TOMMY B

Tape no.: GSP109                              ONCOLOGY OUTPATIENT NOTE

---

SHARFMAN,WILLIAM
July 15, 1999

His head is normocephalic. Pupils are equal, round and reactive to
light. There is no papilledema. Neck is supple. The heart has a
regular rate and rhythm. The abdomen is soft. There is no
organomegaly. There is no rebound. Bowel sounds are active.
Lungs are clear. There is no flank tenderness or spinal
tenderness. There is no edema and no adenopathy. The motor
strength is good. Deep tendon reflexes are +1 and symmetrical.
There is no clubbing or cyanosis. There is no ecchymoses or
petechiae.

ASSESSMENT: The patient has metastatic melanoma. I talked with
Dr. Cashdollar about the situation. The feeling is that he
probably has a small bowel metastases, although it has not been
proven. His upper endoscopy and colonoscopy were negative. His
small bowel follow-up was also negative but shows intermittently
heme positive stool. He clearly has metastases in the adrenal
glands and one in the kidney.

He has failed combination chemotherapy. He remains a young
gentleman with a good performance status at this point. I think
his best hope will be for an IL-2 based therapy. The option too
would be for high-dose IL-2 given off protocol here or given at the
NCI with IL-2 plus vaccine. Initially he did no qualify because of
his HLA typing which was a 30 and 32. I spoke with the NCI today
and they said that they have a new vaccine protocol which is not
HLA restricted. In any case he is going to need to be restaged
completely before we can treat him and then we can proceed.

PLAN: (1) Restaging with MRI of the brain. (2) Bone scan. (3)
CT scan of the abdomen, chest and pelvis. (4) Once these studies
are done we will decide on giving him either high-dose IL-2 here at
Hopkins or let him go to NCI for IL-2 plus vaccine. (5- He has
some business to take care of and does not want to be treated until
the end of July which I think is reasonable.


            ** DICTATED BUT NOT READ UNLESS SIGNED **


---

SHARFMAN,WILLIAM

MRG-11  07/19/99

The Johns Hopkins Hospital                     History #: 317-75-85

Page 3                                         Patient Name: HALL,TOMMY B

Tape no.: GSP109                               ONCOLOGY OUTPATIENT NOTE

---

SHARFMAN,WILLIAM
July 15, 1999


cc: Dr. Michael,Cashdollar
    120 North Seventh Street
    Suite 201
    Chambersburg, PA  17201-1795

    Dr. Chiclo
    1039 Wayne Avenue
    Chambersburg, PA  17201

D0187



RECD JUL 2 8 1999

**THE CHAMBERSBURG HOSPITAL**

DIAGNOSTIC IMAGING
CONSULTATION REPORT

RADIOLOGIST: (CHAMBERSBURG IMAGING ASSOCIATES, P.C.)
ROBERT S. PYATT, M.D., DIRECTOR
PHILIP J. SABIN, M.D.
NITEEN BUKERKAR, M.D.
HENRY CHING, M.D.

PAUL B. WILLIAMS, R.T., ADMIN. DIR.

T. TOE THANE, M.D.
PETER J.W. FANG, M.D.
A.E. LEWANDOWSKI, M.D.
FRANK D'AMELIO, M.D.
CHRISTOPHER DEAN LADD, M.D.

HOSPITAL (717) 267-3000
RADIOLOGY 267-7149 OR 267-7145
NUCLEAR MEDICINE 267-7171
CAT SCAN 267-7707
ULTRASOUND 267-7126
BONE DENSITOMETRY 267-7146

**RADIOLOGISTS REPORT**

FINAL

Name: HALL II, TOMMY B                MR#: 332103          ReqSeq: 782371
  Date Done: 07-26-1999 Read: 07-26-1999 TPD Date: 07-27-1999 Time: 0854
  Ordering Dr: Cashdollar, Michael R              Transcriptionist: DMS
  Nurs Stat: 56                              Pat Class: 3
  Faculty Dr: M.D., FRED T. WANG
  Room no.:                              Date of Birth: 05-12-1955
Admitting Diag: CT/MRI/NM/CANCER
Rsn for Exm:
CHEST CT

  Patient phone: 7173529030      ACCOUNT NO: 618777        *** F/C: 02 ***
                              ** FINAL **


HISTORY: MELANOMA


7-26-99
CT CHEST, ABDOMEN AND PELVIS:  COMPARISON IS MADE TO PREVIOUS STUDY
FROM 5-13-99.

CHEST CT:  THERE ARE TWO 1 CM. LYMPH NODES IDENTIFIED WITHIN THE
LEFT AXILLARY REGION. THERE IS NO SIGNIFICANT CHANGE IN THE SIZE OF
THIS AXILLARY LYMPH NODES.  A LARGE RIGHT HILAR MASS MEASURING 5 BY
5.5 CM. IS SEEN ON THE AXIAL PLANE. PREVIOUSLY, THIS MASS MEASURED
APPROXIMATELY 3 BY 3.5 CM. THERE IS INTERVAL INCREASE IN SIZE.
THERE IS ALSO SOME ENCROACHMENT AS WELL AS NARROWING OF THE RIGHT
UPPER LOBE BRONCHUS BY THE ENLARGING MASS. NON ENLARGED MEDIASTINAL
LYMPH NODES ARE IDENTIFIED.  THERE IS A 1 CM. NODULE SEEN WITHIN THE
POSTERIOR BASAL SEGMENT OF THE RIGHT UPPER LOBE. THIS NODULE
PREVIOUSLY MEASURED APPROXIMATELY 8 MM. THERE ARE ALSO A FEW VERY
TINY NODULES IDENTIFIED WITHIN THE ANTERIOR BASAL SEGMENT OF THE
RIGHT UPPER LOBE.  THESE TINY NODULES MEASURE NO MORE THAN A COUPLE
OF MM.ACROSS.  THESE TINY NODULES HAVE NOT CHANGED IN SIZE SINCE THE
PREVIOUS EXAMINATION.  MINIMUM ATELECTATIC CHANGES ARE SEEN
WITHIN THE RIGHT CARDIOPHRENIC ANGLE AREA ANTERIORLY.  MINIMUM
PLEURAL BLEBS ARE SEEN WITHIN THE PERIPHERY OF THE RIGHT UPPER LOBE,
UNCHANGED SINCE THE PREVIOUS STUDY.

IMPRESSION:   1. INCREASING SIZE OF THE RIGHT MEDIASTINAL HILAR MASS
WHEN COMPARED TO PREVIOUS CT STUDY OF 5-13-99.  THIS INCREASING
RIGHT HILAR MASS IS ENCROACHING UPON THE RIGHT UPPER LOBE BRONCHUS
AND CAUSING SOME NARROWING.

            2.  INCREASING SIZE OF THE LUNG NODULE AT THE
POSTERIOR SEGMENT OF THE RIGHT UPPER LOBE.


ABDOMEN CT  THE LIVER, SPLEEN, PANCREAS, RIGHT ADRENAL GLAND AND THE
RIGHT KIDNEY HAVE A NORMAL APPEARANCE.  THERE IS A LARGE 5.5 CM.
LEFT ADRENAL MASS.  THIS MASS IS SEEN TO DISPLACE THE LEFT KIDNEY



# THE CHAMBERSBURG HOSPITAL

**DIAGNOSTIC IMAGING CONSULTATION REPORT**

RADIOLOGIST: ICHAMBERSBURG IMAGING ASSOCIATES, P.C.)
ROBERT S. PYATT, M.D., DIRECTOR
PHILIP J. SABR, M.D.
NITEEN SUKERKAR, M.D.
HENRY CHING, M.D.

PAUL R. WILLIAMS, R.T., ADMIN. DIR.

Y. TOE THANE, M.D.
PETER J.W. FANG, M.D.
A.E. LEWANDOWSKI, M.D.
FRANK D'AMELIO, M.D.
CHRISTOPHER DEAN LADD, M.D.

HOSPITAL (717) 267-3000
RADIOLOGY 267-7145 OR 267-7145
NUCLEAR MEDICINE 267-7171
CAT SCAN 267-7707
ULTRASOUND 267-7128
BONE DENSITOMETRY 267-7145

RADIOL GISTS REPORT

FINAL

Name: HALL II, TOMMY B          MR#: 332103          ReqSeq: 782371
  Date Done: 07-26-1999 Read: 07-26-1999 TPD Date: 07-27-1999 Time: 0854

POSTERIORLY.    THIS MASS HAS INCREASED IN SIZE PREVIOUS DIMENSION OF
3.5 CM. ON PREVIOUS CT STUDY OF 5-13-99.

PELVIS CT:  WITHIN THE PELVIS, THERE IS A LARGE MASS MEASURING 7 BY
5.5 CM. INVOLVING THE WALL OF THE SIGMOID COLON.  THERE IS NARROWING
OF THE SIGMOID COLON BY THIS MASS. THIS MASS HAS PROGRESSED
SIGNIFICANTLY SINCE THE PREVIOUS CT ABDOMEN FROM FEBRUARY, 1999. NO
FREE FLUID IS SEEN WITHIN THE ABDOMEN.

IMPRESSION:  1.   INTERVAL ENLARGEMENT OF THE LEFT ADRENAL MASS FROM
3.5 CM. TO THE CURRENT STUDY SIZE OF 5 CM.

             2.   LARGE 7 BY 5.5 CM. PELVIC MASS INVOLVING THE WALL OF
THE SIGMOID COLON. THIS MASS HAS PROGRESSED SIGNIFICANTLY SINCE THE
PREVIOUS CT OF THE PELVIS FROM 2-99.

PLEASE SEE DISCUSSION ABOVE.

DX   786.6
     61260    6417.0   62193
EX   293.1
FR   PD

             Signed by  DR.  FRED T. WANG M.D.

PAGE    2

D0163

REC'D JUL 2 8 1999

 **THE CHAMBERSBURG HOSPITAL**

DIAGNOSTIC IMAGING
CONSULTATION REPORT

PAUL R. WILLIAMS, R.T., ADMIN. DIR.

RADIOLOGIST: (CHAMBERSBURG IMAGING ASSOCIATES, P.C.)
ROBERT S. PYATT, M.D., DIRECTOR
PHILIP J. SABR, M.D.
NITEEN SUKERKAR, M.D.
HENRY CHING, M.D.

T. TOE THANE, M.D.
PETER J.W. FANG, M.D.
A.E. LEWANDOWSKI, M.D.
FRANK D'AMELIO, M.D.
CHRISTOPHER DEAN LADO, M.D.

HOSPITAL (717) 267-3000
RADIOLOGY 267-7149 OR 267-7145
NUCLEAR MEDICINE 267-7171
CAT SCAN 267-7707
ULTRASOUND 267-7128
BONE DENSITOMETRY 267-7145

**RADIOLOGISTS REPORT**

FINAL

Name: HALL II, TOMMY B                MR#: 332103        ReqSeq: 782406
  Date Done: 07-26-1999 Read: 07-26-1999 TPD Date: 07-27-1999 Time: 0853
Ordering Dr: Cashdollar, Michael R              Transcriptionist: DMS
  Nurs Stat: 56                        Pat Class: 3
  Faculty Dr: M.D., FRED T. WANG
    Room no.:                            Date of Birth: 05-12-1955
Admitting Diag: CT/MRI/NM/CANCER
Rsn for Exm:
NM

  Patient phone: 7173529030      ACCOUNT NO: 618777      *** F/C: 02 ***
                          ** FINAL **

HISTORY:  MELANOMA

7-26-99
TOTAL BODY BONE SCAN: NO PREVIOUS STUDY IS AVAILABLE FOR
COMPARISON.  THE PATIENT WAS GIVEN 22 MILLICURIES TC99M HDP
INTRAVENOUSLY.  UNIFORM UPTAKE IS SEEN WITHIN THE ENTIRE AXIAL
SKELETAL STRUCTURES. THERE IS A ROUND FOCAL UPTAKE SEEN WITH THE
REGION OF THE TARSAL METATARSAL JOINT SPACES OF THE LEFT FOOT
COMPATIBLE WITH AN ARTHRITIC CHANGE.  THERE IS ALSO MINIMAL UPTAKE
SEEN WITHIN THE LOWER RIGHT JAW REFLECTING DENTAL ABNORMALITIES.
THERE IS NO OTHER FOCAL INCREASE OR DECREASED UPTAKE WITHIN THE AXIAL
SKELETAL STRUCTURES TO SUGGEST PRESENCE OF MALIGNANCY.

IMPRESSION: NO EVIDENCE OF METASTATIC DISEASE WITHIN THE AXIAL
SKELETON.

DX 172.9
68306
HX  172.9
FR ND


            Signed by  DR.  FRED T. WANG M.D.

7/30/99 to Dr. Starkman
Faxed to dr5

D0164

REC'D JUL 28 1999

# THE CHAMBERSBURG HOSPITAL

DIAGNOSTIC IMAGING
CONSULTATION REPORT

RADIOLOGIST: CHAMBERSBURG IMAGING ASSOCIATES, P.C.:
ROBERT S. PYATT, M.D., DIRECTOR
PHILIP J. SABA, M.D.
NITEEN SUKERKAR, M.D.
HENRY CHING, M.D.

PAUL R. WILLIAMS, R.T., ADMIN. DIR.

T. TOE THANE, M.D.
PETER J.W. FANG, M.D.
A.E. LEWANDOWSKI, M.D.
FRANK D'AMELIO, M.D.
CHRISTOPHER DEAN LADD, M.D.

HOSPITAL (717) 267-3000
RADIOLOGY 267-7148 OR 267-7145
NUCLEAR MEDICINE 267-7171
CAT SCAN 267-7707
ULTRASOUND 267-7125
BONE DENSITOMETRY 267-7145

## RADIOLOGISTS REPORT

FINAL

Name: HALL II, TOMMY B                    MR#: 332103          ReqSeq: 782365
   Date Done: 07-26-1999 Read: 07-26-1999 TPD Date: 07-26-1999 Time: 2157
Ordering Dr: Cashdollar, Michael R                    Transcriptionist: DMS
   Nurs Stat: 56                                      Pat Class: 3
Faculty Dr: M.D., HENRY CHING
   Room no.:                                          Date of Birth: 05-12-1955
Admitting Diag: CT/MRI/NM/CANCER
Rsn for Exm:
17 ML HPE LOCK LT 4 V BY BD

   Patient phone: 7173529030          ACCOUNT NO: 618777          *** F/C: 02 ***
                                 ** FINAL **

HISTORY:   MELANOMA

7-26-99
MRI OF BRAIN WITHOUT AND WITH GADOLINIUM:   TECHNIQUE:  T1 SAGITTAL
IMAGES.  T2 AXIAL IMAGES WITHOUT AND WITH FLAIR TECHNIQUE.  POST
GADOLINIUM T1 AXIAL AND CORONAL IMAGES.

FINDINGS:  THE BRAIN PARENCHYMA AND VENTRICLES ARE NORMAL IN
APPEARANCE. NO ABNORMAL ENHANCING LESION, INFARCT, MIDLINE SHIFT OR
HYDROCEPHALUS IS SEEN.  THERE IS MILD MUCOSAL THICKENING IN THE
INFERIOR ASPECT OF THE RIGHT MAXILLARY SINUS.

IMPRESSION:  NO SIGNIFICANT BRAIN ABNORMALITY IS SEEN. NO EVIDENCE
OF METASTATIC BRAIN DISEASE.

DX 0.00
60553
HX  215.9
FR  ND

                    Signed by  DR.  HENRY CHING M.D.

7/30/99
faxed to Dr. Sharpman

D0165

CₑM

| MEDICAL RECORD | INPATIENT RECORD |
|---|---|

Admitted on  09-30-99
Discharged on  09-30-99

DICTATOR IDENTIFICATION:

    Name:             David M. Weinreich, M.D.

    Office Address:    Bldg. 10    Rm. 2B42

    Office Telephone:   (301) 496-4164

CHIEF COMPLAINT:

    The patient is a 44-year-old gentleman with metastatic melanoma.

HISTORY OF PRESENT ILLNESS:

    The patient is a 44-year-old gentleman with metastatic melanoma with metastatic sites including his kidney and adrenal gland who was seen by the surgical consult service in August for resection of a pelvic mass. The patient has partially recovered from his exploratory laparotomy and presented to the clinic for evaluation for a vaccine and IL-2 trial for his metastatic disease.

    The patient was first diagnosed with melanoma in 1993 and underwent a wide local excision of a shoulder lesion. It subsequently recurred in his neck, which was excised in January of 1999. The patient developed progressive disease in his adrenal, pelvis and kidney and was taken to the operating room in August for resection of his pelvic mass. The patient has also failed a bio-chemotherapy regimen in the early part of 1999.

    The patient currently presents extremely lethargic with poor p.o. intake and severe general malaise. Because of his poor functioning status he is, at present, not an interleucin-2 candidate. The patient was admitted from the clinic in order to secure a ride back to Pennsylvania.

DRUG AND THERAPEUTIC HISTORY:

Admitted on  09-30-99
Discharged on  09-30-99

DISCHARGE SUMMARY
COMBINED WITH HISTORY & PHYSICAL EXAMINATION

Patient Identification

Hall, Tommy B. II    33-20-96 0

Inpatient Record
NIH-999-2 (5-92)
P.A. 09-25-0099
File in Section 1: Summaries, Operations,
        History & Physical Exam

-1-

Reference Copy From The Medical Record, Clinical Center, National Institutes of Health, Bethesda, MD. Not for Re-Release.   DO NOT FILE IN MEDICAL RECORD

D0194

ORIGINAL 17

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


NANCY HALL, INDIVIDUALLY AND : CIVIL ACTION - LAW
AS THE REPRESENTATIVE AND    :
ADMINISTRATRIX OF THE ESTATE :
OF TOMMY HALL, DECEASED, HER :
HUSBAND,                      :
     PLAINTIFF         :
                       :
     V                 : 1:01-CV-1265
                       :
CUNA MUTUAL GROUP, CUNA      :
MUTUAL INSURANCE SOCIETY,    :
     DEFENDANTS        : JUDGE SYLVIA H. RAMBO


     DEPOSITION OF:    ERNEST E. CHARLESWORTH, M.D.

     TAKEN BY:         DEFENDANTS

     BEFORE:           PAMELA S. SULLIVAN,
                       REPORTER-NOTARY PUBLIC

     DATE:             JANUARY 9, 2002, 10:05 A.M.

     PLACE:            FAIRWAY MEDICAL ASSOCIATES
                       144 SOUTH 8TH STREET
                       CHAMBERSBURG, PENNSYLVANIA


APPEARANCES:

  McNEES WALLACE & NURICK, LLC
  BY:  MICHAEL R. KELLEY, ESQUIRE

     FOR - DEFENDANTS

  PEDERSEN & PEDERSEN
  BY:  CATHERINE M. MAHADY-SMITH,  ESQUIRE
     STEPHEN R. PEDERSEN, ESQUIRE

     FOR - PLAINTIFF




HAEN
*Reporting Service, Inc.*

Hughes
Albright
Foltz
Natale

Page 2

1                    WITNESS
2 NAME                              EXAMINATION
3 ERNEST E. CHARLESWORTH, M.D.
4    BY:  MR. KELLEY                    3, 62, 67
5    BY:  MS. MAHADY-SMITH                 47, 65
6
7
8
9
10                   EXHIBITS
11 CHARLESWORTH EXHIBIT NO.          PRODUCED & MARKED
12  1 - FACE SHEET, ONE PAGE                      16
13  2 - PHYSICIAN PROGRESS NOTES, ONE PAGE        27
14  3 - MEDICAL RECORD, TWO PAGES                 39
15  4 - LETTER DATED 2-17-99, TWO PAGES           44
16  5 - 1993 PATHOLOGICAL REPORT, ONE PAGE        46
17  6 - CURRICULUM VITAE, TWO PAGES               68
18
19
20
21
22
23
24
25

Page 3

1        ERNEST E. CHARLESWORTH, M.D., called as a
2 witness, being duly sworn, testified as follows:
3                EXAMINATION
4 BY MR. KELLEY:
5    Q  Good morning, Doctor.  As I just introduced
6 myself to you, my name is Mike Kelley.  I'm a lawyer from
7 Harrisburg, and I'm here to take your deposition today in
8 the case of Nancy Hall and the estate of Tommy Hall versus
9 CUNA Mutual Insurance Company.
10       I'm going to be asking you a series of questions
11 today that are relevant to that action.  If at any time
12 during the course of the deposition you don't understand one
13 of my questions, please let me know and I'll try to rephrase
14 it.  Okay?
15    A  Okay.
16    Q  I don't anticipate this being much longer than an
17 hour or an hour and a half.  But if you need to take a break
18 for any reason, obviously just let us know and you can do
19 that.
20    A  Okay.
21    Q  First, what I want to do, Doctor, is just get a
22 little bit of background information on you.  Would you give
23 us your full name, please?
24    A  Ernest E. Charlesworth.
25    Q  And what's your business address here?

Page 4

1    A  144 South 8th Street, Suite 111, Chambersburg,
2 Pennsylvania.
3    Q  And what is the name of your practice?
4    A  The corporate name is Fairway Medical Associates.
5    Q  Are their partners or other members of the
6 practice?
7    A  Yes.  There are four physicians and one
8 physician's assistant that work as part of the practice
9 here.
10    Q  Who are the other physicians who are here?
11    A  Samuel Bricker, William Kramer, Daryl White and
12 Dave Cooper is the physician's assistant.
13    Q  We're here today to talk about some of the
14 treatment that you had provided to Tommy Hall.  Are you
15 familiar with Mr. Hall?
16    A  Yes.
17    Q  Do you know if any of the other physicians here
18 provided any care or treatment to him?
19    A  I'm not aware that they have.  I can check the
20 chart and tell you for sure.
21    Q  Sure, go ahead.  You've got with you here your
22 chart on Mr. Hall.  Is that correct?
23    A  That's correct.  The only entries in the chart
24 for the entire time we saw him are in my writing.  So I
25 don't think anybody else ever took care of him in this

Page 5

1 group.
2    Q  How long have you been associated with this
3 group, Fairway Medical Associates?
4    A  I've been with this practice since 1994.  The
5 name of the practice has changed a couple of times, but it's
6 been the same people.
7    Q  Do you have a particular medical specialty?
8    A  Family practice.  I'm board certified,
9 recertified.
10    Q  When did you receive your board certification in
11 family practice?
12    A  1984, and my last recertification was about two
13 years or three years ago.
14    Q  And the other physicians who are here with you,
15 are they also family practitioners?
16    A  Yes.
17    Q  Starting after high school, Doctor, can you
18 identify the names of the institutions and degrees that you
19 received, college, medical school, et cetera?
20    A  I attended Rensselaer Polytechnic Institution in
21 Troy, New York, and received a B.S. in biomedical
22 engineering.
23    Q  What year was that?
24    A  That was May of 1981.
25    Q  Can you --

Page 10

1 talked about with them?
2     A  Not really other than they just asked about some
3 of the notes I made.
4     Q  So do you remember anything just in terms of the
5 generalities of what you discussed with them?
6     A  Well, they introduced themselves and said that
7 they represented his estate and that there was an issue
8 about insurance covering, I think, a mortgage on a home.  I
9 think that's what I recollect and that they just wanted to
10 know what information I had about his past history before
11 his death.
12     Q  And what did you tell them about that?
13     A  Well, we went over his initial visit to the
14 office and what I had written down.  And they wanted to know
15 -- I guess the clarification -- one of the clarifications
16 was what is the information that Tommy gave me and what is
17 the information that I had corroborated, you know, with
18 records or whatever.
19     Q  Well, we'll get to that.  Anything else you
20 remember either generally or specifically about the
21 conversation that you had with them?
22     A  I know that they focused on the cancer which is
23 what caused his death.  I know that's what the questions
24 were about.
25     Q  Anything else that you recall?

Page 11

1     A  Not -- no, not clearly.
2     Q  Doctor, either in medical school or in continuing
3 medical education classes, anything of that nature, have you
4 had any training in the creation and retention of patient
5 medical records?
6     A  You have that starting in medical school and on
7 through residency training.  And actually these days, we get
8 compliance issues and all kinds of CME that are also in
9 reference to medical records.
10     Q  So you've had that over the years then?
11     A  Yeah.
12     Q  Are you familiar with what the requirements are
13 in terms of what you're supposed to do in terms of creating
14 and maintaining patient records?
15     A  Yes.  One of the big things these days is to make
16 sure you have documentation to verify the level of billing
17 for Medicare guidelines, and that's what the more recent
18 impact has been on.
19     Q  Anything else that -- I mean, if you could just
20 explain to me generally what your understanding is of what
21 the requirements are as a doctor?
22     A  The reality is -- number one is for medical care.
23 The requirements are that you document enough records that
24 you know what's going on with the patient.  I mean that
25 boils down to the basic doctor/patient relationship is that

Page 12

1 you have enough information that you can provide good care
2 for the patient.
3          The secondary issue is what do you require
4 documentation for, for reimbursement and oversight by
5 Medicare and other organizations.  And they aren't
6 necessarily the same.  But, you know, a doctor's records are
7 supposed to be adequate for him to be able to -- his or her
8 to be able to provide good care for the patient.  And that
9 entails getting a history from the patient, a history from
10 family members if they're available, particularly in cases
11 of children, and then documenting physical findings or
12 objective findings, which is a separate part of it.
13          Generally speaking, what is required is that you
14 make an assessment and document what your diagnosis or
15 evaluation of the patient situation is and then document
16 your prescribed treatment or plan.
17     Q  It's my understanding that just from a general
18 way of stating it that the records are required to be
19 accurate, legible and to reflect the evaluation and
20 treatment of the patient?
21     A  That's correct.
22     Q  Is that a fair way of stating it?
23     A  Yes.
24     Q  Now, do you personally or does the practice here
25 have any written guidelines for the creation and retention

Page 13

1 of medical records?
2     A  No, we don't.
3     Q  Do you have any -- well, let me -- I'm sure the
4 answer to this question is yes, but let me ask it anyways.
5 Do you have any unwritten or general guidelines that you
6 follow for the types of information that you put into the
7 medical records?
8     A  Yes.  Let me start by saying that all the
9 physicians here were trained at the same residency program.
10 So we all went through the same instruction on how to
11 evaluate and treat patients.  And at the same time, we went
12 through the same training as far as medical records.  So
13 maybe that's one of the reasons why there's not a written
14 policy.
15          Secondly, we have several meetings, you know,
16 throughout the year on an ongoing basis discussing the
17 business as well as the patient care that's provided in the
18 office.  And we've come up with sheets for the record that
19 help to summarize things.
20          For example, I have in front of me the -- we call
21 it the problem list sheet which includes biographical data
22 on the patient, immunization status and try to record
23 patient past and active problems and surgeries as well as
24 current medications that are prescribed.  That is an
25 agreed-upon tracking sheet that unifies everybody's records

Page 18

1 That's not my writing. And then there's, you know --
2 underneath that, there's another doctor's name which is
3 Dr. Lang written in two lines and ruptured disc, bulging
4 disc on two different lines. That's my writing.
5     Q Okay, I'm sorry. Let me take this from the top.
6 Under Item 1, under Medical Problems, it says -- it looks to
7 me like it says --
8     A Cancerous mole removed.
9     Q -- cancerous mole.
10     A Yes.
11     Q Is that your writing?
12     A No.
13     Q Do you know whose writing that is?
14     A No.
15     Q Is that one of your staff people's writing here?
16     A We have several staff people. That doesn't look
17 like what I'm used to seeing. So I don't know. I wonder if
18 it's not either Nancy or Tommy's writing, the patient or his
19 wife's writing.
20     Q And this is -- so I understand it, this is the
21 document that when the patient arrives at your office for
22 the first visit, this document is actually provided to the
23 patient to fill out?
24     A Sometimes they get it before their appointment,
25 either they pick it up or in the mail. And sometimes they

Page 19

1 get it when they show up. We ask them to come 15 minutes
2 prior to their first appointment, and then they can fill it
3 out in the waiting room.
4     Q But the point where it says cancerous mole
5 removed, that is not your writing?
6     A That's correct.
7     Q And you don't recognize that as anybody from your
8 office?
9     A No, I don't recognize it.
10     Q Is it safe to say that that would most likely be
11 from the patient?
12     MS. MAHADY-SMITH: Objection, calls for
13 speculation. The doctor has testified he doesn't know whose
14 handwriting it is.
15 BY MR. KELLEY:
16     Q Either Mr. Hall or Mrs. Hall?
17     A I don't know. I just -- like I said, they have
18 the sheet first. My staff has it out front, and we have
19 about ten staff members that can enter into these. And,
20 actually, some of those have changed since '98. So, no, I
21 don't keep track of everybodys' writing.
22     Q Now, the writing off to the right then referring
23 to what it looks like is Dr. Guthrie --
24     A Yes.
25     Q -- whose writing is that?

Page 20

1     A I have no idea.
2     Q That's not yours?
3     A That's absolutely not mine. It's bad enough, but
4 it's not.
5     Q And you don't know if that's someone from your
6 practice or not who wrote that in there?
7     A I can't tell you when it was written or who wrote
8 it.
9     Q And the next item then under No. 2, it says, Back
10 surgery.
11     A Yes.
12     Q And then under No. 3, it says, Back surgery.
13     A Correct.
14     Q Is that your writing?
15     A No.
16     Q Is that anybody from your office as far as you
17 can detect?
18     A I don't know.
19     Q Do you recognize that as anybody from your
20 office?
21     A I don't recognize it, and I don't even know if
22 it's the same writing as No. 1, you know.
23     Q And then over then into the right-hand column
24 beside No. 2, it has some writing there. And I believe
25 you've said that that's your writing.

Page 21

1     A Yeah. The writing that has Dr. Lang, ruptured
2 disc, L5-S1, that's my writing.
3     Q Is that what it says under Item 2 in the
4 right-hand column?
5     A Yes. Dr. Lang, ruptured disc, L5-S1.
6     Q And then under Item 3 on the right-hand corner,
7 can you just tell us exactly what that says there?
8     A Dr. Lang, bulging disc; question mark, L4-L5.
9     Q And then under Item 4, I believe you said you
10 wrote that as well?
11     A Diverticulosis, that's my writing, yeah. These
12 problem lists are initially presented, but they're updated
13 as the patients are cared for over time. We try to keep
14 them as current as we can. So if a patient develops a
15 problem and has an operation or a hospitalization, we add
16 that on as time goes by.
17     Q Now, going back to Item 1 here, Doctor, in the
18 date category --
19     A Right.
20     Q -- what is that date supposed to reflect? Is
21 that supposed to reflect the time period that the medical
22 problem surfaced?
23     A That's supposed to reflect the cancerous mole
24 removed 1996.
25     Q Is that your '96 that's written in there?

Page 26

1    When Tommy presented, he and his wife, this was
2 on the note, you know, on the face sheet, cancerous mole.
3 And I said, Well, what kind of cancer?  Was it basal cell?
4 squamous cell? melanoma?  It makes a huge difference in what
5 to expect and what I should be doing as far as monitoring
6 him for follow-up.  And they had no idea.  You know, they --
7    Q  They had no idea as to the type of cancer?
8    A  Yeah.  And at the time, there was debate between
9 the two of them whether it was really cancer or not.
10    Q  What did that -- do you recall the specifics of
11 what they actually said about that?
12    A  Well, let me see what I have written.  But I
13 remember that there was a debate between the patient and his
14 wife as to whether it was really cancerous or if it was just
15 a funny-looking mole.  You know, one of them said, No, it
16 was just a funny-looking mole.  The other one said, No, I
17 think it was cancer.  I don't know what kind of cancer it
18 was.  They said, I don't know.  It really wasn't cancer
19 that's why they don't know.
20    I mean, there was this discussion back and forth
21 between the two of them.
22    Q  Can we -- I'm sorry, Doctor.  Before you move on
23 beyond that I wanted to ask you, do you recall whether it
24 was Mr. Hall or Mrs. Hall who was saying, I think it was
25 cancer, and which one was saying, no, I think it was just a

Page 27

1 funny-looking mole?
2    A  Let me see if I have anything written, and I'll
3 tell you.  Okay?
4    Q  Sure.
5    A  I don't have it specified here in my written
6 records or written notes who said what.  But in my mind what
7 sticks out is that Tommy is the one that's saying it was a
8 funny mole and his wife is the one who was saying it was
9 cancer.  But I don't have a written note to corroborate
10 that, but that's the way it plays out.
11    I do clearly remember that there was debate
12 between the two of them, number one, whether it was cancer
13 or not.  And definitely nobody had any idea what type of it
14 was.  And so that's why I definitely recall requesting
15 records to find out was it cancer and what type was it.
16    Q  If you would, Doctor, turn to the next -- I'm
17 sorry.  I'm not sure if those things are still in there.
18 Yes, they are.
19    MR. KELLEY:  Let's mark this next page then as
20 Charlesworth 2.
21    (Physician progress notes, one page, produced and
22 marked Charlesworth Exhibit No. 2.)
23 BY MR. KELLEY:
24    Q  Doctor, we've marked as Charlesworth 2 a document
25 that says at the top right, Physician Progress Notes.  Do

Page 28

1 you have that in front of you?
2    A  Yes, I do.
3    Q  And the first date looks like it's stamped in
4 there with a stamp.  It says, April 30, 1998.  Do you see
5 that?
6    A  That's correct.
7    Q  Is this your progress note concerning Mr. Hall?
8    A  Yes, it is.
9    Q  And then towards the bottom of the page, it also
10 has a progress note for December 11, 1998.  Correct?
11    A  That's correct.
12    Q  Doctor, I mean this in the nicest way possible.
13 I don't mean to impugn your handwriting at all.  But could
14 you read to us what that note says for April 30th?
15    A  I think the first portion of the April 30th is
16 pretty clear because that's in the handwriting of one of my
17 nurses or physician's assistants -- or medical assistants.
18    Q  That's where it says weight?
19    A  Weight and blood pressure and subjective -- the
20 "S" stands for subjective complaint of pain in the left leg;
21 parentheses, calf, parentheses.  That's pretty clear, and
22 then the rest of that is my handwriting.
23    Q  Can you --
24    A  And what it says is, Pushing pickup truck on flat
25 ground to get it started, took four steps then; quotation

Page 29

1 marks, charley horse; quotation marks.  The pain has not
2 eased and very tight; slash, stiff left calf.  Tried, KY Hot
3 it looks like, which I think was a brand name of an
4 over-the-counter -- I'm sorry.  That's not literal there.
5 I'm sorry.  KY Hot is what it looks like.  I think that's an
6 over-the-counter preparation that's a gel that they apply
7 for muscle strains.
8    And then it says, the record then goes on, No
9 other Rx, which means treatment.  Then I have listed NKA,
10 which stands for no known allergies.  Meds none.  PMH for
11 past medical history, lumbar disc surgery times two with
12 bilateral sciatica pre-op.  Next line is; question marks,
13 melanoma removed back 1996.  Next line is social history,
14 truck driver times four years.  Smoking, one-and-a-half pack
15 per day.
16    Then there's a blank line.  And the next line is
17 objective, which lists the physical findings.  Positive
18 spasm with mild tenderness left calf.  Strength intact.  NV,
19 for neurovascular, intact.
20    The next line is "A" for assessment.  Muscle
21 strain left calf.  The next line is "P" for plan.
22 Stretching; slash, moist heat -- just the letters MH, for
23 your information -- slash, analgesic over-the-counter -- OTC
24 stands for over-the-counter -- prn.  And samples of Relafen,
25 R-E-L-A-F-E-N, 750 milligrams; number, 6, were given to him.

Page 34

1 with the next patient.
2      Whether they never asked for their release to
3 sign or whether they didn't know who to send it to or if it
4 was never sent, I can't tell you where the breakdown was.
5 All I know is we don't have the records.
6      Q  In your file regarding Mr. Hall, is there any
7 record in there indicating that they signed a waiver or a
8 release?
9      A  No, we don't have that kind of a system.
10      Q  That wouldn't have been included in there
11 anyways.  Is that right?
12      A  Not usually.  You know, we send it.  Depending on
13 who's working out front, sometimes they'll photocopy the
14 records request.  And we try to get them to do that, you
15 know.  I mean, when you get somebody to sign a request, sign
16 the -- copy the request, put the date on it so that we know
17 when it was sent.  So whenever we have issues like patients
18 say, Why don't you have my records?  We can say, Well, we
19 sent it on such and such a date.
20      Like I said, we have ten different employees that
21 work up front.  Sometimes it's very busy, and I don't always
22 know if they always do 100 percent of their job they're
23 supposed to do.  So in his case, I don't have a record of a
24 records release at that date.  So I don't know if it was
25 ever signed or sent.

Page 35

1      Q  At any point, have you tried to look into that to
2 see what happened there?
3      A  Not that I recall.
4      Q  Doctor, was Mr. Hall seeing you that day on April
5 30th of 1998 just because he had a leg problem or was he
6 starting to be one of your -- was he coming to your practice
7 to be a regular patient at your practice?
8      A  There's no such thing as a middle-aged male
9 wanting to be a patient at a doctor's practice.  But in all
10 seriousness, his wife was a patient of the practice.  And
11 our policy is that if there are family members that want to
12 be seen, that we'll take them on as new patients.  And I
13 think being a typical male, he came in because he was in
14 pain.
15      But, you know, we assumed he would be our patient
16 whenever he needs us after that.
17      Q  So your rationale behind wanting to get his
18 records regarding whatever problem he had on his back wasn't
19 so that you could treat his left leg problem?
20      A  No.
21      Q  It was because if he came back for other reasons
22 you --
23      A  Wanted a complete record.
24      Q  -- wanted to have a medical history?
25      A  Right.  We wanted a complete record if he's going

Page 36

1 to be an ongoing patient, right.
2      Q  The next item I'd like you to translate for us,
3 if you could, is under the 12-11-98 progress note, Doctor.
4      A  Okay.
5      Q  And I can see the weight and the blood pressure
6 there, no problem.  And then the "S" being subjective.
7 Right?
8      A  Right.
9      Q  And then complaints of lump on inside of throat.
10 Is that correct?
11      A  Correct, right.
12      Q  Can you take us from that point then?  Is that
13 your handwriting underneath that?
14      A  Yes.  Like I said, the nurse or medical assistant
15 generally gets the chief complaint or the reason why they're
16 coming.  And that's her writing for the lump on the inside
17 of the throat.
18      After that is what I have written.  And that is,
19 Lump left lower neck at least times several weeks.  Negative
20 ST, which stands for sore throat.  Negative URI symptoms.
21 Negative cough.  Negative chest congestion.  No other new
22 lumps, and there's a space.  And it's, Quit smoking times
23 six months.  Weight up to 220 since then.
24      Well, let me just get my original records and see
25 if it looks better.

Page 37

1      Q  Go ahead.
2      A  That's all right?
3      Q  Absolutely.
4      A  Oh, what it says is, Quit smoking times six
5 months.  Weight up to 220; comma, started again, which means
6 he started smoking again after his weight went up to 220
7 pounds.  And then the next line is the objective, Firm
8 nodule, approximately 1.5 centimeters, left supraclavicular.
9 No other LN, which means lymph nodes.  Lungs clear.  Throat
10 clear except for -- this is in parentheses -- gingivitis.
11      And then, Abdomen without HSM,
12 hepatosplenomegaly.  And then assessment is, Questionable
13 mass.  Plan is check CBC, ESR, LFT, CXR.
14      Do you want me to tell you what those stand for?
15      Q  No.
16      A  And then recheck in one month if not gone.
17      Q  I want to go back up to the first line then in
18 your handwriting there, Doctor.  This is under subjective
19 complaints.  Right?
20      A  Right.
21      Q  So this is information that would be coming from
22 the patient?
23      A  That's correct.
24      Q  And it mentions about a lump on the throat.  Is
25 that right?

Multi-Page™     ERNEST E. CHARLESWORTH, M.D.
JANUARY 9, 2002

Page 42

1  you were making the referral that you would have had the
2  conversation with Dr. Chicklo?
3      A   Yes.  That's what I'm saying.  I told him that's
4  what my concerns were that we didn't have evidence -- I
5  think we had a chest x-ray.  Let me see.  Anyway, we had a
6  chest x-ray at that time too.  But the upper GI didn't give
7  me a cause for his node.
8          And I wanted him to do a thorough evaluation for
9  head and neck cancer.  So I wanted to make sure he knew what
10 I was concerned about.
11     Q   Do you recall if you provided any history to Dr.
12 Chicklo about any previous cancerous conditions?
13     A   I don't remember giving him any other history
14 other than, like I said, what I was telling you that he had
15 a mass; that he was a heavy smoker; he's anemic; the GI was
16 negative; that he didn't have anything in his chest to pin
17 it on.  So I was really concerned about a head and neck
18 malignancy.
19     Q   Did you give him any history at all as much as
20 you can recall about any problem with a mole on his back?
21     A   I don't know whether I did or not.
22     Q   There's nothing in your notes that would reflect
23 that information and no letter to Dr. Chicklo or anything
24 like that?
25     A   No, that's what I said.  It was a phone

Page 43

1  conversation, and I wanted to convey what my concerns were.
2      Q   So Charlesworth 3, we're actually going to end up
3  making Chicklo 1 then, I presume, since that's not your
4  record.
5          Any other conversations that you had with Dr.
6  Chicklo regarding Tommy Hall that you can recall?
7      A   After he had seen him, I think he had given me a
8  call to tell me that he didn't see any evidence of a head
9  and neck cancer.  But his concern too was that, you know,
10 this was a malignant mass.  So he wanted to talk to me
11 about, you know, referral for a biopsy of the mass.
12     Q   Do you know Dr. Michael Cashdollar?
13     A   Yes.
14     Q   Go to the -- there's a letter in there dated
15 February 17, 1999, Doctor, in that packet of materials.  It
16 appears to be a letter from Dr. Cashdollar --
17     A   To Dr. Chicklo.
18     Q   -- to Dr. Chicklo dated February 17, 1999.  And I
19 believe on the second page there it indicates that you're
20 one of the people who received a copy of it?
21     A   Yes.
22     Q   Do you have any recollection of receiving this
23 letter?
24     A   Yes.
25     Q   When you receive letters like this regarding, you

Page 44

1  know, follow-up on a patient of yours, do you review them?
2      A   Yeah, I read them before they're filed in the
3  chart.
4          MR. KELLEY:  Okay.  Now, on this document of
5  February 17, '99 -- why don't we mark this as Charlesworth
6  4?
7          (Letter dated 2-17-99, two pages, produced and
8  marked Charlesworth Exhibit No. 4.)
9  BY MR. KELLEY:
10     Q   In this letter, Doctor, in the very first
11 paragraph, second line, it says, As you are well aware --
12 and this is to Dr. Chicklo -- Mr. Hall demonstrated a left
13 in scapular dermal lesion in 1993.  Pathology revealed a
14 malignant melanoma.
15         Further down about the middle point of that page,
16 under PMH, which is generally accepted shorthand for patient
17 medical history.  Is that right?
18     A   Past medical history.
19     Q   Past medical history is most notable for the
20 malignant melanoma.  Surgical resection in 1993.
21     A   Right.
22     Q   And then on the second page of that document,
23 second line there, it says, History of left scapular dermal
24 malignant melanoma, 1993.
25     A   Right.

Page 45

1      Q   At the time you reviewed this letter, did you
2  have any conversations with either Doctors Chicklo or
3  Cashdollar regarding these statements in here about a
4  melanoma, a malignant melanoma, back in 1993?
5      A   Dr. Chicklo, like I said, we talked about doing a
6  biopsy.  You know, since he's a head and neck surgeon, he
7  did it himself to find out what was going on.  And after he
8  got the path report, he called me back, you know, to let me
9  know about the path report.
10     Q   You're talking about the path report on the --
11     A   For the neck mass.
12     Q   For the neck mass.
13     A   Which showed a melanoma.  And that's when he
14 said, Well, jeez, this guy had to have had a melanoma, you
15 know, years ago.  Could it be from that?  The question was,
16 Could it be from that or does he have a new one?
17         So we said, well, obviously he needs to go see
18 the oncologist at that point about further treatment.  And
19 that's the first time that I became aware that he definitely
20 had a melanoma.
21     Q   You're saying that time was somewhere in February
22 of '99?
23     A   Well, yes, roughly when Dr. Chicklo -- it had to
24 be in that January/February time frame.
25     Q   So it may have even been prior to the date this

Page 50

1  discussion, what was that mole, if you had the pathology
2  report, you wouldn't rely on any of those things. You'd
3  look at the pathology report yourself, as a physician, and
4  see what the pathologist said. Correct?
5      A  Correct. Because particularly for melanoma, it's
6  purely a pathological diagnosis. It's done on stages based
7  on the depth of penetration of the tumor. I excise
8  melanomas myself in the office. And depending on the stage,
9  that's all the treatment you ever need. You're cured. But
10  if the depth of penetration is a certain level, you need
11  wide excision, you need lymph node exploration and chances
12  of recurrence are far greater.
13      Q  And, Doctor, do you still have the pathology
14  report that was given to you as an exhibit from the 1993
15  mole removal?
16      A  Yes.
17      Q  That is not a pathology report that indicates as
18  its impression, malignant melanoma, is it?
19      A  No.
20      Q  And that would have been the report that you
21  would have -- if they had sent it, that would have been
22  accessed at that time?
23      A  I don't know because he told me 1996. This says
24  1939. You know, there's a little discrepancy there. So I
25  don't know if this was the only time he ever had a mole

Page 51

1  removed or not.
2      Q  Well, let me ask you this: Does it appear that
3  the physician in that case was Dr. Hurley? Do you know Dr.
4  Hurley?
5      A  Yes, I know Dr. Hurley.
6      Q  Under doctor. Here, under doctor.
7      A  Yes, I'm sorry. That's what I was looking for,
8  the doctor that sent the specimen. And that was Dr. Hurley.
9  That's correct.
10      Q  Do you recall whether or not he was partners with
11  Dr. Guthrie?
12      A  Oh, yes, definitely.
13      Q  Is it fair to say, Doctor, that you would have
14  not rendered treatment or recorded as the diagnosis melanoma
15  or cancer without first seeing this pathology report
16  yourself?
17      A  If I saw this pathology report, I would not
18  record a diagnosis of cancer.
19      Q  Has anyone up until this date, including Mr.
20  Kelley here today, ever showed you any document from any
21  other physician that indicates that Mr. Hall had been
22  diagnosed with cancer prior to the 1999 events attendant to
23  the lump in his neck?
24      A  I've never seen a pathology report that shows
25  that.

Page 52

1      Q  Now, have you seen -- other than the documents
2  that are in this group right now is what you're referring
3  to?
4      A  Yeah, I'm just saying Dr. Cashdollar's letter
5  refers to a pathology report. But I've never seen it.
6      Q  And let me just address Dr. Cashdollar's letter.
7  First of all, if you take a look at that exhibit, does it
8  actually say pathology report or does it say pathology
9  revealed malignant melanoma?
10      A  Pathology revealed.
11      Q  So, now, you don't know as you sit here today --
12  and we can only find out what you know factually. And we're
13  taking Dr. Cashdollar's deposition. But you don't know
14  whether Dr. Cashdollar is referring to a report or to an
15  actual re-review of the slides himself attendant to his care
16  of Mr. Hall. Is that correct?
17      A  I'm not sure what he's referring to.
18      Q  And you don't even know what pathology report
19  he's referring to. But you know that the one that he might
20  be referring to, you know that the one that we have here
21  does not diagnose malignant melanoma. Correct?
22      A  Right, it's a difficult diagnosis.
23      Q  So let me rephrase that question. To date, no
24  one has shown you any records from prior to December of 1998
25  that indicate a diagnosis of melanoma or cancer by any of

Page 53

1  Tommy Bob's physicians. Is that correct?
2      A  I have no pathology reports that indicate cancer
3  until he had the metastatic lymph nodes.
4      Q  Well, and that's another question I have here.
5  You explained to Mr. Kelley what you recalled of the
6  conversation with Dr. Chicklo. As I recall the pathology
7  report from the lymph node -- and it's probably in your
8  records, I would think, if you need to access it. Didn't
9  the pathologist at that time indicate that this was not the
10  primary lesion, that it was indeed metastatic melanoma?
11      A  Yes. The lymph node from the supraclavicular
12  area was a metastatic lesion on the initial path.
13      Q  So that you as physicians, you and Dr. Chicklo,
14  then would educatedly conclude that it had to come from some
15  other source. Correct?
16      A  Yes.
17      Q  It spread from some other source. Is that
18  correct?
19      A  Yes.
20      Q  When Mr. Kelley asked you that with regard to
21  medical records there's a requirement to be accurate and
22  complete and legible, do you recall those questions?
23      A  Yes.
24      Q  That's the goal. Is that right?
25      A  Yes.

Page 58

1 intake sheet or correspondence? You would get a pathology
2 report in order to outline a plan or begin a treatment plan?
3    A  If I received a letter like Dr. Cashdollar had
4 written from Dr. Cashdollar or Dr. Hurley or Dr. Chicklo or
5 any of the people I know that I trust and they said that
6 this patient had cancer, even without the pathology report,
7 I would treat that patient as if they had cancer or a
8 management plan or a follow-up plan based on that.
9    Q  And I tell you this because in Dr. Cashdollar's
10 letter to you he indicates in an affirmative way that he has
11 looked at the pathology. Correct?
12    A  Right. And that's his specialty, and I trust his
13 expertise. Likewise, if Dr. Hurley had given me a letter
14 that said that this patient had a cancer, I would -- even if
15 he didn't send the path report, which they normally do, I
16 would still assume that he had it.
17    Q  Because you're presuming that he's reviewed the
18 pathology?
19    A  Right.
20    Q  It's based on the pathology report?
21    A  Right.
22    Q  And if Dr. Hurley had sent you this report that
23 has been marked as Exhibit No. 5, you've already told us
24 that that would have been viewed as a nonmalignancy.
25 Correct?

Page 59

1    A  If I would have gotten that report, I would have
2 -- it depends what the letter would say with it. But I
3 would call and ask him, Where is the report on the cancer?
4    Q  What do you mean, Where is the report on the
5 cancer?
6    A  If he sent me a letter that said he had cancer
7 and sent me this report, I'd ask him, Where is the report
8 that shows he has cancer?
9    Q  Because this does not? The pathology report does
10 not?
11    A  Yes.
12    Q  Since you never received the pathology report
13 from the mole excision in the '90s -- whether it was '93 or
14 '96, you never received the report -- in terms of your
15 records and your conclusions you never concluded that Mr.
16 Hall had cancer in either '93 or '96 because you never saw
17 the reports?
18    A  I had no conclusive evidence of that.
19    Q  And your records cannot be viewed as conclusive
20 evidence of that because the pathology report is the
21 conclusive evidence. Correct?
22    A  Right. Just to clarify, you know, you're asking
23 me about whether I get records or not. Once the diagnosis
24 was made that he had metastatic melanoma -- it's a terrible
25 diagnosis. And at that point, the primary is not as

Page 60

1 important to the treatment as the treatment.
2    Q  Right.
3    A  So I mean, once that was made, there was no
4 reason for me to pursue digging out all the records. I
5 mean, you're asking me why it may have fallen through. You
6 know, once you establish it's a metastatic case, the primary
7 is no longer important, I mean, as far as treatment plans
8 are concerned.
9    Q  Right, I understand. And that's the question I
10 was going to ask you is that the group of physicians --
11 yourself, Dr. Chicklo, Dr. Charlesworth -- you were dealing
12 with an acute life-threatening situation for Mr. Hall. And
13 that's what you were focused on and what you were about the
14 business of dealing with. Correct?
15    A  Right. And I'm saying at that point when you
16 have metastatic melanoma, you know, that's one treatment
17 path and that's it.
18    Q  From what you've told us here today, Doctor,
19 during the deposition, if the representatives from the
20 insurance company had contacted you when they were making a
21 decision to deny benefits or to rescind the policy, would
22 you have told then the same thing that you have told us
23 today?
24    A  What's here is what's here. You know, what I say
25 today is what I would have said three years ago, four years

Page 61

1 ago -- well, not four years ago -- three years ago, two
2 years ago.
3    Q  Did you continue to see Mr. Hall until the time
4 of his death?
5    A  Periodically.
6        MS. MAHADY-SMITH:  Let me just consult with Steve
7 for one minute. We'll take a two-minute break, but I think
8 we may be finished.
9        (A break was taken.)
10 BY MS. MAHADY-SMITH:
11    Q  Dr. Charlesworth, as you sit here today, have you
12 received any medical record from any physician from 1993
13 through December of '98 that reflects in the medical record
14 a diagnosis or a treatment of cancer in Mr. Hall?
15    A  During that time period, you mean?
16    Q  Up until that visit, that December 11th, 1998,
17 visit.
18    A  Just the references in Dr. Cashdollar's letter
19 here.
20    Q  That's in 1999. Correct?
21    A  Yeah, in 1999, correct. I don't have any other
22 records or reference prior to December of '98 of any
23 definitive treatment for a cancer or a diagnosis.
24    Q  Or a diagnosis. And Mr. Kelley hasn't shown you
25 in his packet of records any record from any medical

Page 66

1 questioning?
2     A  Yes.  It's determined on how you ask it.  If you
3 ask me if he called me in December of '98, that's one
4 answer.  If you ask me in March of '99, it's a different
5 answer because I had different records in my possession.
6     Q  If they had asked you based on your recollection
7 of the conversation with Mr. Hall, as you told us earlier
8 today in your deposition -- on April 30th, '98, if they had
9 asked you, Did Mr. Hall have an understanding that he had
10 cancer in 1993?  Your answer would have been no?
11    A  It would have been maybe.  But Mr. Hall, it would
12 have been he doesn't think so.
13    Q  So that his recollection was just a funny-looking
14 mole?
15    A  Right.
16    Q  And the information that you would have given in
17 1999 was based on additional information that became
18 available after the diagnosis of metastatic cancer.
19 Correct?
20    A  Correct.
21    Q  And the insurance company and their
22 representatives had a document which you have told us that
23 you did not have, which is the 1993 pathology report that
24 was attendant to the excision of the mole.  That report if
25 you read it, if you had it in your hand and they asked you,

Page 67

1 you would have told them, That does not reflect malignant
2 melanoma.  Correct?
3        MR. KELLEY:  Objection, calls for speculation.
4 BY MS. MAHADY-SMITH:
5     Q  If you had the 1993 report in your hand, the
6 report itself is not a reflection of a finding of malignant
7 melanoma?
8     A  This report by itself, no.
9     Q  So that if Dr. Cashdollar's letter -- and we
10 haven't deposed him yet -- is a reference to a pathology
11 report, it's not this pathology report.  Correct?
12    A  Knowing Dr. Cashdollar, no, it wouldn't be that
13 report.
14        MS. MAHADY-SMITH:  That's all the questions I
15 have.  Thank you, Dr. Charlesworth.
16        MR. KELLEY:  That's it.  Thank you, sir.
17        (Discussion held off the record.)
18        MR. KELLEY:  Dr. Charlesworth has been kind
19 enough to provide us with a current curriculum vitae.
20              EXAMINATION
21 BY MR. KELLEY:
22    Q  It is not up to date.  Is that right, Doctor?
23    A  Yes, it's at least eight years old.
24    Q  And if you've got a more recent one, if we could
25 get a copy of that?

Page 68

1     A  I'll provide that for you.
2        MR. KELLEY:  And why don't you mark this one as
3 part of the record and call it Charlesworth 6?
4        (Curriculum vitae, two pages, produced and marked
5 Charlesworth Exhibit No. 6.)
6        MR. PEDERSEN:  I would request that if you get a
7 copy of an updated one that you send a copy to us.
8        (Whereupon, the deposition was concluded at 11:47
9 a.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 69

1 COUNTY OF DAUPHIN          :
                       SS
2 COMMONWEALTH OF PENNSYLVANIA  :
3
4     I, Pamela S. Sullivan, a Notary Public, authorized to
5 administer oaths within and for the Commonwealth of
6 Pennsylvania, do hereby certify that the foregoing is the
7 testimony of Ernest E. Charlesworth, M.D.
8     I further certify that before the taking of said
9 deposition, the witness was duly sworn; that the questions
10 and answers were taken down stenographically by the said
11 Reporter-Notary Public, and afterwards reduced to
12 typewriting under the direction of the said Reporter.
13    I further certify that the said deposition was taken
14 at the time and place specified in the caption sheet hereof.
15    I further certify that I am not a relative or employee
16 or attorney or counsel to any of the parties, or a relative
17 or employee of such attorney of counsel, or financially
18 interested directly or indirectly in this action.
19    I further certify that the said deposition
20 constitutes a true record of the testimony given by the said
21 witness.
22    IN WITNESS WHEREOF, I have hereunto set my hand this
23 9th day of January, 2002.
24        Pamela S. Sullivan
25            Reporter-Notary Public

1  COUNTY OF DAUPHIN                    :
                                       SS
2  COMMONWEALTH OF PENNSYLVANIA   :

3

4      I, Pamela S. Sullivan, a Notary Public, authorized to

5  administer oaths within and for the Commonwealth of

6  Pennsylvania, do hereby certify that the foregoing is the

7  testimony of Ernest E. Charlesworth, M.D.

8      I further certify that before the taking of said

9  deposition, the witness was duly sworn; that the questions

10 and answers were taken down stenographically by the said

11 Reporter-Notary Public, and afterwards reduced to

12 typewriting under the direction of the said Reporter.

13     I further certify that the said deposition was taken

14 at the time and place specified in the caption sheet hereof.

15     I further certify that I am not a relative or employee

16 or attorney or counsel to any of the parties, or a relative

17 or employee of such attorney of counsel, or financially

18 interested directly or indirectly in this action.

19     I further certify that the said deposition

20 constitutes a true record of the testimony given by the said

21 witness.

22     IN WITNESS WHEREOF, I have hereunto set my hand this

23 9th day of January, 2002.

24

25

NOTARIAL SEAL
PAMELA S. SULLIVAN, Notary Public
Swatara Twp., Dauphin County
My Commission Expires Jan. 31, 2005

Pamela S. Sullivan
Reporter-Notary Public

| | | |
|---|---|---|
| **-'-** | | |
| **'90s** [1] | 59:13 | |
| **'93** [4] | 46:17 | 46:19 |
| 59:13 | 59:16 | |
| **'96** [5] | 21:25 | 32:1 |
| 32:21 | 59:14 | 59:16 |
| **'98** [8] | 19:20 | 49:25 |
| 54:16 | 61:13 | 61:22 |
| 62:2 | 66:3 | 66:8 |
| **'99** [3] | 44:5 | 45:22 |
| 66:4 | | |

| | | |
|---|---|---|
| **-1-** | | |
| **1** [13] | 2:12 | 16:7 |
| 16:9 | 16:12 | 17:14 |
| 18:6 | 20:22 | 21:17 |
| 43:3 | 55:19 | 55:24 |
| 55:25 | 64:2 | |
| **1-15-99** [2] | | 39:15 |
| 39:23 | | |
| **1-22-99** [1] | | 32:9 |
| **1.5** [1] | 37:8 | |
| **100** [1] | 34:22 | |
| **10:05** [1] | 1:19 | |
| **11** [1] | 28:10 | |
| **111** [1] | 4:1 | |
| **11:47** [1] | 68:8 | |
| **11th** [2] | 38:20 | 61:16 |
| **12-11-98** [3] | | 36:3 |
| 41:2 | 54:23 | |
| **12-89** [1] | 17:20 | |
| **144** [2] | 1:21 | 4:1 |
| **15** [1] | 19:1 | |
| **16** [1] | 2:12 | |
| **17** [3] | 43:15 | 43:18 |
| 44:5 | | |
| **1939** [1] | 50:24 | |
| **1977** [2] | 6:1 | 6:9 |
| **1981** [2] | 5:24 | 6:11 |
| **1982** [1] | 7:20 | |
| **1984** [3] | 5:12 | 6:19 |
| 6:20 | | |
| **1986** [1] | 6:24 | |
| **1993** [18] | 2:16 | 44:13 |
| 44:20 | 44:24 | 45:4 |
| 46:11 | 46:24 | 50:14 |
| 57:12 | 61:12 | 62:1 |
| 62:17 | 63:15 | 63:19 |
| 65:25 | 66:10 | 66:23 |
| 67:5 | | |
| **1994** [4] | 5:4 | 6:20 |
| 6:25 | 7:4 | |
| **1996** [8] | 21:24 | 29:13 |
| 30:21 | 32:2 | 32:5 |
| 32:7 | 50:23 | 64:5 |
| **1998** [8] | 16:12 | 22:13 |
| 28:4 | 28:10 | 35:5 |
| 52:24 | 61:16 | 64:24 |
| **1999** [7] | 41:7 | 43:15 |
| 43:18 | 51:22 | 61:20 |
| 61:21 | 66:17 | |

| | | |
|---|---|---|
| **1:01-CV-1265** [1] | 1:10 | |

| | | |
|---|---|---|
| **-2-** | | |
| **2** [7] | 2:13 | 20:9 |
| 20:24 | 21:3 | 27:20 |
| 27:22 | 27:24 | |
| **2-17-99** [2] | | 2:15 |
| 44:7 | | |
| **2001** [3] | 9:18 | 9:19 |
| 39:11 | | |
| **2002** [2] | 1:19 | 69:23 |
| **220** [3] | 36:23 | 37:5 |
| 37:6 | | |
| **27** [1] | 2:13 | |

| | | |
|---|---|---|
| **-3-** | | |
| **3** [6] | 2:4 | 2:14 |
| 20:12 | 21:6 | 39:19 |
| 43:2 | | |
| **30** [2] | 16:12 | 28:4 |
| **30th** [6] | 6:18 | 28:14 |
| 28:15 | 30:3 | 35:5 |
| 66:8 | | |
| **39** [1] | 2:14 | |

| | | |
|---|---|---|
| **-4-** | | |
| **4** [5] | 2:15 | 17:17 |
| 21:9 | 44:6 | 44:8 |
| **4-30** [1] | 54:16 | |
| **44** [1] | 2:15 | |
| **46** [1] | 2:16 | |
| **47** [1] | 2:5 | |

| | | |
|---|---|---|
| **-5-** | | |
| **5** [4] | 2:16 | 46:23 |
| 46:25 | 58:23 | |
| **5th** [1] | 41:7 | |

| | | |
|---|---|---|
| **-6-** | | |
| **6** [4] | 2:17 | 29:25 |
| 68:3 | 68:5 | |
| **62** [1] | 2:4 | |
| **65** [1] | 2:5 | |
| **67** [1] | 2:4 | |
| **68** [1] | 2:17 | |

| | | |
|---|---|---|
| **-7-** | | |
| **750** [1] | 29:25 | |

| | | |
|---|---|---|
| **-8-** | | |
| **8th** [2] | 1:21 | 4:1 |

| | | |
|---|---|---|
| **-9-** | | |
| **9** [1] | 1:19 | |
| **9th** [1] | 69:23 | |

| | | |
|---|---|---|
| **-A-** | | |
| **a.m** [2] | 1:19 | 68:9 |

| | | |
|---|---|---|
| **Abdomen** [1] | 37:11 | |
| **abilities** [1] | 22:18 | |
| **able** [3] | 8:11 | 12:7 |
| 12:8 | 65:11 | |
| **abnormal** [1] | 41:11 | |
| **absolutely** [6] | 20:3 | |
| 22:1 | 22:17 | 37:3 |
| 39:1 | 49:15 | |
| **accepted** [1] | | 44:16 |
| **access** [1] | 53:8 | |
| **accessed** [1] | | 50:22 |
| **accurate** [11] | | 7:1 |
| 12:19 | 22:2 | 22:8 |
| 23:19 | 53:21 | 54:9 |
| 54:11 | 54:13 | 56:24 |
| 64:15 | | |
| **accurately** [2] | | 23:21 |
| 64:13 | | |
| **action** [3] | 1:3 | 3:11 |
| 69:18 | | |
| **active** [1] | 13:23 | |
| **actual** [2] | 52:15 | 65:3 |
| **acute** [1] | 25:2 | 60:12 |
| **add** [2] | 17:10 | 21:15 |
| **added** [1] | 22:9 | |
| **additional** [1] | | 66:17 |
| **address** [4] | 3:25 | 23:5 |
| 25:13 | 52:6 | |
| **addressed** [1] | | 32:19 |
| **adequate** [1] | | 12:7 |
| **administer** [1] | | 69:5 |
| **ADMINISTRATRIX** [1] | | |
| 1:5 | | |
| **affect** [2] | 24:2 | 24:4 |
| **afterwards** [1] | | 69:11 |
| **again** [6] | 37:5 | 37:6 |
| 46:9 | 48:2 | 57:9 |
| 64:1 | | |
| **age** [1] | 39:25 | |
| **ago** [9] | 5:13 | 9:13 |
| 40:16 | 45:15 | 60:25 |
| 61:1 | 61:1 | 61:1 |
| 61:2 | | |
| **agreed-upon** [1] | | 13:25 |
| **ahead** [5] | 4:21 | 30:12 |
| 37:1 | 46:6 | 63:5 |
| **aids** [1] | 14:25 | |
| **ailments** [1] | | 14:16 |
| **allergies** [1] | | 29:10 |
| **allowed** [1] | | 34:22 |
| **always** [5] | 34:21 | 34:22 |
| 49:3 | 49:21 | 56:24 |
| **Amaze** [1] | 30:12 | |
| **among** [1] | 55:14 | |
| **analgesic** [1] | | 29:23 |
| **anemia** [2] | 41:14 | 41:17 |
| **anemic** [2] | 41:13 | 42:15 |
| **answer** [9] | 13:4 | 31:11 |
| 63:20 | 63:23 | 63:24 |
| 65:23 | 66:4 | 66:5 |
| 66:10 | | |
| **answers** [1] | | 69:10 |

| | | |
|---|---|---|
| **anticipate** [1] | 3:16 | |
| **Anyway** [1] | 42:5 | |
| **anyways** [2] | 13:4 | |
| 34:11 | | |
| **apologize** [1] | 39:6 | |
| **apparent** [1] | 55:11 | |
| **appear** [1] | 51:2 | |
| **APPEARANCES** [1] | | |
| 1:23 | | |
| **applicable** [1] | | 17:12 |
| **apply** [1] | 29:6 | |
| **appointment** [3] | 18:24 | |
| 19:2 | 56:3 | |
| **approach** [1] | | 65:3 |
| **April** [10] | 16:12 | 22:13 |
| 28:4 | 28:14 | 28:15 |
| 30:3 | 35:4 | 49:25 |
| 64:24 | 66:8 | |
| **area** [4] | 22:21 | 41:19 |
| 53:12 | 65:5 | |
| **arrive** [1] | 22:3 | |
| **arrives** [2] | 18:21 | 22:3 |
| **art** [1] | 38:7 | |
| **asks** [1] | 15:25 | |
| **assessment** [3] | | 12:14 |
| 29:20 | 37:12 | |
| **assist** [1] | 22:21 | |
| **assistant** [4] | | 4:8 |
| 4:12 | 23:7 | 36:14 |
| **assistants** [2] | | 28:17 |
| 28:17 | | |
| **associated** [2] | | 5:2 |
| 6:21 | | |
| **Associates** [4] | | 1:20 |
| 4:4 | 5:3 | 16:21 |
| **assume** [4] | 33:4 | 54:13 |
| 56:18 | 58:16 | |
| **assumed** [1] | | 35:15 |
| **attempt** [1] | 57:24 | |
| **attempted** [1] | | 49:9 |
| **attendant** [4] | | 51:22 |
| 52:15 | 56:15 | 66:24 |
| **attended** [1] | | 5:20 |
| 6:10 | | |
| **attorney** [2] | | 69:16 |
| 69:17 | | |
| **authorized** [1] | | 69:4 |
| **automatically** [2] | | 32:25 |
| 33:10 | | |
| **available** [3] | | 12:10 |
| 65:22 | 66:18 | |
| **aware** [3] | 4:19 | 44:11 |
| 45:19 | | |

| | | |
|---|---|---|
| **-B-** | | |
| **B.S** [1] | 5:21 | |
| **bachelor's** [1] | | 6:9 |
| **background** [1] | | 3:22 |
| **bad** [1] | 20:3 | |
| **badger** [2] | 38:8 | 38:8 |
| **basal** [2] | 26:3 | 48:19 |

Multi-Page™

**ERNEST E. CHARLESWORTH, M.D.**

Corps [1]  6:23

correct [53]  4:22
4:23    12:21    16:12
16:17   17:7     19:6
20:13   25:14    28:6
28:10   28:11    30:5
30:19   36:10    36:11
37:23   38:4     39:24
40:3    48:11    48:15
49:10   50:4     50:5
51:9    52:16    52:21
53:1    53:15    53:18
54:6    55:4     55:8
55:16   57:13    58:11
58:25   59:21    60:14
61:20   61:21    62:4
62:13   62:17    62:22
63:17   64:6     64:14
66:19   66:20    67:2
67:11

correctly [3]  16:23
54:16   55:23

correspondence [1] 58:1

corroborate [1]  27:9

corroborated [1]  10:17

cough [1]  36:21

counsel [2]  69:16
69:17

county [2] 57:4  69:1

couple [7]  5:5  9:15
9:15    9:17    48:6
62:6    65:20

course [2]  3:12  15:6

court [2]  1:1  16:6

covering [1]  10:8

creases [1] 56:17

created [1] 17:5

creating [1]  11:13

creation [2]  11:4
12:25

critical [1] 23:25

cross [1]  23:4

CUNA [4]  1:12  1:12
3:9    9:7

cured [1]  50:9

current [5] 8:8  13:24
21:14   24:3    67:19

curriculum [4]  2:17
8:8    67:19    68:4

CXR [1]  37:13

-D-

Darlene [1]  8:9

Daryl [1]  4:11
33:11

data [1]  13:21

databank [1]  57:5

date [14]  1:19  17:20
21:18   21:20   24:5
28:3    34:16   34:19
34:24   45:25   51:19
52:23   65:9    67:22

dated [6]  2:15  16:12
32:9    43:14   43:18
44:7

DAUPHIN [1]  69:1

Dave [1]  4:12

days [3]  11:7  11:15
32:24

deadly [1]  49:3

dealing [2] 60:11  60:14

dealings [1]  17:1

death [3]  10:11  10:23
61:4

debate [7]  26:8  26:13
27:11   31:7    49:8
62:24   63:11

DECEASED [1]  1:6

December [8]  28:10
38:20   52:24   61:13
61:16   61:22   62:1
66:3

decision [1]  60:21

DEFENDANTS [3]
1:14    1:16    1:26

definitely [5]  27:13
27:14   45:19   46:2
51:12

definition [1]  54:6

definitive [1]  61:23

degree [1]  6:9

degrees [1] 5:18

deliberately [1]  54:2

demonstrated [1]  44:12

deny [1]  60:21

depending [3]  23:16
34:12   50:8

deposed [1]  67:10

deposition [12]  1:15
3:7    3:12    8:15
39:8    52:13   60:19
66:8    68:8    69:9
69:13   69:19

depth [2]  50:7  50:10

dermal [2] 44:13  44:23

description [1]  14:16

desk [4]  23:10  33:24
33:25   64:24

details [1] 40:18

detect [1]  20:17

determine [1]  65:11

determined [1]  66:2

determining [1]  64:21

developing [1]  57:22

develops [1]  21:14

DeVries [1]  6:23

diabetes [2]  25:6
33:11

diagnose [1]  52:21

diagnosed [1]  51:22

diagnoses [1]  15:4

diagnosis [16]  12:14
49:10   49:14   50:6
51:14   51:18   52:22
52:25   56:25   59:23
59:25   61:14   61:23
61:24   62:2    66:18

diagnostic [1]  14:25

difference [1]  26:4

different [9]  18:4
30:14   30:16   32:13
34:20   38:9    38:13
66:4    66:5

difficult [1]  52:22

difficulty [2]  22:19
22:22

dig [1]  8:18

digging [1] 60:4

direction [1]  69:12

directly [1]  69:18

disc [6]  18:3  18:4
21:2    21:5    21:8
29:11

discrepancy [1]  50:24

discussed [2]  10:5
32:16

discussing [1]  13:16

discussion [5]  6:7
26:20   49:7    50:1
67:17

disease [1] 25:7

DISTRICT [2]  1:1
1:2

diverticulosis [2]  17:18
21:11

doctor [44] 3:5  3:21
5:17    7:15    8:22
11:2    11:21   16:4
16:11   19:13   21:17
22:13   23:23   26:22
27:16   27:24   28:12
33:14   35:4    36:3
37:18   39:7    39:13
39:21   43:15   44:10
46:10   46:20   47:2
47:15   47:19   48:2
50:13   51:6    51:6
51:8    51:13   55:10
57:9    60:18   62:9
64:21   65:20   67:22

doctor's [3]  12:6
18:2    35:9

doctor/patient [1]  11:25

doctors [2] 6:21  45:2

document [13]  11:23
12:14   12:15   16:11
17:14   18:21   18:22
27:24   39:13   44:4
44:22   51:20   66:22

documentation [2] 11:16
12:4

documenting [2]  12:11
14:8

documents [2]  46:20
52:1

doesn't [4] 18:16  19:13
25:16   66:12

done [2]  22:24  50:6

down [2]  10:14  11:25
22:25   25:11   38:9
38:12   38:15   44:15
64:13   64:16   69:10

dozen [1]  25:10

Dr [58]  6:23  17:25
18:3    19:23   21:1
21:5    21:8    31:18
40:11   40:14   41:4
41:6    41:10   41:22
41:23   42:2    42:11
42:23   43:5    43:12
43:16   43:17   43:18
44:12   45:5    45:23
46:18   51:3    51:3
51:5    51:8    51:11
52:4    52:6    52:13
52:14   53:6    53:13
57:12   57:15   58:3
58:4    58:4    58:4
58:9    58:13   58:22
60:11   60:11   61:11
61:18   63:14   63:21
63:25   67:9    67:12
67:15   67:18

driver [1]  29:14

due [2]  54:4  54:4

duly [2]  3:2  69:9

during [8]  3:12  7:3
22:8    55:13   60:19
61:15   62:1    62:11

-E-

E [5]  1:15  2:3
3:1    3:24    69:7

ear [1]  41:24

earache [1] 25:1

early [1]  56:9

eased [1]  29:2

educatedly [1]  53:14

education [1]  11:3

eight [1]  67:23

eighteen [1]  7:9

either [17]  8:25  10:20
11:2    18:18   18:25
19:16   22:2    24:6
25:11   25:18   41:12
45:2    56:6    59:16
64:3    64:18   64:21

electric [1] 30:15

eliminate [1]  48:19

emergency [2]  7:5
7:10

employed [2]  64:24
64:25

employee [2]  69:15
69:17

employees [3]  23:16
34:20   65:4

employment [2]  65:1
65:8

end [1]  43:2

engineering [1]  5:22

entails [1]  12:9

enter [2]  17:10  19:19

entered [1]  31:2

entire [2]  4:24  7:1

entries [3]  4:23  54:18

| 15:24 | 17:12 | 23:24 |
| 24:21 | 29:11 | 29:13 |
| 31:4 | 35:24 | 40:19 |
| 41:20 | 42:11 | 42:13 |
| 42:19 | 44:17 | 44:18 |
| 44:19 | 44:23 | 64:18 |

**holidays** [1]                38:19
**home** [1]    10:8
**honest** [1]  39:9
**horse** [1]   29:1
**hospital** [5]                6:13
8:2      24:13    56:22
57:1
**hospitalization** [2] 17:19
21:15
**hospitalization/surgery** [1]
23:9
**hospitals** [1]               7:25
**Hot** [2]     29:2     29:5
**hour** [3]    3:17     3:17
47:21
**HSM** [1]     37:11
**huge** [1]    26:4
**Hurley** [9] 51:3     51:4
51:5     51:8     57:12
57:15    58:4     58:13
58:22
**husband** [2]                 1:7
31:8

### -I-

**idea** [5]    9:14     20:1
26:6     26:7     27:13
**ideally** [1] 32:22
**identified** [1]              22:10
**identify** [3]                5:18
14:25    54:17
**ignorance** [2]               54:4
54:8
**illiterate** [1]              22:19
**illnesses** [2]               24:4
24:5
**immunization** [1] 13:22
**impact** [1] 11:18
**important** [3]               23:23
60:1     60:7
**impression** [1]              50:18
**impressions** [1]             15:4
**impugn** [1] 28:13
**inability** [1]               55:6
**inaccurate** [1]              54:2
**include** [3] 14:13    15:3
15:6
**included** [2]                32:9
34:10
**includes** [2]                13:21
14:14
**including** [1]               15:7
51:19
**indeed** [1]  53:10
**indicate** [3]                52:25
53:2     53:9

**indicated** [1]               49:7
**indicates** [4]               43:19
50:17    51:21    58:10
**indicating** [4]              34:7
63:15    64:5     64:17
**indirectly** [1]              69:18
**individual** [1]              15:19
**INDIVIDUALLY** [1]
1:3
**information** [36]            3:22
10:10    10:16    10:17
12:1     13:6     14:13
15:23    22:16    23:6
23:11    23:12    29:23
30:24    31:1     31:1
31:4     31:18    37:21
38:6     38:17    42:23
56:7     57:17    57:18
62:20    62:21    63:7
63:10    63:23    64:4
64:12    64:16    64:17
66:16    66:17
**initial** [9] 10:13    22:5
22:9     23:2     32:15
32:16    32:17    53:12
65:21
**inside** [2]  36:9     36:16
**instances** [1]               25:9
**Institution** [1]             5:20
**institutions** [1]            5:18
**instructed** [2]              23:20
64:12
**instruction** [1]             13:10
**insurance** [8]               1:13
3:9      10:8     48:5
60:20    62:10    65:23
66:21
**intact** [2]  29:18    29:19
**intake** [9] 22:13    32:16
54:15    55:7     55:23
58:1     62:22    63:7
64:1
**intention** [1]               54:4
**interested** [1]              69:18
**internship** [1]              7:19
**interpretation** [2] 38:17
57:16
**interview** [1]               17:9
**introduced** [2]              3:5
10:6
**investigation** [1] 62:11
**involved** [1]                48:19
**involving** [1]               9:7
**issue** [5]   10:7     12:3
32:13    48:4     48:13
**issues** [2]  11:8     34:17
**item** [7]    18:6     20:9
21:3     21:6     21:9
21:17    36:2
**items** [1]   22:25
**itself** [2]  67:6     67:8

### -J-

**January** [3]                 1:19
41:7     69:23
**January/February** [1]
45:24
**jeez** [1]    45:14
**job** [1]     34:22
**JUDGE** [1]                   1:14
**June** [2]    6:18     7:4

### -K-

**keep** [2]    19:21    21:13
**keeps** [2]   32:25    32:25
**Kelley** [32] 1:25    2:4
3:4      3:6      6:6
8:21     16:6     16:10
19:15    27:19    27:23
39:20    44:4     44:9
46:23    47:1     47:15
51:20    53:5     53:20
61:24    62:6     62:8
63:1     63:6     65:11
65:21    67:3     67:16
67:18    67:21    68:2
**Kelley's** [1]                48:7
**kept** [1]    14:3
**kind** [5]    26:3     26:17
31:14    34:9     67:18
**kinds** [1]   11:8
**knew** [1]    42:9
**Knowing** [1]                 67:12
**knowledge** [1]               16:1
**known** [1]   29:10
**Kramer** [2] 4:11     16:20
**KY** [2]      29:2     29:5

### -L-

**L4-L5** [1]   21:8
**L5-S1** [1]   21:2     21:5
**Lang** [4]    18:3     21:1
21:5     21:8
**laryngeal** [1]               40:22
**laryngitis** [1]              48:1
**last** [4]    5:12     6:14
46:20    46:21
**latter** [1]  9:18
**LAW** [1]     1:3
**lawyer** [1]  3:6
**laypeople** [1]               48:18
**least** [9]   9:17     31:13
36:19    38:2     40:15
46:16    48:25    49:1
67:23
**leave** [1]   8:12
**left** [14]   28:20    29:2
29:18    29:21    30:18
32:11    35:19    36:19
37:8     38:1     38:2
44:12    44:23    57:12
**leg** [4]     28:20    30:18
35:5     35:19
**legal** [1]   14:6
**legible** [4] 12:19    16:15

| 23:19 | 53:22 |
**lesion** [3]  44:13    53:10
53:12
**letter** [22] 2:15     42:23
43:14    43:16    43:23
44:7     44:10    45:1
46:1     46:3     46:9
52:4     52:6     58:3
58:10    58:13    59:2
59:6     61:18    63:14
63:21    67:9
**letters** [2] 29:22    43:25
**level** [2]   11:16    50:10
**LFT** [1]     37:13
**license** [3] 7:17     7:19
8:5
**licensed** [1]                7:14
**life-threatening** [1] 60:12
**likely** [3]  19:10    48:25
49:1
**Likewise** [1]                58:13
**line** [11]   29:12    29:13
29:16    29:16    29:20
29:21    37:7     37:17
44:11    44:23    65:25
**lines** [2]   18:3     18:4
**list** [4]    13:21    14:24
16:1     23:8
**listed** [1]  29:9
**lists** [2]   21:12    29:17
**literal** [1] 29:4
**LLC** [1]     1:24
**LN** [1]      37:9
**location** [2]                41:11
57:7
**long-term** [1]               40:20
**longer** [2]  3:16     60:7
**look** [11]   17:17    17:18
18:16    31:23    35:1
41:5     47:9     50:3
52:7     54:10    54:21
**looked** [2]  39:9     58:11
**looking** [3]                 31:25
40:6     51:7
**looks** [8]   18:6     19:23
28:3     29:3     29:9
36:25    41:16    47:7
**lower** [3]   36:19    38:1
38:2
**lumbar** [1]  29:11
**lump** [6]    36:9     36:16
36:19    37:24    41:3
51:23
**lumps** [1]   36:22
**lung** [1]    41:12
**Lungs** [1]   31:9
**lymph** [8]   32:11    37:9
40:24    41:11    50:11
53:3     53:7     53:11

### -M-

**M** [1]       1:28

number [5] 11:22    23:5
    23:5    27:12    29:25
NURICK [1]            1:24
nurse [1]  36:14
nurses [1]  28:17
NV [1]  29:18

-O-

O [1]        31:1
oaths [1]  69:5
objection [4]            19:12
    62:25    63:3    67:3
objective [6]            12:12
    14:20    14:23    29:17
    31:1    37:7
observed [1]            41:3
obtain [5]  23:24    24:7
    24:21    25:8    65:13
obtaining [1]  15:15
obviously [2]            3:18
    45:17
occasion [1]            40:16
occur [1]  25:16
occurred [1]            9:13
off [5]  6:6    6:7
    19:22    49:21    67:17
office [22] 8:9    10:14
    13:18    14:1    14:6
    15:19    15:20    18:21
    19:8    20:16    20:20
    22:3    23:16    32:23
    33:17    46:5    50:8
    56:21    57:3    64:4
    65:1    65:5
Oil [2]  6:24    7:4
old [4]  25:3    25:8
    65:1    67:23
once [3]  59:23    60:3
    60:6
oncologist [1]            45:18
one [49]  2:12    2:13
    2:16    3:12    4:7
    7:19    7:24    8:10
    10:15    11:15    11:22
    13:13    16:8    17:25
    18:15    26:15    26:16
    26:25    27:7    27:8
    27:12    27:21    28:16
    30:13    35:6    37:16
    38:22    38:25    39:2
    39:14    40:15    43:20
    45:16    46:24    48:15
    49:2    52:19    52:20
    52:24    55:8    57:2
    57:7    60:16    61:7
    64:7    66:3    67:24
    68:2    68:7
one-and-a-half [1]  29:14
one-time [2]            24:1
    33:1
ongoing [3]            13:16
    33:9    36:1
onto [3]  22:16    23:11
    23:12

operating [1]  15:15
operation [1]  21:15
order [2]  54:10    58:2
organization [1]  57:5
organizations [1]  12:5
original [4]            31:25
    32:1    36:24    56:17
OTC [1]  29:23
otherwise [1]            33:3
out-of-state [1]  25:14
outline [1] 58:2
over-the-counter [4]
    29:4    29:6    29:23
    29:24
oversight [1]            12:4
own [3]  6:24    14:17
    64:22

-P-

P [1]  29:21
pack [1]  29:14
packet [2] 43:15    61:25
page [16]  2:12    2:13
    2:16    16:8    17:22
    27:19    27:21    28:9
    43:19    44:15    44:22
    46:9    46:20    46:21
    46:24    55:7
pages [7]  2:14    2:15
    2:17    39:16    39:18
    44:7    68:4
pain [4]  28:20    29:1
    30:18    35:14
Pamela [3] 1:17    69:4
    69:24
paragraph [2]            44:11
    46:9
parentheses [3]            28:21
    28:21    37:10
part [9]  4:8    9:18
    12:12    14:5    23:2
    38:7    39:2    56:24
    68:3
particular [5]            5:7
    25:18    33:14    54:11
    57:1
particularly [2]            12:10
    50:5
parties [1] 69:16
partners [2]            4:5
    51:10
parts [2]  17:16    23:13
past [6]  10:10    13:23
    24:21    29:11    44:18
    44:19
path [11]  32:9    32:21
    45:8    45:9    45:10
    46:17    46:19    47:8
    53:12    58:15    60:17
pathological [4]  2:16
    46:24    47:5    50:6
pathologist [2]            50:4
    53:9

pathology [36]            32:2
    32:4    44:13    46:8
    46:10    46:11    49:11
    49:13    49:19    49:22
    50:1    50:3    50:13
    50:17    51:15    51:17
    51:24    52:5    52:8
    52:8    52:10    52:18
    53:2    53:6    58:1
    58:6    58:11    58:18
    58:20    59:9    59:12
    59:20    62:17    66:23
    67:10    67:11
patient [56]            11:4
    11:14    11:24    12:2
    12:8    12:9    12:15
    12:20    13:17    13:22
    13:23    14:10    14:12
    14:22    15:21    15:22
    17:9    18:18    18:21
    18:23    19:11    21:14
    22:3    22:6    22:15
    23:1    23:24    25:11
    26:13    30:24    30:25
    33:2    33:13    33:16
    33:19    34:1    35:7
    35:9    35:10    35:15
    36:1    37:22    38:5
    44:1    44:16    49:19
    55:25    56:7    56:20
    58:6    58:7    58:14
    62:22    63:4    64:3
    64:18
patient's [5]            14:17
    15:15    24:8    64:3
    64:19
patients [16]            13:11
    14:16    17:2    21:13
    22:3    22:19    22:21
    23:21    24:11    24:24
    24:25    25:15    33:4
    34:17    35:12    54:3
Pedersen [10]            1:27
    1:27    1:29    8:24
    8:25    39:10    48:3
    55:18    55:21    68:6
penetration [2]            50:7
    50:10
Pennsylvania [8]            1:2
    1:22    4:2    6:23
    7:16    7:18    69:2
    69:6
people [16] 5:6    18:16
    22:15    22:17    22:18
    22:18    22:3    23:10
    33:22    38:8    43:20
    56:2    58:5    65:2
    65:6    65:13
people's [1]            18:15
per [1]  29:15
percent [1] 34:22
performed [1]            15:8
period [5]  6:16    7:3
    21:21    32:5    61:15
Periodically [1]  61:5
person [4]  23:17    54:23
    64:17    65:3
personal [3]            17:1

    24:18    33:5
personally [3]            12:24
    15:14    24:6
pertain [1] 24:8
phone [3]  23:4    23:5
    42:25
photocopy [2]            34:13
    39:3
physical [4]            12:11
    14:19    14:23    29:17
physician [22]            2:13
    15:19    22:15    23:7
    24:13    27:21    27:25
    33:8    40:2    40:4
    40:8    41:24    48:17
    48:20    49:17    50:3
    51:3    51:21    56:20
    57:24    61:12    62:1
physician's [5]            4:8
    4:12    15:3    25:14
    28:17
physicians [10]            4:7
    4:10    4:17    5:14
    13:9    23:7    53:1
    53:13    60:10    64:23
pick [2]  18:25    56:9
pickup [1] 28:24
pin [2]  38:9    42:16
Pittsburgh [2]            6:10
    6:14
place [6]  1:20    22:14
    55:14    56:23    57:11
    69:14
places [1] 24:12
PLAINTIFF [2]            1:8
    1:30
plan [8]  12:16    29:21
    37:13    57:23    58:2
    58:2    58:8    58:8
plans [1] 60:7
plays [1] 27:10
PMH [2]  29:10    44:16
point [9]  19:4    35:1
    36:12    41:5    44:15
    45:18    46:3    59:25
    60:15
points [1] 41:12
policy [10] 13:14    14:5
    22:14    24:7    24:10
    24:15    24:18    25:9
    35:11    60:21
Polytechnic [1]            5:20
portion [1] 28:15
positive [2]            29:17
    40:24
possession [1]  66:5
possibilities [1]  64:7
possible [4]            14:15
    28:12    40:22    54:14
potential [2]            25:5
    49:6
pounds [1] 37:7
practice [30]            4:3
    4:6    4:8    5:4

Multi-Page™

| | | |
|---|---|---|
| 67:13 | | |
| **reported** [1] | 31:3 | |
| **reporter** [2] | 16:6 | |
| 69:12 | | |
| **Reporter-Notary** | | |
| 1:18 | 69:11 | 69:25 |
| **reports** [4] 32:2 | 32:4 | |
| 53:2 | 59:17 | |
| **represent** [1] | 48:3 | |
| **REPRESENTATIVE** [1] | | |
| 1:4 | | |
| **representatives** [2] 60:19 | | |
| 66:22 | | |
| **represented** [1] | 10:7 | |
| **represents** [1] | 8:23 | |
| **request** [12] | 24:12 | |
| 25:3 | 25:10 | 25:17 |
| 25:19 | 31:17 | 31:20 |
| 34:14 | 34:15 | 34:16 |
| 65:13 | 68:6 | |
| **requesting** [1] | 27:14 | |
| **requests** [2] | 32:25 | |
| 47:11 | | |
| **require** [1] 12:3 | | |
| **required** [2] | 12:13 | |
| 12:18 | | |
| **requirement** [1] | 53:21 | |
| **requirements** [4] | 11:12 | |
| 11:21 | 11:23 | 14:6 |
| **requisition** [2] | 25:12 | |
| 25:12 | | |
| **rescind** [1] 60:21 | | |
| **resection** [1] | 44:20 | |
| **residency** [3] | 6:12 | |
| 11:7 | 13:9 | |
| **resident** [1] | 6:14 | |
| **resort** [1] 65:15 | | |
| **responsibility** [1] | 33:5 | |
| **responsible** [1] | 23:14 | |
| **rest** [2] | 17:11 | 28:22 |
| **resume** [1] 8:8 | | |
| **retention** [2] | 11:4 | |
| 12:25 | | |
| **revealed** [4] | 44:13 | |
| 46:10 | 52:9 | 52:10 |
| **review** [5] 14:6 | 39:7 | |
| 44:1 | 47:2 | 47:3 |
| **reviewed** [2] | 45:1 | |
| 58:17 | | |
| **revoked** [1] | 8:6 | |
| **right** [50] 8:14 | 16:16 | |
| 17:19 | 19:22 | 21:19 |
| 25:13 | 27:25 | 30:2 |
| 34:11 | 35:25 | 36:1 |
| 36:7 | 36:8 | 36:11 |
| 37:2 | 37:19 | 37:20 |
| 37:25 | 38:18 | 38:25 |
| 39:23 | 44:17 | 44:21 |
| 44:25 | 49:2 | 49:14 |
| 52:2 | 52:22 | 53:24 |
| 56:13 | 57:21 | 58:12 |
| 58:19 | 58:21 | 59:22 |
| 60:2 | 60:9 | 60:15 |
| 62:3 | 63:9 | 63:12 |

| | | |
|---|---|---|
| 63:16 | 63:20 | 63:25 |
| 64:8 | 64:10 | 64:15 |
| 64:19 | 66:15 | 67:22 |
| **right-hand** [3] | | 20:23 |
| 21:4 | 21:6 | |
| **room** [7] 7:5 | | 7:10 |
| 19:3 | 30:11 | 30:12 |
| 33:22 | 33:25 | |
| **rooms** [2] 30:14 | | 30:16 |
| **roughly** [1] | | 45:23 |
| **routinely** [1] | | 25:3 |
| **ruptured** [3] | | 18:3 |
| 21:1 | 21:5 | |
| **Rx** [1] | 29:9 | |

-S-

| | | |
|---|---|---|
| **S** [7] | 1:17 | 28:20 |
| 30:23 | 31:2 | 36:6 |
| 69:4 | 69:24 | |
| **sad** [1] | 47:13 | |
| **safe** [1] | 19:10 | |
| **Saint** [1] | 6:13 | |
| **samples** [1] | | 29:24 |
| **Samuel** [1] 4:11 | | |
| **saw** [5] | 4:24 | 23:1 |
| 49:25 | 51:17 | 59:16 |
| **says** [22] | 18:6 | 18:7 |
| 19:4 | 20:9 | 20:12 |
| 21:3 | 21:7 | 27:25 |
| 28:4 | 28:14 | 28:18 |
| 28:24 | 29:8 | 37:4 |
| 39:14 | 39:23 | 44:11 |
| 44:23 | 46:10 | 49:20 |
| 50:23 | 63:22 | |
| **scapular** [2] | | 44:13 |
| 44:23 | | |
| **scheduled** [1] | | 33:10 |
| **school** [6] 5:17 | 5:19 | |
| 6:2 | 6:10 | 11:2 |
| 11:6 | | |
| **sciatica** [1] | | 29:12 |
| **second** [5] 43:19 | 44:11 | |
| 44:22 | 44:23 | 54:22 |
| **secondary** [1] | | 12:3 |
| **Secondly** [1] | | 13:15 |
| **see** [24] | 8:16 | 17:25 |
| 25:2 | 26:12 | 27:2 |
| 28:4 | 30:17 | 31:18 |
| 31:24 | 31:25 | 32:2 |
| 35:2 | 36:5 | 36:24 |
| 41:5 | 42:5 | 43:8 |
| 45:17 | 46:11 | 47:13 |
| 50:4 | 54:11 | 61:3 |
| 65:14 | | |
| **seeing** [4] 18:17 | 35:4 | |
| 51:15 | 62:18 | |
| **seem** [1] | 55:11 | |
| **self-apparent** [1] | | 57:9 |
| **send** [6] 33:20 | | 34:3 |
| 34:12 | 49:22 | 58:15 |
| 68:7 | | |
| **sense** [1] | 23:25 | |
| **sent** [1] | 25:12 | 34:4 |
| 34:17 | 34:19 | 34:25 |

| | | |
|---|---|---|
| 50:21 | 51:8 | 58:22 |
| 59:6 | 59:7 | |
| **separate** [2] | | 12:12 |
| 14:3 | | |
| **series** [1] | 3:10 | |
| **serious** [2] 31:12 | | 31:14 |
| **seriousness** [1] | | 35:10 |
| **Service** [1] 6:22 | | |
| **set** [4] | 46:5 | 46:6 |
| 56:15 | 69:22 | |
| **several** [10] | | 13:15 |
| 18:16 | 36:19 | 38:2 |
| 38:6 | 38:9 | 38:13 |
| 38:14 | 38:16 | 38:24 |
| **severity** [1] | | 49:5 |
| **sheet** [16] | 2:12 | 13:21 |
| 13:25 | 15:21 | 16:8 |
| 17:10 | 19:18 | 22:25 |
| 26:2 | 54:15 | 55:7 |
| 55:13 | 56:16 | 58:1 |
| 64:4 | 69:14 | |
| **sheets** [3] 13:18 | | 14:3 |
| 55:24 | | |
| **shorthand** [1] | | 44:16 |
| **show** [2] | 19:1 | 56:4 |
| **showed** [2] 45:13 | | 51:20 |
| **showing** [1] | | 14:20 |
| **shown** [2] 52:24 | | 61:24 |
| **shows** [3] | 51:24 | 59:8 |
| 62:2 | | |
| **sick** [1] | 24:25 | |
| **side** [1] | 41:3 | |
| **sign** [8] | 25:11 | 33:6 |
| 33:20 | 33:24 | 34:3 |
| 34:15 | 34:15 | 41:18 |
| **signature** [2] | | 30:1 |
| 40:11 | | |
| **signed** [3] 33:17 | | 34:7 |
| 34:25 | | |
| **sit** [4] | 48:10 | 52:11 |
| 56:14 | 61:11 | |
| **situation** [5] | | 12:15 |
| 25:5 | 32:23 | 56:2 |
| 60:12 | | |
| **six** [2] | 36:23 | 37:4 |
| **slash** [4] | 17:19 | 29:2 |
| 29:22 | 29:23 | |
| **slides** [1] 52:15 | | |
| **smoker** [1] 42:15 | | |
| **smoking** [6] | | 29:14 |
| 36:22 | 37:4 | 37:6 |
| 40:19 | 41:20 | |
| **social** [1] 29:13 | | |
| **SOCIETY** [1] | | 1:13 |
| **soldier** [1] 47:20 | | |
| **someone** [3] | | 20:5 |
| 25:4 | 25:19 | |
| **Sometime** [2] | | 9:18 |
| 39:11 | | |
| **sometimes** [9] | | 18:24 |
| 18:25 | 25:16 | 34:13 |
| 34:21 | 54:1 | 56:2 |
| 56:10 | 65:5 | |

| | | |
|---|---|---|
| **somewhere** [4] | | 25:11 |
| 25:22 | 45:21 | 56:21 |
| **sore** [2] | 25:1 | 36:20 |
| **sorry** [11] | 6:1 | 6:18 |
| 7:13 | 17:21 | 18:5 |
| 26:22 | 27:17 | 29:4 |
| 29:5 | 40:5 | 51:7 |
| **sort** [1] | 16:23 | |
| **source** [2] 53:15 | | 53:17 |
| **South** [2] | 1:21 | 4:1 |
| **space** [1] 36:22 | | |
| **spasm** [1] 29:18 | | |
| **speak** [2] | 14:4 | 32:24 |
| **speaking** [2] | | 12:13 |
| 23:23 | | |
| **specialist** [1] | | 40:9 |
| **specialty** [3] | | 5:7 |
| 41:23 | 58:12 | |
| **specific** [1] | | 38:5 |
| **specifically** [2] | | 9:6 |
| 10:20 | | |
| **specifics** [2] | | 9:25 |
| 26:10 | | |
| **specified** [2] | | 27:5 |
| 69:14 | | |
| **specimen** [1] | | 51:8 |
| **speculation** [2] | | 19:13 |
| 67:3 | | |
| **spell** [1] | 6:2 | |
| **spent** [1] | 7:3 | |
| **spoken** [1] 9:6 | | |
| **spread** [1] 53:17 | | |
| **squamous** [2] | | 26:4 |
| 48:19 | | |
| **SS** [1] | 69:1 | |
| **ST** [1] | 36:20 | |
| **staff** [11] | 18:15 | 18:16 |
| 19:18 | 19:19 | 54:23 |
| 55:3 | 55:8 | 55:14 |
| 55:15 | 64:12 | 64:17 |
| **stage** [1] | 50:8 | |
| **stages** [1] 50:6 | | |
| **stamp** [1] 28:4 | | |
| **stamped** [1] | | 28:3 |
| **stand** [1] | 37:14 | |
| **standard** [3] | | 15:14 |
| 15:15 | 16:24 | |
| **stands** [4] 28:20 | | 29:10 |
| 29:24 | 36:20 | |
| **start** [1] | 13:8 | |
| **started** [5] 7:6 | | 28:25 |
| 37:5 | 37:6 | 41:15 |
| **starting** [3] | | 5:17 |
| 11:6 | 35:6 | |
| **state** [2] | 22:8 | 54:12 |
| **statements** [1] | | 45:3 |
| **states** [2] | 1:1 | 7:14 |
| **stating** [2] 12:18 | | 12:22 |
| **Statistically** [1] | | 49:2 |
| **status** [1] | 13:22 | |

Multi-Page™

**waiting** [1] 19:3
**waiver** [1] 34:7
**WALLACE** [1]    1:24
**wanting** [2]    35:9
  35:17
**ways** [2]    38:9    38:13
**weeks** [8]    9:15    9:16
  36:19    38:3    38:6
  38:14    38:16    38:24
**weight** [6]    28:18    28:19
  36:5    36:23    37:5
  37:6
**WHEREOF** [1]    69:22
**wherever** [1]    24:13
**White** [2]    4:11    16:20
**wide** [1]    50:11
**wife** [7]    26:1    26:14
  27:8    31:8    35:10
  64:3    64:19
**wife's** [1]    18:19
**William** [1]    4:11
**window** [2]    22:20
  65:3
**within** [1]    69:5
**without** [3]    37:11
  51:15    58:6
**witness** [7]    2:1
  3:2    6:8    55:15
  69:9    69:21    69:22
**wonder** [1] 18:17
**word** [2]    39:4    49:8
**words** [1]    14:17
**worked** [2] 7:5    65:9
**workup** [1]    41:15
**worry** [1]    49:3
**write** [1]    23:5
**writing** [20]    4:24
  18:1    18:4    18:11
  18:13    18:15    18:18
  18:19    19:5    19:21
  19:22    19:25    20:14
  20:22    20:24    20:25
  21:1    21:2    21:11
  36:16
**written** [17]    10:14
  12:25    13:13    14:4
  15:11    18:3    20:7
  21:25    22:25    26:12
  27:2    27:5    27:6
  27:9    36:18    54:22
  58:4
**wrote** [4]    20:6    20:7
  21:10    65:14

---

**-X-**

---

**x-ray** [3]    41:16    42:5
  42:6

---

**-Y-**

---

**year** [6]    5:23    6:14
  7:17    7:19    13:16
  65:10
**years** [14]    5:13    5:13

6:22    7:9    7:20
11:10    29:14    45:15
60:25    60:25    61:1
61:1    61:2    67:23
**yet** [1]    67:10
**York** [1]    5:21
**yourself** [3]    50:3
  51:16    60:11

DATE 4-30-48    A

WHITE, BRIG...  ...RAMER & CHARLESWORTH MEDICA...  ...IATES

| PATIENT"S NAME | MARITAL STATUS S (M) W D SEP | BIRTHDATE | SOCIAL SECURITY NO. |
|---|---|---|---|

Tommy Bob Hall II          5-12-55    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

| STREET ADDRESS, CITY, STATE, & ZIP. CODE | HOME PHONE | INSURANCE |
|---|---|---|

517 Mt Pleasant Rd Fayetteville Pa 17222  717-352-9030  BLUESHIELD BLUECROSS

PATIENT"S EMPLOYER          OCCUPATION          WORK PHONE.

CRESSLER TRUCKING Inc    TRUCK DRIVER

NEXT OF KIN:                    ALLERGIES
Nancy M. Hall              NONE

| | YES | NO | | YES | NO | |
|---|---|---|---|---|---|---|
| CARDIAC DISEASE | | ✓ | LIVER DISEASE | | ✓ | PAP |
| DIABETES | | ✓ | STOMACH DISEASE | | ✓ | |
| SEIZURES | | ✓ | LUNG DISEASE | | ✓ | MAMMOGRAM |
| THYROID DISEASE | | ✓ | HYPERTENSION | | ✓ | |
| KIDNEY DISEASE | | ✓ | ALCOHOL | | ✓ | RECTAL |
| ANEMIA | | ✓ | CIGARETTES | ✓ | | PNEUMOVAX |
| | | | | | | TETANUS |

| DATE | MEDICAL PROBLEMS | DATE | HOSPITALIZATIONS/SURGERY |
|---|---|---|---|
| | 1. CANCEROUS MOLE - REMOVED | 96 | Dr. Dothry |
| | 2. BACK SURGERY | 12-89 | Dr. Lady   Ruptured Disk  Lg. Si ?4-5 |
| | 3. BACK SURGERY | 1-93 | Dr. Lady   Bulging Disk |
| | 4. Diverticulous | | |
| | 5. | | |
| | 6. | | |
| | 7. | | |

| DATE | MEDICATION | PHARMACY | PHONE: |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

P0905

EXHIBIT
Charlesworth- 1
-9-02    BS

EXHIBIT
Charlesworth-2
1-9-02    PS

PHYSICIAN PROGRESS NOTES

Tommy B. Wall

| Date | |
|------|--|
| APR 30 1998 | WT - 201         BP- 130/78 Lt |

S - c/o pain in Lt leg (calf)

Pushing pickup truck on flat ground to get it started to roll + stops then "thirty horse" but pain has not eased + very tight / stiff (L) calf. Tried Key Het, no other Rx

NKA        Meds: none

P. med hx: lumbar disk surgery x 2 c bilat junction pre op
? melanoma removed forehead 1996

soc hx: truck driver x 4 yrs, smoking 1/2 PPD

O:    (+) spasm    c mild    tenderness    (L) calf
strength intact    N-V intact

A:    muscle strain (L) calf

P:    stretching / rest / Motrin OTC pm
Skelaxin 750 · 0 b

---

| 12-11-98 | WT - 209         BP- 130/74 Rt |

S - c/o lump on inside of throat

lump (L) lower neck of throat x several months
(−) IT (−) wt SN. (−) cough (−) chest complaints
no other new symp.    (Quit smoking x 6 mos, not s mos, started)

O:    Firm nodule ~ 1.5 cm (L) hypopharynx to other LN
bgr cm    sub chin (lymph node)    Dx - ? p/o

A:    ? nodule    P: ✓ CBC, BMP, LFTS, CXR
Rec trough if not gone

P0906

4260

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


NANCY HALL, INDIVIDUALLY AND : CIVIL ACTION - LAW
AS THE REPRESENTATIVE AND    :
ADMINISTRATRIX OF THE ESTATE :
OF TOMMY HALL, DECEASED, HER :
HUSBAND,                     :
        PLAINTIFF           :
                      :
        V           : 1:01-CV-1265
                      :
CUNA MUTUAL GROUP, CUNA      :
MUTUAL INSURANCE SOCIETY,    :
        DEFENDANTS          : JUDGE SYLVIA H. RAMBO


DEPOSITION OF:   JAMES M. CHICKLO, M.D.

TAKEN BY:        DEFENDANTS

BEFORE:          PAMELA S. SULLIVAN,
                 REPORTER-NOTARY PUBLIC

DATE:            JANUARY 9, 2002, 1:04 P.M.

PLACE:           OFFICE JAMES M. CHICKLO, M.D.
                 1039 WAYNE AVENUE
                 CHAMBERSBURG, PENNSYLVANIA

APPEARANCES:

   McNEES WALLACE & NURICK, LLC
   BY:  MICHAEL R. KELLEY, ESQUIRE

       FOR - DEFENDANTS

   PEDERSEN & PEDERSEN
   BY:  STEPHEN R. PEDERSEN, ESQUIRE
       CATHERINE M. MAHADY-SMITH,  ESQUIRE

       FOR - PLAINTIFF



HAEN
Reporting Service, Inc.

Hughes
Albright
Foltz
Natale



Page 2

WITNESS
NAME                              EXAMINATION
JAMES M. CHICKLO, M.D.
    BY:  MR. KELLEY                    3, 38
    BY:  MR. PEDERSEN                  29, 41


                    EXHIBIT
CHICKLO EXHIBIT NO.              PRODUCED & MARKED
1 - MINOR HISTORY AND PHYSICAL EXAMINATION
DATED 1-22-99, TWO PAGES          18

---

Page 4

1 at the conclusion of my questions.
2     A  Okay.
3     Q  First, what I would like to do is just get a
4 little bit of background information on you.  Do you have a
5 current curriculum vitae or a professional resume?
6     A  I might.  Yeah, I think I do.  I think we have
7 one back there.  I could get it for you.
8     Q  That would be helpful.  And in the meantime,
9 we'll go through at least a few of these questions.  But I
10 have a feeling that much of this will be contained on your
11 curriculum vitae.
12     A  Okay.
13     Q  First of all, give us your full name, Doctor.
14     A  James Michael Chicklo, C-H-I-C-K-L-O.
15     Q  And your business address here?
16     A  1039 Wayne Avenue, Chambersburg.
17     Q  And is there a name to your practice?
18     A  Same name.  James M. Chicklo, M.D., P.C.
19     Q  Are you in practice with any other physicians?
20     A  Not currently, no.
21     Q  How long have you been in practice under your
22 current name?
23     A  Twenty-seven years.
24     Q  Do you have a particular medical specialty?
25     A  Inner ear, nose and throat.

---

Page 3

1        JAMES M. CHICKLO, M.D., called as a witness,
2 being duly sworn, testified as follows:
3                EXAMINATION
4 BY MR. KELLEY:
5     Q  Doctor, good afternoon.  My name is Mike Kelley.
6 I'm a lawyer from Harrisburg.  I represent CUNA Mutual
7 Insurance Company in a case that's been filed against CUNA
8 by Nancy Hall and the estate of Tommy Hall.  We're here
9 today to ask you some questions regarding your treatment of
10 Mr. Hall.
11        If at any time during the course of the
12 deposition you don't understand any of the questions that
13 are asked, please let us know and we'll try to rephrase it.
14 Fair enough?
15     A  Sure.
16     Q  If at any time during the deposition you need a
17 break, let us know and, of course, we'll accommodate you for
18 that.  I anticipate that my questioning will take about an
19 hour to an hour and a half.  And when I'm done -- I don't
20 know if it's --
21        MS. MAHADY-SMITH:  Steve.
22        MR. PEDERSEN:  I will be asking some follow-up
23 questions.
24 BY MR. KELLEY:
25     Q  Mr. Pedersen may have some questions for you then

---

Page 5

1     Q  Have you practiced that specialty for all 27
2 years that you've been practicing under this name?
3     A  Yes, um-hum.
4     Q  Doctor, can you describe for us your formal
5 education after high school?
6     A  I went to the University of Virginia
7 undergraduate and University of Virginia Medical School.  I
8 was at the University of Kentucky for an internship and two
9 years of residency.  And I was in the service, the Air
10 Force, as a base surgeon for two years and then three years
11 as an ear, nose and throat resident at the University of
12 Kentucky -- at the University of West Virginia, West
13 Virginia University.
14     Q  What year did you graduate from the medical
15 school in Virginia?
16     A  '59.
17     Q  And when did you complete your residency?
18     A  No, wait a minute.  '59, yeah.  No, '63.  I'm
19 sorry, '63 from medical school.  The undergraduate is '59.
20     Q  When did you complete your residency in ear, nose
21 and throat?
22     A  '72.
23     Q  And that was at West Virginia?
24     A  West Virginia.
25     Q  I'm sorry.  And after your residency, you were in

---



**Multi-Page™**                    **JAMES M. CHICKLO, M.D.**
**JANUARY 9, 2002**

Page 10

1    A  I hope it's the same.
2    Q  But if you would, just so we can mark this for
3  the record.
4    A  That's it right there.  You just passed it.
5  That's it.
6    Q  Okay, that's been marked in a previous
7  deposition, I believe, as Charlesworth -- what number is
8  that, Doctor, at the top there?
9    A  Three.
10    Q  Charlesworth 3.  So that's a form that you had
11  created yourself?
12    A  Um-hum.  Most specialists have their own forms
13  that they use.
14    Q  Other than that form, are there any other either
15  forms or written guidelines or procedures that you use in
16  the creation or maintenance of medical records?
17    A  No.
18    Q  Now, you mentioned that your staff will sometimes
19  put information onto these records.  Is that right?
20    A  Yeah, that's whose writing is on here for the
21  most part except mine.
22    Q  Well, let's go over this document while we've got
23  it.  You've got your original there.  Is that right, Doctor?
24    A  Um-hum.
25    Q  Charlesworth 3 at the top says, January 15 of

Page 11

1  1999.  Is that right?
2    A  Yep, January 15th.
3    Q  Is that the first time then that you would have
4  seen Mr. Hall?
5    A  Exactly, this is an initial sheet, when we saw a
6  patient for the first time.  This is how I know when they're
7  first seen.
8    Q  And this a two-page document, isn't it?
9    A  Yes, um-hum.
10    Q  And on the first page, it has C; slash, O at the
11  top?
12    A  Complaint, yeah.  And HPI is history of present
13  illness.
14    Q  And then PMH?
15    A  Past medical history.
16    Q  And then it has information for family history
17  and your physical examination as well as other information.
18  Correct?
19    A  Yes, whether they smoke or have had any trauma
20  that type of thing.
21    Q  And, obviously, this is for Tommy Hall.  It has
22  his patient name at the top.  Correct?
23    A  Um-hum.
24    Q  Now, what was the purpose as you understood it
25  that you were seeing Mr. Hall for beginning on January 15 of

Page 12

1  1999?
2    A  He was referred because he had a lump on his left
3  side of his neck and it had increased in size over the
4  previous four weeks that he had it, I guess.
5    Q  And you mentioned that some of the writing on
6  here is from your staff?
7    A  My secretary, um-hum.
8    Q  Your secretary.  Which writing is your
9  secretary's?
10    A  The top line.
11    Q  Where it says CO, the very top line there?
12    A  Yes, um-hum.  And medications, the surgery that
13  he had had.
14    Q  This is -- now you're under the patient medical
15  history?
16    A  Under surgery, yeah.  Except where it says on
17  back, that's mine.
18    Q  So focusing on that part that says surgery, it
19  says spinal -- what's that abbreviation?
20    A  Surgery times two.  He must have had back
21  surgery.
22    Q  And 1989 and --
23    A  '89 and '93.
24    Q  And then where it says mole; slash, CA --
25    A  Right.

Page 13

1    Q  -- do you have an understanding of what that
2  means?
3    A  That says a cancerous mole excised in 1993.
4  That's -- my secretary wrote that.
5    Q  And did you circle the '93 or was that her, your
6  secretary?
7    A  Probably, I did.  And I put to find that on the
8  back.
9    Q  And it mentions Guthrie there?
10    A  Dr. Guthrie, yes.
11    Q  Is that your writing?
12    A  That's the secretary's writing.
13    Q  Who's your secretary that was writing this back
14  in January of --
15    A  Paula Statler.  She's here.
16    Q  Is she still with you?
17    A  Um-hum.
18    Q  Can you spell her last name?
19    A  S-T-A-T-L-E-R.  And the other thing she wrote was
20  the anemia, the lack of bleeding tendencies and his habits,
21  that he smoked.
22    Q  Is any -- other than on back --
23    A  The nasal trauma is mine.  And all the rest is
24  mine, all the exam.
25    Q  I'm sorry.  The nasal trauma, where is that?



Multi-Page™

JAMES M. CHICKLO, M.D.
JANUARY 9, 2002

Page 18

1 it was a malignant mole, you still had to do a biopsy. If
2 it wasn't a malignant mole, it was in an area that was
3 growing that should be biopsied. So I didn't request that,
4 his records. I don't have that I did anyway.
5    Q Doctor, is it okay if I sit this up there?
6    A Go right ahead.
7    Q The next document I want to call your attention
8 to, Doctor -- and maybe you've got it there in your original
9 records -- is at the top it says, Minor history and physical
10 examination, dated January 22, '99.
11    A Yeah, pre-op. Yes, okay.
12        MR. KELLEY: Let's mark that as Chicklo 1.
13        (Minor history and physical examination dated
14 1-22-99, two pages, produced and marked Chicklo Exhibit No.
15 1.)
16 BY MR. KELLEY:
17    Q Doctor, you've got that record in front of you.
18 Is that right?
19    A Um-hum.
20    Q First of all, how was this record prepared?
21    A Dictated from this sheet in the office. It's
22 dictated from this.
23    Q So you dictate that based upon --
24    A Based on what I have written.
25    Q -- the January 15, '99 intake form?

Page 19

1    A Exactly.
2    Q And then do you also include additional
3 information if you are --
4    A If I have any, yes. If the lab tests are
5 abnormal or something like that.
6    Q So you would dictate this document, and it would
7 be typed up by your secretary. Is that right?
8    A The hospital types these up.
9    Q Oh, the hospital types it up. Do you then review
10 it to make sure it's accurate?
11    A Yeah. Within reasonable limits, I look it over.
12 I don't study it like you guys do documents. You have to
13 have -- this is a part of the standard. When you do any
14 procedure in the hospital, you have to have a history and
15 physical, preferably typed rather than written.
16    Q And the personal history here, focusing on that
17 for a moment, mentions that he had a malignant mole excised
18 in 1993 on his back?
19    A On his back, that's right. That's based on this
20 history here, my history.
21    Q So there's -- you have the information that was
22 in the intake form, and then you also discussed his history
23 with the patient. Correct?
24    A Right, initially.
25    Q And then based upon that information, you made a

Page 20

1 notation, you dictated in this particular medical record
2 that he had had a malignant mole excised in 1993 on his
3 back?
4    A Right, right. And my working diagnosis said,
5 Left cervical node. Because you can't presume to make a
6 diagnosis until you get the, you know, report.
7    Q Now, it says, History of present illness. The
8 patient complained of a lump in the left neck for about five
9 weeks.
10    A Yep.
11    Q Is that right?
12    A Yes.
13    Q Would that information have come from the patient
14 himself?
15    A Yes. That's what he said initially, that it
16 increased, he had this node that increased in size.
17    Q Doctor, do you recall the patient being unsure
18 about him having had this malignant mole excised back in
19 1993?
20    A It's hard for me to say, you know, that the
21 patient is absolutely sure that he has anything. I mean, he
22 was concerned that he had this node. I'm sure he was
23 concerned that he had some surgery before. I can't remember
24 whether he thought it was a malignancy or not. I cannot say
25 either way for that. I mean, that's a history he gave to

Page 21

1 Paula. And I'd have to take him at his word if he was aware
2 of that diagnosis. I don't know.
3    Q My question really is a different one. It is, Do
4 you recall as you sit here today having him expressing any
5 uncertainty to you? For instance saying, You know, Doc, I
6 may have had this -- I had this mole excised in 1993. I
7 can't remember whether it was malignant or not.
8        MR. PEDERSEN: Objection, asked and answered.
9 BY MR. KELLEY:
10    Q Go ahead. You can answer that, Doctor.
11    A I hate to say for sure, but my recollection -- I
12 mean, I see thousands of patients. He might have -- he may
13 have been concerned. But I'm not sure that he was certain,
14 you know, he had a problem. I think he was concerned
15 though. He was concerned over this node. As I remember, I
16 think he was worried about it.
17    Q Worried about the node on his neck?
18    A Yes, yes. But I don't -- I can't remember
19 anything else about it for sure.
20    Q If he had expressed uncertainty to you about his
21 previous medical condition, would you have noted that in the
22 record?
23    A Probably. Yeah, probably.
24    Q How many times did you actually see Mr. Hall?
25    A One, two times -- three times. His initial


Page 26

1    A  If -- yeah, if it was critical to the patient
2  care. I mean, if it was a wrong diagnosis or something he
3  had come up with, then I would, yes.
4    Q  Did you ever have any conversations with Dr.
5  Chicklo to find out how he --
6       MR. PEDERSEN: You mean Cashdollar.
7  BY MR. KELLEY:
8    Q  Excuse me, I meant Dr. Cashdollar -- to find out
9  what pathology he was referring to back in 1993?
10   A  No, I didn't.
11   Q  Did you ever have any conversations with him to
12  find out how he was aware of what you were aware of with
13  regard to that '93 dermal lesion?
14   A  No, I don't know if he got that from the patient
15  or from my records.
16   Q  Now, in the middle of that first page where it
17  says PMH -- I presume that means past medical history?
18   A  Past medical history, yes.
19   Q  It says, It's most notable for the malignant
20  melanoma. Surgical resection in 1993. Do you know if Dr.
21  Cashdollar is simply taking that information from your
22  records or if that's --
23   A  I don't know.
24   Q  Or if that's his own --
25   A  I don't know. Yeah, I really don't.

Page 27

1    Q  Do you know Dr. Charlesworth?
2    A  Um-hum.
3    Q  I see he's copied on this letter as well, the
4  second page.
5    A  Yes.
6    Q  Did you ever have any conversations with
7  Dr. Charlesworth about Mr. Hall's treatment?
8    A  You know, I don't think I have. I really don't
9  think I have.
10   Q  Do you know Dr. Enders?
11   A  Yes.
12   Q  I see he's also copied on this letter. Do you
13  see that?
14   A  Yes.
15   Q  Have you ever had --
16   A  Because of the anemia problem. Not in regard to
17  this case, I haven't, no, that I can remember anyway.
18   Q  At some point in time then, Doctor, did you refer
19  Tommy Hall to another physician?
20   A  I referred him to Dr. Cashdollar.
21   Q  For what reason did you refer him to Dr.
22  Cashdollar?
23   A  Because he's an oncologist, and they treat this
24  cancer of this type.
25   Q  Other than this correspondence from Dr.

Page 28

1  Cashdollar that we just talked about, did you receive any
2  other written correspondence or written communication from
3  Dr. Cashdollar concerning his care and treatment?
4    A  I don't believe so. If it's on the record, then
5  I did. Otherwise, I wouldn't have talked to him about that.
6    Q  Did you have any -- I'm sorry if I already asked
7  this. Did you have any oral conversations, any phone
8  conversations or any in person conversations with Dr.
9  Cashdollar?
10   A  No. I can't remember any, you know.
11   Q  Would you have had any reason, Doctor, to
12  actually see the medical intake information that Cashdollar
13  undertook when he first met with Tommy Hall?
14   A  No. I did receive some information from the NIH.
15  But I don't know if that was from you guys stimulating that
16  or -- something August 17th that was sent to me of his
17  original or some path report. I don't know where that came
18  from.
19   Q  August 17 of what year?
20   A  '99. It said that some specimens were submitted
21  to someplace -- NIH?
22   Q  Is that the one referring to the '93 specimen?
23   A  Yeah. It says, Specimen. Somebody sent that.
24  I'm not sure who had sent that.
25   Q  Did you ever see the result of that analysis?

Page 29

1    A  I saw this, but I don't know if I have a result
2  of that or not. No, I don't think I have that result.
3    Q  Doctor, do you have any records that you would
4  simply provide to the patient upon their arrival for them to
5  fill out?
6    A  No. We take our histories ourselves. They don't
7  fill those out. Some offices do that.
8    Q  Doctor, have you ever seen a pathology report
9  with regard to any mole that was removed back in 1993
10  regarding Mr. Hall?
11   A  No.
12      MR. KELLEY: Okay, that's all the questions I
13  have for you. Mr. Pedersen may have more. Thank you,
14  Doctor.
15      THE WITNESS: You're welcome.
16          EXAMINATION
17  BY MR. PEDERSEN:
18   Q  Dr. Chicklo, now it's my turn to ask a few
19  questions. Most of these are follow-up questions from what
20  you've already heard.
21      What I'd like to do is first of all set in
22  reference the time period that you saw Mr. Hall. The first
23  time that you saw him was in January of '99?
24   A  January, yes.
25   Q  Do you have any information from any records that

Page 34

1    Q  And, again, that doesn't tell us anything about
2 what Tommy Bob Hall knew in November of '98, does it?
3    A  No.
4    Q  You reference in that sheet that a lump had been
5 present for five weeks, and I believe you testified that it
6 had increased in size over a four-week period.  Is that
7 correct?
8    A  Yeah.
9    Q  Well, if we date back from the 15th, that would
10 put it about the end of November or beginning of December
11 when the lump would have first appeared.  Isn't that
12 correct?
13    A  Yes, sir.
14    Q  Did I understand your testimony to be correct
15 that when Tommy Bob Hall saw you, you were not concerned
16 with the history of that mole, whether it was malignant or
17 not, because you were aware there was a mole and you were
18 treating the cervical node.  Is that correct?
19    A  Exactly.
20    Q  Because whether it was malignant or not did not
21 affect how you were going to care for Mr. Hall?
22    A  No, it still needed a biopsy.
23    Q  Can you explain from a medical perspective the
24 relationship between a mole and the cervical node that you
25 observed in Tommy Bob Hall?

Page 35

1    A  Well, the node is under the skin.  A mole
2 generally is on the skin surface.  You can see it whether
3 it's colored or discolored.  The neck node was just a firm
4 mass, and you don't have any idea where that's from.  That
5 could have come from anything.  It could have been any type
6 of tumor or growth.
7       I mean, the fact that he had a melanoma excised
8 in the past -- if it was a melanoma.  In retrospect, it was.
9 But anytime somebody has some skin lesion near where you
10 are, that puts your antenna up to think about that and maybe
11 warn the pathologist when the path is coming that you
12 suspect it could be this or he had a history of having a
13 mole.  Whether it's benign or malignant, you would probably
14 mention that to them.
15    Q  The primary site is -- has to be something other
16 than the lump in the neck.  Is that correct?
17    A  Generally, yes.  That's why I see people because
18 I look at their nodes and throat.  And, statistically, it
19 comes from in here if it's not lung or kidney.  But mostly
20 in this area, about 80 percent of them.  So you scope them,
21 and you look at them in the office like I did.  And I didn't
22 see any other areas involved.
23    Q  So when you were involved with the history and
24 the caring for Mr. Hall and you heard that he had had a mole
25 whether it was malignant or not and now you feel a node, in

Page 36

1 your mind, were you making a relationship between the two?
2    A  Yes.
3    Q  And you would have made the same relationship
4 whether he reported it as malignant, benign -- because of
5 that mole?
6    A  Yes, I still would have been suspicious.
7    Q  Did you also indicate in your direct testimony
8 that you cannot presume to make a diagnosis without getting
9 a report?
10    A  Yes.  You have to get a -- you have to have a
11 report.
12    Q  And you're referring to a path report,
13 pathological finding?
14    A  Yes, sir.
15    Q  Why can't you presume to make a diagnosis from
16 simply taking a history?
17    A  Because sometimes -- not all lumps are cancer.
18 They're referred to as tumors, which means swelling.  Cancer
19 is a specific type of swelling, and there are different
20 types of cancer which require different treatments.
21 Melanoma requires a different treatment than lymphoma does.
22    MR. PEDERSEN:  Just a minute.
23    (Discussion held off the record.)
24 BY MR. PEDERSEN:
25    Q  Are you aware of whether or not if there is a

Page 37

1 diagnosis of cancer or a tumor that there is a registry
2 where that diagnosis has to be made?
3    A  Yes.
4    Q  Can you describe that registry for us?
5    A  The hospital records all the cancers that are
6 treated in this area.  And I believe it's in York, they
7 record them.  And then they're all registered for this area.
8 They have the statistics dating back for a number of years,
9 the different types of cancer and where they originate, what
10 part of the body.
11    Q  We've taken Dr. Hurley's deposition under oath.
12 And I know you have not read that deposition.  Isn't that
13 correct?
14    A  I haven't talked to any of the other doctors.
15    Q  Assuming Dr. Hurley said in his deposition that
16 the -- he got a pathology report, the '93 report that you
17 have seen.  And he reported to the patient that the mole was
18 benign.  Do you have anything to refute or dispute --
19    MR. KELLEY:  Object to the form.
20 BY MR. PEDERSEN:
21    Q  -- that he would report to the patient that?
22    MR. KELLEY:  You can answer.
23    THE WITNESS:  I don't.  I don't, no.
24 BY MR. PEDERSEN:
25    Q  In fact, if you had gotten that pathology report,

Page 42

1    A  No, it's not.
2       MR. PEDERSEN:  Okay, I don't have any other
3  questions.
4       MR. KELLEY:  That's it.  Thank you, Doctor.
5       (Whereupon, the deposition was concluded at 2:02
6  p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 43

1  COUNTY OF DAUPHIN      :
                          SS
2  COMMONWEALTH OF PENNSYLVANIA :
3
4       I, Pamela S. Sullivan, a Notary Public, authorized to
5  administer oaths within and for the Commonwealth of
6  Pennsylvania, do hereby certify that the foregoing is the
7  testimony of James M. Chicklo, M.D.
8       I further certify that before the taking of said
9  deposition, the witness was duly sworn; that the questions
10  and answers were taken down stenographically by the said
11  Reporter-Notary Public, and afterwards reduced to
12  typewriting under the direction of the said Reporter.
13       I further certify that the said deposition was taken
14  at the time and place specified in the caption sheet hereof.
15       I further certify that I am not a relative or employee
16  or attorney or counsel to any of the parties, or a relative
17  or employee of such attorney of counsel, or financially
18  interested directly or indirectly in this action.
19       I further certify that the said deposition
20  constitutes a true record of the testimony given by the said
21  witness.
22       IN WITNESS WHEREOF, I have hereunto set my hand this
23  9th day of January, 2002.
24          Pamela S. Sullivan
25             Reporter-Notary Public

COUNTY OF DAUPHIN                    :
                                      SS
COMMONWEALTH OF PENNSYLVANIA    :


    I, Pamela S. Sullivan, a Notary Public, authorized to administer oaths within and for the Commonwealth of Pennsylvania, do hereby certify that the foregoing is the testimony of James M. Chicklo, M.D.

    I further certify that before the taking of said deposition, the witness was duly sworn; that the questions and answers were taken down stenographically by the said Reporter-Notary Public, and afterwards reduced to typewriting under the direction of the said Reporter.

    I further certify that the said deposition was taken at the time and place specified in the caption sheet hereof.

    I further certify that I am not a relative or employee or attorney or counsel to any of the parties, or a relative or employee of such attorney of counsel, or financially interested directly or indirectly in this action.

    I further certify that the said deposition constitutes a true record of the testimony given by the said witness.

    IN WITNESS WHEREOF, I have hereunto set my hand this 9th day of January, 2002.

NOTARIAL SEAL
PAMELA S. SULLIVAN, Notary Public
Swatara Twp., Dauphin County
My Commission Expires Jan. 31, 2005

Pamela S. Sullivan
Reporter-Notary Public

**-'-**

'59 [3]         5:16         5:18
5:19
'63 [2]         5:18         5:19
'72 [1]         5:22
'88 [1]         23:9
'89 [1]         12:23
'93 [17]        12:23        13:5
17:14           25:16        26:13
28:22           30:25        31:3
31:18           31:18        32:10
33:1            33:8         37:16
39:23           41:7         41:18
'98 [8]         23:9         23:16
30:2            30:3         30:6
30:9            30:10        34:2
'99 [11]        18:10        18:25
22:4            28:20        29:23
32:9            32:13        32:16
32:25           33:6         33:25

**-1-**

1 [3]           2:12         18:12
18:15
1-22-99 [2]                  2:12
18:14
1-28 [1]        22:3
10 [2]          8:11         8:12
1039 [2]        1:21         4:16
15 [3]          10:25        11:25
18:25
15th [4]        11:2         23:2
33:25           34:9
17 [3]          22:19        23:1
28:19
17th [2]        23:3         28:16
18 [2]          2:12         8:13
1988 [2]        23:12        23:15
1989 [1]        12:22
1993 [17]       13:3         15:22
19:18           20:2         20:19
21:6            22:15        24:8
24:16           26:9         26:20
29:9            38:22        38:25
39:8            39:11        40:18
1998 [4]        23:12        38:17
39:1            39:9
1999 [5]        11:1         12:1
22:19           38:18        38:21
1:01-CV-1265 [1]  1:10
1:04 [1]        1:19

**-2-**

2002 [3]        1:19         43:23
22 [1]          18:10
27 [2]          5:1          15:1
29 [1]          2:5
2:02 [1]        42:5

**-3-**

3 [3]           2:4          10:10
10:25
38 [1]          2:4

**-4-**

4 [1]           22:25
41 [1]          2:5

**-8-**

80 [1]          35:20

**-9-**

9 [1]           1:19
9th [1]         43:23

**-A-**

abbreviation [1]             12:19
ability [1]     15:2
able [1]        41:4
abnormal [3]                 19:5
31:15           31:16
absolutely [2]               20:21
40:7
accommodate [1]              3:17
accurate [8]                 9:7
14:23           19:10        30:10
40:3            40:13        40:14
41:16
act [1]         31:16
action [2]      1:3          43:18
add [1]         38:4
addition [1]                 15:20
additional [1]               19:2
address [1]4:15
administer [1]               43:5
ADMINISTRATRIX [1]
1:5
adult [1]       8:11
affect [1]      34:21
afternoon [1]                3:5
afterwards [1]               43:11
again [2]       34:1         39:6
against [1]3:7
age [1]         8:13
ago [2]         7:11         7:12
agree [3]       32:24        40:2
40:5
ahead [5]       18:6         21:10
32:14           39:5         39:13
Air [2]         5:9          6:4
analysis [1]                 28:25
anemia [2]      13:20        27:16
answer [6]      21:10        30:12
37:22           39:5         39:13
41:10
answered [1]                 21:8
answers [1]                  43:10
antenna [1]                  35:10
anticipate [1]               3:18

anytime [1]                  35:9
anyway [2]                   18:4
27:17
APPEARANCES [1]
1:23
appeared [1]                 34:11
area [4]        18:2         35:20
37:6            37:7
areas [1]       35:22
Army [1]        6:3
arrival [1]     29:4
assume [2]16:16
assumes [1]                  39:10
Assuming [1]                 37:15
attempt [1]30:8
attention [2]                18:7
22:17
attorney [2]                 43:16
43:17
August [2] 28:16             28:19
authorized [1]               43:4
available [1]                25:14
Avenue [2]                   1:21
4:16
aware [17]      21:1         24:7
24:11           25:5         25:7
26:12           26:12        30:15
33:7            34:17        36:25
38:25           39:1         39:8
39:8            39:11        41:7
away [1]        41:5

**-B-**

background [1]               4:4
base [2]        5:10         17:8
based [5]       18:23        18:24
19:19           19:25        38:4
basement [1]                 8:16
became [1]41:7
began [1]       41:8
beginning [2]                11:25
34:10
benign [5] 32:17             35:13
36:4            37:18        38:2
between [2]                  34:24
36:1
biopsied [1]                 18:3
biopsy [2] 18:1              34:22
bit [1]         4:4
bleeding [1]                 13:20
board [6]       6:2          6:9
6:11            6:12         6:13
6:14
Bob [10]        30:5         30:9
30:22           32:1         33:11
34:2            34:15        34:25
41:5            41:6
body [1]        37:10
break [1]       3:17
brief [1]       41:3
briefly [1] 8:3

business [1]                 4:15

**-C-**

C [1]           11:10
C-H-I-C-K-L-O [1]4:14
CA [1]          12:24
cancer [14] 15:21            22:11
27:24           30:9         30:15
31:11           32:7         33:14
36:17           36:18        36:20
37:1            37:9         40:6
cancerous [13]               13:3
16:15           17:6         17:13
31:19           31:21        33:8
38:22           38:25        39:8
39:23           40:17        41:8
cancers [1]37:5
cannot [3] 20:24             36:8
38:7
caption [1]43:14
care [3]        26:2         28:3
34:21
cared [2]       33:10        33:11
caring [1]      35:24
case [8]        3:7          7:9
7:18            7:19         8:2
16:14           24:24        27:17
Cashdollar [14]              22:20
23:5            24:16        24:19
26:6            26:8         26:21
27:20           27:22        28:1
28:3            28:9         28:12
41:23
Cashdollar's [3]             23:13
25:2            41:14
CATHERINE [1]                1:29
center [3]      6:20         6:21
6:22
certain [1] 21:13
certainly [2]                40:11
41:18
certifications [1]           6:14
certified [2]                6:9
6:13
certify [5] 43:6             43:8
43:13           43:15        43:19
cervical [3]                 20:5
34:18           34:24
Chambersburg [4]             1:22
4:16            6:19         6:24
Charlesworth [6]             10:7
10:10           10:25        22:25
27:1            27:7
Charlesworth's [1] 39:15
chemotherapy [1] 22:7
Chicklo [12]                 1:15
1:20            2:3          2:11
3:1             4:14         4:18
18:12           18:14        26:5
29:18           43:7
children's [1]               8:12
circle [1]      13:5
circled [1] 15:23

**Force** [2]    5:10    6:4
**foregoing** [1]    43:6
**form** [15]    9:14    9:17
  10:10    10:14    14:4
  15:13    18:25    19:22
  30:12    31:5    31:20
  32:14    37:19    39:2
  41:10
**formal** [1] 5:4
**forms** [2]    10:12    10:15
**fortunate** [1]    41:4
**four** [1]    12:4
**four-week** [1]    34:6
**front** [2]    18:17    31:17
**full** [1]    4:13

**-G-**

**general** [4] 6:3    6:10
  7:25    25:24
**generally** [2]    35:2
  35:17
**given** [1]    43:20
**good** [3]    3:5    9:2
  15:3
**goodness** [1]    16:18
**graduate** [1]    5:14
**GROUP** [1]    1:12
**growing** [1]    18:3
**growth** [1] 35:6
**guess** [7]    12:4    14:2
  16:14    25:9    32:22
  39:14    41:21
**guidelines** [1]    10:15
**Guthrie** [3]    13:9
  13:10    15:22
**guys** [2]    19:12    28:15

**-H-**

**H** [1]    1:14
**habits** [1]    13:20
**half** [1]    3:19
**Hall** [34]    1:3    1:6
  3:8    3:8    3:10
  7:8    7:8    7:23
  11:4    11:21    11:25
  15:9    16:1    21:24
  24:7    27:19    28:13
  29:10    29:22    30:5
  30:9    30:22    32:1
  33:12    33:18    33:18
  34:2    34:15    34:21
  34:25    35:24    39:22
  41:5    41:6
**Hall's** [2]    17:23    27:7
  30:1    38:16
**hand** [1]    43:22
**hard** [1]    20:20
**Harrisburg** [1]    3:6
**hate** [1]    21:11
**Health** [1]    6:25
**heard** [2]    29:20    35:24
**held** [1]    36:23

**helpful** [1] 4:8
**hereby** [1]    43:6
**hereof** [1]    43:14
**hereunto** [1]    43:22
**high** [1]    5:5
**himself** [3] 15:7    15:10
  20:14
**histories** [2]    29:6
  40:12
**history** [31]    2:12
  11:12    11:15    11:16
  12:15    15:16    16:1
  17:11    17:16    18:9
  18:13    19:14    19:16
  19:20    19:20    19:22
  20:7    20:25    24:16
  24:22    25:9    25:22
  26:17    26:18    33:16
  34:16    35:12    35:23
  36:16    40:3    40:9
**home** [1]    7:24
**hope** [2]    10:1    22:3
**hospital** [7]    6:19
  6:23    6:24    9:8
  9:9    19:14    37:5
**hospitals** [1]    6:17
**hour** [2]    3:19    3:19
**HPI** [1]    11:12
**huh-uh** [2] 17:3    17:17
**Hurley** [1] 37:15
**Hurley's** [1]    37:11
**HUSBAND** [1]    1:7

**-I-**

**idea** [3]    7:19    15:11
  35:4
**identification** [1]    22:24
**illness** [2] 11:13    20:7
**importance** [1]    14:23
**important** [3]    25:19
  40:3    40:5
**impossible** [1]    16:2
**inaccurate** [1]    25:19
**include** [2] 9:3    19:2
**included** [1]    24:12
**increased** [5]    12:3
  17:8    20:16    20:16
  34:6
**independent** [1]    40:18
**indicate** [2]    17:4
  36:7
**indicated** [1]    25:16
  39:21
**indicating** [2]    17:20
  38:21
**indirectly** [1]    43:18
**INDIVIDUALLY** [1]
  1:3
**information** [24]    4:4
  8:21    10:19    11:16
  11:17    14:23    15:5
  15:13    15:21    16:13

  16:20    16:20    19:3
  19:21    19:25    20:13
  25:20    26:21    28:12
  28:14    29:25    32:1
  41:9    41:16
**initial** [3]    9:18    11:5
  21:25
**injured** [1] 14:2
**Inner** [1]    4:25
**instance** [1]    21:5
**Insurance** [2]    1:13
  3:7
**intake** [3]    18:25    19:22
  28:12
**interested** [1]    43:18
**internship** [1]    5:8
**interview** [1]    14:16
**involved** [2]    35:22
  35:23

**-J-**

**James** [7]    1:15    1:20
  2:3    3:1    4:14
  4:18    43:7
**January** [13]    1:19
  10:25    11:2    11:25
  13:14    18:10    18:25
  29:23    29:24    33:25
  38:18    38:20    43:23
**JUDGE** [1]    1:14
**July** [1]    23:2

**-K-**

**keep** [2]    8:18    9:2
**keeping** [2]    9:1
  9:5
**Kelley** [24] 1:25    2:4
  3:4    3:5    3:24
  18:12    18:16    21:9
  23:18    26:7    29:12
  30:12    31:5    31:20
  32:14    33:2    37:19
  37:22    38:12    39:4
  39:12    40:24    41:10
  42:4
**Kentucky** [2]    5:8
  5:12
**kidney** [1] 35:19
**kind** [1]    8:20
**kinds** [1]    23:24
**knew** [3]    17:25    30:9
  34:2
**knowledge** [1]    38:16

**-L-**

**lab** [1]    19:4
**lack** [1]    13:20
**last** [1]    13:18
**LAW** [1]    1:3
**lawyer** [1] 3:6
**lead** [1]    17:15
**learn** [1]    8:24

**learning** [1]    8:25
**least** [5]    4:9    25:7
  30:18    30:20    30:23
**left** [4]    12:2    20:5
  20:8    24:7
**legible** [1]    9:7
**length** [1]    8:18
**lesion** [3]    24:8    26:13
  35:9
**less** [1]    16:17
**letter** [7]    22:19    23:13
  24:5    27:3    27:12
  41:15    41:22
**letters** [1]    23:25
**license** [1] 7:1
**licensed** [1]    6:6
**likely** [1]    40:22
**limits** [1]    19:11
**line** [3]    12:10    12:11
  24:6
**LLC** [1]    1:24
**logic** [2]    38:24    39:7
**look** [5]    19:11    25:2
  31:15    35:18    35:21
**looked** [1] 25:13
**looking** [1]    38:17
**looks** [1]    9:25
**lump** [6]    12:2    17:7
  20:8    34:4    34:11
  35:16
**lumps** [1]    36:17
**lung** [1]    35:19
**lymphoma** [1]    36:21

**-M-**

**M** [7]    1:15    1:20
  1:29    2:3    3:1
  4:18    43:7
**M.D** [6]    1:15    1:20
  2:3    3:1    4:18
  43:7
**Mahady-Smith** [3]    1:29
  3:21    7:7
**maintenance** [1]    10:16
**malignancy** [2]    20:24
  41:23
**malignant** [19]    16:18
  16:19    18:1    18:2
  19:17    20:2    20:18
  21:7    24:9    25:9
  25:10    26:19    30:21
  32:17    34:16    34:20
  35:13    35:25    36:4
**man** [1]    8:1
**margins** [1]    32:20
**mark** [3]    10:2    17:18
  18:12
**marked** [4] 2:11    10:6
  18:14    22:24
**mass** [1]    35:4
**materials** [1]    22:18
**matter** [1]    25:24

Multi-Page™

physique – simply
JAMES M. CHICKLO, M.D.

physique [1]           8:1
place [2]     1:20      43:14
placed [1]  15:13
PLAINTIFF [2]          1:8
  1:30
PMH [2]     11:14      26:17
point [1]   27:18
practice [9]           4:17
  4:19     4:21     6:6
  7:1      8:15     9:12
  16:8     23:24
practiced [1]          5:1
practicing [1]         5:2
pre-op [1]  18:11
preferably [1]         19:15
prepared [1]           18:20
present [3] 11:12      20:7
  34:5
presume [6]            15:1
  20:5     24:11     26:17
  36:8     36:15
previous [6]           10:6
  12:4     17:23     21:21
  24:16    40:6
previously [1]         7:19
primary [2]            32:21
  35:15
privileges [2]         6:17
  7:4
problem [2]            21:14
  27:16
problems [1]           40:6
procedure [2]          16:7
  19:14
procedures [1]         10:15
process [1] 38:2
produced [2]           2:11
  18:14
professional [1]       4:5
proper [1]  8:7
properly [1]           41:22
prove [1]   31:16
provide [1]            29:4
provided [3]           32:2
  32:2     33:16
public [5]   1:18      16:16
  43:4     43:11     43:25
purpose [1]            11:24
purposes [1]           22:24
put [8]     8:16     8:21
  10:19    11:3     14:12
  15:24    15:24    34:10
puts [1]    35:10

-Q-

questioning [1]        3:18
questions [15]         3:9
  3:12     3:23     3:25
  4:1      4:9      7:21
  9:19     29:12    29:19
  29:19    31:9     41:14
  42:3     43:9

-R-

R [2]       1:25      1:28
RAMBO [1]              1:14
rather [1]  19:15
re-review [1]          32:24
reach [1]   8:12
read [4]    14:9      24:4
  37:12    41:24
reading [2] 32:17     32:18
ready [1]   23:19
really [4]  21:3      26:25
  27:8     33:19
reason [3]  27:21     28:11
  40:8
reasonable [1]         19:11
receive [3] 8:19      28:1
  28:14
receiving [2]          24:3
  25:18
recently [1]           7:10
recollection [1]       21:11
recollections [1]      7:22
record [13] 8:16      10:3
  16:4     18:17     18:20
  20:1     21:22     28:4
  36:23    37:7      38:17
  38:20    43:20
records [37]           7:22
  7:24     8:8      8:11
  8:11     8:12     8:13
  8:19     8:22     9:1
  9:2      9:5      9:7
  10:16    10:19    14:24
  16:8     17:24    18:4
  18:9     23:21    24:12
  24:18    25:2     26:15
  26:22    29:3     29:20
  30:8     30:11    30:20
  33:13    37:5     39:16
  39:18    40:8     40:19
reduced [1]            43:11
refer [4]   27:18     27:21
  31:8     32:17
reference [6]          29:22
  32:16    34:4     38:21
  40:15    40:17
referenced [1]         31:4
referencing [1]        41:15
referred [4]           12:2
  27:20    33:22    36:18
referring [7]          9:17
  22:6     23:11    23:14
  26:9     28:22    36:12
refers [2]  16:13     24:11
reflect [1] 9:8
refute [2]  37:18     41:9
regard [3]  26:13     27:16
  29:9
regarding [3]          3:9
  22:14    29:10
regardless [1]         39:22
registered [1]         37:7

registry [2]           37:1
  37:4
regular [2] 16:7      16:8
relationship [3]       34:24
  36:1     36:3
relative [1]           43:15
  43:16
remember [8]           8:2
  16:3     20:23    21:7
  21:15    21:18    27:17
  28:10
remembered [1]         7:25
removal [1]            22:2
removed [2]            29:9
  38:22
rephrase [1]           3:13
report [29] 20:6      22:5
  22:9     22:10    22:14
  24:21    28:17    29:8
  30:25    31:3     31:23
  32:2     32:7     32:10
  32:16    32:20    33:12
  36:9     36:11    36:12
  37:16    37:16    37:21
  37:25    38:1     38:3
  38:7     41:19    41:24
reported [3]           25:23
  36:4     37:17
Reporter [1]           43:12
Reporter-Notary
  1:18     43:11    43:25
represent [2]          3:6
  7:8
REPRESENTATIVE [1]
  1:4
request [3] 16:12     17:23
  18:3
require [1] 36:20
required [1]           40:9
requirement [1]        9:6
requires [1]           36:21
resection [1]          26:20
residency [6]          5:9
  5:17     5:20     5:25
  6:2      6:5
resident [1]           5:11
respect [1] 31:18
rest [1]    13:23
result [3]  28:25     29:1
  29:2
resume [1]  4:5
retain [1]  8:11
retention [1]          8:7
retrospect [1]         35:8
revealed [4]           23:9
  24:8     25:10    41:23
review [4]  19:9      23:6
  32:23    40:18
reviewed [1]           24:2
  30:1     39:15
reviewing [1]          23:24
  32:10
revoked [2]            7:2

7:5
rid [1]     8:14
right [19]  10:4      10:19
  10:23    11:1     12:25
  14:8     18:6     18:18
  19:7     19:19    19:24
  20:4     20:4     20:11
  24:14    24:14    39:25
  40:4     40:22
routinely [1]          14:4
runs [1]    6:23

-S-

S [3]       1:17      43:4
  43:24
S-T-A-T-L-E-R [1] 13:19
saw [9]     8:2      11:5
  23:2     29:1     29:22
  29:23    30:18    33:12
  34:15
says [14]   10:25    12:11
  12:16    12:18    12:19
  12:24    13:3     18:9
  20:7     23:12    23:15
  26:17    26:19    28:23
scapular [1]           24:8
school [7]  5:5      5:7
  5:15     5:19     8:5
  8:19     8:23
scope [1]   35:20
second [3]  23:17     24:6
  27:4
secretaries [1]        9:20
secretary [8]          12:7
  12:8     13:4     13:6
  13:13    15:14    19:7
  25:23
secretary's [2]        12:9
  13:12
section [1] 32:10
see [19]    14:1      15:9
  16:9     21:12    21:24
  22:2     22:14    22:18
  23:10    24:9     25:2
  27:3     27:12    27:13
  28:12    28:25    35:2
  35:17    35:22
seeing [2]  11:25     41:8
send [2]    16:13     24:21
sent [4]    25:6     28:16
  28:23    28:24
service [2] 5:9      6:1
set [2]     29:21     43:22
sheet [6]   9:18     11:5
  18:21    31:17    34:4
  43:14
sheets [1]  9:3
short [1]   8:1
show [2]    9:22     30:25
showed [3] 32:21     33:13
  33:13
side [1]    12:3
simply [3] 26:21     29:4
  36:16

**-Y-**

**year** [3]     5:14     8:14
28:19
**years** [14]   4:23     5:2
5:9       5:10     5:10
8:12      8:12     8:16
9:4       9:12     14:20
14:22     15:1     37:8
**Yep** [4]      9:13     11:2
20:10     24:1
**York** [1]     37:6
**yourself** [1]          10:11

**EXHIBIT**
Charlesworth - 3
1-9-02    PS

DATE 1-15-99

AGE 43

REF. Charlesworth

PATIENT'S NAME Tommy Hall

A

C/O   lump - base (Lt) neck x 5 weeks - increased in Size

H.P.I. - tender - only when moved around. - wears a shoulder strap - increased

in Size 1 cm to Sgl quarter acc to Pt. -

### P.M.H.

Allergies Ø

Medications Iron Med.

Surgery Spinal Sg x 2  1989 - 1993

~~Noble CR Exc~~ (1993) ~~Cut~~

~~on Back~~

### ROS & OTHER C/O

Childbirth  Complicated _____ Uncomplicated _____

### FAMILY HISTORY D- Dad - Aunt

C.  grandmother (breast)

TB - Ø

H. Grandmother (CVA)

### Immunization & Childhood Diseases

Complic _____ Uncomplic _____

Medical Illnesses Anemia

Bleeding Tendencies Ø

Hospitalizations (Excl. Sgy.) _____

Trauma  Head Trauma X 2 -

### HABITS

Tobacco  Yes X  No _____  Amt 1 pkg. d.

ETOH  Yes _____ No X  Amt _____

Rinne  Left  AC  BC   P.N.O. Motion      Valsalva (Motion)

Right  AC  BC   L _____ R _____   L _____ R _____

### Physical Examination

Weber
ML  L  R

### EARS

Canals   OK

External _____

### NOSE

Septum  ML    Defl. ✓  R

Valves  NL    Wide  L  R    Closed  L  R

Turbinates _____

Discharge  Bilat  R  L

External  Dorsal Hump _____ Bridge to L _____ Bridge to R _____

R   L

NL

OK

P0912



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NANCY HALL, INDIVIDUALLY       :
AND AS THE REPRESENTATIVE      :
AND ADMINISTRATRIX OF THE      :
ESTATE OF TOMMY HALL,          :
DECEASED, HER HUSBAND,         :
        PLAINTIFF               :
                      :
                      :    CIVIL ACTION
      V                        :    NO.  1:01-CV-1265
                      :
CUNA MUTUAL GROUP, CUNA        :
MUTUAL INSURANCE SOCIETY,      :
        DEFENDANTS              :    JUDGE SYLVIA H. RAMBO


DEPOSITION OF:  PAULA STATLER

TAKEN BY:       DEFENDANTS

BEFORE:         MARIA N. O'DONNELL, RPR
                NOTARY PUBLIC

DATE:           MARCH 22, 2002, 9:45 A.M.

PLACE:          1039 WAYNE AVENUE
                CHAMBERSBURG, PENNSYLVANIA


APPEARANCES:

    PEDERSEN & PEDERSEN
    BY: STEPHEN R. PEDERSEN, ESQUIRE
        FOR - PLAINTIFFS

    MCNEES, WALLACE & NURICK
    BY: MICHAEL R. KELLEY, ESQUIRE
        FOR - DEFENDANT





Multi-Page™

**PAULA STATLER**
**MARCH 22, 2002**

---

Page 2

```
 1              WITNESSES
 2   NAME              EXAMINATION
 3  PAULA STATLER
 4     BY: MR. KELLEY        3
 5     BY: MR. PEDERSEN      8
 6
 7
 8
 9
10              EXHIBITS
11  DEPOSITION EXHIBIT NO.        PRODUCED AND MARKED
12  1. DOCUMENT                   4
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1              STIPULATION
 2        It is hereby stipulated by and between counsel
 3  for the respective parties that reading, signing, sealing,
 4  certification and filing are hereby waived; and that all
 5  objections except as to the form of the question are
 6  reserved to the time of trial.
 7
 8        PAULA STATLER, called as a witness, being duly
 9  sworn, testified as follows:
10              EXAMINATION
11  BY MR. KELLEY:
12     Q  Good morning.
13     A  Good morning.
14     Q  Again, my name is Michael Kelley.  I represent
15  Cuna Mutual Insurance in a lawsuit that's been filed by the
16  estate of Tommy Hall and his wife, Nancy Hall.
17        We're here today to take your deposition and it's
18  really limited to some of the medical records that Dr.
19  Chicklo has.
20     A  Okay.
21     Q  I see you have got some of those right in front
22  of you here?
23     A  Uh-huh.
24     Q  Would you just state your full name for record,
25  please?
```

---

Page 4

```
 1     A  My name is Paula Noreen Statler.
 2     Q  Where are you employed?
 3     A  At Dr. James M. Chicklo.
 4     Q  How long have you been employed by Dr. Chicklo?
 5     A  Twenty-eight years.
 6     Q  Your name came up in the deposition of Dr.
 7  Chicklo that we took some several weeks ago when we were
 8  reviewing some of the medical records that Dr. Chicklo had,
 9  and he mentioned that you would have been the person who
10  actually put some of the information down on the form and
11  that's the reason we're here to take your deposition today.
12     A  Okay.  Sure.  Okay.
13        MR. KELLEY:  I see you have got in front of you I
14  think the very document I am interested in looking at.
15        We're going to mark that as Statler 1 to your
16  deposition.
17        (Document produced and marked Statler Exhibit
18  Number 1.)
19  BY MR. KELLEY:
20     Q  Looking at either the one we have marked or your
21  original there.
22     A  Right.
23     Q  Can you explain to us what that document is?
24     A  This is a document that whenever a patient comes
25  into the office initially for their first office visit,
```

---

Page 5

```
 1  these are the questions that we -- that Dr. Chicklo has
 2  instructed to ask them prior to him sitting down with the
 3  patient and then he goes over what I have written down and
 4  then he adds to it.
 5     Q  Does the patient ever fill this form out him or
 6  herself?
 7     A  No.
 8     Q  Are you always the one that fills it out?
 9     A  90 percent of the time, yes.
10     Q  Okay.  If you don't fill it out, who does?
11     A  One of the other medical assistants.
12     Q  In this particular case, do you recognize your
13  handwriting on this document?
14     A  Yes, I do.  Yes.
15     Q  Can you identify for us specifically what parts
16  of this contain your handwriting?
17     A  Okay.  Where it asks for allergies, medications,
18  surgeries done, family history, medical illnesses, bleeding
19  tendencies, and their habits.
20     Q  Okay.  The information at the top regarding the
21  complaints?
22     A  Okay.
23     Q  That is yours?
24     A  Yes, on the first line I will ask initially why
25  the patient is here.
```

---

 Multi-Page™ 

PAULA STATLER
MARCH 22, 2002

Page 10

1 morning.

2   Q  Did you see a pathology report in there?

3   A  This would be a pathology report.

4   Q  Now, that's the left node pathology report after

5 the visit, isn't it?

6   A  Oh, okay.  Yes.

7   Q  Do you remember seeing a 1993 pathology report

8 relating to that '93 mole?

9   A  No, I don't.  No, I don't.

10   Q  Are you familiar with pathology reports?

11   A  As far as --

12   Q  Reading them with respect to moles?

13   A  Reading them and understanding, yes, I can read

14 what the report is.

15   Q  If the pathology report had indicated dysplastic

16 nevus for the mole that was removed in '93, what would that

17 indicate to you?

18   MR. KELLEY: Objection.  Lack of foundation.  Go

19 ahead, you can answer.

20 BY MR. PEDERSEN:

21   Q  Let me lay a little more foundation.

22   A  Okay.

23   Q  Do you review pathology reports as part of your

24 work with Dr. Enders?

25   A  With Dr. Chicklo?

Page 11

1   Q  Dr. Chicklo, I am sorry.

2   A  No, I don't.

3   Q  Have you had any training or experience in

4 reading or reviewing pathology reports?

5   A  No, I haven't.

6   Q  Do you have any familiarity with the term

7 dysplastic nevus?

8   A  Only what Dr. Chicklo has explained to me.

9   Q  What has Dr. Chicklo explained with respect to a

10 dysplastic nevus finding?

11   MR. KELLEY: I will just object to that on the

12 basis of relevance and still a lack of a foundation for this

13 witness.

14   You can answer.

15   THE WITNESS: Okay.  Just that the cells aren't

16 normal, but not always malignant.  That was -- that would be

17 my understanding of it.

18 BY MR. PEDERSEN:

19   Q  Have you seen pathology reports with findings of

20 dysplastic nevus in your practice here?

21   A  I would imagine, but I couldn't say specifically.

22   MR. PEDERSEN:  I don't have any other questions.

23   MR. KELLEY: That's it.

24   (Whereupon, the deposition was concluded at

25 10:00 a.m.)

Page 12

1 COUNTY OF DAUPHIN     :

2            : SS

3 COMMONWEALTH OF PENNSYLVANIA :

4   I, Maria N. O'Donnell, a Notary Public, authorized to

5 administer oaths within and for the Commonwealth of

6 Pennsylvania, do hereby certify that the foregoing is the

7 testimony of PAULA STATLER.

8   I further certify that before the taking of said

9 deposition, the witness was duly sworn; that the questions

10 and answers were taken down stenographically by the said

11 Reporter-Notary Public, and afterwards reduced to

12 typewriting under the direction of the said Reporter.

13   I further certify the said deposition was taken at

14 the time and place specified in the caption sheet hereof.

15   I further certify that I am not a relative or

16 employee or attorney or counsel to any of the parties, or a

17 relative or employee of such attorney or counsel, or

18 financially interested directly or indirectly in this

19 action.

20   I further certify the said deposition constitutes

21 a true record of the testimony given by the said witness.

22   IN WITNESS WHEREOF, I have hereunto set my hand

23 this 22ND day of MARCH, 2002.

24           Maria N. O'Donnell, RPR

25           Notary Public

-'-

'93 [2]        10:8      10:16
'99 [1]        8:10

-1-

1 [3]          2:12      4:15
 4:18
1039 [1]       1:21
1989 [1]       7:21
1993 [5]       6:22      7:21
 7:25          9:23      10:7
1:01-CV-1265 [1]  1:11

-2-

2002 [2]       1:20      12:23
22 [1]         1:20
22ND [1]       12:23

-3-

3 [1]          2:4

-4-

4 [1]          2:12

-8-

8 [1]          2:5

-9-

90 [1]         5:9
9:45 [1]       1:20

-A-

a.m [2]        1:20      11:25
abbreviations [1]  7:14
action [2]     1:10      12:19
added [1]      6:13
adds [1]       5:4
administer [1]          12:5
ADMINISTRATRIX [1]
 1:5
afterwards [1]         12:11
Again [1]      3:14
ago [1]        4:7
agree [1]      9:15
ahead [2]      8:17      10:19
allergies [1]  5:4
always [2]     5:8       11:16
answer [2]     10:19     11:14
answers [1]             12:10
APPEARANCES [1]
 1:23
asks [1]       5:17
assistants [1]          5:11
assume [2] 8:14         9:2
attention [1]  6:1
attorney [2]            12:16

12:17
authorized [1]          12:4
AVENUE [1]     1:21

-B-

basis [1]      11:12
between [1]             3:2
bleeding [1]   5:18

-C-

CA [2]         6:6       6:22
cancerous [1]           7:24
caption [1] 12:14
case [1]       5:12
cells [1]      11:15
certification [1]       3:4
certify [5] 12:6        12:8
 12:13         12:15     12:20
CHAMBERSBURG [1]
 1:22
Charlesworth [6]  9:6
 9:7           9:12      9:16
 9:18          9:20
chart [1]      9:25
Chicklo [13]            3:19
 4:3           4:4       4:7
 4:8           5:1       6:12
 8:1           9:16      10:25
 11:1          11:8      11:9
Chicklo's [2]           6:20
 6:21
CIVIL [1]      1:10
coming [2] 9:16         9:20
Commonwealth [2] 12:3
 12:5
complaints [1]          5:21
concluded [1]           11:24
constitutes [1]         12:20
contain [1] 5:16
counsel [3]             3:2
 12:16         12:17
COUNTY [1]     12:1
COURT [1]      1:1
Cuna [3]       1:13      1:13
 3:15

-D-

date [2]       1:20      8:6
dated [1]      8:8
dates [1]      7:23
DAUPHIN [1]    12:1
DECEASED [1]   1:7
DEFENDANT [1]  1:29
DEFENDANTS [1]
 1:15          1:17
deposition [10]  1:16
 2:11          3:17      4:6
 4:11          4:16      11:24
 12:9          12:13     12:20
direction [1]           12:12

directly [2]            7:9
 12:18
DISTRICT [2]   1:1
 1:2
doctor [2] 9:4          9:9
document [7]            2:12
 4:14          4:17      4:23
 4:24          5:13      8:6
done [1]       5:18
down [7]       4:10      5:2
 5:3           7:12      7:14
 7:22          12:10
Dr [25]        3:18      4:3
 4:4           4:6       4:8
 5:1           6:12      6:20
 6:21          7:22      7:23
 7:25          8:1       9:6
 9:7           9:11      9:16
 9:16          9:17      9:20
 10:24         10:25     11:1
 11:8          11:9
duly [2]       3:8       12:9
dysplastic [4]          10:15
 11:7          11:10     11:20

-E-

either [1]     4:20
employed [2]            4:2
 4:4
employee [2]            12:16
 12:17
Enders [1] 10:24
ESQUIRE [2]    1:25
 1:28
estate [2]     1:6       3:16
EXAMINATION [2]
 2:2           3:10
Exc [1]        6:8
except [1]     3:5
excised [2] 6:22        7:25
Exhibit [2] 2:11        4:17
EXHIBITS [1]            2:10
experience [1]          11:3
explain [2] 4:23        7:13
explained [1]           11:8
 11:9

-F-

familiar [1]            10:10
familiarity [1]         11:6
family [3] 5:18         7:4
 8:12
far [1]        10:11
filed [1]      3:15
filing [1]     3:4
fill [2]       5:5       5:10
filled [1]     9:13
fills [1]      5:8
financially [1]         12:18
finding [1] 11:10
findings [1]            11:19

first [3]      4:25      5:24
 7:13
follows [1]             3:9
foregoing [1]           12:6
form [3]       3:5       4:10
 5:5           7:13      9:14
foundation [3]          10:18
 10:21         11:12
frankly [1] 6:4
front [2]      3:21      4:13
full [1]       3:24

-G-

gathered [1]            8:7
given [1]      12:21
goes [1]       5:3
Good [2]       3:12      3:13
GROUP [1]               1:13
Guthrie [2]             6:22
 7:25

-H-

H [1]          1:15
habits [1]     5:19
Hall [11]      1:3       1:6
 3:16          3:16      8:12
 8:12          8:18      8:25
 9:1           9:2       9:19
hand [1]       12:22
handwriting [4]         5:13
 5:16          6:15      6:17
hereby [3] 3:2          3:4
 12:6
hereof [1] 12:14
hereunto [1]            12:22
herself [1] 5:6
himself [1] 9:3
history [1] 5:18
HUSBAND [1]             1:7

-I-

identify [1]            5:15
illnesses [1]           5:18
imagine [1]             11:21
indicate [1]            10:17
indicated [1]           10:15
indirectly [1]          12:18
INDIVIDUALLY [1]
 1:3
information [10]        4:10
 5:20          6:6       6:13
 6:24          7:6       8:7
 8:13          9:1       9:19
instructed [1]          5:2
Insurance [2]           1:14
 3:15
interested [4]          4:14
 6:4           6:5       12:18

-J-

12:21
**today** [4]    3:17    4:11
  6:23    8:20
**Tommy** [2]        1:6
  3:16
**took** [1]    4:7
**top** [1]    5:20
**training** [1]        11:3
**trial** [1]    3:6
**true** [1]    12:21
**turning** [1] 6:1
**Twenty-eight** [1]    4:5
**twice** [1]    7:21
**typewriting** [1]    12:12

_____
-U-
_____

**under** [3]    7:16    7:23
  12:12
**UNITED** [1]        1:1
**up** [1]    4:6

_____
-V-
_____

**V** [1]    1:11
**visit** [2]    4:25    10:5

_____
-W-
_____

**waived** [1] 3:4
**WALLACE** [1]    1:27
**WAYNE** [1]    1:21
**weeks** [1]    4:7
**WHEREOF** [1]    12:22
**wife** [5]    3:16    7:2
  8:21    8:22    9:20
**within** [1]    12:5
**witness** [6]        3:8
  11:13    11:15    12:9
  12:21    12:22
**WITNESSES** [1]    2:1
**writing** [3] 6:20    6:21
  6:21
**written** [2] 5:3    7:14
**wrote** [3]    7:22    8:2
  9:13

_____
-Y-
_____

**years** [1]    4:5



ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
NANCY HALL, INDIVIDUALLY:
AND AS THE            :
REPRESENTATIVE AND    :
ADMINISTRATRIX OF THE :
ESTATE OF TOMMY HALL, :
DECEASED, HER HUSBAND,:
          PLAINTIFF   :
                      :
          V           :    1:01-CV-1265
                      :
CUNA MUTUAL GROUP, CUNA :
MUTUAL INSURANCE      :
SOCIETY,              :
          DEFENDANTS  :    JUDGE SYLVIA H. RAMBO
```

```
     VIDEO DEPOSITION OF:    NANCY HALL

          TAKEN BY:          DEFENDANTS

          BEFORE:            BOBBI JO HAHN, RPR
                             NOTARY PUBLIC

          DATE:              MARCH 19, 2002
                             9:08 A.M.

          PLACE:             PEDERSEN & PEDERSEN
                             214 SENATE AVENUE
                             CAMP HILL, PENNSYLVANIA
```

APPEARANCES ON NEXT PAGE



HAEN
Reporting Service, Inc.

Hughes
Albright
Foltz
Natale

2080 Linglestown Road • Suite 103 • Harrisburg, PA 17110
717.540.0220 • Fax 717.540.0221 • Lancaster 717.393.5101

14

1    or being a melanoma?

2         A    No.

3         Q    What I said was correct?  I think she

4    misunderstood.  I just want to make sure we're clear

5    about that.  Prior to February 11, 1999, is it true

6    that neither you nor your husband had any knowledge

7    about any moles on his body being cancerous, malignant

8    or a melanoma?

9         A    Yes.

10        Q    Who was it who first told you that any moles

11   on your husband's body were malignant, cancerous or a

12   melanoma?

13        A    I don't remember.

14        Q    Was it a doctor?

15        A    I'm not sure.

16        Q    So you don't have any recollection about who

17   it was or even whether it was a doctor who told you

18   that; is that correct?

19        A    I'm not sure.  I don't know.

20        Q    Do you know which doctors your husband saw

21   with regard to the lump on his neck?

22        A    Yes.

23        Q    And who were those doctors?

24        A    Dr. Chicklo.

25        Q    Dr. Chicklo?

15

```
 1      A    Chicklo, yes.

 2      Q    Anyone else?

 3      A    No, Dr. Chicklo did the surgery.

 4      Q    Okay.  As you sit here today, do you know the

 5  names of any other doctors that your husband saw with

 6  regard to the lump on his neck?

 7      A    I'm not sure.

 8      Q    Do you know the name of Dr. Charlesworth?

 9      A    Yes.

10      Q    Did your husband go to see Dr. Charlesworth

11  at any time about the lump on his neck?

12      A    I don't know if he went to see him first.

13      Q    Did you accompany your husband to any of his

14  doctors' visits?

15      A    Yes.

16      Q    Did you ever accompany him on a doctor's

17  visit to Dr. Charlesworth?

18      A    Yes.

19      Q    Do you remember how many times he saw Dr.

20  Charlesworth?

21      A    The time you're talking before or after?

22      Q    At any time.

23      A    Three or four visits.

24      Q    Did you accompany your husband on all of

25  those visits?
```

16

1      A      Yes.

2      Q      And you remember the name of Dr. Chicklo,

3  right?

4      A      Yes.

5      Q      Did you also attend any visits your husband

6  had with Dr. Chicklo?

7      A      No.

8      Q      Are you certain of that?  You seem -- your

9  answer was very self-assured.  Are you certain that you

10 did not attend any of those visits?

11     A      Yes.

12     Q      How about a Dr. Cashdollar, do you know who

13 Dr. Cashdollar is?

14     A      Yes.

15     Q      Did your husband see Dr. Cashdollar with

16 regard to the lump on his neck?

17     A      Yes.

18     Q      Did you attend any of those visits with him?

19     A      Yes.

20     Q      Do you know how many times your husband

21 visited Dr. Cashdollar?

22     A      In his office or during treatment?

23     Q      Anywhere.

24     A      We're talking each cancer treatment.  I would

25 have to say 15 visits or more.

17

```
 1        Q     Dr. Cashdollar --

 2        A     Yes.

 3        Q     -- was the physician who administered the --

 4   the treatments to your husband for his cancer?

 5        A     Yes.

 6        Q     So he went to see Dr. Cashdollar a lot?

 7        A     Yes.

 8        Q     Did you go with him to all of his visits with

 9   Dr. Cashdollar?

10        A     No.

11        Q     Did you go with him to most of them?

12        A     Yes.

13        Q     Did you go with him for the first visit with

14   Dr. Cashdollar?

15        A     Yes.

16        Q     Dr. Enders, do you know Dr. Enders?

17        A     Yes.

18        Q     Did your husband see Dr. Enders for any

19   reason?

20        A     Yes.

21        Q     Did you accompany your husband to any of the

22   visits with Dr. Enders?

23        A     Yes.

24        Q     How many times did your husband see Dr.

25   Enders?
```

1    A    Three or more.

2    Q    Did you attend for all of those visits?

3    A    No.

4    Q    Did you attend for any of them?

5    A    Yes.

6    Q    Did you attend for the first visit with Dr.

7 Enders?

8    A    I don't remember.

9    Q    And the last doctor that I wanted to ask you

10 about is Dr. Sharfman.  Do you know a Dr. Sharfman?

11    A    NIH?

12    Q    I believe he's down in Maryland.

13    A    Yes.  No, I never met him.

14    Q    Now, we talked about Dr. Charlesworth,

15 Chicklo, Cashdollar, Enders and Sharfman.  I wanted to

16 ask you if the discussion of any of those doctors'

17 names jogged your recollection of who it was that first

18 told you that any of the moles on your husband's body

19 were cancerous.

20    A    I'm not sure.

21    Q    So even with the discussion of those doctors,

22 you're still not certain; is that right?

23    A    No.

24    Q    Now, I understand your testimony that it

25 wasn't until at least as of February 11, 1999 or



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


NANCY HALL, INDIVIDUALLY AND : CIVIL ACTION - LAW
AS THE REPRESENTATIVE AND    :
ADMINISTRATRIX OF THE ESTATE :
OF TOMMY HALL, DECEASED, HER :
HUSBAND,                     :
        PLAINTIFF            :
                             :
        V                    : 1:01-CV-1265
                             :
CUNA MUTUAL GROUP, CUNA      :
MUTUAL INSURANCE SOCIETY,    :
        DEFENDANTS           : JUDGE SYLVIA H. RAMBO




        DEPOSITION OF:   MICHAEL R. CASHDOLLAR, M.D.

        TAKEN BY:        DEFENDANTS

        BEFORE:          PAMELA S. SULLIVAN,
                         REPORTER-NOTARY PUBLIC

        DATE:            FEBRUARY 27, 2002, 10:08 A.M.

        PLACE:           OFFICE OF DR. CASHDOLLAR
                         120 NORTH 7TH STREET
                         CHAMBERSBURG, PENNSYLVANIA

APPEARANCES:

    McNEES WALLACE & NURICK, LLC
    BY:  MICHAEL R. KELLEY, ESQUIRE

        FOR - DEFENDANTS

    PEDERSEN & PEDERSEN
    BY:  STEPHEN R. PEDERSEN, ESQUIRE
         CATHERINE M. MAHADY-SMITH, ESQUIRE

        FOR - PLAINTIFF



2080 Linglestown Road • Suite 103 • Harrisburg, PA 17110
717.540.0220 • Fax 717.540.0221 • Lancaster 717.393.5101



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NANCY HALL, INDIVIDUALLY AND : CIVIL ACTION - LAW
AS THE REPRESENTATIVE AND   :
ADMINISTRATRIX OF THE ESTATE :
OF TOMMY HALL, DECEASED, HER :
HUSBAND,                     :
        PLAINTIFF            :
                            :
        V                   : 1:01-CV-1265
                            :
CUNA MUTUAL GROUP, CUNA      :
MUTUAL INSURANCE SOCIETY,    :
        DEFENDANTS     : JUDGE SYLVIA H. RAMBO

DEPOSITION OF:  MICHAEL R. CASHDOLLAR, M.D.

TAKEN BY:    DEFENDANTS

BEFORE:    PAMELA S. SULLIVAN,
           REPORTER-NOTARY PUBLIC

DATE:    FEBRUARY 27, 2002, 10:08 A.M.

PLACE:    OFFICE OF DR. CASHDOLLAR
          120 NORTH 7TH STREET
          CHAMBERSBURG, PENNSYLVANIA

APPEARANCES:

McNEES WALLACE & NURICK, LLC
BY:  MICHAEL R. KELLEY, ESQUIRE

    FOR - DEFENDANTS

PEDERSEN & PEDERSEN
BY:  STEPHEN R. PEDERSEN, ESQUIRE
     CATHERINE M. MAHADY-SMITH, ESQUIRE

    FOR - PLAINTIFF

---

**Page 2**

1                WITNESS

2  NAME                    EXAMINATION

3  MICHAEL R. CASHDOLLAR, M.D.

4     BY:  MR. KELLEY           3,  42

5     BY:  MR. PEDERSEN         27,44

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**Page 3**

1        MICHAEL R. CASHDOLLAR, M.D., called as a witness,

2  being duly sworn, testified as follows:

3        MR. KELLEY: Usual stipulations here?

4        MR. PEDERSEN: That's fine, yes.

5                STIPULATION

6        It is hereby stipulated by and between counsel

7  for the respective parties that sealing, certification and

8  filing are hereby waived; and that all objections except as

9  to the form of the question are reserved to the time of

10  trial.

11                EXAMINATION

12  BY MR. KELLEY:

13     Q  Good morning, Doctor.

14     A  Good morning.

15     Q  As I just introduced myself to you a few moments

16  ago, my name is Mike Kelley.

17     A  Okay.

18     Q  I'm a lawyer, and I'm here representing CUNA

19  Mutual Insurance Company in an action that's been brought by

20  Mrs. Nancy Hall and the estate of her late husband, Tommy

21  Hall.

22        We're here today to take your deposition.  I

23  presume you've been through depositions before.

24     A  Rarely, but yes.

25     Q  Well, the purpose of this deposition today is to

---

**Page 4**

1  seek information about, frankly, some medical records that

2  we have concerning Tommy Hall and to explore the nature of

3  how those records were created and to obtain some background

4  of your treatment of Mr. Hall.

5     A  Okay.

6     Q  Counsel for Plaintiffs are also here, Steve

7  Pedersen and Catherine Mahady-Smith.  Have you met them

8  before?

9     A  Yes.

10     Q  Have you had any conversations with either of

11  Plaintiff's counsel regarding Mr. Hall in the past?

12     A  Yes.

13     Q  How many times have you had conversations with

14  them?

15     A  Twice.

16     Q  How long ago were they?

17     A  One week and possibly four.  I don't recall.

18     Q  So about a week ago, and then maybe a month ago?

19     A  Yeah.

20     Q  Were they in-person meetings or over the

21  telephone?

22     A  In-person.

23     Q  Did you meet with them here in your office?

24     A  Yes.

25     Q  Did you take any notes of the meetings?

---

Page 9

1 January 22nd, 1999?
2    A  Yes.
3    Q  Now, that operative report is with regard to the
4 adenopathy that was on the neck.  Is that correct?
5    A  Yes, yes.
6    Q  Also in your file, Doctor, is a 2-23-99 record
7 that looks like it's from Dr. Enders.  Is that correct?
8    A  Yes, yes.
9    Q  And you're cc'd on that.  Is that right?
10    A  Yes.
11    Q  And then a colonoscopy report dated March 15,
12 1999?
13    A  Yes.
14    Q  Again which is prepared by Dr. Enders?
15    A  Yes.
16    Q  Also in your records -- excuse me, Doctor.  Off
17 the record.
18        (Discussion held off the record.)
19 BY MR. KELLEY:
20    Q  Also in your records is a document with a name of
21 Dr. David Weinrich on it.
22    A  Um-hum.
23    Q  Is that correct?
24    A  Yes.
25    Q  And it seems to be -- I'm looking for a date on

Page 10

1 here, Doctor.  Do you know where it would be dated?
2    A  Well, that's an admission note.  It has admitted
3 date on the left-hand corner.
4    Q  Oh, admitted on 9-30-99?
5    A  Yeah, yeah.
6    Q  And it's a three-page document.  Is that correct?
7    A  Yes.
8    Q  It includes a past history in it as well?
9    A  Yes.
10    Q  It says, Wide local excision of the left shoulder
11 in 1993.  Correct?
12    A  Yes.
13    Q  And there is an oncology outpatient note that
14 looks like it's prepared by Dr. William Sharfman.
15    A  Okay.
16    Q  Is that correct?
17    A  Yes, yes.
18    Q  Dated July 15 of 1999.  Also, Doctor, let me show
19 you this document in here.  Can you identify that?  Tell us
20 when the date of it is and what it is.
21    A  Okay, February 18th, 1999.  It's a CAT scan
22 evaluation of the chest and abdomen of Tommy Hall.
23    Q  Done at Chambersburg Hospital?
24    A  Yes.
25    Q  That mentions in there a history, does it not?

Page 11

1    A  Yes.
2    Q  It indicates metastatic carcinoma and history of
3 melanoma?
4    A  Um-hum.
5    Q  Is that correct?
6    A  Um-hum.
7    Q  You have to say yes or no.
8    A  Yes, yes.
9    Q  Was this a document prepared by you or prepared
10 by the hospital?
11    A  No.  That's prepared by the radiology department
12 of the hospital.
13        MS. MAHADY-SMITH:  Let me see that just briefly.
14        MR. KELLEY:  Yeah.
15 BY MR. KELLEY:
16    Q  The next set of questions, Doctor, you may have
17 to rely upon your documents there.  But why don't we get
18 started?  And if you need to, we'll simply wait until she's
19 done with it and then continue.
20    A  Sure.
21    Q  When did you first see Tommy Hall?
22    A  That was January.  It was 1999.  I'd have to look
23 at the exact date there.
24    Q  In 1999?
25    A  Yes.

Page 12

1        MR. PEDERSEN:  I would prefer that he wait and
2 get his records so that we have an accurate --
3        MS. MAHADY-SMITH:  I'll look at these, Doctor, at
4 the end of the deposition so we don't hold up the testimony.
5        THE WITNESS:  Oh, okay.
6        I saw him on February 17th, 1999.
7 BY MR. KELLEY:
8    Q  That was the first time that you saw him?
9    A  Yes.
10    Q  Who referred Tommy Hall to you?
11    A  Dr. James Chicklo.
12    Q  Do you know Dr. Chicklo?
13    A  Yes, he's an ENT specialist.
14    Q  Has he referred other patients to you?
15    A  Yes.
16    Q  Have you referred patients to him?
17    A  Yes.
18    Q  How long have you known Dr. Chicklo?
19    A  Twenty-two years.
20    Q  And your practice is based here in Chambersburg.
21 Is that correct?
22    A  Yes, yes.
23    Q  And his practice is also based in Chambersburg?
24    A  Yes.
25    Q  How many times did you actually see Tommy Hall?

Page 17

1 practice, are their policies and procedures that you have in
2 place for the intake of patient medical records and medical
3 histories?
4    A  Yes.
5    Q  Are they written down?
6    A  They might be.  There might be a worksheet to
7 collect information.
8    Q  Would it only be a nurse who's taking down the
9 information on that back page of that intake form?
10    A  Yes.
11    Q  What training or instruction does the nurse go
12 through in how to take the information that's contained on
13 that back page?
14    A  Basically their nursing experience and things
15 that we derive, you know.  We instruct them to particularly
16 pursue certain areas, you know, the areas that the patient
17 is being referred for basically.
18    Q  In this particular case, the patient was being
19 referred for what?
20    A  He was referred for metastatic melanoma.
21    Q  Is the patient's history for having had cancer,
22 is that something that's important to you?
23    A  Yes, yes.
24    Q  How would a nurse know that that's important
25 information that you're looking for?

Page 18

1    A  That's part of the training.  Most of these
2 nurses are knowledgeable about what we do, and they would
3 try to retrieve records that would be important for the
4 evaluation.
5    Q  Doctor, if you would, I'd like to call your
6 attention to a February 17, 1999, letter that you wrote to
7 James Chicklo.  In fact, I'll give that to you there.
8    A  Okay.
9    Q  Is it fair to say that you drafted or dictated --
10 oh, do you dictate, or do you write your own letters?
11    A  Yes, I dictate.
12    Q  Did you dictate that letter at or about the time
13 that you were having the initial meeting with Tommy Hall?
14    A  I dictated.  I always dictate immediately after
15 the visit.
16    Q  Now, in your letter -- this is a report to Dr.
17 Chicklo.  Correct?
18    A  Um-hum, yes.
19    Q  And in your letter you indicate that you had the
20 pleasure of seeing Tommy Hall, a medical oncology
21 consultation, on Wednesday February 17 of '99.  Correct?
22    A  Um-hum.
23    Q  You have to say yes or no.
24    A  Yes, I'm sorry.
25    Q  That's okay.  And you say, As you are well aware,

Page 19

1 Mr. Hall demonstrated a left in scapular dermal lesion in
2 1993, pathology revealed a malignant melanoma.  Correct?
3    A  Correct.
4    Q  Where did you obtain the information that you
5 included in this letter about the malignant melanoma back in
6 1993?
7    A  That information was obtained from Dr. Chicklo's
8 referral information.  In that, he mentions that there was a
9 previous malignant melanoma excised in 1993, and also in the
10 nursing data that was obtained.
11    Q  Now, you mentioned that there was -- pathology
12 revealed a malignant melanoma.
13    A  Um-hum.
14    Q  Did you actually see a pathology report?
15    A  At that time, we did not have a pathology report.
16    Q  What were you basing your information on then
17 that pathology revealed that?
18    A  In his information he mentions twice that the
19 pathology was malignant melanoma.
20    Q  In Dr. Chicklo's information?
21    A  Yes.
22    Q  And you felt comfortable in relying upon that
23 information?
24    A  Yes.  Well, the information I needed was the
25 lymph gland report, which we had.  But that's why we went

Page 20

1 back and retrieved the original.  I mean, it was logical.
2 With the lymph gland being involved, he had to have a
3 primary somewhere sometime.
4    Q  So the fact that he was diagnosed with metastatic
5 melanoma in 1999 was consistent with him having had a
6 previous melanoma?
7    A  It would imply that he had a previous melanoma or
8 a coexisting melanoma somewhere.
9    Q  Did you have any conversations with either Mr. or
10 Mrs. Hall during that initial visit about the prior
11 diagnosis of a malignant melanoma back in '93?
12        MS. MAHADY-SMITH:  Objection.
13        MR. PEDERSEN:  Yeah, objection.  There wasn't a
14 prior diagnosis from '93.
15        MR. KELLEY:  Let me rephrase the question.  I
16 understand the nature of the objection.
17 BY MR. KELLEY:
18    Q  Did you have any conversations with Mr. or
19 Mrs. Hall during that initial visit about any previous
20 problems with cancer?
21    A  Yes.
22    Q  Tell us what you recall about that.
23    A  Well, the information was available that he had
24 had a previously documented malignant melanoma from his left
25 scapula excised.

Multi-Page™

MICHAEL R. CASHDOLLAR, M.D.
FEBRUARY 27, 2002

Page 25

1    A  No.
2    Q  Other than that initial visit with Mr. Hall and
3  perhaps his wife, do you recall having other meetings with
4  Mr. Hall, other appointments, other visits?
5    A  Other clinical visits, yes.
6    Q  As best you can recall, was there any discussion
7  that you had with either Mr. or Mrs. Hall about this lesion
8  back in 1993?
9    A  No detailed discussions that I recall because he
10  was immediately involved in a lot of therapy and progressive
11  changes.
12    Q  Do you know Dr. George Baker?
13    A  Yes.
14    Q  How do you know Dr. Baker?
15    A  He's a family physician in Chambersburg -- he
16  practices in Fayetteville, Pennsylvania.
17    Q  How about Dr. James Hurley?
18    A  Yes.  He's a surgeon, a general surgeon, in
19  Chambersburg.
20    Q  Dr. Charlesworth?
21    A  Yeah, he's a family practitioner in Chambersburg.
22    Q  And of course you know Dr. Enders?
23    A  Yes.
24    Q  He's in the same building that you're in?
25    A  Yes, yes.  He's a GI specialist.

Page 26

1    Q  How about a Dr. Sharfman?
2    A  Dr. Sharfman is an oncology specialist involved
3  in experimental therapies for malignant melanoma
4  predominantly.
5    Q  And, Doctor, we sort of got into the substance of
6  your testimony before I went over a little bit of your
7  background.  If we could just go back and do that quickly,
8  your area of medical specialty is what?
9    A  Medical oncology.
10    Q  How long have you been specializing in that?
11    A  Twenty-two years.
12    Q  Where did you graduate from medical school?
13    A  West Virginia University.
14    Q  What year?
15    A  1973.
16    Q  In which states are you licensed to practice
17  medicine?
18    A  Pennsylvania only.
19    Q  Are you board certified?
20    A  Yes.
21    Q  In what?
22    A  Medical oncology.
23    Q  Do you have any privileges at hospitals?
24    A  Privileges at Chambersburg Hospital and
25  Waynesboro Hospital.

Page 27

1    Q  On the record, Doctor, I'm going to ask you --
2  because there are some records in your file that I don't
3  believe I have, I'm going to ask you to make a copy of your
4  records and send them to me.  And, of course, we'll
5  reimburse you for the copying costs for doing that.
6        And do you have a curriculum vitae, a resume?
7    A  Yes.
8    Q  I'm going to ask you to make a copy of that and
9  you send that to me as well.
10    A  Okay.
11    Q  I'll send you a formal request.  Then you just
12  tell us how much it costs, and we'll reimburse you for that.
13  All right?
14    A  Okay.
15    Q  Thank you.
16        MR. PEDERSEN:  I'd like to request on the record,
17  Mike, that when you get a copy of that, you make a copy of
18  everything that you receive and send to us.
19        MS. MAHADY-SMITH:  And you already have a copy of
20  what CUNA had when they made the decision.
21        MR. PEDERSEN:  That's right.
22        MR. KELLEY:  That's all the questions I have,
23  Doctor.  Mr. Pedersen may have some for you.
24            EXAMINATION
25  BY MR. PEDERSEN:

Page 28

1    Q  We get to ask the follow-up questions now.  Let
2  me start off by just clarifying some references to time
3  frame.
4    A  Okay.
5    Q  You first saw -- the first time you ever saw or
6  heard of Tommy Bob Hall was at the time of your February
7  17th, 1999, note.
8    A  Yes.
9    Q  Isn't that correct?
10    A  Yes.
11    Q  And after the questions that you were asked this
12  morning, you don't have any information with respect to what
13  Tommy Bob Hall knew in November of '98 when he filled out an
14  insurance application, do you?
15    A  No information.
16    Q  And it would be inaccurate or a misuse of your
17  records to use your records to state what Tommy Bob Hall
18  knew in November of '98 when he filled out an insurance
19  application, wouldn't it?
20        MR. KELLEY:  Objection.  Calls for speculation,
21  lack of foundation.
22  BY MR. PEDERSEN:
23    Q  Let me ask the question another way, Doctor.  How
24  would you categorize an insurance company using your records
25  for the proposition that Tommy Bob Hall lied on an insurance

Multi-Page™

Page 33

1    A  Um-hum.  He mentions it twice in his report.
2    Q  When you got the March '99 -- in March '99, you
3  received a fax of the pathology report from 1993?
4    A  Yes, yes.
5    Q  And at that time, you became aware that the
6  statement, pathology revealed a malignant melanoma, was
7  incorrect.  Isn't that right?
8    A  Yes.
9    Q  And any doctor or medically trained person would
10  realize when they got the '93 pathology report that this
11  statement was incorrect?
12    A  Yes.
13      MR. KELLEY:  Object to the form of the question.
14  Lack of foundation and insufficient information.
15  BY MR. PEDERSEN:
16    Q  If you were making important decisions with
17  respect to care and treatment that were relevant to the '93
18  removal of the mole, would you get the '93 pathology report?
19      MR. KELLEY:  Object to the form of the question.
20  BY MR. PEDERSEN:
21    Q  Prior to treatment?
22    A  For completeness, we would like to have the
23  original pathology report.  But in this case, it didn't
24  alter the treatment or the evaluation.
25    Q  It didn't alter it for you because at the time

Page 34

1  Mr. Hall came under your care he had already received
2  another pathology report --
3    A  Yes.
4    Q  -- which said metastatic melanoma?
5    A  Yes.
6    Q  But if an insurance company or a doctor were
7  attempting to find out the diagnosis in '93, they'd look at
8  that '93 pathology report?
9    A  Yes.
10      MR. KELLEY:  Objection.  Lack of foundation, lack
11  of information.  On the part of the doctor, it calls for a
12  conclusion which is outside of the scope of this doctor's
13  expertise.
14  BY MR. PEDERSEN:
15    Q  Doctor, just to clarify, you're an oncologist, a
16  board certified oncologist?
17    A  Yes.
18    Q  And you know how cancer is diagnosed?
19    A  Yes.
20    Q  How it's treated?
21    A  Yes.
22    Q  And as a doctor, you know what you're looking for
23  to determine whether there was a historic diagnosis of
24  cancer?
25    A  Yes.

Page 35

1    Q  And that's a pathology report?
2    A  Yes.
3    Q  You were asked questions about our meeting that
4  we had a week ago and approximately four weeks ago.  During
5  any of those meetings, did I give you a single document that
6  you hadn't already seen --
7    A  No.
8    Q  -- or had in your records?
9    A  No.
10    Q  We simply reviewed your medical records?
11    A  Yes.
12    Q  Do you have an understanding as an oncologist as
13  to the -- I guess the word is histological medical
14  information that we now working backwards when you find a
15  metastatic melanoma in a lymph node as it relates to a mole?
16  What's the relationship?
17    A  Well, typically, in metastatic melanoma in a
18  lymph gland, it does not originate in a lymph gland.  It
19  derives -- it comes from another source, typically a skin
20  source.  Although, it could be a GI source.
21    Q  If -- I'm sorry.  Maybe you weren't done.
22    A  No, that's fine.
23    Q  If you have a patient that provides a history of
24  a mole removal and now has a lymph node and you have a
25  biopsy of metastatic melanoma, can you reach any conclusions

Page 36

1  or make any thoughts with respect to that mole?
2    A  Well, you would --
3      MR. KELLEY:  Object to the question.  Go ahead,
4  Doctor.
5      THE WITNESS:  You would immediately -- it would
6  promote a lot of curiosity about the original skin lesion.
7  It would also promote curiosity about additional skin
8  lesions, new skin lesions.
9  BY MR. PEDERSEN:
10    Q  With respect to Mr. Hall, is there any medical
11  significance to the fact that a mole was removed in '93 and
12  now we have a '99 -- or December of '98 appearance of a
13  swollen lymph node and then a biopsy in '99?
14      MR. KELLEY:  Object to the form.  Go ahead,
15  Doctor.
16      THE WITNESS:  The time interval is somewhat
17  prolonged to see a metastatic lesion, but it's possible.
18  Melanomas can do basically anything.  So someone questioned
19  the six-year interval between the skin lesion and the -- it
20  gives you more reason to go back and pull up the original
21  skin biopsy.
22  BY MR. PEDERSEN:
23    Q  As you sit here today after all the questions and
24  the review of your record, you have no information as to
25  when Tommy Bob Hall first became aware of the relationship

Page 41

1 Mr. Hall's care was obtained from Mr. Hall, from the nurses,
2 review of records, that you didn't obtain information by
3 phone conversation with Dr. Chicklo or any of the other
4 treating doctors in this case?
5    A No, no.
6       MR. KELLEY: You would agree with that, Doctor?
7       THE WITNESS: That I didn't -- are we talking
8 about original information?
9 BY MR. PEDERSEN:
10    Q That's right.
11    A Of those, the only ones that I discussed with any
12 information over the phone was Dr. Sharfman. And that was
13 more treatment decisions.
14    Q And you weren't a witness to the conversation
15 between any other physicians, Dr. Chicklo and Dr.
16 Charlesworth or any of the other doctors?
17    A No.
18    Q Last question, do you have an understanding as to
19 whether or not in a routine practice it's the surgeon who
20 removes the lesion that has a discussion with the patient
21 concerning the pathology of that?
22    A Yes. Either a surgeon or a dermatologist.
23    Q As opposed to an oncologist?
24    A Um-hum.
25    Q And in this case, that would have been Dr.

Page 42

1 Chicklo?
2    A Well, the original skin lesion would have been
3 Hurley.
4    Q Hurley in '93, and then Chicklo in '99.
5    A Chicklo in '99.
6       MR. PEDERSEN: I don't have any other questions.
7       MR. KELLEY: Just a couple of follow-up.
8       EXAMINATION
9 BY MR. KELLEY:
10    Q Now, you mentioned that the only oncology report
11 that you've ever seen regarding that 1993 lesion was the one
12 that you obtained in March of '99. Correct?
13    A Um-hum.
14       MR. PEDERSEN: Objection. It was not an oncology
15 report.
16 BY MR. KELLEY:
17    Q Pathology report, excuse me.
18    A Okay, yes.
19    Q Obtained in March of 1999. Correct?
20    A That's the only one pathology report from the '93
21 skin lesion, yeah.
22    Q That's the only one you've ever seen?
23    A Yes.
24    Q Are you aware whether that's the only pathology
25 report that exists regarding a mole removed in 1993?

Page 43

1    A No. I think I am aware that there was some
2 review of the original slides elsewhere for other reasons.
3    Q Other than that?
4    A No, no others.
5       MR. PEDERSEN: And that was in 1999 in Maryland.
6 Is that right?
7       THE WITNESS: Well, I'm not sure where or when.
8 I have no records of it. I'm just aware that the original
9 tissue was reviewed.
10 BY MR. KELLEY:
11    Q So as of the time that your original visit with
12 Tommy Bob Hall occurs, which is February 17 of 1999 --
13    A Um-hum.
14    Q -- there are no, to your knowledge, pathology
15 reports indicating that a 1993 mole was cancerous. Correct?
16    A Correct.
17    Q And yet during that meeting, you have specific
18 recollection of the patient and you discussing the fact that
19 he had a cancerous mole removed in 1993. Is that correct?
20    A Correct.
21    Q Doctor, do you have any information as to where
22 Tommy Bob Hall and/or his wife obtained that information
23 that he had a cancerous mole removed in 1993?
24    A No. When I saw him in February, it was of his
25 opinion that he had a malignant mole removed. I don't know

Page 44

1 where he got that information from.
2       MR. KELLEY: That's all I have.
3       EXAMINATION
4 BY MR. PEDERSEN:
5    Q And you don't know when he got that information?
6    A I don't know where or when he got that
7 information.
8    Q And you know he had met with Dr. Chicklo just
9 before seeing you?
10    A Yes.
11    Q And one final question, in 2000 after Mr. Hall
12 passed away, you had the '93 pathology report in your
13 records. If an insurance company had called you and asked
14 you whether or not Tommy Bob Hall had had any pathology, a
15 diagnosis of cancer or treatment for cancer prior to
16 November '98, what would you have told him?
17       MR. KELLEY: Objection. Calls for speculation.
18       THE WITNESS: Can I answer that?
19 BY MR. PEDERSEN:
20    Q Sure.
21    A The information I had, he had no malignancy prior
22 to January of '99.
23       MR. PEDERSEN: I have no other questions.
24       MR. KELLEY: That's it.
25       MS. MAHADY-SMITH: The only other thing is,

Multi-Page™

'93 – Chicklo's
**MICHAEL R. CASHDOLLAR, M.D.**

| 27 [2] | 1:19 | 2:5 |
|---|---|---|
| 27th [1] | 46:23 | |
| 28 [1] | 24:10 | |
| 28th [1] | 24:5 | |

**-'-**

| '93 [29] | 5:19 | 6:13 |
|---|---|---|
| 14:24 | 20:11 | 20:14 |
| 22:2 | 22:19 | 23:7 |
| 29:17 | 29:19 | 31:10 |
| 33:10 | 33:17 | 33:18 |
| 34:7 | 34:8 | 36:11 |
| 37:6 | 38:9 | 38:14 |
| 38:18 | 39:3 | 39:7 |
| 39:13 | 39:20 | 40:7 |
| 42:4 | 42:20 | 44:12 |
| '98 [6] | 28:13 | 28:18 |
| 29:1 | 29:7 | 36:12 |
| 44:16 | | |
| '99 [20] | 6:14 | 6:15 |
| 7:18 | 15:10 | 16:2 |
| 18:21 | 22:13 | 30:18 |
| 30:19 | 30:23 | 30:24 |
| 32:6 | 33:2 | 33:2 |
| 36:12 | 36:13 | 42:4 |
| 42:5 | 42:12 | 44:22 |

**-1-**

| 10 [1] | 5:7 | |
|---|---|---|
| 10:08 [1] | 1:19 | |
| 11:09 [1] | 45:8 | |
| 120 [1] | 1:21 | |
| 13 [1] | 7:11 | |
| 15 [4] | 9:11 | 10:18 |
| 13:3 | 40:1 | |
| 17 [6] | 8:18 | 15:10 |
| 16:2 | 18:6 | 18:21 |
| 43:12 | | |
| 17th [5] | 12:6 | 28:7 |
| 31:8 | 31:20 | 38:9 |
| 18 [1] | 7:17 | |
| 18th [2] | 7:16 | 10:21 |
| 1973 [1] | 26:15 | |
| 1993 [17] | 6:6 | 6:7 |
| 7:11 | 10:11 | 19:2 |
| 19:6 | 19:9 | 21:11 |
| 21:22 | 22:7 | 25:8 |
| 33:3 | 42:11 | 42:25 |
| 43:15 | 43:19 | 44:23 |
| 1999 [22] | 6:15 | 7:17 |
| 8:18 | 8:21 | 9:1 |
| 9:12 | 10:18 | 10:21 |
| 11:22 | 11:24 | 12:6 |
| 18:6 | 20:5 | 28:7 |
| 29:21 | 30:15 | 31:8 |
| 31:20 | 38:9 | 42:19 |
| 43:5 | 43:12 | |
| 1:01-CV-1265 [1] | 1:10 | |
| 1st [1] | 29:21 | |

**-2-**

| 2-23-99 [1] | 9:6 | |
|---|---|---|
| 20 [1] | 5:4 | |
| 2000 [2] | 24:5 | 24:10 |
| 44:11 | | |
| 2002 [2] | 1:19 | 46:23 |
| 22nd [2] | 8:21 | 9:1 |
| 22:13 | | |

**-3-**

| 3 [1] | 2:4 |
|---|---|

**-4-**

| 4-19-01 [1] | 24:12 |
|---|---|
| 42 [1] | 2:4 |
| 44 [1] | 2:5 |

**-7-**

| 7TH [1] | 1:21 |
|---|---|

**-9-**

| 9-30-99 [1] | 10:4 |
|---|---|

**-A-**

| a.m [2] | 1:19 | 45:9 |
|---|---|---|
| abdomen [1] | 10:22 | |
| accuracy [1] | 15:25 | |
| accurate [2] | 12:2 | |
| 30:11 | | |
| accurately [2] | 29:6 | |
| 30:10 | | |
| action [3] | 1:3 | 3:19 |
| 46:18 | | |
| addition [1] | 24:2 | |
| additional [1] | 36:7 | |
| address [1] | 14:12 | |
| adenopathy [1] | 9:4 | |
| administer [1] | 46:5 | |
| ADMINISTRATRIX [1] | | |
| 1:5 | | |
| admission [1] | 10:2 | |
| admitted [2] | 10:2 | |
| 10:4 | | |
| afterwards [2] | 21:16 | |
| 46:11 | | |
| again [2] | 9:14 | 23:18 |
| ago [12] | 3:16 | 4:16 |
| 4:18 | 4:18 | 5:2 |
| 5:5 | 5:8 | 5:23 |
| 6:22 | 22:10 | 35:4 |
| 35:4 | | |
| agree [3] | 30:17 | 40:25 |
| 41:6 | | |
| ahead [3] | 36:3 | 36:14 |
| 40:23 | | |
| allergies [2] | 13:24 | |
| 14:20 | | |
| almost [1] | 40:2 | |
| alter [3] | 22:23 | 33:24 |
| 33:25 | | |
| always [2] | 7:19 | 18:14 |
| answer [3] | 29:4 | 37:18 |
| 44:18 | | |

| answers [1] | 46:10 |
|---|---|
| appearance [1] | 36:12 |
| APPEARANCES [1] | |
| 1:23 | |
| appeared [1] | 29:12 |
| application [3] | 28:14 |
| 28:19 | 29:1 |
| appointments [1] | 25:4 |
| April [1] | 7:11 |
| area [1] | 26:8 |
| areas [2] | 17:16 | 17:16 |
| Associates [2] | 14:11 |
| 16:21 | |
| asymptomatic [1] | 29:13 |
| attempting [1] | 34:7 |
| attention [1] | 18:6 |
| attorney [2] | 46:16 |
| 46:17 | |
| authorized [1] | 46:4 |
| available [3] | 14:2 |
| 20:23 | 21:1 |
| aware [12] | 18:25 | 29:20 |
| 32:4 | 33:5 | 36:25 |
| 38:19 | 39:1 | 39:4 |
| 39:6 | 42:24 | 43:1 |
| 43:8 | | |
| away [1] | 44:12 |

**-B-**

| B [1] | 8:15 | |
|---|---|---|
| background [2] | 4:3 | |
| 26:7 | | |
| backwards [1] | 35:14 | |
| Baker [2] | 25:12 | 25:14 |
| balance [1] | 40:3 | |
| based [3] | 5:20 | 12:20 |
| 12:23 | | |
| basing [1] | 19:16 | |
| basis [2] | 32:16 | 39:23 |
| became [2] | 33:5 | 36:25 |
| benign [3] | 37:7 | 39:20 |
| 40:8 | | |
| best [1] | 25:6 | |
| between [3] | | 3:6 |
| 36:19 | 41:15 | |
| beyond [1] | 40:12 | |
| biopsy [7] | 6:3 | 30:11 |
| 31:3 | 31:5 | 35:25 |
| 36:13 | 36:21 | |
| birth [1] | 14:13 | |
| bit [1] | 26:6 | |
| board [2] | 26:19 | 34:16 |
| Bob [9] | 28:6 | 28:13 |
| 28:17 | 28:25 | 30:18 |
| 36:25 | 43:12 | 43:22 |
| 44:14 | | |
| bottom [1] | 15:18 | |
| brief [2] | 5:24 | 6:3 |
| briefly [1] | 11:13 | |
| brought [1] | | 3:19 |
| building [1] | 25:24 | |

**-C-**

| calls [4] | 23:25 | 28:20 |
|---|---|---|
| 34:11 | 44:17 | |
| cancer [14] | 17:21 | 20:20 |
| 29:2 | 30:6 | 30:8 |
| 30:10 | 30:14 | 30:19 |
| 30:22 | 30:23 | 34:18 |
| 34:24 | 44:15 | 44:15 |
| cancerous [8] | | 21:11 |
| 22:1 | 23:6 | 23:7 |
| 38:18 | 43:15 | 43:19 |
| 43:23 | | |
| cannot [1] | 29:6 | |
| caption [1] | 46:14 | |
| carcinoma [1] | | 11:2 |
| care [8] | 5:12 | 5:13 |
| 24:3 | 33:17 | 34:1 |
| 39:2 | 40:19 | 41:1 |
| case [4] | 17:18 | 33:23 |
| 41:4 | 41:25 | |
| Cashdollar [5] | | 1:15 |
| 1:20 | 2:3 | 3:1 |
| 46:7 | | |
| CAT [1] | 10:21 | |
| categorize [1] | 28:24 | |
| Catherine [2] | | 1:29 |
| 4:7 | | |
| cc'd [1] | 9:9 | |
| Center [1] | 24:13 | |
| certain [1] | 17:16 | |
| certainty [2] | | 37:5 |
| 37:10 | | |
| certification [1] | 3:7 | |
| certified [2] | | 26:19 |
| 34:16 | | |
| certify [5] | 46:6 | 46:8 |
| 46:13 | 46:15 | 46:19 |
| Chambersburg [11] | | 1:22 |
| 10:23 | 12:20 | 12:23 |
| 13:7 | 13:9 | 16:23 |
| 25:15 | 25:19 | 25:21 |
| 26:24 | | |
| changes [1] | 25:11 | |
| Charlesworth [2] | 25:20 | |
| 41:16 | | |
| chart [6] | 6:25 | 7:1 |
| 14:4 | 14:9 | 14:18 |
| 37:14 | | |
| chemotherapy [2] | 13:6 | |
| 13:7 | | |
| chest [1] | 10:22 | |
| Chicklo [23] | | 6:9 |
| 6:17 | 8:19 | 8:24 |
| 12:11 | 12:12 | 12:18 |
| 18:7 | 18:17 | 21:15 |
| 21:15 | 21:18 | 21:25 |
| 22:5 | 22:15 | 32:5 |
| 32:16 | 41:3 | 41:15 |
| 42:1 | 42:4 | 42:5 |
| 44:8 | | |
| Chicklo's [6] | | 7:21 |
| 19:7 | 19:20 | 21:4 |
| 32:1 | 32:12 | |

Fayetteville [1]           25:16
February [15]              1:19
  8:18      10:21    12:6
  15:10     16:2     18:6
  18:21     28:6     31:8
  31:19     38:9     43:12
  43:24     46:23
felt [1]                   19:22
few [2]         3:15    8:4
file [13]       7:9     8:6
  8:10      8:11    8:17
  8:18      9:6     13:5
  14:9      23:12   23:18
  23:21     27:2
filing [1]                 3:8
fill [1]                   15:9
filled [6]      15:10   15:15
  15:23     28:13   28:18
  29:1
final [1]       44:11
financially [1]            46:17
fine [2]        3:4     35:22
finished [1]               29:10
first [13]      5:20    5:20
  5:25      7:13    11:21
  12:8      13:12   14:7
  28:5      28:5    31:9
  36:25     38:17
follow-up [2]              28:1
  42:7
follows [1]                3:2
foregoing [1]              46:6
forgot [1]      45:1
form [10]       3:9     14:3
  16:15     17:9    31:14
  33:13     33:19   36:14
  37:18     39:22
formal [1]      27:11
foundation [3]             28:21
  33:14     34:10
four [2]        4:17    35:4
frame [1]       28:3
frankly [1] 4:1
front [2]       15:13   23:21

-G-

gain [1]        40:5
general [1] 25:18
Generally [1]              45:3
George [1] 25:12
GI [3]          16:23   25:25
  35:20
Gisele [1]      24:17
given [1]       46:20
gland [8]       7:19    19:25
  20:2      22:17   29:13
  35:18     35:18   38:15
Good [2]        3:13    3:14
graduate [1]               26:12
grand [1]       29:12
Grill [2]       24:22   24:25
group [3]       1:12    16:21

24:5
guess [2]       13:3    35:13

-H-

H [1]           1:14
Hafer [1]       24:23
Hall [49]       1:3     1:6
  3:20      3:21    4:2
  4:4       4:11    5:21
  8:15      10:22   11:21
  12:10     12:25   13:5
  13:13     13:18   18:13
  18:20     19:1    20:10
  20:19     22:1    23:5
  23:7      25:2    25:4
  25:7      28:6    28:13
  28:17     28:25   29:6
  29:23     30:1    30:18
  34:1      36:10   36:25
  39:20     40:1    40:7
  40:12     40:12   40:20
  41:1      43:12   43:22
  44:11     44:14
Hall's [3]      5:12    14:9
  41:1
hand [1]        46:22
handwritten [1]            23:22
Health [1]      16:22
heard [2]       28:6    40:18
held [1]        9:18
hereby [3]      3:6     3:8
  46:6
hereof [1]      46:14
hereunto [1]               46:22
herniated [1]              15:1
histological [1]           35:13
historic [1]               34:23
histories [1]              17:3
history [23]               6:17
  8:22      10:8    10:25
  11:2      13:22   13:24
  13:25     14:21   14:23
  16:7      17:21   21:22
  22:6      22:8    22:9
  22:14     23:15   35:23
  37:14     37:15   37:22
  37:25
hold [1]        12:4
home [1]        24:3
hospital [8]               10:23
  11:10     11:12   13:8
  13:10     16:23   26:24
  26:25
hospitals [1]              26:23
Hurley [3] 25:17    42:3
  42:4
Hurley's [3]               39:19
  40:6      40:11
husband [2]                1:7
  3:20

-I-

idea [1]        24:19

identify [2]               10:19
  22:4
illness [1]     22:9
immediately [3]            18:14
  25:10     36:5
impact [1] 23:1
imply [1]       20:7
important [4]              17:22
  17:24     18:3    33:16
improper [1]               40:13
in-person [2]              4:20
  4:22
inaccurate [1]             28:16
include [1] 37:16
included [3]               13:6
  19:5      32:24
includes [1]               10:8
  14:1      31:22
including [1]              14:19
  30:13
incorrect [4]              21:22
  33:7      33:11   38:10
indicate [1]               18:19
indicates [3]              11:2
  14:24     30:1
indicating [2]             23:14
  43:15
indirectly [1]             46:18
INDIVIDUALLY [1]
  1:3
information [64]           4:1
  5:12      7:21    13:23
  13:25     14:2    14:5
  14:11     14:15   14:19
  15:13     15:16   15:22
  16:6      16:13   17:7
  17:9      17:12   17:25
  19:4      19:7    19:8
  19:16     19:18   19:20
  19:23     19:24   20:23
  21:1      21:3    21:4
  21:21     21:24   21:25
  22:4      22:16   28:12
  28:15     29:5    29:9
  29:11     32:1    32:11
  32:23     32:24   33:14
  34:11     35:14   36:24
  37:11     37:23   38:1
  39:16     40:6    40:15
  41:2      41:8    41:12
  43:21     43:22   44:1
  44:5      44:7    44:21
initial [7]     5:13    6:4
  16:15     18:13   20:10
  20:19     25:2
initiate [1]    23:1
inside [2]      14:4    14:9
instance [1]               21:10
instruct [1]               17:15
instruction [1]            17:11
insufficient [1]           33:14
insurance [1]              1:13
  3:19      14:15   28:14
  28:18     28:24   28:25
  30:14     34:6    44:13

intake [2]      17:2    17:9
interested [1]             46:18
internist [1]              16:24
interpretation [1]         37:25
interval [2]               36:16
  36:19
introduced [1]             3:15
involved [4]               20:2
  25:10     26:2    39:2

-J-

James [3]       12:11   18:7
  25:17
January [14]               1:19
  9:1       11:22   22:13
  24:5      24:10   29:21
  30:18     30:19   30:23
  30:24     32:5    32:6
  44:22
JUDGE [1]                  1:14
July [1]        10:18

-K-

Kelley [38] 1:25    2:4
  3:3       3:12    3:16
  6:21      9:19    11:14
  11:15     12:7    20:15
  20:17     24:10   24:11
  24:21     24:24   27:22
  28:20     29:3    31:14
  33:13     33:19   34:10
  36:3      36:14   37:18
  39:10     39:22   40:10
  40:22     41:6    42:7
  42:9      42:16   43:10
  44:2      44:17   44:24
kind [4]        6:3     7:10
  16:20     16:24
knew [3]        28:13   28:18
  29:6
knowledge [4]              39:23
  40:11     40:12   43:14
knowledgeable [1] 18:2
known [1] 12:18

-L-

L [1]           24:17
label [1]       8:14
lack [4]        28:21   33:14
  34:10     34:10
last [4]        5:3     5:6
  38:7      41:18
late [1]        3:20
LAW [1]         1:3
lawyer [1] 3:18
learned [1] 37:16
leave [1]       21:18
led [1]         32:1
left [3]        10:10   19:1
  20:24
left-hand [1]              10:3
Legal [1]       24:13

**ones** [1]    41:11
**operative** [2]    8:25
  9:3
**opinion** [1]    43:25
**opposed** [1]    41:23
**origin** [1]    32:7
**original** [16]    5:18
  6:3    6:9    8:6
  8:9    8:10    8:16
  20:1    33:23    36:6
  36:20    41:8    42:2
  43:2    43:8    43:11
**originally** [1]    7:14
**originate** [1]    35:18
**otherwise** [1]    29:14
**outpatient** [1]    10:13
**outside** [1]    34:12
**own** [3]    18:10    29:15
  30:12

**-P-**

**page** [2]    17:9    17:13
**pain** [2]    24:1    24:3
**Pamela** [3]    1:17    46:4
  46:24
**paper** [1]    15:5
**part** [6]    5:12    13:9
  18:1    21:8    34:11
  45:4
**particular** [1]    17:18
**particularly** [1]    17:15
**parties** [2]    3:7    46:16
**passed** [1]    44:12
**past** [10]    4:11    10:8
  13:24    14:21    14:23
  16:7    37:13    37:14
  37:22    37:25
**pathologic** [1]    30:11
**pathological** [1]    7:11
**pathology** [49]    5:13
  5:18    6:1    6:1
  6:19    6:20    7:18
  7:20    14:2    19:2
  19:11    19:14    19:15
  19:17    19:19    22:17
  22:19    29:17    29:19
  29:20    30:14    30:17
  31:9    31:12    31:22
  32:6    32:10    32:14
  32:20    33:3    33:6
  33:10    33:18    33:23
  34:2    34:8    35:1
  38:8    38:10    38:17
  39:12    40:8    41:21
  42:17    42:20    42:24
  43:14    44:12    44:14
**patient** [19]    13:21
  13:22    14:12    14:19
  15:15    15:17    16:8
  16:11    17:2    17:16
  17:18    30:4    35:23

**patient's** [2]    17:21
  37:25
**patients** [4]    1:27
  12:16    13:24    16:13
**Pedersen** [35]    1:27
  1:27    1:28    2:5
  3:4    4:7    6:12
  12:1    20:13    27:16
  27:21    27:23    27:25
  28:22    29:8    31:16
  31:18    33:15    33:20
  34:14    36:9    36:22
  37:20    38:25    39:17
  39:24    40:14    40:24
  41:9    42:6    42:14
  43:5    44:4    44:19
  44:23
**Pennsylvania** [6]    1:2
  1:22    25:16    26:18
  46:2    46:6
**perhaps** [1]    25:3
**period** [2]    40:2    40:5
**person** [1]    33:9
**phone** [5]    14:12    21:19
  23:25    41:3    41:12
**physical** [3]    8:22
  22:6    22:14
**physician** [2]    14:1
  25:15
**physicians** [2]    37:24
  41:15
**piece** [2]    15:4    29:9
**place** [3]    1:20    17:2
  46:14
**PLAINTIFF** [2]    1:8
  1:30
**Plaintiff's** [3]    4:11
  5:9    6:23
**Plaintiffs** [1]    4:6
**pleasure** [1]    18:20
**plus** [1]    14:2
**PMH** [1]    14:20
**point** [2]    38:13    39:3
**policies** [1]    17:1
**possible** [2]    36:17
  45:6
**possibly** [1]    4:17
**practice** [8]    12:20
  12:23    16:18    16:19
  17:1    26:16    37:21
  41:19
**practices** [1]    25:16
**practitioner** [1]    25:21
**predominantly** [1]    26:4
**prefer** [1]    12:1
**prepared** [5]    9:14
  10:14    11:9    11:9
  11:11
**prescriptions** [1]    24:1
**present** [2]    22:8    29:13
**presume** [1]    3:23

**pretty** [2]    5:19    14:1
**previous** [9]    7:19
  19:9    20:6    20:7
  20:19    22:1    22:11
  23:6    23:15
**previously** [1]    20:24
**primary** [2]    20:3
  38:18
**privileges** [2]    26:23
  26:24
**problems** [1]    20:20
**procedures** [2]    13:20
  17:1
**process** [1]    40:9
**progressive** [1]    25:10
**prolonged** [1]    36:17
**promote** [2]    36:6
  36:7
**proposition** [1]    28:25
**provided** [1]    29:16
**provides** [1]    35:23
**Public** [4]    1:18    46:4
  46:11    46:25
**pull** [1]    36:20
**purpose** [1]    3:25
  7:22
**pursue** [1]    17:16
**put** [2]    32:1    32:10

**-Q-**

**questioned** [1]    36:18
**questions** [17]    5:14
  5:16    5:17    6:1
  11:16    15:25    27:22
  28:1    28:11    31:19
  35:3    36:23    37:13
  38:7    42:6    44:23
  46:9
**quickly** [1]    26:7

**-R-**

**R** [6]    1:15    1:25
  1:28    2:3    3:1
  46:7
**radiology** [1]    11:11
**RAMBO** [1]    1:14
**Rarely** [1]    3:24
**rather** [1]    38:4
**re-review** [1]    39:4
**re-reviewed** [3]    39:3
  39:6    39:14
**reach** [1]    35:25
**reached** [2]    32:5
  32:19
**realize** [1]    33:10
**realized** [1]    38:10
**realm** [1]    40:12
**reason** [5]    22:23    36:20
  38:12    39:18    40:16
**reasons** [1]    43:2
**receive** [2]    7:13    27:18

**received** [5]    22:18
  31:25    31:25    33:3
  34:1
**receiving** [1]    22:21
**recognize** [1]    15:4
**recollection** [1]    43:18
**record** [10]    8:3    9:6
  9:17    9:18    27:1
  27:16    36:24    38:21
  39:11    46:20
**records** [32]    4:1
  4:3    6:17    9:16
  9:20    12:2    13:10
  16:8    16:11    16:12
  17:2    18:3    22:4
  24:5    24:13    27:2
  27:4    28:17    28:17
  28:24    29:15    29:16
  30:12    35:8    35:10
  38:1    38:2    40:1
  40:19    41:2    43:8
  44:13
**reduced** [1]    46:11
**reference** [1]    24:12
  31:8
**references** [1]    28:2
**referral** [4]    16:12    19:8
  32:1    32:12
**referred** [10]    6:8
  6:10    6:11    6:16
  12:10    12:14    12:16
  17:17    17:19    17:20
**referring** [3]    14:1
  21:24    37:16
**refute** [1]    40:16
**regard** [2]    6:5    9:3
**regarding** [5]    4:11
  5:12    16:7    42:11
  42:25
**reimburse** [2]    27:5
  27:12
**relate** [1]    37:9
**related** [1]    37:10
**relates** [1]    35:15
**relationship** [3]    23:5
  35:16    36:25
**relative** [2]    46:15
  46:16
**relevant** [1]    33:17
**rely** [1]    11:17
**relying** [1]    19:22
**remember** [4]    5:14
  13:13    13:14    21:5
**removal** [4]    31:1
  31:3    33:18    35:24
**removed** [7]    23:7
  32:7    36:11    42:25
  43:19    43:23    43:25
**removes** [1]    41:20
**repeat** [1]    38:20
**rephase** [1]    31:16
**rephrase** [1]    20:15
**report** [46]    7:11    7:25
  8:25    9:3    9:11

**5:5**    5:8    8:16
23:17    29:9    42:11
42:20    42:22    44:11

## -U-

**Um-hum** [20]                7:12
  8:7      8:20      9:22
  11:4     11:6      15:19
  18:18    18:22     19:13
  22:3     22:20     23:23
  31:4     33:1      40:4
  40:21    41:24     42:13
  43:13
**under** [2]    34:1        46:12
**understand** [2]           20:16
  32:8
**UNITED** [1]               1:1
**University** [1]           26:13
**unrelated** [1]            37:12
**up** [2]        12:4        36:20
**upper** [1]    15:16
**using** [1]    28:24
**Usual** [1]    3:3

## -V-

**V** [1]         1:10
**various** [1] 13:4
**Virginia** [1]             26:13
**visit** [13]   5:20        5:24
  5:25     6:4       13:12
  13:14    15:12     18:15
  20:10    20:19     25:2
  31:9     43:11
**visiting** [1]             24:2
**visits** [6]   13:4        13:6
  13:6     25:4      25:5
  40:2
**vitae** [1]    27:6

## -W-

**wait** [2]     11:18       12:1
**waive** [1]    45:3
**waived** [1] 3:8
**WALLACE** [1]              1:24
**Waynesboro** [1]           26:25
**ways** [1]     38:6
**Wednesday** [1]            18:21
**week** [5]     4:17        4:18
  5:5      5:23      35:4
**weeks** [1]    35:4
**Weinrich** [1]             9:21
**West** [1]     26:13
**WHEREOF** [1]              46:22
**white** [1]    8:14
**whole** [3]    16:20       23:18
  39:25
**Wide** [1]     10:10
**wife** [3]     13:17       25:3
  43:22
**William** [1]              10:14
**within** [2]   16:25       46:5
**without** [1]              32:20
**witness** [18]             2:1

3:1        6:14       12:5
29:5       36:5       36:16
38:24      39:15      40:13
41:7       41:14      43:7
44:18      45:6       46:9
46:21      46:22
**word** [1]     35:13
**worksheet** [1]            17:6
**worry** [1]    39:21
**write** [1]    18:10
**writing** [4] 15:4         15:7
  15:8     15:9
**written** [1] 17:5
**wrote** [1]    18:6

## -Y-

**year** [1]     26:14
**year's** [1]   40:2
**years** [3]    12:19       22:10
  26:11
**yellow** [1] 14:10
**yet** [1]      43:17

# FALLING SPRING MEDICAL ASSOCIATES

## NEW PATIENT INFORMATION RECORD (PLEASE PRINT OR WRITE LEGIBLY)

### PATIENT INFORMATION

| PATIENT'S NAME  LAST  FIRST  MI | AGE | DATE OF BIRTH | SOCIAL SECURITY NO. |
|---|---|---|---|
| Hall II  Tommy  B | 43 | 5-12-55 | 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 |

| STREET ADDRESS  ☐ PERMANENT  ☐ TEMPORARY | CITY AND STATE | ZIP CODE | HOME PHONE NO. |
|---|---|---|---|
| 517 Mt Pleasant Rd | Fayetteville  PA | 17222 | 717-352-9030 |

| PATIENT'S EMPLOYER | MARITAL STATUS: |
|---|---|
| Cressler Trucking Inc | SINGLE  (MARRIED)  WIDOW  DIVORCED |

| EMPLOYER'S STREET ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|
| 1069 Seibert Ave | Shippensburg PA | |

| IN CASE OF EMERGENCY CONTACT:  NAME | RELATIONSHIP | PHONE NUMBER |
|---|---|---|
| Nancy Hall | Wife | 717-352-9030 |

| SPOUSE'S NAME | DATE OF BIRTH | SOCIAL SECURITY NUMBER |
|---|---|---|
| Nancy M Hall | 5-28-99 | 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 |

| SPOUSE'S EMPLOYER | OCCUPATION (INDICATE IF STUDENT) | BUSINESS PHONE NO. |
|---|---|---|
| | | |

| EMPLOYER'S STREET ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|
| | | |

| WHO REFERRED YOU TO THIS PRACTICE? | FAMILY DOCTOR |
|---|---|
| Dr Charlesworth/Bachicho | Dr Charlesworth |

D. Endries Runds

## INSURANCE INFORMATION

☐ Medicare (Medical Insurance Only)

Medicare Number _____  Effective Date _____

☑ Blue Shield                       If Out of State, Identify _____

Address, If Out of State _____

Name of Insured Tommy B Hall  Identification No. QA563825959  Group No. 016824800

☐ Other Insurance _____

Address _____

Name of Insured _____  Policy No. _____  Group No. _____

☐ Other Insurance _____

Address _____

Name of Insured _____  Policy No. _____  Group No. _____

☐ Medicaid (Medical Assistance)

Recipient Number _____

**In order to control our cost of billing, we request that office visits be paid at the time service is rendered. We would rather control our billing costs than be forced to raise our fees.**

AUTHORIZATION: I hereby authorize the physician indicated above to furnish information to insurance carriers concerning this illness/accident, and I hereby irrevocably assign to the doctor all payments for medical services rendered. I understand that I am financially responsible for all charges whether or not covered by insurance.

2-17-99
Date

Tommy B Hall II
Responsible Party Signature

D0176

HALL, Tommy B.

Referring Physician _in Charlesworth__ Dr. Stockly 2/11__
_thas ca_

Date Referred

WT _210_ HT _5'6"_ BP _134/74_ P _92_ AGE _43_

DATE: _2/17/99_

CHIEF COMPLAINT:

    Lt. CERVICAL NODE

ALLERGIES: NKA

MEDICATIONS: Ferrous Sulfate  ī Daily

PMH: anemia
~~malignant~~
MALIGNANT MOLE ON BACK 93
RUPTURED & HERN DISA.

SURGERY: Spinal surgery x2 - 89 & 93 - Ruptured & Hern Disc.
malignant mole excised from back in 1993
excisional biopsy of deep cervical node 1/22/99

SH:    OCCUPATION: TRUCK DRIVER / DRESSLER - MARRIED / 1 CHILD

    SMOKE: 2ppd

    ALCOHOL: Ø

    CAFFEINE: COFFEE - 5 CUPS PER DAY

FH:  A MOTHER 62  Healthy
    A FATHER 65  DM, SKIN CANCER
    1 BROTHERS 42  Healthy

1 SISTERS Half 17  Healthy

D0177

ORIGINAL

*13*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


NANCY HALL, INDIVIDUALLY AND : CIVIL ACTION - LAW
AS THE REPRESENTATIVE AND     :
ADMINISTRATRIX OF THE ESTATE :
OF TOMMY HALL, DECEASED, HER :
HUSBAND,                       :
          PLAINTIFF            :
                              :
          V                   : 1:01-CV-1265
                              :
CUNA MUTUAL GROUP, CUNA       :
MUTUAL INSURANCE SOCIETY,     :
          DEFENDANTS          : JUDGE SYLVIA H. RAMBO


         DEPOSITION OF:   JOHN G. ENDERS, M.D.

         TAKEN BY:        DEFENDANTS

         BEFORE:          PAMELA S. SULLIVAN,
                          REPORTER-NOTARY PUBLIC

         DATE:            JANUARY 17, 2002, 10:05 A.M.

         PLACE:           CHAMBERSBURG GASTROENTEROLOGY
                          ASSOCIATES
                          120 NORTH 7TH STREET
                          CHAMBERSBURG, PENNSYLVANIA


APPEARANCES:

    McNEES WALLACE & NURICK, LLC
    BY:  MICHAEL R. KELLEY, ESQUIRE

         FOR - DEFENDANTS

    PEDERSEN & PEDERSEN
    BY:  STEPHEN R. PEDERSEN, ESQUIRE
         CATHERINE M. MAHADY-SMITH,  ESQUIRE

         FOR - PLAINTIFF



HAEN Reporting Service, Inc.
Hughes
Albright
Foltz
Natale

2080 Linglestown Road • Suite 103 • Harrisburg, PA 17110
717.540.0220 • Fax 717.540.0221 • Lancaster 717.393.5101


Page 2

```
              WITNESS
NAME                          EXAMINATION
JOHN G. ENDERS, M.D.
BY:  MR. KELLEY              3,  27
BY:  MR. PEDERSEN            20,33
```

Page 3

1     JOHN G. ENDERS, M.D., called as a witness, being
2 duly sworn, testified as follows:
3               EXAMINATION
4 BY MR. KELLEY:
5     Q  Good morning, Doctor.  My name is Mike Kelley, as
6 I just introduced myself to you a few moments ago.  I'm a
7 lawyer with McNees Wallace & Nurick in Harrisburg.
8        We're here today to take your deposition in a
9 case brought by the estate of Tommy Hall and his wife
10 against CUNA Mutual Insurance Group, which is my client.  I
11 represent CUNA.  We're here to ask you some questions today
12 about your treatment of Mr. Hall and frankly focusing on
13 some of the medical records -- I think there's only three --
14 that have some relevance to the action that we're involved
15 with.
16        Before I get into the specifics of the questions
17 about the medical records, I'd like to just get a little bit
18 of background on you if I could.
19     A  Fine.
20     Q  Could you just give us your full name, please?
21     A  John G. Enders, E-N-D-E-R-S.
22     Q  And do you have a practice separate from the
23 hospital?
24     A  Yes.
25     Q  What's the name of your practice?

Page 4

1     A  Chambersburg Gastroenterology Associates.
2     Q  How long have you been associated with that
3 practice?
4     A  I was here in 1980, and I've been in the same
5 location since that time.
6     Q  Were you at one time referred to as the Fairway
7 Medical Associates?
8     A  No, Falling Spring Medical Associates.
9     Q  Falling Springs?
10     A  Yes.
11     Q  Are you no longer referred to as that?
12     A  That's a complicated situation.  But it's not a
13 corporation, just the name of the group we share this office
14 with.
15     Q  But when we have medical records that refer to
16 Falling Springs, that's also part of your practice?
17     A  Right, that's this office location.
18     Q  Do you have a particular medical specialty?
19     A  Gastroenterology.
20     Q  Are you board certified in that?
21     A  Yes.
22     Q  Do you have any other specialties?
23     A  Internal medicine before that.
24     Q  I'm sorry?
25     A  Internal medicine.

Page 5

1     Q  Can you describe your education, Doctor, after
2 high school, formal education?
3     A  College:  Elizabethtown College, four years.
4 Then Hahnemann Medical College in Philadelphia, four years.
5 Then Geisinger Medical Center for internship and residency,
6 internal medicine, three years.  Then two years in the Army.
7 Then two years GI fellowship in the Army.
8     Q  So you began practicing on your own in about
9 1980?
10     A  1980.
11     Q  In which states are you licensed to practice
12 medicine?
13     A  Pennsylvania.
14     Q  Do you currently have privileges at any
15 hospitals?
16     A  Chambersburg.
17     Q  Anywhere else?
18     A  No.
19     Q  Has your license to practice ever been suspended
20 or revoked?
21     A  No.
22     Q  Doctor, do you maintain a current curriculum
23 vitae?
24     A  Yes.
25     Q  At some point if we could get a copy of that,


Page 10

1    A  Yes.
2    Q  How many times did you meet with him?
3    A  Two, I believe.  Oh, no, three.
4    Q  Three meetings with him?
5    A  Yes.
6    Q  What was the purpose of your involvement with Mr.
7  Hall?
8    A  He was referred to me for a microcytic anemia and
9  with a request that I do colonoscopy and ultimately an upper
10  endoscopy.
11    Q  Was anyone else present other than you and Mr.
12  Hall when you met with him?
13    A  No.
14    Q  His wife wasn't with him?
15    A  I don't remember that.
16    Q  It's possible she was?
17    A  It's possible she was, yes.
18    Q  Would you routinely have a member of your medical
19  staff with you during the visit with the patient?
20    A  No.
21    Q  Did your office or you personally create any
22  records of the meetings or visits that you had with Mr.
23  Hall?
24    A  Yes.
25    Q  Doctor, in my records that I've received, I have

Page 11

1  three documents.  And I just want to make sure that it's the
2  same documents that you have and make sure that you don't
3  have more than I have or less than I have for that matter.
4      I have a record that at the top says, Falling
5  Spring Medical Associates.  At the bottom, it's signed by
6  Tommy Hall and dated February 17, 1999.
7    A  Correct.
8    Q  Do you have that?  And then another page that
9  appears to have information at the top about his height and
10  weight and then continues on with allergies, medications,
11  patient medical history, et cetera.  Do you see that?
12    A  That's the back side of the first one, yes.
13    Q  Okay.
14      MS. MAHADY-SMITH:  And that's the date of
15  2-23-99.  Right?
16      THE WITNESS:  That entire form was 2-23.
17      MS. MAHADY-SMITH:  '99?
18      MR. PEDERSEN:  I think you meant 2-17.
19      MR. KELLEY:  2-17-99 is the one that I have.
20      MR. PEDERSEN:  2-23 is --
21      THE WITNESS:  2-23-99.
22  BY MR. KELLEY:
23    Q  I have one also dated 2-17-99.  Do you have that?
24    A  No, I saw him first on 23.  I have nothing from
25  2-17.

Page 12

1    Q  That's interesting.  Let me show you what I have
2  here.  Just ignore my highlighting here, Doctor.  That's
3  what I have.
4    A  This is Dr. Cashdollar's chart.
5    Q  Okay.
6    A  That's not mine.
7    Q  Is this one yours?
8    A  That one's mine, yes.
9    Q  So Dr. Cashdollar was in Falling Spring Medical
10  Associates as well?
11    A  He is in Falling Spring Medical Associates, but
12  he's not an associate with our group.  He's in
13  hematology/oncology.
14    Q  All right.  When is the first time that you saw
15  Mr. Hall?
16    A  The 23rd of February of '99.
17    Q  So we have then the document of February 23, '99,
18  that has two pages to it.  Right?
19    A  Front and back, right.
20    Q  Front and back.  And then I also have a document
21  dated March 15 of 1999 that's a colonoscopy report.
22    A  Yes.
23    Q  Do you have that?
24    A  And there's also a clinic note that goes with the
25  2-23-99.  You should have that as well.

Page 13

1    Q  I don't believe I have that.  Can I see what
2  you've got there?
3    A  It's the top part and the second page from 2-23.
4  Others are ongoing and in sequence.
5    Q  No, I don't have this one.  Is there any other
6  notes then that you have, Doctor?
7    A  So far, no.  This is the only thing.
8    Q  Can you take a look through your file then and
9  see if you have any other medical records regarding --
10    A  I have the colonoscopy of 3-15.
11    Q  Right.
12    A  The upper endoscopy of 5-26-99.  I have a copy of
13  Dr. Cashdollar's notes from February 17, a letter he sent to
14  me.  And that is all.
15    Q  Okay.  Let's go back then, Doctor, to the --
16    A  I'm sorry.  I do have one other thing.  I have a
17  copy of an upper GI and small bowel follow-through from
18  5-18-99 with notes that I made on the bottom of that.
19    Q  Thank you.
20      MS. MAHADY-SMITH:  Doctor, may I take a look at
21  that too, please?  Thank you.  Oh, we have it.  Sorry,
22  Doctor.
23  BY MR. KELLEY:
24    Q  If you would, Doctor, would you go back to the
25  initial document, the February 23, '99, document?

 **Multi-Page™** ● **JOHN G. ENDERS, M.D.**
**JANUARY 17, 2002**

---

Page 18

1  A  Yes.
2  Q  And in the Indication for Procedure, it says,
3 This is a 43-year-old white male who had melena,
4 M-E-L-E-N-A, removed in 1993.  Do you see that?
5  A  Yes.
6  Q  Does that mean melanoma?  Is that what that
7 refers to?
8  A  My copy is corrected, but your copy is probably
9 not.
10  Q  Where did you get that information when you put
11 it in this particular report?
12  A  When I dictate these, I have my chart available
13 to me.  So from my record, it goes into the dictation.
14  Q  And there was one document, Doctor, that you
15 showed me that I didn't have.  Yes, I believe that's the
16 one.
17  A  My clinic note from 2-23.
18  Q  May I see that again?  I'm sorry.  And this is
19 2-23-99.  These are notes of the visit.  Is that right?
20  A  Correct.
21  Q  And these are your notes.  Correct?
22  A  Correct.
23  Q  And they refer to a 43-year-old white male with
24 melanoma in 1993?
25  A  Correct.

---

Page 19

1  Q  Again, that's you dictating that and it being
2 transcribed by someone else.  Correct?
3  A  Correct.
4  Q  And then you reviewing that afterwards?
5  A  Yes.
6  Q  And that information about the melanoma in '93,
7 again, would come from the records that you had prior to
8 dictating this.  Is that right?
9  A  Correct.
10  Q  Doctor, at any time during the time that you were
11 treating Mr. Hall, did you ever -- were you ever provided
12 with information that suggested that Mr. Hall did not have a
13 cancerous mole removed in 1993?
14  A  No.
15  Q  Have you -- since the time that he treated with
16 you, have you since been given information that he did not
17 have a malignant mole in 1993?
18  A  No.
19  Q  Other than the patient himself or perhaps his
20 wife and Dr. Cashdollar, did you ever have any
21 communications, that is, either orally or through letter
22 form with any other doctors regarding Mr. Hall?
23  A  Not that I remember.
24  Q  And there's nothing in your records that would
25 indicate that?

---

Page 20

1  A  No.
2  MR. KELLEY:  That's all I have for you, Doctor.
3 Thank you.
4  EXAMINATION
5 BY MR. PEDERSEN:
6  Q  Now, I get to ask follow-up questions to try to
7 clarify some things.
8  A  Okay.
9  Q  First of all, I wanted to clarify the first time
10 that you saw Tommy Bob Hall was February 23rd, '99.  Is that
11 right?
12  A  Correct.
13  Q  And is it fair to say then that you have no
14 information about what Tommy Bob Hall knew about his
15 condition in November of '98 at the time he was filling out
16 an insurance application?
17  A  That's correct.
18  Q  And it would be a -- how would you characterize
19 someone's efforts to use your records to state that Tommy
20 Bob Hall knew he had cancer in '98 and lied on an insurance
21 application?
22  MR. KELLEY:  Objection.
23 BY MR. PEDERSEN:
24  Q  Would that be a fair use of your records?
25  A  No.

---

Page 21

1  Q  How would you characterize an effort to use your
2 records in that manner?
3  MR. KELLEY:  Same objection.
4  THE WITNESS:  Inappropriate.
5 BY MR. PEDERSEN:
6  Q  In fact, during the questioning from the attorney
7 for the insurance company, did they at any time during that
8 questioning about trying to get truthful and accurate
9 records show you the '93 pathology report?
10  A  No.
11  Q  Would you like to see that report?
12  A  Sure.
13  Q  Let me show you the '93 pathology report.  What
14 does that report tell us with respect to the '93 mole that
15 was removed?
16  A  That it was a dysplastic nevus, not a melanoma.
17  Q  So if you had your records and this pathology
18 report, what conclusions could you reach?
19  MR. KELLEY:  Objection.  Calls for speculation.
20 BY MR. PEDERSEN:
21  Q  I'm just putting you in the same position the
22 insurance company was in when it was making decisions.
23  MR. KELLEY:  Objection.  That's not true.  Calls
24 for speculation.  Lack of foundation.  Go ahead.
25  THE WITNESS:  Had I had that information, I

---


Page 26

1 Q Dr. Hurley, if he had been -- well, you're not
2 aware that he was deposed already. Is that correct?
3 A No, I have no idea.
4 Q If he had been deposed and said that he got this
5 pathology report and reported to the patient a benign
6 condition, you wouldn't have any information to refute that?
7 A That's correct.
8 Q And, in fact, isn't that how you would report to
9 a patient this same pathology report?
10 A Yes.
11 Q And that's the only source that a patient
12 typically gets diagnosis and information about his cancer is
13 through his treating doctor and the pathology report?
14 A Yes.
15 Q Now, you were asked some questions about efforts
16 for accurate recordkeeping. Even though the best efforts
17 are made for accurate recordkeeping, mistakes can appear in
18 the record. Is that correct?
19 A Correct.
20 Q Sometimes discrepancies can appear in the record?
21 A Correct.
22 Q And a careful doctor or a careful insurance
23 company would attempt to remedy those discrepancies by
24 looking at things like pathology reports?
25 A Correct.

Page 27

1 Q Particularly if a critical decision, a life-care
2 decision is being made or displacing someone from their home
3 is being made, you would expect a careful review?
4 A Correct.
5 Q You were asked whether you had recollections of
6 meeting with Tommy Bob Hall. Do you have any recollection
7 during any of those meetings -- and remember this is in
8 February of '99 -- what Tommy Bob Hall reported to you about
9 that mole?
10 A I do not.
11 Q Do you recall whether he reported to you as
12 having had a treatment and removal of a cancerous mole?
13 A No.
14 Q You don't know when the link was made between the
15 mole that was removed and the node on Tommy Bob Hall's neck,
16 do you?
17 A That's correct.
18 Q And you don't know at the time you got Dr.
19 Cashdollar's letter whether he had gone back and re-reviewed
20 slides or spoken with pathologists at the time he wrote that
21 letter, do you?
22 A That's correct. I do not know.
23     MR. PEDERSEN: I don't have any other questions.
24 Thank you, Dr. Enders.
25     EXAMINATION

Page 28

1 BY MR. KELLEY:
2 Q I just I have couple of follow-up, Doctor.
3     When you met with Plaintiff's counsel back in the
4 latter part of 2001, did they at that time show you a copy
5 of the pathology report from 1993?
6 A Not that I recall.
7 Q So the first opportunity then that the Plaintiffs
8 had to discuss with you, they didn't supply you with this
9 information?
10 A I don't recall. I certainly did not put anything
11 in my record.
12 Q Is it fair to say that today is the first time
13 that you've been advised that there exists this pathology
14 report from 1993 that indicates a dysplastic nevus?
15 A That's the first time I've seen the report to the
16 best of my recollection. I know there's been controversy
17 about the report.
18 Q Now, Doctor, when your office obtains information
19 about a patient's medical history, does your nurse who's
20 actually taking that history, does she endeavor to make sure
21 that that information is accurate?
22 A Other than reviewing the report that is
23 firsthand, we don't go back and check the origination of
24 that report. She would not --
25 Q Her information either comes from the patient or

Page 29

1 from, in this case, the referring letter. Is that correct?
2 A Correct.
3 Q And is it your practice to rely upon information
4 that's supplied by the patient?
5 A If the information is pertinent to what I am
6 doing, I will go back and review other information. If it
7 doesn't have a bearing on my exact part, I may or may not.
8 Q Do you rely upon information that's supplied to
9 you by other doctors?
10 A As a rule, yes.
11 Q Do you know Dr. Cashdollar?
12 A Yes.
13 Q Have you worked with him on other cases?
14 A Yes.
15 Q Have you relied upon his information that has
16 been supplied by him in other cases, other patients that
17 you've dealt with?
18 A Yes.
19 Q Is it a reasonable thing to do, to rely upon that
20 information that's contained in a referring letter from Dr.
21 Cashdollar?
22 A Yes.
23 Q And, Doctor, you would agree with me that if a
24 patient -- if that's what happened here, we need to find
25 that out. But if a patient indicates in his medical history



Multi-Page™

**JOHN G. ENDERS, M.D.**
**JANUARY 17, 2002**

---

Page 34

1 to that procedure?

2  A  The colonoscopy as an evaluation for his anemia,

3 not even as a follow-up to that procedure.

4  Q  And that anemia was -- and the follow-up was

5 referred to you. And those were events that were occurring

6 in '99?

7  A  Correct.

8  Q  You were asked questions whether or not you could

9 rely on the referring letter and doctors referring patients

10 to you and information they provided to you. If you had had

11 that -- you had the referring letter. You had some

12 information. But if you had had the '93 pathology report,

13 that would have caused some questions for you, wouldn't it?

14    MR. KELLEY: Objection. Calls for speculation.

15    THE WITNESS: It would have -- actually, not

16 really because what I knew was he had a melanoma lymph node.

17 I had no idea where that came from, and this would not have

18 made a difference in my care of Tommy Hall one way or the

19 other.

20 BY MR. PEDERSEN:

21  Q  But this pathology report in your mind certainly

22 would not then point to this mole as being the primary

23 source of that lymph node. Is that right?

24  A  That's correct.

25  Q  You would agree with me that patients themselves,

---

Page 35

1 although they may suspect and be concerned about things,

2 they do not diagnose cancer, do they?

3  A  Correct.

4  Q  The pathology report diagnoses cancer?

5  A  Correct.

6  Q  You were asked questions about whether you --

7 what you were aware of that CUNA Mutual had or didn't have

8 at the time they were making decisions about the Tommy Bob

9 Hall home. Would you consider it unreasonable to conclude

10 that Tommy Bob Hall knew he had cancer in '98 as a result of

11 the pathology report from '93?

12    MR. KELLEY: Objection. Calls for speculation

13 beyond the scope of this witness's background and training

14 and based upon insufficient information.

15    MR. PEDERSEN: And the door was opened by the

16 very questions that you asked.

17    THE WITNESS: I would think it would be

18 unreasonable.

19 MR. PEDERSEN:

20  Q  Unreasonable. And if, furthermore, the insurance

21 company had the deposition transcript of Dr. Hurley, the

22 doctor who removed the mole, who said he reviewed the

23 pathology report, considered it a benign condition and

24 reported that to the patient, would you consider it

25 unreasonable to conclude that Tommy Bob Hall knew he had

---

Page 36

1 cancer and knew he had been diagnosed with cancer?

2    MR. KELLEY: Same objection as before.

3 BY MR. PEDERSEN:

4  Q  In '93.

5  A  I would think he had no idea.

6  Q  And if Tommy Bob Hall, before he passed away, was

7 further deposed and that deposition were provided to the

8 insurance company and he said the first time he had any

9 suspicions or concerns that he had cancer was in '99, not

10 '98, and in light of the pathology report and Dr. Hurley's

11 deposition, what would you conclude with respect to an

12 insurance company concluding he had -- knew he had cancer in

13 '98?

14    MR. KELLEY: Same objection as the previous two

15 questions.

16    THE WITNESS: I would think that it would be hard

17 to confirm that he knew anything in '98.

18    MR. PEDERSEN: I have no other questions.

19    MR. KELLEY: That's it. Thank you, Doctor.

20    THE WITNESS: Thank you.

21    MS. MAHADY-SMITH: Thanks, Dr. Enders.

22    (Whereupon, the deposition was concluded at 10:48

23 a.m.)

24

25

---

Page 37

1  COUNTY OF DAUPHIN        :
                            SS
2  COMMONWEALTH OF PENNSYLVANIA :

3

4    I, Pamela S. Sullivan, a Notary Public, authorized to

5 administer oaths within and for the Commonwealth of

6 Pennsylvania, do hereby certify that the foregoing is the

7 testimony of John G. Enders, M.D.

8    I further certify that before the taking of said

9 deposition, the witness was duly sworn; that the questions

10 and answers were taken down stenographically by the said

11 Reporter-Notary Public, and afterwards reduced to

12 typewriting under the direction of the said Reporter.

13    I further certify that the said deposition was taken

14 at the time and place specified in the caption sheet hereof.

15    I further certify that I am not a relative or employee

16 or attorney or counsel to any of the parties, or a relative

17 or employee of such attorney of counsel, or financially

18 interested directly or indirectly in this action.

19    I further certify that the said deposition

20 constitutes a true record of the testimony given by the said

21 witness.

22    IN WITNESS WHEREOF, I have hereunto set my hand this

23 17th day of January, 2002.

24        Pamela S. Sullivan

25            Reporter-Notary Public

---

37

```
1    COUNTY OF DAUPHIN              :
                                    SS
2    COMMONWEALTH OF PENNSYLVANIA   :

3

4        I, Pamela S. Sullivan, a Notary Public, authorized to

5    administer oaths within and for the Commonwealth of

6    Pennsylvania, do hereby certify that the foregoing is the

7    testimony of John G. Enders, M.D.

8        I further certify that before the taking of said

9    deposition, the witness was duly sworn; that the questions

10   and answers were taken down stenographically by the said

11   Reporter-Notary Public, and afterwards reduced to

12   typewriting under the direction of the said Reporter.

13       I further certify that the said deposition was taken

14   at the time and place specified in the caption sheet hereof.

15       I further certify that I am not a relative or employee

16   or attorney or counsel to any of the parties, or a relative

17   or employee of such attorney of counsel, or financially

18   interested directly or indirectly in this action.

19       I further certify that the said deposition

20   constitutes a true record of the testimony given by the said

21   witness.

22       IN WITNESS WHEREOF, I have hereunto set my hand this

23   17th day of January, 2002.
```

NOTARIAL SEAL
PAMELA S. SULLIVAN, Notary Public
Swatara Twp., Dauphin County
My Commission Expires Jan. 31, 2005

Pamela S. Sullivan
Reporter-Notary Public

 Multi-Page™ 

**-'-**

'93 [17]      15:10      19:6
21:9       21:13      21:14
22:7       23:3       23:13
23:16      23:21      24:2
24:13      25:11      33:16
34:12      35:11      36:4
'98 [7]      20:15      20:20
30:21      35:10      36:10
36:13      36:17
'99 [13]     11:17      12:16
12:17      13:25      16:11
17:18      20:10      27:8
30:19      30:20      33:21
34:6       36:9

**-1-**

10:05 [1]    1:19
10:48 [1]    36:22
120 [1]      1:22
15 [1]       12:21
17 [4]       1:19       11:6
13:13      16:11
17th [1]     37:23
1980 [3]     4:4        5:9
5:10
1993 [12]    15:24      16:21
16:25      18:4       18:24
19:13      19:17      28:5
28:14      30:1       30:8
31:4
1998 [2]     30:9       31:9
1999 [3]     11:6       12:21
30:2
1:01-CV-1265 [1]  1:10

**-2-**

2-17 [2]     11:18      11:25
2-17-99 [2]  11:19
11:23
2-23 [4]     11:16      11:20
13:3       18:17
2-23-99 [4]  11:15
11:21      12:25      18:19
20 [1]       2:5
2001 [2]     6:18       28:4
2002 [2]     1:19       37:23
23 [3]       11:24      12:17
13:25
23rd [2]     12:16      20:10
27 [1]       2:4

**-3-**

3 [1]        2:4
3-15 [2]     13:10      17:18
33 [1]       2:5

**-4-**

43-year-old [2]   18:3
18:23

**-5-**

5-18-99 [1]           13:18
5-26-99 [1]           13:12

**-7-**

7TH [1]      1:22

**-A-**

a.m [2]      1:19       36:23
able [2]     9:12       23:17
absolutely [3]       23:14
24:19      24:22
academic [1]         23:9
accurate [10]        21:8
22:17      22:19      22:23
22:25      23:22      25:13
26:16      26:17      28:21
action [5]   1:3       3:14
23:5       23:8       37:18
add [1]      15:21
addition [1]         8:20
administer [1]       37:5
ADMINISTRATRIX [1]
1:5
advised [1]          28:13
afterwards [2]       19:4
37:11
again [4]    17:18      18:18
19:1       19:7
against [1]  3:10
ago [4]      3:6        6:7
6:12       6:16
agree [3]    24:15      29:23
34:25
ahead [1]    21:24
allergies [1]        11:10
anemia [3]   10:8      34:2
34:4
annotations [1]      15:21
answer [2]   30:5       30:12
answers [1]          37:10
appear [2]   26:17      26:20
APPEARANCES [1]
1:24
application [2]      20:16
20:21
appreciate [1]       6:1
Army [2]     5:6        5:7
arrives [2]  14:12      15:16
asks [1]     15:18
associate [3]        7:13
7:15       12:12
associated [1]       4:2
Associates [7]       1:21
4:1        4:7        4:8
11:5       12:10      12:11
association [1]      8:14
assume [1]   9:22
attempt [1]  26:23

Attempting [1]       25:20
attorney [4]         21:6
24:1       37:16      37:17
authorized [2]       8:7
37:4
available [1]        18:12
aware [11]   9:7       25:1
26:2       30:2       30:8
30:13      30:14      30:19
30:20      31:18      35:7
away [1]     36:6

**-B-**

background [3]       3:18
33:2       35:13
based [1]    35:14
basis [2]    22:11      22:12
bearing [2]  22:8       29:7
began [1]    5:8
benign [3]   26:5       31:13
35:23
best [2]     26:16      28:16
between [1]          27:14
beyond [1]   35:13
bit [1]      3:17
board [1]    4:20
Bob [14]     20:10      20:14
20:20      23:12      25:23
25:24      27:6       27:8
27:15      33:19      35:8
35:10      35:25      36:6
bottom [3]   11:5       13:18
14:16
bowel [1]    13:17
brought [1]          3:9

**-C-**

Calls [4]    21:19      21:23
34:14      35:12
cancer [17]  20:20      23:2
23:13      23:16      24:13
24:17      24:23      25:3
25:11      26:12      35:2
35:4       35:10      36:1
36:1       36:9       36:12
cancerous [3]        19:13
27:12      30:8
caption [1]  37:14
care [1]     34:18
careful [3]  26:22      26:22
27:3
case [7]     3:9        6:4
7:6        16:8       25:22
29:1       33:15
cases [2]    29:13      29:16
Cashdollar [6]       12:9
16:13      19:20      23:19
29:11      29:21
Cashdollar's [3]     12:4
13:13      27:19
CATHERINE [1]   1:30
caused [1]   34:13

Center [1]   5:5
certainly [6]        22:1
23:18      23:20      23:21
28:10      34:21
certified [1]        4:20
certify [5]  37:6      37:8
37:13      37:15      37:19
cetera [1]   11:1
Chambersburg [6]     1:20
1:23       4:1        5:16
32:6       32:21
change [1]   23:18
changes [1]          23:20
characterize [2]     20:18
21:1
Charlesworth [2]     32:17
32:19
chart [6]    7:7        8:6
8:6        12:4       16:24
18:12
check [1]    28:23
Chicklo [3]          16:13
32:2       32:4
CIVIL [1]    1:3
clarify [2]  20:7       20:9
client [2]   3:10      31:19
clinic [2]   12:24      18:17
colleague [1]        32:20
College [3]          5:3
5:3        5:4
colonoscopy [6]      10:9
12:21      13:10      17:15
33:25      34:2
coming [2]   7:21      25:20
comments [1]         15:22
Commonwealth [2]  37:2
37:5
communications [1]
19:21
company [13]         21:7
21:22      22:6       23:1
23:15      24:1       24:7
24:12      26:23      31:24
35:21      36:8       36:12
compilation [1]      16:6
complicated [1]      4:12
concerned [1]        35:1
concerning [2]       22:6
23:2
concerns [1]         36:9
conclude [3]         35:9
35:25      36:11
concluded [1]        36:22
concluding [1]       36:12
conclusion [1]       23:22
conclusions [1]      21:18
condition [3]        20:15
26:6       35:23
confirm [1]          36:17
conflict [1]         33:12
consider [2]         35:9
35:24

GI [2]             5:7        13:17
given [4]          9:4        14:13
    19:16          37:20
goes [2]           12:24      18:13
gone [1]           27:19
Good [1]           3:5
group [4]          1:12       3:10
    4:13           12:12
guess [1]          6:5

                 -H-

H [1]              1:14
Hahnemann [1]                 5:4
Hall [28]          1:3        1:6
    3:9            3:12       9:24
    10:7           10:12      10:23
    11:6           12:15      14:4
    15:23          19:11      19:12
    19:22          20:10      20:14
    20:20          23:12      27:6
    27:8           31:21      33:19
    34:18          35:9       35:10
    35:25          36:6
Hall's [3]         25:23      25:24
    27:15
hand [1]           37:22
hard [2]           7:22       36:16
Harrisburg [1]                3:7
height [1]         11:9
help [1]           7:17
helps [1]          31:16
hematology/oncology [1]
    12:13
hereby [1]         37:6
hereof [1]         37:14
hereunto [1]                  37:22
high [1]           5:2
highlighting [1]              12:2
himself [1] 19:19
history [7] 11:11             15:19
    28:19          28:20      29:25
    32:14          32:15
home [1]           27:2       35:9
Hoover [1] 8:14
hospital [3]                  3:23
    32:6           32:21
hospitals [1]                 5:15
hour [1]           31:13
Hurley [2] 26:1               35:21
Hurley's [1]                  36:10
HUSBAND [1]                   1:7

                 -I-

idea [3]           26:3       34:17
    36:5
ignore [1] 12:2
immediate [1]                 8:14
Inappropriate [1]  21:4
includes [1]                  8:4
indicate [1]                  19:25

indicates [2]                 28:14
    29:25
Indication [1]                18:2
indirectly [1]                37:18
INDIVIDUALLY [1]
    1:3
information [34]              11:9
    14:8           14:8       15:14
    15:18          16:2       16:24
    17:5           17:13      18:10
    19:6           19:12      19:16
    20:14          21:25      23:6
    26:6           26:12      28:9
    28:18          28:21      28:25
    29:3           29:5       29:6
    29:8           29:15      29:20
    31:15          31:18      33:2
    34:10          34:12      35:14
initial [2]        13:25      14:4
initiate [1] 9:21
inquiry [1] 33:11
instruction [1]               8:22
insufficient [1]              35:14
insurance [19]                1:13
    3:10           20:16      20:20
    21:7           21:22      22:5
    23:1           23:15      24:1
    24:4           24:7       24:11
    26:22          31:20      31:24
    35:20          36:8       36:12
intake [1]   14:4
interested [2]                15:7
    37:18
interesting [1]               12:1
internal [4]                  4:23
    4:25           5:6        8:17
internship [1]                5:5
interviewed [1]               15:17
interviewing [1]              14:21
introduced [1]                3:6
investigate [2]               17:5
    33:13
involved [2]                  3:14
    8:13
involvement [1]               10:6

                 -J-

James [1]   16:13
January [2]                   1:19
    37:23
John [5]      1:15      2:3
    3:1         3:21       37:7
joins [1]    9:1
JUDGE [1]                     1:14
judging [2]                   30:22
    31:15

                 -K-

keep [2]      6:9       7:22
Kelley [31] 1:26        2:4
    3:4         3:5        6:13
    7:23        11:19      11:22
    13:23       20:2       22:4

21:3           21:19      21:23
22:9           22:20      23:4
24:4           24:7       28:1
30:4           30:11      30:24
31:6           31:17      33:5
34:14          35:12      36:2
34:16          36:19
knew [8]       20:14      20:20
34:16          35:10      35:25
36:1           36:12      36:17
known [1] 31:8

                 -L-

Lack [1]           21:24
last [1]           6:22
latter [2]         6:18       28:4
LAW [1]            1:3
lawyer [1]  3:7
lawyers [1]                   6:3
learned [1] 31:12
less [1]           11:3
letter [14]        13:13      16:8
    16:10          16:13      16:18
    16:20          17:1       19:21
    27:19          27:21      29:1
    29:20          34:9       34:11
letters [1] 16:5
license [1] 5:19
licensed [1]                  5:11
lied [1]           20:20
life-care [1]                 27:1
light [2]          23:23      36:10
likely [3]         17:12      30:1
    30:8
limited [1] 7:6
link [1]           27:14
litigation [2]                22:13
    22:16
LLC [1]            1:25
location [2]                  4:5
    4:17
longer [1]  4:11
look [4]           7:2        8:7
    13:8           13:20
looking [3]                   14:7
    17:14          26:24
lymph [2] 34:16              34:23

                 -M-

M [1]              1:30
M-A-L-period [1]   15:10
M-E-L-E-N-A [1]    18:4
M.D [4]            1:15       2:3
    3:1            37:7
MAHADY-SMITH [9]
    1:30           7:20       11:14
    11:17          13:20      30:17
    30:19          31:5       36:21
main [1]    32:5
maintain [2]                  5:22
    8:1

maintenance [6]               8:5
    8:21           8:24       9:5
    9:10           9:18
male [2]           18:3       18:23
malignant [13]                15:12
    15:24          16:20      16:25
    19:17          24:17      25:6
    25:7           30:7       31:4
    31:8           33:16      33:20
manager [3]                   8:25
    9:5            9:11
manner [1] 21:2
manual [8] 8:2                8:3
    8:20           9:4        9:8
    9:11           9:13       9:22
March [1]   12:21
materials [1]                 9:3
matter [2] 11:3              33:15
may [11]           7:13       13:20
    16:12          17:8       18:18
    23:8           29:7       29:7
    31:12          33:13      35:1
McNees [2]                    1:25
    3:7
mean [1]    18:6
means [1]   16:5
meant [1]   11:18
medical [32]                  3:13
    3:17           4:7        4:8
    4:15           4:18       5:4
    5:5            6:24       8:1
    8:7            8:8        8:16
    8:21           8:24       9:6
    9:10           9:18       10:18
    11:5           11:11      12:9
    12:11          13:9       15:19
    22:18          28:19      29:25
    31:24          32:14      32:15
    33:2
medications [1]               11:10
medicine [5]                  4:23
    4:25           5:6        5:12
    8:17
meet [2]           6:20       10:2
meeting [4]                   6:22
    6:25           9:24       27:6
meetings [3]                  16:21
    10:22          27:7
melanoma [11]                 16:21
    18:6           18:24      19:6
    21:16          22:1       22:7
    25:6           25:7       33:21
    34:16
melena [1] 18:3
member [1]                    10:18
memory [1]                    9:24
met [3]            6:5        10:12
    28:3
MICHAEL [1]                   1:26
microcytic [1]                10:8
MIDDLE [1]                    1:2
might [1]   17:4
Mike [1]    3:5
mind [1]    34:21

**record** [15] 8:7 | 8:8
9:20 | 11:4 | 17:10
18:13 | 23:12 | 23:20
24:10 | 25:10 | 26:18
26:20 | 28:11 | 31:15
37:20
**recorded** [1] | | 15:20
**recordkeeping** [2] | | 26:16
26:17
**records** [31] | | 3:13
3:17 | 4:15 | 6:10
6:24 | 6:24 | 7:2
8:1 | 8:22 | 8:24
9:6 | 9:10 | 9:18
10:22 | 10:25 | 13:9
19:7 | 19:24 | 20:19
20:24 | 21:2 | 21:9
21:17 | 22:6 | 22:18
23:1 | 23:15 | 24:2
24:11 | 25:15 | 31:24
**reduced** [1] | | 37:11
**refer** [3] | 4:15 | 16:20
18:23
**referred** [9] | | 4:6
4:11 | 10:8 | 16:17
32:9 | 32:11 | 32:22
32:24 | 34:5
**referring** [12] | | 6:14
16:5 | 16:6 | 16:8
16:17 | 16:25 | 29:1
29:20 | 32:5 | 34:9
34:9 | 34:11
**refers** [1] | 18:7
**reflect** [1] | 24:10
**refute** [1] | 26:6
**regard** [5] | 8:5 | 8:21
9:18 | 31:20 | 33:3
**regarding** [3] | | 13:9
15:17 | 19:22
**relate** [1] | 9:5
**relative** [2] | | 37:15
37:16
**relevance** [2] | | 3:14
22:12
**relevant** [1] | | 23:11
**relied** [1] | 29:15
**rely** [6] | 29:3 | 29:8
29:19 | 32:14 | 33:2
34:9
**remedy** [1] 26:23
**remember** [3] | | 10:15
19:23 | 27:7
**remembers** [1] | | 17:13
**removal** [1] | | 27:12
**removed** [10] | | 16:21
18:4 | 19:13 | 21:15
24:3 | 27:15 | 30:8
31:4 | 31:8 | 35:22
**removing** [1] | | 33:23
**report** [31] 12:21 | 17:15
17:19 | 18:11 | 21:9
21:11 | 21:13 | 21:14
21:18 | 23:21 | 23:23
24:17 | 24:21 | 25:1
25:5 | 26:5 | 26:8

26:9 | 26:13 | 28:5
28:14 | 28:15 | 28:17
28:22 | 28:24 | 34:12
34:21 | 35:4 | 35:11
35:23 | 36:10
**reported** [4] | | 26:5
27:8 | 27:11 | 35:24
**Reporter** [1] | | 37:12
**Reporter-Notary** [3]
1:18 | 37:11 | 37:25
**reporting** [1] | | 22:17
**reports** [5] 23:19 | 26:24
30:7 | 30:20 | 31:3
**represent** [1] | | 3:11
**REPRESENTATIVE** [1]
1:4
**request** [1] 10:9
**residency** [1] | | 5:5
**respect** [3] 21:14 | 31:20
36:11
**responsibility** [1] | 23:8
**result** [1] 35:10
**review** [6] 6:24 | 15:20
17:25 | 23:17 | 27:3
29:6
**reviewed** [1] | | 35:22
**reviewing** [2] | | 19:4
28:22
**revoked** [1] | | 5:20
**right** [13] | 4:17 | 7:3
11:5 | 12:14 | 12:18
12:19 | 13:11 | 16:14
17:19 | 18:19 | 19:8
20:11 | 34:23
**role** [1] | 7:7
**room** [1] | 15:20
**routinely** [1] | | 10:18
**rule** [1] | 29:10

**-S-**

**S** [3] | 1:17 | 37:4
37:24
**saw** [4] | 11:24 | 12:14
20:10 | 33:20
**says** [5] | 11:4 | 14:8
15:8 | 15:10 | 18:2
**school** [1] | 5:2
**scope** [1] | 35:13
**second** [2] 13:3 | 14:19
**see** [7] | 11:11 | 13:1
13:9 | 16:12 | 18:4
18:18 | 21:11
**seem** [1] | 25:8
**send** [1] | 17:22
**sent** [1] | 13:13
**separate** [1] | | 3:22
**sequence** [1] | | 13:4
**set** [2] | 9:15 | 37:22
**sets** [1] | 8:25
**several** [3] 6:11 | 6:12
6:16
**share** [1] | 4:13

**sheet** [1] | 37:14
**show** [4] | 12:1 | 21:9
21:13 | 28:6
**showed** [1] 18:15
**showing** [3] | | 24:12
25:2 | 25:10
**shown** [2] | 25:2 | 25:9
**side** [2] | 11:12 | 15:17
**signature** [2] | | 14:17
17:8
**signed** [1] | 11:5
**sit** [2] | 14:13 | 16:23
**situation** [1] | | 4:12
**slides** [2] | 25:17 | 27:20
**small** [1] | 13:17
**SOCIETY** [1] | | 1:13
**solitary** [1] | | 25:14
**someone** [5] | | 7:18
17:8 | 17:22 | 19:2
27:2
**Sometime** [1] | | 6:18
**sometimes** [3] | | 25:13
26:20 | 33:11
**sorry** [5] | 4:24 | 13:16
13:21 | 18:18 | 33:10
**source** [4] | 8:23 | 25:23
26:11 | 34:23
**specialties** [1] | | 4:22
8:16
**specialty** [1] | | 4:18
**specific** [2] | | 15:18
25:22
**specifically** [1] | 15:23
**specifics** [2] | | 3:16
7:4
**specified** [1] | | 37:14
**speculation** [8] | | 21:19
21:24 | 22:11 | 30:3
30:10 | 31:10 | 34:14
35:12
**spoken** [2] 6:3 | 27:20
**Spring** [4] | 4:8 | 11:5
12:9 | 12:11
**Springs** [2] | | 4:9
4:16
**SS** [1] | 37:1
**staff** [2] | 10:19 | 32:20
**state** [1] | 20:19
**states** [2] | 1:1 | 5:11
**stating** [1] 25:6
**stenographically** [1]
37:10
**STEPHEN** [1] | | 1:29
**still** [1] | 17:8
**stipulate** [1] | | 24:5
**straight** [1] | | 7:22
**STREET** [1] | | 1:22
**such** [1] | 37:17
**suggested** [1] | | 19:12
**Sullivan** [3] | | 1:17
37:4 | 37:24

**supplied** [6] | | 14:9
16:6 | 22:2 | 29:4
29:8 | 29:16
**supplies** [2] | | 32:13
33:2
**supply** [1] 28:8
**support** [2] | | 22:2
23:22
**Surgeries** [1] | | 15:8
**surgery** [2] 15:19 | 33:23
**suspect** [2] 15:6 | 35:1
**suspended** [1] | | 5:19
**suspicions** [1] | | 36:9
**sworn** [2] | 3:2 | 37:9
**SYLVIA** [1] | | 1:14

**-T-**

**taking** [2] | 28:20 | 37:8
**tells** [1] | 15:19
**Ten** [1] | 6:23
**testified** [1] | | 3:2
**testify** [1] 23:7
**testifying** [1] | | 7:16
**testimony** [3] | | 22:19
37:7 | 37:20
**Thank** [7] | 13:19 | 13:21
20:3 | 27:24 | 33:5
36:19 | 36:20
**Thanks** [1] 36:21
**themselves** [3] | | 7:2
14:11 | 34:25
**thought** [1] 31:13
**three** [6] | 3:13 | 5:6
6:17 | 10:3 | 10:4
11:1
**through** [4] | | 9:2
13:8 | 19:21 | 26:13
**times** [1] 10:2
**today** [13] | 3:8 | 3:11
6:3 | 7:17 | 16:23
17:11 | 22:19 | 22:23
23:1 | 24:8 | 24:12
25:2 | 28:12
**Tommy** [19] | | 1:6
3:9 | 9:24 | 11:6
20:10 | 20:14 | 20:19
23:12 | 25:23 | 25:24
27:6 | 27:8 | 27:15
33:19 | 34:18 | 35:8
35:10 | 35:25 | 36:6
**too** [1] | 13:21
**took** [1] | 17:4
**top** [4] | 11:4 | 11:9
13:3 | 14:8
**tough** [1] 9:19
**track** [1] 15:6
**training** [2] | | 9:1
35:13
**transcribe** [1] | | 17:22
**transcribed** [2] | | 17:25
19:2
**transcript** [1] | | 35:21

# FALLING SPRING MEDICAL ASSOCIATES
## NEW PATIENT INFORMATION RECORD (PLEASE PRINT OR WRITE LEGIBLY)
## PATIENT INFORMATION

| PATIENT'S NAME  LAST  FIRST  MI | AGE | DATE OF BIRTH | SOCIAL SECURITY NO. |
|---|---|---|---|
| HALL II , Tommy B | 43 | 5-12-55 | 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 |

| STREET ADDRESS  ☐ PERMANENT  ☐ TEMPORARY | CITY AND STATE | ZIP CODE | HOME PHONE NO. |
|---|---|---|---|
| 517 Mt PLEASANT RD | Fayetteville Pa | 17222 | 717-352-9030 |

| PATIENT'S EMPLOYER | MARITAL STATUS: | BUSINESS PHONE NO. |
|---|---|---|
| CRESSLER TRUCKING INC | SINGLE (MARRIED) WIDOW DIVORCED | |

| EMPLOYER'S STREET ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|
| 1069 SEIBERT AVE | SHIPPENSBURG PA | |

| IN CASE OF EMERGENCY CONTACT:  NAME | RELATIONSHIP | PHONE NUMBER |
|---|---|---|
| NANCY HALL | WIFE | 717-352-9030 |

| SPOUSE'S NAME | DATE OF BIRTH | SOCIAL SECURITY NUMBER |
|---|---|---|
| NANCY M HALL | 5-28-55 | |

| SPOUSE'S EMPLOYER | OCCUPATION (INDICATE IF STUDENT) | BUSINESS PHONE NO. |
|---|---|---|
| HOUSEWIFE | | |

| EMPLOYER'S STREET ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|
| | | |

| WHO REFERRED YOU TO THIS PRACTICE? | FAMILY DOCTOR |
|---|---|
| Cashdollar | |

Dr. Cashdollar's Records

## INSURANCE INFORMATION

☐ Medicare (Medical Insurance Only)

Medicare Number _____ Effective Date _____

☑ Blue Shield                          If Out of State, Identify _____

Address, If Out of State _____

Name of Insured _Tommy B Hall_  Identification No. _PAC 563825959_ Group No. _26824000_

☐ Other Insurance

Address _____

Name of Insured _____ Policy No. _____ Group No. _____

☐ Other Insurance

Address _____

Name of Insured _____ Policy No. _____ Group No. _____

☐ Medicaid (Medical Assistance)

Recipient Number _____

**In order to control our cost of billing, we request that office visits be paid at the time service is rendered. We would rather control our billing costs than be forced to raise our fees.**

AUTHORIZATION: I hereby authorize the physician indicated above to furnish information to insurance carriers concerning this illness/accident, and I hereby irrevocably assign to the doctor all payments for medical services rendered. I understand that I am financially responsible for all charges whether or not covered by insurance.

_2-23-99_                          _Tommy B Hall_
Date                                Responsible Party Signature

D0182

# CHAMBERSBURG GASTROENTEROLOGY ASSOCIATES, LTD.

120 N. Seventh Street, Suite 201, Chambersburg, PA 17201-1795 • (717) 263-0629

Board Certified
Internal Medicine/Gastroenterology

JOHN G. ENDERS, M.D.  •  MARK P. DOBISH, M.D.  •  WAYNE C. HOOVER, M.D.

HALL, TOMMY B.

2/23/99

SUBJ: 43 yo white male with melanoma in 1993. No with a cervical lymph node showing recurrent melanoma. He developed anemia with hemoglobin of 9.5 and MCV of 71. Upper GI showed GE reflux. Barium enema demonstrated a few diverticuli. CT scan demonstrated adrenal mass and possible peri____ lymph node and a loop of small bowel left lower quadrant seemed thickened. Because of the microcytic anemia further evaluation of colon recommended to rule out neoplastic process. Patient denies hematochezia or alteration in bowel habit. No family history of colon cancer.

OBJ: Patient's physical examination reveals a soft abdomen. Bowel sounds were normal. No masses. Liver and spleen were not enlarged.

ASSESS: Microcytic anemia. Melanoma. Rule our colonic neoplastic process despite negative BE.

RECOMMEND: Proceed with colonoscopy. Discussed the options with the patient. He agrees and will have this scheduled in the near future.

John G. Enders, M.D.

JGE/tml

CC: Dr. Cashdollar                                    SENT  MAR 0 1 1999

1/1.99                                    @

npt 7m—                4/5/99 me

4-27-99 Left msg. on ans. machine re: hemoccults/M↑

5/10/99 Positive Hemoccult (grossly) 6:60/M↑

_____ USR/SDFT  5/18/99 - 11:15 am
_____ reg me do EKG

10/25/99 Records sent to Dailey, Bryan, Sarff, Cohen 2x/w

11/15/99 Records sent to Hartman & Miller - JS

D0183

12/23/2000

Referring Physician _____ Castillar

Date Referred _____

WT _214_  HT _5'6"_  BP _140/70_  P _80_  AGE _43_

DATE: _2/23/99_

CHIEF COMPLAINT:

ALLERGIES: NKDA

MEDICATIONS:
Ferrous Sulfate Tid

PMH:
Anemia

SURGERY:
Spinal x2 89 & 93 Rupt + Her. Disc
Mal. Mole Excised '93
Exc. Bx Deep Cervical Node 1/21/99

SH:    OCCUPATION: Truck Driver

SMOKE: 2ppd

ALCOHOL: NONE

CAFFEINE: Coffee 5 cups a day
Married
1 child

FH: ↑ MOTHER 62 yr. Healthy

↑ FATHER 65 yr. Dm, Skin Ca

| BROTHERS ↑ Healthy

| half
| SISTERS ↑ healthy

D0184

# THE CHAMBERSBURG HOSPITAL

## PATHOLOGICAL REPORT

Pathologists:
Howard L. Hoffman, M.D.
Constancio A. Ramirez, M.D.

| Name of Patient: | Age: | Date: | Doctor: | Acc. No.: |
|---|---|---|---|---|
| HALL II, TOMMY B. | 37 | 4/13/93 | HURLEY | S93-2133 op / 332103 |

Specimen:
SKIN LESION LEFT BACK

Diagnosis:
EXCISION SKIN LESION LEFT BACK

Gross:
The specimen consists of an elliptical portion of skin measuring 1.5 x 1.0 x 0.7 cm. There is a flat rounded irregularly pigmented central area. The underlying tissue is grossly unremarkable. The margins are marked and the entire structure is processed.
HLH/kk
r-4/13/93

MICROSCOPIC
Section of skin demonstrates the mid portion with groups of nevus cells in the dermis and at the epidermal-dermal junction. A few groups of melanocytic cells are also present in the superficial layer of epidermis. In one level of section, the cells at the epidermal-dermal junction are elongated and dysplastic. A mild lymphocytic infiltration is present in the underlying stroma. The overall microscopic features are regarded as those of a dysplastic nevus. The surgical margins appear free of tumor involvement consistent with complete removal of the lesion. Follow up is recommended in view of the dysplastic changes noted.

INTERPRETATION:  DYSPLASTIC NEVUS, SKIN (BACK).

s-1;b-1    88305
CAR/mlw    4/15/93

Examined by _____  M.D.
H.L. Hoffman, M.D.
C.A. Ramirez, M.D.

/16

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

NANCY HALL, individually and as the
Representative and Administratrix of
the Estate of Tommy Hall, deceased,
her husband,

        Plaintiff,

        v.            Case No. 1:01-CV-1265

CUNA MUTUAL GROUP, CUNA MUTUAL
INSURANCE SOCIETY,

        Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF THOMAS J. ANSFIELD, M.D.

Thursday, November 1, 2001

9:00 o'clock a.m.

Reported by:  LISA A. CREERON

**M**ADISON **F**REELANCE **R**EPORTERS

131 W. Wilson St.      Madison, Wisconsin 53703      (608) 255-8100

THOMAS ANSFIELD - 11/01/01 / HALL V. CUNA MUTUAL

PAGE 1  SHEET 1

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

NANCY HALL, individually and as the
Representative and Administratrix of
the Estate of Tommy Hall, deceased,
her husband,

Plaintiff,

v.                          Case No. 1:01-CV-1265

CUNA MUTUAL GROUP, CUNA MUTUAL
INSURANCE SOCIETY,

Defendants.

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

DEPOSITION OF THOMAS J. ANSFIELD, M.D.

Thursday, November 1, 2001

9:00 o'clock a.m.

Reported by: LISA A. CREERON

---

PAGE 2

2

```
 1         DEPOSITION of THOMAS J. ANSFIELD, a
 2  witness in the above-entitled matter, taken at the
 3  instance of the plaintiff, wherein Nancy Hall is the
 4  plaintiff and CUNA Mutual Group, et al., are the
 5  defendants, pending in the United States District
 6  Court for the Middle District of Pennsylvania,
 7  pursuant to notice, before LISA A. CREERON, a
 8  Registered Professional Reporter and Notary Public in
 9  and for the State of Wisconsin, at Melli, Walker,
10  Pease & Ruhly, Attorneys at Law, 10 East Doty Street,
11  in the City of Madison, County of Dane, and State of
12  Wisconsin, on the 1st day of November, 2001, commencing
13  at 9:00 o'clock a.m.
14              A P P E A R A N C E S
15      STEPHEN R. PEDERSEN,
16          Attorney at Law, 214 Senate Avenue, Suite 602,
            Camp Hill, Pennsylvania, appearing on behalf of
            the plaintiff;
17
18      MICHAEL R. KELLEY,
            McNEES, WALLACE & NURICK, Attorneys at Law,
19          100 Pine Street, P. O. Box 1166,
            Harrisburg, Pennsylvania 17108, appearing
20          on behalf of the defendants.
21      ALSO PRESENT: MARK RICHARDSON
22              • • • • •
23
24  (Original transcript is filed with Attorney Pedersen)
25
```

---

PAGE 3

3

```
 1              I N D E X
 2  Examination by:                          Page
 3  Attorney Pedersen                   4/61/67
 4  Attorney Kelley                        57/66
 5  Exhibits Nos.:                     Identified
 6    1 - Curriculum vitae . . . . . . . . . . . . . . .  5
 7              • • • • •
```

---

PAGE 4

4

```
 1              MR. KELLEY:  In terms of
 2  stipulations, I'm fine with the usual
 3  stipulations reserving all objections except as
 4  to the form of the question until the time of
 5  trial, but we would like to read and sign the
 6  deposition transcript.
 7              MR. PEDERSEN:  That's fine.
 8          THOMAS J. ANSFIELD, M.D.,
 9  called as a witness, being first duly
10  sworn in the above cause, testified
11  under oath as follows:
12
13              EXAMINATION
14  BY MR. PEDERSEN:
15  Q   Dr. Ansfield, please state your full name for the
16      record.
17  A   Thomas J. Ansfield.
18  Q   Where are you currently employed?
19  A   I am a partner and an internist and cardiologist at
20      Associated Physicians, LLP in Madison, Wisconsin.
21  Q   Are you a practicing cardiologist?
22  A   I am a practicing internist.  I'm a specialist in
23      internal medicine with subspecialty training in
24      cardiology.
25  Q   You've provided a curriculum vita.  Is this a current
```

THOMAS ANSFIELD - 11/01/01 / HALL V. CUNA MUTUAL

PAGE 5  SHEET 2

5

1    CV?
2  A  Yes, it is.
3           MR. PEDERSEN: I'd like to have
4      this marked as Exhibit 1 to the deposition.
5      (Exhibit 1 is marked for identification)
6  Q  Could you briefly review for the record your medical
7      background starting with the most recent and working
8      backwards or the other way if it's easier?
9  A  I am currently a practicing physician, but I'm also
10     consulting medical director to the CUNA Mutual Group
11     in Madison, Wisconsin.
12         I'm a clinical professor of medicine at the
13     University of Wisconsin, where I participate in
14     undergraduate and graduate training. I also do
15     postgraduate teaching for the University of
16     Wisconsin.
17         I have a long history of a relationship with
18     CUNA Mutual Group. I've been consulting medical
19     director since September 1, 1993. Previously I was
20     consulting medical director for the Rural Insurance
21     Companies for a 25-year period.
22  Q  As the medical director for CUNA -- is it pronounced
23     CUNA or CUNA?
24  A  CUNA, like cue ball.
25  Q  As the medical director for CUNA, what are your job

PAGE 6

6

1      duties today?
2  A  I have a number of responsibilities, which include a
3      consultation to the business lines for CUNA Mutual
4      Group. In this regard I review underwriting
5      questions from a series of insurance products that
6      they have that include life insurance, disability
7      insurance, mortgage insurance, international
8      insurance.
9          I am also a consultant to the claims personnel,
10     who review credit disability claims. And finally I'm
11     a consultant to the organization and participate in
12     programs for health and wellness for the employees of
13     the CUNA Mutual Group.
14  Q  What other medical doctors besides yourself are
15     included within those who are consulted specifically
16     for claims questions?
17  A  I'm the only consulting medical director. There are
18     times where I will recommend that independent medical
19     reviews are provided. But at present I'm the only
20     medical consultant for the CUNA Mutual Group that's
21     on site at CUNA Mutual.
22  Q  And was that also true for 1998 through the present?
23  A  That is correct.
24  Q  Who keeps the statistical data, if statistical data
25     is kept, with respect to claims that are sent for

PAGE 7

7

1      review to the medical director such as yourself?
2  A  The individual business lines would be responsible
3      for any recordkeeping. I would not personally keep a
4      record of that information.
5  Q  With respect to the mortgage insurance line, they
6      would keep their own records statistically with
7      respect to the times that you were involved in
8      reviewing claims?
9  A  That is correct.
10  Q  What is the name of the individual that's in charge
11     of the mortgage insurance division that would have
12     that statistical information?
13  A  Can we go off record for a minute?
14  Q  Sure.
15         (Discussion off the record)
16  A  I'm not sure of the name of the current manager. I
17     work specifically with a number of claims individuals
18     on an intermittent basis.
19  Q  With respect to mortgage insurance claims, who are
20     those individuals that you work with?
21  A  Brenda Larson and William Nardi, N-A-R-D-I.
22  Q  As an internist, what training have you had with
23     respect to diagnosis of melanoma?
24  A  As an internist, my training included rotations in
25     dermatology services during my residency at the

PAGE 8

8

1      University of Wisconsin. The years of the residency
2      were 1967 through 1970.
3          As a practicing internist, I participate -- I
4      conduct physical examinations on an average of two
5      per day. Part of the evaluation includes an
6      evaluation of the skin or the cutaneous system. On
7      average I will conduct 200 examinations yearly that
8      would include examination of the cutaneous system.
9          On an average once or twice yearly our hospital
10     grand rounds will include a dermatologic update where
11     new information concerning either diagnosis or
12     treatment of skin lesions is evaluated.
13  Q  As part of your practice as an internist, would you
14     also remove moles?
15  A  No, sir, I do not. Patients who have suspicious
16     lesions are referred to dermatologists in the City of
17     Madison or in physician groups that are required
18     providers based on the individual's insurance.
19  Q  As part of your practice, do you review pathology
20     reports following the removal of moles?
21  A  I review the written pathology reports. I do not
22     personally conduct a microscopic evaluation of the
23     slides.
24  Q  You don't take resections or review resections?
25  A  No, sir.

PAGE 9  SHEET 3

9

1  Q  You rely on the pathology reports?
2  A  That is correct.
3  Q  Is that standard in the practice for internists such
4     as yourself to rely on pathology reports with respect
5     to moles specifically?
6           MR. KELLEY:  Objection.  He's not
7        here to testify as an expert witness or about
8        the standard of care.  You can answer.  Go
9        ahead.
10 A  Could you repeat the question?
11 Q  Sure.  An internist such as yourself, is it typical
12    or traditional for you to rely on pathology reports?
13 A  That is correct.  That is the standard of care.
14 Q  In the last five years when was the last time that
15    you diagnosed melanoma?
16 A  I've diagnosed two suspicious lesions subsequently
17    determined to be melanoma within the last six
18    months.  Within the last five years, approximately 10
19    of my patients were referred who were subsequently
20    found to have melanoma.
21 Q  Are you aware of the term dysplastic nevus?
22 A  I am.
23 Q  Medically what does that term mean to you?
24 A  A dysplastic nevus is a dermatologic condition in
25    which there are cells that have abnormal pigment.

PAGE 10

10

1     While the majority of dysplastic nevi are found to be
2     benign, there is a concern in an individual if there
3     are -- if there is a family history of melanoma, skin
4     cancer or dysplastic nevi since an individual who is
5     diagnosed with a dysplastic nevus may carry
6     additional risks for developing either other
7     dysplastic nevi or the condition can degenerate into
8     a more serious condition known as malignant melanoma.
9  Q  Is the pathological finding of a dysplastic nevus
10    identical to a finding of cancer?
11 A  No, it is not.
12 Q  What is the difference?
13 A  The difference is that while both conditions are
14    considered a skin tumor, one condition, dysplastic
15    nevus, if followed appropriately and if there is not
16    a family history of either dysplastic nevus or
17    melanoma, usually does not cause ongoing medical
18    problems.
19 Q  If in one of your patients you had a pathology report
20    that had a diagnosis or finding of dysplastic nevus,
21    would you report to that patient that they had
22    cancer?
23          MR. KELLEY:  Objection, calls for
24       speculation.  Go ahead, you can answer it.
25 A  I would inform the patient of the potential risks and

PAGE 11

11

1     would obtain additional history.  I would also
2     arrange to have that patient followed by a
3     dermatologist or if a dermatologist is not available,
4     a surgeon in the area who is skilled and trained in
5     following these conditions appropriately, especially
6     in an individual who may have a family history of
7     melanoma or a family history of dysplastic nevi.
8         I think it's crucial to stress the need to
9     obtain follow-up.  In my patients I also will
10    evaluate the patient on an every six to 12-month
11    basis to make sure that there are no changes
12    surrounding the site of excision of the original skin
13    problem, but I would also look for new lesions and
14    instruct a patient to -- and this is done by letter,
15    to evaluate their skin at least once monthly to look
16    for new lesions.
17        I also instruct patients to have their spouse or
18    another individual examine areas that they may not be
19    able to see because of the skin location.  Example,
20    back, lower parts of the posterior body where you
21    cannot see the areas directly.
22 Q  And I'm sorry, Doctor, let me go back to the
23    question.  If you received a pathology report that
24    had as its finding dysplastic nevus, would you report
25    to the patient at that time that he had cancer?

PAGE 12

12

1  A  No, I would not.
2  Q  Why?
3  A  Because I don't feel that that in itself is a
4     cancer.  I must stress, though, that in patients who
5     are considered at risk, this patient also needs to be
6     informed that the patient may be at additional risk
7     at some point in the future for developing other nevi
8     of malignant potential.
9  Q  What about a microscopic finding that within the mole
10    there were melanocytic cells, what's the significance
11    of that?
12          MR. KELLEY:  Again let me just
13       interpose a couple of objections.  First of all,
14       I think we're still on this question of what
15       would you do in the event one of your patients
16       presented with these symptoms, and that's
17       objectionable, calls for speculation.
18          It's also objectionable because you're
19       getting into really sort of expert testimony.
20       We agree to waive all objections except as to
21       form at time of trial, so I'm going to let him
22       answer, so I just want to put that on the
23       record.
24          MR. PEDERSEN:  Certainly.  We
25       certainly believe that these questions aren't

THOMAS ANSFIELD - 11/01/01 / HALL V. CUNA MUTUAL

PAGE 13  SHEET 4

13

1     objectionable and that these were the specific
2     findings on the '93 pathology report, and it's
3     both relevant and nonspeculative and this doctor
4     himself has testified he has diagnosed melanoma
5     and is familiar with these terms in his everyday
6     practice.
7             MR. KELLEY:  Go ahead.
8 A  The question?
9 Q  This question relates to melanocytic cells and the
10    significance of a microscopic finding of melanocytic
11    cells within the mole itself.
12 A  I can best answer this by describing a situation that
13    one of my patients was involved with several years
14    ago.  Melanocytic cells means that there is
15    melanin-containing components within the cells.
16        Let me state that I'm not a pathologist, and nor
17    do I pretend to be an expert on these lesions, but if
18    I see that an individual has melanocytic cells and
19    the diagnosis of dysplastic nevi -- nevus is made, my
20    concern as an example, the case that I'm discussing,
21    I was concerned because the lesion was growing
22    rapidly, had changed character, and despite the
23    diagnosis, I suggested that additional evaluation be
24    done of the pathologic specimen to make sure that
25    indeed the diagnosis was dysplastic nevus.  In the

PAGE 14

14

1    case I'm referring to, the case was subsequently
2    found to be an early stage of melanoma.
3        That would set up an entirely different protocol
4    of need for evaluation of that patient, specifically
5    by a dermatologist and in this area a dermatologist
6    who is a specialist in pigmented lesions that may go
7    on to develop melanoma.
8 Q  The finding in a microscopic pathology report of
9    melanocytic cells, is that equivalent to cancer?
10 A  No, it is not.
11 Q  Why isn't it?
12 A  Again I'm not a pathologist.  For me as an internist,
13    it raises the question and I frame that in what the
14    individual case is if, for instance, it's a small
15    lesion, it has not been growing, but it has irregular
16    borders, which can be seen in either a melanoma or in
17    a dysplastic nevus.
18        If there is a rapidly growing lesion, it may
19    have another impact and at least raises my antenna to
20    say this may be something other than the pathology
21    report shows, and I would request a review by a
22    different pathologist.
23 Q  With respect to Mr. Hall, have you reviewed the 1993
24    pathology report from Chambersburg Hospital?
25 A  Yes, I have.

PAGE 15

15

1 Q  When did you first review that?
2 A  My memory is that I first reviewed this on
3    December 9th, 1999.  It was on that date that I
4    received an underwriting risk evaluation worksheet
5    following a claims review on the deceased,
6    Mr. Tommy Hall, who expired in 1999.  Following that
7    claim, the case was referred to me.
8 Q  And did you review the 1993 pathology report?
9 A  I did.
10 Q  And you have that report in front of you right now?
11 A  I do.
12 Q  Can you tell us on that pathology report what the
13    pathologist's interpretation was of the mole that was
14    removed?
15 A  Dysplastic nevus, skin (back).
16 Q  Do you have any information as you sit here today to
17    contradict that interpretation?
18 A  I do not.
19 Q  Is there anything in the pathology report that in
20    your mind indicates that there was a cancer that was
21    removed in 1993?
22 A  No, I do not.
23 Q  Did you review all of the medical records that --
24    this is going to get a little bit complicated.  Let
25    me just ask what medical records you reviewed as part

PAGE 16

16

1    of your evaluation in the underwriting claim.
2 A  In my initial review, I reviewed the biopsy report
3    and the outpatient records from the Chambersburg
4    Hospital in Chambersburg, Pennsylvania.  The
5    outpatient report lists a surgical procedure
6    conducted by Dr. James E. Hurley, which was conducted
7    on March 13th, 1993.
8 Q  The surgical report in the record that you're
9    referring to now, is there any indication on that
10    record that there was a cancer that was removed from
11    Mr. Hall?
12 A  The report lists that Mr. Hurley -- that Dr. Hurley
13    conducted the procedure on referral from
14    Dr. George Baker, and I did not have a report from
15    Dr. Baker.
16 Q  Let me ask the question again.  Is there anything
17    from the '93 contemporaneous records with the
18    surgical procedure of the removal of the mole that
19    indicates that any form of cancer was developing in
20    Mr. Hall?
21 A  No, there is not.
22 Q  What other records did you review?
23 A  I reviewed the records of Dr. Charlesworth, is that
24    correct?
25 Q  Yes.

THOMAS ANSFIELD - 11/01/01 / HALL V. CUNA MUTUAL

PAGE 17  SHEET 5

PAGE 19

17

```
1   A   Which was an intake record dated April 30th, 1998.
2   Q   What of significance did you see in that record?
3   A   In that record I see a history that while Mr. Hall
4       was evaluated for leg pain, Dr. Charlesworth obtained
5       a past medical history.  Included in that history was
6       question mark -- "? melanoma removed, back, 1996."
7   Q   Do you know now as you sit here whether the '96 year
8       was accurate with respect to the removal of anything
9       on Mr. Hall's back?
10  A   In retrospect, yes, there is a question here of
11      whether or not that referred to the lesion that was
12      removed in April of 1993, but there is no name of a
13      physician.  So at that point I questioned whether or
14      not we were dealing with one lesion or two lesions,
15      one that was removed by documentation -- as
16      documented in an outpatient record from the hospital
17      or whether or not there was a second lesion that was
18      removed in 1996.
19  Q   Besides the April 30th, 1998 reference to a '96
20      event, do you have any other medical records or
21      reference to a '96 mole removal?
22  A   No, I do not.
23  Q   The entry on April 30th, 1998, do you personally
24      know as you sit here whether that was the doctor's
25      own thoughts and impressions or information conveyed
```

19

```
1       already completed the application form for insurance,
2       wasn't it?
3   A   That is correct.  If I may, I would like to go back
4       to the December 11th, 1998 note.  Dr. Charlesworth's
5       history describes that the lump on the neck had
6       occurred -- let me correct that -- was discovered by
7       the patient at least several weeks prior to the
8       evaluation of December 11th, 1998.  To me this raised
9       the possibility that the lesion or lump was
10      discovered on or about the time of the application.
11  Q   Now, are you saying you would have expected Mr. Hall
12      to make his own diagnosis of cancer upon the
13      discovery of a lump in his neck?
14  A   I don't think that that would be possible for a
15      layperson to make a determination as to what the lump
16      was.  All I am saying is that it appears that
17      Mr. Hall discovered a lump, as stated, several weeks
18      before the December 11th, 1998 visit.  Mr. Hall's
19      application for insurance was November 18th, 1998.
20  Q   You don't have any records, do you, or any
21      information to establish that Mr. Hall knew he had
22      cancer on November 18th, '98, do you?
23  A   No, I do not.
24              MR. KELLEY:  Objection to the
25          form of the question.
```

PAGE 18

18

```
1       to him by Mr. Hall?
2   A   I cannot make a determination of that.  Two possible
3       scenarios, one, and the one that subsequently was
4       considered likely was is that the patient, Mr. Hall,
5       stated that he had a melanoma removed.
6           It is also possible that the doctor, hearing
7       that -- and again this is my supposition -- that a
8       pigmented mole was removed, that the doctor may have
9       written the term melanoma.  I can't be sure.
10  Q   And when you assisted in making the decision about
11      coverage and benefits and rescission of a policy, you
12      were equally unsure, weren't you?
13              MR. KELLEY:  Objection.  You can
14          answer.
15  A   I was unsure, but subsequent records that were
16      obtained following Dr. Charlesworth's referral of
17      Mr. Hall on December 11th, 1998 for an evaluation of
18      a lump that developed in the lateral portion of the
19      neck, the patient was referred to a Dr. Chicklo, who
20      evaluated the patient on January 22nd, 1999.
21      Dr. Chicklo's history included the presence of a
22      malignant mole which was excised in 1993 on his back.
23  Q   Now, at that point what's the date of that report?
24  A   January 22nd, 1999.
25  Q   That was after -- several months after Mr. Hall had
```

PAGE 20

20

```
1   Q   Let me rephrase the question to address the
2       objection.  Do you have any information that on
3       November 18th, 1998 Mr. Hall knew he had cancer?
4   A   No.
5               MR. KELLEY:  Same objection.
6   Q   Have you reviewed subsequent to your initial and
7       second review the depositions that were taken in the
8       underlying medical malpractice case?
9   A   No.
10  Q   Are you aware that depositions were taken with
11      respect to the pathologist who did the gross
12      inspection and the microscopic inspection?
13  A   No.
14  Q   Were you aware that the deposition was taken of the
15      surgeon who removed the mole in '93?
16  A   No.
17  Q   Were you aware that those are available and your
18      counsel has those?
19  A   No.
20              THE WITNESS:  I'm aware -- I mean
21          do you have copies?
22              MR. KELLEY:  Yeah.  For the
23          record, they were supplied in the last couple
24          weeks.
25              MR. PEDERSEN:  That's correct.
```

21

1    Q    Is it consistent with your testimony that Dr. Hurley
2         testified on Page 48 of his transcript that he
3         would -- that he found a dysplastic nevus that was
4         not cancer and that the lesion had been completely
5         removed?
6                   MR. KELLEY:  Object to the form.
7              You can answer.
8    Q    Is that consistent with your understanding of the
9         pathology report and the events that happened?
10   A    I can't make a statement on that.  I've not seen the
11        deposition.
12   Q    Did you have an authorization in your possession at
13        the end of 1999 when you were evaluating this
14        potential claim to obtain medical records?
15   A    It was my request to obtain additional medical
16        records.  Following the discovery of the hospital
17        records as well as the initial evaluation conducted
18        by Dr. Charlesworth, I requested that we obtain
19        medical records from all physicians caring for the
20        patient from 1993 until the time of the decedent's
21        death.
22   Q    Didn't you specifically instruct Ms. Larson to obtain
23        the records from the treating doctor who removed the
24        mole in '93?
25   A    I did.

22

1    Q    Do you know whether she ever obtained those?
2    A    It's my understanding that she requested those
3         records and that those were the records of a Dr. --
4    Q    Hurley?
5    A    -- Hurley.
6    Q    I'm sorry, I didn't mean to put words in your mouth.
7         I'm trying to help you.  There are a number of
8         doctors involved.
9    A    There are a number of doctors involved, thank you.
10        And Dr. Hurley and we -- it's my understanding that
11        Ms. Larson was told that the records were either
12        displaced or lost.
13   Q    From a doctor to a doctor, from yourself to
14        Dr. Hurley, could you have called him with the
15        authorization that you had?
16                  MR. KELLEY:  Objection.  I don't
17             think it's been established that there was an
18             "authorization."
19   Q    Let me -- did you obtain records based upon an
20        authorization?
21   A    I believe records were obtained.  It would not be an
22        authorization that I would request.  It would be an
23        authorization that would be requested by our claims
24        personnel.
25   Q    And do you know whether or not medical records are

23

1         only released pursuant to authorizations of the
2         patient?
3                   MR. KELLEY:  Objection, calls for
4              a legal conclusion.
5    Q    Now, as a doctor, your office releases records all
6         the time, doesn't it?
7    A    That is correct.
8    Q    And you know the protocols required to release
9         records?
10   A    Protocol is we receive a written authorization in
11        order to release medical records.
12                  MR. KELLEY:  Same objection.
13             He's answered.
14   Q    Let me show you the CUNA Mutual letter, and this was
15        the letter that was sent to each of the treating
16        doctors after Mrs. Hall provided their addresses.  Do
17        you recognize that to be a CUNA Mutual letterhead and
18        letter going to doctors requesting records?
19   A    Yes, it is.
20   Q    And what's duplicated at the bottom of that letter?
21   A    Duplicated is a signed authorization from the
22        applicant at the time -- obtained at the time of
23        application signed by the decedent, Tommy Hall, and
24        his wife.
25   Q    And how long does that application remain in force?

24

1         Can you tell?  Does it list 30 months?  It's fine
2         print, I know.
3    A    You have stronger glasses.  Wait a minute.  Off the
4         record.
5    Q    Let me quote from the third line towards the right, a
6         sentence that states, "I agree that this
7         authorization shall be valid for 30 months from the
8         application date."
9                   MR. KELLEY:  We'll stipulate.
10                  MR. PEDERSEN:  You'll stipulate
11             that it was valid for 30 months.
12   A    Okay.
13   Q    Did you know that records had been obtained pursuant
14        to an authorization of the insured?
15   A    Yes, we received a number of records that were
16        obtained, which included the medical records from a
17        number of physicians, including Dr. Charlesworth.  Do
18        you want me to list them all?
19   Q    No, no, that's fine.
20   A    Okay.
21   Q    Do you have an understanding that an authorization
22        existed with CUNA to obtain medical information that
23        would have also covered making a phone call?
24   A    Yes, when records were not obtained, it is my
25        understanding, and this is information that I

THOMAS ANSFIELD - 11/01/01 / HALL V. CUNA MUTUAL

PAGE 25  SHEET 7

25

1    recently was provided, from several of the doctors
2    who were contacted, these included the original
3    doctor who referred Mr. Hall to Dr. Hurley, and that
4    is Dr. Baker.
5         A call was made from one of our staff members,
6    Judy Baker, on January 6, 2000 in which Dr. Baker's
7    office informed her that she had -- that Dr. Baker
8    had not seen the patient since 1989. Therefore, it
9    did not appear that there were records from that
10   physician, although that was the physician named as
11   the referring physician to Dr. Hurley.
12  Q  Doctor, if I may, let me address my questions
13     about -- concerning Dr. Hurley's records. Did you
14     understand at the time the application for benefits
15     was made and your evaluation was taking place that
16     CUNA never obtained the records from Dr. Hurley's
17     office?
18  A  That is correct.
19  Q  Did you recommend at that point that someone or
20     perhaps yourself call Dr. Hurley and speak with him
21     about the '93 mole that was removed?
22  A  I did not. That is normally the responsibility of
23     the claims personnel to obtain records subsequent to
24     an evaluation of the case. But it was my
25     understanding that the file was not available.

PAGE 26

26

1    Q  Apart from the file, would you have expected someone
2       to attempt to speak to the doctor to find out what
3       that mole was, whether it was cancerous, that was
4       removed in '93?
5    A  Not usually.
6    Q  Did you have any information at the time of the
7       attempt to obtain Dr. Hurley's records that an
8       attorney was involved in Harrisburg and the records
9       had been sent to that attorney?
10   A  At that time, no. This is information that was
11      subsequently obtained on -- by one of our staff
12      people. I believe the caller was Barb, the last name
13      is not given, that first a call was made on -- let me
14      go back.
15         A call was made on January 31st, 2000 to
16      Dr. Hurley's office, there was a request for
17      medical records and the response was his file,
18      meaning Mr. Hall's file, cannot be found. They have
19      misplaced or lost the file. And then there is a
20      notation that an attorney is involved.
21         There's another notation dated 2-1-2000 with the
22      name Barb, four pages, to attorney in Harrisburg.
23      Ever since they cannot locate file.
24   Q  So you made no additional efforts to obtain
25      information directly from Dr. Hurley?

PAGE 27

27

1    A  No, I did not.
2    Q  You didn't recommend that any additional steps be
3       taken to obtain information from Dr. Hurley?
4    A  I was not contacted after that time concerning those
5       records.
6    Q  Yet it was your initial request for Dr. Hurley's
7       records that started that process?
8    A  It was my initial --
9    Q  Advice.
10   A  -- request to obtain and advice. It is advice
11      because I provide consultation to the company, a
12      request to obtain all medical records from all
13      physicians who were treating that patient so that we
14      could get an idea of exactly what was going on here.
15         Remember that there was a question of two dates
16      involved. One was a documented record of removal of
17      a mole in April of 1993, and secondly, we had a
18      notation by Dr. Charlesworth that there was the
19      possibility at least of a mole that was removed in
20      1996.
21   Q  And through obtaining those records, we found out
22      that there wasn't any additional information about
23      anything removed in '96, isn't that right?
24   A  That is correct.
25   Q  So then the only issue was -- remaining was about the

PAGE 28

28

1       April '93 mole?
2    A  That is correct.
3    Q  And the person who removed the mole did not provide
4       medical records?
5    A  That is correct.
6    Q  And to your knowledge, neither you nor no one at CUNA
7       attempted to speak with him directly about those
8       records?
9    A  That's correct.
10   Q  And at that time the CUNA records reflect that
11      Dr. Hurley's records were sent to an attorney in
12      Harrisburg?
13   A  That is correct.
14   Q  And there's nothing in the record to indicate that
15      any additional effort was made to obtain the records
16      from that attorney in Harrisburg, is that right?
17   A  That's right.
18   Q  The ultimate CUNA decision to rescind the policy or
19      to deny benefits was made without Dr. Hurley's office
20      records, isn't that correct?
21   A  That's correct.
22   Q  And the decision was based upon the April '93 mole?
23   A  That's correct.
24   Q  And the failure of Mr. Hall to indicate on an
25      insurance application form that that mole was

PAGE 29  SHEET 8

PAGE 31

29

1  cancerous?
2  A  There were two comments on his application that
3     raised concern.  And I would like to refer to his
4     application.  In his application he was asked a
5     question, have you ever been treated or diagnosed by
6     a member of the medical profession as having any of
7     the following.  The one question was cancer.
8        And subsequent medical records obtained after
9     the diagnosis of melanoma show that each physician,
10    including an oncologist and specialty physicians who
11    evaluated the patient listed the 1993 lesion as
12    either a malignant melanoma, a melanoma or a
13    malignant mole.  We did not have the medical records
14    of either the referring physician to Dr. Hurley, who
15    is Dr. --
16  Q  Baker?
17  A  -- Baker, nor do we have the medical records of
18    Dr. Hurley from that date.  The other medical
19    condition that Mr. Hall denied having was a back
20    condition.
21       So it raised the question of a possible
22    misrepresentation since two questions were answered
23    negatively even though, number one, he did have a
24    back condition, and based on the information that we
25    had from information following the removal of the

31

1  there?
2  A  No, it is not -- no, it does not.
3  Q  Is that something more recent that you've developed
4     in reviewing the medical records?
5  A  It was one of the pieces of information that we had
6     in early 2000 that at least raised a question of
7     whether an inaccurate or a misleading application was
8     given at the time of the application.
9  Q  The back problems had nothing to do with the actual
10    rescission or denial of benefits, did it?
11  A  That's correct.
12  Q  In fact --
13              MR. KELLEY:  I'm going to object
14         to the form of the question.  He testified
15         that it played a role in their -- he testified
16         to the role that it played, and now you're
17         characterizing it as playing no role.  If you
18         want to ask him is there anything about the back
19         problem in that letter, he's answered no.
20  Q  Would you expect CUNA Mutual -- you've worked with
21    them for some time, you're their medical director --
22    to completely and accurately tell an insured why
23    they're not paying benefits under a homeowner's
24    policy?
25  A  I would expect that they would provide information to

PAGE 30

PAGE 32

30

1     mole, the information listed the condition of a mole
2     that was removed in 1993 as being a malignant
3     melanoma.
4  Q  Are you aware of a February 10th, 2000 letter sent by
5     CUNA indicating the reasons for the refusal to pay
6     benefits under the policy?  Are you aware of that
7     letter?
8  A  I'm not sure.  I'm not sure, let me review it.  Yes,
9     I've seen this letter.
10  Q  That letter is from CUNA Mutual?
11  A  That is correct.
12  Q  And does that letter indicate the reasons why
13    benefits were not being paid under the policy?
14  A  The letter is a letter to the decedent's wife,
15    Nancy Hall, and the letter states that the policy was
16    being rescinded, and it was based on the following
17    reason.  The review showed that -- this is quotation,
18    "The review showed that Tommy visited a doctor in
19    1993.  On the application Tommy did not list the
20    visit had occurred.  Had we known about the medical
21    condition revealed during this visit, we would not
22    have accepted the application or issued a certificate
23    of insurance."
24  Q  There's nothing in that letter about a back problem
25    or failure to indicate anything about his back, is

32

1     claims to the decision that was made.  There may be
2     certainly a difference of style as to the
3     technicalities.
4        I don't know what other term to use -- of a
5     diagnosis, but the information provided generally
6     will give a sense of why an application -- why an
7     underwriting decision is made.
8  Q  And the sense that you're referring to in this
9     February 10th letter is the '93 doctor visit and
10    information about the mole, isn't that right?
11  A  That's correct.
12  Q  Besides the information that you've already provided
13    to me about your involvement, is there anything else
14    or any other part of the records that you were
15    involved with that we haven't gone over?
16              MR. KELLEY:  Object to the form.
17  A  I'm not sure what you are asking.
18  Q  Do you have any other notations in the record in your
19    own handwriting or letters from you that we haven't
20    reviewed?
21  A  No, sir.
22  Q  Did you author a letter dated August 24th, 2001 to
23    Mark Richardson concerning this claim?
24  A  Yes, I did.
25  Q  Who prepared that letter, you or Brenda Larson?

PAGE 33  SHEET 9

33

1   A   Brenda Larson did.
2   Q   What's the purpose of this letter?
3   A   The letter describes, first of all, our decision to
4       rescind the coverage for Mr. Tommy Hall. It was my
5       suggestion that we describe in the letter that this
6       indeed is a home mortgage protection policy. What
7       this policy is is a policy with limited underwriting
8       restrictions, and the policy can be issued as
9       either -- as a standard policy only.
10          Our only other choice is to decline a product.
11      If an individual has certain risks that exceed a
12      certain minimal limit, it is our policy to not
13      provide coverage to an individual.
14          The importance of that is that in the case of
15      Tommy Hall, there was information we did not have.
16      Specifically we did have a diagnosis of a pathologic
17      diagnosis of a dysplastic nevus, which was resected
18      in 1993. However, we also had information that there
19      possibly was another mole removed in 1996. We did
20      not have the records of the initial physician, and
21      let me tell you that is important as a consultant to
22      an insurance company such as CUNA Mutual Group.
23          A dysplastic nevus in itself may not be a risk,
24      but then we need to obtain additional information to
25      determine whether or not we can provide a standard

PAGE 34

34

1       issue only policy, in other words, one with very
2       minimal risks that we can either accept or decline.
3       And one of it is to obtain information of what
4       happened after the diagnosis was made.
5           There are two physicians that we knew who were
6       involved prior to the case. One was the referring
7       physician, Dr. Baker, as listed on the hospital
8       record, and the other was Dr. Hurley. Dr. Baker told
9       us that there are no records after 1989. The
10      importance of that to me is, well, then the decedent,
11      Mr. Tommy Hall, had not obtained medical review by
12      that physician.
13          Secondly, Dr. Hurley stated that the records
14      were lost, so I did not have information as to
15      what -- whether this individual was followed up or
16      evaluated, and the importance of that is that, first
17      of all, that is standard care.
18  Q   To maintain records?
19  A   To maintain records. And secondly, we add additional
20      risk debits to an individual who does not receive
21      appropriate care or follow-up care from -- for a
22      condition such as a dysplastic nevus.
23          So if I had that information, if I had
24      information of a dysplastic nevus at the time of the
25      initial application, my recommendation would be to

PAGE 35

35

1       our underwriters obtain additional information. And
2       the reason is I need to make sure first how the
3       lesion presented, second, was appropriate follow-up
4       care given, third, determine if there is a family
5       history of skin cancer, melanoma, dysplastic nevi
6       because those may add additional points that would
7       render the condition of dysplastic nevus itself as a
8       condition which we may not accept or not provide
9       coverage to an individual applying for insurance. So
10      that's why that was important information to me.
11  Q   What was the reason that the August 24th, 2001
12      internal memo was written to the legal department?
13  A   It was a memo describing that after review of this
14      rescission, we put a listing of what processes we did
15      in making a determination to rescind the policy on
16      Mr. Tommy Hall.
17  Q   Did you have an understanding at that point that
18      legal action was contemplated by the Hall family?
19  A   Only in that there was a lawyer involved based on the
20      fact that records had been sent to a lawyer, and I
21      did not know if there was an active case at that
22      time.
23  Q   Brenda Larson didn't tell you -- sorry, go ahead.
24  A   Let me correct that. I thought this was in the year
25      2000. This is in August of 2001. At that point I

PAGE 36

36

1       did know that there was legal action entertained by
2       the family of Mr. Tommy Hall.
3   Q   Who asked you to prepare this letter after you knew
4       legal action was contemplated by the Hall family?
5   A   I wasn't asked to prepare it. Brenda Larson prepared
6       the letter, and I added or corrected information
7       after the letter was prepared. So I can't answer
8       that question.
9   Q   At the time the letter was prepared, you understood
10      legal action was being contemplated?
11  A   That's correct.
12  Q   And there's nothing in the August 24th, 2001 internal
13      memo to the legal department concerning the back, is
14      there?
15  A   No, there is not.
16  Q   Attached to that legal memo is a tumor rating guide.
17      Who provided that to your legal department?
18  A   That was provided by Brenda Larson.
19  Q   Are you familiar with a tumor rating guide?
20  A   I am.
21  Q   Is it an insurance document?
22  A   Yes. Every insurance company that I have personally
23      worked with uses tables from reinsurance companies
24      which provide an even broader picture for someone
25      such as I who is a medical consultant to an insurance

THOMAS ANSFIELD - 11/01/01 / HALL V. CUNA MUTUAL

37

```
 1        group of what potential risks an individual has if
 2        they develop a certain condition.
 3    Q   Did you have this tumor rating guide available to you
 4        in the end of 1999 when the claim was being
 5        evaluated?
 6    A   Yes, I did.
 7    Q   Did you consult or review this tumor rating guide?
 8    A   Yes, I did.
 9    Q   At that time?
10    A   That is correct.
11    Q   What information does the internal insurance document
12        provide with respect to a pathological finding of
13        dysplastic nevus?
14    A   After -- it lists a statement stating that, "After
15        reviewing the records we received, the 1993 pathology
16        report indicates dysplastic nevus, skin (back) with a
17        few groups of melanocytic cells." It recommended
18        review in view of the dysplastic changes.
19            In addition, the April 1998 visit noted "?
20        melanoma removed, back, 1996." And with that
21        information, we would normally decline the policy,
22        and there's two ways that can occur. Either we would
23        send a letter stating that we would not accept the
24        application or we would send a letter stating that we
25        are postponing application unless you provide
```

38

```
 1        additional information from your treating physicians.
 2    Q   What does the tumor rating guide attached to the memo
 3        and that you have available and I believe you
 4        testified in fact reviewed before the insurance
 5        company's decision to deny benefits under the policy
 6        with respect to dysplastic nevus?
 7    A   On Page 5 of the tumor rating manual, it lists
 8        dysplastic nevus syndrome.
 9    Q   It also lists dysplastic nevus and dysplastic nevus
10        syndrome, doesn't it?
11    A   That is correct, thank you.
12    Q   What information is provided on this internal
13        insurance document with respect to a finding of
14        dysplastic nevus?
15    A   It lists that if an applicant has a dysplastic nevus,
16        that there is no additional rating required in
17        consideration of the pathologic report. But it also
18        lists that if other members with dysplastic nevi
19        have -- if other members of the family of the
20        applicant have a dysplastic nevi, there is a
21        substandard rating that is applied, and the rating is
22        an additional amount of what we call debits, and the
23        amount of debits is considered plus 50.
24    Q   Did you have any information on November -- that on
25        November 18th, 1998 whether any of Mr. Hall's family,
```

39

```
 1        any family members had ever been diagnosed with
 2        dysplastic nevi?
 3    A   We know that there is a family history of skin
 4        cancer, but I do not know if that skin cancer
 5        represents dysplastic nevi, melanoma or other forms
 6        of skin cancer.
 7    Q   What document shows the family history of skin cancer
 8        that was available in 1998? I'm dating to the time
 9        that Mr. Hall filled out the insurance application
10        form.
11    A   I have no information as of 1998.
12    Q   So you have no information about whether or not CUNA
13        Mutual would have insured Mr. Hall with a finding of
14        dysplastic nevus only?
15    A   On the basis of dysplastic nevus only, but the other
16        vital piece of information that I did not have is
17        whether or not Mr. Hall had received appropriate
18        medical follow-up.
19    Q   Is there a rating anywhere on this chart for
20        appropriate medical follow-up?
21    A   Yes, there is.
22    Q   Where is that?
23    A   Additional considerations. With no follow-up by a
24        dermatologist or attending physician for two or more
25        years, there's an additional risk rating of 50
```

40

```
 1        percent.
 2    Q   And do you know whether or not Mr. Hall had been
 3        following with Dr. Charlesworth in the months
 4        preceding the application?
 5    A   I had no information. Number one, Mr. Hall did not
 6        see Dr. Charlesworth as far as I understand until
 7        April of 1998.
 8    Q   We can stipulate that's the date of a visit, yes.
 9    A   Right. But the information I did not have and it
10        raised a question that if Mr. Hall had a diagnosis of
11        dysplastic nevus at the time of application, and this
12        is -- let me give you a scenario I really would want
13        to know is, one, what was the initial visit -- how
14        the initial lesion was discovered by the attending
15        physician, and secondly, what kind of follow-up was
16        available on that individual.
17    Q   And you don't know the answers to any of those
18        questions as you sit here today?
19    A   That -- as of today?
20    Q   As of today, the follow-up that Mr. Hall had
21        medically following the removal of the '93 -- between
22        the '93 removal and the April '98 Charlesworth
23        visit.
24    A   Within the last few days I was provided information
25        that showed that he had been seen by, I believe,
```

PAGE 41  SHEET 11

41

1      Dr. Hurley subsequent to the removal of the mole in
2      1993.
3  Q   So there had been follow-up from the physician?
4  A   Right. That was not information that was available
5      at the time of the -- our initial decision.
6  Q   With the follow-up that he had, then no additional
7      points would be added, isn't that correct?
8  A   That is correct.
9  Q   And so with no additional points being added --
10 A   Correct -- excuse me. Within the last few days we
11     also found out, I was provided information that he
12     had been seen by other physicians subsequently and
13     that there was a family history of skin cancer.
14     Again that was not information that we had or was
15     made available to me at the time of my review in 1999
16     or in early 2000.
17 Q   Do you know when the first presentation by a family
18     member of skin cancer was or of any form of cancer?
19 A   No.
20 Q   You don't know whether it was '98, '99, 2000?
21 A   No.
22 Q   So it could have been after the time he filled out
23     the application?
24 A   Certainly.
25 Q   So you have no basis as we sit here today to add

PAGE 42

42

1      additional points to Mr. Hall?
2  A   That's correct.
3  Q   And the pathological finding that we did have from
4      '93 listed dysplastic nevus and no additional points
5      were indicated for that, isn't that right?
6  A   For the condition itself.
7  Q   Yes.
8  A   But again we had no evidence that he had any medical
9      follow-up. And with that, my recommendation would be
10     to postpone, decline an application based on a
11     postponement until we obtain additional medical
12     records.
13 Q   Are you aware of the insurance application form?
14 A   Yes.
15 Q   The one that Mr. Hall filled out?
16 A   Yes, I am.
17 Q   And that form asked him whether or not he had been
18     diagnosed or treated for cancer, didn't it?
19 A   That's correct.
20 Q   And you testified earlier you have no information of
21     whether Mr. Hall really had cancer, clear or not,
22     until the time he filled out that application?
23         MR. KELLEY: Objection, misstates
24     the testimony. Go ahead, you can answer.
25 A   Other than the April 30th, 1998 visit to

PAGE 43

43

1      Dr. Charlesworth in which -- most likely in response
2      to the question, have you ever had any surgery, have
3      you ever had any conditions, Mr. Hall had to provide
4      information for -- to Dr. Charlesworth for him to
5      write, "? melanoma removed, back, 1996."
6  Q   You testified earlier that you didn't know whether
7      that was Dr. Charlesworth's own supposition or
8      whether it was information provided by the patient,
9      didn't you?
10 A   That is correct.
11 Q   So at the time the application was made, you have no
12     information that Mr. Hall himself knew he had cancer
13     in '93?
14         MR. KELLEY: Objection, misstates
15     the testimony.
16 Q   Is that correct?
17 A   I had no information. But I'll remind you that I'm
18     concerned about the possibility of two dates. One is
19     a mole removed in 1993, and secondly, a notation by
20     Dr. Charlesworth that, "? melanoma removed, back,
21     1996." My concern was we're dealing with two
22     conditions at that point.
23 Q   You did have one thing for certain, and that was a
24     pathology report from '93?
25 A   Correct.

PAGE 44

44

1  Q   And that pathology report had a finding of dysplastic
2      nevus?
3  A   That is correct.
4  Q   And no finding of cancer or melanoma?
5         MR. KELLEY: Objection, asked and
6      answered several times.
7  Q   Is that correct?
8  A   That's correct.
9  Q   So with respect to this rating chart, the tumor
10     rating chart, at the time Mr. Smith -- Mr. Hall
11     filled out the application, he would have had no
12     additional assignment of points, no points, isn't
13     that right?
14 A   He would have an additional 50 points based on the
15     fact that we had no indication of follow-up. If we
16     have no indication of follow-up, we would list that
17     as an assumption that there hasn't been a follow-up.
18 Q   That's follow-up for cancer, right, because the form
19     itself only asks whether you have cancer or not? And
20     if you put no, you don't have to list follow-up,
21     right?
22 A   That is correct.
23 Q   So based upon the application that was filled out,
24     there was no indication for further review, obtaining
25     medical records or points being assigned, isn't that

PAGE 45  SHEET 12

45

1     correct? Based upon the application --
2  A  Based on the application, that's correct.
3  Q  Are you aware of the policies and procedures within
4     CUNA Mutual to begin an investigation following the
5     death of an individual?
6  A  It is my understanding that with the death of any
7     individual, there is a claims process that is
8     initiated.
9  Q  What's your understanding of that claims process?
10  A  Information is obtained, including a death
11     certificate. In this situation, let me comment, that
12     a death certificate was obtained in which it listed
13     the cause of death was malignant melanoma, and the
14     period of time that the melanoma was listed to be
15     present was, I believe, three years, which also to us
16     raised the question that the melanoma was previously
17     diagnosed and was present for three years.
18  Q  Are you aware whether or not melanomas and cancers of
19     all types of forms can be present and undiagnosed?
20  A  Certainly they can be undiagnosed.
21  Q  Present and unobserved?
22  A  That is correct.
23  Q  And so that didn't give you any information about
24     whether Mr. Hall knew he had cancer three years
25     previously, did it?

PAGE 46

46

1  A  Other than the comment of the April 30th, 1998 visit,
2     which preceded the policy date.
3  Q  We're talking about the death certificate.
4  A  The death certificate I took at its word that it was
5     melanoma that was present for a period of three
6     years.
7  Q  Are you aware of some medical literature that
8     indicates that cancers in their infancy begin at the
9     time of birth?
10  A  There is a possibility of congenital nevi which are
11     present in a quiescence form that can be activated
12     particularly to the sun. There is that possibility.
13  Q  And the only thing insureds are required to do is
14     truthfully answer the application based on
15     information they have, isn't that true?
16  A  That is correct.
17  Q  Are you aware whether or not Dr. Hurley in his
18     deposition testified under oath that he told
19     Mr. Hall that he did not have a cancer and that the
20     lesion had been completely removed?
21          MR. KELLEY: Objection. We've
22     already been over this where you asked him if he
23     was aware of those depositions, and he said he
24     was not.
25  A  No, I've not seen the deposition.

PAGE 47

47

1  Q  What role did you play, if any, in providing
2     additional information in this litigation concerning
3     other claims that have -- where insurance policies
4     have not been issued by CUNA? Have you played any
5     role in that?
6  A  Ask that again.
7  Q  Sorry. We were provided by CUNA a stack of
8     information they label as claims file materials
9     regarding cases which were similar to the
10     plaintiff's. Did you play any role in providing
11     these claim files? And I'll show them to you. Or
12     selecting them.
13  A  That is correct.
14  Q  Correct that you did not have any role?
15  A  No, I did have a role.
16  Q  Oh, you did have a role. Who asked you to collect
17     those claim files or portions of them?
18  A  I don't collect claim files. I'm given claim files
19     to review and then make a decision on what to do
20     based on what the particular condition is.
21  Q  Well, describe for me the circumstances under which
22     you began a review process of certain claim files
23     that are in front of you.
24  A  Standard procedure when I come into my office, there
25     is a box that is marked review for home mortgage

PAGE 48

48

1     protection. In at least one case that I see listed,
2     I was asked to render an opinion concerning a form of
3     skin cancer known as squamous cell carcinoma. And
4     based on this information received, I recommended
5     postpone for follow-up dermatologic evaluation of the
6     skin lesion in order to make and render a decision on
7     what to do with that policy.
8  Q  Let me clarify, if I may, Doctor. You participated
9     in the underlying decisions of these claims and the
10     steps to take to evaluate the claims, is that right?
11  A  That is correct.
12  Q  Did you participate in selecting these particular
13     claims amongst a large group of claims to provide to
14     me?
15  A  No, sir.
16          MR. KELLEY: Object to form of
17     the question.
18  Q  I'd like to go through these -- I'll represent to you
19     that these claims were provided through counsel for
20     CUNA Mutual as claims files which were similar to the
21     plaintiff's case.
22  A  Okay.
23  Q  And I'm going to ask certain questions because you're
24     certainly aware of Mr. Hall's claim file.
25  A  Certainly.

THOMAS ANSFIELD - 11/01/01 / HALL V. CUNA MUTUAL

49

1  Q  The first one is Certificate No. 31675.  The insured
2     himself at the time of application, did he indicate
3     on this claim that he had a prior history of cancer?
4  A  He answered yes.
5  Q  And what was that prior history of cancer?
6  A  It says cancer and then lists a number of physicians
7     to obtain medical records that are listed as his
8     attending physician.
9  Q  Is there anything on that form that indicates there
10    was a pathology report of a dysplastic nevus but not
11    a cancer?
12 A  I see no listing of this as a dysplastic nevus.
13 Q  What was the basis for the denial of this either
14    application or claim for benefits?
15 A  I would have no idea since, first of all, I have not
16    seen this document prior to today nor that I know
17    that this was collected.  But I don't see any
18    underwriting review by me on this claim.
19 Q  So you would not have participated in that evaluation
20    to your knowledge?
21 A  To my knowledge, no.  If this is a complete file.
22 Q  But it appears that the application was denied based
23    on the insured's indication that they had prior
24    cancer?
25              MR. KELLEY:  Well, I'm going to

50

1              object to it.  The witness testified he doesn't
2              know anything about this.  You can read it as
3              well as we can.
4  A  Yes, all I see is that the individual has the
5     condition cancer, that the individual was treated by
6     two physicians with the diagnosis cancer.  I'll
7     remind you that this policy is either an issuance or
8     decline.  There is no room for underwriting
9     evaluation that would allow a special premium or
10    rating.  So either it's accepted or it's declined.
11             Based on that diagnosis, I assume the
12    underwriter made the decision to decline since the
13    individual had been seen by two doctors for the
14    diagnosis cancer in 1994 until 19 -- and then a
15    second doctor in 1996.
16 Q  How many points are required to decline the policy on
17    this type of policy?
18 A  Fifty to seventy-five points.
19 Q  Would be a decline?
20 A  Correct.
21 Q  Why is there a range?
22 A  You'll have to ask the underwriting department.  That
23    was a range that they decided after actuarial
24    determination of what they could issue for the policy
25    and the way it is priced.

51

1  Q  What if an individual had 50 points, who would decide
2     whether that policy was accepted or declined?
3  A  It may be decided by the underwriter.
4  Q  It's discretionary at that point?
5  A  It is discretionary.
6  Q  The second one, Certificate No. 38821, did the
7     insured on this certificate indicate that they'd had
8     skin cancer previously?
9  A  Yes, it does.
10 Q  Any indication about a dysplastic nevus rather than
11    skin cancer?
12 A  No, it refers to a squamous cell carcinoma.
13 Q  Squamous cell is altogether different than this type
14    of melanoma, isn't it?
15 A  That is correct.
16 Q  It's a very fast, progressive cancer?
17 A  It carries a significantly different risk, but a risk
18    beyond the underwriting limits that we would be able
19    to issue this policy, that is correct.
20 Q  And that's a wholly different finding than dysplastic
21    nevus, isn't it?
22 A  That is correct.
23 Q  Let me show you Certificate No. 37470.  And in this
24    the individual is listed yes with respect to having
25    prior conditions and listed basal cell as the nature

52

1     of the condition.
2  A  That is correct.
3  Q  And basal cell is not dysplastic nevus, is it?
4  A  That is correct.
5  Q  It's a wholly different thing?
6  A  That is correct.
7  Q  It's a form of cancer, isn't it, basal cell?
8  A  Yes, it is.
9  Q  And that policy was declined based upon the insured's
10    indication that he had basal cell carcinoma?
11 A  That is correct.  It is for removal of multiple basal
12    cell cancers, not just one basal cell cancer.
13 Q  That's dissimilar to Mr. Hall's case, isn't that
14    right?
15 A  That is correct.
16 Q  Certificate No. 5315, here the insured listed they
17    had been previously diagnosed with cancer, a melanoma
18    cancer.
19 A  Yes, that is correct.
20 Q  A diagnosis of melanoma cancer is different than the
21    finding of a dysplastic nevus pathologically, isn't
22    it?
23 A  If interpreted correctly, that's --
24 Q  We all hope they're interpreted correctly, but as we
25    know --

THOMAS ANSFIELD - 11/01/01 / HALL V. CUNA MUTUAL

PAGE 53  SHEET 14

53

1   A   That is correct.
2   Q   -- they're not always done that way, right?
3   A   That's correct.
4   Q   So this finding of malignant melanoma is different
5       than the pathology report from the '93 finding of
6       dysplastic nevus, isn't that correct?
7   A   That's correct.
8   Q   The Certificate No. 31590, there is a condition
9       that's disclosed by the insured of malignant
10      melanoma, and I'll ask the same question, whether
11      that's dysplastic nevus.
12  A   This lists melanoma.  It does not list dysplastic
13      nevus.
14  Q   The claim files that I've showed you, do any of them
15      give any information about whether CUNA Mutual would
16      insure someone with a finding of dysplastic nevus
17      pathologically?
18  A   We do insure people with dysplastic nevus.  We need
19      additional information if that diagnosis is made that
20      pertains to family history, family history of either
21      dysplastic nevi or melanoma and that there is
22      documentation of appropriate follow-up for the
23      condition once the diagnosis is made.
24  Q   Is there any place on the application form where the
25      insured is required to indicate a finding of

PAGE 54

54

1       dysplastic nevus?
2   A   No, there is not.
3   Q   Is there any place on the form to indicate the
4       removal of a mole where the mole at least as reported
5       by the physician to the patient is nonmalignant?
6   A   State that again.
7   Q   Is there any place on the application form to tell
8       simply whether you had a mole removed that is
9       noncancerous?
10  A   No, there is not.
11  Q   No requirement for the insured to indicate a
12      dysplastic nevus or a mole?
13  A   No, there is not.
14  Q   Would you agree or disagree -- in fairness, I'm
15      taking some statements from Dr. Ramirez's deposition,
16      the micro --
17  A   That's the pathologist?
18  Q   Right, who did the microscopic look.  And I
19      understand you're not a pathologist, and if this is
20      outside your area, just let me know.
21                  MR. KELLEY:  Let me interpose an
22      objection that it's outside --
23                  MR. PEDERSEN:  This is outside
24      his area?
25                  MR. KELLEY:  Yeah, obviously it's

PAGE 55

55

1       outside his area.  You're requiring him now to
2       comment on a deposition that he's not aware --
3       that he wasn't aware of until today and hasn't
4       read, and I don't think it's an appropriate
5       question.  Go ahead.
6   Q   A finding by a micropathologist that there were not
7       abnormal cells invading the dermis, would that be
8       more consistent with a benign or a malignant process?
9   A   I can't answer that.
10  Q   A finding by the pathologist that there were no
11      abnormal melanocytic --
12  A   Melanocytes.
13  Q   Melanocytes, that there were no abnormal melanocytes,
14      is that consistent or inconsistent with a malignant
15      process?
16  A   If the pathologist is correct, that's my
17      understanding.
18  Q   That that's consistent with a benign process?
19  A   Correct.
20  Q   Do I take it from your answers that you would defer
21      to the pathologist actually looking at the slides
22      rather than speculating yourself about the
23      microscopic findings?
24  A   That is correct.  Unless I had a history of a rapidly
25      growing lesion in which I would request review of

PAGE 56

56

1       that information.
2   Q   In your own practice is it a routine for you to
3       obtain a pathology report and give a copy of that
4       pathology report to the patient or read it to him?
5   A   I would usually not provide them with a copy of the
6       report nor read it to them, but in this circumstance
7       I would make sure that they understood their
8       responsibility to follow up on such a condition
9       because of the possibility of other lesions which may
10      or may not have malignant potential.
11  Q   Do you have any understanding as to the progression
12      or histology of a removal of a mole on the shoulder
13      or neck and the development of a lump in the neck?
14  A   I would need to know exactly where the lesion was
15      because the location or the possible lymphatic spread
16      from that can take a course that either goes directly
17      to the area involved or the lesion may have
18      metastasized to an area where it would then drain to
19      that site.
20  Q   And in this -- I'm sorry.
21  A   My understanding of the mole -- of the node that was
22      removed in January of 1999 is that this is considered
23      a "sentinel" node and represented not a primary tumor
24      but a metastasis from a different site.
25                  MR. PEDERSEN:  I don't have any

PAGE 57  SHEET 15

PAGE 59

57

1     other questions of Dr. Ansfield.
2              MR. KELLEY:  I may have a few
3     questions.
4              EXAMINATION
5     BY MR. KELLEY:
6     Q   Doctor, just let me show you, and I'll show you in my
7         file here just because it's easier with these records
8         that you have, and many of them we've already talked
9         about briefly, but let me show you the record from
10        Dr. Chicklo dated January 22 of 1999, and this is a
11        record that refers to Tommy Hall, correct?
12    A   That is correct.
13    Q   All right.  Now, I'll preface this by saying that all
14        of these documents that I'm going to go over are
15        documents that were provided to me as CUNA's counsel
16        as part of the claims file, part of the investigation
17        that was done on this, but I want to ask you
18        specifically is this one of the documents then that
19        you had reviewed prior to helping CUNA decide what
20        action to take on this claim investigation?
21    A   Yes, it is.
22    Q   Okay.  And in this document it relates a personal
23        history, do you see that?
24    A   I do see that.
25    Q   And it mentions that part of the personal history is

59

1         malignant mole?
2     A   Yes, it states that he had a malignant melanoma
3         removed and that the -- correction, Mr. Hall
4         demonstrated a left in-scapular dermal lesion in
5         1993.  Pathology revealed a malignant melanoma.
6     Q   So that's indicating that there was a pathologic
7         report of some kind that indicated that?
8     A   That's correct.
9     Q   And that --
10    A   And additionally it states past medical history is
11        most notable for malignant melanoma.  Cervical
12        resection 1993.
13    Q   And this was a document that you had as part of your
14        evaluation?
15    A   That's correct.
16    Q   And jumping to a -- appears to be a February 23, 1999
17        note on Dr. Enders' letterhead, does it refer to a
18        history in that particular document as well?
19    A   It does.  It refers to a malignant -- correction --
20        melanoma in 1993.  Now it says no, n-o, but I presume
21        that is now with cervical lymph node showing
22        recurrent melanoma.
23    Q   And also let me show you an oncology outpatient note
24        dated July 15 of 1999 by a Dr. William Sharfman.
25        Does that indicate any history about a melanoma or

PAGE 58

58

1         that he had a malignant mole excised in 1993 in his
2         back?
3     A   That is correct.
4     Q   And in your experience as a physician, when a
5         personal history is referenced in a document, where
6         typically does that personal history come from?
7     A   It comes from the patient.
8     Q   I want to jump ahead then to the March 15, 1999, a
9         colonoscopy report from Dr. Enders, E-N-D-E-R-S.  And
10        is there also a reference in there as to a history of
11        having -- it says a melena.  I presume that's a
12        misspelling -- a melanoma removed in 1993?
13    A   That is correct.
14    Q   Was that part of the records that you had reviewed?
15    A   It is.  It also states that in February he had a
16        cervical node that had malignant melanoma.
17    Q   Jumping ahead to a letter from Dr. Michael Cashdollar
18        dated February 17, 1999 --
19              (Discussion off the record)
20    Q   Referring to this February 17, 1999 letter from
21        Dr. Cashdollar, does he relate in that letter to
22        Dr. Chicklo, and that's C-H-I-C-K-L-O, any of the
23        history that Mr. Hall presented with?
24    A   Yes, he does.
25    Q   Does it say anything in there about a melanoma or

PAGE 60

60

1         malignancy?
2     A   Yes, it does.  It states that Mr. Hall was in his
3         usual state of health until 1996 when a number of
4         small moles were removed from his left back.  They
5         were being irritated by his shirt.  In 1993 a mole
6         developed on his left shoulder blade.  It developed a
7         bright red rim around it.  Excised pathology showed a
8         malignant melanoma.
9     Q   And this is in the history of present illness section
10        of this report?
11    A   That is correct.
12    Q   And this is what appears to be a report of a new
13        patient clinic visit report is what the title is of
14        that document, is that correct?
15    A   That is correct.
16    Q   So what would that indicate to you about the source
17        of the information for that history?
18    A   The source of the information would be the patient,
19        Mr. Hall.
20    Q   Now, all of these records, including the records from
21        Dr. Chicklo, Dr. Cashdollar, Dr. Enders, Dr. Sharfman
22        all indicating a past history and even in two of them
23        indicating that there was a pathology which showed a
24        past history of a malignant melanoma or a malignant
25        mole, all that information was available to you when

THOMAS ANSFIELD - 11/01/01 / HALL V. CUNA MUTUAL

61

1     you participated in the decision with regard to
2     Mr. Hall's claim?
3  A  Yes, it was.
4              MR. KELLEY:  That's all I have.
5     Thanks.
6              REEXAMINATION
7  BY MR. PEDERSEN:
8  Q  All of the references to medical records to which
9     you've just been shown, they began on January 22nd,
10    '99 and ran through July 15th of '99, is that
11    correct?
12 A  That's correct.
13 Q  All of those references are after the application for
14    insurance was made in November of '98?
15 A  Correct.
16 Q  And after a certificate was issued by the insurance
17    company?
18 A  That's correct.
19 Q  The pathology report --
20 A  Can we just go off the record?
21           (Discussion off the record)
22 A  Yes, those records are referred to, medical records
23    that occurred after the policy effective date, which
24    I believe was January 11th, 1999.
25 Q  And you don't know when over any of this course of

62

1     time Mr. Hall found out that he had malignant
2     melanoma?
3  A  I can't say for certain, but he is providing his
4     physicians during this time frame with -- apparently
5     with a history that he had a malignant melanoma.
6  Q  During the time frame from January 22nd, '99 through
7     July 15th, '99?
8  A  That's what the records suggest.
9  Q  All after the application date?
10 A  Correct.
11 Q  And the certificate being issued?
12 A  Correct.
13 Q  Are you aware that Mr. Hall was deposed both by
14    transcript and videotape before he died?
15 A  No, I was not.
16 Q  As a physician reviewing his records, wouldn't you
17    want to know if Mr. Hall provided any information as
18    to his knowledge from the time period '93 through
19    '98?
20           MR. KELLEY:  Objection,
21    objection.  Now we're talking about a deposition
22    that was taken well after this review was done.
23    And I think that's unfair not to tell him the
24    dates when this was done.
25 Q  The deposition took place after -- before a claim for

63

1     benefits was made, of course before he died because
2     you had the death certificate.  He was deposed during
3     his lifetime, before the death certificate, before
4     the claim for benefits came out.  He was deposed
5     during that period of time.
6  A  Normally I --
7              MR. KELLEY:  Well, just let me
8     interpose another objection.  I'm going to
9     object to you asking him a question about
10    whether he would have wanted to know about a
11    deposition that no one ever told him about, that
12    he had no knowledge had ever occurred and I
13    might add that Mr. --
14           MR. PEDERSEN:  Okay.
15           MR. KELLEY:  -- Mr. and
16    Mrs. Hall's lawyers never supplied that
17    information, the copies of the deposition
18    transcripts or even any of the information that
19    was contained in those deposition transcripts
20    until they were provided to me as their counsel
21    a couple of weeks ago.  Go ahead.
22 Q  Did you ever speak to Mrs. Hall about what she and
23    her husband knew of concerning that '93 mole?
24 A  No, I did not.
25 Q  Did you have any understanding at any time, including

64

1     up until today, that a lawsuit was filed against
2     Dr. Hurley, Dr. Baker and the hospital with respect
3     to that mole?
4  A  No, I did not know anything with the exception of
5     last night I was informed that there was a
6     malpractice claim, but I did not know to whom that
7     was directed.
8  Q  Are you aware as you sit here today that the mole --
9     that resections from the mole were sent -- from the
10    '93 mole were sent to NIH and they produced a
11    pathology report?
12 A  That information was provided to me by counsel last
13    night.
14 Q  The pathology report that's being referred to in the
15    '99 time frame, you don't know whether that was the
16    '93 pathology report, the NIH pathology report or the
17    January pathology report '99, do you?
18 A  No.
19           MR. KELLEY:  Well, Steve, if
20    we're going to do that, okay, because the
21    pathology report is August of '99 and you
22    know that --
23           MR. PEDERSEN:  Actually I don't
24    remember the date.
25           MR. KELLEY:  Now you're asking

THOMAS ANSFIELD - 11/01/01 / HALL V. CUNA MUTUAL

PAGE 65   SHEET 17

65

1    him questions about that he doesn't know that --
2    you know, when this occurred and whether it
3    occurred before July and all of that.  That
4    pathology report, so that we're clear on this
5    record, that you provided to me occurred in
6    August of 1999.
7                MR. PEDERSEN:  Which one, the
8    NIH?
9                MR. KELLEY:  Yes, which is after
10   all of these documents that we've just referred
11   to.
12 Q There was another pathology report done in either
13   January or February of '99, wasn't there?
14 A There was a biopsy of the lymph node lesion that was
15   removed, that's correct.
16 Q And you don't know what of the various pathology
17   reports is being referred to when they talk about a
18   pathology report in '99, do you?
19 A Since references are made to a pathology report in
20   the records that I had reviewed, they were -- would
21   have to be the pathology report from the January 1999
22   resection because if indeed the date of the pathology
23   report from the NIH was in August of '99, the records
24   that I reviewed preceded that date.  They were in --
25   between January and I think June or July of 1999 by

PAGE 66

66

1    the physicians whose records I reviewed.
2 Q You were conducting your review in December of '99,
3    weren't you?
4 A That is correct.
5                MR. PEDERSEN:  I don't have any
6    other questions.
7                MR. KELLEY:  You know, I just
8    want to -- I want to clear this up too.
9                REEXAMINATION
10 BY MR. KELLEY:
11 Q Doctor, again let me show you -- this is February of
12   1999.  The note from Dr. Cashdollar, Dr. Chicklo, it
13   says in here, as you are well aware in the second
14   sentence, "Mr. Hall demonstrated a left in-scapular
15   dermal lesion in 1993.  Pathology revealed a
16   malignant melanoma."
17       Would you agree with me that that language,
18   pathology revealed a malignant melanoma, is referring
19   to the lesion that was removed in 1993?
20 A Yes, I do.
21 Q And that's what the record says, correct?
22 A Yep.
23                MR. PEDERSEN:  Now, you looked,
24   however --
25                MR. KELLEY:  Wait a minute, wait

PAGE 67

67

1    a minute, wait a minute.
2                MR. PEDERSEN:  I'm sorry, I'm
3    sorry.
4 Q Again just to clear this up, this is Dr. Sharfman's
5    note of July 15 of 1999.  If you would review this
6    section here again and --
7 A This information again states that the "pathology
8    showed a malignant melanoma."  And that refers to the
9    1993 mole that was removed.
10                MR. KELLEY:  Thank you.  Go
11   ahead.
12                REEXAMINATION
13 BY MR. PEDERSEN:
14 Q You've read from two medical records, one in February
15   of '99 and one in July of '99 that refer to pathology
16   from the '93 mole, is that correct?
17 A That's correct.
18 Q You, however, have the '93 pathology report yourself,
19   right?
20 A That is correct.
21 Q You had it in your file at the time the evaluation
22   was made?
23 A Yes.
24 Q And does that pathology report indicate anywhere on
25   it malignant melanoma?

PAGE 68

68

1 A It does not.  But I must remind you that there are
2    medical records that we requested both from
3    Dr. Hurley and from Dr. Baker requesting information,
4    and we were told that there were no records
5    available.  So I had no idea whether or not there had
6    been a review, a re-review of that slide made
7    somewhere in the past.
8 Q Let me clarify.  So what you're saying, in February
9    of '99 and July of '99 you don't know whether those
10   doctors are commenting about the pathology report or
11   a re-review of the slides or a new resection?
12 A That's correct.
13 Q The information then described in February of '99 and
14   July of '99, they don't tell us anything about what
15   Mr. Hall knew at the time he filled out his
16   application about whether he had cancer, do they?
17                MR. KELLEY:  Objection.
18 A Let me make this comment about all of these reports.
19   This is listed in a history of the present illness.
20   That is normally information obtained from the
21   patient.  And it's also very clear that these
22   documents state unequivocally that, quote -- as an
23   example, quote, the July 15th, 1999 note from
24   Dr. Sharfman that it states unequivocally, "Pathology
25   showed a malignant melanoma."

PAGE 69  SHEET 18

PAGE 71

69

```
 1           I must as a physician go with that information
 2      as being reliable, supported by what the pathology
 3      report showed.
 4   Q  But you had the pathology report, right?
 5                   MR. KELLEY:  Objection, asked and
 6           answered.
 7                   MR. PEDERSEN:  Okay.  Let me go
 8           on.  Let me go on.
 9   Q  Both of these records in February of '99 and July of
10      '99, they indicate in the history section information
11      from a pathology report or a reread or resection,
12      something about pathology, right?
13   A  That's correct.
14   Q  There's no indication that that's from the patient,
15      is there, that the patient is telling what was on his
16      pathology report?
17   A  The information related to it.  The actual pathology
18      report would be information obtained from medical
19      records.
20   Q  Not from the patient?
21   A  But the other information that he had a malignant
22      mole removed, which was stated -- or a malignant
23      melanoma, which was stated several times, I would
24      assume was information that was obtained from the
25      patient himself.  Since I can't direct that
```

71

```
 1   STATE OF WISCONSIN   )
 2                        )  ss
 3   COUNTY OF DANE       )
 4           I, LISA A. CREERON, a Notary Public in and for
 5      the State of Wisconsin, do hereby certify that the
 6      above deposition was taken before me on the 1st
 7      day of November, 2001, commencing at 9:00 a.m., at
 8      Melli, Walker, Pease & Ruhly, 10 East Doty Street, in
 9      the City of Madison, in said County and State, that it
10      was taken at the request of the plaintiff, upon verbal
11      interrogatories, that it was taken in shorthand by me, a
12      competent court reporter and disinterested person,
13      approved by all parties in interest, and thereafter
14      reduced to typewriting by me; that the said deposition is
15      a true record of the deponent's testimony; that the said
16      deposition is to be used in the above-entitled action now
17      pending in Federal Court; that the deposition was taken
18      pursuant to notice; that the said THOMAS J. ANSFIELD,
19      before examination, was sworn by me to testify the truth,
20      the whole truth, and nothing but the truth relative to
21      said cause.  Dated at Madison, Wisconsin, this 5th day of
22      November, 2001.
23                        ----------------------------------
24                        NOTARY PUBLIC, STATE OF WISCONSIN
25                        REGISTERED PROFESSIONAL REPORTER
```

PAGE 70

70

```
 1      information to these -- ask that question directly to
 2      the physician, I would presume the records speak for
 3      themselves.
 4   Q  And all of those references that you're referring to,
 5      including these last two, are references after the
 6      application and after the certificate was issued?
 7   A  That's correct.
 8                   MR. PEDERSEN:  I don't have any
 9           other questions.
10                   MR. KELLEY:  Good, we're done.
11                   (10:55 a.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

PAGE 72

72

THOMAS ANSFIELD - 11/01/01 / HALL V. CUNA MUTUAL

## &

& 2:10,18 71:7

## '

'93 13:2 16:17 20:15 21:24 25:21 26:4 28:1,22 32:9 40:21,22 42:4 43:13,24 53:5 62:18 63:23 64:10, 16 67:16,18
'96 17:7,19,21 27:23
'98 19:22 40:22 41:20 61:14 62:19
'99 41:20 61:10,10 62:6,7 64:15, 17 21 65:13,19,23 66:2 67:15,15 68:9,9,13,14 69:9,10

## *

* 3:7,7,7,7,7

## 1

1 3:6 5:4,5,19
10 2:10 9:18 71:7
10:55 70:11
10th 30:4 32:9
11th 18:17 19:4,8,18 61:24
12-month 11:10
13th 16:7
15 58:8 59:24 67:5
15th 61:10 62:7 68:23
17 58:18,20
1710B 2:19
18th 19:19,22 20:3 38:25
19 50:14
1967 8:2
1970 8:2
1989 25:8 34:9
1993 5:19 14:23 15:8,21 16:7 17: 12 18:22 21:20 27:17 29:11 30:2, 19 33:19 37:15 41:2 43:19 58:1,12 59:5,12,20 60:5 66:15,19 67:9
1994 50:14
1996 17:18 27:20 33:19 37:20 43: 21 50:15 60:3
1998 6:22 17:1,19,23 18:17 19:4, 8,18,19 20:3 37:19 38:25 39:8,11 40:7 42:25 46:1
1999 15:3,6 18:20,24 21:13 37:4 41:15 56:22 57:10 58:8,18,20 59: 16,24 61:24 65:6,21,25 66:12 67:5 68:23
1st 2:12 71:5

## 2

2-1-2000 26:21
200 8:7
2000 25:6 26:15 30:4 31:6 35:25 41:16,20
2001 2:12 32:22 35:11,25 36:12 71:6,21
22 57:10
22nd 18:20,24 61:9 62:6
23 59:16
24th 32:22 35:11 36:12
25-year 5:21

## 3

30 24:1,7,11
30th 17:1,19,23 42:25 46:1
31590 53:8
31675 49:1
31st 26:15
37470 51:23
38821 51:6

## 4

4/61/67 3:3
48 21:2

## 5

5 3:6 38:7
50 38:23 39:25 44:14 51:1
5315 52:16
57/66 3:4
5th 71:20

## 6

6 25:6

## 9

9:00 2:13 71:6
9th 15:3

## A

a.m 2:13 70:11 71:6
able 11:19 51:18
abnormal 9:25 55:7,11,13
about 9:7 12:9 18:10 19:10 25:13, 21 27:22,25 28:7 30:20,24,25 31: 18 32:10,13 39:12 43:18 45:23 46: 3 50:2 51:10 53:15 55:22 57:9 58: 25 59:25 60:16 62:21 63:9,10,11, 22 65:1,17 68:10,14,16,18 69:12
above 4:10 71:5
above-entitled 2:2 71:15
accept 34:2 35:8 37:23
accepted 30:22 50:10 51:2
accurate 17:8
accurately 31:22
action 35:18 36:1,4,10 57:20 71: 15
activated 46:11
active 35:21
actual 31:9 69:17
actually 55:21 64:23
actuarial 50:23
add 34:19 35:6 41:25 63:13
added 36:6 41:7,9
addition 37:19
additional 10:6 11:1 12:6 13:23 21:15 26:24 27:2,22 28:15 33:24 34:19 35:1,6 38:1,16,22 39:23,25 41:6,9 42:1,4,11 44:12,14 47:2 53: 19
additionally 59:10
address 20:1 25:12
addresses 23:16
Advice 27:9,10,10
after 18:25,25 23:16 27:4 29:8 34: 4,9 35:13 36:3,7 37:14,14 41:22 50:23 61:13,16,23 62:9,22,25 65:9 70:5,6
Again 12:12 14:12 16:16 18:7 41: 14 42:8 47:6 54:6 66:11 67:4,6,7
against 64:1
ago 11:14 63:21
agree 12:20 24:6 54:14 66:17
ahead 9:9 10:24 13:7 35:23 42:24 55:5 58:8,17 63:21 67:11
al 2:4
allow 50:9
already 19:1 32:12 46:22 57:8
although 25:10
altogether 51:13
always 53:2
amongst 48:13
amount 38:22,23
another 11:18 14:19 26:21 33:19 63:8 65:12
ANSFIELD 2:1 4:8,15,17 57:1 71: 17
answer 9:8 10:24 12:22 13:12 18: 14 21:7 36:7 42:24 46:14 55:9
answered 23:13 29:22 31:19 44:6 49:4 69:6
answers 40:17 55:20
antenna 14:19
anything 15:9 16:16 17:8 27:23 30:25 31:18 32:13 49:9 50:2 58:25 64:4 68:14
anywhere 39:19 67:24
Apart 26:1
apparently 62:4
appear 25:9
appearing 2:16,19
appears 19:16 49:22 59:16 60:12
applicant 23:22 38:15,20
application 19:1,10,19 23:23,25 24:8 25:14 28:25 29:2,4,4 30:19, 22 31:7,8 32:6 34:25 37:24,25 39: 9 40:4,11 41:23 42:10,13,22 43:11 44:11,23 45:1,2 46:14 49:2,14,22 53:24 54:7 61:13 62:9 68:16 70:6
applied 38:21
applying 35:9
appropriate 34:21 35:3 39:17,20 53:22 55:4
appropriately 10:15 11:5
approved 71:12
approximately 9:18

## April

April 17:1,12,19,23 27:17 28:1,22 37:19 40:7,22 42:25 46:1
area 14:14 14:5 54:20,24 55:1 56: 17,18
areas 11:18,21
aren't 12:25
around 60:7
arrange 11:2
ask 15:25 16:16 31:18 47:6 48:23 50:22 53:10 57:17 70:1
asked 29:4 36:3,5 42:17 44:5 46: 22 47:16 48:2 69:5
asking 32:17 63:9 64:25
asks 44:19
assigned 44:25
assignment 44:12
assisted 18:10
Associated 4:20
assume 50:11 69:24
assumption 44:17
Attached 36:16 38:2
attempt 26:2,7
attempted 28:7
attending 39:24 40:14 49:8
Attorney 3:3,4 26:8,9,20,22 28:11, 16
Attorneys 2:10,18
August 32:22 35:11,25 36:12 64: 21 65:6,23
author 32:22
authorization 21:12 22:15,18,20, 22,23 23:10,21 24:7,14,21
authorizations 23:1
available 11:3 20:17 25:25 37:3 38:3 39:8 40:16 41:4,15 60:25 68: 5
average 8:4,7,9
aware 9:21 20:10,14,17,20 30:4,6 42:13 45:3,18 46:7,17,23 48:24 55:2,3 62:13 64:8 66:13

## B

back 11:20,22 15:15 17:9 18:22 19:3 26:14 29:19,24 30:24,25 31: 9,18 36:13 37:16,20 58:2 60:4
background 5:7
backwards 5:8
Baker 16:14,15 25:4,6,7 29:16,17 34:7,8 64:2 68:3
Baker's 25:6
ball 5:24
Barb 26:12,22
basal 51:25 52:3,7,10,11,12
based 8:18 22:19 28:22 29:24 30: 16 35:19 42:10 44:14,23 45:1,2 46:14 47:20 48:4 49:22 50:1 52:9
basis 7:18 11:11 39:15 41:25 49: 13
because 11:19 12:3,18 13:21 27: 11 35:6 44:18 48:23 56:9,15 57:7 63:1 64:20 65:22
before 2:7 19:18 38:4 62:14,25 63:1,3,3 65:3 71:5,18
began 47:22 61:9
begin 45:4 46:8
behalf 2:16
believe 12:25 22:21 26:12 38:3 40:25 45:15 61:24
benefits 18:11 25:14 28:19 30:6, 13 31:10,23 38:5 49:14 63:1,4
benign 10:2 55:8,18
besides 6:14 17:19 32:12
best 13:12
between 40:21 65:25
beyond 51:18
biopsy 16:2 65:14
birth 46:9
bit 15:24
blade 60:6
body 11:20
borders 14:16
both 10:13 13:3 62:13 68:2 69:9
bottom 23:20
box 47:25
Brenda 7:21 32:25 33:1 35:23 36: 5,18
briefly 5:6 57:9
bright 60:7
broader 36:24
business 6:3 7:2

## C

C-H-I-C-K-L-O 58:22
call 24:23 25:5,20 26:13,15 38:22
called 4:9 22:14
caller 26:12
calls 10:23 12:17 23:3
came 63:4
Camp 2:16
Can 7:13 9:8 10:7,24 13:12 14:16 15:12 18:13 21:7 24:1 33:8,25 34: 2 37:22 40:8 42:24 45:19,20 46:11 50:2,3 56:16 61:20
can't 18:9 21:10 36:7 55:9 62:3 69:25
cancer 10:4,10,22 11:25 12:4 14:9 15:20 16:10,19 19:12,22 20:3 21:4 29:7 35:5 39:4,4,6,7 41:13,18,18 42:18,21 43:12 44:4,18,19 45:24 46:19 48:3 49:3,5,6,11,24 50:5,6, 14 51:8,11,16 52:7,12,17,18,20 68: 16
cancerous 26:3 29:1
cancers 45:18 46:8 52:12
cannot 11:21 18:2 26:18,23
carcinoma 48:3 51:12 52:10
cardiologist 4:19,21
cardiology 4:24
care 9:8,13 34:17,21,21 35:4
caring 21:19
carries 51:17
carry 10:5
case 13:20 14:1,1,14 15:7 20:8 25:24 33:14 34:6 35:21 48:1,21 52:13
cases 47:9
Cashdollar 58:17,21 60:21 66:12
cause 4:10 10:17 45:13 71:20
cell 48:3 51:12,13,25 52:3,7,10,12, 12
cells 9:25 12:10 13:9,11,14,15,18 14:9 37:17 55:7
certain 33:11,12 37:2 43:23 47:22 48:23 62:3
Certainly 12:24,25 32:2 41:24 45: 20 48:24,25
certificate 30:22 45:11,12 46:3,4 49:1 51:6,7,23 52:16 53:8 61:16 62:11 63:2,3 70:6
certify 71:4
cervical 58:16 59:11,21
Chambersburg 14:24 16:3,4
changed 13:22
changes 11:11 37:18
character 13:22
characterizing 31:17
charge 7:10
Charlesworth 16:23 17:4 21:18 24:17 27:18 40:3,6,22 43:1,4,20
Charlesworth's 18:16 19:4 43:7
chart 39:19 44:9,10
Chicklo 18:19 57:10 58:22 60:21 66:12
Chicklo's 18:21
choice 33:10
circumstance 56:6
circumstances 47:21
City 2:11 8:16 71:8
claim 15:7 16:1 21:14 32:23 37:4 47:11,17,18,18,22 48:24 49:3,14, 18 53:14 57:20 61:2 62:25 63:4 64:6
claims 6:9,10,16,25 7:8,17,19 15: 5 22:23 25:23 32:1 45:7,9 47:3,8 48:9,10,13,13,19,20 57:16
clarify 48:18
clear 42:21 65:4 66:8 67:4 68:21
clinic 60:13
clinical 5:12
collect 47:16,18
collected 49:17
colonoscopy 58:9
come 47:24 58:6
comes 58:7
commencing 2:12 71:6
comment 45:11 46:1 55:2 68:18
commenting 68:10
comments 29:2
Companies 5:21 36:23
company 27:11 33:22 36:22 61:17
company's 38:5
competent 71:11
complete 49:21

THOMAS ANSFIELD - 11/01/01 / HALL V. CUNA MUTUAL

completed 19:1
completely 21:4 31:22 46:20
complicated 15:24
components 13:15
concern 10:2 13:20 29:3 43:21
concerned 13:21 43:18
concerning 8:11 25:13 27:4 32:23
36:13 47:2 48:2 63:23
conclusion 23:4
condition 9:24 10:7,8,14 29:19,
20,24 30:1,21 34:22 35:7,8 37:2
46:7 47:20 50:5 52:1 53:8,23 56:8
conditions 10:13 11:5 43:3,22 51:
25
conduct 8:4,7,22
conducted 16:6,6,13 21:17
conducting 66:2
congenital 46:10
consideration 38:17
considerations 39:23
considered 10:14 12:5 18:4 38:23
56:22
consistent 21:1,8 55:8,14,18
consult 37:7
consultant 6:9,11,20 33:21 36:25
consultation 6:3 27:11
consulted 6:15
consulting 5:10,18,20 6:17
contacted 25:2 27:4
contained 63:19
contemplated 35:18 36:4,10
contemporaneous 16:17
contradict 15:17
conveyed 17:25
copies 20:21 63:17
copy 56:3,5
correct 6:23 7:9 9:2,13 16:24 19:
3,6 20:25 23:7 25:18 27:24 28:2,5,
9,13,20,21,23 30:11 31:11 32:11
35:24 36:11 37:10 38:11 41:7,8,10
42:2,19 43:10,16,25 44:3,7,8,22
45:1,2,22 46:16 47:13,14 48:11
50:20 51:15,19,22 52:2,4,6,11,15,
19 53:1,3,6,7 55:16,19,24 57:11,12
58:3,13 59:8,15 60:11,14,15 61:11,
12,15,18 62:10,12 65:15 66:4,21
67:16,17,20 68:12 69:13 70:7
corrected 36:6
correction 59:3,19
correctly 52:23,24
counsel 20:18 48:19 57:15 63:20
64:12
County 2:11 71:2,8
couple 12:13 20:23 63:21
course 56:16 61:25 63:1
Court 2:6 71:11,16
coverage 18:11 33:4,13 35:9
covered 24:23
credit 6:10
CREERON 2:7 71:3
crucial 11:8
cue 5:24
CUNA 2:4 5:10,18,22,23,23,24,25
6:3,13,20,21 23:14,17 24:22 25:16
28:6,10,18 30:5,10 31:20 33:22
39:12 45:4 47:4,7 48:20 53:15 57:
19
CUNA's 57:15
current 4:25 7:16
currently 4:18 5:9
Curriculum 3:6 4:25
cutaneous 8:6,8
CV 5:1

**D**

Dane 2:11 71:2
data 6:24,24
date 15:3 18:23 24:8 29:18 40:8
46:2 61:23 62:9 64:24 65:22,24
dated 17:1 26:21 32:22 57:10 58:
18 59:24 71:20
dates 27:15 43:18 62:24
dating 39:8
day 2:12 8:5 71:6,20
days 40:24 41:10
dealing 17:14 43:21
death 21:21 45:5,6,10,12,13 46:3,
4 63:2,3
debits 34:20 38:22,23
deceased 15:5
decedent 23:23 34:10
decedent's 27:11
December 15:3 18:17 19:4,8,18
66:2
decide 51:1 57:19
decided 50:23 51:3
decision 18:10 28:18,22 32:1,7
33:3 38:5 41:5 47:19 48:6 50:12
61:1
decisions 48:9
decline 33:10 34:2 37:21 42:10
50:8,12,16,19
declined 50:10 51:2 52:9
defendants 2:5
defer 55:20
degenerate 10:7
demonstrated 59:4 66:14
denial 31:10 49:13
denied 29:19 49:22
deny 28:19 38:5
department 35:12 36:13,17 50:22
deponent's 71:14
deposed 62:13 63:2,4
DEPOSITION 2:1 4:6 5:4 20:14
21:11 46:18,25 54:15 55:2 62:21,
25 63:11,17,19 71:5,13,15,16
depositions 20:7,10 46:23
dermal 59:4 66:15
dermatologic 8:10 9:24 48:5
dermatologist 11:3,3 14:5,5 39:
24
dermatologists 8:16
dermatology 7:25
dermis 55:7
describe 33:5 47:21
described 68:13
describes 19:5 33:3
describing 13:12 35:13
despite 13:22
determination 18:2 19:15 35:15
50:24
determine 23:25 35:4
determined 9:17
develop 14:7 37:2
developed 18:18 31:3 60:6,6
developing 10:6 12:7 16:19
development 56:13
diagnosed 9:15,16 10:5 13:4 29:5
39:1 42:18 45:17 52:17
diagnosis 7:23 8:11 10:20 13:19,
23,25 19:12 29:9 32:5 33:16,17
34:4 40:10 50:6,11,14 52:20 53:
19,23
Didn't 21:22 22:6 27:2 35:23 42:
18 43:6,9 45:23
died 62:14 63:1
difference 10:12,13 32:2
different 14:3,22 51:13,17,20 52:
5,20 53:4 56:24
direct 69:25
directed 64:7
directly 11:21 26:25 28:7 56:16
70:1
director 5:10,19,20,22,25 6:17 7:1
31:21
disability 6:6,10
disagree 54:14
disclosed 53:9
discovered 19:6,10,17 40:14
discovery 19:13 21:16
discretionary 51:4,5
discussing 13:20
Discussion 7:15 58:19 61:21
disinterested 71:11
displaced 22:12
dissimilar 52:13
District 2:5,6
division 7:11
Doctor 11:22 13:3 18:6,8 21:23
22:13,13 23:5 25:3,12 26:2 30:18
32:9 48:8 50:15 57:6 66:11
doctor's 17:24
doctors 6:14 22:8,9 23:16,18 25:1
50:13 68:10
document 36:21 37:11 38:13 39:7
49:16 57:22 58:5 59:13,18 60:14
documentation 17:15 53:22
documented 17:16 27:16
documents 57:14,15,18 65:10 68:
22
does 9:23 10:17 23:25 24:1 30:12
31:2 34:20 37:11 38:2 51:9 53:12
58:6,21,24,25 59:17,19,25 60:2 67:
24 68:1
doesn't 23:6 38:10 50:1 65:1
done 11:14 13:24 53:2 57:17 62:
22,24 65:12 70:10
Doty 2:10 71:7
drain 56:18
duly 4:9
duplicated 23:20,21
duties 7:25 30:21 62:4,6 63:2,5
duties 6:1
dysplastic 9:21,24 10:1,4,5,7,9,
14,16,20 11:7,24 13:19,25 14:17
15:15 21:3 33:17,23 34:22,24 35:
5,7 37:13,16,18 38:6,8,9,9,14,15,
18,20 39:2,5,14,15 40:11 42:4 44:1
49:10,12 51:10,20 52:3,21 53:6,11,
12,16,18,21 54:1,12

**E**

E-N-D-E-R-S 58:9
each 23:15 29:9
earlier 42:20 43:6
early 14:2 31:6 41:16
easier 5:8 57:7
East 2:10 71:7
effective 61:23
effort 28:15
efforts 26:24
either 8:11 10:6,16 14:16 22:11
29:12,14 33:9 34:2 37:22 49:13
50:7,10 53:20 56:16 65:12
else 32:13
employed 4:18
employees 6:12
end 21:13 37:4
Enders 58:9 60:21
Enders' 59:17
entertained 36:1
entirely 14:3
entry 17:23
equally 18:12
equivalent 14:9
especially 11:5
establish 19:21
established 22:17
et 2:4
evaluate 11:10,15 48:10
evaluated 8:12 17:4 18:20 29:11
34:16 37:5
evaluating 21:13
evaluation 8:5,6,22 13:23 14:4
15:4 16:1 18:17 19:8 21:17 25:15,
24 48:5 49:19 50:9 59:14 67:21
even 29:23 36:24 60:22 63:18
event 12:15 17:20
events 21:9
ever 22:1 26:23 29:5 39:1 43:2,3
63:11,12,22
every 11:10 36:22
everyday 13:5
evidence 42:8
exactly 27:14 56:14
Examination 3:2 4:13 8:8 57:4 71:
18
examination 8:4,7
examine 11:18
Example 11:19 13:20 68:23
exceed 33:11
except 4:3 12:20
exception 64:4
excised 18:22 58:1 60:7
exclusion 11:12
excuse 41:10
Exhibit 5:4,5
Exhibits 3:5
existed 24:22
expect 31:20,25
expected 19:11 26:1
experience 58:4
expert 9:7 12:19 13:17
expired 15:6

**F**

fact 31:12 35:20 38:4 44:15
failure 28:24 30:25
fairness 54:14
familiar 13:5 36:19
family 10:3,16 11:6,7 35:4,18 36:
2,4 38:19,25 39:1,3,7 41:13,17 53:
20,20
far 40:6
fast 51:16
February 30:4 32:9 58:15,18,20
59:16 65:13 66:11 67:14 68:8,13
69:9

Federal 71:16
feel 12:3
few 37:17 40:24 41:10 57:2
Fifty 50:18
file 25:25 26:1,17,18,19,23 47:8
48:24 49:21 57:7,16 67:21
filed 64:1
files 47:11,17,18,18,22 48:20 53:
14
filled 39:9 41:22 42:15,22 44:11,
23 68:15
finally 6:10
find 26:2
finding 10:9,10,20 11:24 12:9 13:
3 14:8 37:12 38:13 39:13 42:3
44:1,4 51:20 52:21 53:4,5,16,25
55:6,10
findings 13:2 55:23
fine 4:2,7 24:1,19
first 4:9 12:13 15:1,2 26:13 33:3
34:16 35:2 41:17 49:1,15
five 9:14,18
follow 56:8
follow-up 11:9 34:21 35:3 39:18,
20,23 40:15,20 41:3,6 42:9 44:15,
16,17,18,20 48:5 53:22
followed 10:15 11:2 34:15
following 8:20 11:5 15:5,6 18:16
21:16 29:7,25 30:16 40:3,21 45:4
follows 4:11
force 23:25
form 4:4 12:21 16:19 19:1,25 21:6
28:25 31:14 32:16 39:10 41:18 42:
13,17 44:18 46:11 48:2,16 49:9
52:7 53:24 54:3,7
forms 39:5 45:19
found 9:20 10:1 14:2 21:3 26:18
27:21 41:11 62:1
four 26:22
frame 14:13 62:4,6 64:15
front 15:10 47:23
full 4:15
further 44:24
future 12:7

**G**

generally 32:5
George 16:14
getting 12:19
give 32:6 40:12 45:23 53:15 56:3
given 26:13 31:8 35:4 47:18
glasses 21:3
goes 56:16
Good 70:10
graduate 5:14
grand 8:10
gross 20:11
Group 2:4 5:10,18 6:4,13,20 33:22
37:1 48:13
groups 8:17 37:17
growing 13:21 14:15,18 55:25
guide 36:16,19 37:3,7 38:2

**H**

Hall 2:3 14:23 15:6 16:11,20 17:3
18:1,4,17,25 19:11,17,21 20:3 23:
16,23 25:3 28:24 29:19 30:15 33:
4,15 34:11 35:16,18 36:2,4 39:9,
13,17 40:2,5,10,20 42:1,15,21 43:
3,12 44:10 45:24 46:19 57:11 58:
23 59:3 60:2,19 62:1,13,17 63:22
66:14 68:15
Hall's 17:9 19:18 26:18 38:25 48:
24 52:13 61:2 63:16
handwriting 32:19
happened 21:9 34:4
Harrisburg 21:2 26:8,22 28:12,16
having 29:6,19 51:24 58:11
health 6:12 60:3
hearing 18:6
help 22:7
helping 57:19
here 9:7 15:16 17:7,10,24 27:14
40:18 41:25 52:16 57:7 64:8 66:13
67:6
hereby 71:4
Hill 2:16
himself 13:4 43:12 49:2 69:25
histology 56:10
history 5:17 10:3,16 11:1,6,7 17:
3,5,5 18:21 19:5 35:5 36:3 41:13
49:3,5 53:20,20 55:24 57:23,25

THOMAS ANSFIELD - 11/01/01 / HALL V. CUE MUTUAL

58:5,6,10,23 59:10,18,25 60:9,17, 22,24 62:5 68:19 69:10
**home** 33:6 47:25
**homeowner's** 31:23
**hope** 52:24
**hopeful** 8:9 14:24 16:4 17:16 21: 16 34:7 64:2
**how** 23:25 35:2 40:3 50:16
**However** 33:18 66:24 67:18
**Hurley** 16:6,12,12 21:1 22:4,5,10, 14 25:3,11,20 26:25 27:3 29:14,18 34:8,13 41:1 46:17 64:2 68:3
**Hurley's** 25:13,16 26:7,16 27:6 28:11,19
**husband** 63:23

## I

**I'd** 5:3 48:18
**idea** 27:14 49:15 68:5
**identical** 10:10
**identification** 5:5
**Identified** 3:5
**illness** 60:9 68:19
**impact** 14:19
**importance** 33:14 34:10,16
**important** 33:21 35:10
**impressions** 17:25
**in-scapular** 59:4 66:14
**inaccurate** 31:7
**include** 6:2,6 8:8,10
**included** 6:15 7:24 17:5 18:21 24: 16 25:2
**includes** 8:5
**including** 24:17 29:10 45:10 60: 20 63:25 70:5
**inconsistent** 55:14
**indeed** 13:25 33:6 65:22
**independent** 6:18
**indicate** 28:14,24 30:12,25 49:2 51:7 53:25 54:3,11 59:25 60:16 67:24 69:10
**indicated** 42:5 59:7
**indicates** 15:20 16:19 37:16 46:8 49:9
**indicating** 30:5 59:6 60:22,23
**indication** 16:9 44:15,16,24 49:23 51:10 52:10 69:14
**individual** 7:2,10 10:2,4 11:6,18 13:18 14:14 33:11,13 34:15,20 35: 9 37:1 40:16 45:5,7 50:4,5,13 51: 1,24
**individual's** 8:18
**individuals** 7:17,20
**infancy** 46:8
**inform** 10:25
**information** 7:4,12 8:11 15:16 17: 25 19:21 20:2 24:22,25 26:6,10,25 27:3,22 29:24,25 30:1 31:5,25 32: 5,10,12 33:15,18,24 34:3,14,23,24 35:1,10 36:6 37:11,21 38:1,12,24 39:11,12,16 40:5,9,24 41:4,11,14 42:20 43:4,8,12,17 45:10,23 46:15 47:2,8 48:4 53:15,19 56:1 60:17, 18,25 62:17 63:17,18 64:12 67:7 68:3,13,20 69:1,10,17,18,21,24 70: 1
**informed** 12:6 25:7 64:5
**initial** 16:2 20:6 21:17 27:6,8 33: 20 34:25 40:13,14 41:5
**initiated** 45:8
**inspection** 20:12,12
**instance** 2:3 14:14
**instruct** 11:14,17 21:22
**Insurance** 5:20 6:5,6,7,7,8 7:5,11, 19 8:18 19:1,19 28:25 30:23 33:22 35:9 36:21,22,25 37:11 38:4,13 39:9 42:13 47:3 61:14,16
**insure** 53:16,18
**insured** 24:14 31:22 39:13 49:1 51:7 52:16 53:9,25 54:11
**insured's** 49:23 52:9
**insureds** 46:13
**intake** 17:1
**interest** 71:12
**intermittent** 7:18
**internal** 4:23 35:12 36:12 37:11 38:12
**international** 6:7
**internist** 4:19,22 7:22,24 8:3,13 9: 11 14:12
**internists** 9:3
**interpose** 12:13 54:21 63:8
**interpretation** 15:13,17

**interpreted** 52:23,24
**interrogatories** 71:10
**invading** 55:7
**investigation** 45:4 57:16,20
**involved** 7:7 13:13 22:8,9 26:8,20 27:16 32:15 34:6 35:19 56:17
**involvement** 32:13
**irregular** 11:15
**irritated** 60:5
**isn't** 14:11 27:23 28:20 32:10 41:7 42:5,44:12,25 46:15 51:14,21 52: 7,13,21 53:6
**issuance** 50:7
**issue** 27:25 34:1 50:24 51:19
**issued** 30:22 33:8 47:4 61:16 62: 11 70:6
**itself** 12:3 13:11 33:23 35:7 42:6 44:19

## J

**James** 16:6
**January** 18:20,24 25:6 26:15 56: 22 57:10 61:9,24 62:6 64:17 65: 13,21,25
**job** 5:25
**Judy** 25:6
**July** 59:24 61:10 62:7 65:3,25 67: 5,15 68:9,14,23 69:9
**jump** 58:8
**Jumping** 58:17 59:16
**June** 65:25

## K

**keep** 7:3,6
**keeps** 6:24
**Kelley** 3:4 4:1 9:6 10:23 12:12 13: 7 18:13 19:24 20:5,22 21:6 22:16 23:3,12 24:3 31:13 32:16 42:23 43:14 44:5 46:21 48:16 49:25 54: 21,25 57:2,5 61:4 62:20 63:7,15 64:19,25 65:9 66:7,10,25 67:10 68:17 69:5 70:10
**kept** 6:25
**kind** 40:15 59:7
**knew** 18:21 20:3 34:5 36:3 43:12 45:24 63:23 68:15
**know** 17:7,24 22:1,25 23:8 24:2,3 13 32:4 35:21 36:1 39:3,4 40:2,13, 17 41:17,20 43:6 49:16 50:2 52:25 54:20 56:1 64:21 65:22 67:13 10 64: 4,6,15,22 65:1,2,16 66:7 68:9
**knowledge** 28:6 49:20,21 62:18 63:12
**known** 10:8 30:20 48:3

## L

**label** 47:8
**language** 66:17
**large** 48:13
**Larson** 7:21 21:22 22:11 32:25 33:1 35:23 36:5,18
**last** 9:14,14,17,18 20:23 26:12 40: 24 41:10 64:5,12 70:5
**lateral** 18:18
**Law** 2:10,18
**lawsuit** 64:1
**lawyers** 35:19,20
**lawyers** 63:16
**layperson** 19:15
**least** 11:15 14:19 19:7 27:19 31:6 48:1 54:4
**left** 16:40:4,6 66:14
**leg** 17:4
**legal** 23:4 35:12,18 36:1,4,10,13, 16,17
**lesion** 13:21 14:15,18 17:11,14,17 19:9 21:4 29:11 35:3 40:4 46:20 48:6 55:25 56:14,17 59:4 65:14 66:15,19
**lesions** 8:12,16 9:16 11:13,16 13: 17 14:6 17:14 56:9
**let** 11:22 12:12,21 13:16 15:24 16: 16 19:6 20:1 22:19 23:14 24:5 25: 12 26:13 30:8 33:21 35:24 40:12 45:11 48:8 51:23 54:20,21 57:6,9 59:23 63:7 66:11 68:8,18 69:7,8
**letter** 11:14 23:14,15,18,20 30:4,7, 9,10,12,14,14,15,24 31:19 32:9,22, 25 33:2,3,5 36:3,6,7,9 37:23,24 58: 17,20,21
**letterhead** 23:17 59:17
**letters** 32:19

**life** 6:6
**lifetime** 63:3
**like** 4:5 5:3,24 19:3 29:3 48:18
**lifetime** 18:4 43:1
**likely** 18:4 43:1
**limit** 33:12
**limited** 33:7
**limits** 51:18
**line** 7:5 24:5
**lines** 6:3 7:2
**LISA** 2:7 71:3
**list** 24:1,18 30:19 44:16,20 53:12
**listed** 29:11 30:1 34:7 42:4 45:12, 14 48:1 49:7 51:24,25 52:16 68:19
**listing** 35:14 49:12
**lists** 16:5,12 37:14 38:7,9,15,18 49:6 53:12
**literature** 46:7
**litigation** 47:2
**little** 15:24
**LLP** 4:20
**locate** 26:23
**location** 11:19 56:15
**long** 5:17 23:25
**look** 11:13,15 54:18
**looked** 66:23
**looking** 55:21
**lost** 22:12 26:19 34:14
**lower** 11:20
**lump** 18:18 19:5,9,13,15,17 56:13
**lymph** 59:21 65:14
**lymphatic** 56:15

## M

**M.D** 4:8
**made** 13:19 25:5,15 26:13,15,24 28:15,19 32:1,7 34:4 41:15 43:11 50:12 53:19,23 61:14 63:1 65:19 67:22 68:6
**Madison** 2:11 4:20 5:11 8:17 71: 8,20
**maintain** 34:18,19
**majority** 10:1
**make** 11:11 13:24 18:2 19:12,15 21:10 35:2 47:19 48:6 56:7 68:18
**making** 18:10 24:23 35:15
**malignancy** 60:1
**malignant** 10:8 12:8 18:22 29:12, 13 30:2 45:13 53:4,9 55:8,14 56: 10 58:1,16 59:1,2,5,11,19 60:8,24, 24 62:1,5 66:16,18 67:8,25 68:25 69:21,22
**malpractice** 20:8 64:6
**manager** 7:16
**manual** 36:7
**many** 50:16 57:8
**March** 16:7 58:8
**mark** 17:6 32:23
**marked** 5:4,5 47:25
**materials** 47:8
**matter** 2:2
**may** 10:5 11:6,18 12:6 14:6,18,20 18:8 19:2 25:12 32:1 33:23 35:6,8 48:8 51:3 56:9,10,17 57:2
**McNEES** 2:18
**mean** 9:23 20:20 22:6
**meaning** 26:18
**means** 13:14
**medical** 5:6,10,18,20,22,25 6:14, 17,18,20 7:1 10:17 15:23,25 17:5, 20 20:8 21:14,15,19 22:25 23:11 24:16,22 26:17 27:12 28:4 29:6,8, 13,17,18 30:20 31:4,21 34:11 36: 3 39:18,20 42:8,11 44:25 46:7 49:7 59:10 61:8,22 67:14 68:2 69: 18
**Medically** 9:23 40:21
**medicine** 4:23 5:12
**melanin-containing** 13:15
**Melanocytes** 55:12,13,13
**melanocytic** 12:10 13:9,10,14,18 14:9 37:1 55:11
**melanoma** 7:23 9:15,17,20 10:3, 8,17 11:7 13:4 14:2,7,16 18:5,9 29:9,12,12 30:3 35:5 37:20 39:5 44:4 45:13,14,16 46:5 51:14 52: 17,20 53:4,10,12,21 58:12,16,25 59:2,5,11,20,22,25 60:8,24 62:2,5 66:16,18 67:8,25 68:25 69:23
**melanomas** 45:18
**melena** 58:11
**Melli** 2:9 71:7
**member** 29:6 41:18
**members** 25:5 38:18,19 39:1

**memo** 35:12,13 36:13,16 38:2
**memory** 15:2
**mentions** 57:25
**metastasis** 56:24
**metastasized** 56:18
**Michael** 58:17
**micro** 54:16
**micropathologist** 55:6
**microscopic** 8:22 12:9 13:10 14:8 20:12 54:18 55:23
**Middle** 2:6
**might** 63:13
**mind** 15:20
**minimal** 33:12 34:2
**minute** 7:13 24:3 66:25 67:1,1
**misleading** 31:7
**misplaced** 26:19
**misrepresentation** 29:22
**misspelling** 58:12
**misstates** 42:23 43:14
**mole** 12:9 13:11 15:13 16:18 17: 21 18:8,22 20:15 21:24 25:21 26:3 27:17,19 28:1,3,22,25 29:13 30:1,1 32:10 33:19 41:1 43:19 54:4,4,8, 12 56:12,21 58:1 59:1 60:5,25 63: 23 64:3,8,9,10 67:9,16 69:22
**moles** 8:14,20 9:5 60:4
**monthly** 11:15
**months** 9:18 18:25 24:1,7,11 40:3
**more** 10:8 31:3 39:24 55:8
**mortgage** 2:5,7,11,19 33:6 47: 25
**most** 5:7 43:1 59:11
**mouth** 22:6
**Mrs** 23:16 63:16,22
**Ms** 21:22 22:11
**multiple** 52:11
**must** 12:4 68:1 69:1
**Mutual** 2:4 5:10,18 6:3,13,20,21 23:14,17 30:10 31:20 33:22 39:13 45:4 48:20 53:15

## N

**N-A-R-D-I** 7:21
**n-o** 59:20
**name** 4:15 7:10,16 17:12 26:12,22
**named** 25:10
**Nancy** 2:3 30:15
**Nardi** 7:21
**nature** 51:25
**neck** 18:19 19:5,13 56:13,13
**need** 11:8 14:4 33:24 35:2 53:18 56:14
**needs** 12:5
**negatively** 29:23
**neither** 28:6
**never** 25:16 63:16
**nevi** 10:1,4,7,16 11:7 12:7 13:19 35:5 38:18,20 39:2,5,46 53:21
**nevus** 9:21,24 10:5,9,15,20 11:24 13:19,25 14:17 15:15 21:3 33:17, 23 34:22,24 35:7 37:13,16 38:6,8, 9,9,14,15 39:14,15 40:11 42:4 44:2 49:10,12 51:10,21 52:3,21 53:6,11, 13,16,18 54:1,12
**new** 8:11 11:13,16 60:12 68:11
**night** 64:5,13
**NIH** 64:10,16 65:8,23
**node** 56:21,23 58:16 59:21 65:14
**noncancerous** 54:9
**nonmalignant** 54:5
**nonspeculative** 13:3
**nor** 13:16 28:20 29:17 49:16 56:6
**normally** 25:22 37:21 63:6 68:20
**Nos** 3:5
**notable** 59:11
**Notary** 2:8 71:3
**notation** 26:20,21 27:18 43:19
**notations** 32:18
**note** 19:4 59:17,23 66:12 67:5 68: 23
**noted** 37:19
**nothing** 28:14 30:24 31:9 36:12 71:19
**notice** 2:7 71:17
**November** 2:12 19:19,22 20:3 38: 24,25 61:14 71:6,21
**now** 15:10 16:9 17:7 18:23 19:11 23:5 31:16 55:13 57:13 59:20,21 60:20 62:21 64:9 66:13 69:23
**number** 6:2 7:17 22:7,9 24:15,17 29:23 40:5 49:6 60:3
**NURICK** 2:18

THOMAS ANSFIELD - 11/01/01 / HALL V. CUNA MUTUAL

# O

o'clock 2:13
oath 4:11 46:18
Object 21:6 31:13 32:16 48:16 50:
1 63:9
Objection 9:6 10:23 18:13 19:24
20:2,5 22:16 23:3,12 42:23 43:14
44:5 46:21 54:22 62:20,21 63:8
68:17 69:5
objectionable 12:17,18 13:1
objections 4:3 12:13,20
obtain 11:1,9 21:14,15,18,22 22:
19 24:22 25:23 26:7,24 27:3,10,12
28:15 33:24 34:3 35:1 42:11 49:7
56:3
obtained 17:4 18:16 22:1,21 23:
22 24:13,16,24 25:16 26:11 29:8
34:11 45:10,12 68:20 69:18,24
obtaining 27:21 44:24
obviously 54:25
occur 37:22
occurred 19:6 30:20 61:23 63:12
65:2,3,5
off 7:13,15 24:3 58:19 61:20,21
office 23:5 25:7,17 26:16 28:19
47:24
Oh 47:16
Okay 24:12,20 48:22 57:22 63:14
64:20 69:7
once 8:9 11:15 53:23
oncologist 29:10
oncology 59:23
one 10:14,19 12:15 13:13 17:14,
15 18:3,3 25:5 26:11 27:16 28:6
29:7,23 31:5 34:1,3,6 40:5,13 42:
15 43:18,23 48:1 49:1 51:6 52:12
57:18 63:11 65:7 67:14,15
ongoing 10:17
only 6:17,19 23:1 27:25 33:9,10
34:1 35:19 39:14,15 44:19 46:13
opinion 48:2
order 23:11 48:6
organization 6:11
original 11:12 25:2
other 5:8 6:14 10:6 12:7 14:20 16:
22 17:20 29:18 32:4,14,18 33:10
34:1,8 38:18,19 39:5,15 41:12 42:
25 46:1 47:3 56:9 57:1 66:6 69:21
70:9
out 26:2 27:21 39:9 41:11,22 42:
15,22 44:11,23 62:1 63:4 68:15
outpatient 16:3,5 17:16 59:23
outside 54:20,22,23 55:1
over 32:15 46:22 57:14 61:25
own 7:6 17:25 19:12 32:19 43:7
56:2

# P

Page 3:2 21:2 38:7
pages 26:22
paid 30:13
pain 17:4
Part 8:5,13,19 15:25 32:14 57:16,
16,25 58:14 59:13
participate 5:13 6:11 8:3 48:12
participated 48:8 49:19 61:1
particular 47:20 48:12 59:18
particularly 46:12
parties 71:12
partner 4:19
parts 11:20
past 17:5 59:10 60:22,24 68:7
pathologic 13:24 33:16 38:17 59:
6
pathological 10:9 37:12 42:3
pathologically 52:21 53:17
pathologist 13:16 14:12,22 20:11
54:17,19 55:10,16,21
pathologist's 15:13
pathology 8:19,21 9:1,4,12 10:19
11:23 13:12 14:8,20,24 15:8,12,19
21:9 37:15 43:24 44:1 49:10 53:5
56:3,4 59:5 60:7,23 61:19 64:11,
14,16,16,17,21 65:4,12,16,18,19,
21,22 66:15,18 67:15,18,24 68:
10,24 69:2,4,11,12,16,18
patient 10:21,25 11:2,10,14,25 12:
5,6 14:4 18:4,19,20 19:7 21:20 23:
2 25:8 27:13 29:11 43:8 54:5 56:4
58:7 60:13,18 68:21 69:14,15,20,
25

Patients 8:15 9:19 10:19 11:9,17
12:4,15 13:13
pay 30:5
paying 31:23
Pease 2:10 71:7
PEDERSEN 2:15 3:3 4:7,14 5:3
12:24 20:25 24:10 54:23 56:25 61:
7 63:14 64:23 65:7 66:5,23 67:2,
13 69:7 70:8
pending 2:5 71:16
Pennsylvania 2:6,16,19 16:4
people 26:12 53:18
per 8:5
percent 40:1
perhaps 25:20
period 5:21 45:14 46:5 62:18 63:5
person 28:3 71:11
personal 57:22,25 58:5,6
personally 7:3 8:22 17:23 36:22
personnel 6:9 22:24 25:23
pertains 53:20
phone 24:23
physical 8:4
physician 5:9 8:17 17:13 25:10,
10,11 29:9,14 33:20 34:7,12 39:24
40:15 41:3 49:8 54:5 58:4 62:16
69:1 70:2
Physicians 4:20 21:19 24:17 27:
13 29:10 34:5 38:1 41:12 49:6 50:
6 62:4 66:1
picture 36:24
piece 39:16
pieces 31:5
pigment 9:25
pigmented 14:6 18:8
place 25:15 53:24 54:3,7 62:25
plaintiff 2:3,4 71:9
plaintiff's 47:10 48:21
play 47:1,10
played 31:15,16 47:4
playing 31:17
please 4:15
plus 38:23
point 12:7 17:13 18:23 25:19 35:
17,25 43:22 51:4
points 35:6 41:7,9 42:1,4 44:12,
12,14,25 50:16,18 51:1
policies 45:3 47:3
policy 18:11 28:18 30:6,13,15 31:
24 33:6,7,7,8,9,12 34:1 35:15 37:
21 38:5 46:2 48:7 50:7,16,17,24
51:2,19 52:9 61:23
portion 18:18
portions 47:17
possession 21:12
possibility 9:19 27:19 43:18 46:
10,12 56:9
possible 18:2,6 19:14 29:21 56:15
possibly 33:19
posterior 1:20
postgraduate 5:15
postpone 42:10 48:5
postponement 42:11
postponing 37:25
potential 10:25 12:8 21:14 37:1
56:10
practice 8:13,19 9:3 13:6 56:2
practicing 4:21,22 5:9 8:3
preceded 46:2 65:24
preceding 40:4
preface 57:13
premium 50:9
prepare 36:3,5
prepared 32:25 36:5,7,9
presence 18:21
present 6:19,22 45:15,17,19,21
46:5,11 60:9 68:19
presentation 41:17
presented 12:16 35:3 58:23
presume 58:11 59:20 70:2
pretend 13:17
Previously 5:19 45:16,25 51:8 52:
17
priced 50:25
primary 56:23
print 24:2
prior 19:7 34:6 49:3,5,16,23 51:25
57:19
problem 11:13 30:24 31:19
problems 10:18 31:3
procedure 16:5,13,18 47:24
procedures 45:3
process 27:7 45:7,9 47:22 55:8,

15,18
processes 35:14
produced 64:10
product 33:10
products 6:5
profession 29:6
Professional 2:8 71:23
professor 5:12
programs 6:12
progression 56:11
progressive 51:16
promoted 5:22
protection 33:6 48:1
protocol 14:3 23:10
protocols 23:8
provide 27:11 28:3 31:25 33:13,
25 35:8 36:24 37:12,25 43:3 48:13
56:5
provided 4:25 6:19 23:16 25:1 32:
5,12 36:17,18 38:12 40:24 41:11
43:8 47:7 48:19 57:15 62:17 63:20
64:12 65:5
providers 8:18
providing 47:1,10 62:3
Public 2:8 71:3
purpose 33:2
pursuant 2:7 23:1 24:13 71:17
put 12:22 22:6 35:14 44:20

# Q

question 4:4 9:10 11:23 12:14 13:
6,9 14:13 16:16 17:6,10 19:25 20:
1 27:15 29:5,7,21 31:6,14 36:8 40:
10 43:2 45:16 48:17 53:10 55:5
63:9 70:1
questioned 17:13
questions 6:5,16 12:25 22:5 12:29:
22 40:18 48:23 57:1,3 65:1 66:6
70:9
quiescence 46:11
quotation 30:17
quote 24:5 68:22,23

# R

raised 19:8 29:3,21 31:6 40:10 45:
16
raises 14:13,19
Ramirez's 54:15
ran 61:10
range 50:21,23
rapidly 13:22 14:18 55:24
rather 51:10 55:22
rating 36:16,19 37:3,7 38:2,7,16,
21,21 39:19,25 44:9,10 50:10
re-review 68:6,11
read 4:5 50:2 55:4 56:4,6 67:14
really 12:19 40:12 42:21
reason 30:17 35:2,11
reasons 30:5,12
receive 23:10 34:20
received 11:23 15:4 24:15 37:15
39:17 48:4
recent 5:7 31:3
recently 25:1
recognize 23:17
recommend 6:18 25:19 27:2
recommendation 34:25 42:9
recommended 37:17 48:4
record 4:16 5:6 7:4,13,15 12:23
16:8,10 17:1,2,3,16 20:23 24:4 27:
16 28:14 32:18 34:8 57:9,11 58:19
61:20,21 65:15 66:21 71:14
recordkeeping 7:3
records 7:6 15:23,25 16:3,17,22,
23 17:20 18:15 19:20 21:14,16,17,
19,23 22:3,3,11,19,21,25 23:5,9,
11,18 24:13,15,16,24 25:9,13,16,
23 26:7,8,17 27:5,7,12,21 28:4,8,
10,11,15,20 29:8,13,17 31:4 32:14
33:20 34:9,13,18,19 20:37:7 38:1
42:12 44:25 49:7 57:7 58:14 60:
20,21 61:8,22,22 62:8,16 65:20,23
66:1 67:14 68:2,4 69:9,19 70:2
recurrent 59:22
red 60:7
reduced 71:13
REEXAMINATION 61:6 66:9 67:
12
refer 29:3 59:17 67:15
reference 17:19,21 58:10
referenced 58:5
references 61:8,13 65:19 70:4,5

15,18
referral 16:13 18:16
referred 8:16 9:19 15:7 17:11 18:
19 25:3 61:22 64:14 65:10,17
referring 14:1 16:9 25:11 29:14
32:8 34:5 58:20 66:18 70:4
refers 51:12 57:11 59:19 67:8
reflect 28:10
refusal 30:5
regard 6:4 61:1
regarding 47:9
Registered 2:8 71:23
reinsurance 36:23
relate 58:21
related 69:17
relates 13:9 57:22
relationship 5:17
relative 71:19
release 23:8,11
released 23:1
releases 23:5
relevant 13:3
reliable 69:2
rely 9:1,4,12
remain 23:25
remaining 27:25
Remember 27:15 64:24
remind 43:17 50:7 68:1
removal 8:10 16:18 17:8,21 27:16
29:25 40:21,22 41:1 52:11 54:4
56:12
remove 8:14
removed 15:14,21 16:10 17:12,
15,18 18:5,8 20:15 21:5,23 25:21
26:4 27:19,23 28:3 30:23 37:20
20 43:19 46:20 54:8 56:22 58:12
59:3 60:4 65:15 66:19 67:9 69:22
render 35:7 48:2,6
repeat 9:10
rephrase 20:1
report 10:19,21 11:23,24 13:2 14:
8,21,24 15:8,10,12,19 16:2,5,8,12,
14 18:23 21:9 37:16 38:17 43:24
17:21 65:4,12,18,19,21,23 67:18,
24 68:10 69:3,4,11,16,18
reported 54:4
Reporter 2:8 71:11,23
reports 8:20,21 9:1,4,12 65:17 68:
18
represent 48:18
represented 56:23
represents 39:5
request 14:21 21:15 22:22 26:16
27:6,10,12 55:25 71:9
requested 21:18 22:2,23 68:2
requesting 23:18 68:3
required 8:17 23:8 38:16 46:13
50:16 53:25
requirement 54:11
requiring 55:1
reread 69:11
rescind 28:18 33:4 35:15
rescinded 30:16
rescission 18:11 31:10 35:14
resected 33:17
resection 59:12 65:22 68:11 69:
11
resections 8:24,24 64:9
reserving 7:25 8:1
respect 6:25 7:5,7,19,23 9:4 14:
23 17:8 20:11 37:12 38:6,13 44:9
51:24 64:2
response 26:17 43:1
responsibilities 6:2
responsibility 25:22 56:8
responsible 7:2
restrictions 33:8
retrospect 17:10
revealed 30:21 59:5 66:15,18
review 5:6 6:4,10 7:1 8:19,21,24
14:21 15:1,5,8,23 16:2,22 20:7 30:
8,17,18 34:11 35:13 37:7,18 41:15
44:24 47:19,22,25 49:18 55:25 62:
22 66:2 67:5 68:8
reviewed 14:23 15:2,25 16:2,23
20:6 32:20 38:4 57:19 58:14 65:
20,24 66:1
reviewing 7:8 31:4 37:15 62:16
reviews 6:19
Richardson 32:23
right 15:10 24:5 27:23 28:16,17

Page 4



THOMAS ANSFIELD - 11/01/01 / HALL V. CUNA MUTUAL

32:10 40:9 41:4 42:5 44:13,18,21
48:10 52:14 53:2 54:18 57:13 67:
19 69:4,12
**rim** 60:7
**risk** 12:5,6 15:4 33:23 34:20 39:25
51:17,17
**risks** 10:6,25 33:11 34:2 37:1
**role** 31:15,16,17 47:1,5,10,14,15,
16
**room** 50:8
**rotations** 7:24
**rounds** 8:10
**routine** 56:2
**Ruhly** 2:10 71:7
**Rural** 5:20

## S

**said** 46:23 71:8,13,14,17,20
**Same** 20:5 23:12 53:10
**say** 14:20 58:25 62:3
**saying** 19:11,16 57:13 68:8
**says** 49:6 58:11 59:20 66:13,21
**scenario** 40:12
**scenarios** 18:3
**second** 17:17 20:7 35:3 50:15 51:
6 66:13
**secondly** 27:17 34:13,19 40:15
43:19
**section** 60:9 67:6 69:10
**see** 11:19,21 13:18 17:2,3 40:6
48:1 49:12,17 50:4 57:23,24
**seen** 14:16 21:10 25:8 30:9 40:25
41:12 46:25 49:16 50:13
**selecting** 47:12 48:12
**send** 37:23,24
**sense** 32:6,8
**sent** 6:25 23:15 26:9 28:11 30:4
35:20 64:9,10
**sentence** 24:6 66:14
**sentinel** 56:23
**September** 5:19
**series** 6:5
**serious** 10:8
**services** 7:25
**set** 14:3
**seventy-five** 50:18
**several** 13:13 18:25 19:7,17 25:1
44:6 69:23
**shall** 24:7
**Sharfman** 59:24 60:21 68:24
**Sharfman's** 67:4
**shirt** 60:5
**shorthand** 71:10
**shoulder** 56:12 60:6
**show** 23:14 29:9 47:11 51:23 57:
6,6,9 59:23 66:11
**showed** 30:17,18 40:25 53:14 60:
7,23 67:8 68:25 69:3
**showing** 59:21
**shown** 61:9
**shows** 14:21 39:7
**sign** 4:5
**signed** 23:21,23
**significance** 12:10 13:10 17:2
**significantly** 51:17
**similar** 47:9 48:20
**simply** 54:8
**since** 5:19 10:4 25:8 26:23 29:22
49:15 50:12 65:19 69:25
**sir** 8:15,25 32:21 48:15
**sit** 15:16 17:7,24 40:18 41:25 64:8
**site** 6:21 11:12 56:19,24
**situation** 13:12 45:11
**six** 9:17 11:10
**skilled** 11:4
**skin** 8:6,12 10:3,14 11:12,15,19
15:15 35:5 37:16 39:3,4,6,7 41:13,
18 48:3,6 51:8,11
**slide** 68:6
**slides** 8:23 55:21 68:11
**small** 14:14 60:4
**Smith** 44:10
**some** 12:7 31:21 46:7 54:15 59:7
**someone** 25:19 26:1 36:24 53:16
**something** 14:20 31:3 69:12
**somewhere** 68:7
**sorry** 11:22 22:6 35:23 47:7 56:20
67:2,3
**sort** 12:19
**source** 60:16,18
**speak** 25:20 26:2 28:7 63:22 70:2
**special** 50:9
**specialist** 4:22 14:6

**specialty** 29:10
**specific** 13:1
**specifically** 6:15 7:17 9:5 14:4 21:
22 33:16 57:18
**specimen** 13:24
**speculating** 55:22
**speculation** 12:24 12:17
**spouse** 11:17
**spread** 56:15
**squamous** 48:3 51:12,13
**stack** 47:7
**staff** 25:5 26:11
**stage** 14:2
**standard** 9:3,8,13 33:9,25 34:17
47:24
**started** 27:7
**starting** 5:7
**State** 2:9,11 4:15 13:16 54:6 60:3
68:22 71:1,4,8
**stated** 18:5 19:17 34:13 69:22,23
**statement** 21:10 37:14
**statements** 54:15
**States** 2:5 24:6 30:15 58:15 59:2,
10 60:2 67:7 68:24
**stating** 37:14,23,24
**statistical** 6:24,24 7:12
**statistically** 7:6
**STEPHEN** 2:15
**steps** 27:2 48:10
**Steve** 64:19
**still** 12:14
**stipulate** 24:9,10 40:8
**stipulations** 4:2,3
**Street** 2:10 71:7
**stress** 11:8 12:4
**stronger** 24:3
**style** 32:2
**subsequently** 9:16,19 14:1 18:3
26:11 41:12
**subspecialty** 4:23
**substandard** 38:21
**such** 7:1 9:3,11 33:22 34:22 36:25
56:8
**suggest** 62:8
**suggested** 13:23
**suggestion** 33:5
**sum** 46:12
**supplied** 20:23 63:16
**supported** 69:2
**supposition** 18:7 43:7
**Sure** 7:14, 16 9:11 11:11 13:24 18:
9 30:6,8 32:17 35:2 56:7
**surgeon** 11:4 20:15
**surgery** 43:2
**surgical** 16:5,8,18
**surrounding** 11:12
**suspicious** 8:15 9:16
**sworn** 4:10 71:18
**symptoms** 12:16
**syndrome** 38:8,10
**system** 8:6,8

## T

**tables** 36:23
**take** 8:24 48:10 55:20 56:16 57:20
**taken** 2:2 20:7,10,14 27:3 62:22
71:5,9,10,16
**talk** 15:15 54:15
**talked** 57:8
**talking** 46:3 62:21
**teaching** 5:15
**technicalities** 32:3
**tell** 15:12 24:1 31:22 33:21 35:23
54:7 62:23 68:14
**telling** 69:15
**term** 9:21,23 18:9 32:4
**terms** 4:11 13:5
**testified** 4:10 13:4 21:2 31:14,15
38:4 42:20 43:6 46:18 50:1
**testify** 9:7 71:18
**testimony** 12:9 21:1 42:24 43:15
71:14
**thank** 22:9 38:11 67:10
**Thanks** 61:5
**That's** 4:7 6:20 7:10 12:16 20:25
24:19 28:9,17,21,23 31:12 32:11
54:7 55:16,18 58:11,22 59:6,8,15
61:4,12,18 62:8,23 64:14 65:15

**66:21 67:17 68:12 69:13,14 70:7**
**themselves** 70:3
**There's** 26:21 28:14 30:24 36:12
37:22 39:25 69:14
**thereafter** 71:1
**Therefore** 25:8
**thing** 43:23 46:13 52:5
**think** 11:8 12:14 19:14 22:17 55:4
62:23 65:25
**third** 24:5 35:4
**THOMAS** 2:1 4:8,17 71:17
**those** 6:15 7:20 20:17,18 22:1,2,3
27:4,21 28:7 35:6 40:17 46:23 47:
17 61:13,22 63:19 68:9 70:4
**though** 12:4 29:23
**thought** 35:24
**thoughts** 17:25
**three** 45:15,17,24 46:5
**time** 4:9 14 11:25 12:21 19:10
21:20 23:6,22,22 25:14 26:6,10
27:4 28:10 31:8,21 34:24 35:22
36:9 37:9 39:8 40:11 41:5,15,22
42:22 43:11 44:10 45:14 46:9 49:2
62:1,4,6,18 63:5,25 64:15 67:21
68:15
**times** 6:18 7:7 44:6 69:23
**title** 60:13
**today** 6:1 15:16 40:18,19,20 41:25
49:16 55:3 64:1,8
**told** 22:11 34:8 46:18 63:11 68:4
**Tommy** 15:6 23:23 30:18,19 33:4,
15 34:11 35:16 36:2 57:11
**took** 46:4 62:20
**towards** 24:5
**traditional** 9:12
**trained** 11:4
**training** 4:13 5:14 7:22,24
**transcript** 4:6 21:2 62:14
**transcripts** 63:18,19
**treated** 29:5 42:18 50:5
**treating** 21:23 23:15 27:13 38:1
**treatment** 8:12
**trial** 4:5 12:21
**true** 6:22 46:15 71:14
**truth** 71:18,19,19
**truthfully** 46:14
**trying** 22:7
**tumor** 10:14 36:16,19 37:3,7 38:2,
7 44:9 56:23
**twice** 8:9
**two** 8:4 9:16 17:14 18:2 27:15 29:
2,22 34:5 37:22 39:24 43:18,21
50:6,13 60:22 67:14 70:5
**type** 50:17 51:13
**types** 45:19
**typewriting** 71:13
**typical** 9:11
**typically** 58:6

## U

**ultimate** 28:18
**under** 4:11 30:6,13 31:23 38:5 46:
18 47:21
**undergraduate** 5:14
**underlying** 20:8 48:9
**understand** 25:14 40:6 54:19
**understanding** 21:8 22:2,10 24:
21,25 25:25 35:17 45:6,9 55:17
56:11,21 63:25
**understood** 36:9 56:7
**underwriter** 50:12 51:3
**underwriters** 35:1
**underwriting** 6:4 15:4 16:1 32:7
33:7 49:18 50:8,22 51:18
**undiagnosed** 45:19,20
**unequivocally** 68:22,24
**unfair** 62:23
**United** 2:5
**University** 5:13,15 8:1
**unless** 37:25 55:24
**unobserved** 45:21
**unsure** 18:12,15
**until** 4:4 21:20 40:6 42:11,22 50:
14 55:3 60:3 63:20 64:1
**up** 14:3 34:15 56:8 64:1 66:8 67:4
**update** 8:10
**upon** 19:12 22:19 28:22 44:23 45:
1 52:9 71:9
**us** 15:12 34:9 45:15 68:14
**use** 32:4
**used** 71:15
**uses** 36:23
**usual** 4:2 60:3

**usually** 10:17 26:5 56:5

## V

**valid** 24:7,11
**various** 65:16
**verbal** 71:9
**very** 34:1 51:16 68:21
**videotape** 62:14
**view** 37:18
**visit** 19:18 30:20,22 32:9 37:19
40:8,13,23 42:25 46:1 60:13
**visited** 30:18
**vita** 4:25
**vitae** 3:6
**vital** 39:16

## W

**Wait** 24:3 66:25,25 67:1
**waive** 12:20
**Walker** 2:9 71:7
**WALLACE** 2:18
**want** 12:22 24:18 31:18 40:12 57:
17 58:8 62:17 66:8,8
**wanted** 63:10
**wasn't** 19:2 27:22 36:5 55:3 65:13
**way** 5:8 50:25 53:2
**ways** 37:22
**We'll** 24:9
**we're** 12:14 43:21 46:3 62:21 64:
20 65:4 70:10
**weeks** 17:14 70:4 20:24 63:21
**well** 21:17 34:10 47:21 49:25 50:3
59:18 62:22 63:7 64:19 66:13
**wellness** 6:12
**what's** 12:10 18:23 23:20 33:2 45:
9
**wherein** 2:3
**whether** 17:7,11,13,17,24 22:1,25
26:3 31:7 33:25 34:15 38:25 39:
12,17 40:2,4 41:20 42:17,21 43:6,8
44:19 45:18,24 46:17 51:2 53:10,
15 54:8 63:10 64:15 65:2 68:5,9,
16
**whole** 71:19
**wholly** 51:20 52:5
**whom** 64:6
**wife** 23:24 30:14
**will** 6:18 8:7,10 11:9 32:6
**William** 7:21 59:24
**Wisconsin** 2:9,12 4:20 5:11,13,16
8:1 7:1,4,20
**within** 6:15 9:17,18 12:9 13:11,15
40:24 41:10 45:3
**without** 28:19
**witness** 2:4 9:9 7 20:20 50:1
**word** 46:4
**words** 22:6 34:1
**work** 7:17,20
**worked** 31:20 36:23
**working** 5:7
**worksheet** 15:4
**wouldn't** 62:16
**write** 43:5
**written** 8:21 18:9 23:10 35:12

## Y

**year** 17:7 35:24
**yearly** 8:7,9
**years** 8:1 9:14,18 13:13 39:25 45:
15,17,24 46:6
**Yet** 27:6
**yourself** 6:14 7:1 9:4,11 22:13 25:
20 55:22 67:18

*17*



CUNA MUTUAL GROUP

*CUNA Mutual Insurance Society*

February 10, 2000

NANCY HALL
517 MT PLEASANT RD
FAYETTEVILLE PA 17222

Dear Mrs. Hall :                                    Certificate No.:  32534

We are very sorry to hear that your husband  Tommy Hall passed away.  You have our sincere condolences and deepest sympathies on your loss.

After Tommy's death, we received a notice of claim under the Home Mortgage Insurance policy.  As with all claims, we reviewed the application, death certificate, and medical information.  The review showed that Tommy visited a doctor in 1993.  On the application, Tommy did not indicate this visit occurred.  Had we known about the medical condition revealed during that visit, we would not have accepted the application or issued a Certificate of Insurance.

The Home Mortgage Insurance contract you have with us has a provision that allows us to contest the validity of policy information provided by a policy owner within two years of the date the contract was issued.  In light of the facts discussed above, we are rescinding Decreasing Term Life Insurance Certificate #  32534 issued to Tommy B. Hall in December of 1998.  As a result, no benefits will be paid under this contract, either now or in the future.

In addition, we have forwarded the amount representing the premium that was paid for the insurance coverage since the 11th day of December, 1998 to your account electronically at the credit union along with a copy of this letter.

If you have any questions, please contact me at 1-800-356-2644, extension X7475.

Sincerely,


Brenda Larson
Life Underwriter
Credit Insurance Underwriting


Cc: Patriot Federal Credit Union

bl
X7475/2D-1/
opeiu-39

*CC: Mike Stel*

P.O. Box 391  ■  5910 Mineral Point Road  ■  Madison, WI 53701-0391
Business: 608/238-5851  ■  Voice/TDD: 800/937-2644  ■  Fax: 608/238-0830

D0006

*18*

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

* * * * * * * * * * * * * * * * * * * * * * * * * *

NANCY HALL, individually and as the
Representative and Administratrix of
the Estate of Tommy Hall, deceased,
her husband,

        Plaintiff,

        v.           `         Case No. 1:01-CV-1265

CUNA MUTUAL GROUP, CUNA MUTUAL
INSURANCE SOCIETY,

        Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * *


DEPOSITION OF MICHAEL E. STEL

Thursday, November 1, 2001

11:20 o'clock a.m.

Reported by:  LISA A. CREERON

---

**M**ADISON **F**REELANCE **R**EPORTERS

131 W. Wilson St.      Madison, Wisconsin 53703      (608) 255-8100

MICHAEL STEL - 11/01/01 / HALL V. CUNA MUTUAL

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

• • • • • • • • • • • • • • • • • • • • • • • • • • •

NANCY HALL, individually and as the
Representative and Administratrix of
the Estate of Tommy Hall, deceased,
her husband,

        Plaintiff,

    v.             Case No. 1:01-CV-1265

CUNA MUTUAL GROUP, CUNA MUTUAL
INSURANCE SOCIETY,

        Defendants.

• • • • • • • • • • • • • • • • • • • • • • • • • • •

DEPOSITION OF MICHAEL E. STEL

Thursday, November 1, 2001

11:20 o'clock a.m.

Reported by:  LISA A. CREERON

---

**PAGE 2**

2

        DEPOSITION of MICHAEL E. STEL, a
witness in the above-entitled matter, taken at the
instance of the plaintiff, wherein Nancy Hall is the
plaintiff and CUNA Mutual Group, et al., are the
defendants, pending in the United States District
Court for the Middle District of Pennsylvania,
pursuant to notice, before LISA A. CREERON, a
Registered Professional Reporter and Notary Public in
and for the State of Wisconsin, at Melli, Walker,
Pease & Ruhly, Attorneys at Law, 10 East Doty Street,
in the City of Madison, County of Dane, and State of
Wisconsin, on the 1st day of November, 2001, commencing
at 11:20 o'clock a.m.

        A P P E A R A N C E S

    STEPHEN R. PEDERSEN,
        Attorney at Law, 214 Senate Avenue, Suite 602,
        Camp Hill, Pennsylvania, appearing on behalf of
        the plaintiff;

    MICHAEL R. KELLEY,
        McNEES, WALLACE & NURICK, Attorneys at Law,
        100 Pine Street, P. O. Box 1166,
        Harrisburg, Pennsylvania 17108, appearing
        on behalf of the defendants.

    ALSO PRESENT:  MARK RICHARDSON

        • • • • •

(Original transcript is filed with Attorney Pedersen)

---

**PAGE 3**

3

            I N D E X

Examination by:               Page

Attorney Pedersen           4

Attorney Kelley           --

    (There are no exhibits marked for identification)

        • • • • •

        MICHAEL E. STEL,

    called as a witness, being first duly

    sworn in the above cause, testified

    under oath as follows:

---

**PAGE 4**

4

1        MR. KELLEY:  Steve, for the
2    record, we agree to the usual stipulations with
3    the exception of he'll read and sign the
4    deposition.
5        MR. PEDERSEN:  That's fine.
6    Good.
7        EXAMINATION
8    BY MR. PEDERSEN:
9  Q  Please state your full name for the record.
10  A  Michael Eric Stel.
11  Q  And that's S-T-E-L?
12  A  Correct.
13  Q  Mr. Stel, where are you currently employed?
14  A  CUNA Mutual Group.
15  Q  In what capacity are you employed at CUNA Mutual?
16  A  My job title is SIU manager.
17  Q  What is SIU manager?
18  A  Special investigation unit manager.
19  Q  What are your job duties as the special investigation
20    unit manager?
21  A  I'm responsible for management of the department and
22    activities contained within the department, which
23    would include training of staff regarding fraud and
24    fraud prevention, fraud investigation, compliance
25    with fraud regulations.  Those would be the major

5

```
1        components.  There are other duties.
2    Q   In part of your training duties or supervising of
3        training duties, do you know specifically whether you
4        trained Brenda Larson to recognize fraud?
5    A   I have in the past.
6    Q   How long has Brenda Larson been working at CUNA?
7    A   I don't know.
8    Q   Less than three years?
9    A   I don't know.
10   Q   I noted somewhere in the file that she was under
11       training and being supervised at the end of 1999.  Do
12       you know anything about that, about her length of
13       time with CUNA?
14   A   No, I don't.
15   Q   What did you do or your staff do with respect to
16       training Linda?
17                   MR. KELLEY:  You mean Brenda.
18                   MR. PEDERSEN:  Brenda, I'm
19       sorry.
20   Q   Brenda Larson.
21   A   Brenda would have sat in on the general training
22       sessions that we provide to staff.
23   Q   Is there a certification process or requirements that
24       individuals such as Brenda Larson attend and complete
25       fraud training?
```

6

```
1    A   A certification process?  What do you mean by that?
2    Q   What requirements are there for someone in
3        Brenda Larson's position to be trained to recognize
4        consumer fraud?
5    A   She would be expected to attend the fraud training
6        sessions that we provide to staff.
7    Q   How often are fraud training sessions given?
8    A   Typically we have some what we call formal fraud
9        training sessions that occur twice a year for two
10       hours each, two two-hour sessions.
11   Q   She would be required to attend those two sessions
12       per year for two hours each?
13   A   We would ask that she attend those, yes.
14   Q   What other training would she be required to attend?
15   A   That I don't know.
16   Q   Do you know of any informal training that she's had
17       in recognizing consumer fraud?
18   A   She may receive informal training on her own.  She
19       may receive it through conversations that we may have
20       had on -- you know, specific case or something like
21       that.  She may ask a question of someone about fraud.
22   Q   How big is the staff that you supervise?
23   A   I don't supervise any staff.
24   Q   Do you train staff?
25   A   (Witness nodding).
```

7

```
1    Q   I'm sorry, that was a nodded head.
2    A   I don't know if that was a question.
3    Q   Do you train staff?
4    A   Yes.
5    Q   But they're not considered staff of your department?
6    A   Correct.
7    Q   How large or how many people are in the special
8        investigations department of CUNA Mutual?
9    A   Currently just myself.
10   Q   In the 2000 time frame, was it also just yourself?
11   A   For a period of time it was just myself.  For a
12       period of time there was someone else as well.
13   Q   Who was the other person?
14   A   Erin Hefty.
15   Q   Do you know how you spell Erin?
16   A   E-R-I-N.
17   Q   It's a female?
18   A   Yes.
19   Q   How do you spell Hefty?
20   A   H-E-F-T-Y.
21   Q   When did Erin Hefty leave CUNA Mutual?
22   A   She still is with CUNA Mutual.
23   Q   Do you know whether or not she's in the Madison area
24       of CUNA Mutual?
25   A   Yes, she is.
```

8

```
1    Q   Still work in your same building?
2    A   Actually I don't think she's in the same building
3        anymore.
4    Q   Which building is she in?
5    A   I think she's in -- I'm not certain.
6    Q   Which department is she working for?
7    A   I'm not certain of that either.
8    Q   Is there a personnel roster where we would be able to
9        the find the location of Erin Hefty?
10   A   Yes.
11   Q   Who maintains that roster?
12   A   There's a corporate roster that is available that
13       would show where -- you know, where her desk location
14       is.
15   Q   Do you know why she left the special investigations
16       unit?
17   A   Not specifically.
18   Q   Generally why did she leave?
19   A   She decided to take another job.
20   Q   Within CUNA?
21   A   Yes.
22   Q   And you don't know the reasons for that decision?
23   A   Not specifically, no.
24   Q   What's your training and background with respect to
25       special investigations for an insurance company?
```

PAGE 9  SHEET 3

9

1   A   Well, I've had a lot of different kinds of training
2       over the years. I have my educational background,
3       which applies to a portion of the job, I think.
4   Q   Let's break it down then if you want. We'll start
5       with the educational, formal educational training
6       that qualifies you to be responsible for the special
7       investigations unit.
8   A   Well, my education includes a bachelor's and master's
9       degree in business administration. My on-the-job
10      training includes various management positions. It
11      also includes a lot of claims background, which
12      exposed me to fraud investigation and investigation
13      of insurance claims and that sort of thing.
14          The first position I held at CUNA Mutual was a
15      field claims examiner, which had a fraud
16      investigation component associated with it, so I
17      received on-the-job training through that position.
18      I've attended various seminars, fraud related
19      seminars where I've received training.
20  Q   Do you have any legal training or legal background?
21  A   No.
22  Q   I'm kind of going back and forth here because things
23      come to mind. With respect to the training of staff,
24      such as Brenda Larson on fraud and the fraud
25      sessions, are they given written material?

PAGE 10

10

1   A   Sometimes, yes.
2   Q   Who maintains the written material at CUNA Mutual
3       with respect to fraud and fraud investigations?
4   A   Well, the special investigation unit puts together
5       any written materials that are included in the
6       training that is provided.
7   Q   So do you have copies of or access to the training
8       material for fraud investigation at CUNA Mutual?
9   A   I have some written materials that have been provided
10      in training. I'm not certain, you know, to what
11      degree we've kept that information.
12  Q   I'll ask it through your counsel in a formal way, but
13      I want to let you know that we will be asking for the
14      materials for training from the '98 through 2000 time
15      period. So don't destroy any of them.
16          MR. KELLEY: Say that again,
17      Steve, so I can make a note of that.
18          MR. PEDERSEN: The '98 through
19      2000 time period, training materials where
20      individuals such as Brenda Larson are trained
21      with respect to consumer fraud.
22  Q   Does CUNA Mutual maintain any policies or procedures
23      with respect to the reporting of suspected consumer
24      fraud apart from training materials?
25  A   Policies or procedures?

PAGE 11

11

1   Q   Yes.
2   A   Other than verbal discussion, I would say no.
3   Q   You don't have a three-ring binder on your desk that
4       are the policies of CUNA Mutual about forms used, how
5       to report fraud, the steps that you take --
6   A   No.
7   Q   -- and when you do it?
8   A   No.
9   Q   That's within your own discretion?
10  A   Yes.
11  Q   You mentioned that you had a B.A. and a master's
12      degree in business administration. What about your
13      B.A. and your master's degree in business
14      administration that qualified you to be the special
15      investigations unit supervisor?
16  A   It's actually a B.S. in business administration. I
17      believe that the reason that I mentioned that is
18      because I think that gave me some business knowledge
19      and background, which does apply to a portion of the
20      job as a special investigation unit manager.
21  Q   Would that be more towards the management end of the
22      supervisory and training duties versus recognizing
23      consumer fraud?
24  A   Yes.
25  Q   As a field claims -- I guess it's an examiner, but a

PAGE 12

12

1       field claims officer at CUNA Mutual, what about that
2       position that qualified you to be the special
3       investigation unit supervisor?
4   A   Well, that position required fraud investigation at
5       times, collecting of information, et cetera, various
6       capacities of fraud investigation.
7   Q   As a field claims examiner, how many times did you
8       undertake a fraud investigation?
9           MR. KELLEY: Object to the form.
10      You can answer it.
11  A   I'm not sure.
12  Q   Do you know whether it was more than 10?
13  A   Yes.
14  Q   Over what period of time were you a field claims
15      examiner?
16  A   Approximately March 1988 through January 1989.
17  Q   When did you take over the duties as the special
18      investigations unit manager?
19  A   Approximately January 1997.
20  Q   So you simultaneously held some duties as a special
21      investigations unit manager and a field claims
22      examiner?
23  A   No.
24  Q   I may have the outline. Can you go through the dates
25      for me of when you held those job duties at CUNA?

MICHAEL STEL - 11/01/01 / HALL V. CUNA MU...

PAGE 13  SHEET 4

13

1  A  Right.  I was a field claims examiner from
2     approximately March 1988 through January 1989.  I was
3     then a district claims manager from that point --
4     from 1989, January 1989 through approximately January
5     1997, and from approximately January 1997 to the
6     present I've been an SIU manager.
7  Q  Thank you.  That clarifies it.  What are the types of
8     seminars that you've attended over the last three
9     years to train in your continued training to be a
10    special investigations unit manager?
11 A  I've attended conferences focused on insurance fraud.
12 Q  What were the last two conferences you attended?
13 A  I attended the Wisconsin chapter of the International
14    Association of Special Investigation Unit -- Units
15    conference.
16 Q  When was that?
17 A  That was in October of this year.  And prior to that,
18    I believe the last one I attended was in September of
19    2000, and that was the International Association of
20    Special Investigation Units conference.
21 Q  How is it that a file comes onto your desk for your
22    attention as a special investigation unit manager?
23    What's the mechanism within the company?
24 A  A mechanism for what specifically?
25 Q  For you to be involved in a claim.

PAGE 14

14

1  A  It can take a number of different forms.  It's
2     typically referred to me by another area.  And that
3     can take the form of an electronic message, an
4     e-mail, it could be a telephone call.
5        It could be routing through a claims system a
6     particular case or file for review, could be a copy
7     of a file in interoffice mail.  It takes a number of
8     different forms.
9  Q  Do you recall specifically with respect to the Hall
10    claim how it was that you became involved?
11 A  I'm not certain.
12 Q  Do you have any information on your computer or in
13    your office that would help you to recall how it
14    became that you were involved?
15 A  It may.  I'm not certain.
16 Q  If we wanted to find out how it was that you became
17    involved, what steps would we take to do that?
18 A  The only step that I'm aware of would be to look at
19    the file and see if you can -- I mean you can make
20    some assumptions based on how it typically works, but
21    to say for certain how it was received, I'm not -- I
22    can't say right now.
23 Q  Can you tell me your custom and practice about how it
24    would typically be that you would be investigating a
25    file on a homeowner's policy, home mortgage policy?

PAGE 15

15

1           MR. KELLEY:  Object to the form.
2        You can answer if you can, Mike.
3  A  Could you ask it again, I'm sorry?
4  Q  I can try to.  Can you tell me based upon your custom
5     and practice, based upon your routine in the office
6     how it would be typically you would become involved
7     in the investigation of a home mortgage protection
8     policy?
9  A  Typically if there's a need for me to be involved, it
10    would be referred to me by someone else.
11 Q  Someone in Brenda Larson's position?
12 A  Potentially, yes.
13 Q  Do you recall at some point apart from the file, do
14    you have a recollection at some point of receiving
15    information on the Hall claim file?
16 A  The only reason I recollect it is because I've looked
17    at the file as a result of this deposition.
18 Q  When was the last time that you looked at this file,
19    claim file?
20 A  Yesterday afternoon, I believe.
21 Q  After reviewing the file, now do you have a
22    recollection of having taken some steps on the Hall
23    claim?
24 A  Yes.
25 Q  You have that recollection independent of the file --

PAGE 16

16

1     I mean now as you sit here, the file refreshed your
2     memory and you can recall what you did on the file?
3  A  Well, really I don't recall it other than when I look
4     at the file, I can kind of see some of the steps that
5     I took.  Beyond that, I don't recall the file
6     specifically.
7  Q  After reviewing the file, can you describe for me the
8     first thing that you remember happening with respect
9     to the Hall claim file?
10 A  I don't recall what would have been the first thing.
11    Nothing comes to my mind.
12 Q  What I'm trying to do is track chronologically your
13    involvement.
14 A  Okay.
15 Q  And so if you don't recall the first thing, what's
16    the next thing?  What would be the recollection that
17    you have?
18 A  Well, the recollection based on my review of the file
19    is that I received a referral.
20 Q  And you don't know who that was from?
21 A  I believe it was from Brenda Larson, which prompted
22    me to review it on the insurance fraud side of things
23    or with that being my role for the company.  That was
24    my focus when I reviewed the file.
25 Q  What steps did you undertake in your review of the

MICHAEL STEL - 11/01/01 / HALL V. CUNA MUTUAL

17

```
 1         file to determine whether you believed insurance
 2         fraud had been committed?
 3     A   Based on my review of the file at this time, it
 4         appears that I would have reviewed the file and the
 5         information contained in it.
 6     Q   Do you have any notes, computer information or memos
 7         to anyone to indicate that you in fact reviewed the
 8         entire file?
 9     A   None that I'm aware of, no.
10     Q   Do you recall reviewing the entire file?
11     A   No, I don't specifically.
12     Q   Is there information within the file that the
13         referral in fact came from Brenda Larson?
14     A   I believe there is.
15     Q   Let me show you what's been provided by your attorney
16         concerning the -- it's labeled under a general
17         category regarding attorney general's investigation.
18             MR. KELLEY:  Regarding -- oh,
19         okay.  I'm sorry.
20     Q   This is a series of documents, a letter dated
21         March 29th, 2000 from the attorney general's office
22         in Pennsylvania to you, another letter dated
23         February 29th, 2000 from the attorney general's
24         office to you, a letter from you to Mrs. Hall and an
25         insurance fraud form submitted to the attorney
```

18

```
 1         general's office.  I want to ask if this is your
 2         understanding of the totality of your involvement in
 3         this claim.
 4     A   I believe it is, yes.
 5     Q   And of these documents --
 6             MR. KELLEY:  Steve, I'm sorry,
 7         before you do that, can I just take a look at
 8         it?
 9             MR. PEDERSEN:  Of course.  Sure.
10         Sorry about that.
11     Q   There's nothing on any of these documents that refers
12         to Brenda Larson, isn't that correct?
13     A   There is an indication of Brenda Larson on my
14         February 22nd letter.
15     Q   What is that indication?
16     A   I refer to Brenda Larson's letter in my letter dated
17         February 22nd.
18     Q   And you indicate that Brenda Larson was the one who
19         provided information that some things were not
20         disclosed?
21     A   Well, what the sentence in my February 22nd letter
22         states is, "As Brenda Larson's February 10, 2000
23         letter explained, medical information obtained
24         confirms that Mr. Hall did not disclose some medical
25         information at the time he completed the application
```

19

```
 1         for home mortgage insurance."
 2     Q   Did you know at the time what medical information
 3         that was that he didn't disclose allegedly?
 4     A   I have reviewed the file, so I was familiar with it,
 5         yes.
 6     Q   Do you recall as you sit here today what that review
 7         revealed?
 8     A   In general terms.
 9     Q   What did that review reveal?
10     A   To the best of my recollection, it revealed that
11         there were certain medical conditions that were not
12         disclosed on the application at the time Mr. Hall
13         completed the application for insurance.
14     Q   What conditions were those?
15     A   The condition I'm thinking of is his cancer
16         condition.
17     Q   Any others?
18     A   Not that I recall right now, no.
19     Q   Was it your understanding that Mr. Hall had known he
20         had cancer and didn't disclose it on a claim
21         application?
22     A   I wouldn't say that, no.
23     Q   What was your understanding with respect to
24         Mr. Hall's insurance application and the disclosing
25         of cancer?
```

20

```
 1     A   The questions that he answered on the insurance
 2         application did not appear to be completely accurate
 3         as a result of the medical records that were
 4         contained in the file.
 5     Q   As an insurance fraud investigator, what's your
 6         understanding of the definition of fraud?
 7             MR. KELLEY:  Object to the form.
 8         You can answer.  Calls for a legal conclusion.
 9         Answer.
10     Q   I'm asking for your understanding of the time you
11         reported consumer fraud.
12             MR. KELLEY:  Well, objection.
13         He didn't report consumer fraud.  You haven't
14         established that.  But go ahead, you can answer,
15         Mike.
16     A   Let me see.  Specific definition is escaping me right
17         now, but in general terms it would be an act to in
18         this case potentially deceive an insurance company.
19     Q   What information did you have that Mr. Hall had
20         potentially deceived an insurance company?
21     A   The documents contained in the claim file -- in the
22         file that I reviewed.
23     Q   And what information was that?
24     A   As I said earlier, it appeared that the answers --
25         the answers that Mr. Hall provided on the insurance
```

MICHAEL STEL - 11/01/01 / HALL V. CUNA MUTUAL

PAGE 21   SHEET 6

21

1     application may not have been completely accurate
2     based on the documents contained in the file.
3   Q  And as you sit here today, you don't recall
4     specifically what any of that was, what the
5     disclosure was, what the medical findings were?
6   A  Not in specific terms.
7   Q  You don't know as you sit here today whether or not a
8     pathology report following the removal of a mole
9     indicated there was no cancer?  Do you know anything
10    about that?
11  A  I did yesterday in preparation for this deposition
12    did review that, yes.
13  Q  Had you reviewed that at the time that you wrote
14    these or were involved in these five letters?
15  A  I don't recall specifically, you know, each document
16    that I reviewed anymore.  It was a long time ago.
17    However, in general terms when I receive a referral,
18    I'll review the file that is presented to me.  So I'm
19    reaching the conclusion that I likely did, but I
20    don't recall doing it.
21  Q  What medical training do you have?
22  A  Other than general training through my work at CUNA
23    Mutual, I don't have any specific.
24  Q  Do you know what a dysplastic nevus is?
25  A  No.

PAGE 22

22

1   Q  Do you know how a dysplastic nevus relates to cancer
2     or malignant findings?
3   A  No.
4   Q  Do you know the signs and indications of a melanoma?
5   A  Other than things that you hear about through media
6     in -- to be aware of for yourself or your own
7     individual health, no.
8   Q  Do you know what melanocytic cells are?
9   A  No.
10  Q  Do you know the significance of those with respect to
11    findings of cancer or not cancer?
12  A  No.
13  Q  Are you qualified to review a pathology report?
14  A  No.
15  Q  Are you qualified to review specific medical findings
16    using medical terminology and medical records?
17  A  Depends upon the purpose.
18  Q  The purpose -- if the purpose is to determine whether
19    or not a mole that has been removed was a dysplastic
20    nevus versus melanoma.
21  A  No.
22  Q  What's the first step that we have documents of that
23    you took after you reviewed Mr. Hall's records?
24  A  Based on the documentation that I have, I believe
25    that I completed an insurance -- it's a Pennsylvania

PAGE 23

23

1     form that they require be completed.
2   Q  Who is they?
3   A  They being the State of Pennsylvania.
4   Q  Where did you obtain that form?
5   A  The form is contained in my department.
6   Q  In some sort of three-ring binder?
7   A  Yes.
8   Q  Do you have claim forms to report fraud for every
9     state?
10  A  I have -- not every state, no.
11  Q  What else is contained in that binder?
12  A  The binder contains mostly -- I think for the most
13    part it's referral forms, information from state
14    insurance departments regarding insurance fraud, some
15    regulations regarding insurance fraud.
16  Q  Did you know whether or not at the time you made this
17    or filled out this insurance fraud form whether
18    Mr. Hall's treating doctor, Dr. Hurley's records had
19    been reviewed by CUNA Mutual?
20  A  I don't know if I -- I can't say if I knew that or
21    not.  I don't recall.
22  Q  Were you the one who actually filled out all the
23    information on the insurance fraud form that was sent
24    to the Pennsylvania Attorney General's Office?
25  A  Yes.

PAGE 24

24

1   Q  You typed that on a typewriter?
2   A  I believe I did, yes.
3   Q  What information did you provide with respect to the
4     allegations of fraud?
5   A  I completed the form.
6              MR. KELLEY:  Do you want him to
7          read that, is that what you're getting at?
8              MR. PEDERSEN:  Sure.
9   Q  From the part that you filled out, which part
10    specifically relates to the allegations of fraud?
11  A  Well, what I do is I follow the form that the state
12    asks me to complete, and I complete those sections
13    that apply.  And one of the sections is No. 8, VIII,
14    and I provided a brief summary there of what I found
15    with the referral.
16  Q  Just for the record, can you tell us what that
17    summary was that was the basis for your referral?
18  A  You want me to read this?
19  Q  If that's what is most helpful, then tell me what
20    that summary says.
21  A  What it says on the form is, "Mr. Hall applied for
22    home mortgage protection insurance on 11-18-99.  The
23    application contains medical history questions.  At
24    the time Mr. Hall's claim was filed, following his
25    death, additional medical information was requested.

PAGE 25  SHEET 7

PAGE 27

---

**25**

```
1       The additional medical information confirmed Mr. Hall
2   had not disclosed all of his medical history and did
3   not answer a medical history question on the
4   application correctly.  Based on the additional
5   information obtained, Mr. Hall's insurance was
6   rescinded and no benefits were paid."
7   Q   Now, as you sit here today and after -- with all the
8       information that you have, what was the history that
9       Mr. Hall did not provide truthfully?
10  A   Again what I'm referring to there is the question --
11      one of the questions contained on the insurance
12      application as compared to the medical records and
13      what they presented.
14  Q   And the question on the application was which one?
15  A   I'd have to look at the application.  I don't recall.
16  Q   Which was the last time you reviewed the claim file?
17  A   Yes.
18  Q   Here's the application.  I'm showing you a copy of
19      the application.  Which part of that application was
20      fraudulent in your mind?
21              MR. KELLEY:  Object to the form
22          of the question.
23  A   I'm not comfortable with that question either because
24      I didn't arrive at the fact that it was fraudulent
25      necessarily.  What I was doing was making a referral
```

**27**

```
1       need to refer to in order to get in compliance for
2   CUNA Mutual Group.
3   Q   Is it your testimony you would have referred to the
4       reference manual, but you don't recall it today?
5   A   Don't recall what?
6   Q   What the reference manual provides with respect to
7       the reporting of something that you don't necessarily
8       believe is fraud to the fraud section of the attorney
9       general's office.
10  A   Well, I don't think that the reference manual says
11      anything about whether I believe it's fraud or not,
12      so I want to make that distinction from your
13      question.  But I have knowledge in doing my job that
14      Pennsylvania has a form that I need to fill out if
15      the evidence in the file leads me to believe that
16      there's a suspicion or that insurance fraud is
17      suspected, and that's what I believe I did in this
18      case.
19              MR. KELLEY:  Can I interject
20          something here?  Yesterday when I was meeting
21          with Mr. Stel, he provided me with additional
22          information that I didn't have in my file and
23          had him make a copy of it that I believe relates
24          to this series of questions that you're asking.
25          I want to give you a copy of that.
```

PAGE 26

PAGE 28

---

**26**

```
1       as required by the State of Pennsylvania due to the
2   documents contained in the file I reviewed.
3   Q   So you didn't form an opinion, your own opinion that
4       fraud had been committed?
5   A   Not necessarily.
6   Q   Did you conduct any investigation, independent
7       investigation besides the review of the file to
8       determine whether fraud had been committed?
9   A   Not that I recall, no.
10  Q   What Pennsylvania law that you're aware of required
11      you to submit this form?
12  A   I'm not sure of the exact title of the Pennsylvania
13      law.
14  Q   Without reference to the specific title, what's the
15      provision that requires you to report something that
16      you yourself don't necessarily believe is insurance
17      fraud?
18              MR. KELLEY:  Object to the form
19          of the question.
20  A   I'm not necessarily comfortable with that question
21      either.  What I will say is that I have the reference
22      manual that I mentioned earlier that contains the
23      referral forms that I use.  Some of the state
24      regulations and statutes, et cetera, is what I would
25      refer to in order to understand what I do or do not
```

**28**

```
1           I apologize for not getting to that
2       sooner.  I forgot about it until you got into
3       this area.  If you want to take a couple minutes
4       to take a look at that, Steve, that's fine.
5   Q   Some documents have just been produced right now,
6       Mr. Stel.  Are you aware of the source of these
7       documents?  Where do they come from?
8   A   They came from the three-ring binder that I was --
9       that I referenced earlier.
10  Q   Is the three-ring binder divided by tabs by state?
11  A   Yes.
12  Q   Is this everything that's contained within the
13      Pennsylvania section of your three-ring binder?
14  A   Yes.
15  Q   And do you believe you would have reviewed this
16      material from the three-ring binder, at least those
17      things which date appropriately from the time of your
18      letter to the attorney general's office before
19      sending the letter to the attorney general's office?
20  A   I may not have reviewed it specifically before I
21      referred it, but I certainly had knowledge of what it
22      says.
23  Q   I would like to make clear, because I'm not clear
24      based upon some of the answers, did you believe as
25      the special investigations unit manager that a fraud
```

MICHAEL STEL - 11/01/01 / HALL V. CUNA MUTUAL

PAGE 29  SHEET 8

29

1    had been committed on CUNA Mutual at the time you
2    submitted the fraud section form?
3  A  I suspected that it may have.
4  Q  Suspected that it may have.  In your mind a suspicion
5    that a fraud may have been committed, is that the
6    standard that warrants submitting the form that you
7    submitted?
8  A  I would say that it did in this case, yes.
9  Q  And that's the standard that you apply?
10  A  Oftentimes, yes.
11  Q  The form that was filled out by you, you sent that to
12    the attorney general's office in Pennsylvania, didn't
13    you?
14  A  Yes.  I sent it to the address contained on the top
15    of the form.
16  Q  After sending that form to the attorney general's
17    office, what else did you do?
18  A  The only other thing that I can think of is I would
19    have made a copy of that and added it to our file for
20    our records.  But beyond that, I don't recall doing
21    anything else.
22  Q  Well, let's go through the documents.  What next do
23    you recall happening?  Did you send a letter to
24    Mrs. Hall?
25  A  Yes.

PAGE 30

30

1  Q  What did you tell Mrs. Hall about informing the
2    attorney general's office of a potential fraud claim?
3  A  I could read the letter if that would answer your
4    question correctly.
5  Q  You can read it or paraphrase it.
6  A  Okay.  My letter is dated February 22nd, 2000,
7    indicates, "Dear Ms. Hall: Mr. Hall's home mortgage
8    protection insurance claim was referred to me for
9    review.  You have my sincere condolences on your
10    loss.
11        As Brenda Larson's February 10, 2000 letter
12    explained, medical information obtained confirms that
13    Mr. Hall did not disclose some medical information at
14    the time he completed the application for home
15    mortgage insurance.  Accurate completion of medical
16    history is important to the underwriting process
17    involved with an insurance application.  Due to the
18    nature of this, we are required to inform the
19    Pennsylvania insurance fraud section of this matter.
20        If you have any questions or concerns regarding
21    this matter, please contact me directly.  Thank you."
22  Q  Now, it was your contention that it was Mr. Hall who
23    didn't provide accurate information, isn't that
24    correct?
25  A  Yes.

PAGE 31

31

1  Q  Because there were two individuals listed on the
2    form, application form, and it was Mr. Hall you were
3    concerned with?
4  A  That was my focus, yes.
5  Q  And you knew at the time that Mr. Hall had died,
6    isn't that right?
7  A  Yes.
8  Q  And you had referred the matter to the criminal
9    investigation fraud section of the Pennsylvania
10    Attorney General's Office, is that right?
11  A  I referred it to the address contained on the top of
12    their referral form.
13  Q  And isn't that what it is?
14  A  It's the -- it says Office of the Attorney General,
15    Insurance Fraud Section.
16  Q  Do you have any knowledge as to whether or not an
17    attorney general's office will investigate a dead
18    person for fraud?
19  A  I'm not certain, no.
20  Q  Do you have any information about whether
21    investigations for fraud take place upon dead people?
22  A  I can say that I know life insurance claims are often
23    investigated involving insurance, potential insurance
24    fraud.
25  Q  But in this specific case the assertion was that

PAGE 32

32

1    Mr. Hall was not truthful and accurate, isn't that
2    correct?
3  A  Well, my letter speaks for itself.
4  Q  Is that what it says, it was Mr. Hall who had not
5    provided accurate information?
6  A  That's correct.
7  Q  And Mr. Hall was dead?
8  A  That's correct.
9  Q  Is the reason that you sent this letter to the
10    attorney general's office to bolster the claim file
11    to explain why insurance premiums weren't -- or
12    benefits weren't being paid?
13  A  No.
14  Q  Did you expect an investigation to take place on the
15    deceased?
16  A  By whom?
17  Q  By the attorney general's office.
18  A  Not necessarily, no.
19  Q  You indicate in your letter that you're required to
20    inform the Pennsylvania insurance fraud section.
21    Where are those requirements stated?
22  A  That's based on my knowledge of the information
23    typically that's contained in the three-ring binder
24    that I referred to earlier that has been produced
25    here and through training I've received in the

MICHAEL STEL - 11/01/01 / HALL V. CUNA MUTUAL

PAGE 33  SHEET 9

33

1   department since starting.
2  Q  I just want to clarify, you've provided certain
3     information from your three-ring binder on
4     Pennsylvania, is that right?
5  A  Yes.
6  Q  And you believe contained within this document is the
7     requirement that you report Mr. Hall to the attorney
8     general fraud section?
9  A  That is the material that I would reference that
10    would help me lead to that conclusion.
11 Q  And that's in fact what you told Mrs. Hall, that you
12    were required to inform the fraud section, right?
13 A  Correct.
14 Q  Did you get a result, anything back from the attorney
15    general's office?
16 A  Yes.
17 Q  What did you receive?
18 A  I received two letters.
19 Q  What's the first one?
20 A  It's dated February 29th, 2000.
21 Q  And in that letter they in essence thank you for your
22    referral?
23 A  That's correct.
24 Q  Substantively that's the substance of the letter,
25    isn't it?

PAGE 34

34

1  A  Correct.
2  Q  What's the second letter that you received?
3  A  It's dated March 29, 2000.
4  Q  One month later?
5  A  Yes.
6  Q  What does that letter tell you in substance?
7  A  Basically that they are not going to be pursuing the
8     matter any further.
9  Q  Did you ever send Mrs. Hall, the surviving widow, a
10    copy of the attorney general's letter that they
11    weren't going to investigate her or her husband?
12 A  No, I did not.
13 Q  Do you have any information or any knowledge about
14    Mrs. -- whether Mrs. Hall for more than a year sat
15    wondering whether she was under investigation because
16    of your first letter?
17 A  No.
18 Q  And you didn't send that letter to Mrs. Hall to
19    frighten her from pursuing a claim?
20 A  No.
21 Q  Did you send to the attorney general's office your
22    claim file that included medical records?
23 A  No, I don't believe I did.
24 Q  You would have just sent the form?
25 A  Yes.

PAGE 35

35

1  Q  Did they ask for any additional records or any
2     information from you?
3  A  No.
4  Q  They made an assessment without that?
5  A  Correct.
6  Q  Do you have any records anywhere to tell us any of
7     the other times that you've reported potential
8     consumer fraud to the Pennsylvania Attorney General's
9     Office? Do you keep statistics, records?
10       MR. KELLEY:  About suspected?
11 Q  That's the standard that you used when you refer to
12    the attorney general's office?
13 A  I did have some records that would indicate other
14    referrals that have been made to Pennsylvania.
15 Q  Where are those records maintained, in your office?
16 A  Yes, we have -- yeah, yes.
17 Q  Do you keep the same kind of records nationwide for
18    all the referrals you make to various attorney
19    general's offices when you have a suspicion of fraud?
20 A  Could you ask that again, I'm sorry?
21 Q  Besides Pennsylvania, do you keep records from other
22    states about when you send in a document such as the
23    one you sent in the Hall case?
24 A  Yes.
25 Q  You keep that statistically?

PAGE 36

36

1  A  We keep record of it, yes.
2  Q  And do you keep records that tell us based on the
3     number of referrals how many are investigated and how
4     many come back with a positive or negative
5     investigation result?
6  A  No.
7  Q  Do you keep files that would tell us -- that we could
8     statistically look at to determine how often when you
9     send something, it comes back with a positive
10    investigation or fraud is prosecuted?
11 A  It would require reviewing the files involved.
12 Q  I'll ask that you maintain those files also as
13    they're going to be part of this case.
14       MR. PEDERSEN:  And at the
15    appropriate time we'll be requesting copies.
16    Objections can be made to producing those.
17       MR. KELLEY:  Well, I'll just put
18    on the record that, you know, they're not
19    necessarily going to be part of this case, that
20    we may or may not object to a specific request
21    after we receive it.
22       MR. PEDERSEN:  Sure.
23 Q  After you received the letter back from the attorney
24    general's office, one month after the form was sent
25    to them, the letter telling you that they weren't

MICHAEL STEL - 11/01/01 / HALL V. CUNA MUTUAL

37

1   going to pursue any investigation of fraud, what did
2   you do internally within CUNA Mutual?
3   A   The only thing I would have done is added it to the
4       file for our documentation.
5   Q   You don't -- who do you report to?
6   A   I report to Reed Koenig.
7   Q   Who is Reed Koenig?
8   A   He's a vice president.
9   Q   How do you spell Koenig?
10  A   K-O-E-N-I-G.
11  Q   Do you report to Reed Koenig concerning statistically
12      how many times you report suspicions of fraud and how
13      many times there are actual investigations?
14  A   No.
15  Q   Have you ever had any consumer complaints or attorney
16      complaints against CUNA Mutual for the way that you
17      have reported to consumer fraud sections of attorney
18      general's offices?
19  A   No.
20          MR. KELLEY:  Objection, but he
21      already --
22          MR. PEDERSEN:  With the answer,
23      you're okay.
24  Q   So this is the first time that assertion's ever come
25      up in your career with CUNA Mutual?

38

1   A   It's the first time I've ever been questioned on it,
2       yes.  That I recall anyway.
3   Q   The letters that you sent to Mrs. Hall concerning the
4       referral to the fraud section -- actually just the
5       one letter, is that a standard type of letter that
6       you send every time you send an attorney general's
7       form?
8   A   You're going to have to ask it again, I'm sorry.
9   Q   I'll speak more slowly also.  The letter you sent to
10      Mrs. Hall, the format, is that a standard format and
11      letter that you send to a potential insured or to an
12      insured when their file has been sent to an attorney
13      general's office for investigation?
14          MR. KELLEY:  Object to the form.
15      You can answer it.
16  A   Yeah, it's pretty close.  I mean they can vary a
17      little bit, but it's a good example of the typical
18      letter, yes.
19  Q   Besides the requirements of the Pennsylvania Attorney
20      General's Office, what's the standard within CUNA
21      Mutual for referring a matter to an attorney general
22      for fraud investigation?
23  A   Can you ask it again, I'm sorry?
24  Q   I'm not referring to the Pennsylvania standard.  I'm
25      referring to the CUNA Mutual standard.  Under CUNA

39

1   Mutual's customs, practices and standards that you're
2   aware of, what's the standard to refer a matter to a
3   fraud section of an attorney general's office?
4           MR. KELLEY:  Object to the form
5       of the question.  Assumes that all laws from all
6       the states in which CUNA does business have
7       similar requirements on the books and have
8       similar statutes, and I believe he's testified
9       previously that they would look at each case,
10      depending upon which state it came from, as to
11      whether or not follow-up was appropriate.
12      Objection, you can answer.
13  Q   Let me clarify if the question is simply what do the
14      states require us to do, whatever your policy is,
15      does CUNA have any policies, customs, practices with
16      respect to referrals generally to attorney general's
17      offices?
18  A   I can't say if there are any specific procedures or
19      policies related to that.
20  Q   Do you know how many referrals are made under
21      homeowner's protection policies per year?
22  A   Referrals?
23  Q   Referrals to attorney general's offices in the
24      country.
25  A   I couldn't say for sure, no.

40

1   Q   More than a hundred?
2   A   I would think no.
3   Q   More than 50?
4   A   I'm not sure.
5   Q   Can you give me a range?  You're the one who does the
6       referrals, right?
7   A   Right, but I'm really not sure.
8           MR. KELLEY:  Wait.  Objection.
9       Asked, he answered the question.
10  Q   Your office, however, contains that information
11      statistically on how high --
12  A   It could be identified.
13          MR. PEDERSEN:  Okay.  It's
14      another area of request that we'll make at an
15      appropriate time to identify how many monthly,
16      yearly go out nationwide and the responses.
17          MR. KELLEY:  Again we'll either
18      respond or not respond to that when an
19      appropriate request is made.
20  Q   Can you show me where in the documents that were
21      taken out of your three-ring binder Pennsylvania
22      requires you to report a case such as the Hall case
23      to them on their form?
24  A   I can refer probably a number of documents.
25  Q   In this set?

PAGE 41  SHEET 11

41

1  A  Yes.
2  Q  Okay. Go ahead. Let's go through it.
3  A  I'm looking at one, this is a copy of an electronic
4     memo dated 10-11-2001, and there's a paragraph on
5     this document indicating -- it's a bulletin from the
6     State of Pennsylvania to CUNA Mutual Group. I
7     believe that it was sent. I don't know, it was
8     probably sent to a lot of insurance companies, but we
9     received it.
10          It states, "The Pennsylvania insurance
11     department has issued a bulletin to revise and remind
12     insurers of their obligations under Pennsylvania law
13     in the reporting of a suspected insurance fraud.
14     Pennsylvania law explicitly requires insurer
15     reporting of suspected insurance fraud to a law
16     enforcement agency for consideration of criminal
17     investigation and prosecution. Pennsylvania law
18     provides immunity to encourage and protect persons in
19     that reporting. Accordingly, the department has
20     released the following guidance to ensure seeking to
21     meet their statutory obligation for reporting
22     suspected insurance fraud." And this goes on for a
23     while.
24  Q  And isn't one of those --
25  A  That would be one of the documents.

PAGE 42

42

1  Q  I'm sorry. Doesn't that same document tell us that
2     it's the insurer who has the burden of first
3     determining that there's a reasonable basis to
4     believe that insurance fraud has been committed?
5  A  Yes, it does.
6  Q  Not a suspicion, a reasonable basis to believe
7     insurance fraud has been committed?
8  A  Well, I can state for you what it states. It says,
9     "Each insurer has the burden of determining through
10     their investigation when a reasonable basis exists to
11     believe that insurance fraud has occurred, is
12     occurring or is to occur."
13  Q  And did you believe you had such a basis in the Hall
14     case, a reasonable basis that fraud had occurred?
15  A  I --
16          MR. KELLEY: A reasonable basis
17     to believe that insurance fraud has occurred, is
18     occurring or is to occur?
19          MR. PEDERSEN: Right.
20  Q  Did you have that basis?
21  A  I had -- I believe that I had sufficient evidence --
22     well, I had and my review of the file led me to
23     believe that there was sufficient evidence to suspect
24     that insurance fraud may have occurred. That's what
25     prompted me to decide that I needed to refer that to

PAGE 43

43

1     Pennsylvania.
2  Q  It doesn't say may have occurred, does it? It says
3     has occurred or is occurring or is about to occur?
4  A  I'm telling you, though, what I did versus what it
5     says.
6          MR. KELLEY: Just note my
7     objection for the record. It says up here -- we
8     can read this like lawyers now, but it says in
9     here, "Pennsylvania law explicitly requires
10     insurer reporting of suspected insurance fraud."
11     He's answered your question.
12  Q  And you knew of the 1993 pathology report --
13          MR. KELLEY: Asked and answered.
14     Objection.
15  Q  -- stating dysplastic nevus?
16          MR. KELLEY: Asked and answered.
17     Objection.
18  Q  And you don't know what that is?
19          MR. KELLEY: Asked and answered.
20     Objection.
21          MR. PEDERSEN: I don't have any
22     other questions.
23          MR. KELLEY: Hold on. I don't
24     have anything. That's fine. No questions.
25          (12:15 p.m.)

PAGE 44

44

1  STATE OF WISCONSIN    )
2  COUNTY OF DANE        )  ss
3          I, LISA A. CREERON, a Notary Public in and for
4     the State of Wisconsin, do hereby certify that the
5     above deposition was taken before me on the 1st
6     day of November, 2001, commencing at 11:20 a.m., at
7     Melli, Walker, Pease & Ruhly, 10 East Doty Street, in
8     the City of Madison, in said County and State, that it
9     was taken at the request of the plaintiff, upon verbal
10     interrogatories, that it was taken in shorthand by me, a
11     competent court reporter and disinterested person,
12     approved by all parties in interest, and thereafter
13     reduced to typewriting by me; that the said deposition is
14     a true record of the deponent's testimony; that the said
15     deposition is to be used in the above-entitled action now
16     pending in Federal Court; that the deposition was taken
17     pursuant to notice; that the said MICHAEL E. STEL,
18     before examination, was sworn by me to testify the truth,
19     the whole truth, and nothing but the truth relative to
20     said cause. Dated at Madison, Wisconsin, this 5th day of
21     November, 2001.
22                    --------------------------------
23                    NOTARY PUBLIC, STATE OF WISCONSIN
24                    REGISTERED PROFESSIONAL REPORTER
25



MICHAEL STEL - 11/01/01 / HALL V. CUNA MUTUAL

**&**

& 2:10,18 44:7

**'**

'98 10:14,18

**\***

\* 3:6,6,6,6,6

**1**

10 2:10 12:12 18:22 30:11 44:7
10-11-2001 41:4
11-18-99 24:22
11:20 2:13 44:6
12:15 43:25
17108 2:19
1988 12:16 13:2
1989 12:16 13:2,4,4
1993 43:12
1997 12:19 13:5,5
1999 5:11
1st 2:12 44:5

**2**

2000 7:10 10:14,19 13:19 17:21,
23 18:22 30:6,11 33:20 34:3
2001 2:12 44:6,21
22nd 18:14,17,21 30:6
29 34:3
29th 17:21,23 33:20

**4**

4 3:3

**5**

50 40:3
5th 44:20

**8**

8 24:13

**A**

a.m 2:13 44:6
able 8:8
about 5:12,12 6:21 11:4,12 12:1
14:23 18:10 21:10 22:5 27:11 28:2
30:1 31:20 34:13 35:10,22 43:3
above 3:9 44:5
above-entitled 2:2 44:15
access 10:7
Accordingly 41:19
accurate 20:2 21:1 30:15,23 32:1,
5
act 20:17
action 44:15
activities 4:22
actual 37:13
Actually 8:2 11:16 23:22 38:4
added 29:19 37:3
additional 24:25 25:1,4 27:21 35:
1
address 29:14 31:11
administration 9:9 11:12,14,16
After 15:21 16:7 22:23 25:7 29:16
36:21,23,24
afternoon 15:20
again 10:16 15:3 25:10 35:20 38:
8,23 40:17
against 37:16
agency 41:16
ago 21:16
agree 4:2
ahead 20:14 41:2
al 2:4
allegations 24:4,10
allegedly 19:3
already 37:21
another 8:19 14:2 17:22 40:14
answer 12:10 15:2 20:8,9,14 25:3
30:3 37:22 38:15 39:12
answered 20:1 40:9 43:11,13,16,
19
answers 20:24,25 28:24
anymore 8:3 21:16
anyone 17:7
anything 5:12 21:9 27:11 29:21
33:14 43:24
anyway 38:2

**B**

anywhere 35:6
apart 10:24 15:13
apologize 28:1
appear 20:2
appeared 20:24
appearing 2:16,19
appears 17:4
application 18:25 19:12,13,21,24
20:2 21:1 24:23 25:4,12,14,15,18,
19,19 30:14,17 31:2
applied 24:21
applies 9:3
apply 11:19 24:13 29:9
appropriate 36:15 39:11 40:15,19
appropriately 28:17
approved 44:12
Approximately 12:16,19 13:2,4,5
area 7:23 14:2 28:3 40:14
arrive 25:24
ask 6:13,21 10:12 15:3 18:1 35:1,
20 36:12 38:8,23
Asked 40:9 43:13,16,19
asking 10:13 20:10 27:24
asks 24:12
assertion 31:25
assertion's 37:24
assessment 35:4
associated 9:16
Association 13:14,19
Assumes 39:5
assumptions 14:20
attend 5:24 6:5,11,13,14
attended 9:18 13:8,11,12,13,18
attention 13:22
Attorney 3:3,4 17:15,17,21,23,25
23:24 27:8 28:18,19 29:12,16 30:2
31:10,14,17 32:10,17 33:7,14 34:
10,21 35:8,12,18 36:23 37:15,17
38:6,12,19,21 39:3,16,23
Attorneys 2:10,18
available 8:12
aware 14:18 17:9 22:6 26:10 28:6
39:2

**B**

B.A 11:11,13
B.S 11:16
bachelor's 9:8
back 9:22 33:14 36:4,9,23
background 8:24 9:2,11,20 11:19
based 14:20 15:4,5 16:18 17:3 21:
2 22:24 25:4 28:24 42:20
Basically 34:7
basis 24:17 42:3,6,10,13,14,16,20
became 14:10,14,16
because 9:22 11:18 15:16 25:23
28:23 31:1 34:15
become 15:6
before 2:7 18:7 28:18,20 44:5,18
behalf 2:16
believe 11:17 13:18 15:20 16:21
17:14 18:4 22:24 24:2 28:9 37:8,
11,15,17,23 28:15,24 33:6 34:23
39:8 41:7 42:4,6,11,13,17,21,23
believed 17:1
benefits 25:6 32:12
besides 26:7 35:21 38:19
best 19:10
Beyond 16:5 29:20
big 6:22
binder 11:3 23:6,11,12 28:8,10,
13,16 32:23 33:3 40:21
bit 38:17
bolster 32:10
books 39:7
break 9:4
Brenda 5:4,6,17,18,20,21,24 6:3
9:24 10:20 15:11 16:21 17:13 18:
12,13,16,18,22 30:11
brief 24:14
building 8:1,2,4
bulletin 41:5,11
burden 42:2,9
business 9:9 11:12,13,16,18 39:6

**C**

call 6:8 14:4
called 3:8
Calls 20:8
came 17:13 28:8 39:10
Camp 22:16
can 10:17 12:10,24 14:1,3,19,19,

**C**

23 15:2,2,4,4 16:2,4,7 18:7 20:8,14
24:16 27:19 29:18 30:5 31:22 36:
16 38:15,16,23 39:12 40:5,5,20,24
42:8 43:8
can't 14:22 23:20 39:18
cancer 19:15,20,25 21:9 22:1,11,
11
capacities 12:6
capacity 4:15
career 37:25
case 6:20 14:6 20:18 27:18 29:8
31:25 35:23 36:13,19 39:9 40:22,
22 42:14
category 17:17
cause 3:9 44:20
cells 22:8
certain 8:5,7 10:10 14:11,15,21
19:11 31:19 33:2
certainly 28:21
certification 5:23 6:1
certify 44:4
cetera 12:5 26:24
chapter 13:13
chronologically 16:12
City 2:11 44:8
claim 13:25 14:10 15:15,19,23 16:
9 18:3 19:20 20:21 23:8 24:24 25:
16 30:2,8 32:10 34:19,22
claims 9:11,13,15 11:25 12:1,7,
14,21 13:1,3 14:5 31:22
clarifies 13:7
clarify 33:2 39:13
clear 28:23,23
close 38:16
collecting 12:5
come 9:23 28:7 36:4 37:24
comes 13:21 16:11 36:9
comfortable 25:23 26:20
commencing 2:12 44:6
committed 17:2 26:4,8 29:1,5 42:
4,7
companies 41:8
company 8:25 13:23 16:23 20:18,
20
compared 25:12
competent 44:11
complaints 37:15,16
complete 5:24 24:12,12
completed 18:25 19:13 22:25 23:
1 24:5 30:14
completely 20:2 21:1
completion 30:15
compliance 4:24 27:1
component 9:16
components 5:1
computer 14:12 17:6
concerned 31:3
concerning 17:16 37:11 38:3
concerns 30:20
conclusion 28:21 29:18 33:10
condition 19:15,16
conditions 19:11,14
condolences 30:9
conduct 26:6
conference 13:15,20
conferences 13:11,12
confirmed 25:1
confirms 18:24 30:12
consideration 41:16
considered 7:5
consumer 6:4,17 10:21,23 11:23
20:11,13 35:8 37:15,17
contact 30:21
contained 4:22 17:5 20:4,21 21:2
23:5,11 25:11 26:2 28:12 29:14
31:11 32:23 33:6
contains 23:12 24:23 26:22 40:10
contention 30:22
continued 13:9
conversations 6:19
copies 10:7 36:15
copy 14:6 25:18 27:23,25 29:19
34:10 41:3
corporate 8:12
Correct 4:12 7:6 18:12 30:24 32:
2,6,8 33:13,23 34:1 35:5
correctly 25:4 30:4
couldn't 39:25
counsel 10:12
country 39:24
County 2:11 44:2,8
couple 8:3
course 18:9

**D**

Court 2:6 44:11,16
CREERON 2:7 44:3
criminal 31:8 41:16
CUNA 2:4 4:14,15 5:6,13 7:8,21,
22,24 8:20 9:14 10:2,8,22 11:4 12:
1,25 21:22 23:19 27:2 29:1 37:2,
16,25 38:20,25,25 39:6,15 41:6
currently 4:13 7:9
custom 14:23 15:4
customs 39:1,15

**D**

Dane 2:11 44:2
date 28:17
dated 17:20,22 18:16 30:6 33:20
34:3 41:4 44:20
dates 12:24
day 2:12 44:6,20
dead 31:17,21 32:7
Dear 30:7
death 24:25
deceased 32:15
deceive 20:18
deceived 20:20
decide 42:25
decided 8:19
decision 8:22
defendants 2:5
definition 20:6,16
degree 9:9 10:11 11:12,13
department 4:21,22 7:5,8 8:6 23:
5 33:1 41:11,19
departments 23:14
depending 39:10
Depends 22:17
deponent's 44:14
DEPOSITION 2:1 4:4 15:17 21:11
44:5,13,15,16
describe 16:7
desk 8:13 11:3 13:21
destroy 10:15
determine 17:1 22:18 26:8 36:8
determining 42:3,9
didn't 19:3,20 20:13 25:24 26:3
27:22 29:12 30:23 34:18
died 31:5
different 9:1 14:1,8
directly 30:21
disclose 18:24 19:3,20 30:13
disclosed 18:20 19:12 25:2
disclosing 19:24
disclosure 21:5
discretion 11:9
discussion 11:2
disinterested 44:11
distinction 27:12
District 2:5,6 13:3
divided 28:10
doctor 23:18
document 21:15 33:6 35:22 41:5
42:1
documentation 22:24 37:4
documents 17:20 18:5,11 20:21
21:2 22:22 26:2 28:5,7 29:22 40:
20,24 41:25
Does 10:22 11:9 34:6 39:6,15
40:5 42:5 43:2
Doesn't 42:1 43:2
doing 21:20 25:25 27:13 29:20
done 37:3
Doty 2:10 44:7
down 9:4
due 26:1 30:17
duly 3:8
duties 4:19 5:1,2,3 11:22 12:17,
20,25
dysplastic 21:24 22:1,19 43:15

**E**

e-mail 14:4
E-R-I-N 7:16
each 6:10,12 21:15 39:9 42:9
earlier 20:24 26:22 28:9 32:24
East 2:10 44:7
education 8:8
educational 9:2,5,5
either 8:7 25:23 26:21 40:17
electronic 14:3 41:3
else 7:12 15:10 23:11 29:17,21
employed 4:13,15
encourage 41:18
end 5:11 11:21

MICHAEL STEL - 11/01/01 / HALL V. CUNA...TUAL

enforcement 41:16
ensure 41:20
entire 17:8,10
Eric 4:10
Erin 7:14,15,21 8:9
escaping 20:16
essence 33:21
established 20:14
et 2:4 12:5 26:24
ever 34:9 37:15,24 38:1
every 23:8,10 38:6
everything 28:12
evidence 27:15 42:21,23
exact 26:12
Examination 3:2 4:7 44:18
examiner 9:15 11:25 12:7,15,22
13:1
example 38:17
exception 4:3
exhibits 3:5
exists 42:10
expect 32:14
expected 6:5
explain 32:11
explained 18:23 30:12
explicitly 41:14 43:9
exposed 9:12

**F**

fact 17:7,13 25:24 33:11
familiar 19:4
February 17:23 18:14,17,21,22
30:6,11 33:20
Federal 44:16
female 7:17
field 9:15 11:25 12:1,7,14,21 13:1
file 5:10 13:21 14:6,7,19,25 15:13,
15,17,18,19,21,25 16:1,2,4,7,9,
18,24 17:1,3,4,8,10,12 19:4 20:4,
21,22 21:2,18 25:16 26:2,7 27:15,
22 29:19 32:10 34:22 37:4 38:12
42:22
filed 24:24
files 36:7,11,12
fill 27:14
filled 23:17,22 24:9 29:11
find 8:9 14:16
findings 21:5 22:2,11,15
fine 4:5 28:4 43:24
first 3:8 9:14 16:8,10,15 22:22 33:
19 34:16 37:24 38:1 42:2
five 21:14
focus 16:24 31:4
focused 13:11
follow 24:11
follow-up 39:11
following 21:8 24:24 41:20
follows 3:10
forgot 28:2
form 12:9 14:3 15:1 17:25 20:7
23:1,4,5,17,23 24:5,11,21 25:21
26:3,11,18 27:14 29:2,6,11,15,16
31:2,2,12,24 34:24 36:24 38:7,14 39:
4 40:23
formal 6:8 9:5 10:12
format 38:10,10
forms 11:4 14:1,8,23,8,13 26:23
forth 9:22
found 24:14
frame 7:10
fraud 4:23,24,24,25 5:4,25 6:4,5,
7,8,17,21 9:12,15,18,24,24 10:3,3,
8,21,24 11:5,23 12:4,6,8 13:11 16:
22 17:2,25 20:5,6,11,13 23:8,14,
15,17,23 24:1 40 26:4,8,17 27:8,8,
11,16 28:25 29:2,5 30:2,19 31:9,
15,18,21,24 32:20 33:8,12 35:8,19
36:10 37:1,12,17 38:4,22 39:3 41:
13,15,22 42:4,7,11,14,17,24 43:10
fraudulent 25:20,24
frighten 34:19
full 4:9
further 34:8

**G**

gave 11:18
general 5:21 17:16 19:8 20:17 21:
17,22 31:14 33:8 38:21
generalized 21:7,17,21,23 18:1 23:24
27:9 28:18,19 29:12,16 30:2 31:
10,17 32:10,17 33:15 34:10,21 35:
8,12,19 36:24 37:18 38:6,13,20 39:

3,16,23
Generally 8:18 39:16
getting 24:7 28:1
give 27:25 40:5
given 6:7 9:25
goes 41:22
Good 4:6 38:17
got 28:2
Group 2:4 4:14 27:2 41:6
guess 11:25
guidance 41:20

**H**

H-E-F-T-Y 7:20
Hall 2:3 14:9 15:15,22 16:9 17:24
18:24 19:12,19 20:19,25 24:21 25:
1,9 29:24 30:1,7,13,22 31:2,5 32:1,
4,7 33:7,11 34:9,14,18 35:23 38:3,
10 40:22 42:13
Hall's 19:24 22:23 23:18 24:24 25:
5 30:7
happening 16:8 29:23
Harrisburg 2:19
having 15:22
he'll 4:3
head 7:1
health 22:7
hear 22:5
Hefty 7:14,19,21 8:9
held 9:14 12:20,25
help 14:13 33:10
helpful 24:19
here 9:22 16:1 19:6 21:3,7 25:7
27:20 32:25 43:7,9
Here's 25:18
hereby 44:4
high 40:11
Hill 2:16
history 24:23 25:2,3,8 30:16
Hold 43:23
home 14:25 15:7 19:1 24:22 30:7,
14
homeowner's 14:25 39:21
hours 6:10,12
How 5:6 6:7,22 7:7,7,15,19 11:4
12:7 13:21 14:10,13,16,20,21,23
15:6 22:1 36:3,3,8 37:9,12,12 39:
20 40:11,15
However 21:17 40:10
hundred 40:1
Hurley's 23:18
husband 34:11

**I**

I'd 25:15
identification 3:5
identified 40:12
identify 40:15
immunity 41:18
important 30:16
include 4:23
included 10:5 34:22
includes 9:8,10,11
independent 15:25 26:6
indicate 17:7 18:18 32:19 35:13
indicated 21:9
indicates 30:7
indicating 41:5
indication 18:13,15
indications 22:4
individual 22:7
individuals 5:24 10:20 31:1
inform 30:18 32:20 33:12
informal 6:16,18
information 10:11 12:5 14:12 15:
17 17:5,6,12 18:19,25 19:2 20:
19,23 23:13,23,24 24:25 25:1,3
33:3,4 34:13 35:2 40:10
informing 30:1
instance 2:3
insurance 8:25 9:13 13:11 16:22
17:1,25 19:1,13,24 20:1,5,18,20,25
22:25 23:14,14,15,17,23 24:9,10,13,
5,11 26:16 27:16 30:8,15,17 39:11
15,22,23,23 32:1,20 41:8,10,13,
15,22 42:4,7,11,17,24 43:10
insured 38:11,12
insurer 41:14 42:2,9 43:10
insurers 41:12
interest 44:12
interject 27:19

internally 37:2
International 13:13,19
interoffice 14:7
interrogatories 44:10
investigate 31:17 34:11
investigated 31:23 36:3
investigating 14:24
investigation 4:18,19,24 9:12,12,
16 10:4,8 11:20 12:3,4,6,8 13:14,
20,22 15:7 17:17 26:6,7 31:9 32:
14 34:15 36:5,10 37:1 38:13,22
41:17 42:10
investigations 7:8 8:15,25 9:7 10:
3 11:15 12:18,21 13:10 28:25 31:
21 37:13
investigator 20:5
involved 13:25 14:10,14,17 15:6,9
14:1 30:17 36:11
involvement 16:13 18:2
involving 31:23
isn't 18:12 30:23 31:6,13 32:1 33:
25 41:24
issued 41:11
itself 32:3

**J**

January 12:16,19 13:2,4,4,5
job 4:16,19 8:19 9:3 11:20 12:25
27:13

**K**

K-O-E-N-I-G 37:10
keep 35:9,17,21,25 36:1,2,7
Kelley 3:4 4:1 5:17 10:16 12:9 15:
1 17:18 18:6 20:7,12 24:6 25:21
26:18 27:19 35:10 36:17 37:20 38:
14 39:4 40:8,17 42:16 43:6,13,16,
19,23
kept 10:11
kind 9:22 16:4 35:17
kinds 9:1
knew 23:20 31:5 43:12
know 5:3,7,9,12 6:15,16,20 7:2,
15,23 8:13,15,22 10:10,13 12:12
16:20 19:2 21:7,9,15,24 22:1,4,8,
10 23:16,20 31:22 36:18 39:20 41:
7 43:18
knowledge 11:18 27:13 28:21 31:
16 32:22 34:13
known 19:19
Koenig 37:6,7,9,11

**L**

labeled 17:16
large 7:7
Larson 5:4,6,20,24 9:24 10:20 16:
21 17:13 18:12,13,18
Larson's 6:3 15:11 18:16,22 30:
11
last 13:8,12,18 15:18 25:16
later 34:4
Law 2:10,18 26:10,13 41:12,14,15,
17 43:9
laws 39:5
lawyers 43:8
lead 33:10
leads 27:15
least 28:16
leave 7:21 8:18
led 42:22
left 8:15
legal 9:20,20 20:8
length 5:12
Less 5:8
let 10:15 17:15 20:16 39:13
Let's 9:4 29:22 41:2
letter 17:20,22,24 18:14,16,16,21,
23 28:18,19 29:23 30:3,6,11 32:3,
9,19 33:21,24 34:2,6,10,16,18 36:
23,25 38:5,5,9,11,18
letters 21:14 33:18 38:3
life 31:22
like 6:20 28:23 43:8
likely 21:19
Linda 5:16
LISA 2:7 44:3
listed 31:1
little 38:17
location 8:9,13
long 5:6 21:16
look 14:18 16:3 18:17 25:15 28:4
36:8 39:9

looked 15:16,18
looking 41:3
loss 30:10
lot 9:1,11 41:8

**M**

made 23:16 29:19 35:4,14 36:16
39:20 40:19
Madison 2:11 7:23 44:8,20
mail 14:7
maintain 10:22 36:12
maintained 35:15
maintains 8:11 10:2
major 4:25
make 10:17 14:19 27:12,23 28:23
35:18 40:14
making 25:25
malignant 22:2
management 4:21 9:10 11:21
manager 4:16,17,18,20 11:20 12:
18,21 13:3,6,10,22 28:25
manual 26:22 27:4,6,10
many 7:7 12:7 36:3,4 37:12,13 39:
20 40:15
March 12:16 13:2 17:21 34:3
marked 3:5
master's 9:8 11:11,13
material 9:25 10:2,8 28:16 33:9
materials 10:5,9,14,19,24
matter 2:2 30:19,21 31:8 34:8 38:
21 39:2
may 6:18,19,19,21 12:24 14:15
21:1 28:20 29:3,4,5 36:20,20 42:
24 43:2
McNEES 2:18
mean 5:17 6:1 14:19 16:1 38:16
mechanism 13:23,24
media 22:5
medical 18:23,24 19:2,11 20:3 21:
5,21 22:15,16,16 24:23,25 25:1,2,
3,12 30:12,13,15 34:22
meet 41:21
meeting 27:20
melanocytic 22:8
melanoma 22:4,20
Melli 2:9 44:7
memo 41:4
memory 16:2
memos 17:6
mentioned 11:11,17 26:22
message 14:3
MICHAEL 2:1 3:7 4:10 44:17
Middle 2:6
Mike 15:2 20:15
mind 9:23 16:11 25:20 29:4
minutes 28:3
mole 21:8 22:19
month 34:4 36:24
monthly 40:15
more 11:21 12:12 34:14 38:9 40:
1,3
mortgage 14:25 15:7 19:1 24:22
30:7,15
most 23:12 24:19
mostly 23:12
Mrs 17:24 29:24 30:1 33:11 34:9,
14,14,18 38:3,10
Ms 30:7
Mutual 2:4 4:14,15 7:8,21,22,24 9:
14 10:2,8,22 11:4 12:1 21:23 23:
19 27:2 29:1 37:2,16,25 38:21,25
41:6
Mutual's 39:1
myself 7:9,11

**N**

name 4:9
Nancy 2:3
nationwide 35:17 40:16
nature 30:18
necessarily 25:25 26:5,16,20 27:7
32:18 36:19
need 15:9 27:1,14
needed 42:25
negative 36:4
nevus 21:24 22:1,20 43:15
next 16:16 29:22
nodded 7:1
nodding 6:25
None 17:9
Notary 2:8 44:3
note 10:17 43:6

Page 2

MICHAEL STEL - 11/01/01 / HALL V. CUNA...TUAL

noted 5:10
notes 17:6
Nothing 16:11 18:11 44:19
notice 2:7 44:17
November 2:12 44:6,21
now 14:22 15:21 16:1 19:18 20:17 25:7 28:5 30:22 43:8 44:15
number 14:1,7 36:3 40:24
NURICK 2:18

## O

o'clock 2:13
oath 3:10
Object 12:9 15:1 20:7 25:21 26:18 36:20 38:14 39:4
objection 20:14 37:20 39:12 40:8 43:7,14,17,20
Objections 36:16
obligation 41:21
obligations 41:12
obtain 23:4
obtained 18:23 25:5 30:12
occur 6:9 42:12,18 43:3
occurred 42:11,14,17,24 43:2,3
occurring 42:12,18 43:3
October 13:17
office 14:13 15:5 17:21,24 18:1 23:24 27:9 28:18,19 29:12,17 30:2 31:10,14,17 32:10,17 33:15 34:21 35:9,12,15 36:24 38:13,20 39:3 40:10
officer 12:1
offices 35:19 37:18 39:17,23
often 6:7 31:22 36:8
Oftentimes 29:10
oh 17:18
Okay 16:14 17:19 30:6 37:23 40:13 41:2
on-the-job 9:9,17
one 13:18 18:18 23:22 24:13 25:11,14 33:19 34:4 35:23 36:24 38:5 40:5 41:3,24,25
only 14:18 15:16 29:18 37:3
onto 13:21
opinion 26:3,3
order 26:25 27:1
other 5:1 6:14 7:13 11:2 16:3 21:22 22:5 29:18 35:7,13,21 43:22
others 19:17
out 14:16 23:17,22 24:9 27:14 29:11 40:16,21
outline 12:24
over 9:2 12:14,17 13:8
own 6:18 11:9 22:6 26:3

## P

p.m 43:25
Page 3:2
paid 25:6 32:12
paragraph 41:4
paraphrase 30:5
part 5:2 23:13 24:9,9 25:19 36:13,19
particular 14:6
past 14:12
past 5:5
pathology 21:8 22:13 43:12
Pease 2:10 44:7
PEDERSEN 2:15 3:3 4:5,8 5:18 10:18 18:9 24:8 36:14,22 37:22 40:13 42:19 43:21
pending 2:5 44:16
Pennsylvania 2:6,16,19 17:22 22:25 23:3,24 26:1,10,12 27:14 28:13 29:12 30:19 31:9 32:20 33:4 35:8, 14,21 38:19,24 40:21 41:6,10,12, 14,17 43:1,9
people 7:7 31:21
per 6:12 39:21
period 7:11,12 10:15,19 12:14
person 7:13 31:18 44:11
personnel 8:8
persons 41:18
place 31:21 32:14
plaintiff 2:3,4 44:9
Please 4:9 30:21
point 13:3 15:13,14
policies 10:22,25 11:4 39:15,19, 21
policy 14:25,25 15:8 39:14
portion 9:3 11:19
position 6:3 9:14,17 12:2,4 15:11

positions 9:10
positive 36:4,9
potential 30:2 31:23 35:7 38:11
Potentially 15:12 20:18,20
practice 14:23 15:5
practices 39:1,15
premiums 32:11
preparation 21:11
present 13:6
presented 21:18 25:13
president 37:8
pretty 38:16
prevention 4:24
previously 39:9
prior 13:17
probably 40:24 41:8
procedures 10:22,25 39:18
process 5:23 6:1 30:16
produced 28:5 32:24
producing 36:16
Professional 2:8 44:23
prompted 16:21 42:25
prosecuted 36:10
prosecution 41:17
protect 41:18
protection 15:7 24:22 30:8 39:21
provide 5:22 6:6 24:3 25:9 30:23
provided 10:6,9 17:15 18:19 20: 25 24:14 27:21 32:5 33:2
provides 27:6 41:18
provision 26:15
Public 2:8 44:3
purpose 22:17,18,18
pursuant 2:7 44:17
pursue 37:1
pursuing 34:7,19
put 36:17
puts 10:4

## Q

qualified 11:14 12:2 22:13,15
qualifies 9:6
question 6:21 7:2 25:3,10,14,22, 23 26:19,20 27:13 30:4 39:5,13 40:9 43:11
questioned 38:1
questions 20:1 24:23 25:11 27:24 30:20 43:22,24

## R

range 40:5
reaching 21:19
read 4:3 24:7,18 30:3,5 43:8
really 16:3 40:7
reason 11:7 15:16 32:9
reasonable 42:3,6,10,14,16
reasons 8:22
recall 14:13 15:13 16:2,3,5,10, 15 17:10 19:6,18 21:3,15,20 23:21 25:15 26:9 27:4,5 29:20,23 38:2
receive 6:18,19 21:17 33:17 36:21
received 9:17,19 14:21 16:19 32: 25 33:18 34:2 36:23 41:9
receiving 15:14
recognize 5:4 6:3
recognizing 6:17 11:22
recollect 15:16
recollection 15:14,22,25 16:16,18 19:10
record 4:2,9 24:16 36:1,18 43:7 44:14
records 20:3 22:16,23 23:18 25: 12 29:20 34:22 35:1,6,9,13,15,17, 21 36:2
reduced 44:13
Reed 37:6,7,11
refer 18:16 26:25 27:1 35:11 39:2 40:24 42:25
reference 26:14,21 27:4,6,10 33:9
referenced 28:9
referral 16:19 17:13 21:17 23:13 24:15,17 25:25 26:23 31:12 33:22 38:4
referrals 35:14,18 36:3 39:16,20, 22,23 40:6
referred 14:2 15:10 27:3 28:21 30:8 31:8,11 32:24
referring 21:10 38:21,24,25
refers 18:11
refreshed 16:1
regarding 4:23 17:17,18 23:14,15 30:20

Registered 2:8 44:23
regulations 4:25 23:15 26:24
related 9:18 39:19
relates 22:1 24:10 27:23
relative 44:19
released 41:20
remember 16:8
remind 41:11
removal 21:8
removed 22:19
report 11:5 20:13 21:8 22:13 23:8 26:15 33:7 37:5,6,11,12 40:22 43: 12
reported 11:21 35:7 37:17
Reporter 2:8 44:11,23
reporting 10:23 27:7 41:13,15,19, 21 43:10
request 36:20 40:14,19 44:9
requested 24:25
requesting 36:15
require 23:1 36:11 39:14
required 6:11,14 12:4 26:1,10 30: 18 32:19 33:12
requirement 33:7
requirements 5:23 6:2 32:21 38: 19 39:7
requires 26:15 40:22 41:14 43:9
rescinded 25:6
respect 5:15 8:24 9:23 10:3,21,23 14:9 16:8 19:23 22:10 24:3 27:6 39:16
respond 40:18,18
responses 40:16
responsible 4:21 9:6
result 15:17 20:3 33:14 36:5
reveal 19:9
revealed 19:7,10
review 14:6 16:18,22,25 17:3 19: 6,9 21:12,18 22:13,15 26:7 30:9 42:22
reviewed 16:24 17:4,7 19:4 20:22 21:13,16 22:23 23:19 25:16 26:2 28:15,20
reviewing 15:21 16:7 17:10 36:11
revise 41:11
Right 13:1 14:22 19:18 20:16 28:5 31:6,10 33:4,12 40:6,7 42:19
role 16:23
roster 8:8,11,12
routine 15:5
routing 14:5
Ruhly 2:10 44:7

## S

S-T-E-L 4:11
said 20:24 44:8,13,14,17,20
same 8:1,2 35:17 42:1
sat 5:21 34:14
Say 10:16 11:2 14:21,22 19:22 23: 20 26:21 29:8 31:22 39:18,25 43:2 32:4 42:8 43:2,5,7,8
says 24:20,21 27:10 28:22 31:14
second 34:2
section 27:8 28:13 29:2 30:19 31: 9,15 32:20 33:8,12 38:4 39:3
sections 24:12,13 37:17
see 14:19 16:4 20:16
seeking 41:20
seminars 9:18,19 13:8
send 29:23 34:9,18,21 35:22 36:9 38:6,6,11
sending 28:19 29:16
sent 23:23 29:11,14 32:9 34:24 35:23 36:24 38:3,9,12 41:7,8
sentence 18:21
September 13:18
series 17:20 27:24
sessions 5:22 6:6,7,9,10,11 9:25
set 40:25
shorthand 44:10
show 8:13 17:15 40:20
showing 25:18
side 16:22
sign 4:3
significance 22:10
signs 22:4
similar 39:7,8
simply 39:13
simultaneously 12:20
since 33:1
sincere 30:9
sit 16:1 19:6 21:3,7 25:7
SIU 4:16,17 13:6

slowly 38:9
some 6:8 10:9 11:18 12:20 14:20 15:13,14,22 16:4 18:19,24 23:6,14 26:23 28:5,24 30:13 35:13
someone 6:2,21 7:12 15:10,11
something 6:20 26:15 27:7,20 36: 9
Sometimes 10:1
somewhere 5:10
sooner 28:2
sorry 5:19 7:1 15:3 17:19 18:6,10 35:20 38:8,23 42:1
sort 9:13 23:6
source 28:6
speak 38:9
speaks 32:3
Special 4:18,19 7:7 8:15,25 9:6 11:8 14:11,19 20:12,12 17,20 13:10,14, 20,22 28:25
specific 6:20 20:16 21:6,23 22:15 26:14 31:25 36:20 39:18
specifically 5:3 8:17,23 13:24 14: 9 16:6 17:11 21:4,15 24:10 28:20
spell 7:15,19 37:9
staff 4:23 5:15,22 6:6,22,23,24 7: 3,5 9:23
standard 29:6,9 35:11 38:5,10,20, 24,25 39:2
standards 39:1
start 9:4
starting 33:1
State 2:9,11 4:9 23:3,9,10,13 24: 11 26:1,23 28:10 39:10 41:6 42:8 44:1,4,8
stated 32:21
States 2:5 18:22 35:22 39:6,14 41:10 42:8
stating 43:15
statistically 35:25 36:8 37:11 40: 11
statistics 35:9
statutes 26:24 39:8
statutory 41:21
STEL 2:1 3:7 4:10,13 27:21 28:6 44:17
step 14:18 22:22
STEPHEN 2:15
steps 11:5 14:17 15:22 16:4,25
Steve 4:1 10:17 18:6 28:4
still 7:22 8:1
stipulations 4:2
Street 2:10 44:7
submit 26:11
submitted 17:25 29:2,7
submitting 29:6
substance 33:24 34:6
Substantively 33:24
such 5:24 9:24 10:20 35:22 40:22 42:13
sufficient 42:21,23
summary 24:14,17,20
supervise 6:22,23
supervised 5:11
supervising 5:2
supervisor 11:15 12:3
supervisory 11:22
sure 12:11 18:9 24:8 26:12 36:22 39:25 40:4,7
surviving 34:9
suspect 42:23
suspected 10:23 27:17 29:3,4 35: 10 41:13,15,22 43:10
suspicion 27:16 29:4 35:19 42:6
suspicions 37:12
sworn 3:9 44:18
system 14:5

## T

tabs 28:10
take 8:19 11:5 12:17 14:1,3,17 18: 7 28:3,4 31:21 32:14
taken 2:2 15:22 40:21 44:5,9,10, 16
takes 14:7
telephone 14:5
tell 14:23 15:4 24:16,19 30:1 34:6 35:6 36:2,7 42:1
telling 36:25 43:4
terminology 22:16
terms 19:8 20:17 21:6,17
testified 3:9 39:8
testify 44:18
testimony 27:3 44:14

Page 3



**Thank** 13:7 30:21 33:21
**That's** 4:5,11 11:9 24:19 27:17 28:4,12 29:9 32:6,8,22,23 33:11,23,24 35:11 42:24 43:24
**There's** 8:12 15:9 18:11 27:16 41:4 42:3
**thereafter** 44:12
**thing** 9:13 16:8,10,15,16 29:18 37:3
**things** 9:22 16:22 18:19 22:5 28:17
**think** 8:2,5 9:3 11:18 23:12 27:10 29:18 40:2
**thinking** 19:15
**Those** 4:25 6:11,13 12:25 19:14 22:10 24:12 28:16 32:21 35:15 36:12,16 41:24
**though** 43:4
**three** 5:8 13:8
**three-ring** 11:3 23:6 28:8,10,13, 16 32:23 33:3 40:21
**time** 5:13 7:10,11,12 10:14,19 12:14 15:18 17:3 18:25 19:2,12 20:10 21:13,16 23:16 24:24 25:16 28:17 29:1 30:14 31:5 36:15 37:24 38:1, 6 40:15
**times** 12:5,7 35:7 37:12,13
**title** 4:16 26:12,14
**today** 19:6 21:3,7 25:7 27:4
**together** 10:4
**told** 33:11
**took** 16:5 22:23
**top** 29:14 31:11
**totality** 18:2
**towards** 11:21
**track** 16:12
**train** 6:24 7:3 13:9
**trained** 5:4 6:3 10:20
**training** 4:23 5:2,3,11,16,21,25 6:5,7,9,14,16,18 8:24 9:1,5,10,17,19, 20,23 10:6,7,10,14,19,24 11:22 13:9 21:21,22 32:25
**treating** 23:18
**true** 44:14
**truth** 44:18,19,19
**truthful** 32:1
**truthfully** 25:9
**try** 15:4
**trying** 16:12
**twice** 6:9
**two** 6:9,10,11,12 13:12 31:1 33:18
**two-hour** 6:10
**type** 38:5
**typed** 24:1
**types** 13:7
**typewriter** 24:1
**typewriting** 44:13
**typical** 38:17
**Typically** 6:8 14:2,20,24 15:6,9 32:23

## U

**under** 3:10 5:10 17:16 34:15 38:25 39:20 41:12
**understand** 26:25
**understanding** 18:2 19:19,23 20:6,10
**undertake** 12:8 16:25
**underwriting** 30:16
**unit** 4:18,20 8:16 9:7 10:4 11:15, 20 12:3,18,21 13:10,14,22 28:25
**United** 2:5
**Units** 13:14,20
**until** 28:2
**up** 37:25 43:7
**upon** 15:4,5 22:17 28:24 31:21 39:10 44:9
**us** 24:16 35:6 36:2,7 39:14 42:1
**use** 26:23
**used** 11:4 35:11 44:15
**using** 22:16
**usual** 4:2

## V

**various** 9:10,18 12:5 35:18
**vary** 38:16
**verbal** 11:2 44:9
**versus** 11:22 22:20 43:4
**vice** 37:8
**VIII** 24:13

## W

**Wait** 40:8
**Walker** 2:9 44:7
**WALLACE** 2:18
**want** 9:4 10:13 18:1 24:6,18 27:12,25 28:3 33:2
**wanted** 14:16
**warrants** 29:6
**way** 10:12 37:16
**We'll** 9:4 36:15 40:14,17
**well** 7:12 9:1,8 10:4 12:4 16:3,18 18:21 20:12 24:11 27:10 29:22 32:3 36:17 42:8,22
**What's** 8:24 13:23 16:15 17:15 20:5 22:22 26:14 33:19 34:2 38:20 39:2
**whatever** 39:14
**wherein** 2:3
**whether** 5:3 7:23 12:12 17:1 21:7 22:18 23:16,17 26:8 27:11 31:16, 20 34:14,15 39:11
**whole** 44:19
**whom** 32:16
**widow** 34:9
**will** 10:13 26:21 31:17
**Wisconsin** 2:9,12 13:13 44:1,4,20
**within** 4:22 8:20 11:9 13:23 17:12 28:12 33:6 37:2 38:20
**Without** 26:14 35:4
**witness** 2:2 3:8 6:25
**wondering** 34:15
**work** 8:1 21:22
**working** 5:6 8:6
**works** 14:20
**wouldn't** 19:22
**written** 9:25 10:2,5,9
**wrote** 21:13

## Y

**year** 6:9,12 13:17 34:14 39:21
**yearly** 40:16
**years** 5:8 9:2 13:9
**Yesterday** 15:20 21:11 27:20
**yourself** 7:10 22:6 26:16

*19*

Revised 10/1/96

**Send To:**

**INSURANCE FRAUD SECTION**
**OFFICE OF THE ATTORNEY GENERAL**

Commonwealth of Pennsylvania
16th Floor, Strawberry Square
Harrisburg, PA 17120
ATTN: Referral Form
(717) 787-3391

**FOR OAG USE ONLY.    DATE STAMP.**

541- _____

Region Assigned: _____

## (PLEASE TYPE or PRINT LEGIBLY)
**IF REFERRAL IS FROM AN INSURANCE COMPANY, PLEASE SEE IT IS COMPLETED BY THE SIU.**

I. **Referring Agency or Private Citizen Information:** (Name, address, and fax number).

CUNA Mutual Group
PO Box 391
5910 Mineral Point Road
Madison, WI  53701
Contact Person:            Michael Stel          Telephone: __800 356-2644 Ext. 7168__

II. **Subject Information:** (Include name, alias, address, phone number, DOB, and SSN.)

Mr. Tommy B. Hall II
517 Mt. Pleasant Rd.
Fayetteville, PA  17222
(717) 352-5959

SS Number: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
Date of Death:  11/06/99

DOB-05/12/1955

If additional subjects are involved, please include in Part VIII.

III. **Please indicate COUNTIES and/or STATES where:**

Incident Occurred _____    Claim Received _____

Claim Mailed From _____    Payment Made From _____

IV. **Alleged Fraud Involves:**
- ☐ Auto
- ☐ Bodily
- ☐ Employee
- ☐ Property
- ☐ Workers' Comp.
- ☐ Atty., Health Care Prov., Medical Professional
- ☐ Business Struct.
- ☐ Agent/Adjuster
- ☐ Personal Property
- ☑ Employer
- ☑ Other _____

V. **Claim Information:**

Insurance Company:CUNA Mutual Group    Policy Number:037-1485-6 ____
☐ 1st Party Claim    OR    ☐ 3rd Party Claim
Claim No.: _____    Value of Policy: ___$56,000____
Date of Loss:_____    Date Claim Filed:_____

☐ Paid    Amount Paid _____    ☐ Pending    ☑ Denied    ☐ Other covergae Rescinded

If additional companies are involved, please note in Part VIII.

D0007

VI.    **Vehicle Information:**

Make _____ Color _____ Model _____

Year _____ VIN # _____ State & License # _____

Title # _____

If additional vehicles are involved, please note in Part VIII.

VII.   **What investigative information is available?** (For SIUs, NICB, and law enforcement only.)

❑ Recorded Statement          ❑ Written Statement          ❑ EUO
❑ IME or Peer Review          ❑ Expert's Report            ❑ Video
❑ 35mm                        ❑ Surveillance Reports       ❑ Police Reports
❑ Criminal History Check      ❑ NICB Hit                   ❑ PILR Hit
❑ Index Bureau Hit            ❑ SIU Reports                xx ❑ Other Medical documents

VIII.  **Please provide a summary of the material false statement(s), written and /or oral, and facts of this allegation.  PLEASE DO NOT SEND OR ATTACH ANY ITEMS FROM PART VII OR ATTACH ADDITIONAL SHEETS TO SUMMARIZE THIS INCIDENT.**

Mr. Hall applied for Home Mortgage Protection insurance on 11/18/99.  The application contains medical history questions.  At the time Mr. Hall's claim was filed following his death, additional medical information was requested.  The additional medical information confirmed Mr. Hall had not disclosed all of his medical history and did not answer a medical history question on the application correctly.

Based on the additional information obtained, Mr. Hall's insurance was rescinded and no benefits were paid.

D0008

*SIU Investigations*
*Fraud Review*
*563 82 5959 Hall, Tommy*
*20*

Michael E. Stel
SIU Manager
Special Investigation Unit
Phone:   800 356 2644 Ext. 7168
Fax:      608/238-0830

## ℞. CUNA MUTUAL GROUP

February 22, 2000

Ms. Nancy Hall
517 Mt. Pleasant Rd.
Fayetteville, PA  17222

Member: Tommy B. Hall II
Contract No.: 037-1485-6

Dear Ms. Hall:

Mr. Hall's Home Mortgage Protection Insurance claim was referred to me for review.  You have my sincere condolences on your loss.

As Brenda Larson's February 10, 2000 letter explained, medical information obtained confirms that Mr. Hall did not disclose some medical information at the time he completed the application for Home Mortgage Insurance.  Accurate completion of medical history is important to the underwriting process involved with an insurance application.

Due to the nature of this, we are required to inform the Pennsylvania Insurance Fraud Section of this matter.

If you have any questions or concerns regarding this letter, please contact me directly.  Thank you.

Sincerely,

*M Stel*

Michael E. Stel
SIU Manager
Special Investigation Unit

cc: Patriot Federal Credit Union



CLEANVER 21

563 82 5959 11/04/1999

**COMMONWEALTH OF PENNSYLVANIA**
**OFFICE OF ATTORNEY GENERAL**

February 29, 2000

MIKE FISHER
ATTORNEY GENERAL

Insurance Fraud Section
1600 Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-0272
Facsimile: (717) 705-0741

Michael Stel
CUNA Mutual Group
P.O. Box 391
Madison, WI 53701

Re:    **Insurance Fraud Referral** - Tommy Hall, II - 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

Dear Mr. Stel:

Thank you for your insurance fraud referral. Your referral has been processed at our Headquarters Section in Harrisburg. It will be sent to the appropriate regional office for investigation and review.

We will keep you informed regarding the results of that review. In the meantime, if you have any questions, please feel free to contact me at (717) 787-0272.

We do appreciate your efforts and cooperation in assisting us to fight insurance fraud in Pennsylvania.

Sincerely,

R. Kirby Conrad
Senior Supervisory Special Agent

RKC:kab
Ref.#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H
Claim #

D0010

563 82 5959 11/04/1999  SFu



**COMMONWEALTH OF PENNSYLVANIA**
**OFFICE OF ATTORNEY GENERAL**

March 29, 2000

**MIKE FISHER**
**ATTORNEY GENERAL**

Bureau of Criminal Investigations
Insurance Fraud Section
1600 Strawberry Square
Harrisburg, PA  17120
(717) 787-0272

Michael Stel
CUNA Mutual Group
P.O. Box 391
Madison, WI 53701

Re:   **Tommy B. Hall, II - #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**

Dear Mr. Stel:

After a review of this referral, our investigation of the available facts and information indicate that we cannot initiate a criminal investigation at this time. However, should new information develop that is material to these allegations, we would appreciate it if you would advise us so we could revisit the matter with you.

We do appreciate your initiative and assistance in helping us to fight insurance fraud in Pennsylvania.  If you have any questions, please feel free to contact me at (717) 787-0272.

Sincerely,

R. Kirby Conrad
Senior Supervisory Special Agent

RKC:kab
File #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
Claim #

D0011

# JOHN S. GENCAVAGE

EXAMINER OF QUESTIONED DOCUMENTS

140  HUNTER LANE, XXXXXXXX XXX XX
HARRISBURG, PA 17112
(717) 469-0497

DIPLOMATE:
AMERICAN BOARD OF FORENSIC DOCUMENT EXAMINERS
FELLOW:
AMERICAN ACADEMY OF FORENSIC SCIENCES
MEMBER:
AMERICAN SOCIETY OF QUESTIONED DOCUMENT EXAMINERS

May 28, 2002

Michael R. Kelley, Esquire
McNees, Wallace & Nurick LLC
Attorneys At Law
P.O. Box 1166
100 Pine Street
Harrisburg, PA 17108-1166



Re:  Hall, et al v. CUNA MUTUAL

Dear Mr. Kelley:

The following is a report covering my examination of the below
listed exhibits.  The documents were examined at the offices of
John Enders, M.D. and Michael Cashdollar, M.D. 120 North 7th
Street, Chambersburg, PA 17201 and the offices of Ernest Charlesworth,
M.D. 144 South 8th Street, Chambersburg, PA 17201.  The purpose
of this examination was to determine, if possible, whether or not
Tommy B. Hall II wrote the questioned handwriting appearing on
the Q-1 exhibit.

QUESTIONED EXHIBITS:

Q-1.  One (1) Medical History form, dated 4-30-98, in the name of
Tommy Bob Hall II, containing questioned handprinting under MEDICAL
PROBLEMS 1. "CANCEROUS MOLE - REMOVED".

STANDARDS:

The following items were submitted as documents containing known
handprinting of Tommy B. Hall II:

S-1.  One (1) Falling Spring Medical Associates New Patient
Information Record, dated 2-17-99, in the name of Hall II, Tommy B.
(front side).

S-2.  One (1) Falling Spring Medical Associates New Patient
Information Record, dated 2-23-99, in the name of Hall II, Tommy B.
(front side).

S-3.  One (1) Medical History form, dated 4-30-98, in the name of
Tommy Bob Hall II, except the entry under MEDICAL PROBLEMS 1.
"CANCEROUS MOLE - REMOVED" and all entries under DATE and
HOSPITALIZATIONS/SURGERY (front side).

Michael R. Kelley, Esquire
May 28, 2002
Page 2


OPINION:

Upon completion of a detailed examination and comparison of
the handprinting involved in this case, it is the opinion of
this examiner that the writer of the S-1 through S-3 exhibits,
Tommy B. Hall II, wrote the questioned handprinting "Cancerous
Mole - Removed" appearing under MEDICAL PROBLEMS on the Q-1
exhibit.

The questioned and standard writings compare favorably in gross
characteristics, including degree of skill, style, slant,
lateral alignment, writing movement, letter formations, proportions
and other characteristics.  All of these factors indicate that
Tommy B. Hall II wrote the handprinting in question.

If you have any questions, please contact me.

Respectfully submitted,

John S. Gencavage
Forensic Document Examiner


JSG/grg

## PROFESSIONAL QUALIFICATIONS

### JOHN S. GENCAVAGE
140 Hunter Lane
Harrisburg, PA 17112
(717) 469-0497
FAX (717) 469-7572

**OCCUPATION:**

Forensic Document Examiner

**EMPLOYED:**

Private Practice - July 1, 1989

**EDUCATION:**

Bachelor of Science 1977
York College of Pennsylvania
York, PA

Associate of Arts 1975
Harrisburg Area Community College
Harrisburg, PA

Questioned Document Examination Training Course 2/64 - 2/67
Pennsylvania State Police Crime Laboratory, Document Section
Harrisburg, PA

Questioned Document Course 4/64
United States Secret Service
Washington, D.C.

Seminar on Law Enforcement Photography 12/67
Eastman Kodak Company
Rochester, NY

Seminar on Law Enforcement Photography 11/71
Eastman Kodak Company
Harrisburg, PA

Seminar - Survey of Questioned Document Problems 7/75
FBI Academy
Quantico, VA

Signature Seminar 2/88
American Academy of Forensic Sciences Meeting
Philadelphia, PA

Workshop - Identification of Office Copiers 2/88
American Academy of Forensic Sciences Meeting
Philadelphia, PA

Photocopier Workshop 8/89
American Society of Questioned Document Examiners Conference
Arlington, VA

Signature Workshop 8/90
American Society of Questioned Document Examiners Conference
San Jose, CA

Signature Workshop 8/91
American Society of Questioned Document Examiners Conference
Lake Buena Vista, FL

Expert Witness Workshop 8/91
American Society of Questioned Document Examiners Conference
Lake Buena Vista, FL

Deposition Testimony Workshop 8/91
American Society of Questioned Document Examiners Conference
Lake Buena Vista, FL

Canon Fax Workshop 8/91
American Society of Questioned Document Examiners Conference
Lake Buena Vista, FL

Fraudulent Documents Workshop 2/92
American Academy of Forensic Sciences Meeting
New Orleans, LA

Forensic Examination of Counterfeit Documents 8/94
American Society of Questioned Document Examiners Conference
Long Beach, CA

Signature Workshop 8/92
American Society of Questioned Document Examiners Conference
Milwaukee, WI

Video Spectral Examination of Documents Throughout the Spectrum 2/96
American Academy of Forensic Sciences Meeting
Nashville, TN

Difficult Handwriting Problems - Workshop 8/97
American Society of Questioned Document Examiners Conference
Scottsdale, AR

The Examination of Medical Records 5/97
Miami, FL


**WORK EXPERIENCE:**

Pennsylvania State Police Training School 10/57 - 4/58
Hershey, PA  (Enlisted 10/16/57)

Pennsylvania State Police, General Police Duties 1958 –1960
and Equestrian Detail, various locations in the Commonwealth of PA

Pennsylvania State Police Criminal Investigator 1960 - 1964
Harrisburg, PA

Questioned Document Training 1964 – 1967
Photography and other Questioned Document related duties,
Pennsylvania State Police Crime Laboratory, Document Section,
Harrisburg, PA

Forensic Document Examiner and Supervisor 1967 – 1982
Pennsylvania State Police Crime Laboratory, Document Section,
Harrisburg, PA

Assistant Director, Pennsylvania State Police Laboratory 1982 – 1985
Division, Harrisburg, PA

Chief Document Examiner, Pennsylvania State Police 1982 – 1987
Laboratory Division, Document Section (Retired 12/31/87)

Forensic Document Examiner 12/87 – 6/30/89
U. S. Treasury Department, Bureau of Alcohol, Tobacco and Firearms
Forensic Science Laboratory, Rockville, MD

Private Practice – July 1, 1989

**LECTURER - INSTRUCTOR - GUEST SPEAKER:**

From 1966 to date served as a lecturer, instructor and guest speaker
on the topic of Questioned Document Evidence and related subjects on
numerous occasions.  The presentations were adapted to meet the needs
of a wide variety of groups.  The following is a list of some of those
groups:

Pennsylvania State Police Academy and Training Centers 1966 – 1987

Harrisburg Area Community College, Police Science/Administration and
Criminalistics Departments 1975 – 1987

Pennsylvania Game Commission and Northeast Wildlife Association
Conference, Harrisburg, PA (Laboratory Tour and Lecture) 4/76

Pennsylvania Engineering Society, Harrisburg, PA 12/76

York College of Pennsylvania, Specialized Photographic Techniques
Spring 1977

Federal Law Enforcement Agents including Military Police and
Investigators, Meeting, New Cumberland Army Depot 1978

Dickinson School of Law, Law Students (Laboratory Tour and Lecture)
1979 – 1987

Shippensburg University, Criminalistics and Criminal Justice students (Laboratory Tour and Lecture) 1979 - 1987

Pennsylvania State University, State College , PA, Seminar, Pennsylvania Association of Arson Investigators, June 1985

National Council of Higher Education Loan Programs, Fraud Conference, San Diego, CA, January 1986

Exchange Club of Harrisburg, PA July 1986

Interviewed as a Guest on Public Television show "Taking Note" Host Lynn Hinds, State College, PA, broadcast 1986

Pennsylvania Higher Education Assistance Agency "Workshop on Detection and Prevention of Fraud, Errors and Abuse in the Government Student Loan Program" Philadelphia, PA, January 1987

CONRAIL CORPORATION white Collar Crime Investigators/Auditors Conference Philadelphia, PA, March 1987

The Institute of Internal Auditors Fraud Conference on Control, Deterrence and Investigation, Atlanta, GA September 1987

The Institute of Internal Auditors Fraud Conference on Control, Deterrence and Investigation, Chicago, IL September 1989

Pennsylvania Association of Private Investigators, September 2001

Lehigh County Pennsylvania Bar Association, February 2002

Assisted in training eleven Forensic Document Examiners for the Pennsylvania State Police and other Agencies between 1966 and 1982

During the Spring of 1970, assisted in training two Malaysian Police Officials, Acting Commissioner Ding Hong Kee and Superintendant Ahmad Bin Haji Abdul, in cooperation with a program sponsored by the U.S. Department of State, Agency for International Development, Washington, D.C.

As Chief Document Examiner, 1982 - 1987, responsible for all Forensic Document related training including the training of three new examiners for the Pennsylvania State Police

Instructor, Federal Law Enforcement Training Center, Glynco, GA

## CONSULTANT:

As Chief Document Examiner, served as a consultant to the various agencies of the Commonwealth of Pennsylvania, concerning safety features and other specifications for various official documents.

Assisted the Attorney General's office and Department of Transportation in setting up a program to detect altered odometer readings and Fraud in Motor vehicle Transaction Documents for the prupose of prosecution and consumer protection.

## PUBLICATIONS AND PROFESSIONAL PAPERS:

"Facsimile Signatures Produced By Gelatin Transfer Duplicator-Recognition And Identification"  Journal of Forensic Sciences

"Recognition And Identification Of Multiple Authorship" Journal of Forensic Sciences

"Water Soluble Paper As Evidence" Journal of Forensic Document Examination

"Examination Of Torn And Cut Paper" Journal of Forensic Document Examination

"Detecting And Identifying Forged Signatures" Director's Memorandum, Bureau of Alcohol, Tobacco and Firearms, Department of the Treasury

"The Document Section" Pennsylvania State Police Laboratory Manual

"Questioned Document Evidence" a handout prepared for distribution to Special Agents of the Bureau of Alcohol, Tobacco and Firearms

## CERTIFICATIONS:

Diplomate, American Board of Forensic Document Examiners, Certified 8/81, Recertified 8/85, 8/90, 8/95, 8/00.

Certified Instructor and Lecturer, Pennsylvania State and Municipal Police Officers Training Commission, March 26, 1976 – Certificate #MPI 663, cancelled 2000.

## PROFESSIONAL AFFILIATIONS:

Fellow – American Academy of Forensic Sciences
      1988 Questioned Document Section Program Chairman
      Questioned Document Section Secretary 1993 – 1994
      Questioned Document Section Chairman  1995 – 1996

Member – American Society of Questioned Document Examiners

Life Member – International Association for Identification

Member – Northeastern Association of Forensic Sciences

**COURT TESTIMONY:**

Federal, State and Local Courts, Hearing Boards and Commissions.
Qualified as a Forensic Document Examiner and testified as an expert
concerning a wide variety of questioned document problems in the
majority of the County Courts of Record in the Commonwealth of
Pennsylvania since 1967.  Testified in Commonwealth Court, State
Civil Service Commission Hearings, Philadelphia Police Department
Disciplinary Board, Investigative Grand Juries and Federal District
Courts: Charlotte, NC, Philadelphia and Harrisburg, PA, Wichita, KS,
Alexandria, VA, Rochester, NY, Arbitration Board Hearing, Stamford, CT,
Superior Court, Monmouth County, NJ and Chenango County, NY.



# Madison Freelance Reporters, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

NANCY HALL, individually and as the
Representative and Administratrix of
the Estate of Tommy Hall, deceased,
her husband,

        Plaintiff,

    v.                  Law No. 1:01-CV-1265

CUNA MUTUAL GROUP, CUNA MUTUAL
INSURANCE SOCIETY,

        Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF RICHARD FISCHER

Thursday, March 14th, 2002

1:20 p.m.

Reported by:  Becky J. Gantt, RPR



131 W. Wilson St. • Suite 1000 • Madison, Wisconsin 53703

Phone: (608) 255-8100    Fax: (608) 255-4096

www.madisonfreelance.com

1  A    I do not, no.

2  Q    Have you at any point reviewed the deposition

3       transcript of Dr. Hurley, the doctor who removed the

4       mole?

5  A    Not to my knowledge.

6  Q    Have you ever reviewed the hospital surgical records

7       where the mole was removed?

8  A    Not to my knowledge.

9  Q    Have you ever read Mr. Hall's deposition transcripts,

10      two depositions taken before he died?

11 A    No, I have not.

12 Q    Have you ever seen Mr. Hall's video deposition taken

13      before he died in which he discusses his knowledge of

14      cancer after the application?

15 A    No, I have not.

16 Q    Are you personally playing any role in the continuing

17      process of Mrs. Hall's request for reconsideration of

18      the rescission?

19          MR. KELLEY:  Objection.  I think that

20          relates to the objection that I made earlier,

21          and I'll instruct the witness not to respond to

22          that.

23          MR. PEDERSEN:  And my same response is

24          repeated here by reference.

25 By Mr. Pedersen:

                                                        69

1  Q    Are you aware that as a CUNA representative and vice

2       president that --

3          MR. KELLEY:  Assistant vice president.

4  By Mr. Pedersen:

5  Q    I'm sorry.  Assistant vice president, that deposition

6       transcripts have been provided to CUNA Mutual where

7       Dr. Hurley testified there was no cancer in '93?

8  A    I'm not aware of that.

9  Q    Are you aware of the deposition transcripts from the

10      pathologists who reviewed the '93 slides stating

11      those were noncancerous findings?

12 A    I am not.

13 Q    Are you even aware of the video deposition transcript

14      of Mr. Hall taken before he died where he said he

15      didn't know about cancer until February of '99?

16 A    No.

17 Q    Are you aware of the depositions of at least four

18      doctors that have been taken more recently in which

19      the doctors describe their understanding of

20      Mr. Hall's medical condition?

21 A    I'm aware of those.

22 Q    Are you aware that at least three of those four

23      doctors, the only three who were questioned about

24      this issue, testified that it would be an abuse of

25      their records to imply or infer that Mr. Hall knew he

                                                        70

1       had cancer before the application?

2          MR. KELLEY:  Objection.  As I've

3          stated in the previous deposition, or maybe it

4          was one or maybe it was two depositions in which

5          that question was asked, I believe that is a

6          mischaracterization of the totality of the

7          physicians' testimony in those cases and I

8          believe it's argumentative and the witness is

9          instructed not to respond to that.

10          MR. PEDERSEN:  It wasn't an attempt to

11          categorize their entire testimony but certainly

12          to abstract from that testimony the conclusion

13          they reached that it would be an abuse of their

14          records to imply or infer that Mr. Hall knew he

15          had cancer prior to the application.  And I

16          understand there's an instruction not to answer.

17 By Mr. Pedersen:

18 Q    Are you aware that CUNA Mutual through its discovery

19      process has not found a single pathology report prior

20      to the application that evidences cancer?

21          MR. KELLEY:  Objection.  Discovery

22          process is not concluded.

23 By Mr. Pedersen:

24 Q    Are you aware up to this point that that's the case?

25          MR. KELLEY:  You can answer.

                                                        71

1  A    I'm not aware of that.

2  By Mr. Pedersen:

3  Q    Are you aware that CUNA Mutual has not discovered up

4       to this point a single document which shows in the

5       medical record contemporaneous with the event a

6       treatment for cancer prior to the application?

7  A    Can you state that again?

8  Q    Sure.  Are you aware that CUNA Mutual through its

9       discovery up to this point has not located a single

10      document which shows contemporaneous with the

11      treatment any treatment for cancer before the

12      application?

13          MR. KELLEY:  Objection.  You can

14          answer.

15 A    I am not aware of that.

16 By Mr. Pedersen:

17 Q    Are you aware that when the treating doctors were

18      deposed that they provided an explanation for the

19      entries in their record that after a lump was found

20      on the neck they began to associate the '93 mole with

21      that lump and that's why it's in their records

22      subsequent to the application?

23          MR. KELLEY:  Objection.  That is a

24          misstatement of the testimony of the physicians

25          that have been deposed.  This witness was not

                                                        72

1  present at those depositions and asking this
2  witness if he's aware of the mischaracterization
3  of your testimony is an improper question.
4  There's no possible way he can respond to that.
5  By Mr. Pedersen:
6  Q  Would you agree that CUNA Mutual up until today, the
7     day of your deposition, is continuing to refuse to
8     pay any benefits to the Halls under their policy?
9         MR. KELLEY:  Object to the form of the
10        question.  CUNA Mutual is investigating the
11        claim.  Go ahead.  You can answer it.
12 A  Could you state it again?
13 By Mr. Pedersen:
14 Q  Sure.  Are you aware that CUNA Mutual up to today,
15    the present day, has refused to pay a single benefit
16    or dollar under the Hall CUNA Mutual insurance
17    policy?
18 A  Yes.
19 Q  Are you aware that Mrs. Hall lost her home as a
20    result of CUNA Mutual's refusal to pay?
21 A  No.
22 Q  Are you aware that Mrs. Hall is a live-in maid
23    following the loss of her home?
24 A  No.
25        MR. KELLEY:  Just -- I'm sorry.  I

73

1  know it's one question past but just interpose
2  an objection to the form in the question before
3  the last one about Mrs. Hall losing her home as
4  a result of CUNA Mutual's refusal to pay the
5  claim.  I object to the form of that.  Sorry.
6  By Mr. Pedersen:
7  Q  Are you aware that CUNA Mutual reported Mr. Hall
8     after he died for criminal prosecution to the
9     Attorney General's Office in Pennsylvania?
10        MR. KELLEY:  Object to the form.
11        Assumes facts that are not accurate.  Go ahead.
12        You can answer.
13 A  I'm aware.
14 By Mr. Pedersen:
15 Q  Are you aware that CUNA Mutual wrote a letter to Mrs.
16    Hall telling her of the criminal referral?
17 A  I'm not aware of that.
18 Q  Are you aware that CUNA Mutual received a letter
19    within 30 days from the Attorney General's Office
20    that they were not going to investigate the claim?
21 A  Yes.
22 Q  And are you aware that no one at CUNA Mutual ever
23    conveyed that information to Mrs. Hall?
24 A  No.
25 Q  Are you aware that in addition to sending a letter to

74

1  Mrs. Hall that CUNA Mutual sent a letter to her
2  credit union where she banked concerning the criminal
3  referral?
4  A  No.
5  Q  And are you aware that CUNA Mutual never wrote to
6     that credit union clearing up that the matter was not
7     being investigated?
8  A  No.
9  Q  Do you know of any reason or justification why CUNA
10    Mutual today hasn't paid Mrs. Hall?
11        MR. KELLEY:  I object to the question.
12        The witness is instructed not to answer that.
13        That's clearly an improper question.
14        MR. PEDERSEN:  Again, this is a
15        corporate designee who's been brought here, and
16        I am entitled to ask someone at CUNA Mutual why
17        they're not paying Mrs. Hall.
18        MR. KELLEY:  The question is improper
19        and it requires information that would involve
20        attorney-client privilege, work product
21        privilege.  The question involves legal analysis
22        which the deponent is not qualified to provide,
23        and the question is improper and I instruct the
24        witness not to respond to that.
25        MR. PEDERSEN:  And just to place it on

75

1  the record, I don't believe that an insurance
2  company can hide behind their attorney when they
3  have a duty to pay a claim, to pay it promptly
4  and timely, to thoroughly and properly
5  investigate a claim and as new information comes
6  to light reconsider their decisions and pay a
7  claim.  They cannot simply hide behind their
8  attorney and refuse to consider the claim and
9  the damage being done to their own insured.
10        MR. KELLEY:  I object to the
11        characterizations by opposing counsel.
12 By Mr. Pedersen:
13 Q  Who is your direct supervisor at CUNA Mutual?
14 A  Dan Meylink.
15 Q  What is Dan Meylink's position?
16 A  He's a vice president of the organization.
17 Q  How do you spell Meylink?
18 A  M-e-y-l-i-n-k.
19 Q  Is Dan Meylink participating in the decision not to
20    pay benefits?
21        MR. KELLEY:  Objection.  Don't answer
22        that.
23 By Mr. Pedersen:
24 Q  Could you describe for me the organizational
25    structure of CUNA Mutual beginning with, my

76

1    understanding is CUNA Mutual Group?
2 A    CUNA Mutual Group is a marketing name.  It's not a
3    legal entity.
4 Q    Are you aware whether or not CUNA Mutual Group
5    reports statistics to various reporting agencies and
6    entities?
7         MR. KELLEY:  Object to the form.  You
8         can answer it.
9 A    The CUNA Mutual Group does not.
10 By Mr. Pedersen:
11 Q    It doesn't?  I'm sorry.  They don't provide
12    statistics, statistical information to reporting
13    agencies?
14 A    No.  CUNA Mutual Insurance Society would.
15 Q    They don't provide information to Standard & Poors?
16         MR. KELLEY:  I'm sorry.  You said
17         they.
18 By Mr. Pedersen:
19 Q    CUNA Mutual Group doesn't provide information to
20    Standard & Poors on their statistics?
21         MR. KELLEY:  Object to the form of the
22         question.  Go ahead.  You can answer if you
23         know.
24 A    I don't know under what company label they report to
25    Best.

77

1 By Mr. Pedersen:
2 Q    That's A.N. Best?
3 A    Yes.
4 Q    That's different than the Standard & Poors; isn't it.
5 A    I'm sorry.  I thought you said Best.
6         MR. KELLEY:  No.  His question was
7         Standard & Poors.
8 A    My answer would be the same for Standard & Poors.
9 By Mr. Pedersen:
10 Q    For Standard & Poors or Best, you're not aware of
11    CUNA Mutual Group's reporting?
12 A    Yes.
13         MR. KELLEY:  Well -- okay.  Go ahead.
14 By Mr. Pedersen:
15 Q    Can you describe for me from CUNA Mutual Group down
16    the organizational chart or structure of CUNA Mutual
17    Group?
18         MR. KELLEY:  Object to the form.  Go
19         ahead.  You can answer.
20 A    The people --
21 By Mr. Pedersen:
22 Q    Not the names of the individuals, the names of the
23    organizations.
24 A    I cannot.
25 Q    You work for CUNA Mutual Insurance Society?

78

1 A    Yes.
2 Q    What is -- is there a parent entity or organization
3    for CUNA Mutual Insurance Society?
4         MR. KELLEY:  Objection.  Calls for a
5         legal conclusion.  You can answer it if you
6         know.
7 A    I don't know.
8 By Mr. Pedersen:
9 Q    Do you know whether or not there are subsidiary
10    organizations to CUNA Mutual Insurance Society?
11         MR. KELLEY:  Objection.  Calls for a
12         legal analysis.  You can answer it if you know.
13 A    I don't know.
14 By Mr. Pedersen:
15 Q    Do you know whether or not there are affiliated
16    entities with CUNA Mutual Insurance Society?
17         MR. KELLEY:  Same objection.  You can
18         answer.
19 A    I don't know.
20 By Mr. Pedersen:
21 Q    What is the relationship between CUNA Mutual
22    Insurance Society and CUNA Mutual Life Insurance
23    Company?
24 A    I don't know under which corporate legal names those
25    two are related.

79

1 Q    Are you able to -- I'm sorry.  Maybe you didn't
2    finish.
3 A    No.
4 Q    Are you able to draw for us the organizational chart
5    of CUNA Mutual Insurance Society?
6 A    No.
7 Q    I don't believe I asked it.  I'm sure defense counsel
8    will correct me if I have.  How long have you worked
9    at CUNA Mutual Insurance Society?
10         MR. KELLEY:  You have not.
11 A    13 years.
12 By Mr. Pedersen:
13 Q    When did you first start with CUNA Mutual Insurance
14    Society?
15 A    In 1989.
16 Q    In what capacity did you start working there?
17 A    I was an actuarial student.
18 Q    Where were you a student?
19 A    It's a position within CUNA Mutual Group.
20 Q    Oh.  I see.  You were as -- you weren't a student
21    somewhere else and then were an actuary in training
22    at CUNA Mutual?
23         MR. KELLEY:  Object to the form.
24 By Mr. Pedersen:
25 Q    Let me just go on with another question.

80

1 A    Okay.

2 Q    What were your duties as an actuarial student at CUNA

3    Mutual in 1989?

4 A    Just centered around pricing of credit disability and

5    credit life insurance.

6 Q    When did your job duties change at CUNA Mutual?

7 A    I was in that category for about six years.

8 Q    And then what position did you get?

9 A    I led a product development unit.

10 Q    Which product development unit?

11 A    Related to credit insurance products.

12 Q    When did this product home, members home mortgage

13    protection come into being?

14 A    Around 1988.

15 Q    I notice it has a No. 2 by it.  What's the difference

16    between the No. 1 and the No. 2?

17 A    The No. 2 made a distinction in their rating between

18    people who used tobacco and people who did not.

19 Q    After you worked in the credit life, could you just

20    describe for us your work history after that with

21    CUNA Mutual?

22 A    I worked six, six to seven years in the pricing role,

23    about three years in that product development role

24    related to credit insurance, again, a little over a

25    year in a staff underwriting role.

81

1 Q    Was the staff underwriting specifically on the home

2    mortgage protection plans?

3 A    Not specifically.

4 Q    More general under credit life and that was a

5    subdivision or subcategory?

6 A    Yes.

7 Q    And then what did you do?

8 A    A little over a year as a product manager for the

9    credit insurance lines.

10 Q    Including members home mortgage protection?

11 A    Yes.

12 Q    And then?

13 A    About six months, the remainder in product leadership

14    role.

15 Q    And is that where you are today or --

16 A    Yes.

17 Q    When did you become the assistant vice president at

18    CUNA Mutual?

19 A    When I took on the product manager's role.

20 Q    And how many years ago was that?

21 A    About a year and a half.

22 Q    What was the last educational level that you

23    attained?

24 A    I graduated college.

25 Q    Which college?

82

1 A    St. Norbert College.

2 Q    I'm sorry.  How do you spell Norbert?

3 A    N-o-r-b-e-r-t.

4 Q    Where is that?

5 A    De Pere, Wisconsin.

6 Q    It's in Wisconsin.  Okay.  And you got a B.S. degree?

7 A    B.A.

8 Q    B.A.  In what field?

9 A    Mathematics.

10 Q    Have you had any other training after that, formal

11    education after that?

12        MR. KELLEY:  Just so we're clear, are

13    you talking about any other formal, you know,

14    college or master's degree, that kind of thing

15    as opposed to insurance training --

16        MR. PEDERSEN:  Yes.

17        MR. KELLEY:  -- with CUNA and that

18    kind of thing?

19        MR. PEDERSEN:  Yes.

20 A    No.

21 By Mr. Pedersen:

22 Q    Within CUNA have you had any medical training?

23 A    No.

24 Q    Do you have any medical background at all?

25 A    No.

83

1 Q    Do you know how many times CUNA Mutual has been sued

2    in the last five years?

3        MR. KELLEY:  Objection.

4 A    No.

5        MR. KELLEY:  Okay.

6        MR. PEDERSEN:  That makes it easier if

7    you don't know.

8        MR. KELLEY:  Fine.

9 By Mr. Pedersen:

10 Q    Who would know that?

11        MR. KELLEY:  Just -- I'm sorry.  Just

12    so you're aware, when I object wait until I

13    instruct you to answer before you answer.

14 By Mr. Pedersen:

15 Q    Who would know that within CUNA Mutual?

16 A    Fay Patzner.

17 Q    And what's her name?

18 A    The head of legal.

19 Q    And what's her name?

20 A    Fay Patzner.

21 Q    The last name I can't --

22 A    Patzner.

23 Q    How do you spell Patzner?

24 A    I don't know.

25        MR. RICHARDSON:  P-a-t-z-n-e-r.

84

HALL v. CUNA ●     3-14-02     ● RICHARD FISCHER

1        MR. PEDERSEN:  Apart from the
2 reservation to recall Mr. Fischer or a different
3 corporate designee to answer the questions that
4 we've lined up previously, I don't have any
5 further questions today for Mr. Fischer.
6        MR. KELLEY:  Okay.  Thank you.
7           (3:40 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

           85

1 STATE OF WISCONSIN )
                   )  ss.
2 COUNTY OF DANE     )
3
4       I, BECKY J. GANTT, Registered Professional
5 Reporter and Notary Public in and for the State of
6 Wisconsin, do hereby certify that the foregoing is a
7 true record of the deposition of RICHARD FISCHER, who was
8 first duly sworn by me; having been taken on the 14th day
9 of March, 2002, at Davis & Kuelthau, 10 East Doty Street,
10 in the City of Madison, County of Dane, and State of
11 Wisconsin, in my presence, and reduced to writing in
12 accordance with my stenographic notes made at said time
13 and place.
14       I further certify that I am not a relative
15 or employee or attorney or counsel for any of the
16 parties, or a relative or employee of such attorney
17 or counsel, or financially interested in said action.
18       In witness whereof, I have hereunto set my hand
19 and affixed my seal of office this 20th day of March,
20 2002.
21
22
              Notary Public, State of Wisconsin
23               My commission Expires 2/16/03
24
25

          86

EXHIBIT

## HMP Life

| STATUTORY AMOUNTS | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|
| Direct Earned Premium (Written + Chg in UPR) | 2,722,278.05 | 2,968,665.87 | 3,154,484.88 | 3,215,318.93 |
| Claims Paid | 977,856.79 | 790,773.30 | 909,351.89 | 1,031,744.42 |
| Claim Reserve (without LAE) | 37,194.00 | 39,749.00 | 93,505.00 | 113,926.00 |
| Policy Reserve | 3,192,949.00 | 3,554,841.00 | 4,084,760.00 | 4,523,957.00 |
| Credit Union Reimbursement (Mort total split by prem) | 393,965.94 | 429,707.06 | 447,894.57 | 436,079.93 |
| Experience Refund | | | | |
| Oper. Exp. excl. CU Reimb. & Gov. (Mort total split by prem) | 744,985.56 | 751,172.22 | 1,081,944.05 | 760,929.97 |
| Policies in Force @ 12/31 | 1,233 | 1,303 | 1,331 | 1,311 |
| Certificates in Force @ 12/31 | 9,472 | 9,764 | 9,877 | 9,601 |
| Number of Claims Paid | 34 | 28 | 35 | 34 |
| Number of Claims Denied | 0 | 0 | 3 | 1 |
| Certificates Rescinded | 0 | 0 | 2 | 1 |

## HMECL

| | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|
| Direct Earned Premium (Written + Chg in UPR) | 143,446,684.04 | 153,050,386.48 | 167,736,696.69 | 173,565,991.88 |
| Claims Paid | 88,688,060.59 | 96,322,370.75 | 96,667,001.10 | 100,442,252.13 |
| Claim Reserve (without LAE) | 13,254,000.00 | 12,114,000.00 | 16,281,000.00 | 14,514,000.00 |
| Policy Reserve | | | | |
| Credit Union Reimbursement | 22,960,789.00 | 25,127,336.00 | 29,203,901.00 | 30,257,305.00 |
| Incurred Experience Refund | 4,526,128.00 | 5,726,378.00 | 6,917,827.00 | 10,904,152.00 |
| Operating Expenses excl. CU Reimb. & Gov. | 25,235,115.86 | 26,837,094.29 | 22,258,914.64 | 16,491,090.87 |
| Policies in Force @ 12/31 | 5,587 | 5,759 | 5,726 | 5,578 |
| Certificates in Force @ 12/31 | 3,014,334 | 3,065,182 | 3,102,139 | 3,082,514 |
| Number of Claims Paid | 12,988 | 13,057 | 12,834 | 12,570 |
| Number claims Denied | 670 | 816 | 871 | 935 |
| Certificates Rescinded* | ? | ? | ? | ? |

* CUNA data systems are not designed to track rescisions and thus the information is not available. HMP rescisions were obtained by conducting a manual search. A manual search would not be practical for CL.



EXHIBIT
Fischer
4

pard + new
- otel

| | STATUTORY AMOUNTS | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|
| IMP Life | Direct Earned Premium (Written + Chg in UPR) | 2,722,278.05 | 2,968,665.87 | 3,154,484.88 | 3,215,318.93 |
| | Claims Paid | 977,856.79 | 790,773.30 | 909,351.89 | 1,031,744.42 |
| | Claim Reserve (without LAE) | 37,194.00 | 39,749.00 | 93,505.00 | 113,926.00 |
| | Policy Reserve | 3,192,949.00 | 3,554,841.00 | 4,084,760.00 | 4,523,957.00 |
| | Credit Union Reimbursement (Mort total split by prem) | 393,965.94 | 429,707.06 | 447,894.57 | 436,079.93 |
| | Experience Refund | - | - | - | - |
| | Oper. Exp. excl. CU Reimb. & Gov. (Mort total split by prem) | 744,985.56 | 751,172.22 | 1,081,944.05 | 760,929.97 |
| | | | | | |
| | Policies in Force @ 12/31 | 1,233 | 1,303 | 1,331 | 1,311 |
| | Certificates in Force @ 12/31 | 9,472 | 9,764 | 9,877 | 9,601 |
| | Number of Claims Paid | 34 | 28 | 35 | 34 |
| | Number of Claims Denied | 0 | 0 | 3 | 1 |
| | Certificates Rescinded | 0 | 0 | 2 | 1 |

*Profit Calc*   (191 806.77)   (623 566.29)   131 619.38   526 746.61

| | | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|
| ECL | Direct Earned Premium (Written + Chg in UPR) | 143,446,684.04 | 153,050,386.48 | 167,736,696.69 | 173,565,991.88 |
| | Claims Paid | 88,688,060.59 | 96,322,370.75 | 96,667,001.10 | 100,442,252.13 |
| | Claim Reserve (without LAE) | 13,254,000.00 | 12,114,000.00 | 16,281,000.00 | 14,514,000.00 |
| | Policy Reserve | - | - | - | - |
| | Credit Union Reimbursement | 22,960,789.00 | 25,127,336.00 | 29,203,901.00 | 30,257,305.00 |
| | Incurred Experience Refund | 4,526,128.00 | 5,726,378.00 | 6,917,827.00 | 10,904,152.00 |
| | Operating Expenses excl. CU Reimb. & Gov. | 25,235,115.86 | 26,837,094.29 | 22,258,914.64 | 16,491,090.87 |
| | | | | | |
| | Policies in Force @ 12/31 | 5,587 | 5,759 | 5,726 | 5,578 |
| | Certificates in Force @ 12/31 | 3,014,334 | 3,065,182 | 3,102,139 | 3,082,514 |
| | Number of Claims Paid | 12,988 | 13,057 | 12,834 | 12,570 |
| | Number claims Denied | 670 | 816 | 871 | 935 |
| | Certificates Rescinded* | ? | ? | ? | ? |

1,714,590.59   177,207.44   ?522 052.95   17 238 151.66

\* CUNA data systems are not designed to track rescissions
and thus the information is not available. HMP rescissions
were obtained by conducting a manual search. A manual
search would not be practical for CL.

IMP
Incurred Claims
An Policy Re

955 656.79    7 763 328.30    9 63 107.89    10 52 105.42
436 446.00    341 962    529 919    439 197

95 510 01.9 65

## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Nancy Hall, individually and as the Representative and Administratrix of the Estate of Tommy Hall, deceased, her husband, Plaintiff | : : : : : | CIVIL ACTION - LAW |
| v. | : : | 1:01-CV-1265 |
| Cuna Mutual Group, Cuna Mutual Insurance Society, Defendants | : : : | Judge Sylvia H. Rambo |

### DECLARATION

I, Richard A. Fischer, hereby make the following declaration pursuant to 28 U.S.C. § 1746 (relating to unsworn declarations under penalty of perjury).

1. I am currently employed by CUNA Mutual Insurance Society as a Product Manager, Member Choice Payment Protection. In that capacity, I have the authority to make this Declaration on behalf of CUNA Mutual Insurance Society.

2. The term "CUNA Mutual Group" is a trademark, which is used in connection with CUNA Mutual Insurance Society and its subsidiaries.

3. "CUNA Mutual Group" is not a corporation, and it is not a recognized legal entity of any sort or variety.

I declare under penalty of perjury that the foregoing is true and correct.

CUNA Mutual Insurance Society

By _Rich Fischer_

Richard A. Fischer,
Product Manager, Member Choice
Payment Protection.

Executed: March 13, 2002

# Madison Freelance Reporters, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

NANCY HALL, individually and as the
Representative and Administratrix of
the Estate of Tommy Hall, deceased,
her husband,

        Plaintiff,

    v.                     Law No. 1:01-CV-1265

CUNA MUTUAL GROUP, CUNA MUTUAL
INSURANCE SOCIETY,

        Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * * *


DEPOSITION OF PAUL LAWIN

Thursday, March 28th, 2002

1:20 p.m.

Reported by:  Becky J. Gantt, RPR



131 W. Wilson St. • Suite 1000 • Madison, Wisconsin 53703

Phone: (608) 255-8100    Fax: (608) 255-4096
www.madisonfreelance.com

4

```
 1                      PAUL LAWIN,
 2            having been first duly sworn on oath,
 3            was examined and testified as follows:
 4
 5                      EXAMINATION
 6   By Mr. Pedersen:
 7   Q    Good afternoon, Mr. Lawin, we were just introduced.
 8        I'm Steve Pedersen, and I represent Mrs. Hall and the
 9        estate of her deceased husband in an action that's
10        been brought against CUNA Mutual.  Are you aware of
11        any of the facts of what the lawsuit is about?
12   A    I talked to Mike and --
13   Q    Now, what I'll exclude is any conversations that
14        you've had with Mr. Kelly --
15   A    Okay.  No.
16   Q    -- and only just ask you if as you sit here today you
17        have some awareness of what the lawsuit is about?
18   A    I think so.
19   Q    And what's your understanding of what it's about?
20   A    My understanding -- let's see, her husband bought a
21        policy.  We would call it an HMP, home mortgage
22        protection policy, I think '98.  He died in '99,
23        cause of death was cancer.  We did some investigation
24        on that because there was a question apparently on
25        the application -- I've never seen the application of
```

5

1    that policy.  There was a question on the application

2    about cancer, and it said no history of cancer.

3         They got some medical records, found some

4    records that said contrarywise.  They denied the

5    claim.  After that, as I understand it, there was

6    some dealing with the doctor that maybe medical

7    records weren't accurate that they were relying on.

8    That's about the extent of what I know.  I don't know

9    where it goes beyond there.

10   Q    And do you understand that you're here today not as a

11        factual witness for the investigative or claim

12        process itself but rather as a corporate designee?

13   A    Okay.  Corporate designee doesn't mean anything to

14        me.

15   Q    Let me try to help with it.

16             MR. KELLEY:  Let me interject.  We

17        have identified Mr. Lawin as a corporate

18        designee to talk about profits and losses with

19        regard to the individual life product through

20        CUNA Mutual Insurance Society.

21   By Mr. Pedersen:

22   Q    Okay.  With that representation from counsel, what is

23        your position at CUNA Mutual as it relates to profits

24        and losses of individual life products?

25   A    I'm an actuary.  I'm involved in product management

6

1    or what we call generically product management.  That

2    would mean I would design and price products, watch

3    experience as it plays out.  Where we have options,

4    change things, change dividends, for example, on a

5    dividend paid policy would be a typical thing we

6    would do.  That's a pretty good description right

7    there, I think.

8  Q  What are the products that you as an actuary are

9    responsible for or lines of business?

10 A  Over time I've worked on a variety of products.

11    They're all individual life annuity and health

12    business products.  Traditional permanent life

13    insurance, term insurance, individual fixed

14    annuities, many years ago disability income, recently

15    I'm working on long-term care insurance.

16 Q  Have you played any role with respect to the home

17    mortgage protection plan?

18 A  No.

19 Q  What are your current job duties at CUNA Mutual?

20 A  Made up of two parts really.  One would say that I

21    would be involved in exactly the kind of product

22    management I was talking about there.  Specifically

23    for life and health insurance products I would say

24    recently I've been working on a long-term care

25    insurance policy that we're developing.  A year ago I

7

1      worked on term insurance policy.

2             Those products are sold primarily

3      through our face-to-face distribution system, and so

4      they're actually sold through CUNA Mutual Life

5      Insurance Company, not through CMIS.  I've been

6      working with the people who work on the CMIS direct

7      response products, but I don't feel I have a

8      substantial decision-making role there.  I'm kind of

9      an advisory and consulting and discussion role of

10     those products.

11  Q    Who employs you?

12  A    CUNA Mutual Life Insurance Company.

13  Q    Do you know the relationship between CUNA Mutual Life

14      Insurance Company and CUNA Mutual Insurance Society?

15  A    I think I understand the relationship.

16  Q    What is the relationship?

17  A    Well, it's an interesting one.  There's a permanent

18      affiliation which means they're two mutual companies

19      that still have separate, in my mind, ownership

20      groups who are the policyowners of those two

21      companies but they have interlocking boards of

22      directors to the extent I think same members.

23            MR. KELLEY:  Paul, wait a second.  I

24        don't want you to speculate.  Tell what you

25        know.

8

1  A    They have same members of boards of directors.  I'm

2       not sure what the, what the numbers fall into today.

3       And essentially within the building we manage the

4       companies as if they were one.

5  By Mr. Pedersen:

6  Q    What about CUNA Mutual Group?  How does that relate

7       to CUNA Mutual Insurance Society or CUNA Mutual Life

8       Insurance?

9  A    CUNA Mutual Group to me is a generic marketing name.

10      I wouldn't go beyond it.

11 Q    Are you aware of any formal structural link between

12      CUNA Mutual Group and either CMIS or CMLIC?

13                 MR. KELLEY:  Object to the form.  You

14           can answer it.

15                 THE WITNESS:  Pardon me?

16                 MR. KELLEY:  I interposed an objection

17           to the form of his question, but you can answer

18           it.

19 A    I think I just said it.  I think the relationships

20      between CMIS and CML is that director and management

21      thing I referred to earlier.

22 By Mr. Pedersen:

23 Q    Do you know whether or not CUNA Mutual Insurance

24      Society files its own annual statements?

25 A    I'm not sure of the question.

9

1   Q   Do you play any role or are you aware of annual

2       statements that are filed by insurance companies with

3       various --

4   A   I'm aware of annual statements.  I have worked on

5       annual statements.

6   Q   Are you aware that CUNA Mutual Insurance Society

7       files annual statements in virtually all of the 50

8       states?

9   A   Yes.

10   Q   And does CUNA Mutual Life Insurance Company also file

11       annual statements?

12   A   Yep.

13   Q   Does CUNA Mutual Group prepare annual statements?

14   A   Again, I'm -- I would be speculating there.  I don't

15       view CUNA Mutual Group as an insurance company.

16   Q   Have you ever seen or heard of the CUNA Mutual Group

17       annual report?

18   A   Something that would be mailed to policyowners, a

19       glossy book?

20   Q   I don't have the glossy version.  I have some black

21       and whites.  But let me show you four documents that

22       are labeled CUNA Mutual Group Annual Report and they

23       correspond with years 1997, '98, '99, and 2000.  Have

24       you seen those before?

25   A   I can't tell you for sure if I have.  I'm a

10

| | | |
|---|---|---|
| 1 | | policyowner of CUNA Mutual Life Insurance Company and |
| 2 | | as such I get a, a glossy thing.  But I'm not sure |
| 3 | | that it was these.  I can't say that I have seen |
| 4 | | these before. |
| 5 | Q | Do they appear to be annual reports for CUNA Mutual |
| 6 | | Insurance Group? |
| 7 | A | The face says CUNA Mutual Group 2000 Annual Report, |
| 8 | | so that's what I know. |
| 9 | Q | Okay.  Is there financial data in these documents |
| 10 | | with respect to assets, operating revenues, and |
| 11 | | income? |
| 12 | A | Are you talking about this page back here? |
| 13 | Q | Yeah.  The financial statement. |
| 14 | A | Yep.  I can see that page. |
| 15 | Q | Does that appear to be a financial statement for |
| 16 | | mutual, CUNA Mutual Group? |
| 17 | A | That's the way it's labeled. |
| 18 | Q | Can you tell us as an actuary -- |
| 19 | A | Uh-huh. |
| 20 | Q | -- and let's start with, with the 2000 and we'll work |
| 21 | | backwards -- |
| 22 | A | Okay. |
| 23 | Q | -- 2000 report. |
| 24 | A | You're on this page? |
| 25 | Q | Yes.  Can you tell me what were the total assets |

# LIFE INSURANCE ANALYSTS, INC.

**Hall v CUNA Mutual Group and CUNA Mutual Insurance Society**
**(referred to collectively as CUNA Mutual)**
June 21, 2002

**Expert Witness Report Prepared by:**  Life Insurance Analysts, Inc.
Richard A. Schwartz, FSA, MAAA, CLU

Overview:  In my review of the Hall v. CUNA Mutual case, I reviewed the materials described below to prepare this report.  Every opinion stated herein is held to a reasonable degree of certainty with respect to the insurance arena and is based upon my knowledge and experience in the areas of life insurance company overall and financial management, product development and pricing, actuarial valuation and underwriting.

It is clear that as part of this review CUNA Mutual breached their insurance contract with Patriot Federal Credit Union for the benefit of Tommy Bob Hall and that their actions were not only unreasonable, but a clear and blatant attempt to deny Mrs. Nancy Hall the benefits that she was fully entitled to receive.  Further, the consequences of their actions should have been expected by them based on the facts that were then ascertainable by CUNA Mutual had they done their homework and reviewed the available data when they initially underwrote the insurance application.

In addition, the actions of CUNA Mutual's SIU group, in referring the claim to the fraud unit of the Pennsylvania Office of the Attorney General without any apparent prior investigation, created a hostile and threatening environment to Mrs. Nancy Hall.  The apparent purpose was to embarrass her and dissuade her from seeking counsel to defend her contractual right to the proceeds under the rescinded policy.  Further when the Office of the Pennsylvania Attorney General declined to proceed with the fraud investigation, CUNA Mutual failed to inform Mrs. Hall that such investigation had been dropped.   Clearly when taken together these actions appear to be an attempt to intimidate Mrs. Hall and to discourage her from following through on her claim.

Other areas where CUNA Mutual went beyond what would have been reasonably expected by a prudent insurer were: Allowing the initial claim adjudication process to be handled by someone without sufficient training.  In fact only minimal training was provided to Brenda Larson.  This case was the first claim she handled.  Further CUNA Mutual failed to provide her with adequate supervision. Additionally, during the claims investigation process CUNA Mutual had clear evidence that the first knowledge by Tommy Bob Hall of the malignant melanoma was after the policy was approved for issue.  As such, given their less stringent underwriting rules for the HMP line of business, which did not encompass any subsequent medical questions when the

Richard A. Schwartz, CLU, FSA
85 Silver Fox Drive, Greenwood Village, CO 80121
303-740-0961      fax: 303-740-7192      dick@LifeInsuranceAnalysts.com




certificate was issued to the credit union (in large measure because the certificate was issued to the credit union and not delivered to the insured), CUNA Mutual clearly attempted to apply more stringent post claim underwriting than was apparently required in this line of business.

**Preparations for Report and Data Reviewed:**

1.    Read depositions of:  Dr. Thomas Ansfield, Dr. George Baker, Dr. Michael Cashdollar, Dr. Ernest Charlesworth, Dr. James Chicklo, Richard Fischer (both 3/14/02 and 3/28/02), Nancy Hall (both 1/10/01 and 3/19/02), Tommy Bob Hall (both written and video), Brenda Larson, Paul Lawin, Brenda Lutz and Michael Stel

2.    Viewed video deposition of Tommy Bob Hall dated October 18, 1999

3.    Reviewed relevant information provided by CUNA Mutual

**Major Report Topics:**

1.    **Underwriting measurement processes for credit life were significantly less stringent than for their individual life insurance policies:**  This is evidenced in the assumed or expected pricing mortality rates between the two lines of business.  Expected death claims over these two policy types' first twenty years, based on CUNA Mutual's own mortality tables, show that the present value of expected death claims under HMP policies for all insureds issue age 42, are **147%** of those expected under individually underwritten insurance policies.

Why is this important?  For individual insurance when the insurance policy is delivered, the applicant is usually asked whether there has been any change in his/her medical condition since the policy was applied for.  If this process had been applied under the home mortgage protection (HMP) insurance policy, the answer to whether there had been any changes in health after the certificate was applied for would have been YES.  The policy would therefore not have been issued without significantly more inquiry on CUNA Mutual's part.  However, for home mortgage protection insurance, these more stringent individual life insurance underwriting processes were not used.  They were not used because the insurance company priced for and expected a significantly higher level of claims (47% higher) under HMP policies due to their less stringent underwriting requirements.  The Tommy Bob Hall case was one which clearly passed through this intentionally less stringent filter.

However CUNA Mutual appears to want the benefit of the more stringent underwriting requirements, even though it priced reflective of significantly less stringent underwriting processes.  Further as can be seen from the charts A and B, the expected death claims under HMP policies are over 210% of those expected under individual life policies in the first two years the policies are inforce.  This is the policy period in which Mr. Hall died.



What CUNA Mutual is in effect saying with respect to the Hall claim is that they priced for and expected significantly more death claims, especially in the policies' early durations, and now they want to avoid their contractual responsibilities. They want to find reasons not to pay the rightful death claims under HMP policies that might have been discovered as part of a more stringent underwriting process analogous to individually underwritten life insurance.

2.   In this same vein, the application form for home mortgage protection insurance asks fewer medical questions and also uses an accept or decline rating methodology. This rating process issues all policies in a single pricing classification. It covers all insureds when such insureds were classified as a standard risk or had an expected extra mortality rating which at most was not greater than 175% of a standard mortality classification. Note however that non-smokers and smokers were charged different rates.

3.   The HMP insurance was not solicited by Tommy Bob Hall. It was just a fact of doing business for Mr. Hall. When he took out a mortgage, he just accepted the related mortgage insurance coverage that went along with it. CUNA Mutual has implied that Mr. Hall lied on his application. Why would someone take $20,000 out of their savings which lowered the amount of HMP insurance on the new mortgage as compared to the previous mortgage? If someone had a medical condition that they wanted to hide, then they clearly would have retained their previous, higher amount mortgage and the correspondingly higher mortgage protection insurance that went along with it.

4.   The Hall claim was not listed as "resisted" in the December 31, 2001 Annual Statement, Schedule F. On page 54 of the 2001 Annual Statement of CUNA Mutual Insurance Society, where all currently resisted claims are shown, the Hall claim was not shown. This leads to the question of what other resisted claims were not shown, and whether there is a pattern of consistent omissions of other resisted claims. For the 1999 Annual Statement, finalized as of February 28, 2000, the Hall claim was correctly <u>not</u> shown as "Resisted" as it was then a rescinded policy.

5.   **<u>Determination of Punitive Damages, if Determined As Applicable By a Jury:</u>**
     A.   Which life insurance company or companies should any punitive damage award be applied against? CUNA Mutual Group is a marketing name. The life companies which are defacto managed by the same executives are CUNA Mutual Insurance Society (CMIS) which issued the certificate of insurance to Mr. Hall and CUNA Mutual Life Insurance Company (CMLIC). On page 8 of Mr. Paul Lawin's deposition, he states that the companies are managed as if they are a single company. Further on page 11, he states that the company is marketing itself as a total entity. Finally, it is very difficult when reviewing the CUNA Mutual Annual Reports to come away with any other conclusion but that it is a single entity, with different operating divisions. As such, any non-direct damage award should be based on the income or surplus (net worth) of the combined entity.

Further supporting a single combined entity approach are that both insurance companies (CMIS and CMLIC) are managed to achieve the same ratings from all the rating services except Weiss' Ratings service: A.M. Best gives both companies an A rating, Standard and Poor's gives both companies an Api rating, Fitch gives both companies a AA rating. Weiss gives CMIS a C+ rating while it gives CMLIC a B+ rating. Further the insurance service Vital Signs which measures insurance companies on a 100 point scale gives both companies a 78 Comdex rating.

B.    **Financial Measures (based on 2001 Annual Statements) that could be used to measure the amount of the punitive damages award:**

(All numbers in thousands of dollars)

| Financial Measure | CMIS | CMLIC | Total | PD % | PD Amount |
|---|---|---|---|---|---|
| Admitted Assets | 2,390,524 | 5,386,351 | 7,776,875 | 1/10 of 1% | 7,777 |
| Total Surplus & AVR | 597,818 | 275,112 | 872,930 | 1% | 8,729 |
| Net Income from Operations | 13,202 | 7,244 | 20,446 | 20% | 4,089 |
| Total Net Income Includes Realized Capital Gains: | 13,413 | 8,914 | 22,327 | 20% | 4,465 |

Note:    PD % is the Punitive Damage percentage which if assessed against the total CMIS and CMLIC amounts would yield the Punitive Damage Amount (PD Amount) found in the last column.

C.    **Comparative Damages:** The combined insurance companies could be assessed a measure of damages in relationship to what Tommy Bob Hall was paying in premiums. Hall was paying $32 per month with after tax dollars. Given that he was making $40,000 per year at the time, that annualized expenditure was equivalent to $533 and represented 1.33% of his gross wages: (384/(1-.28 tax bracket). That percentage of earnings was what Hall was willing to pay annually for this coverage. Based on the HMP smoker mortality rates applicable to Hall's certificate, Hall's life expectancy was far greater than his remaining future working lifetime of 20.5 years. (He was 44.5 at the time of his death.)

The penalty to CUNA Mutual company should be for not less than that same relative magnitude of his earnings, applied to their earnings for his future remaining working lifetime.

Page 4 of  6



D.    **Comparable CUNA Mutual "wages":**

CUNA Mutual's wages, as seen from the above chart, were $22.3 million in 2001. As such applying the 1.33% for 20.5 years yields a comparable damage amount of $5.9 million.

E.    **Risk Based Capital Measure**: The state insurance commissioners and their umbrella organization, the National Association of Insurance Commissioners, have promulgated various standards for the amount of surplus which insurance companies should have based on the particulars of their various assets and liabilities.  In order to not have any operating or reporting restrictions placed on them by the state insurance commissioners, a life insurance company must have Risk Based Capital ratios of 250% or higher.

The combined companies of CMIS and CMLIC have a risk based capital ratio of 296% as of December 31, 2001: 403% for CMLIC and 247% for CMIS.  Their combined surplus and AVR (asset valuation reserve) which is usually considered a part of surplus was $872,930,000 as of 12/31/01.  This means that the combined companies' "free surplus," or surplus not implicitly required to support their policyholder obligations as of that date was $135,658,000.  A percentage of this amount could then be considered as available for a penalty for their disregard of Mrs. Nancy Hall's legitimate claim and still not inhibit their other policyholders' required surplus amounts.  5% of this amount would be 6.8 million dollars.

F.    **Damages Based on Earnings of the CMIS Unit Responsible for the Home Mortgage Protection (HMP) and Member Elect Credit Life (MECL) Lines of Business:**  Based on Rick Fischer's deposition, it is clear that these two lines of business are managed by a single management team. As such should any damages be assessed based on this business unit's results, and not the overall operating entity's results as a whole, then the damages should be based on total results for both these lines of business.  As seen from Chart C, attached, which shows the annual profits for these lines of business for the last four years, the annual and average profits are as follows:

**Annual Profits (CMIS' Credit Union Lines of Business)**
(All numbers in thousands of dollars)

|         | 1998  | 1999 | 2000  | 2001   | Av Last 4 Yrs | Av Last 2 Yrs |
|---------|-------|------|-------|--------|---------------|---------------|
| HMP     | 192   | 633  | 132   | 527    | 371           | 329           |
| MECL    | 1,215 | 177  | 8,522 | 17,238 | 6,788         | 12,880        |
| Total   | 1,406 | 810  | 8,654 | 17,765 | 7,159         | 13,209        |

The average annual profits for this business unit for the last two years was $13.2 million. Therefore should 10% of this unit's profits be assessed as damages for the next five years, and profits are assumed to remain at the average level of the last two years, then such damages would be $6.6 million.

6. **Why punitive damages should be assessed:**

   – CMIS' letter denying claim but CMIS had in their records at the time the claim was denied the 1993 pathology report which clearly stated the mole was not cancerous nor was it a melanoma.

   – CMIS' intimating actions: First by the SIU unit's referral to the Pennsylvania Attorney General without any internal investigation on their own, and second, by not telling Mrs. Nancy Hall that the Attorney General was not going ahead with the any action against her.

   – Brenda Larson being in a position to make a decision without proper training or management: She held the fate of Mrs. Nancy Hall and did not have adequate supervision or training on which to base her decision.

   – The many reports from doctors involved were clear that the 1993 mole was not cancerous nor a melanoma: Yet in spite of these reports, CUNA continued to refuse payment of the Hall claim.

**Summary**:

That CUNA Mutual's continuous denial constitutes unreasonable conduct for a prudent insurance company.

Dr. Charlesworth's name was on the application completed by Tommy Bob Hall. CMIS did not pursue obtaining Tommy Bob Hall's medical records from Dr. Charlesworth at that time. Had they obtained those records, they would have seen their concerns that they subsequently raised when the claim was filed. CMIS had the chance to underwrite the insurance certificate application at that time. They did not.

Further, CMIS priced for an extra level of associated death claims reflective of the less stringent underwriting standard for the HMP line of business. It appears that CMIS and the CUNA Mutual Group now want to have it both ways. This is clearly unreasonable conduct.

*Richard A. Schwartz*

*June 21, 2002*

Page 6 of 6

## Chart A.

## Hall v. CUNA Mutual Group et al:   Expected Death Claims Calculations

### Mortality Comparison Charts

| Duration | 50K - 100K Individual Face Amounts - Age 42: | | | HMP Mortality Rates - Age 42 | | | Ratio: |
| | Indiv Ins Comb NS S 1000 Qx Male | Indiv Ins Comb NS S 1000 Qx Female | Combined M/F 1000 Qx 75/25 | Smoker 1000 Qx | Non-Sm 1000 Qx | Comb 1000 Qx M+F/NS-S .8 NS/.2 SM | HMP/ Individual Coverage |
|---|---|---|---|---|---|---|---|
| 1 | 0.83 | 0.39 | 0.720 | 2.33 | 1.35 | 1.546 | 214.7% |
| 2 | 1.12 | 0.64 | 1.000 | 3.12 | 1.81 | 2.072 | 207.2% |
| 3 | 2.28 | 1.22 | 2.015 | 4.12 | 2.39 | 2.736 | 135.8% |
| 4 | 2.18 | 1.37 | 1.978 | 4.81 | 2.79 | 3.194 | 161.5% |
| 5 | 2.41 | 1.61 | 2.210 | 5.30 | 3.07 | 3.516 | 159.1% |
| 6 | 2.73 | 1.91 | 2.525 | 5.73 | 3.32 | 3.802 | 150.6% |
| 7 | 2.93 | 2.02 | 2.703 | 6.12 | 3.55 | 4.064 | 150.4% |
| 8 | 3.33 | 2.18 | 3.043 | 6.49 | 3.76 | 4.306 | 141.5% |
| 9 | 3.58 | 2.37 | 3.278 | 6.88 | 3.99 | 4.568 | 139.4% |
| 10 | 4.02 | 2.43 | 3.623 | 7.43 | 4.31 | 4.934 | 136.2% |
| 11 | 4.76 | 2.75 | 4.258 | 8.11 | 4.70 | 5.382 | 126.4% |
| 12 | 5.67 | 3.16 | 5.043 | 9.25 | 5.36 | 6.138 | 121.7% |
| 13 | 6.81 | 3.68 | 6.028 | 10.64 | 6.17 | 7.064 | 117.2% |
| 14 | 8.12 | 4.30 | 7.165 | 12.20 | 7.07 | 8.096 | 113.0% |
| 15 | 9.71 | 4.95 | 8.520 | 13.54 | 7.85 | 8.988 | 105.5% |
| 16 | 11.15 | 5.56 | 9.753 | 15.28 | 8.86 | 10.144 | 104.0% |
| 17 | 12.27 | 6.13 | 10.735 | 16.84 | 9.76 | 11.176 | 104.1% |
| 18 | 13.31 | 6.74 | 11.668 | 18.54 | 10.75 | 12.308 | 105.5% |
| 19 | 14.57 | 7.40 | 12.778 | 20.46 | 11.86 | 13.580 | 106.3% |
| 20 | 15.81 | 8.02 | 13.863 | 22.58 | 13.09 | 14.988 | 108.1% |

**Chart B.**

**Comparison of Expected Death Claims Assuming 10% Annual Mortgage Turnover Rate
And HMP Level of Death Claims**

| Duration | Mortgages Inforce BOY | Mortgages Terminated Voluntarily | Mortgages Terminated By Death | Mid Year Face Am't | Annual Expected Death Payments | Discounted Expected Annual Death Payments | Sum: Years 1&2 |
|---|---|---|---|---|---|---|---|
| 1 | 1,000.00 | 100.00 | 1.469 | 55,660 | 81,748 | 81,748 | |
| 2 | 898.53 | 89.85 | 1.769 | 55,040 | 97,348 | 86,917 | 168,665 |
| 3 | 806.91 | 80.69 | 2.097 | 54,380 | 114,052 | 90,922 | |
| 4 | 724.12 | 72.41 | 2.197 | 53,670 | 117,924 | 83,936 | |
| 5 | 649.51 | 64.95 | 2.169 | 52,910 | 114,788 | 72,950 | |
| 6 | 582.39 | 58.24 | 2.104 | 52,090 | 109,573 | 62,175 | |
| 7 | 522.05 | 52.20 | 2.016 | 51,230 | 103,255 | 52,312 | |
| 8 | 467.83 | 46.78 | 1.914 | 50,300 | 96,261 | 43,544 | |
| 9 | 419.13 | 41.91 | 1.819 | 49,300 | 89,670 | 36,216 | |
| 10 | 375.40 | 37.54 | 1.760 | 48,240 | 84,884 | 30,610 | |
| 11 | 336.10 | 33.61 | 1.718 | 47,100 | 80,939 | 26,060 | |
| 12 | 300.77 | 30.08 | 1.754 | 45,880 | 80,466 | 23,132 | |
| 13 | 268.94 | 26.89 | 1.805 | 44,580 | 80,458 | 20,652 | |
| 14 | 240.24 | 24.02 | 1.848 | 43,190 | 79,804 | 18,289 | |
| 15 | 214.37 | 21.44 | 1.830 | 41,700 | 76,328 | 15,618 | Ratio |
| 16 | 191.10 | 19.11 | 1.842 | 40,110 | 73,867 | 13,495 | Top/Bottom |
| 17 | 170.15 | 17.02 | 1.807 | 38,400 | 69,370 | 11,316 | = |
| 18 | 151.33 | 15.13 | 1.769 | 36,580 | 64,726 | 9,427 | **210.7%** |
| 19 | 134.43 | 13.44 | 1.734 | 34,630 | 60,057 | 7,810 | |
| 20 | 119.25 | 11.92 | 1.698 | 32,550 | 55,268 | 6,417 | |

Assumptions:

| | | Cum Exp | |
|---|---|---|---|
| Annual Term Rate | 10.0% | **Death Claims:** | 1,730,787 | 793,546 |
| Annual Discount Rate | 12.0% | | |

**Comparison of Expected Death Claims Assuming 10% Annual Mortgage Turnover Rate
And Individual Life Level of Death Claims**

| Duration | Mortgages Inforce BOY | Mortgages Terminated Voluntarily | Mortgages Terminated By Death | Mid Year Face Am't | Annual Expected Death Payments | Discounted Expected Annual Death Payments | Sum: Years 1&2 |
|---|---|---|---|---|---|---|---|
| 1 | 1,000.00 | 100.00 | 0.684 | 55,660 | 38,071 | 38,071 | |
| 2 | 899.32 | 89.93 | 0.854 | 55,040 | 47,023 | 41,985 | 80,056 |
| 3 | 808.53 | 80.85 | 1.548 | 54,380 | 84,165 | 67,096 | |
| 4 | 726.13 | 72.61 | 1.364 | 53,670 | 73,213 | 52,111 | |
| 5 | 652.15 | 65.22 | 1.369 | 52,910 | 72,444 | 46,039 | |
| 6 | 585.57 | 58.56 | 1.405 | 52,090 | 73,167 | 41,517 | |
| 7 | 525.61 | 52.56 | 1.349 | 51,230 | 69,131 | 35,024 | |
| 8 | 471.70 | 47.17 | 1.363 | 50,300 | 68,578 | 31,021 | |
| 9 | 423.16 | 42.32 | 1.318 | 49,300 | 64,956 | 26,235 | |
| 10 | 379.53 | 37.95 | 1.306 | 48,240 | 63,006 | 22,721 | |
| 11 | 340.27 | 34.03 | 1.376 | 47,100 | 64,822 | 20,871 | |
| 12 | 304.87 | 30.49 | 1.460 | 45,880 | 67,004 | 19,262 | |
| 13 | 272.92 | 27.29 | 1.563 | 44,580 | 69,668 | 17,882 | |
| 14 | 244.07 | 24.41 | 1.661 | 43,190 | 71,751 | 16,444 | |
| 15 | 218.00 | 21.80 | 1.764 | 41,700 | 73,578 | 15,056 | |
| 16 | 194.43 | 19.44 | 1.801 | 40,110 | 72,254 | 13,201 | |
| 17 | 173.19 | 17.32 | 1.766 | 38,400 | 67,823 | 11,063 | |
| 18 | 154.10 | 15.41 | 1.708 | 36,580 | 62,482 | 9,100 | |
| 19 | 136.98 | 13.70 | 1.663 | 34,630 | 57,583 | 7,488 | |
| 20 | 121.62 | 12.16 | 1.602 | 32,550 | 52,136 | 6,053 | |

Assumptions:

| | | | |
|---|---|---|---|
| Annual Term Rate | 10.0% | Cum Exp Death Claims: | 1,312,859 | 538,241 |
| Annual Discount Rate | 12.0% | | |
| | | Ratio Exp Claims HMP/Indiv | 131.8% | **147.4%** |

## Chart C:

## HMP and MECL Profit Calculations

| HMP Life | 1998 | 1999 | 2000 | 2001 | Total 4 Yrs | Average 4 Years | Average Last 2 Years |
|---|---|---|---|---|---|---|---|
| Dir Earned Premiums | 2,722,278 | 2,968,666 | 3,154,485 | 3,215,319 | 12,060,748 | 3,015,187 | 3,184,902 |
| Claims Paid | 977,857 | 790,773 | 909,352 | 1,031,744 | 3,709,726 | 927,432 | 970,548 |
| Incurred Claims | 955,059 | 793,328 | 963,108 | 1,052,165 | 3,763,660 | 940,915 | 1,007,637 |
| Claim Rsv (w/o LAE) | 37,194 | 39,749 | 93,505 | 113,926 | 284,374 | 71,094 | 103,716 |
| Increase in Policy Rsv | 436,406 | 361,892 | 529,919 | 439,197 | 1,767,414 | 441,854 | 484,558 |
| Policy Reserve | 3,192,949 | 3,554,841 | 4,084,760 | 4,523,957 | 15,356,507 | 3,839,127 | 4,304,359 |
| Credit Union Reimb | 393,966 | 429,707 | 447,895 | 436,080 | 1,707,648 | 426,912 | 441,988 |
| Experience Refund | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Operating Expense | 744,986 | 751,172 | 1,081,944 | 760,930 | 3,339,032 | 834,758 | 921,437 |
| | | | | | | | |
| Annual Profits | 191,861 | 632,567 | 131,619 | 526,947 | 1,482,994 | 370,749 | 329,283 |

| MECL Life | 1998 | 1999 | 2000 | 2001 | Total 4 Yrs | Average 4 Years | Average Last 2 Years |
|---|---|---|---|---|---|---|---|
| Dir Earned Premiums | 143,446,684 | 153,050,386 | 167,736,697 | 173,565,992 | 637,799,759 | 159,449,940 | 170,651,345 |
| Claims Paid | 88,688,061 | 96,322,371 | 96,667,001 | 100,442,252 | 382,119,685 | 95,529,921 | 98,554,627 |
| Incurred Claims | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Claim Rsv (w/o LAE) | 13,254,000 | 12,114,000 | 16,281,000 | 14,514,000 | 56,163,000 | 14,040,750 | 15,397,500 |
| Increase in Policy Rsv | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Policy Reserve | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Credit Union Reimb | 22,960,789 | 25,127,336 | 29,203,901 | 30,257,305 | 107,549,331 | 26,887,333 | 29,730,603 |
| Experience Refund | 4,526,128 | 5,726,378 | 6,917,827 | 10,904,152 | 28,074,485 | 7,018,621 | 8,910,990 |
| Operating Expense | 25,235,116 | 26,837,094 | 22,258,915 | 16,491,091 | 90,822,216 | 22,705,554 | 19,375,003 |
| | | | | | | | |
| Annual Profits | 1,214,591 | 177,207 | 8,522,053 | 17,238,192 | 27,152,043 | 6,788,011 | 12,880,123 |
| | | | | | | | |
| HMP+MECL Total Annual Profits: | 1,406,452 | 809,774 | 8,653,672 | 17,765,139 | 28,635,037 | 7,158,759 | 13,209,406 |

# LIFE INSURANCE ANALYSTS, INC.

## RICHARD A. SCHWARTZ
**A Professional Biography**

Dick Schwartz is President of *Life Insurance Analysts, Inc*. In this capacity he functions as a consultant to professional advisors and their clients, national insurance carriers and insurance marketing organizations. Life Insurance Analysts (LIA) provides due care, product analyses, marketing and reinsurance consultation to these communities. Schwartz also assists financial institutions in implementing new insurance distribution strategies by structuring products, insurance carriers and independent distribution resources. In addition Schwartz has completed significant amount of expert witness work for both plaintiffs and the defense.

In October 2000, LIA completed structuring an arrangement among three prominent insurance carriers, which allowed the eighth largest national CPA firm to commence its financial services practice in conjunction with over 100 independent agents. Schwartz now assists in implementation of that venture along with expansion of its services to address different client needs.

Prior to founding Life Insurance Analysts in 1994, Schwartz served for eight years as Executive Vice President of M Life Insurance Company, an affiliate of the M Financial Group. Prior to that he was Senior Vice President of Product Marketing for SunAmerica Insurance where his functional responsibilities also included strategic planning and product development.

Mr. Schwartz brings to the firm 33 years of experience in the insurance industry. After receiving his Bachelor of Science degree from Clarkson University, Mr. Schwartz went on to receive his Master's in Actuarial Science from Northeastern University. Mr. Schwartz is a Fellow in the Society of Actuaries, a Member of the American Academy of Actuaries, a Chartered Life Underwriter and a member of the Association for Advanced Life Underwriting (AALU.)

A frequent speaker on due care as it applies to life insurance companies and products, Mr. Schwartz has spoken before the American College of Trust and Estate Counsel (ACTEC), Miami Estate Planning Institute, Notre Dame Tax and Estate Planning Institute, and the Association for Advanced Life Underwriting (AALU). He has written several articles on these topics for several publications including *Probate & Property, Trusts & Estates,* and *Best's Review.*

### Listing of Publications:
* 1989 - Co-author of the first ABA primer **"Life Insurance Products, Illustrations, and Due Diligence"** for the Real Property, Probate and Trust Law Section.
* April 1991 - Due Diligence: A Means To Build Client Confidence. Broker World
* May 1991- Due Diligence: Assessing the Survivorship Purchase. Trusts and Estates.
* Feb 1993 - **The Scoop on Variable Life**: Probate and Property ABA magazine.
* March 1994 Co-author of **American Bar Association primer "Life Insurance Due Care: Carriers, Products, and Illustrations."**
* March 1995 **Keeping Faith with Policyholders: Guidelines for Companies and Producers**. CLU Journal

# Extended Professional Resume
June 21, 2002

## Qualifications:

- **Extensive experience in life insurance producer groups**

- **Proficiency in life company profitability management** as evidenced by building M Life reinsurance company into a very profitable operation with 1994 net profits exceeding twenty million dollars. This is in contrast to the scratch operation M Life was in 1986 with annual profits of less than one million dollars.

- **Expert in product development and pricing,** for M Financial Group and SunAmerica.

- **Advanced Product Knowledge:** The keys in designing life products are simplicity and creating meaningful edges that can be valued by the customer and advisor. Concept sales, not spread sheet sales, should be the focus. My unique experiences working with insurance carriers, producers, and also in high net worth direct sales, enables me to synthesize these elements into marketable products.

- **Extensive business planning experience,** at The Madison Group, M Financial, M Life and SunAmerica.

- **Excellent communication skills**, both written and verbal as seen from my extensive national speaking presentations, books and articles.

- **Ability to effectively interact with insurance professionals, advisors and senior insurance company management**. This is reflected by LIA's very effective consulting practice established over the last eight years.

- **In-depth understanding of the marketing process** in the high net worth estate planning and COLI areas.

- **Significant expert witness work.**

## Life Insurance Analysts, Inc. (1994 - Current)

- **Consulting Clients:** LIA provides diversified consulting services to life insurance carriers, marketing firms, and law and CPA advisors. In addition LIA provides expert witness support work for both plaintiffs and defendants.

- **Consulting Experience With Producer Groups:** From 1994 - 2002 LIA's clients have included: Connecticut Mutual Life, General American, Lincoln National, Minnesota Life, Partners Group, Programmed Insurance Marketing and Prudential Select Life.

## M Financial Group: (1986 - 1994.)

- Executive Vice President - M Life Ins Company:    1991 - 1994
- Senior VP - Product Development and Sales:    1986 - 1992
- Senior VP - Chief Actuary, M Life Ins Company:    1986 - 1991

2

The M Group is the largest agent-owned marketing and life reinsurance company in the United States. M Financial is structured in five value-added segments: sales (producer relationships), marketing presentation systems, unique product development, carrier relationships, and M Life reinsurance. My responsibilities included the last three.

**SunAmerica  (Sun Life Insurance Company of America)**              (1973 - 1986)
- Senior Vice President, Product Marketing                             (1984 - 1986)
- Senior Vice President, Product and Planning                          (1981 - 1984)
- Vice President, Product Development                                  (1976 - 1980)
- Actuary                                                              (1973 - 1976)
- Member of the Board of Directors of both Sun Life Insurance Company of America and its subsidiary, Universal Guaranty Life Insurance Company.

**Product Marketing Responsibility**: 1984 - 1986
In 1984 I developed a matrix product line organization where the profitability of each distribution arm was a joint responsibility between the sales department and the Product Line function which I managed. My area's responsibility was to develop products, marketing materials and the necessary micro computer systems. Equally important, this group monitored the product lines and took corrective action to maintain ongoing profitability for the existing business. This responsibility encompassed all distribution systems. This group included management of a staff of 35, including 5 direct reports.

**Product Development and Strategic Planning Responsibility**: 1981 -1984
I was responsible for Sun Life's business and strategic planning. Business planning encompassed the annual marketing and financial plans, including budgets. Strategic planning consisted of a five-year plan detailing which distribution systems and markets should be emphasized. During this time I also managed a twenty person product development staff including actuaries, sales promotion and sales training specialists.

**Massachusetts Indemnity and Life Insurance Company:**  (1967 - 1973)
Starting in 1967 as an actuarial trainee, I progressed to Associate Actuary in four years. I managed the actuarial department with responsibilities in both the valuation and product development areas. In this context I developed new life and disability product portfolios and was responsible for the Company's initial conversion to GAAP accounting.

**ACADEMIC:**
- Clarkson University, Potsdam NY: BS in Math, 1967. Fifth out of 370 graduates.
- Northeastern University, Boston: Masters in Actuarial Science, 1969
- Fellow in the Society of Actuaries, 1973.
- Member of the American Academy of Actuaries, 1975
- Chartered Life Underwriter, 1990

**MILITARY:**
- 8/67 - 6/69 US Army - Signal Corps Officer
- Vietnamese language specialist
- Forward operations Signal Platoon leader - Independent infantry brigade

*Richard A. Schwartz*
*June 21, 2002*

3

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this date the foregoing document was served by U.S. first-class mail, postage prepaid, upon the following:

Stephen R. Pedersen, Esquire
214 Senate Avenue, Suite 602
Camp Hill, PA 17011

Catherine Mahady-Smith, Esquire
3115-A N. Front Street
Harrisburg, PA 17110


_____

Charles T. Young, Jr.

Attorney for Defendants


Dated: August ___, 2002

28

02/23/2000

## A MESSAGE

For __Brenda__    Date __1-31__    Time __12:50__

Caller __Barb__

Of __Dr. Hurley office__

Phone __888-296-6933__

94 HOUR PROMISE

☐ **URGENT**

☐ Please Call

☐ Returned Your Call

☐ Will Call Again

☐ Wants To See You

☐ Came To See You

Message __You requested medical info. on Tommy Hall, RE 32534. His file cannot be found. They have mis-placed or lost his records.__

Message Taken By __Julie__

- Attorney involved

2/1/00  Barb → 4 pages to Attorney in Harrisburg 4/99 ever since, they cannot locate file.

D0055

1998 U.S. Dist. LEXIS 4046 printed in FULL format.


CYNTHIA LOCKHART v. FEDERAL INSURANCE CO. and CHUBB & SON, INC.


CIVIL ACTION No. 96-5330


UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA


1998 U.S. Dist. LEXIS 4046


March 30, 1998, Filed; March 31, 1998, Entered


DISPOSITION: [*1] Defendants' Motion for Partial Summary Judgment (Doc. #7) GRANTED in part. Plaintiff's claims against defendant Chubb & Son DISMISSED. Motion otherwise DENIED.

CASE SUMMARY

PROCEDURAL POSTURE:  Defendants, insurer and affiliated company sought summary judgment in an action filed by plaintiff insured that alleged that her insurance claim was wrongfully denied and that the defendants had acted in bad faith.

OVERVIEW:  The insured made a claim relating to a flood that occurred in her basement while she was on vacation. The insurer's investigation lasted approximately 20 months, at which time the insurer denied the claim. The denial letter was on the affiliated company's letterhead, signed by the insurer's adjuster and a subsequent refund of premium was made via a check with the affiliated company's name on it. However, the affiliated company was not named in the insurance contract. The court held that one could not reasonably find from the evidence that the affiliated company was a party to the insurance contract and granted the company's motion. The court denied the insurer's motion, finding that a reasonable jury could have found by clear and convincing evidence that the insurer acted in bad faith in handling or denying the insured's claim because of the delays and refusal to determine the claim without extensive and unnecessary documentation.

OUTCOME:  The court granted the affiliated company's motion for summary judgment and denied the insurer's motion for summary judgment.

CORE TERMS:  basement, adjustor, water, coverage, insurer, insurance contract, personal property, insurance policy, insured, premium, summary judgment, decision to deny, water damage, breaching, discovery, salvage, breach of contract, reasonable basis, recklessly, obtained information, sworn statement, refund check, inventorying, affiliated, reflecting, undertaken, processing, letterhead, effective, demanded

CORE CONCEPTS -

Contracts Law: Breach: Causes of Action
One cannot be liable for a breach of contract unless one is a party to that
contract. One cannot breach a contract that one is not a party to.

Insurance Law: Bad Faith & Extracontractual Liability: Failure to Settle
A defendant who is not legally obligated to pay a claim and who does not make
the decision to deny a claim cannot be liable for knowingly or recklessly
denying a claim under a policy without a reasonable basis.

Insurance Law: Bad Faith & Extracontractual Liability: Failure to Settle
A determination of bad faith does not require proof that the insurer was
motivated by a dishonest or improper purpose. Recklessness or acts undertaken by
the insurer with a reckless indifference to the interests of the insured can
support a finding of bad faith.

COUNSEL: For CYNTHIA LOCKHART, PLAINTIFF: ANGEL LUIS FRANQUI, PHILA, PA USA.

For FEDERAL INSURANCE COMPANY, CHUBB & SONS, INC., DEFENDANTS: ERIC D. FREED,
COZEN & O'CONNOR, PHILA, PA USA.

JUDGES: JAY C. WALDMAN, J.

OPINIONBY: JAY C. WALDMAN

OPINION: MEMORANDUM and ORDER

    This is a breach of insurance contract and bad faith action. Plaintiff
alleges that defendants Federal Insurance Company ("Federal") and Chubb & Son
Inc. ("Chubb") issued a renters insurance policy to her and later failed to pay
a claim covered by that policy. She also alleges that the lengthy investigation
and unreasonable denial of her claim constitute bad faith conduct. See 42 Pa.
C.S.A. @ 8371.

    Presently before the court is defendants' Motion for Partial Summary Judgment
in which Chubb seeks summary judgment on plaintiff's claims against it and
Federal seeks summary judgment on plaintiff's bad faith claim. The pertinent
facts as uncontested or otherwise viewed most favorably to plaintiff are as
follow.

    Plaintiff purchased a Chubb Masterpiece Deluxe Renters[*2] insurance
policy through the David M. Frees Insurance Agency in July 1994. The policy
covered the house plaintiff rented at 807 Byers Road in Chester Springs,
Pennsylvania and was effective from July 25, 1994 until July 25, 1995. It
provided plaintiff with $ 120,000 coverage for personal property loss.

    The "Agreement" section states "We agree to provide the insurance described
in this policy in return for your premium and compliance with the policy
provisions." The policy defines "We" as "the insurance company named in the
Coverage Summary." The Coverage Summary names defendant Federal as the company
issuing the policy. The policy defines "You" as "the person named in the
Coverage Summary, and a spouse who lives with that person." Plaintiff is named
as the insured. Defendant Chubb is not mentioned in the text of the Coverage
Summary, although its name does appear in a copyright notation at the bottom

of the page. Mr. Frees avers that the policy was "purchased from Federal."

On August 3, 1994 plaintiff returned home from a two-week vacation and discovered that the basement was flooded by water approximately ten inches deep. Plaintiff used the basement primarily to store personal property, [*3] including furniture, housewares, clothing and books. Most of the property was saturated by the water.

Plaintiff immediately informed her landlord's property manager of the flooded basement. The property manager's plumber inspected the basement the next day and was unable to pinpoint the source of the water. He did find that the two basement sump pumps were not working because they had been unplugged, and he immediately began draining the thousands of gallons of water from the basement.

On August 8, 1994 plaintiff reported the water damage to the Frees Agency which relayed the claim to Federal. It then engaged an independent insurance adjustor who visited plaintiff's property on August 15, 1994. The adjustor spoke with plaintiff, examined the damaged property and began a preliminary investigation.

Within three days the adjustor determined and reported that the source of the water remained unclear, plaintiff was engaged in eviction proceedings with her landlord and had done little to protect her wet property from further damage after the water was drained. The adjustor recommended that Federal retain an attorney to investigate plaintiff's claim and take her sworn statement. Federal [*4] did so.

It retained an attorney, Eric Freed. He wrote to the plaintiff on September 30, 1994 to advise her that on behalf of Federal he was pursuing an investigation of her claim, and requiring her to produce numerous records and documents. Mr. Freed apprised plaintiff that Federal could not assess its liability for her claim until it examined these records and documents. These included all of plaintiff's credit card statements and other records reflecting any debts, writings reflecting insurance claims "of any kind" made by her "at any time," her tax returns for the prior three years, evidence of all income received by her over the prior three and a half years, and all bank account statements for the past three and a half years.

In late August or early September the adjustor arranged for a property salvage company to assist plaintiff in inventorying her loss and protecting her property from further damage. Despite differences between plaintiff and salvage company employees over the manner in which the work was to proceed, most of the inventorying and clean-up was finished by mid-October 1994.

In December 1994, the adjustor estimated the total property loss in plaintiff's basement [*5] at $ 200,000. In August 1995, plaintiff completed her sworn statement in proof of loss. She demanded the $ 120,000 policy limit based on her estimate of damages of $ 325,000.

The investigation of plaintiff's claim lasted from August 1994 to April 1996. Federal attributes much of the delay to plaintiff's inability or failure timely to provide the company with the requested records and documents and her failure to appear prepared for scheduled depositions. As noted, however, the records and documents demanded by Federal were substantial in scope and time-frame. Federal ultimately deposed plaintiff, obtained information from several witnesses

about the circumstances surrounding the discovery of water in plaintiff's basement, the condition of plaintiff's personal property before the flood and plaintiff's financial situation in the Summer of 1994.

Two witnesses said they saw boxes with mildew when plaintiff moved from her prior residence to the Byers Road house. These witnesses had an obvious antipathy for plaintiff. Plaintiff acknowledged that some items stored in the basement of the prior residence had sustained water damage but averred that these were not among the items for which[*6] she presented a claim to Federal. The basement at the Byers Road house was full of personal property which physically could not have fit into the basement of plaintiff's prior residence. Federal also obtained information that plaintiff's income had fallen around the time of the flood which it viewed as a possible motive to commit insurance fraud.

On April 5, 1996, Federal informed plaintiff through her attorney that her claim was denied. The reasons given by Federal were that a majority of the property damage occurred before the coverage period, that plaintiff intentionally concealed or misrepresented material facts regarding the extent and cause of her loss, that plaintiff failed promptly to notify Federal of the cause and extent of damage, and that she interfered with the salvage company's attempts to mitigate her damages which constituted neglect sufficient to void the policy.

The reasons were set forth in a letter written and signed by a Federal claims adjustor for "Federal Insurance Company." The letterhead read "Chubb Group of Insurance Companies." Federal is one of eight companies identified on several exhibits as members of the "Chubb Group." Chubb provides loss adjustment[*7] services for Federal and other affiliated companies.

In June 1996 Federal canceled plaintiff's renewed insurance policy effective June 18, 1996 based on her alleged misrepresentations. Shortly thereafter plaintiff received a premium refund check for $ 110.00. Defendant Chubb's name appears over the signature. The top of the check has the Chubb Group logo and the names of eight companies including Federal.

Defendant Chubb contends that it was not a party to the insurance contract and thus cannot be liable for a breaching it or for bad faith conduct under @ 8371.

Clearly "one cannot be liable for a breach of contract unless one is a party to that contract." Electron Energy Corp. v. Short, 408 Pa. Super. 563, 597 A.2d 175, 177 (Pa. Super. Ct. 1991) (citing Viso v. Werner, 471 Pa. 42, 369 A.2d 1185 (Pa. 1977)), aff'd, 533 Pa. 66, 618 A.2d 395 (Pa. 1993). It is fundamental that "one cannot breach a contract that one is not a party to." 597 A.2d at 178.

From the evidence of record one cannot reasonably conclude that defendant Chubb was a party to the insurance policy purchased for plaintiff by the Frees Insurance Agency. The plain language of the policy categorically identifies Federal[*8] as the party which agreed to provide plaintiff with coverage. Mr. Frees avers that the policy was purchased from Federal. Federal readily admits that it issued the subject policy and denied plaintiff's claim under it. Defendant Chubb is mentioned nowhere in the substantive terms of the contract.

That Federal and other affiliated companies use stationery with a common

Chubb Group letterhead or forms copyrighted by defendant Chubb does not make
that defendant a party to plaintiff's insurance contract. That defendant
provides loss adjustment services for Federal and other affiliates also does not
make them a party to each underlying insurance contract.

Defendants offer no explanation regarding the $ 110 refund check. It is
unclear whether the Chubb Group companies have certain common accounts or pool
premiums or for some oblique accounting purpose pay refunds for all from a
designated account. Perhaps these was a Federal account and a Chubb check was
used because a processing or administrative error. The point is that one is left
to speculate. Plaintiff apparently never inquired during discovery about the
reason or otherwise about the precise relationship of the defendants, and
certainly[*9] presented no evidence regarding these matters.

Plaintiff makes no allegation or showing of alter ego status. To conclude
that defendants generally commingling funds, let alone disregarded corporate
formalities and independence of function, from one payment of a nominal refund
for one from an account of the other would be pure conjecture. Plaintiff could
have elicited details about the handling of premiums, payments and claims
processing by defendants and the extent to which one may dominate or control the
actions of the other. Plaintiff either failed to do so or elected not to present
any such evidence which was obtained in discovery. n1

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

   n1 There is no showing or suggestion that defendant Chubb or Chubb Group
operated with regard to Federal in a fraudulent manner which deprived plaintiff
of a legal remedy. Federal has assets of $ 9.1 billion and a $ 2.5 billion
surplus.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

   Evidence may exist to show that defendant Chubb was the de facto insurer of
plaintiff and that it was actually responsible for the decision[*10] to deny
her claim. No such evidence, however, has been presented by plaintiff or
otherwise appears of record.

   Plaintiff contends that Chubb was an "agent" of Federal. It may have been for
some purposes but for none which appear of record that would make Chubb the
insurer under plaintiff's policy. While Federal may be liable for conduct
undertaken on its behalf by Chubb as its agent, this would not make Chubb liable
for breaching a contract to which it was not a party or for bad faith toward
someone who was not its insured.

   In short, once cannot reasonably find from the evidence of record that Chubb
was a party to the insurance contract at issue, conducted the investigation of
plaintiff's claim or made the decision to deny coverage to her. In the absence
of such evidence, plaintiff cannot sustain a claim against Chubb for breaching
an insurance contract or for bad faith conduct "toward the insured" by "the
insurer." See 42 Pa. C. S. A. @ 8371. A defendant who is not legally obligated
to pay a claim and who does not make the decision to deny a claim cannot be
liable for knowingly or recklessly denying a claim under a policy without a
reasonable basis. See Klinger v. State Farm [*11]  Mut. Auto Ins. Co., 115

Case 1:01-cv-01265-CCC     Document 34     Filed 08/30/2002     Page 228 of 233

PAGE    7
1998 U.S. Dist. LEXIS 4046, *11                                    LEXSEE

F.3d 230, 233 (3d Cir. 1997). Defendant Chubb is entitled to summary judgment on the record presented in this case.

A determination of bad faith does not require proof that the insurer was motivated by a dishonest or improper purpose. See Klinger, 115 F.3d at 233-34. Recklessness or acts undertaken by the insurer with a reckless indifference to the interests of the insured can support a finding of bad faith.  Id. At 235; Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 751 (3d Cir. 1994).

Federal admits that material issues of fact preclude summary judgment on plaintiff's breach of contract claim. Viewing and construing the record in a light most favorable to plaintiff, one cannot say that no reasonable juror could find by clear and convincing evidence that Federal handled or denied plaintiff's claim in bad faith. n2 A jury could find that Federal had a reasonable basis to suspect fraud and that this justified its demand for extensive personal financial information from plaintiff. A jury, however, also could find that Federal acted unreasonably or recklessly in raising the specter of fraud and, in any event, in refusing to determine plaintiff's[*12] claim without demanding extensive personal information which exceeded that necessary to identify any prior water damage claim or to assess her economic situation in July 1994. n3

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n2 The failure of a plaintiff's claim for coverage does not preclude relief under @ 8371 for the bad faith handling of the claim. See March v. Paradise Mut. Ins. Co, 435 Pa. Super. 597, 646 A.2d 1254, 1256 (Pa. Super. Ct. 1994), app. denied, 540 Pa. 613, 656 A.2d 118 (Pa. 1995).

n3 Tax returns and bank books, for example, can reflect private information about charitable gifts, health treatment and personal affiliations. Also, for example, the pertinence of a five or ten year old automobile accident or health insurance claim is difficult to discern.

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

ACCORDINGLY, this 30th day of March, 1998, upon consideration of defendants' Motion for Partial Summary Judgment (Doc. # 7) and plaintiff's response thereto, IT IS HEREBY ORDERED that said Motion is GRANTED in part in that plaintiff's claims against defendant Chubb & Son are[*13] DISMISSED and this Motion is otherwise DENIED.

BY THE COURT:

JAY C. WALDMAN, J.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this date the foregoing document was served by U.S. first-class mail, postage prepaid, upon the following:

Stephen R. Pedersen, Esquire
214 Senate Avenue, Suite 602
Camp Hill, PA  17011

Catherine Mahady-Smith, Esquire
3115-A N. Front Street
Harrisburg, PA  17110

Michael R. Kelley

Attorney for Defendants

Dated:  August 30, 2002

Moving Defendants was not one of employment or agency, but simply a business arrangement between enterprises that shared a common goal of maximizing the sale of Amish made furniture and home furnishings.

The Bravman court (as well as courts deciding similar cases before and after Bravman) have imposed a "reasonable term" in certain contracts, in recognition of the unequal bargaining positions of large employers and individual employees and agents. Bravman, 552 F.2d at 93-94; see also Lubrecht v. Laurel Stripping Co., 127 A.2d 687 (Pa. 1956) (engineer found entitled to reasonable term of employment by mining corporation for whom he gave up municipal position and personal business ventures); Lucacher v. Kerson, et al., 45 A.2d 245 (Pa. Super. 1946) (employee who underwent substantial hardship in relocating family in order to take new position found entitled to long term employment).  There is some compelling justification for preventing an employer from inducing an employee or agent to restrict his activities to one particular line of work or the sales of a particular manufacturer and then terminating the relationship before the employee or agent may realize a fair return on what he has sacrificed. Marder v. Conwed Corp., 75 F.R.D. 48 (E. D. Pa. 1977) (contract between manufacturer and sales representatives who enabled manufacturer to obtain government contract held not terminable at will before representatives could receive any commissions).  In the

_____

dispute over when Moving Defendants were entitled to be paid for merchandise delivered to QVC. Kauffman Transcript at 212-16.

absence of such compelling justification, courts generally do not impose a duration

or any other contractual terms as to which the parties have not mutually agreed.

Greene v. Oliver Realty, Inc, 526 A.2d 1192, 1194 (Pa. Super 1987).  Plaintiffs cite

no case in which a court has applied the "reasonable term" principle recognized in

Bravman outside of the employment or agency context.[4]  Moving Defendants have

been unable to locate any precedent for extending application of the Bravman

principle to business relationships generally.  Nor should this Court permit

Plaintiffs to get to a jury by metamorphosing a sales contract between two

independent businesses into a contract of employment.

    This court should permit Plaintiffs to proceed to trial only on contract terms

as to which the record provides competent evidence that the parties have mutually

agreed. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  As detailed in

Moving Defendants' Motion and initial Brief, the record demonstrates mutual

commitment of the parties to no more than the ongoing sale of Amish-

manufactured goods for an indefinite period of time.  Styles, quantities and prices

changed as the parties agreed from time to time.  Suggesting that there were no

disputes as to these items does not evidence mutual consent to the unending

commitment that Plaintiffs now seek to impose on Moving Defendants.

---

[4] Plaintiffs cite Loos and Dilworth v. Quaker State Oil Refining Corp., 500 A.2d 1155 (Pa. Super. 1985), as an example of application of the Bravman principle in the context of a franchise agreement.  While the Loos and Dilworth court similarly sought to protect an individual service station franchisee from arbitrary termination by a national franchisor, the court made no reference to the Bravman line of cases or to imposition of a "reasonable" contract term.

III.    Conclusion

Moving Defendants are entitled to summary judgment on Count IV of the

Amended Complaint.

Respectfully submitted,

LAPP & PONTZ, LLP
Attorneys for Moving Defendants

Dated: ___8|29|02___         By: _____
                                  Robert W. Pontz, Esquire
                                  Pa. Attorney I.D. #56554
                                  255 Butler Avenue, Suite 101
                                  Lancaster, PA 17601
                                  (717) 396-1200

13

## CERTIFICATE OF SERVICE

The undersigned certifies that on this *29th* day of *August, 2002,* he caused

true and correct copies of the foregoing Reply Brief in Support of Motion of

Defendants Elam Kauffman, Mary Kauffman, K&M Woodworking, Inc., K&M

Woodworking LLC, John U. Stoltzfus and True Wood Furniture LLC ("Moving

Defendants") for Summary Judgment to be served by first class mail, postage

prepaid, upon counsel of record at the following addresses:

David E. Lehman, Esquire
McNees, Wallace & Nurick LLC
100 Pine Street
P.O. Box 1166
Harrisburg, PA 17108-1166

Paul W. Minnich, Esquire
Barley, Snyder, Senft
& Cohen LLC
100 East Market Street
York, PA 17401

David R. Fine, Esquire
Kirkpatrick & Lockhart LLP
240 North Third Street
Harrisburg, PA 17101-1507

Douglas B. Marcello
Thomas, Thomas & Hafer, LLP
305 North Front Street
P.O. Box 999
Harrisburg, PA 17108

J. Michael Flanagan, Esquire
Flanagan and Associates
150 North Chestnut Street
Lancaster, PA 17602

LAPP & PONTZ, LLP
Attorneys for Moving Defendants

By: _____
Robert W. Pontz, Esquire
Pa. Attorney I.D. #56554
255 Butler Avenue, Suite 101
Lancaster, PA 17601
(717) 396-1200