FILED
HARRISBURG, PA
SEP 11 2002
MARY E. D'ANDREA, CLERK
Per _____

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Nancy Hall, individually and as the Representative and Administratrix of the Estate of Tommy Hall, deceased, her husband,<br>    Plaintiff | CIVIL ACTION - LAW |
| v. | 1:01-CV-1265 |
| Cuna Mutual Group, Cuna Mutual Insurance Society,<br>    Defendants | (Judge Christopher C. Conner) |

**DEFENDANTS' BRIEF IN SUPPORT OF
THEIR MOTION IN LIMINE REGARDING
PLAINTIFF'S PROPOSED EXPERT TESTIMONY**

## I. STATEMENT OF FACTS AND PROCEDURAL HISTORY

This case arises out of CUNA Mutual Insurance Society's ("CUNA") decision to deny credit life insurance benefits to Plaintiff Nancy Hall following the death of her husband, Tommy B. Hall, due to cancer. The policy issued was intended to cover the remainder of the Halls' home mortgage in the event of Mr. Hall's death. Mrs. Hall alleges that CUNA is liable for "bad faith" and related causes of action due to the denial of benefits.

CUNA denies that it acted in "bad faith" or that it is liable under any other theory for denying benefits. CUNA asserts that its denial of benefits was proper because,

following Mrs. Hall's claim for benefits, it learned that Mr. Hall misrepresented his true medical history on the application for insurance when he insisted that he had never been diagnosed with or treated for cancer.

Plaintiff has provided CUNA with the expert reports of Richard A. Schwartz and Michelle Doherty, who both purport to have significant experience in the life insurance industry. (See **Appendix,** at **Tab "A"** & **"B."**) Plaintiff has also provided CUNA with supplemental reports from Schwartz and Doherty. (See **Appendix,** at **Tab "C"** & **"D."**) The Reports of Schwartz and Doherty are objectionable for various reasons, and the proposed testimony of Schwartz and Doherty should be excluded from evidence.

### A. The Schwartz Reports

The Schwartz Report asserts that CUNA breached the insurance contract, and it comments on CUNA's intent. It provides as follows:

> <u>It is clear that as part of this review CUNA Mutual breached their insurance contract with Patriot Federal Credit Union</u> for the benefit of Tommy Bob Hall and that their actions were not only unreasonable, but a clear and blatant attempt to deny Mrs. Nancy Hall the benefits that she was fully entitled to receive.
> . . .
>
> In addition, the actions of CUNA Mutual's SIU group, in referring the claim to the fraud unit of the Pennsylvania Office of the Attorney General without any apparent prior investigation, created a hostile and threatening environment to Mrs. Nancy Hall. <u>The apparent purpose was to embarrass her and dissuade her from seeking counsel</u> to defend her contractual right to the proceeds under the rescinded policy.

(Schwartz Rep. at 1 of 6; underlining added).

The Schwartz Report discusses Mr. Hall's credibility and intent. It provides as follows:

> CUNA Mutual has implied that Mr. Hall lied on his application. Why would someone take $20,000 out of their savings which lowered the amount of

2

> HMP insurance on the new mortgage as compared to the previous mortgage? If someone had a medical condition that they wanted to hide, then they clearly would have retained their previous, higher amount mortgage and the correspondingly higher mortgage protection insurance that went along with it.

(Schwartz Rep., at 3 of 6).

The Schwartz Report asserts that punitive damages should be awarded against CUNA based on the combined assets and/or earnings of the CUNA Mutual companies. It states that, "[A]ny non-direct damage award should be based on the income or surplus (net worth) of the combined entity." (Schwartz Rep., at 3 of 6). The Report discusses a wide variety of financial statistics pertaining to CUNA. It then proceeds to analyze different ways of calculating a punitive damages award.

Finally, the Schwartz Report refers to what is alleged to be "post-claim underwriting." It states the following:

> Dr. Charlesworth's name was on the application completed by Tommy Bob Hall. CMIS did not pursue obtaining Tommy Bob Hall's medical records from Dr. Charlesworth at that time. Had they obtained those records, they would have seen their concerns that they subsequently raised when the claim was filed. CMIS had the chance to underwrite the insurance certificate application at that time. They did not.

(Schwartz Rep., at 6 of 6).

The Supplemental Schwartz Report reiterates the contentions regarding breach of contract and bad faith. It states, in pertinent part, "CUNA breached their life insurance contract with the Halls and their conduct continues to be unfair and unreasonable." (Schwartz Suppl. Rep. at 1). "This type of medical treatment is clearly unreasonable and shows bad faith on CUNA's part." (Schwartz Suppl. Rep. at 2).

## B. The Doherty Reports

The Doherty Report contains repeated references to CUNA's alleged breach of duties and bad faith. The Report states that, "It is also clear to me that CUNA violated their duty to treat the insured Tommy Bob Hall II and his wife Nancy Hall fairly." (Doherty Rep. at 1). The Report asserts that, "It is clear that at each step in the handling of this claim, CUNA's actions were inadequate and unacceptable." (Doherty Rep. at 6). Finally, the Report states that, "it is my opinion CUNA breached their contract with the Halls in the handling of Mr. Hall's claim . . . CUNA's conduct was unreasonable and outrageous under the circumstances." (Doherty Rep. at 9).

The Doherty Report claims that CUNA's actions were "outrageous," and comments on Mrs. Hall's mental state. The Report states that, "Brenda Larson and William Nardi's actions were outrageous." (Doherty Rep. at 7). It asserts that, "CUNA's actions in notifying Mrs. Hall and Patriot Federal Credit Union constitute outrageous action, in that no possible purpose could be served by their notification." (Doherty Rep. at 8). The Report references Mrs. Hall's alleged mental state. It clams that, "Mrs. Hall was a customer of Patriot Federal Credit Union, and it is obvious to me she would have been embarrassed by CUNA's actions." (Doherty Rep. at 8). Finally, the Doherty Report concludes that, "Mr. Stel acted outrageously in notifying Mrs. Hall of the fraud referral, and compounded that outrageous conduct by failing to notify Mrs. Hall that no criminal investigation would be initiated." (Doherty Rep. at 9).

The Doherty Report discusses what is purportedly "post-claim underwriting." It states that, "CUNA was on notice of Mr. Hall's physician and

had the opportunity to request and review Mr. Hall's medical records. No such request was made until the claim for death benefits was made to CUNA. This lead to a situation referred to as post-claim underwriting." (Doherty Rep. at 3).

The Supplemental Doherty Report states that, "There is absolutely zero proof that Tommy Bob Hall had been told by a doctor that he had cancer." (Doherty Suppl. Rep. at 2). The Supplemental Report then reiterates Doherty's prior statements regarding alleged bad faith claim handling. The Report states that, "CUNA continues their bad faith handling of this claim . . . even with clear evidence of Mr. Hall's lack of knowledge of his malignancy." (Doherty Suppl. Rep. at 2). "While some of CUNA's conduct may have been perceived as reasonable, the overwhelming evidence is that their actions were, and continue to be, unreasonable." (Doherty Suppl. Rep. at 2).

### C. **CUNA's Motion in Limine**

Concurrently with this Brief, CUNA has filed a Motion in Limine seeking to exclude from evidence, the proposed testimony of Schwartz and Doherty. CUNA objects to the proposed testimony on the basis that (1) it is laced with conclusions of law; (2) it contains repeated commentary on the credibility of witnesses; and (3) it relies on an improper definition of "post-claim underwriting." Neither Schwartz nor Doherty should be permitted to testify at trial. CUNA believes that a <u>Daubert</u> hearing may be necessary in order for the Court to evaluate the merits of the Motion in Limine. *See* Fed. R. Evid. 104 & 702.

## II. STATEMENT OF QUESTIONS INVOLVED

Whether the proposed testimony of Richard Schwartz and Michelle Doherty should be excluded from evidence when it is laced with conclusions of law and contains repeated references to the credibility of witnesses?

Suggested Answer: Yes.

Whether the proposed testimony of Richard Schwartz and Michelle Doherty should be excluded from evidence when it is dependent upon flawed methodology and an incorrect definition of "post-claim underwriting"?

Suggested Answer: Yes.

## III. ARGUMENT

### A. Conclusions of Law and Comments on Credibility

#### 1. The Law Concerning Admission of Expert Testimony

"'As a general rule an expert's testimony on issues of law is inadmissible.'" Whitmill v. City of Philadelphia, 29 F. Supp.2d 241, 246 (E.D. Pa. 1998) (quoting United States v. Bilzerian, 926 F.2d 1285, 1294 (2nd Cir. 1991)). "While '[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact[,]' . . . 'an expert may not state his or her opinion as to legal standards nor may her or she state legal conclusions drawn by applying the law to the facts.'" VIM, Inc. v. Somerset Hotel Ass'n, 19 F. Supp.2d 422, 427 n.4 (W.D. Pa. 1998), *affirmed without published opinion*, 187 F.3d 627 (3rd Cir. 1999) (quoting Okland Oil Co. v. Conoco, Inc., 144 F.3d 1308, 1328 (10th Cir. 1998)); *see also* Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Plan and Trust Agreement, 812 F. Supp. 1376, 1378 (E.D. Pa. 1992).

6

Federal Rule of Evidence 702 provides that in order to be admitted into evidence, expert testimony must, among other things, "assist the trier of fact to understand the evidence or to determine a fact in issue." "'Because the jury does not decide . . . questions of law, such testimony is not helpful to the jury and so does not fall within the literal terms of Fed.R. Evid. 702.'" VIM, Inc., 19 F. Supp.2d at 427 n. 4 (quoting Nieves-Villaneuva v. Soto-Rivera, 133 F.3d 92, 100 (1st Cir. 1997)). Further, "'[e]ach courtroom comes equipped with a "legal expert," called a judge,'" Id. (quoting Burkhart v. Washington Metro. Area Transit Auth., 112 F.3d 1207, 1213 (D.C. Cir. 1997)). Allowing expert testimony on legal conclusions "is an impermissible delegation of the trial court's duty to determine questions of law." Haberern, 812 F. Supp. at 1378.

"Further, it is generally inappropriate for a witness to judge the credibility of another witness." Griggs v. BIC Corp., 844 F. Supp. 190, 201 (M.D. Pa. 1994), *affirmed without published opinion*, 37 F.3d 1486 (3rd Cir. 1994). "Credibility determinations are within the exclusive province of the fact finder." Whitmill, 29 F. Supp.2d at 246-47. "The use of expert testimony must be carefully circumscribed to assure that the expert does not usurp . . . the role of the jury in applying the law to the facts before it." Id. at 247 (brackets omitted). In addition, a jury does not need, or require, an expert to tell them what the facts of a case are. "While there are some areas of factual inquiry which will require detailed explanation, the facts are well within the layman's understanding." King v. Fox Grocery Co., 642 F. Supp. 288, 291 (W.D. Pa. 1986).

2. The Reports of Richard Schwartz and Michelle Doherty

The Reports of Schwartz and Doherty contain numerous conclusions of law and references to the credibility of witnesses. These conclusions of law and credibility

7

judgments are neither proper, nor helpful to a jury. They serve only to usurp the role of both the judge and jury.

In his Reports, Schwartz repeatedly refers to CUNA's alleged breaches of contract and bad faith. He also asserts that punitive damages should be based on the combined assets of the entities using the "CUNA Mutual Group" trademark. These are conclusions of law, and not the proper basis for expert testimony. Haberern, 812 F. Supp. at 1378. The court should make these decisions, not the Plaintiff's expert. Schwartz also talks about the intent of CUNA, and the credibility of Mr. Hall. Credibility decisions fall within the province of the jury. Griggs, 844 F. Supp. at 201. The jury does not need help from Schwartz on issues of credibility.

Ms. Doherty's Reports contain even more blatant conclusions of law and improper commentary. Ms. Doherty mischaracterizes the facts, stating that there is "absolutely zero proof that Tommy Bob Hall had been told by a doctor that he had cancer." (Doherty Suppl. Rep. at 2). She talks about Mrs. Hall's alleged embarrassment. Doherty claims that CUNA breached its contract and acted outrageously. Finally, she flatly states that CUNA acted in bad faith. (Doherty Suppl. Rep. at 2).

Courts have held that expert testimony is not required on the issue of bad faith. Bergman v. United Serv. Auto. Ass'n, 742 A.2d 1101, 1107 (Pa. Super. 1999) (quoting **Appendix, at Tab "E,"** Dattilo v. State Farm Ins. Co., 1997 WL 644076 (E.D. Pa. 1997), *affirmed without published opinion*, 168 F.3d 478 (3rd Cir. 1998)). "'[B]ad faith is a legal concept of general application which does not require that scientific, technical or specialized knowledge be presented to assist the trier of fact.'" Id. (quoting Dattilo,

8

1997 WL 644076, at *5). Given the conclusory and otherwise unhelpful nature of the Plaintiff's expert reports, the testimony of Plaintiff's experts should be excluded from evidence.

### B. Dependence on Improper Definition of "Post-Claim Underwriting"

#### 1. Post-Claim Underwriting Defined

In <u>Schneider v. Unum Life Ins. Co. of America</u>, 149 F. Supp.2d 169 (E.D. Pa. 2001), the court discussed the definition of post-claim underwriting contained in 31 Pa. Code § 89.908(d).[1] <u>Id.</u> at 187-88. The regulation stated the following:

> An insurer or other entity engaged in the sale of long-term care insurance may not issue a policy or certificate until the insurer or other entity applies its underwriting standards and has determined the policyholder to be an acceptable risk.

149 F. Supp.2d at 187-88. The <u>Schneider</u> case exemplifies an actual instance of post-claim underwriting. In that case, the insurer was fully aware of the insured's multiple sclerosis at the time of his application. <u>Id.</u> at 174. It nonetheless issued the policy, and allowed the insured to pay premiums for 3 years. <u>Id.</u> After a claim was made, the insurer denied coverage – based on information it had at the time of application. It claimed that the insured's multiple sclerosis made him totally disabled at the time of application. <u>Id.</u> at 174 & 188.

Unlike the insurer in <u>Schneider</u>, CUNA was not aware of Mr. Hall's pre-existing illness. On his application, Mr. Hall misrepresented the condition of his health. California statutes contain a definition of post-claim underwriting, which specifically

---

[1] This regulation has since been rescinded.

9

exempts an insurer's remedies for "willful misrepresentation." The pertinent statute provides as follows:

> No health care service plan shall engage in the practice of postclaims underwriting. For purposes of this section, "postclaims underwriting" means the rescinding, canceling, or limiting of a plan contract due to the plan's failure to complete medical underwriting and resolve all reasonable questions arising from written information submitted on or with an application before issuing the plan contract. <u>This section shall not limit a plan's remedies upon a showing of willful misrepresentation.</u>

Cal. Health & Safety Code § 1389.3 (West 2002) (underlining added); *see also* Cal. Ins. Code § 10384. Pennsylvania courts have explicitly recognized that "the existence of many 'red flags,'" may properly lead to "a more thorough and protracted investigation by the insurance provider." <u>O'Donnell ex rel. Mitro v. Allstate Ins. Co.</u>, 734 A.2d 901, 907 (Pa. Super. 1999) (footnote omitted). If a claim for benefits contains "red flags" indicating potential insurance fraud (such as in this case), the insurer may properly conduct an extensive post-claim investigation, without being guilty of post-claim underwriting.

Underwriting involves assessing the risks of enrolling an applicant for insurance coverage. As reflected in Section 1389.3 of the California Health and Safety Code, underwriting does <u>not</u> take into account a situation where an individual willfully misrepresents information on an application. If intentionally incorrect information is given to an underwriter, then the expected payouts will be dramatically different from the results predicted. This problem is even more true in situations like this, where further information gathering is dependent upon how the application questions are originally answered. While Mr. Hall's application may have identified some of the doctors with whom he had treated, Mr. Hall misrepresented the condition of his health. As a result,

10

there was no reason for CUNA to follow-up with Mr. Hall's doctors. Nothing indicated it was necessary or warranted.

### 2. The Standards for Evaluating Expert Testimony

Federal Rule of Evidence 702 provides, with respect to expert testimony, as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

(underlining added). Under the Federal Rules of Evidence, the courts perform a "gatekeeping role," deciding preliminary questions concerning the qualifications of witnesses and admissibility of evidence. Oddi v. Ford Motor Co., 234 F.3d 136, 144 & n. 11 (3rd Cir. 2000). This "gatekeeping function applies not only to scientific testimony, but to all expert testimony." Hamilton v. Emerson Elec. Co., 133 F. Supp.2d 360, 366 (M.D. Pa. 2001). The court must ensure that the proposed expert testimony is "*the product of reliable principles and methods.*" Pappas v. Sony Elec., Inc., 136 F. Supp.2d 413, 420 (W.D. Pa. 2000) (italics in original).

The courts consider a variety of factors in evaluating the reliability and admissibility of expert testimony. These factors include, among others, the following: (1) whether the method has been subjected to peer review; (2) the existence and maintenance of standards controlling the technique's operation; (3) whether the method is generally accepted; and (4) the non-judicial uses to which the method has been put. Oddi, 234 F.3d at 145. In addition, courts "have long stressed the importance of in

limine hearings under Rule 104(a) in making the reliability determination required under Rule 702 and Daubert[v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L. Ed.2d 469 (1993)]." Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 417 (3rd Cir. 1999).

### 3. References to Alleged Post-Claim Underwriting

The Reports of Doherty and Schwartz contain allegations of post-claim underwriting. In Doherty's Report, she states that, "CUNA was on notice of Mr. Hall's physician and had the opportunity to request and review Mr. Hall's medical records. No such request was made until the claim for death benefits was made to CUNA. This lead to a situation referred to as post-claim underwriting." (Doherty Rep. at 3). Doherty's report suggests that the failure to request and review medical records constitutes post-claim underwriting.

Although the Schwartz Report does not use the term "post-claim underwriting," Schwartz is clearly referring to the concept. His Report states the following:

> Dr. Charlesworth's name was on the application completed by Tommy Bob Hall. CMIS did not pursue obtaining Tommy Bob Hall's medical records from Dr. Charlesworth at that time. Had they obtained those records, they would have seen their concerns that they subsequently raised when the claim was filed. CMIS had the chance to underwrite the insurance certificate application at that time. They did not.

(Schwartz Rep., at 6 of 6). Like Doherty, Schwartz asserts that CUNA acted improperly by failing to request Dr. Charlesworth's medical records. He also claims that CUNA failed to properly underwrite Mr. Hall's coverage at the time of application. The clear implication is that CUNA engaged in post-claim underwriting by failing to request medical records when the application was submitted.

As exemplified by the <u>Schneider</u> case discussed above, "Post Claim Underwriting occurs when a Company fails to complete medical underwriting and resolve all reasonable questions arising from information submitted to it on its application form prior to policy issue. In this [case], there were no such questions to resolve – the applicant denied any history of medical disorders that [CUNA] questioned on the application." (**Appendix,** at **Tab "F,"** Expert Report of Tim Terry, at p.4, ¶VIII.2.) Mr. Hall never disclosed his pre-existing cancer, and there were therefore no questions for CUNA to resolve prior to issuing the certificate of insurance. The failure to request medical records is <u>not</u> post-claim underwriting. An application for insurance is an important underwriting tool. CUNA expected its applicants to provide truthful information; it is entitled to rely on the representations of its future insureds.

After evaluating the methodology of the Plaintiff's expert reports, it becomes clear that the proposed testimony should <u>not</u> be admitted into evidence. First, Plaintiff's expert reports do not rely on a generally accepted definition of post-claim underwriting. The definition of post-claim underwriting, which they espouse, is neither supported by Pennsylvania law, nor any other recognized authority. Second, Plaintiff's experts do not cite any evidence that their definition of post-claim underwriting is used by experts in the field or referenced in any literature. <u>Pappas</u>, 136 F. Supp.2d at 421 & 426. No recognized treatise or regulation requires that an insurer request records from a prospective insured's medical providers in order to "verify" the representations of the applicant.

Finally, Plaintiff's experts premise their definition of post-claim underwriting on the notion that an insurer may not rely on the representations of its insured. There are

no standards for evaluating post-claim underwriting of this nature. An insurer may rely upon the representations of insureds in making underwriting decisions.

## IV. CONCLUSION

For the reasons discussed above, the Court should preclude the proposed testimony of Plaintiff's experts. The proposed testimony is laced with impermissible conclusions of law and credibility judgments. In addition, the proposed testimony is based on a flawed understanding of the concept of "post-claim underwriting." If necessary, the Court should hold a <u>Daubert</u> hearing pursuant to Fed. R. Evid. 104 & 702.

Respectfully submitted,

McNEES WALLACE & NURICK LLC

By _____
Michael R. Kelley
Charles T. Young
100 Pine Street
P.O. Box 1166
Harrisburg, PA 17108-1166
Phone: (717) 237-5322
Fax: (717) 237-5300

Dated: September 11, 2002

Attorneys for Defendants

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this date the foregoing document was served by U.S. first-class mail, postage prepaid, upon the following:

Stephen R. Pedersen, Esquire
214 Senate Avenue, Suite 602
Camp Hill, PA  17011

Catherine Mahady-Smith, Esquire
3115-A N. Front Street
Harrisburg, PA  17110

Charles T. Young, Jr.
Attorney for Defendants

Dated: September 11, 2002