ORIGINAL

FILED
HARRISBURG, PA

SEP 1 1 2002

MARY E. D'ANDREA, CLER
Per _____
Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Nancy Hall, individually and as the Representative and Administratrix of the Estate of Tommy Hall, deceased, her husband, **Plaintiff** | : : : : : : | **CIVIL ACTION - LAW** |
| **v.** | : : | **1:01-CV-1265** |
| Cuna Mutual Group, Cuna Mutual Insurance Society, **Defendants** | : : : | **(Judge Christopher C. Conner)** |

---

**APPENDIX TO DEFENDANTS'**
**BRIEF IN SUPPORT OF THEIR**
**MOTION IN LIMINE REGARDING**
**PLAINTIFF'S PROPOSED EXPERT TESTIMONY**

---

Michael R. Kelley
Charles T. Young, Jr.
McNEES WALLACE & NURICK LLC
P.O. Box 1166
100 Pine Street
Harrisburg, PA 17108-1166
Phone: (717) 237-5322
Fax: (717) 237-5300

Dated: September 11, 2002

# LIFE INSURANCE ANALYSTS, INC.

### Hall v CUNA Mutual Group and CUNA Mutual Insurance Society
### (referred to collectively as CUNA Mutual)
June 21, 2002

**Expert Witness Report Prepared by:** Life Insurance Analysts, Inc.
Richard A. Schwartz, FSA, MAAA, CLU

Overview: In my review of the Hall v. CUNA Mutual case, I reviewed the materials described below to prepare this report. Every opinion stated herein is held to a reasonable degree of certainty with respect to the insurance arena and is based upon my knowledge and experience in the areas of life insurance company overall and financial management, product development and pricing, actuarial valuation and underwriting.

It is clear that as part of this review CUNA Mutual breached their insurance contract with Patriot Federal Credit Union for the benefit of Tommy Bob Hall and that their actions were not only unreasonable, but a clear and blatant attempt to deny Mrs. Nancy Hall the benefits that she was fully entitled to receive. Further, the consequences of their actions should have been expected by them based on the facts that were then ascertainable by CUNA Mutual had they done their homework and reviewed the available data when they initially underwrote the insurance application.

In addition, the actions of CUNA Mutual's SIU group, in referring the claim to the fraud unit of the Pennsylvania Office of the Attorney General without any apparent prior investigation, created a hostile and threatening environment to Mrs. Nancy Hall. The apparent purpose was to embarrass her and dissuade her from seeking counsel to defend her contractual right to the proceeds under the rescinded policy. Further when the Office of the Pennsylvania Attorney General declined to proceed with the fraud investigation, CUNA Mutual failed to inform Mrs. Hall that such investigation had been dropped. Clearly when taken together these actions appear to be an attempt to intimidate Mrs. Hall and to discourage her from following through on her claim.

Other areas where CUNA Mutual went beyond what would have been reasonably expected by a prudent insurer were: Allowing the initial claim adjudication process to be handled by someone without sufficient training. In fact only minimal training was provided to Brenda Larson. This case was the first claim she handled. Further CUNA Mutual failed to provide her with adequate supervision. Additionally, during the claims investigation process CUNA Mutual had clear evidence that the first knowledge by Tommy Bob Hall of the malignant melanoma was after the policy was approved for issue. As such, given their less stringent underwriting rules for the HMP line of business, which did not encompass any subsequent medical questions when the

Page 1 of 6

Richard A. Schwartz, CLU, FSA
85 Silver Fox Drive, Greenwood Village, CO 80121
303-740-0961    fax: 303-740-7192    dick@LifeInsuranceAnalysts.com

certificate was issued to the credit union (in large measure because the certificate was issued to the credit union and not delivered to the insured), CUNA Mutual clearly attempted to apply more stringent post claim underwriting than was apparently required in this line of business.

**Preparations for Report and Data Reviewed:**

1. Read depositions of: Dr. Thomas Ansfield, Dr. George Baker, Dr. Michael Cashdollar, Dr. Ernest Charlesworth, Dr. James Chicklo, Richard Fischer (both 3/14/02 and 3/28/02), Nancy Hall (both 1/10/01 and 3/19/02), Tommy Bob Hall (both written and video), Brenda Larson, Paul Lawin, Brenda Lutz and Michael Stel

2. Viewed video deposition of Tommy Bob Hall dated October 18, 1999

3. Reviewed relevant information provided by CUNA Mutual

**Major Report Topics:**

1. **Underwriting measurement processes for credit life were significantly less stringent than for their individual life insurance policies:** This is evidenced in the assumed or expected pricing mortality rates between the two lines of business. Expected death claims over these two policy types' first twenty years, based on CUNA Mutual's own mortality tables, show that the present value of expected death claims under HMP policies for all insureds issue age 42, are **147%** of those expected under individually underwritten insurance policies.

   Why is this important? For individual insurance when the insurance policy is delivered, the applicant is usually asked whether there has been any change in his/her medical condition since the policy was applied for. If this process had been applied under the home mortgage protection (HMP) insurance policy, the answer to whether there had been any changes in health after the certificate was applied for would have been YES. The policy would therefore not have been issued without significantly more inquiry on CUNA Mutual's part. However, for home mortgage protection insurance, these more stringent individual life insurance underwriting processes were not used. They were not used because the insurance company priced for and expected a significantly higher level of claims (47% higher) under HMP policies due to their less stringent underwriting requirements. The Tommy Bob Hall case was one which clearly passed through this intentionally less stringent filter.

   However CUNA Mutual appears to want the benefit of the more stringent underwriting requirements, even though it priced reflective of significantly less stringent underwriting processes. Further as can be seen from the charts A and B, the expected death claims under HMP policies are over 210% of those expected under individual life policies in the first two years the policies are inforce. This is the policy period in which Mr. Hall died.

What CUNA Mutual is in effect saying with respect to the Hall claim is that they priced for and expected significantly more death claims, especially in the policies' early durations, and now they want to avoid their contractual responsibilities. They want to find reasons not to pay the rightful death claims under HMP policies that might have been discovered as part of a more stringent underwriting process analogous to individually underwritten life insurance.

2.  In this same vein, the application form for home mortgage protection insurance asks fewer medical questions and also uses an accept or decline rating methodology. This rating process issues all policies in a single pricing classification. It covers all insureds when such insureds were classified as a standard risk or had an expected extra mortality rating which at most was not greater than 175% of a standard mortality classification. Note however that non-smokers and smokers were charged different rates.

3.  The HMP insurance was not solicited by Tommy Bob Hall. It was just a fact of doing business for Mr. Hall. When he took out a mortgage, he just accepted the related mortgage insurance coverage that went along with it. CUNA Mutual has implied that Mr. Hall lied on his application. Why would someone take $20,000 out of their savings which lowered the amount of HMP insurance on the new mortgage as compared to the previous mortgage? If someone had a medical condition that they wanted to hide, then they clearly would have retained their previous, higher amount mortgage and the correspondingly higher mortgage protection insurance that went along with it.

4.  The Hall claim was not listed as "resisted" in the December 31, 2001 Annual Statement, Schedule F. On page 54 of the 2001 Annual Statement of CUNA Mutual Insurance Society, where all currently resisted claims are shown, the Hall claim was not shown. This leads to the question of what other resisted claims were not shown, and whether there is a pattern of consistent omissions of other resisted claims. For the 1999 Annual Statement, finalized as of February 28, 2000, the Hall claim was correctly _not_ shown as "Resisted" as it was then a rescinded policy.

5.  **Determination of Punitive Damages, if Determined As Applicable By a Jury:**
    A.  Which life insurance company or companies should any punitive damage award be applied against? CUNA Mutual Group is a marketing name. The life companies which are defacto managed by the same executives are CUNA Mutual Insurance Society (CMIS) which issued the certificate of insurance to Mr. Hall and CUNA Mutual Life Insurance Company (CMLIC). On page 8 of Mr. Paul Lawin's deposition, he states that the companies are managed as if they are a single company. Further on page 11, he states that the company is marketing itself as a total entity. Finally, it is very difficult when reviewing the CUNA Mutual Annual Reports to come away with any other conclusion but that it is a single entity, with different operating divisions. As such, any non-direct damage award should be based on the income or surplus (net worth) of the combined entity.

Further supporting a single combined entity approach are that both insurance companies (CMIS and CMLIC) are managed to achieve the same ratings from all the rating services except Weiss' Ratings service: A.M. Best gives both companies an A rating, Standard and Poor's gives both companies an Api rating, Fitch gives both companies a AA rating. Weiss gives CMIS a C+ rating while it gives CMLIC a B+ rating. Further the insurance service Vital Signs which measures insurance companies on a 100 point scale gives both companies a 78 Comdex rating.

B.   **Financial Measures (based on 2001 Annual Statements) that could be used to measure the amount of the punitive damages award:**

(All numbers in thousands of dollars)

| Financial Measure | CMIS | CMLIC | Total | PD % | PD Amount |
|---|---|---|---|---|---|
| Admitted Assets | 2,390,524 | 5,386,351 | 7,776,875 | 1/10 of 1% | 7,777 |
| Total Surplus & AVR | 597,818 | 275,112 | 872,930 | 1% | 8,729 |
| Net Income from Operations | 13,202 | 7,244 | 20,446 | 20% | 4,089 |
| Total Net Income Includes Realized Capital Gains: | 13,413 | 8,914 | 22,327 | 20% | 4,465 |

Note:   PD % is the Punitive Damage percentage which if assessed against the total CMIS and CMLIC amounts would yield the Punitive Damage Amount (PD Amount) found in the last column.

C.   **Comparative Damages:** The combined insurance companies could be assessed a measure of damages in relationship to what Tommy Bob Hall was paying in premiums. Hall was paying $32 per month with after tax dollars. Given that he was making $40,000 per year at the time, that annualized expenditure was equivalent to $533 and represented 1.33% of his gross wages: (384/(1-.28 tax bracket). That percentage of earnings was what Hall was willing to pay annually for this coverage. Based on the HMP smoker mortality rates applicable to Hall's certificate, Hall's life expectancy was far greater than his remaining future working lifetime of 20.5 years. (He was 44.5 at the time of his death.)

The penalty to CUNA Mutual company should be for not less than that same relative magnitude of his earnings, applied to their earnings for his future remaining working lifetime.

D.    **Comparable CUNA Mutual "wages":**

CUNA Mutual's wages, as seen from the above chart, were $22.3 million in 2001. As such applying the 1.33% for 20.5 years yields a comparable damage amount of $5.9 million.

E.    **Risk Based Capital Measure**: The state insurance commissioners and their umbrella organization, the National Association of Insurance Commissioners, have promulgated various standards for the amount of surplus which insurance companies should have based on the particulars of their various assets and liabilities. In order to not have any operating or reporting restrictions placed on them by the state insurance commissioners, a life insurance company must have Risk Based Capital ratios of 250% or higher.

The combined companies of CMIS and CMLIC have a risk based capital ratio of 296% as of December 31, 2001: 403% for CMLIC and 247% for CMIS. Their combined surplus and AVR (asset valuation reserve) which is usually considered a part of surplus was $872,930,000 as of 12/31/01. This means that the combined companies' "free surplus," or surplus not implicitly required to support their policyholder obligations as of that date was $135,658,000. A percentage of this amount could then be considered as available for a penalty for their disregard of Mrs. Nancy Hall's legitimate claim and still not inhibit their other policyholders' required surplus amounts. 5% of this amount would be 6.8 million dollars.

F.    **Damages Based on Earnings of the CMIS Unit Responsible for the Home Mortgage Protection (HMP) and Member Elect Credit Life (MECL) Lines of Business:** Based on Rick Fischer's deposition, it is clear that these two lines of business are managed by a single management team. As such should any damages be assessed based on this business unit's results, and not the overall operating entity's results as a whole, then the damages should be based on total results for both these lines of business. As seen from Chart C, attached, which shows the annual profits for these lines of business for the last four years, the annual and average profits are as follows:

**Annual Profits (CMIS' Credit Union Lines of Business)**
(All numbers in thousands of dollars)

|        | 1998  | 1999 | 2000  | 2001   | Av Last 4 Yrs | Av Last 2 Yrs |
|--------|-------|------|-------|--------|---------------|---------------|
| HMP    | 192   | 633  | 132   | 527    | 371           | 329           |
| MECL   | 1,215 | 177  | 8,522 | 17,238 | 6,788         | 12,880        |
| Total  | 1,406 | 810  | 8,654 | 17,765 | 7,159         | 13,209        |

The average annual profits for this business unit for the last two years was $13.2 million. Therefore should 10% of this unit's profits be assessed as damages for the next five years, and profits are assumed to remain at the average level of the last two years, then such damages would be $6.6 million.

6.    **Why punitive damages should be assessed:**

-    CMIS' letter denying claim but CMIS had in their records at the time the claim was denied the 1993 pathology report which clearly stated the mole was not cancerous nor was it a melanoma.

-    CMIS' intimating actions:  First by the SIU unit's referral to the Pennsylvania Attorney General without any internal investigation on their own, and second, by not telling Mrs. Nancy Hall that the Attorney General was not going ahead with the any action against her.

-    Brenda Larson being in a position to make a decision without proper training or management:  She held the fate of Mrs. Nancy Hall and did not have adequate supervision or training on which to base her decision.

-    The many reports from doctors involved were clear that the 1993 mole was not cancerous nor a melanoma:  Yet in spite of these reports, CUNA continued to refuse payment of the Hall claim.

**Summary**:

That CUNA Mutual's continuous denial constitutes unreasonable conduct for a prudent insurance company.

Dr. Charlesworth's name was on the application completed by Tommy Bob Hall.  CMIS did not pursue obtaining Tommy Bob Hall's medical records from Dr. Charlesworth at that time.  Had they obtained those records, they would have seen their concerns that they subsequently raised when the claim was filed.  CMIS had the chance to underwrite the insurance certificate application at that time.  They did not.

Further, CMIS priced for an extra level of associated death claims reflective of the less stringent underwriting standard for the HMP line of business.  It appears that CMIS and the CUNA Mutual Group now want to have it both ways.  This is clearly unreasonable conduct.

*Richard A. Schwartz*

*June 21, 2002*

## Chart A.

### Hall v. CUNA Mutual Group et al:   Expected Death Claims Calculations

### Mortality Comparison Charts

| | 50K - 100K Individual Face Amounts - Age 42: | | | HMP Mortality Rates - Age 42 | | | |
|---|---|---|---|---|---|---|---|
| | Indiv Ins Comb NS S 1000 Qx | Indiv Ins Comb NS S 1000 Qx | Combined M/F 1000 Qx | Smoker 1000 Qx | Non-Sm 1000 Qx | Comb 1000 Qx M+F/NS-S | Ratio: HMP/ Individual Coverage |
| Duration | Male | Female | 75 / 25 | | | .8 NS/.2 SM | |
| 1 | 0.83 | 0.39 | 0.720 | 2.33 | 1.35 | 1.546 | 214.7% |
| 2 | 1.12 | 0.64 | 1.000 | 3.12 | 1.81 | 2.072 | 207.2% |
| 3 | 2.28 | 1.22 | 2.015 | 4.12 | 2.39 | 2.736 | 135.8% |
| 4 | 2.18 | 1.37 | 1.978 | 4.81 | 2.79 | 3.194 | 161.5% |
| 5 | 2.41 | 1.61 | 2.210 | 5.30 | 3.07 | 3.516 | 159.1% |
| 6 | 2.73 | 1.91 | 2.525 | 5.73 | 3.32 | 3.802 | 150.6% |
| 7 | 2.93 | 2.02 | 2.703 | 6.12 | 3.55 | 4.064 | 150.4% |
| 8 | 3.33 | 2.18 | 3.043 | 6.49 | 3.76 | 4.306 | 141.5% |
| 9 | 3.58 | 2.37 | 3.278 | 6.88 | 3.99 | 4.568 | 139.4% |
| 10 | 4.02 | 2.43 | 3.623 | 7.43 | 4.31 | 4.934 | 136.2% |
| 11 | 4.76 | 2.75 | 4.258 | 8.11 | 4.70 | 5.382 | 126.4% |
| 12 | 5.67 | 3.16 | 5.043 | 9.25 | 5.36 | 6.138 | 121.7% |
| 13 | 6.81 | 3.68 | 6.028 | 10.64 | 6.17 | 7.064 | 117.2% |
| 14 | 8.12 | 4.30 | 7.165 | 12.20 | 7.07 | 8.096 | 113.0% |
| 15 | 9.71 | 4.95 | 8.520 | 13.54 | 7.85 | 8.988 | 105.5% |
| 16 | 11.15 | 5.56 | 9.753 | 15.28 | 8.86 | 10.144 | 104.0% |
| 17 | 12.27 | 6.13 | 10.735 | 16.84 | 9.76 | 11.176 | 104.1% |
| 18 | 13.31 | 6.74 | 11.668 | 18.54 | 10.75 | 12.308 | 105.5% |
| 19 | 14.57 | 7.40 | 12.778 | 20.46 | 11.86 | 13.580 | 106.3% |
| 20 | 15.81 | 8.02 | 13.863 | 22.58 | 13.09 | 14.988 | 108.1% |

### Chart B.
**Comparison of Expected Death Claims Assuming 10% Annual Mortgage Turnover Rate And HMP Level of Death Claims**

| Duration | Mortgages Inforce BOY | Mortgages Terminated Voluntarily | Mortgages Terminated By Death | Mid Year Face Am't | Annual Expected Death Payments | Discounted Expected Annual Death Payments | Sum: Years 1&2 |
|---|---|---|---|---|---|---|---|
| 1 | 1,000.00 | 100.00 | 1.469 | 55,660 | 81,748 | 81,748 | |
| 2 | 898.53 | 89.85 | 1.769 | 55,040 | 97,348 | 86,917 | |
| 3 | 806.91 | 80.69 | 2.097 | 54,380 | 114,052 | 90,922 | 168,665 |
| 4 | 724.12 | 72.41 | 2.197 | 53,670 | 117,924 | 83,936 | |
| 5 | 649.51 | 64.95 | 2.169 | 52,910 | 114,788 | 72,950 | |
| 6 | 582.39 | 58.24 | 2.104 | 52,090 | 109,573 | 62,175 | |
| 7 | 522.05 | 52.20 | 2.016 | 51,230 | 103,255 | 52,312 | |
| 8 | 467.83 | 46.78 | 1.914 | 50,300 | 96,261 | 43,544 | |
| 9 | 419.13 | 41.91 | 1.819 | 49,300 | 89,670 | 36,216 | |
| 10 | 375.40 | 37.54 | 1.760 | 48,240 | 84,884 | 30,610 | |
| 11 | 336.10 | 33.61 | 1.718 | 47,100 | 80,939 | 26,060 | |
| 12 | 300.77 | 30.08 | 1.754 | 45,880 | 80,466 | 23,132 | |
| 13 | 268.94 | 26.89 | 1.805 | 44,580 | 80,458 | 20,652 | |
| 14 | 240.24 | 24.02 | 1.848 | 43,190 | 79,804 | 18,289 | |
| 15 | 214.37 | 21.44 | 1.830 | 41,700 | 76,328 | 15,618 | Ratio |
| 16 | 191.10 | 19.11 | 1.842 | 40,110 | 73,867 | 13,495 | Top/Botton |
| 17 | 170.15 | 17.02 | 1.807 | 38,400 | 69,370 | 11,316 | = |
| 18 | 151.33 | 15.13 | 1.769 | 36,580 | 64,726 | 9,427 | **210.7%** |
| 19 | 134.43 | 13.44 | 1.734 | 34,630 | 60,057 | 7,810 | |
| 20 | 119.25 | 11.92 | 1.698 | 32,550 | 55,268 | 6,417 | |

Assumptions:

| | | | Cum Exp | | |
|---|---|---|---|---|---|
| Annual Term Rate | 10.0% | | Death Claims: | 1,730,787 | 793,546 |
| Annual Discount Rate | 12.0% | | | | |

**Comparison of Expected Death Claims Assuming 10% Annual Mortgage Turnover Rate And Individual Life Level of Death Claims**

| Duration | Mortgages Inforce BOY | Mortgages Terminated Voluntarily | Mortgages Terminated By Death | Mid Year Face Am't | Annual Expected Death Payments | Discounted Expected Annual Death Payments | Sum: Years 1&2 |
|---|---|---|---|---|---|---|---|
| 1 | 1,000.00 | 100.00 | 0.684 | 55,660 | 38,071 | 38,071 | |
| 2 | 899.32 | 89.93 | 0.854 | 55,040 | 47,023 | 41,985 | |
| 3 | 808.53 | 80.85 | 1.548 | 54,380 | 84,165 | 67,096 | 80,056 |
| 4 | 726.13 | 72.61 | 1.364 | 53,670 | 73,213 | 52,111 | |
| 5 | 652.15 | 65.22 | 1.369 | 52,910 | 72,444 | 46,039 | |
| 6 | 585.57 | 58.56 | 1.405 | 52,090 | 73,167 | 41,517 | |
| 7 | 525.61 | 52.56 | 1.349 | 51,230 | 69,131 | 35,024 | |
| 8 | 471.70 | 47.17 | 1.363 | 50,300 | 68,578 | 31,021 | |
| 9 | 423.16 | 42.32 | 1.318 | 49,300 | 64,956 | 26,235 | |
| 10 | 379.53 | 37.95 | 1.306 | 48,240 | 63,006 | 22,721 | |
| 11 | 340.27 | 34.03 | 1.376 | 47,100 | 64,822 | 20,871 | |
| 12 | 304.87 | 30.49 | 1.460 | 45,880 | 67,004 | 19,262 | |
| 13 | 272.92 | 27.29 | 1.563 | 44,580 | 69,668 | 17,882 | |
| 14 | 244.07 | 24.41 | 1.661 | 43,190 | 71,751 | 16,444 | |
| 15 | 218.00 | 21.80 | 1.764 | 41,700 | 73,578 | 15,056 | |
| 16 | 194.43 | 19.44 | 1.801 | 40,110 | 72,254 | 13,201 | |
| 17 | 173.19 | 17.32 | 1.766 | 38,400 | 67,823 | 11,063 | |
| 18 | 154.10 | 15.41 | 1.708 | 36,580 | 62,482 | 9,100 | |
| 19 | 136.98 | 13.70 | 1.663 | 34,630 | 57,583 | 7,488 | |
| 20 | 121.62 | 12.16 | 1.602 | 32,550 | 52,136 | 6,053 | |

Assumptions:

| | | | Cum Exp | | |
|---|---|---|---|---|---|
| Annual Term Rate | 10.0% | | Death Claims: | 1,312,859 | 538,241 |
| Annual Discount Rate | 12.0% | | | | |
| | | | Ratio Exp Claims HMP/Indiv | 131.8% | **147.4%** |

## Chart C:

## HMP and MECL Profit Calculations

### HMP Life

| | 1998 | 1999 | 2000 | 2001 | Total 4 Yrs | Average 4 Years | Average Last 2 Years |
|---|---|---|---|---|---|---|---|
| Dir Earned Premiums | 2,722,278 | 2,968,666 | 3,154,485 | 3,215,319 | 12,060,748 | 3,015,187 | 3,184,902 |
| Claims Paid | 977,857 | 790,773 | 909,352 | 1,031,744 | 3,709,726 | 927,432 | 970,548 |
| Incurred Claims | 955,059 | 793,328 | 963,108 | 1,052,165 | 3,763,660 | 940,915 | 1,007,637 |
| Claim Rsv (w/o LAE) | 37,194 | 39,749 | 93,505 | 113,926 | 284,374 | 71,094 | 103,716 |
| Increase in Policy Rsv | 436,406 | 361,892 | 529,919 | 439,197 | 1,767,414 | 441,854 | 484,558 |
| Policy Reserve | 3,192,949 | 3,554,841 | 4,084,760 | 4,523,957 | 15,356,507 | 3,839,127 | 4,304,359 |
| Credit Union Reimb | 393,966 | 429,707 | 447,895 | 436,080 | 1,707,648 | 426,912 | 441,988 |
| Experience Refund | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Operating Expense | 744,986 | 751,172 | 1,081,944 | 760,930 | 3,339,032 | 834,758 | 921,437 |
| | | | | | | | |
| Annual Profits | 191,861 | 632,567 | 131,619 | 526,947 | 1,482,994 | 370,749 | 329,283 |

### MECL Life

| | 1998 | 1999 | 2000 | 2001 | Total 4 Yrs | Average 4 Years | Average Last 2 Years |
|---|---|---|---|---|---|---|---|
| Dir Earned Premiums | 143,446,684 | 153,050,386 | 167,736,697 | 173,565,992 | 637,799,759 | 159,449,940 | 170,651,345 |
| Claims Paid | 88,688,061 | 96,322,371 | 96,667,001 | 100,442,252 | 382,119,685 | 95,529,921 | 98,554,627 |
| Incurred Claims | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Claim Rsv (w/o LAE) | 13,254,000 | 12,114,000 | 16,281,000 | 14,514,000 | 56,163,000 | 14,040,750 | 15,397,500 |
| Increase in Policy Rsv | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Policy Reserve | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Credit Union Reimb | 22,960,789 | 25,127,336 | 29,203,901 | 30,257,305 | 107,549,331 | 26,887,333 | 29,730,603 |
| Experience Refund | 4,526,128 | 5,726,378 | 6,917,827 | 10,904,152 | 28,074,485 | 7,018,621 | 8,910,990 |
| Operating Expense | 25,235,116 | 26,837,094 | 22,258,915 | 16,491,091 | 90,822,216 | 22,705,554 | 19,375,003 |
| | | | | | | | |
| Annual Profits | 1,214,591 | 177,207 | 8,522,053 | 17,238,192 | 27,152,043 | 6,788,011 | 12,880,123 |

### HMP+MECL

| | 1998 | 1999 | 2000 | 2001 | Total 4 Yrs | Average 4 Years | Average Last 2 Years |
|---|---|---|---|---|---|---|---|
| Total Annual Profits: | 1,406,452 | 809,774 | 8,653,672 | 17,765,139 | 28,635,037 | 7,158,759 | 13,209,406 |

# LIFE
# INSURANCE
# ANALYSTS, INC.

## RICHARD A. SCHWARTZ
### A Professional Biography

Dick Schwartz is President of *Life Insurance Analysts, Inc.* In this capacity he functions as a consultant to professional advisors and their clients, national insurance carriers and insurance marketing organizations. Life Insurance Analysts (LIA) provides due care, product analyses, marketing and reinsurance consultation to these communities. Schwartz also assists financial institutions in implementing new insurance distribution strategies by structuring products, insurance carriers and independent distribution resources. In addition Schwartz has completed significant amount of expert witness work for both plaintiffs and the defense.

In October 2000, LIA completed structuring an arrangement among three prominent insurance carriers, which allowed the eighth largest national CPA firm to commence its financial services practice in conjunction with over 100 independent agents. Schwartz now assists in implementation of that venture along with expansion of its services to address different client needs.

Prior to founding Life Insurance Analysts in 1994, Schwartz served for eight years as Executive Vice President of M Life Insurance Company, an affiliate of the M Financial Group. Prior to that he was Senior Vice President of Product Marketing for SunAmerica Insurance where his functional responsibilities also included strategic planning and product development.

Mr. Schwartz brings to the firm 33 years of experience in the insurance industry. After receiving his Bachelor of Science degree from Clarkson University, Mr. Schwartz went on to receive his Master's in Actuarial Science from Northeastern University. Mr. Schwartz is a Fellow in the Society of Actuaries, a Member of the American Academy of Actuaries, a Chartered Life Underwriter and a member of the Association for Advanced Life Underwriting (AALU.)

A frequent speaker on due care as it applies to life insurance companies and products, Mr. Schwartz has spoken before the American College of Trust and Estate Counsel (ACTEC), Miami Estate Planning Institute, Notre Dame Tax and Estate Planning Institute, and the Association for Advanced Life Underwriting (AALU). He has written several articles on these topics for several publications including *Probate & Property, Trusts & Estates,* and *Best's Review.*

## Listing of Publications:

* 1989 - Co-author of the first ABA primer "**Life Insurance Products, Illustrations, and Due Diligence**" for the Real Property, Probate and Trust Law Section.
* April 1991 - Due Diligence: A Means To Build Client Confidence. Broker World
* May 1991- Due Diligence: Assessing the Survivorship Purchase. Trusts and Estates.
* Feb 1993 - **The Scoop on Variable Life**: Probate and Property ABA magazine.
* March 1994 Co-author of **American Bar Association primer "Life Insurance Due Care: Carriers, Products, and Illustrations."**
* March 1995 **Keeping Faith with Policyholders: Guidelines for Companies and Producers**. CLU Journal

Richard A. Schwartz, CLU, FSA
85 Silver Fox Drive, Greenwood Village, CO 80121
303-740-0961    fax: 303-740-7192    dick@LifeInsuranceAnalysts.com

# Extended Professional Resume
### June 21, 2002

**Qualifications:**

- **Extensive experience in life insurance producer groups**

- **Proficiency in life company profitability management** as evidenced by building M Life reinsurance company into a very profitable operation with 1994 net profits exceeding twenty million dollars. This is in contrast to the scratch operation M Life was in 1986 with annual profits of less than one million dollars.

- **Expert in product development and pricing,** for M Financial Group and SunAmerica.

- **Advanced Product Knowledge:** The keys in designing life products are simplicity and creating meaningful edges that can be valued by the customer and advisor. Concept sales, not spread sheet sales, should be the focus. My unique experiences working with insurance carriers, producers, and also in high net worth direct sales, enables me to synthesize these elements into marketable products.

- **Extensive business planning experience,** at The Madison Group, M Financial, M Life and SunAmerica.

- **Excellent communication skills,** both written and verbal as seen from my extensive national speaking presentations, books and articles.

- **Ability to effectively interact with insurance professionals, advisors and senior insurance company management.** This is reflected by LIA's very effective consulting practice established over the last eight years.

- **In-depth understanding of the marketing process** in the high net worth estate planning and COLI areas.

- **Significant expert witness work.**

**Life Insurance Analysts, Inc.** (1994 - Current)

- **Consulting Clients:** LIA provides diversified consulting services to life insurance carriers, marketing firms, and law and CPA advisors. In addition LIA provides expert witness support work for both plaintiffs and defendants.

- **Consulting Experience With Producer Groups:** From 1994 - 2002 LIA's clients have included: Connecticut Mutual Life, General American, Lincoln National, Minnesota Life, Partners Group, Programmed Insurance Marketing and Prudential Select Life.

**M Financial Group:** (1986 - 1994.)

- Executive Vice President - M Life Ins Company:    1991 - 1994
- Senior VP - Product Development and Sales:    1986 - 1992
- Senior VP - Chief Actuary, M Life Ins Company:    1986 - 1991

2



The M Group is the largest agent-owned marketing and life reinsurance company in the United States. M Financial is structured in five value-added segments: sales (producer relationships), marketing presentation systems, unique product development, carrier relationships, and M Life reinsurance. My responsibilities included the last three.

## SunAmerica  (Sun Life Insurance Company of America)    (1973 - 1986)

- Senior Vice President, Product Marketing    (1984 - 1986)
- Senior Vice President, Product and Planning    (1981 - 1984)
- Vice President, Product Development    (1976 - 1980)
- Actuary    (1973 - 1976)
- Member of the Board of Directors of both Sun Life Insurance Company of America and its subsidiary, Universal Guaranty Life Insurance Company.

### Product Marketing Responsibility: 1984 - 1986
In 1984 I developed a matrix product line organization where the profitability of each distribution arm was a joint responsibility between the sales department and the Product Line function which I managed. My area's responsibility was to develop products, marketing materials and the necessary micro computer systems. Equally important, this group monitored the product lines and took corrective action to maintain ongoing profitability for the existing business. This responsibility encompassed all distribution systems. This group included management of a staff of 35, including 5 direct reports.

### Product Development and Strategic Planning Responsibility: 1981 -1984
I was responsible for Sun Life's business and strategic planning. Business planning encompassed the annual marketing and financial plans, including budgets.  Strategic planning consisted of a five-year plan detailing which distribution systems and markets should be emphasized. During this time I also managed a twenty person product development staff including actuaries, sales promotion and sales training specialists.

## Massachusetts Indemnity and Life Insurance Company:  (1967 - 1973)
Starting in 1967 as an actuarial trainee, I progressed to Associate Actuary in four years. I managed the actuarial department with responsibilities in both the valuation and product development areas.  In this context I developed new life and disability product portfolios and was responsible for the Company's initial conversion to GAAP accounting.

## ACADEMIC:
- Clarkson University, Potsdam NY: BS in Math, 1967.  Fifth out of 370 graduates.
- Northeastern University, Boston:  Masters in Actuarial Science, 1969
- Fellow in the Society of Actuaries, 1973.
- Member of the American Academy of Actuaries, 1975
- Chartered Life Underwriter, 1990

## MILITARY:
- 8/67 - 6/69 US Army - Signal Corps Officer
- Vietnamese language specialist
- Forward operations Signal Platoon leader - Independent infantry brigade

*Richard A. Schwartz*

*June 21, 2002*

3

**Hall vs. CUNA Mutual Group; CUNA Mutual Insurance Society**
**Report of Michelle Doherty**
**June 24, 2002**

## SUMMARY

This is a report of my review of Hall vs. CUNA Mutual Group and CUNA Mutual Insurance Society (CUNA). To prepare this report, I reviewed the following documents: Pennsylvania Insurance Laws; NAIC Model Unfair Trade Practices Act; NAIC Model Unfair Claims Settlement Practices Act; NAIC Model Unfair Life, Accident and Health Claims Settlement Practices Model Regulation; NAIC Compendium of State Laws on Insurance Topics – Insurance Fraud Prevention Laws; NAIC Model Consumer Credit Insurance Model Act. Additionally, I reviewed the entire claim file furnished by CUNA, the PMA Insurance Group's worker's compensation file on Mr. Hall, Cressler Trucking Company's file on Mr. Hall, and the following depositions: Dr. Thomas Ansfield, Dr. George Baker, Dr. Michael Cashdollar, Dr. Ernest Charlesworth, Dr. James Chicklo, Dr. John Enders, Marcia Feldman, Richard Fischer (3/14/02 and 3/28/02), Deb Haglund, Nancy Hall (1/10/01 and 3/19/02), Tommy Hall (10/19/99 and the video deposition on 10/20/99), Erin Hefty, Dr. Howard Hoffman, Brenda Larson, Paul Lawin, Barbara Lutz, William Nardi, Dr. Constancio Ramirez, Dr. William Sharfman, Paula Statler and Michael Stel. In addition, I reviewed CUNA's HMP Field Manual and HMP Credit Union Manual, Online Claims Reference Manual, Underwriting Procedure Manual and SIU State Fraud Manual.

Every opinion in this report is held to a reasonable degree of certainty within the insurance industry, and is based on my knowledge and experience in the areas of claims, compliance and Special Investigative Units (SIU).

It is clear the Halls purchased the credit insurance in order to allow Mrs. Hall to keep the family home in the event of Mr. Hall's death prior to the retirement of the mortgage loan. It is also clear to me that CUNA violated their duty to treat the insured Tommy Bob Hall II and his wife Nancy Hall fairly. In fact, CUNA continued to violate their duty to the Halls at the time the initial claim for benefits was filed, at the time medical records and depositions were provided in connection with another legal action filed by the Halls, and at the time of discovery during this litigation. During each of these time frames, information was either in the company's file or available to the company to provide more than a reasonable doubt as to Mr. Hall's knowledge of his history of melanoma at the time the application for insurance was signed. This information clearly established that Mr. Hall had not been treated or diagnosed with cancer prior to the date his application for insurance with CUNA was completed.

## ANALYSIS

### APPLICATION AND UNDERWRITING PROCESS

On November 18, 1998, Tommy Bob Hall II completed an application for credit life insurance at Patriot Federal Credit Union for Member's Home Mortgage Protection II, issued by CUNA. Mr. Hall correctly answered NO to question (B) 1. "Have you ever been treated for or diagnosed by a member of the medical profession as having any of the following (Please check the box and circle condition(s) that applies) Diabetes; high blood pressure; chest pain; heart, blood, blood vessel, lung or breathing disorders; cancer; epilepsy; stroke; pneumonia(s); arthritis, brain, mental, nervous, back, neck, joint or muscular disorders; stomach, intestines, liver, pancreas, or kidney disorders, cirrhosis, drug or alcohol abuse, acquired immune deficiency syndrome or AIDS related complex, or tested positive for antibodies to the AIDS virus?" A fraud statement appeared on the application, as required by law.

The health question on this application form is an all-encompassing question, obviously listing many health conditions. In everyday insurance terminology, this type of application may be called an "accept or decline" application. This means, depending on the response made to the all-encompassing health question, the company will make the decision to accept or reject the applicant with little to no underwriting involved prior to policy issue. Typically, when a company uses this type of "accept or decline" application form, the insurance product is priced to reflect that higher level of mortality they will experience by failing to fully underwrite the risk.

CUNA's Members Choice Home Mortgage Protection Administration Guide provides procedures and instructions to the credit union in enabling the enrollment process. A couple of significant items appear on the application, which were not handled in accordance with CUNA's published Administration Guide and/or Underwriting Procedure Manual.

(1)     The question regarding tobacco use within the past 24 months was not completed.

(2)     CUNA's published Administration Guide states, "When you enroll members in the Home Mortgage Protection II you must provide the annual premium cost. You will do so by completing the cost disclosure section of the member application form. **The Annual Premium Cost Disclosure was not completed on Mr. Hall's application.** This is important because a more sophisticated insurance consumer may have found that the cost of the credit insurance was relatively expensive, and that cheaper coverage could perhaps have been purchased elsewhere to cover the amount of the mortgage loan.

(3)    The application indicated the CUNA coverage would replace existing coverage.  State insurance department replacement regulations do not apply to credit insurance.  However, the CUNA procedures manual states "Regardless of the state regulations, CUNA Mutual has chose to log all replacements....Depending upon the product and state of issue, additional forms or notifications may or may not also be required."  And further, "If a state requires replacement disclosures or notifications for a product, there should be a replacement question found on the application."  **There is no indication in the company claim or underwriting file that the published company procedure was followed.  No replaced company information was noted on the application, even though the replacement question was answered Yes.**

During the underwriting process, Carolyn McQueen, Life Underwriter, requested, via a letter to Mr. Hall on 12/1/98, the answer to the tobacco use question.  Ms. McQueen's letter states "...and we appreciate your early reply, as there is no coverage in force at this time."  The supplemental information regarding tobacco use was subsequently received by CUNA, stamped "HMP Dec 10 1998".  The Mortgage Protection File Worksheet indicates "FINAL ACTION: APPROVED AS APPLIED FOR. UNDW. INIT. & DATE 12-11-98 C. MCQUEEN."  The CUNA underwriting procedures manual provides the underwriting action on clean applications for the HMP product – under age 50, under $100,000, issue.  The coverage was issued with an effective date of 01/01/99.

CUNA was on notice of Mr. Hall's physician and had the opportunity to request and review Mr. Hall's medical records.  No such request was made until the claim for death benefits was made to CUNA.  This lead to a situation referred to as post-claim underwriting.  CUNA has procedures for processing claims.  During the 2-year contestable period, a policy is usually "suspended" for a contestable period investigation if a claim is received containing a diagnosis of a condition related to the health questions on the application.  This leads to the practice of post-claim underwriting that may be harmful to policyholders, especially those who have replaced other coverage.  (We know Mr. Hall had previous coverage that was replaced by CUNA.)  It is acknowledged that CUNA is exercising their right to investigate whether a material misrepresentation occurred on the application.  However, it appears no pre-approval underwriting was performed by either requesting an MIB report or verifying with Dr. Charlesworth that Mr. Hall had not been diagnosed with any of the conditions identified through the health questions on the application.

## CERTIFICATE OF INSURANCE

On 01/01/99, CUNA issued certificate number 00032534 to Insured Debtor Tommy B. Hall.  The initial amount of decreasing term life insurance elected was $55,951.79.  There is some question as to exactly which certificate was issued to Mr. Hall.  As part of discovery, a specimen form B3a-900-0987 was provided to counsel.  However, one page of form B3a-900-0987PA is also present.  It is not uncommon for the Pennsylvania Department of Insurance to require modifications to insurance contract language during their required approval process.  My comments and observations in this part of my report are based on my review of form B3a-900-0987, which may not have state-specific language that may be present in the –0987PA form.

The specimen certificate and specimen master policy give the definitions and provisions under which coverage is provided.  **From my review of these definitions and provisions, my conclusion is that benefits were improperly declined and that coverage was improperly rescinded.**  The review that led me to this conclusion is outlined here.

(1)  The certificate definition of sickness is "SICKNESS means a disease or illness which causes the Insured Debtor or the Joint Insured Debtor to become Totally Disabled while insured under the Policy and requires the care of a licensed physician other than himself:  There is no mention in the certificate that the disease or illness must first be diagnosed or treated while the coverage is in force.  This would be typical language in an insurance contract.  **It is clear that Mr. Hall became Totally Disabled while insured under the Policy, and that he required care of a licensed physician, and that he was not a licensed physician and qualified to treat himself.**

(2)  The certificate states under LIFE INSURANCE BENEFIT "We will pay a life insurance benefit, subject to the terms of the Policy, if you or your Joint Insured Debtor die while insured under the Policy.  Upon receipt of proof of death of you or your Joint Insured Debtor (whichever occurs first) We will pay the Amount of Insurance Benefit to the Policyholder, to reduce or pay off the Mortgage Loan.  Payment will completely discharge Our liability."  **It is clear that Mr. Hall was the Insured Debtor, that he died while insured under the policy, and that CUNA was provided with proof of death.**

(3)  The certificate states under GENERAL PROVISIONS – LIFE AND DISABILITY INSURANCE "…No statement can be used to void this insurance or deny a claim unless that statement is signed by you or your Joint Insured Debtor and a copy given to you or your Joint Insured Debtor…"  This is the typical contestable period language, such contestable period lasting for a period of 2 years under this policy.  **It is clear that Mr. Hall, based on the medical records and depositions provided to CUNA, made an accurate statement on his application for this coverage.  In addition to his truthful NO answer to the medical question, he listed the name and address of Dr. Ernest Charlesworth on the application.  Had CUNA requested records from Dr. Charlesworth at the time of application, those records could have been reviewed and an underwriting decision could have been made at that time to issue or decline the coverage.**

4

In the Product Overview section of the Members Choice Home Mortgage Protection Field Training Guide, there is certain information provided by CUNA to the member credit unions. For example, member eligibility requirements (for the HMP coverage) are that the members be under age 70 and be in good health. It is clear that, on the date of application, Mr. Hall was under age 70 and in good health, to his knowledge. Additionally, there is a question in the training guide for the credit union regarding conditions where CUNA would not pay any life benefits. There are 3 situations listed where life benefits are not paid: suicide within the first two years of coverage, or act of war, or air travel other than as a pilot, crew member or passenger on a scheduled flight on a commercial airline. It is clear that Mr. Hall's death was not the result of suicide, an act of war, or as the result of air travel.

**CLAIM HANDLING**

Mr. Hall died on 11/04/99. The Home Mortgage Insurance Claim Notice was completed by Jeanette Duquette at Patriot Federal Credit Union and faxed to CUNA with the death certificate on 11/10/99.

A Telephone Contact Sheet in CUNA's file notes a 12/13/99 call from Jeanette at CU had called. The call was returned 12/14/99 and a message was left stating, "…claim has been referred to Issuance & Serv. & there will be a delay on the claim. Any ?s, she can call me back." A subsequent message on 12/14/99 states that Jeanette called back. "I told her that we sent a letter directly to the med. I also gave her the # for issuance & serv."

A letter was sent 12/14/99 to Patriot Federal Credit Union stating that medical information had been received and forwarded to Issuance and Servicing Department for review.

A letter was sent to Nancy Hall 12/15/99 acknowledging Tommy's death and advising that medical records were received from Dr. Charlesworth. The letter requested the names, addresses and telephone numbers of physicians that Tommy received treatment from or consulted from January 1993 to April 1998.

A letter was sent to Nancy Hall 2/10/00 advising her coverage was being rescinded. The letter further stated "As a result, no benefits will be paid under this contract, either now or in the future."

The above sequence of events is of significance because it shows a consistent pattern of non-compliance with Pennsylvania Insurance Regulations. For example, PA Regulation 31s146.5 – failure to acknowledge pertinent communications. Section (a) requires acknowledgement of a claim within 10 working days of receipt of such notice. Notice of claim was received by CUNA 11/10/99 via fax. Acknowledgement to Patriot Federal Credit Union was made 12/14/99 via fax. Acknowledgement to Nancy Hall was made 12/15/99 via letter.

Additionally, PA Regulation 31s146.5 – failure to acknowledge pertinent communications.  Section (d) requires the insurer to provide, within 10 working days, necessary claim forms, instructions, and reasonable assistance so that first-party claimants can comply with the policy conditions and reasonable requirements of the insurer.  There is no indication in the claim file that claim forms, instructions or reasonable assistance were provided to Nancy Hall or Patriot Federal Credit Union within the allotted time frame.

Next is the violation of PA Regulation 31s146.6 – standards for prompt investigation of claims.  This regulation requires insurers to complete their investigation of a claim within 30 days after notification of claim, unless such investigation cannot reasonably be completed within such time.  If the investigation cannot be completed within 30 days, and every 45 days thereafter, the insurer shall provide the claimant with a reasonable explanation for the delay and state when a decision on the claim may be expected.  **The first correspondence with Nancy Hall was dated 12/15/99.  The next correspondence with Nancy Hall was dated 2/10/00, advising her the claim was being denied and coverage rescinded.**

In CUNA's Direct Response Underwriting Procedures Manual is a section entitled Rescission Procedures.  The procedure states, in part, "Also indicate in your letter that if the information is not correct to please contact our office."  This crucial statement was not included in any communication to Mrs. Hall or Patriot Federal Credit Union. The denial letter bluntly stated "…no benefits will be paid under this contract, either now or in the future."  As a result, Mrs. Hall, who was not a sophisticated or knowledgeable insurance person, and who had just suffered the loss of her husband, felt she had no recourse but to accept the company's denial and rescission of the coverage.

It is clear that at each step in the handling of this claim, CUNA's actions were inadequate and unacceptable.  Documents and depositions were available to CUNA at the time the initial claim was made for the death benefits, at the time of exchange of documents when the lawsuit was filed, and at the time of discovery.  For example, there is a note dated 11/19/93 from Dr. Hurley in the Cressler Trucking file that was referenced as an exhibit in Mr. Hall's video deposition of 10/20/99.  This note stated Mr. Hall had a dysplastic nevus removed 4/13/93, and that he was released from care 7/19/93.  Additionally, the 1993 pathology report was in the claim file at the time the claim denial and rescission were made.

## ACTIONS OF BRENDA LARSON AND WILLIAM NARDI

In addition to the violations of Pennsylvania Regulations and published company procedures outlined above in the Claim Handling section of this report, Brenda Larson and William Nardi's actions were outrageous.  By Brenda Larson's own testimony, she was still in training at the time of Mr. Hall's claim.  In fact, she testified this was her first claim.  Her supervisor was located in the Iowa office and was not available to Ms. Larson for consultation or guidance.  Ms. Larson made the incorrect assumption that Mr. Hall had provided a history of malignant melanoma in his medical history to Dr. Cashdollar. There were no continued efforts to secure medical records from Dr. Hurley, even though Dr. Hurley's office advised they had provided records to an attorney in April of 1999. (Further inquiry could have elicited the name of the attorney to whom the records were provided.)  CUNA was on notice at this time that an attorney could have been involved. Prudent claim handling and appropriate training should have caused Ms. Larson to refer the file to her supervisor or to CUNA's legal department.

In addition, by Ms. Larson's own testimony in her deposition, she acknowledged having the 1993 pathology report in the claim file before the decision was made to deny the claim and rescind the coverage.  That pathology report clearly described the mole as a dysplastic nevus.  There is nothing further in the claim file to show that Mr. Hall was advised in 1993 that the mole that was removed and tested was, in fact, a malignant melanoma.  Ms. Larson testified that the patient history provided in Dr. Cashdollar's records indicated "a surgical resection in 1993 of a malignant melanoma."  She believed the patient must have provided this information.  Mr. Hall, a high school graduate who had worked as a cabinetmaker and truck driver, believed he had a mole removed.  He further stated in his deposition that his doctor told him they got all "the infection."

Ms. Larson stated that, even though she knew the dysplastic nevus was not a diagnosis of malignancy, she felt there was enough other evidence in the claim file to deny the claim.

According to Bill Nardi's deposition, he was responsible for training Ms. Larson. There is a question, based on my experience, why Mr. Nardi did not counsel Ms. Larson to take more assertive action with CUNA's legal department.  He did recommend that Ms. Larson review the file with Rich Fischer, and that they may want a legal review process.  Based on my review of the documents provided, such reviews did not take place.  Prudent rescission handling should always call for a review and sign off by the company's legal counsel due to the nature of the action.

## FRAUD AND SPECIAL INVESTIGATIVE UNIT (SIU)

Fraud has been raised as a defense to CUNA's refusal to pay benefits for Mr. Hall's claim. However, it is evident that no investigation was performed which showed fraud had been committed. The head of CUNA's SIU, Mike Stel, did not perform an investigation prior to referring the file to the Pennsylvania Office of the Attorney General.

Based on my own experience in the insurance industry, the SIU exists in an insurance company to provide several key benefits to the company. The SIU is typically charged with the responsibility to review and investigate potential charges of fraud, both internal and external. Many states require the filing of fraud plans that detail how SIU's operate. SIU's also have Anti-Fraud Plan reporting requirements in many states. Some SIU's establish anti-fraud and ethics training programs, and deliver that training to their company employees.

CUNA has a published SIU procedure in their Direct Response Underwriting Procedures Manual. However, there were no written policies and procedures at CUNA on how to investigate a claim for fraud. In fact, it is obvious no actual investigation was performed. The medical records in the claim file were apparently the basis for referral by Ms. Larson to the SIU. However, the SIU failed to perform an additional investigation or to develop further information that would have substantiated whether fraud may have been committed at the time of application. Rather, Mike Stel, manager of CUNA's SIU, forwarded a completed form to the Pennsylvania OAG.

On 2/22/00, Mr. Stel advised Mrs. Hall and Patriot Federal Credit Union that CUNA had been "...required to inform the Pennsylvania Insurance Fraud Section of this matter." The Pennsylvania OAG acknowledged the referral on 2/29/00, and subsequently on 3/29/00, advised Mr. Stel they could not "...initiate a criminal investigation at this time." Mrs. Hall was never notified of the OAG's refusal to initiate a criminal investigation.

In my experience in the insurance industry, the SIU would never have advised the insured's widow that a referral to the Fraud Section was being made. CUNA's actions in notifying Mrs. Hall and Patriot Federal Credit Union constitute outrageous action, in that no possible purpose could be served by their notification. In addition, Mrs. Hall was a customer of Patriot Federal Credit Union, and it is obvious to me she would have been embarrassed by CUNA's actions.

## CONCLUSION

In conclusion, it is my opinion CUNA breached their contract with the Halls in the handling of Mr. Hall's claim. A prudent company would have provided training, supervision, and published policies and procedures for claim handling and fraud investigation. CUNA's conduct was unreasonable and outrageous under the circumstances.

1. Adequate oversight was not provided to Ms. Larson, Mr. Nardi or Mr. Stel. An inexperienced Brenda Larson, who did not have the guidance of her trainer, supervisor, or CUNA's legal department, handled the claim.

2. Time service standards established and required by the Pennsylvania Department of Insurance were violated. Published company procedures and guidelines were not followed regarding the completion of the application, the credit union's role in the application process, and in the rescission process.

3. CUNA failed to publish written policies and procedures on how to investigate a claim for fraud, and allowed the SIU manager to refer the file without investigation. Mr. Stel acted outrageously in notifying Mrs. Hall of the fraud referral, and compounded that outrageous conduct by failing to notify Mrs. Hall that no criminal investigation would be initiated by the state Fraud Bureau.

*Michelle Doherty*
*June 27, 2002*

**MARY MICHELLE DOHERTY**
8236 Tansy Drive
Orlando, FL  32819
(407) 363-7730 (Home)
(407) 628-1776 (Office)

---

## PROFILE

Multi-year experience in both staff and line management insurance company roles.  Key member of management and product development teams with proven expertise in training, aggressive problem solving, successful communications, organization, team leadership and project leadership.

### Highlights of Qualifications

- Outgoing personality with strong interpersonal skills and diversified management background
- Almost 30 years of insurance experience in the areas of claims, product filings, regulatory compliance, product development, customer service, advertising review, and claims training
- Black Belt quality analyst training, with proven team leadership skills
- Proven expertise in effective negotiation with regulators, internal and external counsel, and governmental agencies
- Instrumental in initial IMSA certification for GE Financial Assurance group

---

## SKILLS AND EXPERIENCE

### Management, Administrative Coordination and Government Affairs

- Managed regulatory compliance and product filing staff of 10 - 14 associates.
- Led project to reduce product to market cycle time by 1/3, while increasing filings by 2/3.
- Led multi-company team to manage all form filings for 3 mergers and 1 name change, completing project by target date, resulting in no loss of ability to do business.
- Served as subject matter expert on development of filing strategy for on-line product development training.
- Supervised claims and customer service support staff of 43 associates.
- Provided litigation support and liaison on claim-related litigation, testifying for the company and giving depositions.
- Developed and implemented claims quality control and overpayment procedures, reducing claim errors and backlogs and increasing examiner efficiency.
- Increased productivity of claims department through task simplification, time/motion project and reevaluation of examiner workloads.
- Drafted and filed individual fixed and variable life and annuity, and accident and health policy forms, and negotiated product approvals with state insurance department regulators.
- Developed and maintained strategic working relationships with regulators in several key states.
- Reconciled discrepancies in company marketing activities with state insurance department regulators.

### Communication and Training

- Led multi-company team to develop complaint database and formalized complaint handling procedures.
- Trained claims processors/examiners and support staff (40 associates) in formal classroom and extensive on-the-job training methods.
- Coordinated and drafted written responses to legal, congressional, and state and Federal agency inquiries regarding complaints and company activities.
- Chaired product implementation meetings to coordinate new product introduction through all major operating areas of the company.
- Reviewed and approved product and agent recruiting and training print advertising material.
- Taught medical terminology and better business writing courses to claims department associates.

# EMPLOYMENT HISTORY

**Assistant Vice President, Compliance**
Universal American Financial Corp Cos., Orlando, FL, 2000 - present

**Vice President, Product Compliance**
GE Financial Assurance, Richmond, VA, 1998 – 2000
GE Life and Annuity Assurance Company and General Electric Capital Assurance Company

**Compliance Manager**
GE Financial Assurance, Orlando, FL, 1998

**Vice President/Assistant Vice President, Filing & Compliance**
Federal Home Life and The Harvest Life Insurance Cos., Orlando, FL, 1993-1998

**Director, Regulatory Compliance**
Academy Insurance Group, Atlanta, GA, 1988-1993

**Director, Product Implementation and Compliance**
SunAmerica, Atlanta, GA, 1981-1988

**Administrative Manager, Government Claims Division**
Blue Cross & Blue Shield of Tennessee, Chattanooga, TN, 1979-1981

**Claims Manager**
Union Fidelity Life Insurance Company, Trevose, PA, 1978-1979

**Claim Representative/Coordinator/Processor**
Travelers Insurance Cos., Hartford, CT and Atlanta, GA, 1973-1978

# EDUCATION AND TRAINING

College:
Ashland University, Ashland, OH - Major: English
University of Hartford, Hartford, CT
Kennesaw State University, Kennesaw, GA - Major: Business Management

Industry Training:
LOMA (Completed 9 of 10 parts of FLMI designation, specialty in life and health claims)
Associate in Life and Health Claims (1986)
Associate in Customer Service (1994)
Health Insurance Associate (1995)
Associate in Insurance Agency Administration (1997)
Associate in Insurance Regulatory Compliance (1998)
Managed Healthcare Professional (1998)

*Michelle Doherty*
*June 24, 2002*

FROM :STEVE PEDERSENN          FAX NO. :7177631460          Aug. 14 2002 01:52PM  P3

# LIFE
# INSURANCE
# ANALYSTS, INC.

**Hall vs. CUNA Mutual Group; CUNA Mutual Insurance Society**
**Report of Life Insurance Analysts, Inc.**
**Prepared by: Richard A. Schwartz**
**August 12, 2002**

This report reviews CUNA's experts reports by Charlotte A. Lee, MD, and Tim Terry dated July 25, 2002. The conclusions stated in my report of June 21, 2002 are not changed as a result of these reports: CUNA breached their life insurance contract with the Halls and their conduct continues to be unfair and unreasonable. Their continued refusal to pay the rightful claim on Tommy B. Hall's life disregards the relevant facts. Their experts incorrectly make CUNA's actions sound reasonable because of the bevy of doctor's reports that mention cancer. However all of these save Charlesworth are post the insurance certificate application. While Charlesworth's intake form of April 30, 1998 mentions cancer, it is unclear whose handwriting this is. CUNA's handwriting expert would have you believe that Tommy Bob Hall used the medical abbreviation, "CA" for cancer. Given his background, this appears very unlikely. In fact this finding contradicts the 1993 pathology report from Dr. Hurley. It also contradicts Dr. Charlesworth own conclusion after meeting with the Halls in April 1998 stated in his deposition.

Every opinion stated herein is held to a reasonable degree of certainty with respect to the insurance arena and is based upon my knowledge and experience in the areas of life insurance company overall and financial management, product development and pricing, actuarial valuation and underwriting.

### Charlotte A. Lee, MD's Report:

* Dr. Lee refers in the first paragraph on Page 3 to the cause of death being a condition which was not admitted to on the application, and therefore the appropriate action is to investigate the claim. However, while her statement is correct, it fails to reflect that the application did not ask whether Tommy B. Hall thought he had cancer. It said had he been treated for or diagnosed with cancer. This is a very meaningful distinction, and as such, Dr. Lee's foundation for her report is erroneous.

* Dr. Lee in the third paragraph talks about a "several references to a history of malignant melanoma were interspersed throughout the physicians reports..." Further Dr. Lee states "and she (referring to Brenda Larson) did not rely on only the path report from the 1993 removal of the skin lesion for her final determination." Dr. Lee is apparently weighting all information equally in her conclusion. References in physician's reports should not be given the same weight as the path report. Dr. Lee is apparently confirming Brenda Larsen's mis-treatment of comments in various doctor's reports made after the application and in depositions as weighing equally to the only path report in existence prior to the time of the insurance application.

* On page 4, the second full paragraph, Dr. Lee discusses the reporting of the Hall claim to the Pennsylvania Office of the Attorney General. However there is no mention in her report of CUNA's failure to also inform Nancy Hall of the OAG's prompt declination to proceed on the investigation.

Richard A. Schwartz, CLU, FSA
85 Silver Fox Drive, Greenwood Village, CO 80121
303-740-0961     fax: 303-740-7192     dick@LifeInsuranceAnalysts.com

*      In the last paragraph of page 4, Dr. Lee states that "the (CUNA's) investigation showed that the deceased did know of the diagnosis of cancer at the time of the application." This conclusion is difficult to tie to the facts. The 1993 and only path report clearly states that he did not have cancer. His treatment history prior to the application clearly showed that he did not take the steps that would have been called for had he been diagnosed with or known that he had cancer. As such, there is no clear showing that the insured knew he had cancer as has been asserted by Dr. Lee.

### Tim Terry's Report:

Page 2, point #3 of Mr Terry's report: Mr. Terry states that had the company been aware of the 1993 visits to Dr. Hurley, it would have denied the application. The only conclusive result from the 1993 visit was a negative path report on the mole removed. Dr. Hurley then sent the applicant back to work and that result was confirmed later that year when Tommy B. Hall asked for a report stating his medical record was clean so he could begin a new job with the trucking company he was starting work for.

Page 2, VI. Opinion: Mr. Terry says that had the questions on the application been answered accurately, the Company would not have issued the policy. In fact, the question with respect to cancer was answered correctly, as it was stated. As such, and using Mr. Terry's logic, the company should have therefore paid the claim.

Page 3, Medical references cited. All these references occurred after the application for insurance was completed, and are in fact inaccurate. They either refer to a cancerous condition which was not shown to be known at the time of the insurance application.

### CONCLUSION

The insurance application asked the question "Have you ever been treated for or diagnosed as having cancer? There has been no finding that Tommy Bob Hall was treated for cancer in the six years between his 1993 mole removal and the 1999 application. Further the only pathology report in evidence prior to the application for insurance clearly states the mole was benign. Tommy Hall relied on that report to live a normal life from 1993 until the time of the application for insurance. He received no treatment for cancer.

The company's application for this type of coverage was not a fine filter of medical information. It was broadly worded and consistent with the type of underwriting done on this type of policy. As such the company should not underwrite to a lesser standard and then review claim files to a higher standard. This type of medical treatment is clearly unreasonable and shows bad faith on CUNA's part.

Both these experts state that CUNA acted reasonably. The fact that CUNA had lots of information, supposedly makes it reasonable in the eyes of Dr. Lee and Mr. Terry that they should weigh all the information equally. Incorrect doctor's references should not be given the same weight as a pathology report.

Richard A. Schwartz

August 13 2002

 

**Hall vs. CUNA Mutual Group; CUNA Mutual Insurance Society**
**Report of Michelle Doherty**
**August 12, 2002**

This is a report of my review of the July 25, 2002 reports by Charlotte A. Lee, MD, and Tim Terry, provided as CUNA's experts' reports. Nothing disclosed in either expert report affects my conclusion, as stated in my June 24, 2002 report. That conclusion was that CUNA breached their contract with the Halls, and their conduct was unreasonable and outrageous. Neither Dr. Lee nor Mr. Terry took all of the facts into consideration in formulating their opinions. These facts were the deposition of the treating physician, the original (1993) pathology report, and Mr. Hall's video deposition, taken under oath. Every opinion in this report is held to a reasonable degree of certainty within the insurance industry, and is based on my knowledge and experience.

## CLAIM HANDLING

Prompt handling and reasonable investigation upon all available information have been raised as a defense to the allegation of unfair practices in the handling of Tommy Bob Hall's claim. However

- Acknowledgement was not made within 10 working days. 31 s 146.5
- Claim investigation was not completed within 30 days of notification, although investigation was underway. Status of claim investigation was not provided to Mrs. Hall or to Patriot Federal Credit Union within 30 days. 31 s 146.6

## CLAIM DENIAL AND RESCISSION OF POLICY

The argument has been raised that the claim was denied only after all resources were explored to determine whether Tommy Bob Hall knew he had cancer at the time he applied for coverage with CUNA.

- All physician records beginning 1/15/99 show a record of malignant melanoma from 1993 – not substantiated by pathology report prior to the application date.
- Pathology report from 1993 <u>did not</u> provide a diagnosis of malignancy.
- In Tommy Bob Hall's video deposition under oath, he stated he had no prior diagnosis of malignancy.
- Dr. Hurley's treatment records of Tommy Bob Hall from 3/30/93 to 7/19/93 show no diagnosis of malignancy.
- Dr. Charlesworth's deposition stated Tommy Bob Hall and Nancy Hall argued over whether the mole removed was malignant. Dr. Charlesworth concluded there was no cancer since there had been no follow up.
- CUNA placed too much reliance over the question of whether there was a malignancy, as stated in Dr. Charlesworth's records.
- The pathology report from 1993 was in the claim file. The sole method to diagnosis malignancy is via a pathological examination. The pathology report was ignored in the final claim decision.



## CONTINUED DENIAL AND ONGOING BAD FAITH CONDUCT

At no time since the litigation was filed has CUNA attempted to reverse their decision and pay the benefits due under the Certificate of Insurance.

- All depositions and medical records have been available to CUNA.
- No attempt has been made to contact Nancy Hall and advise her the Pennsylvania Office of the Attorney General will not be pursuing charges against her for fraud.
- Dr. Charlesworth states on page 53 of his deposition, "I have no pathology reports that indicate cancer until he had the metastatic lymph nodes."
- It is clear that cancer existed in Tommy Bob Hall prior to the date of his application to CUNA. There is absolutely zero proof that Tommy Bob Hall had been told by a doctor that he had cancer.

## FRAUD REPORTING

It is essential that all insurers work to report suspected fraud to the various regulatory bodies. However, it is also essential that those same insurers be held to a high standard of conduct in their investigations and referrals.

- No additional investigation for potential fraud was conducted by CUNA prior to their referral of the Hall's case to the Pennsylvania OAG.
- No possible purpose was served in notifying Mrs. Hall of the referral to the OAG for suspected fraud.
- The 'no action letter' from the OAG should have prompted CUNA to send a follow up letter to Mrs. Hall, advising her there would be no action on behalf of the state for the suspected fraud.

## CONCLUSION

Irrespective of whether Tommy Bob Hall or Nancy Hall believed the 1993 mole was cancerous, the application question did not ask "Do you believe you have or had cancer?" Rather, the question asked is "Have you ever been treated for or diagnosed as having...cancer...?" Tommy Bob Hall was a cabinetmaker and truck driver with a high school education, and hardly capable of self-diagnosing cancer. Without a diagnosis by a medical professional, and we already know the medical professional did not diagnose cancer in 1993, Tommy Bob Hall correctly answered the health question on the application in the negative. Brenda Larson's letter of 2/10/00 to Nancy Hall states, "The review showed that Tommy visited a doctor in 1993. On the application, Tommy did not indicate this visit occurred. Had we known about the medical condition revealed during that visit, we would not have accepted the application or issued a Certificate of Insurance." "...As a result, no benefits will be paid under this contract, either now or in the future." The application did not ask if Tommy Bob Hall had visited a doctor. It asked for a diagnosis or treatment of cancer.

CUNA continues their bad faith handling of this claim by their ongoing refusal to pay benefits due, even with clear evidence of Mr. Hall's lack of knowledge of his malignancy prior to the time of application. While some of CUNA's conduct may have been perceived as reasonable, the overwhelming evidence is that their actions were, and continue to be, unreasonable.

Michelle Doherty
August 12, 2002

1997 WL 644076
(Cite as: 1997 WL 644076 (E.D.Pa.))

**H**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

Antoinetta DATTILO and Frank Dattilo
v.
STATE FARM INSURANCE COMPANY

No. CIV. A. 97-1842.

Oct. 17, 1997.

MEMORANDUM OF DECISION

McGLYNN, J.

**\*1** In this diversity action, plaintiffs charge their insurer with acting in bad faith in processing an under insured motorist claim. [FN1] See 42 Pa C.S.A. § 8371. Before the Court is the defendant insurer's motion for summary judgment. "Summary judgment is appropriate only if the record shows no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c)." 2-*J Corporation v. Jewel Building Systems, Inc.,* 3rd Cir., October 2, 1997, p. 4.

> FN1. Plaintiffs have abandoned bad faith claims with respect to wage loss and medical payments.

After a hearing and upon consideration of the briefs and arguments of counsel, the court concludes that there is no genuine issue of material fact and the defendant is entitled to judgment as a matter of law.

The historical facts are essentially undisputed and are as follows:

1. On May 19, 1987, Mrs. Dattilo was involved in an automobile accident with Florence Laub in Philadelphia, Pennsylvania.

2. On the date of that accident, the Dattilos were covered under two automobile insurance policies issued by State Farm, which provided medical, wage loss, and UIM coverage for losses incurred as a result of that accident.

3. On the date of the accident, Florence Laub was covered under a policy of automobile insurance issued by Allstate, which provided liability coverage in the amount of $15,000.

4. Almost six years after the accident, on March 24, 1993, plaintiff's counsel notified State Farm that Allstate had tendered its $15,000 policy limit to settle Mrs. Dattilo's personal injury claim against Mrs. Laub. Counsel requested that State Farm waive its subrogation rights against Mrs. Laub and consent to the settlement of that claim. Counsel also put State Farm on notice of Mrs. Dattilo's UIM claim, but did not make any settlement demand for that claim.

5. State Farm assigned the handling of Mrs. Dattilo's UIM claim to Deborah Purdie on May 13, 1993. Purdie immediately began an investigation of the claim, and learned that Mrs. Dattilo's claim against Laub was conferenced before a settlement master, who evaluated Mrs. Dattilo's claim at between $10,000 and $12,500.

6. Purdie also learned that Mrs. Dattilo's sustained, at most, soft-tissue injuries in the May 19, 1987 accident.

7. Because the settlement master evaluated Mrs. Dattilo's personal injury claim at between $10,000 and $12,500, and because Mrs. Dattilo was going to receive $15,000 from Allstate, it appeared to Purdie that Mrs. Dattilo was adequately compensated for her loss.

8. On May 14, 1993, State Farm waived its subrogation rights against Mrs. Laub and consented to the $15,000 settlement of Mrs. Dattilo's claim against her. At the same time, State Farm offered $1,000 to settle Mrs. Dattilo's UIM claim.

9. Purdie contacted plaintiffs' counsel on July 20, 1993 to inquire whether Mrs. Dattilo accepted State Farm's $1,000 offer.

10. Between July 20, 1993 and January 28, 1994, State Farm contacted plaintiffs' counsel several more times to discuss settlement of Mrs. Dattilo's UIM claim.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1997 WL 644076
(Cite as: 1997 WL 644076 (E.D.Pa.))

**\*2** 11. Plaintiffs' counsel did not respond to these overtures.

12. On February 1, 1994, plaintiffs' counsel finally provided State Farm with a copy of a settlement memorandum that plaintiffs had submitted in connection with Mrs. Dattilo's third-party claim, which included Mrs. Dattilo's version of the accident, theory of liability, and a summary of the dates of Mrs. Dattilo's medical treatment. The memorandum disclosed that the date of Mrs. Dattilo's last medical treatment was May 12, 1988. No demand accompanied the memorandum.

13. By April 28, 1994, plaintiffs had not responded to State Farm's offer or demanded any particular amount to settle UIM claim. Because of the lack of a response and the fact that the records showed that Mrs. Dattilo's last treatment was on May 12, 1988, and in an effort to resolve the claim, Purdie assigned the matter to defense counsel to obtain Mrs. Dattilo's statement under oath and proceed to arbitration in accordance with the terms and conditions of the Dattilos' policy.

14. State Farm first requested Mrs. Dattilo's statement under oath on May 6, 1994, but that statement was not actually taken until February 21, 1995. Between May 6, 1994 and February 21, 1995, Mrs. Dattilo's statement was scheduled and rescheduled approximately seven times, all at the request of Mrs. Dattilo or her counsel.

15. In her statement under oath, Mrs. Dattilo testified to ongoing pain in her neck, back, and right shoulder. However, she had discontinued active medical treatment for those complaints by the Fall of 1988. Between 1988 and 1995, Mrs. Dattilo saw her family physician approximately six times for complaints which she attributed to the May 19, 1987 accident.

16. Because Mrs. Dattilo had ongoing complaints in 1995 arising out of an accident that occurred almost seven years earlier, State Farm requested an Independent Medical Examination of Mrs. Dattilo.

17. That examination was conducted on April 18, 1995 by James A. Anthony, Jr., M.D. In his report, Dr. Anthony concluded that there was objective evidence corroborating Mrs. Dattilo's shoulder complaints, but her back and neck problems had completely resolved.

18. Between May and October 19, 1995, State Farm continued to solicit a settlement demand for the Dattilos.

19. Finally, on November 3, 1995, plaintiffs' counsel demanded the $100,000 UIM policy limits to settle the claim.

20. At no time did the Dattilos or their counsel indicate that their demand for the UIM policy limits was negotiable, or that they would accept less than $100,000 to settle their claim.

21. The parties selected arbitrators as provided by the policy. Plaintiffs' counsel appointed Stanley Schwartz, Esquire, and defense counsel appointed Norton Freedman, Esquire and Messrs. Schwartz and Freedman appointed the Honorable Paul Dandridge as the neutral arbitrator.

22. On December 18, 1995, State Farm offered $5,000 to settle the Dattilos' UIM claim. That offer was based upon, *inter alia*, Mrs. Dattilo's testimony, Dr. Anthony's report, and the fact that Mrs. Dattilo had not been actively treated since 1988.

**\*3** 23. Because neither the Dattilos, nor their attorneys responded to State Farm's $5,000 settlement offer, State Farm contacted plaintiffs' counsel on March 27, 1996 and again on April 9, 1996, to find out if their demand had changed, and to negotiate a settlement of the claim.

24. The arbitration hearing for the Dattilos' UIM was initially scheduled to take place on July 11, 1996, but the Dattilos' arbitrator, Mr. Schwartz, canceled the hearing.

25. The arbitration was held on December 5, 1996, after which a majority of the arbitrators awarded $39,775 to the Dattilos.

26. State Farm paid the arbitration award on February 5, 1997.

27. Plaintiffs commenced this action on March 3, 1997.

### DISCUSSION

The statute in question reads:
    "In an action arising under an insurance policy, if the Court finds that the insurer has acted in bad

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

faith toward the insured, the court may take all the following actions:
(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
(2) Award punitive damages against the insurer.
(3) Assess court costs and attorney fees against the insurer."

42 Pa.C.S.A. § 8371.

Under Pennsylvania law, clear and convincing evidence is necessary to prove bad faith. *Poselli v. Nationwide Mut. Fire Ins. Co.,* 23 F.3d 747 (3d Cir.1994).

"The standard for bad faith claims under § 8371 is set forth in *Terletsky v. Prudential Property & Cas. Ins. Co.,* 437 Pa.Super. 108, 649 A.2d 680, 688 (1994), *appeal denied,* 540 Pa. 641, 659 A.2d 560 (1995). There, the Pennsylvania Superior Court applied a two-part test, both elements of which must be supported with clear and convincing evidence: (1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis." *Klinger v. State Farm Mut. Auto. Ins. Co.,* 115 F.3d 230, 233 (3rd Cir.1997). The *Terletsky* court held that where the insurer "had a rational bases for disputing [insured's] claim ... a determination of bad faith [is] improper." 649 A.2d at 681.

Clearly, plaintiffs have failed to show that State Farm lacked a reasonable basis for denying benefits. To the contrary, the record shows that the insurer had a rational basis for all the actions it took in processing plaintiffs' claim.

To begin, more than five years and nine months had elapsed from the date of the accident to the first notice that State Farm had of the UIM claim. It was only at that point that State Farm learned that plaintiffs had settled their third-party claims for $15,000 after a settlement master had evaluated the claim at between $10,000 and $12,500. Moreover, the papers in the third-party case revealed that Mrs. Dattilo suffered soft tissue injury for which she received medical treatment up until May of 1988. Under these circumstances, it is reasonable for State Farm to conclude that Mrs. Dattilo was adequately compensated for her injury, particularly in light of the fact that State Farm had paid her medical bills

and waived any subrogation right against the amount collected in the third-party action. Nevertheless, from May 1993 to April 1994, Purdie made repeated requests for a response to State Farm's outstanding offer without success.

*4 Having failed to generate a response to the offer, on April 28, 1994 State Farm referred the matter to outside counsel to initiate proceedings provided by the contract of insurance to obtain Mrs. Dattilo's statement under oath and to take the claim to arbitration. As noted above, State Farm first requested Mrs. Dattilo's statement on May 6, 1994, but it was not actually taken until February 21, 1995, through no fault on the part of State Farm.

At all events in her statement, Mrs. Dattilo complained of ongoing pain in her neck, back and right shoulder, while acknowledging that she had discontinued active medical treatment for these complaints by the Fall of 1988.

Because of the lapse of time, and in the absence of treatment in the interim, State Farm requested an independent medical examination, which was conducted on April 18, 1995. The examining physician concluded that there was objective evidence corroborating Mrs. Dattilo's shoulder complaints, but that the back and neck problems had completely resolved.

Between May and October 1995, State Farm continued to solicit a settlement demand. Finally, on November 3, 1995, plaintiffs' counsel demanded the $100,000 UIM policy limits to settle the claim. From that day on, there was no indication that plaintiffs would accept anything less than $100,000.

Nevertheless, primarily on the basis of the independent medical examination, on December 18, 1995 State Farm increased its offer to $5,000 to settle the UIM claim. Again, there was no response to this offer despite telephone calls to plaintiffs' counsel on March 27, 1996 and April 9, 1996.

In the meantime, arbitration under the terms of the policy was proceeding. Each party had appointed an arbitrator and the two arbitrators appointed a third. The arbitration hearing was initially scheduled for July 11, 1996, but was canceled at the request of plaintiffs' appointee. The arbitration took place on December 5, 1996 and by a majority vote, the Dattilos were awarded $39,775. [FN2]

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1997 WL 644076
(Cite as: 1997 WL 644076 (E.D.Pa.))

State Farm paid the arbitration award on February 5, 1997.

> FN2. Although not controlling, the fact is that the award was closer to State Farm's offer of $5,000 then to plaintiff's demand of $100,000.

I am persuaded that no reasonable person can examine this record and conclude that State Farm acted in bad faith in processing the Dattilos' UIM claim.

Whatever delays there were, arose as a result of the unresponsiveness, dilatoriness and intransigeance of plaintiffs and plaintiffs' counsel. State Farm took every reasonable step to bring this claim, which was six years old when asserted, to an early conclusion.

The request for an independent medical examination was certainly reasonable in light of the fact that the injury occurred seven years earlier and treatment for those injuries had ceased six years earlier.

Invoking the arbitration procedure to resolve the dispute is not unreasonable because of the wide gap between State Farm's offer and plaintiffs' extremely high demand. The offer of $5,000 was not unreasonable in view of the medical history.

Finally, plaintiffs offered the testimony of an "expert," who without even looking at State Farm's file, was prepared to testify that in his opinion State Farm was acting in bad faith in handling the Dattillos' UIM claim. No reason is given except that State Farm had made "no fair offer," but there is not a clue as to what, in his judgment, a fair offer would have been. [FN3] In the final analysis, his testimony does not provide the clear and convincing evidence (1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis. His conclusion is simply not supported by the facts in the case.

> FN3. See *Terletsky,* 649 A.2d at 689 where the court held that low settlement offers were not indicative of bad faith.

*5 In addition, there is a serious question as to whether this so-called expert should be permitted to testify. He qualified as a person experienced in claims handling and adjusting on behalf of insurers, but this is not a malpractice case in which the insurer's conduct would be judged by the standards of the insurance industry. Bad faith is a legal concept of general application which does not require that scientific, technical or specialized knowledge be presented to assist the trier of fact. The witness' opinion is nothing more than subjective speculation unsupported by any scientific or specialized knowledge.

I find on the basis of the undisputed material facts of this case that State Farm, as a matter of law, is entitled to judgment. Accordingly, itsmotion for summary judgment will be granted.

ORDER

AND NOW, this day of OCTOBER, 1997, for the reasons set forth in the accompanying Memorandum of Decision, it is hereby

ORDERED that JUDGMENT is entered in favor of the defendant State Farm Insurance Company and against the plaintiffs Antoinetta Dattilo and Frank Dattilo.

1997 WL 644076, 1997 WL 644076 (E.D.Pa.)

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

# TIM TERRY

CONSULTANT, LIFE AND DISABILITY INSURANCE

PRESIDENT
CHUBB SOVEREIGN (1975-93)

EXECUTIVE VICE PRESIDENT
CHUBB LIFE AMERICA (1987-93)

MEMBER, BOARD OF DIRECTORS
CHUBB SOVERIGN LIFE (1964-93)
CHUBB LIFE AMERICA (1987-93)
UNITED LIFE (1987-91)
VOLUNTEER STATE LIFE (1987-91)
COLONIAL LIFE (1987-93)

128 DESERT WEST DRIVE
RANCHO MIRAGE
CALIFORNIA 92270
TELEPHONE (760) 770-4479
FAX (760) 770-4479
TAX ID# 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

July 25, 2002

I have been asked to examine the propriety of CUNA Mutual Insurance Society's ("CUNA") handling of the claim for life insurance benefits submitted by Nancy Hall on a policy insuring the life of her husband, Tommy B. Hall. I have set forth below in this report my background qualifications, the materials that I have examined, and my opinions concerning CUNA's handling of Mrs. Hall's claim for benefits.    I hold the opinions expressed in this report to a reasonable degree of certainty.

1.      Qualifications:   President and Chief Operating Officer, Chubb Sovereign Life insurance Company, a life and disability insurer (1975-1993). Ranking officer, Company Claims Committee. See attached Curriculum Vitae. (Schedule I)

II.     Publications:     (See Schedule 1)

III.    Testimony:        (See Schedule 2)

IV.    Material Reviewed:   Nancy Hall's depo w/exhibit(s); Charlesworth depo, Cashdollar, Chicklo depos; Hurley depo; Enders depo, Sharfman depo, Ansfield depo, Nardi depo, Fischer depo, Lutz depo, Larson depo, Stel depo, T. Hall II depo - 10-19-99, T. Hall II depo - 10-20-99. The file in CUNA's possession at the time of its decision to deny Mrs. Hall's claim and rescind the policy. The information regarding referral of the matter to the Pennsylvania Attorney General for fraud investigation. The April 30, 1998 intake form from Dr. Ernest Charlesworth's office. CUNA's underwriting guidelines and procedures. Summary information re claims, claims denied, claims rescinded and other statistical information. Information regarding CUNA policies and procedures for reporting insurance fraud. Information on CUNA policies and procedures produced to Plaintiff Plaintiffs complaint.   CUNA's Answer and Affirmative Defenses to the Complaint.   Plaintiffs Motion to Amend the Complaint and proposed Amended Complaint. Merck Manual 2000 Edition. T. Hall Video Tape. N. Hall Video Tape, Part I. N. Hall Video Tape, Part II. Schwartz, Doherty reports. Also reviewed: Pennsylvania Bad Faith Statute, Unfair Insurance Practices Act, Regulations re unfair claims practices, and Chapter 13, Credit Life Insurance and Credit Accident Regulations.

V.    Opinion:  The Company's processing of Mrs. Hall's claim was reasonable and appropriate and conformed to industry standards and applicable laws and regulations.

1.    The claim handling process proceeded from an investigation and analysis performed by Credit Insurance Underwriter Brenda Larson in consultation with Underwriting Manager William Nardi.  Nardi's experience in underwriting dated back to 1979 when he was first employed by CUNA.  Larson had been a Medical Claims Examiner with CUNA from August, 1997 to October, 1999.  She became a Credit Insurance Underwriter in October, 1999. Larson also consulted with CUNA's Medical Director, Thomas Ansfield, M.D.

2.    The applicant, Tommy B. Hall, died November 4, 1999.  Mrs. Hall notified Patriot Federal Credit Union of his death, and Patriot acknowledged receipt of the notice immediately, and forwarded a completed claim notice to CUNA by facsimile dated November 10, 1999.  Within six days after his death, CUNA received the completed claim form along with the death certificate; claim investigation commenced November 12, 1999.  On December 15, 1999 the Company advised the beneficiary that certain additional medical information was necessary to complete its claim evaluation.

3.    On February 10, 2000 the beneficiary was advised that the policy was being rescinded because the applicant had not revealed his 1993 doctor's visit and that had the Company been made aware of the medical information revealed during that visit it would not have issued the policy.  The February 10 letter states at its close: "If you have any questions please contact me at 1-800-356-2644, extension X7475."

4.    CUNA handled the claims process in this case in a fair and prompt manner.  The "Unfair Insurance Practices Act", 40 P.S. §1171.1 et seq., proscribes the failure to act "promptly" in acknowledging and acting upon a notice of claim, if such failure is performed with such frequency as to be considered a business practice.  I have been provided with no information which suggests that CUNA regularly fails to acknowledge or act upon claims in a prompt manner, and it certainly did not do so with respect to the claim notice submitted on behalf of Mrs. Hall.

VI.    Opinion:  CUNA's decision to rescind the policy was appropriate, and was based on the applicant's inaccurate response to Medical History questions asked on its application - and the fact that had the questions been answered accurately, the Company would not have issued the policy.

1.    When the application was completed on November 18, 1998 applicant Hall denied that he had been treated for a back disorder and he denied that he had been treated for or diagnosed as having cancer.

In November 1989, the applicant Hall was operated on for a herniated disk in his back. In January 1993 he was again operated on for a herniated disk in his back.

Although his denial of a history of a back disorder is not material to the underwriting of this case, it raises credibility issues regarding his other responses.

2.     On April 30, 1998, seven months prior to the completion of his application to the Company, the applicant consulted with Dr. Charlesworth. Dr. Charlesworth's notes reveal: "Prior Medical History: ? melanoma removed back (?) 1996 ... medical problems" "Cancerous mole - removed 96 (sic?) Dr. Guthrey (?)"

On January 15, 1999 Dr. Chicklo's intake form reveals the following patient history: "Mole on back CA excision '93."

On February 17, 1999 Dr. Enders - new patient form reveals "patient with (malignant) melanoma in 1993."

On July 15, 1999 Dr. Sharfman's new patient visit report reveals "1993 malignant melanoma."

3.     The medical records cited above provide a reasonable basis on which CUNA could conclude that the applicant believed that he had a history of cancer prior to the date of his application. It is common and acceptable practice for an insurance company to rely on the information contained in medical records. In this case, there was overwhelming evidence in the medical records that Mr. Hall had a history of malignant melanoma prior to the date of the application. Had Mr. Hall answered truthfully according to his own belief, CUNA would have obtained records revealing his history of cancer. In addition to the medical records obtained by CUNA before its initial decision to deny the claim and rescind the policy, CUNA also received during the lawsuit an April 30, 1998 intake form from Dr. Charlesworth's office. This document was inexplicably missing from the other records sent by Dr. Charlesworth to CUNA while CUNA was still investigating the claim. In my opinion, this intake form is powerful confirmation that CUNA correctly denied the claim. This intake form lists a history of "cancerous mole removal – '96." I am advised that a handwriting expert has established that Mr. Hall wrote this entry in the form. This entry, made nearly seven months prior to the application for insurance, eliminates any doubt that Mr. Hall knew he had a history of cancer at the time of his application. He obviously knew of his own history of cancer. According to CUNA's underwriting standards, the application would have been declined if CUNA had known of this information. The policy therefore was properly rescinded.

VII    Opinion:  The Company's actions in complying with state directives to report the suspicion of fraud were reasonable in that:

1.     The Company's own investigation revealed that the applicant had answered questions concerning his health history inaccurately: He concealed the fact that had undergone two separate operations for a back disorder - a herniated disk; he concealed his belief - stated seven months previously that he had a history of cancer.

2.    The state of Pennsylvania zealously and repeatedly exhorts insurance Company's doing business in the state to report instances of "suspected fraud." For example on April 4, 2000 in a letter to CUNA the office of the Pennsylvania Attorney General (AG) stated: "our primary concern is simply that suspected fraud is reported." Copies of press releases from the AG's office publicizing its fraud prosecutions were enclosed with this letter.

3.    At the time the Company advised the state of its suspicion of fraud, the beneficiary had taken no action to resist the rescission of the policy. Certainly it was in the Company's best interest to do nothing that would encourage the beneficiary to resist the rescission process. Nevertheless, the Company advised the beneficiary of its action in obliging the AG's office by reporting its suspicion of fraud--thus enabling her to arrange a defense rather than being taken by surprise. This had the effect of causing her to seek legal advise which ultimately resulted in her resisting the rescission through this present action.

VIII    Opinion: Post Claim Underwriting did not occur in this case.

1.    The applicant denied that he had any medical history regarding those conditions inquired about on the Company's application form. Thus, according to existing Company practice, no underwriting in the form of inquiries to medical practitioners were warranted prior to the issuance of this policy.

2.    Post Claim Underwriting occurs when a Company fails to complete medical underwriting and resolve all reasonable questions arising from information submitted to it on its application form prior to policy issue. In this case there were no such questions to resolve - the applicant denied any history of medical disorders that the Company questioned on the application.

IX    Summary Opinion:    The Company's actions in connection with the Hall claim were reasonable in that they conformed to industry standards and applicable laws and regulations. CUNA promptly processed the claim, communicated with Mrs. Hall quickly when it determined it needed more information, analyzed the available medical information, and made follow-up requests where appropriate. Before making the decision to deny the claim and rescind the policy, CUNA called upon its Medical Director, Dr. Ansfield, to review the materials. Both Brenda Larson and Dr. Ansfield believed that, based upon all the facts before them, that Mr. Hall misrepresented his history of cancer, and that his misrepresentation was material to the risk. I concur that Brenda Larson's and Dr. Ansfield's conclusions had a reasonable basis.

TIM TERRY

# TIM TERRY

CONSULTANT, LIFE AND DISABILITY INSURANCE

**PRESIDENT**
CHUBB SOVEREIGN (1975-93)

128 DESERT WEST DRIVE
RANCHO MIRAGE
CALIFORNIA 92270
TELEPHONE (760) 770-4479
FAX (760) 770-4479
TAX ID# 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

**EXECUTIVE VICE PRESIDENT**
CHUBB LIFE AMERICA (1987-93)

**MEMBER, BOARD OF DIRECTORS**
CHUBB SOVERIGN LIFE (1964-93)
CHUBB LIFE AMERICA (1987-93)
UNITED LIFE (1987-91)
VOLUNTEER STATE LIFE (1987-91)
COLONIAL LIFE (1987-93)

## **PRIOR TESTIMONY**

Bander v. Warren - Los Angeles Superior court, 1995
Morse v. Federal Kemper - Sacramento S.C. - 1995
Rubin v. Gradman - Los Angeles S.C. - 1996
Philip v. Jackson National - Los Angeles S.C. - 1995
Hawthorne v. Jackson National - Los Angeles S.C. 1995
Doe v. Paul Revere - Honolulu S.C. - 1995
Mitchell v. John Hancock - Albuquerque S.C. - 1995
State Farm v. Linden - San Francisco Arbitration - 1996
Green v. Monumental - Santa Rosa S.C. - 1996
Matin v. Paul Revere- Sacramento S.C. - 1996
McDonald v. AIG - San Francisco S.C. - 1996
Guy v. Washington National - Los Angeles S.C. - 1996
Fain v. California Indemnity - Ventura S.C. - 1997
Hansen v. Philadelphia Life - Reno S.C.-1996
Wirth v. Transamerica - San Diego S.C. - 1996
McKenna v. American Contractors - Los Angeles S.C. - 1996
Moore v. Rivinius - San Francisco S.C. - 1997
Arnone v. Paul Revere - San Francisco S.C. - 1997
Vencor Hospitals v. Standard Life 7 Accident - Torrance S.C. - 1997
Mehring v. National Life - Los Angeles Federal Court - 1998
Robinson v. Robinson - Burbank S.C. - 1997
Streich v. Mitchell - San Francisco S.C. - 1997
Fisher v. Aetna - Anchorage S.C. - 1998
Grayhek v. UNUM - Los Angeles S.C. - 1998
LeBoy v. Provident - Los Angeles S.C. - 1998
Riggi v. Security Life - Denver S.C. - 1998
Bertz v. Allmerica - Denver S.C. - 1999
Wenska v. General American - Los Angeles S.C. - 1999
Barcenas v. Jackson National - San Diego S.C. – 1999

{A366792:}

**Prior Testimony – Continued**

Lungu v. Kaiser - Oakland S.C. - 1999
Farrel v. Paul Revere - San Francisco Federal Court - 1999
Hollis v. Provident - Mississippi F.C. - 1999
Lawrence v. Provident - L.A. - 1999
Story v. Safeco - Oregon - S.C.- 1999
Fullmer v. LANA - Idaho - 1999
Lutz v. Mega Life - San Diego - 1999
Hatt v. Provident - San Bernardino 1999
Barbero v. Blooming Kemper - Denver - 1999
Heutmaker v. Shields - Seattle - 1999
Rutherford v. Lloyds - Birmingham S.C. - 1999
Hale v. Provident N. CA - 2000
Mocoso v. Prudential S.F. Arbitration - 2000
Western Bank v. Fears, Albuquerque - 2000
Stenger v. Provident, Milwaukee PC - 2000
Banta v. Provident, Tucson - 2000
Love v. LINA, Sacramento - 2000
Parsidano v. Union Central. Phoenix - 2000
Yumukoglu v. Provident, Albuquerque - 2000
Sanders v. Paul Revere, Las Vegas - 2000
Pearson v. Barr, San Diego - 2000
Prabucki v. PR, Seattle - 2001
Archuleta v. Casico, Santa Fe - 2001
Campbell v. Rayal Maccabees, Phoenix - 2001
Magnetek v. CIGNA, Los Angeles - 2001
Fears v. Western Bank, S.C. Albuquerque - 2001
Campbell v. Paul Revere, Federal CT, Phoenix - 2001
Caso v. Braunstein, First Colony, LA, CA - 2002
Heatchcock v. TWA, Burlingame. CA - 2002

## PUBLICATIONS

"The Generalist Expert in Insurance Litigation" –
<u>DEFENSE RESEARCII INSTITUTE</u> magazine, November, 1996.

JTT499-02                * * * *

## TIM TERRY

CONSULTANT, LIFE AND DISABILITY INSURANCE
128 DESERT WEST DRIVE
RANCHO MIRAGE
CALIFORNIA 92270
TELEPHONE (760) 770-4479
FAX (760) 770-4479
TAX ID# 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

PRESIDENT
CHUBB SOVEREIGN (1975-93)

EXECUTIVE VICE PRESIDENT
CHUBB LIFE AMERICA (1987-93)

MEMBER, BOARD OF DIRECTORS
CHUBB SOVERIGN LIFE (1964-93)
CHUBB LIFE AMERICA (1987-93)
UNITED LIFE (1987-91)
VOLUNTEER STATE LIFE (1987-91)
COLONIAL LIFE (1987-93)

## CURRICULUM VITAE

**Education:** BA, History, Stanford University; Chartered Life Underwriter (CLU).

**Career History:** Testifying and Consulting Expert (1994--), President, Chief Operations Officer, Chubb Sovereign Life Insurance Company (1975-93). Executive Vice President, Director. Sovereign Life Insurance Company (1964-75). General Agent, Agent, Brokerage Representative prior to 1964. Past Member Board of Directors, five life and/or disability insurance companies -- see detail on letterhead.

**Managing & Operating Experience:** *Life and Disability Claims* - Senior Officer, Company Claims Committee. Set Claims policy. Personally directed individual handling of pending contestable claims on a case by case basis from initial reporting to final disposition. Final authority regarding policy recessions, denial of benefits and litigation matters. *Life and Disability Underwriting* - Set policy for risk selection and performed oversight of its implementation. Coordinated underwriting policies with requirements of Reinsurers. *Reinsurance* - Negotiated reinsurance treaties; directed handling of reinsurance audits; managed relationships with reinsurers. *Compliance* - Dealt directly with State Departments of Insurance. Set company compliance policy and its administration. *Human Resources:* Set policy and personally directed handling of all aspects of such matters. *Sales* - Chief Marketing Officer and Sales Director. Designed, drafted, priced policies. Designed sales proposals, ledgers. Negotiated Agent, General Agent, Manager compensation contracts. Recruited, trained, supervised, terminated sales personnel. *Administration* - Setup and performed oversight: premium notice and lapse procedures. systems to monitor sales practices, Policy owner service functions. Formulated Company investment policies and practices. *Management* - Responsible for all Company operations.

**Experience As Testifying And Consulting Expert:** Over 200 engagements Nationwide-- Approximately 60% associated with Plaintiff) 40% associated with Defense. Over 50 instances of deposition/trial testimony. — Most frequent issue: Allegations of **bad faith** regarding life and disability claims, sales, underwriting or administrative practices.

**Continuing Education:** Delegate, Western Claims Conference (WCC) 1996, 1997, 1998, 1999, 2000, 2002: WCC is an industry sponsored forum for the presentation and discussion of life and disability claims issues.

{A366792:}

**Professional Affiliations:**  Past Director, Association of California Life Insurance Companies; Past Officer, Chartered Life Underwriter Chapter.

**Publications:**  "The Generalist Expert in Insurance Litigation".  *Defense Research Institute* - November **1996.**

**Military:**  Active duty, U.S. Army; U.S. Naval Reserve (Naval Intelligence) - retired with rank of Captain.  Awarded parachute Jump Wings by Israeli Defense Forces - 1988.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this date the foregoing document was served by U.S. first-class mail, postage prepaid, upon the following:

Stephen R. Pedersen, Esquire
214 Senate Avenue, Suite 602
Camp Hill, PA  17011

Catherine Mahady-Smith, Esquire
3115-A N. Front Street
Harrisburg, PA  17110

Charles T. Young, Jr.

Attorney for Defendants

Dated:  September  11, 2002