2 TO G

42

RB 9/24

ORIGINAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

FILED
HARRISBURG, PA

SEP 2 0 2002

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

| | |
|---|---|
| NANCY HALL, individually and as the Representative and Administratrix of the Estate of TOMMY HALL, deceased, her husband,<br>　　　　　**Plaintiff,**<br><br>CUNA MUTUAL GROUP; CUNA MUTUAL INSURANCE SOCIETY,<br>　　　　　**Defendants.** | **CIVIL ACTION - LAW**<br><br>**1:01-CV-1265**<br><br>**JUDGE CHRISTOPHER CONNER** |

**PLAINTIFF'S BRIEF IN RESPONSE TO**
**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**AND**

**PLAINTIFF'S BRIEF IN SUPPORT OF**
**ITS  MOTION FOR PARTIAL SUMMARY JUDGMENT**
**ON THE CONTRACT CLAIM**

I.　　**INTRODUCTION**

　　　　CUNA Mutual Insurance Society and CUNA Mutual Group (collectively referred to as

"CUNA") denied credit life insurance benefits to Nancy Hall ("Mrs. Hall"), following the death

of her husband, Tommy Bob Hall ("Mr. Hall").  CUNA denied coverage, as stated in their letter

to Mrs. Hall, based upon Mr. Hall's visit to a doctor in 1993 in which he had a mole removed.

At the time of its initial decision, CUNA had in its possession the pathology report from

Chambersburg Hospital which indicated, as admitted by CUNA employees and CUNA's Medical

Director, that the mole was found to be non-cancerous.  CUNA has contended throughout the

litigation that Mr. Hall, when presented with the question on his application, "Have you ever

been treated or diagnosed as having had cancer?", should have answered in the affirmative. However, at the time of the application, CUNA has admitted that the only pathology report which it had in its possession and which it has ever had with respect to the mole that was removed in 1993, was a pathology report which had no findings of cancer. Approximately one year after Mr. Hall's application for insurance was accepted by CUNA, Mr. Hall died of metastatic melanoma. However, as both Mr. and Mrs. Hall testified in their depositions, Mr. Hall was unaware of the cancer at the time he filled out the application for insurance. Despite a year of intensive discovery, depositions of numerous doctors and support staff, and depositions of CUNA's own employees and officers, CUNA has failed to produce a single document which proves a diagnosis or treatment of cancer prior to the date of application. CUNA now points to numerous medical records which reflect that the mole was malignant which was removed in 1993. However, that diagnosis did not come until after the application was made.

Furthermore, once the litigation was instituted, depositions were taken of virtually every doctor who treated Mr. Hall from 1993 to the date of the application. All doctors have confirmed that there was no diagnostic or treatment records of cancer prior to the date of the application. Each of their depositions are attached to Plaintiff's Counterstatement of Disputed Material Facts.

Furthermore, Plaintiff has obtained the opinion of two experts, attached as Exhibits 9 and 10, which delineate and substantiate standards in the industry with respect to denial of benefits under a home mortgage protection policy. Both experts conclude that CUNA Mutual violated the terms of their contract with the Halls and engaged in outrageous conduct in order to wrongfully deny benefits to Mrs. Hall.

The doctor who removed the mole was deposed and stated that he told Mr. Hall that he did not have cancer and that the mole had been cleanly removed. Additionally, the pathologists

themselves were deposed and indicated that there was no diagnosis of cancer which was made.

Those deposition transcripts are attached to Plaintiff's Counterstatement of Disputed Material

Facts. This evidence leads to the conclusion that there are disputed material facts as to whether

or not CUNA engaged in bad faith, fraud, and negligence when they wrongfully denied Mrs.

Hall's insurance claim.

Furthermore, the undisputed fact that CUNA Mutual has never obtained any documents

which prove a diagnosis and treatment of cancer prior to the date of the application, compels the

conclusion that CUNA Mutual breached its insurance contract with Nancy Hall.

Accordingly, Plaintiff requests that CUNA's Motion for Partial Summary Judgment be

denied and that Plaintiff's Motion for Partial Summary Judgment on the Contract Claim be

granted and that a trial proceed as to damages and CUNA's liability on the remaining claims.

## II.    **STATEMENT OF FACTS**

On or about November 18, 1998, Plaintiff Nancy Hall and her late husband, Tommy Bob

Hall, refinanced their mortgage on their home in Fayettville, Franklin County, Pennsylvania. As

part of the refinancing of the mortgage, Mr. Hall purchased mortgage insurance through his

lender, Patriot Federal Credit Union. The application for insurance, as clearly stated on the

application itself, subsection E, was a replacement policy of an existing group mortgage

insurance certificate. The specific purpose of the policy was to insure the balance of a mortgage,

which was $56,000.00 at the time of the application, in the event of Mr. Hall's death and for the

protection of Mrs. Hall. See, Plaintiff's Counterstatement of Disputed Material Facts ("CMF"),

Exhibit 1. The application asks the following pertinent questions:

1.  Have you ever been treated for or diagnosed by a member of the
    medical profession as having any of the following (please check
    the box and circle condition(s) that apply): diabetes; high blood
    pressure; chest pains; heart, blood, blood vessel, lung or bleeding
    disorders; **CANCER**; epilepsy; stroke; pneumonia; arthritis; brain,
    mental, nervous, back, neck, joint or muscular disorders; stomach,
    intestines, liver, pancreas, or kidney disorders; pseorosis, drug or
    alcohol abuse; acquired immune deficiency syndrom or AIDS-
    related complex; or tested positive for antibodies to the AIDS
    virus? (emphasis added for purposes of this brief)

In response to the above question, Mr. Hall appropriately checked the box marked "NO."

It is admitted that he made no mention of a history of cancer, because he had no history of

cancer. Mr. Hall's deposition was taken prior to him passing away and he specifically stated that

he had no prior knowledge of the cancer until after the application. See, Exhibits 3 and 4. Mrs.

Hall was deposed and she indicated that Mr. Hall had no prior knowledge of cancer in advance of

the application. See, Mrs. Hall's deposition, Exhibit 2. Dr. James Hurley, the doctor who

removed the mole, was deposed and indicated that, at the time the mole was removed in 1993,

there was no cancer and that Mr. Hall was in good health and that the removal of the mole had

been successful. See, Dr. Hurley's deposition, Exhibit 5. CUNA has had, since shortly after the

initial claim was made, a copy of a pathology report from the 1993 mole removal which

specifically found, "displastic nevus". CUNA knew this to be a non-cancerous finding. See, Dr.

Ansfield's deposition, Exhibit 13, in which Dr. Ansfield specifically states that the 1993

pathology report was a non-cancerous finding and CUNA Mutual had no other pathology report

at the time of their decision which related to the 1993 mole removal. See also, Brenda Larson's

deposition, Exhibit 14, the CUNA Mutual Claims Examiner who admits that a displastic nevus

finding on a pathology report is a non-cancerous finding. Furthermore, in CUNA's Answers to

Requests for Admissions, CUNA Mutual admitted that, at the time of CUNA Mutual's decision,

CUNA Mutual was in possession of the 1993 pathological report from Chambersburg Hospital. See, Exhibit 15.

At the time of CUNA Mutual's decision to deny benefits, they possessed a 1993 pathology report indicating no cancer and, despite their authorization to speak with doctors concerning Mr. Hall's care, chose not to speak with Dr. Hurley, the treating doctor who removed the mole (See, deposition of Brenda Larson, the CUNA Mutual employee, Exhibit 14) and chose not to speak with Dr. Charlesworth, Dr. Cashdollar, Dr. Enders, Dr. Chicklo, Dr. Ramirez and Dr. Hoffman. Each of these doctors have been deposed and have testified that Mr. Hall had not been treated or diagnosed with cancer prior to the application. Despite receiving this information from those doctors during the course of the litigation, CUNA Mutual continues, throughout the discovery process, to refuse to pay the money on the contract. Dr. Charlesworth's deposition is attached as Exhibit 16, Dr. Cashdollar's deposition is Exhibit 17, Dr. Enders' deposition is Exhibit 18, Dr. Chicklo's deposition is Exhibit 19, Dr. Ramirez's deposition is Exhibit 20, and Dr. Hoffman's deposition is Exhibit 21.

CUNA was also in possession of the hospital surgical records where the mole was removed. See, Exhibit 12, which are the partial records from the hospital.

Additionally, CUNA chose not to speak with Mrs. Hall on the telephone with respect to when she or her husband became aware of Mr. Hall's cancer. Had CUNA done so, they would have found out that Mr. Hall's video deposition was taken before he died wherein he testified under oath that he did not become aware of the cancer until after the application was made. See, Mr. and Mrs. Hall's depositions, Exhibit 2, 3 and 4. However, after the lawsuit was filed, Plaintiff's counsel provided CUNA with the transcript of the video deposition and all other depositions which had taken place in a separate medical malpractice case in which it is alleged

that the diagnosis of cancer should have been made in 1993, but was not. Despite this information, CUNA Mutual continues to refuse to pay under the policy.

After the complaint was filed, CUNA Mutual received medical records and work release from Dr. Hurley showing no cancerous findings in 1993. See, Exhibit 5. They also received the deposition transcripts from the pathologist who reviewed the 1993 slide stating that there were no cancerous findings in 1993. See, Exhibits 20 and 21. CUNA Mutual also sought and obtained voluminous medical records and testimony from doctors who treated Mr. Hall in which they all confirm that Mr. Hall had no diagnosis or treatment for cancer prior to January, 1999. See, depositions of numerous doctors attached as Exhibits 5, 16, 17, 18, 19, 20, and 21.

At the inception of the litigation, Plaintiff's counsel provided Defendants with Dr. David Weinrich's Attending Physician Statement where he indicated that Mr. Hall's first symptoms appeared in January, 1999, more then 2 months after the application was made. See, Exhibit 8. Dr. Weinrich further indicated that the patient had never before had the same or similar condition and that the diagnosis was metastatic melanoma. The doctor indicated that the date of the first visit was in January, 1999 (more then 2 months after the application was made) and the last visit at the time he filled out the Attending Physician Statement was September 30, 1999. Dr. Weinrich further indicated that the melanoma was a rapidly-progressive disorder and that the patient had not been hospitalized up to that point. See, Exhibit 8. During the course of discovery in the instant case, doctors not only indicated that Mr. Hall had not been treated or diagnosed with cancer prior to December, 1998 (prior to the application), but certain doctors indicated that it would be an abuse of their records to imply or infer that Mr. Hall knew he had cancer prior to December, 1998. See, depositions of Dr. Cashdollar (Exhibit 17); Dr. Enders (Exhibit 18); Dr. Chicklo (Exhibit 19); and Dr. Sharfman (Exhibit 23).

Most telling is the deposition of Dr. Ansfield himself, a CUNA Mutual Medical Director who was involved in the decision-making process concerning Mrs. Hall's insurance claim. Dr. Ansfield testified, on page 9 of his deposition which is attached as Exhibit 13, that it is typical or traditional for him to rely on pathology reports in diagnosing cancer and that is, according to Dr. Ansfield, "the standard of care." On page 11, he was asked the question, "If you received a pathology report that had as its findings dysplastic nevus, would you report to the patient at that time that he had cancer?" Answer: "No, I would not." Question: "Why?" Answer: "Because I don't feel that that, in itself, is a cancer." (page 12). Dr. Ansfield was asked whether or not he had reviewed the 1993 pathology report during his decision-making process and, when asked the question, "Is there anything in the pathology report that in your mind indicates that there was a cancer that was removed in 1993?" He answered: "No, I do not." (Page 15). Furthermore, he was asked, on page 16 of his deposition, the following:

> "Let me ask the question again. Is there anything from the 93 medical records with the surgical procedure of the removal of the mole that indicates that any form of cancer was developing in Mr. Hall?"
>
> ANSWER: "No, there is not."

Dr. Ansfield was asked, on page 19 of his deposition, "Now, are you saying you would have expected Mr. Hall to make his own diagnosis of cancer upon the discovery of a lump in his neck?" Answer: "I don't think that that would be possible for a lay person to make the determination as to what the lump was." He was asked, "You don't have any records, do you, or any information to establish that Mr. Hall knew he had cancer on November 18, 1998, do you?"[Application date was November 18, 1998].

**ANSWER: No, I do not.**

He was asked, "Let me rephrase the question to address the objection. Do you have any information that on November 18, 1998, Mr. Hall knew he had cancer." Answer: "No." (Page 20).

Dr. Ansfield was asked certain questions as to whether or not the treating doctor who removed the mole had provided records to CUNA Mutual and he indicated that he know understands that at the time of the application, and evaluation, the records from the treating doctor had never been obtained (page 25). He was asked on page 28 of his deposition, "And the person who removed the mole did not provide medical records?" Answer: "That is correct." He was asked, "And to your knowledge, neither you nor anyone at CUNA attempted to speak with him directly about those records?" Answer: "That is correct." He was further asked, "The ultimate CUNA decision to rescind the policy or deny benefits was made without Dr. Hurley's office records. Isn't this correct?" Answer: "That is correct." Again, he was asked, "The decision was based on the April, 93 mole?" Answer: "That is correct." See, Dr. Ansfield's Deposition, page 28.

Dr. Ansfield further testified in answering the following questions, that the back problems were unrelated to any decision or denial of benefits (page 31): "The back problems had nothing to do with the actual recission or denial of benefits, did it?" Answer: "That is correct." Interestingly, CUNA now contends that Mr. Hall's failure to disclose back problems somehow relate to their decision to deny benefits and rescind the policy. Dr. Ansfield was again asked, "So, at the time the application was made, you have no information that Mr. Hall himself knew he had cancer in 1993? Is that correct?" Answer: "I had no information." On page 44, Dr. Ansfield was asked, "And the pathology report had a finding of dysplastic nevus?" Answer: "That is correct." And Dr. Ansfield was asked, "And no finding of cancer or melanoma? Is that

correct?"    A.    "That is correct."

Q:    "Are you aware whether or not melanoma and cancers of all types and forms can be present and undiagnosed?"

A.    "Certainly, they can be undiagnosed."

Q.    "Present and unobserved?"

A.    "That is correct." (Page 45)

Q.    (Pg. 53) "Is there any place on the application form where the insurer is required to indicate a finding of dysplastic nevus?"

A.    "No there is not."

Q.    (Pg. 54) "Is there any place on the application form to tell simply whether you had a mole removed that is non-cancerous."

A.    "No there is not."

Q.    "No requirement for the insured to indicate a dysplastic nevus or a mole?"

A.    "No there is not." (Pg. 54)

During the course of Dr. Ansfield's deposition, CUNA Mutual's counsel asked CUNA's own witness a number of questions concerning references to the malignant mole. However, Dr. Ansfield acknowledged that those references were all made after the application was made. On page 61 of his deposition, the following conversation took place:

Q.    "All of the references to medical records to which you have just been shown, they begin on January 22, 1999 and ran through July 15, 1999, is that correct?"

A.    "That is correct."

Q.    "All of those references are after the application for insurance was made in November of 1998."

A.    "Correct."

Q.    "And after a certificate was issued by the insurance company?"

A.     "That is correct.  Yes, those records are referred to, medical records that occurred after the policy effective date which I believe was January 11, 1999. (Page 62)

Q.     "During the time frame from January 22, 1999 through July 15, 1999?"

A.     "That is what the records suggest."

Q.     "All after the application date?"

A.     "Correct."

Q.     "And the certificate being issued?"

A.     "Correct."

Despite this deposition testimony of CUNA's own Medical Director, CUNA now insists on the relevance of medical entries made after the time of the application.  CUNA's own Medical Director admitted during his deposition that these references were made after the time of the application and that CUNA Mutual had in their possession the 1993 pathology report which affirmatively indicated that the finding was of a dysplastic nevus, a non-cancerous finding.  The fact that, after the application was made, Mr. Hall subsequently developed a lump on his neck which resulted in surgical intervention, a relation back of the lump to a prior mole and a re-examination of that mole at pathology at the National Institute of Health, has no bearing on the issues presented during this case as to whether or not Mr. Hall had lied on this insurance application.

The only evidence which CUNA has in which they suggest that Mr. Hall lied was a document they did not have at the time of their decision-making process.  In that document, there is an entry on a patient input form concerning a cancerous mole removed in 1996.  There is no evidence in this case that any mole was removed in 1996 and Mr. and Mrs. Hall have both testified in their depositions, at Exhibits 2, 3 and 4, that Mr. Hall did not become aware of a

cancerous mole until months after the application was made. However, as Dr. Ansfield testified, the only issue is whether or not the 1993 mole was cancerous. There was no 1996 mole.

Depositions from CUNA's own employee, in addition to those of Dr. Ansfield, testified that the critical document in determining the diagnosis of cancer is the pathology report and that the only pathology report relevant to CUNA's inquiries is the 1993 pathology report and that the 1993 pathology report reveals a dysplastic nevus, a non-cancerous finding. See, depositions of Dr. Ansfield (Exhibit 15), Brenda Larson (Exhibit 14) and Barbara Lutz (Exhibit 24).

On February 22, 2000, CUNA wrote to Mrs. Hall and indicated that they were reporting the matter to the Pennsylvania Insurance Fraud Section. See, Deposition of Michael Stehl (Exhibit 25). The Pennsylvania Attorney General's Office responded to the referral within 1 month, indicating that no investigation would take place. See, Exhibit 25. CUNA, through its policies and practices, customs and habits, decided not to inform Mrs. Hall that no criminal investigation would take place, but rather, left her dangling and intimidated because of the criminal referral. See, Exhibit 25 and Plaintiff's Expert Reports, Exhibits 9 and 10. CUNA's handling of the referral and investigation, according to the Expert Reports attached as Exhibits 9 and 10, were not within industry standards and were, therefore, meant only to intimidate and harass and frighten Mrs. Hall from pursuing her claim for coverage. CUNA acted in bad faith and intentional disregard for their insured's interests when they reported a dead person for criminal prosecution (Mr. Hall), knowing no prosecution could take place against a deceased. See, Deposition of Michael Stehl (Exhibit 25); Deposition of Rich Fischer (Exhibit 26); Expert Reports (Exhibits 9 and 10). In the referral documents, CUNA failed to complete and fill out the referral form, knowing that no investigation would take place. See, Deposition of Rich Fischer (Exhibit 26); Deposition of Michael Stehl (Exhibit 25); Deposition of Erin Hefty (Exhibit 27);

and Plaintiff's Expert Reports (Exhibits 9 and 10).

Having engaged in all of the conduct described above, Mrs. Hall and the Estate were forced to quickly sell the family residence after Mr. Hall died. Mrs. Hall, because of financial necessities, resulting from CUNA's wrongful conduct, was forced to work as a live-in maid, and continues to work in that capacity today. See, Amended Complaint, Paragraph 28-35 and Mrs. Hall's deposition (Exhibit 2).

All of this conduct was engaged in by CUNA Mutual Insurance Society and CUNA Mutual Group, jointly. Attached as Exhibit 28 are numerous documents evidencing CUNA Mutual Group's efforts to hold itself out as an entity doing business with the public. See also, Deposition of Mr. Lawin (Exhibit 29) and Plaintiff's Expert Report of Mr. Schwartz (Exhibit 10).

## III.   PROCEDURAL HISTORY

On July 9, 2001, Mrs. Hall commenced this action, individually, and as the Representative and Administratrix of the Estate of Tommy Bob Hall, her deceased husband. The suit was brought against CUNA Mutual Group and CUNA Mutual Insurance Society. Both CUNA Mutual Insurance Society and CUNA Mutual Group sought and obtained counsel, accepted service and filed an Answer to the Complaint and Affirmative Defenses. On May 22, 2002, Plaintiff filed an Amended Complaint with the specific approval of the Court and over Defendant's Objections, in which Plaintiff asserts a variety of claims, including the following:

1.   CUNA breached its contract with the Halls;

2.   CUNA acted negligently in the claim process and during the continuing claim process up through the filing of the Amended Complaint;

3.    CUNA committed fraud and deceit;

4.    CUNA breached its duty of good faith and fair dealing;

5.    CUNA violated the Bad Faith Statute;

6.    CUNA violated other statutory duties and obligations.

Plaintiff contends that CUNA acted wrongfully, negligently, intentionally, wantonly, fraudulently, recklessly, carelessly, and in bad faith. CUNA filed a Response to Plaintiff's Motion to Amend the Complaint, seeking that the Amended Complaint not be allowed. Judge Rambo, in her opinion, ruled that Plaintiff's claims should proceed and that the Amended Complaint would be allowed. On July 11, 2002, CUNA filed an Answer to the Amended Complaint and Affirmative Defenses.

CUNA's present motion contends that there are no genuine issues with respect to bad faith, that there are no factual issues with respect to fraud, that judgment should be entered as a matter of law that they were not negligent, and that Plaintiff can not proceed with claims for pain and suffering. CUNA further seeks to strike Paragraph 24, 25, 26, 27 and 29 of the Amended Complaint and seeks dismissal of CUNA Mutual Group. In light of the numerous disputed facts with respect to bad faith, fraud, negligent and emotional distress claims, Plaintiff contends that she should be allowed to go forward on all of these claims. Interestingly, CUNA Mutual has not sought Summary Judgment with respect to the breach of contract claim and consequential damages which flow from the breach of contract. CUNA is aware that it can not make a claim for Summary Judgment on the breach of contract claim in that they breached contract when they denied benefits historically and up-to-the present to a man who had never been diagnosed or treated with cancer prior to the application and who truthfully filled out an insurance application form. For this reason, Plaintiff seeks Partial Summary Judgment on the contract claim and wish

to proceed to trial with those matters that are in dispute; whether CUNA Mutual's conduct was outrageous under the circumstances, whether they engaged in bad faith, whether they were negligent, whether they caused emotional distress, all as set forth in the 29 exhibits attached to Plaintiff's Statement of Disputed Material Facts and as set forth herein.


## IV.   COUNTERSTATEMENT OF QUESTIONS PRESENTED

A.   Whether there are material issues of fact in dispute as to CUNA Mutual's bad faith?

B.   Whether there are material issues of fact in dispute with respect to CUNA's fraudulent conduct?

C.   Whether CUNA has engaged in systemic bad faith as set forth in Plaintiff's Expert Reports?

D.   Whether CUNA is immune from suit with respect to improper claims made to the Attorney General's Office?

E.   Whether CUNA Mutual Group and CUNA Mutual Insurance Society are both proper defendants in this case in that they hold themselves out as legal entities and accepted and received service in the instant case?

F.   Whether there are material issues of fact as to Plaintiff's Cause of Action for negligence and recovery of damages for pain and suffering and emotional trauma?

G.   Whether Plaintiff is entitled to Partial Summary Judgment on the breach of contract claim where there is no material dispute that Mr. Hall was never diagnosed or treated for cancer prior to the date of the application.


## V.   LEGAL ANALYSIS

A.   Bad faith

Title 42, Section 8371 creates a cause of action for first party bad faith against an insurance company. Under the statute, a finding of bad faith leads to the imposition of interest,

court costs, attorney fees and punitive damages against an insurance company. However, Section

8371 does not provide a specific definition for bad faith. Section 8371 states, "In an action

arising under an insurance policy, if the Court finds that an insurer has acted in bad faith towards

the insured, the Court may take all of the following actions:

1.    Award interest on the amount of the claim from the date the claim was made
      by the insured and in an amount equal to the prime rate of interest, plus 3%;

2.    Award punitive damages against the insurer;

3.    Assess court costs and attorney fees against the insurer.

After the enactment of Section 8371, numerous courts have attempted to define bad faith

and examine the context in which bad faith may occur. Most of the decisions in interpreting

Section 8371 have occurred in the context of an insurer denying benefits under a policy, and

courts have concluded that these types of allegations obviously fall within the meaning of the act.

B. O'Donnell vs. Allstate Insurance Company, 1999 Pa. Superior, Lexis 1991 (June 30, 1999).

(Stating, "It is now clear...that Section 8371 is not restricted to an insurer's bad faith in denying a

claim. An action for bad faith may also extend to the insurer's investigative practices.)"

Romano vs. Nationwide Mutual Fire Insurance Company, 646 A.2d 1228 (Pa. Superior 1994).

(Holding that and evaluating the conduct of an insurer under Section 8371, the trial court may

look to the Unfair Insurance Practices Act, which includes as unfair practices inappropriate delay

in investigation or payment of claim.

As stated in O'Donnell, the Superior Court explained the expansive nature of

Pennsylvania' Bad Faith Statute, as follows:

> "The plain language of Section 8371 clearly reveals the lack of
> any restrictive language limiting the scope of bad faith conduct...
> By enacting this statute, the legislature specifically responded
> to our Supreme Court's refusal to create a common law

> remedy, See, D'ambrosio Supra and explicitly rejected the
> Court's conclusion that the provisions of the UIPA are
> sufficient to define and determine bad faith conduct by
> insurers. Therefore, they find that the broad language of
> Section 8371 was designed to remedy all instances of
> bad faith conduct by an insurer, whether occurring before,
> during or after litigation...

Slip Opinion at 14. The Court has gone so far as to conclude that even when there has

not been a breach of contract, there may still be a bad faith claim with respect to the way in

which the claim was handled. Insurance Company vs. Alperine, Inc., et al, 1991 U.S. Dist.,

Lexus 5929 (Eastern District of Pennsylvania, April 29, 1998). The Court, in the present case,

need not reach such extended circumstances in that there was both a breach of the contract, and

unreasonable and outrageous conduct. Certainly, at a minimum, there are material issues of fact

with respect to the nature, extent and degree of the outrageous and unreasonable conduct. As

outlined in Plaintiff's factual section of this Brief and in Plaintiff's Counterstatement of Disputed

Material Facts, CUNA denied the claim for benefit, asserting as a basis that Mr. Hall had failed

to disclose on his insurance application the diagnosis and treatment for cancer. It is undisputed

that Mr. Hall had never been diagnosed or treated for cancer prior to the application. See,

Deposition of Dr. Hurley, the treating doctor who removed the mole and who testified under oath

that he had not diagnosed or treated Mr. Hall for cancer (Exhibit 5); Depositions of Dr. Ramirez

(Exhibit 20) and Dr. Hoffman (Exhibit 21), the pathologist who examined grossly and

microscopically the mole, and who stated that this was a dysplastic nevus and not a cancerous

finding. CUNA's Answers to Request for Admissions, #1, in which the Request for Admissions

was as follows:

> "The only pathology report in CUNA Mutual's possession at the
> time they were making decisions concerning Mr. Hall's policy
> was a 1993 pathology report from Chambersburg Hospital."

A.    It is admitted that, at the time, and before, CUNA advised Mrs. Hall
      of its intention to rescind the Hall's home mortgage protection policy,
      CUNA was in possession of an April, 1993 pathological report from
      Chambersburg Hospital.

In the deposition taken of Dr. Ansfield, CUNA's own Medical Director, admissions are

made that, not only establish CUNA's bad faith, but prove the breach of contract claim.  Dr.

Ansfield testified that a finding of dysplastic nevus on a pathology report would be a finding of

no cancer and that is what he would report to the patient, Exhibit 1, Dr. Ansfield's testimony,

pages 11 and 12.  Furthermore, the expert reports produced by the Plaintiffs and attached as

Exhibits 9 and 10, reiterate, in great detail, the bad faith conduct.  The basis for those reports are

the materials provided in Exhibits 1 through 29 of Plaintiff's Counterstatement of Disputed

Material Facts.  Dick Schwartz, a life insurance analyst, and co-author of the American Bar

Association's Primer on Life Insurance Products, Illustrations and Due Diligence and an

executive in the insurance industry for 33 years, concluded,

> "It is clear that as part of this review, CUNA Mutual breached their
> insurance contract with Patriot Federal Credit Union for the benefit
> of Tommy Bob Hall and that their actions were not only unreasonable,
> but a clear and blatant attempt to deny Mrs. Nancy Hall the benefits
> that she was fully entitled to.  Further, the consequences of their
> actions should have been expected by them based upon the fact
> that they were ascertainable by CUNA Mutual had they done
> their homework and reviewed the available data when they had
> initially underwrote the insurance application."

Mr. Schwartz further summarized that CUNA Mutual's continual denial constitutes

unreasonable conduct for a prudent insurance company. (Exhibit 9)

In another expert report, provided by Michele Doherty, the Assistant Vice President of

Compliance at Universal American Financial Corp., an insurance and annuity company, Ms.

Doherty concluded that CUNA breached their contract with the Halls in the handling of the

Hall's claim and that CUNA's conduct was unreasonable and outrageous under the circumstances.  <u>See</u>, Exhibit 10.  In her concluding remarks and observations, and in her rebuttal report, she concludes as follows:

> "Regardless of whether Tommy Bob Hall or Nancy Hall believed a 1993 mole was cancerous, the application's question did not ask, "Do you believe you have or had cancer?"  Rather, the question asked was, "Have you ever been treated or diagnosed as having... cancer...?"  Tommy Bob Hall was a cabinetmaker and truck driver with a high school education and hardly capable of self-diagnosing cancer.  Without a diagnosis by a medical professional, and we already know the medical professional did not diagnose cancer in 1993, Tommy Bob Hall correctly answered the health question on the application in the negative.  Brenda Larson's letter of 2/10/00 to Nancy Hall states, "the review showed that Tommy visited a doctor in 1993.  On the application, Tommy did not indicate this visit occurred.  Had we known about the medical condition revealed during that visit, we would not have accepted the application or issued a Certificate of Insurance."...As a result, no benefits will be paid under this contract either now or in the future."

The application did not ask if Tommy Bob Hall had visited a doctor.  It asked for a diagnosis or treatment of cancer.  CUNA continues their bad faith handling of this claim by their ongoing refusal to pay benefits due, even with clear evidence of Mr. Hall's lack of knowledge of his malignancy prior to the time of application.  While some of CUNA's conduct may have been perceived as reasonable, the overwhelming evidence is that their actions were, and continue to be, unreasonable.  <u>See</u>, Report attached as Exhibit 10.  These facts clearly establish that there are genuine issues of material facts which require a trial on the bad faith claim.

Evidence contends that bad faith should not continue during the course of litigation, as a matter of law, citing again the <u>Adamski vs. Allstate Insurance Company</u>, 738 A. 2nd, 1033, (Pa. Superior 1999).  CUNA's reference is incorrect.  The duty to act in good faith does not end upon the initiation of a suit.  The Supreme Court, when presented with the opportunity, specifically

held that the insurer's duty to act in good faith does not end upon the initiation of litigation:

> "The broad language of Section 8371 is designed to remedy all instances
> of bad faith conduct by an insurer, whether occurring before, during, or
> after litigation. In so finding, we refuse to hold that an insurer's duty
> to act in good faith ends upon the initiation or suit by the insured.

O'Donnell vs. Allstate Insurance Company, 734 A. 2d 901 (Pa. Superior 1999); See also,
Rottmund vs. Continental Assurance Company, 813 F. Supp. 1104 (Eastern District of
Pennsylvania, 1992); Albert Albertini Restaurant, Inc. vs. Nationwide Mutual Insurance
Company, 1993 U. S. District Lexis 7851 (Eastern District of PA, 2/10/93).

Furthermore, independent efforts to obtain Partial Summary Judgement on the bad faith

issue, Defendant's point to certain "unanswered questions". Those unanswered questions have

been answered in the discovery process. Mr. and Mrs. Hall contend that they did not provide a

history of cancer in 1996. It is Defendant's contention that Mr. and Mrs. Hall did provide a

history of cancer in 1996. Mrs. Hall stated, in her deposition, that the handwriting was not that

of Mr. Hall. See, Exhibit 2. Dr. Charlesworth testified that when Mr. and Mrs. Hall came to his

office, there was a discussion as to whether or not Mr. Hall had cancer and Dr. Charlesworth

concluded that they did not know whether or not he had cancer and that is why Dr. Charlesworth

put a question mark on the medical file. See, Dr. Charlesworth's deposition attached as Exhibit

16. Furthermore, Mr. Hall did not tell Dr. Chicklo on January 15, 1999 that he had a cancerous

mole excised from his back in 1993, but it is more likely that Dr. Chicklo extracted it from some

reference in Dr. Charlesworth's records which was explained previously. By February 17, 1999,

Dr. Enders testified that a relationship was being made between the mole that was excised and

the now-progressive malignant melanoma. This relationship was occurring after the application

was made in November, 1998. At a minimum, Mr. and Mrs. Hall's depositions and the

depositions of Dr. Hurley, the treating doctor who removed the mole and testified there was no

cancerous diagnosis, and the pathology report itself which shows there was no cancerous

diagnosis, and not one single document diagnosing and treating cancer prior to the application,

substantiates the disputed issues of material facts which warrants a trial on the bad faith suit.

Plaintiff's experts have concluded that an insurance company who denies benefits at a

time when they have in their possession the pathology report affirmatively concluding that there

was not a cancerous growth, despite their possession of documents created after the application

referencing the cancerous mole, constitutes unreasonable and outrageous conduct and bad faith

both in the decision-making process and in the investigative efforts of CUNA Mutual. CUNA,

despite awareness of a lawsuit, admits that they never obtained information or attempted to

obtain information concerning the lawsuit. See, Deposition of Brenda Larson (Exhibit 14). If

CUNA would have taken reasonable steps to obtain information about that lawsuit, they would

have found out that Dr. Hurley had testified that there was no diagnosis of a cancerous mole, that

the pathologist testified that pathologically no findings were found of a cancerous mole, that Mr.

Hall had testified under oath, prior to his death, that he was unaware of any cancerous mole until

after January, 1999, and that Mrs. Hall was not aware of any cancerous findings in her husband

prior to the application. However, what is particularly outrageous is that CUNA relied upon its

own ignorance of the true facts as an attempted defense to a bad faith suit. However, at the time

of the initiation of the suit and the disclosure of documents, Plaintiff's counsel delivered to the

Defendants all of the records referenced above. Despite these definitive and absolute records of

the doctor who removed the mole, the pathologist who examined the mole, the pathology report

(which CUNA Mutual already had), and Mr. Hall's video deposition under oath, all affirming

that there was no diagnosis or treatment for cancer, CUNA continued to refuse to pay benefits

under the policy. Rather, CUNA continued in its position that no benefits were due and that,

through discovery or through some investigation, they hoped to find additional information to support their otherwise unsupportable claim.

Accordingly, there are material issues of fact which must be tried and upon the trial of the merit of the bad faith claim, Plaintiff anticipates that the jurors will agree with Plaintiff's experts and all of the evidence in the case that CUNA Mutual engaged, and continues to engage, in bad faith conduct.

      B.     Fraudulent Conduct.

CUNA contends that none of their conduct was fraudulent. However, this factual statement flies in the face of the evidence which has been discussed previously. That evidence includes the 29 exhibits attached to Plaintiff's Counterstatement of Material Facts. Those exhibits evidence a fraud committed against Mr. and Mrs. Hall. The fraud consisted of CUNA's explicit and implicit statements in its members home mortgage protection application and policy (Exhibit 1 and Exhibit 6) that CUNA would pay $56,000 upon Mr. Hall's death. That representation was certainly material to Mr. and Mrs. Hall's decision to make premium payments during the course of Mr. Hall's life. It was also material to Mr. Hall's decision to discontinue with the existing home owner's policy, which would have provided greater coverage than this new policy. The statement was false when it was made because CUNA, as has been revealed through the discovery process, fully intended to deny Mr. Hall's claims through the ruse and guise of non-existing facts. The experts in this case, Exhibits 9 and 10, have labeled this type of conduct "post-claim underwriting". That is the process in which an insurance company does little or no investigation at the time an application is made, but fully intends on making a detailed and involved investigation after a claim is made. In the instant case, that is exactly what happened, wherein Mr. and Mrs. Hall were given a one-page document and a boilerplate list of

all types of ailments.  Mr. Hall indicated that he did not have those ailments.  And, in fact, Mr.

Hall truthfully answered that he did not have cancer.  However, when Mr. Hall died of cancer,

CUNA began an investigative process which revealed a pathology report, proving Mr. Hall's

statement that he had not been diagnosed with cancer and chose to disregard it.  Rather, CUNA

looked at documents which were prepared by doctors after the application was made which

referenced the prior cancerous mole.  As Dr. Ansfield testified in his deposition, cancer can begin

in acute form from infancy and continue through one's lifetime.  See, Dr. Ansfield's deposition.

Accordingly, CUNA had prepared itself to deny a claim where an individual dies of cancer

despite a pathology report which shows there was no cancer, simply by referencing subsequent

records, after the application, which reference a relationship of the existing cancer to some earlier

event or mole removal.  Plaintiff's expert reports, attached as Exhibits 9 and 10, delineate in

great detail this type of fraudulent conduct and post-claim underwriting.  At a minimum, there

are certainly material issues of fact as to whether or not CUNA's conduct was fraudulent.  This

issue must be tried by the jury.  An additional issue of fraudulent conduct is the conduct in which

Michael Stehl, CUNA's Head of the Special Investigation Unit, engaged in when he wrote to

Mrs. Hall and told her that she and her husband were being investigated for fraud and a referral

had been made to the Criminal Investigation Unit.  See, Stehl deposition (Exhibit 25).  In that, as

a matter of law, no criminal investigation or prosecution can take place against a dead person.

That statement was a fraudulent one and made with the intent to harass, frighten and intimidate

Mrs. Hall.  See, Mrs. Hall's deposition (Exhibit 2) and Plaintiff's Expert Reports (Exhibits 9 and

10).

      C.     Systemic Bad Faith

      Plaintiff has alleged in the Complaint that CUNA had systemically acted in bad faith and

breached their contract for insurers when they received and accepted group credit life insurance

premiums. See, paragraph 29 of the Amended Complaint. Plaintiff has alleged that the systemic

conduct relates to Group Credit Life. However, CUNA has provided information and is artfully

asserting in their brief that they have only 3 home mortgage protection life insurance policies,

including the Hall policy, in which a recission has taken place. The allegation, however, is not

that CUNA engaged in systemic bad faith only with respect to home mortgage protection

policies, but rather, with respect to all group credit life insurance policies. As described

previously, Plaintiff's expert reports delineate in great detail this type of systemic bad faith.

Plaintiff's experts, who will be testifying live at trial, examined all of the discovered materials in

the case, including those exhibits and documents attached as exhibits 1 through 29 of Plaintiff's

Counterstatement of Disputed Material Facts. Michele Doherty, one of Plaintiff's experts, in her

report dated June 24, 2002, attached as Exhibit 10, states in her report that:

> "CUNA was on notice of Mr. Hall's condition and had the
> opportunity to request and review Mr. Hall's medical records.
> No such request was made until the claim for just benefits was
> made to CUNA. This leads to a situation referred to as
> "post-claim underwriting". CUNA has procures to processing
> claims. During the two year contestable period, a policy is
> usually suspended for a investigation if a claim is received
> containing a diagnosis of a condition relating to the health
> conditions on the application. This leads to the practice of
> post-claim underwriting that may be harmful to policy holders,
> especially those who have replaced other coverage. (We know
> Mr. Hall had previous coverage that was replaced by CUNA).
> It is acknowledged that CUNA in exercising their right to
> investigate whether there was a material misrepresentation
> occurred on the application. However, it appears no
> pre-approval underwriting was performed by either
> requesting an MID Report or verifying with Dr. Charlesworth
> that Mr. Hall had not been diagnosed with any of the
> conditions identified by the health questions on the
> application." (Report, page 3, Exhibit 10)"

According to Ms. Doherty, CUNA Mutual issued a certificate and will require, under the terms of the certificate, to pay on the policy. The pattern and practice of CUNA Mutual, pursuant to the training which Brenda Larson received at CUNA Mutual, followed the pattern of claim investigation at a much more intense level despite underwriting at a less stringent level. This type of systemic treatment of the insured is inappropriate, systemic bad faith and a violation of law. See, Plaintiff's Expert Reports (Exhibits 9 and 10, and Deposition of Brenda Larson (Exhibit 14).

      D.     No Immunity for Malicious Reporting or Reporting for an improper purpose Alleged Fraudulent Conduct

In Paragraphs 24 through 27 of the Amended Complaint, Plaintiff asserts that CUNA wrote to Mrs. Hall on February 22, 2000 and told her that they were reporting the matter to the Pennsylvania Insurance Fraud Section for criminal investigation. See, Deposition of Michael Stehl (Exhibit 25). The Pennsylvania Attorney General's Office responded to the referral within 1 month indicating that no investigation would take place. See, Exhibit 25, Deposition of Michael Stehl. CUNA, elected not to inform Mrs. Hall that no criminal investigation would take place. See, Exhibit 25, Deposition of Michael Stehl and Expert Reports, Exhibits 9 and 10. The Amended Complaint specifically states that the referral was made in bad faith because :

      A.     CUNA had reported a dead person for criminal prosecution knowing that no prosecution could take place (Stehl deposition, Exhibit 25; Deposition of Rich Fischer, Exhibit 26; and Expert Reports Exhibits 9 and 10).

      B.     CUNA wrote to Mrs. Hall, the surviving spouse, only to intimidate and frighten her from pursuing her claim for benefits. (Expert Reports, Exhibits 9 and 10; and Deposition of Mrs. Hall, Exhibit 2).

      C.     CUNA failed to complete the form for the referral, not even asserting what the alleged misrepresentation was, knowing that no investigation would take place. (Deposition of Rich Fischer, Exhibit 26; Deposition of Michael Stehl, Exhibit 25; Deposition of Erin

Hefty, Exhibit 27).

CUNA, accordingly, systemically used the criminal referral process, as Michael Stehl stated in his deposition, that he was merely following the practices of the company, when referring for criminal prosecution deceased individuals and notifying the spouse of the deceased with respect to the referral. (Expert Reports, Exhibits 9 and 10). As stated in Ms. Doherty's report, Exhibit 10, there was no justifiable basis neither within the statutes or from an investigative perspective, for referring for criminal prosecution a dead individual or notifying an individual who is the subject of the investigation that they are being investigated. Furthermore, the failure to even complete the criminal prosecution, but used the criminal referral process to frighten and intimidate one of their insureds, Mrs. Hall. There is no immunity for this type of conduct.

Although there is general immunity under 40 P.S. Section 3701.102 for reporting claims, there is no immunity in the circumstances of malice or, as in alleged in the instant case, there was something more than a mere referral. Had there been a referral and no letter or          effort to intimidate Mrs. Hall, immunity would exist.

The immunity was not lost as a result of the referral, rather, the immunity was lost as a result of efforts to intimidate and frighten Mrs. Hall from pursuing her claim by cautioning her on the referral and sending a letter to her that a criminal investigation would take place. Additionally, CUNA copied the credit union on the letter to Mrs. Hall that her claim was being criminally investigated. Additionally, there is no immunity for failing to notify your insured that no criminal investigation is taking place. Within 30 days of sending the matter for criminal investigation, CUNA Mutual received a letter from       the Pennsylvania Attorney General's office that no criminal investigation would take place. Despite receiving this letter, CUNA Mutual failed to notify Mrs. Hall that no criminal investigation would take place.

This evidences CUNA Mutual's malice conduct and efforts to frighten and intimidate Mrs. Hall from pursuing her claim.  There was no justifiable basis for failing to notify Mrs. Hall that no criminal investigation was taking place.  There is no immunity for failing to notify an insured, having already told them of a criminal referral, that no criminal investigation would take place.

>        E.        CUNA Mutual Group *and* CUNA Mutual Insurance Society are
>                  both proper parties to the instant action.

In the instant action, Plaintiff filed suit against CUNA Mutual Insurance Society and CUNA Mutual Group and served each entity separately as is evidenced by Exhibits 28 and 29.  CUNA Mutual Group did not seek dismissal in the action, but rather, obtained representation and filed pleadings and court documents in its defense in this case, but failed to raise a Motion to Dismiss.  Defendant CNA Mutual Group has now submitted an Affidavit, self-serving in nature, which simply states that it is not a corporation or a legal entity of any sort.

Defendant, CUNA Mutual Group, has held itself out to the public, its insured and beneficiaries as an entity doing business.  Attached hereto as Exhibit  are numerous letters and correspondence in this case in which CUNA Mutual Group's name appears as the party with whom Mrs. Hall and others are dealing and doing business.

Additionally, CUNA Mutual Group has disseminated to the public and has been disclosed in discovery to have disseminated annual statements detailing CUNA Mutual Group's assets, liabilities, profit, net worth, and names and pictures of members of their Board of Directors.  It certainly contradicts the Affidavit prepared by CUNA Mutual Group that it is not a legal entity when, at the same time, CUNA Mutual Group has billions of dollars in assets and millions of dollars in profits annually.  Additionally, CUNA Mutual Group has its own Board of

Directors as is evidenced by the Annual Statements of CUNA Mutual Group, also attached as part of Exhibits 28 and 29.

Lastly, Plaintiffs deposed a corporate designee in this case in which the corporate designee detailed some of the assets and liabilities and members of CUNA Mutual Group's Board of Directors. A true and correct copy of relevant portions of that deposition is attached hereto as Exhibit 29. See, Exhibit 28 and 29, and Plaintiff's Expert Report of Dick Schwartz, Exhibit 10.

F.     Consequential Damages and Emotional Distress are Recoverable

Plaintiffs do not dispute that generally, courts use two methods to determine whether tort claim that accompany contract claims should be allowed as pre-standing causes of action: the "just of the action" test and the "economic loss doctrine test". Bohler-Uddeholm America, King vs. Elwood Group, Inc., 247 F 103 (3rd Circuit 2001). Defendants cite a number of cases outside the insurance context. Because an insurer owes a particular duty to its insured, the relationships are not identical to those in a more detached factual setting. The Pennsylvania Bad Faith Statute makes clear that the relationship is not the same between an insurance company and their insured and a simple garden-variety contract. In The Birth center vs. The St. Paul Company, Numbers 25-28, Middle District Appeal Docket 2000 (Pennsylvania, December 31, 2001), the Pennsylvania Supreme Court held that a Plaintiff in a bad faith case may recover not only damages enumerated in 42 Pennsylvania CSA Section 8371, but all "foreseeable, compensatory damages...that reasonably flow from the bad faith conduct of the insurer" under the breach of contract claim.

The Plaintiffs in The Birth center allege that the insurer had acted in bad

faith by refusing to settle a civil action brought against the Plaintiff in which the jury returned a

verdict in excess of the Plaintiff's insurance limits. The insurer paid the entire amount of the

verdict against the Plaintiff but the Plaintiff alleged that the insurer's bad faith conduct also

caused Plaintiff additional compensatory damages of $700,000. On the last day of 2001, the

Supreme Court of Pennsylvania held that the insurer's payment of the policy limits, did not

preclude an award of additional compensatory damages, because the damages stemming from the

insurer's bad faith conduct were not resolved in an underlying action.

Finally, the court held that Section 8371 did not preclude an aware of

compensatory damages for breach of contract. Section 8371, the court held, did not alter a

party's common law contract right, but merely provides additional remedy. Thus, the Plaintiff

obtained the right to recover actual damages caused by the insurers breach of its contractual duty

of good faith. Furthermore, emotional damages and physical distress can be rewarded if there is

some foreseeability to the damage as a result of the breach of contract. This principal is stated in

Restatement (2nd) of Contracts, Section 353 which provides: "recovery for emotional

disturbance will be excluded unless the breach also caused bodily harm or the contract or the

breach is of such a kind that serious emotional disturbances was a particularly likely result." In

applying this section, the United States District Court for the Eastern District of Pennsylvania in

Leo vs. State Farm, 908 F. Supp. 254 (E. D. Pa, 1995) stated: "It remains possible that bad faith

failure to pay an insurance claim might meet the standard of Section 353 in some circumstances.

For instance, if an insured's ability to secure the basic necessities of life are foreseeably very

likely to hinge upon payment under an insured's contract, serious emotional disturbance might be

a particularly likely result of failure to pay a claim.

In the instant case, in applying the analysis of the Restatement section of

the Contracts, Plaintiff, who purchased an insurance policy to insure their home against debt, certainly could foreseeably suffer emotional stress if the home is forced to be sold upon the spouse's death and Mrs. Hall is, as a result of economic hardship, forced to work as a live-in maid following her husband's death.  In fact, the policy itself bears the name home mortgage protection policy.  There are few things more fundamental to an individual's emotional health and well-being that following their spouse's death, they be allowed time to mourn and to reside in the family home until financial arrangements can be made.  These financial arrangements may include selling the home or making other living arrangements in a step-by-step and procedural manner.  Mrs. Hall testified, Exhibit 2, that, although she and her husband had contemplated, because of economic hardship, selling the home, she was forced to sell the home almost immediately upon her husband's death and to move in with one of her husband's co-workers as a live-in maid because of CUNA's wrongful denial of benefits under the policy.  Accordingly, whether the action is labeled breach of contract or negligence, under the facts and circumstances of this case, the same damages flow from either label, the ability to recover from emotional stress and other consequential damages which flow from a breach of contract.

G.     CUNA Mutual breached the contract.

It is undisputed in this case that CUNA Mutual had an insurance contract for the benefit of Mr. and Mrs. Hall.  It is undisputed that in the application for insurance, Mr. Hall indicated that he had not been treated or diagnosed with cancer prior to the application.  See, Application, Exhibit 1.  The policy was rescinded, according to Brenda Larson and Dr. Ansfeld as a result of what Brenda Larson categorized as failing to disclose a 1993 office visit and the removal of the mole.  See, Dr. Ansfeld's Deposition, Exhibit 2 and Brenda Larson's Deposition, Exhibit 14. There is no dispute that all cancer must be diagnosed microscopically by a pathological report. See, Dr. Ansfeld's Deposition, Exhibit 2 and the depositions of Dr. Hurly, Exhibit 5; Dr. Charlesworth, Exhibit 16; Dr. Cashdollar, Exhibit 17; Dr. Enders, Exhibit 18; Dr. Chicklo, Exhibit 19; Dr. Ramirez, Exhibit 20; and Dr. Hoffman, Exhibit 21.  The only pathology report which CUNA Mutual has ever received is the pathology report from the removal of the 1993 mole in which there is a finding of dysplastic neuvous and no cancer.  See, Exhibit 12.  It is admitted by the Defendants that the finding of dysplastic neuvous is not a cancerous finding.  See, Exhibit 2, Deposition of Dr. Ansfeld and Exhibit 14, Deposition of Brenda Larson.  Accordingly, there can be no dispute that CUNA Mutual breached its insurance contract and Partial Summary Judgment is appropriate with respect to the breach of contract claim.

## VI.     **CONCLUSION**

For the foregoing reasons, each of Defendants' requests for Partial Summary Judgment should be denied.  Plaintiff's request that Partial Summary Judgment on the breach of contract claim to be granted.  This case should proceed to trial on the issues of CUNA's bad faith, damages, and other issues raised in the Amended Complaint.

Respectfully submitted,

Stephen R. Pedersen
214 Senate Avenue, Suite 602
Camp Hill, PA 17011
(717) 763-1170

I. D. No. 72026
Counsel for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

And now, this *20th* day of *Sept.*, 2002, I, Carleen S. Jensen, do hereby certify

that I have, this date, served a true and correct copy of the within **BRIEF** upon each of the

attorneys of record at the following address(es) by sending same in the United States mail:

Michael R. Kelley, Esq.
Charles T. Young
100 Pine Street
P O Box 1166
Harrisburg, PA 17108-1166

Catherine Mahady-Smith, Esq.
3115-A N. Front Street
Harrisburg, PA 17110

DATE: *9-20-02*

Carleen S. Jensen
Assistant to Stephen R. Pedersen, Esquire
214 Senate Avenue, Suite 602
Camp Hill, PA 17011
(717) 763-1170

I. D. No. 72026
Counsel for Plaintiff