# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **NANCY HALL, individually and as the** | : | **CIVIL ACTION - LAW** |
| **Representative and Administratrix of** | : | |
| **the Estate of TOMMY HALL, deceased,** | : | |
| **her husband,** | : | |
| **Plaintiff,** | : | |
|  | : | |
|  | : | **1:01-CV-1265** |
| **CUNA MUTUAL GROUP;CUNA** | : | |
| **MUTUAL INSURANCE SOCIETY,** | : | |
|  | : | |
| **Defendants.** | : | **JUDGE CHRISTOPHER CONNER** |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION IN LIMINE

Plaintiff, Nancy Hall, individually and as the Representative and Administratrix of the Estate of Tommy Hall, by and through undersigned counsel, respectfully submits the following Plaintiff's Response to Defendants' Motion in Limine, with supporting documents labeled as Exhibits 1 through 4.

Respectfully submitted,

Stephen R. Pedersen, Esq.
214 Senate Ave., Suite 602
Camp Hill, PA 17011
(717) 763-1170

I. D. No. 72026
Counsel for Plaintiff

## I. Statement of Facts and Procedural History

CUNA Mutual Insurance Society and CUNA Mutual Group (collectively referred to as "CUNA"), wrongfully denied life insurance benefits to Nancy Hall ("Mrs. Hall") following the death of her husband, Tommy Bob Hall ("Mr. Hall"). CUNA denied coverage, as stated in their letter to Mrs. Hall, based upon Mr. Hall's failure to disclose a visit to a doctor in 1993 which led to the removal of a mole five years prior to the application. At the time of its decision, CUNA had in its possession, among other things, the pathology report from Chambersburg Hospital which CUNA now admits reveal that no cancer was found at the time.

In preparation for trial and in compliance with a court order, both the plaintiffs and the defendants timely produced and exchanged expert reports. Defendants now seek to strike or limit plaintiff's anticipated trial testimony of experts Mr. Richard A. Schwartz and Michelle Doherty, while being allowed to proceed fully with their own expert witnesses.

CUNA contends that plaintiffs experts should not be allowed to testify concerning "conclusions of law," "credibility of witnesses," and "post-claim underwriting." CUNA, however, has presented a form of order which suggests that plaintiffs experts be precluded from presenting any testimony whatsoever, while allowing their own experts to fully testify. Obviously, fairness requires otherwise.

Each of CUNA's arguments will be addressed, seriatim, below, after the testimony of plaintiff experts is more fully explained.

## II. Mr. Schwartz' Reports

Mr. Schwartz prepared two detailed and thorough reports, one dated June 21, 2002 (the "first report") and the other, a rebuttal report, dated August 12, 2002 (the "second report"), both of which are attached hereto as exhibits 1 and 2 respectively.

In Mr. Schwartz' first six-page detailed report, he delineates the materials he has reviewed, including all deposition transcripts and CUNA documents and files. Mr. Schwartz is the President of Life Insurance Analysts, Inc. and was the co-author of a widely used American Bar Association primer on life insurance products, titled, "Life Insurance Products, Illustrations, and Due Diligence."

He also wrote "Life Insurance Due Care: Carriers, Products, and Illustrations," for the American Bar Association and "Keeping Faith with Policyholders:  Guidelines for Companies and Producers," published in the CLU Journal.  He has been working in the insurance industry for 33 years.  His Professional Biography is attached and included within Exhibit 1.

Mr. Schwartz, at page two of his report, discusses underwriting measurement processes for the insurance purchased by the Halls.  He examined the pricing and mortality rates for two lines of CUNA business.  He further examined CUNA's own mortality tables and found that the present value of expected death claims under CUNA's HMP policies for all insureds age 42 are 147% of those expected under individually underwritten insurance policies.

Mr. Schwartz then asks the question in his report, "Why is this important?"  He then answers the question as follows:

> For individual insurance when the insurance policy is delivered, the applicant is usually asked whether there has been any change in his/her medical condition since the policy was applied for.  If this process had been applied under the home mortgage protection (HMP) insurance policy, the answer to whether there had been any changes in health after the certificate was applied for would have been YES.  The policy would therefore not have been issued without significantly more inquiry on CUNA Mutual's part.  However, for home mortgage protection insurance, these more stringent individual life insurance underwriting processes were not used.  They were not used because the insurance company priced for and expected a significantly higher level of claims (47% higher) under HMP policies due to their less stringent underwriting requirements.  The Tommy Bob Hall case was one which clearly passed through this intentionally less stringent filter.
>
> However CUNA Mutual appears to want the benefit of the more stringent underwriting requirements, even though it priced reflective of significantly less stringent underwriting process.

Exhibit 1, Schwartz Report, p. 2.

In other words, Mr. Schwartz will testify, among other things, that CUNA priced the product sold to Mr. and Mrs. Hall, according to one set of underwriting and risk standards, but when it came time to pay the claim, evaluated the claim under a whole different set of more stringent standards, thus attempting to have their cake and eat it too.  Mr. Schwartz' calculations are based upon CUNA's own charts provided during discovery.  See, Charts A, B and C attached to Mr. Schwartz' first report (Exhibit 1).  It is of little wonder that CUNA does not wish Mr. Schwartz to testify.

Mr. Schwartz also addresses such issues as:

1. The Hall insurance application uses an accept or decline rating methodology and pricing, but claims are assessed using a different standard. Exhibit 1, Report, p. 3.

2. The insurance was not solicited by Mr. Hall, but was a renewal policy in which less insurance was being sought than Mr. Hall previously had, as a result of refinancing and paying down the mortgage by an additional $20,000, Mr. Hall took out of savings. Exhibit 1, Report, p. 3.

3. The Hall claim itself was not listed by CUNA on their December 31, 2001 Annual Statement, Schedule F, as a "resisted" claim, as it should have been. Rather, CUNA concealed on government filings the fact that they were not paying on the Hall life insurance claim. Exhibit 1, Report, p. 3. (Another obvious reason CUNA does not wish Mr. Schwartz to testify).

Mr. Schwart has also prepared a detailed analysis of CUNA's economic condition to assist the jury in determining an appropriate punitive award. Pages three through six of Mr. Schwartz' Report provide a financial analysis of CUNA. Mr. Schwartz is in the business of financially analyzing insurance companies and he does so in his report. He examines the assets of CUNA, the surplus, the net income from operations and the total net income including realized capital gains. Mr. Schwartz has prepared two charts, summarizing his findings, at pages four and five of his report.

Mr. Schwartz concludes that CUNA's conduct was unreasonable under the circumstances and that CUNA "priced for an extra level of associated death claims reflective of the less stringent underwriting standard for the HMP line of business. It appears that CMIS and the CUNA Mutual Group now want t have it both ways. THis is clearly unreasonable conduct."

In Mr. Schwartz' second report (attached as Exhibit 2), Mr. Schwartz address those issues raised by CUNA's retained experts. He addresses, point by point and issue by issue, those items raised by CUNA's experts, Charlotte Lee and Tim Terry. CUNA seeks to introduce its own experts at trial and prohibit the plaintiffs experts from rebutting any part of CUNA's testimony. It appears that CUNA is simply trying to have a one-sided case, in which they produce witness and evidence, with no opportunity for rebuttal. Such is clearly not the law and borders on the ridiculous.

### III. Michelle Doherty's Reports

Plaintiffs have retained Michelle Doherty, who is an expert in claim handling. She is currently Assistant Vice President of Compliance at Universal American Financial Corp. and has been both a claims manager and a claims representative. She has been in the insurance industry for approximately 30 years. CUNA seeks to strike her report, because, according to CUNA, she makes legal conclusions. Her report speaks for itself and is a further testament to CUNA's outrageous conduct in this case.

Ms. Doherty reviewed all depositions, CUNA's HMP Filed Manual, CUNA's Credit Union Manual, CUNA's Online Claims Reference Manual, CUNA's Underwriting Procedure Manual and CUNA's SIU State Fraud Manual. Additionally, she states in here report that she has reviewed and has a working knowledge of the NAIC Model Unfair Trade Practices Act; NAIC Model Unfair Claims Settlement Practices Act; MAIC Model Unfair Life, Accident and Health Claims Settlement Practices Model Regulation; NAIC Compendium of State Laws on Insurance Topics, and other documents.

The report states, on page one, that "it is clear the Halls purchased the credit insurance in order to allow Mrs. Hall to keep the family home in the event of Mr. Hall's death prior to the retirement of the mortgage loan." In the summary at the beginning of the report, Ms. Doherty also testifies that:

> It is also clear to me that CUNA violated their duty to treat the insured Tommy Bob Hall II and his wife Nancy Hall fairly. In fact, CUNA continued to violate their duty to the Halls at the time the initial claim for benefits was filed, at the time medical records and depositions were provided in connection with another legal action filed by the Halls, and at the time of discovery during this litigation. During each of these time frames, information was either in the company's file or available to the company to provide more than a reasonable doubt as to Mr. Hall's knowledge of his history of melanoma at the time the application for insurance was signed. This information clearly established that Mr. Hall had not been treated or diagnosed with cancer prior to the date his application for insurance with CUNA was completed.

Doherty Report, Exhibit 3, p. 1.

Ms. Doherty then, over a nine-page report, details the factual basis for her conclusions cited above. On page two of her report she examines the Application and Underwriting process which was actually undertaken by CUNA and the Halls. On page four Ms. Doherty begins her analysis and

discussion of the Certificate of Insurance being issued. She concludes, in this particular section, that the review of the policy provisions and certificate actually issued leads here to the expert opinion that, "benefits were improperly declined and that coverage was improperly rescinded." Report, Exhibit 3, p. 4. CUNA seeks, in their motion, to strike this type of compelling testimony and to substitute only the testimony of their own experts.

Beginning on page 5 of Doherty's report, she addresses the improper claim handling itself. She carefully analyzes each event and the correspondence between the Mrs. Hall and CUNA. Ms. Doherty concludes this section at page 6, where she states:

> It is clear that at each step in the handling of this claim, CUNA's actions were inadequate and unacceptable. Documents and depositions were available to CUNA at the time the initial claim was made for the death benefits, at the time of exchange of documents when the lawsuit was filed, and at the time of discovery. For example, there is a note dated 11/19/93 from Dr. Hurley in the Cressler Trucking file that was referenced as an exhibit in Mr. Hall's video deposition of 10/20/99. This note stated Mr. Hall had a dysplastic nevus removed 4/13/93, and that he was released from care 7/19/93. Additionally, the 1993 pathology report was in the claim file at the time the claim denial and rescission were made.

Exhibit 3, Doherty Report, p. 6.

Ms. Doherty further discusses the specific conduct of the claim handlers at CUNA, Brenda Larson and William Nardi. Ms. Doherty provides an analysis of the conduct and events and concludes their conduct was outrageous under the circumstances. Again, little wonder that CUNA now seeks to strike the reports and prohibit plaintiff's expert testimony at trial and that they be allowed to produce their own experts only.

Ms. Doherty, additionally, describes the outrageous conduct of CUNA's Special Investigations Unit ("SIU") when SIU report Mr. Hall for insurance fraud, even though he was dead. SIU sent Mrs. Hall and Mrs. Hall's Credit Union a letter, stating that the fraud referral was taking place at a time when the referral from was not even completed. Then, when CUNA's SIU received a letter that no criminal investigation would take place, CUNA chose not to tell either Mrs. Hall or her credit union, but rather, leave them both believing that the criminal investigation was ongoing. Ms. Doherty concludes in her report that, "CUNA's actions in notifying Mrs. Hall and Patriot Federal Credit Union constitute outrageous action, in that no possible purpose could be served by their

notification." Exhibit 3, Doherty Report, p. 8.

> After the nine pages of careful analysis, Ms. Doherty concludes as follows:

> In conclusion, it is my opinion CUNA breached their contract with the Halls in the handling of Mr. Hall's claim. A prudent company would have provided training, supervision, and published policies and procedures for claim handling and fraud investigation. CUNA's conduct was unreasonable and outrageous under the circumstances.

>> 1. Adequate oversight was not provided to Ms. Larson, Mr. Nardi or Mr. Stel. An inexperienced Brenda Larson, who did not have the guidance of her trainer, supervisor, or CUNA's legal department, handled the claim.

>> 2. Time service standards established and required by the Pennsylvania Department of Insurance were violated. Published company procedures and guidelines were not followed regarding the completion of the application, the credit union's role in the application process, and in the recision process.

>> 3. CUNA failed to publish written policies and procedures on how to investigate a claim for fraud, and allowed the SIU manager to refer the file without investigation. Mr. Stel acted outrageously in notifying Mrs. Hall of the fraud referral, and compounded that outrageous conduct by failing to notify Mrs. Hall that no criminal investigation would be initiated by the state Fraud Bureau.

Exhibit 3, Doherty Report, p. 9.

After CUNA submitted their response reports to both Mr. Schwartz and Ms. Doherty's first reports, Mr. Schwartz and Ms. Doherty submitted, as allowed by the court, timely rebuttal reports. Defendants seek, unexplainably, to strike the rebuttal reports also, which simply address issues raised in CUNA's own reports. CUNA seeks to have witnesses testify, in essence, without rebuttal. Ms. Doherty's rebuttal report is attached as Exhibit 4 and responds, point-by-point, to the issues raised in CUNA's reports. This report is not only wholly proper, but necessary to assure that no witness can simply testify without the opportunity for rebuttal testimony.

## IV. Argument

CUNA contends that plaintiffs experts should not be allowed to testify concerning "conclusions of law," "credibility of witnesses," and "post-claim underwriting." CUNA, however, has presented a form of order which suggests that plaintiffs experts be precluded from presenting any testimony whatsoever, while allowing their own experts to fully testify. Obviously, fairness requires

otherwise.

In making its arguments, CUNA has extracted certain phrases from the reports, without examining the reports as a whole. The reports, in their entireties, are attached as Exhibits 1 through 4 and are the type of reports -- outlining the documents reviewed, the facts extracted from the record and the opinions of experts on both liability and damages, as are typically seen in personally injury and insurance suits throughout the country.

CUNA seeks to contravene Federal Rule of Evidence 702, which clearly states:

> If scientific, technical, or other specialized knowledge will assist the trial of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or date, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

As detailed and described above, Ms. Doherty and Mr. Schwartz have specialized knowledge in the insurance industry. Mr. Schwartz has a lifetime of knowledge in evaluating and assessing insurance companies. Mr. Schwartz is the President of Life Insurance Analysts, Inc. and was the co-author of a widely used American Bar Association primer on life insurance products, titled, "Life Insurance Products, Illustrations, and Due Diligence." He also wrote "Life Insurance Due Care: Carriers, Products, and Illustrations," for the American Bar Association and "Keeping Faith with Policyholders: Guidelines for Companies and Producers," published in the CLU Journal. He has been working in the insurance industry for 33 years. His Professional Biography is attached and included within Exhibit 1.

In complement to Mr. Schwartz, Ms. Doherty is an expert in claim handling itself. She is currently Assistant Vice President of Compliance at Universal American Financial Corp. and has been both a claims manager and a claims representative. She has been in the insurance industry for approximately 30 years.

Defendants seek to strike these two witnesses, not because their reports are anything but proper expert testimony, but because their reports wholly indict CUNA. CUNA contends that the reports take away considerations properly for the judge or the jury. To the contrary, the reports give

expert opinions based upon facts detailed in the reports and reach conclusions which flow from those facts. It will certainly be for the jury to decide the case, after both plaintiffs and defendants experts have testified. A standard instruction will be given that the jury may consider the expert testimony or choose to disregard it.

Defendant CUNA has left out of its brief any detailed discussion of Federal Rule of Evidence, 704. It is clear from Fed. R. Evid. 704 that, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces and ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704.

In the present case, Mr. Schwartz will testify, as stated above and as stated in his report, that CUNA's conduct was unreasonable under the circumstances and that CUNA "priced for an extra level of associated death claims reflective of the less stringent underwriting standard for the HMP line of business. It appears that CMIS and the CUNA Mutual Group now want t have it both ways. This is clearly unreasonable conduct." According to Fed. R. Evid. 704, the testimony does not take away from the jury or the judge the ultimate issues to be decided, but provides expert testimony as to Mr. Schwartz' opinion as to the issues raised by the facts of this case. It will be for the jury to ultimately decided the case.

Ms. Doherty will testify that it is her opinion that CUNA breached their contract with the Halls in the handling of Mr. Hall's claim. According to Ms. Doherty, CUNA should have provided training, supervision, and published policies and procedures for claim handling and fraud investigation. CUNA's conduct, according to Ms. Doherty, was unreasonable and outrageous under the circumstances. This type of testimony is wholly within the contemplation of Fed. R. Evid. 704. The jury, however, will decide which expert witness, if any, are persuasive.

There is no need for a Daubert hearing, as the defendant suggests. This would only increase the cost of the litigation to all parties. Mrs. Hall is a widow who lost her home following her husband's death and as a result of CUNA's failure to pay on the home mortgage protection policy. CUNA is attempting to not only deny benefits to Mrs. Hall, but financially bury their conduct under mounds of paperwork and hearings.

Despite CUNA's arguments that experts are not needed in this case (at least, according to CUNA, plaintiff's experts are not needed while CUNA's are), experts are routinely allowed and used in this type of breach of contract and bad faith suit.  Reference to experts is made in both the Klinger v. State Farm Mutual Automobile Insurance Company, 115 F.2d 230 (3d Cir. 1997) and Smokowicz v. Motorist Mutual Insurance Company, No. 94-3400 (3d Cir. May 22, 1995) cases.

The often cited case of Bergman v. United Services Automobile Association, 742 A. 2d 1101 (Pa. Super. 1999), stands only for the proposition that there is no "per se" requirement that experts be called in bad faith actions.  However, courts have routinely allowed the very type of expert testimony which plaintiffs seek.  See, e.g., Klinger v. State Farm Mutual Automobile Insurance Company, 115 F.2d 230 (3d Cir. 1997) and Smokowicz v. Motorist Mutual Insurance Company, No. 94-3400 (3d Cir. May 22, 1995).

CUNA further contends that plaintiffs' expert should be subject to a Daubert hearing with respect to references to "Post-Claim Underwriting."

In Schneider v. Unum Life Ins. Co. of America, 149 F. Supp.2d 169 (E.D. Pa. 2001), a case cited by the defendants, the court concluded that the conduct described therein was an actual case of post-claim underwriting.  Defendants seek to distinguish Schneider, contending that the insurer in Schneider was fully aware of the insured's multiple sclerosis at the time of the application, but chose to underwrite the policy anyway. In the present case, plaintiffs contend that a mole was removed which was reported as non-cancerous and that Mr. Hall truthfully answered the question on his insurance application that he had not be treated for or diagnosed with cancer.  Mr. Schwartz explained in his report that the policy was issued, without further investigation and with the knowledge that some of the insureds would later become aware of diseases which they were not aware of at the time of the application.  However, when benefits were applied for, CUNA changed the underwriting criteria and the criteria for which it has priced, and engaged in an extensive investigative process, attempting to justify a decision to deny benefits.  This case is more like Schneider, and is more egregious than the Schneider case itself.  Defendants have admitted in this case that they possessed the very pathology report showing no cancer, at the time they were denying

benefits and claiming that Mr. Hall knew he had cancer.

### V. Conclusion

Plaintiffs have presented the documents and facts of this case to two national-level experts. These experts have issued reports which were timely produced pursuant to Judge Rambo's scheduling order. Defendant CUNA submitted response reports and plaintiffs timely submitted rebuttal reports. CUNA now, not liking the contents of the reports and the damning conclusions reached, is seeking to strike all of plaintiffs reports and rebuttal reports.    The reports, read in their entireties, contain detailed and specialized analysis known within the insurance industry and applied to the facts of the instant case, that CUNA violated their known duties to the Halls and engaged in outrageous conduct. Plaintiffs experts should be allowed to fully testify at trial, both in plaintiff's case-in-chief and as rebuttal witnesses. Alternatively, if the Court concludes that certain portions of the testimony are inadmissible, the court can instruct the witness and allow the witness to testify within admissible areas. There is no basis to strike the experts testimony in its entirety before they even open their mouths. CUNA would certainly prefer to conceal their outrageous conduct in this manner, but such is not the law.

Respectfully submitted,

Stephen R. Pedersen

Dated this 30th day of September, 2002

# LIFE
# INSURANCE
# ANALYSTS, INC.

### Hall v CUNA Mutual Group and CUNA Mutual Insurance Society
### (referred to collectively as CUNA Mutual)
### June 21, 2002

**Expert Witness Report Prepared by**: Life Insurance Analysts, Inc.
Richard A. Schwartz, FSA, MAAA, CLU

Overview: In my review of the Hall v. CUNA Mutual case, I reviewed the materials described below to prepare this report. Every opinion stated herein is held to a reasonable degree of certainty with respect to the insurance arena and is based upon my knowledge and experience in the areas of life insurance company overall and financial management, product development and pricing, actuarial valuation and underwriting.

It is clear that as part of this review CUNA Mutual breached their insurance contract with Patriot Federal Credit Union for the benefit of Tommy Bob Hall and that their actions were not only unreasonable, but a clear and blatant attempt to deny Mrs. Nancy Hall the benefits that she was fully entitled to receive. Further, the consequences of their actions should have been expected by them based on the facts that were then ascertainable by CUNA Mutual had they done their homework and reviewed the available data when they initially underwrote the insurance application.

In addition, the actions of CUNA Mutual's SIU group, in referring the claim to the fraud unit of the Pennsylvania Office of the Attorney General without any apparent prior investigation, created a hostile and threatening environment to Mrs. Nancy Hall. The apparent purpose was to embarrass her and dissuade her from seeking counsel to defend her contractual right to the proceeds under the rescinded policy. Further when the Office of the Pennsylvania Attorney General declined to proceed with the fraud investigation, CUNA Mutual failed to inform Mrs. Hall that such investigation had been dropped. Clearly when taken together these actions appear to be an attempt to intimidate Mrs. Hall and to discourage her from following through on her claim.

Other areas where CUNA Mutual went beyond what would have been reasonably expected by a prudent insurer were: Allowing the initial claim adjudication process to be handled by someone without sufficient training. In fact only minimal training was provided to Brenda Larson. This case was the first claim she handled. Further CUNA Mutual failed to provide her with adequate supervision. Additionally, during the claims investigation process CUNA Mutual had clear evidence that the first knowledge by Tommy Bob Hall of the malignant melanoma was after the policy was approved for issue. As such, given their less stringent underwriting rules for the HMP line of business, which did not encompass any subsequent medical questions when the

Richard A. Schwartz, CLU, FSA
85 Silver Fox Drive, Greenwood Village, CO 80121
303-740-0961    fax: 303-740-7192    dick@LifeInsuranceAnalysts.com

certificate was issued to the credit union (in large measure because the certificate was issued to the credit union and not delivered to the insured), CUNA Mutual clearly attempted to apply more stringent post claim underwriting than was apparently required in this line of business.

**Preparations for Report and Data Reviewed:**

1. Read depositions of: Dr. Thomas Ansfield, Dr. George Baker, Dr. Michael Cashdollar, Dr. Ernest Charlesworth, Dr. James Chicklo, Richard Fischer (both 3/14/02 and 3/28/02), Nancy Hall (both 1/10/01 and 3/19/02), Tommy Bob Hall (both written and video), Brenda Larson, Paul Lawin, Brenda Lutz and Michael Stel

2. Viewed video deposition of Tommy Bob Hall dated October 18, 1999

3. Reviewed relevant information provided by CUNA Mutual

**Major Report Topics:**

1. **Underwriting measurement processes for credit life were significantly less stringent than for their individual life insurance policies:** This is evidenced in the assumed or expected pricing mortality rates between the two lines of business. Expected death claims over these two policy types' first twenty years, based on CUNA Mutual's own mortality tables, show that the present value of expected death claims under HMP policies for all insureds issue age 42, are **147%** of those expected under individually underwritten insurance policies.

   Why is this important? For individual insurance when the insurance policy is delivered, the applicant is usually asked whether there has been any change in his/her medical condition since the policy was applied for. If this process had been applied under the home mortgage protection (HMP) insurance policy, the answer to whether there had been any changes in health after the certificate was applied for would have been YES. The policy would therefore not have been issued without significantly more inquiry on CUNA Mutual's part. However, for home mortgage protection insurance, these more stringent individual life insurance underwriting processes were not used. They were not used because the insurance company priced for and expected a significantly higher level of claims (47% higher) under HMP policies due to their less stringent underwriting requirements. The Tommy Bob Hall case was one which clearly passed through this intentionally less stringent filter.

   However CUNA Mutual appears to want the benefit of the more stringent underwriting requirements, even though it priced reflective of significantly less stringent underwriting processes. Further as can be seen from the charts A and B, the expected death claims under HMP policies are over 210% of those expected under individual life policies in the first two years the policies are inforce. This is the policy period in which Mr. Hall died.

What CUNA Mutual is in effect saying with respect to the Hall claim is that they priced for and expected significantly more death claims, especially in the policies' early durations, and now they want to avoid their contractual responsibilities. They want to find reasons not to pay the rightful death claims under HMP policies that might have been discovered as part of a more stringent underwriting process analogous to individually underwritten life insurance.

2.    In this same vein, the application form for home mortgage protection insurance asks fewer medical questions and also uses an accept or decline rating methodology. This rating process issues all policies in a single pricing classification. It covers all insureds when such insureds were classified as a standard risk or had an expected extra mortality rating which at most was not greater than 175% of a standard mortality classification. Note however that non-smokers and smokers were charged different rates.

3.    The HMP insurance was not solicited by Tommy Bob Hall. It was just a fact of doing business for Mr. Hall. When he took out a mortgage, he just accepted the related mortgage insurance coverage that went along with it. CUNA Mutual has implied that Mr. Hall lied on his application. Why would someone take $20,000 out of their savings which lowered the amount of HMP insurance on the new mortgage as compared to the previous mortgage? If someone had a medical condition that they wanted to hide, then they clearly would have retained their previous, higher amount mortgage and the correspondingly higher mortgage protection insurance that went along with it.

4.    The Hall claim was not listed as "resisted" in the December 31, 2001 Annual Statement, Schedule F. On page 54 of the 2001 Annual Statement of CUNA Mutual Insurance Society, where all currently resisted claims are shown, the Hall claim was not shown. This leads to the question of what other resisted claims were not shown, and whether there is a pattern of consistent omissions of other resisted claims. For the 1999 Annual Statement, finalized as of February 28, 2000, the Hall claim was correctly _not_ shown as "Resisted" as it was then a rescinded policy.

5.    **Determination of Punitive Damages, if Determined As Applicable By a Jury:**
A.    Which life insurance company or companies should any punitive damage award be applied against? CUNA Mutual Group is a marketing name. The life companies which are defacto managed by the same executives are CUNA Mutual Insurance Society (CMIS) which issued the certificate of insurance to Mr. Hall and CUNA Mutual Life Insurance Company (CMLIC). On page 8 of Mr. Paul Lawin's deposition, he states that the companies are managed as if they are a single company. Further on page 11, he states that the company is marketing itself as a total entity. Finally, it is very difficult when reviewing the CUNA Mutual Annual Reports to come away with any other conclusion but that it is a single entity, with different operating divisions. As such, any non-direct damage award should be based on the income or surplus (net worth) of the combined entity.

Further supporting a single combined entity approach are that both insurance companies (CMIS and CMLIC) are managed to achieve the same ratings from all the rating services except Weiss' Ratings service: A.M. Best gives both companies an A rating, Standard and Poor's gives both companies an Api rating, Fitch gives both companies a AA rating. Weiss gives CMIS a C+ rating while it gives CMLIC a B+ rating. Further the insurance service Vital Signs which measures insurance companies on a 100 point scale gives both companies a 78 Comdex rating.

B.    **Financial Measures (based on 2001 Annual Statements) that could be used to measure the amount of the punitive damages award:**

(All numbers in thousands of dollars)

| Financial Measure | CMIS | CMLIC | Total | PD % | PD Amount |
|---|---|---|---|---|---|
| Admitted Assets | 2,390,524 | 5,386,351 | 7,776,875 | 1/10 of 1% | 7,777 |
| Total Surplus & AVR | 597,818 | 275,112 | 872,930 | 1% | 8,729 |
| Net Income from Operations | 13,202 | 7,244 | 20,446 | 20% | 4,089 |
| Total Net Income Includes Realized Capital Gains: | 13,413 | 8,914 | 22,327 | 20% | 4,465 |

Note:  PD % is the Punitive Damage percentage which if assessed against the total CMIS and CMLIC amounts would yield the Punitive Damage Amount (PD Amount) found in the last column.

C.    **Comparative Damages:** The combined insurance companies could be assessed a measure of damages in relationship to what Tommy Bob Hall was paying in premiums. Hall was paying $32 per month with after tax dollars. Given that he was making $40,000 per year at the time, that annualized expenditure was equivalent to $533 and represented 1.33% of his gross wages: (384/(1-.28 tax bracket). That percentage of earnings was what Hall was willing to pay annually for this coverage. Based on the HMP smoker mortality rates applicable to Hall's certificate, Hall's life expectancy was far greater than his remaining future working lifetime of 20.5 years. (He was 44.5 at the time of his death.)

The penalty to CUNA Mutual company should be for not less than that same relative magnitude of his earnings, applied to their earnings for his future remaining working lifetime.

D.    **Comparable CUNA Mutual "wages":**

CUNA Mutual's wages, as seen from the above chart, were $22.3 million in 2001. As such applying the 1.33% for 20.5 years yields a comparable damage amount of $5.9 million.

E.    **Risk Based Capital Measure**: The state insurance commissioners and their umbrella organization, the National Association of Insurance Commissioners, have promulgated various standards for the amount of surplus which insurance companies should have based on the particulars of their various assets and liabilities. In order to not have any operating or reporting restrictions placed on them by the state insurance commissioners, a life insurance company must have Risk Based Capital ratios of 250% or higher.

The combined companies of CMIS and CMLIC have a risk based capital ratio of 296% as of December 31, 2001: 403% for CMLIC and 247% for CMIS. Their combined surplus and AVR (asset valuation reserve) which is usually considered a part of surplus was $872,930,000 as of 12/31/01. This means that the combined companies' "free surplus," or surplus not implicitly required to support their policyholder obligations as of that date was $135,658,000. A percentage of this amount could then be considered as available for a penalty for their disregard of Mrs. Nancy Hall's legitimate claim and still not inhibit their other policyholders' required surplus amounts. 5% of this amount would be 6.8 million dollars.

F.    **Damages Based on Earnings of the CMIS Unit Responsible for the Home Mortgage Protection (HMP) and Member Elect Credit Life (MECL) Lines of Business:** Based on Rick Fischer's deposition, it is clear that these two lines of business are managed by a single management team. As such should any damages be assessed based on this business unit's results, and not the overall operating entity's results as a whole, then the damages should be based on total results for both these lines of business. As seen from Chart C, attached, which shows the annual profits for these lines of business for the last four years, the annual and average profits are as follows:

**Annual Profits (CMIS' Credit Union Lines of Business)**
(All numbers in thousands of dollars)

|       | 1998  | 1999 | 2000  | 2001   | Av Last 4 Yrs | Av Last 2 Yrs |
|-------|-------|------|-------|--------|---------------|---------------|
| HMP   | 192   | 633  | 132   | 527    | 371           | 329           |
| MECL  | 1,215 | 177  | 8,522 | 17,238 | 6,788         | 12,880        |
| Total | 1,406 | 810  | 8,654 | 17,765 | 7,159         | 13,209        |

Page 5 of 6

The average annual profits for this business unit for the last two years was $13.2 million. Therefore should 10% of this unit's profits be assessed as damages for the next five years, and profits are assumed to remain at the average level of the last two years, then such damages would be $6.6 million.

6.    **Why punitive damages should be assessed:**
   –    CMIS' letter denying claim but CMIS had in their records at the time the claim was denied the 1993 pathology report which clearly stated the mole was not cancerous nor was it a melanoma.

   –    CMIS' intimating actions:  First by the SIU unit's referral to the Pennsylvania Attorney General without any internal investigation on their own, and second, by not telling Mrs. Nancy Hall that the Attorney General was not going ahead with the any action against her.

   –    Brenda Larson being in a position to make a decision without proper training or management:  She held the fate of Mrs. Nancy Hall and did not have adequate supervision or training on which to base her decision.

   –    The many reports from doctors involved were clear that the 1993 mole was not cancerous nor a  melanoma:  Yet in spite of these reports, CUNA continued to refuse payment of the Hall claim.

**Summary**:

That CUNA Mutual's continuous denial constitutes unreasonable conduct for a prudent insurance company.

Dr. Charlesworth's name was on the application completed by Tommy Bob Hall.  CMIS did not pursue obtaining Tommy Bob Hall's medical records from Dr. Charlesworth at that time.  Had they obtained those records, they would have seen their concerns that they subsequently raised when the claim was filed.  CMIS had the chance to underwrite the insurance certificate application at that time.  They did not.

Further, CMIS priced for an extra level of associated death claims reflective of the less stringent underwriting standard for the HMP line of business.  It appears that CMIS and the CUNA Mutual Group now want to have it both ways.  This is clearly unreasonable conduct.

Richard A. Schwartz

June 21, 2002

Page 6 of 6

## Chart A.

## Hall v. CUNA Mutual Group et al:  Expected Death Claims Calculations

### Mortality Comparison Charts

| Duration | 50K - 100K Individual Face Amounts - Age 42: | | | HMP Mortality Rates - Age 42 | | | Ratio: HMP/ Individual Coverage |
|---|---|---|---|---|---|---|---|
| | Indiv Ins Comb NS S 1000 Qx Male | Indiv Ins Comb NS S 1000 Qx Female | Combined M/F 1000 Qx 75/25 | Smoker 1000 Qx | Non-Sm 1000 Qx | Comb 1000 Qx M+F/NS-S .8 NS/.2 SM | |
| 1 | 0.83 | 0.39 | 0.720 | 2.33 | 1.35 | 1.546 | 214.7% |
| 2 | 1.12 | 0.64 | 1.000 | 3.12 | 1.81 | 2.072 | 207.2% |
| 3 | 2.28 | 1.22 | 2.015 | 4.12 | 2.39 | 2.736 | 135.8% |
| 4 | 2.18 | 1.37 | 1.978 | 4.81 | 2.79 | 3.194 | 161.5% |
| 5 | 2.41 | 1.61 | 2.210 | 5.30 | 3.07 | 3.516 | 159.1% |
| 6 | 2.73 | 1.91 | 2.525 | 5.73 | 3.32 | 3.802 | 150.6% |
| 7 | 2.93 | 2.02 | 2.703 | 6.12 | 3.55 | 4.064 | 150.4% |
| 8 | 3.33 | 2.18 | 3.043 | 6.49 | 3.76 | 4.306 | 141.5% |
| 9 | 3.58 | 2.37 | 3.278 | 6.88 | 3.99 | 4.568 | 139.4% |
| 10 | 4.02 | 2.43 | 3.623 | 7.43 | 4.31 | 4.934 | 136.2% |
| 11 | 4.76 | 2.75 | 4.258 | 8.11 | 4.70 | 5.382 | 126.4% |
| 12 | 5.67 | 3.16 | 5.043 | 9.25 | 5.36 | 6.138 | 121.7% |
| 13 | 6.81 | 3.68 | 6.028 | 10.64 | 6.17 | 7.064 | 117.2% |
| 14 | 8.12 | 4.30 | 7.165 | 12.20 | 7.07 | 8.096 | 113.0% |
| 15 | 9.71 | 4.95 | 8.520 | 13.54 | 7.85 | 8.988 | 105.5% |
| 16 | 11.15 | 5.56 | 9.753 | 15.28 | 8.86 | 10.144 | 104.0% |
| 17 | 12.27 | 6.13 | 10.735 | 16.84 | 9.76 | 11.176 | 104.1% |
| 18 | 13.31 | 6.74 | 11.668 | 18.54 | 10.75 | 12.308 | 105.5% |
| 19 | 14.57 | 7.40 | 12.778 | 20.46 | 11.86 | 13.580 | 106.3% |
| 20 | 15.81 | 8.02 | 13.863 | 22.58 | 13.09 | 14.988 | 108.1% |

### Chart B.
**Comparison of Expected Death Claims Assuming 10% Annual Mortgage Turnover Rate
And HMP Level of Death Claims**

| Duration | Mortgages Inforce BOY | Mortgages Terminated Voluntarily | Mortgages Terminated By Death | Mid Year Face Am't | Annual Expected Death Payments | Discounted Expected Annual Death Payments | Sum: Years 1&2 |
|---|---|---|---|---|---|---|---|
| 1 | 1,000.00 | 100.00 | 1.469 | 55,660 | 81,748 | 81,748 | |
| 2 | 898.53 | 89.85 | 1.769 | 55,040 | 97,348 | 86,917 | 168,665 |
| 3 | 806.91 | 80.69 | 2.097 | 54,380 | 114,052 | 90,922 | |
| 4 | 724.12 | 72.41 | 2.197 | 53,670 | 117,924 | 83,936 | |
| 5 | 649.51 | 64.95 | 2.169 | 52,910 | 114,788 | 72,950 | |
| 6 | 582.39 | 58.24 | 2.104 | 52,090 | 109,573 | 62,175 | |
| 7 | 522.05 | 52.20 | 2.016 | 51,230 | 103,255 | 52,312 | |
| 8 | 467.83 | 46.78 | 1.914 | 50,300 | 96,261 | 43,544 | |
| 9 | 419.13 | 41.91 | 1.819 | 49,300 | 89,670 | 36,216 | |
| 10 | 375.40 | 37.54 | 1.760 | 48,240 | 84,884 | 30,610 | |
| 11 | 336.10 | 33.61 | 1.718 | 47,100 | 80,939 | 26,060 | |
| 12 | 300.77 | 30.08 | 1.754 | 45,880 | 80,466 | 23,132 | |
| 13 | 268.94 | 26.89 | 1.805 | 44,580 | 80,458 | 20,652 | |
| 14 | 240.24 | 24.02 | 1.848 | 43,190 | 79,804 | 18,289 | |
| 15 | 214.37 | 21.44 | 1.830 | 41,700 | 76,328 | 15,618 | Ratio |
| 16 | 191.10 | 19.11 | 1.842 | 40,110 | 73,867 | 13,495 | Top/Bottom |
| 17 | 170.15 | 17.02 | 1.807 | 38,400 | 69,370 | 11,316 | = |
| 18 | 151.33 | 15.13 | 1.769 | 36,580 | 64,726 | 9,427 | **210.7%** |
| 19 | 134.43 | 13.44 | 1.734 | 34,630 | 60,057 | 7,810 | |
| 20 | 119.25 | 11.92 | 1.698 | 32,550 | 55,268 | 6,417 | |

Assumptions:

| | | | Cum Exp | | |
|---|---|---|---|---|---|
| Annual Term Rate | 10.0% | | Death Claims: | 1,730,787 | 793,546 |
| Annual Discount Rate | 12.0% | | | | |

**Comparison of Expected Death Claims Assuming 10% Annual Mortgage Turnover Rate
And Individual Life Level of Death Claims**

| Duration | Mortgages Inforce BOY | Mortgages Terminated Voluntarily | Mortgages Terminated By Death | Mid Year Face Am't | Annual Expected Death Payments | Discounted Expected Annual Death Payments | Sum: Years 1&2 |
|---|---|---|---|---|---|---|---|
| 1 | 1,000.00 | 100.00 | 0.684 | 55,660 | 38,071 | 38,071 | |
| 2 | 899.32 | 89.93 | 0.854 | 55,040 | 47,023 | 41,985 | 80,056 |
| 3 | 808.53 | 80.85 | 1.548 | 54,380 | 84,165 | 67,096 | |
| 4 | 726.13 | 72.61 | 1.364 | 53,670 | 73,213 | 52,111 | |
| 5 | 652.15 | 65.22 | 1.369 | 52,910 | 72,444 | 46,039 | |
| 6 | 585.57 | 58.56 | 1.405 | 52,090 | 73,167 | 41,517 | |
| 7 | 525.61 | 52.56 | 1.349 | 51,230 | 69,131 | 35,024 | |
| 8 | 471.70 | 47.17 | 1.363 | 50,300 | 68,578 | 31,021 | |
| 9 | 423.16 | 42.32 | 1.318 | 49,300 | 64,956 | 26,235 | |
| 10 | 379.53 | 37.95 | 1.306 | 48,240 | 63,006 | 22,721 | |
| 11 | 340.27 | 34.03 | 1.376 | 47,100 | 64,822 | 20,871 | |
| 12 | 304.87 | 30.49 | 1.460 | 45,880 | 67,004 | 19,262 | |
| 13 | 272.92 | 27.29 | 1.563 | 44,580 | 69,668 | 17,882 | |
| 14 | 244.07 | 24.41 | 1.661 | 43,190 | 71,751 | 16,444 | |
| 15 | 218.00 | 21.80 | 1.764 | 41,700 | 73,578 | 15,056 | |
| 16 | 194.43 | 19.44 | 1.801 | 40,110 | 72,254 | 13,201 | |
| 17 | 173.19 | 17.32 | 1.766 | 38,400 | 67,823 | 11,063 | |
| 18 | 154.10 | 15.41 | 1.708 | 36,580 | 62,482 | 9,100 | |
| 19 | 136.98 | 13.70 | 1.663 | 34,630 | 57,583 | 7,488 | |
| 20 | 121.62 | 12.16 | 1.602 | 32,550 | 52,136 | 6,053 | |

Assumptions:

| | | | Cum Exp | | |
|---|---|---|---|---|---|
| Annual Term Rate | 10.0% | | Death Claims: | 1,312,859 | 538,241 |
| Annual Discount Rate | 12.0% | | | | |
| | | | Ratio Exp Claims HMP/Indiv | 131.8% | **147.4%** |

## Chart C:

## HMP and MECL Profit Calculations

| HMP Life | 1998 | 1999 | 2000 | 2001 | Total 4 Yrs | Average 4 Years | Average Last 2 Years |
|---|---|---|---|---|---|---|---|
| Dir Earned Premiums | 2,722,278 | 2,968,666 | 3,154,485 | 3,215,319 | 12,060,748 | 3,015,187 | 3,184,902 |
| Claims Paid | 977,857 | 790,773 | 909,352 | 1,031,744 | 3,709,726 | 927,432 | 970,548 |
| Incurred Claims | 955,059 | 793,328 | 963,108 | 1,052,165 | 3,763,660 | 940,915 | 1,007,637 |
| Claim Rsv (w/o LAE) | 37,194 | 39,749 | 93,505 | 113,926 | 284,374 | 71,094 | 103,716 |
| Increase in Policy Rsv | 436,406 | 361,892 | 529,919 | 439,197 | 1,767,414 | 441,854 | 484,558 |
| Policy Reserve | 3,192,949 | 3,554,841 | 4,084,760 | 4,523,957 | 15,356,507 | 3,839,127 | 4,304,359 |
| Credit Union Reimb | 393,966 | 429,707 | 447,895 | 436,080 | 1,707,648 | 426,912 | 441,988 |
| Experience Refund | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Operating Expense | 744,986 | 751,172 | 1,081,944 | 760,930 | 3,339,032 | 834,758 | 921,437 |
| Annual Profits | 191,861 | 632,567 | 131,619 | 526,947 | 1,482,994 | 370,749 | 329,283 |

| MECL Life | 1998 | 1999 | 2000 | 2001 | Total 4 Yrs | Average 4 Years | Average Last 2 Years |
|---|---|---|---|---|---|---|---|
| Dir Earned Premiums | 143,446,684 | 153,050,386 | 167,736,697 | 173,565,992 | 637,799,759 | 159,449,940 | 170,651,345 |
| Claims Paid | 88,688,061 | 96,322,371 | 96,667,001 | 100,442,252 | 382,119,685 | 95,529,921 | 98,554,627 |
| Incurred Claims | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Claim Rsv (w/o LAE) | 13,254,000 | 12,114,000 | 16,281,000 | 14,514,000 | 56,163,000 | 14,040,750 | 15,397,500 |
| Increase in Policy Rsv | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Policy Reserve | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Credit Union Reimb | 22,960,789 | 25,127,336 | 29,203,901 | 30,257,305 | 107,549,331 | 26,887,333 | 29,730,603 |
| Experience Refund | 4,526,128 | 5,726,378 | 6,917,827 | 10,904,152 | 28,074,485 | 7,018,621 | 8,910,990 |
| Operating Expense | 25,235,116 | 26,837,094 | 22,258,915 | 16,491,091 | 90,822,216 | 22,705,554 | 19,375,003 |
| Annual Profits | 1,214,591 | 177,207 | 8,522,053 | 17,238,192 | 27,152,043 | 6,788,011 | 12,880,123 |
| HMP+MECL Total Annual Profits: | 1,406,452 | 809,774 | 8,653,672 | 17,765,139 | 28,635,037 | 7,158,759 | 13,209,406 |

# LIFE INSURANCE ANALYSTS, INC.

### RICHARD A. SCHWARTZ
### A Professional Biography

Dick Schwartz is President of *Life Insurance Analysts, Inc*. In this capacity he functions as a consultant to professional advisors and their clients, national insurance carriers and insurance marketing organizations. Life Insurance Analysts (LIA) provides due care, product analyses, marketing and reinsurance consultation to these communities. Schwartz also assists financial institutions in implementing new insurance distribution strategies by structuring products, insurance carriers and independent distribution resources. In addition Schwartz has completed significant amount of expert witness work for both plaintiffs and the defense.

In October 2000, LIA completed structuring an arrangement among three prominent insurance carriers, which allowed the eighth largest national CPA firm to commence its financial services practice in conjunction with over 100 independent agents. Schwartz now assists in implementation of that venture along with expansion of its services to address different client needs.

Prior to founding Life Insurance Analysts in 1994, Schwartz served for eight years as Executive Vice President of M Life Insurance Company, an affiliate of the M Financial Group. Prior to that he was Senior Vice President of Product Marketing for SunAmerica Insurance where his functional responsibilities also included strategic planning and product development.

Mr. Schwartz brings to the firm 33 years of experience in the insurance industry. After receiving his Bachelor of Science degree from Clarkson University, Mr. Schwartz went on to receive his Master's in Actuarial Science from Northeastern University. Mr. Schwartz is a Fellow in the Society of Actuaries, a Member of the American Academy of Actuaries, a Chartered Life Underwriter and a member of the Association for Advanced Life Underwriting (AALU.)

A frequent speaker on due care as it applies to life insurance companies and products, Mr. Schwartz has spoken before the American College of Trust and Estate Counsel (ACTEC), Miami Estate Planning Institute, Notre Dame Tax and Estate Planning Institute, and the Association for Advanced Life Underwriting (AALU). He has written several articles on these topics for several publications including *Probate & Property, Trusts & Estates,* and *Best's Review.*

### Listing of Publications:
*   1989 -   Co-author of the first ABA primer "**Life Insurance Products, Illustrations, and Due Diligence**" for the Real Property, Probate and Trust Law Section.
*   April 1991 -   Due Diligence: A Means To Build Client Confidence. Broker World
*   May 1991-   Due Diligence: Assessing the Survivorship Purchase. Trusts and Estates.
*   Feb 1993 -   **The Scoop on Variable Life**: Probate and Property ABA magazine.
*   March 1994   Co-author of **American Bar Association primer "Life Insurance Due Care: Carriers, Products, and Illustrations."**
*   March 1995   **Keeping Faith with Policyholders: Guidelines for Companies and Producers**. CLU Journal

# Extended Professional Resume
June 21, 2002

**Qualifications:**

- **Extensive experience in life insurance producer groups**

- **Proficiency in life company profitability management** as evidenced by building M Life reinsurance company into a very profitable operation with 1994 net profits exceeding twenty million dollars. This is in contrast to the scratch operation M Life was in 1986 with annual profits of less than one million dollars.

- **Expert in product development and pricing,** for M Financial Group and SunAmerica.

- **Advanced Product Knowledge:** The keys in designing life products are simplicity and creating meaningful edges that can be valued by the customer and advisor. Concept sales, not spread sheet sales, should be the focus. My unique experiences working with insurance carriers, producers, and also in high net worth direct sales, enables me to synthesize these elements into marketable products.

- **Extensive business planning experience,** at The Madison Group, M Financial, M Life and SunAmerica.

- **Excellent communication skills,** both written and verbal as seen from my extensive national speaking presentations, books and articles.

- **Ability to effectively interact with insurance professionals, advisors and senior insurance company management.** This is reflected by LIA's very effective consulting practice established over the last eight years.

- **In-depth understanding of the marketing process** in the high net worth estate planning and COLI areas.

- **Significant expert witness work.**

**Life Insurance Analysts, Inc.** (1994 - Current)
- **Consulting Clients:** LIA provides diversified consulting services to life insurance carriers, marketing firms, and law and CPA advisors. In addition LIA provides expert witness support work for both plaintiffs and defendants.

- **Consulting Experience With Producer Groups:** From 1994 - 2002 LIA's clients have included: Connecticut Mutual Life, General American, Lincoln National, Minnesota Life, Partners Group, Programmed Insurance Marketing and Prudential Select Life.

**M Financial Group:** (1986 - 1994.)
- Executive Vice President - M Life Ins Company:    1991 - 1994
- Senior VP - Product Development and Sales:    1986 - 1992
- Senior VP - Chief Actuary, M Life Ins Company:    1986 - 1991

2

The M Group is the largest agent-owned marketing and life reinsurance company in the United States.  M Financial is structured in five value-added segments: sales (producer relationships), marketing presentation systems, unique product development, carrier relationships, and M Life reinsurance.  My responsibilities included the last three.

**SunAmerica  (Sun Life Insurance Company of America)**            **(1973 - 1986)**
- Senior Vice President, Product Marketing            (1984 - 1986)
- Senior Vice President, Product and Planning            (1981 - 1984)
- Vice President, Product Development            (1976 - 1980)
- Actuary            (1973 - 1976)
- Member of the Board of Directors of both Sun Life Insurance Company of America and its subsidiary, Universal Guaranty Life Insurance Company.

**Product Marketing Responsibility**: 1984 - 1986
In 1984 I developed a matrix product line organization where the profitability of each distribution arm was a joint responsibility between the sales department and the Product Line function which I managed.  My area's responsibility was to develop products, marketing materials and the necessary micro computer systems.  Equally important, this group monitored the product lines and took corrective action to maintain ongoing profitability for the existing business. This responsibility encompassed all distribution systems.  This group included management of a staff of 35, including 5 direct reports.

**Product Development and Strategic Planning Responsibility**: 1981 -1984
I was responsible for Sun Life's business and strategic planning.  Business planning encompassed the annual marketing and financial plans, including budgets.   Strategic planning consisted of a five-year plan detailing which distribution systems and markets should be emphasized.  During this time I also managed a twenty person product development staff including actuaries, sales promotion and sales training specialists.

**Massachusetts Indemnity and Life Insurance Company:**  (1967 - 1973)
Starting in 1967 as an actuarial trainee, I progressed to Associate Actuary in four years.  I managed the actuarial department with responsibilities in both the valuation and product development areas.  In this context I developed new life and disability product portfolios and was responsible for the Company's initial conversion to GAAP accounting.

**ACADEMIC:**
- Clarkson University, Potsdam NY: BS in Math, 1967.  Fifth out of 370 graduates.
- Northeastern University, Boston:  Masters in Actuarial Science, 1969
- Fellow in the Society of Actuaries, 1973.
- Member of the American Academy of Actuaries, 1975
- Chartered Life Underwriter, 1990

**MILITARY:**
- 8/67 - 6/69 US Army - Signal Corps Officer
- Vietnamese language specialist
- Forward operations Signal Platoon leader - Independent infantry brigade

*Richard A. Schwartz*
*June 21, 2002*

3

FROM :STEVE PEDERSENN          FAX NO. :7177631460          Aug. 14 2002 01:52PM P3

# LIFE
# INSURANCE
# ANALYSTS, INC.

**Hall vs. CUNA Mutual Group; CUNA Mutual Insurance Society**
**Report of Life Insurance Analysts, Inc.**
**Prepared by: Richard A. Schwartz**
**August 12, 2002**

This report reviews CUNA's experts reports by Charlotte A. Lee, MD, and Tim Terry dated July 25, 2002. The conclusions stated in my report of June 21, 2002 are not changed as a result of these reports: CUNA breached their life insurance contract with the Halls and their conduct continues to be unfair and unreasonable. Their continued refusal to pay the rightful claim on Tommy B. Hall's life disregards the relevant facts. Their experts incorrectly make CUNA's actions sound reasonable because of the bevy of doctor's reports that mention cancer. However all of these save Charlesworth are post the insurance certificate application. While Charlesworth's intake form of April 30, 1998 mentions cancer, it is unclear whose handwriting this is. CUNA's handwriting expert would have you believe that Tommy Bob Hall used the medical abbreviation, "CA" for cancer. Given his background, this appears very unlikely. In fact this finding contradicts the 1993 pathology report from Dr. Hurley. It also contradicts Dr. Charlesworth own conclusion after meeting with the Halls in April 1998 stated in his deposition.

Every opinion stated herein is held to a reasonable degree of certainty with respect to the insurance arena and is based upon my knowledge and experience in the areas of life insurance company overall and financial management, product development and pricing, actuarial valuation and underwriting.

## Charlotte A. Lee, MD's Report:

* Dr. Lee refers in the first paragraph on Page 3 to the cause of death being a condition which was not admitted to on the application, and therefore the appropriate action is to investigate the claim. However, while her statement is correct, it fails to reflect that the application did not ask whether Tommy B. Hall thought he had cancer. It said had he been treated for or diagnosed with cancer. This is a very meaningful distinction, and as such, Dr. Lee's foundation for her report is erroneous.

* Dr. Lee in the third paragraph talks about a "several references to a history of malignant melanoma were interspersed throughout the physicians reports..." Further Dr. Lee states "and she (referring to Brenda Larson) did not rely on only the path report from the 1993 removal of the skin lesion for her final determination." Dr. Lee is apparently weighting all information equally in her conclusion. References in physician's reports should not be given the same weight as the path report. Dr. Lee is apparently confirming Brenda Larsen's mis-treatment of comments in various doctor's reports made after the application and in depositions as weighing equally to the only path report in existence prior to the time of the insurance application.

* On page 4, the second full paragraph, Dr. Lee discusses the reporting of the Hall claim to the Pennsylvania Office of the Attorney General. However there is no mention in her report of CUNA's failure to also inform Nancy Hall of the OAG's prompt declination to proceed on the investigation.

Richard A. Schwartz, CLU, FSA
85 Silver Fox Drive, Greenwood Village, CO 80121
303-740-0961     fax: 303-740-7192     dick@LifeInsuranceAnalysts.com

\*    In the last paragraph of page 4, Dr. Lee states that "the (CUNA's) investigation showed that the deceased did know of the diagnosis of cancer at the time of the application." This conclusion is difficult to tie to the facts. The 1993 and only path report clearly states that he did not have cancer. His treatment history prior to the application clearly showed that he did not take the steps that would have been called for had he been diagnosed with or known that he had cancer. As such, there is no clear showing that the insured knew he had cancer as has been asserted by Dr. Lee.

### Tim Terry's Report:

Page 2, point #3 of Mr Terry's report: Mr. Terry states that had the company been aware of the 1993 visits to Dr. Hurley, it would have denied the application. The only conclusive result from the 1993 visit was a negative path report on the mole removed. Dr. Hurley then sent the applicant back to work and that result was confirmed later that year when Tommy B. Hall asked for a report stating his medical record was clean so he could begin a new job with the trucking company he was starting work for.

Page 2, VI. Opinion: Mr. Terry says that had the questions on the application been answered accurately, the Company would not have issued the policy. In fact, the question with respect to cancer was answered correctly, as it was stated. As such, and using Mr. Terry's logic, the company should have therefore paid the claim.

Page 3, Medical references cited. All these references occurred after the application for insurance was completed, and are in fact inaccurate. They either refer to a cancerous condition which was not shown to be known at the time of the insurance application.

### CONCLUSION

The insurance application asked the question "Have you ever been treated for or diagnosed as having cancer? There has been no finding that Tommy Bob Hall was treated for cancer in the six years between his 1993 mole removal and the 1999 application. Further the only pathology report in evidence prior to the application for insurance clearly states the mole was benign. Tommy Hall relied on that report to live a normal life from 1993 until the time of the application for insurance. He received no treatment for cancer.

The company's application for this type of coverage was not a fine filter of medical information. It was broadly worded and consistent with the type of underwriting done on this type of policy. As such the company should not underwrite to a lesser standard and then review claim files to a higher standard. This type of medical treatment is clearly unreasonable and shows bad faith on CUNA's part.

Both these experts state that CUNA acted reasonably. The fact that CUNA had lots of information, supposedly makes it reasonable in the eyes of Dr. Lee and Mr. Terry that they should weigh all the information equally. Incorrect doctor's references should not be given the same weight as a pathology report.

Richard A. Schwartz
August 13 2002

Hall vs. CUNA Mutual Group; CUNA Mutual Insurance Society
Report of Michelle Doherty
June 24, 2002


## SUMMARY

This is a report of my review of Hall vs. CUNA Mutual Group and CUNA Mutual Insurance Society (CUNA). To prepare this report, I reviewed the following documents: Pennsylvania Insurance Laws; NAIC Model Unfair Trade Practices Act; NAIC Model Unfair Claims Settlement Practices Act; NAIC Model Unfair Life, Accident and Health Claims Settlement Practices Model Regulation; NAIC Compendium of State Laws on Insurance Topics – Insurance Fraud Prevention Laws; NAIC Model Consumer Credit Insurance Model Act. Additionally, I reviewed the entire claim file furnished by CUNA, the PMA Insurance Group's worker's compensation file on Mr. Hall, Cressler Trucking Company's file on Mr. Hall, and the following depositions: Dr. Thomas Ansfield, Dr. George Baker, Dr. Michael Cashdollar, Dr. Ernest Charlesworth, Dr. James Chicklo, Dr. John Enders, Marcia Feldman, Richard Fischer (3/14/02 and 3/28/02), Deb Haglund, Nancy Hall (1/10/01 and 3/19/02), Tommy Hall (10/19/99 and the video deposition on 10/20/99), Erin Hefty, Dr. Howard Hoffman, Brenda Larson, Paul Lawin, Barbara Lutz, William Nardi, Dr. Constancio Ramirez, Dr. William Sharfman, Paula Statler and Michael Stel. In addition, I reviewed CUNA's HMP Field Manual and HMP Credit Union Manual, Online Claims Reference Manual, Underwriting Procedure Manual and SIU State Fraud Manual.

Every opinion in this report is held to a reasonable degree of certainty within the insurance industry, and is based on my knowledge and experience in the areas of claims, compliance and Special Investigative Units (SIU).

It is clear the Halls purchased the credit insurance in order to allow Mrs. Hall to keep the family home in the event of Mr. Hall's death prior to the retirement of the mortgage loan. It is also clear to me that CUNA violated their duty to treat the insured Tommy Bob Hall II and his wife Nancy Hall fairly. In fact, CUNA continued to violate their duty to the Halls at the time the initial claim for benefits was filed, at the time medical records and depositions were provided in connection with another legal action filed by the Halls, and at the time of discovery during this litigation. During each of these time frames, information was either in the company's file or available to the company to provide more than a reasonable doubt as to Mr. Hall's knowledge of his history of melanoma at the time the application for insurance was signed. This information clearly established that Mr. Hall had not been treated or diagnosed with cancer prior to the date his application for insurance with CUNA was completed.

## ANALYSIS

### APPLICATION AND UNDERWRITING PROCESS

On November 18, 1998, Tommy Bob Hall II completed an application for credit life insurance at Patriot Federal Credit Union for Member's Home Mortgage Protection II, issued by CUNA. Mr. Hall correctly answered NO to question (B) 1. "Have you ever been treated for or diagnosed by a member of the medical profession as having any of the following (Please check the box and circle condition(s) that applies) Diabetes; high blood pressure; chest pain; heart, blood, blood vessel, lung or breathing disorders; cancer; epilepsy; stroke; pneumonia(s); arthritis, brain, mental, nervous, back, neck, joint or muscular disorders; stomach, intestines, liver, pancreas, or kidney disorders, cirrhosis, drug or alcohol abuse, acquired immune deficiency syndrome or AIDS related complex, or tested positive for antibodies to the AIDS virus?" A fraud statement appeared on the application, as required by law.

The health question on this application form is an all-encompassing question, obviously listing many health conditions. In everyday insurance terminology, this type of application may be called an "accept or decline" application. This means, depending on the response made to the all-encompassing health question, the company will make the decision to accept or reject the applicant with little to no underwriting involved prior to policy issue. Typically, when a company uses this type of "accept or decline" application form, the insurance product is priced to reflect that higher level of mortality they will experience by failing to fully underwrite the risk.

CUNA's Members Choice Home Mortgage Protection Administration Guide provides procedures and instructions to the credit union in enabling the enrollment process. A couple of significant items appear on the application, which were not handled in accordance with CUNA's published Administration Guide and/or Underwriting Procedure Manual.

(1)     The question regarding tobacco use within the past 24 months was not completed.

(2)     CUNA's published Administration Guide states, "When you enroll members in the Home Mortgage Protection II you must provide the annual premium cost. You will do so by completing the cost disclosure section of the member application form. **The Annual Premium Cost Disclosure was not completed on Mr. Hall's application.** This is important because a more sophisticated insurance consumer may have found that the cost of the credit insurance was relatively expensive, and that cheaper coverage could perhaps have been purchased elsewhere to cover the amount of the mortgage loan.

2

(3)     The application indicated the CUNA coverage would replace existing coverage. State insurance department replacement regulations do not apply to credit insurance. However, the CUNA procedures manual states "Regardless of the state regulations, CUNA Mutual has chose to log all replacements….Depending upon the product and state of issue, additional forms or notifications may or may not also be required." And further, "If a state requires replacement disclosures or notifications for a product, there should be a replacement question found on the application. **There is no indication in the company claim or underwriting file that the published company procedure was followed. No replaced company information was noted on the application, even though the replacement question was answered Yes.**

During the underwriting process, Carolyn McQueen, Life Underwriter, requested, via a letter to Mr. Hall on 12/1/98, the answer to the tobacco use question. Ms. McQueen's letter states "…and we appreciate your early reply, as there is no coverage in force at this time." The supplemental information regarding tobacco use was subsequently received by CUNA, stamped "HMP Dec 10 1998". The Mortgage Protection File Worksheet indicates "FINAL ACTION: APPROVED AS APPLIED FOR. UNDW. INIT. & DATE 12-11-98 C. MCQUEEN." The CUNA underwriting procedures manual provides the underwriting action on clean applications for the HMP product – under age 50, under $100,000, issue. The coverage was issued with an effective date of 01/01/99.

CUNA was on notice of Mr. Hall's physician and had the opportunity to request and review Mr. Hall's medical records. No such request was made until the claim for death benefits was made to CUNA. This lead to a situation referred to as post-claim underwriting. CUNA has procedures for processing claims. During the 2-year contestable period, a policy is usually "suspended" for a contestable period investigation if a claim is received containing a diagnosis of a condition related to the health questions on the application. This leads to the practice of post-claim underwriting that may be harmful to policyholders, especially those who have replaced other coverage. (We know Mr. Hall had previous coverage that was replaced by CUNA.) It is acknowledged that CUNA is exercising their right to investigate whether a material misrepresentation occurred on the application. However, it appears no pre-approval underwriting was performed by either requesting an MIB report or verifying with Dr. Charlesworth that Mr. Hall had not been diagnosed with any of the conditions identified through the health questions on the application.

## CERTIFICATE OF INSURANCE

On 01/01/99, CUNA issued certificate number 00032534 to Insured Debtor Tommy B. Hall. The initial amount of decreasing term life insurance elected was $55,951.79. There is some question as to exactly which certificate was issued to Mr. Hall. As part of discovery, a specimen form B3a-900-0987 was provided to counsel. However, one page of form B3a-900-0987PA is also present. It is not uncommon for the Pennsylvania Department of Insurance to require modifications to insurance contract language during their required approval process. My comments and observations in this part of my report are based on my review of form B3a-900-0987, which may not have state-specific language that may be present in the –0987PA form.

The specimen certificate and specimen master policy give the definitions and provisions under which coverage is provided. **From my review of these definitions and provisions, my conclusion is that benefits were improperly declined and that coverage was improperly rescinded.** The review that led me to this conclusion is outlined here.

(1) The certificate definition of sickness is "SICKNESS means a disease or illness which causes the Insured Debtor or the Joint Insured Debtor to become Totally Disabled while insured under the Policy and requires the care of a licensed physician other than himself: There is no mention in the certificate that the disease or illness must first be diagnosed or treated while the coverage is in force. This would be typical language in an insurance contract. **It is clear that Mr. Hall became Totally Disabled while insured under the Policy, and that he required care of a licensed physician, and that he was not a licensed physician and qualified to treat himself.**

(2) The certificate states under LIFE INSURANCE BENEFIT "We will pay a life insurance benefit, subject to the terms of the Policy, if you or your Joint Insured Debtor die while insured under the Policy. Upon receipt of proof of death of you or your Joint Insured Debtor (whichever occurs first) We will pay the Amount of Insurance Benefit to the Policyholder, to reduce or pay off the Mortgage Loan. Payment will completely discharge Our liability." **It is clear that Mr. Hall was the Insured Debtor, that he died while insured under the policy, and that CUNA was provided with proof of death.**

(3) The certificate states under GENERAL PROVISIONS – LIFE AND DISABILITY INSURANCE "…No statement can be used to void this insurance or deny a claim unless that statement is signed by you or your Joint Insured Debtor and a copy given to you or your Joint Insured Debtor…" This is the typical contestable period language, such contestable period lasting for a period of 2 years under this policy. **It is clear that Mr. Hall, based on the medical records and depositions provided to CUNA, made an accurate statement on his application for this coverage. In addition to his truthful NO answer to the medical question, he listed the name and address of Dr. Ernest Charlesworth on the application. Had CUNA requested records from Dr. Charlesworth at the time of application, those records could have been reviewed and an underwriting decision could have been made at that time to issue or decline the coverage.**

In the Product Overview section of the Members Choice Home Mortgage Protection Field Training Guide, there is certain information provided by CUNA to the member credit unions. For example, member eligibility requirements (for the HMP coverage) are that the members be under age 70 and be in good health. It is clear that, on the date of application, Mr. Hall was under age 70 and in good health, to his knowledge. Additionally, there is a question in the training guide for the credit union regarding conditions where CUNA would not pay any life benefits. There are 3 situations listed where life benefits are not paid: suicide within the first two years of coverage, or act of war, or air travel other than as a pilot, crew member or passenger on a scheduled flight on a commercial airline. It is clear that Mr. Hall's death was not the result of suicide, an act of war, or as the result of air travel.

## CLAIM HANDLING

Mr. Hall died on 11/04/99. The Home Mortgage Insurance Claim Notice was completed by Jeanette Duquette at Patriot Federal Credit Union and faxed to CUNA with the death certificate on 11/10/99.

A Telephone Contact Sheet in CUNA's file notes a 12/13/99 call from Jeanette at CU had called. The call was returned 12/14/99 and a message was left stating, "...claim has been referred to Issuance & Serv. & there will be a delay on the claim. Any ?s, she can call me back." A subsequent message on 12/14/99 states that Jeanette called back. "I told her that we sent a letter directly to the med. I also gave her the # for issuance & serv."

A letter was sent 12/14/99 to Patriot Federal Credit Union stating that medical information had been received and forwarded to Issuance and Servicing Department for review.

A letter was sent to Nancy Hall 12/15/99 acknowledging Tommy's death and advising that medical records were received from Dr. Charlesworth. The letter requested the names, addresses and telephone numbers of physicians that Tommy received treatment from or consulted from January 1993 to April 1998.

A letter was sent to Nancy Hall 2/10/00 advising her coverage was being rescinded. The letter further stated "As a result, no benefits will be paid under this contract, either now or in the future."

The above sequence of events is of significance because it shows a consistent pattern of non-compliance with Pennsylvania Insurance Regulations. For example, PA Regulation 31s146.5 – failure to acknowledge pertinent communications. Section (a) requires acknowledgement of a claim within 10 working days of receipt of such notice. Notice of claim was received by CUNA 11/10/99 via fax. Acknowledgement to Patriot Federal Credit Union was made 12/14/99 via fax. Acknowledgement to Nancy Hall was made 12/15/99 via letter.

Additionally, PA Regulation 31s146.5 – failure to acknowledge pertinent communications. Section (d) requires the insurer to provide, within 10 working days, necessary claim forms, instructions, and reasonable assistance so that first-party claimants can comply with the policy conditions and reasonable requirements of the insurer. There is no indication in the claim file that claim forms, instructions or reasonable assistance were provided to Nancy Hall or Patriot Federal Credit Union within the allotted time frame.

Next is the violation of PA Regulation 31s146.6 – standards for prompt investigation of claims. This regulation requires insurers to complete their investigation of a claim within 30 days after notification of claim, unless such investigation cannot reasonably be completed within such time. If the investigation cannot be completed within 30 days, and every 45 days thereafter, the insurer shall provide the claimant with a reasonable explanation for the delay and state when a decision on the claim may be expected. **The first correspondence with Nancy Hall was dated 12/15/99. The next correspondence with Nancy Hall was dated 2/10/00, advising her the claim was being denied and coverage rescinded.**

In CUNA's Direct Response Underwriting Procedures Manual is a section entitled Rescission Procedures. The procedure states, in part, "Also indicate in your letter that if the information is not correct to please contact our office." This crucial statement was not included in any communication to Mrs. Hall or Patriot Federal Credit Union. The denial letter bluntly stated "…no benefits will be paid under this contract, either now or in the future." As a result, Mrs. Hall, who was not a sophisticated or knowledgeable insurance person, and who had just suffered the loss of her husband, felt she had no recourse but to accept the company's denial and rescission of the coverage.

It is clear that at each step in the handling of this claim, CUNA's actions were inadequate and unacceptable. Documents and depositions were available to CUNA at the time the initial claim was made for the death benefits, at the time of exchange of documents when the lawsuit was filed, and at the time of discovery. For example, there is a note dated 11/19/93 from Dr. Hurley in the Cressler Trucking file that was referenced as an exhibit in Mr. Hall's video deposition of 10/20/99. This note stated Mr. Hall had a dysplastic nevus removed 4/13/93, and that he was released from care 7/19/93. Additionally, the 1993 pathology report was in the claim file at the time the claim denial and rescission were made.

## ACTIONS OF BRENDA LARSON AND WILLIAM NARDI

In addition to the violations of Pennsylvania Regulations and published company procedures outlined above in the Claim Handling section of this report, Brenda Larson and William Nardi's actions were outrageous. By Brenda Larson's own testimony, she was still in training at the time of Mr. Hall's claim. In fact, she testified this was her first claim. Her supervisor was located in the Iowa office and was not available to Ms. Larson for consultation or guidance. Ms. Larson made the incorrect assumption that Mr. Hall had provided a history of malignant melanoma in his medical history to Dr. Cashdollar. There were no continued efforts to secure medical records from Dr. Hurley, even though Dr. Hurley's office advised they had provided records to an attorney in April of 1999. (Further inquiry could have elicited the name of the attorney to whom the records were provided.) CUNA was on notice at this time that an attorney could have been involved. Prudent claim handling and appropriate training should have caused Ms. Larson to refer the file to her supervisor or to CUNA's legal department.

In addition, by Ms. Larson's own testimony in her deposition, she acknowledged having the 1993 pathology report in the claim file before the decision was made to deny the claim and rescind the coverage. That pathology report clearly described the mole as a dysplastic nevus. There is nothing further in the claim file to show that Mr. Hall was advised in 1993 that the mole that was removed and tested was, in fact, a malignant melanoma. Ms. Larson testified that the patient history provided in Dr. Cashdollar's records indicated "a surgical resection in 1993 of a malignant melanoma." She believed the patient must have provided this information. Mr. Hall, a high school graduate who had worked as a cabinetmaker and truck driver, believed he had a mole removed. He further stated in his deposition that his doctor told him they got all "the infection."

Ms. Larson stated that, even though she knew the dysplastic nevus was not a diagnosis of malignancy, she felt there was enough other evidence in the claim file to deny the claim.

According to Bill Nardi's deposition, he was responsible for training Ms. Larson. There is a question, based on my experience, why Mr. Nardi did not counsel Ms. Larson to take more assertive action with CUNA's legal department. He did recommend that Ms. Larson review the file with Rich Fischer, and that they may want a legal review process. Based on my review of the documents provided, such reviews did not take place. Prudent rescission handling should always call for a review and sign off by the company's legal counsel due to the nature of the action.

## FRAUD AND SPECIAL INVESTIGATIVE UNIT (SIU)

Fraud has been raised as a defense to CUNA's refusal to pay benefits for Mr. Hall's claim.  However, it is evident that no investigation was performed which showed fraud had been committed.  The head of CUNA's SIU, Mike Stel, did not perform an investigation prior to referring the file to the Pennsylvania Office of the Attorney General.

Based on my own experience in the insurance industry, the SIU exists in an insurance company to provide several key benefits to the company.  The SIU is typically charged with the responsibility to review and investigate potential charges of fraud, both internal and external.  Many states require the filing of fraud plans that detail how SIU's operate.  SIU's also have Anti-Fraud Plan reporting requirements in many states.  Some SIU's establish anti-fraud and ethics training programs, and deliver that training to their company employees.

CUNA has a published SIU procedure in their Direct Response Underwriting Procedures Manual.  However, there were no written policies and procedures at CUNA on how to investigate a claim for fraud.  In fact, it is obvious no actual investigation was performed.  The medical records in the claim file were apparently the basis for referral by Ms. Larson to the SIU.  However, the SIU failed to perform an additional investigation or to develop further information that would have substantiated whether fraud may have been committed at the time of application.  Rather, Mike Stel, manager of CUNA's SIU, forwarded a completed form to the Pennsylvania OAG.

On 2/22/00, Mr. Stel advised Mrs. Hall and Patriot Federal Credit Union that CUNA had been "...required to inform the Pennsylvania Insurance Fraud Section of this matter."  The Pennsylvania OAG acknowledged the referral on 2/29/00, and subsequently on 3/29/00, advised Mr. Stel they could not "...initiate a criminal investigation at this time."  Mrs. Hall was never notified of the OAG's refusal to initiate a criminal investigation.

In my experience in the insurance industry, the SIU would never have advised the insured's widow that a referral to the Fraud Section was being made.  CUNA's actions in notifying Mrs. Hall and Patriot Federal Credit Union constitute outrageous action, in that no possible purpose could be served by their notification.  In addition, Mrs. Hall was a customer of Patriot Federal Credit Union, and it is obvious to me she would have been embarrassed by CUNA's actions.

## CONCLUSION

In conclusion, it is my opinion CUNA breached their contract with the Halls in the handling of Mr. Hall's claim.  A prudent company would have provided training, supervision, and published policies and procedures for claim handling and fraud investigation.  CUNA's conduct was unreasonable and outrageous under the circumstances.

1.  Adequate oversight was not provided to Ms. Larson, Mr. Nardi or Mr. Stel.  An inexperienced Brenda Larson, who did not have the guidance of her trainer, supervisor, or CUNA's legal department, handled the claim.

2.  Time service standards established and required by the Pennsylvania Department of Insurance were violated.  Published company procedures and guidelines were not followed regarding the completion of the application, the credit union's role in the application process, and in the rescission process.

3.  CUNA failed to publish written policies and procedures on how to investigate a claim for fraud, and allowed the SIU manager to refer the file without investigation.  Mr. Stel acted outrageously in notifying Mrs. Hall of the fraud referral, and compounded that outrageous conduct by failing to notify Mrs. Hall that no criminal investigation would be initiated by the state Fraud Bureau.

*Michelle Doherty*
*June 27, 2002*

9

**MARY MICHELLE DOHERTY**
8236 Tansy Drive
Orlando, FL 32819
(407) 363-7730 (Home)
(407) 628-1776 (Office)

## PROFILE

Multi-year experience in both staff and line management insurance company roles. Key member of management and product development teams with proven expertise in training, aggressive problem solving, successful communications, organization, team leadership and project leadership.

**Highlights of Qualifications**
- Outgoing personality with strong interpersonal skills and diversified management background
- Almost 30 years of insurance experience in the areas of claims, product filings, regulatory compliance, product development, customer service, advertising review, and claims training
- Black Belt quality analyst training, with proven team leadership skills
- Proven expertise in effective negotiation with regulators, internal and external counsel, and governmental agencies
- Instrumental in initial IMSA certification for GE Financial Assurance group

## SKILLS AND EXPERIENCE

**Management, Administrative Coordination and Government Affairs**
- Managed regulatory compliance and product filing staff of 10 - 14 associates.
- Led project to reduce product to market cycle time by 1/3, while increasing filings by 2/3.
- Led multi-company team to manage all form filings for 3 mergers and 1 name change, completing project by target date, resulting in no loss of ability to do business.
- Served as subject matter expert on development of filing strategy for on-line product development training.
- Supervised claims and customer service support staff of 43 associates.
- Provided litigation support and liaison on claim-related litigation, testifying for the company and giving depositions.
- Developed and implemented claims quality control and overpayment procedures, reducing claim errors and backlogs and increasing examiner efficiency.
- Increased productivity of claims department through task simplification, time/motion project and reevaluation of examiner workloads.
- Drafted and filed individual fixed and variable life and annuity, and accident and health policy forms, and negotiated product approvals with state insurance department regulators.
- Developed and maintained strategic working relationships with regulators in several key states.
- Reconciled discrepancies in company marketing activities with state insurance department regulators.

**Communication and Training**
- Led multi-company team to develop complaint database and formalized complaint handling procedures.
- Trained claims processors/examiners and support staff (40 associates) in formal classroom and extensive on-the-job training methods.
- Coordinated and drafted written responses to legal, congressional, and state and Federal agency inquiries regarding complaints and company activities.
- Chaired product implementation meetings to coordinate new product introduction through all major operating areas of the company.
- Reviewed and approved product and agent recruiting and training print advertising material.
- Taught medical terminology and better business writing courses to claims department associates.

## EMPLOYMENT HISTORY

**Assistant Vice President, Compliance**
Universal American Financial Corp Cos., Orlando, FL, 2000 - present

**Vice President, Product Compliance**
GE Financial Assurance, Richmond, VA, 1998 – 2000
GE Life and Annuity Assurance Company and General Electric Capital Assurance Company

**Compliance Manager**
GE Financial Assurance, Orlando, FL, 1998

**Vice President/Assistant Vice President, Filing & Compliance**
Federal Home Life and The Harvest Life Insurance Cos., Orlando, FL, 1993-1998

**Director, Regulatory Compliance**
Academy Insurance Group, Atlanta, GA, 1988-1993

**Director, Product Implementation and Compliance**
SunAmerica, Atlanta, GA, 1981-1988

**Administrative Manager, Government Claims Division**
Blue Cross & Blue Shield of Tennessee, Chattanooga, TN, 1979-1981

**Claims Manager**
Union Fidelity Life Insurance Company, Trevose, PA, 1978-1979

**Claim Representative/Coordinator/Processor**
Travelers Insurance Cos., Hartford, CT and Atlanta, GA, 1973-1978

## EDUCATION AND TRAINING

College:
Ashland University, Ashland, OH - Major: English
University of Hartford, Hartford, CT
Kennesaw State University, Kennesaw, GA - Major: Business Management

Industry Training:
LOMA (Completed 9 of 10 parts of FLMI designation, specialty in life and health claims)
Associate in Life and Health Claims (1986)
Associate in Customer Service (1994)
Health Insurance Associate (1995)
Associate in Insurance Agency Administration (1997)
Associate in Insurance Regulatory Compliance (1998)
Managed Healthcare Professional (1998)

*Michelle Doherty*
*June 24, 2002*

4

**Hall vs. CUNA Mutual Group; CUNA Mutual Insurance Society**
**Report of Michelle Doherty**
**August 12, 2002**


This is a report of my review of the July 25, 2002 reports by Charlotte A. Lee, MD, and Tim Terry, provided as CUNA's experts' reports. Nothing disclosed in either expert report affects my conclusion, as stated in my June 24, 2002 report. That conclusion was that CUNA breached their contract with the Halls, and their conduct was unreasonable and outrageous. Neither Dr. Lee nor Mr. Terry took all of the facts into consideration in formulating their opinions. These facts were the deposition of the treating physician, the original (1993) pathology report, and Mr. Hall's video deposition, taken under oath. Every opinion in this report is held to a reasonable degree of certainty within the insurance industry, and is based on my knowledge and experience.


## CLAIM HANDLING

Prompt handling and reasonable investigation upon all available information have been raised as a defense to the allegation of unfair practices in the handling of Tommy Bob Hall's claim. However

- Acknowledgement was not made within 10 working days. 31 s 146.5
- Claim investigation was not completed within 30 days of notification, although investigation was underway. Status of claim investigation was not provided to Mrs. Hall or to Patriot Federal Credit Union within 30 days. 31 s 146.6


## CLAIM DENIAL AND RESCISSION OF POLICY

The argument has been raised that the claim was denied only after all resources were explored to determine whether Tommy Bob Hall knew he had cancer at the time he applied for coverage with CUNA.

- All physician records beginning 1/15/99 show a record of malignant melanoma from 1993 - not substantiated by pathology report prior to the application date.
- Pathology report from 1993 <u>did not</u> provide a diagnosis of malignancy.
- In Tommy Bob Hall's video deposition under oath, he stated he had no prior diagnosis of malignancy.
- Dr. Hurley's treatment records of Tommy Bob Hall from 3/30/93 to 7/19/93 show no diagnosis of malignancy.
- Dr. Charlesworth's deposition stated Tommy Bob Hall and Nancy Hall argued over whether the mole removed was malignant. Dr. Charlesworth concluded there was no cancer since there had been no follow up.
- CUNA placed too much reliance over the question of whether there was a malignancy, as stated in Dr. Charlesworth's records.
- The pathology report from 1993 was in the claim file. The sole method to diagnosis malignancy is via a pathological examination. The pathology report was ignored in the final claim decision.

## CONTINUED DENIAL AND ONGOING BAD FAITH CONDUCT

At no time since the litigation was filed has CUNA attempted to reverse their decision and pay the benefits due under the Certificate of Insurance.

- All depositions and medical records have been available to CUNA.
- No attempt has been made to contact Nancy Hall and advise her the Pennsylvania Office of the Attorney General will not be pursuing charges against her for fraud.
- Dr. Charlesworth states on page 53 of his deposition, "I have no pathology reports that indicate cancer until he had the metastatic lymph nodes."
- It is clear that cancer existed in Tommy Bob Hall prior to the date of his application to CUNA.  There is absolutely zero proof that Tommy Bob Hall had been told by a doctor that he had cancer.

## FRAUD REPORTING

It is essential that all insurers work to report suspected fraud to the various regulatory bodies.  However, it is also essential that those same insurers be held to a high standard of conduct in their investigations and referrals.

- No additional investigation for potential fraud was conducted by CUNA prior to their referral of the Hall's case to the Pennsylvania OAG.
- No possible purpose was served in notifying Mrs. Hall of the referral to the OAG for suspected fraud.
- The 'no action letter' from the OAG should have prompted CUNA to send a follow up letter to Mrs. Hall, advising her there would be no action on behalf of the state for the suspected fraud.

## CONCLUSION

Irrespective of whether Tommy Bob Hall or Nancy Hall believed the 1993 mole was cancerous, the application question did not ask "Do you believe you have or had cancer?"  Rather, the question asked is "Have you ever been treated for or diagnosed as having...cancer...?"  Tommy Bob Hall was a cabinetmaker and truck driver with a high school education, and hardly capable of self-diagnosing cancer.  Without a diagnosis by a medical professional, and we already know the medical professional did not diagnose cancer in 1993, Tommy Bob Hall correctly answered the health question on the application in the negative.  Brenda Larson's letter of 2/10/00 to Nancy Hall states, "The review showed that Tommy visited a doctor in 1993.  On the application, Tommy did not indicate this visit occurred.  Had we known about the medical condition revealed during that visit, we would not have accepted the application or issued a Certificate of Insurance."  "...As a result, no benefits will be paid under this contract, either now or in the future."  The application did not ask if Tommy Bob Hall had visited a doctor.  It asked for a diagnosis or treatment of cancer.

CUNA continues their bad faith handling of this claim by their ongoing refusal to pay benefits due, even with clear evidence of Mr. Hall's lack of knowledge of his malignancy prior to the time of application.  While some of CUNA's conduct may have been perceived as reasonable, the overwhelming evidence is that their actions were, and continue to be, unreasonable.

*Michelle Doherty*
*August 12, 2002*

## CERTIFICATE OF SERVICE

And now, this _30th_ day of _Sept._, 2002, I, Carleen S. Jensen, do hereby certify

that I have, this date, served a true and correct copy of the within **PLAINTIFF'S RESPONSE**

**TO DEFENDANTS' MOTION IN LIMINE** upon each of the attorneys of record at the

following address(es) by sending same in the United States mail:

Michael R. Kelley, Esq.
Charles T. Young
100 Pine Street
P O Box 1166
Harrisburg, PA 17108-1166

Catherine Mahady-Smith, Esq.
3115-A N. Front Street
Harrisburg, PA 17110

DATE: _9-30-02_

Carleen S. Jensen
Assistant to Stephen R. Pedersen, Esquire
214 Senate Avenue, Suite 602
Camp Hill, PA 17011
(717) 763-1170

I. D. No. 72026
Counsel for Plaintiff