

45
10-7-0
SC

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Nancy Hall, individually and as the Representative and Administratrix of the Estate of Tommy Hall, deceased, her husband, **Plaintiff** | : : : : : : | **CIVIL ACTION - LAW** |
| v. | : : | 1:01-CV-1265 |
| Cuna Mutual Group, Cuna Mutual Insurance Society, **Defendants** | : : : | (Judge Christopher C. Conner) |

FILED
HARRISBURG, PA
~~OCT~~ 4 2002
MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

---

## SUPPLEMENTAL APPENDIX TO DEFENDANT'S
## BRIEF IN SUPPORT OF ITS
## MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Michael R. Kelley
Charles T. Young, Jr.
McNees Wallace & Nurick LLC
P.O. Box 1166
100 Pine Street
Harrisburg, PA 17108-1166
Phone: (717) 237-5322
Fax: (717) 237-5300

Dated: October 4 , 2002

ORIGINAL

Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
NANCY HALL, INDIVIDUALLY    :
AND AS THE                  :
REPRESENTATIVE AND          :
ADMINISTRATRIX OF THE       :
ESTATE OF TOMMY HALL,       :
DECEASED, HER HUSBAND,      :
        PLAINTIFF           :
                            :
        V                   :   1:01-CV-1265
                            :
CUNA MUTUAL GROUP, CUNA     :
MUTUAL INSURANCE            :
SOCIETY,                    :
        DEFENDANTS          :   JUDGE SYLVIA H. RAMBO
```

```
VIDEO DEPOSITION OF:    NANCY HALL

    TAKEN BY:          DEFENDANTS

    BEFORE:            BOBBI JO HAHN, RPR
                       NOTARY PUBLIC

    DATE:              MARCH 19, 2002
                       9:08 A.M.

    PLACE:             PEDERSEN & PEDERSEN
                       214 SENATE AVENUE
                       CAMP HILL, PENNSYLVANIA
```

APPEARANCES ON NEXT PAGE



HAEN
Reporting Service, Inc.

Hughes
Albright
Foltz
Natale

APPEARANCES:

    PEDERSEN & PEDERSEN
    BY:  STEPHEN R. PEDERSEN, ESQUIRE

        FOR - PLAINTIFF

    MCNEES, WALLACE & NURICK, LLC
    BY:  MICHAEL R. KELLEY, ESQUIRE
    BY:  CHARLES YOUNG, ESQUIRE

        FOR - DEFENDANTS

ALSO PRESENT:

    CRAIG ASHWAY, VIDEOGRAPHER

<u>WITNESSES</u>

<u>NAME</u>                              <u>DIRECT</u>

NANCY HALL

    BY:  MR. KELLEY                      6

<u>EXHIBITS</u>

<u>MRS. HALL NO.</u>                              <u>PRODUCED & MARKED</u>

  1.   PATIENT INFORMATION FORM, 2/17/99   43

  2.   PATIENT INFORMATION FORM, 2/17/99   46

  3.   NEW PATIENT INFORMATION RECORD,
      2/23/99   47

  4.   PATIENT INFORMATION FORM, 2/23/99   51

  5.   INSURANCE POLICY   77

  6.   INSURANCE CLAIM NOTICE   132

  7.   DEATH CERTIFICATE   133

  8.   LETTER, 12/15/99   134

  9.   LIST OF NAMES AND ADDRESSES   136

10.   GROUP OF LETTERS   140

11.   PRAECIPE FOR WRIT OF SUMMONS   141

12.   TELEPHONE CONTACT SHEET, 12/13/99   143

13.   LETTER, 12/14/99   146

14.   LETTER, 2/10/00   146

15.   LETTER, 2/22/00   148

16.   LETTER, 2/29/00   151

17.   LETTER, 3/29/00   152

18.   TELEPHONE DATA SHEET, 3/14/01   154

5

1              <u>STIPULATION</u>

2              It is hereby stipulated by and between

3    counsel for the respective parties that reading,

4    signing, sealing, certification and filing are hereby

5    waived; and that all objections except as to the form

6    of the question are reserved until the time of trial.

7

8              THE VIDEOGRAPHER:  My name is Craig Ashway.

9    I represent VideoImages, 155 Wynshire Lane, Red Lion,

10   Pennsylvania.  Today's date is March 19th, 2002.  The

11   time of day is 9:08 a.m..  This deposition was

12   videotaped at 210 Senate Avenue, Camp Hill,

13   Pennsylvania.

14             The caption of the case is Hall versus Cuna

15   Mutual.  The name of the witness is Nancy Hall.  This

16   deposition is being videotaped on behalf of Defendant.

17   Will counsel introduce themselves?

18             MR. PEDERSEN:  Steve Pedersen on behalf of

19   the Plaintiff, Nancy Hall, and Tommy Bob Hall's

20   estate.

21             MR. KELLEY:  Michael Kelley and Charles Young

22   on behalf of Cuna Mutual.

23             THE VIDEOGRAPHER:  Will the court reporter

24   identify herself and swear in the witness?

25             THE COURT REPORTER:  My name is Bobbi Hahn.

1

2          NANCY HALL, called as a witness, being duly

3   sworn, testified as follows:

4

5                    DIRECT EXAMINATION

6   BY MR. KELLEY:

7          Q     Good morning, Mrs. Hall.  As I introduced

8   myself to you a few moments ago, my name is Michael

9   Kelley.  I'm a lawyer in Harrisburg, and I represent

10  Cuna Mutual Group and Cuna Mutual Insurance Society in

11  the lawsuit that you have brought against them.  Are

12  you familiar with the fact that you've brought a

13  lawsuit against Cuna Mutual?

14         A     Yes.

15         Q     We're here today to take your deposition in

16  that case.  A deposition is the opportunity for counsel

17  for the parties in the case to find out what witnesses

18  and parties know about the facts of the case.  That's

19  the purpose of why we're here today.  Do you understand

20  that?

21         A     Yes.

22         Q     I want to go over just a few instructions

23  with you beforehand that will help make the process go

24  more smoothly.  First of all, it's important that you

25  and I understand one another.  If you don't understand

1  one of my questions, please let me know and I'll try to

2  rephrase it.  Okay?

3      A    Yes.

4      Q    It's also important that you provide an

5  audible response and a verbal response to questions.

6  Things like shaking your head up and down or -- or

7  uh-huhs and hu-huhs, things like that, things we do in

8  everyday conversation, it's difficult for the court

9  reporter to take that down and to know exactly what you

10  meant.  Okay?

11      A    Okay.

12      Q    It's also important that only one of us is

13  speaking at a time.  So please try to wait until I

14  finish my question before you provide your answer, and

15  I'll provide you with the same courtesy.  Okay?

16      A    Okay.

17      Q    Are you on any medications today?

18      A    No.

19      Q    Okay.  Nothing that -- no cold medications or

20  anything like that that would make you drowsy or affect

21  your -- your ability to listen to the questions?

22      A    No.

23      Q    Now, Mrs. Hall, I understand that some of the

24  things we're going to talk about today might be very

25  difficult for you.  We understand you've lost your

1  husband, and I apologize up front for some of the

2  questions that I'm going to need to talk to you about.

3  They may bring back some -- some very tough memories

4  for you.

5           Again, I apologize for that; but in order to

6  thoroughly find out what you know about the case, I

7  really don't have any choice but to ask some of these

8  questions.  But please forgive me for that.  I

9  understand, Mrs. Hall, that your husband died as a

10 result of a metastatic melanoma; is that correct?

11     A    Yes.

12     Q    And that was -- that was a lump that

13 developed on his neck at one point; is that correct?

14     A    Yes.

15     Q    And eventually the doctors told you what it

16 was and it was a metastatic melanoma, correct?

17     A    Yes.

18     Q    Now, I want to go back to before you knew or

19 your husband knew anything about a lump on his neck;

20 and I want to talk to you about some moles.  Now, as I

21 understand it, your husband had a number of moles on

22 his body; is that correct?

23     A    Yes.

24     Q    When were you married?

25     A    When?

1    Q    Yes.

2    A    1986.

3    Q    Did you know him prior to 1986?

4    A    1985.

5    Q    First met him in 1985?

6    A    Yes.

7    Q    And from the time that you were married going

8    forward, is it fair to say you were aware that he had a

9    number of moles on his body?

10   A    Yes.

11   Q    Mrs. Hall, when was the first time that you

12   had any knowledge that any mole on your husband's body

13   was cancerous or malignant or a melanoma?

14   A    February 11th, 1999.

15   Q    And you seem to remember that date

16   specifically.  Why is that?

17   A    That's the date that I had a doctor

18   appointment and my doctor told me what it was while he

19   was being told what it was at home on the phone.

20   Q    Now, when you say what it was, are you

21   referring to the -- to the lump on his throat?

22   A    Yes, yes.

23   Q    Now, just -- if you would, my question is a

24   little bit different than that.

25   A    Okay.

10

1      Q    I'm talking to you about any moles --

2      A    Okay.

3      Q    -- that your husband had on his body; and my

4 question is when is the first time that you had

5 knowledge that any moles on his body were either

6 cancerous, malignant or a melanoma.

7      A    Not until 1999.

8      Q    Do you know when in 1999?

9      A    No.

10     Q    So it was sometime in 1999 but you're not

11 sure when?

12     A    Yes.

13     Q    Was it before or after this date of February

14 11, 1999?

15     A    Well, that -- that date.

16     Q    Now, the reason you remember February 11,

17 that's the first time you found out that your husband's

18 lump on his -- on his neck was cancerous, correct?

19     A    Yes.

20     Q    That's a watershed moment in your life I'm

21 sure.

22     A    Yes.

23     Q    And I just want to be clear now.  The first

24 time that you knew that any of the moles on his body

25 were cancerous was after that February 11, 1999 date?

1        MR. PEDERSEN:  Objection.

2        THE VIDEOGRAPHER:  Off the record at 9:15.

3        MR. PEDERSEN:  It's been asked and answered.

4  I think it misstates her testimony.  Her testimony was

5  that on that date she also became aware that the mole

6  was related to the lump.  I believe that was her

7  testimony.

8        MR. KELLEY:  Well, it hasn't been asked and

9  answered; and I'm trying to clarify what she said.  And

10 counsel is suggesting an answer which I'm going to ask

11 that he refrain from doing.  Back on the record.

12       THE VIDEOGRAPHER:  Okay.  One second,

13 please.  Back on the record at 9:15.

14 BY MR. KELLEY:

15     Q    Mrs. Hall, let me ask it in another way.  In

16 relation to this February 11, 1999 date, the watershed

17 date for you, when did you first know that any of the

18 moles that your husband had on his body were either

19 cancerous, malignant or were melanoma?

20     A    I have to go back to the same date.

21     Q    It was the same date?

22     A    Yeah.

23     Q    Okay.  How certain are you of that?

24     A    Certain that that's the date that my doctor

25 told me what it was.

12

1    Q    And again, when you say what it was, are you

2    referring to the moles or to the lump on --

3    A    To the lump on his neck.  To the lump on his

4    neck.

5    Q    And I'm trying to focus on specifically the

6    moles.

7    A    Right.

8    Q    And you know, if you don't know, that's a

9    perfectly fine answer; but I'm just trying to find out

10   if you do know when you first became aware that -- that

11   any moles were cancerous.

12   A    Not -- I don't know the date.  I don't

13   remember the date.

14   Q    I understand that.  Do you know if it was

15   before February 11, after February 11th or on that same

16   date?

17   A    No, it would have been after February 11th.

18   Q    Okay.  Can you be anymore specific about when

19   it was that you learned that any of the moles were

20   cancerous?

21   A    No.

22   Q    Do you know if it was within weeks after

23   February 11?  Was it months after February 11?

24   A    No, I don't know.  Don't remember.

25   Q    So you can't narrow it down in any time

13

1  frame?

2      A    No.

3      Q    Mrs. Hall, when was it that your husband

4  first had knowledge that any of the moles on his body

5  were cancerous?

6      A    Not until after '99, until '99.

7      Q    Until 1999?

8      A    Yes.

9      Q    Do you know if he knew that moles were

10  cancerous prior to -- prior to that February 11 date?

11      A    Any moles or his moles?

12      Q    Any moles on his body.

13      A    No, he didn't.

14      Q    How do you know that?

15      A    We would have discussed it.

16      Q    Did you have any discussions with your

17  husband prior to February 11, 1999 about any of his

18  moles being cancerous?

19      A    No.

20      Q    Never had any kind of discussion like that?

21      A    No.

22      Q    So prior to February 11 when you found out

23  about the -- the lump on his throat being cancerous,

24  neither you nor your husband had any knowledge about

25  any moles on his body being cancerous, being malignant

14

1   or being a melanoma?

2       A    No.

3       Q    What I said was correct?  I think she

4   misunderstood.  I just want to make sure we're clear

5   about that.  Prior to February 11, 1999, is it true

6   that neither you nor your husband had any knowledge

7   about any moles on his body being cancerous, malignant

8   or a melanoma?

9       A    Yes.

10      Q    Who was it who first told you that any moles

11  on your husband's body were malignant, cancerous or a

12  melanoma?

13      A    I don't remember.

14      Q    Was it a doctor?

15      A    I'm not sure.

16      Q    So you don't have any recollection about who

17  it was or even whether it was a doctor who told you

18  that; is that correct?

19      A    I'm not sure.  I don't know.

20      Q    Do you know which doctors your husband saw

21  with regard to the lump on his neck?

22      A    Yes.

23      Q    And who were those doctors?

24      A    Dr. Chicklo.

25      Q    Dr. Chicklo?

15

```
 1       A    Chicklo, yes.

 2       Q    Anyone else?

 3       A    No, Dr. Chicklo did the surgery.

 4       Q    Okay.  As you sit here today, do you know the

 5   names of any other doctors that your husband saw with

 6   regard to the lump on his neck?

 7       A    I'm not sure.

 8       Q    Do you know the name of Dr. Charlesworth?

 9       A    Yes.

10       Q    Did your husband go to see Dr. Charlesworth

11   at any time about the lump on his neck?

12       A    I don't know if he went to see him first.

13       Q    Did you accompany your husband to any of his

14   doctors' visits?

15       A    Yes.

16       Q    Did you ever accompany him on a doctor's

17   visit to Dr. Charlesworth?

18       A    Yes.

19       Q    Do you remember how many times he saw Dr.

20   Charlesworth?

21       A    The time you're talking before or after?

22       Q    At any time.

23       A    Three or four visits.

24       Q    Did you accompany your husband on all of

25   those visits?
```

16

1      A     Yes.

2      Q     And you remember the name of Dr. Chicklo,

3  right?

4      A     Yes.

5      Q     Did you also attend any visits your husband

6  had with Dr. Chicklo?

7      A     No.

8      Q     Are you certain of that?  You seem -- your

9  answer was very self-assured.  Are you certain that you

10 did not attend any of those visits?

11     A     Yes.

12     Q     How about a Dr. Cashdollar, do you know who

13 Dr. Cashdollar is?

14     A     Yes.

15     Q     Did your husband see Dr. Cashdollar with

16 regard to the lump on his neck?

17     A     Yes.

18     Q     Did you attend any of those visits with him?

19     A     Yes.

20     Q     Do you know how many times your husband

21 visited Dr. Cashdollar?

22     A     In his office or during treatment?

23     Q     Anywhere.

24     A     We're talking each cancer treatment.  I would

25 have to say 15 visits or more.

1    Q    Dr. Cashdollar --

2    A    Yes.

3    Q    -- was the physician who administered the --

4    the treatments to your husband for his cancer?

5    A    Yes.

6    Q    So he went to see Dr. Cashdollar a lot?

7    A    Yes.

8    Q    Did you go with him to all of his visits with

9    Dr. Cashdollar?

10    A    No.

11    Q    Did you go with him to most of them?

12    A    Yes.

13    Q    Did you go with him for the first visit with

14    Dr. Cashdollar?

15    A    Yes.

16    Q    Dr. Enders, do you know Dr. Enders?

17    A    Yes.

18    Q    Did your husband see Dr. Enders for any

19    reason?

20    A    Yes.

21    Q    Did you accompany your husband to any of the

22    visits with Dr. Enders?

23    A    Yes.

24    Q    How many times did your husband see Dr.

25    Enders?

18

```
1        A     Three or more.

2        Q     Did you attend for all of those visits?

3        A     No.

4        Q     Did you attend for any of them?

5        A     Yes.

6        Q     Did you attend for the first visit with Dr.

7   Enders?

8        A     I don't remember.

9        Q     And the last doctor that I wanted to ask you

10  about is Dr. Sharfman.  Do you know a Dr. Sharfman?

11       A     NIH?

12       Q     I believe he's down in Maryland.

13       A     Yes.  No, I never met him.

14       Q     Now, we talked about Dr. Charlesworth,

15  Chicklo, Cashdollar, Enders and Sharfman.  I wanted to

16  ask you if the discussion of any of those doctors'

17  names jogged your recollection of who it was that first

18  told you that any of the moles on your husband's body

19  were cancerous.

20       A     I'm not sure.

21       Q     So even with the discussion of those doctors,

22  you're still not certain; is that right?

23       A     No.

24       Q     Now, I understand your testimony that it

25  wasn't until at least as of February 11, 1999 or
```

1    sometime after that you knew that any of the moles on

2    your husband's body were cancerous.  Prior to February

3    11 of 1999, did you suspect that any of the moles were

4    cancerous?

5        A    No.

6        Q    Is it fair to say that prior to being told

7    that the moles were cancerous that you had no

8    suspicions that the moles were cancerous?

9        A    Yes.

10        Q    Do you know if your husband had any

11    suspicions prior to February 11 of 1999 that any of his

12    moles were cancerous?

13        A    No.

14        Q    So -- it was a poorly phrased question; and I

15    apologize.  Does your response indicate that you don't

16    know if your husband knew or that he did not know?

17        A    He did not know.

18        Q    Now, I believe, Mrs. Hall, that when your

19    husband first found a lump on his throat that the first

20    doctor that he went to see was Dr. Cashdollar who then

21    referred him to Dr. Chicklo.  Is that consistent with

22    your recollections or you don't remember one way or

23    another?

24        A    No, I don't remember that, who came first.

25        Q    Okay.  At any of the doctors' offices that

20

1    you visited, did either the doctors or anybody from the

2    office staff, any nurse or any receptionist ever ask

3    you or your husband to provide medical history during a

4    visit?

5        A    The first visit for every doctor you had to

6    provide medical history.

7        Q    Do you recall that being the case for each of

8    the doctors that we've talked about?

9        A    Yes, the ones I was at.

10       Q    In terms of the first visits, did you attend

11   the first visit with Dr. Charlesworth?

12       A    Yes.

13       Q    And Dr. Chicklo?

14       A    No.

15       Q    And with Dr. Cashdollar, it was yes, correct?

16       A    Yes.

17       Q    And Dr. Enders was?

18       A    No.

19       Q    And Dr. Sharfman was no?

20       A    No.

21       Q    So the two doctors that you were there for

22   the initial visit was Charlesworth and Cashdollar,

23   correct?

24       A    Yes.

25       Q    Now, during those initial visits to those

1   doctors, as you sit here today, do you have a specific

2   recollection of anybody from Charlesworth's office or

3   from Cashdollar's office asking you about your

4   husband's past medical history?

5       A    Yes, it's on the form.

6       Q    Do you have a specific recollection of that

7   outside of seeing it on a form?

8       A    No.

9       Q    Prior to coming to your deposition today, did

10  you look at some of the records?

11      A    Some, yes.

12      Q    Did you look at some of the records from the

13  doctors' offices that contain the information about the

14  past medical history?

15      A    His forms, yes.  Doctors' forms, no.

16      Q    Mrs. Hall, did you ever report to either Dr.

17  Charlesworth or Dr. Cashdollar that your husband had a

18  history of a cancerous, malignant mole back in either

19  1993 or 1996?

20      A    No.

21      Q    And as you sit here today, you're certain you

22  never provided that information to either of those

23  physicians or anybody at their office; is that correct?

24      A    Yes.

25      Q    In your presence at either Dr. Charlesworth

22

1    or Dr. Cashdollar's office, did your husband ever

2    provide a history that he had been -- that he had had a

3    cancerous or malignant mole back in 1993 or 1996?

4        A    No.

5        Q    When you were at Dr. Charlesworth's office --

6    let's just limit it to Dr. Charlesworth for right now

7    so we can break it down a little bit.  When you were at

8    Dr. Charlesworth's office, were you with your husband

9    the whole time that he was there for his initial visit?

10       A    I don't remember if I went back or not, back

11   into the examining room.  I don't remember.

12       Q    Do you remember being with him in the

13   reception area?

14       A    Yes.

15       Q    Okay.  Did anybody from Dr. Charlesworth's

16   office bring a form out to you to fill out?

17       A    Yes.

18       Q    Did anybody from Dr. Charlesworth's office

19   send you a form before you even got to the doctor's

20   office?

21       A    No.

22       Q    What did you do after they -- well, first of

23   all, who was it who brought the form out to you?

24       A    You got it at the front window.  The

25   receptionist hands it to you.

23

1      Q     Do you know which receptionist it was?

2      A     No.

3      Q     And what did you do after you received it?

4      A     We set down, filled it out.

5      Q     Okay.  Mrs. Hall, let me show you what we've

6  marked in Dr. Charlesworth's deposition as Charlesworth

7  1.  Do you need some glasses?

8      A     I thought I brought my pocketbook over with

9  me.

10            MR. KELLEY:  Let's take a break to see if we

11  can find it.

12            THE VIDEOGRAPHER:  Off the record at 9:35.

13            (Break taken.)

14            THE VIDEOGRAPHER:  Back on the record at

15  9:36.

16  BY MR. KELLEY:

17      Q     Mrs. Hall, would you take a moment and look

18  at that document?

19      A     Yes.

20      Q     Have you seen that document prior to today?

21      A     Yes.

22      Q     What is that?

23      A     It's a history that you fill out at a

24  doctor's office when you first go in.

25      Q     Okay.  Is any of the writing on that document

24

1  your writing?

2      A    No.

3      Q    Is any of the writing on that document your

4  husband's writing?

5      A    Yes, at the top.

6      Q    You recognize your husband's writing?

7      A    Yes.

8      Q    And when you say at the top, how far down on

9  the top of this document is your husband's writing?

10     A    Down here.

11     Q    So from the patient's name at the very top of

12  the document down to next of kin?

13     A    Yes.

14     Q    And allergies?

15     A    Yes.

16     Q    And then below that, is any of that writing

17  your husband's writing?

18     A    I -- I'm not sure about -- I believe he wrote

19  these two.

20     Q    One and two?

21     A    No, two and three.

22     Q    Two and three?

23     A    Yes.

24     Q    Two and three where it says back surgery,

25  back surgery?

25

1    A    Yes.

2    Q    Is that correct?

3    A    Yes.

4    Q    And then Item No. 1, cancerous mole removed,

5    do you see that?

6    A    Yes.

7    Q    Is that your husband's writing?

8    A    No.

9    Q    Are you certain of that?

10    A    Yes.

11    Q    Mrs. Hall, as you sit here today, do you have

12    any knowledge as to how in Item No. 1 under medical

13    problems information regarding a cancerous mole removed

14    and then it has a date '96 how that was placed on this

15    Charlesworth 1?

16    A    No.

17    Q    When you were visiting Dr. Charlesworth's

18    office, did the receptionist or anybody else at Dr.

19    Charlesworth's office before you actually met with the

20    doctor ask you any questions about your husband's past

21    medical history?

22    A    I don't remember.

23    Q    Is it possible that that occurred and you

24    just don't remember it now?

25    A    I don't know.

26

1      Q      It's Charlesworth Exhibit No. 1.  It's

2   already been marked in a previous deposition.  Mrs.

3   Hall, the first time that you went to see Dr.

4   Charlesworth with your husband, why is it that you were

5   going to see the doctor at that time, do you remember?

6      A      Yes.

7      Q      What was the reason?

8      A      He had a cut on his leg that wouldn't heal.

9      Q      Okay.  And according to this record, that's

10  April 30th of 1998; is that correct?

11     A      Yes.

12     Q      That's what the date on the record says?

13     A      Yes, yes.

14     Q      Is that consistent with your recollection of

15  about the time that was?

16     A      Yes.

17     Q      And that's prior to anybody knowing anything

18  about the lump on your husband's neck; is that right?

19     A      Yes.

20     Q      So you were just there because he had a

21  problem with his leg?

22     A      Yes.

23     Q      Did you or your husband bring with you to Dr.

24  Cashdollar's office any of his previous medical

25  records?

1    A    No.

2    Q    Do you know if anybody at Dr. Cashdollar's

3    office had your husband's previous medical records on

4    the date of this first visit to his office?

5    A    Whose office?

6    Q    To Cashdollar's office.

7    A    I don't know that.

8    Q    You don't know one way or the other?

9    A    No.

10    Q    And just so we're clear about this, the

11    writing over here under hospitalization and surgery, I

12    see a reference here to Dr. Guthrie.  Do you see that?

13    A    Yes, yes.

14    Q    Was Dr. Guthrie any physician that your

15    husband had visited in the past?

16    A    Yes.

17    Q    What did your husband visit Dr. Guthrie for?

18    A    He had a mole removed from his back.

19    Q    Do you know when that was?

20    A    '93, 1993.

21    Q    Do you know what month it was in 1993?

22    A    No.

23    Q    And beside back surgery, it has a couple of

24    dates there of 12/89 and 1/93.  Is that when those back

25    surgeries occurred?

28

1      A    I believe so.

2      Q    Is that your husband's writing here where the

3 dates are listed?

4      A    I'm not sure.

5      Q    And then off to the -- off under

6 hospitalizations and surgery beside the back surgeries,

7 that's obviously a different type of writing, isn't it?

8      A    Yes.

9      Q    And you have no idea whose writing that is?

10     A    No.

11     Q    And the same way under here.  It looks like

12 diverticulitim or something along those lines.  That's

13 not your husband's writing?

14     A    No.

15     Q    And it's not your writing?

16     A    No.

17     Q    You say between the -- the information about

18 your husband here and then the -- the medical problems

19 section, there's a section that has a number of

20 ailments listed there and boxes to check yes or no.  Do

21 you see that?

22     A    Yes.

23     Q    Did you or your husband check in those boxes?

24     A    I don't remember.

25     Q    At any time that your husband saw Dr.

1   Charlesworth, were you present when Dr. Charlesworth

2   had any discussions at all with your husband about any

3   cancerous or malignant mole being removed in either '93

4   or '96?

5       A    No.

6       Q    You don't recall any conversations like that

7   at all?

8       A    No, none.

9       Q    When we took Dr. Charlesworth's deposition,

10   he recalled a conversation between you and your husband

11   in which you were in his words sort of debating about

12   whether a mole that was removed sometime in the past

13   was cancerous.  Do you recall having any kind of

14   conversation like that with your husband in the

15   presence of Dr. Charlesworth?

16       A    No, no.

17       Q    Can you say for certain that that did not

18   occur or you just don't remember it?

19       A    I don't remember that.

20       Q    All right.  It might have occurred and you

21   just don't remember it?

22       A    I don't know.

23       Q    When is the first time, Mrs. Hall, that you

24   ever saw this document that we've marked as

25   Charlesworth 1?

30

```
 1       A     The first time?

 2       Q     Yes.

 3       A     Last year.

 4       Q     After this particular litigation started; is

 5    that fair?  This litigation started in July of 2001,

 6    the litigation against Cuna.

 7       A     I'm not sure.

 8       Q     Is it fair to say it was at some time in 2001

 9    or you're not even sure of that?

10       A     No, I'm not sure.

11       Q     Now, the other doctor that you attended the

12    initial visit with your husband was Dr. Cashdollar,

13    correct?

14       A     Yes.

15       Q     Did you fill out any kind of form at Dr.

16    Cashdollar's office indicating who you were and

17    providing any kind of medical history?

18       A     I don't remember doing that, no.

19       Q     Did you have any conversations with anybody

20    from Dr. Cashdollar's office including the doctor

21    himself about a history of a malignant or cancerous

22    mole or melanoma from back in 1993?

23       A     No.

24       Q     Do you know if your husband had any

25    conversations with the doctor about having a malignant
```

31

1  or cancerous mole or melanoma back in 1993?

2      A    No.

3      Q    And again, so we're clear about this, you

4  don't have a recollection one way or the other of these

5  discussions taking place; is that fair?

6      A    With Dr. Cashdollar?

7      Q    Correct.

8      A    We didn't have any discussions about that,

9  no.

10     Q    So you're sure that that did not happen?

11     A    That's right, yes.

12     Q    Let me show you, Mrs. Hall, what we've marked

13  in, I believe, also Dr. Charlesworth's deposition as

14  Charlesworth Exhibit 4.  That's the February 17, 1999

15  letter.  If you would, just take a moment and

16  familiarize yourself with that document.  I'm going to

17  ask you a number of questions about it including the

18  first one will be have you seen that before.

19         MR. PEDERSEN:  I'm going to put an objection

20  on the record.

21         THE VIDEOGRAPHER:  Off the record at 9:47.

22         MR. PEDERSEN:  And I object to the use of

23  this document; and so I don't provide information to

24  the deponent, let me just say that it's immaterial,

25  irrelevant and in light of the depositions which have

1   been taken to date a misuse of this document.

2          MR. KELLEY:  Okay.  We disagree.

3          THE WITNESS:  So am I supposed to look at

4   it?

5          MR. PEDERSEN:  Yes.

6          THE WITNESS:  Did I ever see this, is that

7   what you asked me?

8          MR. KELLEY:  Have you had a chance to review

9   that?

10          THE VIDEOGRAPHER:  We're off the record.

11   Mrs. Hall, I'd like you to -- those mics are very

12   sensitive.  Don't -- try not to play with the cord.

13   Could you -- could you -- could you move it up a little

14   bit?  Thank you.  All right.  One second.  That's a

15   little too high.

16          MR. PEDERSEN:  While we're still off the

17   record, let me just make a standing objection to the

18   use of this document so I don't have to interrupt the

19   flow of the deposition.

20          THE VIDEOGRAPHER:  Okay.  One second we'll be

21   back on.  Back on the record at 9:48.

22   BY MR. KELLEY:

23      Q    Mrs. Hall, if you would, just take your time,

24   review the document in its entirety; and then the first

25   question I have for you is have you seen that before.

33

1      A      No.

2      Q      Prior to today, you've never seen that

3  document before?

4      A      No.

5      Q      Is it consistent with your recollection, Mrs.

6  Hall, that your husband first saw Dr. Cashdollar on or

7  about February 17 of 1999?

8      A      No, I don't remember the dates.

9      Q      Could have been but you just don't recall?

10      A      Yeah.

11      Q      This is for the record a letter from Dr.

12  Cashdollar to Dr. Chicklo, and we've taken both Dr.

13  Chicklo and Dr. Cashdollar's depositions.  And they

14  have indicated that this letter was, in fact, sent by

15  Dr. Cashdollar and received by Dr. Chicklo; and I just

16  want to bring your attention to a couple of the lines

17  in here.

18          It's referring in the first line saying I had

19  the pleasure of seeing Tommy Hall on medical oncology

20  consultation on Wednesday 2/17/99.  You see that?  You

21  have to say yes or no.

22      A      Yes.

23      Q      And then it says as you are well aware, Mr.

24  Hall demonstrated a left in scapular dermal lesion in

25  1993.  Pathology revealed a malignant melanoma.  Do you

34

1   see that?

2       A    Yes.

3       Q    And down here further in the document about

4   midway through, it says PMH -- and doctors would say it

5   means past medical history -- is most notable for the

6   malignant melanoma.  Surgical resection in 1993.  Do

7   you see that?

8       A    Yes.

9       Q    As you sit here today, Mrs. Hall, do you have

10  any idea how Dr. Cashdollar obtained the information

11  that he sets forth in this letter that we just

12  discussed?

13      A    No.

14      Q    And so we're clear about this, you did not

15  provide any of that information to Dr. Cashdollar; is

16  that correct?

17      A    No.

18      Q    And as far as you know at least in your

19  presence, your husband didn't provide any of that

20  information; is that correct?

21      A    No.

22      Q    Is what I said correct?

23      A    Yes.

24      Q    As you sit here today, do you recall having

25  any conversation at all whether it was the first visit,

1    the second visit or any other visit after that with Dr.

2    Cashdollar about whether any moles on your husband's

3    body were malignant or cancerous?

4        A    No.

5        Q    Do you have any recollection of Dr.

6    Cashdollar discussing with you that a malignant or

7    cancerous mole may have been the primary site for the

8    melanoma that developed on your husband's neck?

9        A    I don't recall.

10       Q    Just so we're clear, that may have happened

11   and you don't remember?

12       A    It could have.  Maybe.

13       Q    Mrs. Hall, now, we've talked about when you

14   and your husband first found out that the lump on your

15   husband's neck was cancerous.  That was that February

16   11, 1999, correct?

17       A    I believe, yes.

18       Q    When was it that you first saw the -- the

19   lump on your husband's neck?

20       A    November or December of '98.

21       Q    November or December?

22       A    Yes.

23       Q    Can you be anymore specific in your time

24   frame in November or December?

25       A    No, he -- he just showed it to me.  No, I

36

1    don't remember exactly dates.

2        Q    Was he -- was there any particular event?

3    For instance, Thanksgiving is in November.  Was your

4    husband a hunter?

5        A    Yes.

6        Q    Hunting season, I believe, begins in -- in

7    November.  Is there any particular event that occurred

8    where you can say, well, we -- I first saw that lump

9    either before or after that particular event?

10       A    No, I can just say November or December,

11   somewhere in there.

12       Q    How is it you have that recollection that

13   it's November or December?  What causes you to remember

14   that?

15       A    It was going on Christmas.

16       Q    It was going on Christmas?

17       A    Yes.

18       Q    In your mind, is it possible that -- that you

19   first noticed the lump on your husband's neck prior to

20   Thanksgiving in November?

21       A    I never noticed the lump at all.

22       Q    Oh, you never did?

23       A    No.

24       Q    Well, that's -- and so we're clear about

25   this, that's what my question is -- is directed to is

37

1    your knowledge.

2        A    No.

3        Q    When did you first know your husband had --

4    when did you first see that your husband had this lump

5    on his neck?

6        A    Somewhere in November or December.

7        Q    Well, I'm -- I'm --

8        A    Okay.

9        Q    It's okay.  It's okay, and I want to make

10    sure that you're not confused by my questions.  Let's

11    go back to the landmark date.

12        A    Okay.

13        Q    All right.  February 11 of '99, that's when

14    you find out that the lump on his neck is cancerous,

15    right?

16        A    Somewhere in there, yes.

17        Q    Prior to that date, were you aware that your

18    husband had a lump on his neck at any time prior to

19    that date?

20        A    Yes, he told me about it.

21        Q    And your best recollection is that it was

22    back in November or December that you first learned

23    about the lump on his neck?

24        A    Yes.

25        Q    Do you know when he first detected, felt, saw

38

```
 1   in the mirror that he had this lump on his neck?
 2       A    No.
 3       Q    Was it sometime prior to him telling you
 4   about it?
 5       A    I don't know.
 6       Q    Do you know if you were the first one to
 7   notice it and said, hey, honey, there's this lump on
 8   your neck?
 9       A    I never noticed it until he told me.
10       Q    So he was the first one of the two of you to
11   notice it?
12       A    Yes.
13       Q    So he would have seen it prior to you but you
14   don't know how much prior to you?
15       A    No.
16            MR. KELLEY:  All right.  The application for
17   home mortgage protection insurance in this case was
18   signed November 18 of 1998.  I'll represent that to
19   you.  I'm sure your counsel will agree with that.  Is
20   that correct, Steve?
21            MR. PEDERSEN:  Yes.
22   BY MR. KELLEY:
23       Q    Do you have any recollection of signing the
24   mortgage documents on or about November 18 of 1998?
25       A    If that's when we were switching banks, yes.
```

39

1       Q    Well, tell me what happened there in terms of

2  why is it that you were going to a bank or a credit

3  union, I believe, to do anything with your mortgage.

4       A    Cheaper rates.

5       Q    Were you refinancing your mortgage?

6       A    Yes.

7       Q    Did you -- at the time you were refinancing

8  your mortgage, did you also purchase the life insurance

9  policy on the mortgage?

10      A    Yes.

11      Q    Were either you or your husband -- well,

12  let's break it down.  Were you aware as of the time of

13  that application which is November 18 of 1998 as to

14  whether or not your husband had a lump on his neck by

15  that time?

16      A    No.

17      Q    You were not aware of that?

18      A    No.

19      Q    And you're certain of that; is that right?

20      A    I just -- I don't remember.  You would have

21  to pinpoint me when hunting season was.  Then I could

22  tell you it was right there.

23      Q    Well, what relationship does hunting season

24  have to your knowledge about the lump?

25      A    Because I'm -- I'm remembering that that's

1   when he told me after hunting season.

2       Q    It was after hunting season?

3       A    Yeah, it was, yes.

4       Q    Where did your husband go to hunt?

5       A    You want the name of the mountain?  I don't

6   know the name of the mountain.

7       Q    Well, I'm from a little town that's famous

8   for hunting so I might recognize it.

9       A    I don't know the name of the mountain.

10  Mercersburg, Pennsylvania.

11      Q    It's in Mercersburg.  Did he go to the same

12  location every year to hunt?

13      A    Yes.

14      Q    Did he go with the same group of people?

15      A    Yes.

16      Q    Who did he go with, do you know?

17      A    My sister's husband.

18      Q    What's his name?

19      A    Leroy Mellott.

20      Q    Can you spell his last name?

21      A    M-e-l-l-o-t-t.

22      Q    Anybody else that he went with?

23      A    Daryl Yoder.

24      Q    Y-o-d-e-r?

25      A    Yes.

41

1     Q     Just keep going if you would, please.

2     A     I don't know Wolfy's name.

3     Q     Wolfy?

4     A     I just know him by Wolfy.  His last name is

5  Wolf.  That's all I know.  I don't know.  Pete would

6  know.  Leroy would know.  I'm sorry.

7     Q     Okay.  All right.  Anybody else that -- that

8  you know of that he went to --

9     A     No.  I didn't go.

10    Q     Okay.  Do you know where Leroy Mellott lives

11  now?

12    A     Yes.

13    Q     Where does he live?

14    A     You want the whole address?

15    Q     If you've got it.

16    A     It's 15040 Shimpstown --

17    Q     What is it?

18    A     S-h-i-m-p-s-t-o-w-n, Shimpstown Road.  It's

19  Mercersburg.

20    Q     How about Daniel Yoder?

21    A     Daryl Yoder.

22    Q     Excuse me, Daryl.

23    A     Yeah, it's --

24    Q     I can't read my own writing over here.

25    A     It's Lincolnway East.

42

1    Q    In what town?

2    A    Chambersburg.  You'll find him at DJ Repair

3 Center.

4    Q    What's he do there?

5    A    He owns it.  He's a mechanic.

6    Q    How about Wolfy, do you know at least where

7 he lives?

8    A    Mercersburg.

9    Q    He's from Mercersburg?

10    A    Yes.

11    Q    Mrs. Hall, let me show you a document.  If

12 you would just ignore my highlighting on this.  For the

13 record, it's -- it has P0917, Plaintiff's designation

14 at the bottom; and it's a document dated February 17,

15 1999 with Falling Spring Medical Associates at the top

16 of it.  I want to ask you if you've seen that document

17 before and can you identify the handwriting on this

18 document for us.

19    A    No, I never saw this before.

20    Q    Do you know whose handwriting that is?

21    A    No.

22    Q    Can you state that that is not your

23 handwriting?

24    A    It's not mine.

25    Q    Can you state that it's not your husband's

43

1   handwriting?

2       A    It looks like his.

3       Q    Is that his signature at the bottom of the

4   document?

5       A    Yes.

6           MR. KELLEY:  Why don't we identify that as

7   Mrs. Hall Deposition Exhibit No. 1, and I'll get a

8   clean copy to attach to the record.

9           (Patient Information Form dated February 17,

10  1999, one page, produced and marked Mrs. Hall Exhibit

11  No. 1.)

12  BY MR. KELLEY:

13      Q    And Mrs. Hall, I want to show you a document

14  that has Plaintiff's designation P0918 at the bottom

15  right-hand corner.  It's date -- it has a date of

16  2/17/99.  It has some handwritten information on

17  there.  Again, please just ignore my highlighting of

18  it.  And it says here in PMH, malignant mole on back

19  '93.  Do you see that?

20      A    Yes.

21      Q    Do you recognize that handwriting at all?

22      A    No.

23      Q    Can you state that that's not your

24  handwriting?

25      A    It's not mine, no.

44

1     Q    Can you state that's not your husband's

2 handwriting?

3     A    It's not his.

4     Q    And the same -- same thing down here under

5 surgery, malignant mole excised from back in 1993.  Do

6 you see that?

7     A    Yes.

8     Q    Is that your handwriting?

9     A    No.

10     Q    Is that your husband's handwriting?

11     A    No.

12     Q    Down here under it says FH -- I'm not sure

13 what that means -- it might mean family history -- it

14 has mother, 62, and healthy.  Do you know how old Mr.

15 Hall's mother was back in 1999?

16     A    No.

17     Q    Would she have been about 62?

18     A    I don't know.

19     Q    Mr. Hall's father, at some point in time, was

20 he diagnosed with skin cancer?

21     A    On his nose, yes.

22     Q    And this record indicates skin cancer.  Do

23 you see that?

24     A    Yes.

25     Q    Is that your handwriting?

1    A    No.

2    Q    Is that your husband's handwriting?

3    A    No.

4    Q    Does your husband have any brothers?

5    A    Yes.

6    Q    Okay.  Back three years ago, would he have

7  been about 42?

8    A    Yes.

9    Q    Does your -- did your husband have a sister?

10    A    Yes.

11    Q    And it says half sister about 17 years of age

12  at that time.  Is that consistent?

13    A    No.

14    Q    Does he have someone that he referred to as a

15  half sister?

16    A    Yes.

17    Q    What's her name?

18    A    Violet.

19    Q    How old is she?

20    A    She's -- she'll be 21.

21    Q    Okay.  So she may have been 18 back then?

22    A    Yes, yes.

23    Q    Did your husband have any other family

24  members, mother, father, brothers or sisters?

25    A    No.

46

1      Q      Okay.

2      A      You mean his daughter?

3      Q      Well, no, just of mother, father, brother or

4   sister.  Did he have any other?

5      A      No.

6      Q      Not any other mother or father but any other

7   brother or sister.

8      A      No.

9              MR. KELLEY:  Let's mark that for the record

10  as Hall -- Mrs. Hall Exhibit 2.  Again, I'll get a

11  clean copy of that for the record.

12             (Patient Information Form dated February 17,

13  1999, one page, produced and marked Mrs. Hall Exhibit

14  No. 2.)

15  BY MR. KELLEY:

16     Q      We'll take a break in a little bit, okay?

17     A      No, that's okay.

18     Q      This is a document for the record with the

19  Falling Spring Medical Associates at the top, has

20  2/23/99 at the bottom.  And is that your husband's

21  signature at the bottom of that document?

22     A      Yes.

23     Q      Sorry.  I had it crooked for you.  Are you

24  sure of that?

25     A      Yes, I'm just wondering why the II is gone.

47

1     The II is not there.

2          Q     Your husband usually signed his name with

3     a --

4          A     Yes.

5          Q     -- II behind it?

6          A     Yes.

7          Q     Other than the II, does that look like his

8     handwriting?

9          A     Yes.

10         Q     Now, the -- on this particular form, it says

11    new patient information record, patient information.

12    Is that your husband's writing in the -- in the block

13    at the top of that document?

14         A     I don't know.

15         Q     You're not sure?

16         A     No, I'm not sure.

17         Q     Could be but you're not sure?

18         A     I'm not sure.

19         Q     And just -- just so we're clear, you're not

20    saying you know for sure that's not his, you just don't

21    recognize it?

22         A     I don't recognize it, no.

23               MR. KELLEY:  Let's mark that as Mrs. Hall 3.

24               MR. YOUNG:  And that's P0919.

25               (New Patient Information Record dated

1  February 23, 1999, one page, produced and marked Mrs.

2  Hall Exhibit No. 3.)

3  BY MR. KELLEY:

4       Q    Thank you, Chuck.  Let me see this again, all

5  of them.  Let me show you another document here.  It

6  has at the bottom P020 and is a medical record of some

7  kind, has a referring physician of Cashdollar at the

8  top and indicates surgery spinal times two -- I believe

9  that means two surgeries -- in '89 and '93.  That is

10  correct, that's when your husband had the surgeries on

11  his back?

12       A    I believe so.

13       Q    And was it a ruptured disc that he suffered

14  from back then?

15       A    Yes.

16       Q    And then it has mole -- excuse me -- MAL

17  period which I believe stands for malignant mole

18  excised '93.  Do you see that?

19       A    Yes.

20       Q    And then it has EXC period BX deep cervical

21  node 1/22/99.

22       A    Yes.

23       Q    Do you see that?  And has occupation truck

24  driver.  Your husband was a truck driver at the time

25  that he became ill, isn't that correct?

49

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Was he a smoker? |
| 3 | A | Yes. |
| 4 | Q | And it says two PPD.  Is that two packs per |
| 5 | day? | |
| 6 | A | Yes. |
| 7 | Q | Is that consistent with the amount of |
| 8 | cigarettes that he smoked? | |
| 9 | A | Only on the road. |
| 10 | Q | Only on the road, not at home? |
| 11 | A | No, not at home. |
| 12 | Q | Did you not permit him to smoke at home? |
| 13 | A | Oh, yeah, yes. |
| 14 | Q | His cigarette consumption decreased when he |
| 15 | was at home; is that right? | |
| 16 | A | Yes. |
| 17 | Q | And he did not consume alcohol; is that |
| 18 | correct? | |
| 19 | A | No. |
| 20 | Q | Is what I said correct? |
| 21 | A | Yes, that is correct. |
| 22 | Q | Caffeine, coffee, five cups a day.  Is that |
| 23 | consistent with his coffee drinking habit? | |
| 24 | A | Not at home. |
| 25 | Q | Not at home? |

50

1    A    No.

2    Q    You don't know about it on the road?

3    A    No, hu-huh, I wouldn't know on the road.

4    Q    All right.  And it indicates he's married and

5    one child.

6    A    Yes.

7    Q    Did the two of you have one child?

8    A    No.

9    Q    Do you know what the one child refers to?

10    A    Megan, his daughter.

11    Q    His daughter?

12    A    Previous marriage.

13    Q    And then again it has FH which I believe is

14    family history, a mother, father, brother and sister.

15    You see that?

16    A    Yes.

17    Q    All right.  Is any of the writing on this

18    piece of paper that we're looking at here your writing?

19    A    No.

20    Q    Is it your husband's writing?

21    A    No.

22    Q    You're sure of that with regard to both?

23    A    As sure as I can be.

24        MR. KELLEY:  Let's mark that as Mrs. Hall

25    Deposition Exhibit -- what's the next one -- 4.

51

```
 1              (Patient Information Form dated February 23,

 2    1999, one page, produced and marked Mrs. Hall Exhibit

 3    No. 4.)

 4              MR. PEDERSEN:  Mike, we've been going for

 5    about an hour.  And at an appropriate time in your

 6    questioning, can we take a break?

 7              MR. KELLEY:  Now is fine.  Why don't you go

 8    ahead and take a five minute break?

 9              MR. PEDERSEN:  Let's take a five minute

10    break.

11              THE VIDEOGRAPHER:  Off the record at 10:13.

12              (Break taken.)

13              THE VIDEOGRAPHER:  Back on the record at

14    10:19.

15    BY MR. KELLEY:

16         Q    Mrs. Hall, at some point, I believe you were

17    advised that the mole that was removed from your

18    husband's back from 1993 was reevaluated by the

19    National Institute of Health.  Are you familiar with

20    that?

21         A    Yes.

22         Q    Are you familiar with the fact that -- that

23    on their reevaluation of that slide that the mole was

24    found to be cancerous?

25         A    At that time, yes.
```

52

1    Q    When was that that you found out about the

2    mole being cancerous?

3    A    I don't remember the dates or even the month.

4    MR. KELLEY:  Okay.  Steve, my records

5    indicate that it was on or about August 11 of '99 that

6    the pathology report was dated of the re-review of the

7    slide.  Is that consistent with your recollection of

8    it?

9    MR. PEDERSEN:  I don't have the records in

10   front of me, but I don't have anything to refute that

11   in front of me.  It's fine if you ask her questions

12   about that date if she remembers.  It's in the time

13   frame, however, that I'm familiar with

14   MR. KELLEY:  Yeah, I didn't bring that record

15   with me.  I just have the summary of when it occurred.

16   Can we agree that it was -- it was in the Summer of

17   1999?

18   MR. PEDERSEN:  Yes.

19   BY MR. KELLEY:

20   Q    Now, Mrs. Hall, with that understanding from

21   your counsel that the re-review of the pathology slide

22   or of the -- bad question.  Let me start again.  With

23   the understanding that your counsel agrees that the

24   re-review of the slide of the mole that was removed

25   from your husband's back in '93 took place sometime in

1    the Summer of 1999 -- okay, you with me so far?

2        A    Yes.

3        Q    Your husband saw a number of doctors in the

4    latter part of 1998 and the earlier part of 1999 before

5    the re-review of that slide.  Could you just accept

6    that as a premise for right now?  And I believe

7    those -- there are several records at least which

8    indicate in the -- in the patient medical history that

9    your husband had a history of a malignant or cancerous

10    mole back in either '93 or '96.  Again, just accepting

11    that for a moment.

12            If those things are true, do you have any

13    idea how the history of a malignant mole got into those

14    medical records?

15        A    No.

16        Q    But you can state that you didn't provide any

17    of that history to any of those physicians, correct?

18        A    No.  Yes.

19        Q    And can you state with certainty that your

20    husband did not do that in your presence?

21        A    Yes.

22        Q    Do you know if your husband gave that history

23    outside of your presence?

24        A    No.

25        Q    You don't know one way or the other?

54

1      A   No.

2      Q   The date that you found out about the lump on

3 your husband's neck being a metastatic melanoma which,

4 I believe, you said was about February 11 of '99, how

5 did you find out about that?

6      A   I was at my doctor's office.  I'm -- I'm not

7 sure if that's even the month frame now.  I mean it

8 could have been February 11th.  It might have been

9 March 11th.  Now, I'm not sure.  But I had a doctor

10 appointment, and he told me.  And when I got home, my

11 husband said Dr. Chicklo told him on the phone.

12      Q   And what was the name of the doctor that you

13 were visiting?

14      A   Dr. Charlesworth.

15      Q   Dr. Charlesworth?

16      A   Yes.

17      Q   So you were there for a visit with Dr.

18 Charlesworth.  What was the nature -- why were you

19 there to visit with Dr. Charlesworth?

20      A   I don't remember.

21      Q   And your husband was visiting with Dr.

22 Chicklo; is that right?

23      A   No, he was at home.

24      Q   Oh, he was at home.

25      A   Yes.

1      Q     And so Dr. Cash -- Cashdollar --

2   Charlesworth -- I'm sorry.  Getting my Cashdollars and

3   my Charlesworths mixed up.  I apologize.  So Dr.

4   Charlesworth and Dr. Chicklo were having a conversation

5   on the telephone?

6      A     No, Dr. Charlesworth told me in his office

7   when I was there for my office visit that it was cancer

8   or something; and Dr. Chicklo was on the phone with

9   Tommy at home.  Dr. Chicklo from his office.  My

10   husband was at home.

11      Q     Okay.  Do you know if this was sometime after

12   the initial visit with Dr. Chicklo that Dr. Chicklo had

13   that conversation with your husband?

14      A     It would have had to have been, yes.

15      Q     What did Dr. Cashdollar tell you about the

16   melanoma at that time?

17           MR. PEDERSEN:  Dr. Charlesworth, I believe.

18   BY MR. KELLEY:

19      Q     Excuse me.  I apologize.  I keep doing.  What

20   did Dr. Charlesworth tell you about the cancer at that

21   time?

22      A     Well, he didn't want to tell me; but I told

23   him my husband told me he was supposed to tell me.  And

24   he told me that it was cancer and he wanted to see us

25   both in the office and he wanted me to go home and

1  pretend that he didn't tell me that so -- until I

2  brought Tommy over for him to talk to.  I made the

3  appointment; and we canceled it because when I got

4  home, Dr. Chicklo had already told my husband on the

5  phone.

6      Q    Do you remember the substance, the specifics

7  of anything that Dr. Charlesworth told you about on

8  that day?

9      A    I believe he said something in the line of

10 maybe two years.

11     Q    In terms of how long your husband would have

12 to live?

13     A    Yes, maybe two years.

14     Q    Do you remember anything else about the

15 conversation?

16     A    We talked about an RV.

17     Q    Why?

18     A    Because my husband and I were planning on

19 traveling that summer after his daughter was out of

20 high school and now we couldn't do that.

21     Q    Did Dr. Charlesworth discuss with you the

22 type of cancer that it was?

23     A    I don't remember.

24     Q    Did he discuss with you whether the type of

25 cancer that he had was -- was a primary site or a

57

1    secondary site?

2        A    No, I don't remember that.

3        Q    When you got home and talked to your husband,

4    what did he tell you about in terms of the type of

5    cancer or any information that Dr. Chicklo provided to

6    him?

7        A    I don't remember at the time.

8        Q    It's okay.

9        A    I just remember we both cried.  That's all I

10   remember, but I don't think he went into any length

11   about what it was.  I told him that I didn't know

12   anything; and he said, well, that's okay, Dr. Chicklo

13   told me.  So I still lied to him and said I didn't

14   know; but he found out and wanted me -- and then he

15   told me.  So I said, okay, and then I told him that Dr.

16   Charlesworth wanted me to keep it to myself until we

17   went to his office on Saturday.

18       Q    But you ended up cancelling that appointment?

19       A    Yes.

20       Q    Mrs. Hall, I want to move on to another

21   area.

22       A    Okay.

23       Q    You okay?  You ready to continue?

24       A    Yes, let's go.

25       Q    Let me show you what I believe has been

1    marked in several other depositions as the Members Home

2    Mortgage Protection Application.  Would you just take a

3    moment and look at that?

4        A    Yes.

5        Q    That's a copy of it obviously.  Have you seen

6    that application before?

7        A    Yes.

8        Q    Were you with your husband at the time that

9    application was filled out?

10       A    Yes.

11       Q    Where did you fill it out?

12       A    At the bank.

13       Q    Can you identify what writing is yours, if

14   any of the writing is yours on that document?

15       A    My second insured.  This is the stuff here.

16       Q    All right.  Signature?

17       A    Just this is mine.

18       Q    Just the signature and the date?

19       A    Yes, and this here.  That's it then.

20       Q    Well, can you read off what it is that it

21   says there that's in your handwriting?

22       A    It says the date last payment was made

23   January 1, 1999.  Monthly payment amount.  I can't even

24   read that.  It's scratched through.  Total monthly

25   mortgage payment was 363.21.  The APR was 6.75.  The

1    loan effective date was January, 1999.

2        Q    Are you just reading the things that you

3    actually wrote in there?

4        A    Yeah, and I don't -- closed November 18, '98;

5    and is this application for replacement and is circled

6    replacement or -- I can't read that part -- amend --

7    okay -- amend an existing group mortgage insurance

8    certificate.  Yes is checkmarked, and that was it for

9    my writing.

10        Q    Is any of the writing on here your husband's

11    writing?

12        A    Yes.

13        Q    Would you identify that, please?

14        A    Here and the signature right there.

15        Q    So all of the information in Block A?

16        A    Yes.

17        Q    Including the information about you?

18        A    No, I believe I did that.

19        Q    So his background information is in his

20    handwriting?

21        A    Yes.

22        Q    Your background information is in your

23    handwriting?

24        A    I believe, yes.

25        Q    And then you've also signed the application;

60

1   is that correct?

2        A    Yes.

3        Q    And your husband signed it, correct?

4        A    Yes.

5        Q    Now, I note in here that it requests single

6   life coverage.  Do you see that?

7        A    Yes.

8        Q    Do you know why it is single as opposed to

9   joint coverage that you requested?

10       A    I wasn't working and we just felt it wasn't

11  necessary.

12       Q    Why is that?

13       A    Why isn't it necessary or why wasn't I

14  working?

15       Q    Why is it that you didn't feel it was

16  necessary because you weren't working?

17       A    Well, because we always felt if he went -- if

18  I went first then he would still continue to work

19  anyway.

20       Q    And be able to make the mortgage payments on

21  his own?

22       A    Yes, yes.

23       Q    So this policy was designed just to protect

24  you in that sense in the event your husband died; is

25  that right?

61

```
 1        A    Yes, yes.

 2        Q    Now, there are several questions on here; and

 3   I apologize.  This is maybe not the best copy that we

 4   have.  But in Section B, there are a number of

 5   questions that you're asked as the applicant.  Do you

 6   see those?

 7        A    Yes.

 8        Q    And you've seen this document before,

 9   correct?

10        A    Yes.

11        Q    Did you review this document prior to your

12   deposition?

13        A    Not in -- thoroughly.  Not thoroughly, no.

14        Q    With regard to Question No. 1, I'll just --

15   I'll read it for the record here.

16        A    Okay.

17        Q    It says have you ever been treated for or

18   diagnosed by a member of the medical profession as

19   having any of the following, and then it has in

20   parentheses please check the box and circle condition

21   or conditions that apply.

22             And the conditions are diabetes, high blood

23   pressure, chest pain, heart, blood, blood vessel, lung

24   or breathing disorders, cancer, epilepsy, stroke,

25   pneumonias, arthritis, brain, mental, nervous, back,
```

62

```
 1   neck, joint or muscular disorders, stomach, intestines,

 2   liver, pancreas or kidney disorders, cirrhosis, drug or

 3   alcohol abuse, Acquired Immune Deficiency Syndrome or

 4   AIDS related complex or tested positive for antibodies

 5   to the AIDS virus.

 6            Did you and your husband read that particular

 7   section of the application at the time the application

 8   was made?

 9        A    Yes.

10        Q    Did you check off the boxes?

11        A    Yes.

12        Q    Did each of you check off the boxes that

13   applied to -- to each of you or did one of you check

14   off the boxes for both?

15        A    I don't know if we both did or just one.

16        Q    In response to that first question, you both

17   indicated no --

18        A    Yes.

19        Q    -- is that right?  And you understood that

20   you were indicating no, that neither of you had any of

21   the ailments which I just recited, isn't that correct?

22        A    Yes.

23        Q    And down here by your signature -- in fact,

24   under Section D -- did you read the preliminary

25   language here prior to your signature before you signed
```

63

1   it?

2       A    Probably.

3       Q    Okay.  As you just sit here today, you don't

4   have a specific recollection?

5       A    No.

6       Q    It says down here these answers are true and

7   correct to the best of my knowledge and belief.

8       A    Yes, it says that.

9       Q    Do you remember reading at least that part of

10  it?

11      A    No, I don't remember.

12      Q    Did you understand that the information that

13  you put on here needed to be accurate?

14      A    Yes.

15      Q    And is the information accurate that neither

16  you nor your husband had any of those conditions that

17  are identified here that I just recited for the record?

18      A    Yes.

19      Q    And I notice in here it references back

20  disorders.  You see that?

21      A    Yes.

22      Q    Prior to the date of this application, did

23  your husband have any back disorders?

24      A    No.

25      Q    I thought I saw in the medical records that

64

1   your husband had a ruptured disc back in 1989 and

2   1993.

3        A    Back surgery, yes.

4        Q    Back surgery.  Do you not consider that to be

5   a back disorder?

6        A    No.

7        Q    Why not?

8        A    Because of how it happened.  I just feel it

9   was an accident.

10       Q    So you didn't consider that to be a back

11  disorder?

12       A    No.

13       Q    What did you understand back disorder to

14  mean?

15       A    Like spina bifida or scoliosis or something

16  like that.

17       Q    So is it your testimony today that you did

18  not understand back disorder to include surgery for

19  ruptured discs?

20       A    No.  Yes, yes.

21       Q    You want me to ask that again?  Is it your

22  testimony today that at the time you filled out this

23  application that you did not understand back disorders

24  to include conditions such as surgery for ruptured

25  discs?

65

```
 1        A     Yes.

 2        Q     And were you truthful when each of you stated

 3   on November 18 of 1998 when you indicated in this

 4   application that neither of you had had -- had ever

 5   been treated or diagnosed by a member of the medical

 6   profession with cancer?

 7        A     Yes.

 8        Q     Now, you were refinancing your mortgage,

 9   correct?

10        A     Yes.

11        Q     And that was on your home at it says 517 Mt.

12   Pleasant Road, Fayetteville, Pennsylvania; is that

13   correct?

14        A     Yes.

15        Q     What type of home was located there?

16        A     It was considered -- it was a ranch.

17        Q     It was a ranch home?

18        A     Yeah.

19        Q     Do you know how many square feet it was?

20        A     Seventeen hundred.

21              THE COURT REPORTER:  Could you repeat that?

22              THE WITNESS:  Seventeen hundred.

23   BY MR. KELLEY:

24        Q     How many bedrooms did it have?

25        A     Four.
```

1     Q    How old was the home?

2     A    Eight years old.

3     Q    When did you and your husband purchase that

4 home?

5     A    I don't remember.

6     Q    Can you estimate for us in relationship to

7 when you were applying for the refinancing?

8     A    It was before we bought the -- we refinanced

9 after we bought the home.  After we bought it, yes.

10    Q    Can you give me any time frame at all?  Was

11 it a year or two years or five years later that you

12 were doing the refinancing after you originally

13 purchased it?

14    A    No, I believe it was a year at the most.

15    Q    Okay.  What caused you to go in and

16 refinance?

17    A    Interest rates.

18    Q    Do you remember what the interest rate was on

19 the original mortgage?

20    A    No.

21    Q    Was it significantly higher than the 6.75

22 percent?

23    A    I don't remember.

24    Q    Were you and your husband the original

25 purchasers of the home?

67

| 1 | A | What do you mean? |
|---|---|---|

1    A    What do you mean?

2    Q    Did you buy it when it was brand new?

3    A    No.

4    Q    It was owned by somebody else prior to you?

5    A    Yes.

6    Q    Who owned it prior to you?

7    A    Oh, my gosh.  Brookens.

8    Q    Do you remember their full name?

9    A    No.  Tony.

10    Q    Tony Brookens.

11    A    I think it's Tony.

12    Q    What was the total purchase price of the home

13 when you and your husband purchased it?

14    A    Seventy-nine thousand.

15    Q    And I'm assuming that you and your husband

16 purchased it.  Is that true?

17    A    Yes.

18    Q    You were both on the mortgage for that home?

19    A    Yes.

20    Q    Did it come with a certain amount of acreage

21 with it?

22    A    Less than a half.

23    Q    Less than half an acre?

24    A    Yeah.

25    Q    Did you have a garage?

68

```
1        A    Yes.

2        Q    Two car garage?

3        A    Plus.

4        Q    Two plus garage.  What type of heat did it

5   have?

6        A    The garage?  The garage?

7        Q    No.  What type heat did the home have?

8        A    I was going to say the garage didn't have

9   any.  Kerosene, fuel.

10       Q    Did it have air conditioning?

11       A    Central air.

12       Q    Did it have a basement?

13       A    No.

14       Q    How many total rooms did it have?

15       A    Are we counting the bathrooms too?

16       Q    Sure.

17       A    Three, seven, eight, nine, ten.  Ten.

18       Q    Ten rooms.  And how many of those rooms are

19  bathrooms?

20       A    Two and a half.

21       Q    And you would have purchased this home

22  originally in approximately 1997 sometime?

23       A    '97 or '96.  I'm not sure of the year.

24       Q    1996, 1997.  Do you remember what time of

25  year it was?  Was it any particular season or anything
```

```
 1   like that that jogs your memory?

 2        A     It was summertime.

 3        Q     Summertime.

 4        A     Yeah.

 5        Q     Did you go through a particular realty

 6   company in order to purchase the home?  What realty

 7   company?

 8        A     Prudential.

 9        Q     Do you remember your realtor's name?

10        A     Yes.

11        Q     Who is it?

12        A     Helen Myers.

13        Q     Where did you live prior to you and your

14   husband purchasing this home?

15        A     Sixteen Twenty-Eight Newcomer Road.

16        Q     What town was that?

17        A     Chambersburg.

18        Q     And what type of home was that?

19        A     It was a trailer, mobile home.

20        Q     Was that the first home that you and your

21   husband lived in?

22        A     Together, yes.

23        Q     That's what I meant.  Okay.  How old was the

24   mobile home trailer?

25        A     Five.
```

70

1    Q    Five years.  Five years old when you moved

2    out?

3    A    Yes.

4    Q    Okay.  Did you buy the mobile home new?

5    A    Yes.

6    Q    How much was the mobile home?

7    A    Twenty-one thousand.

8    Q    Do you remember the size of the home?

9    A    Fourteen by sixty.

10   Q    When you purchased the home on Lafayette

11   Road --

12   A    Where?

13   Q    Is it Lafayette?

14   A    No, Mt. Pleasant.

15   Q    Oh, I'm sorry.  On Mt. Pleasant Road.  Excuse

16   me.  When you purchased the home on Mt. Pleasant Road,

17   do you remember how much the mortgage payments were for

18   that?

19   A    No.

20   Q    Is that the figure that's listed on the

21   application or is that some other figure?

22   A    That was probably going to be the new

23   mortgage payment on it.

24   Q    And you don't remember what the old mortgage

25   payment was?

71

```
1       A    No.

2       Q    How long did you take out the loan, for what

3  period of time?

4       A    I don't remember that either.

5       Q    Do you know if it was 20 or 15 or 30 years?

6       A    No, I don't remember.

7       Q    Would you describe for me, Mrs. Hall, what

8  happened while you were refinancing your home that

9  caused you and your husband to purchase this life

10 insurance policy?  Did somebody present that option to

11 you, explain it to you?  What happened?

12      A    No, we always had mortgage insurance.

13      Q    Okay.  So you'd had mortgage insurance in the

14 past?

15      A    Yes.

16      Q    Do you know what company through -- through

17 whom you had mortgage insurance in the past?

18      A    No, just the bank.

19      Q    When you say the bank, are you talking

20 about -- well, what are you talking about when you say

21 the bank?

22      A    I remember the bank's name.  I don't remember

23 the mortgage name.

24      Q    What's the bank's name?

25      A    It was Chambersburg Trust Company.  It's now
```

72

1   M & T.

2       Q    So that's who you had your original mortgage

3   through?

4       A    Yes, not M & T though.

5       Q    I know.  I understand.  That's -- that's --

6   you're checking on my -- my notetaking over here to

7   make sure I'm accurate.  That's good.  I understand

8   it's M & T now.  It used to be Chambersburg.  And then

9   when you refinanced, you went through Patriot Federal

10  Credit Union; is that correct?

11      A    Yes.

12      Q    How did you -- how did you come to Federal

13  Patriot?

14      A    Lower rates.

15      Q    Were you a member of that credit union?

16      A    No, you had to become a member first.

17      Q    Did somebody suggest to you that you go to

18  the credit union?

19      A    No.

20      Q    You read about it in the newspaper?

21      A    Yeah, you read the rates in the paper.

22      Q    And did you pick up the phone and called

23  somebody at the credit union and found out that they

24  had a lower rate and you went in to talk to them?

25      A    Yes.

73

1      Q     Do you remember who it was that you talked
2  to?

3      A     No.

4      Q     Was it a man or a woman?

5      A     I don't remember.  It's a come as you come in
6  the door.

7      Q     Did the same person who provided you with the
8  refinancing for your mortgage also talk to you about
9  and provide you with the paperwork for the Members Home
10 Mortgage Protection Plan?

11     A     I don't -- at the time, it might have been.
12 I don't know.  I don't remember that.

13     Q     Okay.  Do you recall the substance of any
14 conversation that the person who sold you this policy
15 had with you about it and what it covered?

16     A     No.

17     Q     What was your understanding as to what this
18 policy would cover?

19     A     I understood that if he died that it would
20 cover what was left on the mortgage.

21     Q     Did the person who sold you this policy then
22 provide you with any kind of, you know, brochures or
23 any kind of glossy publications or anything like that
24 explaining what the policy was?

25     A     I don't remember.

74

1     Q    Did they provide you with any information

2  about the terms and conditions of the policy?

3     A    I don't remember.

4     Q    Other than filling out this application and

5  sending it in, okay, did you at any time before your

6  husband passed away did you receive any other piece of

7  paper either from the credit union regarding the life

8  insurance or from Cuna Mutual about the life insurance?

9     A    I don't remember.

10     Q    So you don't even know if you received a copy

11  of a policy, for instance?

12     A    No, I don't remember.

13     Q    You could have but you don't recall?

14     A    No, I don't recall.

15     Q    So when you and your husband went to the

16  credit union, did you have to fill out an application

17  to become a member of the credit union as well?

18     A    You had to open up a savings account.

19     Q    Do you know if you had to become a member of

20  the credit union?

21     A    That's how you became a member of the credit

22  union.

23     Q    By -- by opening up the savings account?

24     A    Yes.

25     Q    Do you know what the eligibility requirements

1    were in order to become a member of the credit union?

2        A    At that time, I believe you had to have

3    family or knew somebody or be a government worker at

4    that time, I believe, yes.

5        Q    And what was your connection to having a

6    family member or knowing somebody who was a government

7    worker?

8        A    His ex-wife.

9        Q    His ex-wife was what?

10       A    She works at Letterkenny Army Depot.

11            THE COURT REPORTER:    Excuse me?

12            THE WITNESS:  She works at Letterkenny Army

13   Depot.

14            MR. KELLEY:  Can we just go off the record

15   for a second?

16            THE VIDEOGRAPHER:  Off the record at 10:53.

17            (Discussion held off the record.)

18            THE VIDEOGRAPHER:  Back on the record at

19   10:54.

20   BY MR. KELLEY:

21       Q    Mrs. Hall, on the applicant for insurance, is

22   there a question on there that asks have you used

23   tobacco in any form within the past 24 months?  You see

24   that under No. 3?

25       A    Yes.

76

1     Q     And for Borrower No. 1, that was your

2   husband, correct?

3     A     Yes.

4     Q     It indicated -- there was no indication about

5   that; is that correct?

6     A     It's blank for some reason.

7     Q     Okay.  Do you know why that was left blank?

8     A     No.

9     Q     Do you remember receiving any request from

10  Cuna Mutual to fill out that particular portion of the

11  policy?

12    A     I don't remember.

13    Q     Let me show you a document dated December 1,

14  1998 addressed to Mr. Hall.  Back in December of '98,

15  is that your address at the time?

16    A     Yes.

17    Q     Just take a moment and review that.

18    A     Yes.

19    Q     Do you recall receiving that document?

20    A     No.

21    Q     Okay.  It indicates on here that your husband

22  looks like updated the information.  Is that your

23  husband's signature?

24    A     Yes.

25    Q     And it updated the information to say, yes,

77

1    that he has used tobacco in the past 24 months?

2        A    Yes.

3            MR. KELLEY:  Let me show you a document which

4    we'll mark as Hall Deposition Exhibit 5.

5            (Insurance Policy, thirty-one pages, produced

6    and marked Mrs. Hall Exhibit No. 5.)

7    BY MR. KELLEY:

8        Q    The front of the document is just a

9    certificate from Cuna Mutual that this is the actual

10   policy that applied to your situation.  And on the

11   front of this -- the actual policy information -- it

12   says coverage schedule, group mortgage insurance,

13   decreasing term life, has the policy holder as Patriot

14   Federal Credit Union and the insured or debtor being

15   Tommy B. Hall.  Is that your correct address right in

16   there?

17       A    Yes.

18       Q    And his date of birth, is that accurate?

19       A    Yes.

20       Q    Okay.  And then the initial amount of the

21   life insurance was $55,951.79, is that accurate?

22       A    Yes.

23       Q    Did you ever receive this piece of paper from

24   Cuna Mutual?

25       A    Yes.

78

1      Q      And why don't you take a moment and review

2  the policy here and let me know if you received just

3  the policy documents.   I think there's some other

4  documents attached to it.

5      A      Yes, we received these.

6      Q      Okay.  Was it some time after filling out the

7  application you received that in the mail?

8      A      It would have had to have been, but I don't

9  remember when.

10     Q      What did you do with it after you received

11 it?

12     A      Probably stuck it in a file.

13     Q      Did you look at it before you stuck it in the

14 file?

15     A      I always looked at these -- the -- how the

16 benefit premium would go down as the policy -- as the

17 loan was paid off.  Yes, I would look at those.

18     Q      It actually has a schedule on there for each

19 month and each year of the amount of benefits that

20 would be paid if Mr. Hall -- if your husband passed

21 away at that given moment; is that right?

22     A      That's right.

23     Q      And you reviewed that prior to putting it

24 away in the file?

25     A      Yes.

1     Q   Did you look at anything else?  That's my

2  highlighting on the page.

3     A   If I read them, I wouldn't remember it.

4     Q   Okay.  Other than filling out the mortgage

5  application -- excuse me -- the life insurance

6  application which we've already talked about and then

7  receiving a copy of a policy that looked like this or

8  similar to this --

9     A   Yes.

10     Q   -- did you receive or fill out anything else

11  with regard to that life insurance policy?

12     A   I don't remember.

13     MR. PEDERSEN:  I would like to clarify the

14  Exhibit 5 was included and are we going to -- because

15  you had other documents attached to that.

16     MR. KELLEY:  Yeah, let me make sure we take

17  that out.  Actually, it just looks like it's another

18  copy of it.  Let's -- let's identify Exhibit 5 as the

19  document containing numbers -- the designation D12

20  through D32.  I believe that's the end of the policy,

21  Steve; and for some reason, it has a copy of the notice

22  letter denying the claim in there as well.  Excluding

23  that which is D22.

24  BY MR. KELLEY:

25     Q   Now, prior to your husband passing away,

1    after you found out that your husband had cancer and

2    after it became apparent that he was not going to

3    survive, did you and your husband make any plans for

4    attending to your financial matters?

5        A    We talked about selling the house right away.

6        Q    What else did you talk about?

7        A    He was just worried about what was going to

8    happen to me when he was gone.

9        Q    Did your husband have health insurance that

10   covered the cost and expense of treating his cancer?

11       A    Not totally.

12       Q    Did he have coverage for some of it?

13       A    Yes.

14       Q    That was with Blue Cross/Blue Shield?

15       A    Yes.

16       Q    That was through his employer, Cressler

17   Trucking?

18       A    Yes.

19       Q    Throughout the entire time that your husband

20   was treated for cancer, do you know how much was not

21   covered by insurance?

22       A    No.

23       Q    Was it about $2,000?

24       A    I don't remember.

25       Q    Okay.  Don't remember.  Does that at least

81

1    sound about right or you have no idea?

2        A    I have no idea.

3        Q    Were the bills paid off that were not covered

4   by health insurance?

5        A    Yes.

6        Q    How did you pay those off?

7        A    We paid as they came in.

8        Q    Okay.  If you would, I need to get an idea of

9   income and assets that you and your husband had after

10  he was diagnosed with being sick but before he passed

11  away.  I know you had the home, right?

12       A    Yes.

13       Q    Did you own any vehicles?

14       A    Yes.

15       Q    What type of vehicles did you own?

16       A    Pickup truck.

17       Q    What year was that?  Wrong person to ask that

18  question.

19       A    I don't remember.

20       Q    What other vehicles did you have?

21       A    Buick Regal, '92.

22       Q    Anything else?

23       A    No.

24       Q    Did you or your husband have any

25  collectibles?

1    A    Yes.

2    Q    What type of collectibles did you have?

3    A    Cobalt glass.

4    Q    Cobalt glass?

5    A    Yes.

6    Q    What is cobalt glass?

7    A    It's cobalt blue.

8    Q    And these are figurines that you buy?  Is

9    that what it is?

10    A    It can be anything that was cobalt blue.

11    Q    And what type of collection of cobalt glass

12    did you have?

13    A    Over 500 pieces.

14    Q    Who was the collector, you or your husband or

15    both of you?

16    A    Both.

17    Q    Do you know how much that collection was

18    worth?

19    A    Probably about around 2,000.

20    Q    Did you own any boats or any kind of

21    recreational vehicles?

22    A    No.

23    Q    Did your husband have any tools?

24    A    Yes.

25    Q    I'm trying to think if -- can you describe

83

1     just generally was he a person that had a lot of tools

2     or not many tools?

3         A     Yes, he was a cabinetmaker by trade.

4         Q     So he had a lot of tools?

5         A     Yes.

6         Q     Any idea how much his tools were worth?

7         A     No.

8         Q     When your husband was employed by Cressler,

9     what was his income either on a monthly, weekly or

10    yearly basis?

11        A     Thirty-nine thousand.

12        Q     Per year?

13        A     Yes.

14        Q     Is that his gross income?

15        A     Yes.

16        Q     And he started working for Cressler in 1994;

17    is that right?

18        A     Sounds right.

19        Q     And did he continue to be employed by

20    Cressler until he died or close to --

21        A     Yes.

22        Q     -- to when he couldn't do the duties anymore?

23        A     Yes.

24        Q     Did his income remain the same throughout the

25    time that he was in Cressler?

84

1      A      No.

2      Q      How did it change?

3      A      As he was dying, he couldn't work.  He

4  couldn't run.

5      Q      When did the income start to decrease?

6      A      I'd say during his second chemo treatment.

7      Q      Which roughly is when?

8      A      March or April.

9      Q      March or April of --

10     A      '99.

11     Q      -- '99?  Did Cressler find him another job to

12  do for a while?

13     A      Yes.

14     Q      What did they have him doing?

15     A      In the office.

16     Q      Do you know how much he was making when he

17  was doing the office job?

18     A      No.

19     Q      Was it like $7 per hour?

20     A      Could have been.  I don't know.

21     Q      If your husband talked about it -- we have --

22  your husband had his deposition taken before he passed

23  away, isn't that right?

24     A      Yes.

25     Q      In fact, he had a -- a deposition without a

85

1    camera there on one day; and then the following day, he

2    had a videotape deposition.  Do you recall that?

3         A    I wasn't here.

4         Q    Okay.  Do you recall that that was done?

5         A    Yes.

6         Q    Is it fair to say that what he said in the

7    deposition in terms of how much he was making and --

8    and what jobs he had at Cressler would be probably more

9    accurate than your recollection of it?

10        A    Yes.

11        Q    At the time your husband was diagnosed with

12   the cancer, did you have any bank accounts?

13        A    In '99, yes.

14        Q    Who did you bank with?

15        A    Before the credit union, it was the

16   Chambersburg Trust Company.

17        Q    And then you moved all of your savings then

18   to the credit union?  Is that what happened?

19        A    Yes.

20        Q    At the time your husband became sick, do you

21   know how much you had in your savings account?

22        A    Before we bought the house, it would have

23   been close to around -- I believe around 25 or 30

24   thousand.

25        Q    And then after you bought the house?

86

1     A     Yeah -- no.

2     Q     How much did it go down there?

3     A     We gave the bank 20,000 on the mortgage.

4     Q     So you were left with maybe $5,000 in savings

5     after you purchased the home?

6     A     Yes, somewhere.

7     Q     Had you increased your savings at all between

8     the time you purchased your home and the time your

9     husband got sick?

10    A     From '94?

11    Q     I -- I'm sorry.  I was assuming you purchased

12    the home in about '96 or '97.

13    A     Yes.

14    Q     And then he was diagnosed with being sick in

15    '99.

16    A     Okay.

17    Q     So really the question is from like '96 or

18    '97 to '99 would you have increased those savings and

19    if so, how much.

20    A     I don't know.  I don't remember.

21    Q     Did you have to use any of your savings to

22    pay off the medical bills?

23    A     Yes.

24    Q     Do you know how much of your savings you had

25    to use?

1      A     No.

2      Q     Did you have to sell the pickup truck or the

3  car or anything else to pay off the medical bills?

4      A     While he was dying, yes, the pickup truck.

5      Q     You sold the pickup truck?

6      A     Yes.

7      Q     Anything else?

8      A     The glass.

9      Q     Okay.  Anything else?

10      A     The furniture.

11      Q     What type of furniture did you sell?

12      A     The dining room set.  It was rock maple.

13  Beds.

14      Q     You sell all of the beds or just some of

15  them?

16      A     No, we kept three, family.  A spare TV.  Most

17  of the other knickknacks were sold.  Most everything we

18  just didn't have to have.

19      Q     Did you keep any kind of list of the items

20  that you actually sold and the amount that you obtained

21  for those?

22      A     I don't know.

23      Q     Did you have to use all of the money that you

24  obtained from selling these items to pay off the

25  medical bills?

88

1     A     And other bills, yes.

2     Q     When you say other bills, you're talking

3 about the normal monthly bills that you receive?

4     A     Yes.

5     Q     Now, the home.  You had mentioned you and

6 your husband talked about selling the home; is that

7 right?

8     A     Yes.

9     Q     What did you decide with regard to the home?

10     A     Well, we believed that it was going to be

11 paid for so we thought I was going to have more time,

12 you know, to sell it for what it was worth and then I

13 would find someplace smaller.

14     Q     That was the plan, to find someplace smaller?

15     A     Much smaller, yes.

16     Q     What has actually happened to the home?  Did

17 you sell it?

18     A     Yes.

19     Q     Who did you sell it to?

20     A     I don't know.  They weren't married.  A

21 single couple.  They weren't married.  I don't even

22 remember their names.

23     Q     How much did you get for the home?

24     A     Before or after concessions?

25     Q     Just the final.

89

1    A    Seventy-eight.

2    Q    That was the purchase price that they paid

3 you?

4    A    I'm not sure.

5    Q    You're not sure?

6    A    No, I'm not sure.

7    Q    What was your asking price for the home?

8    A    I don't remember that.

9    Q    You talked about concessions.  What

10 concessions did you have to make?

11    A    The 22 hundred dollars I had to give for them

12 for their financing.  Their closing costs I had to pay.

13    Q    Okay.  So the -- the $78,000 or so, that was

14 the money that you actually received after taking care

15 of your closing costs or did the -- were the closing

16 costs subtracted from that amount?

17    A    The amount I actually -- I actually received

18 after the sale?

19    Q    Right.

20    A    Was 14,000.

21    Q    Okay.  You paid off the mortgage?

22    A    Yeah, uh-huh.

23    Q    What did you do at that point?  Where did you

24 go?  Well, first of all -- I'm sorry.  Before we do

25 that, when did you sell the home?

90

```
1        A    May of 2000.

2        Q    May of 2000.  When did you put the home on

3   the market?

4        A    January.

5        Q    Did you list it with a realtor?

6        A    Yes.

7        Q    Who did you list it with?

8        A    Prudential.

9        Q    Same person that you talked about --

10       A    Yes.

11       Q    -- before?

12       A    Helen Myers.

13       Q    Excuse me.  I have another tickle in my

14   throat.  I'm sorry.  What was the name of the realtor

15   again?

16       A    Helen Myers.

17       Q    Where's she located?

18       A    Chambersburg.

19       Q    Is she still with Prudential?

20       A    Yes.

21       Q    Are you friends with Helen?

22       A    Yes.

23       Q    Do you know where she lives?

24       A    Saint Thomas.

25       Q    Saint Thomas Street?
```

91

```
 1        A      Saint Thomas, Pennsylvania.

 2        Q      Oh, okay.  And when you say you put the home

 3   up for sale in January of 2000, is that when you

 4   actually listed it with Helen Myers?

 5        A      I believe so.

 6        Q      What did you do after you sold the home?

 7   Where did you go?

 8        A      I moved to Shippensburg, Pennsylvania.

 9        Q      How far away is that?

10        A      Oh, gee, ten miles.

11        Q      Okay.  And where did you go?

12        A      To -- to a house to -- I'm a housekeeper.

13        Q      Okay.  You live at the house?

14        A      Yes, live-in housekeeping, yes.

15        Q      Who's the owner of the home?

16        A      John Millhouse, Junior.

17        Q      What does Mr. Millhouse do?

18        A      He's a truck driver.

19        Q      What type of home is it?

20        A      Earth sheltered, underground house.

21        Q      Okay.  Sounds interesting.  How big a place

22   is it?

23        A      It's either 18 or 20 thousand square feet.

24        Q      Eighteen or twenty thousand square feet?

25        A      Well --
```

92

1     Q    Just so we're clear --

2     A    Eighteen hundred.

3     Q    Was it -- was it about the same size as the

4  house that you and your husband had?

5     A    A little bigger.

6     Q    Just a little bit bigger?

7     A    Okay.  It was 18 hundred.

8     Q    Oh, okay.  It's all right.  My wife makes

9  that confusion all the time.

10    A    Okay.

11    Q    A little bit bigger than your home?

12    A    Yes, yes.

13    Q    How many rooms does it have?

14    A    Nine.

15    Q    Okay.  Do you have your own room in the

16  place?

17    A    Yes.

18    Q    How are you compensated for your work?

19    A    I get room -- free room and board.  He gives

20  me $40 a week to help with the groceries.  That's all I

21  pay is the groceries and my own personal meals.

22    Q    All right.  Free room I think I understand.

23  You live at the house for nothing?

24    A    Yes.

25    Q    What does board include?  Do you pay for any

1   of the groceries in the home out of your own pocket?

2       A    Yes, yes.

3       Q    Do you also consume some of Mr. Millhouse's

4   food?

5       A    Yes.

6       Q    Do you take care of -- is there a yard to the

7   home?

8       A    Yes.

9       Q    Do you take care of that as well?

10      A    Just the flowerbeds.

11      Q    Just the flowerbeds.  You take care of the

12  inside of the home and the flowerbeds?

13      A    Yes.

14      Q    What do you actually do?  How often do you

15  clean the home?

16      A    Once a week.

17          MR. KELLEY:  Let's take a break right there.

18  It's been about another hour, and I believe our

19  videographer needs to change his tape anyways.

20          THE VIDEOGRAPHER:  Off the record at 11:21.

21          (Break taken.)

22          THE VIDEOGRAPHER:  Back on the record at

23  11:31.

24  BY MR. KELLEY:

25      Q    Excuse me.  When we finished, Mrs. Hall, you

94

1    were explaining how you work one time -- you clean the

2    house one time a week; is that right?

3         A    One thorough cleaning a week, but you clean

4    as you go.

5         Q    Okay.  Do you also then cook the meals?

6         A    Yes.

7         Q    And how often do you cook the meals?

8         A    When he's home.

9         Q    How often is he home?

10        A    Three or four times a week.

11        Q    Does he own his own truck?

12        A    No.

13        Q    Does he work for a trucking company?

14        A    Yes.

15        Q    Who does he work for?

16        A    Cressler Trucking.

17        Q    Does he have any particular route that he --

18   that he travels?

19        A    No.

20        Q    He goes all over the country or all over the

21   region?

22        A    Yes.

23        Q    Does he have particular times that he's away?

24        A    Mostly through the week.

25        Q    So Monday through Friday he's mostly away?

95

1    A    Off and on, in and out.

2    Q    And then mostly on the weekends he's home?

3    A    Yes.

4    Q    Is this relationship -- this working

5    relationship and living arrangement -- is that working

6    out to your satisfaction?

7    A    For now, yes.

8    Q    What are your plans for the future?

9    A    I don't know my future plans yet.

10   Q    Well, you said for now.  It led me to infer

11   from your comment that you have some other plan for the

12   future.

13   A    I want to go visit his family.

14   Q    Tommy's family?

15   A    Yes.

16   Q    Where are they located?

17   A    Texas.

18   Q    When you say visit, are you talking about

19   visit for a couple of weeks or staying there

20   permanently?

21   A    I don't think permanently.  Not permanently.

22   Q    Well, what plan do you have in mind in terms

23   of visiting them?

24   A    Well, they're pretty lenient.  I could go for

25   a month or so at a time and visit, yes.

96

```
 1        Q     Is that where Tommy was from, Texas?

 2        A     Yes.

 3        Q     When did he move to Pennsylvania?

 4        A     I -- 1980.

 5        Q     Mrs. Hall, when your husband passed away, I

 6    believe you submitted a -- a notice -- a claim notice

 7    to recover the life insurance benefits; is that right?

 8        A     Yes.

 9        Q     I'm sorry.  Before we move on to that, I just

10    remembered I wanted to ask you a couple other things.

11    Other than the life insurance for Cuna Mutual, did your

12    husband have any other life insurance?

13        A     Yes, through Cressler Trucking.

14        Q     How much did he have through Cressler?

15        A     Ten thousand they paid for.

16        Q     Excuse me?

17        A     They paid -- the company paid the policy.

18        Q     The company paid the policy.  Did he have any

19    other life insurance on his life?

20        A     No.

21        Q     Okay.  Did he have any kind of 401K plan or

22    any retirement benefit?

23        A     Yes.

24        Q     Have any of those moneys been made available

25    to you yet?
```

97

```
1        A     Yes.

2        Q     Was it 401K?  Was that what he had --

3        A     Yes.

4        Q     -- with Cressler?

5        A     Yes.

6        Q     How much money did he have built up in his

7  410K?

8        A     I don't remember.

9        Q     How much money has been made available to

10  you?

11       A     That and his profit sharing, all of it.

12       Q     Do you know the figure as to how much?

13       A     It was somewhere around 24 to 26 thousand

14  altogether.

15       Q     That's with the 401K and his profit sharing?

16       A     Yes.

17       Q     Do you receive any kind of -- yeah, excuse me

18  -- Social Security benefits?

19       A     Did I or do I?

20       Q     Do you.

21       A     No.

22       Q     Did you in the past?

23       A     Just the -- the 255 for burial.  That's it.

24       Q     That's it.  No other Social Security

25  benefits?
```

98

1       A    No.

2       Q    Other than the $40 per week income that you

3   obtain from your job, do you receive any other kind of

4   regular income?

5       A    No.

6       Q    Have you ever searched for other employment?

7       A    No.

8       Q    I'm talking about just -- just since your

9   husband passed away.

10      A    No.

11      Q    How is it that you came about to obtaining

12  this -- this arrangement and this job with Mr.

13  Millhouse?

14      A    We were talking; and he offered me a place to

15  live to -- because he knew what I was going through.

16  He sort of knew my husband.  He didn't know him, but he

17  knew him from working at the same company.  That was

18  it.

19      Q    And is Mr. Millhouse married?

20      A    No.

21      Q    And is it just he that lives in the home --

22      A    Yeah.

23      Q    -- other than you?

24      A    Yes.

25      Q    So this was an arrangement that worked out

99

1    for both of you then?

2        A    Yes.

3        Q    When did you decide to do this particular

4    arrangement with Mr. Millhouse?

5        A    It was right before the house was sold.

6        Q    When did you first talk to him -- I'm sorry.

7    I should let you finish your answer.

8        A    That's -- that is my answer.  I don't know

9    exactly when.

10       Q    And the house was sold in May?

11       A    Yes.

12       Q    Of 2000, correct?

13       A    Yes.

14       Q    When did you first talk with Mr. Millhouse

15    about this particular arrangement?

16       A    After the holidays, all the holidays.  After

17    New Years, I believe.

18       Q    Of '99?

19       A    And 2000.

20       Q    What I'm getting at, after December, after

21    Christmas of '99 and New Years --

22       A    Yes.

23       Q    -- of 2000.  So it would have been in January

24    of 2000 you first talked about this?

25       A    I'm not sure of the month.

100

1      Q     Did you have any discussions about doing this

2 when your husband was still alive?

3      A     No.

4      Q     You understand what -- what I meant by my

5 question?  Not that you would go and -- and live there

6 while your husband was --

7      A     No.

8      Q     -- still alive.  But was that part of your

9 plan while your husband was still alive?

10      A     No.

11      Q     When did you first move into the Millhouse

12 home?

13      A     Springtime.  That's all I can remember is

14 springtime because it was warming up.

15      Q     And what was the -- what was your main

16 reason -- what was the reason for moving into Mr.

17 Millhouse's home?

18      A     Because it was hard to stay in the house

19 where my husband died.

20      Q     Any other reason?

21      A     It was sort of easier for me to do that at

22 the time because it was almost like what I was doing

23 already.  You know, just, you know, keeping house when

24 my husband wasn't home, things like that.  Almost the

25 same type of situation.

1    Q    Now that you mention that, I haven't really

2    gotten any background information on you.  Why don't we

3    do that now.  What's your date of birth?

4    A    May 28th, 1953.

5    Q    And where did you go to high school?

6    A    Chambersburg Senior High School.

7    Q    Did you graduate from Chambersburg?

8    A    No.

9    Q    How far did you go?

10   A    Eleventh.

11   Q    What did you do after high school?

12   A    Had a baby, one.  Got married.

13   Q    Is that a boy or a girl?

14   A    Boy.

15   Q    What's your son's name?

16   A    Richard Allen Fogelsonger, Junior.

17   Q    Fogelsonger?

18   A    Uh-huh.

19   Q    Okay.  And when was he born?

20   A    January 7th, 1972.

21   Q    When did you leave high school then?  Was

22   that in 1971 sometime?

23   A    Yes.

24   Q    And who did you marry then after high school?

25   A    Richard Fogelsonger.

102

```
 1       Q    Okay.  Your son's father?

 2       A    Yes.

 3       Q    When did you get married?

 4       A    November.

 5       Q    Of '72?

 6       A    No, '71.

 7       Q    Oh, sorry.  How long were you married to

 8  Richard?

 9       A    I don't remember.  We weren't together.

10       Q    Roughly how long were you married?  Just a

11  couple of years, three years, four years?

12       A    Seven or eight years.

13       Q    Do you remember when -- were you divorced at

14  some point?

15       A    Oh, yes.

16       Q    When did the divorce become final?

17       A    I don't remember.

18       Q    Was it sometime in the '70s?

19       A    Yes.

20       Q    Have you ever obtained any education beyond

21  the 11th grade in high school, any formal education?

22       A    No.

23       Q    Ever taken any courses at -- at -- in

24  completing your high school degree?

25       A    No.
```

1    Q    Ever taken any courses at a local community

2 college or anything like that?

3    A    No.

4    Q    Did you work outside of the home from 11th

5 grade up until now?

6    A    Some.

7    Q    Where did you work outside the home?

8    A    After my son was born, I was -- I was going

9 to nurse's aide through Welfare.  Welfare sent us to

10 get some kind of training.

11    Q    So you have nurse's aide training?

12    A    Yes, South Mountain Restoration Center.

13    Q    I'm sorry?

14    A    South Mountain Restoration Center.

15    Q    Approximately what time frame was that?

16    A    '73.

17    Q    '73.  How long did that particular training

18 take place?

19    A    Eight or nine months.

20    Q    Did you receive some type of certificate or

21 degree?

22    A    No.

23    Q    Did you complete the course?

24    A    Yes.

25    Q    Was it your intention at that time to become

104

1  a nurse's aide?

2      A    Yes, yes.

3      Q    Did you actually become a nurse's aide?

4      A    No.

5      Q    Why not?

6      A    Well, I was only going through that course to

7  work at that place; and they only took the best ones of

8  us.  And I wasn't one of the top whatever it was to get

9  the job.

10      Q    So you worked there throughout your eight or

11  nine months of training?

12      A    Yes.

13      Q    And then once that was over with, you no

14  longer worked there?

15      A    No.

16      Q    What I said was correct?

17      A    Yes.

18      Q    I know it's confusing sometimes.  Did you

19  ever work as a nurse's aide at any place else?

20      A    No.

21      Q    Did you ever try to obtain employment as a

22  nurse's aide anywhere else?

23      A    No.

24      Q    What other outside -- outside of the home

25  employment have you had between the time you began

105

1   working for Mr. Millhouse and the time that you were a

2   nurse's aide in training?

3       A    I worked at Ponderosa Steak House as a

4   waitress.

5       Q    As a waitress?

6       A    Yes.

7       Q    When was that?

8       A    I don't remember.

9       Q    '70s, '80s, '90s?

10      A    '70s.

11      Q    First part of the '70s, latter part of the

12  '70s?

13      A    I don't remember.

14      Q    Sometime in the '70s?

15      A    Uh-huh, yes.

16      Q    How long were you there?

17      A    Oh, two years.

18      Q    What did you do after that?

19      A    Got married in 1980.

20      Q    And that was to?

21      A    Eugene Kopas.

22      Q    Eugene?

23      A    Eugene Kopas, K-o-p-a-s.

24      Q    Okay.  And how long were you married to

25  Eugene?

106

1    A    Five years.

2    Q    Did you divorce from him?

3    A    Yes.

4    Q    About in 1985 divorced?

5    A    Yes.

6    Q    Did you work outside of the home during the

7  time that you were married to Eugene?

8    A    No, he didn't want me to.

9    Q    I'm sorry.  I should go back.  With Richard,

10  did you have any children other than Richard, Junior?

11    A    No.

12    Q    Did you have any children with -- with

13  Eugene?

14    A    No.

15    Q    I won't say anything.  I was going to say is

16  that a good thing.

17    A    Yes.

18    Q    Okay.  And then what did you do after your

19  divorce?  Did you obtain employment outside the home at

20  that point?

21    A    Yes.

22    Q    What did you do?

23    A    I worked at an oil store, Oliver Oil Company.

24    Q    What -- where is Oliver Oil Company located?

25    A    Chambersburg.

1    Q    What does Oliver Oil Company do?

2    A    They're an oil company.

3    Q    Well, do they have a particular clientele

4    that they serve?

5    A    They sell fuel oil.  They sell gear oil.

6    They sell oil -- car oil.  They sell any kind of oil

7    you want.

8    Q    Are they a retail distributor of oil or

9    wholesale?

10    A    Both.

11    Q    What did you do?

12    A    I worked behind the register.  I made sure

13    that the shelves were stocked.  If a farmer came in

14    with a five gallon bucket wanting gear oil or

15    something, I'd pump it in the bucket and took it back

16    out and gave it to him.

17    Q    This was in the retail end of the business?

18    A    Yes.  Did moneybag for the business.  You

19    know, the bank business.  I did all that.

20    Q    Also selling motor oil to customers coming in

21    off the street --

22    A    Yes.

23    Q    -- that kind of thing?

24    A    Yes.

25    Q    How long did you work there?

108

1    A    Maybe a year, a little over a year.

2    Q    Why did you leave that job?

3    A    Well, I was having back problems, back pain,

4    a lot of back pain probably from the lifting.

5    Q    Did you ever seek any treatment for your back

6    pain?

7    A    Oh, yes.

8    Q    Tell me about that.  What treatment have you

9    had for your back pain?

10    A    I went to chiropractors, and I went through

11    pain clinic.

12    Q    Did you ever receive a diagnosis as to what

13    the back pain was?

14    A    No, no.

15    Q    Was it an injury or was it a chronic problem?

16    A    Chronic pain, yes.

17    Q    Did you injure it while you were -- I mean

18    did you injure it at some point or just something that

19    developed over time?

20    A    No, it was from a car accident.  Most of -- I

21    attribute it to that.  We're not sure.

22    Q    When were you involved in a car accident?

23    A    '93.  I'm not even sure about that.

24    Q    Were you involved in one car accident or more

25    than one?

109

1      A    Two.  Somebody hit me.

2      Q    You think one was maybe 1993 but you're not

3  sure?

4      A    Yeah, I'm not sure.  I was in a lot of

5  accidents.  We're not sure.

6      Q    Excuse me?

7      A    I was in a lot of accidents.  We're not sure

8  which one started it.

9      Q    Okay.  Well, what -- tell me about the

10  accidents you were involved in.

11      A    Oh, my.  Let me see.  A horse threw me, fell

12  on me then.  I was a teenager.  Somebody else was

13  driving, and they ran into the back of one of those tar

14  things you see on the highway that the crews use to

15  heat up the tar.  And they don't move.  When you hit

16  them, they don't move.  So I ran into the back of one

17  of those.

18      Q    Was that part of the two car accident?

19      A    No, this is all before that.  I was leaving

20  the hospital going to go to school, and they hit

21  somebody else again.  So it was back to the hospital

22  for me.

23      Q    I'm sorry.  They -- they hit --

24      A    Somebody else was driving.

25      Q    You're a passenger in a vehicle --

110

```
 1      A    Yes.

 2      Q    -- and you were involved in an accident?

 3      A    Every one but one.

 4      Q    Excuse me.  You were coming from the

 5 hospital?

 6      A    Yes.

 7      Q    Okay.  What else?

 8      A    That's all I can remember.

 9      Q    All right.  The horse accident was when you

10 were a teenager?

11      A    Yes.

12      Q    The tar machine --

13      A    Motorcycle accident after the horse

14 accident.  There was a motorcycle accident and then the

15 two.

16      Q    Okay.  When was the motorcycle accident?

17      A    I was 16.  I don't know what year.

18      Q    All right.  When did you run into the tar

19 machine on the road?

20      A    1971 because I was pregnant, passenger.

21      Q    Okay.  You were a passenger at that time?

22      A    Yes.

23      Q    And then coming from the hospital, when was

24 that?

25      A    That's when I was a teenager too because it
```

1   was after the motorcycle wreck.

2      Q   And then you mentioned that in addition to

3   those -- in addition to the horse accident, the

4   motorcycle accident, the tar machine accident and then

5   coming from the hospital accident, there were two

6   additional car accidents?

7      A   No, there was one after that, I think.  I'm

8   not --

9      Q   And what was the nature of that other car

10   accident then?

11      A   Oh, I was finally driving for a change.

12      Q   Okay.  You were driving?

13      A   Somebody hit me almost head on.

14      Q   Is that the one you think was maybe '93 but

15   you're not sure?

16      A   Yeah, I'm not sure.

17      Q   Okay.  Is that the most recent one that

18   occurred, most recent accident?

19      A   Yes.

20      Q   Were you an adult at that time?

21      A   Yes.

22      Q   Were you in your 20s, your 30s?

23      A   I was in my 30s.

24      Q   Do you remember how old you were?

25      A   No, I was with Tommy so I had to be close

112

1   to -- let me see.  I don't remember the year.  I just

2   know it was in my late 30s.

3       Q    Okay.  Did you hurt your back in any of these

4   accidents?

5       A    Well, until it built up to that point, I

6   probably had, you know, just the jarring of it and

7   stuff; but most of the pain was caused after the car

8   accident.

9       Q    Well, let's --

10      A    It couldn't have been in '93.  The car was

11  brand new.  It was an '88 so it had to be somewhere

12  between '89 and '90.  Yeah, it takes me a while.

13      Q    Well, let's go back to the horse accident.

14  Did you hurt your back in the horse accident?

15      A    My neck.

16      Q    You hurt your neck.  What did you do to your

17  neck?

18      A    Well, the horse threw me off and was coming

19  over to meet me; and he tripped and his head smashed

20  mine down into the road.  So there was -- you know,

21  split this ear in half and blood everywhere.

22      Q    You're referring to your right ear?

23      A    Yeah.

24      Q    Were you in the hospital for a period of time

25  after that?

1    A    Oh, no, stitches and home.

2    Q    Stitches and home.  Did you have any back

3  problems following that horse accident?

4    A    I don't remember.

5    Q    And the motorcycle accident you were in when

6  you were 16, what injuries did you have in that

7  accident?

8    A    Lost all my toenails.  Well, I slid a half

9  mile down a -- not a half mile -- a tenth of a mile

10  down a hill.  He went through the fence, and I went

11  down the hill when we wrecked.

12    Q    Who's he?

13    A    The driver.

14    Q    Of the motorcycle?

15    A    Yes.

16    Q    So you were a passenger on a motorcycle?

17    A    Yes.

18    Q    And other than losing all your toenails --

19    A    You know, scars and stuff and --

20    Q    Scrapes and bruises?

21    A    Nothing broken.

22    Q    Nothing broken.  Any back problems after

23  that?

24    A    I don't remember that.

25    Q    When you -- when you were a passenger in a

114

1   vehicle that ran into the tar machine, what types of

2   injuries did you have as a result of that?

3       A    Well, they -- I had to go to the hospital

4   because they thought I was going to have my baby too

5   soon.  That was -- I was pregnant.  I was pregnant at

6   the time.

7       Q    No other injuries?

8       A    No, just head and chin.  I don't remember.

9       Q    Just some scrapes and bruises?

10      A    Yes.

11      Q    Was your baby okay?

12      A    Yes.

13      Q    And then the passenger coming from the

14  hospital when you were a teenager.

15      A    My mother.

16      Q    I'm sorry?

17      A    My mother.

18      Q    She was driving?

19      A    Yes.

20      Q    And did you have any injuries in that

21  accident?

22      A    No, it just opened up all the wounds and

23  stuff that -- she took me back to the hospital to get

24  them all redressed.

25      Q    So you were coming from the hospital after

115

1  which of these accidents?

2      A    The motorcycle.

3      Q    After the motorcycle accident?

4      A    I was going -- she was taking me to school.

5      Q    And you were involved in a car accident?

6      A    Yes.

7      Q    And the car accident when you were with Tommy

8  then in about '89 or '90, what injuries did you receive

9  in that?

10     A    Well, I went home first.  I wouldn't let the

11 ambulance take me to the hospital; and then I did go to

12 the hospital because I ended up with the strap -- a

13 black and blue mark across my body like this because

14 when they hit me, my -- I stayed this way but the

15 bottom part of my body went around so much that I hit

16 the gear shift with this leg because it was the force.

17 And that's where the back pain really come in.

18     Q    So after that accident, you started

19 experiencing back pain?

20     A    Yes.

21     Q    Were you treated for that back pain for a

22 period of time after the accident?

23     A    Yes.

24     Q    Did you go to chiropractors?

25     A    Yes.

116

1    Q    Did you go to the physical therapists?

2    A    Yes.

3    Q    Do you recall who the physician was who

4    treated you back at that time?

5    A    No, just through the hospital and the pain

6    clinic.  It's called the pain clinic.

7    Q    Through Chambersburg Hospital?

8    A    Yes.

9    Q    Does the pain clinic still exist?

10    A    Yes.

11    Q    Is that also located in Chambersburg?

12    A    Yes.

13    Q    Sorry to head off on a tangent there.  I was

14    talking to you about your work with Oliver Oil

15    Company.  You worked at the register there and you

16    stopped doing that job because of problems with your

17    back; is that right?

18    A    Yes.

19    Q    So when did you -- how long were you with

20    Oliver Oil Company?

21    A    Maybe a year.

22    Q    What did you do after that?

23    A    Stayed home.

24    Q    Were you married at that time?

25    A    Yes, to Tommy.

117

```
1      Q      When did you get married to Tommy?

2      A      1986, January 17th.

3      Q      Where did you get married?

4      A      At home.

5      Q      Who performed the service for you?

6      A      A Reverend Rose.

7      Q      Do you know his full name?

8      A      Perry.

9      Q      Perry Rose.  Is he affiliated with any

10     religious institution?

11     A      He's retired.

12     Q      Was he affiliated with any religious

13     institution?

14     A      Yes.

15     Q      What -- what church was he affiliated with?

16     A      Church of God.

17     Q      You said he's retired now?

18     A      Yes.

19     Q      From the time that you were married to Tommy

20     until the time he passed away, did you work outside of

21     the home?

22     A      No.

23     Q      Is there a reason for that?

24     A      No, when he became a truck driver, he wanted

25     me to stay home.  I was more available to -- to their
```

1  crazy schedules and that way I could be there when he

2  was home.

3      Q    Okay.  Did you prefer to be at home or to be

4  employed outside the home?

5      A    To be at home.

6      Q    Excuse me.  Did you have any children with

7  Tommy?

8      A    No.

9      Q    Did Tommy have any particular friends,

10  coworkers that he hung around with?

11      A    Daryl Yoder.

12      Q    Daryl Yoder.  Anybody else?

13      A    My -- Leroy Mellott.  That was my sister's

14  husband.

15      Q    Daryl and Leroy?

16      A    Yes.

17      Q    Anybody else?

18      A    No, he left work at work.

19      Q    There weren't any coworkers that he was

20  particularly friendly with or did things outside of

21  work with?

22      A    Outside of work, no.

23      Q    Where does Daryl -- what does Daryl Yoder do?

24      A    He owns his own garage, DJ Repair.

25      Q    Oh, that's right.  I'm sorry.  And how about

119

1    Leroy Mellott?

2        A    He's a mason, and they have their own

3    butchering shop.

4        Q    Anybody else that he was -- other than

5    yourself, of course, anyone else that he was friends

6    with?

7        A    He was friends with lots of people, but we

8    didn't bring them home.

9        Q    These -- Daryl and Leroy would be his closest

10   friends other than you?

11       A    Yes.

12       Q    Do you still see Daryl and Leroy?

13       A    Yes.

14       Q    The folks that you sold your home to, do they

15   still live in it?

16       A    Yes.

17       Q    Do you have any of your belongings with you

18   at Mr. Millhouse's home?

19       A    Yes.

20       Q    What -- what belongings do you have with you?

21       A    The bed.  The last thing Tommy ever made.

22   What do you call that?  You use it in the kitchen.

23   It's a microwave cart custom made for me.

24       Q    What else?

25       A    Dressers.

120

```
 1        Q     Anything else?

 2        A     Photos and some blankets and knickknacks.

 3   That's about it.

 4        Q     Do you still bank with the credit union?

 5        A     No.

 6        Q     Where do you bank now?

 7        A     Orrstown.

 8        Q     Is it Orrstown Bank?

 9        A     Orrstown.  Orrstown, yes.

10        Q     What's the full name?

11        A     Orrstown Bank.

12        Q     What type of accounts do you have there?

13        A     Savings, checking.

14        Q     Anything else?

15        A     Another checking account.  It's called a

16   money maker account.

17        Q     Is that with Orrstown as well?

18        A     Yes.

19        Q     Anything else?

20        A     Just opened up a business account.

21        Q     What's your business?

22        A     Nutrition products.

23        Q     Okay.  What type of nutrition products do

24   you -- do you sell?

25        A     What do you mean?  Isotonics, Market
```

121

1    America?   You mean the brand name?

2        Q    Well, tell me about your business.   What do

3    you do?

4        A    Well, it's his business.   I'm just helping

5    him, but we're both on the account.

6        Q    It's Millhouse's business?

7        A    Yes, we're both on the account so I can write

8    checks out for the stuff I want when he's not around.

9    That's what that's for.

10       Q    So it's a joint account?

11       A    Yes.

12       Q    Well, tell me about this nutrition products

13   business.

14       A    We just started it on Monday.

15       Q    This past Monday?

16       A    Yes.

17       Q    Okay.   Well, what's the nature of it?   What's

18   your goal?

19       A    I sell the products for him.   I take care of

20   the checking account part of it; and he goes out and

21   he -- he tries to recruit people in to sell the

22   product.   That's -- that's what he does.   He tries to

23   bring them in.

24       Q    Is this a weight loss product?

25       A    Oh, it's everything.   It's nutrition.   It's

1    Vitamin B.  It's C.  It's -- it's some weight loss.

2    It's smoke, odor and stain.  It's your kitchen dish

3    washing liquid.  It's your laundry detergent.  It's

4    your engine stuff you pour in to make your engine last

5    longer.  It's -- it's -- it's makeup.  It's jewelry.

6    It's everything.

7        Q    Okay.  Well, you're going well beyond

8    nutrition products then.

9        A    Yeah, it's everything; but I sell mostly the

10   nutrition products.

11       Q    Okay.  Do you have a location outside of Mr.

12   Millhouse's home?

13       A    No.

14       Q    Where do you store the -- the product?

15       A    At home.  It's a home based business.

16       Q    Have you contributed any funds to this

17   business?

18       A    No.

19       Q    Do you receive any benefit from -- or will

20   you receive any benefit from the sale of items?

21       A    No, I just take the product.  That's my

22   benefit.  I don't have to pay for them.

23       Q    Oh, you get the product for free?

24       A    Yes, yes.

25       Q    And this is a wide range of products from

1    nutritional products to health and beauty aids to

2    everything you described earlier?

3        A    Yes.

4        Q    Okay.  Any other accounts?

5        A    No.

6        Q    All right.  How much do you have in your

7    savings account?

8        A    Can I ask you a question?  Why?

9        Q    Well, your counsel has represented that as a

10   result of losing your home you've been -- I don't want

11   to misstate but rendered destitute.

12       A    Oh, okay.  I still have about $26,000 left.

13       Q    And that's in your savings?

14       A    Checking.

15       Q    That's in the checking?

16       A    Yes, the two checkings.

17       Q    The checking account and the money maker

18   account --

19       A    Yes.

20       Q    -- has about 26,000?

21       A    Yes.

22       Q    And you say left.  That's left from what?

23       A    From everything that I started with in '99.

24       Q    Okay.  From the life insurance, from the

25   401K, from the sale of the home?

124

```
 1        A     Yes.

 2        Q     And do you have additional amounts in your

 3   savings?

 4        A     No, I just remembered the savings account is

 5   closed.

 6        Q     Okay.  That's closed.  Now, do you draw --

 7   I'm talking about the time period from -- after Tommy

 8   passed away and then after you began the arrangement

 9   with -- with Mr. Millhouse.  Do you draw down off of

10   this money that's in your checking account now to take

11   care of your weekly and monthly expenses?

12        A     Yes.

13        Q     And how much did you start off with that was

14   either in your savings or your checking after Tommy

15   passed away?

16        A     Gosh.  I think it was 38 -- 33 or 38.  I

17   don't remember.

18        Q     So you started with 33 or 38?

19        A     Yes.

20        Q     And you're down to about 26,000?

21        A     Yes.

22        Q     Are you continuing then -- from -- from this

23   point forward, do you expect to continue to have to

24   draw down on that 26,000 that you have now in order to

25   pay your weekly and monthly expenses?
```

125

1     A    Yes.

2     Q    So if I understand your testimony correctly,

3 the free room and board and the $40 per week that you

4 receive from Mr. Millhouse is not enough to take care

5 of all of your weekly or monthly obligations --

6 financial obligations; is that correct?

7     A    It's not enough?

8     Q    That's what I'm asking you.  Is that -- is

9 that accurate that it's not enough?

10    A    No, no.

11    Q    All right.  Then I am -- I'm misunderstanding

12 you.  I want to make sure we're clear about this.  Why

13 don't we approach it from this -- from this

14 perspective.  At this point, you don't have a mortgage

15 payment, correct?

16    A    No.

17    Q    You don't have rent to pay, correct?

18    A    Correct.

19    Q    Do you pay for any of the utilities that Mr.

20 Millhouse uses at his home?

21    A    No.

22    Q    What monthly obligations other than buying

23 some food do you have?

24    A    Clothing, personal feminine items.

25    Q    Sure.

126

1       A    I pay for all the cleaning supplies and stuff

2   in the home.  My own personal credit cards, shopping,

3   clothing.  That's --

4       Q    Okay.  What else?  Anything?

5       A    Gas in the car, my car insurance.

6       Q    What kind of car do you have?

7       A    A Buick Regal.

8       Q    The same one?

9       A    Yes.

10      Q    Okay.

11      A    Just mostly upkeep on the car.  That's the

12  most of it.

13      Q    Anything else?

14      A    No.

15      Q    Have you ever figured out on a monthly basis

16  what these expenses total?

17      A    No.

18      Q    Well, let me ask it again to make sure

19  that -- with the free room and board and the $40 per

20  week that you receive from Mr. Millhouse --

21          MR. PEDERSEN:  I just want to note I'm going

22  to put an objection on the record.

23          MR. KELLEY:  Okay.  Can I finish my

24  question?

25          MR. PEDERSEN:  Sure.

127

1          MR. KELLEY:  With the free room and board and

2     the $40 per week that you get from Mr. Millhouse, is

3     that enough to meet your weekly or monthly obligations

4     -- financial obligations?

5          MR. PEDERSEN:  The objection.

6          THE VIDEOGRAPHER:  Off the record at 12:16.

7          MR. PEDERSEN:  The objection is I think it

8     misstates her testimony.  The room and board was not

9     free.  She earns it.

10          MR. KELLEY:  Okay.  Sorry.

11          THE WITNESS:  Okay.

12          THE VIDEOGRAPHER:  One second to go back on.

13     Back on the record at 12:16.

14     BY MR. KELLEY:

15     Q     Do you understand my question?

16     A     Say it again.

17     Q     Yeah.  With your room and board, okay, that

18     you're provided by Mr. Millhouse and with the $40 per

19     week that you receive from Mr. Millhouse, is that

20     enough to cover your weekly and monthly expenses

21     financially?

22     A     No.

23     Q     How much on a weekly or monthly basis do you

24     have to draw down from your savings or from your

25     checking accounts in order to take care of your monthly

128

1    or weekly expenses?

2         A    Oh, I don't know.  I just know that I'm using

3    it.

4         Q    You have no idea how much you're using on a

5    weekly or monthly or yearly basis?

6         A    No.

7         Q    Do you know how much car insurance is?

8         A    Yes.

9         Q    How much is it?

10        A    Three hundred sixty.

11        Q    Is that a year?

12        A    Yes.

13        Q    How much do your cleaning supplies cost you

14   in a weekly, monthly?

15        A    Probably monthly for cleaning probably 10.

16        Q    Ten bucks a month?

17        A    Yes.

18        Q    And food, clothing, personal items, do you

19   know how much you spend on that a month?

20        A    I know I spend more than 40 a week.

21        Q    You spend more than 40 a week just on food,

22   clothing and personal items?

23        A    Yes.

24        Q    Okay.  How about gas in the car, how much do

25   you spend a week or a month on that?

129

1    A    Ten dollars a week.

2    Q    Other than the -- the business arrangements

3  that you have with Mr. Millhouse, do you have any other

4  relationship with him?

5    A    We're friends, good friends.

6    Q    Anything else?

7    A    No.

8    Q    Romantically involved at all?

9    A    Yes.

10    Q    Do you have any plans for the future with

11  him?

12    A    No.

13    Q    When did you become romantically involved?

14    A    After I moved in.  Last year sometime.

15    Q    You don't have any plans of marrying?

16    A    No.

17    Q    Have you talked about your future together at

18  all?

19    A    Us together?

20    Q    Yeah.

21    A    No.

22    Q    Have you ever filed for bankruptcy?

23    A    No.

24        MR. KELLEY:  Steve, we probably have another

25  hour to two hours of material to cover.  You want to

1    take a break for lunch?  I mean at some point I'm going

2    to need a break for lunch.  The question is whether or

3    not we do it now or go for perhaps another hour and

4    then we'll take a break.

5            MR. PEDERSEN:  Let's take a break now.  Go

6    off the record.

7            THE VIDEOGRAPHER:  Off the record at 12:21.

8            (Break taken.)

9            THE VIDEOGRAPHER:  Back on the record at

10    1:10.

11    BY MR. KELLEY:

12        Q    Mrs. Hall, after your husband's death, you

13    submitted a claim to Cuna Mutual Group; is that right?

14        A    Yes.

15        Q    Would you take a look at that document?  Is

16    that the Notice of Claim that you filed?

17        A    It looks like it.

18        Q    And it has a date at the top, at least a

19    facsimile date from Patriot Federal Credit Union of

20    11/10/99.  Oh, I'm sorry.  There's a date over here of

21    11/4/1999.

22        A    That's when he died.

23        Q    That's your husband's date of death.  Okay.

24    Did you actually prepare this document?

25        A    I didn't do the writing, no.

131

1    Q    Who did?

2    A    Whoever I talked to at the bank that day.

3    Q    At the credit union?

4    A    Yes.

5    Q    So how did you go about submitting the notice

6    that you had this claim for insurance?  Did you contact

7    somebody at Cuna or did you just contact somebody at

8    the credit union?

9    A    I don't remember if I called ahead of time or

10    not or just went into the bank -- the credit union.

11    Q    And did they take care of submitting the

12    claim for you then?

13    A    Yes.

14    Q    What did you take with you to -- to show that

15    your husband passed away?

16    A    Death certificate.

17    Q    Anything else?

18    A    No.

19    Q    Okay.  You don't remember who the person was

20    that -- that you dealt with?

21    A    No.

22    Q    Is it Jeanette Duquette?  I see a person's

23    name on here.

24    A    If that's what she wrote, that must be her.

25    Q    Why is it that you went to the credit union

1   as opposed to just going to Cuna Mutual directly?

2       A    Cuna Mutual is out of town.  They're in

3   town.  I just assumed I went to the bank.  I did not

4   know.

5       Q    Okay.  None of this writing on here is yours?

6       A    I don't think so, no.

7       Q    Did you get a copy of this when it was

8   submitted to Cuna?

9       A    I don't remember.

10      Q    Did you -- there doesn't appear to be any

11  place on here where you sign it.  Did you actually see

12  the person take down this information?

13      A    I sat across from her while she did it, yes.

14      Q    And what did she indicate to you as to what

15  she was going to do with this?

16      A    She typed something in her computer, and she

17  said she would forward the information off to you, to

18  Cuna Mutual.

19          MR. KELLEY:  Let's mark this as Hall

20  Deposition 6, is it?

21          (Insurance Claim Notice, one page, produced

22  and marked Mrs. Hall Exhibit No. 6.)

23  BY MR. KELLEY:

24      Q    And is this a copy of the death certificate?

25      A    Yes.

133

1     Q    It's a really poor copy.  I apologize.

2     A    Yes, that's it.

3     Q    And your husband passed away November 4,

4  1999?

5     A    Yes.

6     Q    Was an autopsy done?

7     A    I don't know.

8     Q    Did anyone ask you for your permission to

9  perform an autopsy?

10     A    No.

11     Q    And you're not aware of any autopsy having

12  been performed?

13     A    No.

14     MR. KELLEY:  Let's mark the death certificate

15  as Mrs. Hall Deposition Exhibit 6 -- or 7.

16     (Death Certificate, one page, produced and

17  marked Mrs. Hall Exhibit No. 7.)

18  BY MR. KELLEY:

19     Q    Did the person at the credit union where you

20  went with the -- to make the notice that your husband

21  had passed away did they tell you how long it would be

22  before you could expect to receive the insurance

23  income?

24     A    No.

25     Q    At some point, did you become aware that Cuna

134

1  was gathering information regarding your husband's

2  prior medical history before determining to pay the

3  claim?

4      A    Yes, when they asked for names.

5      Q    Okay.  Did they do that in writing to you or

6  did they call you on the phone?  How did that happen?

7      A    I'm not sure.

8          (Letter dated December 15, 1999, Larson to

9  Hall, one page, produced and marked Mrs. Hall Exhibit

10  No. 8.)

11  BY MR. KELLEY:

12      Q    Let me show you what we'll mark as Hall

13  Deposition Exhibit 7 -- excuse me, 8 --

14      A    Okay.

15      Q    -- which is a letter dated December 15, 1999

16  to you from Brenda Larson, Credit Insurance

17  Underwriting at Cuna Mutual.  Do you see that?

18      A    Yes.

19      Q    Do you recall receiving that letter?

20      A    Yes.

21      Q    Did you ever speak with Brenda Larson on the

22  telephone?

23      A    I don't remember.

24      Q    Did you ever speak with anybody from Cuna on

25  the telephone?

135

1      A    Yes.

2      Q    Do you remember who that was that you spoke

3   with?

4      A    No.  It wasn't about this though.

5      Q    What was it about?

6      A    Mortgage payments, the insurance that you

7   take out of the account.  That's all.  It wasn't about

8   this.

9      Q    Did you ever have any conversations with

10   anybody at Cuna after your husband passed away?

11      A    I don't know.  I don't think so.

12      Q    Now, this is a letter asking that --

13   indicating we're sorry to hear your husband passed away

14   and requesting information from Dr. Charlesworth.  Do

15   you see that -- excuse me -- information about any

16   other physicians that your husband received treatment

17   from --

18      A    Other than him.

19      Q    -- other than Dr. Charlesworth?  Do you see

20   that?

21      A    Yes.

22      Q    What did you do in response to that letter?

23      A    I sent them names and addresses and phone

24   numbers.

25           MR. KELLEY:  I believe I identified that,

136

1  haven't I?  Let's mark this Hall Exhibit 9, I believe.

2           (List of Names and Addresses, two pages,

3  produced and marked Mrs. Hall Exhibit No. 9.)

4  BY MR. KELLEY:

5      Q    This next group of documents that has the

6  Defendant's stamp at the bottom D75 and D76 and appears

7  to be handwritten information about names of doctors

8  and addresses, do you recognize that?

9      A    Yes.

10      Q    What is that?

11      A    I sent those, the names and addresses and

12  phone numbers.  I wrote that.

13      Q    Did you supply any other information to Cuna

14  at this time other than the names and addresses?

15      A    I don't think so, no.

16      Q    Now, the date of that letter -- can I see

17  that, Chuck -- the date of this letter from Cuna is

18  December 15 of 1999; is that right?

19      A    Yes.

20      Q    Now, at that point in time, was there other

21  litigation that was going on with regard to your

22  husband's condition?

23      A    At that time?

24      Q    Yeah.

25      A    Yes.

137

1      Q    Okay.  What was going on at that time?

2      A    A lawsuit.

3      Q    And what's the nature of that lawsuit?

4      A    Wrongful death.  I'm not sure what you'd call

5 it.

6      Q    Do you understand that there's a lawsuit

7 that's been brought on your behalf against your

8 husband's -- some of your husband's physicians?

9      A    Yes.

10      Q    For malpractice?

11      A    Yes.

12      Q    And was that action going on at the time that

13 Cuna sent this letter to you requesting information as

14 of December of 1999?

15      A    Yes.

16      Q    Okay.  Did you make any effort to advise Cuna

17 that there was this malpractice litigation going on

18 with Mr. Hall's physicians?

19      A    No.

20      Q    Now, I see in this letter from Brenda Larson

21 that she has a 1-800 number in there and her direct

22 extension and asked you to call if you have any

23 questions.  Do you see that?

24      A    Yes.

25      Q    Did you ever take advantage of that and call

138

1    with any questions?

2         A    I don't think so, no.

3         Q    Were you aware then that Cuna was gathering

4    information from several of your husband's physicians

5    including Dr. Charlesworth, Dr. Laing -- L-a-i-n-g --

6    Dr. Enders, Dr. Cashdollar and Dr. Hurley?

7         A    They asked me for names.  Those are the ones

8    I sent them.

9         Q    Okay.  Did you have any conversations with

10   anybody at Cuna as to why they wanted this information?

11        A    No, I don't think so.

12        Q    Did you know why they wanted this

13   information?

14        A    Only what they wanted in the letter, no.

15        Q    Do you recall having -- calling up and having

16   any conversations with anybody to find out what it is

17   that -- that Cuna was looking for?

18        A    No.

19        Q    Mrs. Hall, I'm going to show you a series of

20   letters that appear to be dated in November of 1999 --

21   November 12 of 1999 from Brenda Larson to Dr.

22   Charlesworth; November 30, 1999 to Dr. Charlesworth

23   from Brenda Larson; December 29, 1999 from Brenda

24   Larson to Dr. Cashdollar; December 29, 1999 to Dr.

25   Baker from Brenda Larson; December 29, 1999 from Brenda

139

1    Larson to Dr. Hurley and then a December 29, 1999

2    letter again to Dr. Cashdollar.  If you would, look at

3    those documents, please.

4        A    All of them?

5        Q    Yes, please.

6        A    Yes.

7        Q    Have you ever seen any of those documents

8    prior to today?

9        A    I don't think so, no.

10       Q    Were you copied at all on any of these

11   documents at the time they were sent out?

12       A    Was I what?

13       Q    Were you copied on them?  Did you receive a

14   copy of those?

15       A    No.

16       Q    Were you aware that Cuna was conducting this

17   request for records from these various physicians?

18       A    No, I only knew what they asked me for.  That

19   was it.  I didn't know what they were going to do with

20   it.

21       Q    Did you ever call up anybody to find out?

22       A    No.

23            MR. KELLEY:  Why don't we mark this group of

24   documents from the November 12, '99 letter to the

25   December 29, 1999, several letters, as a group as Hall

140

1    Exhibit 10.

2              (Group of Letters, six pages, produced and

3    marked Mrs. Hall Exhibit No. 10.)

4    BY MR. KELLEY:

5         Q    Now, these -- these letters are going out in

6    November and December of '99, correct?

7         A    Yes.

8         Q    And Cuna actually sent you a letter

9    requesting more information December 15 of 1999,

10   correct?

11        A    If that's what it says on the page, yes.

12        Q    Do you want to see it again?  Chuck, do you

13   have that there?

14        A    Okay.

15        Q    And the malpractice litigation was going on

16   at that time, right?

17        A    Yes.

18        Q    And you understand, do you not, that part of

19   the claim in the malpractice action is that your

20   husband had a mole removed in 1993 and it was

21   misdiagnosed by the doctors at that time?

22        A    Yes.

23        Q    And you understand that part of the claim in

24   that case is that it was later determined by the

25   National Institute of Health that the mole that was

141

1    removed in 1993 was, in fact, cancerous; is that right?

2    A    Yes.

3    Q    Do you know who the Defendants are in that

4    lawsuit?

5    A    The hospital.

6    Q    I have a copy of the --

7    A    Yes, I have that.

8         (Praecipe For Writ of Summons, twenty-nine

9    pages, produced and marked Mrs. Hall Exhibit No. 11.)

10   BY MR. KELLEY:

11   Q    Okay.  Let me show you what we'll mark as

12   Hall Exhibit 11.  This is the Praecipe For Writ of

13   Summons that was filed date stamped June 4 of 1999.

14   And would you read off who the Defendants are?

15   A    George Baker M.D., Chambersburg Hospital,

16   Summit Health, Howard Hoffman, M.D., Constancio

17   Ramirez, M.D., James E. Hurley, II, M.D. and James E.

18   Hurley, II, M.D., P.C..

19   Q    And it also attached to this document is --

20   I'm sorry.  And here's an actual copy of the Complaint

21   that was filed.  Do you see that?

22   A    Yes.

23   Q    Who's representing you in this litigation?

24   A    Catherine M. Mahady-Smith.

25   Q    And is she also working with your counsel on

142

1    this case?

2         A    On this case?

3         Q    Yes.

4         A    I don't know.

5         Q    Are you aware that Ms. Mahady-Smith has

6    attended several of the depositions in this case?

7         A    No, I wasn't aware of it, no.

8         Q    Is Mr. Pedersen also involved in representing

9    you in this malpractice action against the doctors?

10        A    No.

11        Q    Now, at any time after you received the

12   request for information from Cuna, did you supply any

13   information about the -- the lawsuit -- the malpractice

14   lawsuit that was going on at the time to Cuna?

15        A    No.

16        Q    Did you make any effort to provide them with

17   the -- the names of all the doctors who are involved in

18   that malpractice lawsuit?

19        A    No.

20        Q    Did you make any effort to advise Cuna of the

21   nature of the allegations of that lawsuit?

22        A    No.

23        Q    Do you know whether Cuna actually received

24   records from the physicians that you supplied the names

25   and addresses for?

1    A    Do I know?

2    Q    Yeah.

3    A    No.

4    Q    Did anybody from the credit union ever make

5    any attempts on your behalf to find out from Cuna what

6    the status of your claim was before Cuna issued its

7    decision?

8    A    I don't know.

9    Q    Did you ever go to anybody at the credit

10   union and ask what the status of the decision on the

11   claim was?

12   A    No.

13        (Telephone Contact Sheet dated December 13,

14   1999, one page, produced and marked Mrs. Hall Exhibit

15   No. 12.)

16   BY MR. KELLEY:

17   Q    Let me show you what we will mark as Hall

18   Exhibit 12.  It's a handwritten document that seems to

19   be dated December 13, 1999.  I believe this is a

20   contact sheet from Cuna indicating a person by the name

21   of Jeanette at the credit union was calling.  If you

22   would, take a moment and try to read that.

23   A    This is -- I can't -- you'll have to read the

24   last paragraph because I can't.

25   Q    Okay.  First of recall, just to refresh your

1    recollection now on the Notice of Claim that was filed

2    by the credit union on your behalf, there's a person

3    named Jeanette Duquette appears to have signed that,

4    correct?

5        A    Yes.

6        Q    And this telephone contact sheet which I'll

7    represent to you is a Cuna document and is note of a

8    conversation that someone at Cuna had with a credit

9    union person named Jeanette.  There's a note here from

10   both 12/13/99 and 12/14/99; and the -- the 12/13/99

11   note indicates had a message on voice mail to call her

12   back.  You see that?

13       A    Yes.

14       Q    And then on 12/14/99, it says left a message

15   on Jeanette's voice mail that the claim has been

16   something to issuance and serv.. There will be a delay

17   on the claim.  Do you see that?

18       A    Yes.

19       Q    Any questions she can call me back.  Okay.

20   And then further note down here looks to be later in

21   the day.  First one was 8:00 in the morning.  Second

22   one is 9:02 it appears.  It says Jeanette called back.

23   She wanted to know who needed to get the med period.  I

24   told her that we sent a letter directly to the

25   insured.  That's i-n-s-d.  I also gave her the number

145

1   for issuances and service and then -- and initials of

2   someone at Cuna.

3           Does that refresh your recollection at all

4   about having any conversations with Jeanette or anybody

5   else at the credit union to find out what the status of

6   your claim was?

7       A    No, I don't remember that.

8       Q    Let me show you the next document here.  It's

9   a letter dated December 14, 1999 from Cuna Mutual to

10  the Patriot Federal Credit Union.  Have you seen that

11  document before?

12      A    Not that I recall.

13      Q    Okay.  It indicates that a person from Cuna

14  is advising the Patriot Federal Credit Union we've

15  recently received medical information on the home

16  mortgage insurance claim for this member and it refers

17  to your husband, correct?

18      A    Yes.

19      Q    And it says this information has been

20  forwarded to our issuance and servicing department for

21  review and if you have any questions please call the

22  1-800 number.  Were you aware that -- that this letter

23  had been sent to your credit union?

24      A    No.

25      Q    No one from the credit union advised you that

146

1  they received this?

2      A    I don't recall.

3      Q    Could it have happened and you don't remember

4  it?

5      A    I don't know.

6           MR. KELLEY:  Why don't we mark this as --

7           MR. YOUNG:  Thirteen.

8           (Letter dated December 14, 1999, Barnabo to

9  Patriot, one page, produced and marked Mrs. Hall

10 Exhibit No. 13.)

11          (Letter dated February 10, 2000, Larson to

12 Hall, one page, produced and marked Mrs. Hall Exhibit

13 No. 14.)

14 BY MR. KELLEY:

15     Q    And let me show you what we'll mark as Hall

16 Exhibit 14.

17     A    Yes, I remember that one.

18     Q    Okay.  That's the letter where Cuna is

19 advising you that -- that your claim is being denied?

20     A    Yes, I know.

21     Q    What, if anything, did you do after receiving

22 that letter?

23     A    I got angry.

24     Q    After that, what did you do?

25     A    Didn't talk to anybody for a couple days.

147

1    Q    Then what did you do?

2    A    Nothing really.  I figured there was nothing

3  I could do.

4    Q    I see at the bottom here it says if you have

5  any questions please contact me.  Did you contact

6  Brenda Larson?

7    A    No.

8    Q    You remember that specifically that you made

9  no attempt to contact her?

10    A    No.

11    Q    Is what I said correct?

12    A    Yes.

13    Q    At that point in time, did you make any

14  effort to supply any of the information about the --

15  the malpractice claim to Cuna?

16    A    No.

17    Q    Did you give any thought to providing your

18  side of the story so to speak to Cuna so that they

19  would reconsider this decision?

20    A    No, didn't think about it.

21    Q    Did you give any thought to the proposition

22  that perhaps Cuna didn't have the whole story?

23    A    No, didn't know.

24    Q    You didn't have any idea what information

25  Cuna had?

148

```
 1        A     That's right.

 2        Q     When did you first decide to do something

 3   about this denial of your claim?

 4        A     When I got the second letter.

 5        Q     What do you mean the second letter?

 6        A     The other letter that I got from Cuna Mutual.

 7              MR. KELLEY:  Have we marked this one?

 8              (Letter dated February 22, 2000, Stel to

 9   Hall, one page, produced and marked Mrs. Hall Exhibit

10   No. 15.)

11   BY MR. KELLEY:

12        Q     Is this the letter you're referring to?

13        A     Yes.

14        Q     This is a letter dated February 22nd, 2000

15   from Michael Stel at Cuna, the Special Investigation

16   Unit to you; is that correct?

17        A     Yes.

18        Q     And that's advising you that due to the

19   nature of this we're required to inform the

20   Pennsylvania Insurance Fraud Section of this matter; is

21   that correct?

22        A     Yes.

23        Q     What did you do as a result of receiving this

24   letter?

25        A     I got angry.  I cried.  I didn't talk to
```

1    anybody again for a few days, and then I just set on
2    it.  I figured I had no recourse to do anything.
3         Q    It says at the bottom of this letter if you
4    have any questions or concerns regarding this letter
5    please contact me directly.  Thank you.  You see that?
6         A    Yes.
7         Q    And I believe it includes his number up here;
8    is that correct?
9         A    Yes.
10        Q    Did -- did you ever give any consideration to
11   calling him and providing him with any information
12   about this?
13        A    No.
14        Q    Why not?
15        A    When somebody tells you something like that,
16   you assume it's said and done and nothing you can do
17   about it.
18        Q    Did you read his entire letter when you
19   received it?
20        A    Oh, yeah.
21        Q    Did you completely disregard or -- his if you
22   have any questions or concerns to please call him or
23   you didn't think it would do any good?
24        A    I didn't think it would do any good.
25        Q    So you didn't call up Michael Stel or anybody

150

1   else at Cuna to find out why they were doing this?

2      A    No.

3      Q    What action did you take?

4      A    Eventually I talked to my attorney about it.

5      Q    I don't want to know what you said but who

6   did you talk to?

7      A    At first, Catherine Mahady-Smith.

8      Q    And then at some point, Mr. Pedersen, you

9   talked to him about it?

10     A    Yes.

11     Q    When did you first get Mr. Pedersen involved

12   in this?

13     A    Last year sometime.

14     Q    I'll represent to you that the Complaint was

15   filed on -- it looks to be on or about July 9 of 2001.

16   Do you know how much prior to that time you got Mr.

17   Pedersen involved?

18     A    No.

19     Q    Did you ever receive any contact from the

20   Attorney General's office to investigate this fraud

21   claim?

22     A    No.

23     Q    Did you ever call up the -- the Pennsylvania

24   Insurance Fraud Section?

25     A    No.

151

1     Q   Did you take any action at all to determine

2 what the status of any investigation by the Insurance

3 Fraud Section was?

4     A   No.

5     Q   Were you interested in that information?

6     A   No.

7     Q   You didn't want to know what was going on?

8     A   He was dead.  I figured there was nothing

9 they could do.  He was dead.

10    Q   So you weren't concerned about it?

11    A   No.

12    MR. KELLEY:  Let me show you what we'll mark

13 as Exhibit 16.

14    MR. YOUNG:  Sixteen.

15    (Letter dated February 29, 2000, Conrad to

16 Stel, one page, produced and marked Mrs. Hall Exhibit

17 No. 16.)

18 BY MR. KELLEY:

19    Q   It's a letter from the Attorney General's

20 office to Michael Stel at Cuna acknowledging the

21 referral of the matter to the Attorney General's

22 office, correct?

23    A   Yes.

24    Q   Did you ever receive a copy of that letter?

25    A   No.

1    Q    Did anybody from the Attorney General's

2  office forward a copy of that letter on to you?

3    A    No.

4    Q    Did anybody from the Attorney General's

5  office ever try to contact you?

6    A    No.

7         (Letter dated March 29, 2000, Conrad to Stel,

8  one page, produced and marked Mrs. Hall Exhibit No.

9  17.)

10 BY MR. KELLEY:

11   Q    Let me show you what we'll mark as Hall

12 Exhibit 17.  It's a letter dated March 29 of 2000 from

13 Kirby Conrad at the Attorney General's office to

14 Michael Stel at Cuna indicating that they were not

15 pursuing the investigation.

16   A    Okay.

17   Q    Have you ever seen that document before?

18   A    No.

19   Q    So no one from the Attorney General's office

20 ever tried to provide you with a copy of that?

21   A    No.

22   Q    No one ever called you about the fact that

23 they had concluded their investigation?

24   A    No.

25   Q    And as I understand your testimony, you

1  weren't concerned about the investigation because your

2  husband was deceased and you knew they couldn't go

3  anywhere with it?

4     A   No, I just felt that he was dead and what

5  could they do to him.

6     Q   Okay.  At some point in time, did you talk to

7  Mr. Pedersen about contacting the insurance company,

8  Cuna?

9          MR. PEDERSEN:  I object to attorney/client

10  privilege, conversations she had with her counsel.

11          MR. KELLEY:  Did you authorize Mr. Pedersen

12  to contact Cuna Mutual?

13          MR. PEDERSEN:  Same objection.

14  BY MR. KELLEY:

15     Q   At some point in time, did you become aware

16  that your counsel had contacted Cuna Mutual about this

17  denial of your claim?

18     A   Was I aware of it?

19     Q   Yes.

20     A   Yes.

21          MR. PEDERSEN:  Mike, as part of an offer of

22  proof and objection, let me just ask did all of your

23  awareness come through conversations you had with

24  counsel.

25          THE WITNESS:  Yes.

1        MR. KELLEY:  Well -- and I don't want her to

2   get into the substance of those conversations; but I

3   just -- my question does not relate at all to the

4   substance of your conversations with counsel but did

5   counsel relate to you information regarding his

6   conversation with Cuna.

7        MR. PEDERSEN:  Same objection.  What I told

8   my client is privileged.

9        MR. KELLEY:  I understand.  I'm not asking

10  her to disclose what you told her.  I'm asking her

11  to -- to -- to -- to state whether you did advise her

12  of your conversation.

13        MR. PEDERSEN:  That's the same objection.

14        MR. KELLEY:  Okay.  Are you instructing her

15  not to answer that?

16        MR. PEDERSEN:  I'll allow her to answer if

17  you had conversations with counsel about contacting

18  Cuna.

19        MR. KELLEY:  All right.

20        THE WITNESS:  Yes.

21        (Telephone Data Sheet dated March 14, 2001,

22  two pages, produced and marked Mrs. Hall Exhibit No.

23  18.)

24        MR. KELLEY:  Let me show you what we'll mark

25  as Hall Exhibit 18.  Take a moment and read that.  It's

1  in script handwriting, but I think it's fairly

2  legible.

3          MR. PEDERSEN:  Take your time, Nancy.  Read

4  the whole thing.

5          THE WITNESS:  What's that?

6  BY MR. KELLEY:

7      Q    I believe it's referred and part of the word

8  is not copied.

9      A    Okay.

10     Q    For the record, this is a document dated

11 3/14/01.  It's a Cuna document referencing a phone call

12 with Mr. Pedersen regarding Tommy Bob Hall.  Were you

13 represented by Mr. Pedersen as of March 14 of 2001?

14     A    If that's what the date says, yes.

15         MR. PEDERSEN:  Do you want to clarify

16 something?

17         THE WITNESS:  No, that's fine.

18 BY MR. KELLEY:

19     Q    Mrs. Hall, you're aware that your lawyer on

20 your behalf has filed a Complaint against Cuna Mutual

21 Group and Cuna Mutual Insurance Society in this case?

22     A    Yes.

23     Q    Have you ever read the Complaint?

24     A    Yes.

25     Q    Did you read the Complaint before it was

156

1   actually filed with the court?

2        A    I don't know.

3             MR. PEDERSEN:  I'll represent on the record a

4   copy of it was mailed to Mrs. Hall before it was

5   filed.

6   BY MR. KELLEY:

7        Q    Thank you.  And are you aware that your

8   counsel has filed a motion to amend the original

9   Complaint?

10       A    No.

11       Q    Are you aware that your counsel has drafted a

12  Proposed Amended Complaint?

13       A    No.

14       Q    Prior to the early part of 1999 when you

15  found out your husband had been diagnosed with cancer,

16  did you have any knowledge of or familiarity with

17  cancer?

18       A    Just what you see on TV.

19       Q    Did you have any -- any knowledge about skin

20  cancer and what causes it and -- and things like that?

21       A    Just the sun.

22       Q    Did you have any particular knowledge about

23  lumps or moles?

24       A    Just what you see on TV.

25       Q    And when you say what you see on TV, are you

157

1  talking about news programs, documentaries?  What are

2  you referring to?

3       A    Yeah, like PBS.

4       Q    You watch PBS?

5       A    Yes, I do.

6       Q    Do you watch frequently?

7       A    Yes.

8       Q    How about the -- one of my neighbors calls

9  the Discovery channel the surgery channel because

10 there's always something on there about medical

11 information.  Do you ever watch that?

12      A    I don't have cable.

13      Q    But you watch PBS and you've seen programs on

14 PBS from time to time about cancer?

15      A    Yes.

16      Q    And this is prior to 1999?

17      A    Yes.

18      Q    Did you receive any training with regard to

19 cancer in your nurse's aide training?

20      A    No.

21      Q    What kind of information did you pick up

22 about moles in particular prior to 1999?

23      A    Just off of PBS or what you see on TV, what

24 they look like, the color, shape.

25      Q    Did any of the programs that you watched talk

158

1  about some signs to look for to determine whether or

2  not a mole is a problem?

3       A    Like I just said, the colors, the change of

4  the shape of them.  That's it.

5       Q    Did you know prior to 1999 that moles

6  potentially could be cancerous?

7       A    I didn't have any moles so I don't know.  I

8  didn't know.

9       Q    Were you ever concerned about your husband

10  because he had a number of moles on his body?

11       A    No.

12       Q    How many moles did he have?

13       A    I don't know.

14       Q    More than ten?

15       A    Yes.

16       Q    More than 20?

17       A    No.

18       Q    Somewhere between 10 and 20?

19       A    Somewhere.

20       Q    Do you know if your husband was knowledgable

21  with regard to moles?

22       A    No.

23       Q    Did he ever watch any of the programs with

24  you about moles?

25       A    Oh, I don't remember.

159

1      Q    Did he ever express any concern to you about
2 his moles?
3      A    No.
4      Q    Did you pay particular attention to him when
5 he didn't have his shirt on as to the look or
6 appearance of his moles?
7      A    Yes.
8      Q    Why did you do that?
9      A    I just looked at him, just looking at him.  I
10 wasn't looking for anything like a mole or a discolored
11 mole.  I just looked at him while he was shaving.  I
12 just watched him.
13      Q    Well -- and -- okay.  Fair enough.  But did
14 you pay particular attention to his moles though?
15      A    No.
16      Q    Have you ever discussed either this case
17 with -- against Cuna or the underlying medical
18 malpractice cases with anybody other than your
19 attorneys?
20      A    No.
21      Q    Never had conversations with friends or
22 family about the status of those cases?
23      A    No.
24      Q    What documents did you review prior to coming
25 to your deposition, if any?

160

1    A    Oh, just ones with the two letters that you

2  showed me about Cuna Mutual and the death certificate.

3    Q    That's it?

4    A    Yes.

5    Q    Three pieces of paper?

6    A    Three or four.

7    Q    After your husband was diagnosed with cancer,

8  Mrs. Hall, obviously that was a very traumatic time for

9  you; is that right?

10    A    Yes.

11    Q    Can you explain how you coped with that?

12    A    You mean while he was dying?

13    Q    After he was diagnosed and -- and while

14  the -- the disease was progressing, yes.

15    A    I took him to his chemotherapy sessions

16  because after the first two he couldn't drive hisself.

17  He got sick.  So he couldn't take hisself there or come

18  home.

19         It was hard to -- to get him to eat

20  anything.  He didn't -- couldn't eat anything.  Didn't

21  know what he was hungry or thirsty for because nothing

22  tasted good or felt good in his stomach.  I took care

23  of his medications, make sure he took his medications

24  at the right time, put his pain patches on, helped him

25  at the very end helping him to the bathroom.

161

1    Q    It brings back a lot of those memories.  I'm

2  sorry.

3    A    You don't ever forget it.

4    Q    This is the way you were feeling at the time?

5    A    I was trying to hold up for him.

6    Q    Were you able to find any support, friends,

7  family, support groups for cancer victims, anything

8  like that?

9    A    No, his mother came to live with us.

10    Q    Did that help?

11    A    She helped a little bit, yes.

12    Q    Did you ever seek out any kind of support

13  groups to help you with your situation?

14    A    No, he went too fast.

15    Q    Have you ever gone to seek any therapy,

16  anything like that to help you through it?

17    A    Me?

18    Q    Yes.

19    A    No.

20    Q    I'm talking about from the time you first

21  found out up until today.

22    A    No, friends, family.

23    Q    Friends and family.  Who's your -- who's your

24  emotional support post for you?

25    A    Right now?  Oh, sorry.  Probably my sister.

162

```
 1        Q     How about at the time when Tommy was going
 2   through his disease?
 3        A     Him.
 4        Q     Tommy?
 5        A     Yes.
 6        Q     How about after he passed away?
 7        A     Nobody.
 8        Q     No one.  And now, it's -- I'm sorry -- your
 9   sister you said?
10        A     Yeah, we're close, yes.
11        Q     What's your sister's name?
12        A     Diane Mellott.
13        Q     Since your husband passed away -- I mean what
14   I'm trying to find out is do you have good days, bad
15   days.  Do you have times where you're very emotional
16   and you need support from -- from some friends?  Does
17   that happen?
18        A     Yes.
19        Q     How often does that happen?
20        A     Well, I still think about him everyday so
21   there's always sadness everyday.  It's an everyday
22   thing.  You got to move on everyday.
23        Q     Is there ever times when you -- when you
24   can't do your work at home or you cancel plans or you
25   cancel a trip, anything like that?
```

163

1      A    I only -- I don't do this in front of people

2  so I hold off until like he's gone or I don't -- I

3  don't want to do this in front of people.  I don't want

4  to bring people down.

5           MR. KELLEY:  I think that's going to be all,

6  but let me have a few minutes just to check my notes.

7  Let's go off camera.

8           THE VIDEOGRAPHER:   Off the record at 2:08.

9           (Whereupon, the deposition concluded at 2:08

10  p.m..)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3    COUNTY OF JUNIATA              :
                                        SS
4    COMMONWEALTH OF PENNSYLVANIA :

5

6         I, Bobbi Hahn, a Notary Public, authorized to
administer oaths within and for the Commonwealth of
7    Pennsylvania, do hereby certify that the foregoing is
the testimony of NANCY HALL.
8

9         I further certify that before the taking of
said deposition, the witness was duly sworn; that the
questions and answers were taken down stenographically
10   by the said Reporter-Notary Public, and afterwards
reduced to typewriting under the direction of the said
11   Reporter.

12        I further certify that the said deposition
was taken at the time and place specified in the
13   caption sheet hereof.

14        I further certify that I am not a relative or
employee or attorney or counsel to any of the parties,
15   or a relative or employee of such attorney or counsel,
or financially interested directly or indirectly in
16   this action.

17        I further certify that the said deposition
constitutes a true record of the testimony given by the
18   said witness.

19        IN WITNESS WHEREOF, I have hereunto set my
hand this 3rd day of April, 2002.
20

21                              _Bobbi Jo Hahn_
                                Bobbi Jo Hahn, RPR
22   ┌─────────────────────────────┐   Notary Public
     │        Notarial Seal        │
23   │ Bobbi Jo Hahn, Notary Public │
     │  Greenwood Twp., Juniata County │
     │ My Commission Expires Mar. 10, 2005 │
24   │ Member, Pennsylvania Association of Notaries │
     └─────────────────────────────┘

24

25

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this date the foregoing document was served by U.S. first-class mail, postage prepaid, upon the following:

Stephen R. Pedersen, Esquire
214 Senate Avenue, Suite 602
Camp Hill, PA  17011

Catherine Mahady-Smith, Esquire
3115-A N. Front Street
Harrisburg, PA  17110


Charles T. Young, Jr.

Attorney for Defendants

Dated:  October 4, 2002