49

11/5/02

# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NANCY HALL, individually and as the Representative and Administratrix of the Estate of TOMMY HALL, deceased, her husband, | : : : : | CIVIL ACTION - LAW |
| **Plaintiff,** | : | |
| vs. | : : | 1:01-CV-1265 |
| CUNA MUTUAL GROUP; CUNA MUTUAL INSURANCE SOCIETY, | : : | |
| **Defendants.** | : | JUDGE CHRISTOPHER CONNER |

FILED
HARRISBURG, PA

NOV 0 4 2002

MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

## PLAINTIFF'S BRIEF IN SUPPORT OF
## ITS MOTION IN LIMINE

Plaintiff, by and through undersigned counsel, hereby brings a Motion in Limine with respect to the above-captioned matter. The motion asks the Court to prohibit the introduction of evidence concerning an entry in the medical records dated April 30, 1998 for which there is no evidencary foundation and which is erroneous. The motion asks that the testimony of Defendants' Expert, Mr. Gencavage, be disallowed in that it is based, in its entirety, on the erroneous entry in the medical records concerning a 1996 mole removal, which never took place. Lastly, Plaintiff requests that the Court preclude CUNA from offering a defense in this case

1

because of CUNA's refusal to respond to discovery requests despite a Court Order to do so.

**STATEMENT OF FACTS**

On or about November 18, 1998, Plaintiff, Nancy Hall, and her late husband, Tommy B. Hall, refinanced the mortgage on their home in Fayetteville, Franklin County, Pennsylvania. As part of refinancing the mortgage, Mr. Hall purchased mortgage insurance through his lender, Patriot Federal Credit Union. Defendant, CUNA Mutual Group and CUNA Mutual Insurance Society, issued a policy to the Patriot Federal Credit Union and to Mr. and Mrs. Hall.

On or about November 4, 1999, Mr. Hall died as a result of a metastatic melanoma. Within a few days thereafter, Plaintiff submitted a claim for benefits under the group mortgage insurance policy. Defendants denied Plaintiff's claim for benefits, asserting that Plaintiff's decedent had submitted a false application for mortgage insurance in that he had failed to disclose a prior doctor visit in 1993. Defendants improperly reported the conduct of Plaintiff's decedent to the fraud section of the Pennsylvania Department of Insurance. On July 9, 2001, Plaintiff Nancy Hall commenced this action, both individually and as the Administratrix of the Estate of her late husband, by filing a Complaint against Defendants, CUNA Mutual Insurance Society and CUNA Mutual Group.

I.    **ANY TESTIMONY CONCERNING, REFERENCE TO, OR THE INTRODUCTION OF EVIDENCE CONCERNING AN ENTRY IN THE MEDICAL RECORDS DATED APRIL 30, 1998, SHOULD BE EXCLUDED**

It is anticipated that the Defendants will attempt to introduce, during the course of the trial, testimony and evidence concerning an entry in the medical records dated April 30, 1998.

2

The entry states, "CA mole removed -- 96." This entry, by whomever it was made, is erroneous. Throughout the entire discovery process, including the depositions of all treating doctors and the doctor in whose medical record this entry is found, acknowledged that no such mole was removed in 1996. There is no direct testimony as to who made the entry, when it was made, the circumstances under which it was made, and whether the entry is, in fact, correct. The treating doctor, Dr. Charlesworth, was deposed and he indicated that, after meeting with Mr. and Mrs. Hall, and having a discussion concerning whether or not there was in fact a cancerous mole removed prior to that medical consultation, he concluded that a cancerous mole had not been removed and that Mr. and Mrs. Hall were not sure of the details of their medical history. See, Extracts from Dr. Charlesworth's Deposition, attached hereto as Exhibit A.

Furthermore, CUNA was not even in possession of this medical document at the time it reached its decision to deny benefits to Mr. and Mrs. Hall. The document was produced by the Plaintiff during the course of exchange of documents sometime shortly after the instigation of this lawsuit. Accordingly, it is wholly improper for the insurance company, CUNA Mutual, to attempt to introduce and rely upon a document which they did not have at the time they were making the decision whether to pay or not pay on the policy. The entry itself is erroneous. All parties know of its falsity and have discovered no documents to support the removal of a cancerous mole in 1996, despite more than a year of discovery. Accordingly, the document itself and any references to the document are only intended to mislead the jury on a false premise that there was a mole removed in 1996. In fact, no such mole was removed and no medical evidence can or will be introduced to substantiate the removal of a cancerous mole in 1996.

## II.   THE COURT SHOULD PRECLUDE MR. GENCAVAGE'S ANTICIPATED TESTIMONY CONCERNING THE APRIL 30, 1998 ENTRY

CUNA Mutual has proffered an expert report from Mr. Gencavage in which he attempts to examine the handwriting contained on the entry referred to above, and concludes that this entry was made by Mr. Hall, prior to the Application for Insurance (Mr. Gencavage's report is attached hereto as Exhibit B). The report itself is flawed, however, in that it is based on an erroneous entry. Dr. Charlesworth has testified, as indicated above, that Mr. and Mrs. Hall did not know whether or not any cancerous mole had been removed, although there was a discussion in his office concerning a prior mole removal (Dr. Charlesworth's deposition, attached hereto as Exhibit A). The only mole for which there is medical evidence and which is pertinent to this case is a 1993 mole which was removed in which there was not a finding of cancer. Rather, according to the only relevant pathology report, the finding for that mole was, "dysplastic nevus." A finding of dysplastic nevus, even according to CUNA Mutual's own Medical Director, Dr. Ansfield, is not a finding of cancer. Dr. Ansfield testified in his deposition (attached hereto as Exhibit C) that it is typical or traditional for him to rely on pathology reports in diagnosing cancer and that is, according to Dr. Ansfield, "the standard of care." He was asked the question, "If you received a pathology report that had as its findings dysplastic nevus, would you report to the patient at that time that he had cancer?" Answer: "No, I would not." Question: "Why?" Answer: "Because I don't feel that that, in itself, is a cancer." Dr. Ansfield was asked whether or not he had reviewed the 1993 pathology report during his decision-making process and, when asked the question, "Is there anything in the pathology report that in your mind indicates that there was a cancer that was removed in 1993?", he answered "No, I do not." Furthermore, he was asked the following:

4

Q.     "Let me ask the question again. Is there anything from the 93 medical records with the surgical procedure of the removal of the mole that indicates that any form of cancer was developing in Mr. Hall?"

A.     "No, there is not."

Q.     "Now, are you saying you would have expected Mr. Hall to make his own diagnosis of cancer upon the discovery of a lump in his neck?"

A.     "I don't think that that would be possible for a lay person to make the determination as to what the lump was."

Q.     "You don't have any records, do you, or any information to establish that Mr. Hall knew he had cancer on November 18, 1998, do you?" (Application date was November 18, 1998)

A.     **"No, I do not."**

Q.     "Let me rephrase the question to address the objection. Do you have any information that on November 18, 1998, Mr. Hall knew he had cancer?"

A.     "No."

Q.     "So, at the time the application was made, you have no information that Mr. Hall himself knew he had cancer in 1993?" Is that correct?"

A.     "I had no information."

Q.     "And the pathology report had a finding of dysplastic nevus?"

A.     "That is correct."

Q.     "And no finding of cancer or melanoma? Is that correct?"

A.     "That is correct."

5

Q.    "Are you aware whether or not melanoma and cancers of all types and forms can be present and undiagnosed?"

A.    "Certainly, they can be undiagnosed."

Q.    "Present and unobserved?"

A.    "That is correct."

Accordingly, Defendants' expert is going to attempt to contradict CUNA Mutual's own Medical Director, wherein that Medical Director indicates that the only relevant pathology report, the 1993 pathology report, indicated no cancerous mole (Dr. Ansfield's deposition, attached hereto as Exhibit C). A speculative report based upon a false premise that there was a cancerous mole removed in 1996 should not, and can not, be introduced to the jury when all parties know the entry is false, and do not know the circumstances under which the entry was made. However, all parties also know that the doctor has explained this entry in that he met with the patient, Mr. Hall, and concluded that there was no prior cancerous mole removed, despite a discussion between the doctor and his patient.

Furthermore, Mr. Gencavage, nowhere in his report, indicates the degree of certainty with which his report is proffered. Any expert testimony, or anticipated testimony, must be offered at least to a reasonable degree of certainty. No such standard is set by Mr. Gencavage.

Additionally, the report is wholly conclusory, without an explanation of the rationale, methodology, or a description of how the handwriting met any fully-accepted criteria. Accordingly, the report should be stricken and the anticipated testimony disallowed.

6

### III.    CUNA SHOULD BE PRECLUDED FROM OFFERING A DEFENSE IN THIS CASE BECAUSE OF DISCOVERY ABUSES

On February 28, 2002, Plaintiffs propounded Plaintiff's Second Request for Production of Documents directed to CUNA Mutual Group and CUNA Mutual Insurance Society (attached hereto as Exhibit D). The document references Federal Rule of Civil Procedure No. 34, requiring complete and full answers to the discovery requests within 30 days of service. On March 20, 2002, counsel for CUNA Mutual Group and CUNA Mutual Insurance Society objected to the propounded discovery and specifically, with respect to Requests #4 through #18, objected as follows:

> "Because Requests #4 through #18 of the Second Request for Production exceed the agreed-upon limit for requests, CUNA will not provide answers, if such answers are appropriate, due to the agreed-upon discovery limitation. Without waiving these objections, CUNA will provide those documents responsive to the Court's Order of March 7, 2002, as clarified by counsel's agreement on the record of Rich Fischer's deposition."

(Attached hereto as Exhibit E) In making this objection, counsel misstated the Court's March 7, 2002 Order and the context of the agreement reached during the Rich Fischer deposition. Neither the Court Order nor Rich Fischer's deposition in any way limited CUNA's duty to fully and completely respond to the discovery requests.

These issues were raised during a telephonic conference before Judge Rambo held on April 19, 2002. At the conclusion of that phone conference, Judge Rambo ordered that the discovery date, which had passed at that point, would remain open until May 31, 2002 for two specific purposes, as follows (Court Order attached hereto as Exhibit F):

a)      Plaintiff shall permit Defendants' Expert access to original documents for purposes of examination.  Plaintiff's counsel may be present for said examination;

b)      Defendants shall respond to questions #4 through #18 of Plaintiff's Request for Production of Documents.

Plaintiff fulfilled requirements under the Court Order when Plaintiff allowed Defendants' Handwriting Expert to examine original documents and attended the examination of those original documents, despite the close of discovery.  However, Defendants have wholly failed to comply with the Court Order.  Rather, on May 30, 2002, despite the Court Order and 15 unanswered Requests for Production of Documents, CUNA provided a single sheet of paper labeled, "Member's Financial Services", and what appears to be a small, organizational chart with certain redactions.  The document was provided on the eve of the discovery deadline and well past the required period of time for responding.  Rather than responding to the discovery requests as ordered by the Court, Defendants simply provided additional objections and refused to respond (attached hereto as Exhibit G).  This issue was raised before the Court at a recent telephonic conference and the Court instructed the parties to attempt to work it out before raising any additional Motions.  Plaintiff's counsel sent a letter on May 7, 2002 (letter attached hereto as Exhibit H) again requesting full and complete responses to Plaintiff's Second Request for Production of Documents #4 through #18.  Again, on September 12, 2002, Plaintiff wrote to CUNA Mutual, through their counsel, and indicated that the Defendants had violated the Court Order requiring the production of documents and, once again, requested full compliance with the Court Order (letter attached hereto as Exhibit I).  CUNA responded on September 17, 2002 without the production of a single additional document, but rather, provided excuses and

8

additional objections (attached hereto as Exhibit J). On September 18, 2002, Plaintiff's counsel

again wrote to CUNA Mutual delineating each violation and delineating each request and the

reason for each request (letter attached hereto as Exhibit K). CUNA Mutual, on September 19,

2002, simply responded as follows (letter attached hereto as Exhibit L):

> "I am in receipt of your letter dated September 18, 2002. Mike
> Kelley and I have reviewed your discovery requests, the Court
> Order and our discovery responses. **You are in receipt of all**
> **documents responsive to Plaintiff's Second Request for**
> **Production of Documents #4 through #18.**"

In so responding, CUNA has thwarted the discovery process, disregarded Plaintiff's

numerous requests for important documents, and, most importantly, directly violated a Court

Order requiring them to produce these documents.

Accordingly, Plaintiff requests that severe sanctions be imposed including, but not limited

to, any of those described in Federal Rule of Civil Procedure No. 26. In light of the importance of

these documents, and CUNA's continued and repeated refusal and failure to comply with a Court

Order despite numerous requests, Plaintiff requests that CUNA Mutual be prohibited from

offering a defense in this case. Additionally, Plaintiff requests the imposition of costs and attorney

fees. This type of severe sanction is specifically allowed under Federal Rule of Civil Procedure 26

and Middle District Local Rules 37.1 and 83.3.


## IV. CONCLUSION

For all of the foregoing reasons, the Court should exclude any evidence concerning the

entry in the medical records dated April 30, 1998, prohibit CUNA Mutual's expert, Mr.

## CERTIFICATE OF SERVICE

And now, this _4th_ day of _Nov._, 2002, I, Carleen S. Jensen, do hereby certify

that I have, this date, served a true and correct copy of the within **PLAINTIFF'S BRIEF IN**

**SUPPORT OF ITS MOTION IN LIMINE** upon each of the attorneys of record at the

following address(es) by sending same in the United States mail:

Michael R. Kelley, Esq.
Charles T. Young
100 Pine Street
P O Box 1166
Harrisburg, PA 17108-1166

Catherine Mahady-Smith, Esq.
3115-A N. Front Street
Harrisburg, PA 17110

DATE: _11-4-02_

Carleen S. Jensen
Assistant to Stephen R. Pedersen, Esquire
214 Senate Avenue, Suite 602
Camp Hill, PA 17011
(717) 763-1170

I. D. No. 72026
Counsel for Plaintiff

## EXHIBIT "A"



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NANCY HALL, INDIVIDUALLY AND : CIVIL ACTION - LAW
AS THE REPRESENTATIVE AND :
ADMINISTRATRIX OF THE ESTATE :
OF TOMMY HALL, DECEASED, HER :
HUSBAND, :
      PLAINTIFF :
                  :
      V :  1:01-CV-1265
                  :
CUNA MUTUAL GROUP, CUNA :
MUTUAL INSURANCE SOCIETY, :
      DEFENDANTS : JUDGE SYLVIA H. RAMBO

     DEPOSITION OF:   ERNEST E. CHARLESWORTH, M.D.

     TAKEN BY:        DEFENDANTS

     BEFORE:          PAMELA S. SULLIVAN,
                    REPORTER-NOTARY PUBLIC

     DATE:            JANUARY 9, 2002, 10:05 A.M.

     PLACE:           FAIRWAY MEDICAL ASSOCIATES
                    144 SOUTH 8TH STREET
                    CHAMBERSBURG, PENNSYLVANIA

APPEARANCES:

    McNEES WALLACE & NURICK, LLC
    BY:  MICHAEL R. KELLEY, ESQUIRE

       FOR - DEFENDANTS

    PEDERSEN & PEDERSEN
    BY:  CATHERINE M. MAHADY-SMITH,  ESQUIRE
       STEPHEN R. PEDERSEN, ESQUIRE

       FOR - PLAINTIFF



1              When Tommy presented, he and his wife, this was

2    on the note, you know, on the face sheet, cancerous mole.

3    And I said, Well, what kind of cancer?  Was it basal cell?

4    squamous cell? melanoma?  It makes a huge difference in what

5    to expect and what I should be doing as far as monitoring

6    him for follow-up.  And they had no idea.  You know, they --

7         Q    They had no idea as to the type of cancer?

8         A    Yeah.  And at the time, there was debate between

9    the two of them whether it was really cancer or not.

10        Q    What did that -- do you recall the specifics of

11   what they actually said about that?

12        A    Well, let me see what I have written.  But I

13   remember that there was a debate between the patient and his

14   wife as to whether it was really cancerous or if it was just

15   a funny-looking mole.  You know, one of them said, No, it

16   was just a funny-looking mole.  The other one said, No, I

17   think it was cancer.  I don't know what kind of cancer it

18   was.  They said, I don't know.  It really wasn't cancer

19   that's why they don't know.

20             I mean, there was this discussion back and forth

21   between the two of them.

22        Q    Can we -- I'm sorry, Doctor.  Before you move on

23   beyond that I wanted to ask you, do you recall whether it

24   was Mr. Hall or Mrs. Hall who was saying, I think it was

25   cancer, and which one was saying, no, I think it was just a

1 funny-looking mole?

2     A   Let me see if I have anything written, and I'll

3 tell you.  Okay?

4     Q   Sure.

5     A   I don't have it specified here in my written

6 records or written notes who said what.  But in my mind what

7 sticks out is that Tommy is the one that's saying it was a

8 funny mole and his wife is the one who was saying it was

9 cancer.  But I don't have a written note to corroborate

10 that, but that's the way it plays out.

11        I do clearly remember that there was debate

12 between the two of them, number one, whether it was cancer

13 or not.  And definitely nobody had any idea what type if it

14 was.  And so that's why I definitely recall requesting

15 records to find out was it cancer and what type was it.

16     Q   If you would, Doctor, turn to the next -- I'm

17 sorry.  I'm not sure if those things are still in there.

18 Yes, they are.

19        MR. KELLEY:  Let's mark this next page then as

20 Charlesworth 2.

21        (Physician progress notes, one page, produced and

22 marked Charlesworth Exhibit No. 2.)

23 BY MR. KELLEY:

24     Q   Doctor, we've marked as Charlesworth 2 a document

25 that says at the top right, Physician Progress Notes.  Do

1  And then my signature.

2      Q    Okay, let's stop right there for a moment.  And

3  this note then from April 30th, this is your note of your

4  first visit with Mr. Hall?

5      A    That's correct.

6      Q    And you recall Mrs. Hall being there as well?

7      A    Yes.

8      Q    Anybody else there other than you, Mr. and Mrs.

9  Hall?

10     A    No.  But it's strange I can even tell you which

11  exam room it was.

12     Q    Go ahead.  Amaze us.  Which exam room was it?

13     A    It was the back corner one.  The reason I can

14  tell is it's different than all the other exam rooms.  It

15  has a mechanical table, an electric table that raises.  So

16  it's different than all the other rooms.

17     Q    So the reason that Mr. Hall was there to see you

18  that day was regarding pain in his left leg?

19     A    That's correct.

20     Q    And can you explain to us what this notation then

21  about; question mark, melanoma, removed back 1996, what that

22  refers to?

23     A    The way my record is "S" subjective -- that means

24  that is information given by the patient, the family members

25  or whoever comes with the patient.  That's subjective

1  information or historical information.  "O" is objective

2  findings.  So anything that is entered in under "S" is

3  what's reported to me but not necessarily verified by other

4  information, just what's given to me by history.

5       Q     Okay.

6       A     The reason I put a question mark is because of

7  what I told you earlier.  There was a debate between the

8  husband and wife -- was it cancerous? wasn't it cancerous?

9  what type of cancer was it?

10            But, you know, my question was, Was it a

11  melanoma?  They couldn't answer it or not.  And the reason I

12  do that is because the most serious thing it could be is a

13  melanoma.  Though that's the least common, it's the most

14  serious.  And that's my -- kind of a reminder to make sure

15  we pursue this.

16       Q     Did you, in fact, pursue it?

17       A     Yeah.  That's the request for records from

18  Dr. Guthrie to see if I could get the information about what

19  it was.

20       Q     Was that request ever made?

21       A     Yes.

22       Q     Did you ever receive the records?

23       A     Let me look at my records here, and I'll tell

24  you.  I received, yeah, quite a few records.  Let me see,

25  but I'm looking to see if I got the original records from

1    '96. And I don't remember ever getting the original

2    pathology reports from 1996. I don't see them. So I don't

3    believe I ever received them.

4         Q    Did you receive any pathology reports from any

5    other time period other than 1996?

6         A    Yes.

7         Q    What report did you receive other than from 1996?

8         A    Well, that's what I'm saying, subsequent records

9    that I got included a path report dated 1-22-99.

10        Q    Okay.

11        A    And that's from a left cervical node, lymph node

12   in the neck.

13        Q    That's a different issue than what the -- than

14   what was contained on the --

15        A    Initial visit.

16        Q    -- initial intake form and discussed at the

17   initial visit?

18        A    Yes, that was a subsequent problem that we

19   addressed.

20        Q    Do you know why it is that you never received the

21   path report from back in '96?

22        A    I don't know. You can't have everything ideally

23   in an office situation. We don't have a tickler file, so to

24   speak, that if we don't get something in so many days, it

25   automatically keeps making calls or keeps making requests.

1  removed or not.

2      Q    Well, let me ask you this:  Does it appear that

3  the physician in that case was Dr. Hurley?  Do you know Dr.

4  Hurley?

5      A    Yes, I know Dr. Hurley.

6      Q    Under doctor.  Here, under doctor.

7      A    Yes, I'm sorry.  That's what I was looking for,

8  the doctor that sent the specimen.  And that was Dr. Hurley.

9  That's correct.

10     Q    Do you recall whether or not he was partners with

11 Dr. Guthrie?

12     A    Oh, yes, definitely.

13     Q    Is it fair to say, Doctor, that you would have

14 not rendered treatment or recorded as the diagnosis melanoma

15 or cancer without first seeing this pathology report

16 yourself?

17     A    If I saw this pathology report, I would not

18 record a diagnosis of cancer.

19     Q    Has anyone up until this date, including Mr.

20 Kelley here today, ever showed you any document from any

21 other physician that indicates that Mr. Hall had been

22 diagnosed with cancer prior to the 1999 events attendant to

23 the lump in his neck?

24     A    I've never seen a pathology report that shows

25 that.

1    Q    Now, have you seen -- other than the documents

2   that are in this group right now is what you're referring

3   to?

4    A    Yeah, I'm just saying Dr. Cashdollar's letter

5   refers to a pathology report.  But I've never seen it.

6    Q    And let me just address Dr. Cashdollar's letter.

7   First of all, if you take a look at that exhibit, does it

8   actually say pathology report or does it say pathology

9   revealed malignant melanoma?

10    A    Pathology revealed.

11    Q    So, now, you don't know as you sit here today --

12   and we can only find out what you know factually.  And we're

13   taking Dr. Cashdollar's deposition.  But you don't know

14   whether Dr. Cashdollar is referring to a report or to an

15   actual re-review of the slides himself attendant to his care

16   of Mr. Hall.  Is that correct?

17    A    I'm not sure what he's referring to.

18    Q    And you don't even know what pathology report

19   he's referring to.  But you know that the one that he might

20   be referring to, you know that the one that we have here

21   does not diagnose malignant melanoma.  Correct?

22    A    Right, it's a difficult diagnosis.

23    Q    So let me rephrase that question.  To date, no

24   one has shown you any records from prior to December of 1998

25   that indicate a diagnosis of melanoma or cancer by any of

1    Tommy Bob's physicians.  Is that correct?

2          A    I have no pathology reports that indicate cancer

3    until he had the metastatic lymph nodes.

4          Q    Well, and that's another question I have here.

5    You explained to Mr. Kelley what you recalled of the

6    conversation with Dr. Chicklo.  As I recall the pathology

7    report from the lymph node -- and it's probably in your

8    records, I would think, if you need to access it.  Didn't

9    the pathologist at that time indicate that this was not the

10   primary lesion, that it was indeed metastatic melanoma?

11         A    Yes.  The lymph node from the supraclavicular

12   area was a metastatic lesion on the initial path.

13         Q    So that you as physicians, you and Dr. Chicklo,

14   then would educatedly conclude that it had to come from some

15   other source.  Correct?

16         A    Yes.

17         Q    It spread from some other source.  Is that

18   correct?

19         A    Yes.

20         Q    When Mr. Kelley asked you that with regard to

21   medical records there's a requirement to be accurate and

22   complete and legible, do you recall those questions?

23         A    Yes.

24         Q    That's the goal.  Is that right?

25         A    Yes.

55

1    A    No.

2    Q    But you know for certain, even though you don't

3    recognize that handwriting, that it was by a staff member.

4    Correct?

5    A    Yes.

6    Q    So your inability to recognize the handwriting on

7    the previous page, the intake sheet, does not necessarily

8    mean it wasn't one of your staff.  Correct?

9    A    It could be.  I don't know.

10    Q    I have to ask you some questions, Doctor, that

11    are going to seem very apparent to you.  But I need to make

12    the record.  Is it fair to say that you were not present

13    during the generation of this sheet?  And if there were

14    conversations that took place between your staff or among

15    your staff and Mr. and Mrs. Hall, you weren't a witness to

16    those conversations.  Correct?

17    A    No.

18        MR. PEDERSEN:  For clarification, are you

19    referring to Exhibit 1?

20        MS. MAHADY-SMITH:  Yes.

21        MR. PEDERSEN:  Okay.

22    BY MS. MAHADY-SMITH:

23    Q    If I understood you correctly, these intake

24    sheets, Exhibit No. 1, what's been marked as Charlesworth

25    No. 1, is generally mailed to the patient and they bring it

## EXHIBIT "B"

# JOHN S. GENCAVAGE

EXAMINER OF QUESTIONED DOCUMENTS

140  HUNTER LANE, ~~BOX 7483 X X X X X~~
HARRISBURG, PA 17112
(717) 469-0497

DIPLOMATE:
AMERICAN BOARD OF FORENSIC DOCUMENT EXAMINERS
FELLOW:
AMERICAN ACADEMY OF FORENSIC SCIENCES
MEMBER:
AMERICAN SOCIETY OF QUESTIONED DOCUMENT EXAMINERS

May 28, 2002

Michael R. Kelley, Esquire
McNees, Wallace & Nurick LLC
Attorneys At Law
P.O. Box 1166
100 Pine Street
Harrisburg, PA 17108-1166


received
6 5 02 M.R.K

Re:  Hall, et al v. CUNA MUTUAL

Dear Mr. Kelley:

The following is a report covering my examination of the below
listed exhibits.  The documents were examined at the offices of
John Enders, M.D. and Michael Cashdollar, M.D. 120 North 7th
Street, Chambersburg, PA 17201 and the offices of Ernest Charlesworth,
M.D. 144 South 8th Street, Chambersburg, PA 17201.  The purpose
of this examination was to determine, if possible, whether or not
Tommy B. Hall II wrote the questioned handwriting appearing on
the Q-1 exhibit.

QUESTIONED EXHIBITS:

Q-1.  One (1) Medical History form, dated 4-30-98, in the name of
Tommy Bob Hall II, containing questioned handprinting under MEDICAL
PROBLEMS 1. "CANCEROUS MOLE - REMOVED".

STANDARDS:

The following items were submitted as documents containing known
handprinting of Tommy B. Hall II:

S-1.  One (1) Falling Spring Medical Associates New Patient
Information Record, dated 2-17-99, in the name of Hall II, Tommy B.
(front side).

S-2.  One (1) Falling Spring Medical Associates New Patient
Information Record, dated 2-23-99, in the name of Hall II, Tommy B.
(front side).

S-3.  One (1) Medical History form, dated 4-30-98, in the name of
Tommy Bob Hall II, except the entry under MEDICAL PROBLEMS 1.
"CANCEROUS MOLE - REMOVED" and all entries under DATE and
HOSPITALIZATIONS/SURGERY (front side).

Michael R. Kelley, Esquire
May 28, 2002
Page 2

OPINION:

Upon completion of a detailed examination and comparison of
the handprinting involved in this case, it is the opinion of
this examiner that the writer of the S-1 through S-3 exhibits,
Tommy B. Hall II, wrote the questioned handprinting "Cancerous
Mole - Removed" appearing under MEDICAL PROBLEMS on the Q-1
exhibit.

The questioned and standard writings compare favorably in gross
characteristics, including degree of skill, style, slant,
lateral alignment, writing movement, letter formations, proportions
and other characteristics.  All of these factors indicate that
Tommy B. Hall II wrote the handprinting in question.

If you have any questions, please contact me.

Respectfully submitted,

John S. Gencavage
Forensic Document Examiner


JSG/grg

## EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

NANCY HALL, individually and as the
Representative and Administratrix of
the Estate of Tommy Hall, deceased,
her husband,

        Plaintiff,

        v.             Case No. 1:01-CV-1265

CUNA MUTUAL GROUP, CUNA MUTUAL
INSURANCE SOCIETY,

        Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF THOMAS J. ANSFIELD, M.D.

Thursday, November 1, 2001

9:00 o'clock a.m.

Reported by:  LISA A. CREERON

1    Q    You rely on the pathology reports?

2    A    That is correct.

3    Q    Is that standard in the practice for internists such

4         as yourself to rely on pathology reports with respect

5         to moles specifically?

6                        MR. KELLEY:  Objection.  He's not

7              here to testify as an expert witness or about

8              the standard of care.  You can answer.  Go

9              ahead.

10   A    Could you repeat the question?

11   Q    Sure.  An internist such as yourself, is it typical

12        or traditional for you to rely on pathology reports?

13   A    That is correct.  That is the standard of care.

14   Q    In the last five years when was the last time that

15        you diagnosed melanoma?

16   A    I've diagnosed two suspicious lesions subsequently

17        determined to be melanoma within the last six

18        months.  Within the last five years, approximately 10

19        of my patients were referred who were subsequently

20        found to have melanoma.

21   Q    Are you aware of the term dysplastic nevus?

22   A    I am.

23   Q    Medically what does that term mean to you?

24   A    A dysplastic nevus is a dermatologic condition in

25        which there are cells that have abnormal pigment.

1    would obtain additional history.  I would also

2    arrange to have that patient followed by a

3    dermatologist or if a dermatologist is not available,

4    a surgeon in the area who is skilled and trained in

5    following these conditions appropriately, especially

6    in an individual who may have a family history of

7    melanoma or a family history of dysplastic nevi.

8         I think it's crucial to stress the need to

9    obtain follow-up.  In my patients I also will

10   evaluate the patient on an every six to 12-month

11   basis to make sure that there are no changes

12   surrounding the site of excision of the original skin

13   problem, but I would also look for new lesions and

14   instruct a patient to -- and this is done by letter,

15   to evaluate their skin at least once monthly to look

16   for new lesions.

17        I also instruct patients to have their spouse or

18   another individual examine areas that they may not be

19   able to see because of the skin location.  Example,

20   back, lower parts of the posterior body where you

21   cannot see the areas directly.

22  Q  And I'm sorry, Doctor, let me go back to the

23     question.  If you received a pathology report that

24     had as its finding dysplastic nevus, would you report

25     to the patient at that time that he had cancer?

1    A    No, I would not.

2    Q    Why?

3    A    Because I don't feel that that in itself is a

4         cancer.  I must stress, though, that in patients who

5         are considered at risk, this patient also needs to be

6         informed that the patient may be at additional risk

7         at some point in the future for developing other nevi

8         of malignant potential.

9    Q    What about a microscopic finding that within the mole

10        there were melanocytic cells, what's the significance

11        of that?

12                      MR. KELLEY:  Again let me just

13            interpose a couple of objections.  First of all,

14            I think we're still on this question of what

15            would you do in the event one of your patients

16            presented with these symptoms, and that's

17            objectionable, calls for speculation.

18                It's also objectionable because you're

19            getting into really sort of expert testimony.

20            We agree to waive all objections except as to

21            form at time of trial, so I'm going to let him

22            answer, so I just want to put that on the

23            record.

24                      MR. PEDERSEN:  Certainly.  We

25            certainly believe that these questions aren't

MADISON FREELANCE REPORTERS

15

1   Q  When did you first review that?

2   A  My memory is that I first reviewed this on

3      December 9th, 1999.  It was on that date that I

4      received an underwriting risk evaluation worksheet

5      following a claims review on the deceased,

6      Mr. Tommy Hall, who expired in 1999.  Following that

7      claim, the case was referred to me.

8   Q  And did you review the 1993 pathology report?

9   A  I did.

10  Q  And you have that report in front of you right now?

11  A  I do.

12  Q  Can you tell us on that pathology report what the

13     pathologist's interpretation was of the mole that was

14     removed?

15  A  Dysplastic nevus, skin (back).

16  Q  Do you have any information as you sit here today to

17     contradict that interpretation?

18  A  I do not.

19  Q  Is there anything in the pathology report that in

20     your mind indicates that there was a cancer that was

21     removed in 1993?

22  A  No, I do not.

23  Q  Did you review all of the medical records that --

24     this is going to get a little bit complicated.  Let

25     me just ask what medical records you reviewed as part

MADISON FREELANCE REPORTERS

16

1       of your evaluation in the underwriting claim.

2   A   In my initial review, I reviewed the biopsy report

3       and the outpatient records from the Chambersburg

4       Hospital in Chambersburg, Pennsylvania.  The

5       outpatient report lists a surgical procedure

6       conducted by Dr. James E. Hurley, which was conducted

7       on March 13th, 1993.

8   Q   The surgical report in the record that you're

9       referring to now, is there any indication on that

10      record that there was a cancer that was removed from

11      Mr. Hall?

12  A   The report lists that Mr. Hurley -- that Dr. Hurley

13      conducted the procedure on referral from

14      Dr. George Baker, and I did not have a report from

15      Dr. Baker.

16  Q   Let me ask the question again.  Is there anything

17      from the '93 contemporaneous records with the

18      surgical procedure of the removal of the mole that

19      indicates that any form of cancer was developing in

20      Mr. Hall?

21  A   No, there is not.

22  Q   What other records did you review?

23  A   I reviewed the records of Dr. Charlesworth, is that

24      correct?

25  Q   Yes.

MADISON FREELANCE REPORTERS

1    A    Which was an intake record dated April 30th, 1998.

2    Q    What of significance did you see in that record?

3    A    In that record I see a history that while Mr. Hall

4         was evaluated for leg pain, Dr. Charlesworth obtained

5         a past medical history.  Included in that history was

6         question mark -- "? melanoma removed, back, 1996."

7    Q    Do you know now as you sit here whether the '96 year

8         was accurate with respect to the removal of anything

9         on Mr. Hall's back?

10   A    In retrospect, yes, there is a question here of

11        whether or not that referred to the lesion that was

12        removed in April of 1993, but there is no name of a

13        physician.  So at that point I questioned whether or

14        not we were dealing with one lesion or two lesions,

15        one that was removed by documentation -- as

16        documented in an outpatient record from the hospital

17        or whether or not there was a second lesion that was

18        removed in 1996.

19   Q    Besides the April 30th, 1998 reference to a '96

20        event, do you have any other medical records or

21        reference to a '96 mole removal?

22   A    No, I do not.

23   Q    The entry on April 30th, 1998, do you personally

24        know as you sit here whether that was the doctor's

25        own thoughts and impressions or information conveyed

1   to him by Mr. Hall?

2 A I cannot make a determination of that.  Two possible

3   scenarios, one, and the one that subsequently was

4   considered likely was is that the patient, Mr. Hall,

5   stated that he had a melanoma removed.

6     It is also possible that the doctor, hearing

7   that -- and again this is my supposition -- that a

8   pigmented mole was removed, that the doctor may have

9   written the term melanoma.  I can't be sure.

10 Q And when you assisted in making the decision about

11   coverage and benefits and rescission of a policy, you

12   were equally unsure, weren't you?

13       MR. KELLEY:  Objection.  You can

14    answer.

15 A I was unsure, but subsequent records that were

16   obtained following Dr. Charlesworth's referral of

17   Mr. Hall on December 11th, 1998 for an evaluation of

18   a lump that developed in the lateral portion of the

19   neck, the patient was referred to a Dr. Chicklo, who

20   evaluated the patient on January 22nd, 1999.

21   Dr. Chicklo's history included the presence of a

22   malignant mole which was excised in 1993 on his back.

23 Q Now, at that point what's the date of that report?

24 A January 22nd, 1999.

25 Q That was after -- several months after Mr. Hall had

19

1      already completed the application form for insurance,

2      wasn't it?

3  A   That is correct.  If I may, I would like to go back

4      to the December 11th, 1998 note.  Dr. Charlesworth's

5      history describes that the lump on the neck had

6      occurred -- let me correct that -- was discovered by

7      the patient at least several weeks prior to the

8      evaluation of December 11th, 1998.  To me this raised

9      the possibility that the lesion or lump was

10     discovered on or about the time of the application.

11 Q   Now, are you saying you would have expected Mr. Hall

12     to make his own diagnosis of cancer upon the

13     discovery of a lump in his neck?

14 A   I don't think that that would be possible for a

15     layperson to make a determination as to what the lump

16     was.  All I am saying is that it appears that

17     Mr. Hall discovered a lump, as stated, several weeks

18     before the December 11th, 1998 visit.  Mr. Hall's

19     application for insurance was November 18th, 1998.

20 Q   You don't have any records, do you, or any

21     information to establish that Mr. Hall knew he had

22     cancer on November 18th, '98, do you?

23 A   No, I do not.

24                  MR. KELLEY:  Objection to the

25         form of the question.

MADISON FREELANCE REPORTERS

20

1  Q   Let me rephrase the question to address the

2      objection. Do you have any information that on

3      November 18th, 1998 Mr. Hall knew he had cancer?

4  A   No.

5                   MR. KELLEY:  Same objection.

6  Q   Have you reviewed subsequent to your initial and

7      second review the depositions that were taken in the

8      underlying medical malpractice case?

9  A   No.

10 Q   Are you aware that depositions were taken with

11     respect to the pathologist who did the gross

12     inspection and the microscopic inspection?

13 A   No.

14 Q   Were you aware that the deposition was taken of the

15     surgeon who removed the mole in '93?

16 A   No.

17 Q   Were you aware that those are available and your

18     counsel has those?

19 A   No.

20                   THE WITNESS:  I'm aware -- I mean

21         do you have copies?

22                   MR. KELLEY:  Yeah.  For the

23         record, they were supplied in the last couple

24         weeks.

25                   MR. PEDERSEN:  That's correct.

MADISON FREELANCE REPORTERS

1  Q   Is it consistent with your testimony that Dr. Hurley

2      testified on Page 48 of his transcript that he

3      would -- that he found a dysplastic nevus that was

4      not cancer and that the lesion had been completely

5      removed?

6                      MR. KELLEY:   Object to the form.

7          You can answer.

8  Q   Is that consistent with your understanding of the

9      pathology report and the events that happened?

10 A   I can't make a statement on that.   I've not seen the

11     deposition.

12 Q   Did you have an authorization in your possession at

13     the end of 1999 when you were evaluating this

14     potential claim to obtain medical records?

15 A   It was my request to obtain additional medical

16     records.   Following the discovery of the hospital

17     records as well as the initial evaluation conducted

18     by Dr. Charlesworth, I requested that we obtain

19     medical records from all physicians caring for the

20     patient from 1993 until the time of the decedent's

21     death.

22 Q   Didn't you specifically instruct Ms. Larson to obtain

23     the records from the treating doctor who removed the

24     mole in '93?

25 A   I did.

1      Can you tell?  Does it list 30 months?  It's fine

2      print, I know.

3   A  You have stronger glasses.  Wait a minute.  Off the

4      record.

5   Q  Let me quote from the third line towards the right, a

6      sentence that states, "I agree that this

7      authorization shall be valid for 30 months from the

8      application date."

9                      MR. KELLEY:  We'll stipulate.

10                     MR. PEDERSEN:  You'll stipulate

11       that it was valid for 30 months.

12  A  Okay.

13  Q  Did you know that records had been obtained pursuant

14     to an authorization of the insured?

15  A  Yes, we received a number of records that were

16     obtained, which included the medical records from a

17     number of physicians, including Dr. Charlesworth.  Do

18     you want me to list them all?

19  Q  No, no, that's fine.

20  A  Okay.

21  Q  Did you have an understanding that an authorization

22     existed with CUNA to obtain medical information that

23     would have also covered making a phone call?

24  A  Yes, when records were not obtained, it is my

25     understanding, and this is information that I

MADISON FREELANCE REPORTERS

25

1     recently was provided, from several of the doctors

2     who were contacted, these included the original

3     doctor who referred Mr. Hall to Dr. Hurley, and that

4     is Dr. Baker.

5         A call was made from one of our staff members,

6     Judy Baker, on January 6, 2000 in which Dr. Baker's

7     office informed her that she had -- that Dr. Baker

8     had not seen the patient since 1989.  Therefore, it

9     did not appear that there were records from that

10    physician, although that was the physician named as

11    the referring physician to Dr. Hurley.

12 Q  Doctor, if I may, let me address my questions

13    about -- concerning Dr. Hurley's records.  Did you

14    understand at the time the application for benefits

15    was made and your evaluation was taking place that

16    CUNA never obtained the records from Dr. Hurley's

17    office?

18 A  That is correct.

19 Q  Did you recommend at that point that someone or

20    perhaps yourself call Dr. Hurley and speak with him

21    about the '93 mole that was removed?

22 A  I did not.  That is normally the responsibility of

23    the claims personnel to obtain records subsequent to

24    an evaluation of the case.  But it was my

25    understanding that the file was not available.

MADISON FREELANCE REPORTERS

27

1    A    No, I did not.

2    Q    You didn't recommend that any additional steps be

3         taken to obtain information from Dr. Hurley?

4    A    I was not contacted after that time concerning those

5         records.

6    Q    Yet it was your initial request for Dr. Hurley's

7         records that started that process?

8    A    It was my initial --

9    Q    Advice.

10   A    -- request to obtain and advice.  It is advice

11        because I provide consultation to the company, a

12        request to obtain all medical records from all

13        physicians who were treating that patient so that we

14        could get an idea of exactly what was going on here.

15        Remember that there was a question of two dates

16        involved.  One was a documented record of removal of

17        a mole in April of 1993, and secondly, we had a

18        notation by Dr. Charlesworth that there was the

19        possibility at least of a mole that was removed in

20        1996.

21   Q    And through obtaining those records, we found out

22        that there wasn't any additional information about

23        anything removed in '96, isn't that right?

24   A    That is correct.

25   Q    So then the only issue was -- remaining was about the

MADISON FREELANCE REPORTERS

28

1        April '93 mole?

2    A   That is correct.

3    Q   And the person who removed the mole did not provide

4        medical records?

5    A   That is correct.

6    Q   And to your knowledge, neither you nor no one at CUNA

7        attempted to speak with him directly about those

8        records?

9    A   That's correct.

10   Q   And at that time the CUNA records reflect that

11       Dr. Hurley's records were sent to an attorney in

12       Harrisburg?

13   A   That is correct.

14   Q   And there's nothing in the record to indicate that

15       any additional effort was made to obtain the records

16       from that attorney in Harrisburg, is that right?

17   A   That's right.

18   Q   The ultimate CUNA decision to rescind the policy or

19       to deny benefits was made without Dr. Hurley's office

20       records, isn't that correct?

21   A   That's correct.

22   Q   And the decision was based upon the April '93 mole?

23   A   That's correct.

24   Q   And the failure of Mr. Hall to indicate on an

25       insurance application form that that mole was

MADISON FREELANCE REPORTERS

1    additional points to Mr. Hall?

2  A  That's correct.

3  Q  And the pathological finding that we did have from

4     '93 listed dysplastic nevus and no additional points

5     were indicated for that, isn't that right?

6  A  For the condition itself.

7  Q  Yes.

8  A  But again we had no evidence that he had any medical

9     follow-up.  And with that, my recommendation would be

10    to postpone, decline an application based on a

11    postponement until we obtain additional medical

12    records.

13 Q  Are you aware of the insurance application form?

14 A  Yes.

15 Q  The one that Mr. Hall filled out?

16 A  Yes, I am.

17 Q  And that form asked him whether or not he had been

18    diagnosed or treated for cancer, didn't it?

19 A  That's correct.

20 Q  And you testified earlier you have no information of

21    whether Mr. Hall really had cancer, clear or not,

22    until the time he filled out that application?

23              MR. KELLEY:  Objection, misstates

24        the testimony.  Go ahead, you can answer.

25 A  Other than the April 30th, 1998 visit to

MADISON FREELANCE REPORTERS

1    Dr. Charlesworth in which -- most likely in response

2    to the question, have you ever had any surgery, have

3    you ever had any conditions, Mr. Hall had to provide

4    information for -- to Dr. Charlesworth for him to

5    write, "? melanoma removed, back, 1996."

6  Q  You testified earlier that you didn't know whether

7    that was Dr. Charlesworth's own supposition or

8    whether it was information provided by the patient,

9    didn't you?

10 A  That is correct.

11 Q  So at the time the application was made, you have no

12    information that Mr. Hall himself knew he had cancer

13    in '93?

14              MR. KELLEY:  Objection, misstates

15       the testimony.

16 Q  Is that correct?

17 A  I had no information.  But I'll remind you that I'm

18    concerned about the possibility of two dates.  One is

19    a mole removed in 1993, and secondly, a notation by

20    Dr. Charlesworth that, "? melanoma removed, back,

21    1996."  My concern was we're dealing with two

22    conditions at that point.

23 Q  You did have one thing for certain, and that was a

24    pathology report from '93?

25 A  Correct.

44

1    Q   And that pathology report had a finding of dysplastic

2          nevus?

3    A   That is correct.

4    Q   And no finding of cancer or melanoma?

5                 MR. KELLEY:  Objection, asked and

6            answered several times.

7    Q   Is that correct?

8    A   That's correct.

9    Q   So with respect to this rating chart, the tumor

10        rating chart, at the time Mr. Smith -- Mr. Hall

11        filled out the application, he would have had no

12        additional assignment of points, no points, isn't

13        that right?

14    A   He would have an additional 50 points based on the

15        fact that we had no indication of follow-up.  If we

16        have no indication of follow-up, we would list that

17        as an assumption that there hasn't been a follow-up.

18    Q   That's follow-up for cancer, right, because the form

19        itself only asks whether you have cancer or not?  And

20        if you put no, you don't have to list follow-up,

21        right?

22    A   That is correct.

23    Q   So based upon the application that was filled out,

24        there was no indication for further review, obtaining

25        medical records or points being assigned, isn't that

45

1         correct?  Based upon the application --

2    A    Based on the application, that's correct.

3    Q    Are you aware of the policies and procedures within

4         CUNA Mutual to begin an investigation following the

5         death of an individual?

6    A    It is my understanding that with the death of any

7         individual, there is a claims process that is

8         initiated.

9    Q    What's your understanding of that claims process?

10   A    Information is obtained, including a death

11        certificate.  In this situation, let me comment, that

12        a death certificate was obtained in which it listed

13        the cause of death was malignant melanoma, and the

14        period of time that the melanoma was listed to be

15        present was, I believe, three years, which also to us

16        raised the question that the melanoma was previously

17        diagnosed and was present for three years.

18   Q    Are you aware whether or not melanomas and cancers of

19        all types of forms can be present and undiagnosed?

20   A    Certainly they can be undiagnosed.

21   Q    Present and unobserved?

22   A    That is correct.

23   Q    And so that didn't give you any information about

24        whether Mr. Hall knew he had cancer three years

25        previously, did it?

MADISON FREELANCE REPORTERS

46

1   A   Other than the comment of the April 30th, 1998 visit,

2       which preceded the policy date.

3   Q   We're talking about the death certificate.

4   A   The death certificate I took at its word that it was

5       melanoma that was present for a period of three

6       years.

7   Q   Are you aware of some medical literature that

8       indicates that cancers in their infancy begin at the

9       time of birth?

10  A   There is a possibility of congenital nevi which are

11      present in a quiescence form that can be activated

12      particularly to the sun.  There is that possibility.

13  Q   And the only thing insureds are required to do is

14      truthfully answer the application based on

15      information they have, isn't that true?

16  A   That is correct.

17  Q   Are you aware whether or not Dr. Hurley in his

18      deposition testified under oath that he had told

19      Mr. Hall that he did not have a cancer and that the

20      lesion had been completely removed?

21              MR. KELLEY:  Objection.  We've

22          already been over this where you asked him if he

23          was aware of those depositions, and he said he

24          was not.

25  A   No, I've not seen the deposition.

MADISON FREELANCE REPORTERS

1    A    That is correct.

2    Q    -- they're not always done that way, right?

3    A    That's correct.

4    Q    So this finding of malignant melanoma is different

5         than the pathology report from the '93 finding of

6         dysplastic nevus, isn't that correct?

7    A    That's correct.

8    Q    The Certificate No. 31590, there is a condition

9         that's disclosed by the insured of malignant

10       melanoma, and I'll ask the same question, whether

11       that's dysplastic nevus.

12    A    This lists melanoma.  It does not list dysplastic

13       nevus.

14    Q    The claim files that I've showed you, do any of them

15       give any information about whether CUNA Mutual would

16       insure someone with a finding of dysplastic nevus

17       pathologically?

18    A    We do insure people with dysplastic nevus.  We need

19       additional information if that diagnosis is made that

20       pertains to family history, family history of either

21       dysplastic nevi or melanoma and that there is

22       documentation of appropriate follow-up for the

23       condition once the diagnosis is made.

24    Q    Is there any place on the application form where the

25       insured is required to indicate a finding of

```
 1        dysplastic nevus?
 2    A   No, there is not.
 3    Q   Is there any place on the form to indicate the
 4        removal of a mole where the mole at least as reported
 5        by the physician to the patient is nonmalignant?
 6    A   State that again.
 7    Q   Is there any place on the application form to tell
 8        simply whether you had a mole removed that is
 9        noncancerous?
10    A   No, there is not.
11    Q   No requirement for the insured to indicate a
12        dysplastic nevus or a mole?
13    A   No, there is not.
14    Q   Would you agree or disagree -- in fairness, I'm
15        taking some statements from Dr. Ramirez's deposition,
16        the micro --
17    A   That's the pathologist?
18    Q   Right, who did the microscopic look.  And I
19        understand you're not a pathologist, and if this is
20        outside your area, just let me know.
21                   MR. KELLEY:  Let me interpose an
22            objection that it's outside --
23                   MR. PEDERSEN:  This is outside
24            his area?
25                   MR. KELLEY:  Yeah, obviously it's
```

MADISON FREELANCE REPORTERS

1          outside his area.  You're requiring him now to

2          comment on a deposition that he's not aware --

3          that he wasn't aware of until today and hasn't

4          read, and I don't think it's an appropriate

5          question.  Go ahead.

6     Q    A finding by a micropathologist that there were not

7          abnormal cells invading the dermis, would that be

8          more consistent with a benign or a malignant process?

9     A    I can't answer that.

10    Q    A finding by the pathologist that there were no

11         abnormal melanocytic --

12    A    Melanocytes.

13    Q    Melanocytes, that there were no abnormal melanocytes,

14         is that consistent or inconsistent with a malignant

15         process?

16    A    If the pathologist is correct, that's my

17         understanding.

18    Q    That that's consistent with a benign process?

19    A    Correct.

20    Q    Do I take it from your answers that you would defer

21         to the pathologist actually looking at the slides

22         rather than speculating yourself about the

23         microscopic findings?

24    A    That is correct.  Unless I had a history of a rapidly

25         growing lesion in which I would request review of

```
 1              a minute, wait a minute.
 2                        MR. PEDERSEN:  I'm sorry, I'm
 3          sorry.
 4    Q   Again just to clear this up, this is Dr. Sharfman's
 5        note of July 15 of 1999.  If you would review this
 6        section here again and --
 7    A   This information again states that the "pathology
 8        showed a malignant melanoma."  And that refers to the
 9        1993 mole that was removed.
10                        MR. KELLEY:  Thank you.  Go
11          ahead.
12                      REEXAMINATION
13    BY MR. PEDERSEN:
14    Q   You've read from two medical records, one in February
15        of '99 and one in July of '99 that refer to pathology
16        from the '93 mole, is that correct?
17    A   That's correct.
18    Q   You, however, have the '93 pathology report yourself,
19        right?
20    A   That is correct.
21    Q   You had it in your file at the time the evaluation
22        was made?
23    A   Yes.
24    Q   And does that pathology report indicate anywhere on
25        it malignant melanoma?
```

68

1    A   It does not.  But I must remind you that there are

2          medical records that we requested both from

3          Dr. Hurley and from Dr. Baker requesting information,

4          and we were told that there were no records

5          available.  So I had no idea whether or not there had

6          been a review, a re-review of that slide made

7          somewhere in the past.

8    Q   Let me clarify.  So what you're saying, in February

9          of '99 and July of '99 you don't know whether those

10         doctors are commenting about the pathology report or

11         a re-review of the slides or a new resection?

12    A   That's correct.

13    Q   The information then described in February of '99 and

14         July of '99, they don't tell us anything about what

15         Mr. Hall knew at the time he filled out his

16         application about whether he had cancer, do they?

17                        MR. KELLEY:  Objection.

18    A   Let me make this comment about all of these reports.

19         This is listed in a history of the present illness.

20         That is normally information obtained from the

21         patient.  And it's also very clear that these

22         documents state unequivocally that, quote -- as an

23         example, quote, the July 15th, 1999 note from

24         Dr. Sharfman that it states unequivocally, "Pathology

25         showed a malignant melanoma."

MADISON FREELANCE REPORTERS

<u>**EXHIBIT "D"**</u>

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**LAW OFFICES OF**
**STEPHEN R. PEDERSEN, ESQUIRE**
**214 SENATE AVENUE, SUITE 602**
**CAMP HILL, PA 17011**
**717) 763-1170**

**ATTORNEY FOR PLAINTIFF:**
**NANCY HALL**

---

| | | |
|---|---|---|
| **NANCY HALL, individually and as the** | : | **CIVIL ACTION - LAW** |
| **Representative and Administratrix of** | : | **NO. 1:01-CV-1265** |
| **the Estate of Tommy Hall, deceased,** | : | |
| **her husband,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **CUNA MUTUAL GROUP, CUNA** | : | **JUDGE SYLVIA H. RAMBO** |
| **MUTUAL INSURANCE SOCIETY,** | : | |
| **Defendants.** | : | |

<u>**PLAINTIFF'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS**
**DIRECTED TO CUNA MUTUAL GROUP,**
**CUNA MUTUAL INSURANCE SOCIETY**</u>

This Request for Production of Documents shall be deemed to be continuing in nature so as to require the production of further documents obtained between the date this present Request is responded to and the date of trial or such earlier time as the Court in this case may fix as the deadline for the production of documents which are to be used or will be usable at the trial of the case.

Please take notice that pursuant to Fed. R.Civ. P. No. 34, please furnish our office, within thirty (30) days of service hereof, a photostatic copy or like reproduction of the materials concerning this action or its subject matter which are in your possession, custody or control and

which are not protected by the attorney/client privilege; or, in the alternative, produce the said

matter at said time to permit inspection and copying thereof.

## RECORDS TO BE PRODUCED

     1.     A full and complete copy of the group policy issued by CUNA Mutual to Patriot

Federal Credit Union, Chambersburg, Pennsylvania.

     2.     All CUNA Mutual policy and procedure manuals for each of the following

categories:

    a)     underwriting, with respect to credit life insurance policies;
    b)     home mortgage protection policies and procedures if different than a);
    c)     initial underwriting manuals that relate to pre-claim investigations in the
           credit life insurance area;
    d)     all re-insurance manuals that in any respect relate to credit life underwriting;
    e)     all policy and procedure manuals that relate to claims administration;
    f)     the manual, policies and procedures that relate to CUNA Mutual's special
           unit investigation;
    g)     for each of the above, provide updates, bulletins, internal memoranda or other
           documents which in any way update or keep current the policies and procedure
           manuals produced.
    h)     entire 1997 Lincoln National Reassurance Company Manual.

     3.     All documents of any type that relate to information provided to field offices or

provided from field offices with respect to the home life insurance division.

     4.     All documents of any type that relate to information provided to specifically

Federal Credit Union in Chambersburg, PA or provided from Federal Credit Union with respect

to the home life insurance division, including, but not limited to, contracts, agreements,

memoranda and documents.

     5.     Copies of all contested claims within CUNA Mutual within the home life insurance

area for the past 3 years, including, but not limited to, the entire claims file for each of those

contested claims.

6.    A CUNA Mutual organizational chart which shows the name, title and position of each of the employees and supervisors within the home life insurance area of CUNA Mutual.

7.    A CUNA Mutual organizational chart which shows the name, title and position of each of the employees and supervisors within the credit life insurance area of CUNA Mutual.

8.    A CUNA Mutual organizational chart which shows the relationships and reporting responsibilities and chain of command with respect to the overlap between home life and credit life.

*NOTE: For each of the 3 items above, provide the charts that were in effect on November 18, 1998 and each subsequent chart as it was modified through the present        time.

9.    All annual statements for the years ending 1998, 1999, 2000 and 2001.

10.    All internal profit and loss calculations and statements with respect to credit life for the years 1998, 1999, 2000 and 2001.

11.    All internal profit and loss calculations and statements with respect to home mortgage insurance for the years 1998, 1999, 2000 and 2001.

12.    All statistical data and documents which reflect home mortgage protection applications received by CUNA Mutual for the period 1998, 1999, 2000 and 2001 showing the percentage approved, declined and the percentage of applications for which additional information was sought by CUNA Mutual prior to acceptance of the application.  For those which more information is sought by CUNA, provide statistical data as to how many are ultimately accepted or declined.

13.    For all home mortgage protection policies issued by CUNA Mutual, provide the statistical data concerning the number of claims submitted within two years of the issuance of an insurance certificate.  Of those that are submitted, provide statistical data concerning the number

of claims paid and the amount of payment, and the numbers contested. Of the contested claims, provide the statistical data showing the numbers ultimately paid in the contest process and the numbers not paid, and those that are still in process. Each of the data required above under each of the entries should be categorized by both the face amount of the policy and the number of claims.

14.    With respect to the claims that are denied, show the statistical data with respect to the number of claims which are referred to any Attorney General offices or other criminal investigation unit for fraud.

15.    CUNA Mutual's Annual Policy Report/Statement for the public dated 1997, 1998, 1999, 2000 and 2001.

16.    CUNA Mutual's Annual Policy Report/Statement provided to Wisconsin and Pennsylvania insurance departments in 1997, 1998, 1999, 2000 and 2001.

17.    Provide copy of all forms of individual insurance applications used in November, 1998 in the state of Pennsylvania by CUNA Mutual.

18.    The respective mortality tables in effect as of November, 1998 used in pricing the following types of insurance:

    a)    home life insurance policy issued to Tommy Bob Hall;
    b)    individual life insurance line of business with respect to individuals Tommy Bob Hall's age;
    c)    both tables and mortality rates for males Tommy Bob Hall's age;
    d)    provide all information for both smokers and non-smokers.

Respectfully submitted,

Stephen R. Pedersen
214 Senate Ave., Suite 602
Camp Hill, PA 17011
(717) 763-1170
I. D. No. 72026
Counsel for Plaintiff

DATE: 2-28-02

## CERTIFICATE OF SERVICE

And now, this _29th_ day of _Feb._, 2001, I, Carleen S. Jensen, do hereby certify

that I have, this date, served a true and correct copy of the within **PLAINTIFF'S SECOND**

**REQUEST FOR PRODUCTION OF DOCUMENTS** upon each of the attorneys of record at

the following address(es) by sending same in the United States mail:

Michael R. Kelley, Esq.
Charles T. Young
100 Pine Street
P O Box 1166
Harrisburg, PA 17108-1166

Catherine Mahady-Smith, Esq.
3115-A N. Front Street
Harrisburg, PA 17110

DATE: _2-28-02_

Carleen S. Jensen
Assistant to Stephen R. Pedersen, Esquire
214 Senate Avenue, Suite 602
Camp Hill, PA 17011
(717) 763-1170

I. D. No. 72026
Counsel for Plaintiff

## EXHIBIT "E"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NANCY HALL, individually and as the Representative and Administratrix of the Estate of Tommy Hall, deceased, her husband,<br>　　　　　　　Plaintiff<br><br>　　　vs.<br><br>CUNA MUTUAL GROUP, CUNA MUTUAL INSURANCE SOCIETY,<br>　　　　　Defendants | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL ACTION - LAW<br><br>NO. 1:01-CV-1265<br><br><br><br>JUDGE SYLVIA H. RAMBO |

## CUN'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS DIRECTED TO CUNA MUTUAL GROUP, CUNA MUTUAL INSURANCE SOCIETY

Pursuant to Fed. R. Civ. P. No. 34, Defendants, CUNA Mutual Group and Cuna Mutual Insurance Society ("CUNA"), responds to Plaintiff's Second Request for Production of Documents by objecting and otherwise responding to the Requests as follows:

### GENERAL OBJECTIONS

1.　　　CUNA objects to the document requests on the grounds that Plaintiff seeks the discovery of information which is not relevant to the claim or defense of any party, and is not reasonably calculated to lead to the discovery of admissible evidence.

2.     CUNA objects to the document requests on the grounds and to the extent that Plaintiff seeks information or documents protected from disclosure by the attorney-client privilege, the attorney work product privilege.

3.     CUNA objects to Plaintiff's document requests to the extent that they require CUNA to take action and/or provide information not required by Fed. R. Civ. P. 34.

4.     CUNA objects to the document requests upon the grounds that the manner in which they are worded are so vague, broad, general, and all inclusive that they do not permit a proper or reasonable response and are, therefore, unduly burdensome and oppressive.

5.     CUNA objects to the document requests on the grounds and to the extent that Plaintiff seeks to have CUNA make certain conclusions as to the legal significance of certain documents which it is not required to make and which must be determined by the Court in this action.

6.     CUNA objects to any inference that can be drawn from any portion of the document requests or this response to them that the documents requested or events referred to in the requests actually occurred.  The failure to object to each such inference in no way constitutes an admission by CUNA that such information exists or that such events actually occurred.

7.     CUNA objects to any attempt to impose upon it an obligation to supplement its responses beyond its obligation under the Federal Rules of Civil Procedure.

8.     These requests exceed the agreed upon limit of Requests for Production of Documents set forth in the Joint Case Management Plan which was filed with the Court.

## RECORDS TO BE PRODUCED

### RESPONSES

1.     A full and complete copy of the group policy issued by CUNA Mutual to Patriot Federal Credit Union, Chambersburg, Pennsylvania.

This document has already been disclosed.

2.      All CUNA Mutual policy and procedure manuals for each of the following

categories:

    a)    underwriting, with respect to credit life insurance policies;
    b)    home mortgage protection policies and procedures if different than a);
    c)    initial underwriting manuals that relate to pre-claim investigations in the credit life insurance area;
    d)    all re-insurance manuals that in any respect relate to credit life underwriting;
    e)    all policy and procedure manuals that relate to claims administration;
    f)    the manual, policies and procedures that relate to CUNA Mutual's special unit investigation;
    g)    for each of the above, provide updates, bulletins, internal memoranda or other documents which in any way update or keep current the policies and procedure manuals produced.
    (h)    entire 1997 Lincoln National Reassurance Company Manual.

See General Objections. Without waiving these objections, all relevant, non-privileged information will be provided.

3.      All documents of any type that relate to information provided to field offices or

provided from field offices with respect to the home life insurance division.

See General Objections. Without waiving these objections, information related to brochures provided to field offices was provided at the deposition of Deb Haglund.

4.      All documents of any type that relate to information provided to specifically

Federal Credit Union in Chambersburg, PA or provided from Federal Credit Union with respect

to the home life insurance division, including, but not limited to, contracts, agreements,

memoranda and documents.

See General Objections. Because Request Numbers 4-18 of the Second Request for Production exceed the agreed upon limit for requests, CUNA will not provide answers, if such answers are appropriate, due to the agreed upon discovery limitation. Without waiving these objections, CUNA will provide those documents responsive to the Court's Order of <u>March 7, 2002</u>, as clarified by counsel's agreement on the record of Rich Fischer's deposition.

5.    Copies of all contested claims within CUNA Mutual within the home life insurance area for the past 3 years, including, but not limited to, the entire claims file for each of those contested claims.

See General Objections. Because Request Numbers 4-18 of the Second Request for Production exceed the agreed upon limit for requests, CUNA will not provide answers, if such answers are appropriate, due to the agreed upon discovery limitation. Without waiving these objections, CUNA will provide those documents responsive to the Court's Order of March 7, 2002, as clarified by counsel's agreement on the record of Rich Fischer's deposition.

6.    A CUNA Mutual organizational chart which shows the name, title and position of each of the employees and supervisors within the home life insurance area of CUNA Mutual.

See General Objections. Because Request Numbers 4-18 of the Second Request for Production exceed the agreed upon limit for requests, CUNA will not provide answers, if such answers are appropriate, due to the agreed upon discovery limitation. Without waiving these objections, CUNA will provide those documents responsive to the Court's Order of March 7, 2002, as clarified by counsel's agreement on the record of Rich Fischer's deposition.

7.    A CUNA Mutual organizational chart which shows the name, title and position of each of the employees and supervisors within the credit life insurance area of CUNA Mutual.

See General Objections. Because Request Numbers 4-18 of the Second Request for Production exceed the agreed upon limit for requests, CUNA will not provide answers, if such answers are appropriate, due to the agreed upon discovery limitation. Without waiving these objections, CUNA will provide those documents responsive to the Court's Order of March 7, 2002, as clarified by counsel's agreement on the record of Rich Fischer's deposition.

8.    A CUNA Mutual organizational chart which shows the relationships and reporting responsibilities and chain of command with respect to the overlap between home life and credit life.

*NOTE: For each of the 3 items above, provide the charts that were in effect on November 18, 1998 and each subsequent chart as it was modified through the present time.

See General Objections. Because Request Numbers 4-18 of the Second Request for Production exceed the agreed upon limit for requests, CUNA will not provide answers, if such answers are appropriate, due to the agreed upon discovery limitation. Without waiving these

- 4 -

objections, CUNA will provide those documents responsive to the Court's Order of <u>March 7, 2002</u>, as clarified by counsel's agreement on the record of Rich Fischer's deposition.

    9.     All annual statements for the years ending 1998, 1999, 2000 and 2001.

    See General Objections. Because Request Numbers 4-18 of the Second Request for Production exceed the agreed upon limit for requests, CUNA will not provide answers, if such answers are appropriate, due to the agreed upon discovery limitation. Without waiving these objections, CUNA will provide those documents responsive to the Court's Order of <u>March 7, 2002</u>, as clarified by counsel's agreement on the record of Rich Fischer's deposition.

    10.     All internal profit and loss calculations and statements with respect to credit life for the years 1998, 1999, 2000 and 2001.

    See General Objections. Because Request Numbers 4-18 of the Second Request for Production exceed the agreed upon limit for requests, CUNA will not provide answers, if such answers are appropriate, due to the agreed upon discovery limitation. Without waiving these objections, CUNA will provide those documents responsive to the Court's Order of <u>March 7, 2002</u>, as clarified by counsel's agreement on the record of Rich Fischer's deposition.

    11.     All internal profit and loss calculations and statements with respect to home mortgage insurance for the years 1998, 1999, 2000 and 2001.

    See General Objections. Because Request Numbers 4-18 of the Second Request for Production exceed the agreed upon limit for requests, CUNA will not provide answers, if such answers are appropriate, due to the agreed upon discovery limitation. Without waiving these objections, CUNA will provide those documents responsive to the Court's Order of <u>March 7, 2002</u>, as clarified by counsel's agreement on the record of Rich Fischer's deposition.

    12.     All statistical data and documents which reflect borne mortgage protection applications received by CUNA Mutual for the period 1998, 1999, 2000 and 2001 showing the percentage approved, declined and the percentage of applications for which additional information was sought by CUNA Mutual prior to acceptance of the application. For those which more information is sought by CUNA, provide statistical data as to how many are ultimately accepted or declined.

    See General Objections. Because Request Numbers 4-18 of the Second Request for Production exceed the agreed upon limit for requests, CUNA will not provide answers, if such

answers are appropriate, due to the agreed upon discovery limitation. Without waiving these objections, CUNA will provide those documents responsive to the Court's Order of <u>March 7, 2002</u>, as clarified by counsel's agreement on the record of Rich Fischer's deposition.

13.     For all home mortgage protection policies issued by CUNA Mutual, provide the statistical data concerning the number of claims submitted within two years of the issuance of an insurance certificate. Of those that are submitted, provide statistical data concerning the number of claims paid and the amount of payment, and the numbers contested. Of the contested claims, provide the statistical data showing the numbers ultimately paid in the contest process and the numbers not paid, and those that are still in process. Each of the data required above under each of the entries should be categorized by both the face amount of the policy and the number of claims.

See General Objections. Because Request Numbers 4-18 of the Second Request for Production exceed the agreed upon limit for requests, CUNA will not provide answers, if such answers are appropriate, due to the agreed upon discovery limitation. Without waiving these objections, CUNA will provide those documents responsive to the Court's Order of <u>March 7, 2002</u>, as clarified by counsel's agreement on the record of Rich Fischer's deposition.

14.     With respect to the claims that are denied, show the statistical data with respect to the number of claims which are referred to any Attorney General offices or other criminal investigation unit for fraud.

See General Objections. Because Request Numbers 4-18 of the Second Request for Production exceed the agreed upon limit for requests, CUNA will not provide answers, if such answers are appropriate, due to the agreed upon discovery limitation. Without waiving these objections, CUNA will provide those documents responsive to the Court's Order of <u>March 7, 2002</u>, as clarified by counsel's agreement on the record of Rich Fischer's deposition.

15.     CUINA Mutual's Annual Policy Report/Statement for the public dated 1997, 1998, 1999, 2000 and 2001.

See General Objections. Because Request Numbers 4-18 of the Second Request for Production exceed the agreed upon limit for requests, CUNA will not provide answers, if such answers are appropriate, due to the agreed upon discovery limitation. Without waiving these

objections, CUNA will provide those documents responsive to the Court's Order of <u>March 7,</u>
<u>2002</u>, as clarified by counsel's agreement on the record of Rich Fischer's deposition.

     16.     CUNA Mutual's Annual Policy Report/Statement provided to Wisconsin and
Pennsylvania insurance departments in 1997, 1998, 1999, 2000 and 2001.

     See General Objections.  Because Request Numbers 4-18 of the Second Request for
Production exceed the agreed upon limit for requests, CUNA will not provide answers, if such
answers are appropriate, due to the agreed upon discovery limitation.  Without waiving these
objections, CUNA will provide those documents responsive to the Court's Order of <u>March 7,</u>
<u>2002</u>, as clarified by counsel's agreement on the record of Rich Fischer's deposition.

     17.     Provide copy of all forms of individual insurance applications used in November,
1998 in the state of Pennsylvania by CUNA Mutual.

     See General Objections.  Because Request Numbers 4-18 of the Second Request for
Production exceed the agreed upon limit for requests, CUNA will not provide answers, if such
answers are appropriate, due to the agreed upon discovery limitation.  Without waiving these
objections, CUNA will provide those documents responsive to the Court's Order of <u>March·7,</u>
<u>2002</u>, as clarified by counsel's agreement on the record of Rich Fischer's deposition.

     18.     The respective mortality tables in effect as of November, 1998 used in pricing the
following types of insurance:

     a)     home life insurance policy issued to Tommy Bob Hall;
     b)     individual life insurance line of business with respect to individuals Tommy Bob
           Hall's age;
     c)     both tables and mortality rates for males Tommy Bob Hall's age;
     d)     provide all information for both smokers and nonsmokers.

See General Objections.  Because Request Numbers 4-18 of the Second Request for Production exceed the agreed upon limit for requests, CUNA will not provide answers, if such answers are appropriate, due to the agreed upon discovery limitation.  Without waiving these objections, CUNA will provide those documents responsive to the Court's Order of <u>March 7, 2002</u>, as clarified by counsel's agreement on the record of Rich Fischer's deposition.

McNEES WALLACE & NURICK LLC

By _____

Michael R. Kelley
Charles T. Young
100 Pine Street
P.O. Box 1166
Harrisburg, PA  17108-1166
(717) 237-5322

Attorneys for Defendants
CUNA Mutual Group and CUNA Mutual
  Insurance Society

Dated: 3/20/02

- 8 -

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this date the foregoing document was served by first-class mail, postage prepaid, upon the following:

Stephen R. Pedersen, Esquire
214 Senate Avenue, Suite 602
Camp Hill, PA  17011

Catherine Mahady-Smith, Esquire
3115-A N. Front Street
Harrisburg, PA  17110

Michael R. Kelley
Attorney for Defendants,
CUNA Mutual Group and CUNA Mutual
Insurance Society

Dated: 3/20/02

EXHIBIT "F"

(21)
4-19-02
MA

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NANCY HALL,

      **Plaintiff**

      v.

CUNA MUTUAL GROUP;
AND CUNA MUTUAL INSURANCE,

      **Defendants**

:
:
:
:
:
:
:
:
:
:

CIVIL NO. 1:CV-01-1265



FILED

APR 1 9 2002

PER _____ MA
HARRISBURG, PA.        DEPUTY CLERK

ORDER

Pursuant to a conference call this date, **IT IS HEREBY ORDERED THAT** the deadlines set forth in the November 9, 2001 case management order are amended as stated below. Counsel shall note that all other provisions of the November 9, 2001 case management order remain in effect.

1) Discovery is reopened until May 31, 2002, **only for the following purposes:**

    a) Plaintiff shall permit Defendants' expert access to original documents for purposes of examination. Plaintiff's counsel may be present for said examination.

    b) Defendants shall respond to questions 4 through 18 of Plaintiff's request for production of documents.

2) The deadline for Plaintiff's expert is July 1, 2002.

3) The deadline for Defendants' expert report is July 31, 2002.

4) The deadline for supplemental/rebuttal reports is August 15, 2002.

5) Dispositive motions **and** supporting briefs shall be filed no later than August 30, 2002.

6) Motions *in limine* **and** supporting briefs shall be filed no later than November 4, 2002.

7) Pretrial memoranda shall be filed no later than **noon** on Wednesday, November 20, 2002, in conformity with the local rules.

8) The pretrial conference is rescheduled from October 4, 2002 to Wednesday, November 27, 2002 at 1:30 p.m. in the chambers of Courtroom No. 3.

9) This case is removed from the October 2002 trial list and is added to the December 2002 trial list. Jury selection for cases on the December list will commence at 9:30 a.m. on Monday, December 2, 2002 in Courtroom No. 3, Eighth Floor, Federal Building, Third and Walnut Streets, Harrisburg, Pennsylvania. Counsel are advised that criminal cases have priority and may delay the commencement of civil trials. A date certain for trial may be discussed at the pretrial conference; however, counsel shall be prepared to go forward with trial at any time during the trial term.

SYLVIA H. RAMBO
United States District Judge

Dated: April *19*, 2002.

2

5/30/0

<u>EXHIBIT "G"</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NANCY HALL, individually and as the Representative and Administratrix of the Estate of Tommy Hall, deceased, her husband, | : : : : | CIVIL ACTION - LAW<br><br>NO. 1:01-CV-1265 |
| Plaintiff | : | |
| | : | |
| vs. | : | |
| | : | |
| CUNA MUTUAL GROUP, CUNA MUTUAL INSURANCE SOCIETY, | : : | JUDGE SYLVIA H. RAMBO |
| Defendants | : | |

**DEFENDANT'S SUPPLEMENTAL RESPONSES TO
<u>PLAINTIFF'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS</u>**

**I. <u>EXPLANATION FOR REVISED ANSWERS</u>**

These answers are submitted in a good faith attempt to comply with the Court's

Order of April 19, 2002.  The undersigned counsel for CUNA was unavailable for the

discovery conference with the Honorable Sylvia J. Rambo prior to issuance of the above-

referenced Order, and the undersigned counsel therefore was not a party to the discovery

conference.  It is nonetheless the undersigned counsel's understanding that the Court

overruled CUNA's objections to responding to question nos. 4 through 18 of Plaintiff's

Second Request for Production of Documents on the basis that those questions exceeded

the agreed upon number of document requests.  Our understanding is based, in part, on

Plaintiff's counsel May 7, 2002 correspondence in which he notes:

As noted on the court order and on the discovery responses, you answered each of these questions by objecting that the question exceeded those agreed to in prediscovery. The court has overruled that objection and instructed you to answer each of those questions fully.

CUNA objected, however, to questions nos. 14 through 18 on a number of other bases, and CUNA also responded to each of the document requests, nos. 4 through 18, by noting:

Without waiving these objections, CUNA will provide those documents responsive to the Court's Order of March 7, 2002, as clarified by counsel's agreement on the record of Rich Fischer's deposition.

Pursuant to the responses set forth in nos. 4 through 18, and the agreement of counsel reached during Rich Fischer's deposition, CUNA produced on or before March 28, 2002 all relevant documents requested, unless specifically noted in these supplemental answers.

## II. SUPPLEMENTAL ANSWERS TO PLAINTIFF'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS 4-18

4.      See General Objections 1-7 set forth in CUNA's response dated March 20, 2002. Without waiving these objections, the documents responsive are the credit union information pamphlet which has previously been produced at the deposition of Deb Haglund, and the documents provided under cover letter dated March 26, 2002.

5.      See General Objections 1-7 set forth in CUNA's response dated March 20, 2002. Without waiving these objections, CUNA has supplied documents pursuant to this Court's Order of March 7, 2002, as clarified by counsel's agreement on the record of Rich Fischer's deposition, and pursuant to cover letters dated March 26, 2002, by facsimile dated March 27, 2002, and at the deposition of Rich Fischer on March 28, 2002. By way of further response, CUNA has no record of any "contested" claim in the home mortgage protection area in the past three years with the exception of the claim brought by Mrs. Hall.

6.    See General Objections 1-7 set forth in CUNA's response dated March 20, 2002. Without waiving these objections, attached is an organizational chart.

7.    See General Objections 1-7 set forth in CUNA's response dated March 20, 2002. Without waiving these objections, attached is an organizational chart.

8.    See General Objections 1-7 set forth in CUNA's response dated March 20, 2002. Without waiving these objections, attached is an organizational chart.

9.    See General Objections 1-7 set forth in CUNA's response dated March 20, 2002. Without waiving these objections, the annual statements were provided by letter dated March 26, 2002.

10.    See General Objections 1-7 set forth in CUNA's response dated March 20, 2002. Without waiving these objections, such information was provided under cover letter dated March 26, 2002, and via facsimile dated March 27, 2002, and at the deposition of Rich Fischer on March 28, 2002.

11.    See General Objections 1-7 set forth in CUNA's response dated March 20, 2002. Without waiving these objections, such information was provided under cover letter dated March 26, 2002, and via facsimile dated March 27, 2002, and at the deposition of Rich Fischer on March 28, 2002.

12.    See General Objections 1-7 set forth in CUNA's response dated March 20, 2002. Without waiving these objections, such information was provided under cover letter dated March 26, 2002, and via facsimile dated March 27, 2002, and at the deposition of Rich Fischer on March 28, 2002.

13.    See General Objections 1-7 set forth in CUNA's response dated March 20, 2002. Without waiving these objections, such information was provided under cover letter

dated March 26, 2002, and via facsimile dated March 27, 2002, and at the deposition of Rich Fischer on March 28, 2002.

14.    See General Objections 1-7 set forth in CUNA's response dated March 20, 2002. Without waiving these objections, such information was provided under cover letter dated March 26, 2002, and via facsimile dated March 27, 2002, and at the deposition of Rich Fischer on March 28, 2002.

15.    See General Objections 1-7 set forth in CUNA's response dated March 20, 2002. Without waiving these objections, such information was provided under cover letter dated March 26, 2002, and via facsimile dated March 27, 2002, and at the deposition of Rich Fischer on March 28, 2002.

16.    See General Objections 1-7 set forth in CUNA's response dated March 20, 2002. Without waiving these objections, such information was provided under cover letter dated March 26, 2002, and via facsimile dated March 27, 2002, and at the deposition of Rich Fischer on March 28, 2002.

17.    See General Objections 1-7 set forth in CUNA's response dated March 20, 2002. Without waiving these objections, such information was provided under cover letter dated March 26, 2002, and via facsimile dated March 27, 2002, and at the deposition of Rich Fischer on March 28, 2002.

18.     See General Objections 1-7 set forth in CUNA's response dated March 20, 2002. Without waiving these objections, such information was provided under cover letter dated March 26, 2002, and via facsimile dated March 27, 2002, and at the deposition of Rich Fischer on March 28, 2002.

McNEES WALLACE & NURICK LLC

By _____
      Michael R. Kelley
      Charles T. Young
      100 Pine Street
      P.O. Box 1166
      Harrisburg, PA  17108-1166
      (717) 237-5322

Attorneys for Defendants
CUNA Mutual Group and CUNA Mutual
   Insurance Society

Dated:  5/30/02



MEMBERS
FINANCIAL SERVICES

Sales & Marketing

Jim Gowan (Interim)

Credit Union Marketing
and Sales Support
Dan Kaiser

MEMBER Marketing
and Sales Support
Kevin Lentz

Customer Service
· Services to Members
  - Reid Koenig
· IRA Admin Services
  - Scott Schuppe

Assistant to
Chief Officer
Ann Briggs

MEMBERS Enterprise

Dan Meylink

Executive Assistant
Phillis Meisel

Product Management
· Asset Accumulation
  -Bob Buckingham
· Credit Insurance
  - Rich Fischer
· CU Consumer Products
  -Mike Armstrong
· Debt Cancellation
  -Steve Martin
· Life/Health, MPC
  -Mike Hulme

Support Functions
· Finance
  -Joette Schlelsman
· IT/Development
  - Brenda Schuppe

Support Functions
· Human Resources
  - Adrian Talbot
· Legal
  - Rob Rusch

· Credit Union Marketing: Expand MEMBERS Financial Services to all credit unions through CDP partnership with DLT's & ARM's.
· MEMBER Marketing: Use member information and analysis to develop and drive MDP processes -- sales to members -- through F2F reps and direct channels.
· Customer Service: Support distribution efforts and cross-selling service after sale.
· Product Management: Provide top tier products; manage their growth and profitability.
· Support Functions: Provide leadership and resource support to MEMBERS Enterprise staff and business processes.

CUNA MUTUAL GROUP
Revised 4/23/02

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this date a true and correct copy of the

foregoing document was served by first-class mail, postage prepaid, upon the following

counsel of record.

> Stephen R. Pedersen, Esquire
> 214 Senate Avenue, Suite 602
> Camp Hill, PA  17011
>
> Catherine Mahady-Smith, Esquire
> 3115-A N. Front Street
> Harrisburg, PA  17110

Michael R. Kelley

Of Counsel for Defendants
CUNA Mutual Group and CUNA Mutual
   Insurance Society

Dated: 5/30/02

<u>EXHIBIT "H"</u>

# Stephen R. Pedersen, Esq.

### Attorney at Law

214 Senate Avenue, Suite 602  • Camp Hill, PA 17011
Tel: (717) 763-1170  • Fax: (717) 763-1460

May 7, 2002

Michael R. Kelley, Esq.
McNees Wallace & Nurick
100 Pine Street
P O Box 1166
Harrisburg, PA 17108-1166

**Re:    Nancy Hall vs. CUNA Mutual Group**

**Via fax ( #237-5300) and U. S. Mail**

Dear Mike:

I understand that your handwriting expert will be reviewing and examining original medical records on May 22, 2002 beginning at 10:00 a.m. I informed your office by telephone messages through my secretary, that either I or Ms. Mahady-Smith would be attending the examination of those documents. This letter is the confirmation that the examination will take place on May 22, 2002 beginning at 10:00 and that Plaintiff's counsel will attend. I will assume you will be there also and we can simply follow you from one doctor's office to the next as your handwriting expert reviews and evaluates the original medical records.

Pursuant to the Court Order, I await full and complete responses to Plaintiff's Second Request for Production of Documents #4 through #18. As noted on the Court Order and on the Discovery responses, you answered each of these questions by objecting that the question exceeded those agreed to in pre-discovery. The Court has overruled that objection and instructed you to answer each of those questions fully. I believe you have provided partial answers to many of the questions, but we await full and complete answers as instructed by the Court. Please let me know when you will have these answers available. I hope this can be provided to us within the next 10 days, or no later than May 22, 2002, so that your responses may be reviewed and analyzed prior to the date upon which my expert reports are due. If you have any difficulties getting these responses to me timely, please do not hesitate to call me.

Lastly, pursuant to the Court's original Scheduling Order, I was to initiate, within 4 weeks following the close of Discovery, a settlement conference and discussion between counsel. I spoke with your secretary about setting up this conference, and we both mentioned that the conference would be most meaningful following the production of expert reports. Accordingly, I suggest an informal discussion on May 22, 2002 when we meet in person, in which we agree to

Licensed in PA and AZ.
Former United States District Court Staff Attorney

Michael R. Kelley, Esq.
McNees Wallace & Nurick
May 7, 2002
Page two

**Re:     Nancy Hall vs. CUNA Mutual Group**

hold a more formal discussion following the production of the expert reports.  If you are
agreeable, please let me know.  Otherwise, pursuant to the original Court Order, I will try to
schedule something earlier and in a more formal way.

      Nothing in this letter, however, should be construed as an alteration in any way of my
client's long-standing and continued request that the policy limits be immediately tendered.
Previously, upon earlier requests, you indicated that your client wished to conclude the discovery
process before considering making any such payments.  I believe the evidence to be overwhelming
that payment must be made and must be made promptly.  Therefore, I once again request that the
policy limits be immediately tendered.  Your discovery responses indicate that CUNA Mutual
does not now have nor has it ever possessed a pathology report which diagnoses cancer nor does
it have any treatment records for cancer.  Accordingly, CUNA Mutual should tender its policy
limits while the remainder of this case is litigated.  Please provide this continuing request
immediately to your client.

                Sincerely,

                Stephen R. Pedersen

SRP/cj

cc:     Catherine Mahady-Smith, Esq.

EXHIBIT "I"

# Stephen R. Pedersen, Esq.

### Attorney at Law

214 Senate Avenue, Suite 602 • Camp Hill, PA 17011
Tel: (717) 763-1170 • Fax: (717) 763-1460

September 12, 2002

Michael R. Kelley, Esq.
100 Pine Street
P O Box 1166
Harrisburg, PA 17108-1166

**Re:    HALL vs. CUNA MUTUAL GROUP**

Dear Mike:

This letter is intended to address the outstanding documents which CUNA Mutual continues to refuse to produce despite a Court Order that production take place. I received your letter with all of its explanations, however, it does not provide justification for violating the Court Order which required that all of the documents be produced. I mentioned this to the Judge, as you may recall, in our last telephonic conference. The Judge, as you may recall, asked that I make a final effort to obtain these documents from you and to call his chambers if the documents were not produced. Accordingly, I am once again requesting full compliance with the Court Order that you produce all documents identified in Plaintiff's Second Request for Production of Documents, #3 through #18. If these documents are not produced by next Friday, we will have no choice but to make arrangements for a conference with the Judge in which you can explain your client's failure to comply with the Court Order.

Sincerely,

Stephen R. Pedersen

SRP/cj

Licensed in PA and AZ.
Former United States District Court Staff Attorney

# MWN

## McNees Wallace & Nurick LLC
attorneys at law

**EXHIBIT "J"**

CHARLES YOUNG
DIRECT DIAL: (717) 237-5397
E-MAIL ADDRESS: CYOUNG@MWN.COM

September 17, 2002

**VIA FAX**
**CONFIRMATION BY MAIL**

Stephen R. Pedersen, Esquire
214 Senate Avenue, Suite 602
Camp Hill, PA 17011

    RE:    Nancy Hall, individually and as the Representative and Administratrix of the
           Estate of Tommy Hall, deceased, her husband
           v. CUNA Mutual Group, et al.

Dear Mr. Pedersen:

    We have received your letter dated September 12, 2002, regarding Plaintiff's Second Request for Production of Documents Nos. 3 through 18. In her Order of April 19, 2002, Judge Rambo directed that "Defendants shall respond to questions 4 through 18 of Plaintiff's request for production of documents." (Order, ¶1.b.) On May 30, 2002, pursuant to the above Order, CUNA provided Plaintiff with Supplemental Responses to Plaintiff's Second Request for Production of Documents.

    CUNA has fully complied with all Court Orders. Moreover, it has now been over 3 ½ months since CUNA provided you with its Supplemental Responses. During that 3 ½ month period, you never indicated that CUNA's Supplemental Responses were in any way deficient.

    At this point, neither Mike Kelley nor myself understand the issues, which you raise in your letter of September 12, 2002. We request that you provide us with a detailed statement of exactly what information you are requesting.

    Sincerely,

    McNEES WALLACE & NURICK LLC

    By        Charles Young

CY/mca

PO Box 1166 • 100 PINE STREET • HARRISBURG, PA 17108-1166 • TEL: 717.232.8000 • FAX: 717.237.5300 • WWW.MWN.COM

COLUMBUS, OH • HAZLETON, PA • WASHINGTON, DC

# Stephen R. Pedersen, Esq.

### Attorney at Law

214 Senate Avenue, Suite 602 • Camp Hill, PA 17011
Tel: (717) 763-1170 • Fax: (717) 763-1460

September 18, 2002

Charles Young
McNees Wallace & Nurick
100 Pine Street
Harrisburg, PA 17108-1166

**Re:    Hall vs. CUNA Mutual Group, et al.**

**Via Fax #237-5300**

Dear Mr. Young:

I am in receipt of your letter dated September 17, 2002 in which you reaffirm that you will be providing no further responses to questions 4 through 18 of Plaintiff's Second Request for Production of Documents, despite the Court Order to do so. Despite oral argument and an order that CUNA Mutual provide full and complete responses to questions 4 through 18, you request a detailed statement of what information is being requested. A detailed statement is found in the request for production itself which you are required to not respond by objection, but respond by providing the documents.

Request No. 4 states that CUNA Mutual is to provide all documents to and from the credit union in Chambersburg, PA and CUNA Mutual with respect to home life insurance, including, but not limited to, contracts, agreements, memoranda and documents. Plaintiffs await a full and complete response to this discovery request.

Plaintiffs requested in Paragraph No. 5 copies of all contested claims within CUNA Mutual within the home life insurance area for the past 3 years, including the entire claims file for those contested claims. To date, CUNA Mutual has not provided any portion of any claim file in response to this request.

Questions No. 6 through 8 require the production of organizational charts which were in effect from November 18, 1998 through the present, identifying every modification. Plaintiffs await a full and complete response to this discovery request.

Paragraph No. 9 requests annual statements for the years ending 1998 through 2001. CUNA Mutual has provided annual statements and, therefore, unless there are other statements which CUNA did not provide which are responsive to this request that Plaintiff is unaware of, CUNA Mutual has complied with this request.

Licensed in PA and AZ.
Former United States District Court Staff Attorney

Charles Young
McNees Wallace & Nurick
September 18, 2002
Page two

Re:    **Hall vs. CUNA Mutual**

Paragraph No. 10 requests internal profit and loss calculations and statements with respect to credit life for the years 1998 through 2001. Defendants have provided certain profit and loss calculations which were made specifically for this case and which were derived from internal profit and loss calculations and statements. To date, CUNA Mutual has not provided the source materials of the profit and loss accounting document which was produced. Accordingly, CUNA Mutual has failed to comply with this request for all internal profit and loss calculations and statements.

Request No. 11, requested internal profit and loss calculations and statements with respect to home mortgage insurance for the years 1998 through 2001. Just as in the proceeding paragraph, Defendants have produced a sheet of numbers prepared specifically for this case in which it is asserted that those numbers are derived from the profit and loss calculations and statements internally within the company. However, Defendants have not provided the actual profit and loss calculations and statements from which this document was derived. Accordingly, CUNA Mutual has failed to provide all internal profit and loss calculations and statements as requested in No. 11.

Plaintiffs have requested, in Request No. 12, statistical documents which reflect home mortgage protection applications received by CUNA Mutual for the period 1998 through 2001. Although Defendants have not provided the underlying statistical data and documents, Plaintiffs have received sufficient information with respect to No. 12 and, therefore, under this paragraph, are not pursuing additional information.

With respect to Plaintiffs' Request No. 13, CUNA Mutual has failed to provide the specific items in Paragraph 13 by category and type number. Alternatively, CUNA Mutual has refused to provide the underlying documents, but rather, has provided a summary prepared specifically for this case.

With respect to Plaintiffs' Request No. 15 and 16, Plaintiffs understand that CUNA Mutual has provided certain annual statements, but has not provided any annual policy report statements for public dissemination, specifically for the general public and those to Wisconsin and Pennsylvania independently. Plaintiff has requested these from 1997 through 2001 and understands that there are different documents reflecting an annual report and an annual policy statement. The policy statements have not specifically been provided as were provided to Wisconsin and Pennsylvania Insurance Departments and for the public.

Plaintiffs requested, in Request No. 17, a copy of all forms of individual insurance applications used in November, 1998 in the state of Pennsylvania by CUNA Mutual. Rather,

Charles Young
McNees Wallace & Nurick
September 18, 2002
Page three

**Re:   Hall vs. CUNA Mutual**

CUNA Mutual has simply provided the application sheet for this specific type of insurance. Plaintiffs are entitled, and the court has ordered, that Plaintiffs receive copies of all forms of individual insurance so comparisons can be made across the various forms.

As previously indicated, Plaintiffs await a full and complete response to all outstanding Requests for Production of Documents, as ordered by the court. Plaintiffs have requested that all of these documents be received by this Friday. If additional time is needed, please call me so that a mutually-convenient time can be arranged for the production of all documents requested. However, if you are simply refusing to produce those documents which you have been ordered to produce by the court, please let me know so that a court conference can be arranged.

Sincerely,

Stephen R. Pedersen

SRP/cj

**EXHIBIT "L"**

# MWN

## McNees Wallace & Nurick LLC
attorneys at law

CHARLES YOUNG
DIRECT DIAL: (717) 237-5397
E-MAIL ADDRESS: CYOUNG@MWN.COM

September 19, 2002

**VIA FAX**
**CONFIRMATION BY MAIL**

Stephen R. Pedersen, Esquire
214 Senate Avenue, Suite 602
Camp Hill, PA 17011

RE:    Nancy Hall, individually and as the Representative and Administratrix of the
Estate of Tommy Hall, deceased, her husband
v. CUNA Mutual Group, et al.

Dear Mr. Pedersen:

I am in receipt of your letter dated September 18, 2002. Mike Kelley and I have reviewed your discovery requests, the Court's Order, and our discovery responses. You are in receipt of all documents responsive to Plaintiff's Second Request for Production of Documents Nos. 4 through 18.

Sincerely,

McNEES WALLACE & NURICK LLC

By

Charles Young

CY/mca