2 TO G

51

11/20/0

ORIGINAL

FILED
HARRISBURG, PA

NOV 1 9 2002

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Nancy Hall, individually and as the Representative and Administratrix of the Estate of Tommy Hall, deceased, her husband, **Plaintiff** | : : : : : : | **CIVIL ACTION - LAW** |
| **v.** | : : | **1:01-CV-1265** |
| Cuna Mutual Group, Cuna Mutual Insurance Society, **Defendants** | : : : | **(Judge Christopher C. Conner)** |

---

### APPENDIX TO DEFENDANTS'
### BRIEF IN OPPOSITION TO
### PLAINTIFF'S MOTION IN LIMINE

---

Michael R. Kelley
Charles T. Young, Jr.
McNEES WALLACE & NURICK LLC
P.O. Box 1166
100 Pine Street
Harrisburg, PA 17108-1166
Phone: (717) 237-5322
Fax: (717) 237-5300

Dated: November 19th, 2002

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


NANCY HALL, INDIVIDUALLY AND : CIVIL ACTION - LAW
AS THE REPRESENTATIVE AND     :
ADMINISTRATRIX OF THE ESTATE  :
OF TOMMY HALL, DECEASED, HER  :
HUSBAND,                      :
        PLAINTIFF           :
                            :
        V                   : 1:01-CV-1265
                            :
CUNA MUTUAL GROUP, CUNA       :
MUTUAL INSURANCE SOCIETY,     :
        DEFENDANTS          : JUDGE SYLVIA H. RAMBO


DEPOSITION OF:    ERNEST E. CHARLESWORTH, M.D.

TAKEN BY:       DEFENDANTS

BEFORE:         PAMELA S. SULLIVAN,
                REPORTER-NOTARY PUBLIC

DATE:           JANUARY 9, 2002, 10:05 A.M.

PLACE:         FAIRWAY MEDICAL ASSOCIATES
                144 SOUTH 8TH STREET
                CHAMBERSBURG, PENNSYLVANIA


APPEARANCES:

    McNEES WALLACE & NURICK, LLC
    BY:  MICHAEL R. KELLEY, ESQUIRE


        FOR - DEFENDANTS

    PEDERSEN & PEDERSEN
    BY:  CATHERINE M. MAHADY-SMITH,  ESQUIRE
        STEPHEN R. PEDERSEN, ESQUIRE


        FOR - PLAINTIFF



HAFN Reporting Service, Inc.
Hughes
Albright
Foltz
Natale

2080 Linglestown Road • Suite 103 • Harrisburg, PA 17110
717.540.0220 • Fax 717.540.0221 • Lancaster 717.393.5101

Page 2

```
 1              WITNESS
 2 NAME                      EXAMINATION
 3 ERNEST E. CHARLESWORTH, M.D.
 4   BY:  MR. KELLEY              3, 62, 67
 5   BY:  MS. MAHADY-SMITH        47, 65
 6
 7
 8
 9
10              EXHIBITS
11 CHARLESWORTH EXHIBIT NO.      PRODUCED & MARKED
12 1 - FACE SHEET, ONE PAGE                16
13 2 - PHYSICIAN PROGRESS NOTES, ONE PAGE  27
14 3 - MEDICAL RECORD, TWO PAGES           39
15 4 - LETTER DATED 2-17-99, TWO PAGES     44
16 5 - 1993 PATHOLOGICAL REPORT, ONE PAGE  46
17 6 - CURRICULUM VITAE, TWO PAGES         68
18
19
20
21
22
23
24
25
```

Page 3

```
 1        ERNEST E. CHARLESWORTH, M.D., called as a
 2 witness, being duly sworn, testified as follows:
 3              EXAMINATION
 4 BY MR. KELLEY:
 5    Q  Good morning, Doctor.  As I just introduced
 6 myself to you, my name is Mike Kelley.  I'm a lawyer from
 7 Harrisburg, and I'm here to take your deposition today in
 8 the case of Nancy Hall and the estate of Tommy Hall versus
 9 CUNA Mutual Insurance Company.
10       I'm going to be asking you a series of questions
11 today that are relevant to that action.  If at any time
12 during the course of the deposition you don't understand one
13 of my questions, please let me know and I'll try to rephrase
14 it.  Okay?
15    A  Okay.
16    Q  I don't anticipate this being much longer than an
17 hour or an hour and a half.  But if you need to take a break
18 for any reason, obviously just let us know and you can do
19 that.
20    A  Okay.
21    Q  First, what I want to do, Doctor, is just get a
22 little bit of background information on you.  Would you give
23 us your full name, please?
24    A  Ernest E. Charlesworth.
25    Q  And what's your business address here?
```

Page

```
 1    A  144 South 8th Street, Suite 111, Chambersburg,
 2 Pennsylvania.
 3    Q  And what is the name of your practice?
 4    A  The corporate name is Fairway Medical Associates.
 5    Q  Are their partners or other members of the
 6 practice?
 7    A  Yes.  There are four physicians and one
 8 physician's assistant that work as part of the practice
 9 here.
10    Q  Who are the other physicians who are here?
11    A  Samuel Bricker, William Kramer, Daryl White and
12 Dave Cooper is the physician's assistant.
13    Q  We're here today to talk about some of the
14 treatment that you had provided to Tommy Hall.  Are you
15 familiar with Mr. Hall?
16    A  Yes.
17    Q  Do you know if any of the other physicians here
18 provided any care or treatment to him?
19    A  I'm not aware that they have.  I can check the
20 chart and tell you for sure.
21    Q  Sure, go ahead.  You've got with you here your
22 chart on Mr. Hall.  Is that correct?
23    A  That's correct.  The only entries in the chart
24 for the entire time we saw him are in my writing.  So I
25 don't think anybody else ever took care of him in this
```

Page

```
 1 group.
 2    Q  How long have you been associated with this
 3 group, Fairway Medical Associates?
 4    A  I've been with this practice since 1994.  The
 5 name of the practice has changed a couple of times, but it's
 6 been the same people.
 7    Q  Do you have a particular medical specialty?
 8    A  Family practice.  I'm board certified,
 9 recertified.
10    Q  When did you receive your board certification in
11 family practice?
12    A  1984, and my last recertification was about two
13 years or three years ago.
14    Q  And the other physicians who are here with you,
15 are they also family practitioners?
16    A  Yes.
17    Q  Starting after high school, Doctor, can you
18 identify the names of the institutions and degrees that you
19 received, college, medical school, et cetera?
20    A  I attended Rensselaer Polytechnic Institution in
21 Troy, New York, and received a B.S. in biomedical
22 engineering.
23    Q  What year was that?
24    A  That was May of 1981.
25    Q  Can you --
```

ERNEST E. CHARLESWORTH, M.D.          **Multi-Page**™
JANUARY 9, 2002

Page 6

1      A   I'm sorry, May of 1977.
2      Q   Can you spell the name of the school for us,
3  please?
4      A   Is this a trick question?  Yeah,
5  R-E-N-S-S-A-L-E-A-R.
6          MR. KELLEY:  Off the record.
7          (Discussion held off the record.)
8          THE WITNESS:  And then following Renssalear,
9  after -- that was 1977 -- I got my bachelor's degree, I
10  attended the University of the Pittsburgh School of Medicine
11  and received my M.D. in May of 1981.
12         Subsequent to that, I did a three-year residency
13  in family practice at Saint Margaret Memorial Hospital in
14  Pittsburgh.  And I was the chief resident the last year I
15  was there.
16     Q   So that would have been up until what period of
17  time?
18     A   That was -- I'm sorry.  I finished June 30th of
19  1984.
20     Q   And what did you do then between 1984 and 1994
21  when you became associated with the doctors that are here?
22     A   I did two years in the National Health Service
23  Corps in Boswell, Pennsylvania, with Dr. DeVries.  And then
24  I was on my own, private practice in Oil City from 1986
25  until 1994.

Page 7

1      Q   For your entire career, is it accurate to say
2  that you've been a family practitioner?
3      A   Yes.  I spent -- during my transition period in
4  1994 from March until June, I closed my practice in Oil City
5  and I worked three months in the emergency room here while I
6  was closing the practice before I started in this group
7  here.
8      Q   So for --
9      A   So for three months out of eighteen years or
10  whatever I was in the emergency room.
11     Q   When you're talking about here, you mean
12  Chambersburg?
13     A   Yes, I'm sorry.
14     Q   Which states are you licensed to practice
15  medicine in, Doctor?
16     A   Pennsylvania.
17     Q   And when did you receive your license, what year?
18     A   Well, in Pennsylvania actually when I got my
19  license, you could get it after one year of internship.  So
20  that would been 1982.  I think now it takes two years to get
21  it, of training before you get it.
22     Q   Do you have any other board certifications other
23  than in family practice?
24     A   No, that's the only one.
25     Q   Do you have any privileges at any hospitals

Page 8

1  currently?
2      A   At Chambersburg Hospital.
3      Q   Anywhere else?
4      A   No.
5      Q   Has your license to practice ever been suspended
6  or revoked?
7      A   No.
8      Q   Do you have a current curriculum vitae or resume?
9      A   Darlene, my office manager, would have my most
10  up-to-date one.
11     Q   Okay.  Would we be able to get that before we
12  leave today?
13     A   I won't verify how up-to-date it is.
14     Q   All right.  Well, that's good.  Maybe we should
15  do that before we actually conclude the deposition.  Do you
16  want to take a moment and step out and see if she can get
17  that for us?
18     A   Yeah, I'll ask her to dig it out.
19     Q   Thank you.
20         (A break was taken.)
21  BY MR. KELLEY:
22     Q   Doctor, as you know Ms. Mahady-Smith is here
23  today.  And she represents the Halls in this case, and she
24  is cocounsel with a gentleman named Steve Pedersen.  Before
25  today, have you ever met either Steve Pedersen or Ms.

Page 9

1  Mahady-Smith?
2      A   Yes.
3      Q   Have you ever talked to them about this case
4  before?
5      A   Yes.
6      Q   Have you spoken to them about -- specifically
7  about the matter involving CUNA Mutual?
8      A   They asked me questions about the records they
9  received from me.
10     Q   When did you have -- did you have a face-to-face
11  meeting with them, or was it over the telephone?
12     A   Face-to-face.
13     Q   Do you know how long ago that occurred?
14     A   I have no idea.
15     Q   Couple weeks or couple months?
16     A   Oh, it's been more than a few weeks.  It's been
17  at least a couple months.
18     Q   Sometime in the latter part of 2001?
19     A   I couldn't tell you.  I would say it's in 2001.
20  That's probably as good as I could tell you.
21     Q   Did you make any notes of the conversations you
22  had with them?
23     A   No.  It was brief and just clarification of what
24  was -- I think you referred to me for my handwriting.
25     Q   Do you remember any of the specifics that you

**HUGHES, ALBRIGHT, FOLTZ & NATALE**
**717-540-0220\717-393-5101**

Page 10

1 talked about with them?
2     A  Not really other than they just asked about some
3 of the notes I made.
4     Q  So do you remember anything just in terms of the
5 generalities of what you discussed with them?
6     A  Well, they introduced themselves and said that
7 they represented his estate and that there was an issue
8 about insurance covering, I think, a mortgage on a home.  I
9 think that's what I recollect and that they just wanted to
10 know what information I had about his past history before
11 his death.
12     Q  And what did you tell them about that?
13     A  Well, we went over his initial visit to the
14 office and what I had written down.  And they wanted to know
15 -- I guess the clarification -- one of the clarifications
16 was what is the information that Tommy gave me and what is
17 the information that I had corroborated, you know, with
18 records or whatever.
19     Q  Well, we'll get to that.  Anything else you
20 remember either generally or specifically about the
21 conversation that you had with them?
22     A  I know that they focused on the cancer which is
23 what caused his death.  I know that's what the questions
24 were about.
25     Q  Anything else that you recall?

Page 11

1     A  Not -- no, not clearly.
2     Q  Doctor, either in medical school or in continuing
3 medical education classes, anything of that nature, have you
4 had any training in the creation and retention of patient
5 medical records?
6     A  You have that starting in medical school and on
7 through residency training.  And actually these days, we get
8 compliance issues and all kinds of CME that are also in
9 reference to medical records.
10     Q  So you've had that over the years then?
11     A  Yeah.
12     Q  Are you familiar with what the requirements are
13 in terms of what you're supposed to do in terms of creating
14 and maintaining patient records?
15     A  Yes.  One of the big things these days is to make
16 sure you have documentation to verify the level of billing
17 for Medicare guidelines, and that's what the more recent
18 impact has been on.
19     Q  Anything else that -- I mean, if you could just
20 explain to me generally what your understanding is of what
21 the requirements are as a doctor?
22     A  The reality is -- number one is for medical care.
23 The requirements are that you document enough records that
24 you know what's going on with the patient.  I mean that
25 boils down to the basic doctor/patient relationship is that

Page 1

1 you have enough information that you can provide good care
2 for the patient.
3         The secondary issue is what do you require
4 documentation for, for reimbursement and oversight by
5 Medicare and other organizations.  And they aren't
6 necessarily the same.  But, you know, a doctor's records are
7 supposed to be adequate for him to be able to -- him or her
8 to be able to provide good care for the patient.  And that
9 entails getting a history from the patient, a history from
10 family members if they're available, particularly in cases
11 of children, and then documenting physical findings or
12 objective findings, which is a separate part of it.
13         Generally speaking, what is required is that you
14 make an assessment and document what your diagnosis or
15 evaluation of the patient situation is and then document
16 your prescribed treatment or plan.
17     Q  It's my understanding that just from a general
18 way of stating it that the records are required to be
19 accurate, legible and to reflect the evaluation and
20 treatment of the patient?
21     A  That's correct.
22     Q  Is that a fair way of stating it?
23     A  Yes.
24     Q  Now, do you personally or does the practice here
25 have any written guidelines for the creation and retention

Page 13

1 of medical records?
2     A  No, we don't.
3     Q  Do you have any -- well, let me -- I'm sure the
4 answer to this question is yes, but let me ask it anyways.
5 Do you have any unwritten or general guidelines that you
6 follow for the types of information that you put into the
7 medical records?
8     A  Yes.  Let me start by saying that all the
9 physicians here were trained at the same residency program.
10 So we all went through the same instruction on how to
11 evaluate and treat patients.  And at the same time, we went
12 through the same training as far as medical records.  So
13 maybe that's one of the reasons why there's not a written
14 policy.
15         Secondly, we have several meetings, you know,
16 throughout the year on an ongoing basis discussing the
17 business as well as the patient care that's provided in the
18 office.  And we've come up with sheets for the record that
19 help to summarize things.
20         For example, I have in front of me the -- we call
21 it the problem list sheet which includes biographical data
22 on the patient, immunization status and try to record
23 patient past and active problems and surgeries as well as
24 current medications that are prescribed.  That is an
25 agreed-upon tracking sheet that unifies everybodys' records

ERNEST E. CHARLESWORTH, M.D.          Multi-Page™
JANUARY 9, 2002

---

Page 14

1  in the office.
2        As far as the progress notes that we do, that's
3  kept on the separate sheets.  We have a general format that
4  we've all grown up with so to speak, but there's no written
5  policy on that part other than the fact that we've had
6  office meetings that review the legal requirements as far as
7  billing to make sure that we're in compliance and that we're
8  documenting what we're submitting.
9        Q  Is it fair to say that when your -- from the time
10  that you first visit with a patient up through the time that
11  you're having progress notes and the time then that your
12  treatment of the patient is concluded, that the types of
13  information you want to include in the medical records
14  includes the following:  A complete medical history?
15        A  As complete as possible.
16        Q  A description of the patients ailments and in
17  many times in the patient's own words?
18        A  Yes.
19        Q  You want to have a report of any physical
20  examination that you do showing both objective findings and
21  subjective complaints?
22        A  Subjective complaints would be in the patient
23  history.  The objective findings would be under the physical
24  list.
25        Q  You would identify any diagnostic aids that you

---

Page 15

1  would use?
2        A  Yes.
3        Q  You would include your, the physician's,
4  impressions and diagnoses?
5        A  Yes.
6        Q  And you would include your course of treatment
7  including any prescriptions and procedures that were
8  recommended or performed?
9        A  And referrals also, yes.
10        Q  And referrals also, okay.  And then you would
11  have regular written progress notes as well?
12        A  Yes.
13        Q  Now, I want to talk to you next about medical
14  history.  Do you personally have any standard procedure,
15  standard operating procedure, for obtaining a patient's
16  medical history?
17        A  Yes.
18        Q  What is that?
19        A  There's office and then individual physician
20  variation.  The office procedure is when we get a new
21  patient, this face sheet that I referred to before is given
22  to the patient before they're seen for their visit.  And we
23  ask them to fill in as much information as they can,
24  biographical as well as medical history.  And there's a
25  checklist here that asks about prior medical problems -- to

---

Page 16

1  fill it in to the best of their knowledge and also to list
2  their medicines if they know them.
3        Q  Let's get that marked so that we can refer to
4  that, Doctor.
5        A  Okay.
6            MR. KELLEY:  Let's have our court reporter mark
7  that as Charlesworth 1.
8            (Face sheet, one page, produced and marked
9  Charlesworth Exhibit No. 1.)
10  BY MR. KELLEY:
11        Q  Now, Doctor, the document we've marked as
12  Charlesworth 1 is dated April 30 of 1998.  Is that correct?
13        A  Yes.
14        Q  And it has at the top -- some of it is not
15  legible because of the copying.  But it has the name of the
16  practice at that time.  Is that right?
17        A  That's correct.
18        Q  What is the name, the full name of the practice
19  at that time?
20        A  At that time, it went by White, Bricker, Kramer &
21  Charlesworth Medical Associates.
22        Q  And I believe you said -- I just want to make
23  sure I understood this correctly -- that this form is sort
24  of a standard form that you use throughout the practice?
25        A  Yes.

---

Page 17

1        Q  And you also use that in your personal dealings
2  with patients?
3        A  Yes.
4        Q  So is it fair to say that this would have been
5  the first record that was created of your treatment and care
6  of Mr. Hall?
7        A  That's correct.  The process is -- like I said,
8  we get that to them before they're actually seen.  And then
9  when I interview the patient for the first time, I try to
10  add to fill in the blanks on this same sheet and then enter
11  into our, you know, the medical progress notes, the rest of
12  the history that's applicable.
13        Q  Are you familiar with the handwriting that's on
14  this document, Charlesworth 1?
15        A  I'm familiar with my handwriting that's on there.
16        Q  What parts of this are in your handwriting?
17        A  If you look under Medical Problems, No. 4,
18  diverticulosis, that's my handwriting.  And if you look
19  under Hospitalization; slash, Surgery to the right of the
20  date 12-89, there's --
21        Q  Oh, I'm sorry.  I'm not following you.  Is that
22  on the next page?
23        A  In the other column.
24        Q  Oh, okay.
25        A  Under -- you'll see the first one is Dr. Guthrie.

---

Multi-Page™    ERNEST E. CHARLESWORTH, M.D
JANUARY 9, 200

**Page 18**

1 That's not my writing. And then there's, you know --
2 underneath that, there's another doctor's name which is
3 Dr. Lang written in two lines and ruptured disc, bulging
4 disc on two different lines. That's my writing.
5    Q  Okay, I'm sorry. Let me take this from the top.
6 Under Item 1, under Medical Problems, it says -- it looks to
7 me like it says --
8    A  Cancerous mole removed.
9    Q  -- cancerous mole.
10    A  Yes.
11    Q  Is that your writing?
12    A  No.
13    Q  Do you know whose writing that is?
14    A  No.
15    Q  Is that one of your staff people's writing here?
16    A  We have several staff people. That doesn't look
17 like what I'm used to seeing. So I don't know. I wonder if
18 it's not either Nancy or Tommy's writing, the patient or his
19 wife's writing.
20    Q  And this is -- so I understand it, this is the
21 document that when the patient arrives at your office for
22 the first visit, this document is actually provided to the
23 patient to fill out?
24    A  Sometimes they get it before their appointment,
25 either they pick it up or in the mail. And sometimes they

**Page 19**

1 get it when they show up. We ask them to come 15 minutes
2 prior to their first appointment, and then they can fill it
3 out in the waiting room.
4    Q  But the point where it says cancerous mole
5 removed, that is not your writing?
6    A  That's correct.
7    Q  And you don't recognize that as anybody from your
8 office?
9    A  No, I don't recognize it.
10    Q  Is it safe to say that that would most likely be
11 from the patient?
12        MS. MAHADY-SMITH: Objection, calls for
13 speculation. The doctor has testified he doesn't know whose
14 handwriting it is.
15 BY MR. KELLEY:
16    Q  Either Mr. Hall or Mrs. Hall?
17    A  I don't know. I just -- like I said, they have
18 the sheet first. My staff has it out front, and we have
19 about ten staff members that can enter into these. And,
20 actually, some of those have changed since '98. So, no, I
21 don't keep track of everybodys' writing.
22    Q  Now, the writing off to the right then referring
23 to what it looks like is Dr. Guthrie --
24    A  Yes.
25    Q  -- whose writing is that?

**Page 2**

1    A  I have no idea.
2    Q  That's not yours?
3    A  That's absolutely not mine. It's bad enough, but
4 it's not.
5    Q  And you don't know if that's someone from you
6 practice or not who wrote that in there?
7    A  I can't tell you when it was written or who wrote
8 it.
9    Q  And the next item then under No. 2, it says, Back
10 surgery.
11    A  Yes.
12    Q  And then under No. 3, it says, Back surgery.
13    A  Correct.
14    Q  Is that your writing?
15    A  No.
16    Q  Is that anybody from your office as far as you
17 can detect?
18    A  I don't know.
19    Q  Do you recognize that as anybody from your
20 office?
21    A  I don't recognize it, and I don't even know if
22 it's the same writing as No. 1, you know.
23    Q  And then over then into the right-hand column
24 beside No. 2, it has some writing there. And I believe
25 you've said that that's your writing.

**Page 2**

1    A  Yeah. The writing that has Dr. Lang, ruptured
2 disc, L5-S1, that's my writing.
3    Q  Is that what it says under Item 2 in the
4 right-hand column?
5    A  Yes. Dr. Lang, ruptured disc, L5-S1.
6    Q  And then under Item 3 on the right-hand corner,
7 can you just tell us exactly what that says there?
8    A  Dr. Lang, bulging disc; question mark, L4-L5.
9    Q  And then under Item 4, I believe you said you
10 wrote that as well?
11    A  Diverticulosis, that's my writing, yeah. These
12 problem lists are initially presented, but they're updated
13 as the patients are cared for over time. We try to keep
14 them as current as we can. So if a patient develops a
15 problem and has an operation or a hospitalization, we add
16 that on as time goes by.
17    Q  Now, going back to Item 1 here, Doctor, in the
18 date category --
19    A  Right.
20    Q  -- what is that date supposed to reflect? Is
21 that supposed to reflect the time period that the medical
22 problem surfaced?
23    A  That's supposed to reflect the cancerous mole
24 removed 1996.
25    Q  Is that your '96 that's written in there?

ERNEST E. CHARLESWORTH, M.D.      **Multi-Page**™
JANUARY 9, 2002

Page 22

1    A  Absolutely not.
2    Q  Now, is it accurate to say that either before the
3  patient arrives or when the patients arrive at your office
4  they're given this form and then would you actually have
5  this form with you when you're conducting your initial visit
6  with the patient?
7    A  Yes, that's what is the purpose.
8    Q  And is it accurate to state that during that
9  initial visit then that you would have added the things that
10 you've already identified on here as being in your
11 handwriting?
12   A  Yes.
13   Q  Doctor, at this time back in April of 1998, did
14 you have any policy or procedure in place that would have
15 allowed people other than the physician or the patient that
16 was being seen to put information onto this chart?
17   A  Yes, absolutely.  The people vary in their
18 abilities.  Some people are not bilingual.  Some people are
19 illiterate.  Some patients have difficulty with vision,
20 hearing or whatever.  And so whoever is working the window,
21 the front reception area, is supposed to assist patients if
22 they have questions or difficulty with filling out the form.
23 So anybody who is working up front at the time of intake may
24 have filled in the biographical, may have even done the
25 checklist or written down other items on this sheet before I

Page 23

1  saw the patient.
2         After an initial visit, this is part of the
3  chart.  And like I said, it can be updated.  So when people
4  come back for another visit, they may cross out the phone
5  number and write in a new phone number, change the address.
6  They may, you know, update the biographical information.
7  And any of the physicians or the physician assistant may
8  update the problem list, medications or the
9  hospitalization/surgery category.
10   Q  Do the people at the front desk who may have also
11 been putting information onto these forms, are they trained
12 at all in how to put information onto these forms?
13   A  Yes, they're trained on the parts that they're
14 responsible for.
15   Q  And who does that training?
16   A  The office manager and other employees depending
17 on who the person is that's hired.
18   Q  Are they trained to know that medical records are
19 supposed to be accurate and legible and complete?
20   A  Yes.  We've also instructed them to record what
21 it is that the patients tell them as accurately as they can
22 and if there's questions to try to follow up on that.
23   Q  Doctor, generally speaking, why is it important
24 to obtain a patient medical history?
25   A  I'd say it's critical in the sense that a lot of

Page 24

1  medical problems are not just a one-time thing and it could
2  affect whatever symptoms you have at a future time or at the
3  current time.  Problems change over time, you know.  Medical
4  illnesses can change over time and may affect your other
5  illnesses or other complaints at a future date.
6    Q  Do either you personally or does the practice
7  have any procedure or policy that you are to obtain the
8  patient's previous medical records as they pertain to your
9  care or treatment?
10   A  It's a policy that we try to pursue that whenever
11 patients transfer in from another practice or if they've
12 been treated at other places that we request records from
13 that previous physician or hospital or wherever they have
14 been seen.
15   Q  So that is the policy and practice of your
16 medical practice?
17   A  Yes.
18   Q  Is that also your personal policy?
19   A  Yes.
20   Q  Are there any exceptions to that?  Are there
21 times when you don't obtain the past medical history?
22   A  Yes.  For example, when -- we're a family
23 practice.  And it's not every day, but frequently we'll have
24 relatives visiting from out of town of patients that are our
25 patients.  And they'll say they're sick today, can they come

Page 25

1  in and be seen for an earache or a sore throat or the flu.
2  And we'll see them for an acute visit.  And for those cases,
3  we don't routinely request old records.
4    Q  What about someone who's coming in with a
5  potential cancerous situation?
6    A  It would be like somebody with diabetes or heart
7  disease or a stroke or other problems, we would try to
8  obtain old records.  The reality is even though that's our
9  policy, I can give you many instances where we've made the
10 request three times, four times, a dozen times and it breaks
11 down somewhere.  Either the patient forgets to sign the
12 requisition -- you know, the requisition is sent.  But maybe
13 they didn't have the right address or they didn't have the
14 physician's correct name, especially with out-of-state
15 patients.
16         So sometimes it doesn't occur even though we
17 request it.
18   Q  In this particular case, did either you or
19 someone at your practice request Mr. Hall's previous medical
20 records?
21   A  Yes.
22   Q  How do you know that?  Is that somewhere noted in
23 your records, or do you just remember that?
24   A  Well, I know I did because there was a question
25 about this cancerous mole thing.

Page 22 - Page 25


Page 26

1      When Tommy presented, he and his wife, this was
2 on the note, you know, on the face sheet, cancerous mole.
3 And I said, Well, what kind of cancer?  Was it basal cell?
4 squamous cell? melanoma?  It makes a huge difference in what
5 to expect and what I should be doing as far as monitoring
6 him for follow-up.  And they had no idea.  You know, they --
7      Q  They had no idea as to the type of cancer?
8      A  Yeah.  And at the time, there was debate between
9 the two of them whether it was really cancer or not.
10      Q  What did that -- do you recall the specifics of
11 what they actually said about that?
12      A  Well, let me see what I have written.  But I
13 remember that there was a debate between the patient and his
14 wife as to whether it was really cancerous or if it was just
15 a funny-looking mole.  You know, one of them said, No, it
16 was just a funny-looking mole.  The other one said, No, I
17 think it was cancer.  I don't know what kind of cancer it
18 was.  They said, I don't know.  It really wasn't cancer
19 that's why they don't know.
20      I mean, there was this discussion back and forth
21 between the two of them.
22      Q  Can we -- I'm sorry, Doctor.  Before you move on
23 beyond that I wanted to ask you, do you recall whether it
24 was Mr. Hall or Mrs. Hall who was saying, I think it was
25 cancer, and which one was saying, no, I think it was just a

Page 27

1 funny-looking mole?
2      A  Let me see if I have anything written, and I'll
3 tell you.  Okay?
4      Q  Sure.
5      A  I don't have it specified here in my written
6 records or written notes who said what.  But in my mind what
7 sticks out is that Tommy is the one that's saying it was a
8 funny mole and his wife is the one who was saying it was
9 cancer.  But I don't have a written note to corroborate
10 that, but that's the way it plays out.
11      I do clearly remember that there was debate
12 between the two of them, number one, whether it was cancer
13 or not.  And definitely nobody had any idea what type if it
14 was.  And so that's why I definitely recall requesting
15 records to find out was it cancer and what type was it.
16      Q  If you would, Doctor, turn to the next -- I'm
17 sorry.  I'm not sure if those things are still in there.
18 Yes, they are.
19      MR. KELLEY:  Let's mark this next page then as
20 Charlesworth 2.
21      (Physician progress notes, one page, produced and
22 marked Charlesworth Exhibit No. 2.)
23 BY MR. KELLEY:
24      Q  Doctor, we've marked as Charlesworth 2 a document
25 that says at the top right, Physician Progress Notes.  Do

Page 2

1 you have that in front of you?
2      A  Yes, I do.
3      Q  And the first date looks like it's stamped in
4 there with a stamp.  It says, April 30, 1998.  Do you see
5 that?
6      A  That's correct.
7      Q  Is this your progress note concerning Mr. Hall?
8      A  Yes, it is.
9      Q  And then towards the bottom of the page, it also
10 has a progress note for December 11, 1998.  Correct?
11      A  That's correct.
12      Q  Doctor, I mean this in the nicest way possible.
13 I don't mean to impugn your handwriting at all.  But could
14 you read to us what that note says for April 30th?
15      A  I think the first portion of the April 30th is
16 pretty clear because that's in the handwriting of one of my
17 nurses or physician's assistants -- or medical assistants.
18      Q  That's where it says weight?
19      A  A Weight and blood pressure and subjective -- the
20 "S" stands for subjective complaint of pain in the left leg;
21 parentheses, calf, parentheses.  That's pretty clear, and
22 then the rest of that is my handwriting.
23      Q  Can you --
24      A  And what it says is, Pushing pickup truck on flat
25 ground to get it started, took four steps then; quotation

Page 29

1 marks, charley horse; quotation marks.  The pain has not
2 eased and very tight; slash, stiff left calf.  Tried, KY Hot
3 it looks like, which I think was a brand name of an
4 over-the-counter -- I'm sorry.  That's not literal there.
5 I'm sorry.  KY Hot is what it looks like.  I think that's an
6 over-the-counter preparation that's a gel that they apply
7 for muscle strains.
8      And then it says, the record then goes on, No
9 other Rx, which means treatment.  Then I have listed NKA,
10 which stands for no known allergies.  Meds none.  PMH for
11 past medical history, lumbar disc surgery times two with
12 bilateral sciatica pre-op.  Next line is; question mark,
13 melanoma removed back 1996.  Next line is social history,
14 truck driver times four years.  Smoking, one-and-a-half pack
15 per day.
16      Then there's a blank line.  And the next line is
17 objective, which lists the physical findings.  Positive
18 spasm with mild tenderness left calf.  Strength intact.  NV,
19 for neurovascular, intact.
20      The next line is "A" for assessment.  Muscle
21 strain left calf.  The next line is "P" for plan.
22 Stretching; slash, moist heat -- just the letters MH, for
23 your information -- slash, analgesic over-the-counter -- OTC
24 stands for over-the-counter -- prn.  And samples of Relafen,
25 R-E-L-A-F-E-N, 750 milligrams; number, 6, were given to him.

Page 30

1 And then my signature.
2    Q  Okay, let's stop right there for a moment.  And
3 this note from April 30th, this is your note of your
4 first visit with Mr. Hall?
5    A  That's correct.
6    Q  And you recall Mrs. Hall being there as well?
7    A  Yes.
8    Q  Anybody else there other than you, Mr. and Mrs.
9 Hall?
10   A  No.  But it's strange I can even tell you which
11 exam room it was.
12   Q  Go ahead.  Amaze us.  Which exam room was it?
13   A  It was the back corner one.  The reason I can
14 tell is it's different than all the other exam rooms.  It
15 has a mechanical table, an electric table that raises.  So
16 it's different than all the other rooms.
17   Q  So the reason that Mr. Hall was there to see you
18 that day was regarding pain in his left leg?
19   A  That's correct.
20   Q  And can you explain to us what this notation then
21 about; question mark, melanoma, removed back 1996, what that
22 refers to?
23   A  The way my record is "S" subjective -- that means
24 that is information given by the patient, the family members
25 or whoever comes with the patient.  That's subjective

Page 31

1 information or historical information.  "O" is objective
2 findings.  So anything that is entered in under "S" is
3 what's reported to me but not necessarily verified by other
4 information, just what's given to me by history.
5    Q  Okay.
6    A  The reason I put a question mark is because of
7 what I told you earlier.  There was a debate between the
8 husband and wife -- was it cancerous? wasn't it cancerous?
9 what type of cancer was it?
10       But, you know, my question was, Was it a
11 melanoma?  They couldn't answer it or not.  And the reason I
12 do that is because the most serious thing it could be is a
13 melanoma.  Though that's the least common, it's the most
14 serious.  And that's my -- kind of a reminder to make sure
15 we pursue this.
16   Q  Did you, in fact, pursue it?
17   A  Yeah.  That's the request for records from
18 Dr. Guthrie to see if I could get the information about what
19 it was.
20   Q  Was that request ever made?
21   A  Yes.
22   Q  Did you ever receive the records?
23   A  Let me look at my records here, and I'll tell
24 you.  I received, yeah, quite a few records.  Let me see,
25 but I'm looking to see if I got the original records from

Page 32

1 '96.  And I don't remember ever getting the original
2 pathology reports from 1996.  I don't see them.  So I don't
3 believe I ever received them.
4    Q  Did you receive any pathology reports from any
5 other time period other than 1996?
6    A  Yes.
7    Q  What report did you receive other than from 1996?
8    A  Well, that's what I'm saying, subsequent records
9 that I got included a path report dated 1-22-99.
10   Q  Okay.
11   A  And that's from a left cervical node, lymph node
12 in the neck.
13   Q  That's a different issue than what the -- than
14 what was contained on the --
15   A  Initial visit.
16   Q  -- initial intake form and discussed at the
17 initial visit?
18   A  Yes, that was a subsequent problem that we
19 addressed.
20   Q  Do you know why it is that you never received the
21 path report from back in '96?
22   A  I don't know.  You can't have everything ideally
23 in an office situation.  We don't have a tickler file, so to
24 speak, that if we don't get something in so many days, it
25 automatically keeps making calls or keeps making requests.

Page 33

1 You know, this was a one-time visit -- first-time visit from
2 a new patient for a muscle strain in his calf in an
3 otherwise healthy, relatively healthy, middle-aged male.
4       And so we do assume that the patients have some
5 personal responsibility to make sure that the records get
6 here.  You know, we get them to sign a release on the way
7 out, put it in the mail or have them take it to the
8 physician to try to get the records.
9       Unless they're being seen for ongoing problems
10 where they're automatically scheduled for, you know,
11 diabetes, blood pressure or something else -- if they don't
12 come back, I can't, you know, myself, pursue it with the
13 patient because we don't have like a tickler system.
14   Q  In this particular case, Doctor, do you know if
15 the manner that was going to be utilized to get the records
16 was that that the patient was going to get them or was it
17 that they signed a release and then your office was to get
18 them?
19   A  Yeah, what I do is I tell the patient, On your
20 way out, sign a release and ask them to send the records.
21 From there, I can't tell you for sure what happened because,
22 you know, like I said, there were two people in the room.  I
23 told them I'd like to get the records so I can check it out.
24 Have them give you a release to sign at the desk, you know.
25 And then they go out to the desk, but I'm into the next room

Multi-Page™   ERNEST E. CHARLESWORTH, M.D.
JANUARY 9, 200_

Page 34

1 with the next patient.
2        Whether they never asked for their release to
3 sign or whether they didn't know who to send it to or if it
4 was never sent, I can't tell you where the breakdown was.
5 All I know is we don't have the records.
6        Q  In your file regarding Mr. Hall, is there any
7 record in there indicating that they signed a waiver or a
8 release?
9        A  No, we don't have that kind of a system.
10       Q  That wouldn't have been included in there
11 anyways.  Is that right?
12       A  Not usually.  You know, we send it.  Depending on
13 who's working out front, sometimes they'll photocopy the
14 records request.  And we try to get them to do that, you
15 know.  I mean, when you get somebody to sign a request, sign
16 the -- copy the request, put the date on it so that we know
17 when it was sent.  So whenever we have issues like patients
18 say, Why don't you have my records?  We can say, Well, we
19 sent it on such and such a date.
20       Like I said, we have ten different employees that
21 work up front.  Sometimes it's very busy, and I don't always
22 know if they always do 100 percent of their job they're
23 supposed to do.  So in his case, I don't have a record of a
24 records release at that date.  So I don't know if it was
25 ever signed or sent.

Page 35

1        Q  At any point, have you tried to look into that to
2 see what happened there?
3        A  Not that I recall.
4        Q  Doctor, was Mr. Hall seeing you that day on April
5 30th of 1998 just because he had a leg problem or was he
6 starting to be one of your -- was he coming to your practice
7 to be a regular patient at your practice?
8        A  There's no such thing as a middle-aged male
9 wanting to be a patient at a doctor's practice.  But in all
10 seriousness, his wife was a patient of the practice.  And
11 our policy is that if there are family members that want to
12 be seen, that we'll take them on as new patients.  And I
13 think being a typical male, he came in because he was in
14 pain.
15       But, you know, we assumed he would be our patient
16 whenever he needs us after that.
17       Q  So your rationale behind wanting to get his
18 records regarding whatever problem he had on his back wasn't
19 so that you could treat his left leg problem?
20       A  No.
21       Q  It was because if he came back for other reasons
22 you --
23       A  Wanted a complete record.
24       Q  -- wanted to have a medical history?
25       A  Right.  We wanted a complete record if he's going

Page 3_

1 to be an ongoing patient, right.
2        Q  The next item I'd like you to translate for us,
3 if you could, is under the 12-11-98 progress note, Doctor.
4        A  Okay.
5        Q  And I can see the weight and the blood pressure
6 there, no problem.  And then the "S" being subjective.
7 Right?
8        A  Right.
9        Q  And then complaints of lump on inside of throat.
10 Is that correct?
11       A  Correct, right.
12       Q  Can you take us from that point then?  Is that
13 your handwriting underneath that?
14       A  Yes.  Like I said, the nurse or medical assistant
15 generally gets the chief complaint or the reason why they're
16 coming.  And that's her writing for the lump on the inside
17 of the throat.
18       After that is what I have written.  And that is,
19 Lump left lower neck at least times several weeks.  Negative
20 ST, which stands for sore throat.  Negative URI symptoms.
21 Negative cough.  Negative chest congestion.  No other new
22 lumps, and there's a space.  And it's, Quit smoking times
23 six months.  Weight up to 220 since then.
24       Well, let me just get my original records and see
25 if it looks better.

Page 37

1        Q  Go ahead.
2        A  That's all right?
3        Q  Absolutely.
4        A  Oh, what it says is, Quit smoking times six
5 months.  Weight up to 220; comma, started again, which means
6 he started smoking again after his weight went up to 220
7 pounds.  And then the next line is the objective, Firm
8 nodule, approximately 1.5 centimeters, left supraclavicular.
9 No other LN, which means lymph nodes.  Lungs clear.  Throat
10 clear except for -- this is in parentheses -- gingivitis.
11       And then, Abdomen without HSM,
12 hepatosplenomegaly.  And then assessment is, Questionable
13 mass.  Plan is check CBC, ESR, LFT, CXR.
14       Do you want me to tell you what those stand for?
15       Q  No.
16       A  And then recheck in one month if not gone.
17       Q  I want to go back up to the first line then in
18 your handwriting there, Doctor.  This is under subjective
19 complaints.  Right?
20       A  Right.
21       Q  So this is information that would be coming from
22 the patient?
23       A  That's correct.
24       Q  And it mentions about a lump on the throat.  Is
25 that right?

ERNEST E. CHARLESWORTH, M.D.     **Multi-Page**™
JANUARY 9, 2002

Page 38

1    A  Left lower neck.
2    Q  Left lower neck.  And at least times several
3 weeks?
4    A  Correct.
5    Q  Did the patient give you any more specific
6 information other than several weeks?
7    A  Believe me, that's part of the art of medicine.
8 We try to badger people, not really badger.  But we try to
9 ask the question several different ways to pin them down.
10 You know, like this time I would say, Was it before
11 Thanksgiving or after Thanksgiving?  Was it before Halloween
12 or after Halloween?  I would try to narrow down the time
13 frame in several different ways as best I could.
14         So when I said several weeks, that's probably the
15 best I could get him narrowed down.
16    Q  So the several weeks notation is actually your
17 best interpretation of the information he was giving to you?
18    A  Right.  And in this case -- like I said, my usual
19 trick is to tie it to holidays, birthdays or whatever.  And
20 since it was December 11th, that would have meant it was
21 probably before Thanksgiving but not Halloween.  I mean,
22 that's one of the tricks I use to --
23    Q  And that's your understanding of what you mean by
24 several weeks?
25    A  Right.  And can I just clarify one thing?

Page 39

1    Q  Sure, absolutely.
2    A  The reason I had problems with that one part is
3 that it didn't completely come through on the photocopy.  I
4 mean, so this is not -- you know, there's a word or so
5 missing on that copy.
6    Q  Okay, I apologize for that.
7       Doctor, did you review your medical records prior
8 to your deposition here today?
9    A  To be honest with you, the only time I looked at
10 it was when I met with Mr. Pedersen.
11    Q  Sometime back in 2001?
12    A  Yeah.
13    Q  Let's have the next document on there, Doctor,
14 then marked as well.  It should be the one that says,
15 1-15-99.
16    A  That's actually two pages, I guess.
17    Q  It is, yes.
18       (Medical record, two pages, produced and marked
19 Charlesworth Exhibit No. 3.)
20 BY MR. KELLEY:
21    Q  You have that in front of you, Doctor?
22    A  Yes.
23    Q  And at the top it says, 1-15-99.  Is that right?
24    A  Correct.
25    Q  And it also has Mr. Hall's age there?

Page 40

1    A  Yes.
2    Q  And it has your name up there as the physician.
3 Correct?
4    A  It has my name as referral physician.
5    Q  I'm sorry.  Is this not your record here?
6    A  No, that's why I was looking back through.  I
7 don't have any copy of that in my chart.  I think what that
8 refers to is who was the referring physician to the
9 specialist.
10    Q  Okay.
11    A  Yes.  And I recognize the signature.  That's Dr.
12 Chicklo.
13    Q  Did you provide -- did you have any conversations
14 with Dr. Chicklo?
15    A  I had a conversation with him at least on one
16 occasion about Tommy Hall, but that was a long time ago.
17    Q  You don't remember anything about it?
18    A  It's hard to remember details.  But I was
19 concerned because Tommy Hall's smoking history was pretty
20 long-term heavy and this neck mass about a head and neck
21 malignancy.  So that's when I communicated to him that I was
22 referring him because of concerns about possible laryngeal
23 or head and neck cancer.
24       With a lymph node positive, I wanted him to
25 evaluate him and make sure whether it was or was not a

Page 41

1 malignancy.
2    Q  So after this visit on 12-11-98 when you noticed
3 -- when you observed the lump on the side of his throat, you
4 referred him then to Dr. Chicklo?
5    A  Let me take a look and see.  Not at that point.
6    Q  When did you refer him to Dr. Chicklo?
7    A  This was January 5th, 1999.
8    Q  That's when you referred him?
9    A  Yes.
10    Q  Why did you refer him to Dr. Chicklo?
11    A  The location of the abnormal lymph node that he
12 had usually points to either a head and neck cancer, a lung
13 cancer or an esophageal or a GI malignancy.  He was anemic,
14 quite pronounced anemia at that time.
15       And I had already started the workup, you know,
16 with an upper GI, which is an x-ray that looks at the
17 esophagus, to try to find a cause for his anemia.  And there
18 wasn't any sign of an esophageal cancer or mass that would
19 explain the metastatic nodes of the supraclavicular area.
20       So like I said, having a heavy smoking history,
21 the big concern would be a head and neck cancer.
22    Q  And you chose to refer him to Dr. Chicklo because
23 that's Dr. Chicklo's specialty?
24    A  Yes.  He's an ear, nose and throat physician.
25    Q  Would it have been at about that time then that

Page 42

1 you were making the referral that you would have had the
2 conversation with Dr. Chicklo?
3     A   Yes.  That's what I'm saying.  I told him that's
4 what my concerns were that we didn't have evidence -- I
5 think we had a chest x-ray.  Let me see.  Anyway, we had a
6 chest x-ray at that time too.  But the upper GI didn't give
7 me a cause for his node.
8         And I wanted him to do a thorough evaluation for
9 head and neck cancer.  So I wanted to make sure he knew what
10 I was concerned about.
11     Q   Do you recall if you provided any history to Dr.
12 Chicklo about any previous cancerous conditions?
13     A   I don't remember giving him any other history
14 other than, like I said, what I was telling you that he had
15 a mass; that he was a heavy smoker; he's anemic; the GI was
16 negative; that he didn't have anything in his chest to pin
17 it on.  So I was really concerned about a head and neck
18 malignancy.
19     Q   Did you give him any history at all as much as
20 you can recall about any problem with a mole on his back?
21     A   I don't know whether I did or not.
22     Q   There's nothing in your notes that would reflect
23 that information and no letter to Dr. Chicklo or anything
24 like that?
25     A   No, that's what I said.  It was a phone

Page 43

1 conversation, and I wanted to convey what my concerns were.
2     Q   So Charlesworth 3, we're actually going to end up
3 making Chicklo 1 then, I presume, since that's not your
4 record.
5         Any other conversations that you had with Dr.
6 Chicklo regarding Tommy Hall that you can recall?
7     A   After he had seen him, I think he had given me a
8 call to tell me that he didn't see any evidence of a head
9 and neck cancer.  But his concern too was that, you know,
10 this was a malignant mass.  So he wanted to talk to me
11 about, you know, referral for a biopsy of the mass.
12     Q   Do you know Dr. Michael Cashdollar?
13     A   Yes.
14     Q   Go to the -- there's a letter in there dated
15 February 17, 1999, Doctor, in that packet of materials.  It
16 appears to be a letter from Dr. Cashdollar --
17     A   To Dr. Chicklo.
18     Q   -- to Dr. Chicklo dated February 17, 1999.  And I
19 believe on the second page there it indicates that you're
20 one of the people who received a copy of it?
21     A   Yes.
22     Q   Do you have any recollection of receiving this
23 letter?
24     A   Yes.
25     Q   When you receive letters like this regarding, you

Page 4

1 know, follow-up on a patient of yours, do you review them?
2     A   Yeah, I read them before they're filed in the
3 chart.
4         MR. KELLEY:  Okay.  Now, on this document of
5 February 17, '99 -- why don't we mark this as Charlesworth
6 4?
7         (Letter dated 2-17-99, two pages, produced and
8 marked Charlesworth Exhibit No. 4.)
9 BY MR. KELLEY:
10     Q   In this letter, Doctor, in the very first
11 paragraph, second line, it says, As you are well aware --
12 and this is to Dr. Chicklo -- Mr. Hall demonstrated a left
13 in scapular dermal lesion in 1993.  Pathology revealed a
14 malignant melanoma.
15         Further down about the middle point of that page,
16 under PMH, which is generally accepted shorthand for patient
17 medical history.  Is that right?
18     A   Past medical history.
19     Q   Past medical history is most notable for the
20 malignant melanoma.  Surgical resection in 1993.
21     A   Right.
22     Q   And then on the second page of that document,
23 second line there, it says, History of left scapular dermal
24 malignant melanoma, 1993.
25     A   Right.

Page 45

1     Q   At the time you reviewed this letter, did you
2 have any conversations with either Doctors Chicklo or
3 Cashdollar regarding these statements in here about a
4 melanoma, a malignant melanoma, back in 1993?
5     A   Dr. Chicklo, like I said, we talked about doing a
6 biopsy.  You know, since he's a head and neck surgeon, he
7 did it himself to find out what was going on.  And after he
8 got the path report, he called me back, you know, to let me
9 know about the path report.
10     Q   You're talking about the path report on the --
11     A   For the neck mass.
12     Q   For the neck mass.
13     A   Which showed a melanoma.  And that's when he
14 said, Well, jeez, this guy had to have had a melanoma, you
15 know, years ago.  Could it be from that?  The question was,
16 Could it be from that or does he have a new one?
17         So we said, well, obviously he needs to go see
18 the oncologist at that point about further treatment.  And
19 that's the first time that I became aware that he definitely
20 had a melanoma.
21     Q   You're saying that time was somewhere in February
22 of '99?
23     A   Well, yes, roughly when Dr. Chicklo -- it had to
24 be in that January/February time frame.
25     Q   So it may have even been prior to the date this

| Page 46 | Page 48 |
|---|---|

**Page 46**

1 letter went out that you had that conversation with him?
2   A  I think it was -- yes.  Oh, it was definitely
3 prior to this letter because that's the point where we made
4 the referral to Cashdollar.  He asked -- he was in the
5 office that day.  And he was asking me, Do you want to set
6 up the referral or should I just go ahead and set him up
7 while he's here?
8   Q  It mentions up here, Pathology -- this is in the
9 first paragraph, again, on the first page of the letter,
10 Doctor.  It says, Pathology revealed a malignant melanoma.
11 Did you ever see the pathology report from 1993?
12   A  No.
13   Q  Do you know if --
14   A  Still haven't.
15   Q  -- Chicklo or Cashdollar has ever seen it?
16   A  Chicklo never had.  At least based on our
17 conversation, he had never seen a path report from '93.  And
18 I would say that based on this that Dr. Cashdollar actually
19 had the path report from '93.
20   Q  Doctor, flip to the last page in those documents
21 there, the very last page.
22   A  Okay.
23     MR. KELLEY:  Let's mark that as Charlesworth 5.
24     (1993 pathological report, one page, produced and
25 marked Charlesworth Exhibit No. 5.)

**Page 47**

1 BY MR. KELLEY:
2   Q  Doctor, take a moment and review that.  Take as
3 much time as you like and review it.
4   A  Okay.
5   Q  Have you ever seen this pathological report prior
6 to today?
7   A  I'm not certain, but it looks familiar.
8   Q  Is that path report in your records anywhere?
9   A  I'll look.  That's the problem when you get all
10 these other nonmedical records thrown in there like record
11 requests, you have a lot to go through.
12   Q  Take your time.
13   A  It also brings back sad memories.  I don't see it
14 in my chart.
15     MR. KELLEY:  Thank you, Doctor.  That's all the
16 questions I have.  These folks may have some.
17         EXAMINATION
18 BY MS. MAHADY-SMITH:
19   Q  Doctor, do you want to take a break or do you
20 just want to soldier on?
21   A  Unless you do another hour, I'll need a break.
22 But that will be okay.
23   Q  No, I won't be that long.
24   A  Okay.
25   Q  And you'll have to excuse me, I have a bit of

**Page 48**

1 laryngitis.
2     Let me just follow up, Doctor.  Again, I'm Catie
3 Mahady-Smith.  And Steve Pedersen is here, and we represent
4 Nancy Hall and Tommy's estate in this issue with the
5 insurance company.
6     May I clarify just a couple of things that were
7 raised on Mr. Kelley's questioning, please?  You have told
8 us about your recollection of that first visit with Mr. Hall
9 and Mrs. Hall being present.  My question is, That's your
10 best recollection of the events as you sit here today.
11 Correct?
12   A  Yes.
13   Q  And is it fair to say that the issue regarding
14 the mole about whether it was Mr. Hall or Mrs. Hall, they
15 were talking about one mole that was removed.  Correct?
16   A  Yes.
17   Q  And, generally, if you, as a physician, not as
18 laypeople -- but if they're telling you that a mole was
19 involved, that would eliminate probably basal and squamous
20 cell.  You'd be focused as a physician if it is a cancer
21 from a mole, it's probably a melanoma?
22   A  No.
23   Q  No, that would not be so?
24   A  I would be most concerned about that, but that's
25 the least likely.

**Page 49**

1   Q  The least likely cancer?
2   A  Statistically, right.  So that's the one you
3 always worry about.  The others aren't so deadly.
4   Q  And so you're concerned about it because of its
5 severity?
6   A  Yes, potential for harm.
7   Q  When you indicated that there was a discussion --
8 debate, I think was the word you used -- between Nancy and
9 Tommy regarding this funny mole, you attempted to clarify
10 precisely what the diagnosis was, correct, by getting the
11 pathology report?
12   A  By asking for it.
13   Q  By asking for the pathology report.  And that's
14 because cancer is a histologic diagnosis.  Is that right?
15   A  Absolutely.
16   Q  So that -- let's say, for example, even on that
17 subsequent visit where you as a physician had clinical
18 suspicions, concerns about cancer, you would never tell a
19 patient that they had cancer until you had that pathology
20 report that in fact says that?
21   A  That's true.  That's why we always take moles off
22 and we send them for pathology so that we know for sure.
23   Q  And if, in fact -- and we understand that you did
24 not that day or even subsequently.  But if, in fact, on the
25 day that you saw Mr. Hall in April of '98 and there was a

Page 50

1  discussion, what was that mole, if you had the pathology
2  report, you wouldn't rely on any of those things.  You'd
3  look at the pathology report yourself, as a physician, and
4  see what the pathologist said.  Correct?
5      A  Correct.  Because particularly for melanoma, it's
6  purely a pathological diagnosis.  It's done on stages based
7  on the depth of penetration of the tumor.  I excise
8  melanomas myself in the office.  And depending on the stage,
9  that's all the treatment you ever need.  You're cured.  But
10  if the depth of penetration is a certain level, you need
11  wide excision, you need lymph node exploration and chances
12  of recurrence are far greater.
13      Q  And, Doctor, do you still have the pathology
14  report that was given to you as an exhibit from the 1993
15  mole removal?
16      A  Yes.
17      Q  That is not a pathology report that indicates as
18  its impression, malignant melanoma, is it?
19      A  No.
20      Q  And that would have been the report that you
21  would have -- if they had sent it, that would have been
22  accessed at that time?
23      A  I don't know because he told me 1996.  This says
24  1939.  You know, there's a little discrepancy there.  So I
25  don't know if this was the only time he ever had a mole

Page 51

1  removed or not.
2      Q  Well, let me ask you this:  Does it appear that
3  the physician in that case was Dr. Hurley?  Do you know Dr.
4  Hurley?
5      A  Yes, I know Dr. Hurley.
6      Q  Under doctor.  Here, under doctor.
7      A  Yes, I'm sorry.  That's what I was looking for,
8  the doctor that sent the specimen.  And that was Dr. Hurley.
9  That's correct.
10      Q  Do you recall whether or not he was partners with
11  Dr. Guthrie?
12      A  Oh, yes, definitely.
13      Q  Is it fair to say, Doctor, that you would have
14  not rendered treatment or recorded as the diagnosis melanoma
15  or cancer without first seeing this pathology report
16  yourself?
17      A  If I saw this pathology report, I would not
18  record a diagnosis of cancer.
19      Q  Has anyone up until this date, including Mr.
20  Kelley here today, ever showed you any document from any
21  other physician that indicates that Mr. Hall had been
22  diagnosed with cancer prior to the 1999 events attendant to
23  the lump in his neck?
24      A  I've never seen a pathology report that shows
25  that.

Page 52

1      Q  Now, have you seen -- other than the documents
2  that are in this group right now is what you're referring
3  to?
4      A  Yeah, I'm just saying Dr. Cashdollar's letter
5  refers to a pathology report.  But I've never seen it.
6      Q  And let me just address Dr. Cashdollar's letter.
7  First of all, if you take a look at that exhibit, does it
8  actually say pathology report or does it say pathology
9  revealed malignant melanoma?
10      A  Pathology revealed.
11      Q  So, now, you don't know as you sit here today --
12  and we can only find out what you know factually.  And we're
13  taking Dr. Cashdollar's deposition.  But you don't know
14  whether Dr. Cashdollar is referring to a report or to an
15  actual re-review of the slides himself attendant to his care
16  of Mr. Hall.  Is that correct?
17      A  I'm not sure what he's referring to.
18      Q  And you don't even know what pathology report
19  he's referring to.  But you know that the one that he might
20  be referring to, you know that the one that we have here
21  does not diagnose malignant melanoma.  Correct?
22      A  Right, it's a difficult diagnosis.
23      Q  So let me rephrase that question.  To date, no
24  one has shown you any records from prior to December of 1998
25  that indicate a diagnosis of melanoma or cancer by any of

Page 53

1  Tommy Bob's physicians.  Is that correct?
2      A  I have no pathology reports that indicate cancer
3  until he had the metastatic lymph nodes.
4      Q  Well, and that's another question I have here.
5  You explained to Mr. Kelley what you recalled of the
6  conversation with Dr. Chicklo.  As I recall the pathology
7  report from the lymph node -- and it's probably in your
8  records, I would think, if you need to access it.  Didn't
9  the pathologist at that time indicate that this was not the
10  primary lesion, that it was indeed metastatic melanoma?
11      A  Yes.  The lymph node from the supraclavicular
12  area was a metastatic lesion on the initial path.
13      Q  So that you as physicians, you and Dr. Chicklo,
14  then would educatedly conclude that it had to come from some
15  other source.  Correct?
16      A  Yes.
17      Q  It spread from some other source.  Is that
18  correct?
19      A  Yes.
20      Q  When Mr. Kelley asked you that with regard to
21  medical records there's a requirement to be accurate and
22  complete and legible, do you recall those questions?
23      A  Yes.
24      Q  That's the goal.  Is that right?
25      A  Yes.

**ERNEST E. CHARLESWORTH, M.D.**              Multi-Page™
**JANUARY 9, 2002**

---

Page 54

1    Q   And sometimes medical records can misstate things
2  or be inaccurate?  Not deliberately so.
3    A   Yeah, histories.  And patients can misstate
4  things due to ignorance, not usually due to intention.
5    Q   Or even because they're not the familiar with the
6  true definition of medical terms.  Correct?
7    A   That's what I'm saying, I mean, just through
8  ignorance of medical terminology or treatments.
9    Q   So the goal is that the records would be accurate
10  and complete, but we'd have to look at every entry in order
11  to see whether a particular entry is an accurate reflection
12  of the state of evaluation?
13    A   You assume that everything is as accurate as
14  possible.
15    Q   Let me ask you about this form, the intake sheet
16  from 4-30 of '98, if I could.  Do I understand you correctly
17  that you can identify your handwriting, but you do not know
18  for certain who made the other entries?
19    A   I'm not an expert in handwriting.  But I do know
20  mine, yes.
21    Q   If you look at the first progress note that was
22  written and it even appears the second progress note of
23  12-11-98, the staff person who made those entries at the
24  very beginning of both of those notes, do you know who that
25  would have been?  Do you recognize that handwriting?

---

Page 55

1    A   No.
2    Q   But you know for certain, even though you don't
3  recognize that handwriting, that it was by a staff member.
4  Correct?
5    A   Yes.
6    Q   So your inability to recognize the handwriting on
7  the previous page, the intake sheet, does not necessarily
8  mean it wasn't one of your staff.  Correct?
9    A   It could be.  I don't know.
10    Q   I have to ask you some questions, Doctor, that
11  are going to seem very apparent to you.  But I need to make
12  the record.  Is it fair to say that you were not present
13  during the generation of this sheet?  And if there were
14  conversations that took place between your staff or among
15  your staff and Mr. and Mrs. Hall, you weren't a witness to
16  those conversations.  Correct?
17    A   No.
18    MR. PEDERSEN:  For clarification, are you
19  referring to Exhibit 1?
20    MS. MAHADY-SMITH:  Yes.
21    MR. PEDERSEN:  Okay.
22  BY MS. MAHADY-SMITH:
23    Q   If I understood you correctly, these intake
24  sheets, Exhibit No. 1, what's been marked as Charlesworth
25  No. 1, is generally mailed to the patient and they bring it

---

Page 56

1  in?  That's the goal?
2    A   It depends on the situation.  Sometimes people
3  call that day and ask for their first appointment that day.
4  So then they just get it when they show up.
5    Q   Okay.
6    A   So we either -- it depends on -- we ask the
7  patient, We have some information we need to get.  Would you
8  like us to mail it to you, or would you like to come in and
9  pick it up or just come early and do it while you're here?
10    Q   And I take it that sometimes you can even mail
11  it out and they might forget to bring it and they have to redo
12  it when they get here?
13    A   Yeah, right.
14    Q   So just as you sit here today, you don't know
15  which of those set of circumstances was attendant to Mr.
16  Hall filling out -- or Mr. Hall's sheet?
17    A   Since there's no creases in the original record,
18  I assume it was never mailed.
19    Q   In your experience and -- strike that.  In your
20  experience and training, if a physician treats a patient for
21  cancer, is that generally recorded somewhere in their office
22  records or notes or in hospital records if that's where the
23  treatment takes place?
24    A   We always try to, as part of accurate records,
25  report the diagnosis and that would be there.  In certain

---

Page 57

1  cases like cancer, at this particular hospital here, there's
2  a cancer registry.  It goes one step further.  They not only
3  record it in the office notes, there's a cancer registry for
4  the county.  I forget the exact title of the national
5  organization, but it's a cancer databank.
6    Q   So that actually would be recorded in more than
7  one location?
8    A   Yes.
9    Q   Now, again, Doctor, this is pretty self-apparent.
10  But I take it that you were not present and not privy to any
11  conversations that took place between Mr. Hall and his
12  surgeon Dr. Hurley in 1993 when the left upper back mole was
13  removed.  Is that correct?
14    A   Yes, I was not present.
15    Q   And if Dr. Hurley has testified and Mr. Hall has
16  testified that the interpretation of the mole was that it
17  was benign, you have no information to refute that that was
18  the information that was given to Mr. Hall?
19    A   I don't know.
20    Q   You can't refute it or validate it?
21    A   Right.
22    Q   I take it that in terms of developing a
23  management plan and rendering medical treatment, that you as
24  a physician in your practice, that you would not attempt to
25  begin a treatment of cancer or any treatment based on an

---

Page 54 - Page 57

**HUGHES, ALBRIGHT, FOLTZ & NATALE**
**717-540-0220\717-393-5101**

Page 58

1 intake sheet or correspondence? You would get a pathology
2 report in order to outline a plan or begin a treatment plan?
3    A If I received a letter like Dr. Cashdollar had
4 written from Dr. Cashdollar or Dr. Hurley or Dr. Chicklo or
5 any of the people I know that I trust and they said that
6 this patient had cancer, even without the pathology report,
7 I would treat that patient as if they had cancer or a
8 management plan or a follow-up plan based on that.
9    Q And I tell you this because in Dr. Cashdollar's
10 letter to you he indicates in an affirmative way that he has
11 looked at the pathology. Correct?
12    A Right. And that's his specialty, and I trust his
13 expertise. Likewise, if Dr. Hurley had given me a letter
14 that said that this patient had a cancer, I would -- even if
15 he didn't send the path report, which they normally do, I
16 would still assume that he had it.
17    Q Because you're presuming that he's reviewed the
18 pathology?
19    A Right.
20    Q It's based on the pathology report?
21    A Right.
22    Q And if Dr. Hurley had sent you this report that
23 has been marked as Exhibit No. 5, you've already told us
24 that that would have been viewed as a nonmalignancy.
25 Correct?

Page 59

1    A If I would have gotten that report, I would have
2 -- it depends what the letter would say with it. But I
3 would call and ask him, Where is the report on the cancer?
4    Q What do you mean, Where is the report on the
5 cancer?
6    A If he sent me a letter that said he had cancer
7 and sent me this report, I'd ask him, Where is the report
8 that shows he has cancer?
9    Q Because this does not? The pathology report does
10 not?
11    A Yes.
12    Q Since you never received the pathology report
13 from the mole excision in the '90s -- whether it was '93 or
14 '96, you never received the report -- in terms of your
15 records and your conclusions you never concluded that Mr.
16 Hall had cancer in either '93 or '96 because you never saw
17 the reports?
18    A I had no conclusive evidence of that.
19    Q And your records cannot be viewed as conclusive
20 evidence of that because the pathology report is the
21 conclusive evidence. Correct?
22    A Right. Just to clarify, you know, you're asking
23 me about whether I get records or not. Once the diagnosis
24 was made that he had metastatic melanoma -- it's a terrible
25 diagnosis. And at that point, the primary is not as

Page 60

1 important to the treatment as the treatment.
2    Q Right.
3    A So I mean, once that was made, there was no
4 reason for me to pursue digging out all the records. I
5 mean, you're asking me why it may have fallen through. You
6 know, once you establish it's a metastatic case, the primary
7 is no longer important, I mean, as far as treatment plans
8 are concerned.
9    Q Right, I understand. And that's the question I
10 was going to ask you is that the group of physicians --
11 yourself, Dr. Chicklo, Dr. Charlesworth -- you were dealing
12 with an acute life-threatening situation for Mr. Hall. And
13 that's what you were focused on and what you were about the
14 business of dealing with. Correct?
15    A Right. And I'm saying at that point when you
16 have metastatic melanoma, you know, that's one treatment
17 path and that's it.
18    Q From what you've told us here today, Doctor,
19 during the deposition, if the representatives from the
20 insurance company had contacted you when they were making a
21 decision to deny benefits or to rescind the policy, would
22 you have told then the same thing that you have told us
23 today?
24    A What's here is what's here. You know, what I say
25 today is what I would have said three years ago, four years

Page 61

1 ago -- well, not four years ago -- three years ago, two
2 years ago.
3    Q Did you continue to see Mr. Hall until the time
4 of his death?
5    A Periodically.
6    MS. MAHADY-SMITH: Let me just consult with Steve
7 for one minute. We'll take a two-minute break, but I think
8 we may be finished.
9    (A break was taken.)
10 BY MS. MAHADY-SMITH:
11    Q Dr. Charlesworth, as you sit here today, have you
12 received any medical record from any physician from 1993
13 through December of '98 that reflects in the medical record
14 a diagnosis or a treatment of cancer in Mr. Hall?
15    A During that time period, you mean?
16    Q Up until that visit, that December 11th, 1998,
17 visit.
18    A Just the references in Dr. Cashdollar's letter
19 here.
20    Q That's in 1999. Correct?
21    A Yeah, in 1999, correct. I don't have any other
22 records or reference prior to December of '98 of any
23 definitive treatment for a cancer or a diagnosis.
24    Q Or a diagnosis. And Mr. Kelley hasn't shown you
25 in his packet of records any record from any medical

ERNEST E. CHARLESWORTH, M.D.          Multi-Page™
JANUARY 9, 2002

Page 62

1 physician during that time frame, 1993 through December of
2 '98, that shows a diagnosis of cancer or a treatment of
3 cancer in Mr. Hall. Is that right?
4      A  That's correct.
5      MS. MAHADY-SMITH: Thank you.
6      MR. KELLEY: I have a couple of follow-ups.
7           EXAMINATION
8 BY MR. KELLEY:
9      Q  Doctor, Ms. Mahady-Smith had asked you if you
10 would have told -- had the insurance company called you
11 during their investigation, you would have told them the
12 same things that you told them here today.
13     A  Correct.
14     Q  Do you recall that question?
15     A  Yes.
16     Q  And prior to today, you didn't have that
17 pathology report from 1993. Isn't that correct?
18     A  No, that's what I said. I don't remember seeing
19 this.
20     Q  So prior to today, the information that you would
21 have had would have been the information provided by the
22 patient in the intake form. Correct?
23     A  Um-hum.
24     Q  The debate that you --
25     MS. MAHADY-SMITH: Objection.

Page 63

1      MR. KELLEY: Excuse me.
2      MS. MAHADY-SMITH: I just want to put the
3 objection on the record that you mischaracterized the
4 testimony. You said, Provided by the patient. But go
5 ahead.
6 BY MR. KELLEY:
7      Q  The information provided on the intake form that
8 wasn't put there by you.
9      A  Right.
10     Q  You would have had the information regarding the
11 debate between Mr. and Mrs. Hall about whether it was a
12 cancerous mole or it wasn't a cancerous mole. Right?
13     A  Um-hum.
14     Q  And you would have had Dr. Cashdollar's letter
15 indicating that in 1993 there was a cancerous mole removed.
16 Right?
17     A  That's correct.
18     Q  So prior to today, if somebody from my client had
19 called you up and said, Did he have cancer back in 1993?
20 Your answer would have been yes. Isn't that right?
21     A  My answer would have been Dr. Cashdollar's letter
22 says that he had cancer, yes.
23     Q  Based upon the information, the records that you
24 had at that time, the answer would have been yes?
25     A  Yeah. Based on Dr. Cashdollar's records, right.

Page 64

1      Q  And referring back to that intake form again --
2 that's Charlesworth 1 -- it's fair to say then that it was
3 either the patient, the patient's wife or somebody from your
4 office who put the information on that first sheet
5 indicating a cancerous mole removed in 1996? Is that fair?
6      A  That's correct.
7      Q  It's one of those three possibilities?
8      A  Right.
9      Q  Since it wasn't you?
10     A  Right.
11     Q  And I believe you mentioned earlier that your
12 staff is instructed to make sure that the information, if
13 they put anything on there, is taken down accurately. Isn't
14 that correct?
15     A  As accurate as they can get, right.
16     Q  And that information -- even if it was put down
17 there by a staff person, that information indicating a
18 history would have come from either the patient or the
19 patient's wife in this case. Isn't that right?
20     A  Yes.
21     Q  Doctor, do you have any way of determining either
22 by your own memory or by the memory of the -- the collective
23 memory of you and the other physicians here or some record
24 of who was employed at the front desk back in April of 1998?
25     A  Well, I can tell you who was employed by the

Page 65

1 office then by going back through old employment records.
2 But people, you know, float through there. You know, it's a
3 team approach. So the actual person that was at the window
4 at the time could be any of the employees that were hired
5 for the reception area or even the office manager sometimes
6 comes out to help out. So it could be any of those people.
7      Q  I'm just --
8      A  But I would have -- you know, I'd have employment
9 records of who worked whatever date that -- I mean, that
10 year, that month or whatever.
11     MR. KELLEY: If we're not able to determine whose
12 handwriting that is by some other means, I may submit a
13 request to you to obtain the names of all the people and
14 we're going to have to go through them and see if they wrote
15 it on there. But we'll try other methods before we resort
16 to that.
17          That's all the questions I have. Thank you.
18           EXAMINATION
19 BY MS. MAHADY-SMITH:
20     Q  Doctor, I have a couple of follow-up questions.
21          The initial question on redirect that Mr. Kelley
22 asked you regarding the records that you had available and
23 the answer you would have given to the insurance company had
24 they consulted you and the question had been asked, Did he,
25 Mr. Hall, have cancer in 1993? Do you remember that line of

**Page 66**

1 questioning?

2    A  Yes.  It's determined on how you ask it.  If you

3 ask me if he called me in December of '98, that's one

4 answer.  If you ask me in March of '99, it's a different

5 answer because I had different records in my possession.

6    Q  If they had asked you based on your recollection

7 of the conversation with Mr. Hall, as you told us earlier

8 today in your deposition -- April 30th, '98, if they had

9 asked you, Did Mr. Hall have an understanding that he had

10 cancer in 1993?  Your answer would have been no?

11    A  It would have been maybe.  But Mr. Hall, it would

12 have been he doesn't think so.

13    Q  So that his recollection was just a funny-looking

14 mole?

15    A  Right.

16    Q  And the information that you would have given in

17 1999 was based on additional information that became

18 available after the diagnosis of metastatic cancer.

19 Correct?

20    A  Correct.

21    Q  And the insurance company and their

22 representatives had a document which you have told us that

23 you did not have, which is the 1993 pathology report that

24 was attendant to the excision of the mole.  That report if

25 you read it, if you had it in your hand and they asked you,

**Page 6**

1    A  I'll provide that for you.

2       MR. KELLEY:  And why don't you mark this one as

3 part of the record and call it Charlesworth 6?

4       (Curriculum vitae, two pages, produced and marked

5 Charlesworth Exhibit No. 6.)

6       MR. PEDERSEN:  I would request that if you get a

7 copy of an updated one that you send a copy to us.

8       (Whereupon, the deposition was concluded at 11:47

9 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 67**

1 you would have told them, That does not reflect malignant

2 melanoma.  Correct?

3       MR. KELLEY:  Objection, calls for speculation.

4 BY MS. MAHADY-SMITH:

5    Q  If you had the 1993 report in your hand, the

6 report itself is not a reflection of a finding of malignant

7 melanoma?

8    A  This report by itself, no.

9    Q  So that if Dr. Cashdollar's letter -- and we

10 haven't deposed him yet -- is a reference to a pathology

11 report, it's not this pathology report.  Correct?

12    A  Knowing Dr. Cashdollar, no, it wouldn't be that

13 report.

14       MS. MAHADY-SMITH:  That's all the questions I

15 have.  Thank you, Dr. Charlesworth.

16       MR. KELLEY:  That's it.  Thank you, sir.

17       (Discussion held off the record.)

18       MR. KELLEY:  Dr. Charlesworth has been kind

19 enough to provide us with a current curriculum vitae.

20       EXAMINATION

21 BY MR. KELLEY:

22    Q  It is not up to date.  Is that right, Doctor?

23    A  Yes, it's at least eight years old.

24    Q  And if you've got a more recent one, if we could

25 get a copy of that?

**Page 69**

1 COUNTY OF DAUPHIN     SS     :

2 COMMONWEALTH OF PENNSYLVANIA :

3

4    I, Pamela S. Sullivan, a Notary Public, authorized to

5 administer oaths within and for the Commonwealth of

6 Pennsylvania, do hereby certify that the foregoing is the

7 testimony of Ernest E. Charlesworth, M.D.

8    I further certify that before the taking of said

9 deposition, the witness was duly sworn; that the questions

10 and answers were taken down stenographically by the said

11 Reporter-Notary Public, and afterwards reduced to

12 typewriting under the direction of the said Reporter.

13    I further certify that the said deposition was taken

14 at the time and place specified in the caption sheet hereof.

15    I further certify that I am not a relative or employee

16 or attorney or counsel to any of the parties, or a relative

17 or employee of such attorney or counsel, or financially

18 interested directly or indirectly in this action.

19    I further certify that the said deposition

20 constitutes a true record of the testimony given by the said

21 witness.

22    IN WITNESS WHEREOF, I have hereunto set my hand this

23 9th day of January, 2002.

24       Pamela S. Sullivan

25       Reporter-Notary Public

```
1   COUNTY OF DAUPHIN           :
                                     SS
2   COMMONWEALTH OF PENNSYLVANIA :

3

4        I, Pamela S. Sullivan, a Notary Public, authorized to

5   administer oaths within and for the Commonwealth of

6   Pennsylvania, do hereby certify that the foregoing is the

7   testimony of Ernest E. Charlesworth, M.D.

8        I further certify that before the taking of said

9   deposition, the witness was duly sworn; that the questions

10  and answers were taken down stenographically by the said

11  Reporter-Notary Public, and afterwards reduced to

12  typewriting under the direction of the said Reporter.

13       I further certify that the said deposition was taken

14  at the time and place specified in the caption sheet hereof.

15       I further certify that I am not a relative or employee

16  or attorney or counsel to any of the parties, or a relative

17  or employee of such attorney of counsel, or financially

18  interested directly or indirectly in this action.

19       I further certify that the said deposition

20  constitutes a true record of the testimony given by the said

21  witness.

22       IN WITNESS WHEREOF, I have hereunto set my hand this

23  9th day of January, 2002.

24  ┌─────────────────────────────────┐
    │         NOTARIAL SEAL           │          Pamela S. Sullivan
    │ PAMELA S. SULLIVAN, Notary Public│         Reporter-Notary Public
25  │   Swatara Twp., Dauphin County  │
    │ My Commission Expires Jan. 31, 2005│
    └─────────────────────────────────┘
```

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**LAW OFFICES OF**
**STEPHEN R. PEDERSEN, ESQUIRE**
**214 SENATE AVENUE, SUITE 602**
**CAMP HILL, PA 17011**                    **ATTORNEY FOR PLAINTIFF:**
717) 763-1170                              **NANCY HALL**

---

| | | |
|---|---|---|
| **NANCY HALL, individually and as the** | : | **CIVIL ACTION - LAW** |
| **Representative and Administratrix of** | : | **NO. 1:01-CV-1265** |
| **the Estate of Tommy Hall, deceased,** | : | |
| **her husband,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **CUNA MUTUAL GROUP, CUNA** | : | **JUDGE SYLVIA H. RAMBO** |
| **MUTUAL INSURANCE SOCIETY,** | : | |
| **Defendants.** | : | |

## PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS
## DIRECTED TO CUNA MUTUAL GROUP,
## CUNA MUTUAL INSURANCE SOCIETY

This Request for Production of Documents shall be deemed to be continuing in nature so as to require the production of further documents obtained between the date this present Request is responded to and the date of trial or such earlier time as the Court in this case may fix as the deadline for the production of documents which are to be used or will be usable at the trial of the case.

Please take notice that pursuant to Fed. R.Civ. P. No. 34, please furnish our office, within thirty (30) days of service hereof, a photostatic copy or like reproduction of the materials concerning this action or its subject matter which are in your possession, custody or control and

which are not protected by the attorney/client privilege; or, in the alternative, produce the said matter at said time to permit inspection and copying thereof.

**RECORDS TO BE PRODUCED**

1.     Any and all documents referred to, relating to, or pertaining to any answer to any Interrogatory.

2.     Any and all documents containing information relating to any answer to any Interrogatory.

3.     Any and all statements concerning this action or its subject matter obtained by you or anyone acting on your behalf.

4.     Any and all investigation reports, except those protected from discovery, prepared by you or by anyone on your behalf in regard to the evaluation and litigation of the instant action.

5.     Any and all curriculum vitae for each and every person whom you expect to call as an expert witness at trial.

6.     Any and all expert reports from each person whom you expect to call as an expert witness at trial.

7.     Any and all writings, memoranda, reports, statements and records, etc., which you, your company and/or client possess concerning the case, investigation or review of the plaintiff and his/her case.

8.     Copies of all statements, memoranda, summaries of other writings, documents, diagrams and pictures obtained from your investigation, your insurance company's investigation or your attorney's investigation into the incident involved.  You need not supply any attorney's "work product" or other material which is specifically accepted as privileged by the above rule.

9.     All documents in your possession, custody or control prepared in anticipation of

litigation or trial of this case, except those documents which disclose the mental impressions of your attorney or your attorney's conclusions, opinions, memoranda, notes or summaries, legal research or legal theories, and except those documents prepared in anticipation of litigation by your representatives to the extent that they would disclose the representatives' mental impression, conclusions, or opinions respecting the value or merit of the claim or defense.

10.     To the extent that you have not already provided the same in response to previous requests herein, all statements obtained from any witnesses or memoranda of conversations with witnesses or recordings of witnesses' statements made or obtained during the course of the investigation or matters relating to this law suit, and all such statements, memoranda, or records made by parties to this law suit or their representatives.

11.     To the extent not already provided in response to previous requests herein, all statements made by any party to this action, including written statements, signed or otherwise adopted or approved by the person making it, or stenographic, mechanical, electrical or other recording or transcription thereof, which is a substantially verbatim recital of an oral statement and contemporaneously recorded.

12.     To the extent that you have not already provided the same, copies of all records, documents and memoranda which have any bearing upon the matters alleged against the requesting party or upon the responsibility of the requesting party for the matters alleged against the requesting party.

13.     To the extent not already provided, copies of all experts' reports made or secured by you in connection with your investigation of the matters relating to this law suit.

14.     To the extent not already provided, copies of all exhibits which you intend to offer into evidence at the trial of this matter.

15.    Copies of Declaration Sheets for <u>each and every policy</u> insuring you against the claims made in the instant action.

16.    Any and all documents which evidence any facts on the basis of which you will assert a defense against the cause of action stated in the Complaint.

17.    Any and all documents which evidence the amount of premiums collected for Tommy Bob Hall for the period he was insured through CUNA Mutual.

18.    Any and all documents which evidence the amount of monies or benefits paid out to Tommy Bob Hall for the period he was insured through CUNA Mutual.

19.    Any and all documents which verify the date which you contend Tommy Bob Hall was diagnosed with cancer.

20.    Any and all documents which verify the date which you contend Tommy Bob Hall was treated for cancer.

21.    Provide the pathology report which establishes a diagnosis of cancer prior to November, 1998.

22.    Provide the pathology report which establishes the need for treatment of cancer prior to November, 1998.

23.    Provide any and all documents which substantiate the amount of premiums collected on home mortgage insurance policies with CUNA over the past ten years.

24.    Provide any and all documents which substantiate the amounts paid out on home mortgage insurance policies with CUNA over the past ten years.

25.    Provide any and all documents which substantiate the number of times that policies are rescinded, including, but not limited to, statistical data and financial data over the past ten years.

26.    Provide any and all documents which substantiate the number of times benefits are denied globally to potential CUNA customers.

27.    Provide any and all documents which list the guidelines and protocol used by CUNA employees when deciding to deny or rescind a policy for any reason.

Respectfully submitted:

DATE: 2-22-02

*Stephen R. Pedersen*
Stephen R. Pedersen
I. D. No. 72026
214 Senate Avenue
Suite 602
Camp Hill, PA 17011
(717) 763-1170

## CERTIFICATE OF SERVICE

And now, this _22nd_ day of _February_ 2002, I, Carleen S. Jensen, do hereby certify

that I have, this date, served a true and correct copy of the within **PLAINTIFF'S REQUEST**

**FOR PRODUCTION OF DOCUMENTS** upon each of the attorneys of record at the following

address(es) by sending same in the United States mail:

Michael R. Kelley, Esq.
Charles T. Young
100 Pine Street
P O Box 1166
Harrisburg, PA 17108-1166

Catherine Mahady-Smith, Esq.
3115-A N. Front Street
Harrisburg, PA 17110

DATE: _2-22-02_

Carleen S. Jensen
Assistant to Stephen R. Pedersen, Esquire
214 Senate Avenue, Suite 602
Camp Hill, PA 17011
(717) 763-1170

I. D. No. 72026
Counsel for Plaintiff



# Madison Freelance Reporters, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

NANCY HALL, individually and as the
Representative and Administratrix of
the Estate of Tommy Hall, deceased,
her husband,

        Plaintiff,

   v.                   Law No. 1:01-CV-1265

CUNA MUTUAL GROUP, CUNA MUTUAL
INSURANCE SOCIETY,

        Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF RICHARD FISCHER

Thursday, March 14th, 2002

1:20 p.m.

Reported by:  Becky J. Gantt, RPR



131 W. Wilson St. • Suite 1000 • Madison, Wisconsin 53703

Phone: (608) 255-8100   Fax: (608) 255-4096

www.madisonfreelance.com

HALL v. CUNA                 3-14-02                 RICHARD FISCHER

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3  * * * * * * * * * * * * * * * * * * * * * * * * * * *

4  NANCY HALL, individually and as the
   Representative and Administratrix of
5  the Estate of Tommy Hall, deceased,
   her husband,

6

7          Plaintiff,

8     v.                    Law No. 1:01-CV-1265

9  CUNA MUTUAL GROUP, CUNA MUTUAL
   INSURANCE SOCIETY,

10         Defendants.

11 * * * * * * * * * * * * * * * * * * * * * * * * * * *

12

13        DEPOSITION OF RICHARD FISCHER

14        Thursday, March 14th, 2002

15              1:20 p.m.

16       Reported by: Becky J. Gantt, RPR

17

18

19

20

21

22

23

24

25

                                                    1

---

1            * * * * * *

2              I N D E X

3  Examination by:                        Page:

4  Attorney Pedersen                        4
   Attorney Kelley                         --

5

6              * * * * * *

7           E X H I B I T S

8  Exhibit Nos.:                          Page:

9

         (No exhibits were marked for identification)

10

11

12             * * * * * *

13    (Original transcript filed with Attorney Pedersen)

14

15

16

17

18

19

20

21

22

23

24

25

                                                    3

---

1         DEPOSITION of RICHARD FISCHER, a witness in the

2  above-entitled action, taken at the instance of the

3  plaintiff , under the provisions of Chapter 804 of the

4  Wisconsin Statutes pursuant to notice, before BECKY J.

5  GANTT, a Registered Professional Reporter and Notary

6  Public in and for the State of Wisconsin, at the law

7  offices of Davis & Kuelthau, S.C., 10 East Doty Street, in

8  the City of Madison, County of Dane, and State of

9  Wisconsin, on the 14th day of March, 2002, commencing at

10 1:20 p.m.

11

12             * * * * * *

13        A P P E A R A N C E S

14    MR. STEPHEN R. PEDERSEN,
         Attorney at Law,
15       214 Senate Avenue, Site 602,
         Camp Hill, Pennsylvania, 17011-2336,
16       appearing on behalf of the
         plaintiff;

17    MR. MICHAEL R. KELLEY,
18       McNEES, WALLACE & NURICK,
         Attorneys at Law,
19       100 Pine Street,
         P.O. Box 1166,
20       Harrisburg, Pennsylvania 17108-1166,
         appearing on behalf of the
21       defendants.

22    ALSO PRESENT:  Mark Richardson

23             * * * * * *

24

25

                                                    2

---

1              RICHARD FISCHER,

2        having been first duly sworn on oath,

3        was examined and testified as follows:

4

5              EXAMINATION

6  By Mr. Pedersen:

7  Q   Mr. Fischer, please state your full name for the

8      record.

9  A   Richard Allen Fischer.

10 Q   Mr. Fischer, where are you currently employed?

11 A   CUNA Mutual.

12 Q   When you say CUNA Mutual, what's the full

13     designation?

14 A   CUNA Mutual Insurance Society.

15 Q   Did you understand that you were, a notice was sent

16     out for your deposition for you to attend this

17     deposition today?

18 A   Yes.

19 Q   And did you understand that furthermore that there

20     was a court order requiring CUNA Mutual to produce an

21     individual knowledgeable with statistical data

22     concerning CUNA Mutual and you've been designated?

23 A   Yes.

24 Q   And did you understand that you were also designated

25     by CUNA Mutual under court order to address profits

                                                    4

Page 5:

```
 1   and losses --
 2 A   Yes.
 3 Q   -- of CUNA Mutual?  Did you ever see a copy of the
 4     notice of deposition?
 5 A   Yes, yes.
 6 Q   Did you have an understanding that the notice of
 7     deposition required you to bring certain documents
 8     with you today?
 9 A   I saw that this morning and my attorney -- I wasn't
10     instructed to by our side of the attorneys.
11 Q   You weren't instructed to bring any documents with
12     you today?
13 A   No.
14         MR. KELLEY:  Just for the record as
15     we've mentioned I think in a few of the other
16     depositions, we have interposed objections to
17     the request for documents and they were
18     submitted to opposing counsel.  Based upon those
19     objections, I have not asked the witnesses to
20     bring any documents with them.
21 By Mr. Pedersen:
22 Q   Are you prepared to address from memory statistical
23     data concerning home mortgage insurance policies,
24     rescission and denial of policies, amounts paid in
25     benefits and premiums received?
```

Page 6:

```
 1         MR. KELLEY:  Object to the form of the
 2     question in that counsel has not identified what
 3     he means by statistical data and a full range of
 4     statistical data.  The witness may be prepared
 5     to answer some information but not all of the
 6     details of statistical information that counsel
 7     may request.
 8 By Mr. Pedersen:
 9 Q   Did you understand that you would be asked questions
10     about details of statistical data at this deposition
11     today?
12 A   Yes.
13 Q   And are you prepared to address from memory the
14     statistical data concerning the home mortgage
15     protection products?
16 A   To the extent I have it by knowledge, yes.
17 Q   And are you prepared to address from memory, without
18     reference to any documents, profits and losses in
19     lines of business including home mortgage protection
20     and individual life?
21 A   No.
22         MR. KELLEY:  Objection to the form of
23     the question because you included information in
24     there that's beyond the scope of his respective
25     knowledge.
```

Page 7:

```
 1         MR. PEDERSEN:  And I disagree.  This
 2     was specifically the area raised to Judge Rambo,
 3     the inquiry about profits and losses comparing
 4     individual life with group life and credit life
 5     and this is the individual that's been produced
 6     by the company to address those.  And now we
 7     find out he's not prepared to address those.
 8         MR. KELLEY:  Hold on one second,
 9     please.  In my March 8th, 2002, facsimile to
10     opposing counsel, I indicated quote, "The person
11     at CUNA Mutual Insurance Society most
12     knowledgeable as to profits and losses and with
13     statistical data relating to credit insurance is
14     Rich Fischer.
15         "You have already, you already have
16     him scheduled for deposition.  Fischer may or
17     may not have time before his deposition to
18     compile and analyze the information on
19     statistical data and profits and losses.  I want
20     you to be aware of this fact beforehand."  That
21     is the description of what this witness has, the
22     designation of this witness to testify in these
23     proceedings.
24         MR. PEDERSEN:  And my understanding of
25     the oral argument that was made to the Judge and
```

Page 8:

```
 1     the court order is that the requirement was an
 2     individual be produced knowledgeable to address
 3     and compare profits and losses in at least two
 4     lines of business, credit life and individual
 5     life.
 6         MR. KELLEY:  The judge's order states,
 7     without reading the whole order, under Item 2,
 8     "Plaintiff's request to depose a designated
 9     representative regarding CUNA's profits and
10     losses is granted in part and denied in part as
11     follows:  Inquiry may be made of the designated
12     representative concerning profits and losses
13     insofar as it is related to plaintiff's theory
14     regarding the profits of CUNA relative to its
15     policy of its claims denial and policy
16     rescission."  And it also says that the request
17     to depose a designated representative regarding
18     statistical information on the claims denial and
19     the policy rescission is granted.
20         Now, I can note for the record that
21     the defendants in this case are CUNA Mutual
22     Group -- which is an umbrella company.  It's not
23     a legal entity -- and CUNA Mutual Insurance
24     Society.
25         This witness has been designated to be
```

1    able to testify consistent with the Court's
2    order with regard to statistical information in
3    profits and losses.  Since the information was
4    requested at such a late date, CUNA has not had
5    time to be able to compile all of the details of
6    that information and this witness is prepared to
7    discuss the information regarding CUNA Mutual
8    Insurance Society to the best of his knowledge
9    and recollection.
10        MR. PEDERSEN:  I disagree with several
11   points.  One, the late notice and the letters
12   were exchanged more than a month ago.  Two,
13   there was notice with respect to discovery
14   requests that went out as to the line of
15   inquiry.  Three, there was a specific oral
16   argument before the judge in which the line of
17   inquiry was discussed and the order came in the
18   context of that argument.  And three, or four,
19   it's surprising, if not shocking, that an
20   individual would come without a single document
21   to discuss statistics and profits and losses of
22   any line of business.
23        What I suggest  we do is proceed and
24   find out those areas in which he is either not
25   knowledgeable or does not have documents with

9

1    to us that we had the entire claim file and all
2    relevant documents to the case.  And it was
3    subsequently that statistical and financial
4    documents and records have been sought.
5         MR. KELLEY:  And just to note for the
6    record that we produced information pursuant to
7    Rule 26 of the federal rules.  And what Rule 26
8    requires is different than what Mr. Pedersen
9    just described.  Go ahead.
10   By Mr. Pedersen:
11   Q   What were the total assets of CUNA Mutual Group in
12       2001?
13   A   I don't know that.
14   Q   What were the capital surplus funds of CUNA Mutual
15       Group in 2001?
16   A   I don't know that.
17   Q   What were the net premiums written from CUNA Mutual
18       Group in 2001?
19   A   I don't know that.
20   Q   What was the net investment income of CUNA Mutual
21       Group in 2001?
22   A   I don't know that.
23   Q   What was the net income of CUNA Mutual Group in 2001?
24   A   I don't know that.
25   Q   Do you know any of that information for 1998?

11

1    him today and then determine whether or not that
2    in fact complies with the judge's order.
3         MR. KELLEY:  Just to comment.  It's,
4    it's not shocking at all that a witness would
5    show up on, with less than ten days or
6    approximately ten days notice of his
7    deposition -- that's when the notice of
8    deposition was sent out in this case -- with a
9    request to provide documents that was so broad
10   as to be meaningless.
11        And it's not surprising the witness
12   would show up without such statistical
13   information when counsel has provided formal
14   request for any documents that's only ten days
15   old at this point and counsel for plaintiffs who
16   brought this action in July of 2001 didn't send
17   out a single request for documents until
18   February 22nd of 2002.  And those answers to
19   those requests for production of documents are
20   not even due yet under the Rules of Civil
21   Procedure.
22        MR. PEDERSEN:  I would note for the
23   record that documents were exchanged at the
24   inception of the case pursuant to both federal
25   rule and local rule in which it was represented

10

1    A   Not by memory.
2    Q   Do you know any of it from 1999?
3    A   Not by memory.
4    Q   Do you know any of it from 2000?
5    A   No.
6    Q   On CUNA Mutual Group's balance sheet, what were the
7        assets listed on life and annuity premiums due?
8    A   I don't know.
9    Q   Do you know that for any of those years?
10   A   Not by memory.
11   Q   What were the liabilities that were listed, the total
12       liabilities on CUNA Mutual Group's balance sheet as
13       of December 31st, 2000?
14   A   I don't know.
15   Q   What were the ordinary life premiums of CUNA Mutual
16       Group in the year 2001?
17   A   I don't know.
18   Q   Do you know that for any of the years '98 through
19       2001?
20   A   Not by memory.
21   Q   What was the credit life premiums that were paid in
22       to CUNA Mutual Group in the years 2001 through, in
23       reverse order, 1998?
24   A   I don't know.
25   Q   What about with respect to credit life?

12

1 A   I think you just asked credit life.
2 Q   Group life, I'm sorry?
3 A   I don't know.
4 Q   You don't know for any of those years?
5 A   Not the exact.
6 Q   With respect to CUNA Mutual Insurance Society, what
7      were the assets, total assets of CUNA Mutual
8      Insurance Society in 2000?
9 A   I don't know.
10 Q   In 1999?
11 A   I don't know.
12 Q   In 1998?
13 A   I don't know.
14 Q   '97?
15 A   I don't know.
16 Q   Capital surplus for CUNA Mutual Insurance Society for
17     those same years?
18 A   I don't know.
19 Q   Reserve funds for CUNA Mutual Insurance Society for
20     those same years?
21 A   I don't know.
22 Q   Net written premiums for CUNA Mutual Society for
23     those years?
24 A   I don't know.
25 Q   Net investment income for CUNA Mutual Society for

13

1      those same years?
2 A   I don't know.
3      MR. KELLEY:  And just let me note for
4      the record that CUNA Mutual has a website with
5      public information including financial
6      statements.  I believe the financial statements
7      from 1999, 2000 are contained on the website.  I
8      believe Mr. Pedersen is actually reading from
9      that document.
10     MR. PEDERSEN:  No, I am not.
11 By Mr. Pedersen:
12 Q   And you didn't bring even that document with you, did
13     you?  You didn't bring a single piece of paper with
14     you to address the accuracy of any information that I
15     might tell you or read to you; is that right?
16 A   That's correct.
17 Q   With respect to premiums and reserves in the year
18     2000, what were CUNA Mutual Society's ordinary life
19     premiums?
20 A   I don't know.
21 Q   What were their reserves?
22 A   I don't know.
23 Q   For '99?
24 A   I don't know.
25 Q   '98?

14

1 A   I don't know.
2 Q   With respect to group life and credit life, are you
3      aware of any of that statistical information?
4 A   Not on what you're asking.
5 Q   You don't know the numbers?
6 A   I don't know the exact number.
7 Q   You don't have any papers with you today to refer to?
8 A   I do not.
9 Q   With respect to individual annuities for the years
10     2000 through '98, are you aware of any of the
11     numbers?
12 A   No.
13 Q   Group annuities --
14 A   No.
15 Q   -- same question?  With respect to ordinary life for
16     1998 through 2000, do you know those numbers?
17 A   No.
18 Q   Group life, do you know those numbers?
19 A   No.
20 Q   Credit life?
21 A   No.
22 Q   With respect to net premiums and deposit of funds
23     with CUNA Mutual Insurance Society for 1998, are you
24     aware of any of the specific numbers in these
25     categories, ordinary life, group life, credit and

15

1      credit life?
2 A   No.
3 Q   1999?
4 A   No.
5 Q   2000?
6 A   No.
7 Q   With respect to general account reserve distributions
8      in 1998 for ordinary life, do you know those numbers?
9 A   No.
10 Q   '99?
11 A   No.
12 Q   2000?
13 A   No.
14 Q   With respect to group life, are you aware of any of
15     the premium and reserve analysis numbers for '98,
16     '99, or 2000?
17 A   No.
18 Q   With respect to credit life, are you aware of any of
19     those numbers for '98, '99, or 2000?
20 A   No.
21 Q   With respect to profitability ratios for net benefits
22     paid, are you aware of the actual profitability ratio
23     numbers for '98, '99, or 2000 for CUNA Mutual
24     Insurance Society?
25 A   No.

16

1  Q    With respect to commission and expense ratios and
2       profitability tests, are you aware of those numbers?
3  A    No.
4  Q    With respect to total assets, total revenues, are you
5       aware of the profitability numbers for '98, '99, or
6       2000?
7  A    No.
8  Q    With respect to return on equity under the
9       profitability test for '98, '99, or 2000 for CUNA
10      Mutual Insurance Society, are you aware of those
11      numbers?
12 A    No.
13 Q    With respect to net yield, are you aware of the
14      profitability test numbers for CUNA Mutual Insurance
15      Society for 1998, '99, or 2000?
16 A    Not the exact numbers.
17 Q    Are you aware of the total return under profitability
18      for CUNA Mutual Insurance Society products from '98
19      through 2000?
20 A    No.
21 Q    Under the profitability analysis, are you aware of
22      the ordinary life product profitability analysis for
23      the year 2000?
24 A    No.
25 Q    1999?

                                                        17

1  A    No.
2  Q    1998?
3  A    No.
4  Q    With respect to group life, net operating gains, and
5       profitability analysis, are you aware of the numbers
6       for 2000?
7  A    No.
8  Q    '99?
9  A    No.
10 Q    '98?
11 A    No.
12 Q    With respect to credit life, are you aware of the
13      profitability analysis net operating gain numbers for
14      2000?
15 A    Not the exact numbers.
16 Q    1999?
17 A    No.
18 Q    1998?
19 A    No.
20 Q    Individual annuities within CUNA Mutual Insurance
21      Society profitability analysis net operating gains
22      for 2000?
23 A    No.
24          MR. KELLEY:  Objection.  That's beyond
25      the judge's order.  Go ahead.  You can answer.

                                                        18

1  A    No.
2  By Mr. Pedersen:
3  Q    '99?
4  A    No.
5  Q    '98?
6          MR. KELLEY:  Same objection for all
7       those years.
8  A    No.
9  By Mr. Pedersen:
10 Q    Are those numbers to all of those questions available
11      within CUNA Mutual Insurance Society?
12 A    Yes.
13 Q    They're within records and documents maintained at
14      CUNA Mutual Insurance Society?
15 A    Yes.
16 Q    Are you able to access that information?
17 A    Yes.
18 Q    Where is the information maintained?
19 A    I would say our finance department has that
20      information.
21 Q    Would the people in the finance department be in a
22      better position than you to address those questions?
23          MR. KELLEY:  Well, I'm going to
24      object.
25 Q    If you know.

                                                        19

1          MR. KELLEY:  I'm going to object to
2       that in that Mr. Fischer may be the best person
3       to be able to address those questions, but he
4       has not had the opportunity to pull all of that
5       information together.  Go ahead, you can answer.
6  A    If what you want are the numbers, then someone from
7       finance can give you the numbers.
8  By Mr. Pedersen:
9  Q    And the numbers with respect to investment yields for
10      the various years, is that finance?
11 A    Yes.
12 Q    Numbers with respect to liquidity under various
13      products?
14 A    Yes.
15 Q    Are you aware of the total assets on the balance
16      sheet for CUNA Mutual Insurance Society in the year
17      2000?
18 A    Not the exact number.
19 Q    For 1999?
20 A    No.
21 Q    For 1998?
22 A    No.
23 Q    And are you aware of the breakdown of assets into
24      various asset categories for CUNA Mutual Insurance
25      Society?

                                                        20

1  A    No.

2  Q    With respect to liabilities, are you aware of the

3       total liabilities as reported for CUNA Mutual

4       Insurance Society as of December 31st, 2000?

5  A    Not the exact number.

6  Q    What's the approximate number?

7  A    Of the liabilities?

8  Q    Yes.

9  A    For which line?

10 Q    For the overall balance sheet from December 31st,

11      2000, reporting.

12 A    I don't know.

13 Q    With respect to assets you said you knew

14      approximately?

15 A    I did not say that.

16 Q    Oh, I'm sorry.  Do you know approximately the assets

17      of CUNA Mutual Insurance Society as reported on

18      December 31st, 2000?

19 A    No.

20 Q    Is 2.28 billion in the ball park?

21            MR. KELLEY:  Object to the form.  You

22         can answer.

23 A    I think it is.

24 By Mr. Pedersen:

25 Q    With respect to the summary of operations, the

21

---

1       operations of each individual, some individual lines

2       of insurance, are you aware of the premiums collected

3       in 2000 for ordinary life?

4  A    No.

5  Q    The individual, I'm sorry, credit life, same

6       question?

7  A    Not the exact number.

8  Q    Do you know approximately the number?

9  A    The approximate number should be in the 700 million

10      range.

11 Q    That's for credit life?

12 A    For -- no.  It's not.  For credit, for credit life

13      it's probably in the 300 million range.

14 Q    Would it be consistent with your recollection if it

15      were 238 million, or you think it's more than that?

16 A    That could be consistent.

17 Q    What about group life?

18 A    I don't know.

19 Q    And those numbers for 1999, do you know?

20 A    No.

21 Q    For 1998?

22 A    No.

23 Q    Are you aware of any of the cash flow numbers or

24      statistics for CUNA Mutual Insurance Society for

25      1998?

22

---

1  A    The exact numbers?

2  Q    '99?

3  A    No.

4  Q    2000?

5  A    No.

6  Q    Are you aware of the ordinary life statistics

7       provided by CUNA Mutual Society for the year 1998?

8  A    No.

9  Q    '99?

10 A    No.

11 Q    2000?

12 A    No.

13 Q    Are you aware of the number of policies issued in

14      1998 for CUNA Mutual Insurance Society?

15 A    No.

16 Q    '99?

17 A    No.

18 Q    2000?

19 A    No.

20 Q    Are you aware of the number of policies in force in

21      1998, '99, or 2000?

22 A    No.

23 Q    Are you aware of the first year premiums collected

24      for 1998 through 2000?

25 A    No.

23

---

1  Q    Are you aware of the general expense reserves for

2       '98, '99, or 2000?

3  A    No.

4  Q    Are you aware of the return on reserves for '98, '99,

5       or 2000?

6  A    No.

7  Q    Are you aware of new business issues in whole life

8       for '98 through 2000?

9  A    No.

10 Q    Are you aware of, for '98 through 2000, term life

11      business issues?

12 A    No.

13 Q    Credit life?  Same question for credit life.

14 A    No.

15 Q    Group life?

16 A    No.

17 Q    The same question with respect to total insurance

18      issued for CUNA Mutual Insurance Society on new

19      business issued during '98, '99, or 2000.

20 A    No.

21 Q    With respect to insurance in force, are you aware of

22      the statistical information from '98 through 2000 for

23      whole life?

24 A    No.

25 Q    Term life?

24

HALL v. CUNA                3-14-02                RICHARD FISCHER

1  A    No.
2  Q    Credit life?
3  A    No.
4  Q    Group life?
5  A    No.
6  Q    Or the total of any of those categories for insurance
7       in force?
8  A    No.
9  Q    Are you aware of the total premiums collected on
10      Tommy Bob Hall's policy?
11 A    No.
12 Q    Are you aware of the total premiums collected during
13      a one-, five-, and ten-year period for CUNA Mutual on
14      the same or similar policies issued to Tommy Bob
15      Hall?
16          MR. KELLEY:  Object to the form of the
17      question.
18 By Mr. Pedersen:
19 Q    I can break it down into years if you like.  Are you
20      aware of the total premiums collected by CUNA Mutual
21      Insurance Society during the one-year period from '98
22      for the same types of policies that were issued to
23      Tommy Bob Hall?
24          MR. KELLEY:  Are you talking about a
25      home mortgage protection policy?

25

1           MR. PEDERSEN:  Right.
2  A    I am not aware of the exact number.
3  By Mr. Pedersen:
4  Q    What about over a five-year period?
5  A    Not -- again, not the exact number.
6  Q    Are you aware of the amount of moneys or benefits
7       paid out to Tommy Bob Hall?
8  A    Not the exact amount.
9  Q    Have you seen or researched -- well, let me break it
10      down.  Have you seen the documents that relate to the
11      relationship between the Patriot Federal Credit Union
12      in Chambersburg, Pennsylvania, and CUNA Mutual
13      Insurance Society?
14          MR. KELLEY:  Object to the form.  You
15      can answer.
16 A    Yes.
17 By Mr. Pedersen:
18 Q    Where is that document maintained?
19 A    In our home office.
20 Q    Here in Madison?
21 A    In Madison.
22 Q    When was the last time you reviewed that document?
23 A    Prior to coming down here this morning.
24 Q    This morning.  You didn't bring that document with
25      you today?

26

1  A    No.
2  Q    Did you know that it was one of the documents
3       requested in a discovery request?
4  A    No.
5  Q    Have you seen the request for production of documents
6       that plaintiffs sent?
7           MR. KELLEY:  Which one?
8  By Mr. Pedersen:
9  Q    The second request for production of documents.
10 A    I don't know if I've seen the second.
11 Q    Have you seen the first one?
12 A    I did not pay attention to the order of them.
13 Q    Without referring to number, have you seen a request
14      for production of documents generated from the
15      plaintiffs in this case?
16 A    I don't know if I've seen the actual request.
17 Q    What makes you think that you've seen some part of
18      the information at least within the request?
19 A    Because there were requests from the attorneys on our
20      side to begin pulling together the information that
21      you've asked for.
22 Q    When did you first see that request?
23 A    Rough, but about a week ago.
24 Q    And you've located the, the document that sets forth
25      the relationship between the Patriot Federal Credit

27

1       Union and CUNA Mutual Insurance Society?
2  A    I located a copy of the policy under which Patriot
3       Federal Credit Union is a member and that Mr. Hall
4       enrolled on insurance for.
5  Q    Can you describe that document for me?
6  A    It is a group insurance policy.
7  Q    Issued to Patriot Federal Credit Union?
8  A    I'm not sure of that.  I believe it was issued to a
9       trust of which Patriot Federal Credit Union is a part
10      of.
11 Q    How long is the document?
12 A    Maybe seven pages.
13 Q    The CUNA entity on the document, is it CUNA Mutual
14      Insurance Society?
15 A    It should be.  I didn't look at that part of the
16      document.
17 Q    How many contested claims have there been within CUNA
18      Mutual home life insurance products over the last
19      three years?
20          MR. KELLEY:  Objection.  Define the
21      term contested.
22 By Mr. Pedersen:
23 Q    Where a claim has been made and it's been denied by
24      CUNA Mutual Insurance Society.
25 A    I don't know the answer to that but it's not many.

28

1  Q    You don't know how many?

2  A    No.

3  Q    Did you understand that plaintiffs have requested

4       annual statements for '98 through 2001?

5  A    I'm not sure if that was in the requested information

6       of me.

7            MR. KELLEY:  Just state what you know.

8  A    I don't know if that was forwarded to me to deliver.

9  By Mr. Pedersen:

10 Q    And do you have an understanding as to whether or not

11      the judge, the federal judge in this case

12      specifically ordered that those documents be provided

13      in lieu of taking at least a partial deposition in

14      this case?

15 A    I was not aware of that.

16           MR. KELLEY:  And they will be

17           provided.  By the way, they are public

18           information on the website.

19 By Mr. Pedersen:

20 Q    Are you aware of the profit and loss calculations for

21      credit life for the years 1998?

22 A    Can you ask that a different way?

23 Q    Does CUNA Mutual maintain profits and loss

24      calculations on each line, product line for each

25      year?

29

1  A    Pretax, pregovernance, yes.

2  Q    And what were the profit and loss calculations pretax

3       for CUNA Mutual Insurance Society's credit life for

4       1998?

5  A    I don't know that number.

6  Q    For '99?

7  A    I don't know that number.

8  Q    For 2000?

9  A    I don't know that number.

10 Q    And for 2001?

11 A    I don't know the exact number.

12 Q    Does CUNA Mutual maintain statistics concerning

13      internal profits and losses pretax with respect to

14      home mortgage insurance?

15           MR. KELLEY:  Define what you mean by

16           home mortgage insurance, Steve.

17           MR. PEDERSEN:  The home mortgage

18           protection plan that's the plan that is the

19           subject of this litigation.

20           MR. KELLEY:  Okay.

21 A    I believe that is a line item that's broken out, yes.

22 By Mr. Pedersen:

23 Q    What were the profits and losses pretax for 1998 on

24      that line of business?

25 A    I don't have those with me.

30

1  Q    Where are they?

2  A    They're -- if they are available broken out, they are

3       in the home office in Madison.

4  Q    And this deposition is taking place in Madison.

5       They're here locally; is that right?

6  A    Uh-huh.

7  Q    Is that a yes?

8  A    Yes.  Sorry.

9  Q    Do you work in the Madison office?

10 A    Yes.

11 Q    Is that where you came from this morning before you

12      came to your deposition today?

13 A    Yes.

14 Q    Same question, the profit and loss calculations for

15      home mortgage protection credit insurance for 1999.

16      Do you know that?

17 A    Not the exact number.

18 Q    For 2000?

19 A    No.

20 Q    For 2001?

21 A    No.

22 Q    What statistical data is available at CUNA Mutual

23      Insurance Society with respect to home mortgage

24      protection products?

25           MR. KELLEY:  Object to the form.  You

31

1            can answer it if you understand, Rich.

2  A    I believe I understand it.  There's, there's an array

3       of information.  The information available would

4       include premium, claims paid, claim reserves, credit

5       union fee income expense allocations.  Other

6       statistics that are available would include policies

7       in force, group policies, certificates in force,

8       certificates or applications, the number approved,

9       declined, closed out, the number of revisions to

10      certificates.  I think that we would know the number

11      of policies, sorry, not policies but claims paid and

12      declined.

13 By Mr. Pedersen:

14 Q    And I can go one by one.  I'm sorry, were you done?

15 A    There probably are a few other statistics that we

16      will come across as we look at the different things

17      in your request.  Those are the ones that are off the

18      top of my head.

19 Q    The information that you just provided to us that's

20      statistically available at CUNA Mutual Insurance

21      Society, how is it available?  In other words, what

22      form is it in?

23 A    Some of it is available electronically and some of it

24      is in paper files.

25 Q    When you say electronically, what do you mean?  It's

32

1  on a computer? I don't want to put words in your
2  mouth. What do you mean?
3 A   On the computer or within our computer systems,
4  either in images or in total summary level data.
5 Q   Do you participate in any respect in preparing
6  reports on any regular basis on any of the categories
7  that you've described?
8 A   I do not prepare the reports on that.
9 Q   Do you review the reports?
10 A  The reports are available for review when I need to.
11 Q  How easily accessible are they?
12 A  For some of the, the core pieces of information that
13 are like premium and claims and credit union
14 reimbursements, they're very accessible.
15 Q  You say very. How long would it take you to pull
16 them up to find them?
17 A  I would walk over to the department and find the
18 stack of papers where they are in.
19 Q  So immediately available?
20       MR. KELLEY: That's not what he said.
21       Objection.
22 By Mr. Pedersen:
23 Q   I don't want to put words in your mouth. How long
24 would it take to get the core statistical
25 information?

33

1 A   To know premium and claims paid for a policy year, it
2  would take a couple minutes.
3 Q   And that could be in a printed out form? Or would it
4  be in a printed out form or on a disk? What's the
5  form that it would take?
6 A   It's in a printed form.
7 Q   Well, it's already printed?
8 A   It's printed, yeah.
9 Q   How often is that core statistical information
10 printed out?
11 A  Monthly. And that is premium and paid claims. It's
12 all that report shows. Well, and number of
13 certificates active I believe is on that report.
14 Q  What specific statistical data, a specific number,
15 have you come prepared here to address?
16       MR. KELLEY: Object to the form of the
17       question.
18 A  My understanding today was that I would come and
19 answer your questions about home mortgage protection
20 and our policies and practices. I was not of the
21 impression that I needed to know the exact dollars of
22 assets of CUNA Mutual Insurance Society in 1998.
23 By Mr. Pedersen:
24 Q  Or '99?
25 A  Or '99.

34

1 Q   Or 2000?
2 A   Or 2000.
3 Q   Or any specific lines of business and their
4  profitability or statistical data?
5 A   Not in the way you've asked it. Not down to the
6  level of detail that you've asked for today.
7 Q   Is there a specific dollar number in any category
8  that you've been prepared, not been prepared, that
9  you have on the top of your head that you are able to
10 discuss in the subject category of home mortgage
11 protection?
12       MR. KELLEY: Object to the form. You
13       can answer.
14 A  Not down to the dollar in the way you seem to want it
15 today.
16       MR. PEDERSEN: I would like to go off
17       the record.
18       (Off the record discussion)
19       MR. KELLEY: Counsel have agreed that
20 the deposition of Rich Fischer will continue
21 here today to the extent that Mr. Fischer is
22 able to respond to Mr. Pedersen's questions and
23 that it will be then postponed until some later
24 date prior to the close of discovery in this
25 case in which such time Mr. Fischer will have

35

1  available the specific numbers regarding the
2  following categories as they relate to home
3  mortgage protection and credit life insurance.
4       And those categories are premiums
5  paid, claims paid, claim reserves, credit union
6  fee income, expense allocations, policies in
7  force, group policies, certificates and
8  applications, and the number of claims paid and
9  declined and the number of rescissions. And
10 that's to be over a certain period of time --
11 off the record for a moment.
12       (Off the record discussion)
13       MR. KELLEY: And that certain period
14 of time will be 1998 to present. CUNA Mutual
15 will also make available an appropriate person
16 to be determined who will be able to answer the
17 same types of questions on the same types of
18 categories of information that we have just
19 described for individual life insurance policies
20 either issued by or maintained by the CUNA
21 Mutual Insurance Society as opposed to those
22 individual life policies that are issued by or
23 maintained by CUNA Mutual Life Insurance
24 Company, which CUNA asserts is a separate
25 company, not suggesting the plaintiff agrees or

36

**[Page 37]**

1  disagrees with that. Does counsel for
2  plaintiffs have anything to add or clarify?
3        MR. PEDERSEN: I believe there were
4  two categories that were left out, the number of
5  closed-out policies and claims and the number of
6  revisions. And maybe I've misstated that.
7        MR. KELLEY: Let's go off the record
8  for a moment.
9        (Off the record discussion)
10        MR. PEDERSEN: I'll clarify that the
11  categories -- and I've gotten information from
12  the deponent that the category of closed-out and
13  revisions relate to applications and not claims
14  but that the statistical information in those
15  categories is available and we're requesting
16  that information also. And I think we've agreed
17  that that information will also be provided.
18        MR. KELLEY: Off the record for one
19  moment.
20        (Off the record discussion)
21        MR. PEDERSEN: And again, off the
22  record, when we were off the record we received
23  information that the deponent is not certain how
24  far back the statistical data goes for
25  closed-out and revision of applications but that

**[Page 38]**

1  he would provide information that was available
2  and, of course, not provide the information that
3  was not available.
4        MR. KELLEY: Okay.
5        MR. PEDERSEN: Additionally, we had
6  requested information on profits and losses in
7  those same lines of business. And I need to ask
8  if the statistical data that we've discussed
9  today includes profits and losses or only the
10  gross figures.
11        MR. KELLEY: Let's go off the record.
12        (Off the record discussion)
13        MR. PEDERSEN: Let me just clarify
14  again on the record. We've had a discussion off
15  the record, and it appears that profits and
16  losses under these lines of business, credit
17  life, home mortgage protection and individual
18  life can be derived but they are not readily
19  available from the statistical data that we've
20  just listed.
21        However, my understanding of the order
22  is that we receive profit and loss information,
23  and we're limiting it to those lines of
24  business. And I believe the deponent has
25  indicated that that information is obtainable

**[Page 39]**

1  through either him or in conjunction with him
2  and consulting with other individuals at CUNA
3  Mutual or through another individual at CUNA
4  Mutual being deposed in that area.
5        And we're satisfied to simply await
6  for the appropriate designee from CUNA Mutual to
7  address the profits and losses in those three
8  lines of business for '98 through the present.
9  Is that what we're agreeing to, Mike?
10        MR. KELLEY: Yes. And just to further
11  clarify, the information in those categories
12  that we discussed would provide profit and loss
13  information but it would not be the, for lack of
14  a better way of stating it, the net profits and
15  losses; is that right, Rich?
16        THE WITNESS: Yes.
17        MR. KELLEY: But it would not be the
18  net profit and loss figures, and we're going to
19  work with the appropriate persons to get that
20  net profit and loss figure for, again for home
21  mortgage protection, credit life, and individual
22  life of CUNA Mutual Insurance Society. Okay.
23        MR. PEDERSEN: We don't have our
24  calendars here today, and I'm sure you don't
25  know your calendar for the next two weeks.

**[Page 40]**

1        MR. KELLEY: Next week is pretty busy
2  but after that I know I'm okay.
3        MR. PEDERSEN: I know I have a trial
4  scheduled. It may be at the very end of the
5  month, but we'll work out a convenient date for
6  both of us to come back out here to conduct that
7  deposition or series of depositions.
8        MR. KELLEY: We'll get it done.
9        MR. PEDERSEN: And I think too we've
10  agreed with some effort of professional courtesy
11  to return here and each to bear our own expenses
12  in returning to the depositions here in Madison?
13        MR. KELLEY: Yes.
14  By Mr. Pedersen:
15  Q   With that, we'll continue with the deposition
16      excluding specific statistical profit and loss
17      questions and proceed with the, the corporate
18      designation that I understand you've been presented
19      here for your deposition with as the individual most
20      knowledgeable with the home mortgage protection
21      policies that are issued through CUNA Mutual
22      Insurance Society; is that correct?
23  A   Yes.
24  Q   What is your position at CUNA Mutual Insurance
25      Society?

1  A   I'm an officer of the company and the product leader
2      for the credit insurance product line.
3  Q   What does that mean to be an officer of the company?
4  A   I'm an assistant vice president.
5  Q   When you say the product leader for credit insurance
6      line, what are the subcategories of products within
7      credit insurance?
8  A   The main categories would include credit disability,
9      credit life, loan protection, life savings, home
10     mortgage protection, and then a couple other smaller
11     products, credit card enhancement product with travel
12     accident insurance.
13 Q   The policy that was issued to Mr. Hall, what type of
14     policy was that?
15 A   It was a home mortgage protection policy.
16 Q   Did it have a disability aspect to it?
17 A   It had it available.
18 Q   What does that mean the home mortgage protection
19     insurance?
20 A   It's a product name for a decreasing term life
21     insurance product and a disability product designed
22     to cover a mortgage event, a first or second
23     mortgage.
24 Q   The word protection is in the title of that type of
25     policy issued to Mr. Hall. What's being protected?

                                                            41

1  A   For Mr. Hall the protection is that if he were to
2      die, his mortgage balance or the scheduled amount due
3      on that loan would be paid off for his wife or
4      estate, so it provides him that protection. The
5      disability feature provides the protection for an
6      individual that during a period of disability their
7      monthly payment is made subject to limits and that it
8      also provides protection for the credit union in that
9      the credit union doesn't have to go and find a way to
10     collect on a mortgage if a person is disabled or if
11     they die.
12 Q   Does CUNA Mutual as an insurance company enjoy any
13     form of protection by issuing the home mortgage
14     protection insurance?
15 A   I don't understand what you mean by protection there.
16 Q   Does CUNA Mutual receive any benefit by having a home
17     mortgage insurance protection policy issued through a
18     credit union?
19 A   To the extent that a group of policies is profitable,
20     CUNA Mutual gets the profit off of that.
21 Q   CUNA Mutual receives premiums that are paid on a home
22     mortgage protection policy?
23 A   Yes.
24 Q   And CUNA Mutual pays the credit union a fee for
25     referring the member for insurance?

                                                            42

1  A   I wouldn't use those words.
2  Q   How would you describe the relationship between, the
3      financial relationship between the credit union and
4      the issuance of a home mortgage protection policy?
5  A   The credit union incurs a cost in staff time and in
6      training to make the home mortgage protection product
7      available to their members. CUNA Mutual gives them a
8      portion of the premium to offset that cost.
9  Q   Do you know what portion is given to credit unions of
10     the premium to offset the cost that you've described?
11 A   It varies by credit union.
12 Q   Are you aware that the Patriot Federal Credit Union
13     was the specific credit union in Pennsylvania of
14     which Mr. Hall was a member?
15 A   Yes, I am.
16 Q   Do you know what the Patriot Federal Credit Union
17     received in terms of the portion of the premium that
18     was paid?
19 A   I know what they get today. I didn't look if they
20     were getting that amount in 1998. Today they get 10
21     percent of the premium.
22 Q   Over what period of time?
23 A   Over the life of the certificate.
24 Q   And CUNA Mutual gets 90 percent of the premium over
25     the life of the certificate?

                                                            43

1  A   We get a full hundred percent of the premium. We
2      give them ten back but we get all of the premium.
3  Q   With respect to the agreement between CUNA Mutual
4      Insurance Society and the Federal, Patriot Federal
5      Credit Union, what other, if any, financial
6      arrangements exist? For example, is there an
7      exclusivity requirement?
8  A   There is not a specified requirement of that but it
9      would be very rare to see a credit union incur the
10     cost of having more than one similar program
11     available.
12 Q   Typically with credit unions in the arena that you
13     work in, they would only offer one product of any
14     product line because of the costs associated with
15     multiple products?
16 A   Yes.
17 Q   And to your understanding was CUNA Mutual the only
18     insurance company that was working through First
19     Patriot Credit Union, the Patriot Credit Union,
20     Federal?
21 A   That's my understanding.
22 Q   What role did CUNA Mutual play in training or working
23     with individuals at the credit union?
24 A   I don't know exactly what the implementation process
25     was at Patriot Federal Credit Union.

                                                            44

1  Q    What's the general way in which it works?

2  A    The general way in which it works would be that one

3       of our field people assigned to that credit union

4       would deliver the product, would most likely have a

5       training session to explain the features and

6       benefits, the enrollment process, the premium

7       collection process, the claims process to members of

8       the credit union.  Sorry, not members of the credit

9       union but to staff members of the credit union.

10 Q    Are product brochures left at the credit union?

11 A    Yes.

12 Q    Are product applications left at the credit union,

13      blank application forms?

14 A    They're part of the brochure.

15 Q    There's a whole packet of material left at the credit

16      union that assists the credit union staff or members

17      working at the credit union to fill out forms for

18      their members and resend to CUNA Mutual?  If I

19      haven't described that right, describe it better for

20      me.

21 A    Can I?

22 Q    Sure.

23 A    There would be left at the credit union an

24      administrative manual for the credit union and staff

25      to review on any of the procedures in how to do

45

1       things.  Also at the credit union is a member level

2       brochure that explains the features of the product

3       and contains the cost disclosure as well as an

4       application to enroll, all in one brochure.

5  Q    Does CUNA Mutual at any time -- and I'll limit it to

6       CUNA Mutual Insurance Society -- participate in the

7       mortgage itself, either directly or by buying

8       mortgages from credit unions?

9  A    Yes, we do.

10 Q    Can you describe how that is done or initiated?

11 A    It's not my area of expertise.  I have a general

12      knowledge of it.

13          MR. KELLEY:  With that limitation,

14      I'll allow the witness to answer.  Go ahead.

15 A    We, we have an area that helps credit unions make

16      mortgages by providing software and the appropriate

17      forms for the mortgage event.  We also purchase

18      mortgages for, from credit unions to lighten their

19      liquidity risk.  Many small credit unions just don't

20      want to handle a 30-year fixed mortgage.

21 By Mr. Pedersen:

22 Q    Is the participation of CUNA Mutual in the underlying

23      mortgage itself ever done at the inception of the

24      mortgage?

25 A    I think the answer is yes.

46

1          MR. KELLEY:  Well, no.  We're not

2       going to speculate about it.

3          MR. PEDERSEN:  I don't want you to

4       guess.

5          THE WITNESS:  You're right.  I'm

6       sorry.

7          MR. KELLEY:  If you don't know, just

8       say you don't know.

9  A    I don't know.

10 By Mr. Pedersen:

11 Q    But you are aware generally that it's at least done

12      by buying or working out agreements for larger

13      amounts of mortgage payments; is that right?

14          MR. KELLEY:  I'm going to object to

15      the form of the question mostly because I'm not

16      sure I understood it, Steve.

17 By Mr. Pedersen:

18 Q    Let me rephrase it.  I'm trying to clarify your

19      earlier testimony that generally your understanding

20      was CUNA Mutual does participate in the mortgage but

21      you're not sure whether it's at the inception or

22      generally later on for smaller credit unions?

23 A    Yes.

24 Q    Do you know whether or not CUNA Mutual participated

25      in any way in Mr. Hall's underlying mortgage?

47

1  A    I do not.

2  Q    Where -- how would we determine whether or not CUNA

3       Mutual participated in the underlying mortgage?

4  A    I would believe that the mortgage papers would point

5       that out.

6  Q    That would be if the mortgage at its inception were

7       worked through CUNA Mutual; is that right?

8  A    Or if they were later changed.

9  Q    Would the mortgage -- are you aware whether the

10      mortgage documents were changed once CUNA Mutual

11      bought a portion of the mortgage?

12 A    If the servicing of a mortgage changes, the mortgage

13      holder gets notification that that mortgage is now

14      being serviced by someone else.

15 Q    If CUNA Mutual participates in a mortgage, whether

16      it's initially or later on by carrying part of the

17      mortgage and the mortgage has insurance in place

18      through CUNA Mutual, hasn't CUNA Mutual also gained

19      one level of protection?

20          MR. KELLEY:  I'll object to the form.

21      You can answer.

22 A    Actually, I don't think they have because to the

23      extent that there's a claim benefit, it's, it's going

24      to be paid by CUNA Mutual and that mortgage would be

25      within CUNA Mutual.  So my take on that would be that

48

1   there's not a cross-benefit there.
2 By Mr. Pedersen:
3 Q   Wouldn't you agree that if CUNA Mutual stepped into
4     the mortgage they would be in the same shoes as the
5     credit union was initially as far as the mortgage
6     goes?
7               MR. KELLEY: Well, I'm going to object
8           to that, Steve, just because he's stated that
9           that's outside of his area of expertise. And
10          you know, and any comments that he's going to
11          make about that are going to be, you know, his
12          understandings, which may or may not be
13          accurate. You can answer it if you understand
14          or if you know the answer to it.
15 A   Could you restate it, please?
16 By Mr. Pedersen:
17 Q   Yeah. I can try to. Didn't you testify earlier that
18    when we were defining who was protected you indicated
19    the credit union would be protected in part because
20    the mortgage, where they were holding that mortgage
21    would be paid through the insurance policy?
22 A   Yes, I did.
23 Q   And if CUNA Mutual stepped into the place of the
24    credit union to take over the mortgage, wouldn't they
25    be benefited or protected in that same way?

49

1 A   The side of the business that, in your words, steps
2     in on that mortgage would benefit, yes, and would
3     have that protection. As a corporate entity the
4     product lines combine. I don't see the protection
5     going across -- well, going -- the protection
6     benefited to the mortgage area would be at the
7     expense of the credit insurance area.
8 Q   Whose home is being protected under the home mortgage
9     protection insurance issued through CUNA Mutual?
10 A   The mortgage is being protected, not a home.
11 Q   I see. The word home mortgage is what's being
12    protected but not a home?
13 A   Yes.
14 Q   So in the case of the Halls, it was their mortgage
15    that was being protected but not their home by the
16    home mortgage protection insurance?
17 A   The mortgage was being protected and to the extent
18    that a benefit is paid to an individual that pays off
19    a mortgage in the event of death, the surviving
20    spouse or family has protection of the asset, the
21    home, because it's now paid and theirs. So while
22    it's not specifically protecting the home, it's
23    protecting a family's ability to stay in a home.
24 Q   And I guess I just want to verify or confirm that
25    CUNA Mutual understands that its decision on claims

50

1     under the home mortgage protection policies can, and
2     often does, have an effect of an insured or a member
3     of a credit union being able to keep or lose their
4     home?
5               MR. KELLEY: Object to the form. Go
6           ahead. You can answer.
7 A   On a policy like this, yes, we are aware of that.
8 By Mr. Pedersen:
9 Q   How would you describe the importance or relative
10    importance of a claim process that involves the home
11    mortgage protection?
12              MR. KELLEY: Object to the question.
13          Can you describe what you mean by importance?
14 By Mr. Pedersen:
15 Q   What weight, if any, does CUNA Mutual place in the
16    investigative process of a claim presented on a home
17    mortgage protection policy?
18              MR. KELLEY: Well, again, I'm going to
19          object to that. Do you mean do they place more
20          weight on it because it's a home mortgage policy
21          as opposed to some other policy?
22 By Mr. Pedersen:
23 Q   No. Not relative weight. How serious or how
24    important is it for CUNA Mutual to fairly and
25    completely investigate a home mortgage protection

51

1     claim?
2               MR. KELLEY: Same objection. Go
3           ahead. You can answer.
4 A   It's important for us to investigate every claim with
5     a level of importance whether that be a claim on a
6     credit card, on a home mortgage, on a life policy.
7 By Mr. Pedersen:
8 Q   What's your understanding of the duties that CUNA
9     Mutual owes to insureds or credit union members such
10    as the Halls?
11              MR. KELLEY: Objection, calls for a
12          legal conclusion, lack of foundation. Go ahead.
13 A   I think we owe to people insured with our product in
14    a claim event a fair process, fair application of
15    policies and procedures in every claim.
16 By Mr. Pedersen:
17 Q   Are you aware of any policies or procedures at CUNA
18    Mutual specifically with respect to obtaining
19    pathology reports when the issue is whether or not an
20    individual was diagnosed or treated for cancer?
21 A   My level of awareness is that we would look at all
22    available medical records to determine whether a
23    claim should be valid or not.
24 Q   Are you involved with underwriting at all?
25 A   Individual underwriting?

52

1  Q   Or group underwriting, credit product underwriting
2      and, actually, underwriting of the home mortgage
3      protection policy.
4  A   There's both a group underwriting and an individual
5      underwriting involved with home mortgage protection.
6      The group underwriting sets the terms of the coverage
7      for the credit union, the rates, the availability,
8      the limits.
9          And then there's the individual
10     underwriting which looks at an individual member and
11     whether they meet the criteria necessary for this
12     product based on its pricing at the group level.
13 Q   Are you aware of any policies or practices at CUNA
14     Mutual with respect to obtaining pathology reports
15     when cancer is the issue of an insured?
16 A   Not directly.
17 Q   Would you agree or disagree, if you know, whether or
18     not cancer can only be diagnosed pathologically, it's
19     a pathological diagnosis?
20         MR. KELLEY:  Objection, lack of
21     foundation.
22 A   I'm not aware of that.
23 By Mr. Pedersen:
24 Q   Would you agree or disagree with Ms. Lutz's prior
25     testimony that when cancer is the issue the most

53

1      important document is the pathology report?
2          MR. KELLEY:  Objection.  Lack of
3      foundation.  And Ms. Lutz's testimony was
4      whatever it was and object to counsel's
5      characterization of it.  Go ahead.  You can
6      answer.
7  A   I would trust the judgment of the underwriters on the
8      product to make that call on what was or was not the
9      best use of medical information.
10 By Mr. Pedersen:
11 Q   Let me clarify that.  From your position you don't
12     get involved with the claims decisions and reviewing
13     medical records?
14 A   I do not.
15 Q   You're not qualified to review medical records and
16     make medical evaluations; is that right?
17 A   I am not.
18 Q   Am I correct that the individual who is filling out
19     the home mortgage protection insurance application
20     that he is required to answer truthfully to the best
21     of his ability?
22 A   Yes.
23 Q   And you would agree that an, that the Home Mortgage
24     Protection 2 policy asks a single question with
25     respect to cancer.  Have you been treated or

54

1      diagnosed for cancer and a number of other things.
2      But with respect to cancer, that's the only question;
3      isn't it?
4          MR. KELLEY:  Well, I'll just object to
5      the characterization of the question.  The
6      application states it exactly.  Counsel's
7      recitation of it is, is basically correct but
8      not completely correct.
9  By Mr. Pedersen:
10 Q   You're aware of that application, aren't you?
11 A   I'm aware of the application.
12 Q   Isn't that your primary product line of business,
13     you're the product leader for credit insurance life?
14 A   Yes.
15 Q   And one of the product areas that you're responsible
16     for is the home mortgage protection plan?
17 A   Yes.
18 Q   And it's a one-page document, the application itself?
19 A   The application is a one-page document.
20 Q   And there are four questions on the document?
21 A   Yes.
22 Q   And the only question that relates to cancer is have
23     you been treated or diagnosed for cancer?
24 A   Along with other conditions, yes.
25 Q   And an individual who has never been diagnosed or

55

1      treated for cancer, he should not mark on that form
2      that he's been treated or diagnosed for cancer,
3      should he?
4  A   True.
5  Q   That would be a false application if he marked, yes,
6      I've been treated and diagnosed when he hadn't been?
7  A   Yes.
8  Q   What role, if any, did you play in the initial claim
9      process of Tommy Bob Hall's widow?
10 A   I was not at all involved to my knowledge.
11 Q   You weren't consulted at any time in that initial
12     process?
13 A   I was --
14         MR. KELLEY:  When you say the initial
15     process --
16         MR. PEDERSEN:  Sure.
17         MR. KELLEY:  -- you're talking about
18     the time period from when the claim was received
19     up until the time that a notice of rescission
20     was issued?
21         MR. PEDERSEN:  Yes.
22 A   To the best of my knowledge, I was not involved.  And
23     in reviewing the case file, there was no indication
24     that I was involved.  And typically if I were asked
25     to be involved, there would have been notification in

56

1     the, in the claim file of whatever opinion I gave.
2  By Mr. Pedersen:
3  Q    Does CUNA Mutual, to your knowledge, have any policy
4       or procedure with respect to calling doctors in the
5       event of a discrepancy within the medical records?
6  A    I don't know their exact position on that.  I would,
7       I would expect that we would call doctors.
8  Q    If there's a discrepancy in the record, is there any
9       policy or procedure with respect to calling either an
10      insured or a surviving widow to address
11      discrepancies?
12 A    There is a policy regarding that and a privacy
13      concern about discussing medical information of one
14      person with another to the point where we would not
15      call a spouse of a person to talk about that person's
16      medical information.
17 Q    Even if that person whose medical information is
18      being discussed is dead?
19 A    I don't know what the policy would be on that.
20 Q    And even if it means that without discussing with the
21      surviving spouse she may lose her home, you
22      wouldn't -- but there's no policy about calling her,
23      or is there a policy not to call her?
24            MR. KELLEY:  Object to the form.
25 A    I don't know that -- I don't know the policy at that

57

1     point with that situation which you just described.
2  By Mr. Pedersen:
3  Q    Is there a written policy about when to call either
4       doctors or spouses where there's a conflict in the
5       records?
6             MR. KELLEY:  Object to the form.  You
7        can answer.
8  A    I don't know.
9  By Mr. Pedersen:
10 Q    Is there a policy manual generally for the claim
11      process?
12 A    Yes.
13 Q    Who maintains that claim manual?
14 A    The manager of the claims area.
15 Q    I'm sure we've done it in our request, but I would
16      like to do it at the deposition also on the record
17      request a copy of that claims procedure manual.
18            MR. KELLEY:  That's not a question you
19        need to respond to.
20 By Mr. Pedersen:
21 Q    Is there a policy at CUNA Mutual with respect to
22      notifying Attorney Generals' Offices; that is -- I'll
23      ask the general question first if there's a policy
24      that exists.
25 A    Yes.

58

1  Q    What is the policy with respect to when you call an
2       Attorney General's Office to report an insurance
3       matter?
4  A    It varies often by the state, and it's subject to
5       their laws and the situations in which we, as an
6       insurance company, are required to report situations
7       that have the appearance of fraud.
8  Q    Do you know whether or not states, some states
9       require a reasonable investigation before a report
10      takes place?
11 A    I do not know the specifics of that.
12 Q    Are statistics kept at CUNA Mutual concerning the
13      reporting to Attorney Generals' Offices in the
14      country on potential fraud claims?
15 A    I would expect so.
16            MR. KELLEY:  Don't, I don't want you
17        to guess.  I don't want you to speculate.  If
18        you know, the answer is yes.  If you don't
19        know --
20            THE WITNESS:  I don't know the answer.
21            MR. KELLEY:  Okay.
22 By Mr. Pedersen:
23 Q    Is there a policy at CUNA Mutual with respect to
24      notifying a surviving widow when her spouse is being
25      reported for insurance fraud?

59

1  A    I don't know.
2  Q    Are you aware whether or not any state in the union
3       will prosecute a dead person for insurance fraud?
4  A    I don't know. ·
5  Q    Does CUNA Mutual have any policies with respect to
6       reporting dead people for insurance fraud?
7  A    Yes, we do.
8  Q    What is the policy?
9  A    The policy is to abide by the laws on fraud.
10 Q    And you believe at least one or more states require
11      the reporting of a dead person for insurance fraud?
12            MR. KELLEY:  Objection.  I don't
13        believe he stated that.
14 By Mr. Pedersen:
15 Q    Do you believe that?
16            MR. KELLEY:  Well, objection.  We're
17        not here to find out what he believes.  We're
18        here to find out his information, what he knows.
19 By Mr. Pedersen:
20 Q    Is it the policy and procedure of CUNA Mutual to
21      report a dead person for insurance fraud in any
22      state?
23 A    If the state law requires that we report under
24      certain situations, those situations could include
25      reporting of a deceased person.

60

1 Q    Is it the policy and custom of CUNA Mutual to, having
2      referred a matter for insurance fraud to an Attorney
3      General's office, to notify the surviving spouse of
4      the referral?
5 A    I don't know that.
6 Q    Is it the policy and custom of CUNA Mutual upon
7      referral of a matter to an Attorney General's Office
8      to notify the surviving spouse's credit union of the
9      referral for insurance fraud?
10 A   I don't know that.
11 Q   Is it the policy and custom of CUNA Mutual having
12     made a referral for insurance fraud and having
13     received a letter back within 30 days that no further
14     investigation will take place to not notify the
15     surviving spouse?
16 A   I don't know the procedure.
17 Q   At what point did you become involved in the Hall
18     claim?
19         MR. KELLEY:  Well, objection.  I
20     believe he's stated already that he was not
21     involved in the Hall claim.
22 By Mr. Pedersen:
23 Q   At what point did you first become aware of issues
24     being raised by Mr. Hall and the Hall estate
25     concerning the handling of their claim?

                                                          61

1          MR. KELLEY:  Well, I'm going to let
2      him answer, but I'm going to interpose an
3      objection.  I know we generally don't get into
4      relevancy in these types of things, but I don't
5      believe that's relevant to the claims that
6      you've asserted in this case.  But go ahead.
7 A    I don't know the exact date but my first involvement
8      with this was after there was a lawsuit pending and
9      that was nothing more than --
10         MR. KELLEY:  No, no.  He didn't ask
11     you -- he asked you when.
12         THE WITNESS:  Okay.
13 By Mr. Pedersen:
14 Q   What was the nature of your awareness that the
15     lawsuit had been filed?
16 A   I was made aware that there was a lawsuit.
17 Q   Did you review any part of the claim file after you
18     became aware of the lawsuit?
19 A   Yes.
20 Q   What did you review?
21 A   I reviewed the medical history notation.
22 Q   Did you review a letter from Ms. Larson in which she
23     indicated that the reason for the rescission was a
24     '93 doctor visit that was not disclosed on the
25     application?

                                                          62

1          MR. KELLEY:  Let me interpose the
2      objection.  There was a letter from Brenda
3      Larson as to the full explanation of the reason
4      for the rescission, and I object to counsel's
5      characterization of the letter.  Go ahead.  You
6      can answer.
7 A    I did see it in the review.
8 By Mr. Pedersen:
9 Q    Did you also see in your review the '93 pathology
10     report which indicated dysplastic nevus?
11 A   I did not see the pathology report.
12 Q   Would it have made any difference in any role that
13     you were playing if you had seen a '93 pathology
14     report indicating dysplastic nevus?
15         MR. KELLEY:  Objection, calls for
16     speculation, vague.
17         MR. PEDERSEN:  Well, the '93 pathology
18     report was in the medical records.  It was part
19     of the claim file.
20         MR. KELLEY:  Well, that's not a
21     question.  That's a statement.
22 By Mr. Pedersen:
23 Q   And the question then is still on the table.
24 A   It wouldn't have changed.
25 Q   Did you have any understanding what dysplastic nevus

                                                          63

1      even was in a pathology report?
2 A    No, I do not.
3 Q    What role, if any, did you play after the lawsuit was
4      filed in evaluating or re-evaluating the claim?
5          MR. KELLEY:  Objection.  Again, we
6      generally don't make objections to relevancy
7      here, but now we're getting into matters that
8      relate to the litigation of this claim and
9      you're getting into areas that are going to
10     involve necessarily, I believe, matters of
11     attorney-client privilege and work product
12     privilege and I don't believe that these types
13     of questions are appropriate based upon the
14     allegations of your complaint.
15         MR. PEDERSEN:  Well, we obviously
16     disagree.  And I want to exclude any
17     conversations or information that you obtained
18     through counsel.  And I'm only asking what your
19     role was at that point after the lawsuit was
20     filed.
21         MR. KELLEY:  Well, hold on before you
22     answer that.  Go ahead.  You can answer that
23     question.
24 A   Would you mind restating it?
25 By Mr. Pedersen:

                                                          64

HALL v. CUNA          3-14-02          RICHARD FISCHER

1  Q   What was your role after the complaint was filed as a
2      CUNA Mutual representative?
3  A   My role was to prepare for today.
4  Q   To prepare for your deposition?
5  A   Yes.
6  Q   Who at CUNA Mutual is deciding whether or not to pay
7      this claim?
8          MR. KELLEY:  Objection, it's
9      irrelevant, beyond the scope of your complaint,
10     and I'm going to instruct the witness not to
11     expound on that question.
12         MR. PEDERSEN:  Well, we obviously
13     disagree in instructing him not to answer who's
14     making the decision at CUNA Mutual.  We
15     certainly differ, and I'll have to raise that
16     with the judge prior to the next deposition.
17         MR. KELLEY:  And just -- yeah.  I'm
18     going to, I'm going to instruct him not to
19     answer that question.
20         MR. PEDERSEN:  Okay.
21         MR. KELLEY:  And just -- I'm sorry,
22     Steve.  I'm trying to think about this as you're
23     preparing to move forward on the questions, I
24     apologize.  Just to note for the record, the
25     additional basis for my objection and

65

1      instruction to the witness not to respond to
2      that is I think it necessarily is going to
3      require the witness to get into areas that are
4      frankly subject to the attorney-client privilege
5      and work product doctrine and matters of
6      confidentiality.  Go ahead.
7          MR. PEDERSEN:  And again, my question
8      specifically excludes any conversations you've
9      had with counsel, any theories of the case, any
10     trial preparation material, any investigation
11     through counsel, and it's the simple question
12     who's making the decisions at CUNA Mutual to
13     continue to deny benefits under this policy?
14     And I understand the objection.  We'll raise it
15     with the judge.
16         MR. KELLEY:  Okay.
17 By Mr. Pedersen:
18 Q   Were you aware at the time that the claim was made
19     information was gathered through Ms. Larson, medical
20     information was gathered?
21 A   I was not aware.
22 Q   At some point you reviewed the medical information;
23     isn't that correct, that was gathered by Ms. Larson?
24 A   Yes.
25 Q   Were you aware that the information at the time the

66

1      claim was made included a signed statement from
2      Mr. Hall that he had never been treated or diagnosed
3      with cancer prior to the application?
4  A   Yes.
5  Q   Were you aware that included in the packet of
6      material was a pathology report which was a
7      noncancerous finding?
8  A   Yes.
9  Q   Were you aware that not a single doctor had been
10     called on the telephone to discuss Mr. Hall's medical
11     condition before he died?
12         MR. KELLEY:  I object to the form of
13     the question.
14 By Mr. Pedersen:
15 Q   Were you aware of that?
16         MR. KELLEY:  Assumes facts that I
17     don't think are entirely correct.
18 By Mr. Pedersen:
19 Q   We disagree with the facts.  Not a single doctor was
20     called, asked to come to the telephone.  I'm just
21     asking if you're aware of that?
22         MR. KELLEY:  Well, but I think you
23     need to ask the first question, Steve, and that
24     is does he know if any doctor was called.
25     Because your question assumes that fact, and I'm

67

1      not willing to agree that that fact is true.
2  By Mr. Pedersen:
3  Q   Well, I'll alter the question at the request of
4      defense counsel.  Are you aware whether any single
5      doctor was ever called to discuss on the phone his
6      medical records?
7  A   All of my awareness of the claim file, the
8      underwriting file, have come from documents provided
9      by my attorneys to me.  And if that puts them out of
10     the scope of these questions --
11         MR. KELLEY:  No, no.  His question is
12     simply are you aware of whether or not anybody
13     from CUNA called on the telephone any of the
14     doctors that were involved.  It's just an are
15     you aware of question.
16 A   All right.  Based on the information provided to me,
17     there were call sheets to doctors' offices that
18     indicated attempts to call doctors' offices.
19 By Mr. Pedersen:
20 Q   Do you know whether those were attempts to speak to
21     doctors or attempts to gather records, do you know?
22 A   They were attempts to gather records.
23 Q   Do you know whether or not records were ever obtained
24     in the initial claim process from the surgeon who
25     removed the mole?

68

HALL v. CUNA                3-14-02                RICHARD FISCHER

1 A    I do not, no.

2 Q    Have you at any point reviewed the deposition
3      transcript of Dr. Hurley, the doctor who removed the
4      mole?

5 A    Not to my knowledge.

6 Q    Have you ever reviewed the hospital surgical records
7      where the mole was removed?

8 A    Not to my knowledge.

9 Q    Have you ever read Mr. Hall's deposition transcripts,
10     two depositions taken before he died?

11 A   No, I have not.

12 Q   Have you ever seen Mr. Hall's video deposition taken
13     before he died in which he discusses his knowledge of
14     cancer after the application?

15 A   No, I have not.

16 Q   Are you personally playing any role in the continuing
17     process of Mrs. Hall's request for reconsideration of
18     the rescission?

19         MR. KELLEY:  Objection.  I think that
20         relates to the objection that I made earlier,
21         and I'll instruct the witness not to respond to
22         that.

23         MR. PEDERSEN:  And my same response is
24         repeated here by reference.

25 By Mr. Pedersen:

                                                          69

1 Q    Are you aware that as a CUNA representative and vice
2      president that --

3         MR. KELLEY:  Assistant vice president.

4 By Mr. Pedersen:

5 Q    I'm sorry.  Assistant vice president, that deposition
6      transcripts have been provided to CUNA Mutual where
7      Dr. Hurley testified there was no cancer in '93?

8 A    I'm not aware of that.

9 Q    Are you aware of the deposition transcripts from the
10     pathologists who reviewed the '93 slides stating
11     those were noncancerous findings?

12 A   I am not.

13 Q   Are you even aware of the video deposition transcript
14     of Mr. Hall taken before he died where he said he
15     didn't know about cancer until February of '99?

16 A   No.

17 Q   Are you aware of the depositions of at least four
18     doctors that have been taken more recently in which
19     the doctors describe their understanding of
20     Mr. Hall's medical condition?

21 A   I'm aware of those.

22 Q   Are you aware that at least three of those four
23     doctors, the only three who were questioned about
24     this issue, testified that it would be an abuse of
25     their records to imply or infer that Mr. Hall knew he

                                                          70

1      had cancer before the application?

2         MR. KELLEY:  Objection.  As I've
3         stated in the previous deposition, or maybe it
4         was one or maybe it was two depositions in which
5         that question was asked, I believe that is a
6         mischaracterization of the totality of the
7         physicians' testimony in those cases and I
8         believe it's argumentative and the witness is
9         instructed not to respond to that.

10        MR. PEDERSEN:  It wasn't an attempt to
11        categorize their entire testimony but certainly
12        to abstract from that testimony the conclusion
13        they reached that it would be an abuse of their
14        records to imply or infer that Mr. Hall knew he
15        had cancer prior to the application.  And I
16        understand there's an instruction not to answer.

17 By Mr. Pedersen:

18 Q   Are you aware that CUNA Mutual through its discovery
19     process has not found a single pathology report prior
20     to the application that evidences cancer?

21        MR. KELLEY:  Objection.  Discovery
22        process is not concluded.

23 By Mr. Pedersen:

24 Q   Are you aware up to this point that that's the case?

25        MR. KELLEY:  You can answer.

                                                          71

1 A    I'm not aware of that.

2 By Mr. Pedersen:

3 Q    Are you aware that CUNA Mutual has not discovered up
4      to this point a single document which shows in the
5      medical record contemporaneous with the event a
6      treatment for cancer prior to the application?

7 A    Can you state that again?

8 Q    Sure.  Are you aware that CUNA Mutual through its
9      discovery up to this point has not located a single
10     document which shows contemporaneous with the
11     treatment any treatment for cancer before the
12     application?

13        MR. KELLEY:  Objection.  You can
14        answer.

15 A   I am not aware of that.

16 By Mr. Pedersen:

17 Q   Are you aware that when the treating doctors were
18     deposed that they provided an explanation for the
19     entries in their record that after a lump was found
20     on the neck they began to associate the '93 mole with
21     that lump and that's why it's in their records
22     subsequent to the application?

23        MR. KELLEY:  Objection.  That is a
24        misstatement of the testimony of the physicians
25        that have been deposed.  This witness was not

                                                          72

MADISON FREELANCE REPORTERS, LLC

**Page 73**

```
 1        present at those depositions and asking this
 2        witness if he's aware of the mischaracterization
 3        of your testimony is an improper question.
 4        There's no possible way he can respond to that.
 5  By Mr. Pedersen:
 6  Q    Would you agree that CUNA Mutual up until today, the
 7        day of your deposition, is continuing to refuse to
 8        pay any benefits to the Halls under their policy?
 9              MR. KELLEY:  Object to the form of the
10              question.  CUNA Mutual is investigating the
11              claim.  Go ahead.  You can answer it.
12  A    Could you state it again?
13  By Mr. Pedersen:
14  Q    Sure.  Are you aware that CUNA Mutual up to today,
15        the present day, has refused to pay a single benefit
16        or dollar under the Hall CUNA Mutual insurance
17        policy?
18  A    Yes.
19  Q    Are you aware that Mrs. Hall lost her home as a
20        result of CUNA Mutual's refusal to pay?
21  A    No.
22  Q    Are you aware that Mrs. Hall is a live-in maid
23        following the loss of her home?
24  A    No.
25              MR. KELLEY:  Just -- I'm sorry.  I
```

**Page 74**

```
 1        know it's one question past but just interpose
 2        an objection to the form in the question before
 3        the last one about Mrs. Hall losing her home as
 4        a result of CUNA Mutual's refusal to pay the
 5        claim.  I object to the form of that.  Sorry.
 6  By Mr. Pedersen:
 7  Q    Are you aware that CUNA Mutual reported Mr. Hall
 8        after he died for criminal prosecution to the
 9        Attorney General's Office in Pennsylvania?
10              MR. KELLEY:  Object to the form.
11              Assumes facts that are not accurate.  Go ahead.
12              You can answer.
13  A    I'm aware.
14  By Mr. Pedersen:
15  Q    Are you aware that CUNA Mutual wrote a letter to Mrs.
16        Hall telling her of the criminal referral?
17  A    I'm not aware of that.
18  Q    Are you aware that CUNA Mutual received a letter
19        within 30 days from the Attorney General's Office
20        that they were not going to investigate the claim?
21  A    Yes.
22  Q    And are you aware that no one at CUNA Mutual ever
23        conveyed that information to Mrs. Hall?
24  A    No.
25  Q    Are you aware that in addition to sending a letter to
```

**Page 75**

```
 1        Mrs. Hall that CUNA Mutual sent a letter to her
 2        credit union where she banked concerning the criminal
 3        referral?
 4  A    No.
 5  Q    And are you aware that CUNA Mutual never wrote to
 6        that credit union clearing up that the matter was not
 7        being investigated?
 8  A    No.
 9  Q    Do you know of any reason or justification why CUNA
10        Mutual today hasn't paid Mrs. Hall?
11              MR. KELLEY:  I object to the question.
12              The witness is instructed not to answer that.
13              That's clearly an improper question.
14              MR. PEDERSEN:  Again, this is a
15              corporate designee who's been brought here, and
16              I am entitled to ask someone at CUNA Mutual why
17              they're not paying Mrs. Hall.
18              MR. KELLEY:  The question is improper
19              and it requires information that would involve
20              attorney-client privilege, work product
21              privilege.  The question involves legal analysis
22              which the deponent is not qualified to provide,
23              and the question is improper and I instruct the
24              witness not to respond to that.
25              MR. PEDERSEN:  And just to place it on
```

**Page 76**

```
 1        the record, I don't believe that an insurance
 2        company can hide behind their attorney when they
 3        have a duty to pay a claim, to pay it promptly
 4        and timely, to thoroughly and properly
 5        investigate a claim and as new information comes
 6        to light reconsider their decisions and pay a
 7        claim.  They cannot simply hide behind their
 8        attorney and refuse to consider the claim and
 9        the damage being done to their own insured.
10              MR. KELLEY:  I object to the
11              characterizations by opposing counsel.
12  By Mr. Pedersen:
13  Q    Who is your direct supervisor at CUNA Mutual?
14  A    Dan Meylink.
15  Q    What is Dan Meylink's position?
16  A    He's a vice president of the organization.
17  Q    How do you spell Meylink?
18  A    M-e-y-l-i-n-k.
19  Q    Is Dan Meylink participating in the decision not to
20        pay benefits?
21              MR. KELLEY:  Objection.  Don't answer
22              that.
23  By Mr. Pedersen:
24  Q    Could you describe for me the organizational
25        structure of CUNA Mutual beginning with, my
```

1   understanding is CUNA Mutual Group?
2 A  CUNA Mutual Group is a marketing name. It's not a
3   legal entity.
4 Q  Are you aware whether or not CUNA Mutual Group
5   reports statistics to various reporting agencies and
6   entities?
7       MR. KELLEY: Object to the form. You
8     can answer it.
9 A  The CUNA Mutual Group does not.
10 By Mr. Pedersen:
11 Q  It doesn't? I'm sorry. They don't provide
12   statistics, statistical information to reporting
13   agencies?
14 A  No. CUNA Mutual Insurance Society would.
15 Q  They don't provide information to Standard & Poors?
16       MR. KELLEY: I'm sorry. You said
17     they.
18 By Mr. Pedersen:
19 Q  CUNA Mutual Group doesn't provide information to
20   Standard & Poors on their statistics?
21       MR. KELLEY: Object to the form of the
22     question. Go ahead. You can answer if you
23     know.
24 A  I don't know under what company label they report to
25   Best.

                           77

1 A  Yes.
2 Q  What is -- is there a parent entity or organization
3   for CUNA Mutual Insurance Society?
4       MR. KELLEY: Objection. Calls for a
5     legal conclusion. You can answer it if you
6     know.
7 A  I don't know.
8 By Mr. Pedersen:
9 Q  Do you know whether or not there are subsidiary
10   organizations to CUNA Mutual Insurance Society?
11       MR. KELLEY: Objection. Calls for a
12     legal analysis. You can answer it if you know.
13 A  I don't know.
14 By Mr. Pedersen:
15 Q  Do you know whether or not there are affiliated
16   entities with CUNA Mutual Insurance Society?
17       MR. KELLEY: Same objection. You can
18     answer.
19 A  I don't know.
20 By Mr. Pedersen:
21 Q  What is the relationship between CUNA Mutual
22   Insurance Society and CUNA Mutual Life Insurance
23   Company?
24 A  I don't know under which corporate legal names those
25   two are related.

                           79

1 By Mr. Pedersen:
2 Q  That's A.N. Best?
3 A  Yes.
4 Q  That's different than the Standard & Poors; isn't it.
5 A  I'm sorry. I thought you said Best.
6       MR. KELLEY: No. His question was
7     Standard & Poors.
8 A  My answer would be the same for Standard & Poors.
9 By Mr. Pedersen:
10 Q  For Standard & Poors or Best, you're not aware of
11   CUNA Mutual Group's reporting?
12 A  Yes.
13       MR. KELLEY: Well -- okay. Go ahead.
14 By Mr. Pedersen:
15 Q  Can you describe for me from CUNA Mutual Group down
16   the organizational chart or structure of CUNA Mutual
17   Group?
18       MR. KELLEY: Object to the form. Go
19     ahead. You can answer.
20 A  The people --
21 By Mr. Pedersen:
22 Q  Not the names of the individuals, the names of the
23   organizations.
24 A  . I cannot.
25 Q  You work for CUNA Mutual Insurance Society?

                           78

1 Q  Are you able to -- I'm sorry. Maybe you didn't
2   finish.
3 A  No.
4 Q  Are you able to draw for us the organizational chart
5   of CUNA Mutual Insurance Society?
6 A  No.
7 Q  I don't believe I asked it. I'm sure defense counsel
8   will correct me if I have. How long have you worked
9   at CUNA Mutual Insurance Society?
10       MR. KELLEY: You have not.
11 A  13 years.
12 By Mr. Pedersen:
13 Q  When did you first start with CUNA Mutual Insurance
14   Society?
15 A  In 1989.
16 Q  In what capacity did you start working there?
17 A  I was an actuarial student.
18 Q  Where were you a student?
19 A  It's a position within CUNA Mutual Group.
20 Q  Oh. I see. You were as -- you weren't a student
21   somewhere else and then were an actuary in training
22   at CUNA Mutual?
23       MR. KELLEY: Object to the form.
24 By Mr. Pedersen:
25 Q  Let me just go on with another question.

                           80

HALL v. CUNA                3-14-02                RICHARD FISCHER

1  A    Okay.
2  Q    What were your duties as an actuarial student at CUNA
3       Mutual in 1989?
4  A    Just centered around pricing of credit disability and
5       credit life insurance.
6  Q    When did your job duties change at CUNA Mutual?
7  A    I was in that category for about six years.
8  Q    And then what position did you get?
9  A    I led a product development unit.
10 Q    Which product development unit?
11 A    Related to credit insurance products.
12 Q    When did this product home, members home mortgage
13      protection come into being?
14 A    Around 1988.
15 Q    I notice it has a No. 2 by it.  What's the difference
16      between the No. 1 and the No. 2?
17 A    The No. 2 made a distinction in their rating between
18      people who used tobacco and people who did not.
19 Q    After you worked in the credit life, could you just
20      describe for us your work history after that with
21      CUNA Mutual?
22 A    I worked six, six to seven years in the pricing role,
23      about three years in that product development role
24      related to credit insurance, again, a little over a
25      year in a staff underwriting role.

                                                          81

1  Q    Was the staff underwriting specifically on the home
2       mortgage protection plans?
3  A    Not specifically.
4  Q    More general under credit life and that was a
5       subdivision or subcategory?
6  A    Yes.
7  Q    And then what did you do?
8  A    A little over a year as a product manager for the
9       credit insurance lines.
10 Q    Including members home mortgage protection?
11 A    Yes.
12 Q    And then?
13 A    About six months, the remainder in product leadership
14      role.
15 Q    And is that where you are today or --
16 A    Yes.
17 Q    When did you become the assistant vice president at
18      CUNA Mutual?
19 A    When I took on the product manager's role.
20 Q    And how many years ago was that?
21 A    About a year and a half.
22 Q    What was the last educational level that you
23      attained?
24 A    I graduated college.
25 Q    Which college?

                                                          82

1  A    St. Norbert College.
2  Q    I'm sorry.  How do you spell Norbert?
3  A    N-o-r-b-e-r-t.
4  Q    Where is that?
5  A    De Pere, Wisconsin.
6  Q    It's in Wisconsin.  Okay.  And you got a B.S. degree?
7  A    B.A.
8  Q    B.A.  In what field?
9  A    Mathematics.
10 Q    Have you had any other training after that, formal
11      education after that?
12          MR. KELLEY:  Just so we're clear, are
13      you talking about any other formal, you know,
14      college or master's degree, that kind of thing
15      as opposed to insurance training --
16          MR. PEDERSEN:  Yes.
17          MR. KELLEY:  -- with CUNA and that
18      kind of thing?
19          MR. PEDERSEN:  Yes.
20 A    No.
21 By Mr. Pedersen:
22 Q    Within CUNA have you had any medical training?
23 A    No.
24 Q    Do you have any medical background at all?
25 A    No.

                                                          83

1  Q    Do you know how many times CUNA Mutual has been sued
2       in the last five years?
3          MR. KELLEY:  Objection.
4  A    No.
5          MR. KELLEY:  Okay.
6          MR. PEDERSEN:  That makes it easier if
7       you don't know.
8          MR. KELLEY:  Fine.
9  By Mr. Pedersen:
10 Q    Who would know that?
11         MR. KELLEY:  Just -- I'm sorry.  Just
12      so you're aware, when I object wait until I
13      instruct you to answer before you answer.
14 By Mr. Pedersen:
15 Q    Who would know that within CUNA Mutual?
16 A    Fay Patzner.
17 Q    And what's her name?
18 A    The head of legal.
19 Q    And what's her name?
20 A    Fay Patzner.
21 Q    The last name I can't --
22 A    Patzner.
23 Q    How do you spell Patzner?
24 A    I don't know.
25         MR. RICHARDSON:  P-a-t-z-n-e-r.

                                                          84

1          MR. PEDERSEN: Apart from the
2    reservation to recall Mr. Fischer or a different
3    corporate designee to answer the questions that
4    we've lined up previously, I don't have any
5    further questions today for Mr. Fischer.
6          MR. KELLEY: Okay. Thank you.
7              (3:40 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                                              85

1  STATE OF WISCONSIN  )
                       )    ss.
2  COUNTY OF DANE      )

3

4       I, BECKY J. GANTT, Registered Professional
5  Reporter and Notary Public in and for the State of
6  Wisconsin, do hereby certify that the foregoing is a
7  true record of the deposition of RICHARD FISCHER, who was
8  first duly sworn by me; having been taken on the 14th day
9  of March, 2002, at Davis & Kuelthau, 10 East Doty Street,
10 in the City of Madison, County of Dane, and State of
11 Wisconsin, in my presence, and reduced to writing in
12 accordance with my stenographic notes made at said time
13 and place.
14      I further certify that I am not a relative
15 or employee or attorney or counsel for any of the
16 parties, or a relative or employee of such attorney
17 or counsel, or financially interested in said action.
18      In witness whereof, I have hereunto set my hand
19 and affixed my seal of office this 20th day of March,
20 2002.
21
22
            Notary Public, State of Wisconsin
23          My commission Expires 2/16/03
24
25

                                              86



Madison Freelance
Reporters, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

NANCY HALL, individually and as the
Representative and Administratrix of
the Estate of Tommy Hall, deceased,
her husband,

        Plaintiff,

   v.                       Law No. 1:01-CV-1265

CUNA MUTUAL GROUP, CUNA MUTUAL
INSURANCE SOCIETY,

        Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF RICHARD FISCHER

Thursday, March 28th, 2002

9:05 a.m.

Reported by:  Becky J. Gantt, RPR

**CONDENSED**



131 W. Wilson St. • Suite 1000 • Madison, Wisconsin 53703

Phone: (608) 255-8100    Fax: (608) 255-4096

www.madisonfreelance.com

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2        FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 3    * * * * * * * * * * * * * * * * * * * * * * * *
 4   NANCY HALL, individually and as the
     Representative and Administratrix of
 5   the Estate of Tommy Hall, deceased,
     her husband,
 6
 7          Plaintiff,
 8       v.                      Law No. 1:01-CV-1265
 9   CUNA MUTUAL GROUP, CUNA MUTUAL
     INSURANCE SOCIETY,
10          Defendants.
11   * * * * * * * * * * * * * * * * * * * * * * * *
12
13          DEPOSITION OF RICHARD FISCHER
14          Thursday, March 28th, 2002
15               9:05 a.m.
16       Reported by:  Becky J. Gantt, RPR
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                  * * * * * *
 2                  I N D E X
 3   Examination by:                    Page:
 4   Attorney Pedersen                    8
     Attorney Kelley                      --
 5
 6                  * * * * * *
 7                E X H I B I T S
 8   Exhibit Nos.:                      Page:
 9   1 - Summary Sheet of Information     10
10   2 - Claims Summary Report            13
11   3 - 40-page document with various figures  13
12   4 - Summary Sheet with Profit Totals  115
13       (Original exhibits were attached to the original
         transcript.  Copies were provided to both counsel.)
14
15
16                  * * * * * *
17
18       (Original transcript filed with Attorney Pedersen)
19
20
21
22
23
24
25
```

**Page 2**

```
 1       DEPOSITION of RICHARD FISCHER, a witness in the
 2   above-entitled action, taken at the instance of the
 3   plaintiff , under the provisions of Chapter 804 of the
 4   Wisconsin Statutes pursuant to notice, before BECKY J.
 5   GANTT, a Registered Professional Reporter and Notary
 6   Public in and for the State of Wisconsin, at the law
 7   offices of Davis & Kuelthau, S.C., 10 East Doty Street, in
 8   the City of Madison, County of Dane, and State of
 9   Wisconsin, on the 28th day of March, 2002, commencing at
10   9:05 a.m.
11
12                  * * * * * *
13              A P P E A R A N C E S
14       MR. STEPHEN R. PEDERSEN,
             Attorney at Law,
15           214 Senate Avenue, Site 602,
             Camp Hill, Pennsylvania, 17011-2336,
16           appearing on behalf of the
             plaintiff;
17
18       MR. MICHAEL R. KELLEY,
         McNEES, WALLACE & NURICK,
19           Attorneys at Law,
             100 Pine Street,
20           P.O. Box 1166,
             Harrisburg, Pennsylvania 17108-1166,
21           appearing on behalf of the
             defendants.
22       ALSO PRESENT: Mark Richardson
23                  * * * * * *
24
25
```

**Page 4**

```
 1       MR. KELLEY:  I just want to put some
 2   things on the record.  First off, this past week
 3   we produced a number of records to plaintiff's
 4   counsel regarding profits and loss figures for
 5   three different product lines at CUNA Mutual
 6   Insurance Society, the home mortgage protection
 7   product, credit life, and also individual life
 8   products.
 9       We produced most of those documents on
10   Tuesday, which would be the 26th of March, 2002.
11   We produced a summary sheet to Mr. Pedersen via
12   fax on the 27th, and we have here today just an
13   extra copy of that summary sheet of information
14   and that refers to the home mortgage protection
15   and the credit life information and then some of
16   the underlying numbers and data that I believe
17   support that summary sheet of information that
18   we've made available to Mr. Pedersen here today
19   for the continuation of Rich Fischer's
20   deposition.
21       And I just wanted to also note a
22   general objection and a continuing objection to
23   any questions regarding profits and losses of
24   CUNA Mutual.  I understand that the Court has
25   ordered that that information be provided.
```

1    I just want to state for the record
2    that we have objected to that. We objected to
3    that with the judge, and I want to make sure
4    that we're of record in this deposition noting a
5    general objection to the production of that kind
6    of information.
7    We believe that it is not relevant to
8    this dispute. It is not reasonably calculated
9    to lead to the discovery of relevant or
10   admissible evidence at the trial of this matter.
11   We believe that the plaintiff's claim for bad
12   faith in this action is not supported by the
13   evidence which has been disclosed in this case
14   through discovery and, as such, this kind of
15   information is inappropriate to be discovered.
16   We also believe that plaintiff has
17   discovered no evidence in this case to support a
18   claim of punitive damages so that again this
19   information is not relevant or reasonably
20   calculated to lead to relevant or admissible
21   evidence at trial.
22   Furthermore, when we discussed the
23   production of this information during the
24   conference with Judge Rambo held a couple of
25   weeks ago, it is my understanding that counsel's

5

1    contention was that at that time that he
2    believed that CUNA Mutual was engaging in a
3    systematic process whereby it would do minimal
4    underwriting on a matter or on a potential
5    insured at the outset of the relationship with
6    the insured and then had a practice or policy or
7    systematic procedure of then reviewing any
8    claims that came in and had a practice of
9    rescinding those policies so as to avoid paying
10   those claims.
11   We advised the Court, I advised the
12   Court at the time we had this argument with
13   counsel and the Court regarding the production
14   of this information that this was nothing more
15   than a fishing expedition, that there was no
16   evidence to support plaintiff's belief that CUNA
17   was engaging in any kind of systematic effort in
18   that regard. And I just wanted to renew and
19   restate my objection on that basis for the
20   record. Thank you.
21   MR. PEDERSEN: And I would like to
22   just respond briefly on the record since that
23   record has been made. Obviously we disagree.
24   There has been a complaint that was originally
25   filed that included a claim for bad faith and a

6

1    claim for punitive damages.
2    The judge considered and had before
3    her the complaint that had been written and
4    ruled that we were entitled to discover on the
5    punitive damage claim the profits and losses of
6    CUNA Mutual both in specific lines of business
7    and with respect to both of the defendants, CUNA
8    Mutual and CUNA Mutual Group.
9    She didn't rule separately for each
10   defendant but ruled that the defendants would be
11   required to disclose that type of information.
12   In addition to the bad faith claim as it related
13   to Mr. and Mrs. Hall specific benefits and
14   claims under the policy, we did assert systemic
15   bad faith relating to CUNA Mutual's postclaim
16   underwriting process and the policies and
17   procedures with respect to reporting individuals
18   for insurance fraud and the manner in which that
19   is done, particularly on life insurance claims
20   with respect to deceased insureds and with
21   respect to the manner in which Mrs. Hall, an
22   individual such as Mrs. Hall was treated
23   following the filing of the fraud claim and no
24   notification of the resolution of those claims.
25   And we're here today by agreement of

7

1    counsel pursuant to the court order to take a
2    deposition concerning certain lines of business
3    and profits and losses in those lines of
4    business as well as profits and losses for CUNA
5    Mutual Group and CUNA Mutual Insurance Society.
6    And we're prepared to undertake that deposition.
7    MR. KELLEY:  Okay.
8
9    RICHARD FISCHER,
10   having been first duly sworn on oath,
11   was examined and testified as follows:
12
13   EXAMINATION
14 By Mr. Pedersen:
15 Q   We took your deposition a couple of weeks ago and
16   have you had a chance, have you received that
17   deposition?
18 A   Yes.
19 Q   Have you reviewed it?
20 A   Yes.
21 Q   Are there any modifications after review of that
22   deposition that you wanted to make?
23   MR. KELLEY:  Object to the form. You
24   can answer it.
25 A   No.

8

1 By Mr. Pedersen:
2 Q   You may recall during that deposition we had agreed
3     with your counsel to redepose you on this, at this
4     time on certain areas of questions, certain lines of
5     business.  And some documents have been produced by
6     your counsel with respect to that, and I intend on
7     asking questions with respect to the documents that
8     have been produced thus far in the case.
9             The first document, can you explain to me,
10    this is a document that appears to be a summary for
11    1998, '99, 2000, and 2001 on at least two lines of
12    business, a three-page document.  Can you explain to
13    me what this document is and I'll mark it Exhibit 1
14    to the deposition?
15             MR. KELLEY:  It's going to be Fischer
16        Exhibit 1.
17             MR. PEDERSEN:  Fischer 1, right.
18             MR. KELLEY:  Well, is this a new
19        deposition or is this a continuation of his
20        previous deposition?
21             MR. PEDERSEN:  I'll treat it as a new
22        deposition so I can label it one.  It's a
23        deposition on a different date.  He's been sworn
24        in again.
25             MR. KELLEY:  I just don't want to have

9

1         two Fischer 1 exhibits to avoid the confusion of
2         that.
3              MR. PEDERSEN:  I can't recall what the
4         last exhibit was that we left off with.  I have
5         it here.  Then let's mark this Fischer 1.
6              (Exhibit No. 1 marked for identification)
7 Q   Mr. Fischer, can you tell me what that document is?
8 A   The summary information put together to answer
9     specific numbers asked for in the previous
10    deposition.
11 Q   When was it prepared?
12 A   I believe the final version was last, late yesterday,
13    the 26th.
14 Q   Who prepared it?
15             MR. KELLEY:  Yesterday is actually the
16        27th.
17 A   My watch is wrong.  Kirk Johnson prepared the summary
18    information.
19 By Mr. Pedersen:
20 Q   Who is Kirk Johnson?
21 A   He's a statistician within our business finance team.
22 Q   In the chain of command or line of authority, where
23    does Kirk Johnson fall with respect to you?
24 A   There's not a chain.
25 Q   Have you spoken with Kirk Johnson about the

10

1     preparation of this document?
2 A   I have not.
3 Q   Are you aware how the document was compiled?
4 A   Yes.
5 Q   How is it that you're aware of the manner in which
6     the document was compiled?
7 A   The summary, the detail information behind this
8     summary is information that Kirk has readily
9     available to him.  And when we would ask questions
10    like this for situations like today, that is how he
11    would go about producing it.
12 Q   Is the information stored on a computer database or
13    is it in hard copies or do you know?
14 A   Some of both.
15 Q   Have you reviewed the information that supports the
16    figures in Exhibit 1 to your deposition here?
17 A   Could you say that again?
18 Q   Yeah.  Have you reviewed the documents and computer
19    information that supports the summary numbers listed
20    in Exhibit 1?
21 A   No, I have not.
22 Q   As a corporate designee, are you able to tell us
23    whether or not the figures are accurate in Fischer 1?
24 A   To the best of my knowledge they are accurate.
25 Q   How or what is the basis for your statement that

11

1     they're accurate?
2 A   I trust the individuals who put it together.
3 Q   Those individuals work for CUNA Mutual?
4 A   Yes.
5 Q   They're salaried and employed by CUNA Mutual?
6 A   Yes.
7 Q   And they were given a task to do by CUNA Mutual as an
8     entity or corporation?
9 A   Yes.
10 Q   And do you know how they went about doing their task
11    specifically?
12 A   Not specifically.
13 Q   The documents that were used to compile this summary,
14    are these the documents that you've brought with you
15    today or are these other documents?  You brought
16    certain documents with you today, and I'll show you
17    the stack of those documents that have been produced
18    by counsel.
19             MR. KELLEY:  Just for the record so
20        that the witness isn't confused --
21             MR. PEDERSEN:  Sure.
22             MR. KELLEY:  -- the documents
23        Mr. Pedersen is showing you are documents which
24        I just handed him this morning and which
25        certainly have been represented to me as sort of

12

1    being the underlying data of information that
2    supports the piece of paper, the summary here
3    that we're looking at.
4 By Mr. Pedersen:
5 Q    Is that correct?  Is that what this is?
6 A    Yes.
7 Q    Do you want to take a look at those documents?  Do
8    those documents in fact appear to be the documents
9    which form the basis for the summary report?
10 A    Yes.
11 Q    The document, the summary report and the supportive
12    documents which you've just reviewed -- and I'll have
13    the supportive documents marked as exhibits,
14    actually, there are two parts to it.  Claims summary
15    report we'll mark as Exhibit 2.  And a stapled sheet
16    of pages that was, the claims summary report is a
17    single page and the stapled together packet of
18    material we'll mark as Fischer 3.
19        (Exhibit Nos. 2-3 marked for identification)
20 Q    Now, if you, if you didn't speak with Mr. Johnson
21    about preparing the summary report, do you know how
22    it is that Mr. Johnson got the assignment and knew
23    what information to gather?
24 A    Yes.
25 Q    How is it that --

13

1 A    We went through his manager, both myself and Mark
2    Richardson, to describe what we needed.
3 Q    Who is Mr. Johnson's manager that you spoke with?
4 A    Sue Bartholf.
5 Q    How do you spell Bartholf?
6 A    B-a-r-t-h-o-l-f.
7 Q    And to your knowledge then Sue Bartholf gave the
8    assignment to Kirk Johnson?
9 A    Yes.
10 Q    The information contained in the summary in Exhibit 1
11    and the supporting information in Exhibits 2 and 3,
12    is this the type of information that you review on a
13    regular basis as part of your job function at CUNA
14    Mutual?
15 A    Some pieces of it.
16 Q    Can you tell us from the summary sheet which are the
17    pieces that you review on a regular basis as part of
18    your job function and can you put a check by those?
19 A    Sure.  The elements that I would look at on a regular
20    basis for home mortgage protection life would be the
21    direct earned premium, the claims paid, credit union
22    reimbursements, operating expenses excluding
23    governance, policies in force, certificates in force.
24        I then move into credit life, the direct
25    earned premium, claims paid, credit union

14

1    reimbursement, incurred experience refunds, operating
2    expenses, on the bottom of the page the section with
3    policies in force, certificates in force, number of
4    claims paid, number of claims denied and certificates
5    rescinded that's information I may look at
6    occasionally but not on a regular basis.
7 Q    When you say you review the information on a regular
8    basis that's checked on Fischer 1, in what form do
9    you review it?
10 A    Usually reviewed in total for all products which I
11    manage and then broken out in detail with those,
12    those types of numbers broken out in detail by
13    product line.
14 Q    And how often do you review the checked information?
15 A    Monthly.
16 Q    So is it fair to say that at least with respect to
17    the checked information, you're very familiar with
18    the numbers and the type of information that's listed
19    on Fischer 1?
20 A    Yes.
21 Q    I would like to go through each of the categories and
22    ask questions about each of the categories of
23    information that's on Fischer 1.  The HMP life, what
24    does that mean?
25 A    That's home mortgage protection life insurance

15

1    coverage.
2 Q    Is that the type of insurance that Mr. Hall had?
3 A    It is.
4 Q    The information that's been gathered on this summary
5    form, is this CUNA Mutual Insurance Society
6    information?
7 A    Yes.
8 Q    And is it nationwide information or is it state
9    specific?
10 A    It's nationwide.
11 Q    The first entry, direct earned premium, what is that?
12 A    That is the premium that CUNA Mutual would earn in
13    the time period specified.
14 Q    Are these the insurance premiums paid in to CUNA
15    Mutual by credit union members?
16 A    At the most exact point, no, they're not.
17 Q    Can you explain that?
18 A    If you see on Fischer 1 behind earned premiums is in
19    parentheses, written plus change in UPR or unearned
20    premium reserve.  We allocate to the time period the
21    premium that should have been earned during that time
22    period.
23        If someone were to pay for premium that
24    went beyond that time period, we don't earn it.  We
25    would earn part of that in the next time period, so

16

1  we set a reserve up for that. And that's the earned
2  number.
3  Q   Is that because some insurance or some insureds pay
4  in advance?
5  A   It could be. That's one of the reasons.
6  Q   The category in 1998 for direct earned premiums,
7  understanding there may be some amount that was paid
8  in, it would be carried over to '99 if it was paid in
9  advance, what is the number with respect to premiums
10  paid by insureds in 1998 under the home mortgage
11  protection?
12  A   $2,722,278.05.
13  Q   And in 1999?
14  A   $2,968,665.87.
15  Q   And in 2000?
16  A   $3,154,484.88.
17  Q   And in 2001?
18  A   $3,215,308.93.
19  Q   Would you agree --
20       MR. KELLEY: That's 318.93. I thought
21       you said 308. It's the figure written on the --
22  By Mr. Pedersen:
23  Q   Sure. We can all stipulate that these figures,
24  you've read the figures across from the direct earned
25  premiums on Fischer 1; is that right?

17

1  A   Yes.
2  Q   And would you agree that from 1998 through 2001 the
3  direct earned premiums have increased every year?
4  A   Yes.
5  Q   Do you know why that is?
6  A   More policies are being sold.
7  Q   Has -- do you know whether or not CUNA Mutual has
8  made efforts to increase the sale of this type of
9  policy during that four-year period that would
10  account for the additional premiums collected?
11  A   Could you restate?
12  Q   Besides the fact that more policies have been sold,
13  do you know why more policies have been sold? Has
14  CUNA Mutual engaged in advertising in efforts to gain
15  more policies?
16       MR. KELLEY: Object to the form. Go
17       ahead, Rich, you can answer.
18  By Mr. Pedersen:
19  Q   Let me restate it. It ended up a two-part question
20  with my trying to explain what I meant. Over the
21  four-year period, can you explain why more, there
22  were more direct earned premiums each year in an
23  increasing amount?
24       MR. KELLEY: Objection, asked and
25       answered. Go ahead.

18

1  A   I think there are several reasons for it. The first
2  reason would be that there are more policies in
3  force; there are more credit unions that have the
4  program available for their members. The second
5  would be that through that time period values on real
6  estate in general have gone up and the amount of
7  coverage has gone up. Those would be the two main
8  drivers that I would see on why that number is
9  increasing.
10  Q   Do you know whether or not CUNA Mutual has actively
11  engaged in efforts to affect the first of those two
12  that you've identified, more credit union enrollments
13  and thus more members?
14  A   I would not say we've actively done that.
15  Q   What steps that you're aware of has CUNA Mutual taken
16  to increase the sale of the home mortgage protection
17  life policies?
18       MR. KELLEY: Object to the form of the
19       question. It misstates the witness's testimony.
20       MR. PEDERSEN: If they have.
21       MR. KELLEY: Do you understand the
22       question, Rich?
23       THE WITNESS: Yes.
24       MR. KELLEY: Go ahead.
25  A   To the extent our field force knows that the product

19

1  is available and credit unions want to make the
2  product available, they're working together to have
3  more people, more credit unions offer it.
4  By Mr. Pedersen:
5  Q   Has CUNA Mutual published brochures that are sent to
6  credit unions advertising this home mortgage
7  protection life product?
8  A   There's two questions in there.
9  Q   I can only think of one. You need some
10  clarification?
11  A   Yes.
12  Q   Okay. Has CUNA Mutual published any documents that
13  it has disseminated to credit unions with respect to
14  the home mortgage protection life?
15  A   Yes.
16  Q   What types of documents has CUNA Mutual published?
17       MR. KELLEY: Just object to the form.
18       And can you give him some sort of a time frame
19       that you're talking about, Steve?
20  By Mr. Pedersen:
21  Q   Yeah. We're trying to explain and investigate the
22  difference between the 1998 and 2001 earned premiums.
23  And you've broken it down for me I believe into two
24  possible or two contributing factors, more credit
25  union members and the value of real estate coverage

20

1   increasing, the actual value of the real estate going
2   up and the coverage going up and, therefore, the
3   premiums being higher.
4       And now we're exploring the first of those
5   two about credit union membership. And you said,
6   this is my understanding, you weren't sure whether or
7   not CUNA Mutual directly contributed to that or not
8   and the role it played. And now I'm asking what
9   steps did CUNA Mutual take to affect that aspect of
10  the premium?
11      MR. KELLEY: And I just need a
12      clarification, Steve. Sorry to drag this out.
13      Are you asking him what brochures CUNA Mutual
14      has sent out in addition to those that were sent
15      out in the past to try and increase the number
16      of direct earned premiums or are you just asking
17      him in the period '98 until 2001 what brochures
18      of any kind did CUNA Mutual send out?
19      MR. PEDERSEN: I can break it down
20      into both of those questions --
21      MR. KELLEY: Okay.
22      MR. PEDERSEN: -- if you want to.
23  By Mr. Pedersen:
24  Q   Were there any differences from '98 to 2001 in the
25      type of brochures, including information, leaflets,

                                            21

1   pamphlets, written instructions to credit unions than
2   existed prior to 1998?
3       MR. KELLEY: Object to the form, lack
4       of foundation. Go ahead. You can answer it if
5       you know.
6   A   I don't know.
7   By Mr. Pedersen:
8   Q   Without looking at the differences before '98 and
9       after '98, are you aware of the type of informational
10      brochures or pamphlets that are provided to credit
11      unions with respect to the direct earned premium,
12      actually with respect to the home mortgage protection
13      policies?
14  A   Yes.
15  Q   Can you describe those?
16      MR. KELLEY: Object to the form, go
17      ahead.
18  A   Information provided to credit unions on home
19      mortgage protection would generally be administrative
20      guides and training guides for the employees of the
21      credit union.
22  By Mr. Pedersen:
23  Q   And what would be the purpose that CUNA Mutual would
24      send those guides to members of the credit union?
25  A   So the credit union is knowledgeable about the

                                            22

1   product, they know the procedures to make it
2   available to members, they know the procedures to
3   continue administration of the program.
4   Q   Without addressing changes in brochures, because I
5       understand you're not aware of any changes or
6       modifications to brochures for '98 and after '98, are
7       you aware of the number of brochures, whether the
8       number of brochures had increased over the last four
9       years; in other words, dissemination of material?
10  A   I'm not aware of that.
11  Q   Besides the brochures and the type of information
12      that we've described, are you aware of any other
13      method in which CUNA Mutual has participated in
14      efforts to increase the home mortgage protection life
15      product sales?
16      MR. KELLEY: Object to the form, go
17      ahead.
18  A   Ensuring that our field staff knowing of the
19      availability of the product to meet the needs of
20      credit unions is --
21  By Mr. Pedersen:
22  Q   When you say field staff, do you mean CUNA Mutual
23      employees?
24  A   Yes.
25  Q   Do you know who the CUNA Mutual employee

                                            23

1   representative is for the Pennsylvania, or more
2   specifically, Chambersburg, Pennsylvania, area?
3   A   I do not.
4   Q   There is one assigned to that region?
5   A   Yes.
6   Q   If Mr. Hall -- actually, we have information that
7       Mr. Hall had paid premiums in 1999, would his
8       premiums that were paid on his product be part of the
9       figures for 1999 on this sheet?
10      MR. KELLEY: Assuming that your
11      information is accurate.
12      MR. PEDERSEN: That he paid premiums,
13      that was information provided by you. Yes. I
14      hope it's accurate.
15      MR. KELLEY: Well, all I'm saying is
16      this witness isn't looking at that. You haven't
17      established that he's reviewed that particular
18      number. But assuming that that information is
19      correct that you're relating to him, you're
20      asking him would that be part of this
21      information?
22      MR. PEDERSEN: Yes.
23  A   I am unsure if his premiums are in that total.
24  By Mr. Pedersen:
25  Q   If I tell you that Mr. Hall paid premiums to CUNA

                                            24

1 Mutual in 1999, is there any other place those
2 premiums would be reported other than this figure in
3 1999?
4 A   If he paid premiums for home mortgage protection life
5 in '99, yes, they would be in that figure.
6 Q   And if his policy were rescinded and the premiums
7 were returned in the year 2000, how would that be
8 reflected?
9 A   I don't know exactly.
10 Q   Do you know the average annual premium for '98, '99,
11 2000, and 2001?
12 A   I do not.
13 Q   Is that information recorded somewhere?  Is that
14 kept?
15 A   Not specifically, no.
16 Q   Can you give me an idea of the range of premiums
17 charged on, an average range of premiums for over
18 that period of time '98 through 2001?
19      MR. KELLEY:  Object to the form of the
20      question, calls for speculation.  Go ahead, if
21      you know.
22 By Mr. Pedersen:
23 Q   I don't want you to speculate, but are you aware of
24 premium rates for the home mortgage protection
25 product?

25

1 A   I am aware of premium rates.
2 Q   And I understand there's a smoker and a nonsmoker
3 rate; is that right?
4 A   Yes.
5 Q   And can you tell me the range of rates?
6 A   The range of rates go from as low as 14 cents per
7 month per thousand to as high as 360.
8 Q   And when you say 360 --
9 A   Per month per thousand.
10 Q   360.
11 A   $3.60.
12 Q   And I'm sorry.  You're speaking to someone who's not
13 aware of the, where the decimal place lies on some of
14 these figures --
15 A   Okay.
16 Q   -- so $3.60 a month per thousand insured?
17 A   Yes.
18 Q   And just so I can clarify what we're talking about, a
19 thousand dollar policy, if you purchased a thousand
20 dollar policy, the range would be from 14 cents to
21 $3.60 a month on the premiums?
22 A   Yes.
23 Q   And if we had multiples of ten, a $10,000 policy, we
24 would move the decimal place over to $1.40 or to $36
25 a month?

26

1 A   Yes.
2 Q   And over again we would move the decimal place to $14
3 a month or $360 a month?
4 A   Yes.
5 Q   The second category, claims paid, what is that?
6 A   Those are the dollars of claims paid on policies for
7 home mortgage protection life in the time period.
8 Q   So in each year we have a comparison between the
9 premiums received and the claims that are paid out;
10 is that right?
11 A   Yes.
12 Q   Can you describe for us, because the numbers speak
13 for themselves, we have an entry in each year under
14 that category telling us the claims paid; is that
15 right?
16 A   Yes.
17 Q   Can you describe for us any trend tendencies with
18 respect to claims paid?
19 A   There's not a, a sure trend across the four-year time
20 period.
21 Q   Would you agree that fewer claims were paid in '99
22 than they were in '98?
23 A   Fewer dollars of claims.
24 Q   Yes.  Not the number of claims but the dollars that
25 went out from CUNA Mutual on payment of claims.

27

1 A   Yes.
2 Q   And in the year 2000 also fewer than in 1998?
3 A   Yes.
4 Q   And in the year 2001 was the highest year of claims
5 paid of those four years?
6 A   Yes.
7 Q   What is the third category, claim reserves?  And I
8 see that's not one that you've checked.
9 A   No.
10 Q   What is that category?
11 A   It's an actuarial term.  It's a liability set up for
12 claims that should be attributed to the product line.
13 They -- the two categories in there are claims
14 incurred but not reported and pending claims.
15 Q   Can you explain the difference between a claim paid,
16 which is the second category, and a claim reserve?
17 And I understand you broke the reserve into two
18 separate subcategories of incurred not reported and
19 pending claims.
20 A   Yes, I can.  In the insurance world, you, you try to
21 tie back to the period that the premium was earned,
22 the losses that were incurred on that premium that
23 was earned.  Paid claims, it's very simple to do
24 that.  They were paid in that period and so they tie
25 back real nicely.

28

1    But what you don't know is if very late in
2  the year you incurred another claim that you just
3  don't know about yet.  The estate hasn't filed a
4  claim yet or you know about it but you haven't been
5  able to do the research to view if it's a valid claim
6  or not.  So you set a reserve up for what those
7  amounts should be.
8  Q  How is the reserve set when it's not a reported
9    claim?
10 A  For this product line, the incurred but not reported
11   part of the reserve is a percent  of the premium
12   written.
13 Q  Do you know that percent ?
14 A  Not the exact percent .
15 Q  Do you know the range of possibilities where that
16   percent  lies?
17 A  Below ten.
18 Q  It's a number less than 10 percent  of the premium
19   received for that specific insured?
20 A  For the block of business.
21 Q  When you say the block of business, are you referring
22   to all of the direct earned premiums in that year and
23   a figure below 10 percent  to set the reserve --
24 A  Yes.
25 Q  -- as opposed to addressing any specific claim?

29

1  A  True.
2  Q  When you said that you set the claim reserves you --
3    the claims paid are paid in the year that the
4    premiums are collected for reporting purposes.  Was I
5    correct or not?
6  A  Can you say that again?
7  Q  Yeah.  I was confused.  I didn't understand.  You
8    said the claims that are paid statistically you
9    attempt to report those claims paid in the year the
10   premiums were earned and that's why you set a reserve
11   in that same year for the potential that claims would
12   be paid after the premium year?
13 A  Yes.
14 Q  In the home mortgage protection area, isn't it
15   accurate that premiums are paid typically over many,
16   many years?
17 A  Yes.
18 Q  15 to 30 years?
19 A  Yes.
20 Q  And so the reporting year is the year in which the
21   last premium is paid and the claim is made in that
22   year, not the year in which all of the premiums are
23   paid, right?
24 A  Right.
25 Q  With respect to Mr. Hall, the claim reserve for his

30

1    claim, which year would that fall in?
2  A  Mr. Hall's claim would not be reserved right now.
3  Q  There would be no reserve at all?
4  A  Right.
5  Q  Why is that?
6  A  Because the policy was rescinded.
7  Q  It would not fall in the category of pending claims?
8  A  No.
9  Q  What is the difference between a policy rescinded and
10   a pending claim, policy rescinded and a claim and a
11   pending claim?
12 A  Could you say that again, please?
13          MR. KELLEY:  Object to the form.
14 By Mr. Pedersen:
15 Q  Yeah.  Am I correct that you distinguished in
16   Mr. Hall's case between a claim that he's obviously
17   making for benefits under the policy; is that
18   correct?
19 A  Yes.
20 Q  But that's not in the category of a pending claim for
21   statistical reporting purposes?
22 A  No.
23 Q  And that's because the policy was rescinded?
24 A  Yes.
25 Q  And I'm asking if you can explain the difference

31

1    between, in Mr. Hall's case, a claim which has been
2    made on his policy and pending claims which are
3    reported for which reserves are sent?
4  A  Mr. Hall's claim was reviewed.  His coverage was
5    rescinded, and there was no claim paid and no reserve
6    set.  A pending claim would be a claim where we have
7    partial information but not enough information yet to
8    make a full claims decision.
9  Q  Would it be fair to say that reserves are set then
10   where there's an ongoing investigation into a claim?
11 A  Not within the product line.
12 Q  I guess what does that mean not within the product
13   line?  And if it's easier, we can deal specifically
14   with home mortgage protection.  If a claim is under
15   investigation such as Mr. Hall's was at the end of
16   1999 and the beginning of 2000, would that be, would
17   a reserve be set?
18 A  Yes, it would.
19 Q  And it would be set in the year 1999?
20 A  Yes.
21 Q  And so part of the policy reserves for 1999, they,
22   they were set at $39,000?
23 A  Yes.
24 Q  And how was that 39,000 determined?
25 A  Part of it is for pending claims and part of it is

32

**Page 33**

1    for incurred but not reported.

2 Q  How is the number derived, this 39,749 in the year

3    that Mr. Hall had a claim under investigation or a

4    pending claim?

5 A  Part of it is a percent of premium incurred but not

6    reported.

7 Q  The first category, this 2.9 million?

8 A  Yes.

9 Q  And is there another factor?

10 A  Pending claims and I don't know to what extent they

11    value a pending claim in setting the reserve.

12 Q  If we wanted to find out if Mr. Hall's claim was

13    included in the reserve, policy reserves, how would

14    we do that?

15 A  We would go back and review the makeup of that policy

16    reserve when it was set.

17 Q  With the factual predicate that Mr. Hall died at the

18    end of '99 and at the end of '99, in November of '99

19    made a claim for benefits under the policy which was

20    under investigation through the end of '99, wasn't

21    resolved until actually the first month or two in

22    2000, in 1999 how would we categorize Mr. Hall's

23    claim?

24 A  At the end of 1999 the claim would be categorized as

25    pending.  Claim reserves for the policy year 1999 are

**Page 34**

1    set in mid-April.  We run a three-month lag to let as

2    much of the information develop as possible.  So we

3    would set the claim reserve for 1999 in mid-April.

4 Q  In mid-April of 2000?

5 A  Of 2000.

6 Q  Okay.  Are you aware of reporting requirements for

7    pending claims at the end of each calendar year,

8    December 31st of each calendar year?

9 A  I'm not aware of that.

10 Q  Are you aware whether or not pending claims are part

11    of the annual report which CUNA Mutual files in every

12    state?

13 A  I am not aware of that.

14 Q  Are you aware of requirements with respect to the

15    annual report of accuracy in reporting?

16 A  I am not aware of that.

17 Q  Do you know whether they have to be accurate?

18 A  Yes.  They have to be accurate.

19 Q  Do you know why that is?

20 A  Because they're giving the value of a corporate

21    entity.

22 Q  Let me show you the 1999 annual report.  I've marked

23    a page which is Schedule F on that report.  I'll just

24    take that one page out.  And for the record, this is

25    a Schedule F for the annual statement for the year

**Page 35**

1    1999 of CUNA Mutual Insurance Society.  This is a

2    document that was produced as Page 77, a document

3    that was produced by CUNA Mutual Insurance Society in

4    discovery and in compliance with a court order.  Let

5    me show you --

6        MR. KELLEY:  Schedule what?

7        MR. PEDERSEN:  Schedule F.

8        MR. KELLEY:  Just let me note an

9    objection for the record that this witness I

10    believe has already testified that he is not

11    involved in preparing that entire document, that

12    entire annual statement, and in fact does not

13    have knowledge relative to the entire annual

14    statement.  And with that objection, go ahead.

15    You can review that and respond accordingly.

16 By Mr. Pedersen:

17 Q  Can you read at the top what Schedule F is?

18 A  Showing all claims for death losses and all other

19    policy claims resisted or comprised during the year

20    and all claims for death losses and all other policy

21    claims resisted December 31 of current year.

22 Q  And that would be December 31st of 1999; is that

23    right?

24 A  Yes.

25 Q  Can you look through the categories of claims?

**Page 36**

1    What's the first category?

2 A  I don't understand what you're asking.

3 Q  Is this the -- I'm sorry.  This is broken down into

4    different categories.  Does it say it's death claims

5    credit?

6 A  Yes.

7 Q  And there's another category for death claims group?

8 A  Yes.

9 Q  And another category for disability benefits claim

10    credit?

11 A  Yes.

12 Q  And another category for death claims credit; is that

13    right?

14 A  Yes.

15 Q  Do you know which of those categories the home

16    mortgage protection life falls under?

17 A  I do not.

18 Q  You would agree that the home mortgage protection

19    life product sold to Mr. Hall was a group product; is

20    that right?

21 A  Yes.

22 Q  And it's a credit product?

23 A  I do not know the definitions on this page that

24    distinguish between credit and group.

25 Q  Without distinguishing between any of the categories,

1     can you look and see whether the claims are, or the
2     claimants are identified by state?
3 A   Yes.
4 Q   And by year of the claim for death --
5 A   Yes.
6 Q   -- or disability?  And Category 5 the amount of the
7     claim?
8 A   Yes.
9 Q   And there's a Category 8 for the reason why it's
10    compromised or resisted, the claim; is that right?
11 A   Yes.
12 Q   I would like you to look through this entire sheet
13    and see if you see anything that resembles Mr. Hall's
14    claim.
15         MR. KELLEY:  Object to the form.
16 By Mr. Pedersen:
17 Q   With respect to the state or the amount or the year.
18 A   I do not.
19 Q   Was there any reporting for Pennsylvania?
20 A   Yes.
21 Q   And what was the amount of the claim for
22    Pennsylvania, the amount claimed?
23 A   There were two for Pennsylvania.
24 Q   Describe the first one.  What category does it fall
25    under?

37

1 A   Death claims credit.
2 Q   And that's listed as Pennsylvania?
3 A   Yes.
4 Q   And what's the year of the claim of death or
5    disability?
6 A   1995.
7 Q   And the amount?
8 A   $14,500.
9 Q   So that doesn't appear to be Mr. Hall's claim, does
10    it?
11         MR. KELLEY:  Objection.
12 By Mr. Pedersen:
13 Q   Does it appear to be Mr. Hall's claim?
14 A   No.
15 Q   What other claim is there in Pennsylvania?
16 A   There is a claim under the category death claims
17    group incurred in 1996.
18 Q   Does that appear to be Mr. Hall's claim?
19 A   That does not.
20 Q   And can we tell from this form why the claim was not
21    paid, at least the reason CUNA Mutual gave on its
22    reporting why the claim was not paid?
23 A   Yes.
24 Q   What was the reason stated?
25 A   Misrepresentation.

38

1 Q   So on this Schedule F for 1999 it doesn't appear
2    anything was reported for Mr. Hall, does it?
3         MR. KELLEY:  Object to the form.
4 A   No.
5 By Mr. Pedersen:
6 Q   Let me show you the 2000 annual report, the same
7    Schedule F.  Can you look through this schedule, same
8    Schedule F but for the year 2000?  Is there a claim
9    there that appears to be Mr. Hall's claim?
10        MR. KELLEY:  Note my continuing
11         objection on the basis that this witness doesn't
12         have the foundation to appropriately respond to
13         these questions.  Go ahead.
14 A   I do not.
15 By Mr. Pedersen:
16 Q   You don't see anything that looks like Mr. Hall's
17    claim for the year 2000?
18 A   No.
19 Q   Let me show you CUNA Mutual Insurance Society Annual
20    Report for the year 2001, the same Schedule F.  Is
21    there anything on that Schedule F that appears to be
22    reflective of Mr. Hall's claim?
23        MR. KELLEY:  Same objection as before.
24 A   I do not.
25 By Mr. Pedersen:

39

1 Q   You don't see anything that resembles Mr. Hall's
2    claim?
3         MR. KELLEY:  Object to the form.  Go
4         ahead.  You can answer.
5 A   No.
6 By Mr. Pedersen:
7 Q   As you sit here today, do you know why Mr. Hall's
8    claim was not reported in any of the annual reports?
9        MR. KELLEY:  Objection.  The witness
10        has been shown categories of information that,
11        that he has testified that he does not know
12        where or if the home mortgage protection product
13        falls under those categories.
14        And now counsel is asking him to
15        describe why Mr. Hall's claim is not reported.
16        So there's a -- the question itself assumes
17        information that this witness is not aware of so
18        it's an objectionable question.
19 By Mr. Pedersen:
20 Q   Let me rephrase it to try to help.  Are you aware
21    that the lawsuit for Mr. Hall's claim was filed in
22    the year 2001?
23 A   No.  I was not.
24 Q   Do you know what year it was filed?
25 A   No.

40

1 Q   Would you agree that it was filed sometime between
2     November '99 and the end of 2001?
3 A   Yes.
4 Q   And you would agree at least that with respect to the
5     Schedule F on each of the annual statements that
6     claim was not reported to any insurance agency,
7     wouldn't you?
8            MR. KELLEY:  Object to the form.
9 A   It did not appear on Schedule F.
10 By Mr. Pedersen:
11 Q  Of any of those annual reports for '99, 2000, and
12    2001?
13 A  Yes.
14 Q  Are you aware of any other reporting requirements to
15    insurance commissions in any states with respect to
16    litigation that's pending?
17 A  I am not.
18 Q  Are you aware of any penalties that insurance
19    commissions impose for failure to accurately report?
20 A  I am not.
21 Q  Why are reserves set?  And I'm referring to the third
22    category where reserves are set.
23 A  To allocate back to the correct year losses that are
24    incurred but not yet known about.
25 Q  Is there any effort on CUNA Mutual's part to keep

                                                      41

1 A   I am not aware if they were done in that time period.
2 Q   Over what period are you aware that they were done or
3     do you not know the time frame?
4 A   I do not know the time frame.
5 Q   What was the -- who conducted the adequacy of reserve
6     study that you're referring to or studies?
7 A   Our business finance team.
8 Q   What was the result of the study?  Did they --
9 A   I'm not sure.
10 Q  You don't know whether they concluded reserves were
11    too high, too low, or appropriate?
12 A  I am unsure.
13 Q  Would you agree that in the calendar year 1999 with
14    direct earned premiums at approximately 2.9 million
15    and reserves, policy reserves at 39,000 we could
16    calculate with some exactness the percentage of
17    reserves to premiums earned, couldn't we?
18 A  Yes.
19 Q  Does it appear to you that that number would be
20    something far less than 10 percent ?
21 A  Yes.
22 Q  Something about 1.5 percent ?
23 A  Yes.
24 Q  Is there any benefit to CUNA Mutual in having smaller
25    reserves?

                                                      43

1    claims paid within reserve limits?
2 A  I don't understand.
3 Q  If we were to take the claims paid and the policy
4    reserves and add them together, would you agree that
5    that would be CUNA Mutual's anticipated highest
6    potential payout for that year on claims?
7 A  That would be the anticipated payout.
8 Q  And do you know whether or not there's any effort on
9    CUNA Mutual's part to not pay out beyond the addition
10   of claims paid and reserves for any calendar year?
11 A  There is no effort like that.
12 Q  How would we find out whether CUNA Mutual in each of
13   these calendar years has in fact paid out more than
14   the addition of the claims paid and claim reserves?
15         MR. KELLEY:  Object to the form of the
16         question.  It assumes facts contrary to the
17         witness's testimony.
18 By Mr. Pedersen:
19 Q  Are you aware how that would, any method for
20   determining that?
21 A  A reserve adequacy study.
22 Q  Are you aware of any reserve adequacy studies that
23   have been done?
24 A  Yes.
25 Q  Over the '98 through 2001 time period?

                                                      42

1 A   I don't know the answer to that.
2 Q   Would you agree that from 1999 to the year 2000 the
3     CUNA Mutual policy reserves under this home mortgage
4     protection life more than doubled?
5 A   Yes.
6 Q   Yet the direct earned premiums increased by less than
7     10 percent ?
8 A   I didn't check if it was less than 10 percent .
9 Q   Could you look at the numbers there from '99 and
10    2000?
11         MR. KELLEY:  Object to the question.
12 A   Could you restate the question?
13 By Mr. Pedersen:
14 Q   The direct earned premium increase from '99 to 2000
15    went from approximately 2.9 to 3.1; is that right?
16 A   Yes.
17 Q   And would you agree that that's a number less than 10
18    percent ?
19 A   Yes.
20 Q   And in the same year the policy reserves more than
21    doubled?
22 A   Yes.
23 Q   Do you know why that is?
24 A   No.
25 Q   The fourth category, and I note you don't have a

                                                      44

1    check by that category, credit union reimbursement.
2    What is that?
3         MR. KELLEY: Wait.
4         THE WITNESS: That's the fifth.
5         MR. KELLEY: Fourth category is policy
6    reserves.
7 By Mr. Pedersen:
8 Q   I'm sorry. I'm reviewing the document upside down.
9    We had claim reserve and the fourth category was
10    policy reserve. And I note you don't have a check by
11    that one; is that correct?
12 A   That is correct.
13 Q   What is policy reserve?
14 A   It's an actuarial reserve set on products that are
15    long-term in nature with a level premium. A policy
16    reserve is required.
17 Q   Do you know how it's calculated?
18 A   Not exactly.
19 Q   Do you know who requires it?
20 A   I know it's required by standard actuarial practice
21    to hold the policy reserve on products that use a
22    level premium over a long period of time.
23 Q   And do you know whether or not that policy reserve is
24    derived mathematically from a function of the earned
25    premiums?

45

1 A   I do not.
2 Q   You're not aware how it's calculated?
3 A   No.
4 Q   Okay. Let me count these categories. The fifth
5    category, credit union reimbursement, what is that?
6 A   That's expense reimbursement paid to credit unions
7    for making the home mortgage protection life product
8    available.
9 Q   There's a parenthetical after the credit union
10    reimbursement. What does that say?
11 A   Mort total split by premium.
12 Q   Do you know what that means? And I note you're
13    pausing. I don't want you to guess. If you know
14    what it means, fine; if not, just let me know.
15 A   I don't.
16 Q   Would you agree that this figure, the credit union
17    reimbursement, appears to be the money paid back to
18    the credit unions on the home mortgage protection
19    life policies?
20 A   Yes.
21 Q   And in 1998 would you agree that in that calendar
22    year the number exceeded 10 percent?
23 A   Yes.
24         MR. KELLEY: 10 percent of what?
25 By Mr. Pedersen:

46

1 Q   10 percent of the direct earned premium?
2 A   Yes.
3 Q   And we could calculate with certainty what that
4    percentage is, but it appears to be a number between
5    10 and 20 percent?
6 A   Yes.
7 Q   Do you know why or can you explain why more than 10
8    percent was paid when I believe your prior testimony
9    was 10 percent was the amount contractually that
10    should be paid?
11 A   I don't believe that was my prior testimony.
12 Q   What was your understanding as to the contractual
13    amount that was paid back to credit unions for
14    selling this home mortgage product?
15 A   That it varied by credit union. Each credit union
16    has a percent associated with it.
17 Q   Do you know what the range of percentages is?
18 A   On this product line it ranges from as low as zero to
19    25 percent.
20 Q   How is it determined what percent a credit union
21    gets?
22 A   The group underwriter who is underwriting the credit
23    union determines the features of the agreement
24    between CUNA Mutual and the credit union and it's
25    determined in that process.

47

1 Q   Is it negotiated?
2 A   It could be a negotiated item.
3 Q   The categories labeled credit union reimbursements,
4    what's that a reimbursement for?
5 A   For their expenses associated with offering the
6    program.
7 Q   Their meaning the credit union's expenses?
8 A   Yes.
9 Q   And some credit unions get reimbursed zero for their
10    expenses and others up to 25 percent?
11 A   Yes.
12 Q   Are you aware of any studies, efforts, or accounting
13    that's done to determine the actual credit union
14    expenses?
15 A   No.
16 Q   Are you aware of any information sent by credit
17    unions to verify their expenses for offering a
18    particular product such as the home mortgage
19    protection life?
20 A   No.
21 Q   Is there anyone in accounting that you're aware of
22    who verifies credit union expenses?
23 A   No.
24 Q   So as you sit here today, you don't know if this is
25    actually a reimbursement of credit union expenses or

48

1    an amount that's negotiated to pay the credit union,
2    do you?
3 A   Can you state that again?
4 Q   Yeah.  You don't know as you sit here today whether
5    or not the figures that are listed under credit union
6    reimbursements are the amounts that are actually
7    reimbursed dollar-for-dollar credit union expenses or
8    whether or not they're an amount that's sent back to
9    the credit union on a negotiated basis?
10 A   No, I do not.
11 Q   The next category is experience refund.  What is
12    that?
13 A   It does not apply to the home mortgage protection
14    life product.
15 Q   What is it and then maybe you can explain why it
16    doesn't apply?
17 A   For our credit life program, we, within certain
18    credit unions if the experience is such that at the
19    end of an accounting period claims plus premium plus
20    CUNA Mutual's retention, the sum of those three is
21    less than the premium, the credit union will get some
22    or all of that difference.
23 Q   So in some product lines the credit union can benefit
24    if the claims are reduced; is that right?
25 A   What do you mean by reduced?

49

1 Q   Well, you told me there are three factors -- and I'm
2    not saying who would reduce the claim, but I'm
3    talking about just the mathematics of the numbers.
4    There are three factors that go into determining
5    whether or not there's an experience refund, and
6    that's refunding back to the credit union; is that
7    right?
8 A   It is refunding back to the credit union.
9 Q   And there are three factors to determine whether or
10    not the refund goes to the credit union, an amount of
11    money is paid to the credit union, claims, premiums,
12    and retention; is that right?
13 A   No.
14 Q   Oh, what was not right about that?
15 A   There's four factors and very simplistic here, but
16    premium less the claims less reimbursements less CUNA
17    Mutual's retention.  If there's a balance after that
18    math calculation, some or all of that could go back
19    to the credit union in the form of an experience
20    refund.
21 Q   And let me, if I may, try to clarify.  The way that
22    calculation takes place, we take the total premiums
23    for a given credit union, premiums received by CUNA
24    Mutual; is that right?
25 A   For the specific product.

50

1 Q   And for the specific year?
2 A   And year.
3 Q   And we subtract from that claims that are paid by
4    members of that credit union; is that right?
5 A   Not technically.
6 Q   How is that done technically?
7 A   It's claims incurred versus paid.
8 Q   What's the difference between incurred and paid in
9    this context?
10 A   In this context it factors in the change in reserve
11    as well as paid.
12 Q   And we discussed the reserve earlier.  There's an
13    amount actually paid, and there's an amount kept that
14    might be paid in the future based on statistical
15    data?
16 A   Yes.
17 Q   So it's the claims actually paid plus the reserves?
18 A   Plus the change in the reserve from the prior period.
19 Q   And those are calculated on a credit union specific
20    basis?
21 A   Yes.
22 Q   And then you would subtract reimbursements.  And that
23    means this reimbursement of expenses, this other
24    category we talked about, right, to credit unions?
25 A   It does.  You're pointing at HMP life.

51

1 Q   I'm sorry.  I'm pointing generally.
2 A   And I'm talking now about credit life and what an
3    experience refund is, and then we'll go back and talk
4    about it under HMP.
5 Q   That's fine.  I stand corrected.  I'm pointing
6    generally to the document.  And I understand under
7    HMP life there are simply line designations under
8    each year, and you've indicated that that's because
9    this does not apply in that category?
10 A   Yes.
11 Q   So back to where we were then.  From the premiums
12    we -- in addition to the claims paid and the
13    difference in the reserve or change in the reserves
14    for that year, we would subtract the reimbursements
15    to the credit unions as you --
16 A   (Witness nodded.)
17 Q   Is that right?
18 A   Yes.
19 Q   And we would subtract the retention?
20 A   Yes.
21 Q   What retention is that?
22 A   That would be the total that CUNA Mutual needs to
23    keep on that program.
24 Q   Is that calculated on a percentage basis or how is
25    that retention calculated?

52

1 A   There's a lot -- it, it ends up being a percent of
2     premium. How that percent is derived is a very
3     complicated process.
4 Q   But that retention is what makes it profitable for
5     CUNA Mutual to operate under that product; is that
6     right?
7 A   One component of the retention would be the profit
8     needed.
9 Q   And then where there's a surplus, something left
10    beyond that calculation, the credit union may get a
11    portion of that; is that right?
12 A  Yes.
13 Q  How is it calculated what portion the credit union
14    will get?
15 A  It depends on the experience refund program that
16    they've agreed to.
17 Q  A negotiated item?
18 A  Yes.
19 Q  So the, that formula that we just described is the
20    second way that we've discussed so far that credit
21    unions can be paid for participating and selling CUNA
22    Mutual products; is that right?
23 A  Yes.
24 Q  First being the retention, I'm sorry, first being the
25    reimbursement?

                                                    53

1 A   Yes.
2 Q   And second being the calculation of this equation and
3     a factor of what remains as the, as the sum of that
4     calculation; is that right? I know we're not adding
5     but the conclusion of that calculation.
6 A   Yes.
7 Q   Now, you indicated that was not applicable to home
8     mortgage protection life. Why is that?
9 A   It's never been made a part of that product line.
10 Q  It's not on the table for negotiation because it's
11    not part of the line; is that right?
12 A  Right.
13 Q  So with respect to the home mortgage protection life
14    product, then the credit unions are paid only through
15    the credit union reimbursement category; is that
16    right?
17 A  Yes.
18 Q  Is there any other way that they're paid?
19 A  No.
20 Q  Are you aware when, at the time the percentage is
21    negotiated, is claim history with the credit union
22    reviewed?
23 A  No.
24 Q  How is it that you're aware of that?
25 A  I understand the group rating, group underwriting

                                                    54

1     process.
2 Q   Can you describe the group -- were you finished? I'm
3     sorry.
4 A   Go ahead.
5 Q   Could you describe the group underwriting process
6     that would lead to the negotiation for the percentage
7     of credit union reimbursement?
8 A   For home mortgage protection --
9 Q   Yes.
10 A  -- life? It would typically look at how many
11    mortgages that credit union is currently writing, and
12    that would lead us to a standard reimbursement. To
13    the extent that there's negotiation after the fact,
14    it can get changed beyond that standard. But
15    typically it would be done at the onset of a program
16    and for home mortgage protection very rarely is it
17    changed.
18 Q  Would you agree with me in a general sense that the
19    fewer claims that are paid, the more profitable any
20    particular product line is?
21 A  No. I would not.
22 Q  Why?
23 A  Because I think you get to a point where the product
24    has no value if you're not paying claims and profit
25    would diminish.

                                                    55

1 Q   And you're referring to the goodwill factor in the
2     company if they simply paid no claims; is that right?
3 A   I wouldn't call it a goodwill.
4 Q   What accounting category would you put that in, the
5     diminishment of the value of CUNA Mutual as perceived
6     by the public?
7 A   I was not saying that the value of CUNA Mutual would
8     be diminished. I was saying that any product line
9     that produces no benefit is going to see a decline in
10    profitability over the long term.
11 Q  Let's only talk about one calendar year and the
12    profitability in a calendar year. How is the
13    profitability for CUNA Mutual calculated on the home
14    mortgage protection product?
15 A  Premiums less incurred claims. I'm going to define
16    incurred claims as paid claims plus the change in
17    reserve less the change in the policy reserve less
18    credit union reimbursement -- if there were
19    experience refunds, I would subtract them here. For
20    this line there are not -- less operating expenses.
21    That would be the profit for the line, and then you
22    would subtract from that corporate overhead type
23    expenses, corporate governance and role in how it
24    impacts taxes to get to a bottom line profitability.
25 Q  You would agree that CUNA Mutual can take losses in

                                                    56

1 one category or line of business and from a tax
2 perspective carry them over to some other line to
3 affect the company's overall profitability?
4 A Yes.
5 Q So to know whether, how any particular line affected
6 the overall company we would have to look at the
7 overall company's financial statement?
8 A Yes.
9 Q In the equation that you gave me it begins with
10 premiums and then from that premium, from those
11 premiums we subtract incurred claims; is that right?
12 A Yes.
13 Q And why are incurred claims subtracted from the
14 premiums in the profitability equation?
15 A Because those are expenses paid out on the policies
16 included in the premium.
17 Q And if Tommy Bob Hall's claim had been paid in 1999,
18 we would have subtracted the amount of payout on his
19 claim from the premiums in this equation; is that
20 right?
21 A Yes.
22 Q Or if it had been paid in 2000, the same thing, we
23 would have subtracted the payout of the claim from
24 the premiums?
25 A Yes.

57

1 Q And the resultant of that subtraction would affect
2 overall profit in a negative way; is that right?
3 A Yes.
4 Q Do you know whether or not in the home life product
5 the credit union reimbursements are at a higher rate
6 than credit union reimbursements in other products?
7 A I do not know that.
8 Q I'm making some effort to determine whether or not by
9 not giving any experience refunds in this product
10 line if there's any other incentive for credit unions
11 where if they sell other product lines they get both
12 a credit union reimbursement and a potential
13 experience refund. Are you aware of any other
14 incentives?
15 A No.
16 Q You're not aware of whether there's a differential in
17 the percentage of reimbursement?
18 A The percentage of reimbursement can vary with every
19 credit union.
20 Q What's the selling factor for a credit union when
21 comparing the option of selling a home mortgage
22 protection plan versus a term life policy?
23 A Probably the first comparison would be that the home
24 mortgage protection plan better meets the declining
25 amount of coverage needed on a mortgage where term

58

1 life typically does not.
2 Q Is the premium less because it's a declining coverage
3 than a comparable term life policy?
4 MR. KELLEY: Objection. You can
5 answer it if you know.
6 A There are term life policies that charge more than
7 home mortgage protection, and there are term life
8 policies that charge less.
9 By Mr. Pedersen:
10 Q Within CUNA Mutual?
11 A I don't know that.
12 Q So as we sit here today, you don't know if Mr. Hall's
13 premium would have been higher or lower if he had
14 purchased a 15-year term life or the home mortgage
15 protection plan?
16 A No, I do not.
17 Q Do you know the premium range for the term life
18 products that CUNA Mutual sells?
19 A No.
20 Q The next category which you have checked is the -- is
21 that operation expenses exclusive of reimbursements
22 and government? Is that what that says?
23 A No.
24 Q Help me, please. What does that say?
25 A It's short for operating expenses excluding credit

59

1 union reimbursements and governance.
2 Q What does that mean?
3 A It's the expenses assigned to that HMP life product
4 not including corporate governance and not including
5 credit union reimbursement.
6 Q What types of expenses are included in that category?
7 A Expenses associated with developing the product,
8 marketing the product, developing materials for the
9 product, doing any training needed for the product,
10 administrative expenses associated with the product.
11 Q Is that it?
12 A It's the ones that come to mind.
13 MR. KELLEY: Steve, we've been at this
14 for quite some time. Why don't we take five.
15 MR. PEDERSEN: Okay.
16 (Brief Recess Taken)
17 By Mr. Pedersen:
18 Q We've returned from the break, and I believe we were
19 discussing the operation expenses listed under the
20 home mortgage protection life policy areas and I had
21 asked for the categories that make up the operating
22 expenses. I believe you had given me the five that
23 came to mind. Is there any document that breaks down
24 the figure of operating expenses to its component
25 parts?

60

1 A    I'm not aware of a document that does that.
2 Q    In the documents that have been produced and are
3      marked as Exhibit 3, are there any supporting
4      materials for the expense, operating expenses in
5      there?  I'll strike that question.  I'll go through
6      that and just have you identify what those pages are
7      at the end of the deposition.
8 A    All right.
9 Q    In the category of development of the product, what's
10     included?  What type of work is included in that
11     expense component?
12 A    Continuing changing of the product to meet regulatory
13     requirements as an example.
14 Q    I understand that corporate governance is excluded
15     from this category; is that right, from the entire
16     category of operating expenses under this product?
17 A    Yes.
18 Q    What is corporate governance?
19 A    Overhead-type expenses.
20 Q    Would that be the salaries of individuals at CUNA
21     Mutual?
22 A    It would.
23              MR. KELLEY:  Object to the form, go
24         ahead.
25 A    It would include the salaries of some individuals.

61

1 By Mr. Pedersen:
2 Q    What types of individuals would be excluded, or
3      another way, which would be included within the
4      development of the product?
5 A    Expenses which are directly controllable within the
6      product line are the expenses included in the
7      calculation.
8 Q    Let me ask and try to get some example of this.  In
9      the development of the product if you hired an
10     outside firm to design or come up with brochures,
11     would that fall within the development of the product
12     where the expense for that outside consulting firm
13     would be one of those expenses?
14 A    Yes.
15 Q    If you had a staff person at the headquarters office
16     look over that brochure or review it, would that be
17     included within governance or expenses for the
18     product?
19 A    Expenses for the product.
20 Q    Do individuals keep track of their time worked on
21     different product lines to determine how to divide
22     their, their, how to associate their salaries with
23     different expenses?
24 A    They do not keep track of their time.
25 Q    How is a determination made as to the employed

62

1      individuals at CUNA Mutual on how to allocate those
2      expenses for those individuals to product lines?
3 A    During the time period we have in front of us, '98 to
4      2000, expenses to the product line are just allocated
5      back where an individual might say I spend 10 percent
6      of my time supporting home mortgage protection and so
7      10 percent of their salaries would allocate back to
8      the product line.
9 Q    Who makes the determination as to the percentage of
10     salary that's allocated to the product line?
11 A    It would be a joint discussion between the person
12     allocating it and possibly their manager.
13 Q    Is it typical or atypical to have an employee working
14     on different product lines?
15 A    It would be typical.
16 Q    Are there any standards with respect to the total
17     percent of an employee's time that is allocated to
18     product lines?
19 A    A hundred percent of the time should be allocated to
20     product lines.
21 Q    So employees working on product lines, they would not
22     fall within the corporate governance, that is
23     excluded, their time would be allocated to various
24     product lines?
25 A    Yes.

63

1 Q    At what level does an individual fall within the
2      corporate governance to have their time excluded from
3      product line expenses?
4 A    It wouldn't be at a certain level where you become
5      overhead.  It's more the role that that person is
6      playing and whether their role is attributed back to
7      a product line or not.
8 Q    Is there a reporting, a monthly or annual reporting
9      where individuals know the designation of their
10     percentage of work on different product lines?
11 A    I'm going to try to explain something here that will
12     make the answer make sense.
13 Q    Okay.
14 A    We changed between 2000 and 2001 how expenses get
15     allocated back to the product line.  In the past
16     individuals who were allocating to a product line
17     would get a quarterly report that showed how much
18     time is allocated to that product line.  And so the
19     answer to your question would be yes.  In the past we
20     would have seen that, and it's those allocations that
21     drove the operating expense numbers within this
22     report for '98 and '99, part of 2000 and possibly all
23     of 2000.
24 Q    And what changed in 2001?
25 A    Certain areas of the organization moved to a concept

64

1  called unit costing. Using your example, if an
2  outside organization put together a marketing
3  material and an inside person reviewed it, under unit
4  costing that inside person and the expenses
5  associated with them are allocated back on -- every
6  time you give me something to review, there's an
7  allocation back. So it's a use for services expense
8  type allocation versus in the past that person or
9  that role might have allocated, I spend about 2
10 percent of my time reviewing home mortgage protection
11 materials.
12 Q   What was the reason for the change? Did it relate to
13     efficiency or what was the reason for the change, or
14     accounting?
15 A   It's anticipated that product line managers will be
16     able to better manage the expenses within their
17     product line in this approach.
18 Q   It was a reorganization and a reorganization of the
19     accounting methodology in product lines for,
20     specifically for those areas of expenses?
21         MR. KELLEY: Object to the form of the
22     question.
23         MR. PEDERSEN: Maybe I misstated it.
24     I don't mean to. How would you categorize the
25     effort that was made in 2000?

65

1  Q   Is corporate governance assigned or assessed to
2      specific product lines or a portion to specific
3      product lines?
4  A   Yes.
5  Q   How is that done with respect to the home mortgage
6      protection life?
7  A   I'm not sure of the specific way that it's done.
8      There's just an allocation of overhead expenses.
9  Q   Would you agree with me that in the year 2000 the
10     operating expenses that excluded corporate governance
11     and excluded credit union reimbursement was greater
12     than all of the claims paid in the same year?
13         MR. KELLEY: I'm sorry. What year?
14         MR. PEDERSEN: 2000.
15 A   Yes. I would agree with that statement.
16 By Mr. Pedersen:
17 Q   And that in 1998 the claims paid exceeded by
18     approximately 23,000 the operating expenses?
19 A   Yes.
20 Q   And in 1999 about 40,000, the paid outs exceeded the
21     operating expenses?
22 A   Yes.
23 Q   And in 2001 the claims paid were $270,000 more than
24     the operating expenses?
25 A   Yes.

67

1          MR. KELLEY: Well, I think he's
2      explained that already. I'll object to him
3      restating.
4  By Mr. Pedersen:
5  Q   And I'm asking the purpose behind it. I understand
6      the reorganizational structure.
7  A   The purpose was for us to better understand and be
8      able to influence the costs associated with the
9      product line.
10 Q   Is there ever a analysis done with respect to the
11     operating expenses in that category as it relates to
12     claims paid?
13 A   The expense to process claims is one component of the
14     administrative expenses, yes.
15 Q   What are the other administrative components
16     attributable to a specific product line other than
17     operating expenses? And I understand the categories
18     that we've already described of credit union
19     reimbursements.
20 A   You confused me.
21 Q   Are there other components that are not listed here
22     on the home mortgage protection life product with
23     respect to determining profitability on that line?
24 A   Corporate governance and the tax implications are the
25     two that are not shown on here.

66

1          MR. KELLEY: For the record, I need to
2      take issue with some of your math there. I'm no
3      mathematician, but it doesn't seem like those
4      numbers are adding up to me.
5  By Mr. Pedersen:
6  Q   Do they seem to add up to you, approximating?
7  A   Oh, the last one did not. We moved a decimal.
8      270,000? From 760 to 1.03. Oh, I see. That's, it's
9      less; isn't it?
10 A   It is less.
11 Q   It's 240,000?
12 A   It's 240,000.
13 Q   I apologize. I'm reading upside down these numbers,
14     but --
15         MR. KELLEY: I thought you misstated
16     the first one for '98 as well.
17         MR. PEDERSEN: 233,000.
18         MR. KELLEY: I thought you said
19     something like $26,000.
20         MR. PEDERSEN: I may have.
21 By Mr. Pedersen:
22 Q   The numbers speak for themselves, right? We can take
23     the number of the claims paid and determine a ratio
24     between the claims paid and the operating expenses,
25     excluding credit union reimbursements and governance,

68

**Page 69**

1    can't we?
2 A  Yes.
3 Q  The next category, policies in force. And is that at
4    the end of that specific calendar year?
5 A  Yes.
6 Q  What does that number represent?
7 A  That would be the number of credit unions who have an
8    active, who have a policy with us on home mortgage
9    protection life.
10 Q  If a credit union has multiple branches or offices,
11    how is that number reflected in, in these policies in
12    force?
13 A  They would have one policy.
14 Q  So they might have 20 or 30 offices but one policy
15    and that would be given a one designation when
16    summing the number of credit union policies in force?
17 A  Yes.
18 Q  Is there a number that reflects the number of
19    beneficiaries -- let me restate that -- the number of
20    credit union members insured under the product?
21 A  Certificates in force.
22 Q  Each individual member would have his own
23    certificate?
24 A  Under home mortgage protection there is joint
25    insurance. There's insurance for a coborrower and

**Page 70**

1    yet they would count as one. They might have
2    insurance on two people.
3 Q  And we've sort of skipped down to the second
4    category, certificates in force. Is your testimony
5    that the certificates in force represent the number
6    of either individual or husband and wife credit union
7    members who had a certificate in force through CUNA
8    Mutual?
9 A  It would not be required that they be husband and
10    wife.
11 Q  Or joint, a joint --
12 A  Joint --
13 Q  -- a joint application?
14 A  -- a joint application.
15 Q  So in 1999 there were a total of 9,472 either --
16    MR. KELLEY: Wrong year.
17 By Mr. Pedersen:
18 Q  I'm sorry, 1998, a total of 9,472, either individuals
19    or individuals plus another entity, I'm assuming its
20    one, but it would be multiple applicants?
21 A  It would be limited to one additional individual, not
22    entity.
23 Q  Nationwide?
24 A  Nationwide.
25 Q  How does that compare -- well, I'm skipping ahead.

**Page 71**

1    But how does the home mortgage protection life
2    product compare in terms of policies issued, the
3    number of policies or the number of certificates
4    issued with the life insurance products, just in your
5    own words, with CUNA Mutual's life insurance
6    products?
7    MR. KELLEY: Object to the form of the
8    question. Compound, lack of foundation. You
9    can answer if you know.
10 A  The use of home mortgage protection is much less
11    prevalent within the credit union than under credit
12    life.
13 By Mr. Pedersen:
14 Q  Do you know why that is?
15 A  The product isn't offered as often to members to
16    purchase and in some cases other products or a
17    person's overall financial package meets the need of
18    covering their new or existing mortgage; whereas,
19    under credit life they want a very short-term
20    specific product to meet a short-term loan, two-,
21    three-, four-year signature loan, auto loan.
22 Q  Are auto loans sold under the home mortgage
23    protection life category?
24 A  No, they are not.
25 Q  The next category, number of claims paid, what does

**Page 72**

1    that category represent?
2 A  Those are the number of individuals with whom we made
3    a life claim payment for home mortgage protection.
4 Q  Could we take the number of claims paid and divide it
5    by the number of claims to determine the average
6    payout of each claim?
7 A  Yes.
8 Q  The category number of claims denied, what is that
9    category?
10 A  Those are claims which were not paid where we got
11    information in on the claim and we did not make a
12    payment.
13 Q  What's the difference between a claim being denied
14    under this category and certificates rescinded under
15    the next category?
16 A  There are exclusions in the policy where a claim
17    could be denied even though there was coverage. When
18    coverage is rescinded, which is a certificate is
19    rescinded, that would include claims denied but there
20    are other reasons that claims could be denied.
21 Q  You're not saying that the claims denied is a
22    subcategory of certificates rescinded, are you?
23 A  No, I'm not. I'm saying that certificates rescinded
24    would be a subcategory of claims denied.
25 Q  I just need to be clear. I'm sorry. So the

1    certificate, when a certificate is rescinded, that is
2    a subset of those claims that are denied?
3 A  Yes.
4 Q  So in, for example, the year 2000 where we have three
5    claims denied, two of those three claims would be
6    certificates that were rescinded?
7 A  Yes.
8 Q  And in 2001 one claim was denied and that same claim,
9    the certificate was rescinded?
10 A  Yes.
11 Q  Under what circumstance, for example in the year
12    2000, would you have a claim denied on a death case
13    but the certificate not be rescinded?
14       MR. KELLEY:  Are you just asking him
15    generally speaking?
16       MR. PEDERSEN:  Yes.
17       MR. KELLEY:  What circumstances?
18       MR. PEDERSEN:  Right.
19 A  Generally speaking, if one of the exclusions on the
20    product was the cause of death, then the claim could
21    be denied because of that exclusion.
22 By Mr. Pedersen:
23 Q  On the home mortgage protection product, is there
24    underwriting that includes exclusions or is it an all
25    or nothing product?

73

1 A  We do not exclude specific medical conditions in the
2    product.  So it's, it is an all -- we only underwrite
3    all risks except for the exclusions in the policy
4    which are not related to medical.
5 Q  What are those exclusions that you're aware of?  I
6    mean, acts of war?  I'm guessing.  You tell me.
7 A  And it's in our materials that we had provided.  The
8    two exclusions would be suicide and air travel on
9    other than commercial flights.
10 Q  Are you aware of whether or not it's suicide within
11    two years of the policy?
12 A  It would vary based on the laws in the state.
13 Q  Except for those two exclusions, suicide and air
14    travel on a noncommercial flight, are there any other
15    exclusions that you're aware of under the home
16    mortgage protection life?
17 A  Those are the two main ones.  There might be other
18    exclusions in other states or other language
19    explaining those but generally those would be the
20    exclusions.
21 Q  So generally except for those two exclusions under
22    the home mortgage protection plan when a claim is
23    denied, the policy is also rescinded?
24 A  I would have said those the other way around that the
25    policy is rescinded; therefore, the claim is denied.

74

1 Q  And that's in every general case that you can think
2    of except with those two exclusions?
3 A  A policy could be rescinded on home mortgage
4    protection life if in fact we found out that the
5    member was not eligible for coverage based on age and
6    we found that out after coverage had already been
7    issued and a member given a certificate of insurance.
8    So while the numbers don't support that here, that's
9    another category where you could have a rescission
10    but it -- it's very rare for that to happen on home
11    mortgage protection life.
12 Q  What is the age restriction for issuing the home
13    mortgage protection?
14 A  It depends on the state but generally they have to be
15    under age 70.
16 Q  Are you aware of whether or not Mr. Hall is included
17    in the statistical reporting data for the year 2000
18    with respect to certificates rescinded and claims
19    denied?
20 A  Yes, he is.
21 Q  He's one of the two under the certificates rescinded
22    and one of the three under claims denied?
23 A  Yes.
24 Q  How did you determine that?
25       MR. KELLEY:  Determine what?

75

1 By Mr. Pedersen:
2 Q  That Mr. Hall was included in the statistical data
3    reporting in 2000 for claims denied and certificates
4    rescinded?
5 A  We evaluated each of the three individuals and each
6    of the two rescissions.  And I know the situation
7    behind all three of those, which one of them is
8    Mr. Hall.
9 Q  Do you know whether or not in the claims denial and
10    the rescissions both of those are areas of required
11    reporting in the annual statement?
12 A  I am not aware of that.
13 Q  Are you aware whether or not in fact claim or policy
14    rescissions have in fact been reported in the
15    Schedule F's from your review previously?
16 A  Yes.
17 Q  They have been included; is that right?
18 A  I was aware that rescissions are included in Schedule
19    F.
20 Q  Yes.  In the annual statement?
21 A  In the annual statement.
22 Q  And Mr. Hall's was not?
23 A  I don't fully understand the annual statement.  It,
24    it isn't something that I have studied.  To the
25    extent that we looked through one schedule of the

76

1  annual statement, I did not see anything that would
2  indicate Mr. Hall was on that schedule.
3  Q  Have we covered all the categories of the summary for
4  home mortgage protection life?
5  A  Yes, we have.
6  Q  On Exhibit 2, what is Exhibit 2?
7  A  Exhibit 2 was the information, the claim counts
8  pulled together which fed into the summary report on
9  Exhibit 1.
10 Q  Which part of Exhibit 2 -- let me rephrase that.
11 Where is Exhibit 2 reflected on the summary figures
12 under the home mortgage protection life?
13 A  For HMP and by year you have the number of claims
14 paid, which is on Figure 1 as number of claims paid
15 and number of claims denied, which is also on Exhibit
16 1 as number of claims denied.
17 Q  In the year 2000, how many claims were paid under the
18 home mortgage protection, according to Exhibit 2?
19 A  40.
20 Q  And for that same year in Exhibit 1, the summary of
21 this sheet, how many claims were indicated were paid?
22 A  35.
23 Q  Do you have any explanation for the discrepancy
24 between the supporting document and the summary
25 document?

77

1  A  This was an initial look I believe.
2       MR. KELLEY:  You're referring to
3       Exhibit 2?
4  A  Exhibit 2 was an initial look at how many claims were
5  paid.  As we were preparing for today, we went back
6  and reviewed claims and determined that in fact 40
7  was not the correct number but rather 35 was the
8  correct number.
9  By Mr. Pedersen:
10 Q  So Exhibit 1 to your deposition with respect to that
11 category of paid claims you believe is more accurate
12 after a hand count; is that right?
13 A  Yes, I do.
14 Q  Are there any other discrepancies that you noticed
15 between Exhibit 2 and Exhibit 1?
16       MR. KELLEY:  Do you want him to take
17       the time to go through all of those?
18       MR. PEDERSEN:  Sure.
19       MR. KELLEY:  Yeah.  Why don't we do
20       that.
21       MR. PEDERSEN:  And if you do notice
22       discrepancies, I'll ask that you circle them on
23       Exhibit 2.
24       MR. KELLEY:  Do you want him to do
25       that first for the home mortgage protection and

78

1  then credit life later?
2       MR. PEDERSEN:  Let's do the whole
3  sheet now while he has it in front of him.  I
4  think it will go more quickly.
5       MR. KELLEY:  All right.  Okay.
6  By Mr. Pedersen:
7  Q  You have circled four entries on Exhibit 2; is that
8  correct?
9  A  Yes.
10 Q  Can you explain one at a time each of the circles and
11 the discrepancy?
12 A  I do not know the explanation why the number of paid
13 claims for credit life are different between Exhibit
14 2 and Exhibit 1, and those would be the three numbers
15 circled for 1999, 2000, and 2001.
16 Q  For 1999 is the amount on the summary higher or lower
17 than the circled amount on Exhibit 2?
18 A  The amount on the summary is lower than Exhibit 2.
19 Q  And for the year 2000?
20 A  The amount is lower.
21 Q  And for 2001?
22 A  The amount is lower.
23 Q  Do you, as you sit here today, know whether Exhibit 2
24 or Exhibit 1 is more accurate with respect to those
25 three entries that you've just described?

79

1  A  I do not know which of those two for credit life
2  would be the most accurate figure.
3  Q  With the home mortgage protection, 40 and 35 that
4  you've already described, the last discrepancy that
5  you've circled, you are aware, however, or you
6  believe that Exhibit 1 is more accurate --
7  A  Yes, I do.
8  Q  -- with the 35?
9  A  Yes.
10 Q  What I would like you to do now is look through
11 Exhibit 3 and identify those parts of Exhibit 3 that
12 are supporting documents for the home mortgage
13 protection life area by putting an X in the left
14 corner of any pages that relate to home mortgage
15 protection life.
16 A  In preparing this morning I saw Exhibit 3 for the
17 first time.  Some of these pages I'm familiar with;
18 others I am not.  And I could not tell you if they
19 support the summary information for HMP life or
20 credit life.  The ones that are titled such that they
21 do, I can put an X in the corner of those.
22 Q  Well, instead of doing that, I'm trying to move this
23 as quickly as we can.  Let me number the pages so we
24 can refer to page numbers and just identify what each
25 page represents.  Or if you don't know, you just tell

80

1   me you don't know what that page is.
2 A   Okay.
3 Q   Let me take a break and identify this by page number.
4         (Off the record discussion)
5 Q   I would like the record to reflect that we've
6   numbered Exhibit 3 with page numbers in the bottom
7   left corner, numbers 1 through 40. And I'm just
8   going to ask Mr. Fischer first of all to go page by
9   page and tell me if he can identify it, if he's
10   familiar with it, and what it is.
11         MR. KELLEY: Do you want to take five
12     and have him do that rather than sitting here on
13     the record?
14         MR. PEDERSEN: I would like to do it
15     on the record.
16 A   I am familiar with Page 1.
17 By Mr. Pedersen:
18 Q   What is Page 1?
19 A   It's net written premiums for home mortgage
20   insurance.
21 Q   And that relates to the home mortgage protection area
22   that you've described?
23 A   Yes.
24 Q   Okay. We'll just move through them like that. If
25   you can look at Page 2 and just tell me the page

                                                    81

1   number, what it is, and what it relates to if you
2   know.
3 A   This is net written premium for home mortgage
4   protection insurance.
5         MR. KELLEY: Rich, if you would, for
6     each page as you go through identify the page
7     and say, yes, I know the information and
8     describe what it is so we're clear on the
9     record.
10         MR. PEDERSEN: That's right. That's
11     all I need. Just go ahead. Page 3.
12 A   I am not familiar with Page 3. Is that enough?
13 By Mr. Pedersen:
14 Q   Yeah. If you don't know what that page is or how it
15   relates to the summary sheet, just tell us and go to
16   the next page.
17 A   Okay. Page 4 is trial balance paid claims for home
18   mortgage protection.
19         MR. KELLEY: You are familiar with
20     that?
21         THE WITNESS: I am familiar with it.
22 By Mr. Pedersen:
23 Q   What does trial balance mean?
24 A   It's used in verifying accounting that the dollars of
25   claims reported, the dollars of claims actually paid

                                                    82

1   are consistent. It's a balancing item. Page 5 I am
2   familiar with and it relates to home mortgage
3   protection insurance, trial balance paid claims.
4         Page 6 I have not seen before but I
5   understand the concept and it relates to home
6   mortgage protection life. And Page 7, again, I
7   haven't seen this, but it relates to home mortgage
8   protection life policy and deficiency reserves and
9   life claim reserves.
10         Page 8, again, I haven't seen this report,
11   but it relates to home mortgage protection policy and
12   deficiency reserves as well as claim reserves. Page
13   9, again, is one I haven't seen but it relates to
14   home mortgage protection policy and deficiency
15   reserves and claim reserves.
16         Page 10 I have not seen as well as Page 11.
17   I have not seen Page 12 and I have not seen Page 13.
18   Page 14 I have not seen but it relates to home
19   mortgage protection policy and certificates in force.
20   Page 15 is the same information.
21         MR. KELLEY: Well, are you sure about
22     that, Rich?
23         THE WITNESS: The same type of
24     information.
25         MR. KELLEY: I'm just looking at the

                                                    83

1   top, and I'm seeing different categories of
2   information there.
3         THE WITNESS: Thank you. I have not
4     seen this report.
5         MR. KELLEY: 15?
6 A   On Page 15 it does appear to relate to home mortgage
7   protection. Page 16, again, I have not seen this
8   page but it relates to home mortgage protection.
9   Pages 14, 15, 16, 17, 18, 19 all have home
10   mortgage/Transitions in the upper left-hand corner.
11   Transitions is a separate product. It appears to me
12   that the information combines these two products
13   together on these pages.
14 By Mr. Pedersen:
15 Q   And I want to clarify, it combines the home mortgage
16   protection plan that we've been speaking of and
17   another product?
18 A   And another product.
19 Q   What is the other product, Transitions?
20 A   It was a product that we tried several years ago as a
21   lower cost alternative to home mortgage protection.
22   We, we determined that the product didn't meet the
23   needs of credit unions or members and eliminated the
24   product.
25         However, for the individuals who had

                                                    84

1  purchased it, we agreed to grandfather them and
2  continue to administer the product for them. And it,
3  it looks like that is grouped here with home mortgage
4  insurance.
5  Q  Do you know what year it was discontinued?
6  A  I don't know the exact year, '99 or 2000.
7  Q  When you say they were grandfathered in, were they
8  grandfathered in to the home mortgage protection plan
9  or system within CUNA Mutual?
10  A  No. I didn't mean to intend that. I meant we
11  allowed them to keep the coverage which they
12  purchased, and we're just not offering it to any new
13  credit unions or to any new members.
14  Q  Did you consider not allowing them to keep the
15  policies?
16  A  We did consider that. I believe we were on Page 16?
17  Q  I think you said those were all part of the same
18  through 19.
19  A  All right.
20      MR. KELLEY: I think you actually
21      stopped on 20 then.
22  A  Page 20 I am not familiar with. Again, this page has
23  the Transitions product included on it as well. It
24  relates to home mortgage protection. Page 21 I am
25  familiar with. It is earned premiums for credit life

85

1  insurance. Page 22 I am familiar with. It is
2  dollars of paid claims for credit life insurance.
3      Page 23 I am familiar with, and it is
4  unearned premium reserve as well as incurred but not
5  reported claims reserves for credit life insurance.
6  Page 24 I'm familiar with and it is the unearned
7  premium reserve as well as incurred but not reported
8  claims reserves for credit life.
9      Pages 25 through 28, again, I'm not
10  familiar with. Page 29 I am familiar with, and it is
11  both the accrual and incurral of experience refunds
12  for credit life insurance. And Page 30 I am familiar
13  with, is the accrual and incurred experience refunds
14  for credit life insurance.
15      Pages 31 through 36 are pages that I'm not
16  familiar with but by title they relate to credit life
17  insurance. Page 37 I am not familiar with but they
18  relate to credit life insurance. Page 38 I am not
19  familiar with but they relate to credit life
20  insurance.
21      Page 39 I am not familiar with but they
22  relate to credit insurance, credit life insurance.
23  And Page 40 I am not familiar with but they relate
24  to -- the home mortgage protection is included on
25  here as well as two other products, the Transitions

86

1  product and a life savings product as it relates to
2  home mortgage protection.
3  Q  Do all of the pages of Exhibit 3, Page 1 through 40,
4  appear to be statistical data internal to CUNA Mutual
5  Insurance Society?
6      MR. KELLEY: We'll so stipulate.
7  By Mr. Pedersen:
8  Q  Okay. And do the documents generally appear to be
9  the documents, the type of documents you would expect
10  to see supportive of the summary which has been
11  prepared and which is Exhibit 1?
12  A  Yes, they are.
13  Q  Going back to Exhibit 1, the MECL, what does that
14  stand for?
15  A  Member elect credit life.
16  Q  What type of product is that?
17  A  It's credit life insurance, decreasing term insurance
18  to provide life insurance coverages on consumer debt
19  typically.
20  Q  How is it different than the home mortgage
21  protection?
22  A  There are a lot of differences.
23      MR. KELLEY: Before he explains that,
24      could we take a quick break?
25      (Brief Recess Taken)

87

1  By Mr. Pedersen:
2  Q  I think we were explaining the differences between
3  the credit life and the home mortgage protection and
4  you said there are many. Can you just generalize the
5  concept of the difference?
6  A  I will generalize and I'll probably miss a few of the
7  intricacies. But the limits are typically lower
8  corresponding with auto loans or credit card loans
9  having lower limits, lower amount of need for members
10  than would a mortgage loan. So the limits are much
11  lower. The rating is significantly different.
12      Under home mortgage protection life where I
13  had given you a range of rates before that really
14  varied across a wide range by age group and by smoker
15  versus nonsmoker, under credit life almost
16  universally for every policyholder there's one rate
17  that applies for every member regardless of age,
18  regardless of whether they do or don't use tobacco in
19  comparing it to home mortgage protection. So there's
20  one rate.
21  Q  Could I interject? How does the underwriting
22  compare? Maybe you're getting to that.
23  A  Yep. You asked about underwriting. With credit life
24  there -- for CUNA Mutual Group, it's rare for us to
25  do any form of underwriting up front on the member.

88

1   To be eligible they have to be under age, under an
2   eligibility age, typically 70 again for credit life.
3   And if they're under that age and they have a loan
4   through a credit union who has a policy through us,
5   they can elect credit insurance.
6 Q   Do they have to provide any medical information at
7   all?
8 A   No.  They do not.  As long as they enroll within a
9   certain time period of taking the loan, we do not
10   require any medical information.  If they were to
11   come in four, five, six months after taking the loan
12   and say I would like to add credit life to my loan,
13   at that point we would require underwriting, very
14   similar underwriting to home mortgage protection.
15   But generally that's not the case.
16          The coverage declines with the loan as the
17   loan declines, but it's different than home mortgage
18   protection in that home mortgage protection there was
19   a schedule of coverage which declined each month and
20   said the monthly benefit in this month is X dollars
21   for credit life.  The monthly benefit is whatever the
22   outstanding loan balance is at the time of death.
23          Credit life has similar exclusions to home
24   mortgage protection except that it also has a
25   preexisting conditions exclusion limit which

89

1   basically would say if you were treated six months
2   prior to coverage for a condition, that condition is
3   not insured in the six months following enrolling for
4   the coverage.
5 Q   The home mortgage protection plan does not have that
6   kind of preexisting condition limit, does it?
7 A   It does not, no.
8 Q   I didn't want to interrupt you, so I didn't know if
9   you were done.
10 A   Both products are regulated differently and there are
11   regulations built around credit life under which you
12   operate, and then there's, there's some regulations
13   that overlap and then there's a different set of
14   regulations that the home mortgage protection product
15   is built under.  That probably gives a pretty good
16   depiction of the differences.
17 Q   The categories listed on the summary sheet are the
18   categories, the same as the categories that were
19   listed under the home mortgage protection life for
20   statistical purposes?
21 A   They are the same types of information, yes.
22 Q   You've described in some detail those categories
23   under the home mortgage protection life.  Can you
24   look through the category listings under the credit
25   life and just tell me if there are any differences

90

1   definitionally in the category?
2          MR. KELLEY:  Object to the form, go
3   ahead.
4          MR. PEDERSEN:  And if you want me to
5   try to clarify.
6          MR. KELLEY:  Well, the basis of my
7   objection is those types of questions are
8   sometimes difficult to answer because it
9   requires the witness to remember everything that
10   he's said in a previous, in previous questions.
11   But I understand what you're trying to get at.
12   And if he understands it, he can go ahead and do
13   that.
14          MR. PEDERSEN:  I don't mean to be
15   tricky.
16          MR. KELLEY:  I'm not suggesting that
17   at all.
18          MR. PEDERSEN:  I'm just trying to
19   determine if I need to follow up with any
20   differences, or are we just going to repeat the
21   same type of testimony that we've already had.
22 By Mr. Pedersen:
23 Q   Like what is the definition of direct earned premium?
24   Is it the same under each category?
25 A   It would be the same for direct earned premium and

91

1   for the other categories which we talked about, at
2   least in the top part.  Once you get farther down in
3   the list and specifically for certificates rescinded,
4   there, there are some differences.  I referenced them
5   when we were talking about home mortgage protection,
6   but here is where they play in a lot more.
7 Q   Okay.  If we could we'll focus on only the
8   differences.  When you say there are two categories,
9   there's a listing of a number of categories and then
10   a space and then a listing of five additional
11   categories; is that right?
12 A   Yes.
13 Q   And you're referring to under the credit life, the
14   top groupings above the space would be the, generally
15   the same definitional categories as above the space
16   in the home mortgage protection; is that right?
17 A   They are with one change.  On the direct earned
18   premium for credit life there is a premium mode
19   called single premium where you pay at the onset of
20   coverage for the full duration of coverage.  So it
21   could span out over as many as ten years, but
22   typically in the three to five-year range.  And that
23   impacts the unearned premium reserve much more so
24   than what we saw in home mortgage protection life.
25   It's the only change I would have made in talking

92

**Page 93**

1  about what direct earned premiums were for credit
2  life.
3  Q  And any others generally?
4  A  No.
5  Q  Then let's focus on the areas after the space
6  starting with policies in force under the credit life
7  category.  The policies in force at the end of the
8  year, how is that different than the policies in
9  force, if it is, under home mortgage protection?
10 A  It is not different.
11 Q  The certificates in force --
12         MR. KELLEY:  The definition of it is
13  not different, right?
14 By Mr. Pedersen:
15 Q  Right.  We're only speaking definitionally.  Of
16  course, the numbers statistically are different and
17  the actual policies as they're written are different.
18  But definitionally or how we count these numbers,
19  certificates in force, is that different from the
20  counting methodology than certificates in force under
21  home mortgage?
22 A  The process to count and to develop a number under
23  credit life is different than the process under home
24  mortgage protection.  But definitionally they are the
25  same and both would house that same concept of there

**Page 94**

1  could be more than one life insured on that
2  certificate.
3  Q  Let me just clarify.  Under the credit life the
4  policies in force, the numbers that we have here are
5  the number of, total number of credit unions
6  participating as a group; is that right?
7  A  Yes.
8  Q  And the certificates in force for each of the years,
9  these are the actual number of certificates issued
10  for either an individual or one or more individuals
11  on a particular, for a particular insured event; is
12  that right?
13 A  Yes.
14         MR. KELLEY:  They're either individual
15  or joint policies; is that the --
16         THE WITNESS:  Yes.
17         MR. KELLEY:  -- categories?
18         THE WITNESS:  And they get one
19  certificate even if it's a joint policy.
20         MR. KELLEY:  Just a simpler way of
21  stating it.  I know you've been sort of
22  struggling with it.  Summarizing it, it's single
23  and joint policies.
24 By Mr. Pedersen:
25 Q  The number of claims paid, is that category

**Page 95**

1  definitionally different than the number of claims
2  paid under home mortgage?
3  A  No.
4  Q  When you said the certificates in force issued the
5  actual counting methodology is different, what did
6  you mean?
7  A  For much of our business we don't hold member level
8  information to the point where we can count everyone
9  who's insured.  We might get a premium report for
10  credit life that says for XYZ credit union for the
11  month of June we had 153 people insured.  And so
12  we're relying on the 153 to be what their cert count
13  is; whereas, with home mortgage protection we have
14  the information on everyone who's insured.
15 Q  And you know the name of each individual for which
16  certificates have been issued?
17 A  Yes.
18 Q  And in the credit life area, you wouldn't have the
19  name-by-name listing of every certificate holder?
20 A  For 90 percent  of our business we do not.
21 Q  The number of claims paid, definitionally would that
22  be the same as the claims that are paid out?
23 A  Yes.
24 Q  And the number of claims denied --
25 A  Yes.

**Page 96**

1  Q  -- would that be the same?
2  A  Yes.  It would be the same definition.
3  Q  And under the category certificates rescinded, there
4  we have question marks.  What does that mean?
5  A  We were unable to pull together the data that would
6  tell us how many certificates were rescinded.
7  Q  We were able to get -- you were able to get that
8  information with respect to the home mortgage but not
9  with respect to credit life; is that right?
10 A  That is true.
11 Q  Is that in part because of the nature of this credit
12  life of not having individual names on certificates
13  that are kept by CUNA Mutual?
14 A  No.  That's not the reason for it.
15 Q  Could you explain the difficulty in counting the
16  number of certificates rescinded?
17 A  We rescind probably a greater number of individuals
18  under credit life for being over the age maximum.
19 Q  It's 70?
20 A  It's 70.  Because we rely on credit unions to do the
21  processing.  And until we get some indication, we
22  might not know that they're over age or were over age
23  when they applied for coverage.  So that kind of
24  processing happens after the fact; whereas, with home
25  mortgage protection we are involved in every

1  individual who's insured and so we don't issue a
2  policy so there's no need to rescind a policy.
3          We wouldn't issue a policy to a person over
4  age.  So there's no need for that rescission.  So a
5  bunch of the rescissions happened in kind of a
6  premium function where it is not tracked.  And then
7  even within the claims function, rescissions are not
8  and were not stored in our claims system.  They
9  aren't for credit life.  They are not for home
10 mortgage protection.  But we were able to go to the
11 paper files because of the limited number of claims
12 and review, do the review to provide numbers.  We
13 were not able to do that with credit life.
14 Q   Now, unlike the home mortgage protection, the
15 distinction between the number of claims denied and
16 certificates rescinded would be on a different basis;
17 isn't that correct?
18          MR. KELLEY:  Object to the form.
19 By Mr. Pedersen:
20 Q   Let me try to clarify.
21 A   Thank you.
22 Q   Did you testify earlier that under the claims denial
23 one of the bases for denying a claim would be a
24 preexisting condition?
25 A   Yes.

                                                    97

1  Q   And under these categories of, listed of number of
2  claims denied, a portion of those would reflect
3  preexisting conditions, wouldn't they?
4  A   Yes, they would.
5  Q   And there may be a claim denied where the policy is
6  not rescinded; is that right?
7  A   Yes.
8  Q   If the application or the claim was for a condition
9  for which there was a preexisting medical treatment,
10 then you would deny that claim but the policy would
11 remain in force?
12 A   Yes.
13 Q   And that's different than the home mortgage
14 protection that you've just --
15 A   Now, actually I'm going to step back on that.
16 Q   Okay.
17 A   The policy wouldn't remain in force for that
18 individual because for there to have been a claim,
19 they would have died.  And so there's no need for a
20 future policy for that individual.  So it's not that
21 we would rescind it.  It's just that coverage would
22 terminate because they're no longer alive.
23 Q   And you wouldn't expect a new claim down the road
24 because they would be dead?
25 A   Yeah.  Sorry if I answered too quickly.

                                                    98

1  Q   Yeah.  So then the number of claims denied should be
2  equal to the category -- well, no.  Let me strike
3  that.  Under what circumstances would a certificate
4  be rescinded under the credit life?
5          MR. KELLEY:  Let me just interpose an
6  objection, because I think some of the
7  difficulty that we're going to have here relates
8  to the definition of rescission.  I think you
9  need to define with the witness what you mean by
10 rescission and see how that compares with his
11 understanding of the term rescission.
12 By Mr. Pedersen:
13 Q   Under the credit life listing where it has
14 certificates rescinded, what's your understanding of
15 what that term means within the credit life area?
16 A   My understanding would be that for several reasons we
17 are determining that coverage never should have been
18 issued and we are going back to the date that they
19 originally enrolled and saying there was not a period
20 of coverage between those two dates.
21 Q   Age being one of the reasons?
22 A   Age being one of those reasons.
23 Q   What other reasons are you aware of?
24 A   I had testified earlier that if an individual came in
25 late and asked to enroll in coverage say six months

                                                    99

1  after they took their loan out and they go through a
2  medical underwriting process at that point and we
3  found that later in the process that they were not
4  truthful with us or did not fully disclose their
5  medical history, then we would take that as another
6  situation to rescind.
7  Q   What happens to the policy after the individual dies
8  under the credit life and the claim is denied?  What
9  category does that fall in?
10 A   In terms of certificates for single life coverage,
11 that certificate would just stop at that point and it
12 would be a debit in the total number of certs in
13 force.  For joint where there are two on the policy,
14 the individual who is still alive would have the
15 option to continue that certificate going forward.
16 Q   Would the premium change?
17 A   Yes.
18 Q   It would reduce reflecting a single life rather than
19 that joint --
20 A   Yes.
21 Q   -- policy?  Let me turn to Page 2 of Exhibit 1 to ask
22 what information categorically is on Page 2?
23 A   Page 2 is the calculation page that references back
24 to the parenthetical that we struggled to define
25 earlier, mort total split by premium.  This is the

                                                    100

1  spreadsheet where Kirk Johnson allocated back total
2  credit union reimbursements to the life product.
3 Q  The numbers on Page 2, are they numbers that are
4  supportive numbers for home mortgage protection or
5  credit life?
6 A  Home mortgage protection.
7 Q  And the percentages that are listed after life
8  percentage, what does that represent?
9 A  That represents the percentage of home mortgage
10  protection, life and disability premium that was
11  generated from home mortgage protection life premium.
12 Q  The number, the .81, .81, .80, .80 for years '98
13  through '01 respectively, how is that number derived?
14  What's that the ratio of?
15 A  It is life premium '98 divided by total premium '98
16  would derive the .81 percent life for '98.
17 Q  The total premium, that's I believe the subtrahend of
18  the equation, what total premium is that for that
19  specific product?
20 A  It's for the home mortgage protection product, the
21  life and disability premium.
22 Q  Whereas, the numerator is just the life premium?
23 A  Yes.
24 Q  So we have disability added for the total premium?
25 A  Yes.

                                    101

1 Q  And what's the third page?
2 A  I'm not sure.  I haven't seen that before.
3 Q  Does it appear to be a listing of operating expenses
4  without governance?
5 A  That is the title, yes.
6 Q  How does that relate to the home mortgage protection
7  overview sheet on Page 1?
8 A  I'm unsure of how that relates.
9        MR. KELLEY:  Just for the record, I
10    note up here in the left-hand corner of Page 3
11    it seems to indicate that it refers, those
12    numbers refer to credit life as opposed to home
13    mortgage protection.  I don't know if that helps
14    the witness at all.
15 A  The numbers on this third page of Exhibit 1 don't
16  seem to tie back to this summary page as I look at
17  them.
18        MR. KELLEY:  Steve, do you have any
19    idea how much longer?  We're at a point where we
20    should, if we're going to break for lunch we
21    probably ought to do that, depending upon how
22    much you've got to do here.  And we've got to
23    figure out how long we're going to be with Paul
24    Lawin out there.
25        MR. PEDERSEN:  I can answer the

                                    102

1  question if we go off the record for a moment.
2        (Off the record discussion)
3        MR. PEDERSEN:  Having consulted off
4    the record, I believe we probably only have
5    another seven or eight minutes.  I suggest we
6    finish with Mr. Fischer.
7        MR. KELLEY:  Sure.
8        MR. PEDERSEN:  During the course of
9    discovery, certain documents were produced and I
10    would like, so we don't have to question on
11    these documents, to reach a stipulation that
12    these documents are true and accurate and
13    complete as they purport to be, at least to the
14    best of your ability.  The CUNA Mutual Group
15    2000 annual report going back, the 1999 and 1998
16    and 1997 CUNA Mutual Group annual report.
17        MR. KELLEY:  Yeah.  You don't have to
18    show them to me.  With regard to all of the
19    annual reports that we have produced from '98
20    through 2001, they have been represented to me
21    as being the true and correct copies of the
22    annual reports that have been generated in the
23    past.
24 By Mr. Pedersen:
25 Q  Are you are -- let me ask Mr. Fischer.  Are you aware

                                    103

1  whether or not different annual reports are filed in
2  Wisconsin than in the various states besides a cover
3  sheet?
4 A  I am not aware of that.
5 Q  A document referred to during discovery as Attachment
6  L, an HMP product report, can you identify  what this
7  document is?  And it looks to be a series of stapled
8  documents together but all under Attachment L.
9        MR. KELLEY:  Just so the witness is
10    aware that the items on there that are blacked
11    out, crossed out, and then you see lettering
12    saying redacted, that's information that your
13    counsel has determined was either not relevant
14    or was confidential and was not part of the
15    production in this case.  So the pieces of paper
16    may actually look different to you as a result
17    of that.
18 A  They are year-end reports of activity on the home
19  mortgage protection line.
20 By Mr. Pedersen:
21 Q  These reports appear to be accurate reports from CUNA
22  Mutual?
23 A  They are reports that I'm familiar with that I review
24  every month, and they appear to be just extracts of
25  those reports.

                                    104

1  Q  Okay. And these reports are with respect to the home
2     mortgage protection product line only; is that right,
3     with the exception of the Transitions?
4  A  With the exception of the Transitions which has been
5     pulled out.
6  Q  And you've explained what the Transitions product was
7     earlier?
8  A  Yes.
9  Q  Have you at any time during your work evaluated the
10    profitability of the home mortgage protection
11    product?
12 A  Yes, I have.
13 Q  Can you describe for me -- and you can break it down
14    by year if that's helpful -- the profitability of the
15    home mortgage protection product as it relates to
16    CUNA Mutual Insurance Society?
17       MR. KELLEY:  You want him to describe
18       in verbal terms or in numeric terms?
19 By Mr. Pedersen:
20 Q  Do you have a profit statement that's been prepared
21    today by calculation?
22 A  From the numbers included in the summary, you can
23    determine the profitability of each line.
24 Q  Have you done that before your deposition today?
25 A  Yes.

                                                        105

1  Q  Can you tell us are you using the formula that you
2     described earlier to calculate the product
3     profitability for the home mortgage protection plan?
4  A  Yes, I am.
5  Q  Can you -- you don't have it written in front of you.
6     Can you tell us from memory what they were for each
7     of the four years?
8  A  I actually did write it.
9        MR. KELLEY:  He did. He wrote it out.
10       And just so we're clear, I think that his
11       numbers, although he can describe them to you,
12       do not include the expenses for corporate
13       governance and tax allocations.
14 By Mr. Pedersen:
15 Q  I think we've described that earlier. You're using
16    the same formula that you described earlier with the
17    same exclusions; is that right?
18 A  Yes.
19 Q  You've prepared and you have in front of you a sheet
20    with handwritten information; is that what you
21    prepared in advance of your deposition today?
22 A  Yes, it is.
23 Q  I would like to make a copy of that and have that
24    attached as Exhibit 4 --
25       MR. KELLEY:  Okay.

                                                        106

1  Q  -- to the deposition. Describe for me the profits on
2     the home mortgage protection line with the exclusions
3     that you've described using the formula that you
4     previously testified about for 1998.
5  A  The formula that we talked about for 1998 would
6     generate profits of $191,861.77.
7  Q  Okay. For 1999?
8  A  Is that what you want?
9  Q  Yes. You can just give us those numbers that you've
10    calculated.
11 A  For 1999, $623,566.29; for 2000, $131,619.38; for
12    2001, $526,946.61.
13 Q  And you have other entries for the credit life.
14    Without having you read those, you've written those
15    in at the bottom of each of those annual categories;
16    is that right?
17 A  I've written them under the category of credit life.
18 Q  Yes. And at the bottom of the sheet, what are those
19    three lines?
20 A  At the bottom of the sheet are lines that I have
21    calculated to date in the calculation. They are
22    incurred claims, change in the policy reserve, and
23    credit life incurred claims.
24 Q  And those numbers at the bottom then you've put into
25    the formula derived from the numbers at the top to

                                                        107

1     come up with the profit margins as the bottom line;
2     is that right?
3  A  There were three numbers missing needed to calculate
4     incurred claims for both home mortgage protection and
5     for credit life. To calculate a change in the
6     reserve level for '98 you needed the '97 reserve
7     levels. So for 1998 I've used those reserve levels,
8     which are not on this page, but for the rest of them
9     it's based on the numbers on the page.
10 Q  In the year 2000 if Mr. Hall's claim of approximately
11    $56,000 had been paid, we would subtract the 56 from
12    the 131,619; is that right?
13 A  Yes.
14 Q  And that profit line would have still been profitable
15    for CUNA Mutual?
16 A  It would have been profitable at the line level
17    before governance and before any tax, yes.
18 Q  Have you looked at the profitability during those
19    same years for CUNA Mutual Insurance Society as a
20    whole?
21 A  I don't have the exact numbers of the profitability
22    for those four years as a whole. Yes. I've looked
23    at the profitability of the organization --
24 Q  You would agree --
25 A  -- in that time period.

                                                        108

1  Q   I'm sorry.  You would agree that those numbers are
2      contained within the annual reports for CUNA Mutual
3      Insurance Society, wouldn't you?
4  A   Yes, I would.
5  Q   And you would agree generally that CUNA Mutual over
6      the last four years has done well and prospered?
7          MR. KELLEY:  Object to the form.
8  A   Yes, I would.
9  By Mr. Pedersen:
10 Q   Did you bring any other documents with you in
11     response to the document request which was part of
12     your notice of deposition?
13 A   I did bring all of my prep documents which I believe
14     were all documents that we shared.
15         MR. KELLEY:  Yes.
16 By Mr. Pedersen:
17 Q   Just for completeness, can you tell me the categories
18     of documents?  For example, your prior deposition
19     or --
20         MR. KELLEY:  Yeah.  Go ahead and pull
21     them out.  There's one correction that he wants
22     to make on mortality tables as well.
23 By Mr. Pedersen:
24 Q   Oh, sure.  Okay.
25 A   These -- the first four documents were your Exhibit

109

1      L --
2  Q   Okay.
3  A   -- documents.
4          MR. KELLEY:  Attachment L.
5  A   Thank you, Attachment L.
6  By Mr. Pedersen:
7  Q   Okay.
8  A   Attachment M, mortality table for both product lines.
9  Q   And did you have any adjustments to make to that
10     mortality table?
11 A   Actually, I do.  On the home mortgage protection
12     mortality page, I stated that these were annual
13     mortality rates per ten thousand lives and that was
14     incorrect.  They're per life --
15 Q   Okay.  It's a --
16 A   -- not ten thousand lives.
17 Q   It's a question of where we place the decimal point?
18 A   Yes, it is.  I apologize for that.
19 Q   That's okay.  I would like the record to reflect so
20     it's clear when others review this that Attachment M
21     which was produced in discovery lists at the bottom
22     annual mortality rates per ten thousand lives.  And I
23     believe the correction is now that that's annual
24     mortality rates per life; is that right?
25 A   Yes.

110

1  Q   Okay.  Thank you.
2  A   I brought a page talking about the underwriting
3      guidelines for the product effective 6/12 of 1998.
4  Q   I would like to have, make a copy of that and have
5      that marked as Exhibit 5.
6          MR. KELLEY:  That was part of
7      production.
8  A   It was part of the production.  It's just a single
9      page of it.
10 By Mr. Pedersen:
11 Q   Okay.  Just so we have it complete on your
12     transcript, because I don't know which attachment it
13     falls under.
14 A   I'm not sure either.
15         MR. KELLEY:  Well, let me see if I can
16     tell you.
17         MR. PEDERSEN:  I can -- do you want to
18     either mark it and I'll move on and you can tell
19     me?
20         MR. KELLEY:  Go ahead.  You can move
21     on.
22 By Mr. Pedersen:
23 Q   I'm trying to move this through for you.  Just tell
24     me -- if it's an exhibit that has an attachment
25     letter to it, just tell me what the attachment letter

111

1      was.
2  A   Attachment K.
3  Q   Okay.  No changes to that?
4  A   No changes.
5  Q   Okay.
6  A   My summary deposition, the notes from my previous
7      deposition.
8  Q   The transcript?
9  A   The transcript.
10 Q   Does it have notes separate from the transcript?
11 A   I'm sorry.  It does not have notes.
12 Q   Okay.
13 A   It's the transcript.
14 Q   Just a copy of the transcript?
15 A   It's a copy of the transcript.  And these are ones
16     that I think you're going to have to look up again.
17     I don't have the letters for them but they were all
18     copies of stuff that we had produced.
19         MR. KELLEY:  I'm still looking.  Go
20     ahead.
21         MR. PEDERSEN:  I think we're on the
22     last three documents.
23         THE WITNESS:  The last three.
24         MR. PEDERSEN:  I just wanted to make
25     sure I have everything.

112

1    MR. KELLEY:  You definitely have that.
2  I know you do.  And I've got it because I was
3  looking at it last night.
4    MR. PEDERSEN:  You know, I'll accept,
5  Mike, if you just tell me on the record that
6  that's been produced.
7    MR. KELLEY:  Yes.  It's been produced.
8  By Mr. Pedersen:
9  Q   Let me just read what it is on the record.  The CUNA
10  Mutual Insurance Society Home Mortgage Protection
11  Point of Sale Life Underwriting Guidelines effective
12  6/12/98.  It's been represented by defense counsel
13  that these have been produced in discovery and this
14  is one of the documents that you reviewed before your
15  deposition?
16  A   Yes.
17    MR. PEDERSEN:  Okay.  And Mike, the
18  last three, they're not associated with
19  attachments but he believes they were produced.
20    MR. KELLEY:  Yes.
21    THE WITNESS:  They were attachments.
22    MR. KELLEY:  Yeah.  They are a part of
23  the attachments.
24    THE WITNESS:  I didn't have the
25  attachment page.

113

1    MR. PEDERSEN:  Let me just read into
2  the record what they are.  The Members Choice
3  Home Mortgage Protection Field Training Guide,
4  multipage document with an index.
5    MR. KELLEY:  That's Attachment F as in
6  Frank.
7    MR. PEDERSEN:  Attachment F.  Okay.
8  The Members Choice Home Mortgage Protection
9  Administration Guide.
10    MR. KELLEY:  That was part of G,
11  Attachment G.
12    MR. PEDERSEN:  Okay.  And another
13  document called Why Purchase Mortgage Life
14  Protection From Your Credit Union with a home
15  mortgage protection summary of coverage, life
16  coverage, it's a -- there's a cover sheet that's
17  not numbered and then there's Pages 1 through 6
18  that are numbered and a final sheet that's also
19  not numbered that's labeled home mortgage
20  protection at the top.
21    MR. KELLEY:  Yes.  That was also a
22  part of Attachment G.
23    MR. PEDERSEN:  With the understanding
24  that all of those documents have been produced
25  and exchanged in discovery and with the

114

1  understanding that we received most of the
2  documents the day before yesterday, I have no
3  further questions.
4    (Exhibit No. 4 marked for identification)
5    (12:30 p.m.)

115

1  STATE OF WISCONSIN  )
2  COUNTY OF DANE      )  ss.
3
4    I, BECKY J. GANTT, Registered Professional
5  Reporter and Notary Public in and for the State of
6  Wisconsin, do hereby certify that the foregoing is a
7  true record of the deposition of RICHARD FISCHER, who was
8  first duly sworn by me; having been taken on the 28th day
9  of March, 2002, at Davis & Kuelthau, 10 East Doty Street,
10  in the City of Madison, County of Dane, and State of
11  Wisconsin, in my presence, and reduced to writing in
12  accordance with my stenographic notes made at said time
13  and place.
14    I further certify that I am not a relative
15  or employee or attorney or counsel for any of the
16  parties, or a relative or employee of such attorney
17  or counsel, or financially interested in said action.
18    In witness whereof, I have hereunto set my hand
19  and affixed my seal of office this 3rd day of April, 2002.
20
21
22    Notary Public, State of Wisconsin
      My commission expires 2/16/03
23
24
25

116

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this date the foregoing document was served by U.S. first-class mail, postage prepaid, upon the following:

Stephen R. Pedersen, Esquire
214 Senate Avenue, Suite 602
Camp Hill, PA 17011

Catherine Mahady-Smith, Esquire
3115-A N. Front Street
Harrisburg, PA 17110

Charles T. Young, Jr.

Attorney for Defendants

Dated:    November 19, 2002