ORIGINAL

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NANCY HALL, individually and as the     :     CIVIL ACTION - LAW
Representative and Administratrix of     :
the Estate of TOMMY HALL, deceased,      :
her husband,                             :
                    Plaintiff,           :                          FILED
                                         :                     HARRISBURG, PA
                                         :
            vs.                          :                      DEC 0 4 2002
                                         :
                                         :     1:01-CV-1265        MARY E. D'ANDREA, CLER
CUNA MUTUAL GROUP; CUNA                  :                     Per
MUTUAL INSURANCE SOCIETY,                :
                                         :     JUDGE CHRISTOPHER CONNER
                    Defendants.          :

## PLAINTIFF'S REPLY BRIEF IN SUPPORT
## OF ITS MOTION IN LIMINE

Plaintiff, by and through undersigned counsel, has submitted a Motion in Limine seeking

to:  1) Preclude any testimony concerning or evidence submitted to the jury with respect to the

April 30, 1998 entry which states, "CA mole removed...96";  2) Preclude CUNA's handwriting

expert, Mr. Gencavage, from testifying in that his entire report is based on the erroneous entry

mentioned above; and 3) Sanction CUNA Mutual for its failure to comply with a Court Order

requiring full and complete responses to Plaintiff's Second Request for Production of Documents,

numbers 4 through 18.

1

I.    **THE APRIL 30, 1998 ENTRY IS ERRONEOUS AND NOT SUPPORTED BY ANY MEDICAL EVIDENCE IN THIS CASE**

Mr. and Mrs. Hall attended a doctor's visit with Dr. Charlesworth on April 30, 1998.  A medical intake sheet was generated.  Mr. and Mrs. Hall then met with Dr. Charlesworth.  Dr. Charlesworth, in his sworn deposition, testified concerning the erroneous entry concerning the prior mole which had been removed.  Dr. Charlesworth testified as follows:

Q.    "They had no idea as to the type of cancer?"

A.    "Yeah.  And at the time, there was a debate between the two of them whether it was really cancer or not."

Q.    "What did that...do you recall the specifics of what they actually said about that?"

A.    "Well, let me see what I have written.  But I remember that there was a debate between the patient and his wife as to whether it was really cancerous or if it was just a funny looking mole.  You know, one of them said, No, it was just a funny looking mole.  The other said, No, I think it was a cancer.  I don't know what kind of cancer it was.  They said, I don't know.  It really wasn't cancer.  That's why they don't know.  I mean, there was this discussion back and forth between the two of them." (Deposition, pg. 26. See, relevant pages of Dr. Charlesworth's deposition, attached as Exhibit A.).

Dr. Charlesworth further testified, "I do clearly remember that there was a debate between the two of them, number 1, whether it was cancer or not.  And, definitely, nobody had any idea what type, if it was.  And so that is why I definitely recall requesting records to find out was it cancer and what type was it."  (See, Deposition, pg. 27).  And finally, Dr. Charlesworth was asked:

Q.    "Has anyone up until this date, including Mr. Kelly (CUNA Mutual's counsel) here today ever showed you any document from any other physician that indicates that Mr. Hall had been diagnosed with cancer prior to the 1999 events attendant to the lump in his neck?"

A.    **"I have never seen a pathology report that shows that."** (See, Charlesworth deposition, pg. 51).

Dr. Ansfield, CUNA's own Medical Director, has agreed with Dr. Charlesworth's conclusions. Dr. Ansfield testified as follows:

Q.    "Let me ask the question again. Is there anything from the 93 medical records with the surgical procedure of the removal of the mole that indicates that any form of cancer was developing in Mr. Hall?"

A.    "No, there is not."

Q.    "Now, are you saying you would have expected Mr. Hall to make his own diagnosis of cancer upon the discovery of a lump in his neck?"

A.    "I don't think that that would be possible for a lay person to make the determination as to what the lump was."

Q.    "You don't have any records, do you, or any information to establish that Mr. Hall knew he had cancer on November 18, 1998, do you?"  (Application date was November 18, 1998)

A.    **"No, I do not."**

Q.    "Let me rephrase the question to address the objection. Do you have any information that on November 18, 1998, Mr. Hall knew he had cancer?"

A.    "No."

Q.    "So, at the time the application was made, you have no information that Mr. Hall himself knew he had cancer in 1993?" Is that correct?"

A.    "I had no information."

Q.    "And the pathology report had a finding of dysplastic nevus?"

A.    "That is correct."

Q.    "And no finding of cancer or melanoma?  Is that correct?"

A.    "That is correct."

Q.    "Are you aware whether or not melanoma and cancers of
      all types and forms can be present and undiagnosed?"

A.    "Certainly, they can be undiagnosed."

Q.    "Present and unobserved?"

A.    "That is correct." (See, Exhibit C in Plaintiff's original Motion in Limine)

Defendants in this case are attempting to rely upon a medical entry dated April 30, 1998

for which there is no medical support, no medical documentation, and no witness who will testify

concerning its accuracy.  To the contrary, witnesses will testify concerning its inaccuracy.

Accordingly, CUNA Mutual will attempt to contradict their own Medical Director, the

treating doctor who generated the records in question, and their own insured, through testimony

concerning an erroneous entry which states "cancerous mole removed."  In that all parties and all

counsel are aware that no diagnosis had been made of a cancerous mole prior to the date of the

insurance application, and that no witness will take the stand, and no witness has been identified

by CUNA who will testify that a cancerous mole had been removed prior to the application, the

introduction of this information is only intended to mislead the jury on a false premise that Mr.

Hall was aware of a prior cancerous mole.

4

## II.   CUNA'S HANDWRITING EXPERT, DR. GENCAVAGE, SHOULD BE PRECLUDED IN THAT HIS REPORT IS BASED ENTIRELY UPON THE ERRONEOUS ENTRY REFERENCE IN SECTION I.

CUNA Mutual hired a handwriting expert, John Gencavage, to examine the entry which CUNA knew to be erroneous. CUNA was aware of the erroneous entry based upon their own Medical Director's testimony, as indicated previously, and the deposition of the treating doctor who met with Mr. and Mrs. Hall after the erroneous entry found its way into the medical records. Both CUNA Mutual's Medical Director and the treating doctor have testified that there was no history of a prior cancerous mole.

However, despite this knowledge and information, CUNA is persisting with attempts to introduce an erroneous medical entry through a handwriting expert. Based upon Mr. Gencavage's report, it is anticipated that he will offer testimony that the erroneous entry, "cancerous mole removed" was in Mr. Hall's handwriting. However, as was previously discussed, there is no medical evidence in this case, nor any witness who will testify that the entry was in fact correct. Rather, all witnesses will testify that the entry was erroneous. A speculative report based upon a false premise that there was an erroneous mole removed in 1996 should not, and can not, be introduced to the jury when all parties know the entry to be false.

Furthermore, the issue before the jury is not what Mr. and Mrs. Hall thought concerning any prior moles, but rather, according to the application itself, whether Mr. Hall had been treated or diagnosed with cancer prior to the application, not whether he suspected that he may have cancer. (See, application attached hereto as Exhibit B).

Furthermore, any proposed testimony from Mr. Gencavage should be precluded in that Mr. Gencavage's report does not meet the required level of certainty in all cases involving expert

testimony in Pennsylvania. In diversity cases, Federal Courts apply State rules with respect to the degree of certainty required of an expert's opinion. Heller vs. Shaull Industries, Inc., 167 F.3d 146, 153 (3d Cir. 1999). To be admissible in Pennsylvania, any proposed opinion testimony of an expert must be rendered within a reasonable degree of certainty, Montgomery vs. South Philadelphia Med. Group, Inc., 656 A2d, 1385, 1390 (Pa. Supp. 1995).

Although expert testimony need not express the exact language of "reasonable degree of certainty", the opinion must be expressed at least to that degree of certainty. Pennsylvania courts have concluded that expert testimony need not be to absolute certainty, but that any testimony less than the required level of "reasonable degree of certainty" is inadmissibly speculative. Argust vs. Dick Mackey Gen. Contracting Company, Inc., 568 A2d 255, 258 (Pa. Supp. 1990).

Mr. Gencavage's report does not meet any of the required Pennsylvania standards. No where in his report does he detail any degree of certainty whatsoever. The report, contained within a page and a half, simply offers Mr. Gencavage's opinion that Mr. Hall, the decedent, made the April 30, 1998 entry. A report that states no degree of certainty, but is merely Mr. Gencavage's personal opinion, does not meet the muster required under Pennsylvania law. Accordingly, his report should be stricken both because it is based upon an erroneous medical entry, and it does not meet the degree of certainty requirement for all reports within Pennsylvania.

III.  **CUNA MUTUAL HAS VIOLATED AND CONTINUES TO VIOLATE THE
COURT'S APRIL 19, 2002 ORDER SPECIFICALLY REQUIRING THEM
TO RESPOND TO PLAINTIFF'S SECOND REQUEST FOR PRODUCTION
OF DOCUMENTS, # 4 through #18.**

The Court, on April 19, 2002, ordered CUNA Mutual specifically to respond to Plaintiff's

Second Request for Production of Documents #4 through #18. CUNA has ignored that Court

Order. The arguments which CUNA now makes are all arguments and discussions which, if at all,

should have taken place during the Court's phone conference prior to the April 19, 2002 Order.

CUNA is simply attempting to rehash what was or could have been argued prior to the April 19,

2002 Order. However, the Court's Order is clear, that CUNA Mutual was to fully and

completely respond to Plaintiff's Second Request for Production of Documents #4 through #18.

All arguments currently raised by CUNA Mutual to justify their refusal to comply with the

April 19, 2002 Order are attempts, simply, to misdirect the inquiry. CUNA Mutual has referred

to a March 7, 2002 Order relating to who would be deposed, but not which documents would be

required to be produced. CUNA Mutual refers to a March 14, 2002 deposition of Rich Fischer

and a subsequent March 28, 2002 follow-up deposition, both of which occurred prior to the

Court's April 19, 2002 Order. Neither of those depositions, in any way, affected CUNA's

requirement to comply with the April 19, 2002 Order and provide full and complete documentary

discovery responses.

It is indeed surprising that CUNA Mutual would bring before the Court's pervue their

own conduct during the March 14, 2002 Rich Fischer deposition. That deposition was taking

place as a result of a Court Order that CUNA produce an expert concerning profits and losses of

CUNA Mutual. CUNA Mutual produced Rich Fischer for his deposition on March 14, 2002 in

Madison, Wisconsin.  Plaintiffs, at significant expense, flew out to Madison, Wisconsin, hired a

court reporter, and incurred hotel and air expenses.  Mr. Fischer arrived at the deposition without

a single document and unable to answer any of the statistical questions.  A copy of the Rich

Fischer deposition is attached hereto as Exhibit C.  The following is an illustrative excerpt of his

testimony:

Q.    "Did you understand that, furthermore, there was a Court Order
      requiring CUNA Mutual to produce an individual knowledgeable
      with statistical data concerning CUNA Mutual and you have
      been designated"?

A.    "Yes." (Page #4)

Q.    "Did you have an understanding that the Notice of Deposition
      required you to bring certain documents with you today?"

A.    "I saw that this morning and my attorney...I wasn't instructed
      to by our side of the attorneys."

Q.    "You weren't instructed to bring any documents with you
      today?"

A.    "No." (Page #5)

Q.    "What were the total assets of CUNA Mutual Group in 2001?"

A.    "I don't know that."

Q.    "What were the surplus capital funds of CUNA Mutual Group in
      2001?"

A.    "I don't know that."

Q.    "What were the net premiums written for CUNA Mutual Group
      in 2001?"

A.    "I don't know that."

Q.    "What was the net investment income of CUNA Mutual Group in 2001?"

A.    "I don't know that."

Q.    "What was the net income of CUNA Mutual Group in 2002?"

A.    "I don't know that."

Q.    "Do you know any of the information for 1998?"

A.    "Not by memory."

Q.    "Do you know any of it from 1999?"

A.    "Not by memory."

Q.    "Do you know any of it from 2000?"

A.    "No."

Q.    "On CUNA Mutual Group's balance sheet, what were the assets listed on life and annuity premiums due?"

A.    "I don't know." (Pages 11 and 12)

For the next twenty pages of the deposition Rich Fischer continued to provide the answer that he didn't know to any of the statistical questions asked. On Page #19 of his deposition, he said that the records necessary to answer the questions were within CUNA Mutual Insurance Society and maybe were on his desk. On Page #33 of his deposition he was asked:

Q.    "I don't want to put words in your mouth. How long would it take you to get the core statistical information?"

A.    "To know premiums and claims paid for a policy year, it would take a couple of minutes."

Q.    "And that could be in a printed-out form or would it be in a printed-out form or on a disc? What is the form it would take?"

A.      "It is in a printed form."

Q.      "Well, its already printed?"

A.      "It is printed, yeah."

Q.      "How often is the core statistical information printed out?"

A.      "Monthly.  And that is premium and paid claims.  It is all that
        report shows.  Well, and number of certificates active, I believe,
        is on that report."

At that point, after finding out that Mr. Fischer had available all statistical data and either

chose not to bring it to the deposition or was instructed by his counsel not to bring it to the

deposition, Plaintiff's counsel advised CUNA that either CUNA would face a sanction from the

Court or Plaintiff's counsel would agree to reconvene the deposition within two weeks and Mr.

Fischer would provide documents and be fully prepared to address a range of categories of

questions.  (See deposition transcript, pages 35 -36).  Just as it was astounding that Mr. Fischer

had come to a court-ordered deposition with no documents and no ability to answer any statistical

questions, it remains equally astounding that, because of Plaintiff's agreement not to file a Motion

for Sanctions at that time with respect to the deposition, but rather allow the deposition to be

reconvened two weeks later, CUNA Mutual is now using the agreement reached during that

deposition, to justify its refusal to answer Plaintiff's Request for Production of Documents in the

face of a Court Order to do so.  The Court Order was entered and argued after the Rich Fischer

deposition.

In response to Plaintiff's requests #4 through #18, and the Court's Order, CUNA Mutual

provided a single document, a redacted organizational chart of a small sector of their business.

10

CUNA's explanation that they believe they have complied with the request is astounding,

to say the least.  The following time line illustrates Plaintiff's efforts to obtain the full and

complete responses ordered by the Court:

May 7, 2002 Letter from Plaintiff's counsel to CUNA - "I await full and complete responses to Plaintiff's Second Request for Production of Documents #4 through #18...I believe you have provided partial answers to many of the questions, but await full and complete answers as instructed by the Court.  Please let me know when you will have these answers available.  I hope this can be provided to us within the next 10 days or no later than May 22, 2002, so that your responses may be reviewed and analyzed prior to the date upon which my expert reports are due." (Attached hereto as Exhibit D)

September 12, 2002 Letter from Plaintiff's counsel to CUNA - "I received your letter with all of its explanations, however, it does not provide justification for violating the Court Order which required that all of the documents be produced...I am once again requesting full compliance with the Court Order that you produce all documents identified in Plaintiff's Second Request for Production of Documents #4 through #18." (Attached hereto as Exhibit E)

September 17, 2002 Letter from CUNA Mutual - "We request that you provide us with a detailed statement of exactly what information you are requesting."(Attached hereto as Exhibit F)

September 18, 2002 Letter from Plaintiff's counsel to CUNA - "I am in receipt of your letter dated September 17, 2002 in which you reaffirm that you will be providing no further responses to questions #4 through #18 of Plaintiff's Second Request for Production of Documents, despite the Court Order to do so.  Despite oral argument and in order that CUNA Mutual provide full and complete responses to question #4 through #18, you requested a detailed statement of what information is being requested.  A detailed statement is found in the Request for Production itself which you are required to not respond by objection, but respond by providing the documents." (Attached hereto as Exhibit G)

Plaintiff's September 18, 2002 detailed letter then sets forth, in detail, the numerous

violations.  The following chart, derived from the specific requests details CUNA's flagrant

violation of the Court Order:

| Req # | Document Requested | CUNA's response |
|---|---|---|
| #4 | All documents to and from the credit union in Chambersburg, PA and CUNA Mutual with respect to home life insurance, including, but not limited to, contracts, agreements, memoranda and documents. | New objection |
| #5 | Copies of all contested claims within CUNA Mutual within the home life insurance area for the past 3 years, including the entire claims file for those contested claims. | New objection |
| #6 | CUNA Mutual organizational chart which shows the name, title, and position of each of the employees and supervisors within the home life insurance area of CUNA Mutual. | New objection |
| #7 | CUNA Mutual organizational chart which shows the name, title, and position of each of the employees and supervisors within the credit life insurance area of CUNA Mutual. | New objection |
| #8 | CUNA Mutual organizational chart which shows the relationships and reporting responsibilities and chain of command with respect to the overlap between home life and credit life. | New objection |
| #10 | Internal profit and loss calculations and statements with respect to credit life for the years 1998-2001 | New objection. [Profit and loss sheet generated for this case only, without providing the source materials and the actual accounting documents.] |
| #11 | Internal profit and loss calculations and statements with respect to home mortgage insurance for the years 1998-2001 | New objection. [A sheet specifically prepared for this case, with no internal company profit and loss supporting documents from which the numbers were derived.] |

12

| | | |
|---|---|---|
| #13 | Within the home mortgage protection area, the statistical data showing the claims submitted, claims paid, the amount of payment, the amount contested, claims ultimately paid in the contest process, claims not paid, claims in process, the face amount of each policy, and the number of claims | New objection.<br>[Some documents were provided but not within the categories specifically requested. The documents provided were those generated for purposes of this litigation and were not those internal documents within the company which could be used to check CUNA's calculations and reporting for purposes of this case.] |
| #15 | Annual policy report statements for public dissemination | New objection |
| #16 | Annual policy report statements for public dissemination generated for Wisconsin | New objection |
| #17 | A copy of all forms of individual insurance applications used in November, 1998 in the State of PA by CUNA | A single application was provided but not all various forms as requested |

Despite Plaintiff's numerous requests and detailed letter as described above, CUNA has thumbed its nose at Plaintiff's Request and the April 19, 2002 Court Order. After all the requests and efforts that Plaintiff made to obtain these documents prior to the Production of Reports and prior to the Motions for Partial Summary Judgment which are pending, CUNA simply responded with a blanket statements in its September 19, 2002 letter, which states, in essence, that Plaintiffs are in possession of all the documents which CUNA sees fit to release.

Such cavalier refusal to comply with a Court Order and refusal to provide discovery documents, can only be met with an equally proportionate response from the Court. By the nature of type of requests, it is clear that many of these requests were needed to further detail information in Plaintiff's Expert Reports which go to both CUNA Mutual's liability and the punitive nature of their conduct. After having failed to provide Plaintiff with the requested documents and refusing to comply with the Court Order, CUNA Mutual then filed a Motion for

Partial Summary Judgment asserting that Plaintiffs did not have enough information and evidence to pursue a punitive damage claim. However, CUNA Mutual has concealed many of the very documents which would likely assist the Plaintiff in pursuing such a claim. For example, the claims file of other insureds would have been instrumental in developing a pattern of prior conduct. CUNA Mutual refused to provide these documents despite a Court Order to do so. Additionally, CUNA Mutual provided many documents which were generated simply for the purpose of this case, without providing the supporting statistical data and supporting internal documents. This leaves Plaintiffs without the ability to effectively prepare for trial, more effective impeachment, and cross examination concerning the statistical data in this case.

IV.    **CONCLUSION**

For all of these reasons, Plaintiff requests that the anticipated testimony or submission of evidence concerning the April 30, 1998 erroneous medical entry be disallowed. Plaintiff further requests that CUNA's handwriting expert, Mr. Gencavage, be precluded from testifying in light of the fact that his entire testimony is based upon an erroneous entry and his report does not meet evidentiary muster concerning the degree of certainty in which his report is expressed. Finally, Plaintiff requests that the Court sanction CUNA Mutual for its blatant refusal to comply with the Court's April 19, 2002 Order requiring full and complete responses to Plaintiff's Request for Production of Documents #4 through #18.

14

Respectfully submitted,

Stephen R. Pedersen
214 Senate Ave., Suite 602
Camp Hill, PA 17011
(717) 763-1170

I. D. No 72026
Counsel for Plaintiff

DATE: 12/4/02

## CERTIFICATE OF SERVICE

And now, this ____4ᵗʰ____ day of ____Dec.____, 2002, I, Carleen S. Jensen, do hereby certify

that I have, this date, served a true and correct copy of the within **PLAINTIFF'S REPLY**

**BRIEF IN SUPPORT OF ITS MOTION IN LIMINE** upon each of the attorneys of record at

the following address(es) by sending same in the United States mail:


Michael R. Kelley, Esq.
Charles T. Young
100 Pine Street
P O Box 1166
Harrisburg, PA 17108-1166

Catherine Mahady-Smith, Esq.
3115-A N. Front Street
Harrisburg, PA 17110


DATE: _12-4-02_

_Carleen A. Jensen_
Carleen S. Jensen
Assistant to Stephen R. Pedersen, Esquire
214 Senate Avenue, Suite 602
Camp Hill, PA 17011
(717) 763-1170


I. D. No. 72026
Counsel for Plaintiff

 EXHIBIT A 

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NANCY HALL, INDIVIDUALLY AND : CIVIL ACTION - LAW
AS THE REPRESENTATIVE AND     :
ADMINISTRATRIX OF THE ESTATE  :
OF TOMMY HALL, DECEASED, HER  :
HUSBAND,                      :
      PLAINTIFF          :
                    :
      V                  : 1:01-CV-1265
                    :
CUNA MUTUAL GROUP, CUNA       :
MUTUAL INSURANCE SOCIETY,     :
      DEFENDANTS         : JUDGE SYLVIA H. RAMBO


DEPOSITION OF:    ERNEST E. CHARLESWORTH, M.D.

TAKEN BY:         DEFENDANTS

BEFORE:           PAMELA S. SULLIVAN,
                  REPORTER-NOTARY PUBLIC

DATE:             JANUARY 9, 2002, 10:05 A.M.

PLACE:            FAIRWAY MEDICAL ASSOCIATES
                  144 SOUTH 8TH STREET
                  CHAMBERSBURG, PENNSYLVANIA

APPEARANCES:

    McNEES WALLACE & NURICK, LLC
    BY:  MICHAEL R. KELLEY, ESQUIRE

         FOR - DEFENDANTS

    PEDERSEN & PEDERSEN
    BY:  CATHERINE M. MAHADY-SMITH,  ESQUIRE
         STEPHEN R. PEDERSEN, ESQUIRE

         FOR - PLAINTIFF



2080 Linglestown Road • Suite 103 • Harrisburg, PA 17110
717.540.0220 • Fax 717.540.0221 • Lancaster 717.393.5101

1    When Tommy presented, he and his wife, this was

2    on the note, you know, on the face sheet, cancerous mole.

3    And I said, Well, what kind of cancer?  Was it basal cell?

4    squamous cell? melanoma?  It makes a huge difference in what

5    to expect and what I should be doing as far as monitoring

6    him for follow-up.  And they had no idea.  You know, they --

7        Q    They had no idea as to the type of cancer?

8        A    Yeah.  And at the time, there was debate between

9    the two of them whether it was really cancer or not.

10       Q    What did that -- do you recall the specifics of

11   what they actually said about that?

12       A    Well, let me see what I have written.  But I

13   remember that there was a debate between the patient and his

14   wife as to whether it was really cancerous or if it was just

15   a funny-looking mole.  You know, one of them said, No, it

16   was just a funny-looking mole.  The other one said, No, I

17   think it was cancer.  I don't know what kind of cancer it

18   was.  They said, I don't know.  It really wasn't cancer

19   that's why they don't know.

20       I mean, there was this discussion back and forth

21   between the two of them.

22       Q    Can we -- I'm sorry, Doctor.  Before you move on

23   beyond that I wanted to ask you, do you recall whether it

24   was Mr. Hall or Mrs. Hall who was saying, I think it was

25   cancer, and which one was saying, no, I think it was just a

1    funny-looking mole?

2         A    Let me see if I have anything written, and I'll

3    tell you.  Okay?

4         Q    Sure.

5         A    I don't have it specified here in my written

6    records or written notes who said what.  But in my mind what

7    sticks out is that Tommy is the one that's saying it was a

8    funny mole and his wife is the one who was saying it was

9    cancer.  But I don't have a written note to corroborate

10   that, but that's the way it plays out.

11        I do clearly remember that there was debate

12   between the two of them, number one, whether it was cancer

13   or not.  And definitely nobody had any idea what type if it

14   was.  And so that's why I definitely recall requesting

15   records to find out was it cancer and what type was it.

16        Q    If you would, Doctor, turn to the next -- I'm

17   sorry.  I'm not sure if those things are still in there.

18   Yes, they are.

19             MR. KELLEY:  Let's mark this next page then as

20   Charlesworth 2.

21             (Physician progress notes, one page, produced and

22   marked Charlesworth Exhibit No. 2.)

23   BY MR. KELLEY:

24        Q    Doctor, we've marked as Charlesworth 2 a document

25   that says at the top right, Physician Progress Notes.  Do

51

1    removed or not.

2        Q    Well, let me ask you this:  Does it appear that

3    the physician in that case was Dr. Hurley?  Do you know Dr.

4    Hurley?

5        A    Yes, I know Dr. Hurley.

6        Q    Under doctor.  Here, under doctor.

7        A    Yes, I'm sorry.  That's what I was looking for,

8    the doctor that sent the specimen.  And that was Dr. Hurley.

9    That's correct.

10        Q    Do you recall whether or not he was partners with

11    Dr. Guthrie?

12        A    Oh, yes, definitely.

13        Q    Is it fair to say, Doctor, that you would have

14    not rendered treatment or recorded as the diagnosis melanoma

15    or cancer without first seeing this pathology report

16    yourself?

17        A    If I saw this pathology report, I would not

18    record a diagnosis of cancer.

19        Q    Has anyone up until this date, including Mr.

20    Kelley here today, ever showed you any document from any

21    other physician that indicates that Mr. Hall had been

22    diagnosed with cancer prior to the 1999 events attendant to

23    the lump in his neck?

24        A    I've never seen a pathology report that shows

25    that.

EXHIBIT B

# MEMBERS HOME MORTGAGE PROTECTION II APPLICATION
**GROUP MORTGAGE INSURANCE**
PLEASE PRINT

CERTIFICATE NO. **32534**

**[A]** Name *Tommy Bob Hall II*
Borrower #1
Address *517 Mt Pleasant Rd*
*Fayetteville Pa 17222*
Home Phone ( *717* ) *352-9030*
Social Security # *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*
Date of Birth *5-13-55* Age *43* Sex ☑ M ☐ F
Height *5'6"* Weight *200*
Occupation *Truck Driver*

Name *Nancy M. Hall*
Borrower #2 (Must be an adult & jointly responsible for the loan)
Address *517 Mt Pleasant Rd*
*Fayetteville Pa 17222*
Home Phone ( *717* ) *852-9030*
Social Security # *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*
Date of Birth *5-28-53* Age *45* Sex ☐ M ☑ F
Height *5'9"* Weight *165*
Occupation *House Wife*

**[B]**
Borrower # 1   Borrower # 2
Yes   No   Yes   No

1. Have you ever been treated for or diagnosed by a member of the medical profession as having any of the following (Please check the box and circle condition(s) that applies)

Diabetes; high blood pressure; chest pain; heart, blood, blood vessel, lung or breathing disorders; cancer; epilepsy; stroke; pneumonia(s); arthritis, brain, mental, nervous, back, neck, joint or muscular disorders, stomach, intestines, liver, pancreas, or kidney disorders, cirrhosis, drug or alcohol abuse, acquired immune deficiency syndrome or AIDS related complex, or tested positive for antibodies to the AIDS virus? (NOTE TO RESIDENTS OF ME, ND, VT and WI: You do not have to disclose positive test results for the antibodies to the AIDS Virus )

2. During the past 3 years, have you for any reason been hospitalized?

3. Have you used tobacco in any form within the past 24 months?

If Disability Coverage is Requested—

4. Are you now gainfully employed on a full-time basis and presently working 25 hours a week or more? *PA*

Name and Address of Family Physician *Dr Ernst Charlesworth 144 S 8th St. Chambersburg 17201*

GIVE FULL DETAILS BELOW FOR ANY HEALTH PROBLEM INDICATED IN THIS SECTION.

| Name of Person | Name & Address of Physician | Nature of Condition | Dates & Duration |
|---|---|---|---|
| | | | |

**[C]** LIFE COVERAGE: ☑ Single ☐ Joint
1. Amount of Insurance Requested ......... $ *56,000.00*
(Your loan balance, up to $250,000)
DISABILITY COVERAGE: ☐ Single ☐ Joint ☑ No Coverage
1. Amount of Insurance Benefit Requested ...... $
(Your monthly payment, up to $1,000 for single and $1,500 for joint coverage)
NOTE You must apply and be approved for LIFE to be eligible for DISABILITY coverage If you select **Joint Disability**, coverage and benefit will be split equally between Borrower #1 and #2 If the insurance you applied for is approved, it will become effective on the date of approval or, if later, the effective date of the loan as shown on this Application

2. Life Insurance Charge ......
(Refer to rate table)

Disability Insurance Charge .......
(Refer to rate table)

**[D]** CONSUMER PROTECTIVE AUTHORIZATION
Consumer Authorization Form
These answers are true and complete to the best of my knowledge and belief To determine my insurability, or for claims purposes, I authorize any medical practitioner or institution, insurance company or the Medical Information Bureau, Inc , Consumer Reporting Agency or employer to give any information about my physical or mental health condition, treatment, or any nonmedical information to CUNA Mutual Insurance Society, or its reinsurer I agree that this authorization shall be valid for 30 months from the application date I have read the Consumer Privacy Notice pertaining to the Medical Information Bureau as required by the Fair Credit Reporting Act The Society shall incur no liability until this application is approved by the Society and the first premium paid
By signing this application, I acknowledge that I understand that this policy contains a war exclusion. Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud
I authorize my financial institution to pay my insurance premiums as indicated above to CUNA Mutual Insurance Society by Electronic Funds Transfer from my credit union account or collect these premiums with my regular loan payment, according to my financial institution's discretion As my financial institution you will be fully protected in honoring these payments until you receive written notice from me cancelling this request

X *Tommy Bob Hall II* *11-18-98*
SIGNATURE OF BORROWER # 1   DATE

X *Nancy M Hall* *11-18-98*
SIGNATURE OF BORROWER # 2   DATE

**[E]** TO BE COMPLETED BY LENDER OR SERVICING FIRM
Mortgageholder's Name *Patriot Federal Credit Union*
Contract No *037.1485.6*
Member Account No *67-103537220*
Original Loan Term *30 yrs*
Months To Run *360*
Loan Balance After Last Payment *55951.79*

Date Last Payment Was Made *Jan 1 1999*
Monthly Principal And Interest $ *403.21* (New) (Date of First Payment)
Total Monthly Mortgage Payment $ *503.21*
APR *6.75*
Loan Effective Date *Jan 1 1999* (Closed Nov 18, 98)
Is this application to **replace** or amend an existing Group Mortgage Insurance Certificate? ☐ YES ☑ NO

B34902-0394
836-900-0987

I/we understand that this insurance is optional and is not a condition or requirement for approval of my/our loan My monthly premium will be
$ _____ x 12 = an estimated annual premium of $ _____

HMP   DEC 01 1998

 **CUNA MUTUAL GROUP**
*CUNA Mutual Insurance Society*
P.O. Box 391, 5910 Mineral Point Road
Madison, WI 53701-0391

EXHIBIT C



# Madison Freelance Reporters, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

* * * * * * * * * * * * * * * * * * * * * * * * * * *

NANCY HALL, individually and as the
Representative and Administratrix of
the Estate of Tommy Hall, deceased,
her husband,

       Plaintiff,

  v.                       Law No. 1:01-CV-1265

CUNA MUTUAL GROUP, CUNA MUTUAL
INSURANCE SOCIETY,

       Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF RICHARD FISCHER

Thursday, March 14th, 2002

1:20 p.m.

Reported by:  Becky J. Gantt, RPR



131 W. Wilson St. • Suite 1000 • Madison, Wisconsin 53703
Phone: (608) 255-8100    Fax: (608) 255-4096
www.madisonfreelance.com

2

1              DEPOSITION of RICHARD FISCHER, a witness in the

2    above-entitled action, taken at the instance of the

3    plaintiff, under the provisions of Chapter 804 of the

4    Wisconsin Statutes pursuant to notice, before BECKY J.

5    GANTT, a Registered Professional Reporter and Notary

6    Public in and for the State of Wisconsin, at the law

7    offices of Davis & Kuelthau, S.C., 10 East Doty Street, in

8    the City of Madison, County of Dane, and State of

9    Wisconsin, on the 14th day of March, 2002, commencing at

10   1:20 p.m.

11

12                        * * * * * *

13                   A P P E A R A N C E S

14        MR. STEPHEN R. PEDERSEN,
               Attorney at Law,
15             214 Senate Avenue, Site 602,
               Camp Hill, Pennsylvania, 17011-2336,
16             appearing on behalf of the
               plaintiff;
17
          MR. MICHAEL R. KELLEY,
18             McNEES, WALLACE & NURICK,
               Attorneys at Law,
19             100 Pine Street,
               P.O. Box 1166,
20             Harrisburg, Pennsylvania 17108-1166,
               appearing on behalf of the
21             defendants.

22        ALSO PRESENT:  Mark Richardson

23                        * * * * * *

24

25

3

1                          * * * * * *

2                          I N D E X

3    Examination by:                              Page:

4    Attorney Pedersen                                4
     Attorney Kelley                                 --

5

6                          * * * * * *

7                       E X H I B I T S

8    Exhibit Nos.:                                 Page:

9

10        (No exhibits were marked for identification)

11                          * * * * * *

12

13        (Original transcript filed with Attorney Pedersen)

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    RICHARD FISCHER,

2          having been first duly sworn on oath,

3          was examined and testified as follows:

4

5                       EXAMINATION

6    By Mr. Pedersen:

7    Q    Mr. Fischer, please state your full name for the

8         record.

9    A    Richard Allen Fischer.

10   Q    Mr. Fischer, where are you currently employed?

11   A    CUNA Mutual.

12   Q    When you say CUNA Mutual, what's the full

13        designation?

14   A    CUNA Mutual Insurance Society.

15   Q    Did you understand that you were, a notice was sent

16        out for your deposition for you to attend this

17        deposition today?

18   A    Yes.

19   Q    And did you understand that furthermore that there

20        was a court order requiring CUNA Mutual to produce an

21        individual knowledgeable with statistical data

22        concerning CUNA Mutual and you've been designated?

23   A    Yes.

24   Q    And did you understand that you were also designated

25        by CUNA Mutual under court order to address profits

5

1    and losses --

2    A    Yes.

3    Q    -- of CUNA Mutual?  Did you ever see a copy of the

4    notice of deposition?

5    A    Yes, yes.

6    Q    Did you have an understanding that the notice of

7    deposition required you to bring certain documents

8    with you today?

9    A    I saw that this morning and my attorney -- I wasn't

10    instructed to by our side of the attorneys.

11    Q    You weren't instructed to bring any documents with

12    you today?

13    A    No.

14              MR. KELLEY:  Just for the record as

15         we've mentioned I think in a few of the other

16         depositions, we have interposed objections to

17         the request for documents and they were

18         submitted to opposing counsel.  Based upon those

19         objections, I have not asked the witnesses to

20         bring any documents with them.

21    By Mr. Pedersen:

22    Q    Are you prepared to address from memory statistical

23    data concerning home mortgage insurance policies,

24    rescission and denial of policies, amounts paid in

25    benefits and premiums received?

6

1            MR. KELLEY:  Object to the form of the

2        question in that counsel has not identified what

3        he means by statistical data and a full range of

4        statistical data.  The witness may be prepared

5        to answer some information but not all of the

6        details of statistical information that counsel

7        may request.

8    By Mr. Pedersen:

9    Q    Did you understand that you would be asked questions

10        about details of statistical data at this deposition

11        today?

12   A    Yes.

13   Q    And are you prepared to address from memory the

14        statistical data concerning the home mortgage

15        protection products?

16   A    To the extent I have it by knowledge, yes.

17   Q    And are you prepared to address from memory, without

18        reference to any documents, profits and losses in

19        lines of business including home mortgage protection

20        and individual life?

21   A    No.

22            MR. KELLEY:  Objection to the form of

23        the question because you included information in

24        there that's beyond the scope of his respective

25        knowledge.

7

1           MR. PEDERSEN:  And I disagree.  This

2      was specifically the area raised to Judge Rambo,

3      the inquiry about profits and losses comparing

4      individual life with group life and credit life

5      and this is the individual that's been produced

6      by the company to address those.  And now we

7      find out he's not prepared to address those.

8           MR. KELLEY:  Hold on one second,

9      please.  In my March 8th, 2002, facsimile to

10     opposing counsel, I indicated quote, "The person

11     at CUNA Mutual Insurance Society most

12     knowledgeable as to profits and losses and with

13     statistical data relating to credit insurance is

14     Rich Fischer.

15           "You have already, you already have

16     him scheduled for deposition.  Fischer may or

17     may not have time before his deposition to

18     compile and analyze the information on

19     statistical data and profits and losses.  I want

20     you to be aware of this fact beforehand."  That

21     is the description of what this witness has, the

22     designation of this witness to testify in these

23     proceedings.

24           MR. PEDERSEN:  And my understanding of

25     the oral argument that was made to the Judge and

8

1    the court order is that the requirement was an

2    individual be produced knowledgeable to address

3    and compare profits and losses in at least two

4    lines of business, credit life and individual

5    life.

6                MR. KELLEY:  The judge's order states,

7    without reading the whole order, under Item 2,

8    "Plaintiff's request to depose a designated

9    representative regarding CUNA's profits and

10    losses is granted in part and denied in part as

11    follows:  Inquiry may be made of the designated

12    representative concerning profits and losses

13    insofar as it is related to plaintiff's theory

14    regarding the profits of CUNA relative to its

15    policy of its claims denial and policy

16    rescission."  And it also says that the request

17    to depose a designated representative regarding

18    statistical information on the claims denial and

19    the policy rescission is granted.

20                Now, I can note for the record that

21    the defendants in this case are CUNA Mutual

22    Group -- which is an umbrella company.  It's not

23    a legal entity -- and CUNA Mutual Insurance

24    Society.

25                This witness has been designated to be

9

1    able to testify consistent with the Court's

2    order with regard to statistical information in

3    profits and losses.  Since the information was

4    requested at such a late date, CUNA has not had

5    time to be able to compile all of the details of

6    that information and this witness is prepared to

7    discuss the information regarding CUNA Mutual

8    Insurance Society to the best of his knowledge

9    and recollection.

10           MR. PEDERSEN:  I disagree with several

11   points.  One, the late notice and the letters

12   were exchanged more than a month ago.  Two,

13   there was notice with respect to discovery

14   requests that went out as to the line of

15   inquiry.  Three, there was a specific oral

16   argument before the judge in which the line of

17   inquiry was discussed and the order came in the

18   context of that argument.  And three, or four,

19   it's surprising, if not shocking, that an

20   individual would come without a single document

21   to discuss statistics and profits and losses of

22   any line of business.

23           What I suggest we do is proceed and

24   find out those areas in which he is either not

25   knowledgeable or does not have documents with

10

1    him today and then determine whether or not that

2    in fact complies with the judge's order.

3            MR. KELLEY:  Just to comment.  It's,

4    it's not shocking at all that a witness would

5    show up on, with less than ten days or

6    approximately ten days notice of his

7    deposition -- that's when the notice of

8    deposition was sent out in this case -- with a

9    request to provide documents that was so broad

10   as to be meaningless.

11           And it's not surprising the witness

12   would show up without such statistical

13   information when counsel has provided formal

14   request for any documents that's only ten days

15   old at this point and counsel for plaintiffs who

16   brought this action in July of 2001 didn't send

17   out a single request for documents until

18   February 22nd of 2002.  And those answers to

19   those requests for production of documents are

20   not even due yet under the Rules of Civil

21   Procedure.

22           MR. PEDERSEN:  I would note for the

23   record that documents were exchanged at the

24   inception of the case pursuant to both federal

25   rule and local rule in which it was represented

11

1      to us that we had the entire claim file and all

2      relevant documents to the case.  And it was

3      subsequently that statistical and financial

4      documents and records have been sought.

5              MR. KELLEY:  And just to note for the

6      record that we produced information pursuant to

7      Rule 26 of the federal rules.  And what Rule 26

8      requires is different than what Mr. Pedersen

9      just described.  Go ahead.

10  By Mr. Pedersen:

11  Q    What were the total assets of CUNA Mutual Group in

12      2001?

13  A    I don't know that.

14  Q    What were the capital surplus funds of CUNA Mutual

15      Group in 2001?

16  A    I don't know that.

17  Q    What were the net premiums written from CUNA Mutual

18      Group in 2001?

19  A    I don't know that.

20  Q    What was the net investment income of CUNA Mutual

21      Group in 2001?

22  A    I don't know that.

23  Q    What was the net income of CUNA Mutual Group in 2001?

24  A    I don't know that.

25  Q    Do you know any of that information for 1998?

12

| | | |
|---|---|---|
| 1 | A | Not by memory. |
| 2 | Q | Do you know any of it from 1999? |
| 3 | A | Not by memory. |
| 4 | Q | Do you know any of it from 2000? |
| 5 | A | No. |
| 6 | Q | On CUNA Mutual Group's balance sheet, what were the |
| 7 | | assets listed on life and annuity premiums due? |
| 8 | A | I don't know. |
| 9 | Q | Do you know that for any of those years? |
| 10 | A | Not by memory. |
| 11 | Q | What were the liabilities that were listed, the total |
| 12 | | liabilities on CUNA Mutual Group's balance sheet as |
| 13 | | of December 31st, 2000? |
| 14 | A | I don't know. |
| 15 | Q | What were the ordinary life premiums of CUNA Mutual |
| 16 | | Group in the year 2001? |
| 17 | A | I don't know. |
| 18 | Q | Do you know that for any of the years '98 through |
| 19 | | 2001? |
| 20 | A | Not by memory. |
| 21 | Q | What was the credit life premiums that were paid in |
| 22 | | to CUNA Mutual Group in the years 2001 through, in |
| 23 | | reverse order, 1998? |
| 24 | A | I don't know. |
| 25 | Q | What about with respect to credit life? |

13

1   A   I think you just asked credit life.

2   Q   Group life, I'm sorry?

3   A   I don't know.

4   Q   You don't know for any of those years?

5   A   Not the exact.

6   Q   With respect to CUNA Mutual Insurance Society, what

7       were the assets, total assets of CUNA Mutual

8       Insurance Society in 2000?

9   A   I don't know.

10  Q   In 1999?

11  A   I don't know.

12  Q   In 1998?

13  A   I don't know.

14  Q   '97?

15  A   I don't know.

16  Q   Capital surplus for CUNA Mutual Insurance Society for

17      those same years?

18  A   I don't know.

19  Q   Reserve funds for CUNA Mutual Insurance Society for

20      those same years?

21  A   I don't know.

22  Q   Net written premiums for CUNA Mutual Society for

23      those years?

24  A   I don't know.

25  Q   Net investment income for CUNA Mutual Society for

14

1      those same years?

2    A    I don't know.

3              MR. KELLEY:  And just let me note for

4          the record that CUNA Mutual has a website with

5          public information including financial

6          statements.  I believe the financial statements

7          from 1999, 2000 are contained on the website.  I

8          believe Mr. Pedersen is actually reading from

9          that document.

10             MR. PEDERSEN:  No, I am not.

11   By Mr. Pedersen:

12   Q    And you didn't bring even that document with you, did

13        you?  You didn't bring a single piece of paper with

14        you to address the accuracy of any information that I

15        might tell you or read to you; is that right?

16   A    That's correct.

17   Q    With respect to premiums and reserves in the year

18        2000, what were CUNA Mutual Society's ordinary life

19        premiums?

20   A    I don't know.

21   Q    What were their reserves?

22   A    I don't know.

23   Q    For '99?

24   A    I don't know.

25   Q    '98?

15

```
1    A    I don't know.
2    Q    With respect to group life and credit life, are you
3         aware of any of that statistical information?
4    A    Not on what you're asking.
5    Q    You don't know the numbers?
6    A    I don't know the exact number.
7    Q    You don't have any papers with you today to refer to?
8    A    I do not.
9    Q    With respect to individual annuities for the years
10        2000 through '98, are you aware of any of the
11        numbers?
12   A    No.
13   Q    Group annuities --
14   A    No.
15   Q    -- same question?  With respect to ordinary life for
16        1998 through 2000, do you know those numbers?
17   A    No.
18   Q    Group life, do you know those numbers?
19   A    No.
20   Q    Credit life?
21   A    No.
22   Q    With respect to net premiums and deposit of funds
23        with CUNA Mutual Insurance Society for 1998, are you
24        aware of any of the specific numbers in these
25        categories, ordinary life, group life, credit and
```

16

1      credit life?

2   A   No.

3   Q   1999?

4   A   No.

5   Q   2000?

6   A   No.

7   Q   With respect to general account reserve distributions

8       in 1998 for ordinary life, do you know those numbers?

9   A   No.

10  Q   '99?

11  A   No.

12  Q   2000?

13  A   No.

14  Q   With respect to group life, are you aware of any of

15      the premium and reserve analysis numbers for '98,

16      '99, or 2000?

17  A   No.

18  Q   With respect to credit life, are you aware of any of

19      those numbers for '98, '99, or 2000?

20  A   No.

21  Q   With respect to profitability ratios for net benefits

22      paid, are you aware of the actual profitability ratio

23      numbers for '98, '99, or 2000 for CUNA Mutual

24      Insurance Society?

25  A   No.

17

1    Q    With respect to commission and expense ratios and

2           profitability tests, are you aware of those numbers?

3    A    No.

4    Q    With respect to total assets, total revenues, are you

5           aware of the profitability numbers for '98, '99, or

6           2000?

7    A    No.

8    Q    With respect to return on equity under the

9           profitability test for '98, '99, or 2000 for CUNA

10          Mutual Insurance Society, are you aware of those

11          numbers?

12    A    No.

13    Q    With respect to net yield, are you aware of the

14          profitability test numbers for CUNA Mutual Insurance

15          Society for 1998, '99, or 2000?

16    A    Not the exact numbers.

17    Q    Are you aware of the total return under profitability

18          for CUNA Mutual Insurance Society products from '98

19          through 2000?

20    A    No.

21    Q    Under the profitability analysis, are you aware of

22          the ordinary life product profitability analysis for

23          the year 2000?

24    A    No.

25    Q    1999?

18

1    A    No.

2    Q    1998?

3    A    No.

4    Q    With respect to group life, net operating gains, and

5         profitability analysis, are you aware of the numbers

6         for 2000?

7    A    No.

8    Q    '99?

9    A    No.

10   Q    '98?

11   A    No.

12   Q    With respect to credit life, are you aware of the

13        profitability analysis net operating gain numbers for

14        2000?

15   A    Not the exact numbers.

16   Q    1999?

17   A    No.

18   Q    1998?

19   A    No.

20   Q    Individual annuities within CUNA Mutual Insurance

21        Society profitability analysis net operating gains

22        for 2000?

23   A    No.

24                  MR. KELLEY:  Objection.  That's beyond

25             the judge's order.  Go ahead.  You can answer.

1    A    No.

2    By Mr. Pedersen:

3    Q    '99?

4    A    No.

5    Q    '98?

6                   MR. KELLEY:   Same objection for all

7            those years.

8    A    No.

9    By Mr. Pedersen:

10   Q    Are those numbers to all of those questions available

11           within CUNA Mutual Insurance Society?

12   A    Yes.

13   Q    They're within records and documents maintained at

14           CUNA Mutual Insurance Society?

15   A    Yes.

16   Q    Are you able to access that information?

17   A    Yes.

18   Q    Where is the information maintained?

19   A    I would say our finance department has that

20           information.

21   Q    Would the people in the finance department be in a

22           better position than you to address those questions?

23                   MR. KELLEY:   Well, I'm going to

24            object.

25   Q    If you know.

20

1              MR. KELLEY:  I'm going to object to

2         that in that Mr. Fischer may be the best person

3         to be able to address those questions, but he

4         has not had the opportunity to pull all of that

5         information together.  Go ahead, you can answer.

6    A    If what you want are the numbers, then someone from

7         finance can give you the numbers.

8    By Mr. Pedersen:

9    Q    And the numbers with respect to investment yields for

10        the various years, is that finance?

11   A    Yes.

12   Q    Numbers with respect to liquidity under various

13        products?

14   A    Yes.

15   Q    Are you aware of the total assets on the balance

16        sheet for CUNA Mutual Insurance Society in the year

17        2000?

18   A    Not the exact number.

19   Q    For 1999?

20   A    No.

21   Q    For 1998?

22   A    No.

23   Q    And are you aware of the breakdown of assets into

24        various asset categories for CUNA Mutual Insurance

25        Society?

21

1    A    No.

2    Q    With respect to liabilities, are you aware of the

3         total liabilities as reported for CUNA Mutual

4         Insurance Society as of December 31st, 2000?

5    A    Not the exact number.

6    Q    What's the approximate number?

7    A    Of the liabilities?

8    Q    Yes.

9    A    For which line?

10   Q    For the overall balance sheet from December 31st,

11        2000, reporting.

12   A    I don't know.

13   Q    With respect to assets you said you knew

14        approximately?

15   A    I did not say that.

16   Q    Oh, I'm sorry.  Do you know approximately the assets

17        of CUNA Mutual Insurance Society as reported on

18        December 31st, 2000?

19   A    No.

20   Q    Is 2.28 billion in the ball park?

21                  MR. KELLEY:  Object to the form.  You

22            can answer.

23   A    I think it is.

24   By Mr. Pedersen:

25   Q    With respect to the summary of operations, the

MADISON FREELANCE REPORTERS, LLC

22

1  operations of each individual, some individual lines

2  of insurance, are you aware of the premiums collected

3  in 2000 for ordinary life?

4  A  No.

5  Q  The individual, I'm sorry, credit life, same

6     question?

7  A  Not the exact number.

8  Q  Do you know approximately the number?

9  A  The approximate number should be in the 700 million

10    range.

11  Q  That's for credit life?

12  A  For -- no.  It's not.  For credit, for credit life

13     it's probably in the 300 million range.

14  Q  Would it be consistent with your recollection if it

15     were 238 million, or you think it's more than that?

16  A  That could be consistent.

17  Q  What about group life?

18  A  I don't know.

19  Q  And those numbers for 1999, do you know?

20  A  No.

21  Q  For 1998?

22  A  No.

23  Q  Are you aware of any of the cash flow numbers or

24     statistics for CUNA Mutual Insurance Society for

25     1998?

23

1    A    The exact numbers?

2    Q    '99?

3    A    No.

4    Q    2000?

5    A    No.

6    Q    Are you aware of the ordinary life statistics

7         provided by CUNA Mutual Society for the year 1998?

8    A    No.

9    Q    '99?

10   A    No.

11   Q    2000?

12   A    No.

13   Q    Are you aware of the number of policies issued in

14        1998 for CUNA Mutual Insurance Society?

15   A    No.

16   Q    '99?

17   A    No.

18   Q    2000?

19   A    No.

20   Q    Are you aware of the number of policies in force in

21        1998, '99, or 2000?

22   A    No.

23   Q    Are you aware of the first year premiums collected

24        for 1998 through 2000?

25   A    No.

24

1    Q    Are you aware of the general expense reserves for

2         '98, '99, or 2000?

3    A    No.

4    Q    Are you aware of the return on reserves for '98, '99,

5         or 2000?

6    A    No.

7    Q    Are you aware of new business issues in whole life

8         for '98 through 2000?

9    A    No.

10   Q    Are you aware of, for '98 through 2000, term life

11        business issues?

12   A    No.

13   Q    Credit life?  Same question for credit life.

14   A    No.

15   Q    Group life?

16   A    No.

17   Q    The same question with respect to total insurance

18        issued for CUNA Mutual Insurance Society on new

19        business issued during '98, '99, or 2000.

20   A    No.

21   Q    With respect to insurance in force, are you aware of

22        the statistical information from '98 through 2000 for

23        whole life?

24   A    No.

25   Q    Term life?

25

1    A    No.

2    Q    Credit life?

3    A    No.

4    Q    Group life?

5    A    No.

6    Q    Or the total of any of those categories for insurance

7         in force?

8    A    No.

9    Q    Are you aware of the total premiums collected on

10        Tommy Bob Hall's policy?

11   A    No.

12   Q    Are you aware of the total premiums collected during

13        a one-, five-, and ten-year period for CUNA Mutual on

14        the same or similar policies issued to Tommy Bob

15        Hall?

16                   MR. KELLEY:  Object to the form of the

17             question.

18   By Mr. Pedersen:

19   Q    I can break it down into years if you like.  Are you

20        aware of the total premiums collected by CUNA Mutual

21        Insurance Society during the one-year period from '98

22        for the same types of policies that were issued to

23        Tommy Bob Hall?

24                   MR. KELLEY:  Are you talking about a

25             home mortgage protection policy?

MADISON FREELANCE REPORTERS, LLC

26

1                    MR. PEDERSEN:  Right.

2      A    I am not aware of the exact number.

3      By Mr. Pedersen:

4      Q    What about over a five-year period?

5      A    Not -- again, not the exact number.

6      Q    Are you aware of the amount of moneys or benefits

7           paid out to Tommy Bob Hall?

8      A    Not the exact amount.

9      Q    Have you seen or researched -- well, let me break it

10          down.  Have you seen the documents that relate to the

11          relationship between the Patriot Federal Credit Union

12          in Chambersburg, Pennsylvania, and CUNA Mutual

13          Insurance Society?

14                    MR. KELLEY:  Object to the form.  You

15               can answer.

16     A    Yes.

17     By Mr. Pedersen:

18     Q    Where is that document maintained?

19     A    In our home office.

20     Q    Here in Madison?

21     A    In Madison.

22     Q    When was the last time you reviewed that document?

23     A    Prior to coming down here this morning.

24     Q    This morning.  You didn't bring that document with

25          you today?

1   A   No.

2   Q   Did you know that it was one of the documents

3       requested in a discovery request?

4   A   No.

5   Q   Have you seen the request for production of documents

6       that plaintiffs sent?

7               MR. KELLEY:  Which one?

8  By Mr. Pedersen:

9   Q   The second request for production of documents.

10   A   I don't know if I've seen the second.

11   Q   Have you seen the first one?

12   A   I did not pay attention to the order of them.

13   Q   Without referring to number, have you seen a request

14       for production of documents generated from the

15       plaintiffs in this case?

16   A   I don't know if I've seen the actual request.

17   Q   What makes you think that you've seen some part of

18       the information at least within the request?

19   A   Because there were requests from the attorneys on our

20       side to begin pulling together the information that

21       you've asked for.

22   Q   When did you first see that request?

23   A   Rough, but about a week ago.

24   Q   And you've located the, the document that sets forth

25       the relationship between the Patriot Federal Credit

28

1       Union and CUNA Mutual Insurance Society?

2    A    I located a copy of the policy under which Patriot

3       Federal Credit Union is a member and that Mr. Hall

4       enrolled on insurance for.

5    Q    Can you describe that document for me?

6    A    It is a group insurance policy.

7    Q    Issued to Patriot Federal Credit Union?

8    A    I'm not sure of that.  I believe it was issued to a

9       trust of which Patriot Federal Credit Union is a part

10      of.

11   Q    How long is the document?

12   A    Maybe seven pages.

13   Q    The CUNA entity on the document, is it CUNA Mutual

14      Insurance Society?

15   A    It should be.  I didn't look at that part of the

16      document.

17   Q    How many contested claims have there been within CUNA

18      Mutual home life insurance products over the last

19      three years?

20               MR. KELLEY:  Objection.  Define the

21         term contested.

22   By Mr. Pedersen:

23   Q    Where a claim has been made and it's been denied by

24      CUNA Mutual Insurance Society.

25   A    I don't know the answer to that but it's not many.

29

1   Q   You don't know how many?

2   A   No.

3   Q   Did you understand that plaintiffs have requested

4       annual statements for '98 through 2001?

5   A   I'm not sure if that was in the requested information

6       of me.

7                 MR. KELLEY:  Just state what you know.

8   A   I don't know if that was forwarded to me to deliver.

9  By Mr. Pedersen:

10  Q   And do you have an understanding as to whether or not

11      the judge, the federal judge in this case

12      specifically ordered that those documents be provided

13      in lieu of taking at least a partial deposition in

14      this case?

15  A   I was not aware of that.

16                 MR. KELLEY:  And they will be

17        provided.  By the way, they are public

18        information on the website.

19  By Mr. Pedersen:

20  Q   Are you aware of the profit and loss calculations for

21      credit life for the years 1998?

22  A   Can you ask that a different way?

23  Q   Does CUNA Mutual maintain profits and loss

24      calculations on each line, product line for each

25      year?

30

1    A    Pretax, pregovernance, yes.

2    Q    And what were the profit and loss calculations pretax

3         for CUNA Mutual Insurance Society's credit life for

4         1998?

5    A    I don't know that number.

6    Q    For '99?

7    A    I don't know that number.

8    Q    For 2000?

9    A    I don't know that number.

10   Q    And for 2001?

11   A    I don't know the exact number.

12   Q    Does CUNA Mutual maintain statistics concerning

13        internal profits and losses pretax with respect to

14        home mortgage insurance?

15             MR. KELLEY:  Define what you mean by

16        home mortgage insurance, Steve.

17             MR. PEDERSEN:  The home mortgage

18        protection plan that's the plan that is the

19        subject of this litigation.

20             MR. KELLEY:  Okay.

21   A    I believe that is a line item that's broken out, yes.

22   By Mr. Pedersen:

23   Q    What were the profits and losses pretax for 1998 on

24        that line of business?

25   A    I don't have those with me.

31

1    Q    Where are they?

2    A    They're -- if they are available broken out, they are

3         in the home office in Madison.

4    Q    And this deposition is taking place in Madison.

5         They're here locally; is that right?

6    A    Uh-huh.

7    Q    Is that a yes?

8    A    Yes.  Sorry.

9    Q    Do you work in the Madison office?

10   A    Yes.

11   Q    Is that where you came from this morning before you

12        came to your deposition today?

13   A    Yes.

14   Q    Same question, the profit and loss calculations for

15        home mortgage protection credit insurance for 1999.

16        Do you know that?

17   A    Not the exact number.

18   Q    For 2000?

19   A    No.

20   Q    For 2001?

21   A    No.

22   Q    What statistical data is available at CUNA Mutual

23        Insurance Society with respect to home mortgage

24        protection products?

25                   MR. KELLEY:  Object to the form.  You

32

1          can answer it if you understand, Rich.

2     A    I believe I understand it.  There's, there's an array

3          of information.  The information available would

4          include premium, claims paid, claim reserves, credit

5          union fee income expense allocations.  Other

6          statistics that are available would include policies

7          in force, group policies, certificates in force,

8          certificates or applications, the number approved,

9          declined, closed out, the number of revisions to

10         certificates.  I think that we would know the number

11         of policies, sorry, not policies but claims paid and

12         declined.

13    By Mr. Pedersen:

14    Q    And I can go one by one.  I'm sorry, were you done?

15    A    There probably are a few other statistics that we

16         will come across as we look at the different things

17         in your request.  Those are the ones that are off the

18         top of my head.

19    Q    The information that you just provided to us that's

20         statistically available at CUNA Mutual Insurance

21         Society, how is it available?  In other words, what

22         form is it in?

23    A    Some of it is available electronically and some of it

24         is in paper files.

25    Q    When you say electronically, what do you mean?  It's

33

```
1              on a computer?  I don't want to put words in your

2              mouth.   What do you mean?

3      A       On the computer or within our computer systems,

4              either in images or in total summary level data.

5      Q       Do you participate in any respect in preparing

6              reports on any regular basis on any of the categories

7              that you've described?

8      A       I do not prepare the reports on that.

9      Q       Do you review the reports?

10     A       The reports are available for review when I need to.

11     Q       How easily accessible are they?

12     A       For some of the, the core pieces of information that

13             are like premium and claims and credit union

14             reimbursements, they're very accessible.

15     Q       You say very.  How long would it take you to pull

16             them up to find them?

17     A       I would walk over to the department and find the

18             stack of papers where they are in.

19     Q       So immediately available?

20                        MR. KELLEY:  That's not what he said.

21             Objection.

22  By Mr. Pedersen:

23     Q       I don't want to put words in your mouth.  How long

24             would it take to get the core statistical

25             information?
```

34

```
 1   A    To know premium and claims paid for a policy year, it

 2        would take a couple minutes.

 3   Q    And that could be in a printed out form?  Or would it

 4        be in a printed out form or on a disk?  What's the

 5        form that it would take?

 6   A    It's in a printed form.

 7   Q    Well, it's already printed?

 8   A    It's printed, yeah.

 9   Q    How often is that core statistical information

10        printed out?

11   A    Monthly.  And that is premium and paid claims.  It's

12        all that report shows.  Well, and number of

13        certificates active I believe is on that report.

14   Q    What specific statistical data, a specific number,

15        have you come prepared here to address?

16              MR. KELLEY:  Object to the form of the

17        question.

18   A    My understanding today was that I would come and

19        answer your questions about home mortgage protection

20        and our policies and practices.  I was not of the

21        impression that I needed to know the exact dollars of

22        assets of CUNA Mutual Insurance Society in 1998.

23   By Mr. Pedersen:

24   Q    Or '99?

25   A    Or '99.
```

MADISON FREELANCE REPORTERS, LLC

35

1    Q    Or 2000?

2    A    Or 2000.

3    Q    Or any specific lines of business and their

4         profitability or statistical data?

5    A    Not in the way you've asked it.  Not down to the

6         level of detail that you've asked for today.

7    Q    Is there a specific dollar number in any category

8         that you've been prepared, not been prepared, that

9         you have on the top of your head that you are able to

10        discuss in the subject category of home mortgage

11        protection?

12                    MR. KELLEY:  Object to the form.  You

13             can answer.

14   A    Not down to the dollar in the way you seem to want it

15        today.

16                    MR. PEDERSEN:  I would like to go off

17             the record.

18             (Off the record discussion)

19                    MR. KELLEY:  Counsel have agreed that

20             the deposition of Rich Fischer will continue

21             here today to the extent that Mr. Fischer is

22             able to respond to Mr. Pedersen's questions and

23             that it will be then postponed until some later

24             date prior to the close of discovery in this

25             case in which such time Mr. Fischer will have

36

1    available the specific numbers regarding the

2    following categories as they relate to home

3    mortgage protection and credit life insurance.

4         And those categories are premiums

5    paid, claims paid, claim reserves, credit union

6    fee income, expense allocations, policies in

7    force, group policies, certificates and

8    applications, and the number of claims paid and

9    declined and the number of rescissions.  And

10   that's to be over a certain period of time --

11   off the record for a moment.

12        (Off the record discussion)

13        MR. KELLEY:  And that certain period

14   of time will be 1998 to present.  CUNA Mutual

15   will also make available an appropriate person

16   to be determined who will be able to answer the

17   same types of questions on the same types of

18   categories of information that we have just

19   described for individual life insurance policies

20   either issued by or maintained by the CUNA

21   Mutual Insurance Society as opposed to those

22   individual life policies that are issued by or

23   maintained by CUNA Mutual Life Insurance

24   Company, which CUNA asserts is a separate

25   company, not suggesting the plaintiff agrees or

37

1    disagrees with that.  Does counsel for

2    plaintiffs have anything to add or clarify?

3            MR. PEDERSEN:  I believe there were

4    two categories that were left out, the number of

5    closed-out policies and claims and the number of

6    revisions.  And maybe I've misstated that.

7            MR. KELLEY:  Let's go off the record

8    for a moment.

9        (Off the record discussion)

10           MR. PEDERSEN:  I'll clarify that the

11   categories -- and I've gotten information from

12   the deponent that the category of closed-out and

13   revisions relate to applications and not claims

14   but that the statistical information in those

15   categories is available and we're requesting

16   that information also.  And I think we've agreed

17   that that information will also be provided.

18           MR. KELLEY:  Off the record for one

19   moment.

20       (Off the record discussion)

21           MR. PEDERSEN:  And again, off the

22   record, when we were off the record we received

23   information that the deponent is not certain how

24   far back the statistical data goes for

25   closed-out and revision of applications but that

38

1    he would provide information that was available

2    and, of course, not provide the information that

3    was not available.

4            MR. KELLEY:  Okay.

5            MR. PEDERSEN:  Additionally, we had

6    requested information on profits and losses in

7    those same lines of business.  And I need to ask

8    if the statistical data that we've discussed

9    today includes profits and losses or only the

10    gross figures.

11            MR. KELLEY:  Let's go off the record.

12        (Off the record discussion)

13            MR. PEDERSEN:  Let me just clarify

14    again on the record.  We've had a discussion off

15    the record, and it appears that profits and

16    losses under these lines of business, credit

17    life, home mortgage protection and individual

18    life can be derived but they are not readily

19    available from the statistical data that we've

20    just listed.

21            However, my understanding of the order

22    is that we receive profit and loss information,

23    and we're limiting it to those lines of

24    business.  And I believe the deponent has

25    indicated that that information is obtainable

39

1    through either him or in conjunction with him

2    and consulting with other individuals at CUNA

3    Mutual or through another individual at CUNA

4    Mutual being deposed in that area.

5            And we're satisfied to simply await

6    for the appropriate designee from CUNA Mutual to

7    address the profits and losses in those three

8    lines of business for '98 through the present.

9    Is that what we're agreeing to, Mike?

10           MR. KELLEY:  Yes.  And just to further

11   clarify, the information in those categories

12   that we discussed would provide profit and loss

13   information but it would not be the, for lack of

14   a better way of stating it, the net profits and

15   losses; is that right, Rich?

16           THE WITNESS:  Yes.

17           MR. KELLEY:  But it would not be the

18   net profit and loss figures, and we're going to

19   work with the appropriate persons to get that

20   net profit and loss figure for, again for home

21   mortgage protection, credit life, and individual

22   life of CUNA Mutual Insurance Society.  Okay.

23           MR. PEDERSEN:  We don't have our

24   calendars here today, and I'm sure you don't

25   know your calendar for the next two weeks.

40

1           MR. KELLEY: Next week is pretty busy

2       but after that I know I'm okay.

3           MR. PEDERSEN: I know I have a trial

4       scheduled. It may be at the very end of the

5       month, but we'll work out a convenient date for

6       both of us to come back out here to conduct that

7       deposition or series of depositions.

8           MR. KELLEY: We'll get it done.

9           MR. PEDERSEN: And I think too we've

10      agreed with some effort of professional courtesy

11      to return here and each to bear our own expenses

12      in returning to the depositions here in Madison?

13          MR. KELLEY: Yes.

14  By Mr. Pedersen:

15  Q   With that, we'll continue with the deposition

16      excluding specific statistical profit and loss

17      questions and proceed with the, the corporate

18      designation that I understand you've been presented

19      here for your deposition with as the individual most

20      knowledgeable with the home mortgage protection

21      policies that are issued through CUNA Mutual

22      Insurance Society; is that correct?

23  A   Yes.

24  Q   What is your position at CUNA Mutual Insurance

25      Society?

**EXHIBIT D**

# Stephen R. Pedersen, Esq.

### Attorney at Law

214 Senate Avenue, Suite 602   • Camp Hill, PA 17011
Tel: (717) 763-1170  • Fax: (717) 763-1460

May 7, 2002

Michael R. Kelley, Esq.
McNees Wallace & Nurick
100 Pine Street
P O Box 1166
Harrisburg, PA 17108-1166

**Re:    Nancy Hall vs. CUNA Mutual Group**

**Via fax ( #237-5300) and U. S. Mail**

Dear Mike:

I understand that your handwriting expert will be reviewing and examining original medical records on May 22, 2002 beginning at 10:00 a.m. I informed your office by telephone messages through my secretary, that either I or Ms. Mahady-Smith would be attending the examination of those documents. This letter is the confirmation that the examination will take place on May 22, 2002 beginning at 10:00 and that Plaintiff's counsel will attend. I will assume you will be there also and we can simply follow you from one doctor's office to the next as your handwriting expert reviews and evaluates the original medical records.

Pursuant to the Court Order, I await full and complete responses to Plaintiff's Second Request for Production of Documents #4 through #18. As noted on the Court Order and on the Discovery responses, you answered each of these questions by objecting that the question exceeded those agreed to in pre-discovery. The Court has overruled that objection and instructed you to answer each of these questions fully. I believe you have provided partial answers to many of the questions, but we await full and complete answers as instructed by the Court. Please let me know when you will have these answers available. I hope this can be provided to us within the next 10 days, or no later than May 22, 2002, so that your responses may be reviewed and analyzed prior to the date upon which my expert reports are due. If you have any difficulties getting these responses to me timely, please do not hesitate to call me.

Lastly, pursuant to the Court's original Scheduling Order, I was to initiate, within 4 weeks following the close of Discovery, a settlement conference and discussion between counsel. I spoke with your secretary to discuss setting up this conference, and we both mentioned that the conference would be most meaningful following the production of expert reports. Accordingly, I suggest an informal discussion on May 22, 2002 when we meet in person, in which we agree to

Licensed in PA and AZ.
Former United States District Court Staff Attorney



Michael R. Kelley, Esq.
McNees Wallace & Nurick
May 7, 2002
Page two

**Re:    Nancy Hall vs. CUNA Mutual Group**

hold a more formal discussion following the production of the expert reports. If you are agreeable, please let me know. Otherwise, pursuant to the original Court Order, I will try to schedule something earlier and in a more formal way.

Nothing in this letter, however, should be construed as an alteration in any way of my client's long-standing and continued request that the policy limits be immediately tendered. Previously, upon earlier requests, you indicated that your client wished to conclude the discovery process before considering making any such payments. I believe the evidence to be overwhelming that payment must be made and must be made promptly. Therefore, I once again request that the policy limits be immediately tendered. Your discovery responses indicate that CUNA Mutual does not now have nor has it ever possessed a pathology report which diagnoses cancer nor does it have any treatment records for cancer. Accordingly, CUNA Mutual should tender its policy limits while the remainder of this case is litigated. Please provide this continuing request immediately to your client.

Sincerely,

*Stephen R. Pedersen/caj*

Stephen R. Pedersen

SRP/cj

cc:    Catherine Mahady-Smith, Esq.

# Stephen R. Pedersen, Esq.

### Attorney at Law

**EXHIBIT E**

214 Senate Avenue, Suite 602 • Camp Hill, PA 17011
Tel: (717) 763-1170 • Fax: (717) 763-1460

September 12, 2002

Michael R. Kelley, Esq.
100 Pine Street
P O Box 1166
Harrisburg, PA 17108-1166

Re:    **HALL vs. CUNA MUTUAL GROUP**

Dear Mike:

This letter is intended to address the outstanding documents which CUNA Mutual continues to refuse to produce despite a Court Order that production take place. I received your letter with all of its explanations, however, it does not provide justification for violating the Court Order which required that all of the documents be produced. I mentioned this to the Judge, as you may recall, in our last telephonic conference. The Judge, as you may recall, asked that I make a final effort to obtain these documents from you and to call his chambers if the documents were not produced. Accordingly, I am once again requesting full compliance with the Court Order that you produce all documents identified in Plaintiff's Second Request for Production of Documents, #3 through #18. If these documents are not produced by next Friday, we will have no choice but to make arrangements for a conference with the Judge in which you can explain your client's failure to comply with the Court Order.

Sincerely,

Stephen R. Pedersen

SRP/cj

d in PA and AZ.
United States District Court Staff Attorney

Charles Young
McNees Wallace & Nurick
September 18, 2002
Page three

**Re:    Hall vs. CUNA Mutual**

CUNA Mutual has simply provided the application sheet for this specific type of insurance.
Plaintiffs are entitled, and the court has ordered, that Plaintiffs receive copies of all forms of
individual insurance so comparisons can be made across the various forms.

   As previously indicated, Plaintiffs await a full and complete response to all outstanding
Requests for Production of Documents, as ordered by the court. Plaintiffs have requested that all
of these documents be received by this Friday. If additional time is needed, please call me so that
a mutually-convenient time can be arranged for the production of all documents requested.
However, if you are simply refusing to produce those documents which you have been ordered to
produce by the court, please let me know so that a court conference can be arranged.

         Sincerely,

         Stephen R. Pedersen

SRP/cj